**No. __-____**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE TENTH CIRCUIT**

IN RE: SANTA FE NATURAL TOBACCO COMPANY MARKETING & SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION

---

On Petition for Permission to Appeal from the United States District Court for the District of New Mexico
No. MD 16-2695 JB/LF
The Honorable James O. Browning

---

# PETITION OF PLAINTIFFS AND CLASS MEMBERS FOR PERMISSION TO APPEAL PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 23(f)

---

NANCY R. LONG
nancy@longkomer.com
**LONG, KOMER & ASSOCIATES, PA**
1800 Old Pecos Trail, Ste. A
P.O. Box 5098
Santa Fe, NM 87505
Phone: (505)982-8405

MELISSA S. WEINER
mweiner@pwfirm.com
**PEARSON WARSHAW, LLP**
328 Barry Avenue S., Suite 200
Wayzata, MN 55391
Phone: (612) 389-0600
Facsimile: (612) 389-0610

Scott P. Schlesinger
**SCHLESINGER LAW OFFICES, P.A.**
1212 SE Third Ave.
Ft. Lauderdale, FL 33316
Phone: (954) 467-8800
Email: scott@schlesingerlaw.com

# TABLE OF CONTENTS

**Page**


INTRODUCTION .......... 1

FACTUAL BACKGROUND .......... 6

QUESTION PRESENTED .......... 7

RELIEF SOUGHT .......... 7

REASONS FOR GRANTING THE PETITION .......... 8

I. The Court Erred in Finding that the Safer Theory Class Does Not Satisfy Predominance .......... 9

II. The Court Erred in Finding Plaintiffs' Proposed Damages Model is Not an Adequate Fit with Plaintiffs' Safer-Cigarette Theory .......... 12

III. The Court Erred in Finding that Administrative Feasibility Concerns Tilt Against a Finding of Predominance .......... 14

IV. The District Court Erred in Finding that the All State Classes (Other than Menthol) did not Satisfy the Predominance Requirement .......... 18

CONCLUSION .......... 22

CERTIFICATION OF DIGITAL SUBMISSION AND FILED UNDER SEAL .......... 23

CERTIFICATE OF WORD COUNT .......... 24

EXHIBIT A .......... A

EXHIBIT B .......... B

EXHIBIT C .......... C

EXHIBIT D .......... D

EXHIBIT E .......... E

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allapattah Servs., Inc. v. Exxon Corp.*,
333 F.3d 1248 (11th Cir. 2003) ........ 19

*Anderson Living Trust v. WPX Energy Prod., LLC*,
306 F.R.D. 312 (D.N.M. 2015) ........ 9

*In re Arris Cable Modem Consumer Litig.*,
327 F.R.D. 334 (N.D. Cal. 2018) ........ 14

*Black v. Occidental Petroleum Corp.*,
69 F.4th 1161 (10th Cir. 2023) ........ 20

*Booe v. Shadrick*,
369 S.E.2d 554 (N.C. 1988) ........ 22

*Briseno v. ConAgra Foods, Inc.*,
844 F.3d 1121 (9th Cir. 2017) ........ 16

*CGC Holding Co., LLC v. Broad & Cassel*,
773 F.3d 1076 (10th Cir. 2014) ........ 9

*Disc. Tobacco City & Lottery v. U.S.*,
674 F.3d 509 (6th Cir. 2012) ........ 10

*In re EpiPen (Epinephrine Injection, USP) Mktg, Sales Pracs and Antitrust Litig.*,
No. 17-md-2785-DDC, 2020 WL 1180550 (D. Kan. Mar. 10, 2020) ........ 15, 16

*Featherstone v. Barash*,
345 F.2d 246 (10th Cir. 1965) ........ 10

*Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*,
326 F.R.D. 592 (N.D. Cal. 2018) ........ 13, 14

*Goldemberg v. Johnson & Johnson Consumer Cos., Inc.*,
317 F.R.D. 374 (S.D.N.Y. 2016) ........ 21

*Gonzalez v. Wilshire Credit Corp.*,
25 A.3d 1103 (N.J. 2011)....................................................................20

*Gray v. N. Carolina Ins. Underwriting Ass'n*,
529 S.E.2d 676 (N.C. 2000)................................................................21

*Gunaratna v. Dennis Gross Cosmetology LLC*,
No. CV 20-2311-MWF, 2023 WL 5505052 (C.D. Cal. Apr. 4, 2023) ..........................................................................................13, 14

*Hadley v. Kellogg Sales Co*.,
324 F. Supp. 3d 1084 (N.D. Cal. 2018) (Koh, J.) ...............................18

*Hasemann v. Gerber Prods. Co.*,
331 F.R.D. 239 (E.D.N.Y. 2019) .........................................................21

*Kauffman v. New England Fitness S., Inc.*,
No. A-1789-17T1, 2019 WL 1752922 (N.J. Super. App. Div. Apr. 17, 2019) ..........................................................................................20

*Kelley v. Microsoft Corp*.,
251 F.R.D. 544 (W.D. Wash. 2008)......................................................22

*Krommenhock v. Post Foods, LLC*,
334 F.R.D. 552 (N.D. Cal. 2020).................................................13, 14

*Kumar v. Salov N. Am. Corp.*,
No. 14-cv-2411-YGR, 2016 WL 3844334 (N.D. Cal. July 15, 2016) ..........................................................................................17

*Lujan v. State of N.M. Health & Soc. Servs. Dep't*,
624 F.2d 968 (10th Cir. 1980)...............................................................10

*McMorrow v. Mondelēz Int'l, Inc*.,
No. 17-cv-2327-BAS, 2021 WL 859137 (S.D. Cal. Mar. 8, 2021)............13, 14

*Microsoft Corp. v. Baker*,
137 S.Ct. 1702 (2017) ..........................................................................1

*Mullins v. Direct Digital, LLC*,
795 F.3d 654 (7th Cir. 2015)................................................................16

*In re Nexium Antitrust Litig.*,
777 F.3d 9 (1st Cir. 2015) .......... 19

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
31 F.4th 651 (9th Cir. 2022) .......... 19

*Payne v. Tri-State CareFlight, LLC*,
332 F.R.D. 611 (D.N.M. 2019) .......... 9

*In re Petrobras Sec.*,
862 F.3d 250 (2d Cir. 2017) .......... 16

*Petrosino v. Stearn's Prods., Inc.*,
No. 16-CV-7735 (NSR), 2018 WL 1614349 (S.D.N.Y. Mar. 30, 2018) .......... 9

*Pfizer, Inc. v. All Plaintiffs*,
No. 20-603, 2020 WL 4048681 (10th Cir. May 26, 2020) .......... 1

*Reichert v. Keefe Commissary Network, L.L.C.*,
331 F.R.D. 541 (W.D. Wash. 2019) .......... 22

*Rikos v. Procter & Gamble Co.*,
799 F.3d 497 (6th Cir. 2015) .......... 16, 20

*Rikos v. Procter & Gamble Co.*,
No. 1:11-CV-226, 2014 WL 11370455 (S.D. Ohio June 19, 2014) .......... 18

*Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*,
821 F.3d 992 (8th Cir. 2016) .......... 16

*Schnall v. AT & T Wireless Servs., Inc.*,
259 P.3d 129 (Wash. 2011) .......... 22

*Stevenson v. Louis Dreyfus Corp.*,
811 P.2d 1308 (N.M. 1991) .......... 21

*Stutman v. Chem. Bank*,
731 N.E.2d 608 (N.Y. 2000) .......... 21

*U.S. v. Hunt*,
513 F.2d 129 (10th Cir. 1975) .......... 10

*U.S. v. Philip Morris USA, Inc.*,
449 F. Supp. 2d 1 (D.D.C. 2006) ....................9

*Vallario v. Vandehey*,
554 F.3d 1259 (10th Cir. 2009)....................8, 9, 11, 12

*In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*,
722 F.3d 838 (6th Cir. 2013)....................20

**Other Authorities**

9 C. Wright & A. Miller, Federal Practice & Procedure (1971). ....................10

Law 360, "The State of Consumer Class Actions Amid COVID-19"
(Dec. 2, 2020)....................8

# INTRODUCTION

The Tenth Circuit has jurisdiction and "unfettered discretion" to grant interlocutory review of class certification decisions under Federal Rule of Civil Procedure 23(f). *Microsoft Corp. v. Baker*, 137 S.Ct. 1702, 1709 (2017). There are three principles this Court has set forth in evaluating the merits of a Rule 23(f) petition. Appeal may be appropriate when the certification order (1) sounds the "death-knell" for the entire case, or (2) implicates unresolved legal issues and may facilitate development of the law application to class actions; or (3) the district court's decision is manifestly erroneous. *Pfizer, Inc. v. All Plaintiffs*, No. 20-603, 2020 WL 4048681, at *1 (10th Cir. May 26, 2020). For the reasons stated below, this Court should grant Plaintiffs' petition.

In its September 1, 2023 Memorandum Opinion and Order, the district court granted in part and denied in part Plaintiffs' Motion for Class Certification. ("Order") (ECF No. 394).[1] Plaintiffs moved for class certification under two theories. First, that Natural American Spirit cigarettes ("NAS cigarettes"), which were uniformly labeled as "Natural," "Organic" and "Additive-Free," falsely implied that NAS cigarettes are safer than others (the "Safer-Cigarette Theory," *see* Order, at ¶ 102). Second, that purchasers of Menthol NAS cigarettes were harmed because they purchased a cigarette that claimed to be "Additive-Free," but contained

[1] Included as Exhibit A to this Petition.

menthol—which is an additive—and therefore, such a representation was literally false (the "Menthol Theory," *see* Order, at ¶ 102). Plaintiffs proposed a conjoint survey and marketplace simulation to calculate classwide damages caused by Defendants' false and misleading labeling. (*See* Order, at ¶ 224.)

The district court overwhelmingly adopted Plaintiffs' proposed findings of fact. The district court adjudged:

> Natural, additive-free, and organic labeling increases consumers' health benefit perception and drives both purchases of Natural American cigarettes and consumers' willingness to pay a premium. (Order, ¶ 130.)
>
> Natural American cigarettes would not have their current product differentiation or market standing if consumers had not believed that their products were safer and healthier than other cigarettes. (*Id*. ¶ 131).
>
> The majority of mentholated Natural American smokers chose the brand because of its 100% no additives and all-natural claims. (*Id*. ¶ 132.)
>
> 39% of Natural American smokers ranking additive-free as the reason for their purpose, and 74% of buyers stating that additive-free, natural, and organic descriptors were the main reason for their first purchase. (*Id*. ¶ 136.)
>
> The FDA concluded that, conversely to expectations, the disclaimer ["No additives in our tobacco does NOT mean a safer cigarette"] did not offset consumer opinions that Natural American cigarette products conveyed "modified risk to consumers." When the disclaimer was present on the pack label, consumers rated comparative harmful exposure *lower* than when the disclaimer was absent.'" (*Id*. ¶¶ 88-90.)
>
> FDA sent a warning letter advising Defendants that their use of the terms "natural" and "additive-free" …"represents… the products

> present a lower risk of tobacco-related disease or are less harmful than one or more other commercially marketed tobacco products." (*Id.* ¶ 91.)
>
> While overall cigarette consumption in the United States is declining, Natural American cigarette sales have been increasing, and it is the only growing conventional cigarette brand. (*Id.* ¶¶ 122, 124.)




*Data Source:* Sources: RAI 10Ks; Santa Fe Causal Reports; Calderon Dep. Ex. 28G; BAT Annual Report 2019

Plaintiffs' proposed class definitions were for *all* purchasers of NAS cigarettes or Menthol NAS cigarettes under various state consumer protection statutes. (Second Consolidated Amended Class Action Complaint, ("SAC"), ECF No. 219, ¶¶ 107-27;[2] Order, at ¶ 9.) None of these classes required any specific inquiry into what any one person thought of the brand's descriptors or the disclaimer.

The district court certified the following classes pursuant to Rule 23(b)(3), to the extent the claims are premised on the Menthol Theory: the California Menthol Subclass, the Florida Menthol Subclass' FDUTPA claim, the Illinois Menthol

[2] Included as Exhibit B to this Petition.

Subclass' IUDTPA claim, the New Jersey Menthol Subclass, the New Mexico Menthol Subclass under the New Mexico Unfair Practices Act claim, and the New York Menthol Subclass' GBL claims. (Order at pp. 419-23.)

The district court found that the Menthol Theory was administratively feasible because Plaintiffs' damages model does not require individual inquiries and is designed to calculate the price premium associated with the literally false assertion that NAS menthol cigarettes did not contain additives based on the additive-free label's assertion. For the reasons expressed below, while the reasoning underpinning the certification of the Menthol Theory also supports the Safer Cigarette Theory, the Menthol Theory is independently certifiable as the district court concluded.

The district court declined to certify any class on the issue of injunctive relief pursuant to Rule 23(b)(2) for lack of standing. (*Id.*)

The district court declined to certify the following classes, finding that the claims premised on the Safer-Cigarette Theory failed to satisfy Rule 23(b)(3)'s predominance requirement as (1) administrative feasibility concerns tilted against a finding of predominance, (2) the proposed damages model was not an adequate fit and (3) the disclaimer raised individualized issues: the California Classes, the Colorado Classes, the Florida Class, the Illinois Class, the Massachusetts Class, the Michigan Class, the New Jersey Class, the New Mexico Class, the New York Class,

the North Carolina Class, the Ohio Class and the Washington Class. (*Id.*) The Court also declined to certify the North Carolina Menthol Class. (*Id.*)

The district court declined to certify the Nationwide Menthol Class. (*Id.*)

The district court imposed too high a burden when applying Rule 23(b)(3)'s requirements. The record is replete with common evidence, which the district court adopted, supporting a claim that consumers are misled by Defendants' uniform labeling of their NAS cigarettes to promote health reassurance. (*See e.g.*, Order at ¶¶ 88-91, 122, 124, 130-32, 136). Plaintiffs presented a reliable scientific methodology to calculate class-wide damages that is fit to their theory regarding Defendants' uniform labeling of the NAS cigarettes. Further the district court's decision regarding administratively feasibility in connection with the Safer-Cigarette Theory does not adequately account for the availability of Class data the Plaintiffs produced, including proof of purchases, receipts, and Defendants' own customer database. (*See* Plaintiffs' Motion for Class Certification, "Mot. Cert.," ECF No. 278;[3] Order.)

The district court erred in concluding that individualized inquiry is necessary as to whether a particular class member was actually misled. The class definition applied to all purchasers of NAS cigarettes in a particular state. (SAC at ¶¶ 107-27; Order at ¶ 9). Every purchaser was harmed the same way: they overpaid because they paid a premium for NAS cigarettes that could not be charged absent the label

[3] Included as Exhibit C to this Petition.

misrepresentations. (Order at ¶ 72.) The common evidence overwhelmingly supports Plaintiffs' theory—which includes evidence regarding the lack of impact of the disclaimer—and the Class can be easily managed. Therefore, this Court should grant Plaintiffs' petition.

## FACTUAL BACKGROUND

The district court's findings of fact support Plaintiffs' claims that NAS cigarettes mislead consumers into thinking that these cigarettes, which are labeled as "Natural" "Organic" and "Additive Free" are safer than others, and that Defendants are profiting off that deception. (*See e.g*., Order at ¶¶ 33, 39, 43, 44, 46-48, 54, 59, 60, 64, 66-70, 73, 82, 88-91, 116-122, 124, 130-133, 136-150, 152, 155-56.) Defendants intentionally and successfully convey to consumers that NAS cigarettes are safer than other brands by uniformly labeling them as "Natural," "Organic" and "100% Additive Free." (*Id*. at ¶¶ 33, 39, 43, 44, 46-47, 54-68, 73, 136.) These label descriptors are the brand's key differentiator and purchase driver showing that consumers are misled. (*Id*. at ¶¶ 59, 131, 136-142, 155 & 156; *see also* ¶ 122, Figure 1.)

Noticing the brand's popularity, the tobacco industry commissioned impact studies on the all-natural labeling, which revealed that consumers believed the products were less harmful and less addictive because they were additive-free. Order*,* at ¶ 122, Figure 1. Yet, the truth is NAS cigarettes are not less harmful than

other cigarettes as they generally deliver more free-base nicotine and have higher concentrations of harmful chemicals than other cigarettes. (*Id*. at ¶¶ 116-121.) NAS cigarettes' packaging includes a disclaimer "No additives in our tobacco does not mean a safer cigarette," but this does not offset the effect of the health reassurance and deceptive advertising and fails to address the "organic" advertising. (Order, at ¶¶ 130-133, 143-153.) Without this intentional branding, Defendants would not have achieved their health-conscious market standing driven by customer choices and premium pricing.

## QUESTION PRESENTED

Whether the district court was overly restrictive in applying Rule 23(b)(3)'s predominance requirements in denying certification of Plaintiffs' Safer-Cigarette Classes in a consumer fraud class action alleging deceptive advertising of NAS cigarettes because, with respect to the Safer-Cigarette Theory: (1) Plaintiffs' damages theory was not a fit to their theory of liability; (2) the disclaimer raised individualized issues; and (3) administrative feasibility concerns tilt against a finding that common questions predominate.

## RELIEF SOUGHT

This Court should grant Plaintiffs' Rule 23(f) petition and, upon consideration of this petition or after full briefing on the merits, reverse the district court's order regarding the Safer-Cigarette Theory.

## REASONS FOR GRANTING THE PETITION

This Court should grant interlocutory review for multiple reasons. First, interlocutory review will protect the interests of the Safer-Cigarette Theory Class and the merits upon which their allegations rest. "Where the high costs of litigation grossly exceed an individual plaintiff's potential damages, the denial of class certification sounds the death knell of that plaintiff's claims." *Vallario v. Vandehey*, 554 F.3d 1259, 1263-64 (10th Cir. 2009). The district court's decision to deny class certification sounds the "death-knell" for Plaintiffs of the Safer-Cigarette Theory Class based on the current evidentiary proffer and the basis for denying Plaintiffs' motion for class certification on the Safer-Cigarette Theory and will force them to resolve their cases independent of the merits.

Furthermore, the claims alleged by the Safer-Cigarette Theory Class present a significant public health concern in a burgeoning area of law "that is likely to evade end of case review." *See Vallario*, 554 F.3d at 1263. There is great public interest in facilitating the development of law in a proliferating area—especially with respect to misleading labeling of tobacco products.[4] Finally, the district court's imposition and (mis)application of an administrative feasibility requirement (i) is unduly burdensome under this Court's Rule 23 precedent, and (ii) in the alternative, is a

[4] *See* Law 360, "The State of Consumer Class Actions Amid COVID-19" (Dec. 2, 2020) ("the most common putative class actions were consumer fraud lawsuits alleging that a manufacturer's marketing is deceptive or misleading").

ruling that "implicates unresolved legal issues [whose resolution] may facilitate development of the law application to class actions." *Vallario*, 554 F.3d at 1263.

## I. The Court Erred in Finding that the Safer-Cigarette Theory Class Does Not Satisfy Predominance

The Rule 23(b)(3) predominance inquiry tests whether "questions common to the class predominate over those questions that are individualized." *Payne v. Tri-State CareFlight, LLC*, 332 F.R.D. 611, 665 (D.N.M. 2019). "A question is common when the same evidence will suffice for each member to make a prima facie showing, or when the issue is susceptible to generalized, class-wide proof." *Id*. (quotations omitted). Under Rule 23(b)(3), "class status is appropriate as long as plaintiffs can establish an aggregation of legal and factual issues, the uniform treatment of which is superior to ordinary one-on-one litigation." *CGC Holding Co., LLC v. Broad & Cassel*, 773 F.3d 1076, 1086 (10th Cir. 2014). Predominance requires courts to "*characterize* the issues in the case as common or not, and then *weigh* which issues predominate." *Id.* at 1087. Thus, "the presence of some individual questions does not destroy predominance." *Anderson Living Trust v. WPX Energy Prod., LLC*, 306 F.R.D. 312, 386 (D.N.M. 2015) *adh'd to on recons*, 312 F.R.D. 620 (D.N.M. 2015) (Browning, J.); *see also Petrosino v. Stearn's Prods., Inc*., No. 16-CV-7735 (NSR), 2018 WL 1614349, at *7 (S.D.N.Y. Mar. 30, 2018) (whether a label is misleading to a reasonable consumer is a question for the fact finder); *U.S. v. Philip Morris USA, Inc*., 449 F. Supp. 2d 1, 27 (D.D.C. 2006)

(Kessler, J.); *Disc. Tobacco City & Lottery v. U.S.*, 674 F.3d 509, 536 (6th Cir. 2012).

Here, the district court adopted findings of fact in conjunction with its Order "to show the parties as much as possible how the [c]ourt [] reached its conclusions." (Order, at p. 2, n.2.)[5] Findings of fact satisfy Fed. R. Civ. P. 52(a) "if they afford the reviewing court a clear understanding of the factual basis for the trial court's decision." *Lujan v. State of N.M. Health & Soc. Servs. Dep't*, 624 F.2d 968, 970 (10th Cir. 1980). The trial court's compliance with Rule 52(a) ensures that the court has carefully considered and adjudicated the facts in dispute. *Featherstone v. Barash*, 345 F.2d 246, 249 (10th Cir. 1965); 9 C. Wright & A. Miller, Federal Practice & Procedure § 2579 at 679-70 (1971). The district court's overwhelming adoption of Plaintiffs' Findings of Fact demonstrates Defendants' misrepresentations connotes a cigarette that may be less harmful, including that such understanding is not impacted by the disclaimer. (*See e.g.*, Order, at ¶¶ 88-90, 143-49, 152, 155-56, 186; *see also* Mot. Cert., at pp. 23-28 (summarizing the marshalled

---

[5] Rule 52 of the Federal Rules of Civil Procedure allows a court to state findings of fact when ruling on a Rule 23 motion for class certification. *See* Rule 52(a)(3). Where a court has done so, findings of fact must not be set aside unless clearly erroneous. Fed. R. Civ. P. 52(1)(6); *U.S. v. Hunt*, 513 F.2d 129, 136 (10th Cir. 1975).

evidence, including the expert reports of Dr. Jennifer Pearson and Dr. Michael Cummings, FDA studies, and Defendants' own internal research and memoranda.))[6]

Despite these Findings of Fact, the district court concluded "because different consumers may or may not have seen the disclaimers on the cigarettes' packaging and advertisements, whether an individual saw a disclaimer is an individualized question that defeats predominance." (Order, at ¶ 156.) This conclusion undermines and is irreconcilable with the district court's Findings of Facts. Indeed, as the common evidence shows, whether a proposed class member viewed the disclaimer prior to purchase is irrelevant as a matter of law to the reasonable consumer's understanding of the Challenged Claims. (Order, at ¶ 108 (citing Plaintiffs' Reply Memorandum Support Class Certification, "Cert. Reply," ECF No. 331, at p. 18);[7] *see also* Order, at ¶¶ 88-90, 143-49, 152, 155-56, 186.)

As a result, the deficiencies of the district court's Order are both significant and readily ascertainable and should be overturned on this point. *Vallario*, 554 F.3d at 1263-64. The district court manifestly erred in relying upon whether an individual consumer observed a disclaimer on the NAS cigarette packaging prior to the

---

[6] Indeed, when denying the motion to dismiss claims under the Safer-Cigarette theory, the district court found that "[t]he Defendants do not contest that the descriptors convey to a reasonable consumer that Natural American cigarettes are healthier than other cigarettes." *See* Order on Motion to Dismiss, "MTD Order," ECF No. 146 at 169.

[7] Included as Exhibit D to this Petition.

purchase in holding that such analysis presents an individualized question that defeats predominance. Order, at ¶ 156; Fed. R. Civ. P. 23(f); *Vallario,* 554 F.3d at 1262.

## II. **The Court Erred in Finding Plaintiffs' Proposed Damages Model is Not an Adequate Fit with Plaintiffs' Safer-Cigarette Theory**

The district court held that "Dr. Dubé's conjoint analysis is not an adequate fit with the Plaintiffs' Safer-Cigarette Theory, because it incorporates all possible values which consumers may associate with the challenged labels and which may contribute to Natural American cigarettes' price premium, as opposed to isolating the understandings which the Plaintiffs allege the challenged labels cause Safer-Cigarette." (Order, at ¶ 129.)

With respect to all of Plaintiffs' claims under the various state consumer protection statutes alleging that the uniform labeling as "Natural" and "Additive-Free" is deceptive and misled consumers into believing that the products are safer, the district court found that this theory is subject to a reasonable consumer standard. (*See* MTD Order at pp. 163-65 (citing cases).)[8] Plaintiffs have presented common evidence (that the district court adopted) that a reasonable consumer would interpret the challenged terms to mean that the products are safer (even when accounting for the disclaimer). (*See* Mot. Cert., at pp. 23-28 (summarizing the marshalled evidence,

---

[8] Included as Exhibit E to this Petition.

including the expert reports of Dr. Jennifer Pearson and Dr. Michael Cummings, FDA studies, and Defendants' own internal research and memoranda.))

For all these reasons, a damages model that calculates class-wide damages resulting from the challenged terms—without consideration of other potential subjective interpretations that class members may have—fits a legal theory of liability premised on the reasonable consumer standard. *See, e.g.*, *Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*, 326 F.R.D. 592, 615 (N.D. Cal. 2018) (conjoint analysis that does not consider differing interpretations that consumers may have); *see also Gunaratna v. Dennis Gross Cosmetology LLC*, No. CV 20-2311-MWF, 2023 WL 5505052, at *21 (C.D. Cal. Apr. 4, 2023) (conjoint analysis that does not consider differing interpretations that consumers may have of a representation because the worth of the label will only matter if a jury finds that the Claim is false or misleading); *McMorrow v. Mondelēz Int'l, Inc.*, No. 17-cv-2327-BAS, 2021 WL 859137, at *15 (S.D. Cal. Mar. 8, 2021) ("Plaintiffs' damages model need not isolate and test the various possible interpretations of the term 'nutritious.'"); *Krommenhock v. Post Foods, LLC*, 334 F.R.D. 552, 575 (N.D. Cal. 2020).

Moreover, the Classes here are defined to include "*[a]ll persons* who purchased NAS cigarettes in" the relevant states, and not just persons who purchased NAS cigarettes because they thought they were safer. (*See* SAC, at ¶¶ 107-18.) Defendants are able to, and do, as a result of their misleading labels, charge a price

premium for NAS cigarettes. (*See* Mot. Cert., at pp. 34-35 (summarizing marshalled evidence, including the expert report of Dr. Timothy Dewhirst and Defendants' internal analyses.)) Consumers who have subjective beliefs that differ from those of reasonable consumers are nonetheless harmed because they too pay the price premium resulting from the safer cigarette deception. *Fitzhenry-Russell*, 326 F.R.D. at 612-15. Measuring damages resulting from objectively deceptive statements, even if some consumers might have differing subjective views, is the appropriate methodology for determining the injury flowing from those deceptive statements.[9] *See Gunaratna*, 2023 WL 5505052, at *21; *McMorrow*, 2021 WL 859137, at *15; *Fitzhenry-Russell*, 326 F.R.D. at 615; *Krommenhock*, 334 F.R.D. at 575.

## III. <u>The Court Erred in Finding that Administrative Feasibility Concerns Tilt Against a Finding of Predominance</u>

The district court found that "the Nationwide Menthol Subclass members are readily ascertainable using objective criteria." Order, at ¶ 302.[10] The district court

---

[9] The district court also raised concerns that "allowing a model to calculate a price premium without isolating the challenged claims may allow for an inflated damage depending on the value associated with the unchallenged or truthful claims." Order, at ¶ 134. However, to the extent there is such a concern, a defendant "will be free to attack [an expert's] conjoint study as inflating the price premium at trial." *Fitzhenry-Russell*, 326 F.R.D. at 604; *see also In re Arris Cable Modem Consumer Litig.*, 327 F.R.D. 334, 373 (N.D. Cal. 2018) (same).

[10] *See also* Cert. Reply, at pp. 10-11 (comparing the class membership criteria here—"(i) whether a person purchased one or more NAS Cigarette product, (ii) the state in which the person purchased the NAS Cigarette product(s), and (iii) when they purchased the NAS Cigarette product(s)"—as both sufficiently objective and

also recognized that the Tenth Circuit ***has not*** held that Rule 23 imposes a requirement for a plaintiff to show *administrative feasibility* in order to certify a class. Order, at ¶¶ 235 (acknowledging *In re EpiPen (Epinephrine Injection, USP) Mktg. Sales Pracs. & Antitrust Litig.*, No. 17-md-2785-DDC, 2020 WL 1180550 (D. Kan. Mar. 10, 2020), in which the Judge Crabtree "predict[ed] that the Tenth Circuit, if confronted with this question, would decline to recognize ascertainability as a separate, unstated requirement of rule 23….") (internal quotation marks omitted), 242-43 (citing *In re Urethane Antitrust Litig.*, 768 F.3d 1245 (10th Cir. 2014), *Davoll v. Webb*, 194 F.3d 1116 (10th Cir. 1999)).

But despite the district court's former finding (objective criteria) and the latter prediction (Tenth Circuit not adopting an administrative feasibility requirement), the district court nevertheless proceeded to (i) add such a requirement to Rule 23, in the form of a predominance determination related to "managing a class action" (*see* Order, at ¶¶ 251-53), and (ii) then misapplied that extra-textual requirement to Plaintiffs' Class Certification Motion to conclude that the Nationwide Menthol Subclass "will face substantial administrative difficulties at the claims administration stage." (*See id*. at ¶¶ 256-58.) The district court then also used that

comparable to criteria used by Judge Crabtree in *In re EpiPen*, 2020 WL 1180550, at *11, as well as numerous other consumer cases from courts that do not follow the Third Circuit in adding an *administrative feasibility* requirement to Rule 23.

same analytical framework to assess on a state-by-state basis each of Plaintiffs' classes (and subclasses) and legal claims. (*See id*. at ¶¶ 310-418.)

The Order presents this Court with the opportunity to state whether the Tenth Circuit agrees with the majority of the Circuits,[11] as well as Judge Crabtree's holding on this precise question in an analogous consumer case (*In re EpiPen*), that Rule 23 does not contain an administrative feasibility requirement, including as part of Rule 23(b)(3)(D)'s "managing" prong, *i.e.*, by requiring plaintiffs to satisfy an additional predominance inquiry as to identification of class members.

Indeed, the district court acknowledged that grafting an administrative feasibility requirement that does not appear in Rule 23, "erects a high barrier for potential class actions, particularly in the low-value consumer class action context." (Order, at ¶ 248 (citing *Mullins,* 795 F.3d at 662).) And the district court acknowledged the explanation provided by courts of appeal in a majority of the circuits that imposing such a requirement "has the effect of skewing the balance that district courts must strike when deciding whether to certify classes and noting that Rule 23's existing requirements already address the balance of interests that Rule 23 is designed to protect." (Order, at ¶ 242.) Nevertheless, the district court proceeded

[11] *See, e.g.*, *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1123 (9th Cir. 2017); *In re Petrobras Sec.*, 862 F.3d 250, 268 (2d Cir. 2017); *Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*, 821 F.3d 992, 995-96 (8th Cir. 2016); *Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 525 (6th Cir. 2015); *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 658 (7th Cir. 2015).

to find that "an administrative feasibility requirement … is built into 23(b)(3)(D)." (*Id*. at ¶¶ 251.)

The district court never properly addressed explanations (from the Plaintiffs' proffered cases from the majority of circuits) as to why straight-forward claims procedures in consumer class actions like this one (*e.g.*, proof of purchase via affidavit where a significant database of class member contact information exists) ***do not*** (i) create administrative issues, or (ii) violate a defendant's rights (*e.g.* being subject to total damages no more than proved at trial). (*See* Cert. Reply, at pp. 10-12; *see also* Order, at ¶¶ 249-51.)

In other words, the district court set too high a burden when it required more than consumer affidavits of purchase coupled with a comprehensive database of class member information as legitimate and concluded (in a paragraph which opined that such consumer cases are "largely manufactured by attorneys") that the "consumer cannot be ascertained." Order, at ¶ 95; *see also* ¶¶ 257-58; *Kumar v. Salov N. Am. Corp.*, No. 14-cv-2411-YGR, 2016 WL 3844334, at *7 (N.D. Cal. July 15, 2016) ("[t]hough it is unlikely that this class of consumers will be able to produce evidence of purchase such as receipts…., this is no impediment to their offering evidence of purchase by affidavit on a claim form.")).

Moreover, the district court's footnoted explanations of why it would like to adopt (but does not expressly adopt) the Third Circuit's requirement of

administrative feasibility makes clear it is imposing a *de facto* imposing an administrative feasibility requirement despite the absence of such a requirement in Rule 23. (*See* Order, at ¶¶ 252-55, n. 64-65.)

## IV. <u>The District Court Erred in Finding that the State Classes (Other Than Under the Menthol Theory) did not Satisfy the Predominance Requirement</u>

In order to satisfy Rule 23(b)(3)'s predominance with respect to the California, Colorado, Illinois, Massachusetts, Michigan, New Jersey, New Mexico, New York, North Carolina and Washington Safer-Cigarette Theory Classes, Plaintiffs need only make "an objective showing of a probability that a 'significant portion' of the relevant consumers acting reasonably "could be misled." *Hadley v. Kellogg Sales Co*., 324 F. Supp. 3d 1084, 1116-18 (N.D. Cal. 2018) (Koh, J.). Accordingly, the relevant inquiry for determining predominance is whether there is common evidence in support of [consumers' health reassurance] understanding. *Rikos v. Procter & Gamble Co.,* No. 1:11-CV-226, 2014 WL 11370455, at *11 (S.D. Ohio June 19, 2014), *aff'd*, 799 F.3d 497 (6th Cir. 2015) (noting that the predominance inquiry must not focus on the conduct of class members, but on defendants' conduct and whether such conduct is deceptive).

Instead of considering whether Plaintiffs presented common evidence to establish that reasonable consumers could be misled by Defendants' conduct, the district court considered a host of hypothetical situations concerning how consumers

may have interpreted the Defendants' deceptive labeling, (Order, at ¶¶ 157-58), which had the effect of improperly requiring that Plaintiffs establish reliance. For this reason, and as discussed below, the district court erred in its finding that Plaintiffs failed to meet Rule 23(b)(3)'s predominance requirement with respect to the States' Safer-Cigarette Theory claims.

In California, "evidence need merely be capable of resolving a common question on a class-wide basis." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 666-668 (9th Cir. 2022), *cert. denied sub nom*; *StarKist Co. v. Olean Wholesale Grocery Coop., Inc.*, *On Behalf of Itself & All Others Similarly Situated*, 143 S.Ct. 424 (2022).

In Massachusetts, a district court need only have "enough information to evaluate preliminarily whether the proposed model will be able to establish ... which consumers were impacted." *In re Nexium Antitrust Litig*., 777 F.3d 9, 21, 24 (1st Cir. 2015) (citing *In re New Motor Vehicles Canadian Exp. Antitrust Litig*., 522 F.3d 6, 10 (1st Cir. 2008)) ("the need for some individualized determinations at the liability and damages stage does not defeat class certification").

In Florida, "[p]redominance is met when there exists generalized evidence which proves or disproves an element on a simultaneous, class-wide basis…" *Allapattah Servs., Inc. v. Exxon Corp.*, 333 F.3d 1248, 1260 (11th Cir. 2003), *aff'd*

*sub nom., Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546 (2005) (quotations and citations omitted).

Concerning Illinois, plaintiffs alleging claims under the consumer protection laws routinely establish predominance. *See Rikos*, 799 F.3d at 514-15 (affirming certification of ICFA claims).

In Michigan, a plaintiff need only "show that they will be able to prove injury through common evidence, not that they have in fact proved that common injury." *Id.* at 521; *see also In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*, 722 F.3d 838, 858 (6th Cir. 2013).

In Colorado, the "predominance inquiry at class certification asks to what extent issues susceptible to class-wide proof predominate over those requiring individual inquiries—not whether such issues are likely to be resolved in Plaintiffs' favor." *Black v. Occidental Petroleum Corp.*, 69 F.4th 1161, 1185 (10th Cir. 2023);

Under New Jersey's NJCFA, a consumer who proves "(1) an unlawful practice, (2) an ascertainable loss, and (3) a causal relationship between the unlawful conduct and the ascertainable loss, is entitled to legal and/or equitable relief, treble damages, and reasonable attorneys' fees," *Gonzalez v. Wilshire Credit Corp.*, 25 A.3d 1103, 1115 (N.J. 2011) (quotations omitted). Accordingly, Plaintiffs have satisfied the predominance requirement. *See also Kauffman v. New England Fitness*

*S., Inc.*, No. A-1789-17T1, 2019 WL 1752922, at *2 (N.J. Super. App. Div. Apr. 17, 2019) (citation omitted) (same regarding New Jersey's TCCWNA).

In New Mexico, a similar objective standard applies to claims brought under the state's consumer protection statutes. *See Stevenson v. Louis Dreyfus Corp.*, 811 P.2d 1308, 1311 (N.M. 1991) (noting that NMUPA applies to oral or written statements, visual descriptions or other representations knowingly made in connection with the sale or goods that may tend to "deceive or mislead any person.").

New York's consumer protection statutes allow for Plaintiffs to easily establish predominance. *See Stutman v. Chem. Bank*, 731 N.E.2d 608, 611 (N.Y. 2000) (noting that a plaintiff need only "prove three elements: first, that the challenged act or practice was consumer oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act."); *Hasemann v. Gerber Prods. Co.*, 331 F.R.D. 239, 274 (E.D.N.Y. 2019) (quotation omitted) (finding that "[t]he materiality of potentially deceptive representations is similarly subject to objective proof."); *Goldemberg v. Johnson & Johnson Consumer Cos., Inc.*, 317 F.R.D. 374, 393 (S.D.N.Y. 2016) (finding that an injury simply requires showing that plaintiffs paid money they otherwise would not have paid based on defendants' misrepresentations, such as a price premium).

Because North Carolina consumer protection laws focus on the defendant's conduct, predominance can be established through common evidence. *See Gray v.*

*N. Carolina Ins. Underwriting Ass'n*, 529 S.E.2d 676, 681 (N.C. 2000); *Booe v. Shadrick*, 369 S.E.2d 554, 556 (N.C. 1988).

Finally, such is the case with respect to the Washington class's safer-theory claim. *See Reichert v. Keefe Commissary Network, L.L.C.*, 331 F.R.D. 541, 556 (W.D. Wash. 2019) (finding common issues predominate for WCPA claim); *Kelley v. Microsoft Corp.*, 251 F.R.D. 544, 559 (W.D. Wash. 2008) (certifying unjust enrichment class); *Schnall v. AT & T Wireless Servs., Inc.*, 259 P.3d 129, 137 (Wash. 2011) (noting individual reliance is not required to establish WCPA claim).

**CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that this Court grant their Rule 23(f) petition.

*/s/Nancy R. Long*
NANCY R. LONG
nancy@longkomer.com
**LONG, KOMER & ASSOCIATES, PA**
1800 Old Pecos Trail, Ste. A
P.O. Box 5098
Santa Fe, NM 87505
Phone: (505)982-8405

MELISSA S. WEINER
mweiner@pwfirm.com
**PEARSON WARSHAW, LLP**
328 Barry Avenue S., Suite 200
Wayzata, MN 55391
Telephone: (612) 389-0600
Facsimile: (612) 389-0610

Scott P. Schlesinger
**SCHLESINGER LAW OFFICES, P.A.**
1212 SE Third Ave.
Ft. Lauderdale, FL 33316
Phone: (954) 467-8800
Email: scott@schlesingerlaw.com

## CERTIFICATION OF DIGITAL SUBMISSION AND FILED UNDER SEAL

I respectfully certify the following:

a. This Petition and corresponding Exhibits are filed under seal.

b. The hard copies of any pleading required to be submitted to the clerk's office are exact copies of the ECF filing with the exception of any required privacy redactions.

c. The ECF submission was scanned for viruses with the most recent version of a commercial virus scanning program is free of viruses.

*/s/Nancy R. Long*
NANCY R. LONG

**CERTIFICATE OF WORD COUNT**

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), I hereby certify that, the foregoing Petition of Plaintiffs and Class Members for Permission to Appeal Pursuant to Federal Rule of Civil Procedure 23(f) which was prepared using Times New Roman 14-point typeface, contains 4984 words, excluding the parts of the document that are exempted by Rule 32(f) and the Tenth Circuit Rule 32(B). This certificate was prepared in reliance on the word-count function of the word-processing system (Microsoft Word) used to prepare the document.

I declare under penalty of perjury that the foregoing is true and correct.

*/s/ Nancy R. Long*
NANCY R. LONG

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

No. MD 16-2695 JB/LF

IN RE: SANTA FE NATURAL TOBACCO
COMPANY MARKETING & SALES
PRACTICES AND PRODUCTS LIABILITY
LITIGATION

**MEMORANDUM OPINION AND ORDER**[1]

**THIS MATTER** comes before the Court on: (i) the Plaintiffs' Motion for Class Certification, filed July 23, 2020 (Doc. 278)("Certification Motion"); (ii) the Defendants' Motion to Exclude in Their Entirety the Expert Report and Opinions of Plaintiff Rebuttal Expert Dr. J. Michael Dennis and Incorporated Memorandum of Law, filed July 23, 2020 (Doc. 277)("Motion to Exclude Dr. Dennis"); (iii) the Plaintiff's Motion to Exclude the Opinions and Testimony of Charles D. Garner, Ph.D, DABT, filed July 23, 2020 (Doc. 282)("Motion to Exclude Dr. Garner"); (iv) the Plaintiffs' Motion to Exclude the Expert Testimony of Dr. Joannes Evangelista Steenkamp, filed July 23, 2020 (Doc. 283)("Motion to Exclude Dr. Steenkamp"); (v) the Plaintiffs' Motion to Exclude the Expert Testimony of Dr. David J. Teece, filed July 23, 2020 (Doc. 284)("Motion to Exclude Dr. Teece"); (vi) the Plaintiffs' Motion to Exclude the Opinions and Testimony of Dr. Kent Van Liere, filed July 23, 2020 (Doc. 286)("Motion to Exclude Dr. Van Liere"); (vii) the Plaintiffs' Motion to Exclude the Opinions and Testimony of W. Kip

[1]On September 1, 2023, the Court issued a Sealed Memorandum Opinion and Order, (Doc. 394)("Sealed MOO"). In it, the Court requested that the parties propose redactions, if any are necessary to protect confidential information. See Sealed MOO at 1, n.1. In response to the Court's request, the parties propose that the Court redact portions of the Sealed MOO. See Email from Melanie Stambaugh (dated September 15, 2023) filed September 17, 2023 (Doc. 401); Letter from David M. Monde (dated September 15, 2023), filed September 17, 2023 (Doc. 402). This public version of the Memorandum Opinion and Order is the redacted version of the Sealed MOO. The Court has made no other changes to the public opinion other than the redactions.

Viscusi, filed July 23, 2020 (Doc. 290)("Motion to Exclude Dr. Viscusi"); (viii) the Defendants' Motion to Exclude in Their Entirety the Expert Report and Opinions of Dr. Jennifer Pearson and Incorporated Memorandum of Law, filed July 23, 2020 (Doc. 303)("Motion to Exclude Dr. Pearson"); and (ix) Defendants' Motion to Exclude in Their Entirety the Expert Report and Opinions of Dr. Jean-Pierre Dubé and Incorporated Memorandum of Law, filed July 23, 2020 (Doc. 291)("Motion to Exclude Dr. Dubé"). The Court held a five-day evidentiary hearing from December 14, 2020, to December 18, 2020. Clerk's Minutes, filed December 14, 2020 (Doc. 340); Clerk's Minutes, filed December 15, 2020 (Doc. 341); Clerk's Minutes, filed December 16, 2020 (Doc. 342); Clerk's Minutes, filed December 17, 2020 (Doc. 343); Clerk's Minutes, filed December 18, 2020 (Doc. 344). The primary issues before the Court are: (i) whether the Plaintiffs' twenty-one proposed classes and subclasses satisfy the requirements in rule 23 of the Federal Rules of Civil Procedure. See Fed. R. Civ. P. 23. For the reasons discussed below, the Court concludes that some, but not all, of the Plaintiffs' proposed classes and subclasses satisfy rule 23. Accordingly, the Court grants in part and denies in part the Certification Motion.

## FINDINGS OF FACT

Both the Plaintiffs and the Defendants have submitted proposed findings of fact. See Plaintiff's Requested Findings of Fact and Conclusions of Law, filed February 26, 2021 (Doc. 361)("Plaintiffs' FOF"); Defendants' Proposed Findings of Fact and Conclusions of Law Regarding Plaintiffs' Motion for Class Certification, filed February 26, 2021 (Doc. 362)("Defendants' FOF"). The Court has considered carefully all proposed facts, and accepts some of them, rejects others, and finds some facts that no party brought to its attention.[2] The

[2]The Court is not required to make formal findings of fact in ruling on a class certification motion. See Fed. R. Civ. P. 54(a)(3) ("The court is not required to state findings or

Court also liberally judicially notices background facts. See Fed. R. Evid. 201. All of these findings of fact are authoritative only on the question of class certification, and the parties may relitigate any of them at the merits stage. See Abbott v. Lockheed Martin Corp., 725 F.3d 803, 810 (7th Cir. 2013); In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 313 (3d Cir. 2008); Gariety v. Grant Thornton, LLP, 368 F.3d 356, 366 (4th Cir. 2004); Anderson Living Tr. v. WPX Energy Prod., LLC, 306 F.R.D. 312, 320 (D.N.M. 2015)(Browning, J.), adhered to on reconsideration, 312 F.R.D. 620 (D.N.M. 2015)(Browning, J.). The Court sets forth its findings of fact below.

**1. The Litigation and Parties.**

1. This case addresses the alleged mass deception of Natural American Spirit cigarettes ("Natural American cigarettes"), that Defendants Santa Fe Natural Tobacco Company ("Santa Fe Tobacco"), R.J. Reynolds Tobacco Company ("R.J. Reynolds Tobacco") and Reynolds American, Inc. ("Reynolds American" or "RAI")(collectively, "the Defendants"), made and marketed. Plaintiffs' FOFs ¶ 5, at 2 (asserting this fact). See Second Consolidated Amended Class Action Complaint ¶ 1, at 1, filed November 1, 2018 (Doc. 219)("SAC")); Defendants' Answer to the Second Consolidated Amended Class Action Complaint ¶ 1, at 1, filed December 10, 2018 (Doc. 225)("Second Amended Answer").

2. The Plaintiffs allege that the Defendants have capitalized on the misperception that cigarettes made with "natural" tobacco that is "additive-free" may be less harmful than other

conclusions when ruling on a motion under Rule 12 or 56 or, unless these rules provide otherwise, on any other motion."); id. Advisory Committees Notes to 2007 Amendments ("Amended Rule 52(a)(3) says that findings are unnecessary 'unless these rules provide otherwise.' This change reflects provisions in other rules that require Rule 52 findings on deciding motions. Rules 23(e), 23(h), and 54(d)(2)(C) [but not rule 23(a), (b), or (g)] are examples."). The Court has elected to make findings of fact to show the parties as much as possible how the Court has reached its conclusions.

cigarettes. Plaintiffs' FOFs ¶ 6, at 2 (asserting this fact). See SAC ¶ 3, at 2.

**a. The Defendants.**

3. Reynolds American is a North Carolina corporation whose principal place of business is in Winston-Salem, North Carolina. See SAC ¶ 26, at 12; Second Amended Answer ¶ 25, at 6, filed February 28, 2018 (Doc. 171)("First Amended Answer"). See also Defendants' FOFs ¶ 1, at 4.

4. The Court has jurisdiction over Reynolds American only as to claims brought in a North Carolina forum. See Memorandum Opinion and Order at 3, filed December 21, 2017 (Doc. 146)("MTD MOO"); Defendants' FOFs ¶ 1, at 4.

5. "Reynolds American remains a Defendant only as to claims brought in a North Carolina forum and participates here only as to those claims against it over which the Court has personal jurisdiction." Defendants' FOFs n.1, at 1 (citing MTD MOO at 3).

6. Santa Fe Tobacco is a New Mexico corporation whose principal place of business is in Santa Fe, New Mexico. See SAC ¶ 25, at 12; Second Amended Answer ¶ 25, at 6; Defendants' FOFs ¶ 2, at 4; Plaintiffs' FOFs ¶ 326, at 81.

7. RJR Tobacco is a North Carolina corporation with its principal place of business in Winston-Salem, North Carolina. SAC ¶ 27, at 12; Second Amended Answer ¶ 27, at 6; Defendants' FOFs ¶ 3, at 4.

8. Both Santa Fe Tobacco and RJR Tobacco are Reynolds American's subsidiaries. See SAC ¶¶ 25-26, at 12; Second Amended Answer ¶¶ 25-26, at 6.

**b. The Plaintiffs and Proposed Classes.**

9. The Plaintiffs seek certification of the following classes: the California Class and California Menthol Subclass, the Colorado Class and Colorado Menthol Subclass, the Florida

Class and Florida Menthol Subclass, the Illinois Class and Illinois Menthol Subclass, the Massachusetts Class, the Michigan Class, the New Jersey Class and New Jersey Menthol Subclass, the New Mexico Class and New Mexico Menthol Subclass, the New York Class and New York Menthol Subclass, the North Carolina Class and North Carolina Menthol Subclass, the Ohio Class, the Washington Class, and the Nationwide Menthol Subclass. See SAC ¶¶ 107-127, at 28-43 (defining classes); Second Amended Answer ¶ 107-127, at 30-32; Plaintiffs' FOFs ¶ 1, at 1.

10. The Plaintiffs seek certification of the State menthol subclasses only in the alternative to the Nationwide Menthol Subclass. See Plaintiffs' FOFs ¶ 1, at 1. See also SAC ¶ 127, at 43; Second Amended Answer ¶ 127, at 32.

11. Plaintiff Jacques-Rene Hebert seeks to represent a class of "[a]ll persons who purchased Natural American Spirit cigarettes in California," "in Illinois," "in Massachusetts," "in Michigan," "in New York," and "in Ohio." SAC ¶ 107, 110-12, 115, 117, at 28. See Second Amended Answer ¶¶ 59, at 15; Defendants' FOFs ¶ 5, at 4.

12. Plaintiff Sara Benson seeks to represent a class of "[a]ll persons who purchased Natural American Spirit cigarettes in Colorado." SAC ¶¶ 13, 108, at 4-5, 39; Second Amended Answer ¶¶ 13, 108, at 3, 30; Defendants' FOFs ¶ 6, at 4-5.

13. Plaintiff Justin Sproule seeks to represent a class of "[a]ll persons who purchased Natural American Spirit cigarettes in Florida." SAC ¶ 109, at 39. See Second Amended Answer ¶ 109, at 30; Defendants' FOFs ¶ 7, at 5.

14. Plaintiff Abigail Emmons seeks to represent a class of "[a]ll persons who purchased Natural American Spirit cigarettes in New Jersey." SAC ¶ 113, at 40. See Second Amended Answer ¶ 113, at 30; Defendants' FOFs ¶ 8, at 5.

15. Plaintiff Ceyhan Haksal seeks to represent a class of "[a]ll persons who purchased Natural American Spirit cigarettes in New Mexico." SAC ¶ 114, at 41. See Second Amended Answer ¶ 114, at 31; Defendants' FOFs ¶ 9, at 5.

16. Plaintiff Rudolph Miller seeks to represent a class of "[a]ll persons who purchased Natural American Spirit cigarettes in North Carolina." SAC ¶ 116, at 41. See Second Amended Answer ¶ 116, at 31; Defendants' FOFs ¶ 10, at 5.

17. Plaintiff Clive Pontusson seeks to represent a class of "[a]ll persons who purchased Natural American Spirit cigarettes in Washington." SAC ¶ 118, at 41. See Second Amended Answer ¶ 118 at 31; Defendants' FOFs ¶ 11, at 5.

18. Plaintiff Francisco Chavez seeks to represent a class of "[a]ll persons who purchased Natural American Spirit menthol cigarettes in California." SAC ¶ 119, at 42. See Second Amended Answer ¶ 119, at 31; Defendants' FOFs ¶ 12, at 5.

19. Plaintiff Joshua Horne seeks to represent a class of "[a]ll persons who purchased Natural American Spirit menthol cigarettes in Colorado," "in Florida," and "in New Mexico." SAC ¶¶ 120-21, 124, at 42. See Second Amended Answer ¶¶ 120-21, 124, at 31-32; Defendants' FOFs ¶ 13, at 5.

20. Plaintiff Albert Lopez seeks to represent a class of "[a]ll persons who purchased Natural American Spirit menthol cigarettes in Illinois." SAC ¶ 122, at 42. See Second Amended Answer ¶ 122, at 32; Defendants' FOFs ¶ 14, at 6.

21. Plaintiff Robert Litwin seeks to represent a class of "[a]ll persons who purchased Natural American Spirit menthol cigarettes in New Jersey" and "in New York." SAC ¶¶ 123, 125, at 42-43. See Second Amended Answer ¶¶ 123, 125, at 32; Defendants' FOFs ¶ 15, at 6.

22. Plaintiff Charlene Blevins seeks to represent a class of "[a]ll persons who

purchased Natural American Spirit menthol cigarettes in North Carolina." SAC ¶ 126, at 43. See Second Amended Answer ¶ 126 at 32; Defendants' FOFs ¶ 16, at 5.

23. Plaintiffs Francisco Chavez, Joshua Horne, Albert Lopez, Robert Litwin, and Charlene Blevins also seek to represent a subclass defined as "[a]ll persons who purchased Natural American Spirit menthol cigarettes in the United States [("Nationwide Menthol Class")]." SAC ¶ 127, at 43. See Second Amended Answer ¶ 127, at 32; Defendants' FOFs ¶ 17, at 6.

24. The members of the proposed state-specific classes are all persons who have purchased Natural American cigarettes in New Jersey, Illinois, Colorado, Florida, New Mexico, California, Washington, North Carolina, New York, Massachusetts, Michigan, and Ohio. See SAC ¶¶ 107-18, at 39-41; Second Amended Answer ¶¶ 107-18, at 30-31; Plaintiffs' FOFs ¶ 2, at 1; Defendants' FOFs ¶ 18, at 6.

25. The members of the proposed state-specific menthol sub-classes are all persons who have purchased Natural American menthol cigarettes in California, Colorado, Florida, Illinois, New Jersey, New Mexico, New York, and North Carolina. See SAC ¶¶ 119-26, at 42-43; Second Amended Answer ¶¶ 119-26, at 31-32; Plaintiffs' FOFs ¶ 2, at 1; Defendants' FOFs ¶ 19, at 6.

26. The members of the proposed Nationwide Menthol Class are all persons who have purchased Natural American menthol cigarettes in the United States. See SAC ¶ 127, at 43; Second Amended Answer ¶ 127, at 32; Plaintiffs' FOFs ¶ 2, at 1; Defendants' FOFs ¶ 20, at 6-7.

27. The Plaintiffs propose the following class periods:

- September 30, 2009 to the present for the Nationwide Menthol Subclass, New York Class, New Mexico Class, New Jersey Class, Michigan Class, and Massachusetts Class;

- September 30, 2010 to the present for the Illinois Class;
- September 30, 2011 to the present for the California Class, Florida Class, and Washington Class;
- September 30, 2012 to the present for the Colorado Class; and
- September 30, 2013 to the present for the Ohio Class.

Defendants' FOFs ¶ 22, at 7. See Plaintiffs' FOFs ¶ 3, at 1-2. See also Certification Motion at 3, n.1.

**2. Natural American Cigarettes.**

28. Santa Fe Tobacco began selling Natural American cigarettes in 1985. See Expert Report of David J. Teece ¶ 46, at 35 (dated August 16, 2019), filed October 8, 2020 (Doc. 315-1)("Teece Report"). See Defendants' FOFs ¶ 23, at 7 (asserting this fact); Plaintiffs' FOF ¶ 70, at 16.

29. Santa Fe Tobacco has marketed itself as a company committed to producing high-quality products in an environmentally conscious manner. See Teece Report, ¶¶ 46, 50, at 35-36. Defendants' FOFs ¶ 24, at 7.

30. Santa Fe Tobacco "only uses selected tobaccos that meet specific quality standards and does not use 'tobacco additives, tobacco preservatives, tobacco flavoring, or scrap tobacco' . . . ." Teece Report ¶ 50, at 36 (no citation for quotation). See Defendants' FOFs ¶ 25, at 7.

31. Santa Fe's founders believed that an additive-free cigarette would prove less harmful than the brands produced by large tobacco manufacturers, which contained added chemicals. See Plaintiffs' FOFs ¶ 71, at 16; Expert Report by Robert N. Proctor at 11-12 (dated May 17, 2019), filed July 23, 2020 (Doc. 280-1)("Proctor Report")

32. Santa Fe sells a variety of styles of Natural American cigarettes with different features in different colored packs. See Transcript of Class Certification Hearing at 680:24-25 (dated December 16, 2020), filed January 4, 2021 (Doc. 347)(Belasic)("December 16 Tr.")(noting that there are thirteen Natural American cigarette styles); Defendants' FOFs ¶ 26, at 7 (asserting this fact). See also Proctor Report at 82 (explaining the different pack colors' meanings).

33. Brands achieve success primarily through positioning -- "the act of designing the company's offering and image to occupy a distinctive place in the mind of the target market" -- which involves "differentiating the company's marketing offer so it will give consumers more value than competitors' offers," and identifying "points of difference," or "attributes or benefits consumers strongly associate with a brand, positively evaluate, and believe that they could not find to the same extent with a competitive brand." Expert Report by Timothy Dewhirst at 5 (dated May 17, 2019), filed July 23, 2020 (Doc. 280-7)("Dewhirst Report"). See Plaintiffs' FOFs ¶ 113, at 25.

34. Collectively, this marketing concepts is known as a brand's primary points of differentiation ("PPOD"). See Plaintiffs' FOFs ¶ 114, at 25; Dewhirst Report at 5.

35. Natural American's PPOD, at least until 2017, has been "100% additive-free natural tobacco" and, for its organic line, "organic." Plaintiffs' FOFs ¶ 114, at 25; Dewhirst Report at 5. See Presentation, Consumer Engagement Research & Business Case at 6 (dated April, 2014), filed July 23, 2020 (Doc. 280-15)(listing "Additive Free," "All Natural Tobacco," "100% Whole Leaf," "Organic Blend," and "Premium Quality," as Natural American's most recalled messaging); Presentation, 2014 -- Strategic Plan for NAS Background (undated) at 21-24, filed July 23, 2020 (Doc. 280-3); December 16 Tr. at 631:1-632:5 (Cummings, Gdanski); id.

at 797:3-20 (Cummings, Gdanski); id. at 798:20-799:1 (Cummings, Gdanski); Reynolds American Inc. Form 10-K (fiscal year ended 12/31/11) at 7, filed July 23, 2020 (Doc. 281-2) ("2011 10-K")(stating that Natural American cigarettes are "differentiated from key competitors through its use of all natural, additive-free tobacco")[3]; Reynolds American Inc. Form 10-K (fiscal year ended 12/31/12) at 7, filed July 23, 2020 (Doc. 281-3)("2012 10-K")(same); Reynolds American Inc. Form 10-K (fiscal year ended 12/31/13) at 7, filed July 23, 2020 (Doc. 281-4)("2013 10-K")(same); Reynolds American Inc. Form 10-K (fiscal year ended 12/31/14) at 7, filed July 23, 2020 (Doc. 281-5)("2014 10-K")(same); Reynolds American Inc. Form 10-K (fiscal year ended 12/31/15) at 7, filed July 23, 2020 (Doc. 281-6)("2015 10-K")(same); Plaintiffs' FOFs ¶¶ 125-27, at 28-29 (citing Video Deposition of Kimberly Gonzales at 60:12-21 (taken April 10, 2018), filed July 23, 2020 (Doc. 281-12)("Gonzales Depo.")(Gonzales, Schultz); id. at 160:5-17 (Gonzales, Schultz); id. at 168:6-13 (Gonzales, Schultz)).

36. Natural American's brand identity, including other elements of Natural American labels and advertising -- which together form Santa Fe's "campaignable umbrella" and include themes like "Made with Organic Tobacco," "Tobacco and Water," and "Grown on American Soil" -- support the company's PPODs. Plaintiffs' FOFs ¶¶ 128-29, at 29; 2015-2016 Brand Equity Team Op Plan at 4, filed July 23, 2020 (Doc. 281-13).

37. In 1999, Santa Fe marketing executive Henry Sicignano wrote to the company's

[3]"The federal securities laws require publicly reporting companies to disclose information on an ongoing basis . . . . [D]omestic companies must submit annual reports on Form 10-K . . . [, which] provides a comprehensive overview of the company's business and financial condition and includes audited financial statements." Form 10-K, United States Securities and Exchange Commission, https://www.investor.gov/introduction-investing/investing-basics/glossary/form-10-k (last visited November 11, 2022).

president and board of directors: "[O]ur 'positioning' is what our brand stands for . . . what makes Natural American Spirit unique . . . why our product is better than other premium brands," and "'100% Additive-Free Natural Tobacco' is unmistakably the primary point of differentiation that has come to define our brand." Memorandum from Henry Sicignano to Robin Sommers and the SFNTC Board of Directors (dated January 20, 1999) at 6, filed July 23, 2020 (Doc. 281-1) (ellipses in original). See Plaintiffs' FOFs ¶ 116, at 26.

38. During the class periods, Santa Fe has uniformly labeled every pack of Natural American Cigarettes as "natural," including in the brand name -- Natural American Spirit Cigarettes -- and corporate name -- Santa Fe Natural Tobacco Company. Plaintiff's FOF ¶ 30, at 8. See Plaintiffs' FOFs ¶ 117, at 26; Dewhirst Report at 20.

39. The term "natural" is "central to both the brand name and that of its producer," and is "the fundamental differentiating feature of the product offering." Dewhirst Report at 20. See Plaintiffs' FOFs ¶ 118, at 26.

40. Santa Fe Tobacco used the phrase "100% additive-free natural tobacco" on its packaging to describe the tobacco used in Natural American cigarettes from 1985 until 2017. Declaration of Kara A. Calderon ¶¶ 9-10, at 2 (dated June 25, 2020), filed July 23, 2020 (Doc. 291-10)("Calderon Decl."). See Defendants' FOFs ¶ 27, at 8 (asserting this fact); Plaintiffs' FOF ¶ 31, at 8; id. ¶ 100, at 22 (citing Image of Natural American Spirit Cigarette Packs, filed July 23, 2020 (Doc. 280-12)).

41. In many instances, the labels included the descriptor "'tobacco & water,'" and would state in prominent, bold font: "'TOBACCO & WATER: 100% ADDITIVE-FREE NATURAL TOBACCO.'" Plaintiffs' FOFs ¶ 110, at 24 (quoting Dewhirst Report at 42-43).

42. Some labels and advertising also included language highlighting that Natural

American cigarettes were "'organic'" in addition to consisting of "'100% additive-free natural tobacco.'" See Plaintiffs' FOFs ¶ 111, at 25; Dewhirst Report at 43.

43. The descriptor "'100% additive-free natural tobacco'" was one of the most frequently used labels in Natural American cigarette advertisements. See Plaintiffs' FOFs ¶ 112, at 25; Videotaped Deposition of David DePalma at 60:12-16 (taken June 6, 2018), filed July 23, 2020 (Doc. 280-14)("DePalma Depo.")(DePalma, Schultz).

44. These descriptors, coupled with increased advertising, were a key part of the Natural American brand's strategic growth plan to drive consumers' trial of and ultimate conversion to the product. See Plaintiffs' FOFs ¶¶ 120-22, at 26-27; Presentation, 2013 Strategic Plan -- Functional Reviews: SFNTC Marketing at 4, 7 (undated), filed July 23, 2020 (Doc. 281-7); Dewhirst Report at 38.

45. These descriptors were so important, that Santa Fe considered not being able to use them as some of the brand's key risks, and planned on using substitute descriptors, such as a leaf logo, to represent respect for the environment. See Plaintiffs' FOFs ¶ 123, at 27; 2014 -- Strategic Plan for NAS Background at 3, 5 (undated), filed July 23, 2020 (Doc. 280-3); 2015 -- Strategic Plan (dated July 2014) at 24, filed July 23, 2020 (Doc. 281-8); Meeting Invitation from David DePalma to Susanne Lippert (dated March 12, 2014), at 2, filed July 23, 2020 (Doc. 281-10).

46. The labels did not, and do not, vary from state to state. See Plaintiffs' FOFs ¶ 101, at 22; Video Deposition of Stephanie Trujillo at 152:1-9 (taken April 11, 2018), filed July 23, 2020 (Doc. 280-13)(Schultz, Trujillo); id. at 155:10-15 (Schultz, Trujillo).

47. Santa Fe sought to capitalize on the country's "'increasing demand for healthier products.'" See Plaintiffs' FOFs ¶ 91, at 21 (quoting Proctor Report at 26).

48. The use of natural and additive-free labels were "'key points of differentiation' that 'drove trial and sales of the product at a premium price.'" Plaintiffs' FOFs ¶ 108, at 2 (quoting Dewhirst Report at 2).

49. Similarly, Reynolds American, Inc. concluded in 2009 that "'[o]rganic elevates the total proposition and serves as a halo for the entire brand,'" and in 2011 that "'[t]he additive-free blend is the core of our portfolio. The organic styles act as a 'halo' to the brand . . . .'" Plaintiffs' FOFs ¶ 233, at 56(quoting Santa Fe Natural Tobacco Company Presentation at 3, filed July 23, 2020 (Doc. 281-25)).

50. "Defendants 'focus[ed] on the Organic line proposition as an additional point of differentiation to strengthen and elevate the existing additive-free, natural tobacco product point of difference for NAS.'" Plaintiffs' FOFs ¶ 234, at 57 (quoting 2014 Strategic Plan for NAS at 7, filed July 23, 2020 (Doc. 280-3)).

51. The organic line of Natural American cigarettes "offers adult cigarette consumers who value smoking but are more wholesome an alternative to traditional cigarettes." Plaintiffs' FOFs ¶ 236, at 57 (quoting Market SWOT Analysis Year 2015, at 8, filed July 23, 2020 (Doc. 281-35)).

52. Santa Fe Tobacco supported its PPODs "by promoting harmonious aspects of brand identity, such as the company's focus on sustainability and 'eco-consciousness.'" Plaintiff's FOFs ¶ 131, at 30 (quoting Dewhirst Report at 2, 45). See Dewhirst Report at 47-50).

53. Natural American cigarettes' packaging, which Santa Fe Tobacco designed to give a natural look and feel -- by, for example, using recycled card stock and avoiding plastics -- reinforces the core message that Natural American cigarettes are natural and additive-free. Plaintiffs' FOFs ¶ 134, at 31 (citing Dewhirst Report at 25).

54. Santa Fe Tobacco's advertising, which included images of "clean sunny fields, healthy farming, and customers being in safe hands," Plaintiffs' FOFs ¶ 135, at 31 (quoting Proctor Report at 26) suggests "links to organic farming and organic foods . . . [and] fuses a sense of environmental responsibility ('healthy earth') with personal responsibility ('healthy body')," Plaintiffs' FOFs ¶ 136, at 31 (quoting Proctor Report at 39). See Plaintiffs' FOFs ¶¶ 135-36, at 31 (citing Proctor Report at 64, 79).

55. Defendants' have also advertised Natural American cigarettes by juxtaposing branded cigarette packages with carrots and language reading: "You might expect to find it at the farmer's market." Plaintiffs' FOFs ¶ 231, at 55. See December 16 Tr. at 815:21-816:4 (Cummings, Gdanski).

56. Santa Fe Tobacco's marketing campaigns targeted consumers focused on lifestyles of health and sustainability, who have a "'[c]lear connection of personal and planetary health -- [which] drives purchase of natural products and highest likelihood to think that the environment affects their health.'" Plaintiffs' FOFs ¶¶ 137-38 (quoting Presentation, Lifestyles of Health and Sustainability at 7 (dated March 14, 2013), filed July 23, 2020 (Doc. 281-15))(first alteration in Plaintiffs' FOFs)(citing Untitled American Spirit Presentation Notes at 4 (dated May 30, 2018), filed July 23, 2020 (Doc. 281-14)).

57. Santa Fe Tobacco uses Native American imagery -- like the Tobacco Chief, the Thunderbird and the typographical logo -- on Natural American's packaging to "evoke a sense of spiritual connection" to the brand, to which consumers connect personally. Presentation on Branding Recommendations at 77 (undated), filed July 23, 2020 (Doc. 281-17). See Plaintiffs' FOFs ¶ 139, at 32.

58. The Thunderbird, for example, appears at the top of the packaging, and "has

'prominent significance in Native American culture' and 'is a constant reminder of our shared belief that tobacco should be enjoyed in its *natural* state, *without any additives*.'" Plaintiffs' FOFs ¶ 140, at 32 (quoting Branding Guidelines at 2 (undated), filed July 23, 2020 (Doc. 281-18))(italics in Plaintiffs' FOFs).

59. Native American imagery has been a part of the Natural American brand identity since its earliest days, and implies that Natural American tobacco and Native American tobacco are equivalent, reinforcing consumers' perception that Natural American cigarettes are natural, despite differences between the two tobacco types' production processes and consumption. See Dewhirst Report at 26; Plaintiffs' FOFs ¶ 141, at 32.

60. Such imagery thus implies that Natural American cigarettes have a reduced risk of harm, since there is "'virtually no record of lung cancer anywhere in the world prior to the rise of the modern industrial cigarette.'" Plaintiffs' FOFs ¶ 142, at 32 (quoting Proctor Report at 26).

61. Santa Fe Tobacco spent an estimated "$223 million on marketing between 2009 and 2014, and noted in 2013 and 2013, that their per-pack marketing spend 'far exceeds competition.'" Dewhirst Report at 17. See Plaintiffs' FOFs ¶ 157, at 36.

62. In the fourth quarter of 2013, Natural American print ads reached more than 78.7 million tobacco consumers in an effort to enhance awareness of the "100% additive-free natural tobacco" PPOD. Gonzales Depo. at 75:8-23. See Gonzales Depo. at 182:16-183:6; Plaintiffs' FOFs ¶¶ 160-61, at 37.

63. Participants in advertisement concept studies, when shown Natural American advertisements, felt that the advertisements conveyed that Natural American cigarettes were "'safer,' 'healthier,' 'free of chemicals,' 'pure,' and 'clean'". Plaintiffs' FOFs ¶ 243, at 58 (quoting Expert Report of K. Michael Cummings at 15 (dated May 10, 2019), filed July 23, 2020

(Doc. 280-6)("Cummings Report")).

64. In response to consumers' beliefs that Natural American cigarettes are less harmful, Defendants train their employees to eliminate common misconceptions, including that a cigarette can be healthy or that no-additives or organic labeling means a safer cigarette. See Report of Prof. Joannes Evangelista ("Jan-Benedict") Steenkamp, PhD, MSc, BSc at 88, filed October 8, 2020 (Doc. 317-1)("Steenkamp Report"); Presentation, Natural American Spirit Portfolio at 3, July 23, 2002 (Doc. 281-22); Plaintiffs' FOFs ¶ 244, at 59.

65. Santa Fe Tobacco's 2016 consumer marketing budget (i.e., excluding trade marketing) was $78 million. See DePalma Depo. at 54:10-20 (DePalma, Schultz); Plaintiffs' FOFs ¶ 159, at 37.

66. By the late 1990s, the tobacco industry took notice of Natural American cigarettes' health-based appeal, with several tobacco companies commissioning research to determine the impact of all-natural labeling on Natural American brand appeal. See Plaintiffs' FOFs ¶¶ 80-86, at 19-20; Proctor Report at 15-17; C.I. Highlights (dated November, 1994) at 2-3, filed January 8, 2021 (Doc. 350-29); Notes/Excerpts from Santa Fe New Clips at 7-10, filed January 8, 2021 (Doc. 305-30)("Santa Fe News Clips"); Competitive Assessment Report, filed January 8, 2021 (Doc. 350-31); American Spirit Market Analysis at 2, filed January 8, 2021 (Doc. 350-32).

67. For example, Brown and Williamson's research found that one of Natural American's key selling points was the perception that Natural American cigarettes were less harmful. See Plaintiffs' FOFs ¶ 80, at 19; Proctor Report at 17.

68. In 1994, a confidential memo from Philip Morris noted that "'American spirit smokers said the cigarettes were "healthier and less addictive because of the absence of

additives.”’” Plaintiffs’ FOFs ¶ 84, at 19 (quoting C.I. Highlights at 2).

69. Philip Morris also recognized that Natural Americans marketed their cigarettes, and that consumers perceived them, as safer, because “‘they were additive free and therefore . . . more healthful . . . .’” Plaintiffs’ FOFs ¶ 86, at 20 (quoting Proctor Report at 23).

70. In 1996, R.J. Reynolds’ competitive surveillance recognized that Natural American’s “‘growing popularity’ was due to an ‘increasing demand for healthier products, especially in light of recent revelations that tobacco companies add several unsavory chemicals to their cigarettes.’” Plaintiffs’ FOFs ¶ 82, at 19 (quoting American Spirit Market Analysis at 4).

71. R.J. Reynolds attempted to capitalize on the success of Natural American cigarettes by launching its Winston Natural brand, which it advertised as containing “‘No Additives’” and “‘No Bull.’” Plaintiffs’ FOFs ¶ 87, at 20 (quoting Proctor Report at 17).

72. In 2002, Reynolds American Inc. (“RAI”) purchased Santa Fe, believing the company “was ‘in an excellent position’ to handle ‘the pressure . . . against the tobacco industry as a whole because of its continued use of additives,’ and that it should emphasize to as substantial ‘a cross section of the smoking public as possible’ that Natural American Spirit Cigarettes are ‘additive free.’” Plaintiffs’ FOFs ¶¶ 92-93, at 21 (quoting Memorandum on Product Modification from Dick Shepherd to Rick Sanders at 7 (dated October 14, 2002), filed July 23, 2020 (Doc. 280-10)).

73. Although R.J. Reynolds, the second-largest tobacco company in the United States at the time, now owned Santa Fe Tobacco, Santa Fe Tobacco, projected an image as a small company focused on environmental sustainability, which, when compared to large tobacco companies, gave the company the credibility to sell ‘natural’ and ‘additive-free’ cigarettes that consumers perceived as less harmful. See Plaintiffs’ FOFs ¶ 132, at 30 (citing Untitled Santa Fe

Natural American Presentation at 4-5, filed July 23, 2020 (Doc. 281-9)).

74. Other brands, like Winston Natural, were less successful than Natural American cigarettes because smokers were more skeptical of health claims coming from "Big Tobacco." Proctor Report at 42 n.112. See Plaintiffs' FOFs ¶ 133, at 30.

75. Although not as successful, Winston's No Additives marketing campaign in the 1990s resulted in the brand's first market share gain in 25 years. See Proctor Report at 17; Plaintiffs' FOFs ¶ 180, at 40.

**3. Natural American Cigarettes and Federal Regulatory Bodies.**

76. As early as 1990, Santa Fe Tobacco became "'aware that some regulatory authorities may construe the statement '100% Additive-Free Natural Tobacco' to read as an implied health claim.'" Plaintiffs' FOFs ¶ 241, at 58 (no citation given for quotation).

77. In April, 2000, Santa Fe Tobacco entered into a consent agreement, see Agreement Containing Consent Order at 1-10, filed July 23, 2020 (Doc. 291-10 at 6)("Consent Order"), with the Federal Trade Commission ("FTC"), which requires Santa Fe Tobacco to add a disclaimer informing consumers that Natural American cigarettes are not safer than other cigarettes. See Calderon Decl. ¶¶ 9-10, at 2.

78. In a press release, the Director of the FTC's Bureau of Consumer Protection states that "[t]he new disclosures should make it clear that . . . cigarettes without additives are not safe to smoke. The fact is, there's no such thing as a safe smoke." FTC Accepts Settlements of Charges that "Alternative" Cigarette Ads Are Deceptive, at 21 (dated April 27, 2000), filed November 18, 2016 (Doc. 71-1). See Defendants' FOFs ¶ 32, at 8 (asserting this fact).

79. In its MTD MOO, the Court concludes that a reasonable consumer who has an opportunity to inspect a Natural American cigarette package would be expected to see and read

the disclaimer, and understand from it that the lack of additives in Natural American cigarettes does not make Natural American cigarettes safer than other cigarettes. See MTD MOO at 172; Defendants' FOFs ¶ 33, at 9 (asserting this fact).

80. Pursuant to the Consent Order, Santa Fe Tobacco included a disclaimer on their tobacco products that read: "No additives in our tobacco does NOT mean safer." Consent Order at 5 (capitalization in original).

81. All Natural American cigarette advertisements and packages that Santa Fe Tobacco distributed between July 20, 2000, and September 30, 2017, included a disclaimer that read: "'No additives in our tobacco does NOT mean a safer cigarette.'" Calderon Decl. ¶ 10, at 2 (capitalization in original). See Consent Order at 5; Defendants' FOFs ¶ 30, at 8 (quoting Calderon Decl. ¶ 10, at 2)(asserting this fact); id. ¶ 78, at 18.

82. The disclaimer is limited to additives and "'says nothing about the natural or organic descriptors.'" Plaintiffs' FOFs ¶ 255, at 61 (quoting MTD MOO at 172).

83. In March, 2010, Santa Fe entered into an Assurance of Voluntary Compliance with the National Association of Attorney Generals. See Assurance of Voluntary Compliance at 1-10, filed July 23, 2020 (Doc. 291-10 at 19)("Voluntary Compliance").

84. In the Voluntary Compliance, Santa Fe Tobacco acknowledged the Attorney Generals' concerns that "consumers may be misled" by Santa Fe Tobacco's advertising certain Natural American cigarettes as containing "'organic'" or "'100% organic'" tobacco. Voluntary Compliance at 1 (no citation for quotation).

85. In the Voluntary Compliance, the Attorney Generals state that they "believe that the advertisements are deceptive and misleading in violation of the Master Settlement Agreement and Consent Decree as well as various state consumer protection laws." Voluntary Compliance

at 1.

86. In entering into the Voluntary Compliance, Santa Fe Tobacco states that it believes its advertisements are true and not misleading, but it is in the parties' best interest to enact the agreement rather than proceed to litigation. See Voluntary Compliance at 1.

87. In accordance with the Voluntary Compliance agreement, from March 31, 2010, through the present, Santa Fe Tobacco has used a second disclaimer on all advertisements for organic Natural American cigarettes, which reads: "Organic tobacco does NOT mean a safer cigarette." Calderon Decl. ¶ 12, at 2 (capitalization in original). See Defendants' FOFs ¶¶ 34-35, at 9 (asserting this fact); id. ¶ 78, at 18.

88. On August 21, 2015, the Food and Drug Administration ("FDA") published a study, titled Additive-Free and Natural Descriptors and Disclaimer Influence on Smokers' Perceptions of Natural American Spirit Cigarettes, filed July 23, 2020 (Doc. 280-4)("FDA NAS Study"), which concluded that a disclaimer, that "No additives in our tobacco does NOT mean a safer cigarette," did not offset the effect of "100% Additive-Free Natural Tobacco" and "natural" descriptors on consumers' opinions, and that tested Natural American cigarette products conveyed "modified risk to consumers." FDA NAS Study at 3 (capitalization in original); Plaintiffs' FOFs ¶ 37, at 10; id. ¶ 255, at 61; Expert Report by Jennifer Pearson at 13 (dated May 12, 2019), filed July 23, 2020 (Doc. 280-5)("Pearson Report").

89. The FDA reached the same conclusion in its review of Nat Sherman-branded cigarettes, which features natural descriptors and the same disclaimer. See Plaintiffs' FOFs ¶ 256, at 61; Pearson Report at 13-14.

90. The FDA also concluded that, conversely to expectations, "'[w]hen the disclaimer was present on the pack label, consumers rated comparative exposure *lower* than when the

disclaimer was absent.'" Plaintiffs' FOFs ¶ 257, at 62 (quoting FDA 2015 Nat Sherman Report at 2, filed July 23, 2020 (Doc. 287-4)).

91. On August 27, 2015, as a result of its conclusions in the FDA NAS Study, the FDA sent a warning letter advising the Defendants that their use of the terms "natural" and "additive-free" on Natural American cigarettes' labeling "represents explicitly and/or implicitly that the products or their smoke do not contain or are free of a substance and/or that the products present a lower risk of tobacco-related disease or are less harmful than one or more other commercially marketed tobacco products." Plaintiffs' FOFs ¶ 103, at 22-23 (asserting this fact)(citing Second Consolidated Amended Class Action Complaint ¶ 59, at 28, filed November 1, 2018 (Doc. 219)("Second Amended Complaint")). See Plaintiffs' FOFs ¶ 189, at 42; Second Amended Answer ¶ 59, at 15.

92. In January, 2017, the Defendants entered into a Memorandum of Agreement Between The United States Food and Drug Administration's (FDA) Center for Tobacco Products (CTP) and RAI Services Company (RAIS)/Santa Fe Natural Tobacco Company, Inc. (Santa Fe), at 31-32, filed July 23, 2020 (Doc. 291-10)("Memo. of Agreement"), with the FDA. See Defendants FOFs ¶ 37, at 9 (asserting this fact); Plaintiffs' FOFs ¶ 31, at 8.

93. Pursuant to the Memo. of Agreement, Santa Fe Tobacco stopped using the terms "natural" and "additive-free" on its Natural American packaging, and in its advertisements, except for in the brand name Natural American Spirits, Santa Fe Natural Tobacco, and all associated trademarks. Memo. of Agreement ¶¶ 1-3, at 1. See Defendants FOFs ¶ 37, at 9 (asserting this fact); Plaintiffs' FOFs ¶ 31, at 8; id. ¶ 104, at 23.

94. The Memo. of Agreement allows Santa Fe Tobacco to use the statements "Tobacco Ingredients: Tobacco & Water" or "Tobacco Filler Ingredients: Tobacco & Water."

Defendants FOFs ¶ 37, at 9 (citing Memo. of Agreement at ¶ 2, at 31).

95. Since 2013, Santa Fe Tobacco had begun "'measuring whether consumers would view "Ingredients: Tobacco & Water" as synonymous with "additive-free."'" Plaintiffs' FOFs ¶ 148, at 34 (quoting Dewhirst Report at 17).

96. "Tobacco and water" labeling "seems to rule out other ingredients" and gives consumers the impression that Natural American cigarettes are additive-free. Draft Presentation, Qualitative Research Findings: 2016 NAS DM Creative Testing at 3 (dated September, 2015), filed July 23, 2020 (Doc. 281-26)("Creative Testing"). See Dewhirst Report at 31 ("[M]ore than 60% of ad viewers equated 'Ingredients: Tobacco and Water' with 'additive-free.'"); Plaintiffs' FOFs ¶ 50, at 35.

97. In light of the Memo. of Agreement, Santa Fe Tobacco sought the FTC's view whether the "Tobacco & Water" statements would require a disclaimer, and whether the FTC would accept Santa Fe Tobacco's proposal to modify the disclaimer under the Consent Order to state: "Natural American Spirit cigarettes are not safer than other cigarettes." Calderon Decl. ¶ 15, at 4. See Defendants' FOFs ¶ 38, at 10 (asserting this fact).

98. In a May 9, 2017, guidance letter, the FTC states that "whether a claim is reasonably conveyed in an advertisement requires an examination of the entire advertisement, and an assessment of the overall net impression(s) conveyed." Letter from Mark K. Engle to Mark S. Brown, Request for Informal Staff Guidance Regarding Santa Fe Natural Tobacco Company's Consent Order (FTC Dkt. No. C-3952) at 34-36 (dated May 9, 2017), filed July 23, 2020 (Doc. 291-10)("FTC Informal Guidance").

99. The FTC also expressed concern that "[l]ooking solely at the [Tobacco & Water] phrases. . . raises concerns that, depending on the context, consumers could reasonably interpret

advertisements containing the phrases at issue to mean that Santa Fe Natural American Spirit cigarettes contain no additives or chemicals." FTC Informal Guidance at 35.

100. In addition, the FTC noted that Santa Fe Tobacco's phrases "are very similar to '100% tobacco' and 'pure tobacco' -- each of which specifically triggers the cigarette disclosure." FTC Informal Guidance at 35 (no citation for quotation).

101. The FTC concluded that it could not "definitively opine" whether Santa Fe Tobacco's "Tobacco & Water" descriptor would trigger the disclosure requirement under the Consent Order. FTC Informal Guidance at 35. See Defendants' FOFs ¶ 39, at 10 (asserting this fact).

102. Nevertheless, the FTC agreed that Santa Fe Tobacco's proposed modified disclaimer -- that "Natural American Spirit cigarettes are not safer than other cigarettes" -- would "convey the core message that Santa Fe Tobacco cigarettes are not safer than other cigarettes" and would be acceptable under the Consent Order. FTC Informal Guidance at 36. See Defendants' FOFs ¶ 39, at 10 (asserting this fact).

103. The FTC stated that it had no issue with the modified disclaimer, so long as it was displayed on advertisements subject to the Consent Order. See FTC Informal Guidance at 36. See Defendants' FOFs ¶ 39, at 10 (asserting this fact).

104. On October 1, 2017, Santa Fe Tobacco stopped using the phrase "100% additive-free natural tobacco" in its packaging and advertisements Calderon Decl. ¶ 15, at 4. See Defendants' FOFs ¶ 36, at 9 (asserting this fact).

105. When Santa Fe Tobacco stopped using the phrase "100% additive-free natural tobacco," it modified the disclaimer on its advertisements and packaging to read: "Natural American Spirit cigarettes are not safer than other cigarettes." Calderon Decl. ¶ 15, at 4. See

Defendants' FOFs ¶ 36, at 9 (asserting this fact).

106. Santa Fe Tobacco also substituted the natural and additive-free descriptors with a descriptor that states that the tobacco's ingredients are "tobacco & water." Defendants' FOFs ¶ 78, at 18 (citing Calderon Decl. ¶ 15).

107. Santa Fe Tobacco has not used additive-free or natural descriptors on Natural American cigarette packages distributed since October 1, 2017, or on advertisements or promotional materials published since that date. Calderon Decl. ¶ 16, at 4. See Defendants' FOFs ¶ 40, at 10 (asserting this fact).

108. The word "natural" nevertheless remains on the label, as it is a part of Natural American's brand name. Plaintiff's FOFs ¶¶ 151-52, at 35 (citing Dewhirst Report at 38); Defendants' FOFs ¶ 78, at 18 (citing Calderon Decl. ¶ 15).

109. Since October 1, 2017, Santa Fe Tobacco has included the "not safer" disclaimer on all advertisements that the Consent Order covers and on all Natural American cigarette packages. Calderon Decl. ¶¶ 17-18, at 4-5. See Defendants' FOFs ¶ 41, at 10 (asserting this fact).

110. Consumers will not necessarily have seen these disclaimers before purchasing Natural American cigarettes. See Defendants' FOFs ¶ 80, at 19 (quoting Plaintiffs' Reply in Support of Motion for Class Certification at 17 n.13, filed November 19, 2020 (Doc. 331)("Certification Reply").

111. A reasonable consumer holding a cigarette pack "'would be expected to locate, read, and understand the disclosure.'" Defendants' FOFs ¶ 81, at 19 (quoting MTD MOO at 170-72).

4. **Cigarettes and Health.**

112. "'Cigarettes today cause about 500,000 deaths per year just in the United States, and that number has grown significantly over time."' Plaintiffs' FOFs ¶ 4, at 2 (quoting Proctor Report at 2).

113. Cigarettes are as addictive as heroin and cocaine. See Plaintiffs' FOFs ¶ 47, at 12; Proctor Report at 9.

114. Nicotine[4] causes cigarette addiction via the inhalation of cigarette smoke through the lungs to the brain. See Plaintiffs' FOFs ¶ 46, 48, at 12; Proctor Report at 7-8.

115. The tobacco industry has worked to make cigarette smoke progressively easier to inhale, and carefully calibrates the nicotine content of cigarettes to create and sustain addiction. See Plaintiffs' FOFs ¶¶ 45, 48, at 12; Proctor Report at 6.

116. Natural American cigarettes are not less harmful than other cigarettes. See Plaintiffs' FOFs ¶ 41, at 10; id. ¶ 262, at 62; id. ¶ 268, at 65 (citing Warning Letter from Ann Simoneau, Director, Office of Compliance and Enforcement, Center for Tobacco Products, Food & Drug Administration, to Michael Little, President, Santa Fe Natural Tobacco Company, Inc. (dated August 27, 2015), filed July 23, 2020 (Doc. 287-6)("FDA Warning Letter")(concluding that there is no scientific support for the claim that Natural American cigarettes are safer of healthier than other cigarettes); id. ¶ 274-75, at 66 (quoting Cummings Report at 9).

117. Natural American cigarettes may be more harmful than other cigarette brands because, on average, they deliver more free-base nicotine --which makes them on average at

[4]Nicotine is an addictive chemical found naturally in the tobacco plant. See U.S. Food & Drug Administration, Nicotine Is Why Tobacco Products Are Addictive, https://www.fda.gov/tobacco-products/health-effects-tobacco-use/nicotine-why-tobacco-products-are-addictive (last visited October 5, 2022).

least as addictive as other cigarettes -- and certain carcinogenic compounds than most other cigarettes. See Plaintiffs' FOFs ¶ 41, at 10; id. ¶ 263, at 62; Transcript of Class Certification Hearing at 541:5-542:4 (taken December 15, 2020), filed January 4, 2021 (Doc. 345)("December 15 Tr.")(Cummings).

118. The FDA and Centers for Disease Control and Prevention (CDC) found that, among fifty mainstream U.S. cigarette brands, blue packs of Natural American cigarettes yielded the highest total concentration of polycyclic aromatic hydrocarbons,[5] with yields 60% to 170% higher than the average yield of all cigarettes analyzed. See Plaintiffs' FOFs ¶ 270, at 65-66 (citing An T. Vu, Kenneth M. Taylor, Matthew R. Holman, Yan S. Ding, Bryan Hearn & Clifford H. Watson, Polycyclic Aromatic Hydrocarbons in the Mainstream Smoke of Popular U.S. Cigarettes, 28 Chem. Rsch Toxicology 1616, 1623 (2015), filed July 23, 2020 (Doc. 287-7)).

119. Compared to fifty U.S. cigarette brands, Natural American cigarettes "'had the highest mean concentrations for cadmium and mercury.'"[6] Plaintiffs' FOFs ¶ 271, at 66 (quoting Mark R. Fresquez, R. Steven Pappas & Clifford H. Watson, Establishment of Toxic Metal Reference Range in Tobacco from U.S. Cigarettes at 8, Author Manuscript (2013), filed July 23, 2020 (Doc. 287-8)).

[5]Polycyclic aromatic hydrocarbons are "a class of known carcinogenic compound in cigarette smoke" that "do not occur naturally in the tobacco plant; rather, they are formed through incomplete combustion during the smoking process." Plaintiffs' FOFs ¶ 270, at 65.

[6]"Cadmium is both a known carcinogen and associated with chronic obstructive pulmonary disease and nephrotoxicity." Plaintiffs' FOFs ¶ 272, at 66 (quoting Mark R. Fresquez et al., Establishment of Toxic Metal Reference Range in Tobacco from U.S. Cigarettes, filed July 23, 2020 (Doc. 287-8)). "Mercury causes a wide array of well-known, deleterious health effects." Plaintiffs' FOFs ¶ 273, at 66 (quoting Establishment of Toxic Metal Reference Range in Tobacco from U.S. Cigarettes).

120. Santa Fe Tobacco has internally "acknowledged the higher concentrations of harmful and potentially harmful chemicals isolated in the smoke of NAS cigarettes," compared to other R.J. Reynolds and non-R.J. Reynolds brands. Plaintiffs' FOFs ¶ 264, at 63 (quoting Cummings Report at 6).

121. In an "internal comparison of deliveries of harmful constituents in Natural American Spirit Cigarettes versus those in the leading competitive brands," only Natural American cigarettes delivered more than 40mg of tar, and all 10 Natural American brands delivered more nicotine than other leading brands, and more 1,3-butadiene[7] than all but one competitor. Plaintiffs' FOFs ¶¶ 265-67, at 63-64 (citing Santa Fe Tobacco Presentation on Harmful & Potentially Harmful Constituents (HPHCs), filed July 23, 2020 (Doc. 287-5)).

5. **Natural American Sales and Growth.**

122. While overall cigarette consumption in the United States is declining, Natural American cigarette sales have been increasing. See Proctor Report at 2. See Figure 1.



Figure 1: Sales trends in Natural American cigarettes (blue) and sales trends for cigarettes in the rest of the industry (red). Plaintiffs' FOFs ¶ 7, at 3 (citing Proctor Report at 2).

123. As of May 2018, Santa Fe had 13 million people on its active mailing list. See Plaintiffs' FOFs ¶ 96, at 21; Videotaped Deposition of Andrew Huyett at 163:15-16 (taken June 15, 2018), filed July 23, 2020 (Doc. 280-11)("Huyett Depo.").

124. Natural American "'is the only growing brand of conventional cigarette, with sales increasing by double digit percentages every year.'" Plaintiffs' FOFs ¶ 165, at 37 (quoting Proctor Report at 42).

125. This growth occurred because of Natural American Cigarettes' brand differentiation, which includes "everything '[f]rom our core proposition of additive free . . . to organic styles.'" Plaintiffs' FOFs ¶ 166, at 38 (quoting Untitled American Spirit Presentation Notes at 3).

126. Santa Fe Tobacco's PPODs are the "first motivators" that lead consumers to try Natural American cigarettes, with the "natural," "additive-free," and "organic" PPODs accounting for 74% of consumers' initial trials. Plaintiffs' FOFs ¶¶ 167-68, at 38 (quoting Gonzales Depo. at 123:14-124:2, and citing Dewhirst Report at 6).

127. In the mid-1990s, between 89% and 100% of surveyed Natural American consumers indicated that the "absence of additives" was the "primary" reason for trying the brand. Plaintiffs' FOFs ¶ 169, at 38 (quoting Untitled Survey Documentations at 1207-08, filed July 23, 2020 (Doc. 281-30)).

128. That number reached 100% in April, 1996. See Plaintiffs' FOFs ¶ 170, at 38; Paid Sample Request at 8878, filed July 23, 2020 (Doc. 281-31).

129. "[T]he 'vast majority' of consumers who usually smoke Natural American Spirit

Cigarettes 'claim to choose the brand because it is "100% No Additives" or "All Natural."''' Plaintiffs' FOFs ¶ 171, at 38-39 (quoting Zoom Insights Summary of Learning at 4643, filed July 23, 2020 (Doc. 281-32)).

130. Natural, additive-free, and organic labeling increases consumers' health benefit perception and drives both purchases of Natural American cigarettes and consumers' willingness to pay a premium. See December 15 Tr. at 504:1-23 (Cummings, Gdanski); id. at 528:4-11 (Cummings); id. at 594:3-11 (Cummings); December 16 Tr. at 630:1-631:14 (Cummings, Gdanski); id. at 628:17-629:11 (Cummings, Gdanski); Plaintiffs' FOFs ¶ 157, at 36.

131. Natural American cigarettes would not have their current product differentiation or market standing if consumers had not believed that their products were safer and healthier than other cigarettes. See December 15 Tr. at 594:3-7 (Cummings); Plaintiffs' FOFs ¶ 157, at 36.

132. The majority of mentholated Natural American smokers chose the brand because of its 100% no additives and all-natural claims. See Tr. at 796:5 (Cummings); Plaintiffs' FOFs ¶ 162, at 37.

133. R.J. Reynolds has noted that Natural American cigarettes "'appeal to smokers turned on by a new-agey alternative consciousness and who are concerned about their health, even if resigned to their addiction.'" Plaintiffs' FOFs ¶ 241, at 58 (quoting Notes/Excerpts from Santa Fe Newsclips at 9, filed July 23, 2020 (Doc. 287-1)).

134. Santa Fe Tobacco President Robin Sommers, in a discussion on additive-free cigarettes, stated: "'People are going to smoke, I don't care what you do, so let's make the best product for people who have chosen to smoke or can't stop smoking.'" Plaintiffs' FOFs ¶ 242, at 58 (quoting Notes/Excerpts from Santa Fe Newsclips at 9)

135. Claims that Natural American cigarettes are "manufactured by a socially responsible company" are "low driver[s]" of smoker's repurchasing the brand. Plaintiffs' FOFs ¶ 178, at 40 (quoting 2015 Buyer Research Guide at 70-72, filed July 23, 2020 (Doc. 279-30).

136. Conversely, descriptors like additive-free, natural, and organic, are "High Drivers" of future purchase intent, with 39% of Natural American smokers ranking additive-free as the reason for their purpose, and 74% of buyers stating that additive-free, natural, and organic descriptors were the main reason for their first purchase. Plaintiffs' FOFs ¶ 215, at 50 (quoting 2015 Buyer Research Guide at 70).

137. Out of 2,063 surveyed Natural American purchasers, 189 said that additive-free and natural descriptors drove future purchasing intent, and 137 indicated that a premium-quality brand, a term that strongly correlates with all-natural and additive-free tobacco, drove future purchasing intent. See Plaintiffs' FOFs ¶ 216, at 50; 2015 Buyer Research Guide at 70-72; December 16 Tr. at 827:12-25 (Cummings, Gdanski).

138. Many of those who smoke Natural American brands believe their product may be healthier or safer for them compared to other brands. See Plaintiffs' FOFs ¶ 182, at 41; id. ¶ 193, at 44; id. ¶ 195, at 44-45; id. ¶ 197, at 45; id. ¶ 205, at 46; December 15 Tr. at 528:20-530:24 (Cummings, Gdanski); Pearson Report at 3, 5-8; December 16 Tr. at 846:17-847:12 (Gdanski, Pearson).

139. Natural American smokers are 22 times more likely than smokers of other brands to believe that their brand of cigarettes may be less harmful than others. See Plaintiffs' FOFs ¶ 196, at 45; Pearson Report at 7.

140. Similarly, 67% of Natural American mellow smokers and 55% of Natural American full-bodied smokers believed that the cigarettes that they smoked were less harmful

than other brands. Plaintiffs' FOFs ¶ 185, at 42; December 15 Tr. at 531:22-532:1 (Cummings); id. at 535:19-38:5 (Cummings, Gdanski).

141. 63.9% of Natural American cigarette smokers believe their preferred brand may be less harmful than other brands. See Plaintiffs' FOFs ¶ 206, at 46; December 16 Tr. at 883:8-17 (Pearson).

142. Descriptors like organic, natural, and additive-free in Natural American cigarettes' marketing reduce non-smokers', former smokers', and current smokers' perceived harm associated with the cigarette brand compared to other brands. See Plaintiffs' FOFs ¶ 202, at 45; id. ¶ 207, at 46; id. ¶ 237, at 57; Pearson Report at 9, 15; December 16 Tr. at 870:18-871:21 (Pearson); id. at 880:4-7 (Pearson); id. at 887:5-12 (Pearson); id. at 898:23-899:14 (Pearson).

143. Natural American cigarettes' warnings and disclaimers on their packaging and in their marketing are "'not effective in correcting product misperceptions.'" Plaintiffs' FOFs ¶ 259, at 62 (quoting Cummings Report at 5).

144. Disclaimers about cigarettes' safety, even when "blown up to the size of the Surgeon General's warning and shown to survey participants," do not offset misperceptions of cigarettes' harms. Plaintiffs' FOFs ¶ 203, at 46. See Plaintiffs' FOFs ¶ 254, at 61; December 16 Tr. at 832:-893:4 (Pearson); id. at 953:13-19 (Pearson); Pearson Report at 19.

145. In 1967, the FTC concluded that a recently added cautionary statement on cigarette packs did not have a discernible effect on cigarette consumption. See Plaintiffs' FOFs ¶ 245, at 59; December 15 Tr. at 546:3-19 (Cummings).

146. The FTC released a similar study in 1981 that analyzed warnings that were included on cigarette packages beginning in 1970, which determined that they failed to inform

consumers about smoking's hazards, and that consumers did not notice or read the warnings. See Plaintiffs' FOFs ¶ 245, at 59; December 15 Tr. at 547:2-11 (Cummings).

147. This pattern continues to the present day, with few smokers being able to tell what the warnings are and otherwise not looking at or reading the warnings. See Plaintiffs' FOFs ¶ 245, at 59; December 15 Tr. at 548:4-17 (Cummings).

148. "For a health warning and/or disclaimer to be effective it needs to be noticed, read, cognitively processed and remembered." Cummings Report at 18. See Plaintiffs' FOFs ¶ 260, at 62.

149. "'[W]hile consumers might be able to accurately report 'additive-free' cigarettes are no less harmful than other cigarettes, they still harbor the belief that these products *might* be less harmful than other brands.'" Plaintiffs' FOFs ¶ 252, at 61 (quoting Pearson Report at 18).

150. Text-only, black and white warnings are comparatively less impactful than in-color graphic warnings. See Plaintiffs' FOFs ¶ 248, at 60; December 15 Tr. at 554:15-25 (Cummings).

151. "In general, small text-only warnings on the side of packs are associated with lower levels of awareness and recall compared to larger, more prominent warnings located on the face of cigarette packs." Pearson Report at 18. See Plaintiffs' FOFs ¶ 249, at 60; December 16 Tr. at 874:18-878:10 (Schultz, Pearson); id. at 892:4-893:4 (Pearson); Transcript of Class Certification Hearing at 953:13-19 (taken December 17, 2020), filed January 4, 2021 (Doc. 348)(Pearson, Reisman)("December 17 Tr.").

152. "Corrective statements concerning misconceptions about tobacco products are rarely effective at correcting the emotional basis of beliefs about tobacco products." Plaintiffs' FOFs ¶ 251, at 61 (citing Pearson Report at 18).

153. It is frequently impossible for a consumer to review a cigarette pack's warnings before purchasing, as vendors store packs typically behind the counter with only the front visible, and so a package's disclosure does not necessarily "cure a deception inflicted upon a reasonable consumer." MTD MOO at 172. See Plaintiffs' FOFs ¶ 250, at 60-61.

154. Standardized packing reduces perceptions that Natural American Cigarettes are safer. See Plaintiffs' FOFs ¶ 204, at 46; Pearson Report at 16.

155. Defendants' consumer perception studies determined that their consumers "perceived Natural American Spirit Cigarettes as 'safer, healthier, less harmful, fewer chemicals, cleaner, pure, [and] not bad for you.'" Plaintiffs' FOFs ¶ 212, at 49 (quoting Tr. at 506:18-23 (Cummings)).

156. Reynolds' advertising campaign analysis in 2014 and 2017 revealed that at least 21% of consumers thought that Natural American cigarettes were better or safer than other cigarettes. See Plaintiffs' FOFs ¶ 213, at 49; December 15 Tr. at 636:15-21 (Cummings).

**6. Consumer Perception of Cigarettes**

157. In 1953, tobacco industry leaders met at the Plaza Hotel in New York City to plan a response to growing evidence that cigarette smoke caused disease, especially lung cancer. See Plaintiffs' FOFs ¶ 51, at 12; Proctor Report at 6.

158. That meeting launched an industry movement to deceive the public, including with claims that cigarettes with certain design features were safer than conventional cigarettes. See Plaintiffs' FOF ¶ 53, at 13; Proctor Report at 5.

159. Since the 1950s, the tobacco industry has used advertising to combat and create doubt regarding the public health community's scientific research showing that smoking was harmful, and smeared and belittled those who wrote about smoking's dangers and publicized the

tobacco industry's marketing manipulation. See Plaintiffs' FOFs ¶¶ 54, 60 at 13-14; December 15 Tr. at 554:1-557:13 (Cummings, Gdanski); id. at 559:1-260:22 (Cummings, Gdanski) id. at 592:2-18 (Cummings).

160. During the 1970s and 1980s, the public became increasingly concerned about the presence of chemicals in food, water, and cigarettes, and in 1994, the release of the tobacco industry's previously confidential list of 600 cigarette additives lent credence to these fears. See Plaintiffs' FOFs ¶¶ 72-73, at 16-17; Proctor Report at 12, 28; December 16 Tr. at 627:5-628:3 (Cummings).

161. The publicity of this cigarette additives list "'made it easier to believe that the true horror of cigarettes lay in their myriad additives.'" Plaintiffs' FOFs ¶ 74, at 17 (quoting Proctor Report at 28).

162. Adults in the United States believe commonly that cigarette additives are primarily responsible for cigarettes' harmful aspects, and that natural or additive-free cigarettes are or may be less harmful than other brands. See Plaintiffs' FOFs ¶ 193, at 44; Pearson Report at 3; December 16 Tr. at 846:17-847:12 (Pearson, Schultz).

163. Phrases like "'100% Additive Free' and 'Made with Organic Tobacco' communicated reduced harm to experimental study participants." Plaintiffs' FOFs ¶ 199, at 45 (quoting Pearson Report at 10-11).

164. " 'Consumers perceive[] cigarettes marketed as 'natural' or 'additive-free' as less harmful, and this influence[s] their perceptions of advertising claims and intention to purchase, controlling for other factors.'" Plaintiffs' FOFs ¶ 200, at 45 (quoting Pearson Report at 14).

165. "Nearly half of smokers believe that organic and additive-free cigarettes may be less harmful than other brands." Plaintiffs' FOFs ¶ 206, at 46 (citing December 16 Tr. at 883:8-

17 (Pearson)).

166. Youth similarly rate cigarette labels that use the term 'natural' as "significantly more appealing to people their age and less harmful than packages without this term." Plaintiffs' FOFs ¶ 201, at 45 (quoting Pearson Report at 14).

167. Over the twentieth century, the tobacco industry developed a number of features intended to induce consumers to smoke cigarettes they perceived as safer, including: (i) toasted leaves, ostensibly to drive off poison; (ii) menthols and milds, to reduce irritation; (iii) king-sized and filtered cigarettes, to trap poisons; (iv) low-tars, lights, and ultralights, to reduce the toxic dose; and (v) natural, organic, and additive-free labels, to yield cleaner smoke. See Plaintiffs' FOFs ¶ 55, at 13; Proctor Report at 6-7; id. at 28-42; MTD MOO at 167-68 ("The terms natural and organic have long been used across the country to convey products' health benefits.").

168. These product features and labels did not make cigarettes any safer. See Plaintiffs' FOFs ¶ 55, at 13; Proctor Report at 6-7; id. at 28-42.

169. The tobacco industry uses descriptors like natural, low-tar, additive-free, or ultralight, to target smokers who are thinking of quitting. See Plaintiffs' FOFs ¶ 68, at 16; December 15 Tr. at 523:19-524:9 (Cummings, Gdanski).

170. Beginning in the 1950s, filtered cigarettes' popularity grew -- from 2% market share to 99.7% market share today -- as a result of tobacco industry efforts to respond to the growing public awareness of cigarette smoking's health risks. See Plaintiffs' FOF ¶ 56, at 13-14; December 15 Tr. at 515:4-20 (Cummings), id. at 566:11-19 (Cummings).

171. The use of these features and advertising methods marks a campaign of health reassurance, as part of which tobacco companies, instead of addressing frankly cigarette smoking's health risks, provide smokers a "'psychological crutch and the self rationale to

continue smoking.'" Plaintiffs' FOF ¶ 58, at 14 (quoting December 15 Tr. at 573:X23-24(Cummings))

172. The tobacco industry knew that these features were effective at maintaining smokers' health misconceptions, noting, for instance, that "the 'illusion of filtration' -- in other words, what the consumer believes -- 'is as important as the fact of filtration." Plaintiffs' FOFs ¶ 59, at 14 (quoting December 15 Tr. at 586:16-22 (Cummings)).

173. The tobacco industry created a "wallpaper effect" of cigarette advertising, meaning it was impossible for consumers to escape the industry's advertising. See Plaintiffs' FOFs ¶ 61, at 15 (quoting December 15 Tr. at 567:20-24 (Cummings)).

174. In 1984, the American Tobacco Company commissioned a study of attitudes toward cigarettes made from additive-free tobacco, and found that the additive-free label had "'significant appeal'" due to the phrase's health implications. Plaintiffs' FOFs ¶ 76, at 18 (quoting Proctor Report at 20).

175. The American Tobacco study also indicated that smokers needed "'reassurances'" and that, particularly when combined with fine-tobacco and natural-ingredients marketing themes, a no-additives label could appeal to half of all smokers. Plaintiffs' FOFs ¶ 77, at 18 (quoting Proctor Report at 19).

176. The tobacco industry knew that advertising cigarettes as pure and clean implied a healthier product. See Plaintiffs' FOFs ¶ 88, at 20; December 15 Tr. at 579:7-581:25 (Court, Cummings, Gdanski).

177. Between the 1970s and 1990s, several major tobacco companies -- including R.J. Reynolds, Brown and Williamson, Philip Morris, Lorillard, and Nat Sherman -- developed or planned to develop cigarettes with natural, organic, or additive-free attributes, intended to reach

smokers with health concerns or to demonstrate the product's wholesomeness. See Plaintiffs' FOFs ¶ 79, at 18; Proctor Report at 14-17.

178. Philip Morris explored developing an all-natural cigarette in the 1990s, and concluded that """Natural" has never been a more compelling word than it is today -- in areas of nutrition and health. Its expanded meaning in advertising and labelling has become a by-word for quality and wholesomeness.'" Plaintiffs' FOFs ¶ 78, at 18 (quoting Proctor Report at 16 (quoting Philip Morris, Additive-Free (1988), https://www.industrydocumentslibrary .ucsf.edu/tobacco/docs/#id=lgnb0106)).

179. When Winston released its No Additives campaign in the 1990s, surveyed smokers stated commonly that the word natural meant healthier or less harmful. See Proctor Report at 18; Plaintiffs' FOFs ¶ 180, at 41.

180. The tobacco industry has never publicly acknowledged that their marketing causes consumers to use their products, but internally has noted that marketing is the key to brand sales and market share. See Plaintiffs' FOFs ¶ 63-64, at 15; December 15 Tr. at 502:22-503:2 (Cummings, Gdanski).

181. Natural American has also internally celebrated the effect of their marketing on sales. See Plaintiffs' FOFs ¶ 64, at 15; December 15 Tr. at 503:19-504:5 (Cummings, Gdanski).

182. In 2001, the National Cancer Institute released a monograph concluding that:

> 1. Advertisements of filtered and low-tar cigarettes were intended to reassure smokers (who were worried about the health risks of smoking) and were meant to prevent smokers from quitting based on those same concerns.
>
> 2. Advertising and promotional efforts were successful in getting smokers to use filtered and low-yield cigarette brands.
>
> 3. Internal tobacco company documents demonstrate that the

> cigarette manufacturers recognized the inherent deception of advertising that offered cigarettes as "Light" or "Ultra-Light," or as having the lowest tar and nicotine yields.

National Cancer Institute, Risks Associated with Smoking Cigarettes with Low Machine-Measured Yields of Tar and Nicotine at 233, NCI Monograph 13 (November 2001). See Plaintiffs' FOFs ¶ 69, at 16.

183. These conclusions are reflected in the 2012 Surgeon General's Report, which concludes that "[t]here is strong empirical evidence that tobacco companies' advertising and promotions affect awareness of smoking and of particular brands, the recognition and recall of cigarette advertising, attitudes about smoking, intentions to smoke, and actual smoking behavior." Office of the Surgeon General, Preventing Tobacco Use Among Youth and Young Adults at 508 (2012). See Plaintiffs' FOFs ¶ 69, at 16.

184. In 2015, the FDA's Center for Tobacco Products conducted a study "to determine whether Natural American Spirit cigarette products" using natural and additive-free descriptors on the packaging "conveyed modified risk to consumers." FDA NAS Study at 2. See Plaintiffs' FOFs ¶ 7, at 2 (asserting this fact).

185. The FDA NAS Study concludes: "Overall, the descriptors elicited statistically significant findings on consumer ratings of risk, harm, and exposure. The presence of the descriptors caused consumers to rate the product lower in terms of comparative risk, comparative harm, absolute exposure, and comparative exposure." FDA NAS Study at 2. See Plaintiffs' FOFs ¶ 7, at 2 (asserting this fact); id. ¶ 186, at 42.

186. The 2015 FDA Study also analyzes the disclaimers on Natural American cigarettes -- that "No additives in our tobacco does NOT mean a safer cigarette" -- and concludes:

> Consistent with multiple copy tests completed by FDA for enforcement, the results here indicate that disclaimers fail to offset descriptors' effects on consumer perceptions. When informed by the disclaimer that 'no additives' does not mean a safer cigarette, consumers rated perceptions of the product the same as consumers who did not see the disclaimer statement about additives.

2015 FDA Study at 2. See Plaintiffs' FOFs ¶ 7, at 2 (asserting this fact); id. ¶ 187-88, at 42.

### 7. Expert Witness Qualifications

#### a. K. Michael Cummings, Ph.D's Qualifications.

187. Dr. Cummings, trained in public health and health education, has decades of experience in the areas of tobacco use and cancer, smoking behavior, initiation, cessation, relapse, and its relationship to various diseases, particularly cancer. See December 15 Tr. at 496:19-25 (Cummings). See Plaintiffs' FOFs ¶ 11, at 4 (asserting this fact).

188. Dr. Cummings is a professor at the Medical University of South Carolina, and co-leads the university's Tobacco Research Program. See Defendants' FOFs ¶ 57, at 14 (citing Cummings Report at 2).

189. Dr. Cummings is an expert in understanding how consumers perceive different tobacco products, and how risk perceptions of tobacco products influence smokers' willingness to take up using certain tobacco products or certain brands of cigarettes. See December 15 Tr. at 497:23-498:4 (Cummings); Plaintiffs' FOFs ¶ 11, at 4 (asserting this fact).

190. As of May, 2019, Dr. Cummings testified in tobacco litigation as an expert plaintiffs' witness more than 150 times in federal and state courts. See Defendants' FOFs ¶ 58, at 14-15 (citing Cummings Report at 5).

191. Dr. Cummings has over 500 peer-reviewed publications, 95% of which have focused on smoking and health. See December 15 Tr. at 511:7-11 (Cummings); Plaintiffs' FOFs ¶ 12, at 4 (asserting this fact).

192. Dr. Cummings has authored numerous papers dealing with smokers' perceptions of tobacco products, including their marketing. See December 15 Tr. at 512:7-11 (Gdanski, Cummings); Plaintiffs' FOFs ¶ 12, at 4 (asserting this fact).

193. Dr. Cummings has published on why smokers select cigarettes marketed as natural and additive free. See December 15 Tr. at 513:9-20 (Cummings); Plaintiffs' FOFs ¶ 12, at 4 (asserting this fact).

194. Dr. Cummings has studied smokers' brand selection in the context of their desires to smoke a product that they believe is safer or better for them. See Plaintiffs' FOFs ¶ 66, at 15; December 15 Tr. at 514:18-22 (Cummings, Gdanski).

195. Dr. Cummings has participated in the writing and editing of multiple United States Surgeon General reports on smoking. See December 15 Tr. at 517:5-8 (Gdanski, Cummings); Plaintiffs' FOFs ¶ 13, at 4 (asserting this fact).

196. He also has been a reviewer and contributor to the numerous monographs[8] the National Cancer Institute publishes. See December 15 Tr. at 521:11-19 (Gdanski, Cummings); Plaintiffs' FOFs ¶ 13, at 4 (asserting this fact).

197. Dr. Cummings has spent considerable time reviewing and studying tobacco industry documents. See December 15 Tr. at 496:12-22 (Cummings); Plaintiffs' FOFs ¶ 14, at 4 (asserting this fact).

198. This work includes studying tobacco industry marketing documents such as advertising campaigns and business plans. See December 15 Tr. at 501:9-502:1 (Gdanski, Cummings); Plaintiffs' FOFs ¶ 14, at 4 (asserting this fact).

[8]Monographs are "very similar to Surgeon General reports, but they were very topical on specific issues like smoking cessation or guidelines for doctors and how doctors could work more effectively with their patients." December 15 Tr. at 517:5-8 (Cummings).

199. He has reviewed the marketing documents regarding Natural American cigarettes. See December 15 Tr. at 502:2-5 (Gdanski, Cummings); Plaintiffs' FOFs ¶ 15, at 5 (asserting this fact).

200. The core question Dr. Cummings addresses is whether there is common evidence that Natural American cigarette consumers have been deceived or misled by Natural American marketing. See December 15 Tr. at 527:15-19 (Cummings); Plaintiffs' FOFs ¶ 15, at 5 (asserting this fact).

201. Some Natural American cigarette smokers perceive those cigarettes are healthier, safer, and better for them. See December 15 Tr. at 528:4-11 (Cummings); Plaintiffs' FOFs ¶ 15, at 5 (asserting this fact).

202. Dr. Cummings' opinions are based on public health and academic studies, government reports and studies, as well as the Defendants' internal business records. See December 15 Tr. at 529:2-4 (Cummings); Plaintiffs' FOFs ¶ 17, at 5 (asserting this fact).

203. There is broad support for the conclusion that the natural, additive-free, and organic descriptors used in Natural American cigarettes' labeling and marketing are deceptive and misleading. See December 15 Tr. at 529:2-9 (Gdanski, Cummings); Plaintiffs' FOFs ¶ 17, at 5 (asserting this fact).

204. Dr. Cummings noted how the same conclusion from multiple sources using different methods to study the issue lends reliability to that conclusion. See December 15 Tr. at 529:15-530-3 (Gdanski, Cummings); Plaintiffs' FOFs ¶ 17, at 5 (asserting this fact).

**b. Dr. Proctor's Qualifications.**

205. Robert Proctor, Ph.D., is a Professor of the History of Science at Stanford University. See Plaintiffs FOF ¶ 18, at 5.

206. Dr. Proctor is a leading authority on tobacco industry conduct. See Plaintiffs FOF ¶ 18, at 5.

207. Dr. Proctor was a scientific reviewer of the 2014 United States Surgeon General's fiftieth anniversary report on the health consequences of smoking. See Plaintiffs FOF ¶ 18, at 5.

208. Dr. Proctor provides a historical overview of the tobacco industry's decades-long fraudulent health reassurance campaigns. See Plaintiffs FOF ¶ 19, at 6.

209. Dr. Proctor's opinion is that the Defendants' use of "natural," "additive-free," and their substitutes in the labeling and advertising of Natural American cigarettes implies that those cigarettes are less harmful than others.

c. **Jennifer Pearson, Ph.D's Qualifications.**

210. Dr. Pearson has a doctorate in social and behavioral health from Johns Hopkins University. See Plaintiffs FOF ¶ 20, at 6.

211. Dr. Pearson is an Associate Professor at the School of Community Health Services at the University of Nevada, and was previously an Adjunct Assistant Professor at the Johns Hopkins Bloomberg School of Public Health. See Plaintiffs FOF ¶ 20, at 6; Defendants' FOFs ¶ 52, at 13 (citing December 16 Tr. at 831:3-832:13 (Pearson)).

212. Between 2009 to 2017, Dr. Pearson worked at Truth Initiative, which describes itself as "'America's largest nonprofit public health organization committed to making tobacco use and nicotine addiction a thing of the past.'" Defendants' FOFs ¶ 53, at 13 (quoting Truth Initiative, Who We Are, https://truthinitiative.org/who-we-are (last visited November 25, 2022).

213. Dr. Pearson's experience with the tobacco industry includes serving as contributing editor to the 2016 Surgeon General's Report on smoking and health, as deputy editor of Nicotine and Tobacco Research, a major publication in her field, and as program co-

chair for the Society for Research on Nicotine and Tobacco. See Plaintiffs FOF ¶ 21, at 6.

214. Dr. Pearson has authored six publications relating to Natural American cigarettes. See Plaintiffs FOF ¶ 22, at 6.

215. Work for the first two of these publications took place before Dr. Pearson performed any work for this case. See Plaintiffs FOF ¶ 22, at 6.

216. All of the scientific literature underpinning Dr. Pearson's research -- with the exception of internal FDA work product -- has been subject to peer review. See Plaintiffs FOF ¶ 23, at 6; id. ¶ 194, at 44.

217. Dr. Pearson also relies on peer-reviewed, published experimental and observational studies. See Plaintiffs' FOFs ¶ 198, at 45.

218. The methods Dr. Pearson uses are the same methods she teaches her students. See Plaintiffs FOF ¶ 23, at 6.

**d. Dr. Dewhirst's Qualifications.**

219. Timothy Dewhirst, Ph.D., is an Associate Professor and Senior Research Fellow in Marketing and Public Policy in the Department of Marketing and Consumer Studies at the University of Guelph. See Plaintiffs FOF ¶ 25, at 7.

220. Dr. Dewhirst has contributed to National Cancer Institute monographs on the issues of smoking in health. See Plaintiffs FOF ¶ 25, at 7.

221. These contributions focused on the tobacco industry's marketing and advertising of filtered, light, and low tar cigarettes. See Plaintiffs FOF ¶ 25, at 7.

**e. Jean-Pierre Dubé, Ph.D's Qualifications.**

222. Dr. Dubé, is the Sigmund E. Edelstone Professor of Marketing at the University of Chicago Booth School of Business. See Plaintiffs FOF ¶ 27, at 8; Defendants' FOFs ¶ 59, at 15.

223. Dr. Dubé has taught graduate level classes concerning conjoint analysis, consumer demand, and willingness-to-pay. See Plaintiffs FOF ¶ 28, at 8.

224. Dr. Dubé has been retained by for-profit corporations to perform conjoint analyses to determine consumer preferences for the purposes of measuring willingness-to-pay and demand. See Plaintiffs FOF ¶ 28, at 8.

225. Dr. Dubé has published extensively in peer-reviewed journals regarding the use of conjoint analysis to assess consumer demand and willingness-to-pay in connection with particular product features. See Plaintiffs FOF ¶ 28, at 8.

**f. J. Michael Dennis, Ph.D's Qualifications.**

226. Dr. Dennis is a Senior Vice President at the National Opinion Research Center at the University of Chicago, where he oversees the group's online panel survey research business. See Defendants' FOFs ¶ 62, at 15 (citing Rebuttal Expert Report of J. Michael Dennis, Ph.D. ¶ 6, at 2, filed July 23, 2020 (Doc. 277-1)("Dennis Report")).[9]

---

[9]Rule 702 of the Federal Rules of Evidence governs an expert's admissibility:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> **(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> **(b)** the testimony is based on sufficient facts or data;
>
> **(c)** the testimony is the product of reliable principles and methods; and
>
> **(d)** the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The proponent of the expert's opinion testimony bears the burden of establishing that the expert is qualified, that the methodology he or she uses to support his or her

opinions is reliable, and that his or her opinion fits the facts of the case, and thus will be helpful to the fact finder. See Norris v. Baxter Healthcare Corp., 397 F.3d 878, 881 (10th Cir. 2005). Courts should, under the Federal Rules of Evidence, liberally admit expert testimony, see United States v. Gomez, 67 F.3d 1515, 1526 (10th Cir. 1995)(describing rule 702 as a "liberal standard"), and the trial court has broad discretion in deciding whether to admit or exclude expert testimony, see Werth v. Makita Elec. Works, Ltd., 950 F.2d 643, 647 (10th Cir. 1991)(noting the trial court's decision will not be overturned "unless it is manifestly erroneous or an abuse of discretion").

In its gatekeeper role, a court must assess the reasoning and methodology underlying an expert's opinion, and determine whether it is both scientifically valid and relevant to the case's facts, i.e., whether it is helpful to the trier of fact. See v. Merrell Dow Pharmaceuticals, 509 U.S. 594-95 (1993)("Daubert"); Witherspoon v. Navajo Ref. Co., No. 03-1160, 2005 WL 5988649, at *2 (D.N.M. July 18, 2005)(Black, J.)(citing Dodge v. Cotter Corp., 328 F.3d 1212, 1221 (10th Cir. 2003)). In Daubert, the Supreme Court of the United States of America articulated a non-exclusive list of factors that weigh into a district court's first-step reliability determination, including: (i) whether the method has been tested; (ii) whether the method has been published and subject to peer review; (iii) the error rate; (iv) the existence of standards and whether the witness applied them in the present case; and (v) whether the witness' method is generally accepted as reliable in the relevant medical and scientific community. See Daubert, 509 U.S. at 594-95. The Court also is to consider whether the witness' conclusion represents an "unfounded extrapolation" from the data; whether the witness adequately has accounted for alternative explanations for the effect at issue; whether the opinion was reached for the purposes of litigation or as the result of independent studies; or whether it unduly relies on anecdotal evidence. See Witherspoon v. Navajo Ref. Co., 2005 WL 5988649, at *3 (citing Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997)).

"Under the relevance prong of the Daubert analysis, the court must ensure that the proposed expert testimony logically advances a material aspect of the case. . . . The evidence must have a valid scientific connection to the disputed facts in the case." Norris v. Baxter Healthcare Corp., 397 F.3d at 884 n.2 (citing Daubert v. Merrell Dow Pharm., Inc., 43 F.3d 1311, 1315 (9th Cir. 1995)(on remand from the Supreme Court); Daubert, 509 U.S. at 591). "[W]hen experts employ established methods in their usual manner, a district court need not take issue under Daubert. . . ." Att'y Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d 769, 780 (10th Cir. 2009). "[H]owever, where established methods are employed in new ways, a district court may require further indications of reliability." Att'y Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d at 780. Whether courts have accepted theories underlying an expert's opinion is a relevant consideration in determining whether expert testimony is reliable. See Att'y Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d at 780.

The Court denies the Motion to Exclude Dr. Dennis. The Plaintiffs offer Dr. Dennis' testimony in rebuttal of Dr. Van Liere's testimony. See Dennis Report ¶ 2, at 2. The Defendants dispute that Dr. Dennis reached appropriately his conclusions that: (i) Dr. Van Liere should have used a conjoint analysis instead of a direct-question design; (ii) Dr. Van Liere's survey introduced possible recall bias; (iii) Dr. Van Liere should not have used open-ended questions for some data points, and should not have used closed questions for other data points; and (iv) Dr. Van Liere did not pre-test his survey questions. Motion to Exclude Dr. Dennis at 8-12.

**g. Kent Van Liere, Ph.D's Qualifications.**

227. Dr. Van Liere[10] is the Managing Principal of Van Liere Consulting Inc. and between 2006 and 2017, was Vice President, Senior Vice President, and then Managing Director at NERA

---

In essence, the Defendants argue that Dr. Dennis did not rely on sufficient facts and data, did not conduct his own survey, and misunderstands the Plaintiffs' core allegations. See Motion to Exclude Dr. Dennis at 16-33. They also argue that Dr. Dennis was incorrect in his opinion that Dr. Van Liere did not pretest his survey, because Dr. Van Liere in fact conducted a pre-test. See Motion to Exclude Dr. Dennis at 33-34. Finally, they argue that Dr. Dennis' opinions are not relevant or helpful to the Court in deciding class certification issues, because his testimony does not explain how any of the issues which he identifies impact Dr. Van Liere's conclusions. See Motion to Exclude Dr. Dennis at 34-36.

Regarding relevance, to the extent that the Court has concluded that Dr. Van Liere's expert testimony is relevant to the Court, the Court concludes that Dr. Dennis' testimony critiquing Dr. Van Liere's methodology also is relevant, because it affects the weight the Court should afford Dr. Van Liere's testimony. See Harolds Stores, Inc. v. Dillard Dept. Stores, Inc., 82 F.3d 1533, 1544 (10th Cir. 1996)("Technical and methodological deficiencies in the survey, including the sufficiency of the universe sampled, bear on the weight of the evidence, not the survey's admissibility."). Regarding reliability, the Court first notes that Dr. Dennis has demonstrated extensive experience in survey design. See Dennis Report ¶¶ 4-18, at 2-7. In preparing his report, Dr. Dennis indicates that he relied on the Van Liere Report, Dr. Van Liere's survey report, as well as all materials the Defendants provides on which Dr. Van Liere relied. See Dennis Report at 45. The Court agrees with the Plaintiffs, who argue that Dr. Dennis' role as a rebuttal witness means that the materials on which he must rely to critique a survey are different from the materials on which Dr. Van Liere must rely to create his survey in the first place, and do not require Dr. Dennis to create his own survey. See Plaintiff's Opposition to Defendants' Motion to Exclude in Their Entirety the Expert Report and Opinions of Plaintiff Rebuttal Expert Dr. J. Michael Dennis at 15, filed October 8, 2020 (Doc. 308)("Motion to Exclude Dr. Dennis Opposition")(citing Aviva Sports v. Fingerhut Direct Mktg., 829 F. Supp. 2d 802, 835 (D. Minn. 2011)(Ericksen, J.); In re Cessna 208 Series Aircraft, 2009 WL 1649773, at *1 (D. Kan. June 9, 2009)(Vratil, J.)). The Defendants have not sought to attack Dr. Dennis' credentials or qualifications to scrutinize a survey's methodology, and the Court concludes, therefore, that they have not demonstrated that his methods are unreliable. Accordingly, the Court denies the Motion to Exclude Dr. Dennis.

[10]The Court denies the Motion to Exclude Dr. Van Liere. The Plaintiffs raise three arguments in support of their assertion that Dr. Van Liere's testimony is irrelevant, unreliable, and inadmissible: (i) his survey, which analyzes consumers' motives and intent in purchasing Natural American cigarettes, is not relevant to the Court at the class certification stage, and does not measure materiality; (ii) his survey methodology is flawed, because he did not properly code certain responses, did not control properly for bias, and used open-ended survey questions; (iii) a conjoint-analysis is the appropriate methodology instead of Dr. Van Liere's survey methodology.

Economic Consulting, where he is currently a Special Consultant. See Defendants' FOFs ¶ 67, at 16 (citing Expert Report of Dr. Ken Van Liere ¶ 1, at 1, filed July 23, 2020 (Doc. 277-2)("Van Liere Report")).

228. Dr. Van Liere has forty years of experience designing, conducting, and analyzing hundreds of consumer surveys for corporations and government agencies, which measure consumers' opinions and behaviors regarding products and services, including purchasing, branding, positioning, market segmentation, and product features. See Defendants' FOFs ¶ 67, at 16 (citing Van Liere Report ¶ 4, at 5).

229. Dr. Van Liere has served as an expert in cases involving allegedly deceptive advertising and trademark and patent infringement. See Defendants' FOFs ¶ 67, at 16 (citing Van Liere Report ¶ 5, at 5).

---

See Motion to Exclude Dr. Van Liere at 6-24. The Court disagrees that Dr. Van Liere's expert opinions are irrelevant and unreliable.

Regarding relevance, the Plaintiffs argue that Dr. Van Liere's survey is irrelevant, because any discussion on materiality is a merits issue and not relevant to whether common questions support the Plaintiffs' claims, and that, in any event, he does not measure materiality in his survey. See Motion to Exclude Dr. Van Liere at 8-12. As the Court discusses in its analysis below, whether the Plaintiffs can use common proof to establish their claims and satisfy the rule 23 requirements requires considering why consumers purchased Natural American cigarettes. Dr. Van Liere's survey results address whether consumers uniformly associate the challenged labels with certain health benefits, which is relevant to determining whether the Plaintiffs will be able to meet their burden. Accordingly, the Court does not exclude Dr. Van Liere's opinions on this ground.

Additionally, to the extent that the Plaintiffs disagree with Dr. Van Liere's coding method or content that a conjoint methodology is a more appropriate method for determining consumer preferences, see Motion to Exclude Dr. Van Liere at 12-25, the Court concludes that these questions are better suited for cross-examination and are not a barrier to admissibility. Dr. Van Liere explains thoroughly his methodologies for survey design and survey reporting -- with reference to applicable industry standards, see, e.g., Van Liere Report ¶ 37 n.25, at 28, and the Court concludes that the Plaintiffs have not demonstrated that Dr. Van Liere's implementation of that methodology departs significantly from those standards such that his methods are unreliable. Accordingly, the Court concludes that Dr. Van Liere's expert opinions are relevant and reliable, and it will not exclude them.

**h. David Teece, Ph.D's Qualifications.**

230. Dr. Teece[11] is a business professor at the Haas School of Business at the University of California, Berkeley, and has written over 200 books and articles on brand valuation and strategic

[11]The Court grants in part and denies in part the Motion to Exclude Dr. Teece. The Defendants offer Dr. Teece as an expert in the fields of economics and business strategy. See Motion to Exclude Dr. Teece at 1. Specifically, the Plaintiffs seek to exclude seven of Dr. Teece's opinions:

- The market share of various cigarette brands demonstrates that descriptors such as "additive free" and "natural" are not drivers of sales of Natural American Spirit ("NAS") products (Teece Report at 4-14);
- The lack of a decrease in NAS market share after disclaimers were added to NAS packaging or after certain descriptors were removed from NAS packaging demonstrates that descriptors such as "additive free" and "natural" are not drivers of NAS sales (Teece Report at 14-20);
- Wholesale and retail pricing of NAS products demonstrate that descriptors such as "additive free" and "natural" are not drivers of NAS sales (Teece Report at 20-34);
- The premium pricing of NAS products was the result of NAS brand equity and defendants' marketing efforts (Teece Report at 35-51);
- There is variability among NAS product users with respect to the reasons for their purchases and the product attributes they value (Teece Report at 51-54); and
- The methodology of the proposed conjoint analysis of Plaintiffs' expert, Dr. Jean-Pierre Dubé, is unreliable or improper (Teece Report at 66-81)[.]

Motion to Exclude Dr. Teece at 1-2. As the Supreme Court notes in Kumho Tire Co. v. Carmichael, the Daubert factors apply to testimony based on technical and specialized knowledge, but are flexible and not a definitive checklist. See Kumho Tire Co. v. Carmichael, 526 U.S. at 141, 150.

Dr. Teece has presented himself as an expert in the field of industrial organization, business strategy, and public policy. See Teece Report ¶ 1, at 1. In the Teece Report, he indicates that he bases his conclusions "on the pleadings, deposition testimony and materials produced in this litigation, public source materials, and [his] background and knowledge of economics, including industrial organization, business strategy, and the economics of innovation." Teece Report ¶ 6, at 2. The Court groups his opinions into two categories: the first

management, among other topics. See Defendants' FOFs ¶ 71, at 17 (citing Teece Report ¶¶ 1-2, at 1).

**i. Charles D. Garner, Ph.D's Qualifications.**

231. Dr. Garner[12] is the Vice President of Next Generation Products/Submission and Engagement in Scientific and Regulatory Affairs at the RAI Services Company. See Expert Witness

---

six involve business strategy and customer values, while the seventh opinion involves Dr. Dubé's damages model. See Teece Report at 4-81.

The Plaintiffs contest Dr. Teece's opinions on the basis that he relied primarily on market share to reach his conclusions, and that he did not consider differences in how certain comparator brands marketed themselves or how consumers viewed them. See Motion to Exclude Dr. Teece at 10-15. The Court considers these arguments to be more appropriate for cross-examination rather than as requiring exclusion of Dr. Teece's opinions. Similarly, although Dr. Teece's assertion that he reaches his conclusions based on his "'common sense,'" Motion to Exclude Dr. Teece at 16 (quoting Deposition of David Teece (taken January 30, 2020) at 79:11-23, filed October 8, 2020 (Doc. 312-2)(Schultz, Teece)). may weaken his conclusions' strength, what is common sense to Dr. Teece, a business-strategy professional, is not the same common sense that a jury could reach on its own. It is this sort of common sense that courts have concluded does not require expert testimony to explain. See ,e.g., Dahlberg v. MCT Transp. LLC, 2012 WL 8945006, at *3 (D.N.M. July 20, 2012)(Scott, M.J.); Newsome v. Tull, 2019 WL 5197566, at *4 (W.D. Okla. August 6, 2019)(Heaton, J.).

Regarding Dr. Teece's opinion that Dr. Dubé's opinion and methodologies are not reliable, the Court concludes that the Dr. Teece and the Defendants have not demonstrated that he is familiar with conjoint analyses. Although the Court is willing to accept Dr. Teece's expert testimony regarding drivers of Natural American's popularity and brand growth as an expert in business strategy, he does not explain in his report what qualifies him to critique a damages methodology or that he has familiarity with the methodology Dr. Dubé employs. Accordingly, the Court will exclude Dr. Teece's seventh opinion that Dr. Dubé's methodology in unreliable. Because the Court concludes that Dr. Teece's first six opinions are sufficiently reliable, the Court will not exclude those opinions.

[12]The Court denies the Motion to Exclude Dr. Garner. The Plaintiffs have moved under Daubert to exclude Dr. Garner's expert opinions and testimony in their entirety. See Motion to Exclude Dr. Garner at 1-17. They argue that Dr. Garner's opinions regarding menthol in Natural American cigarettes are not reliable under Daubert, because they are "based solely upon his say-so" and without "scientifically reliable support." Motion to Exclude Dr. Garner at 9. The Plaintiffs also argue that Dr. Garner's definition of an "additive" fails the second Daubert prong, because it is a "personal definition" which will not aid the Court. Motion to Exclude Dr. Garner at 15.

First, the Plaintiffs argue that Dr. Garner is not qualified to give an opinion on whether

menthol is an additive, because he has "no special qualifications by training, education or experience in what constitutes an 'additive.'" Motion to Exclude Dr. Garner at 10. In response, the Defendants cite Dr. Garner's Ph.D. in toxicology, decades of work experience in "tobacco product evaluation," and publications on topics including "the relative difference in risk . . . between menthol and non-menthol cigarettes." Defendants' Opposition to Plaintiffs' Motion to Exclude the Expert Opinions and Testimony of Dr. Charles D. Garner at 10, filed October 8, 2020 (Doc. 316)("Motion to Exclude Dr. Garner Opposition") The Court agrees that Dr. Garner's background as a toxicologist and in the tobacco industry is sufficient to qualify him to opine on what constitutes an additive. See Garner Report at 2-3.

Second, the Plaintiffs assert that Dr. Garner's opinions are not reliable, because they are not based "'good grounds'" under Daubert, and instead consist of "semantics and review of cherry-picked literature." Motion to Exclude Dr. Garner at 10 (quoting Daubert, 509 U.S. at 596). In response, the Defendants state that Dr. Garner's methodology is reliable because he has "reviewed peer-reviewed literature, government reports, and industry and regulatory practice." Motion to Exclude Dr. Garner Opposition at 10. The Plaintiffs state that Dr. Garner invented his own definition of "additive" which is "squarely at odds with federal law." Motion to Exclude Dr. Garner at 11. They further contend that, by doing so, Dr. Garner has provided "a legal conclusion in the guise of an expert opinion." Motion to Exclude Dr. Garner at 11. To the extent that Dr. Garner's definition of a filter additive as opposed to a tobacco additive contradicts the FDA's definition of an additive, the Court concludes that this argument does not impugn the reliability of Dr. Garner's opinion, and therefore goes instead to its weight and not to its admissibility. The Court also is satisfied that Dr. Garner's review of the relevant literature is sufficient to render his opinion reliable. Further, to the extent that the Plaintiffs argue that Dr. Garner's definition of "additive" will not assist the Court, because the Court has already found its own definition, Motion to Exclude Dr. Garner at 15, the Court concludes that this does not render Dr. Garner's opinion irrelevant. Although the Court reaches a conclusion about what constitutes an additive in its MTD MOO, see MTD MOO at 184, that there exist alternative definitions is relevant in considering whether consumers interpret language like additive-free uniformly.

Finally, Plaintiffs attack Dr. Garner's opinion that menthol cigarettes do not increase harm to smokers as unreliable, because "he provides no articulable standard upon which he bases this opinion." Motion to Exclude Dr. Garner at 15. The Plaintiffs cite research contradicting Dr. Garner's testimony, including studies on the addictiveness of menthol cigarettes. Motion to Exclude Dr. Garner at 15-16. Dr. Garner cites to scientific studies indicating that menthol does not show carcinogenic properties. See Garner Report at 7 (citing J.D. Heck, A Review and Assessment of Menthol Employed as a Cigarette Flavoring Ingredient, 48 Food & Chem. Toxicology S1, S10 (2010); U.S. FDA, Preliminary Scientific Evaluation of the Possible Public Health Effects of Menthol Versus Nonmenthol Cigarettes (2013)). To the extent that the Plaintiffs dispute this conclusion with evidence of their own, that assertion goes to weight and not to admissibility.

Ultimately, the Court is satisfied that Dr. Garner's opinions and testimony are reliable and relevant under the Daubert criteria. Dr. Garner's education and background do not render him unqualified to provide testimony on what an additive is or whether menthol is particularly harmful to a cigarette smoker, as these inquiries are within his "scientific," "technical," and

Report of Charles D. Garner, Ph.D., DABT at 1, filed October 8, 2020 (Doc. 316-1)("Garner Report").

232. Dr. Garner received his Ph.D. in pharmaceutical sciences with a focus on toxicology and pharmacology from Wayne State University in 1994. See Garner Report at 3.

233. Dr. Garner has nearly twenty-five years of experience in tobacco product evaluation and harm reduction, and has worked with menthol and menthol-style cigarettes. See Garner Report at 1.

**j. W. Kip Viscusi, Ph.D's Qualifications.**

234. Dr. Viscusi[13] is the University Distinguished Professor of Law, Economics, and Management at Vanderbilt University. See Report of Professor W. Kip Viscusi (dated September 6, 2019) ¶ 1, at 1, filed October 8, 2020 (Doc. 313-1)("Viscusi Report").

---

"specialized knowledge." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 148 (1999). Accordingly, the Court denies the Motion to Exclude Dr. Garner.

[13]The Court denies the Motion to Exclude Dr. Viscusi. The Defendants have engaged Dr. Viscusi to opine on how consumers evaluate the health risks associated with smoking and what role labels like natural and additive-free play in making cigarette purchasing decisions. See Defendants' Opposition to Plaintiffs' Motion to Exclude the Expert Opinions and Testimony of Dr. W. Kip Viscusi at 1, filed October 8, 2020 (Doc. 313); Viscusi Report ¶ 3, at 2. The Plaintiffs attack Dr. Viscusi's opinions as biased and unreliable. See Motion to Exclude Dr. Viscusi at 10-14.

The Plaintiffs argue that Dr. Viscusi cites largely to his own work, some of which he created in anticipation of litigation. See Motion to Exclude Dr. Viscusi at 12. They also argue that his citations to his book, Smoking: Making the Risky Decision, are unreliable, because he presented the book to tobacco companies for review, and that it "likely contains wording contributed by the lawyers defending the tobacco companies." Motion to Exclude Dr. Viscusi at 13-14. Finally, they argue that other courts and scientists have questioned Dr. Viscusi's methodologies, and that it is unreliable "ipse dixit masquerading as scientific methodology." Motion to Exclude Dr. Viscusi at 14 (citing Discount Tobacco City & Lottery, Inc. v United States, 674 F.3d 509, 526 n.4, 567 (6th Cir. 2012); Paul Slovic, Rejoinder: The Perils of Viscusi's Analyses of Smoking Risk Perceptions, J. Behav. Decision Making (March 2000)).

The Court concludes that the Plaintiffs have not shown that these criticisms render Dr. Viscusi's opinions unreliable. Experts often conduct studies in anticipation of litigation, and this does not render their methodologies inherently unreliable. Dr. Viscusi additionally has disclosed

235. Dr. Viscusi holds a master's in public policy and a Ph.D. in economics from Harvard University, among other degrees. See Declaration of W. Kip Viscusi, Ph.D. ¶ 2, at 1, filed October 8, 2020 (Doc. 313-2).

236. Dr. Viscusi previously has testified as an expert witness for the defense in tobacco litigation in the United States and Canada. See Viscusi Report ¶ 1, at 1.

237. His research focuses on how consumers make decisions which involve risk regarding products like household chemicals and tobacco, as well as regulatory responses to risks. See Viscusi Report ¶ 2, at 2.

**h. Joannes Evangelista Steenkamp, Ph.D's Qualifications.**

238. Dr. Steenkamp[14] is the C. Knox Massey Distinguished Professor of Marketing at the Kenan-Flagler Business School at the University of North Carolina at Chapel Hill. See Steenkamp Report at 1.

---

these industry connections. See Declaration of W. Kip Viscusi, Ph.D ¶ 15, at 6, filed October 8, 2020 (Doc. 313-2). Similarly, with regard to Dr. Viscusi's book, the Plaintiffs have not shown any factual basis for their assertion that it "likely contains wording contributed by the lawyers defending the tobacco companies." Motion to Exclude Dr. Viscusi at 13-14. To the extent that these criticisms show a potential for Dr. Viscusi's opinions to be biased, the Court considers these to be matters for the weight to be afforded his opinions. Additionally, to the extent that other courts and researchers have critiqued Dr. Viscusi's methodology, the Court notes that he asserts that his books and studies have been peer-reviewed, see Viscusi Report ¶ 18 & n.7, at 11, and he has referred to a substantial list of studies and documents outside of his own work, see Viscusi Report ¶ 4, at 2-5. On this basis, the Court does not conclude that Dr. Viscusi's work is unreliable, and denies the Motion to Exclude Dr. Viscusi.

[14]The Court grants in part and denies in part the Motion to Exclude Dr. Steenkamp. The Plaintiffs ask the Court to exclude Dr. Steenkamp's opinions that:

1. NAS packaging has never implied that NAS products are safer or healthier than other cigarettes (Steenkamp Report at 8-9 ¶¶ 1-3, 81-82, 85-91);

2. Market shares of NAS and other brands of cigarettes with similar descriptors demonstrate that descriptors such as "additive free" and

"natural" are not drivers of NAS sales (id. at 9-10 ¶ 5-6, 72-76, 93-96);

3. NAS sales have been driven by a group of brand attributes such as authenticity, environmental initiatives, and personal selling efforts (id. at 9-10 ¶¶ 4 & 7, 25-51, 57-59, 70-72, 75-77, 80, 96-97);

4. Dr. Dewhirst incorrectly concludes that descriptors such as "additive free," "natural," and "organic" are drivers of NAS sales (id. at 9-10 ¶¶ 5-7, 63-70, 79-81, 84, 90-93);

5. The price premium for NAS products are not the result of descriptors such as "additive free" and "natural" (id. at 9-10 ¶ 5-6, 91-93);

6. Dr. Dewhirst incorrectly concludes that "academic research has found that the natural product descriptor is associated with being more nutritious, healthier, safer, etc., and consumers express a willingness to pay more for such products." (id. at 81-82); and

7. Dr. Pearson incorrectly concludes that there is an association between descriptors such as "additive free" and "natural" and health (Steenkamp Report at 83-84).

Motion to Exclude Dr. Steenkamp at 3. With regard to Steenkamp's assertion that Natural American's labeling does not imply that Natural American cigarettes are healthier, the Plaintiffs note correctly that Dr. Steenkamp does not refer to any scientific studies to support this proposition, but rather relies on the history of the disclaimer's presence on the cigarettes' packaging, as well as the FTC opinion and deposition testimony regarding Santa Fe's call centers and the messaging they provided consumers regarding health. See Motion to Exclude Dr. Steenkamp at 8-9; Steenkamp Report at 84-90. Although the Court recognizes Dr. Steenkamp's expertise in marketing, that he cites only to evidence surrounding the Santa Fe's marketing strategy but not to how consumers understood that strategy undermines his reliability on this point.

The Plaintiffs next argue that Dr. Steenkamp's opinion -- based on industry competitors' market share -- that additive-free labels do not drive sales is unreliable, because he looks only at market share and not at other variables that could impact the competitors' success. The Court has addressed a similar argument in considering the Motion to Exclude Dr. Teece, and concludes that the Plaintiffs' arguments regarding whether market share is a sufficient measurement to determine whether additive-free language impacts a company's success is a question better suited for cross-examination. The Court therefore will not exclude Dr. Steenkamp's opinion on this point.

The Plaintiffs next argue that Dr. Steenkamp's suggestion that Natural American cigarettes' success results from various brand attributes is unreliable, because he relies on anecdotal evidence that features such as Natural American cigarettes' authenticity and environmentalism are part of a consumer trend. The Court agrees that the sources which Dr.

239. Dr. Steenkamp received his bachelors in economics, masters in business administration, and Ph.D. in marketing from Wageningen University in the Netherlands. See Steenkamp Report at 1, 98.

---

Steenkamp cites to support the proposition that Natural American's success reflect a rise in consumers' appreciation for authenticity is unsupported by scientific evidence. As the Plaintiffs note, Dr. Steenkamp cites an interview with a former Campbell Soup Chief Executive Officer, a Nielsen article about craft beer's success, and blog posts about why consumers like craft beer, evidence which is dubious to support the assertion that consumers prefer authentic products. See Steenkamp Report at 70-71. Even assuming that evidence supports a showing that consumers prefer authentic products, aside from describing Natural American's labels, Dr. Steenkamp does not cite evidence to support a conclusion that the brand's authenticity has driven its success.

Regarding the brand's environmentalism, as the Plaintiffs note, Dr. Steenkamp provides evidence on consumer preferences regarding a variety of Natural American attributes, including its environmental impact. See Motion to Exclude Dr. Steenkamp at 20 (citing Steenkamp Report at 68). To the extent that the Plaintiffs disagree that the data show that environmentalism drives sales, that is a question of the evidence's weight. Additionally, to the extent that the Plaintiffs argue that the Court should exclude Dr. Steenkamp's criticisms of Dr. Dewhirst's opinions on the basis that they do not consider certain attributes or rely improperly on certain studies, see Motion to Exclude Dr. Steenkamp at 23-24, the Court concludes that, as a rebuttal witness with expertise in marketing, Dr. Steenkamp may proffer his opinions on these areas of weakness in Dr. Dewhirst's analysis.

Finally, the Plaintiffs argue that Dr. Steenkamp's opinion that authenticity drives Natural American sales, opposing Dr. Dewhirst's opinion that natural and additive-free labels drive sales, is improper, because Dr. Steenkamp has shown no evidence that authenticity drives sales. See Motion to Exclude Dr. Steenkamp at 24-25. The Plaintiffs also argue that the Court should not permit Dr. Steenkamp to rebut Dr. Dewhirst's and Dr. Pearson's opinions that natural and additive-free labels are associated with health, and that Dr. Pearson's studies involving disclaimers are flawed. See Motion to Exclude Dr. Steenkamp at 25-27. The Court reiterates its conclusion above that Dr. Steenkamp has not demonstrated with reliable evidence that authenticity drives sales, and will exclude his rebuttal of Dr. Dewhirst's opinion on that point. Regarding Dr. Steenkamp's rebuttal opinions regarding the association that natural and additive-free labels have with health, as well as Dr. Pearson's conclusions on disclaimers, the Court agrees with the Defendants that Dr. Steenkamp has considered reliable materials in reaching these conclusions. See Defendants' Opposition to Plaintiffs' Motion to Exclude the Expert Opinions and Testimony of Dr. Joannes Evangelista Steenkamp at 19-25, filed October 8, 2020 (Doc. 317)("Motion to Exclude Dr. Steenkamp Opposition"). The Court concludes, therefore, the Plaintiffs' objections go more properly to his opinions' weight. In summary, the Court excludes opinions one and three -- to the extent that it focuses on authenticity driving Natural American's sales -- but does not exclude opinions two, four, five, six, and seven -- to the extent that these opinions do not rely on Dr. Steenkamp's opinions regarding authenticity.

240. Dr. Steenkamp has 35 years of experience in branding, consumer behavior, global marketing, and market research methods. See Steenkamp Report at 2.

241. Dr. Steenkamp and has been active in the food industry and has presented at over one-hundred conferences on topics of marketing strategy, branding, private labels, global marketing, consumer behavior, and retailing. See Steenkamp Report at 1.

242. Dr. Steenkamp's research has received over 46,000 citations. See Steenkamp Report at 3.

**8. Damages Model.**

243. Dr. Dubé[15] proposes designing and conducting a conjoint survey to measure "Class Members' preferences for cigarette product features." Expert Report of Professor Jean-

[15]The Plaintiffs proffer Dr. Dubé's testimony and opinions regarding a conjoint analysis model that the Plaintiffs argue can calculate class-wide damages -- an element which must be satisfied for the Court to certify the proposed class. The Defendants ask the Court to exclude Dr. Dubé's testimony entirely, because they contend that Dr. Dubé's damages theory is not tailored to the Plaintiffs' theories of liability, see Motion to Exclude Dr. Dubé at 14, because Dr. Dubé proposes to conduct the conjoint survey after the Court rules on class certification, see Motion to Exclude Dr. Dubé at 3, because Dr. Dubé has not yet determined several aspects of his conjoint survey analysis, see Motion to Exclude Dr. Dubé at 27, and because Dr. Dubé proposes a "willingness to pay" model instead of modeling the effect on market prices as the measure of damages, and thereby does not measure the supply side of the market, Motion to Exclude Dr. Dubé at 3. The Plaintiffs assert that Dr. Dubé's proposed methodology is tied directly to the Plaintiffs' theory of injury, that numerous courts have accepted this methodology to certify deceptive labelling classes, and that the Defendants' arguments go to the weight, but not admissibility, of Dr. Dubé's testimony. Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Exclude the Expert Report and Opinions of Dr. Jean-Pierre Dubé at 1-3, filed October 8, 2020 (Doc. 311)("Motion to Exclude Dr. Dubé Opposition"). The Court concludes that Dr. Dubé's expert testimony and opinions are admissible, and will deny the Motion to Exclude Dr. Dubé.

The Defendants contend that the Court should exclude Dr. Dubé's testimony, because it is not tailored to the Plaintiffs' theories of liability. The Defendants rely heavily on In re ConAgra Foods, Inc., 202 F.R.D. 537 (C.D. Cal. 2014)(Morrow, J.), to assert that the Plaintiffs' damages expert must tailor their damages model to the Plaintiffs' theory of liability. The Defendants' reliance on In re ConAgra Foods, Inc., is, however, inapposite in this context. See 202 F.R.D. at 549-50. While the Defendants are correct in asserting that the Honorable Judge Margaret Morrow, United States District Judge for the United States District Court for the

Central District of California, concludes in In re ConAgra Foods, Inc. that the plaintiffs' expert did not propose a damages model tied to the plaintiffs' liability theory, this analysis occurred in the course of class certification, not in terms of a challenge to the proposed expert's admissibility. See 202 F.R.D. at 578-79. In a Daubert motion, the Court's task is to assess whether the proposed expert is reliable and helpful to the trier of fact, see Daubert, 509 U.S. at 594-95, and, if the expert's proposed damages model is reliable and helpful to the trier of fact, the Court will then determine if it is sufficient under Rule 23(b)(3) to certify the class.

Moreover, the Defendants ask the Court to exclude Dr. Dubé's testimony, because he has not yet conducted his conjoint survey, he only has proposed a damages model. The Defendants' argument is similarly unavailing. Several courts have held that a damages expert need not perform their analysis at the class certification stage. See In re Scotts EZ Seed Litigation, 304 F.R.D. 397, 413 (S.D.N.Y. 2015)(Briccetti, J.)("[N]othing in *Comcast* requires an expert to *perform* his analyses at the class certification stage.")(emphasis in original); Chavez v. Blue Sky Nat. Beverage Co., 268 F.R.D. 365, 379 (N.D. Cal. 2010)("At class certification, plaintiff must present 'a likely method for determining class damages,' though it is not necessary to show that his method will work with certainty at this time.")(quoting In re Tableware Antitrust Litigation, 241 F.R.D. 644, 652 (N.D. Cal. 2007)(Walker, J.).

The Defendants also challenge Dr. Dubé's choice of variables, and allege that Dr. Dubé has not yet determined several aspects of his conjoint survey analysis. The Plaintiffs assert, to the contrary, that Dr. Dubé "lists the product features he intends to study: (i) brand name and style; (ii) shelf price; and (iii) labeling claims." Motion to Exclude Dr. Dubé Response at 23. The Plaintiffs also assert that at the class certification stage, they need only present a likely method for determining class damages, and that Dr. Dubé is intentionally able modify the parameters of his survey. See Jones v. ConAgra Foods, Inc., 2014 WL 2702726, at *19 N.D. Cal. June 12, 2014)(stating that the plaintiffs need only supply a likely method for determining class damages, and that they do not need to assert a model with certainty). Moreover, the Plaintiffs assert that, "because [Dr. Dubé] will perform a marketplace simulation that accounts for competing brands and actual prices, Professor Dubé does in fact account for the supply side of the market," as conjoint analysis requires. Motion to Exclude Dr. Dubé Response at 30. Dr. Dubé also accounts for the supply side of the market by accounting for purchase choices between competing brands. See Motion to Exclude Dr. Dubé Response at 30-31. The Court concludes that, because Dr. Dubé considers competing brands, Dr. Dubé adequately accounts for the supply side of the market, and thus, his survey is not an improper conjoint analysis. See e.g., In re NJOY, Inc. Consumer Class Action Litigation, 120 F. Supp. 3d 1050, 1119 (C.D. Cal. 2015)(noting that an expert's conjoint analysis is insufficient where it does not consider what price consumers are willing to pay in a functioning market).

Ultimately, the Court concludes that Dr. Dubé's opinions and testimony are reliable and helpful to the trier of fact. Many courts have accepted conjoint analyses as permissible methods for calculating damages. See, e.g., Khoday v. Symantec Corp., 93 F. Supp. 3d 1067, 1082 (D. Minn. 2015)(Tunheim, J.)(citing cases). Further, the issues that the Defendants' raise with Dr. Dubé's methodologies can be raised on cross-examination and go towards the weight rather than the admissibility of Dr. Dubé's opinions and testimony. See Khoday v. Symantec Corp., 93 F. Supp. 3d at 1082; TV Interactive Data Corp. v. Sony Corp., 929 F. Supp. 2d 1006, 1021 (N.D. Cal. 2013)(Spero, J.)("The Court notes from the outset, however, that Sony's criticism of the

Pierre H. Dubé at ¶¶ 17-20, (dated May 15, 2019), filed July 23, 2020 (Doc. 291-1)("Dubé Report"). See Defendants' FOFs ¶ 60, at 15 (asserting this fact); id. ¶ 325, at 81 (asserting this fact). See also Plaintiffs' FOFs ¶ 29, at 8; id. ¶ 283, at 68.

244. Conjoint analysis is a marketing research technique for estimating how consumers value a product's individual attributes, based on consumer surveys in which respondents are asked to choose between certain combinations of product features. See Dubé Report ¶ 45, at 16; Defendants' FOFs ¶ 326, at 81 (asserting this fact).

245. Dr. Dubé has not yet finalized a survey design or conducted the survey; he opines only on whether a method exists to determine economic damages on a class-wide basis using common evidence. See Dubé Report ¶ 2, at 2; Defendants' FOFs ¶ 60, at 15 (asserting this fact).

246. Dr. Dubé's proposed model measures the value of the challenged descriptors -- natural, organic, and additive free -- which he would then use to calculate class-wide damages using two different metrics: willingness to pay and price premium. See Expert Report of Professor Jean-Pierre H. Dubé at ¶¶ 17-20, (dated May 15, 2019), filed July 23, 2020 (Doc. 291-1)("Dubé Report"); Defendants' FOFs ¶ 60, at 15 (asserting this fact). See also Plaintiffs' FOFs ¶ 283, at 68 (asserting this fact).

247. Dr. Dubé's first proposed measure of class-wide damages is the price premium, which measures the difference between the price that class members actually paid for Natural American cigarettes and the price they would have paid but for the challenged claims on the labels. See Dubé Report ¶ 23; Plaintiffs' FOFs ¶ 284, at 68 (asserting this fact).

---

survey designs is more appropriate for consideration by a jury, rather than the Court on a *Daubert* motion.")

## PROCEDURAL BACKGROUND

The Court reviews below the motions that the parties have filed in this case regarding class certification. The Court first summarizes the motions regarding class certification. Next, the Court summarizes the motions regarding expert testimony.

**1. Certification Motion.**

The Plaintiffs seek damages from the Defendants based on consumer protection, warranty, and unjust enrichment claims. See Certification Motion at 5. The Plaintiffs seek to certify twenty-one classes: the California Class and California Menthol Subclass, the Colorado Class and Colorado Menthol Subclass, the Florida Class and Florida Menthol Subclass, the Illinois Class and Illinois Menthol Subclass, the Massachusetts Class, the Michigan Class, the New Jersey Class and New Jersey Menthol Subclass, the New Mexico class and New Mexico Menthol Subclass, the New York Class and New York Menthol Subclass, the North Carolina Class and North Carolina Menthol Subclass, the Ohio Class, the Washington Class, and the Nationwide Menthol Subclass. See Certification Motion at 6. The Plaintiffs seek specific state menthol subclasses certification only in the alternative to the Nationwide Menthol Subclass. See Certification Motion at 6 n.3. The Plaintiffs contend that the Defendants' labeling on Natural American cigarettes conveys to consumers that Natural American cigarettes are less harmful than other cigarettes. See Certification Motion at 3. The Plaintiffs contend that they present common questions whether: (i) the Defendants' marketing and labeling of Natural American cigarettes was uniform and commonly presented to class members; and (ii) the Defendants' labelling misled reasonable consumers that Natural American cigarettes may be less harmful than other cigarettes. See Certification Motion at 4. The Plaintiffs also contend that they present common evidence to the issues at hand and that the common questions predominate over any

individualized issues. See Certification Motion at 4. Moreover, the Plaintiffs argue that class-wide damages can be calculated based on a common methodology for each class member. See Certification Motion at 4.

**a. Rule 23(a).**

At the outset, the Plaintiffs note that, in seeking class certification, they must satisfy each of rule 23(a) of the Federal Rules of Civil Procedure's requirements, and at least one of rule 23(b)'s requirements. See Certification Motion at 42 (citing Fed. R. Civ. P. 23). First, the Plaintiffs argue each of the ways that they meet rule 23(a)'s requirements. See Certification Motion at 42-50; Fed. R. Civ. P. 23(a). Next, the Plaintiffs argue that they meet rule 23(b)(2) and (3)'s requirements. See Certification Motion at 50-85; Fed. R. Civ. P. 23(b).

**i. Numerosity.**

First, the Plaintiffs argue that the proposed classes are sufficiently numerous to justify certification. See Certification Motion at 43. The Plaintiffs note that, to satisfy the numerosity requirement, they must demonstrate that "'the class is so numerous that joinder of all members is impracticable.'" Certification Motion at 43 (quoting Fed. R. Civ. P. 23(a)(1)). The Plaintiffs contend that they satisfy this standard, because evidence that the Defendants sold "over 2 billion NAS Cigarettes in 2009, over 5.6 billion NAS Cigarettes in 2017, and over 5.8 billion NAS Cigarettes in 2018" suggests that there likely are millions of class members, and at least tens of thousands of class members in each State for which the Plaintiffs seek certification. Certification Motion at 43-44. Joinder of millions, or even tens of thousands, of claims would likely be impossible, the Plaintiffs argue and, therefore, the Plaintiffs satisfy rule 23(a)(1)'s numerosity requirement.

**ii. Commonality.**

Second, the Plaintiffs contend that, to demonstrate commonality, they must show that there are common questions between the Plaintiffs, and "common answers that 'would resolve an issue that is central to the validity of each of one of the claims in one stroke.'" Certification Motion at 44 (citing Menocal v. Geo Grp., Inc., 882 F.3d 905, 916 (10th Cir. 2018)). Here, the Plaintiffs contend that the question of the Defendants' false advertising is common to all of the Plaintiffs, because: (i) the question of whether the Defendants' statements are false, deceptive, or misleading can be determined without regard to the Plaintiff's individual circumstances; (ii) the Plaintiffs can prove the claims through common evidence; (iii) the Defendants' conduct and scienter does not differ between the Plaintiffs and class members; and (iv) the amount of the Plaintiffs' injuries will not vary by different class members. See Certification Motion at 45. Moreover, the Plaintiffs specifically point to seven common questions that are central to the litigation:

- Defendants' practices in labeling and marketing NAS Cigarettes as "natural" and "additive-free" tends to mislead reasonable consumers into believing that NAS Cigarettes may be less harmful than other cigarettes;

- Defendants engaged in deceptive or misleading acts or practices by labeling NAS Cigarettes as "natural" and "additive-free";

- NAS Menthol Cigarettes are in fact "additive-free" given that they contain the additive menthol;

- NAS Cigarettes are less harmful than other cigarettes;

- As a result of Defendants' misrepresentations, class members suffered an ascertainable loss;

- Class members either paid a price premium for the NAS Cigarettes that they would not have paid but for the false labeling and marketing of the NAS Cigarettes or would not have purchased them at all.

- Defendants should be enjoined from continuing to sell NAS Cigarettes as currently labeled.

Certification Motion at 45-46. Further, the Plaintiffs explain that common evidence regarding labeling, marketing, and economic damages will answer each of the common questions, and that, therefore, the Plaintiffs have satisfied rule 23(a)(2)'s commonality prong. See Certification Motion at 46.

**iii. Typicality.**

Third, the Plaintiffs attest that the class representatives' claims are typical of the represented class. See Certification Motion at 47. The Plaintiffs contend that their claims are typical, "because they are all based on the same underlying conduct and legal theories." Certification Motion at 47. Specifically, the Plaintiffs' claims are all based on being regular purchases of Natural American cigarettes, which the Defendants uniformly marketed and labeled. See Certification Motion at 47. Moreover, the Plaintiffs "paid the premium price for NAS Cigarettes specifically as a result of their belief that they may be less harmful than competing cigarettes." Certification Motion at 47. Consequently, the Plaintiffs contend that they satisfy rule 23(a)(3)'s typicality prong. See Certification Motion at 47.

**iv. Adequacy.**

Finally, the Plaintiffs argue that their proposed classes "'will fairly and adequately protect the interests of class.'" Certification Motion at 48 (citing Fed. R. Civ. P. 23(a)(4)). The Plaintiffs contend that the proposed classes are adequate representatives, because "they all have the same claims: they paid money for NAS Cigarettes that they would not have paid but for Defendants' false, deceptive, and misleading advertising and breach of warranty." Certification Motion at 48. The Plaintiffs argue that, because their interests wholly are aligned with the

proposed class, they are vigorously prosecuting the action, they have adequate counsel, and they adequately represent the proposed class. See Certification Motion at 48-49.

**b. Rule 23(b)(3).**

Plaintiffs note that, in order for the Court to certify a class, they must satisfy both rule 23(a) and at least one prong of rule 23(b). See Certification Motion at 42. Plaintiffs contend that they satisfy rule 23(b)(3), because they satisfy both rule 23(b)(3)'s predominance and superiority requirements. See Certification Motion at 50-84. In the alternative, Plaintiffs contend they satisfy rule 23(b)(2). See Certification Motion at 85.

**i. Predominance.**

Plaintiffs note that, to satisfy rule 23(b)(3)'s predominance element, they must demonstrate that "'questions common to the class predominate over those questions that are individualized.'" Certification Motion at 50 (quoting Payne v. Tri-State Care Flight, LLC, 332 F.R.D. 611, 665 (D.N.M. 2019)(Browning, J.)). Plaintiffs contend that they satisfy the predominance element, because Plaintiffs can prove the elements of Plaintiffs claims -- which are generally similar from State to State -- with common evidence. See Certification Motion at 51. The Plaintiffs contend: "Objective questions, or questions focusing on the defendants' conduct, are the driving issues for all of Plaintiffs' claims here." Certification Motion at 51. First, the Plaintiffs note that, generally, State consumer protection statutes require that the Plaintiffs prove that the Defendants' marketing is likely to mislead a reasonable consumer. See Certification Motion at 51. Second, the Plaintiffs argue that unjust enrichment claims can be treated similarly where "'there are common circumstances bearing on whether the defendant's retention of a benefit received from class members was just or not.'" Certification Motion at 52 (quoting In re Checking Account Overdraft Litig., 286 F.R.D. 645, 657 (S.D. Fla. 2012)

(King, J.)). Finally, the Plaintiffs contend that breach-of-warranty claims require the same common proof as consumer fraud claims. See Certification Motion at 52.

Next, the Plaintiffs attest that they will determine class-wide damages through a common methodology. See Certification Motion at 53. The Plaintiffs contend that their expert, Jean-Pierre H. Dubé, can use a conjoint analysis[16] to determine class-wide economic damages. See Certification Motion at 56. Moreover, the Plaintiffs state that Dr. Dubé can conduct a choice-based conjoint analysis to measure individual class members' injuries. See Certification Motion at 59. The Plaintiffs also explain that they will use common proof to make out claims for each subclass and summarize the relevant state laws for each proposed subclass. See Certification Motion at 60-84.

**ii. Superiority.**

The Plaintiffs also argue that a class action suit is superior to other methods of adjudicating the controversy. See Certification Motion at 84 (citing Fed. R. Civ. P. 23(b)(3)). First, the Plaintiffs contend that their claims are "negative value claims" in which the cost of litigation exceeds the likely recovery unless the claims are aggregated. See Certification Motion at 84. The Plaintiffs assert that each class member's claim amounts to only a few dollars per purchase and class members "have little interest in individually controlling the prosecution of separate actions." Certification Motion at 85. The Plaintiffs further argue that there is no other litigation concerning the same subject matter outside this case, that concentrating the claims in a

[16]Conjoint analysis is "a survey-based statistical technique used in market research that helps determine how people value different attributes . . . that make up an individual product or service." Conjoint Analysis, Wikipedia, https://en.wikipedia.org/wiki/Conjoint_analysis (last visited January 21, 2022).

single forum is desirable, and that trial is manageable, because cases will either "return to the home jurisdiction for trial or will be consolidated." Certification Motion at 85.

**c. Rule 23(b)(2).**

The Plaintiffs also contend that they meet rule 23(b)(2)'s requirements, because the class members' injuries are sufficiently similar so that the litigation can address all injuries without differentiating between class members. See Certification Motion at 86. The Plaintiffs argue that the Court can certify classes seeking injunctive relief alongside classes seeking damages, so long as the classes are separately and independently certifiable. See Certification Motion at 86. The Plaintiffs attest that an injunction prohibiting the Defendants from marketing their cigarettes as natural is appropriate and requests the Court certify a class pursuant to rule 23(b)(2) for injunctive relief. See Certification Motion at 88.

**2. Certification Opposition.**

The Defendants oppose the Plaintiffs' Certification Motion. See Defendants' Opposition to Plaintiffs' Motion for Class Certification at 1, filed October 8, 2020 (Doc. 315)("Certification Opposition"). The Defendants argue that the Plaintiffs do not demonstrate a feasible method of identifying potential class members or a feasible method of calculating the damages each class member has suffered. See Certification Opposition at 1. Further, the Defendants contend that the Plaintiffs' claim for injunctive relief is moot, because the Defendants already have stopped using many of the complained about descriptors, and added a sentence on their cigarette packaging stating: "'Natural American Spirit cigarettes are not safer than other cigarettes.'" Certification Opposition at 3 (no citation for quotation provided). The Defendants also argue that the Plaintiffs lack standing to certify an injunctive-relief class, because no named Plaintiff

alleges that he or she is currently misled about Natural American cigarettes' safety, or is in danger of being misled in the future. See Certification Opposition at 3.

**a. Ineligibility for Class Certification.**

The Defendants argue that several of the Plaintiffs' claims are ineligible for class certification. See Certification Opposition at 17. First, the Defendants attest that the Court has dismissed the unjust enrichment claim for the New Jersey subclass, and, therefore, certification for that claim is improper. See Certification Opposition at 17. Second, the Defendants contend that the Court dismissed the Plaintiffs' claim pursuant to the Illinois Uniform Deceptive Trade Practices Act, 815 I.L.C.S. 510, ("IUDTPA"), insofar as the Plaintiffs seek injunctive relief, and the IUDTPA does not allow for monetary relief, so the Court cannot certify a class for this claim. See Certification Opposition at 17. Third, the Defendants argue that the Court has dismissed the "sole Ohio claim" under the Ohio Consumer Sales Practice Act, Ohio Rev. Code § 1345.01 et seq, ("OCSPA"), because the Plaintiffs did not satisfy the State's notice requirement. Certification Opposition at 18. Fourth, the Defendants argue that the New Mexico Plaintiffs have "'no private right of action'" under the New Mexico False Advertising Act, N.M.S.A. §59A-16-4 ("NMFAA"). Certification Opposition at 18-19 (quoting Ahlgrim v. Keefe Grp., LLC, 2016 WL 9819520, at *4 (D.N.M. Oct. 19, 2016)(Fouratt, J.), adopted, 2016 WL 7246110 (D.N.M. Nov. 30, 2016)(Browning, J.)). Fifth, the Defendants argue that monetary damages are barred in class actions under the Colorado Consumer Protection Act, C.R.S. § 6-1-101 et seq., ("CCPA"). See Certification Opposition at 19 (citing Friedman v. Dollar Thrifty Auto. Grp., Inc., 2015 WL 4036319, at *6 (D. Colo. July 1, 2015)(Daniel, J.). Sixth, the Defendants attest that "a damages class is unavailable under the New Mexico Unfair Practices Act[, N.M.S.A. § 57-12-1 through § 57-12-24]('NMUPA') because that statute privileges named plaintiffs over

absent class members with respect to claims for damages" and that, therefore, a class action is not a superior method of adjudication for such claims. Certification Opposition at 19.

**b. Rule 23(a).**

Moreover, the Defendants argue that the Plaintiffs do not satisfy rule 23(a)'s threshold requirements. See Certification Opposition at 20 (citing Fed. R. Civ. P. 23(a)). The Defendants concede that the Plaintiffs can demonstrate numerosity and adequacy, but contend that the Plaintiffs do not demonstrate commonality and typicality. See Certification Opposition at 20.

**i. Commonality.**

The Defendants argue that the Plaintiffs' claims "hinge on individual issues -- namely, which representations (including disclaimers) potentially millions of consumers saw, and how each consumer understood and responded to each of them." Certification Opposition at 20. The Defendants contend that, of the seven common questions which the Plaintiffs identify, four of them -- the first, second, fifth, and sixth -- can be resolved "only individually, by assessing what representations each putative class member actually saw over time, how she understood them, whether and when she saw or was exposed to a disclaimer, what considerations she relied upon in buying NAS cigarettes, and whether she in fact paid a premium." Certification Opposition at 21. According to the Defendants, two other proposed common questions that the Plaintiffs present -- the third and fourth -- are not central to the validity of the Plaintiffs' claim, because they can be answered only by analyzing a class member's perception of Natural American cigarettes. See Certification Opposition at 21. Finally, according to the Defendants, the Plaintiffs' seventh common question is not common to class members, because many class members do not have standing for injunctive relief to contend that the Defendants should be

enjoined from selling Natural American cigarettes as currently labeled. See Certification Opposition at 21.

**ii. Typicality.**

The Defendants also contend that the Plaintiffs' representative class members' claims are not typical of absent class members' claims. See Certification Opposition at 22. The Defendants argue that class members' hinge on unique circumstances, namely, how each individual person perceived Natural American cigarettes' labelling. See Certification Opposition at 22. Further, the Defendants attest that certain representative class members' claims are subject to one or more unique defenses, which is detrimental to the class' interests, because the class representative might spend time litigating that defense at the expense of the common issues. See Certification Opposition at 22. First, the Defendants contend that three representative class members have stated that they have continued buying Natural American cigarettes, even after filing suit, which "expressly acknowledge[es] their belief that NAS cigarettes are not healthier or safer than others." Certification Opposition at 23. Second, the Defendants argue that two representative class members admit that they did not pay a premium price for Natural American cigarettes. See Certification Opposition at 23. The Defendants contend that, because several representative class members' claims are subject to unique defenses, the Plaintiffs have failed to demonstrate that representative class members' claims are typical of all class members. See Certification Opposition at 24.

**c. Rule 23(b)(3).**

In addition to arguing that the Plaintiffs do not meet rule 23(a)'s requirements, the Defendants also contend that the Plaintiffs do not meet rule 23(b)(3)'s requirements. See Certification Opposition at 24. First, the Defendants argue that the Plaintiffs do not demonstrate

that there are common issues that predominate over individual issues. See Certification Opposition at 24. Second, the Defendants argue that a class action lawsuit is not a superior method of resolving the Plaintiffs' claims, because the individualized inquiries dominate. See Certification Opposition at 24-25.

**i. Predominance.**

At the outset, the Defendants argue that the Plaintiffs have not demonstrated that the members of their proposed class are ascertainable. See Certification Opposition at 25. The Defendants contend that the class must be "'currently and readily ascertainable based on objective criteria.'" Certification Opposition at 25 (quoting Abraham v. WPX Production Productions, LLC, 317 F.R.D. 169, 254 (D.N.M. 2016)(Browning, J.)). Here, the Defendants attest, the Plaintiffs have not "even *proposed* a method of ascertaining class members, much less proven with evidentiary support that any method 'will be successful.'" See Certification Opposition at 26 (quoting Abraham v. WPX Production Productions, LLC, 317 F.R.D. at 258)(emphasis added in Certification Opposition). The Defendants note that individual class members would have purchased Natural American cigarettes from retailers rather than from any Defendant and that the Plaintiffs have no proposed way of demonstrating that individuals have purchased Natural American cigarettes at all. See Certification Opposition at 26-27. That is, the Defendants contend that, because Plaintiffs have no way to "reliably identify" Natural American cigarette purchasers, the class is not ascertainable. Certification Opposition at 27. Moreover, determining who purchased Natural American cigarettes would require individualized inquires and would dominate over common issues in the case. See Certification Opposition at 27.

Moreover, the Defendants contend that, even if the Plaintiffs could demonstrate that their proposed class is ascertainable, the Plaintiffs claims still require individualized inquiries. See

Certification Opposition at 30. The Defendants argue that "there is a division within the class between those who saw the pre-October 1, 2017 descriptions and those who saw the descriptors on advertisements and products distributed from October 1, 2017 to the present," after which time Natural American cigarette packages no longer stated that they were "natural" and "additive-free," and contained a disclaimer that "'Natural American Spirit cigarettes are not safer than other cigarettes.'" Certification Opposition at 31 (no quotation for citation). Additionally, the Defendants contend that whether a consumer saw the disclaimer, what advertising a consumer saw on the Natural American cigarette packaging, and whether the consumer was misled by the packaging, will differ among individual consumers. See Certification Opposition at 32. The Defendants note that several named Plaintiffs interpret the word "natural" in different ways, indicating that the individual consumers' perception of the Defendants' advertising is something that must be ascertained on an individual level. Certification Opposition at 38. The Defendants also note that the Plaintiffs attempt to use survey data to support their claim that the Natural American cigarette packaging is misleading, but the Defendants' expert, Dr. Kent Van Liere, demonstrates that surveys show the opposite. See Certification Opposition at 39, 41.

The Defendants also contend that the Plaintiffs' "statutory and unjust-enrichment claims . . . will require overwhelming individualized inquiries into the materiality of Defendants' alleged misrepresentations." Certification Opposition at 42. The Defendants argue that the Florida Deceptive and Unfair Trade Practice Act, Fla. Stat. § 501.201, ("FDUTPA"), the Illinois Consumer Fraud Act, 815 I.L.C.S. 505/1 ("ICFA"), Massachusetts Chapter 93A, the New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-2.11 ("NJCFA"), the New Jersey Truth-in Consumer Contract, Warranty & Notice Act, N.J. Stat. Ann., § 56:12-14 ("TCCWNA"), the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. Ann. § 75-1.1

("NCUDTPA"), and the Washington Consumer Protection Act, Wash. Rev. Code Ann. § 19.86.010 ("WCPA"), all require individual proof. See Certification Opposition at 45-50.

Moreover, the Defendants contend that all of the Plaintiffs' unjust enrichment claims require individualized proof. See Certification Opposition at 50. Notably, the Defendants contend that, in each of the ten relevant states -- California, Colorado, Florida, Illinois, Massachusetts, Michigan, New Mexico, New York, North Carolina, and Washington -- courts have foreclosed class certification for unjust enrichment claims. See Certification Opposition at 51 (citing Oshana v. Coca-Cola Co., 472 F.3d 506 (7th Cir. 2006); Payne v. Tri-State CareFlight, LLC, 332 F.R.D. at 703; Abla v. Brinker Rest. Corp., 279 F.R.D. 51, 58 (D. Mass. 2011) (Tauro, J.); Kelley v. Microsoft Corp., 251 F.R.D. 544, 559 (W.D. Wash. 2008)(Pechman, J.), certification withdrawn, No. C07-0475 MJP, 2009 WL 413509 (W.D. Wash. Feb. 18, 2009); Kunzelmann v. Wells Fargo Bank, N.A., 2013 WL 139913, at *9 (S.D. Fla. Jan. 10, 2013)(Middlebrooks, J.); Weiner v. Snapple Beverage Corp., No. 07 CIV. 8742 DLC, 2010 WL 3119452, at *2 (S.D.N.Y. Aug. 5, 2010)(Cote, J.); Dudding v. Norton Frickey & Assocs., 11 P.3d 441, 445 (Colo. 2000)(en banc); Jackson v. Wal-Mart Stores, Inc., 2005 WL 3191394, at *5 (Mich. Ct. App. Nov. 29, 2005); Harrison v. Wal-Mart Stores, Inc., 2004 WL 5202760, at ¶¶ 32-33 (N.C. Super. Ct. Mar. 5, 2004); Savaglio v. Wal-Mart Stores, Inc., 2003 WL 25676640 (Cal. Super. Ct. Nov. 6, 2003)). The Defendants contend that, because individualized inquiries will be required to evaluate seven of the statutory and ten of the unjust enrichment claims, common questions are not dominant and, therefore, the Court should not certify the class. See Certification Opposition at 57.

The Defendants contend, then, that the Plaintiffs would have only six statutory claims for five potential classes remaining:

- the California Class and California Menthol Subclass, which assert claims under California's Consumer Legal Remedies Act (Cal. Civ. Code § 1750), False Advertising Law (Cal. Bus. & Prof. Code § 17500), and Unfair Competition Act (Cal. Bus. & Prof. Code § 17200);

- the Michigan Class, which asserts a claim under the Michigan Consumer Protection Act (Mich. Comp. Laws § 445.901); and

- the New York Class and New York Menthol Subclass, which assert claims under New York General Business Law §§ 349 and 350.

Certification Opposition at 57. The Defendants further contend that, for proposed classes to be certified under the remaining statutes, the Plaintiffs must make a threshold showing that the "Defendants' 'alleged deceptive conduct caused the same damage to the class by showing that the alleged misrepresentation would have been material to reasonable persons.'" Certification Opposition at 58 (quoting Jones v. ConAgra Foods, Inc., No. C 12-01633 CRB, 2014 WL 2702726, at *1 (N.D. Cal. June 13, 2014)(Breyer, J.)). The Defendants argue that the Plaintiffs do not demonstrate that the Defendants' conduct is material to consumers. See Certification Opposition at 58-60. Specifically, the Defendants argue that the Plaintiffs "have failed to show that any of the challenged terms carries a uniform message of comparative health," and, therefore, the Plaintiffs do not show that any misperception is material to class members. Certification Opposition at 61. The Defendants contend that both the Plaintiffs' expert, Dr. Jennifer Pearson, and the Defendants' expert, Dr. Van Liere, have produced reports and given testimony that "demonstrates that Plaintiffs cannot prove that any safer-cigarette belief was material on a classwide basis." Certification Opposition at 62. The Defendants further argue that several named Plaintiffs demonstrate that misperceptions about Natural American cigarettes' health is not material to their decision to purchase the cigarettes, because they admit that they continue purchasing the cigarettes even after this litigation' start. See Certification Opposition at

63. With regard to the Plaintiffs' Menthol Theory, the Defendants argue that the Plaintiffs cannot show materiality, because the Plaintiffs "have not attempted to explain why the location of the menthol -- or whether it is deemed a tobacco additive -- would be significant to the decisions of a reasonable person, let alone established that it is significant to consumers classwide." Certification Opposition at 64.

The Defendants further attest that, under the applicable choice-of-law rules, the substantive law that applies to each of Plaintiffs' claims is the law of the State in which a consumer purchased Natural American cigarettes. See Certification Opposition at 66. The Defendants argue that, because the substantive statutes of the States differ, the "material differences in the States' laws predominate over common questions." Certification Opposition at 66. The Defendants contend that the Plaintiffs incorrectly argue that New Mexico law alone governs their express warranty claims, but even if it did, the Plaintiffs cannot use common proof to demonstrate that:

> (1) until 2017, NAS menthol cigarettes expressly warranted that they contain "additive free" tobacco; (2) consumers "do not know what menthol is" and whether it is an additive; and (3) because some menthol migrates from the cigarette filters (where it is placed during manufacturing) into the tobacco, that menthol amounts to an additive and so Defendants breach the warranty.

Certification Opposition at 70 (no citation for quotation).

Finally, the Defendants contend that the Plaintiffs have not put forth a valid method for calculating damages and, thus, individualized inquires will predominate over common questions. See Certification Opposition at 72. The Defendants attest that "Under *Comcast* [*Corp. v. Behrend*, 569 U.S. 27 (2013)], Plaintiffs 'must be able to isolate the price premium associated with misleading consumers' in the 'particular fashion' underlying their 'specific theor[ies] of liability,'" Certification Opposition at 72 (quoting In re ConAgra Foods, Inc., 302 F.R.D. 537,

579 (C.D. Cal. 2014)(Morrow, J.))(first alteration added; second alteration in the Certification Opposition, but not in In re ConAgra Foods, Inc.), and that the Plaintiffs have not demonstrated a valid way to calculate the price premium which consumers paid for Natural American cigarettes because of their supposed health value, see Certification Opposition at 72. First, the Defendants contend that, under their theory that consumers purchased Natural American cigarettes because they believed they were safer, the Plaintiffs "damages model must identify how much the price of NAS cigarettes was inflated by a belief that NAS cigarettes are or may be safer and healthier -- and nothing else." Certification Opposition at 75. The Defendants argue that the Plaintiffs' expert, Dr. Dubé, concedes that his damages model cannot do that. See Certification Opposition at 75. Second, the Defendants contend that the Plaintiffs have not set forth a valid damages model for their theory that the use of the phrase "additive-free" is misleading, because "Dr. Dubé's model will simply assess the entire price premium attributable to the 'additive-free' descriptor, and not the premium attributable to the specific belief underlying the Menthol Theory." Certification Opposition at 78 (no citation for quotation). Further, the Defendants contend that Dr. Dubé's model does not account for the Plaintiffs' claim that additive-free has two misleading meanings: first, that Natural American cigarettes are safer and, second, that there are no additives. See Certification Opposition at 78.

The Defendants also maintain that the Plaintiffs' damages model only calculates consumers' willingness to pay. See Certification Opposition at 79. The Defendants contend that "[t]he 'proper measure of damages in a consumer class action case is . . . . The amount necessary to compensate the purchaser for the difference between a product as labeled and the product as received.'" (quoting In re 5-Hour Energy Mktg. & Sales Pracs. Litig., No. ML13-2438 PSG (PLAx), 2017 WL 2559615, at *10 (C.D. Cal. June 7, 2017)(Gutierrez, J.)). Based on this

measure of damages, the Defendants claim that damages should be calculated based on Natural American cigarettes' market value rather than on what Natural American cigarette consumers are willing to pay. See Certification Opposition at 79.

**ii. Superiority.**

Next, the Defendants contend that a class action lawsuit is not superior to other methods of resolving the Plaintiffs' claims. See Certification Opposition at 82. The Defendants argue that this class action lawsuit would be "unmanageable," because of individualized issues regarding class membership, information a consumer received, the consumers' perceptions of advertising, and what injury each consumer suffered as a result of the Defendants' conduct. See Certification Opposition at 82. Consequently, the Defendants argue that the Court should not certify the Plaintiffs' proposed classes pursuant to rule 23(b)(3). Certification Opposition at 83.

**d. Rule 23(b)(2).**

The Defendants also contend that the Court should not certify the Plaintiffs' proposed classes pursuant to rule 23(b)(2). See Certification Opposition at 83. First, the Defendants contend that the request for injunctive relief is moot, because the Defendants no longer use the descriptors "natural" and "additive-free" pursuant to an agreement with the Food and Drug Administration ("FDA"). Certification Opposition at 84 (no citation for quotation). The Defendants also argue that the Plaintiffs' sought injunctive relief for the Defendants to cease "(1) the use of 'natural' in the 'Natural American Spirits' brand name; (2) the 'organic' descriptor; and (3) the 'tobacco & water' descriptors" is moot, because the Defendants now include a disclaimer on their packaging stating: "Natural American Spirit cigarettes are not safer than other cigarettes." Certification Opposition at 84 (no citation for quotations). The Defendants also attest that the Plaintiffs do not have standing for their injunctive relief claims, because the class

members cannot demonstrate that they are suffering a continuing injury or are in danger of being injured in the future. See Certification Opposition at 86. Consequently, the Defendants contend that the Plaintiffs have not demonstrated that they have standing for their injunctive relief claims and, accordingly, that the Court should not certify their class pursuant to rule 23(b)(2). See Certification Opposition at 90.

**3. Certification Reply.**

The Plaintiffs reply. See Certification Reply. At the outset, the Plaintiffs contend that the Defendants' argument that the Plaintiff's IUDTPA, NMFAA, and NMUPA claims cannot be certified is wrong. See Certification Reply at 2. First, the Plaintiffs contend that money damages are available under the IUDTPA, contrary to the Defendants' assertion. See Certification Reply at 2 (citing Thrope v. State of Ohio, 173 F.R.D. 483, 490 (S.D. Ohio 1997)(Spiegel, J.)). Second, the Plaintiffs contend that "'the [Illinois] Consumer Fraud and Deceptive Business Practices Act authorizes recovery of damages from violations of the Uniform Deceptive Trade Practices Act.'" Certification Reply at 2-3 (quoting Dorr-Oliver Inc. v. Fluid-Quip, Inc., 834 F. Supp. 1008, 1014-15 (N.D. Ill. 1993)(Conlon, J.)(alteration in Certification Reply but not in Dorr-Oliver Inc. v. Fluid-Quip, Inc.). Next, the Plaintiffs contend that there is a private right of action for consumers under the NMFAA. See Certification Reply at 3 (citing Fiser v. Dell Computer Corp., 2008-NMSC-046, ¶¶ 9-10, 144 N.M. 464, 467-68, 188 P.3d 1215, 1218). Finally, the Plaintiffs contend that certification is proper under the NMUPA, even if statutory damages are not available to individual litigants. See Certification Reply at 3 (citing Daye v. Cmty. Fin. Serv. Ctrs., LLC, 313 F.R.D. 147, 171-74 (D.N.M. 2016)(Browning, J.) (certifying NMUPA class)).

**a. Rule 23(a).**

The Plaintiffs further contend that they satisfy rule 23(a)'s requirements. See Certification Reply at 3. The Plaintiffs contend that they satisfy rule 23(a)'s commonality and typicality requirements. See Certification Reply at 3, 6. Consequently, the Plaintiffs contend that class certification is proper. See Certification Reply at 3, 6.

**i. Commonality.**

First, the Plaintiffs argue that their claims do not hinge on individualized issues and attest that a "single common question may satisfy the commonality requirement." Certification Reply at 4 (citing Menocal v. GEO Grp., Inc., 882 F.3d at 914). The Plaintiffs contend that the question whether the Defendants' uniform marketing practices are misleading to a reasonable consumer is central to their claims. See Certification Reply at 4. Moreover, the Plaintiffs contend that several common questions exist, including whether consumers paid a price premium, whether the Court should enjoin the Defendants' marketing practices, whether the Defendants' marketing practices led reasonable consumers to believe that Natural American cigarettes are less harmful, and what economic damages are attributable to the Defendants' marketing practices. See Certification Reply at 4. The Plaintiffs also refute the Defendants' argument that individualized issues dominate, because the Plaintiffs contend that courts routinely consider whether representations "on a product's packing 'raise[] the common question of whether the packaging would mislead a *reasonable consumer*.'" Certification Reply at 5 (quoting Broomfield v. Craft Brew All., Inc., No. 17-CV-01027-BLF, 2018 WL 4952519, at *5 (N.D. Cal. Sept. 25, 2018)(Freeman, J.)(alteration and emphasis added in Certification Reply, but not in Broomfield v. Craft Brew Alliance, Inc.). Moreover, the Plaintiffs attest that the Defendants' contention that individual questions outweigh common questions is directed

improperly at rule 23(a)'s commonality requirement and is properly suited for consideration as an issue of predominance. See Certification Reply at 6 n.3.

**ii. Typicality.**

Next, the Plaintiffs contend that "commonality and typicality rise or fall together." Certification Reply at 6 (citing Anderson Living Trust v. WPX Energy Prod., LLC, 306 F.R.D. at 440; and Payne v. Tri-State CareFlight, LLC, 332 F.R.D. at 661). The Plaintiffs argue that the class representatives' claims are typical, because they will demonstrate with common evidence that Natural American cigarettes mislead reasonable consumers, and this issue does not involve analysis of individual consumers' subjective thoughts. See Certification Reply at 7. The Plaintiffs also argue that the fact that consumers m ay have continued smoking Natural American cigarettes after the litigation's beginning does not make the Class Representatives' claims atypical, and that "the testimony of two Plaintiffs that they subjectively *believe* they did not pay a price premium is irrelevant." Certification Reply at 8 (emphasis in original).

**b. Rule 23(b)(3).**

The Plaintiffs contend that they satisfy rule 23(b)(3)'s requirements. See Certification Reply at 9. The Plaintiffs first argue that individual issues do not predominate. See Certification Reply at 9. Next, the Plaintiffs contend that a class action is superior to individual actions. See Certification Reply at 44.

**i. Predominance.**

The Plaintiffs first respond to the Defendants' argument that the proposed classes are not readily ascertainable. See Certification Reply at 9. The Plaintiffs contend that, under rule 23(c) of the Federal Rules of Civil Procedure, a court's certification order need only "'define the class and the class claims, issues, or defenses,'" Certification Reply at 9 (quoting Fed. R. Civ. P.

23(c)(1)(B)), and that the class be defined by "objective criteria," Certification Reply at 9 (quoting Anderson Living Tr. v. Energen Res. Corp, No. 13-cv-00909-WJ-CG, 2019 WL 6618168, at *8 (D.N.M. Dec. 5, 2019)(Johnson, C.J.)). Instead, the Plaintiffs contend that the district court has discretion to determine a case's method for trial based on the facts of the case, including class certification. See Certification Reply at 10 (citing Davoll v. Webb, 194 F.3d 116 (10th Cir. 1999)). Here, the Plaintiffs argue, the Plaintiffs' proposed class definitions are based on objective criteria: "whether a person purchased one or more NAS Cigarette product, (ii) the state in which the person purchased the NAS Cigarette product(s), and (iii) when they purchased the NAS Cigarette product(s)." Certification Reply at 11. The Plaintiffs contend that they can identify class members at the claims administration stage by using sworn affidavits, claim forms, receipts, and other purchase records. See Certification Reply at 11.

Second, the Plaintiffs contend that the Defendants are incorrect to assert that class members may have seen different marketing representations. See Certification Reply at 13. The Plaintiffs assert that, on the whole, the Defendants' marketing of Natural American cigarettes gave the impression that the cigarettes may be less harmful than other cigarettes. See Certification Reply at 13. Moreover, the Plaintiffs contend that, in consumer protection cases, courts should "'presume class members who purchased products with misleading packaging . . . were exposed to misleading statements on that packaging.'" Certification Reply at 14 (quoting Davidson v. Apple, Inc., No. 16-CV-04942-LHK, 2018 WL 2325426, at *18 (N.D. Cal. May 8, 2018)(Koh, J.). The Plaintiffs also argue that the statements on Natural American cigarettes with which the Plaintiffs take issue "are all the same or substantially similar," and convey the same marketing message that Natural American cigarettes may be safer than other cigarettes. Certification Reply at 14.

Finally, the Plaintiffs contend that they will present common evidence to demonstrate that "the reasonable consumer's understanding of Defendants' misrepresentations connotes a cigarette that may be less harmful, *including that such understanding is not impacted by any disclaimer*." Certification Reply at 15 (emphasis in original). The Plaintiffs also emphasize that, at the class certification stage, they do not have to prove that they will prevail on their theory, but only demonstrate that there is common evidence in support of their argument. See Certification Reply at 15. The Plaintiffs argue that the Defendants' contention that the Plaintiffs do not show commonality is merely an attack on the merits of the Plaintiffs' claims. See Certification Reply at 16-17. The Plaintiffs also attest that the Defendants "are improperly asking to strip the trier of fact the opportunity to consider Plaintiffs' experts' conclusions about the effect of Defendants' product claims, and instead substitute in Defendants' experts' conclusions." Certification Reply at 19.

Next, the Plaintiffs contend that the Defendants are incorrect in arguing that state specific statutes require individualized proof of deception or causation. See Certification Reply at 19. First, the Plaintiffs contend that, under their theory of recovery, they need demonstrate only that an objective, reasonable consumer would find that Natural American cigarettes are less harmful or that the consumer would pay a price premium for Natural American cigarettes. See Certification Reply at 19-20. The Plaintiffs argue that, under the FDUTPA, the Plaintiffs do not need to prove that every class member purchased Natural American cigarettes because of the deceptive marketing, and thus, the cases that the Defendants cited are inapposite. See Certification Reply at 20 (citing Green v. McNeil Nutritionals, LLC, Case No. 2004-0379-CA, 2005 WL 3388158 (Fla. Cir. Ct. Nov. 16, 2005), and Philip Morris USA Inc. v. Hines, 883 So. 2d 292 (Fla. Dist. Ct. App. 2003)). Second, the Plaintiffs contend that the ICFA does not

require individualized proof, because, under the ICFA, the Plaintiffs need to demonstrate only "that there is a uniform material representation seen by class members . . . and that class members paid more for the product at issue as a result." Certification Reply at 21 (citing In re ConAgra Foods, Inc., 90 F. Supp. 3d at 996). Third, the Plaintiffs contend that Massachusetts Chapter 93A does not require individualized proof and that the First Circuit, instead, has recognized that a "price premium theory of causation, such as that proffered by Plaintiffs here, is cognizable under Chapter 93A." Certification Reply at 22 (citing Lee v. Conagra Brands, Inc., 958 F.3d 70, 80-81 (1st Cir. 2020)). Fourth, the Plaintiffs attest that they do not need individualized proof under the NJCFA, because, as the Defendants concede, the NJCFA requires a showing of only a causal relationship between the Defendants' conduct and the consumers' injury. See Certification Reply at 23. Fifth, the Plaintiffs argue that they do not need individualized proof under the TCCWNA, because "[t]he statute includes no reliance requirement, and there is no need to prove a causal connection on an individual basis." Certification Reply at 24 (citing Browne v. Capital One Bank (USA), N.A., No. A-2102-19T1, 2020 WL 4045271, at *7 (N.J. Super. Ct. App. Div. July 20, 2020)). Sixth, the Plaintiffs contend that the WCPA does not require individualized proof, because the WCPA recognizes a theory of causation that turns on a price premium, which the Plaintiffs allege here. See Certification Reply at 24.

Moreover, the Plaintiffs contend that individualized inquires do not predominate in their unjust enrichment claims. See Certification Reply at 25. First, the Plaintiffs address the Defendants' argument that common questions will "'rarely, if ever, predominate' in an unjust enrichment claim" by noting that the Tenth Circuit upheld class certification for an unjust enrichment claim in Menocal v. GEO Group, Inc., 882 F.3d at 925. Certification Reply at 25

(quoting Certification Opposition at 50). The Plaintiffs also attest that courts in "every other district and state whose laws are implicated in this case have also certified classes bringing claims for unjust enrichment." Certification Reply at 25. The Plaintiffs contend that the unjust enrichment elements are essentially the same in every State and require the Plaintiffs to show only that: (i) the Defendants received a benefit; (ii) at the Plaintiffs' expense; (iii) under circumstances that would make it unjust for the Defendants to retain the benefit without commensurate compensation. See Certification Reply at 25 (citing Menocal v. GEO Grp., Inc., 882 F.3d at 926). Moreover, the Plaintiffs contend that, because the claims rely on the Defendants' misconduct, common questions predominate. See Certification Reply at 25. The Plaintiffs also note that they are not pursuing class certification for a claim under the NCUDTPA. See Certification Reply at 31 n.25.

Next, the Plaintiffs contend that the Defendants are incorrect in asserting that the Plaintiffs cannot show materiality with respect to their California, Michigan, and New York claims. See Certification Reply at 31. The Plaintiffs assert that, in California, "'no evidence of materiality is necessary for purposes of class certification' where alleged misrepresentations are common to the class." Certification Reply at 31 (quoting In re McCormick & Co., Inc., Pepper Prod. Mktg. & Sales Practices Litig., 422 F. Supp. 3d 194, 252 (D.D.C. 2019)(Huvelle, J.)). The Plaintiffs also attest that the same is true under New York and Michigan law. See Certification Reply at 32 (citing In re FCA US LLC Monostable Electronic Gearshift Litig., 334 F.R.D. 96, 116-17 (E.D. Mich. 2019)(Lawson, J.)). Further, the Plaintiffs contend that their expert, Dr. Dewhirst, attests that the "Defendants' marketing employed common marketing techniques" and that their expert, Dr. Pearson, attests that "many American adults erroneously believe that 'natural' or 'additive-free' cigarettes are or may be less harmful than other brands." Certification

Reply at 33 (no citation for quotations). The Plaintiffs contend that, at this stage, the Plaintiffs do not need to prove materiality, but that they need to prove only that common proof will answer common questions. See Certification Reply at 33 (citing Broomfield v. Craft Beer Alliance, Inc., 2018 WL 4952519, at *11). The Plaintiffs also cite to an FDA report, the Defendants' internal documents, and their own expert, Dr. Van Liere's, survey evidence to attest that they are able to demonstrate materiality. See Certification Reply at 34-36.

The Plaintiffs also contend that, with regard to the Nationwide Menthol Subclass, New Mexico's choice-of-law rules apply and, therefore, the Court should apply New Mexico law to the breach-of-express-warranty claims. See Certification Reply at 37. The Plaintiffs contend that New Mexico law should apply, because, during the relevant time period:

> (1) SFNTC was a New Mexico corporation; (2) SFNTC was headquartered at Santa Fe, New Mexico; (3) the 'employees and decision makers tasked with the development and execution of product labeling, marketing and advertising are located primarily at Santa Fe's headquarters in New Mexico"; and, (4) events during the relevant [time period] to the allegations in the Consumer Actions took place in New Mexico.

Certification Reply at 38 (quoting Consolidated Complaint, filed January 12, 2017 (Doc. 82)). The Plaintiffs also note that the Supreme Court of New Mexico has adopted the Restatement (Second) test for multi-state class actions so that the law of the State with the most significant contacts applies; the court need not apply several States' laws. See Certification Reply at 38-39.

Finally, the Plaintiffs argue that they have sufficiently demonstrated a method to calculate class members' damages. See Certification Reply at 39. The Plaintiffs contend that their expert, Dr. Dubé,[17] has proffered a method to calculate class-wide economic damages. See Certification Reply at 41. Dr. Dubé proposes a damages model based on a conjoint analysis,

---

[17]Dr. Dubé is an expert whom the Plaintiffs proffer to opine on how the Court may determine damages on a class-wide basis.

which, the Plaintiffs attest, other cases have upheld. See Certification Reply at 41 (citing Price v. L'Oréal USA, Inc., No. 17 CIV. 614 (LGS), 2018 WL 3869896, at *9 (S.D.N.Y. Aug. 15, 2018)(Schofield, J.), and Goldenberg v. Johnson & Johnson Consumer Cos., Inc., 317 F.R.D. 374, 394 (S.D.N.Y. 2016)(Román, J.)). The Plaintiffs argue that Dr. Dubé has "proposed a model for measuring the price premium and explained how it work," and that Dr. Dubé "suggested there are two separate ways to measure economic damages: a price premium (which Defendants admit is proper) *and* willingness to pay." Certification Reply at 42 (emphasis in original). Consequently, the Plaintiffs argue that either damages model is valid. See Certification Reply at 42-43.

**ii. Superiority.**

As to superiority, the Plaintiffs attest that the Defendants' argument that a class action is not a superior form of litigation to individual actions is "nothing more than a recast of their predominance argument." Certification Reply at 44. The Plaintiffs contend that, because predominance is met, the class action approach is superior to individual actions and that manageability is reason alone for the Court to decline to certify the class. See Certification Reply at 44. The Plaintiffs also note that, in cases where the cost of litigation exceeds the likely recovery, the alternative to a class action is likely no action at all. See Certification Reply at 44 (citing Anderson Living Trust v. WPX Energy Prod. LLC, 306 F.R.D. at 407).

**c. Rule 23(b)(2).**

The Plaintiffs contend that, if the Court were to accept the Defendants' argument that the Plaintiffs "can no longer claim that they risk being deceived into believing NAS Cigarettes may be less harmful since they filed a lawsuit premised on the recognition that NAS Cigarettes are not less harmful than other cigarettes," then injunctive relief could never be available in false

advertising cases. Certification Reply at 45. While the Plaintiffs note that the Tenth Circuit has not addressed squarely this issue, the Plaintiffs contend that other circuits have allowed class members to pursue injunctive relief based on false advertising claims. See Certification Reply at 45 (citing Davidson v. Kimberly Clark Corp., 889 F.3d 956, 969-70 (9th Cir. 2018)). The Plaintiffs further contend that, without injunctive relief, the Defendants will be free to continue marketing Natural American cigarettes with misleading representations. See Certification Reply at 47. The Plaintiffs also argue that their request for injunctive relief is not moot, because the Plaintiffs seek to "pursue an injunction against descriptors *not covered*" by the Court's MTD MOO -- "specifically (1) the use of 'natural' in the 'Natural American Spirits' brand name; (2) the 'organic' descriptor; and (3) the 'tobacco & water' descriptors." Certification Reply at 49 (no citations for quotations).

**4. Motion to Exclude Dr. J. Michael Dennis.**

The Defendants filed the Motion to Exclude Dr. Dennis on July 23, 2020. The Plaintiffs respond. See Motion to Exclude Dr. Dennis Opposition at 1-30. The Defendants reply. See Defendants' Reply in Support of Motion to Exclude in Their Entirety the Expert Report and Opinions of Plaintiff Rebuttal Expert Dr. J. Michael Dennis, filed November 19, 2020 (Doc. 321)("Motion to Exclude Dr. Dennis Reply").

**a. Motion to Exclude Dr. Dennis.**

The Defendants begin their motion by noting that Dr. Dennis is a rebuttal expert whom the Plaintiffs intend to present to opine on the testimony of the Defendants' expert, Dr. Kent D. Van Liere, which details consumer perception of Natural American cigarettes. See Motion to Exclude Dr. Dennis at 1. The Defendants contend that Dr. Dennis' testimony and report does not pass the Daubert test. Motion to Exclude Dr. Dennis at 1-2. The Defendants contend that

Dr. Dennis' testimony and report are not helpful to the Court, and that Dr. Dennis does not use reliable methods to draw his conclusions. See Motion to Exclude Dr. Dennis at 1-2.

The Defendants first note that Dr. Van Liere designed and conducted a survey to determine consumers' perceptions about the descriptors on Natural American cigarettes. See Motion to Exclude Dr. Dennis at 3-4. Dr. Van Liere conducted a double-blind[18] survey of "438 consumers who bought NAS cigarettes between 2010 and 2015." Motion to Exclude Dr. Dennis at 4. Dr. Van Liere also used direct questions in his survey, to which respondents provided answers. See Motion to Exclude Dr. Dennis at 4. Dr. Van Liere's study concludes:

> - Only 8 percent said they first purchased NAS because they thought that NAS was healthier, safer, or not addictive, and most of these respondents identified additional reasons for first purchase.
>
> - Only 7 percent who chose NAS as their regular/usual brand, or 3 percent of all respondents, mentioned healthier or safer as a reason for ongoing purchase, and of these, most identified additional reasons for choosing NAS as their regular/usual brand.
>
> - Only 4 percent who smoked NAS occasionally (2 percent overall) mentioned healthier or safer as a reason for their occasional purchases; none mentioned "not addictive." These respondents also usually identified additional reasons.

Motion to Exclude Dr. Dennis at 6 (internal citations omitted)(no citation for quotation). Based on the survey data that Dr. Van Liere collected, Dr. Van Liere formed the following expert conclusions:

> (1) consumers purchase NAS for a variety of reasons unrelated to harm misperceptions; less than 10% mention any health misperception as a reason for purchase, and most of them mention other reasons for purchase too; (2) NAS purchasers have varying interpretations of the NAS descriptors; and (3) many

[18]A double-blind study "is one in which neither the participants nor the experimenters know who is receiving a particular treatment. This procedure is utilized to prevent bias in research results." Kendra Cherry, Double-Blind Studies in Research (April 2, 2020), https://www.verywellmind.com/what-is-a-double-blind-study-2795103.

> NAS consumers say they did not pay a price premium over other brands for NAS; and those that do, did so for a variety of reasons unrelated to health misperceptions.

Motion to Exclude Dr. Dennis at 7.

The Defendants attest that Dr. Dennis does not criticize or challenge any of Dr. Van Liere's survey methodology. See Motion to Exclude Dr. Dennis at 7. Further, the Defendants contend that, typically, Dr. Dennis conducts his own survey to form the basis of his expert opinions, and this case is the first time in which Dr. Dennis did not conduct a survey to rebut another expert's survey results. See Motion to Exclude Dr. Dennis at 7. The Defendants also argue that Dr. Dennis has no data to refute Dr. Van Liere's survey, has not found any data inconsistent with Dr. Van Liere's survey, and has not reviewed any data or literature concerning why Natural American cigarette consumers purchase Natural American cigarettes. See Motion to Exclude Dr. Dennis at 8.

First, the Defendants take issue with Dr. Dennis' opinion that "Dr. Van Liere should have used a conjoint rather than direct question design." Motion to Exclude Dr. Dennis at 8. The Defendants attest that, in the past, Dr. Dennis has used direct question surveys to answer questions akin to Dr. Van Liere's survey. See Motion to Exclude Dr. Dennis at 8-9. The Defendants contend that, in fact, Dr. Dennis never has used conjoint question design to identify consumers' reasons for purchasing an item, or to measure consumers' attitudes, opinions, beliefs, about a product. See Motion to Exclude Dr. Dennis at 9.

Second, the Defendants challenge Dr. Dennis' opinion that Dr. Van Liere's survey "is unreliable because its methods introduced possible recall bias.[19]" Motion to Exclude Dr.

---

[19]Recall bias

Dennis at 9. The Defendants contend that Dr. Dennis states only that recall bias "'*could* be problematic'" when Dr. Van Liere asked consumers in 2019 about their purchasing habits between 2010-2015. Motion to Exclude Dr. Dennis at 9 (quoting Deposition of Dr. Dennis at 164:3-9 (taken January 16, 2020), filed July 23, 2020 (Doc. 277-3)("Dennis Depo.")(emphasis in Motion to Exclude Dr. Dennis but not in Dennis Depo.). The Defendants argue, however, that Dr. Dennis has taken surveys similar to Dr. Van Liere's in which he asked participants to recall purchases they made thirteen to seventeen years before taking the survey. See Motion to Exclude Dr. Dennis at 10.

Third, the Defendants contend that Dr. Dennis' opinion that "Dr. Van Liere wrongly used open-ended questions to ask about purchase reasons" is improper. Motion to Exclude Dr. Dennis at 10. The Defendants contend that Dr. Dennis opines that Dr. Van Liere's open-ended-question use was inappropriate, but that Dr. Dennis concedes that "'it would be irresponsible for me to say what those differences would be without actually collecting the information' about his preferred methodology." Motion to Exclude Dr. Dennis at 10-11 (quoting Dennis Depo. at 94:6-95:6). The Defendants also take issue with Dr. Dennis' conclusion that survey respondents made a poor effort to answer the open-ended questions, because Dr. Dennis' conclusion is based on the fact that many respondents gave less than three-word responses and Dr. Dennis admitted that criteria was "'entirely arbitrary.'" Motion to Exclude Dr. Dennis at 10-11 (quoting Dennis Depo. at

---

> is a systematic error that occurs when participants do not remember previous events or experiences accurately or omit details: the accuracy and volume of memories may be influenced by subsequent events and experiences. Recall bias is a problem in studies that use self-reporting, such as case-control studies and retrospective cohort studies.

Recall Bias, Catalogue of Bias, https://catalogofbias.org/biases/recall-bias/ (last visited April 21, 2022).

252:4-10).

Fourth, the Defendants challenge Dr. Dennis' opinion that "Dr. Van Liere wrongly used closed-ended questions to ask about NAS descriptors and whether respondents paid for NAS compared to other brands they purchased." Motion to Exclude Dr. Dennis at 11. Dr. Dennis contends that closed-ended question in Dr. Van Liere's survey's -- asking "if respondents paid more for NAS than other cigarettes they purchased" -- is unreliable, because Dr. Van Liere does not provide a justification why a consumer accurately can answer that question. Motion to Exclude Dr. Dennis at 11. The Defendants contend, however, that Dr. Dennis "has no data to support his opinion." Motion to Exclude Dr. Dennis at 11.

Finally, the Defendants take issue with Dr. Dennis' opinion that "Dr. Van Liere failed to pre-test his survey questions." Motion to Exclude Dr. Dennis at 12. Dr. Dennis contends that Dr. Van Liere does not follow generally accepted survey protocol, because he did not pre-test his questionnaire. See Motion to Exclude Dr. Dennis at 12. The Defendants argue that Dr. Dennis has no basis for his conclusion and that Dr. Dennis conceded that "the form of pretesting is a judgment call." Motion to Exclude Dr. Dennis at 12 (citing Dennis Depo. at 54:9-17; id. at 347:14-350:20).

The Defendants contend that Dr. Dennis' opinions are unreliable and that, therefore, the Court should exclude his opinion under rule 702 of the Federal Rules of Evidence. See Motion to Exclude Dr. Dennis at 16; Fed. R. Evid. 702. First, the Defendants contend that Dr. Dennis did not consider sufficient materials to opine on Dr. Van Liere's survey, because he did not read the Complaint, any case documents, any deposition transcripts, or literature on "'reasons why NAS consumers purchase NAS cigarettes,'" and did not conduct any survey work of his own. Motion to Exclude Dr. Dennis at 16-17 (quoting Dennis Depo. at 89:12-90:1). Consequently, the

Defendants contend that Dr. Dennis relies solely on his own experience in survey design and does not adequately explain how his experience led to his conclusions. See Motion to Exclude Dr. Dennis at 18 (citing United States v. Medina-Copete, 757 F.3d 1092, 1104 (10th Cir. 2014)). Second, the Defendants contend that Dr. Dennis' opinions are not the product of reliable principles and methods. See Motion to Exclude Dr. Dennis at 19. The Defendants argue that Dr. Dennis misunderstands the core allegations behind the Plaintiffs' Complaint and, therefore, cannot accurately opine on the veracity of Dr. Van Liere's survey. See Motion to Exclude Dr. Dennis at 19-20. The Defendants attest that Dr. Dennis' opinion that Dr. Van Liere should have used a conjoint survey is based on the premise that Dr. Van Liere's survey was designed to measure the economic value that consumers place on Natural American cigarette product descriptors, when Dr. Van Liere's survey was not designed to measure the economic value consumers place on descriptors, but was designed to measure consumers' reasons for purchasing Natural American cigarettes, including whether the product descriptors drove consumer decisions to purchase Natural American cigarettes at a higher price. See Motion to Exclude Dr. Dennis at 20. The Defendants also attest that Dr. Dennis has never used a conjoint survey to ask consumers about past purchases and that he has used a conjoint survey only to ask consumers about present purchases. See Motion to Exclude Dr. Dennis at 21. Next, the Defendants argue that Dr. Dennis' contention that Dr. Van Liere's survey is flawed because of consumers' recall bias is an untested hypothesis and that Dr. Dennis does not cite to anything to support his contention. See Motion to Exclude Dr. Dennis at 21-22. The Defendants also argue that Dr. Dennis has conducted a survey similar to Dr. Van Liere under similar conditions of consumer recall, so he cannot proffer legitimately the opinion that the survey is flawed because of recall bias. See Motion to Exclude Dr. Dennis at 23. The Defendants further contend that Dr. Dennis'

contention that Dr. Van Liere should not have used open-ended questions is based only on an untested hypothesis and speculation. See Motion to Exclude Dr. Dennis at 27. The Defendants contend that, in fact, open-ended questions are the preferred survey method for measuring what first comes to a respondent's mind. See Motion to Exclude Dr. Dennis at 27. The Defendants argue, moreover, that, because Dr. Dennis did not conduct his own survey, Dr. Dennis cannot speak to how closed-ended questions would have changed the survey results, and that Dr. Dennis admits that open-ended and closed-ended questions are both appropriate survey methods. See Motion to Exclude Dr. Dennis at 27. The Defendants also attest that Dr. Dennis has no scientific basis for alleging that Dr. Van Liere improperly coded the open-ended responses or that respondents gave "'poor effort'" in their responses. Motion to Exclude Dr. Dennis at 29 (quoting Dennis Depo. at 245:4-247:19).

The Defendants next contend that "Dr. Dennis' opinions criticizing the . . . survey's closed-ended questions are unreliable because they rest on a mistaken understanding of the questions and their purpose." Motion to Exclude Dr. Dennis at 30. The Defendants argue that Dr. Dennis assumes that Dr. Van Liere used closed-ended survey questions to determine the meaning of the descriptors "organic tobacco" and "natural tobacco" in isolation, but Dr. Van Liere used the questions to measure whether the two descriptors have the same or different meanings. Motion to Exclude Dr. Dennis at 31. The Defendants argue that Dr. Dennis' interpretation is contrary to the question's plain meaning. See Motion to Exclude Dr. Dennis at 31. The Defendants further contend that Dr. Dennis improperly challenges Dr. Van Liere's conclusion that many Natural American cigarette consumers did not pay a price premium for Natural American cigarettes, and those that paid a price premium bought Natural American cigarettes for reasons unrelated to conceptions about health. See Motion to Exclude Dr. Dennis

at 33. The Defendants contend that Dr. Dennis does not provide any scientific basis for his challenge on Dr. Van Liere's conclusion. See Motion to Exclude Dr. Dennis at 33.

The Defendants also argue that "Dr. Dennis' opinions about the failure of Dr. Van Liere to pre-test his survey instrument are unreliable because they are based on a false premise that Dr. Van Liere did no such pre-testing." Motion to Exclude Dr. Dennis at 33. The Defendants contend, however, that Dr. Van Liere pre-tested his survey. See Motion to Exclude Dr. Dennis at 33-34. The Defendants also opine that Dr. Dennis conceded that Dr. Van Liere used a valid form of pre-testing his survey and, therefore, Dr. Dennis' cannot argue that Dr. Van Liere's pre-test was inadequate. See Motion to Exclude Dr. Dennis at 34.

Finally, the Defendants contend that the Court should exclude Dr. Dennis' testimony, because his "opinions do not fit the facts at issue, do not logically advance material aspects of the case, and are not helpful to the Court on class certification or to the jury." Motion to Exclude Dr. Dennis at 34. The Defendants argue that Dr. Dennis cannot say how any of the issues that he raised with Dr. Van Liere's survey affected the results and, therefore his testimony is not helpful to the Court or the jury. See Motion to Exclude Dr. Dennis at 34. The Defendants further contend that "Dr. Dennis does not assist the fact finder; he merely offers 'an analysis that suggests a myriad of potential problems' but that does not identify any of them as manifesting in fact." Motion to Exclude Dr. Dennis at 36 (quoting Armeanu v. Bridgestone/Firestone N. Am. Tire, LLC, No. CIV 05-0619 JB/DJS, 2006 WL 4060665, at *19 (D.N.M. Sept. 26, 2006)(Browning, J.)(emphasis added in Motion to Exclude Dr. Dennis, but not at Armeanu v. Bridgestone/Firestone N. Am. Tire, LLC). The Defendants conclude that Dr. Dennis' opinions are not reliable, and will not be helpful to the Court or a jury. See Motion to Exclude Dr. Dennis at 37.

**b. Motion to Exclude Dr. Dennis Opposition.**

The Plaintiffs contend that Dr. Dennis' testimony should be allowed to challenge Dr. Van Liere's survey design with respect to the survey's recall bias, use of open-ended survey questions, and biased closed-ended response options. See Motion to Exclude Dr. Dennis Opposition at 4. Further, the Plaintiffs argue that the Court should allow Dr. Dennis to challenge Dr. Van Liere's survey pre-testing methods. See Motion to Exclude Dr. Dennis Opposition at 6. The Plaintiffs also note that they have asked the Court to exclude Dr. Van Liere's testimony, and if the Court does so, then the Dr. Dennis' testimony would be irrelevant. See Motion to Exclude Dr. Dennis Opposition at 8. The Plaintiffs also attest that Dr. Dennis is a qualified expert, because he has a Ph.D. from the University of Chicago, has worked in survey design and research for private industry, and has designed and conducted hundreds of statistical surveys over the past eighteen years. See Motion to Exclude Dr. Dennis Opposition at 9.

The Plaintiffs argue that Dr. Dennis' testimony is reliable. See Motion to Exclude Dr. Dennis Opposition at 10. The Plaintiffs contend that, when a survey is admissible, rebuttal opinion testimony that highlights the survey's deficiencies is admissible. See Motion to Exclude Dr. Dennis Opposition at 11. Moreover, the Plaintiffs attest that "'rebuttal expert witnesses may criticize other experts' theories and calculations *without offering alternatives*.'" Motion to Exclude Dr. Dennis Opposition at 12 (quoting Aviva Sports, Inc. v. Fingerhut Direct Mktg., Inc., 829 F. Supp. 2d at 834 (emphasis in Motion to Exclude Dr. Dennis Opposition, but not in Aviva Sports, Inc. v. Fingerhut Direct Mktg., Inc.). Consequently, as the Plaintiffs argue, Dr. Dennis need not have conducted his own survey to opine on Dr. Van Liere's flawed methodology. See Motion to Exclude Dr. Dennis Opposition at 13.

Next, the Plaintiffs argue that Dr. Dennis considered sufficient facts and data to form his opinions. See Motion to Exclude Dr. Dennis Opposition at 13. The Plaintiffs argue that "[a] witness may acquire expertise on a subject based on experience in that field," Motion to Exclude Dr. Dennis Opposition at 13 (quoting United States v. Rodella, No. CR 14-2783 JB, 2014 WL 6634310, at *8 (D.N.M. November 19, 2014)(Browning, J.)), and that Dr. Dennis has expertise based on his twenty years of experience working in survey research, see Motion to Exclude Dr. Dennis Opposition at 13. Moreover, the Plaintiffs contend that Dr. Dennis points to research that supports his opinion that Dr. Van Liere's survey suffers from recall bias, that he inappropriately used open-ended questions, and inadequately used closed-ended questions. See Motion to Exclude Dr. Dennis Opposition at 14. The Plaintiffs also contend that the Defendants are incorrect in asserting that Dr. Dennis needed to review the pleadings, depositions transcripts, and expert reports to be a qualified expert. See Motion to Exclude Dr. Dennis Opposition at 15. The Plaintiffs contend that the pleadings, depositions, and other expert reports are irrelevant to Dr. Dennis' testimony, because Dr. Dennis opines only on Dr. Van Liere's survey methodology and the opinions he derives from his survey. See Motion to Exclude Dr. Dennis Opposition at 16.

**c. Motion to Exclude Dr. Dennis Reply.**

In the Motion to Exclude Dr. Dennis Reply, the Defendants first argue that Dr. Dennis' opinions are unfounded and unreliable, because he did not conduct any surveys, review any pleadings, or review any documents. See Motion to Exclude Dr. Dennis Reply at 3. Second, the Defendants contend that Dr. Dennis' theoretical criticisms of Dr. Van Liere are unreliable, because Dr. Dennis misunderstands what Dr. Van Liere was measuring, Dr. Dennis' opinions in this case contradict his past testimony in similar cases, Dr. Dennis does not identify a methodological flaw in Dr. Van Liere's use of open-ended questions or his coding of the open-

ended questions, Dr. Dennis misunderstands Dr. Van Liere's use of closed-ended questions, and Dr. Dennis does not identify a methodological flaw in Dr. Van Liere's pretesting method. See Motion to Exclude Dr. Dennis Reply at 8, 10, 13, 15, 17. Third, the Defendants argue that Dr. Dennis' criticisms of Dr. Van Liere are theoretical and, therefore, will not assist the Court or a jury. See Motion to Exclude Dr. Dennis Reply at 17. Consequently, the Defendants conclude that the Court should exclude Dr. Dennis' testimony. See Motion to Exclude Dr. Dennis Reply at 18.

**5. Motion to Exclude Charles D. Garner.**

The Plaintiffs filed the Plaintiffs' Motion to Exclude the Opinions and Testimony of Charles D. Garner, Ph.D., DABT. See Plaintiffs' Motion to Exclude the Opinions and Testimony of Charles D. Garner, Ph.D., DABT, filed July 23, 2020 (Doc. 282)("Motion to Exclude Dr. Garner"). The Defendants respond. See generally Motion to Exclude Dr. Garner Opposition. The Plaintiffs reply. See Plaintiffs' Reply to Defendants' Opposition to Plaintiffs' Motion to Exclude the Expert Opinions and Testimony of Dr. Charles D. Garner, filed November 19, 2020 (Doc. 326)("Motion to Exclude Dr. Garner Reply").

**a. Motion to Exclude Dr. Garner.**

The Plaintiffs ask the Court to exclude Dr. Charles Garner's testimony that the Defendants do not add menthol to the tobacco of Natural American cigarettes. Motion to Exclude Dr. Garner at 1. First, the Plaintiffs argue that Dr. Garner's opinion that Natural American cigarettes are "additive-free" is unreliable, because it contradicts directly federal law and executives at Santa Fe Tobacco's testimony. Motion to Exclude Dr. Garner at 9. The Plaintiffs argue that Dr. Garner is not qualified to render an opinion on whether menthol is an additive, because he "has no special qualifications by training, education or experience in what

constitutes an 'additive' as that term is used by Santa Fe in marketing and labeling NAS menthol cigarettes as 'additive-free.'" Motion to Exclude Dr. Garner at 10. The Plaintiffs also argue that Dr. Garner's opinions are based only on his own opinion and do not have any basis in reliable support. See Motion to Exclude Dr. Garner at 11-12. For example, the Plaintiffs protest Dr. Garner's testimony that he does not agree with the FDA's definition of additive and stating: "'I think I like my definition better.'" Motion to Exclude Dr. Garner (quoting Deposition of Charles Garner, PhD at 119:21-120:4 (taken January 16, 2020), filed July 23, 2020 (Doc. 279-12)(Garner)("Garner Depo."). See Garner Depo. at 119:10-11 (Garner)(defining a tobacco additive as "a chemical or chemical mixture that is added to the tobacco"). The Plaintiffs further argue that, by defining additive in the face of the FDA's legal definition of additive, Dr. Garner is attempting to provide an impermissible legal conclusion. See Motion to Exclude Dr. Garner at 12. The Plaintiffs also contend that Dr. Garner's testimony that, if menthol is added to a cigarette, the menthol will migrate to the tobacco undermines his testimony that the Defendants do not add additives to their cigarettes. See Motion to Exclude Dr. Garner at 13 (citing Garner Depo. 56:15-25; 57:13-17). The Plaintiffs argue that, because Dr. Garner's opinion is contradictory, it is inherently unreliable and is not based on scientific principles. See Motion to Exclude Dr. Garner at 14.

Second, the Plaintiffs argue that Dr. Garner's opinion that menthol cigarettes do not present increased harm to smokers is unreliable. See Motion to Exclude Dr. Garner at 15. The Plaintiffs contend that Dr. Garner did not explain how he came to this factual conclusion, and that no scientific or medical journal, or evidence supports his opinion. See Motion to Exclude Dr. Garner at 15. The Plaintiffs argue that Dr. Garner's opinion is "nothing more than his own *ipse dixit*" and that his opinion is "against the great weight of scientific evidence supported by

the FDA." Motion to Exclude Dr. Garner at 16.

**b. Motion to Exclude Dr. Garner Opposition.**

The Defendants argue that the Court should consider Dr. Garner's testimony, because Dr. Garner's opinions are based on undisputed facts in the case, relevant peer-reviewed literature, scientific data, and industry practice. See Motion to Exclude Dr. Garner Opposition at 1. Specifically, the Defendants make four arguments. First, the Defendants argue that Dr. Garner is qualified to testify as an expert, and that his opinions are reliable, because Dr. Garner "holds a Ph.D. in toxicology, has worked for decades in the field of tobacco product evaluation and harm reduction," and publishes work on differences in risk between tobacco products. Motion to Exclude Dr. Garner Opposition at 9-10. The Defendants also contend that Dr. Garner's methodology is reliable, because he has "reviewed peer-reviewed literature, government reports, and industry and regulatory practice." Motion to Exclude Dr. Garner Opposition at 10. Second, the Defendants contend that the Plaintiffs ask the Court to "exclude two opinions that Dr. Garner does not hold": (i) that "'Dr. Garner opines that mentholated NAS cigarettes are "additive-free"'"; and (ii) that Dr. Garner "'opines that because menthol is not added directly into the tobacco in NAS cigarettes, it is not an 'additive.'" Motion to Exclude Dr. Garner Opposition at 10 (quoting Motion to Exclude Dr. Garner at 2, 9). Third, the Defendants argue that Dr. Garner's opinion "that menthol in mentholated NAS cigarettes is a filter additive and cigarette additive -- but *not* a tobacco additive -- is reliable, helpful, within Dr. Garner's expertise, and not an impermissible legal opinion." Motion to Exclude Dr. Garner Opposition at 12 (emphasis in original). The Defendants contend that the parties do not dispute that menthol is added only to the filter of Natural American cigarettes rather than the tobacco. See Motion to Exclude Dr. Garner Opposition at 12. Moreover, the Defendants argue that the parties do not dispute that,

after manufacturing, menthol from the filter migrates to the tobacco. See Motion to Exclude Dr. Garner Opposition at 14. The Defendants also contend that the menthol on the filter of Natural American cigarettes is placed on a sepiolite,[20] which inhibits the menthol from migrating from the filter to other parts of the cigarette. See Motion to Exclude Dr. Garner Opposition at 15. The Defendants further contend that Dr. Garner's conclusion that menthol in the filter of a Natural American cigarette is not a "tobacco additive" is reliable and relevant, and that Dr. Garner's opinion is consistent with FDA regulations mandating that manufacturers report whether menthol is added to a filter or to tobacco. Motion to Exclude Dr. Garner Opposition at 16. Fourth, the Defendants contend that "Dr. Garner's opinion that there is no increased harm due to the migration of some menthol in NAS cigarettes to the tobacco is reliable." Motion to Exclude Dr. Garner Opposition at 24. The Defendants contend that peer-reviewed studies support Dr. Garner's conclusion that menthol cigarettes do not pose increased risk to smokers. See Motion to Exclude Dr. Garner Opposition at 25. Consequently, the Defendants contend that Dr. Garner's opinions that menthol is not a tobacco additive, and that migration of menthol from the filter to the tobacco does not increase harm to smokers are admissible, because they are based in fact, supported by review of scientific data, and are relevant to disputed issues in the case. See Motion to Exclude Dr. Garner Opposition at 29.

**c. Motion to Exclude Dr. Garner Reply.**

In their Motion to Exclude Dr. Garner Reply, the Plaintiffs make two arguments. See Motion to Exclude Dr. Garner Reply at 1, 3. First, the Plaintiffs contend that Dr. Garner's opinions should be excluded because they are not helpful to the trier of fact. See Motion to

[20]A sepiolite is a "clay-like substance meant to inhibit the migration of menthol from the filter to other parts of the cigarette." Motion to Exclude Dr. Garner Opposition at 15.

Exclude Dr. Garner Reply at 1. The Plaintiffs contend that Dr. Garner's testimony is not helpful, because his "attempt to draw a distinction between a filter additive and tobacco additive is confusing and misleading." Motion to Exclude Dr. Garner Reply at 2. The Plaintiffs also argue that Dr. Garner's testimony is not helpful in light of the Court's previous determination that "'an additive-free cigarette cannot have menthol.'" Motion to Exclude Dr. Garner Reply at 3 (quoting MTD MOO at 184). Second, the Plaintiffs argue that Dr. Garners opinions should be excluded, because Dr. Garner is not qualified. See Motion to Exclude Dr. Garner Reply at 3. Specifically, the Plaintiffs contend that Dr. Garner "is not qualified to opine on whether menthol is an additive," because his "lengthy employment at Reynolds' merely highlights his bias and reinforces his lack of impartiality in his own research" and his opinions on menthol have not been tested or subject to peer-review. Motion to Exclude Dr. Garner Reply at 3. The Plaintiffs also attest that Dr. Garner's opinion that menthol does not increase harm from cigarettes is mere guesswork and that this conclusion is unsupported by research. See Motion to Exclude Dr. Garner Reply at 3.

**6. Motion to Exclude Dr. Kent Van Liere.**

The Plaintiffs ask the Court to exclude the opinions and testimony of Defendants' expert, Dr. Kent Van Liere. See Motion to Exclude Dr. Van Liere at 25. The Defendants respond. See Defendants' Opposition to Plaintiffs' Motion to Exclude the Expert Opinions and Testimony of Dr. Kent Van Liere, filed October 8, 2020 (Doc. 314)("Motion to Exclude Dr. Van Liere Opposition"). The Plaintiffs reply. See Plaintiffs' Reply in Support of Plaintiffs' Motion to Exclude the Expert Opinions and Testimony of Dr. Kent Van Liere, filed November 19, 2020 (Doc. 327)("Motion to Exclude Dr. Van Liere Reply").

**a. <u>Motion to Exclude Dr. Van Liere</u>.**

The Plaintiffs argue that Dr. Van Liere's testimony is irrelevant, unreliable, and inadmissible. <u>See</u> Motion to Exclude Dr. Van Liere at 6. The Plaintiffs contend that the Court should exclude Dr. Van Liere's testimony for three reasons. <u>See</u> Motion to Exclude Dr. Van Liere at 6, 12. First, the Plaintiffs argue that Dr. Van Liere's survey "does not logically advance any material aspect of the case." Motion to Exclude Dr. Van Liere at 6. The Plaintiffs attest that Dr. Liere's survey, which analyzes consumers' motives and intent in purchasing Natural American cigarettes, is not relevant to the Court at the class certification stage. <u>See</u> Motion to Exclude Dr. Van Liere at 8. The Plaintiffs argue also that Dr. Van Liere's survey does not measure materiality, meaning that Dr. Van Liere's study does not measure whether the Defendants' advertisements that Natural American cigarettes are "'100% additive-free,' 'natural,' and 'organic'" were material to the consumer. Motion to Exclude Dr. Van Liere at 11 (no citation for quotations). Second, the Plaintiffs contend that Dr. Van Liere's opinions are not based on "'good grounds.'" Motion to Exclude Dr. Van Liere at 12 (no citation for quotation). The Plaintiffs argue that Dr. Van Liere's conclusions are the "product of methodological distortions," and that Dr. Van Liere miscoded the survey results. Motion to Exclude Dr. Van Liere at 12-13. Namely, the Plaintiffs allege that Dr. Van Liere did not properly code responses that included health reassurance terms, such as not categorizing the word "natural" as "healthy." Motion to Exclude Dr. Van Liere at 13-14. The Plaintiffs contend also that Dr. Van Liere's opinions are "based on an ignorance of market realities." Motion to Exclude Dr. Van Liere at 18. The Plaintiffs also take issue with Dr. Van Liere's failure to control for recall bias and argue that undermines the reliability of Dr. Van Liere's study and opinions. <u>See</u> Motion to Exclude Dr. Van Liere at 19. Further, the Plaintiffs argue that Dr. Van Liere uses open-ended questions

inappropriately and against industry standards, because coding open-ended answers introduces interviewer and coder variance. See Motion to Exclude Dr. Van Liere at 22. Third, the Plaintiffs argue that conjoint analysis is the appropriate methodology for a survey like the one Dr. Van Liere conducted, because conjoint analysis involves less risk of recall bias and would have been more accurate at measuring the reasons why consumers purchased Natural American cigarettes. See Motion to Exclude Dr. Van Liere at 24.

**b. Motion to Exclude Dr. Van Liere Opposition.**

The Defendants contend that Dr. Van Liere's survey, findings, and opinions are admissible. See Motion to Exclude Dr. Van Liere Opposition at 14. The Defendants make two primary arguments. See Motion to Exclude Dr. Van Liere Opposition at 15, 19. First, the Defendants argue that Dr. Van Liere's survey findings are relevant to the Certification Motion, because the findings address the issue whether Plaintiffs can demonstrate on a class-wide basis that consumers pay more for Natural American cigarettes based on Natural American cigarettes health representations. See Motion to Exclude Dr. Van Liere Opposition at 15. The Defendants contend that, at the class certification stage, the Plaintiffs must demonstrate that materiality can be inferred on a class-wide basis, and Dr. Van Liere's survey supports the Defendants' argument that materiality cannot be inferred on a class-wide basis. See Motion to Exclude Dr. Van Liere Opposition at 16. The Defendants also contend that Plaintiffs are incorrect in asserting that Dr. Van Liere's survey does not measure materiality, because Dr. Van Liere only testified that "it is for the Court, not him, to determine whether the *legal requirement* of materiality is satisfied." Motion to Exclude Dr. Van Liere Opposition at 17 (emphasis in original). Second, the Defendants argue that Dr. Van Liere's survey methodology is reliable. See Motion to Exclude Dr. Van Liere Opposition at 19. The Defendants contend that Dr. Van Liere's survey

methodology is generally accepted within the relevant medical and scientific community. See Motion to Exclude Dr. Van Liere Opposition at 19. Specifically, the Defendants attest that Dr. Van Liere conducted a sample survey, used double-blind techniques, sampled the relevant population -- United States consumers who were twenty-one years or older during the class period who purchased one or more variety of Natural American cigarettes during the class period -- prevented respondents from guessing by instructing respondents not to guess and providing options for a respondent to select that they did not know the answer or could not recall the answer, used both open- and closed-ended questions, and pretested the survey, and followed best practices in coding the data. See Motion to Exclude Dr. Van Liere Opposition at 19-23. The Defendants take issue with the Plaintiffs' argument that Dr. Van Liere improperly coded responses to the open-ended "'reasons for purchase'" question, arguing that Dr. Van Liere's methods were sound and the Plaintiffs only object to Dr. Van Liere not treating "a host of themes as implicitly representing a health misperception, even if a response did not mention a belief that NAS cigarettes are healthy/healthier/safe/safer." Motion to Exclude Dr. Van Liere Opposition at 24-25 (no citation for quotation). The Defendants also contend that Dr. Van Liere's survey reflects market realities, and that the survey is relevant to this litigation. See Motion to Exclude Dr. Van Liere Opposition at 26. The Defendants further argue that Plaintiff's contention that recall bias renders Dr. Van Liere's survey unreliable is inapposite, because the Plaintiff's own expert, Dr. Dennis, identifies recall bias only as a potential source of error. See Motion to Exclude Dr. Van Liere Opposition at 28. The Defendants also attest that Dr. Van Liere's use of open-ended questions is acceptable practice. See Motion to Exclude Dr. Van Liere Opposition at 29. Finally, the Defendants contend that the Plaintiffs' argument that Dr. Van Liere should have performed a conjoint analysis is "predicated on a misunderstanding of Dr. Van Liere's purpose

in conducting his survey, and calls into question neither the survey's relevance nor its reliability." Motion to Exclude Dr. Van Liere Opposition at 31. Consequently, the Defendants argue that Dr. Van Liere's survey and opinions are admissible and will assist the Court at the class certification stage.

**c. Motion to Exclude Dr. Van Liere Reply.**

In their Motion to Exclude Dr. Van Liere Reply, the Plaintiffs argue that the "central issue" with Dr. Van Liere's report is that Dr. Van Liere "simply decided, without justification, to code certain ambiguous responses which admit of a health reassurance interpretation as something other than a health reassurance belief" and then failed to address the coding decisions' effect on his conclusion. Motion to Exclude Dr. Van Liere Reply at 2. The Plaintiffs make two primary arguments in the Motion to Exclude Dr. Van Liere Reply. See Motion to Exclude Dr. Van Liere Reply at 4, 13. First, the Plaintiffs argue that the methodological defects involved in Dr. Van Liere's survey render his opinion unreliable. See Motion to Exclude Dr. Van Liere Reply at 4. Specifically, the Plaintiffs contend that Dr. Van Liere never considered the coding decisions' effects in his report, his opinion was reached for the litigation's purposes, and his report rests entirely on anecdotal evidence, because he "literally just asked respondents an open-ended question about why they purchased NAS." Motion to Exclude Dr. Van Liere Reply at 6. Further, the Plaintiffs contend that Dr. Van Liere's failure to address the coding ambiguities issue renders his survey unreliable. See Motion to Exclude Dr. Van Liere Reply at 8. Second, the Plaintiffs argue that Dr. Van Liere's testimony and report "fail the Rule 403 balancing test." Motion to Exclude Dr. Van Liere Reply at 13. The Plaintiffs argue also that Dr. Van Liere did not test for materiality, but that the "Defendants have demonstrated their intent to hugely extrapolate from these limited (and questionable) findings and conclusions and treat Dr. Van

Liere's study as an actual materiality study." Motion to Exclude Dr. Van Liere Reply at 15. Consequently, the Plaintiffs attest that the Court should exclude Dr. Van Liere's report and testimony. See Motion to Exclude Dr. Van Liere Reply at 17.

**7. Motion to Exclude Dr. Joannes Evangelista Steenkamp.**

The Plaintiffs ask the Court to exclude Dr. Joannes Evangelista Steenkamp's testimony. See Motion to Exclude Dr. Steenkamp at 27-28. The Defendants respond. See generally Motion to Exclude Dr. Steenkamp Opposition. The Plaintiffs reply. See Plaintiffs' Reply Memorandum of Law in Further Support of Their Motion to Exclude the Expert Testimony of Dr. Joannes Evangelista Steenkamp, filed November 19, 2020 (Doc. 328)("Motion to Exclude Dr. Steenkamp Reply").

**a. Motion to Exclude Dr. Steenkamp.**

The Plaintiffs ask the Court to exclude Dr. Steenkamp's opinions that:

1. NAS packaging has never implied that NAS products are safer or healthier than other cigarettes (Steenkamp Report at 8-9 ¶¶ 1-3, 81-82, 85-91);

2. Market shares of NAS and other brands of cigarettes with similar descriptors demonstrate that descriptors such as "additive free" and "natural" are not drivers of NAS sales (id. at 9-10 ¶ 5-6, 72-76, 93-96);

3. NAS sales have been driven by a group of brand attributes such as authenticity, environmental initiatives, and personal selling efforts (id. at 9-10 ¶¶ 4 & 7, 25-51, 57-59, 70-72, 75-77, 80, 96-97);

4. Dr. Dewhirst incorrectly concludes that descriptors such as "additive free," "natural," and "organic" are drivers of NAS sales (id. at 9-10 ¶¶ 5-7, 63-70, 79-81, 84, 90-93);

5. The price premium for NAS products are not the result of descriptors such as "additive free" and "natural" (id. at 9-10 ¶ 5-6, 91-93);

6. Dr. Dewhirst incorrectly concludes that "academic research has found that the natural product descriptor is associated with being more

nutritious, healthier, safer, etc., and consumers express a willingness to pay more for such products." (id. at 81-82); and

7. Dr. Pearson incorrectly concludes that there is an association between descriptors such as "additive free" and "natural" and health (Steenkamp Report at 83-84).

Motion to Exclude Dr. Steenkamp at 3. The Plaintiffs make five primary arguments. See Motion to Exclude Dr. Steenkamp at 8, 14, 16, 24. First, the Plaintiffs contend that Dr. Steenkamp's "sole basis" for his opinion that Santa Fe's marketing does not represent that Natural American cigarettes are healthier is based on the FDA required disclaimer on the side of Natural American cigarettes that states that no additives does not mean a safer cigarette, Motion to Exclude Dr. Steenkamp at 9, and a conclusion "driven by an expert's own purported common sense is inadmissible," Motion to Exclude Dr. Steenkamp at 10. Consequently, the Plaintiffs attest that there "is no reliable basis for Dr. Steenkamp's opinion that the NAS disclaimer is effective" or "that the terms 'additive free' and 'natural' do not mislead consumers regarding the safety of NAS products." Motion to Exclude Dr. Steenkamp at 14 (no citation for quotation). Additionally, the Plaintiffs contend that Dr. Steenkamp's opinions "will not help the Court to determine whether class certification is appropriate." Motion to Exclude Dr. Steenkamp at 14.

Second, the Plaintiffs contend that the Court should exclude Dr. Steenkamp's opinion that the "small market shares of two other tobacco companies that sell products with similar descriptors" demonstrates that the terms "additive free" and "natural" do not impact sales. Motion to Exclude Dr. Steenkamp at 14. The Plaintiffs argue that Dr. Steenkamp's theory ignores the numerous factors that "could affect a company's market share." Motion to Exclude Dr. Steenkamp at 15. The Plaintiffs further contend that Dr. Steenkamp's opinion is unreliable, because he did not perform any financial or business analysis of the other two tobacco

companies. See Motion to Exclude Dr. Steenkamp at 15.

Third, the Plaintiffs argue that the Court should exclude Dr. Steenkamp's opinion that Natural American cigarettes sales result from "an amorphous group of 'brand attributes,'" Motion to Exclude Dr. Steenkamp at 17 (quoting Steenkamp Report at 96), because Dr. Steenkamp does not provide any evidence that the brand attributes, either individually or collectively, resulted in increased sales, see Motion to Exclude Dr. Steenkamp at 18. The Plaintiffs contend that Dr. Steenkamp merely cites to anecdotal evidence that there is a consumer trend in purchasing "authentic" products, but that Dr. Steenkamp does not provide scientific evidence to support this theory. Motion to Exclude Dr. Steenkamp at 18. The Plaintiffs also argue that Dr. Steenkamp contends that environmental initiatives drove Natural American cigarette sales, but does not cite to any causal evidence to support the assertion. See Motion to Exclude Dr. Steenkamp at 19. Dr. Steenkamp also asserts that the Defendants used "'personal selling'"[21] to sell Natural American cigarettes, but the Plaintiffs contend that Dr. Steenkamp cannot identify any personal selling materials, training manuals, or what quantity of consumers the personal selling experiences reached. Motion to Exclude Dr. Steenkamp at 21.

Fourth, the Plaintiffs ask the Court to exclude Dr. Steenkamp's opinion that "the price premium for NAS products is not the result of 'additive-free' or 'natural' descriptors." Motion to Exclude Dr. Steenkamp at 24. The Plaintiffs attest that Dr. Steenkamp "suggests that authenticity is the reason for the price premium," but that he "admits that there is no data that supports his assertion that authenticity contributed to a price premium." Motion to Exclude Dr. Steenkamp at 24. Consequently, the Plaintiffs conclude that Dr. Steenkamp's opinion on Natural

[21]"Personal selling" includes "direct spoken or written communications between sellers and potential retail customers." Motion to Exclude Dr. Steenkamp at 21.

American cigarettes' price premium is unreliable. See Motion to Exclude Dr. Steenkamp at 25.

Fifth, and finally, the Plaintiffs argue that the Court should exclude Dr. Steenkamp's rebuttal of Dr. Dewhirst's and Dr. Pearson's opinions regarding the associations between "additive-free" and "natural" and health. Motion to Exclude Dr. Steenkamp at 25. The Plaintiffs argue that Dr. Steenkamp is not qualified to opine on marketing research on how consumers interpret messages, because he is not an expert on marketing research. See Motion to Exclude Dr. Steenkamp at 25-26. Moreover, the Plaintiffs assert that Dr. Steenkamp does not cite to any scientific support to rebut Dr. Dewhirst or Dr. Pearson's opinions and, therefore, his opinions are unreliable. See Motion to Exclude Dr. Steenkamp at 26.

**b. Motion to Exclude Dr. Steenkamp Opposition.**

The Defendants make three arguments that the Court should not exclude Dr. Steenkamp's opinions. See Motion to Exclude Dr. Steenkamp Opposition at 11, 19, 29. First, the Defendants argue that Dr. Steenkamp uses reliable methodology to analyze Natural American cigarette sales, because he "conducted a comprehensive review of Santa Fe's advertisements." Motion to Exclude Dr. Steenkamp Opposition at 11. Specifically, the Defendants note that Dr. Steenkamp reviewed "available data, company documents, marketing literature," and has "over thirty-five years of experience," which he uses to determine the attributes that played a role in Natural American cigarettes' successful sales. Motion to Exclude Dr. Steenkamp Opposition at 12. The Defendants also attest that Dr. Steenkamp applied generally accepted practices to form his opinions about authenticity, environmental initiatives, and personal selling being instrumental to Natural American cigarette sales, because he reviews and cites published marketing research results and consumer survey data. See Motion to Exclude Dr. Steenkamp Opposition at 15.

Second, the Defendants contend that "Dr. Steenkamp employed a reliable methodology

to assess the role of the descriptors and disclaimers, and the alleged health implications of them, in Santa Fe's marketing." Motion to Exclude Dr. Steenkamp Opposition at 19. The Defendants assert that Dr. Steenkamp has reviewed extensively Santa Fe's marketing materials, the information provided to consumers, the Plaintiffs' expert reports, published literature, and survey data to draw his conclusions, and they are, therefore, reliable. See Motion to Exclude Dr. Steenkamp Opposition at 20. The Defendants also assert that Dr. Steenkamp relies on marketing science principles based on various studies and data to determine that the Defendants' disclaimers were effective. See Motion to Exclude Dr. Steenkamp Opposition at 24. Third, the Defendants argue that "Dr. Steenkamp employed a reliable methodology to analyze and rebut Plaintiffs' claim that the price premium for NAS products are the result of descriptors such as 'additive-free' and 'natural.'" Motion to Exclude Dr. Steenkamp Opposition at 29 (no citation for quotation).

**c. Motion to Exclude Dr. Steenkamp Reply.**

The Plaintiffs make five arguments in their reply. See Motion to Exclude Dr. Steenkamp Reply at 2. First, the Plaintiffs contend that Dr. Steenkamp's opinions that the descriptors additive-free and natural do not mislead consumers, and that disclaimers are ineffective, directly contradicts FDA studies that find the contrary. See Motion to Exclude Dr. Steenkamp Reply at 3. Further, the Plaintiffs contend that Dr. Steenkamp relies properly on scientific studies and appropriate data when forming his opinions. See Motion to Exclude Dr. Steenkamp Reply at 4-5. Second, the Plaintiffs argue that, in forming his opinion that the additive-free and natural descriptors did not contribute to Natural American cigarette sales, Dr. Steenkamp relied on only two other tobacco brands with similar descriptors who have small market shares and that he does not consider any other factors that impact market share. See Motion to Exclude Dr. Steenkamp

Reply at 7. Third, the Plaintiffs argue that Dr. Steenkamp does not rely on scientific methodology or on actual data in opining that Natural American cigarette sales are the result of the Defendants' branding Natural American cigarette products as authentic, on the Defendants' environmental initiatives, or on the Defendants' personal selling tactics and, therefore, Dr. Steenkamp's opinion is unreliable. See Motion to Exclude Dr. Steenkamp Reply at 9-14. Moreover, the Plaintiffs attest that Dr. Steenkamp cannot opine that "segmentation"[22] drove sales, because he cannot identify any "materially distinct messaging that was sent to a particular segment," and because there is no scientific evidence that segmentation led to increased sales. Motion to Exclude Dr. Steenkamp Reply at 14. Fourth, the Plaintiffs contend that the Court should exclude Dr. Steenkamp's opinion that the price premium for Natural American cigarettes is not the result of the additive-free or natural descriptors, because Dr. Steenkamp never controlled for any variables that might cause a price premium, nor did he ask the Defendants about their pricing decisions. See Motion to Exclude Dr. Steenkamp Reply at 17. Fifth, the Plaintiffs ask the Court to exclude Dr. Steenkamp's rebuttal of Dr. Dewhirst and Dr. Pearson, because Dr. Steenkamp does not provide any support for his conclusion that surveys on consumer perceptions of food descriptors are inapplicable to cigarettes. See Motion to Exclude Dr. Steenkamp Reply at 17. Moreover, the Plaintiffs contend that "[t]his is an opinion outside of his area of expertise." Motion to Exclude Dr. Steenkamp Reply at 18. The Plaintiffs also argue that Dr. Steenkamp misunderstands Dr. Pearson's report and that, therefore, his criticisms of Dr. Pearson are misguided. See Motion to Exclude Dr. Steenkamp Reply at 18.

[22]Segmentation is "a marketer's efforts to divide markets into segments by 'identify[ing] and profil[ing] distinct groups of buyers that demand different products.'" Motion to Exclude Dr. Steenkamp Reply at 14 (quoting Dr. Steenkamp Report at 12)(alteration in Motion to Exclude Dr. Steenkamp Reply and not in Dr. Steenkamp Report).

**8. Motion to Exclude Dr. David J. Teece.**

The Plaintiffs ask the Court to exclude the Defendants' expert, Dr. David J. Teece. See Motion to Exclude Dr. Teece at 30-31. The Defendants respond in opposition. See Defendants' Opposition to Plaintiffs' Motion to Exclude the Expert Opinions and Testimony of Dr. David J. Teece, filed October 8, 2020 (Doc. 312)("Motion to Exclude Dr. Teece Opposition"). The Plaintiffs reply. See Plaintiffs' Reply Memorandum of Law in Further Support of Their Motion to Exclude the Expert Testimony of Dr. David J. Teece, filed November 19, 2020 (Doc. 324)("Motion to Exclude Dr. Teece Reply").

**a. Motion to Exclude Dr. Teece.**

The Defendants offer Dr. Teece as an expert in the fields of economics and business strategy. See Motion to Exclude Dr. Teece at 1. The Plaintiffs contend that Dr. Teece's expert report and opinions do not satisfy the standards for expert testimony. See Motion to Exclude Dr. Teece at 1. Specifically, the Plaintiffs seek to exclude seven of Dr. Teece's opinions:

- The market share of various cigarette brands demonstrates that descriptors such as "additive free" and "natural" are not drivers of sales of Natural American Spirit ("NAS") products (Teece Report at 4-14);

- The lack of a decrease in NAS market share after disclaimers were added to NAS packaging or after certain descriptors were removed from NAS packaging demonstrates that descriptors such as "additive free" and "natural" are not drivers of NAS sales (Teece Report at 14-20);

- Wholesale and retail pricing of NAS products demonstrate that descriptors such as "additive free" and "natural" are not drivers of NAS sales (Teece Report at 20-34);

- The premium pricing of NAS products was the result of NAS brand equity and defendants' marketing efforts (Teece Report at 35-51);

- There is variability among NAS product users with respect to the reasons for their purchases and the product attributes they value (Teece Report at 51-54); and

- The methodology of the proposed conjoint analysis of Plaintiffs' expert, Dr. Jean-Pierre Dubé, is unreliable or improper (Teece Report at 66-81)[.]

Motion to Exclude Dr. Teece at 1-2. The Plaintiffs make seven primary arguments that the Court should exclude Dr. Teece's testimony. Motion to Exclude Dr. Teece at 10, 17, 22, 24, 25, 26, 28. First, the Plaintiffs contend that "Dr. Teece, by his own admission, used non-scientific methods when he looked at brand market shares to conclude that descriptors such as 'additive free' and 'natural' are not drivers of sales." Motion to Exclude Dr. Teece at 10 (no citation for quotation). The Plaintiffs contend that Dr. Teece's opinion that health descriptors are not drivers of sales is unreliable, because he did not perform financial or business analysis of other brands who use similar health descriptors. See Motion to Exclude Dr. Teece at 10-11. Further, the Plaintiffs attest that Dr. Teece's "opinions on consumer perceptions resulting from marketing efforts are beyond the scope of his expertise and should not be admitted." Motion to Exclude Dr. Teece at 13.

Second, the Plaintiffs ask the Court to exclude Dr. Teece's testimony on disclaimers, because it is unreliable. See Motion to Exclude Dr. Teece at 17. According to the Plaintiffs, Dr. Teece's opinion is unreliable, because he "offers no scientific evidence or analysis of any causal connection (or lack thereof)" regarding Natural American cigarettes' changes in market share after the Defendants added the disclaimer. See Motion to Exclude Dr. Teece at 18. Moreover, the Plaintiffs contend that "Dr. Teece admits that he is not an expert on disclaimers . . . , or on consumer perceptions of advertising and marketing." Motion to Exclude Dr. Teece at 18. The Plaintiffs also criticize Dr. Teece's consideration of market share as a metric, because, as the Plaintiffs attest, Dr. Teece conflates market share with sales, despite that cigarette sales have declined continually in the United States. See Motion to Exclude Dr. Teece at 21.

Third, the Plaintiffs ask the Court to exclude Dr. Teece's opinion that "wholesale and retail pricing demonstrate that alleged implied health claims are not drivers of sales," because Dr. Teece has not performed "scientific or econometric analysis" to reach this conclusion. Motion to Exclude Dr. Teece at 22. The Plaintiffs argue that, because Dr. Teece relies only on anecdotal evidence, his opinion is unreliable. See Motion to Exclude Dr. Teece at 24. Fourth, the Plaintiffs argue that the Court should exclude Dr. Teece's opinion "that NAS's premium pricing was the result of NAS brand equity and Santa Fe's marketing strategy." Motion to Exclude Dr. Teece at 24. The Plaintiffs attest that Dr. Teece's opinion is based on "Santa Fe's own self-promoting narrative as a socially and environmentally conscious company." Motion to Exclude Dr. Teece at 24. The Plaintiffs contend, furthermore, that Dr. Teece is not "an expert on marketing or advertising," and, accordingly, Dr. Teece is not qualified to opine on the Defendant's marketing or advertising strategies. Motion to Exclude Dr. Teece at 24. The Plaintiffs allege that Dr. Teece's opinion is "nothing but inadmissible *ipse dixit*." Motion to Exclude Dr. Teece at 25.

Fifth, the Plaintiffs contend that the Court should exclude Dr. Teece's opinion that "there is variability among NAS product users with respect to the reasons for their purchases and the attributes they value," because Dr. Teece does not "perform any type of statistical or econometric analysis with respect to his opinion on the variability of consumers." Motion to Exclude Dr. Teece at 25. The Plaintiffs attest that "Dr. Teece is not an expert on consumer behavior or the mental processes of individuals," and that Dr. Teece's opinion is based merely on speculation and anecdotal evidence. Motion to Exclude Dr. Teece at 26. Sixth, the Plaintiffs ask the Court to exclude Dr. Teece's opinions on Dr. Dubé's expert report, because Dr. Teece attacks Dr. Dubé's conjoint analysis methodology, and because Dr. Teece is "not an expert in conjoint

analysis." Motion to Exclude Dr. Teece at 26. The Plaintiffs further attest that Dr. Teece's opinions with respect to Dr. Dubé are "legal arguments in the guise of expert opinion," because, in his conclusions, Dr. Teece cites district court opinions to opine that Dr. Dubé's conjoint analysis model is not the appropriate measure of damages. Motion to Exclude Dr. Teece at 27.

Seventh, and finally, the Plaintiffs argue that "Dr. Teece has a long history of providing expert opinions based on little more than baseless assumptions and his own *ipse dixit*." Motion to Exclude Dr. Teece at 28. The Plaintiffs argue that Dr. Teece's work is based primarily on the work of "underlings" with whom he does not work closely. Motion to Exclude Dr. Teece at 28. Furthermore, the Plaintiffs bolster their argument that Dr. Teece's testimony is unreliable by citing to Burton v. Am Cyanamid, No. 07-CV-0303, No. 07-CV-0441, No. 10-CV-0075, 2018 WL 3954858, at *9-10 (E.D. Wis. August 16, 2018)(Adelman, J.), a case in which the Honorable Lynn Adelman, United States District Judge in the United States District Court for the Eastern District of Wisconsin, excluded Dr. Teece's testimony, because Dr. Teece's opinions were not based on reliable principles and methods. Motion to Exclude Dr. Teece at 29 (citing Burton v. Am Cyanamid, 2018 WL 3954858, at *9-10). Consequently, the Plaintiffs request that the Court exclude the aforementioned opinions of Dr. Teece. See Motion to Exclude Dr. Teece at 30.

**b. Motion to Exclude Dr. Teece Opposition.**

The Defendants argue that the Court should deny the Plaintiffs' Motion to Exclude Dr. Teece. See Motion to Exclude Dr. Teece Opposition at 1. The Defendants make four primary arguments. See Motion to Exclude Dr. Teece Opposition at 13, 26, 28, 32. First, the Defendants contend that Dr. Teece "employed a reliable methodology in refuting Plaintiffs' position that NAS' commercial success is driven by health misperceptions linked to the descriptors." Motion to Exclude Dr. Teece Opposition at 13. The Defendants concede that Dr. Teece has not

performed an econometric analysis, but the Defendants argue that Dr. Teece's conclusions are still scientific. See Motion to Exclude Dr. Teece Opposition at 14. Namely, the Defendants argue:

> Dr. Teece (1) identified other cigarettes brands that used descriptors like those at issue here; (2) analyzed the market-share data of those brands and of NAS over time; (3) examined the effect on market share when some of these brands added disclaimers or removed certain descriptors; and (4) assessed whether price discounting could provide an alternative explanation for NAS' success.

Motion to Exclude Dr. Teece Opposition at 14-15. The Defendants contend, therefore, that Dr. Teece's methodology is data-driven and reliable. See Motion to Exclude Dr. Teece Opposition at 15. The Defendants also attest that the Plaintiffs' assertion that Dr. Teece's testimony that other brands who used descriptors similar to Natural American cigarettes had a lower market share contradicts the Plaintiffs' claim that the health descriptors were the reason for Natural American cigarettes' success. Further, the Defendants argue that the Plaintiffs' assertion relies on the idea that Dr. Teece was required to "prove that no *other* factor affected each of the comparator brands' performance." Motion to Exclude Dr. Teece Opposition at 16 (emphasis in original). Further, the Defendants attest that Dr. Teece's opinions are within his expertise, because he opines only that "the economic data do not support Plaintiffs' claim that NAS' success is explained by any perception, derived from the descriptors, that NAS cigarettes are safer," and does not opine on consumer perception from marketing, which would fall outside of his expertise's scope. Motion to Exclude Dr. Teece Opposition at 17-18. The Defendants argue, furthermore, that Dr. Teece's conclusion that Natural American cigarettes' success is "attributable to a successful and well-executed business strategy" is sound, because the analysis is "well within Dr. Teece's capability as a preeminent expert on strategic management." Motion to Exclude Dr. Teece Opposition at 21. Specifically, the Defendants contend that Dr. Teece

reviewed company materials, internal documents, the Defendants' advertising strategies, and business plans to conclude that Natural American cigarettes success was largely a result of the Defendants' investments in advertising, in branding the company as having high-quality and environmentally conscious products, and the Defendants' ability to sell Natural American cigarettes in many retailers. See Motion to Exclude Dr. Teece Opposition at 21-24.

Second, the Defendants contend that Dr. Teece "employed a reliable methodology in concluding that NAS consumers vary significantly in the reasons they purchase NAS and the NAS attributes they value." Motion to Exclude Dr. Teece Opposition at 26. The Defendants attest that Dr. Teece reviewed internal company marketing research and the Plaintiffs' deposition testimony to assess whether consumers have common reasons for purchasing Natural American cigarettes. See Motion to Exclude Dr. Teece Opposition at 26. The Defendants argue that the Plaintiffs do not demonstrate that Dr. Teece necessarily needed statistical analysis to opine that the Plaintiffs' testimony is inconsistent with the Plaintiffs' claims. See Motion to Exclude Dr. Teece Opposition at 27-28. Third, the Defendants attest that "Dr. Teece employed a reliable methodology in concluding that the hypothetical survey proposed by Plaintiffs' damages expert would not yield data capable of measuring classwide damages." Motion to Exclude Dr. Teece Opposition at 28. The Defendants concede that Dr. Teece is not an expert on survey methods, but the Defendants argue that Dr. Teece's expertise in economics is sufficient for him to opine whether data that Dr. Dubé used is useful in calculating consumer damages. See Motion to Exclude Dr. Teece Opposition at 29. Further, the Defendants argue that an expert may testify regarding ultimate issues in the case, and that "given his expertise in economics, Dr. Teece is well-positioned to address whether Dr. Dubé's proposed analysis would accurately capture the damages attributable to Plaintiffs' theories of liability." Motion to Exclude Dr. Teece

Opposition at 30. The Defendants also argue that Dr. Teece's opinion regarding Dr. Dubé's conjoint analysis is not premature, because the Plaintiffs must demonstrate that there is a valid means for calculating class-wide damages at the class certification stage. See Motion to Exclude Dr. Teece Opposition at 31.

Fourth, the Defendants contend that the Plaintiffs have not demonstrated any basis in Dr. Teece's past testimony that justifies the Court limiting his testimony in this case. See Motion to Exclude Dr. Teece Opposition at 32. The Defendants argue that other courts' decisions on Dr. Teece's past testimony and opinions do not bear on his testimony and opinions here, because his opinions are reliable and relevant in this litigation. See Motion to Exclude Dr. Teece Opposition at 32. Consequently, the Defendants ask the Court to deny the Plaintiffs' Motion to Exclude Dr. Teece. See Motion to Exclude Dr. Teece Opposition at 32-33.

**c. Motion to Exclude Dr. Teece Reply.**

In their Motion to Exclude Dr. Teece Reply, the Plaintiffs argue that the Court should exclude six of Dr. Teece's opinions. See Motion to Exclude Dr. Teece Reply at 3, 7, 9, 12, 14, 17. First, the Plaintiffs argue that the Court should exclude Dr. Teece's opinion that "the market share of various tobacco companies demonstrates that alleged implied health claims are not drivers of sales," because the Plaintiffs attest that this opinion is not reliable. Motion to Exclude Dr. Teece Reply at 3. The Plaintiffs argue that this opinion is not reliable, because Dr. Teece did not consider any factors other than market share in reaching his conclusion. See Motion to Exclude Dr. Teece Reply at 3. Additionally, the Plaintiffs argue that Dr. Teece does not provide evidence of a causal link between "any attribute (or lack thereof) and the market shares of NAS and comparator brands." Motion to Exclude Dr. Teece Reply at 6. The Plaintiffs also request that the Court exclude Dr. Teece's opinion, because the Plaintiffs attest that Dr. Teece is not "an

expert on marketing, advertising, or consumer perceptions." Motion to Exclude Dr. Teece Reply at 7. The Plaintiffs refute the Defendants' argument that, because Dr. Teece is an economist, he can proffer opinions on subjects relating to economics, business, or mathematics by stating that the Defendants are overstretching the reach of Dr. Teece's expertise. See Motion to Exclude Dr. Teece Reply at 8.

Second, the Plaintiffs argue that the Court should exclude Dr. Teece's testimony "regarding disclaimers," because his opinion is based on the assumption that "nothing else could affect market share during the relevant time period," and because "he assumes the effectiveness of the effectiveness of the disclaimer." Motion to Exclude Dr. Teece Reply at 9. Third, the Plaintiffs argue that the Court should exclude Dr. Teece's opinion that pricing demonstrates that health claims are not drivers of sales, because Dr. Teece relies on anecdotal evidence, and "assumes a simple correlative effect between descriptors and market share without considering any other factors." Motion to Exclude Dr. Teece Reply at 12. Fourth, the Plaintiffs ask the Court to exclude Dr. Teece's opinion that "NAS's premium pricing was the result of NAS brand equity and Santa Fe's marketing strategy," because he did not perform scientific or economic analysis to form this conclusion, and because he is not an expert on marketing or advertising. Motion to Exclude Dr. Teece Reply at 12. Fifth, the Plaintiffs argue that the Court should exclude Dr. Teece's opinion that "there is variability among NAS product users with respect to the reasons for their purchases and the attributes they value," because the Defendants acknowledge that this opinion is based only on "a summary of marketing and consumer surveys that are not economic in nature . . . ; Dr. Teece's own speculation; and testimony of individual plaintiffs." Motion to Exclude Dr. Teece Reply at 14-15. Sixth, and finally, the Plaintiffs contend that the Court should exclude Dr. Teece's opinions on Dr. Dubé, because Dr. Teece does

not have experience in conjoint analysis, and his expertise in economics does not make him qualified to testify on conjoint analysis. See Motion to Exclude Dr. Teece Reply at 17.

**9. Motion to Exclude Dr. W. Kip Viscusi.**

The Plaintiffs ask the Court to exclude Dr. W. Kip Viscusi's[23] opinions and testimony. See Motion to Exclude Dr. Viscusi at 15. The Defendants oppose the Plaintiffs' motion. See generally Motion to Exclude Dr. Viscusi Opposition. The Plaintiffs reply. See Plaintiffs' Reply to Defendant's Opposition to Exclude the Opinions and Testimony of W. Kip Viscusi, filed November 19, 2020 (Doc. 325)("Motion to Exclude Dr. Viscusi Reply").

**a. Motion to Exclude Dr. Viscusi.**

The Plaintiffs argue that the Court should exclude Dr. Viscusi's opinions, because they are litigation-driven and, therefore, unreliable. See Motion to Exclude Dr. Viscusi at 10. The Plaintiffs attest that Dr. Viscusi's opinions that "people are not deceived by Santa Fe's Natural American Spirit ("NAS") brand descriptors -- 'natural,' 'additive-free,' and 'organic,'" Motion to Exclude Dr. Viscusi at 1, and "that consumers overestimate the health risks of smoking," Motion to Exclude Dr. Viscusi at 1, are not reliable, because he cites to only his own work to support these claims, and rejects "numerous peer-reviewed studies and the FDA's commissioned consumer perception study," Motion to Exclude Dr. Viscusi at 12. Moreover, one of the sources

---

[23]Dr. Viscusi is Defendant's expert, whom Defendants proffer to opine on:

> (1) how consumers evaluate health risk information regarding cigarettes and how those beliefs impact actual cigarette purchase decisions, both generally and regarding Natural American Spirit ("NAS") cigarettes specifically, (2) other factors that consumers consider in their purchasing process, and (3) whether the challenged NAS descriptors -- 'natural,' 'additive-free,' and 'organic' tobacco -- play any meaningful role in those purchasing decisions.

Motion to Exclude Dr. Viscusi Opposition at 1.

to which Dr. Viscusi cites -- his own book, Smoking: Making the Risky Decision -- lawyers heavily involved in tobacco litigation at the time reviewed, and the Plaintiffs suggest that lawyers defending tobacco companies likely influenced the book. See Motion to Exclude Dr. Viscusi at 13-14. The Plaintiffs also attest that two other courts have rejected Dr. Viscusi's unreliable methodology and opinions that consumers overestimate the risks of smoking: Discount Tobacco City & Lottery, Inc. v United States, 674 F.3d 509 (noting that "Viscusi admitted at trial in [*United States v.*] *Philip Morris*, [449 F. Supp. 2d 1 (D.D.C. 2006)(Kessler, J.)] that his conclusions are largely based on research commissioned by tobacco-industry law firms specifically for use in litigation," and that "myriad independent studies contradict Viscusi's position"), and United States v. Philip Morris USA, Inc., 449 F. Supp. 2d at 578 (rejecting Viscusi's opinion that consumers know the health risks of smoking and holding that "[m]ost people do not possess a meaningful knowledge of the adverse health effects of smoking" and that "most people have only a superficial awareness that smoking is dangerous"). See Motion to Exclude Dr. Viscusi at 11.

**b. Motion to Exclude Dr. Viscusi Opposition.**

The Defendants oppose the Plaintiffs' Motion to Exclude Dr. Viscusi. See Motion to Exclude Dr. Viscusi Opposition at 1. The Defendants attest that the Plaintiffs do not challenge Dr. Viscusi's opinions that: (i) "there is substantial variation in the factors that influence individual smoking and cigarette purchase decisions . . . , and consumers differ significantly in their risk beliefs, risk tolerance, and the importance of various product attributes"; and (ii) "the perceived competitive advantages of NAS cigarettes over competing brands are not a consequence of misleading consumers about relative product risk." Motion to Exclude Dr. Viscusi Opposition 2. The Defendants make two arguments that the Court should not exclude

Dr. Viscusi's testimony. See Motion to Exclude Dr. Viscusi Opposition at 20, 21. First, the Defendants argue that the Plaintiffs' Motion to Exclude Dr. Viscusi "fails to undertake a proper analysis of Dr. Viscusi's opinions under any *Daubert* standards." Motion to Exclude Dr. Viscusi Opposition at 20. The Defendants argue that Dr. Viscusi is qualified, that Dr. Viscusi's opinions are relevant to issues in this case, that Dr. Viscusi relies on reliable data, and that Dr. Viscusi followed accepted protocols. See Motion to Exclude Dr. Viscusi Opposition at 20. The Defendants contend that "the mere fact that a survey was done in connection with litigation says nothing about its quality or admissibility." Motion to Exclude Dr. Viscusi Opposition at 21. Second, the Defendants contend that the Plaintiffs' argument that Dr. Viscusi's methodology is biased lacks merit. See Motion to Exclude Dr. Viscusi Opposition at 21. The Defendants attest that the Plaintiffs' assertions that tobacco lawyers read and influenced Dr. Viscusi's book are unfounded, and that Dr. Viscusi testified that he did not make any changes to the book in response to lawyers' comments. See Motion to Exclude Dr. Viscusi Opposition at 23. Moreover, the Defendants argue that only two of the five surveys on which Dr. Viscusi relies were prepared for litigation, see Motion to Exclude Dr. Viscusi Opposition at 24, and that all of the surveys on which Dr. Viscusi relies have been subjected to peer-review, see Motion to Exclude Dr. Viscusi Opposition at 27. The Defendants contend that Dr. Viscusi's work is reliable and, therefore, Dr. Viscusi's opinions and testimony are admissible. See Motion to Exclude Dr. Viscusi Opposition at 30.

**c. Motion to Exclude Dr. Viscusi Reply.**

The Plaintiffs argue that their Motion to Exclude Dr. Viscusi is a proper *Daubert* motion, and that "Dr. Viscusi's biased and litigation-driven analysis is the precise type of expert testimony that *Daubert* seeks to exclude." Motion to Exclude Dr. Viscusi Reply at 1. The

Plaintiffs argue that Dr. Viscusi's opinions are unreliable, because he relies on litigation-driven surveys, and because he sought comment and review of his book from tobacco lawyers. See Motion to Exclude Dr. Viscusi Reply at 1. Moreover, the Plaintiffs allege that Dr. Viscusi's "work is so entangled with tobacco industry litigation that it's all done with the purpose of testifying." Motion to Exclude Dr. Viscusi Reply at 2. The Plaintiffs argue that, because attorneys for litigation commissioned two of the surveys on which Dr. Viscusi relies, Dr. Viscusi's methodology is unreliable. See Motion to Exclude Dr. Viscusi Reply at 3. Consequently, the Plaintiffs ask the Court to exclude Dr. Viscusi's opinions and testimony. See Motion to Exclude Dr. Viscusi Reply at 4.

**10. Motion to Exclude Dr. Jennifer Pearson.**

The Defendants ask the Court to exclude Dr. Pearson's testimony and opinions.[24] See Motion to Exclude Dr. Pearson at 37. The Plaintiffs respond. See Plaintiffs' Response in Opposition to Defendants' Motion to Exclude the Opinions and Testimony of Dr. Jennifer Pearson, filed October 8, 2020 (Doc. 309)("Motion to Exclude Dr. Pearson Opposition"). The Defendants reply. See Defendants' Reply in Support of Motion to Exclude in Their Entirety the Expert Report and Opinions of Plaintiff Rebuttal Expert Dr. Jennifer Pearson, filed November 19, 2020 (Doc. 323)("Motion to Exclude Dr. Pearson Reply").

**a. Motion to Exclude Dr. Pearson.**

The Defendants ask the Court to exclude in their entirety Dr. Pearson's expert report and opinions. See Motion to Exclude Dr. Pearson at 1. The Defendants argue that Dr. Pearson's opinions are not reliable, and therefore, do not meet Daubert's standard. See Motion to Exclude

[24]Dr. Pearson is the Plaintiffs' expert in consumer behavior and perceptions. See Plaintiffs' Response in Opposition to Defendants' Motion to Exclude the Opinions and Testimony of Dr. Jennifer Pearson at 1, filed October 8, 2020 (Doc. 309).

Dr. Pearson at 1. The Defendants also argue that the Court should exclude Dr. Pearson's opinions, because they are not relevant to the Certification Motion. See Motion to Exclude Dr. Pearson at 3. The Defendants make three primary arguments in support of their Motion to Exclude Dr. Pearson. See Motion to Exclude Dr. Pearson at 11, 21, 35. First, the Defendants argue that Dr. Pearson's methodology and analyses are unreliable, because she selectively disclosed certain surveys and methodology in forming her opinion. See Motion to Exclude Dr. Pearson at 11. The Defendants argue that Dr. Pearson "has repeatedly omitted data and findings that are inconsistent with her preferred conclusions, in violation of the established survey research standards to which she purports to adhere." Motion to Exclude Dr. Pearson at 11. The Defendants argue that, after they subpoenaed survey data for two surveys on which Dr. Pearson relies, they discovered that Dr. Pearson "did not disclose to Defendants or the scientific community data and findings that directly bear on and undermine her opinions in this case and the conclusions of her published studies." Motion to Exclude Dr. Pearson at 12. [redacted]

[redacted] The Defendants argue that, because Dr. Pearson "suppressed data that undercut her opinion," Dr. Pearson's opinions are unreliable and should be excluded. Motion to Exclude Dr. Pearson at 18. Moreover, the Defendants assert that Dr Pearson's "selective disclosure of studies, data and findings violates generally accepted survey research standards that she claims to follow." Motion to Exclude Dr. Pearson at 19-20.

Second, the Defendants argue that the Court should exclude Dr. Pearson's report and opinions, because Dr. Pearson makes "unfounded extrapolations from the studies to her conclusions" which "render her analyses and opinions unreliable." Motion to Exclude Dr.

Pearson at 21. The Defendants assert that, even ignoring the data for which Dr. Pearson did not account, the data on which she relies does not support her conclusions. See Motion to Exclude Dr. Pearson at 21. The Defendants contend that Dr. Pearson relies only on a single study that addresses the minority of Natural American cigarette smokers who smoke Natural American cigarettes as their usual brand, and that Dr. Pearson does not have data on the majority of Natural American purchasers who do not smoke it as their usual brand. See Motion to Exclude Dr. Pearson at 23-24. The Defendants contend that Dr. Pearson cannot extrapolate reliably this study to non-usual Natural American cigarette smokers, as she purports to do in her expert report. See Motion to Exclude Dr. Pearson at 24. Furthermore, the Defendants assert that Dr. Pearson relies on studies that "fail to test NAS descriptors as they actually appear, including with the disclaimer that appeared on every pack and advertisement, making extrapolation to real-world NAS purchasers unfounded and reliable." Motion to Exclude Dr. Pearson at 26. The Defendants contend that Dr. Pearson improperly relied on studies that mimic Natural American cigarette products, with products or advertisements that did not include the disclaimer on Natural American cigarettes. See Motion to Exclude Dr. Pearson at 27. The Defendants also challenge Dr. Pearson's conclusion that disclaimers did not offset health misperceptions, because the study on which she relies concludes the opposite. See Motion to Exclude Dr. Pearson at 28. The Defendants also contend that Dr. Pearson extrapolates from a study which asks "only whether respondents believe NAS cigarettes *might be* safer than other brands" that Natural American cigarettes "*are* safer than other brands." Motion to Exclude Dr. Pearson at 30 (emphasis in original). The Defendants further argue that "the sole study Dr. Pearson cites in support of her opinion that alleged misperceptions affect consumers' intention to buy NAS cigarettes refutes any such effect, leaving her opinion without foundation." Motion to Exclude Dr. Pearson at 33.

The Defendants argue that the study on which Dr. Pearson relies to conclude that people perceive natural or additive-free cigarettes as less harmful refutes that proposition, and that the study demonstrates that such misperceptions were not correlated with intent to purchase. See Motion to Exclude Dr. Pearson at 24.

Third, and finally, the Defendants argue that Dr. Pearson's opinions "lack a valid scientific connection to the disputed facts in this case" and are, therefore, not helpful to the Court in deciding the Certification Motion. Motion to Exclude Dr. Pearson at 35. The Defendants argue that, even if the Court concludes that Dr. Pearson's opinions are reliable, the analysis that Dr. Pearson offers "is not tethered to the issues in this case." Motion to Exclude Dr. Pearson at 35. The Defendants contend that Dr. Pearson cannot speak on the core question she purports to address -- "whether consumers are misled into buying[/]paying more for NAS cigarettes based on a misperception of those cigarettes as healthier, safer, or less addictive than alternatives" -- because she does not account properly for data or conclusions that might refute conclusions which are at odds with her own. Motion to Exclude Dr. Pearson at 35. Consequently, the Defendants ask the Court to exclude Dr. Pearson's testimony and opinions in their entirety. See Motion to Exclude Dr. Pearson at 35-36.

**b. Motion to Exclude Dr. Pearson Opposition.**

The Plaintiffs oppose the Defendant's Motion to Exclude Dr. Pearson. See Motion to Exclude Dr. Pearson Opposition at 1. The Plaintiffs argue that the Defendants' arguments apply only to the weight of Dr. Pearson's opinions rather than to their admissibility. See Motion to Exclude Dr. Pearson Opposition at 1. The Plaintiffs characterize the Defendants' Motion to Exclude Dr. Pearson as improperly asking the Court "to parse through the empirical research and literature, make a factual determination on whether her opinions are correct, and, on that basis to

exclude Dr. Pearson's opinions at the class certification stage." Motion to Exclude Dr. Pearson Opposition at 1. The Plaintiffs make five primary arguments in their Motion to Exclude Dr. Pearson Opposition. See Motion to Exclude Dr. Pearson Opposition at 10, 12, 16, 20, 29.

First, the Plaintiffs argue that Dr. Pearson's methodology is reliable. See Motion to Exclude Dr. Pearson Opposition at 10. The Plaintiffs argue that Dr. Pearson's theories can be tested and Dr. Pearson has tested her theories, and that her collection and analysis of nationally representative data "follows the established scientific analysis for surveying consumer perceptions." Motion to Exclude Dr. Pearson Opposition at 11. The Plaintiffs also argue that Dr. Pearson's theories were subject to peer-review, publication, and statistical analyses, see Motion to Exclude Dr. Pearson Opposition at 11, and that Dr. Pearson's theories "have been subject to controlling standards which test the theory against different variables," Motion to Exclude Dr. Pearson Opposition at 11. The Plaintiffs attest that the publication of her studies in peer-reviewed journals is "proof that the relevant scientific community accepts her methodologies." Motion to Exclude Dr. Pearson Opposition at 12.

Second, the Plaintiffs argue that Dr. Pearson did not selectively identify or purposefully omit data in drawing her conclusions. See Motion to Exclude Dr. Pearson Opposition at 12. The Plaintiffs assert that Dr. Pearson addressed and refuted in her deposition the Defendants' concerns with the studies which the Defendants attest Dr. Pearson improperly left out of her consideration. See Motion to Exclude Dr. Pearson Opposition at 12. The Plaintiffs contend that Dr. Pearson did not see the data from the GfK Study, and that she did not have access to it until two weeks before her deposition. See Motion to Exclude Dr. Pearson Opposition at 13-14. The Plaintiffs also note that Dr. Pearson testified at her deposition, see Video Recorded Deposition of Jennifer Pearson, MPH, Ph.D., filed October 8, 2020 (Doc. 309-1)("Pearson Depo.") that she

was not able to see or discuss data from the Truth Initiatives Study, filed July 23, 2020 (Doc. 303-14), in her Pearson in Preparation manuscript, because it belonged to Truth Initiatives. See Motion to Exclude Dr. Pearson Opposition at 14. See also Pearson Depo. 26:9-12 (Pearson).

Third, the Plaintiffs contend that the Defendants' criticisms of Dr. Pearson's report and opinions selectively disclosing data goes to the weight of her opinions rather than to their admissibility. See Motion to Exclude Dr. Pearson Opposition at 16. The Plaintiffs argue that the Tenth Circuit is clear that "so long as 'a logical basis exists for [the] expert's opinion . . . the weaknesses in the underpinnings of the opinion[] go to the weight and not the admissibility of the testimony.'" Motion to Exclude Dr. Pearson Opposition at 17 (quoting Compton v. Subaru of America, Inc., 82 F.3d 1513, 1518 (10th Cir. 1996)). Here, the Plaintiffs contend that the Defendants' allegation that Dr. Pearson cherry-picked data is grounds for the Court to consider the weight of her opinions, and that reliable data supports her opinions, so the Court should not exclude them. See Motion to Exclude Dr. Pearson Opposition at 18-20.

Fourth, the Plaintiffs argue that Dr. Pearson's opinions are "reasonably and reliably extrapolated from the studies cited in her expert report." Motion to Exclude Dr. Pearson Opposition at 20. The Plaintiffs contend that the Defendants' arguments related to Dr. Pearson extrapolating from studies goes to the weight, not the admissibility, of Dr. Pearson's opinions. See Motion to Exclude Dr. Pearson Opposition at 20.

The Plaintiffs argue that it is permissible for experts to extrapolate from existing data. See Motion to Exclude Dr. Pearson Opposition at 21 (citing Gen. Elec. Co. v. Joiner, 522 U.S. at 146). The Plaintiffs also argue that it was relevant for Dr. Pearson to consider the perceptions of people who do not regularly smoke Natural American cigarettes, because they are potential Natural American cigarette consumers. See Motion to Exclude Dr. Pearson Opposition at 21.

The Plaintiffs respond to the Defendants' argument that Dr. Pearson relies on studies that use inaccurate packaging by explaining that the study on which Dr. Pearson relies increased the size of the disclaimer on packaging to test whether an obvious disclaimer would offset health perceptions from the Natural American cigarette descriptors. See Motion to Exclude Dr. Pearson Opposition at 22. Moreover, the Plaintiffs note that several FDA studies support Dr. Pearson's conclusion from this study -- that the disclaimer is ineffective at mitigating health misperceptions from the descriptors. See Motion to Exclude Dr. Pearson Opposition at 23. The Plaintiffs also respond to the Defendants' criticism that Dr. Pearson relied on a study, which asks whether respondents believed Natural American cigarettes might be safer than other cigarettes and concluded that consumers believe they are safer than other cigarettes, by explaining that Dr. Pearson provides the opinion that, from a public health perspective, there is little difference between the idea that a consumer might believe something and a consumer believing it. See Motion to Exclude Dr. Pearson Opposition at 25. Further, the Plaintiffs argue that Dr. Pearson's opinions do not suffer from a lack of foundation, as the Defendants assert, because her work has been peer-reviewed, published in prestigious journals, and corroborated by other peer-reviewed and published studies with very similar findings. See Motion to Exclude Dr. Pearson Opposition at 26.

Fifth, the Plaintiffs argue that "Dr. Pearson's testimony is directly relevant to disputed issues in this case and helpful to the Court in deciding whether to certify the class." Motion to Exclude Dr. Pearson Opposition at 29. The Plaintiffs assert that Dr. Pearson will assist the Court in understanding how consumers are misled by the Natural American cigarette descriptors. See Motion to Exclude Dr. Pearson Opposition at 29. Further, the Plaintiffs contend that the question whether Natural American cigarette descriptors mislead consumers is a question which the Court

must decide is common to all class members and that Dr. Pearson's expert opinions can aid the Court in that analysis. See Motion to Exclude Dr. Pearson Opposition at 29. Consequently, the Plaintiffs ask the Court not to exclude Dr. Pearson's expert report and opinions. See Motion to Exclude Dr. Pearson Opposition at 30.

**c. Motion to Exclude Dr. Pearson Reply.**

The Defendants reply to the Plaintiffs' Motion to Exclude Dr. Pearson Opposition. See Motion to Exclude Dr. Pearson Reply at 1. The Defendants make three primary arguments in their reply. See Motion to Exclude Dr. Pearson Reply at 2, 9, 18. First, the Defendants argue that "Dr. Pearson failed to account for findings from her own studies that are at odds with her opinions in this case, which departs from established standards (including her own) and renders her methodology unreliable and subject to exclusion under *Daubert*." Motion to Exclude Dr. Pearson Reply at 2. The Defendants argue that Dr. Pearson adheres to standards which require a "'full reporting of all relevant findings, *including any that may seem contradictory or unfavorable*.'" Motion to Exclude Dr. Pearson Reply at 2 (quoting AAPOR, Best Practices for Survey Research, tinyurl.com/AAPOR-BestPractices)("AAPOR Best Practices")(emphasis in Motion to Exclude Dr. Pearson Reply, but not in AAPOR).[25] Moreover, the Defendants argue that Daubert requires "a full disclosure of relevant data" and that failure to address contrary data renders an experts' opinion unreliable. Motion to Exclude Dr. Pearson Reply at 3. The Defendants contend that, because Dr. Pearson does not consider studies that refute her conclusions, her opinions are unreliable. See Motion to Exclude Dr. Pearson Reply at 4-5. The Defendants also contend that the Plaintiffs are incorrect to assert that any shortcomings in Dr.

[25]At the time of this opinion's publication, the AAPOR Best Practices website no longer contains the quote to which the Defendants cite.

Pearson's opinions are a matter of weight rather than admissibility, because "an expert must 'employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" Motion to Exclude Dr. Pearson Reply at 9 (quoting Kumho Tire Co. Ltd. v. Carmichael, 526 U.S. at 147).

Second, the Defendants argue that Dr. Pearson's conclusions rely on extrapolations from the studies on which she relies, which renders her opinions unreliable. See Motion to Exclude Dr. Pearson Reply at 9. The Defendants contend that

> "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."

Motion to Exclude Dr. Pearson Reply at 10 (quoting Gen. Elec. Co. v. Joiner, 522 U.S. at 146). The Defendants contend that Dr. Pearson's conclusion that Natural American cigarette descriptors have an effect on purchasing behavior is an impermissible extrapolation, because the study on which she relies concludes the opposite. See Motion to Exclude Dr. Pearson Reply at 10. The Defendants also contend that Dr. Pearson impermissibly extrapolates conclusions based on studies that do not address the population of Natural American smokers, see Motion to Exclude Dr. Pearson Reply at 11, and that Dr. Pearson cannot extrapolate data based on studies of cigarette packaging that do not include Natural American cigarettes' disclaimer, see Motion to Exclude Dr. Pearson Reply at 13. The Defendants also assert that, when Dr. Pearson concludes that consumers believe Natural American cigarettes are safer where the study shows that consumers believe Natural American cigarettes might be safer, Dr. Pearson states an "exaggerated conclusion that she *knew* her study did not support." Motion to Exclude Dr. Pearson Reply at 16.

Finally, the Defendants contend that "Dr. Pearson's opinions lack a valid scientific connection to the facts of the case and thus are irrelevant and inadmissible." Motion to Exclude Dr. Pearson Reply at 18. The Defendants argue that the studies on which Dr. Pearson rely do not relate to the population of consumers at issue in this case and do not account for the disclaimers that have been present on the Natural American cigarette packages during the class period. See Motion to Exclude Dr. Pearson Reply at 18. The Defendants specifically argue that Dr. Pearson's opinions are not connected to the case because of "her consistent over-reading of the studies she interprets." Motion to Exclude Dr. Pearson Reply at 18. Consequently, the Defendants urge the Court to exclude Dr. Pearson's testimony and opinions. See Motion to Exclude Dr. Pearson Reply at 18-19.

**11. Motion to Exclude Dr. Jean-Pierre Dubé.**

The Defendants ask the Court to exclude Dr. Dubé's expert report and opinions in their entirety.[26] See Motion to Exclude Dr. Dubé at 36. The Plaintiffs oppose the Motion to Exclude Dr. Dubé. See generally Motion to Exclude Dr. Dubé Opposition. The Defendants reply. See Defendants' Reply in Support of Motion to Exclude in Their Entirety the Expert Report and Opinions of Plaintiff Rebuttal Expert Dr. Jean-Pierre Dubé, filed November 19, 2020 (Doc. 322)("Motion to Exclude Dr. Dubé Reply").

**a. Motion to Exclude Dr. Dubé.**

The Defendants ask the Court to exclude Dr. Dubé's opinions and testimony entirely, because the Defendants contend that Dr. Dubé's report is "irrelevant, terminally vague, and the details it does contain are error-filled," rendering it unreliable. Motion to Exclude Dr. Dubé at 1.

[26]Dr. Dubé is the Plaintiffs' expert on determining damages on a class-wide basis. See Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Exclude the Expert Report and Opinions of Dr. Jean-Pierre Dubé at 1, filed October 8, 2020 (Doc. 311).

The Defendants make three primary arguments. See Motion to Exclude Dr. Dubé at 13, 26, 30. First, the Defendants argue that "Dr. Dubé proposes to measure the wrong thing at the wrong time, and thus his report, opinions and proffered testimony are irrelevant and unhelpful to the trier of fact." Motion to Exclude Dr. Dubé at 13. Namely, the Defendants assert that Dr. Dubé's proposed damages model is not tailored to the Plaintiffs' theories of liability. See Motion to Exclude Dr. Dubé at 13. The Defendants note that, under Comcast Corp. v. Behrend, 569 U.S. 27 (2013), the "Plaintiffs must produce a damages model that can calculate classwide damages in a manner consistent with their remaining theories of liability." Motion to Exclude Dr. Dubé at 13 (citing Comcast Corp. v. Behrend, 569 U.S. at 35). The Defendants identify two "fatal" errors with Dr. Dubé's analysis:

> (i) Dr. Dubé does not propose to determine what damages result from Plaintiffs' theories of liability, and thus he cannot answer the question *Comcast* poses; and (ii) his proposed analysis cannot distinguish between allegedly false beliefs implied by a given descriptor and legitimate, non-actionable beliefs, which would necessarily overstate damages and thus overcompensate Plaintiffs.

Motion to Exclude Dr. Dubé at 14-15.

Namely, the Defendants assert that Dr. Dubé's proposed survey will estimate damages based on a value that "respondents ascribe to descriptors *other than* a belief that NAS cigarettes are safer." Motion to Exclude Dr. Dubé at 19 (emphasis in original). The Defendants acknowledge that the Tenth Circuit has not spoken directly on this issue, but argue that other jurisdictions have upheld such a requirement. See Motion to Exclude Dr. Dubé at 16 (citing In re ConAgra Foods, Inc., 302 F.R.D. at 579, and In re ConAgra Foods, 90 F. Supp. 3d at 1024-25). Moreover, the Defendants argue that Dr. Dubé's assertion that he will conduct his survey after class certification is improper, because participants reasonably will have seen one of the disclaimers that Natural American cigarettes are not safer. See Motion to Exclude Dr. Dubé at

18. The Defendants also attest that Dr. Dubé's proposed survey will not measure adequately the Plaintiffs' theory that, "by labeling the tobacco in NAS menthol cigarettes 'Additive-Free' and 'Natural,' Defendants mislead consumers because menthol is an additive, and some of the menthol placed in the filter when those cigarettes are made migrates to the tobacco by the time of purchase." Motion to Exclude Dr. Dubé at 20 (no citation for quotation). The Defendants criticize Dr. Dubé's proposed survey, because the Defendants assert that it does not "distinguish between a hypothetical cigarette with tobacco that contains no additives except natural or organic menthol that migrated from the filter after manufacture, and a cigarette with tobacco to which untold other additives, including artificial or synthetic additives, were applied intentionally during manufacturing." Motion to Exclude Dr. Dubé at 20. Moreover, the Defendants assert that Dr. Dubé's survey improperly will yield only one damages estimate regarding the premium consumers paid from the additive-free descriptor, when the Plaintiffs allege two misleading inferences from that descriptor: (i) that Natural American cigarettes are safer; and (ii) a belief that no menthol placed in the filter migrated to the additive-free tobacco in the cigarette. See Motion to Exclude Dr. Dubé at 20. The Defendants also assert that Dr. Dubé's survey will assess damages from "claims the Court has dismissed," because Dr. Dubé's survey does not "ensure that respondents do not ascribe value to the 'Natural' and 'Tobacco + Water' descriptors based on the unprocessed-cigarette theory." Motion to Exclude Dr. Dubé at 21. The Defendants also contend that Dr. Dubé's proposed survey is flawed, because "it cannot reliably measure damages sustained during the class period based on the preferences of consumers surveyed a decade or more later." Motion to Exclude Dr. Dubé at 22.

Second, the Defendants argue that Dr. Dubé's proposed conjoint analysis "is so skeletal that it leaves many fundamental questions without answers," because Dr. Dubé has not yet

determined important aspects of his proposed analysis, such as: (i) "what cigarette brand/styles to test"; (ii) "what prices to use"; (iii) "what product images to use"; (iv) "what 'distractors' to use to avoid bias that can arise when respondents focus too heavily on tested attributes"; (v) "how large a sample is required to yield valid statistical results for each putative class or subclass"; (vi) "how to ensure the sample is a random sample of each putative class or subclass or is otherwise representative of them"; and (vii) "what instructions will be given to survey respondents." Motion to Exclude Dr. Dubé at 27. The Defendants assert that other courts have found testimony inadmissible where an expert does not specify basic aspects of a damages model. See Motion to Exclude Dr. Dubé at 29 (citing In re ConAgra, 302 F.R.D. at 552, and Saavedra v. Eli Lilly & Co., No. 2:12-cv-9366-SVW, 2014 WL 7338930, at *6 (C.D. Cal. Dec. 18, 2014)(Wilson, J.)). Third, the Defendants contend that "Dr. Dubé's proposed methodologies will yield the wrong measure of damages because they focus on subjective consumer preferences instead of market prices, and thus his report and testimony are irrelevant." Motion to Exclude Dr. Dubé at 30. The Defendants contend that Dr. Dubé's analysis will measure the average consumer's willingness to pay for Natural American cigarettes and that the proper analysis would measure the price premium: "the difference in the market price for the product with and without the alleged misperception." Motion to Exclude Dr. Dubé at 30. The Defendants contend that Dr. Dubé's "willingness to pay" analysis is improper, because it considers only consumer demand and ignores sellers' willingness to sell, and that other courts have excluded his testimony on these grounds. Motion to Exclude Dr. Dubé at 32-33 (citing Simply Orange Orange Juice Mktg & Sales Practices Litig., No. 4:12-md-02361-FJG, 2017 WL 3142095, at *7 (W.D. Mo. July 24, 2017)(Gaitan, J.)). Consequently, the Defendants argue that Dr. Dubé's report and testimony "is unmoored to Plaintiffs' allegations," and that the Court should exclude his report and testimony

in their entirety. Motion to Exclude Dr. Dubé at 35-36.

**b. Motion to Exclude Dr. Dubé Opposition.**

The Plaintiffs oppose the Defendants' Motion to Exclude Dr. Dubé. See Motion to Exclude Dr. Dubé Opposition at 1. The Plaintiffs argue that Dr. Dubé's proposed methodology is tied to the Plaintiffs' theory of injury and that his methodology is able to calculate consumer damages on a class-wide basis, using methods that others in the field generally accept. See Motion to Exclude Dr. Dubé Opposition at 1-2. The Plaintiffs make six primary arguments in support of their Opposition Motion. See Motion to Exclude Dr. Dubé Opposition at 13, 21, 27, 29, 34, 35. First, the Plaintiffs argue that Dr. Dubé's methodology is tied to the Plaintiffs' theories of liability. See Motion to Exclude Dr. Dubé Opposition at 13. The Plaintiffs contend that Dr. Dubé's "method isolates the economic damages associated with removing the Challenged Claims from the labels to determine the economic value of the Challenged Products to Class members, but for the Challenged Claims." Motion to Exclude Dr. Dubé Opposition at 13. Moreover, the Plaintiffs assert that this methodology is a "standard conceptual approach" to measuring economic damages, and that such methodology has been approved by numerous courts. Motion to Exclude Dr. Dubé Opposition at 13. The Plaintiffs also attest that Dr. Dubé's "proposed method will isolate the associated economic damages by determining economic value to class members but for the Challenged Claims, claims which should be excised from Defendants' labels because they are misleading to reasonable consumers." Motion to Exclude Dr. Dubé Opposition at 14-15. The Plaintiffs assert that Dr. Dubé is measuring "the price that is charged *and* the value of the product delivered to the consumer," and therefore, that his method measures both willingness-to-pay and the price premium. Motion to Exclude Dr. Dubé Opposition at 15 (emphasis in original). The Plaintiffs also attest that other courts have accepted

the same conjoint analysis methodology. See Motion to Exclude Dr. Dubé Opposition at 16 (citing Price v. L'Oreal USA, Inc., 2018 WL 3869896, at *9).

Second, the Plaintiffs argue that Dr. Dubé "need not perform the actual conjoint analysis in order to assist the Court in its class certification determination." Motion to Exclude Dr. Dubé Opposition at 21. The Plaintiffs argue that there is no dispute that conjoin methodology is reliable and that courts have routinely recognized "conjoint analyses as a reliable methodology for classwide damage calculations." Motion to Exclude Dr. Dubé Opposition at 22 (citing In re MyFord Touch Consumer Litig., 291 F. Supp. 3d 936, 971 (N.D. Cal. 2018)(Chen, J.) and Fitzhenry-Russell v. Dr. Pepper-Snapple Grp., Inc., 326 F.R.D. 592, 604 (N.D. Cal. 2018)(Cousins, J.)). Moreover, the Plaintiffs assert that Dr. Dubé explains in detail how he will conduct his conjoint analysis survey, the details he provides are sufficient to demonstrate that he can perform a reliable conjoint analysis, and nothing more is required of Dr. Dubé before he runs the actual conjoint survey. See Motion to Exclude Dr. Dubé Opposition at 23. That is, at the class-certification stage the Plaintiffs only need "'present a likely method for determining class damages, though it is not necessary to show that [the] method will work with certainty at this time.'" Motion to Exclude Dr. Dubé Opposition at 24 (quoting Brown v. Hain Celestial Grp., Inc., No. C 11-03082 LB, 2014 WL 6483216, at *19 (N.D. Cal. Nov. 18, 2014)(Beeler, J.) (alteration in Motion to Exclude Dr. Dubé Opposition only)).

Third, the Plaintiffs argue that "[t]he time period in which a consumer survey will be conducted is irrelevant." Motion to Exclude Dr. Dubé Opposition at 27. The Plaintiffs contend that the Defendants' argument that the conjoint analysis is improper, because it will take part after the time period of class, because "every time a conjoint survey is conducted it will occur after the purchase at issue occurred." Motion to Exclude Dr. Dubé Opposition at 27. Moreover,

the Plaintiffs argue that the time period argument goes to the weight rather than to the admissibility of Dr. Dubé's conjoint analysis. See Motion to Exclude Dr. Dubé Opposition at 27-28. The Plaintiffs note that courts routinely have held that "'using current research results to draw inferences about past consumer behavior is a regular practice in litigation.'" Motion to Exclude Dr. Dubé Opposition at 28 (quoting Kurtz v. Kimberly-Clark Corporation, 321 F.R.D. 482, 551 (E.D.N.Y. 2017)(Weinstein, S.J.)).

Fourth, the Plaintiffs argue that the Defendants are incorrect in their assertion that Dr. Dubé's measure of class-wide damages "fails to account for the supply side of the market." Motion to Exclude Dr. Dubé Opposition at 29. The Plaintiffs state that Dr. Dubé's analysis incorporates the supply side of the market, because, in his survey, consumers will "face a choice set comprising competing brands, each with a different price and differentiating sets of product features," which "reflects the supply-side factors." Motion to Exclude Dr. Dubé Opposition at 29. The Plaintiffs assert that Dr. Dubé "did in fact properly account for the supply side and was not solely looking at willingness to pay a premium." Motion to Exclude Dr. Dubé Opposition at 32.

Fifth, the Plaintiffs contend that Dr. Dubé measuring consumer's willingness to pay is a proper measure of economic damages. See Motion to Exclude Dr. Dubé Opposition at 34. The Plaintiffs attest that "classwide economic damages represent the difference between the aggregate economic value that Class Members perceived to receive when they made their purchase decisions and the economic value that they actually received once the misrepresentation was revealed." Motion to Exclude Dr. Dubé Opposition at 34. The Plaintiffs note that a price premium model "would only compensate a class member if she would purchase the Challenged Products 100% of the time but for the Challenged Claims on the labels," whereas the appropriate

measure of damages -- willingness to pay -- "depends on the manner in which class members derive economic value from the Challenged Products." Motion to Exclude Dr. Dubé Opposition at 34. Sixth, the Plaintiffs argue that Dr. Dubé's methodology "is feasible and has been tested." Motion to Exclude Dr. Dubé Opposition at 35. The Plaintiffs note that several other courts have accepted similar methodologies in other cases and, therefore, the Plaintiffs ask the Court to deny the Defendants' Motion to Exclude Dr. Dubé. Motion to Exclude Dr. Dubé Opposition at 35.

**c. Motion to Exclude Dr. Dubé Reply.**

The Defendants reply to the Plaintiffs' Motion to Exclude Dr. Dubé Opposition. See Motion to Exclude Dr. Dubé Reply at 1. The Defendants make three primary arguments in their reply. See Motion to Exclude Dr. Dubé Reply at 2, 10, 12. First, the Defendants argue that "Dr. Dubé's damages model is irrelevant and unhelpful to the trier of fact." Motion to Exclude Dr. Dubé Reply at 2. The Defendants argue that Dr. Dubé's proposed model is untethered from the Plaintiffs' theories of liability and that it overstates the Plaintiffs' claimed damages. See Motion to Exclude Dr. Dubé Reply at 3. The Defendants contend that the Plaintiffs' reliance on previous cases that have approved Dr. Dubé's conjoint analysis models is misplaced, because such decisions show "only that Dr. Dubé's approach *could* be appropriate in a case in which a representation is wholly and literally false in a manner that deprives consumers of a clearly represented benefit." Motion to Exclude Dr. Dubé Reply at 6 (emphasis in original). The Defendants argue that the same analysis is improper here, where the Plaintiffs concede that the challenged descriptors carry other, non-actionable meanings. See Motion to Exclude Dr. Dubé Reply at 7. The Defendants also argue that Dr. Dubé "has no way of accounting for changes in consumer preferences that have occurred over the course of the class period." Motion to Exclude Dr. Dubé Reply at 8. The Defendants acknowledge the Plaintiffs' point that using current

research results to draw inferences about past behavior is common practice in litigation, but argue that this application is appropriate only when preferences for a product remained stable over time. See Motion to Exclude Dr. Dubé Reply at 9. The Defendants argue that Natural American cigarettes' brand recognition has increased, the retail availability of Natural American cigarettes has increased, and Natural American cigarettes receive a larger portion of the market share in the last ten years. See Motion to Exclude Dr. Dubé Reply at 9. The Defendants contend that, because consumer awareness of and preferences for Natural American cigarettes have changed over the past decade, Dr. Dubé's model cannot measure accurately preferences that consumers held a decade ago. See Motion to Exclude Dr. Dubé Reply at 10.

Second, the Defendants argue that "Dr. Dubé has not determined key components of his proposed conjoint analysis, such that his proposal amounts to 'no damages model at all.'" Motion to Exclude Dr. Dubé Reply at 10 (no citation for quotation). The Defendants again assert that Dr. Dubé has not yet designed his analysis and that even the most basic aspects of his analysis remain undetermined. See Motion to Exclude Dr. Dubé Reply at 10. Namely, the Defendants assert that Dr. Dubé has not determined what prices to use, what product images to use, what distractors to use, how large of a sample he needs to obtain statistically significant results, how to ensure the sample is a random sample, or what instructions will be given to survey respondents. See Motion to Exclude Dr. Dubé Reply at 11.

Third, the Defendants contend that "Dr. Dubé's proposed methodology will yield the wrong measure of damages." Motion to Exclude Dr. Dubé Reply at 12. The Defendants acknowledge the Plaintiffs' assertion that Dr. Dubé's use of willingness-to-pay is proper, but argue that "courts have consistently held that willingness to pay is *not* the appropriate legal standard for calculating damages in consumer-fraud cases like this one." Motion to Exclude Dr.

Dubé Reply at 12 (emphasis in original). The Defendants again assert that Dr. Dubé's model does not account for the market's supply-side and that Dr. Dubé accounting for competing products and their process does not adequately account for supply-side determinations that affect Natural American cigarettes' prices. See Motion to Exclude Dr. Dubé Reply at 14. The Defendants contend, therefore, that Dr. Dubé's proposed analysis would "confer a windfall on many class members." Motion to Exclude Dr. Dubé Reply at 16. Furthermore, the Defendants assert that Dr. Dubé does not contend that he could make determinations "needed to identify the proper measure of damages for each consumer." Motion to Exclude Dr. Dubé Reply at 17. Consequently, the Defendants ask the Court to exclude Dr. Dubé's opinions in their entirety. See Motion to Exclude Dr. Dubé Reply at 18.

## CONCLUSIONS OF LAW

Having made its findings of fact, the Court issues its legal conclusions. First, the Court outlines the applicable law. The Court then analyzes the applicable facts at hand.

## RELEVANT LAW REGARDING EXPERT TESTIMONY

1. "Since the Supreme Court of the United States decided Daubert . . . , trial courts have had the responsibility to make certain that proffered experts will assist the jury in understanding the evidence and in determining the factual issues it must decide." United States v. Gutierrez-Castro, 805 F. Supp. 2d 1218, 1224 (D.N.M. 2011)(Browning, J.). "The Court now must not only decide whether the expert is qualified to testify, but, under Daubert, whether the opinion testimony is the product of a reliable methodology." United States v. Gutierrez-Castro, 805 F. Supp. 2d at 1224. "Daubert . . . requires a court to scrutinize the proffered expert's reasoning to determine if that reasoning is sound." United States v. Gutierrez-Castro, 805

F. Supp. 2d at 1224.[27]

**1. Rule 702.**

---

[27]One of the things that consistently amazes the Court is the unwillingness of modern lawyers to tailor their briefing to the particular judge before whom they argue. The Court still gets briefings filled with citations to other district cases, even though it has written opinions more directly on point. See, e.g., United States v. Begay, 310 F. Supp. 3d 1318, 1336 (D.N.M. 2018)(Browning, J.)(party citing Caine v. Burge, No. 11 C 8996, 2013 WL 1966381, at *1 (N.D. Ill. May 10, 2013)(Durkin, J.)) to argue for admitting expert testimony); United States v. Chapman, No. CR 14-1065 JB, 2015 WL 10401776, at *3 (D.N.M. Aug. 28, 2015)(Browning, J.)(party citing First Data Corp. v. Konya, No. CIV 04-0856, 2007 WL 2116378, at *10 (D. Colo. July 20, 2007)(Kane, J.)). There is nothing wrong -- and a lot right -- with our colleagues in other states, but it mystifies the Court why lawyers continue not to research and know the judge before whom they are practicing.

Nowhere is the need to research the presiding judge more important than in the Daubert area. Given Daubert's and rule 702's demands, trial judges often have to write detailed opinions, with findings of fact and conclusions of law. See, e.g., Abraham v. WPX Prod. Prods., LLC, 184 F. Supp. 3d 1150 (D.N.M. 2016)(Browning, J.); United States v. Rodriguez, 125 F. Supp. 3d 1216 (D.N.M. 2015)(Browning, J.); Montoya v. Sheldon, 286 F.R.D. 602 (D.N.M. 2012). Cf. Admissibility of Scientific Evidence, SJ081 ALI-ABA 1 , 21 ("Appellate courts increasingly insist that even when no Daubert hearing is held, the district court must create a sufficient record so that the basis for the admissibility decision can be reviewed."). The written opinions are a goldmine for figuring out what the trial judge is going to do with the new expert's report. Lawyers should research their judge thoroughly through Lexis and Westlaw. In the 21st century, litigants can know their judge like the hand knows the glove.

When the Court was a young associate at a large law firm after its clerkships, the Court and a co-associate, and the Court's future partner, would swing by the University of New Mexico School of Law every evening after work, alternating days, to go through a box of slip opinions by the federal judges. The lower federal judges in the early 1980s would send the opinion to the counsel of record by mail but also send a copy to the law library. The Court and the other associate would copy almost every opinion and create binders by subject matter: rule 12(b)(1), rule 32, etc. Some binders got so large that they got dividers to divide the opinions by specific judges. The Court and the other associate kept up the laborious data collection even when the Court and the other associate started their own firm. The Court and its firm would cite, quote, and discuss the opinions of the local federal judges back to them in its briefing.

If the Court went to this much travail to locate all the opinions of the judge before whom it was appearing, imagine what it thinks when it receives a brief citing, discussing, or quoting mostly other courts' opinions on topics on which the Court has written, sometimes extensively and exhaustively. In contrast to the paper world in which the Court lived in the early and mid-1980s, all an associate has to do with Lexis and Westlaw is put in the judge's name and the subject to be researched. With research by judge and topic so easy today, there is no excuse for a lawyer not to know the opinion of the judge before whom they are practicing.

2. Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> **(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> **(b)** the testimony is based on sufficient facts or data;
>
> **(c)** the testimony is the product of reliable principles and methods; and
>
> **(d)** the expert has reliably applied the principles and methods to the facts of the case.

3. Fed. R. Evid. 702.[28] Rule 702 thus requires the trial court to "determine whether

[28]Rule 702's most prominent hurdle is the sufficiency of basis. Yet the judiciary's uncomfortableness with analyzing an opinion's basis can be seen in the conflict in the cases. The current conflict is whether the questions of sufficiency of basis, and of application of principles and methods, are matters of weight or admissibility. Compare David E. Bernstein & Eric G. Lasker, Defending Daubert: It's Time to Amend Federal Rule of Evidence 702, 57 Wm. & Mary L. Rev. 1, 32 (2015)("[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, Daubert and Rule 702 mandate the exclusion of that unreliable opinion testimony." (quoting Ruggiero v. Warner-Lambert Co., 424 F.3d 249, 255 (2d Cir. 2005)), with Bernstein & Lasker, supra, at 33 ("[T]he soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact." (quoting Milward v. Acuity Speciality Prods. Grp. 639 F.3d 11, 22 (1st Cir. 2011)). There should not be a conflict. Rule 702 states that these are questions of admissibility. Yet many courts treat them as questions of weight. See, e.g., Bernstein & Lasker, supra, at 33 (citing several Courts of Appeals that instruct district courts to consider the sufficiency of basis and/or application of the methodology as questions of weight).

What is most interesting is what the divergence from Supreme Court precedent and rule 702 suggest. The divergence suggests that Daubert and rule 702 are too academic. Daubert and rule 702 write better than they work in the courtroom and in practice. Lower courts continue -- rightfully so -- to be uncomfortable with deciding these issues with the Sixth and Seventh Amendments to the Constitution of the United States protecting the right to jury trials in civil and criminal cases. Cf. Bernstein & Lasker, supra, at 33 (2015)("[C]ourts have held that '[t]he district court usurps the role of the jury, and therefore abuses its discretion, if it unduly scrutinizes the quality of the expert's data and conclusions rather than the reliability of the

the expert is proposing to testify to (1) scientific, technical, or other specialized knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." United States v. Muldrow, 19 F.3d 1332, 1337 (10th Cir. 1994). Rule 702 uses a liberal definition of "expert." Fed. R. Evid. 702 advisory committee's note to 1972 proposed rules ("[W]ithin the scope of this rule are not only experts in the strictest sense of the word, e.g., physicians, physicists, and architects, but also the large group sometimes called 'skilled' witnesses, such as bankers or landowners testifying to land values."). An expert is "required to possess such skill, experience or knowledge in that particular field as to make it appear that his opinion would rest on

---

methodology the expert employed.'" (quoting Manpower, Inc. v. Ins. of Pa., 732 F.3d 796, 806 (7th Cir.)); Ronald J. Allen, Esfand Fafisi, Daubert and its Discontents, Brooklyn L.R., 131, 147 (2010)(describing an argument for Daubert's unconstitutionality under the Seventh Amendment).

The Court is concerned that the federal courts will overact to the wayward opinions that have created a split whether sufficiency of basis and application of methods is for the court or goes to the evidence's weight. The Court is concerned that the federal courts are going in the direction of new rules. There is thus a built-in institutional bias towards more rules and amendments. The Judicial Conference runs the federal judiciary through committees. See About the Judicial Conference, U.S. Cts., https://www.uscourts.gov/about-federal-courts/governance-judicial-conference/about-judicial-conference (last visited Jan. 5, 2019)("The Conference operates through a network of committees . . . "). The Judicial Conference has a Standing Committee on Rules. The Standing Committee has five Advisory Committees: (i) Civil Procedure; (ii) Criminal Procedure; (iii) Evidence; (iv) Bankruptcy; and (v) Appellate. See How the Rulemaking Process Works, U.S. Cts., https://www.uscourts.gov/rules-policies/about-rulemaking-process/how-rulemaking-process-works (last visited Jan. 5, 2019). Each of these advisory committees has a reporter, almost always a prominent professor. See Overview for the Bench, Bar, and Public, U.S. Cts., https://www.uscourts.gov/rules-policies/about-rulemaking-process/how-rulemaking-process-works/overview-bench-bar-and-public (last visited Jan. 5, 2019). The reporter position is more prestigious if the reporter can get new rules promulgated. They have to justify their existence. There is thus a very smart, likeable, and well-liked person putting pressure on the committee to amend the rules. While judges are more conservative about promulgating new rules, they too often succumb to the reporter's pressure. The result is that the federal judiciary and the bar gets a host of new rules almost every year. The development of new rules burdens the federal judiciary and the bar -- all of which are overworked -- with mandatory changes each year, often constituting little more than stylistic changes. Everyone has to get new rule books every year. The burden of new rules often does not justify the meager benefits of the changes.

substantial foundation and would tend to aid the trier of fact in his search for truth." LifeWise Master Funding v. Telebank, 374 F.3d 917, 928 (10th Cir. 2004). See United States v. Harry, 20 F. Supp. 3d 1196, 1243 (D.N.M. 2014)(Browning, J.)(deeming inadmissible testimony on a sex crime's victim's demeanor during an examination, because "demeanor is not always a reliable indicator whether someone is telling the truth, especially about sex -- then no expert testimony is needed. That knowledge is well within the knowledge of jurors and most people."); United States v. Rodella, No. CR 14-2783 JB, 2014 WL 6634310, at *25 (D.N.M. Nov. 19, 2014)(Browning, J.)(stating that "testimony regarding nationally accepted police standards is irrelevant" to issues of "excessive force and" reasonableness). The proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the pertinent admissibility requirements are met.[29] See Morales v. E.D. Etnyre & Co., 382 F. Supp. 2d 1252, 1266 (D.N.M. 2005)(Browning, J.)(citing Bourjaily v. United States, 483 U.S. 171, 175 (1987)). Once the trial court has determined that expert testimony would be helpful to the trier of fact, a

[29]The Court is clipping the wings of experts all the time. See, e.g., Abraham v. WPX Prod. Prods., LLC, 184 F. Supp. 3d at 1204 (precluding an expert from discussing class certification requirements, but allowing the expert to testify to information about royalty instruments); United States v. Rodriguez, 125 F. Supp. 3d at 1255-56 (permitting an expert to describe a cartel's structure and organization, and to explain drug running, but not admitting the expert's testimony opining that the defendant was running drugs); Montoya v. Sheldon, 286 F.R.D. at 619 (precluding a treating physician from testifying about a party's PTSD diagnosis, opinions about the causes for a party's symptoms, or a party's prognosis). Attorneys ask experts to do too much, and experts try to do too much. The experts are being paid; they are trying to be helpful to the attorney. Cf. Mark I. Bernstein, Jury Evaluation of Expert Testimony Under the Federal Rules, Drexel L. Rev. 239, 268 (2015)("Any use of expert witnesses paid by a party raises concerns of partisanship, competency, and honesty. Because experts are partisan witnesses paid by a party, there is an inevitable danger of bias."). The experts will often do anything. They toss statements into their reports to be helpful. Too many attorneys release the report as written -- without editing and without trimming. This failure to edit and to trim creates unnecessary litigation. Many expert reports contain statements that the proponent attorney does not need or even want. The reports draw Daubert motions or rule 702 challenges. The proponent is then forced to defend the statements that he or she does not even need or want.

witness "may qualify as an expert by knowledge, skill, experience, training, or education and . . . the expert . . . should not be required to satisfy an overly narrow test of his own qualifications." Gardner v. Gen. Motors Corp., 507 F.2d 525, 528 (10th Cir. 1974)(internal quotation marks omitted). See United States v. Rodella, 2014 WL 6634310, at *20 ("Because of [the proposed expert's] lack of practical experience, lack of nationwide experience, and lack of an advanced degree in criminology or law enforcement, [the proposed expert's] is not qualified to testify about nationally accepted police procedures and practices."); United States v. Goxcon-Chagal, 886 F. Supp. 2d at 1245 (determining an expert qualified to testify to drug trafficking when he had personal knowledge of the subject from working in the Drug Enforcement Agency for almost fifteen years).

4. Courts should, under the Federal Rules of Evidence, liberally admit expert testimony, see United States v. Gomez, 67 F.3d 1515, 1526 (10th Cir. 1995)(describing rule 702 as a "liberal standard"), and the trial court has broad discretion in deciding whether to admit or exclude expert testimony, see Werth v. Makita Elec. Works, Ltd., 950 F.2d 643, 647 (10th Cir. 1991)(noting the trial court's decision will not be overturned "unless it is manifestly erroneous or an abuse of discretion"). "The Tenth Circuit appears to draw a line between expert testimony regarding credibility and expert testimony regarding voluntariness." United States v. Ganadonegro, 805 F. Supp. 2d 1188, 1214 (D.N.M. 2011)(Browning, J.)(citing United States v. Benally, 541 F.3d 990, 996 (10th Cir. 2008)). "The Tenth Circuit may draw this distinction because, generally, it is the jury's exclusive function to make credibility determinations . . . whereas a court makes a pretrial determination of the constitutional voluntariness of a statement." United States v. Ganadonegro, 805 F. Supp. 2d at 1214 (citation omitted)(citing United States v. Adams, 271 F.3d 1236, 1245 (10th Cir. 2001)).

**2. The Standard in Daubert.**

5. In its gatekeeper role, a court must assess the reasoning and methodology underlying an expert's opinion, and determine whether it is both scientifically valid and relevant to the facts of the case, i.e., whether it is helpful to the trier of fact. See Daubert, 509 U.S. at 594-95; Witherspoon v. Navajo Ref. Co., No. 03-1160, 2005 WL 5988649, at *2 (D.N.M. July 18, 2005)(Black, J.)(citing Dodge v. Cotter Corp., 328 F.3d 1212, 1221 (10th Cir. 2003)).[30] The

[30]The current law -- and its trajectory -- are casting serious shadows over using expensive experts. This is particularly true in cases involving jury trials. It is probably a good time for the judiciary to rethink expert testimony rather than continuing with the current regime and making incremental changes.

Lawyers and appellate courts overemphasize the importance of experts, and distrust juries. See Sanja Kutnjak Ivkovic & Valerie P. Hans, Jurors' Evaluations of Expert Testimony: Judging the Messenger and the Message, 28 Law & Soc. Inquiry 441, 442 (2003)("One key assumption underlying the Daubert line of cases is that jurors might be duped by a persuasive but untrustworthy expert who testifies about matters that are not based on sound scientific principles or data."). Cf., Elaine E. Sutherland, Undue Deference to Experts Syndrome?, 16 Ind. Int'l & Comp. L. Rev. 375, 382 (2006)("After all, if one is coming from a position of ignorance, the person who holds the key to that certain body of knowledge is something of a savior. The danger for the legal system is that this empowerment of the expert witness will result in undue deference to his or her opinion."). Appellate judges often do not have extensive or any trial experience, particularly as Presidents want to rule from the grave, and appoint younger and younger appellate judges, who often -- because of their years -- have not spent a lot of time trying cases in the courtroom before juries. Academics, corporate lawyers, general counsel, and appellate judges -- without considerable courtroom experience -- think that experts will easily mislead juries. Yet, the Court talks regularly to juries after jury trials, and the Court listens to trial lawyers talking to juries after jury trials. Juries often expressly state that they disregarded the parties' experts. The Court often hears comments like the "expert arrogant and/or incomprehensible."

Part of the problem is that academics and, often, appellate jurists do not appreciate or understand modern American jurors. Jurors have become very independent, and do not take direction well or easily from anyone -- the judge, lawyers, or experts. The days of dressing up for court in coats and ties, and doing what the judge tells them to do are fading. Jurors question everything. If the Court tells them to go in one door, they want to use another. Whereas jurors used to complement the Court's jury instructions as giving a roadmap to the jurors' decisions, jurors now criticize even the uniform or pattern jury instructions. Modern American jurors do not like to think that they are being told what to do. And they certainly do not like experts telling them what to do; modern American jurors do not like the idea of "experts" who are smarter than they are.

Supreme Court articulated a non-exclusive list of factors that weigh into a district court's first-step reliability determination, including: (i) whether the method has been tested; (ii) whether the method has been published and subject to peer review; (iii) the error rate; (iv) the existence of standards and whether the witness applied them in the present case; and (v) whether the witness' method is generally accepted as reliable in the relevant medical and scientific community.[31] See Daubert, 509 U.S. at 594-95. The court is also to consider whether the witness' conclusion represents an "unfounded extrapolation" from the data; whether the witness has adequately accounted for alternative explanations for the effect at issue; whether the opinion was reached for the purposes of litigation or as the result of independent studies; or whether it unduly relies on anecdotal evidence. See Witherspoon v. Navajo Ref. Co., 2005 WL 5988649, at *3 (citing Gen. Elec. Co. v. Joiner, 522 U.S. at 146). The Tenth Circuit stated the applicable standard in Norris v. Baxter Healthcare Corp., 397 F.3d 878 (10th Cir. 2005):

> Rule 702 requires the district court to "ensure that any and all scientific testimony or evidence is not only relevant, but reliable." Bitler v. A.O. Smith Corp., 391

---

At the same time that modern American jurors are showing more independence, paternalistic Daubert hearings have proliferated. This phenomenon raises many concerns. One concern is the sheer prevalence of Daubert motions. Cf. Cynthia Lynne Pike, The Impact of Revised MRE 702 and 703 in Response to Daubert, 52 Wayne L. Rev. 285, 301 (2006)(describing the effects of a state-specific rule resembling rule 702 and stating, "One of the more important tactical strategies in dealing with the court's role as gatekeeper under the new MRE 702 is the use of motions in limine and other pretrial evidentiary hearings."). Motions to dismiss, class certification motions, and motions for summary judgment, sentencings, competency hearings -- in addition to testimony -- require Daubert hearings. The costs of Daubert motions, to the court and the parties, is staggering. The time-consuming nature of Daubert motions is overwhelming.

[31]Federal courts are obsessed with reliability problems. This idea pops up several places and in several ways, creating multiple grounds upon which the court has the power to exclude the expert. See Admissibility of Scientific Evidence, SJ081 ALI-ABA 1 , 27 (noting that courts treat the "assist the trier of fact" requirement for expert testimony as a relevancy requirement, and stating that rule 401 already requires evidence to be relevant).

> F.3d 1114, 1120 (10th Cir. 2004)(quoting Daubert, 509 U.S. at 589 . . .). This obligation involves a two-part inquiry. Id. "[A] district court must [first] determine if the expert's proffered testimony . . . has 'a reliable basis in the knowledge and experience of his [or her] discipline.'" Id. (quoting Daubert, 509 U.S. at 592 . . .). In making this determination, the district court must decide "whether the reasoning or methodology underlying the testimony is scientifically valid. . . ." Id. (quoting Daubert, 509 U.S. at 592-93 . . .). Second, the district court must further inquire into whether proposed testimony is sufficiently "relevant to the task at hand." Daubert, 509 U.S. at 597 . . . .

Norris v. Baxter Healthcare Corp., 397 F.3d at 883-84 (footnote omitted). "The second inquiry is related to the first. Under the relevance prong of the Daubert analysis, the court must ensure that the proposed expert testimony logically advances a material aspect of the case. . . . The evidence must have a valid scientific connection to the disputed facts in the case." Norris v. Baxter Healthcare Corp., 397 F.3d at 884 n.2 (citing Daubert v. Merrell Dow Pharm., Inc., 43 F.3d 1311, 1315 (9th Cir. 1995)(on remand from the Supreme Court); Daubert, 509 U.S. at 591). If the expert's proffered testimony fails on the first prong, the court does not reach the second prong. See Norris v. Baxter Healthcare Corp., 397 F.3d at 884. In Kumho Tire Co. v. Carmichael, the Supreme Court expanded the rules under Daubert to non-scientific expert testimony. See Kumho Tire Co. v. Carmichael, 526 U.S. at 141 ("We conclude that Daubert's general holding -- setting forth the trial judge's general 'gatekeeping' obligation -- applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." (quoting Carmichael v. Samyang Tires, Inc., 923 F. Supp. 1514, 1521 (S.D. Ala. 1996)). The Supreme Court recognized in Kumho Tire Co. v. Carmichael that the factors from Daubert will not apply to all cases:

> Our emphasis on the word "may" thus reflects Daubert's description of the Rule 702 inquiry as a flexible one. Daubert makes clear that the factors it mentions do not constitute a definitive checklist or test. And Daubert adds that the gatekeeping inquiry must be tied to the facts of a particular case.

Kumho Tire Co. v. Carmichael, 526 U.S. at 150 (internal quotation marks omitted).

6. In conducting its review under Daubert, a court must focus generally on "principles and methodologies, and not on the conclusions generated." Armeanu v. Bridgestone/Firestone N. Am., Tire, LLC, 2006 WL 4060665, at *11 (citing Daubert, 509 U.S. at 595). "Despite this focus on methodology, an expert's conclusions are not immune from scrutiny . . . and the court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." Armeanu v. Bridgestone/Firestone N. Am., Tire, LLC, 2006 WL 4060665, at *11 (alterations and internal quotation marks omitted)(quoting Dodge v. Cotter Corp., 328 F.3d at 1222). The proponent of the expert's opinion testimony bears the burden of establishing that the expert is qualified, that the methodology he or she uses to support his or her opinions is reliable, and that his or her opinion fits the facts of the case and thus will be helpful to the jury. See Norris v. Baxter Healthcare Corp., 397 F.3d at 881. The Tenth Circuit noted in Hollander v. Sandoz Pharm. Corp., 289 F.3d 1193 (10th Cir. 2002):

> Because the district court has discretion to consider a variety of factors in assessing reliability under Daubert, and because, in light of that discretion, there is not an extensive body of appellate case law defining the criteria for assessing scientific reliability, we are limited to determining whether the district court's application of the Daubert manifests a clear error of judgment or exceeds the bounds of permissible choice in the circumstances. . . . Thus, when coupled with this deferential standard of review, Daubert's effort to safeguard the reliability of science in the courtroom may produce a counter-intuitive effect: different courts relying on the essentially the same science may reach different results.

289 F.3d at 1206. The United States Court of Appeals for the Ninth Circuit noted in Claar v. Burlington N.R.R., 29 F.3d 499 (9th Cir. 1994):

> Coming to a firm conclusion first and then doing research to support it is the antithesis of this method. Certainly, scientists may form initial tentative hypotheses. However, scientists whose conviction about the ultimate conclusion of their research is so firm that they are willing to aver under oath that it is correct prior to performing the necessary validating tests could properly be viewed by the

> district court as lacking the objectivity that is the hallmark of the scientific method.

29 F.3d at 502-03.

> Once reliability is established, however, it is still within the district court's discretion to determine whether expert testimony will be helpful to the trier of fact. In making that determination, the court should consider, among other factors, the testimony's relevance, the jurors' common knowledge and experience, and whether the expert's testimony may usurp the jury's primary role as the evaluator of evidence.

Ram v. N.M. Dep't of Env't, No. CIV 05-1083, 2006 WL 4079623, at *10 (Dec. 15, 2006)(Browning, J.)(citing United States v. Rodriguez-Felix, 450 F.3d 1117, 1123 (10th Cir. 2006)).

7. An untested hypothesis does not provide a scientific basis to support an expert opinion. See Norris v. Baxter Healthcare Corp., 397 F.3d at 887 ("[A]t best, silicone-associated connective tissue disease is an untested hypothesis. At worst, the link has been tested and found to be untenable. Therefore, there is no scientific basis for any expert testimony as to its specific presence in Plaintiff."); In re Breast Implant Litig., 11 F. Supp. 2d 1217, 1228 (D. Colo. 1998)(Sparr, J.)("An untested hypothesis cannot be a scientifically reliable basis for an opinion on causation."). A court is not required "to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert. The court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." Gen. Elec. Co. v. Joiner, 522 U.S. at 146. See Hollander v. Sandoz Pharm. Corp., 289 F.3d at 1209 (noting a lack of similarity between animal studies and human studies); Tyler v. Sterling Drug, Inc., 19 F. Supp. 2d 1239, 1244 (N.D. Okla. 1998)(Cook, J.)("Test results on animals are not necessarily reliable evidence of the same reaction in humans."). Courts have excluded experts' opinions when the experts depart from their own established standards. See Truck Ins. Exch. v. MagneTek, Inc., 360 F.3d

1206, 1213 (10th Cir. 2004)("The district court noted that [the expert]'s opinion did not meet the standards of fire investigation [the expert] himself professed he adhered to."); Magdaleno v. Burlington N.R.R., 5 F. Supp. 2d 899, 905 (D. Colo. 1998)(Babcock, J.)("In sum, [the expert]'s methodology is not consistent with the methodologies described by the authors and experts whom [the expert] identifies as key authorities in his field.").

**3. Necessity of Evaluating an Issue Under Daubert.**

8. The restrictions in Daubert apply to both "novel" expert testimony and "well-established propositions." 509 U.S. at 593 n.11 ("Although the *Frye*[32] decision itself focused exclusively on 'novel' scientific techniques, we do not read the requirements of Rule 702 to apply specially or exclusively to unconventional evidence."). "Of course, well-established propositions are less likely to be challenged than those that are novel, and they are more handily defended." Daubert, 509 U.S. at 593 n.11. "Indeed, theories that are so firmly established as to have attained the status of scientific law, such as the laws of thermodynamics, properly are subject to judicial notice under Federal Rule of Evidence 201." Daubert, 509 U.S. at 593 n.11.

9. "[W]hen experts employ established methods in their usual manner, a district court need not take issue under Daubert. . . ." Att'y Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d 769, 780 (10th Cir. 2009). "[H]owever, where established methods are employed in new ways, a district court may require further indications of reliability." Att'y Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d at 780. Whether courts have accepted theories underlying an expert's opinion is a relevant consideration in determining whether expert testimony is reliable. See Att'y Gen. of

[32]Frye v. United States, 293 F. 1013 (D.C. Cir. 1923), superseded by rule 702 of the Federal Rules of Evidence, held that, for an expert opinion to be admissible, "the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." 293 F. at 1014.

Okla. v. Tyson Foods, Inc., 565 F.3d at 780 ("The case law indicates that the courts are not unfamiliar with the PCR methodology,[33] and in fact some courts have indicated their acceptance of it.").[34]

---

[33]PCR, a "[p]olymerase chain reaction," Att'y Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d at 780, is a widely used method for copying DNA segments. Polymerase Chain Reaction, Wikipedia, https://en.wikipedia.org/wiki/Polymerase_chain_reaction (last visited Nov. 28, 2018).

[34]Much of the focus of current debate about experts is on forensic evidence, which comes in many forms. The challenge to forensic evidence comes from two areas: (i) the federal courts; and (ii) the scientific community. The reports of the National Academies of Science ("NAS") and the President's Council of Advisors on Science and Technology ("PCAST") raise challenges to the reliability of forensic methods. See Executive Office of the President President's Council of Advisors on Science and Technology, Report to the President, Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature-Comparison Methods (Sept. 2016); Committee on Identifying the Needs of the Forensic Sciences Community, National Research Council, Strengthening Forensics Science in the United States: A Path Forward (July 2009). There is increasing skepticism of the legal profession's most cherished evidence, including fingerprints, DNA, firearms, and breath tests. See, e.g., President's Council of Advisors on Science and Technology, supra, at 67-110; Committee on Identifying the Needs of the Forensic Sciences Community, supra, at 42-48.

The Court is concerned that the federal judiciary is moving toward a freestanding rule on forensic evidence. The Court is not a big fan of addressing the topic of forensic evidence through rulemaking. No rule, procedures manual, or note is needed to tell judges that there is no certainty with forensic opinions. There is also no reasonable degree of certainty. These opinions are now considered overstated: in the old days -- like last week -- attorneys would routinely ask: "Doctor, in your opinion, to a reasonable degree of certainty, that the plaintiff's appendix was on the left side of the body?"

The nation does not need another rule. An examination of Article VII -- Opinions and Expert Testimony -- shows six rules: (i) rule 701 -- Opinion Testimony by Lay Witnesses; (ii) rule 702 -- Testimony by Expert Witnesses; (iii) rule 703 -- Bases of an Expert's Opinion Testimony; (iv) rule 704 -- Opinion on an Ultimate Issue; (v) rule 705 -- Disclosing the Facts or Data Underlying an Expert's Opinion; (vi) rule 706 -- Court-Appointed Expert Witnesses (a bad idea in about all cases). See Fed. R. Evid. 701-06. If the reporter would drop rule 706, perhaps there would be room for a rule pertaining to forensic evidence.

The Court is concerned with what a new rule would look like. The judiciary could make its point in a committee note, but without a new rule, there is no need for a new note. The PCAST report does not propose a change to the Evidence Rules. Rather, PCAST proposes a best procedures manual. See President's Council of Advisors on Science and Technology, supra, at 145. It would be better if legal leaders do like Duke University School of Law has done for class actions and the Sedona Conference has done for electronic discovery. See Class-Action Settlement Conference, Duke Law, https://law.duke.edu/judicialstudies/conferences/oct2016/

## LAW REGARDING EXPERT TESTIMONY ON ULTIMATE ISSUES

10. Rule 704 of the Federal Rules of Evidence states:

> **(a) In General -- Not Automatically Objectionable.** An opinion is not objectionable just because it embraces an ultimate issue.
>
> **(b) Exception.** In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone.

Fed. R. Evid. 704. "Traditionally, there was a general doctrine that witnesses could not give their opinion or conclusions on an ultimate issue of fact." Vondrak v. City of Las Cruces, No. CIV 05-0172 JB/LAM, 2009 WL 3241555, at *10 (D.N.M. Aug. 25, 2009)(Browning, J.). "The stated justification was sometimes that such testimony usurps the function or invades the province of the jury." Vondrak v. City of Las Cruces, 2009 WL 3241555, at *10 (quoting 1 K. Broun, McCormick on Evidence § 12 (6th ed. 2006 update)). The Federal Rules of Evidence reflect that the ultimate-issue rule has been abolished. See United States v. Smith, 156 F.3d 1046, 1054 (10th Cir. 1998). Although rule 704(a) permits an expert to testify about areas that embrace an ultimate issue, there are some other limitations, aside from those that rule 704(b)

---

(last visited Jan. 7, 2019); The Sedona Conference Working Group Series, The Sedona Conference, https://thesedonaconference.org/wgs (last visited Jan. 7, 2019). Rather than a new rule or note, the Court believes that a best practices manual -- prepared by professional leaders that come together to write -- and not the judiciary -- would be the better approach.

The Court expects several difficulties with a new rule. The first difficulty with any rule on forensic evidence will be determining to whom it should apply. A new rule would presumably apply to forensic witnesses' testimony. Such witnesses include people testifying about evidence about through scientific means, by comparing patterns, or by "experimental or scientific analysis." See Evidence, Black's Law Dictionary (10th ed. 2014). After the Court and the bar have identified the universe of experts to whom the rule applies or the best practices apply, the new rules' requirements must be determined. An expert must already satisfy all of rule 702's requirements. Under a new rule, the expert will also need to satisfy all of the new requirements. With more handles, the chances of exclusion or limiting are enhanced. Rule 702's requirements, however, are enough, and the law should not require more.

expressed, regarding testimony on ultimate issues. More specifically, the Tenth Circuit has stated that "'a expert may not state legal conclusions drawn by applying the law to the facts.'" United States v. Bedford, 536 F.3d 1148, 1158 (10th Cir. 2008)(quoting A.E. by and Through Evans v. Indep. Sch. Dist. No. 25, of Adair Cty., 936 F.2d 472, 476 (10th Cir. 1991)).

11. "Rule 704(b) prohibits an expert from expressly stating the final conclusion or inference as to a defendant's mental state; it does not prevent an expert from testifying to facts or opinions from which the jury could conclude or infer that the defendant had the requisite mental state." United States v. Ganadonegro, No. CR 09-0312 JB, 2012 WL 592170, at *5 (D.N.M. Feb. 17, 2012)(Browning, J.)(citing United States v. Torres, 53 F.3d 1129, 1141-42 (10th Cir. 1995)). The restrictions in rule 704(b) do not apply to lay witnesses, see United States v. Goodman, 633 F.3d 963, 968 (10th Cir. 2011), although the lay witnesses' testimony must still be helpful to the trier of fact to satisfy rule 701, see Fed. R. Evid. 701(b). "[Rules 701, 702, and 403] afford ample assurances against the admission of opinions [under rule 704] which would merely tell the jury what result to reach, somewhat in the manner of the oath-helpers of an earlier day." United States v. Barile, 286 F.3d 749, 759-60 (4th Cir. 2002). Pursuant to rule 704, it is the Court's task "to distinguish [helpful] opinion testimony that embraces an ultimate fact from [unhelpful] opinion testimony that states a legal conclusion." United States v. Perkins, 470 F.3d 150, 158 (4th Cir. 2006)(internal quotation marks omitted)(quoting United States v. Barile, 286 F.3d at 760). In making that determination, a court should consider whether the question tracks the language of the legal principle or statute at issue, and then consider whether any terms employed have a specialized legal meaning. See United States v. Perkins, 470 F.3d at 158. The Court has addressed this issue in various contexts. See, e.g., Sec'y & Exch. Comm'n v. Goldstone, No. CIV 12-0257 JB/LFG, 2016 WL 3135651, at *1, *44 (D.N.M. May 10,

2016)(Browning, J.)(internal quotation marks omitted)(prohibiting, in a case involving a Form 10-K's allegedly "fraudulent misrepresentations and omissions," expert testimony on whether the defendants' actions were "reasonable" or "certain information" disclosed was "material" and distinguishing the case from Tenth Circuit decisions in which "[t]he issues . . . were far simpler and subject to easy determination by a single expert . . . ."); United States v. Rodella, 2014 WL 6634310, at *29 (rejecting expert testimony as on an ultimate issue when the United States introduced the expert to testify to whether an officer "acted reasonably or violated the Constitution"); United States v. Gould, No. CR 03-2274 JB, 2007 WL 1302596, at *4 (D.N.M. March 17, 2007)(Browning, J.)("The Tenth Circuit has indicated in recent opinions that, in the 42 U.S.C. § 1983 context, the jury cannot use law enforcement policies and standards to inform the debate whether a civil rights violation has occurred" (citing Tanberg v. Sholtis, 401 F.3d 1151, 1163-64 (10th Cir. 2005)); Marquez v. City of Albuquerque, 399 F.3d 1216, 1222 (10th Cir. 2005); Chamberlin v. City of Albuquerque, No. CIV 02-0603, 2005 WL 2313527 (D.N.M. July 31, 2005)(Browning, J.).

## LAW REGARDING RULE 23 CLASS ACTIONS

12. Rule 23 sets forth the requirements for certifying a class action under the Federal Rules of Civil Procedure. See Fed. R. Civ. P. 23. All classes must satisfy: (i) all rule 23(a) requirements; and (ii) one of the three sets of requirements under rule 23(b), where the three sets of requirements correspond to the three categories of classes that a court may certify. See Fed. R. Civ. P. 23(a)-(b). The plaintiff[35] bears the burden of showing that the requirements are met.

[35]Technically, the movant bears the burden of proof; defendants may also move for a denial of class certification and will bear the burden of proof for such a motion. See William B. Rubenstein, Newberg on Class Actions § 7:20 (5th ed. 2017). As a practical matter, however, motions for class certification are made almost exclusively by plaintiffs.

See Rex v. Owens ex rel. Okla., 585 F.2d 432, 435 (10th Cir. 1978); Pueblo of Zuni v. United States, 243 F.R.D. 436, 444 (D.N.M. 2007)(Johnson, J.). In ruling on a class certification motion, the Court need not accept either party's representations, but must independently find the relevant facts by a preponderance of the evidence.[36] See Rutstein v. Avis Rent-A-Car Sys., Inc., 211 F.3d 1228, 1234 (11th Cir. 2000)("Going beyond the pleadings is necessary, as a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues." (quoting Castano v. American Tobacco Co., 84 F.3d 734, 744 (5th Cir. 1996))). "'In determining the legality of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met.'" Anderson v. City of Albuquerque, 690 F.2d 796, 799(10th Cir. 1982)(quoting Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 178 (1974)). See Vallario v. Vandehey, 554 F.3d 1259, 1267(10th Cir. 2009)("We, of

[36]As the Court has previously noted, Tenth Circuit precedent suggests that the Court must show some level of deference to a complaint's factual allegations when ruling on a rule 23 motion: "The Court must accept a plaintiff's substantive allegations as true," but it "need not blindly rely on conclusory allegations which parrot Rule 23," and "may consider the legal and factual issues presented by plaintiff's complaints." In re Thornburg Mortg., Inc. Sec. Litig., 912 F. Supp. 2d at 1097, 1120 (D.N.M. 2012)(Browning, J.)(citing Shook v. El Paso Cty., 386 F.3d 963, 968 (10th Cir. 2004); J.B. v. Valdez, 186 F.3d 1280, 1290 n.7 (10th Cir. 1999); Eisen v. Carlisle & Jacquelin, 417 U.S. at 178). Since the Court's statement in In re Thornburg Mortgage, Inc. Securities Litigation, however, the Tenth Circuit issued an opinion stating that district courts should apply a "strict burden of proof" to class certification issues. Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc., 725 F.3d 1213, 1218 (10th Cir. 2013). This request is consistent with the general trend in the federal judiciary toward using an ordinary preponderance standard to find facts at the class certification stage. See, e.g., Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc., 546 F.3d 196, 202 (2d Cir. 2008); In re Hydrogen Peroxide Litig., 552 F.3d 305, 318-20 (3d Cir. 2008); Newberg § 7.21 (5th ed. 2017)(tracing the shift in the case law from deferring to plaintiffs' representations to adopting an ordinary preponderance standard, and disclaiming the Court's statement from In re Thornburg Mortgage, Inc. Securities Litigation -- a statement that earlier versions of the treatise espoused). Thus, although the Tenth Circuit has not yet explicitly adopted the preponderance standard for fact-finding in class certification analyses, it most likely will, and the Court will employ that standard here.

course, adhere to the principle that class certification does not depend on the merits of a suit.”). Still, the Court must conduct a rigorous analysis of the rule 23 requirements, even if the facts that the Court finds in its analysis bear on the merits of the suit:

> Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule -- that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc. We recognized in General Telephone Co. of the Southwest v. Falcon [457 U.S. 147 (1982)] that “sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question,” and that certification is proper only if “the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied. Actual, not presumed, conformance with Rule 23(a) remains indispensable.” Frequently that “rigorous analysis” will entail some overlap with the merits of the plaintiff’s underlying claim. That cannot be helped. The class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff’s cause of action. Nor is there anything unusual about that consequence: The necessity of touching aspects of the merits in order to resolve preliminary matters, e.g., jurisdiction and venue, is a familiar feature of litigation.

Wal-Mart, 564 U.S. at 350-52. In a subsequent admonition, the Supreme Court cautioned district courts not to decide the case’s merits at the class certification stage:

> Although we have cautioned that a court’s class-certification analysis must be “rigorous” and may “entail some overlap with the merits of the plaintiff’s underlying claim,” Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent -- but only to the extent -- that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.

Amgen Inc. v. Conn. Ret. Plans & Tr. Funds, 568 U.S. 455, 465-66 (2013). The Court will find facts for the purposes of class certification by the preponderance of the evidence, but will allow the parties to challenge these findings during the subsequent merits stage of this case. See Menocal v. GEO Group, Inc., 882 F.3d at 926 n.17 (considering facts relevant to the merits only to the extent necessary for class certification). This approach is analogous to preliminary injunction practice, and many circuits have endorsed it. See Abbott v. Lockheed Martin Corp.,

725 F.3d at 810; In re Hydrogen Peroxide Antitrust Litig., 552 F.3d at 313; Gariety v. Grant Thornton, LLP, 368 F.3d at 366. In taking evidence on the question of class certification, the Federal Rules of Evidence apply, albeit in a relaxed fashion. See Anderson Living Tr. v. WPX Energy Prod. LLC, 306 F.R.D. at 378 n.39 ("The Court concludes that the Federal Rules of Evidence apply [to a class certification hearing.]. . . [R]ealistic[ally,] the judge [should] consider all but the most egregiously inadmissible pieces of evidence as they are presented, and factor any evidentiary infirmity into the weight he or she gives them.")

13. All classes must satisfy the prerequisites of rule 23(a):

> **(1)** the class is so numerous that joinder of all members is impracticable;
>
> **(2)** there are questions of law or fact common to the class;
>
> **(3)** the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> **(4)** the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). These four requirements are often referenced as numerosity, commonality, typicality, and adequacy, respectively. See Fed. R. Civ. P. 23(a). "A party seeking to certify a class is required to show . . . that all the requirements of [rule 23(a)] are clearly met." Reed v. Bowen, 849 F.2d at 1309. "Although the party seeking to certify a class bears the burden of proving that all the requirements of Rule 23 are met, the district court must engage in its own 'rigorous analysis' of whether 'the prerequisites of Rule 23(a) have been satisfied.'" Shook v. El Paso Cty., 386 F.3d 963, 968 (10th Cir. 2004)(quoting Gen. Tel. Co. of the S.W. v. Falcon, 457 U.S. at 161, and citing Reed v. Bowen, 849 F.2d at 1309).

**1. Numerosity.**

14. Rule 23(a)(1) provides for class certification where "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). See Trevizo v. Adams, 455 F.3d 1155, 1162 (10th Cir. 2006). "[R]ule 23(a)(1) is concerned with manageability, i.e., the Court's ability to handle the case as a non-class action; this purpose is obvious from the rules text, which calls for 'joinder . . . [being] impracticable.'" Anderson Living Tr. v. WPX Energy Prod., LLC, 306 F.R.D. at 436 (quoting Fed. R. Civ. P. 23(a)(1)), adhered to on reconsideration, 312 F.R.D. 620 (D.N.M. 2015)(Browning, J.). "[T]he numerosity requirement . . . is [second] concerned with protecting absent plaintiffs from the dangers that inhere in class litigation's foregoing of meaningful, face-to-face attorney-client representation." Anderson Living Tr. v. WPX Energy Prod., LLC, 306 F.R.D. at 436. "The Tenth Circuit has stated that there is 'no set formula' to determine whether the numerosity requirement is met; instead, it is a fact-specific inquiry best left to the district court's discretion." Gonzales v. City of Albuquerque, No. CIV 09-0520 JB/RLP, 2010 WL 4053947, at *7 (D.N.M. Aug. 21, 2010)(Browning, J.)(quoting Rex v. Owens, 585 F.2d at 436).

15. Some courts have held that numerosity may be presumed at a certain number; the Tenth Circuit, however, "has never adopted such a presumption." Trevizo v. Adams, 455 F.3d at 1162. "The Tenth Circuit has stated that there is 'no set formula' to determine whether the numerosity requirement is met; instead, it is a fact-specific inquiry best left to the district court's discretion." Gonzales v. City of Albuquerque, 2010 WL 4053947, at *7 (quoting Rex v. Owens, 585 F.2d at 436). Cf. Mullen v. Treasure Chest Casino, LLC, 186 F.3d 620, 624 (5th Cir. 1999)(finding that proposed class consisting of "100 to 150 members . . . is within the range that generally satisfies the numerosity requirement"). In determining whether a proposed class meets

the numerosity requirement, "the exact number of potential members need not be shown," and a court "may make 'common sense assumptions' to support a finding that joinder would be impracticable." Neiberger v. Hawkins, 208 F.R.D. 301, 313 (D. Colo. 2002)(Babcock, J.) (quoting Joseph v. Gen. Motors Corp., 109 F.R.D. 635, 639 (D. Colo. 1986)(Kane, J.)). See Bittinger v. Tecumseh Prods. Co., 123 F.3d 877, 884 n.1 (6th Cir. 1997)(noting that rule 23(a)(1) is not a "'strict numerical test'"; holding, however, that where class comprises over 1,100 persons, suggestion that joinder is not impractical is "frivolous" (citing Senter v. General Motors Corp., 532 F.2d 511, 523 n. 24 (6th Cir. 1976))); Robidoux v. Celani, 987 F.2d 931, 936 (2nd Cir. 1993)("[T]he difficulty in joining as few as 40 putative class members should raise a presumption that joinder is impracticable."); 1 Newberg on Class Actions: A Manual for Group Litigation at Federal and State Levels, § 3.05, at 141-42 (2d ed. 1985).

16. "Satisfaction of the numerosity requirement does not require that joinder is impossible, but only that plaintiff will suffer a strong litigational hardship or inconvenience if joinder is required." Cook v. Rockwell Int'l Corp., 151 F.R.D. 378, 384 (D. Colo. 1993). See Robidoux v. Celani, 987 F.2d at 935 ("Impracticable does not mean impossible."). The Court has previously found that joinder of "several hundred tenants and homeowners" would be impracticable, and thus the proposed class met rule 23(a)(1)'s numerosity requirement. Lowery v. City of Albuquerque, 273 F.R.D. 668, 682-83 (D.N.M. 2011)(Browning, J.). At the other end of the spectrum, the Court found that a class of 6,100 members, in a securities action, was so numerous that joinder was impracticable. See Lane v. Page, 272 F.R.D. 558, 574 (D.N.M. 2011)(Browning, J.). See also Thompson v. Jiffy Lube Intern., Inc., 250 F.R.D. 607, 620 (D. Kan. 2008)(Brown, J.)(finding that the numerosity requirement is met by a proposed class

seeking injunctive relief that constituted "at least tens of millions of members," and by a proposed class seeking damages that constitutes at least 4,900 members).

**2. Commonality.**

17. Rule 23(a)(2) requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Even "factual differences in the claims of the individual putative class members should not result in a denial of class certification where common questions of law exist." In re Intelcom Grp. Sec. Litig., 169 F.R.D. 142, 148 (D. Colo. 1996)(Daniel, J.). See Adamson v. Bowen, 855 F.2d at 676 ("That the claims of individual putative class members may differ factually should not preclude certification under Rule 23(b)(2) of a claim seeking the application of a common policy."); Lopez v. City of Santa Fe, 206 F.R.D. 285, 289 (D.N.M. 2002)(Vázquez, J.)("Commonality requires only a single issue common to the class, and the fact that 'the claims of individual putative class members may differ factually should not preclude certification under Rule 23(b)(2) of a claim seeking the application of a common policy.'" (citations omitted)(citing In re Am. Med. Sys., Inc., 75 F.3d 1069, 1080 (6th Cir. 1996) and quoting Adamson v. Bowen, 855 F.2d at 676)).

18. The commonality requirement was widely perceived to lack teeth before the Supreme Court's decision in Wal-Mart, which grafted the following requirements onto rule 23(a)(2): (i) that the common question is central to the validity of each claim that the proposed class brings; and (ii) that the common question is capable of a common answer. See Wal-Mart, 564 U.S. at 348-52. In that case, a proposed class of about 1.5 million current and former Wal-Mart employees sought damages under Title VII for Wal-Mart's alleged gender-based discrimination. See 564 U.S. at 342. Wal-Mart, however, had no centralized company-wide hiring or promotion policy, instead opting to leave personnel matters to the individual store

managers' discretion. See 564 U.S. at 343-45. The plaintiffs argued that, although no discriminatory formal policy applied to all proposed class members, "a strong and uniform 'corporate culture' permits bias against women to infect, perhaps subconsciously, the discretionary decisionmaking of each one of Wal-Mart's thousands of managers -- thereby making every [proposed class member] the victim of one common discriminatory practice." 564 U.S. at 345. The Supreme Court disagreed that such a theory constitutes a common question under rule 23(a)(2).

> The crux of this case is commonality -- the rule requiring a plaintiff to show that "there are questions of law or fact common to the class." Rule 23(a)(2). That language is easy to misread, since "[a]ny competently crafted class complaint literally raises common 'questions.'" Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L. Rev. 97, 131-132 (2009). For example: Do all of us plaintiffs indeed work for Wal-Mart? Do our managers have discretion over pay? Is that an unlawful employment practice? What remedies should we get? Reciting these questions is not sufficient to obtain class certification. Commonality requires the plaintiff to demonstrate that the class members "have suffered the same injury," [Gen. Tel. Co. of the S.W. v. Falcon, 457 U.S. at 157]. This does not mean merely that they have all suffered a violation of the same provision of law. Title VII, for example, can be violated in many ways -- by intentional discrimination, or by hiring and promotion criteria that result in disparate impact, and by the use of these practices on the part of many different superiors in a single company. Quite obviously, the mere claim by employees of the same company that they have suffered a Title VII injury, or even a disparate-impact Title VII injury, gives no cause to believe that all their claims can productively be litigated at once. Their claims must depend upon a common contention -- for example, the assertion of discriminatory bias on the part of the same supervisor. That common contention, moreover, must be of such a nature that it is capable of classwide resolution -- which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.
>
>> What matters to class certification . . . is not the raising of common "questions" -- even in droves -- but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.

Wal-Mart, 564 U.S. at 349-50 (emphasis in original)(quoting Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U.L. Rev. 97, 132 (2009)). In EQT Production Co. v. Adair, 764 F.3d 347 (4th Cir. 2011)(Diaz, J., joined by Keenan and Wilkinson, JJ.), the United States Court of Appeals for the Fourth Circuit stated:

> We first review the aspects of the district court's analysis that apply to all five royalty underpayment classes.
>
> At bottom, the district court believed that both the commonality and predominance requirements of Rule 23 were satisfied by the same basic fact: the defendants employed numerous uniform practices related to the calculation and payment of CBM [coalbed methane gas] royalties. These common practices are not irrelevant to Rule 23(b)'s predominance requirement. But we hold that the district court abused its discretion by failing to consider the significance of this common conduct to the broader litigation.
>
> The district court identified numerous common royalty payment practices. For example, it noted that EQT sells all of the CBM it produces in Virginia to an affiliate, EQT Energy, and that "all royalty owners within the same field have been paid royalties based on the same sales price for the CBM." With respect to CNX, it noted that CNX "has uniform policies and procedures which governed its calculation of CBM revenues," and that "it has deducted severance and license taxes when calculating royalties since January 1, 2004."
>
> That the defendants engaged in numerous common practices may be sufficient for commonality purposes. As noted above, the plaintiffs need only demonstrate one common question of sufficient importance to satisfy Rule 23(a)(2).

764 F.3d at 366 (citing Adair v. EQT Prod. Co., No. 1:10-CV-00037, 2013 WL 5429882, at *38-39 (W.D. Va. Sept. 5, 2013)(Sargent, M.J.)).

19. In Wal-Mart, the Honorable Antonin Scalia, then Associate Justice of the Supreme Court of the United States, stated: "Wal-Mart is entitled to individualized determinations of each employee's eligibility for backpay." 564 U.S. at 366. Scalia concluded from this observation:

> Because the Rules Enabling Act forbids interpreting Rule 23 to "abridge, enlarge or modify any substantive right," 28 U.S.C. § 2072(b), a class cannot be certified on the premise that Wal-Mart will not be entitled to litigate its statutory defenses to individual claims. And because the necessity of that litigation will prevent backpay from being "incidental" to the classwide injunction, respondents' class could not be certified even assuming, arguendo, that "incidental" monetary relief can be awarded to a 23(b)(2) class.

Wal-Mart, 564 U.S. at 367. "Thus, the common question or questions cannot be 'incidental,' nor can the plaintiff submit a long list of 'incidental' questions or issues, and say that they predominate over the real issues." Anderson Living Tr. v. WPX Energy Prod. LLC, 306 F.R.D. at 382.

**3. Typicality.**

20. Rule 23(a)(3) requires that the named representative's claims be typical of the class' claims. See Fed. R. Civ. P. 23(a)(3). The typicality requirement ensures that absent proposed class members are adequately represented by evaluating whether the named plaintiff's interests are sufficiently aligned with the class' interest. See Baby Neal ex rel. Kanter v. Casey, 43 F.3d 48, 57 (3d Cir. 1994). "Typicality measures whether a sufficient nexus exists between the claims of the named representatives and those of the class at large." Thompson v. Jiffy Lube Int'l, Inc., 250 F.R.D. at 622 (citing Busby v. JRHBW Realty, Inc., 513 F.3d 1314, 1320 (11th Cir. 2008)).

21. The Supreme Court has noted that "[t]he commonality and typicality requirements of Rule 23(a) tend to merge." Gen. Tele. Co. of the Sw. v. Falcon, 457 U.S. at 157 n.13. "The United States Court of Appeals for the Tenth Circuit has said that the typicality requirement is satisfied if there are common questions of law or fact." Gianzero v. Wal-Mart Stores Inc., No. CIV 09-00656 REB/BNB, 2010 WL 1258071, at *3 (D. Colo. Mar. 29, 2010)(Blackburn, J.)(citing Milonas v. Williams, 691 F.2d 931, 938 (10th Cir. 1982)("In

determining whether the typicality and commonality requirements have been fulfilled, either common questions of law or fact presented by the class will be deemed sufficient.")); Adamson v. Bowen, 855 F.2d at 676). "[L]ike commonality, typicality exists where . . . all putative class members are at risk of being subjected to the same harmful practices, regardless of any class member's individual circumstances." DG ex rel. Stricklin v. Devaughn, 594 F.3d 1188, 1199 (10th Cir. 2010). Factual differences among some of the proposed class members will "not defeat typicality under Rule 23(a)(3) so long as the claims of the class representative and putative class members are based on the same legal or remedial theory." Adamson v. Bowen, 855 F.2d at 676. See DG ex rel. Stricklin v. Devaughn, 594 F.3d at 1199 (citing Adamson v. Bowen, 855 F.2d at 676 ("Provided the claims of Named Plaintiffs and putative class members are based on the same legal or remedial theory, differing fact situations of the putative class members do not defeat typicality.")); Penn v. San Juan Hosp., Inc., 528 F.2d 1181, 1189 (10th Cir. 1975)("It is to be recognized that there may be varying fact situations among individual members of the class and this is all right so long as the claims of Plaintiffs and the other putative class members are based on the same legal or remedial theory.").

22. Accordingly, differences in the amount of damages will not defeat typicality. See Harrington v. City of Albuquerque, 222 F.R.D. 505, 511 (D.N.M. 2004)(Hansen, J.). On the other hand, "it is well-established that a proposed class representative is not 'typical' under Rule 23(a)(3) if 'the representative is subject to a unique defense that is likely to become a major focus of the litigation.'" In re Crocs, Inc. Sec. Litig., 306 F.R.D. 672, 687 (D. Colo. 2014)(Brimmer, J.)(quoting Marcus v. BMW of N. Am., LLC, 687 F.3d 583, 599 (3d Cir. 2012)). "[A] lead plaintiff's unique defense is detrimental to the class . . . [because] the lead plaintiff 'might devote time and effort to the defense at the expense of issues that are common

and controlling for the class.'" In re Crocs, Inc. Sec. Litig., 306 F.R.D. at 687 (quoting Beck v. Maximus, Inc., 457 F.3d 291, 297 (3d Cir. 2006)). See Genesee Cty. Employees' Ret. Sys. v. Thornburg Mortg. Sec. 825 F. Supp. 2d 1082, 1214 (D.N.M. 2011)(Browning, J.).

**4. Adequacy.**

23. Rule 23(a)(4) requires that "representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "The requirement of typicality dovetails into the requirement of adequacy of representation." Edgington v. R.G. Dickinson & Co., 139 F.R.D. 183, 189 (D. Kan. 1991)(Crow, J.)(quoting Penn v. San Juan Hospital, Inc., 528 F.2d at 1189). See Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc., 725 F.3d at 1219 (noting that "the commonality, typicality, and adequacy requirements of Rule 23(a) 'tend to merge'" (quoting Wal-Mart, 564 U.S. at 349 n.5)). The adequacy requirement protects the interests of unnamed proposed class members -- who are bound by any judgment in the action. See Lile v. Simmons, 143 F. Supp. 2d 1267, 1277 (D. Kan. 2001)(Vratil, J.)("Due process requires that the Court 'stringently' apply the competent representation requirement because putative class members are bound by the judgment (unless they opt out), even though they may not actually be aware of the proceedings." (citing Albertson's, Inc. v. Amalgamated Sugar Co., 503 F.2d 459, 463-64 (10th Cir. 1974)). "The requirement of fair and adequate representation is perhaps the most important of the criteria for class certification set forth in Rule 23(a)." Miller ex rel. S.M. v. Bd. of Educ., 455 F. Supp. 2d 1286, 1294 (D.N.M. 2006)(Armijo, J.). See Cobb v. Avon Prods., Inc., 71 F.R.D. 652, 654 (W.D. Pa. 1976)(Gourley, J.)("Adequacy of the representative is of monumental importance since representation demands undiluted loyalty to the class interests . . . .").

24. The Tenth Circuit has identified two questions relevant to the adequacy of representation inquiry: (i) whether the named plaintiffs and their counsel have any conflicts with other proposed class members; and (ii) whether the named plaintiffs and their counsel will vigorously prosecute the action on the class' behalf. See Rutter & Wilbanks Corp. v. Shell Oil Co., 314 F.3d 1180, 1187-88 (10th Cir. 2002). The Supreme Court "has repeatedly held [that] a class representative must be part of the class and 'possess the same interest and suffer the same injury' as the putative class members." E. Tex. Motor Freight Sys. Inc. v. Rodriguez, 431 U.S. 395, 403 (1977)(quoting Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208, 216 (1974)). Intra-class conflicts "may negate adequacy under Rule 23(a)(4)." Langbecker v. Elec. Data Sys. Corp., 476 F.3d 299, 315-16 (5th Cir. 2007)(holding that the district court erred in certifying a class without evaluating intra-class conflicts). See Pickett v. Iowa Beef Processors, 209 F.3d 1276, 1280 (11th Cir. 2000)(finding that representation was inadequate where the class included those "who claim harm from the very acts from which other putative class members benefitted"); Broussard v. Meineke Discount Muffler Shops, Inc., 155 F.3d 331, 344 (4th Cir. 1998)(holding that the current franchisees, who had an interest in the continued viability of the franchiser had an inherent conflict with former franchisees, whose only interest was in the maximization of damages); Alston v. Va. High Sch. League, Inc., 184 F.R.D. 574, 579 (W.D. Va. 1999)(Michael, J.)(ruling that a class of all high school female athletes could not be certified -- even if the alleged conduct of the defendant school system was discriminatory -- where some female athletes did not share the same goals or interests as the named female plaintiffs, because those unnamed female athletes were satisfied with and/or benefitted from the alleged discriminatory treatment). On the other hand, "[t]hough a plaintiff cannot be an adequate representative if he or she has a conflict of interest with putative class

members, not every potential disagreement between a class representative and the putative class members will stand in the way of a class suit." Lowery v. City of Albuquerque, 273 F.R.D. at 680 (quoting 1 A. Conte & H. Newberg, Newberg on Class Actions § 3:26, at 433-34 (4th ed. 2002)). "[O]nly a conflict that goes to the very subject matter of the litigation will defeat a party's claim of representative status. Beyond that straightforward proposition, defining the level of antagonism or conflict that should preclude class certification is a more difficult proposition." 7A Wright, Miller & Kane, supra § 1768, at 389-93.

25. Although Tenth Circuit precedent suggests that the adequacy-of-counsel analysis is conducted as a part of the rule 23(a)(4) inquiry, see Lopez v. City of Santa Fe, 206 F.R.D. at 289-90, this analysis has now been moved to rule 23(g). The 2003 amendment to rule 23 created rule 23(g), entitled "class counsel." Fed. R. Civ. P. 23(g). This subsection contains its own adequacy-of-counsel analysis. See Fed. R. Civ. P. 23(g)(1)-(2). The advisory committee notes advise that rule 23(g) should replace the analysis of class counsel under rule 23(a)(4); these notes describe that rule 23(g)

> responds to the reality that the selection and activity of class counsel are often critically important to the successful handling of a class action. Until now, courts have scrutinized proposed class counsel as well as the class representative under Rule 23(a)(4). This experience has recognized the importance of judicial evaluation of the proposed lawyer for the class, and this new subdivision builds on that experience rather than introducing an entirely new element into the class certification process. Rule 23(a)(4) will continue to call for scrutiny of the proposed class representative, while this subdivision will guide the court in assessing proposed class counsel as part of the certification decision. This subdivision recognizes the importance of class counsel, states the obligation to represent the interests of the class, and provides a framework for selection of class counsel. The procedure and standards for appointment vary depending on whether there are multiple applicants to be class counsel. The new subdivision also provides a method by which the court may make directions from the outset about the potential fee award to class counsel in the event the action is successful.

Fed. R. Civ. P. 23(g) advisory committee notes to the 2003 amendment. See Lyall v. City of Denver, 319 F.R.D. 558, 565 (D. Colo. 2017)(Martinez, J.)(addressing the named plaintiffs' adequacy under rule 23(a)(4) and the counsel's adequacy under rule 23(g)); Thompson v. Jiffy Lube Int'l, Inc., 250 F.R.D. at 628 ("Rule 23(g) now sets forth a specific set of factors relevant to the appointment of class counsel."). Cf. Martin v. Blessing, 571 U.S. 1040, 1040 (2013)(stating, while denying a writ of certiorari, that rule 23(g) orders a district court to consider the adequacy of class counsel in determining whether to grant class certification).

**5. Rule 23(b).**

26. Once the court concludes that the threshold requirements have been met, "it must then examine whether the class falls within at least one of three categories of suits set forth in Rule 23(b)." Adamson v. Bowen, 855 F.2d at 675. See DG ex rel. Stricken v. Devaughn, 594 F.3d 1188, 1199 (10th Cir. 2010)("In addition to satisfying Rule 23(a)'s requirements, the class must also meet the requirements of one of the types of classes described in subsection (b) of Rule 23."). Rule 23(b) provides that a class action is appropriate if the threshold requirements are satisfied, and the case falls into one or more of three categories:

> (b) Types of Class Actions. A class action may be maintained if Rule 23(a) is satisfied and if:
>
> (1) prosecuting separate actions by or against individual putative class members would create a risk of:
>
> (A) inconsistent or varying adjudications with respect to individual putative class members that would establish incompatible standards of conduct for the party opposing the class; or
>
> (B) adjudications with respect to individual putative class members that, as a practical matter, would be dispositive of the interests

> of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;
>
> (2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or
>
> (3) the court finds that the questions of law or fact common to putative class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
>
> (A) the putative class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against putative class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b). "Only one of rule 23(b)'s subdivisions must be satisfied to meet the class-action requirements." Gonzales v. City of Albuquerque, No. CIV 09–0520 JB/RLP, 2010 WL 4053947, at *11 (citing Carpenter v. Boeing, Co., 456 F.3d 1183, 1187 (10th Cir. 2006)(stating that the district court must determine whether a suit "falls within one of the categories of actions maintainable as class actions")).

27. The three categories of class actions -- really four, as rule 23(b)(1) contains two subcategories, known as (b)(1)(A) and (b)(1)(B) class actions -- are not of equal utility. Class

actions under (b)(1) can be certified only in very particular circumstances. Class actions under (b)(2) are broadly available, but are only capable of seeking injunctive or declaratory relief, and not damages. Far and away the most controversial class action category, (b)(3), can be brought for class-wide damages, injunctive relief, declaratory relief, or any combination thereof. Class actions under (b)(3) always require notice to all proposed class members of certification of the class, and those individuals must be given the opportunity to opt out if they so desire. See Fed. R. Civ. P. 23(c)(2)(B), (c)(3)(B); Phillips Petrol. Co. v. Shutts, 472 U.S. 797, 812 (1985)("[W]e hold that due process requires at a minimum that an absent plaintiff be provided with an opportunity to remove himself from the class by executing and returning an 'opt out' or 'request for exclusion' form to the court."). The other class action categories, however, are ordinarily mandatory, and neither notice nor opportunity to opt out needs to be given. See Fed. R. Civ. P. 23(c)(2)(B), (c)(3)(A). The Court will focus on the most important form of class action, the (b)(3) damages class action.[37]

---

[37]The Court will briefly address the other class-action types. Rule 23(b)(1) contains two subcategories of class action, (b)(1)(A) actions and (b)(1)(B) actions; a class need satisfy the requirements of only one to be certified. See Fed. R. Civ. P. 23(b)(1). Class actions under (b)(1)(A) are designed to avoid the situation in which a defendant subject to suit by multiple plaintiffs is ordered to undertake incompatible courses of conduct as a result of the non-centralized nature of the adjudication. See Fed. R. Civ. P. 23(b)(1)(A). "Incompatible" means more than simply inconsistent. A situation in which, for example, a defendant was ordered to pay ten thousand dollars to a plaintiff in one case, was ordered to pay ten million dollars to another plaintiff in an identical or similar case, and was found to not be at fault at all in yet another case, may be inconsistent, but the situation does not create "incompatible standards of conduct for the party opposing the class." Fed. R. Civ. P. 23(b)(1)(A). Such alleged inconsistency is a normal and expected part of the system of individualized adjudication used by the judiciary to apply a uniform set of laws to varied factual settings. What (b)(1)(A) is designed to avoid is injunctive or declaratory "whipsawing" in which, for example, one court orders a school district to close an underperforming inner-city school and bus its students to suburban schools, and another court orders the district to keep the school open and bus suburban students in to the school. Class actions under (b)(1)(B) serve a similar role, but apply when varying adjudications would result in practically -- rather than legally or logically -- incompatible

judgments. Fed. R. Civ. P. 23(b)(1)(B). Rule 23(b)(1)(B) applies when the defendant has possession or control of a *res* -- a pot of money or thing that constitutes the relief that the proposed class seeks -- and the relief sought by all the individual members of the proposed class would more than exhaust the *res*. For example, if a Ponzi scheme operator took ten billion dollars of investors' money, and, upon law enforcement's discovery of the scheme, had only six billion dollars remaining, then the individual investors' claims to recover their rightful share would add up to four billion dollars more than existed in the *res*. Thus, the court might certify a (b)(1)(B) class action to ensure that the custodian of the *res* does not pay out the entire *res* to the first investors to file suit, but, instead, distributes the *res* fairly among all investors.

The two subcategories of (b)(1) class action have other things in common as well. Both exist, in a sense, for the defendant's benefit -- at least relative to (b)(2) and (b)(3) class actions -- and are rarely brought, in part because plaintiffs have little incentive to bring them. In the (b)(1)(B) example, each investor hopes to recover the full value of his or her investment, not a 60% value, and thus is incentivized to file as an individual. In the (b)(1)(A) example, the plaintiff seeking to close down the school (i) does not care about the inconsistent obligations of the school district, and (ii) would rather not be joined in a class action with plaintiffs who want to keep the school open. Last, (b)(1) class actions, along with (b)(2) class actions, are mandatory: if certified, no person covered under the class definition may opt out of it, or pursue his or her own individual claim. Accordingly, no notice needs to be given to the class members that they are part of ongoing litigation, although the certifying court may elect to direct notice in appropriate circumstances. See Fed. R. Civ. P. 23(c)(2)(A). Class actions under (b)(2) provide for injunctive or declaratory relief when a defendant has "acted or refused to act on grounds that apply generally to the class." Fed. R. Civ. P. 23(b)(2).

> The key to the (b)(2) class is "the indivisible nature of the injunctive or declaratory remedy warranted -- the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." . . .In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant. Similarly, it does not authorize class certification when each class member would be entitled to an individualized award of monetary damages.

Wal-Mart, 564 U.S. at 360-61 (emphasis in original). The (b)(2) class action was invented for the purpose of facilitating civil rights suits, and much of its use is in that field today. See Newberg § 4:26. The (b)(2) class action allows civil rights litigants to advocate on behalf of all similarly situated individuals, such as a disenfranchised black voter representing a class of all black voters within an unconstitutionally drawn district or a jail inmate representing all inmates in an overcrowding case. Anyone familiar with the nation's seminal civil rights cases, however, knows that many of them are not brought as class actions, which raises a question:

> [W]hy would anyone ever bring one? . . .Th[is] inquiry is generated because if an individual litigant pursues an individual case for injunctive relief and prevails, she

28. To satisfy rule 23(b)(3), the court must find "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). Rule 23(b)(3) provides that "[t]he matters pertinent to these findings include": (i) "the class members' interest in individually controlling the prosecution or defense of separate actions"; (ii) "the extent and nature of any

---

> can generally get all of the remedy that she needs without going through the hurdles of certifying a class. For example, to return to Brown v. Board of Education, [349 U.S. 294 (1955),] once Linda Brown prevailed on her race discrimination claim, her remedy -- a desegregated school -- was hers to pursue. Although that remedy would affect many other persons not a part of her litigation, hence making class certification appropriate, there is no requirement that to secure that remedy, she had to file a class action.
>
> Nonetheless, social change advocates tend to pursue class certification under Rule 23(b)(2) for several reasons. First, and perhaps most importantly, Linda Brown will likely graduate from school long before her case ends; if hers is simply an individual action, it will become moot and risk dismissal. Class certification, however, constitutes an exception to the mootness doctrine in certain circumstances. Second, the scope of the plaintiff's relief is likely augmented by certifying a class. It is arguable that all that Linda Brown would have been able to secure as a remedy for her individual claim was a desegregated school for herself, not for students throughout the entire school district; there is some relationship between the scope of the class and the scale of the remedy. Third, it is often the case that the attorneys pursuing civil rights actions are doing so as public interest lawyers paid by an organization like the NAACP Legal Defense Fund or the American Civil Liberties Union (ACLU); they may therefore have a financial incentive to pursue a class's case rather than a series of5 individual cases as they have limited resources, and the economies of scale may argue for a class action suit. Most generally, many civil rights cases are brought as class suits because the attorneys and clients pursuing them conceptualize their efforts in group, not individual, terms. Thus, while an individual civil rights plaintiff might be able to secure the relief that she seeks without a (b)(2) class, a series of factors may encourage the pursuit of one.

Newberg § 4:26 (footnotes omitted). Like (b)(1) class actions, (b)(2) class actions are mandatory -- individuals covered under the class definition may not opt out -- and do not require notice to be given to the class. See Fed. R. Civ. P. 23(c)(2)(A).

litigation concerning the controversy already begun by or against members of the class"; (iii) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum"; and (iv) "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(A)-(D). "Only one of rule 23(b)'s subdivisions must be satisfied to meet the class-action requirements." *Gonzales v. City of Albuquerque*, 2010 WL 4053947, at *11 (citing *Carpenter v. Boeing, Co.*, 456 F.3d at 1187 (stating that the district court must determine whether a suit "falls within one of the categories of actions maintainable as class actions")).

**a. Predominance.**

29. Rule 23(b)(3)'s first requirement is that questions common to the class predominate over those questions that are individualized. See Fed. R. Civ. P. 23(b)(3). A question is common when "the same evidence will suffice for each member to make a prima facie showing," Blades v. Monsanto Co., 400 F.3d 562, 566 (8th Cir. 2005)(citing In re Visa Check/MasterMoney Antitrust Litig., 208 F.3d 124, 136-40 (2d Cir. 2001)), or when the issue is "susceptible to generalized, class-wide proof," In re Nassau Cnty. Strip Search Cases, 461 F.3d 219, 227 (2d Cir. 2006). A question is individual when "the members of a proposed class will need to present evidence that varies from member to member." Blades v. Monsanto Co., 400 F.3d at 566. Although a case need not present only common questions to merit certification, and the presence of some individual questions does not destroy predominance, the rule 23(b)(3) predominance requirement is much stricter than the rule 23(a)(1) commonality requirement: the latter requires only that a common question or questions exist; the former requires that the common question or questions predominate over the individual ones. See In re Thornburg Mortg., Inc. Sec. Litig., 912 F. Supp. 2d at 1225 ("The predominance criterion of rule 23(b)(3) is 'far more demanding' than rule 23(a)(2)'s commonality requirement.")(quoting Amchem Prods.,

Inc. v. Windsor, 521 U.S. 591, 623-24 (1997). As the Tenth Circuit, addressing a Title VII claim, put it:

> Although we do not rest our decision upon Rule 23(a), cases that interpret . . . the commonality requirement of Rule 23(a) illustrate the instant Plaintiffs' inability to satisfy Rule 23(b)(3)'s "far more demanding" requirement that common issues predominate.
>
> . . . The myriad discriminatory acts that Plaintiffs allege (e.g., failure to promote, failure to train, unequal pay, disrespectful treatment, etc.) each require independent legal analysis, and similarly challenge the predominance requirement of Rule 23(b)(3) if not also the commonality requirement of Rule 23(a).

Monreal v. Potter, 367 F.3d 1224, 1237 (10th Cir. 2004)(footnote omitted).

30. The predominance question applies to both macro damages -- the total class damages -- and to the micro damages -- the individual damages. In Comcast Corp. v. Behrend, 569 U.S. 27 (2013), the Supreme Court held that it could not accept the regression model which the plaintiffs' expert had developed as evidence that damages were susceptible of measurement across an entire class -- as rule 23(b)(3) requires. See 569 U.S. at 35-38. The plaintiffs argued four theories of antitrust violations; one theory was that Comcast Corp.'s activities had an antitrust impact, because Comcast Corp.'s activities reduced the level of competition from "overbuilders," companies that build competing cable networks in areas where an incumbent cable company already operates. 569 U.S. at 31. The district court found, among other things, that the damages resulting "from overbuilder-deterrence impact could be calculated on a classwide basis." 569 U.S. at 31-32.

> To establish such damages, [the plaintiffs relied] solely on the testimony of Dr. James McClave. Dr. McClave designed a regression model comparing actual cable prices in the Philadelphia [Designated Market Area] with hypothetical prices that would have prevailed but for [Comcast Corp.'s] allegedly anticompetitive activities. The model calculated damages of $875,576,662.00 for the entire class. As Dr. McClave acknowledged, however, the model did not

> isolate damages resulting from any one theory of antitrust impact. The District Court nevertheless certified the class.

569 U.S. at 31-32 (citations omitted).

31. The United States Court of Appeals for the Third Circuit affirmed the district court decision. The Third Circuit concluded that the plaintiffs "'provided a method to measure and quantify damages on a classwide basis,' finding it unnecessary to decide 'whether the methodology was a just and reasonable inference or speculation.'" 569 U.S. at 32 (quoting 655 F.3d 182, 206 (3d Cir. 2011)). The Supreme Court granted certiorari on the question "[w]hether a district court may certify a class action without resolving whether the plaintiff class had introduced admissible evidence, including expert testimony, to show that the case is susceptible to awarding damages on a class-wide basis." Comcast Corp. v. Behrend, 567 U.S. 933, 933 (2012). Justice Scalia criticized the Third Circuit's reluctance to entertain arguments against the plaintiffs' damages model "simply because those arguments would also be pertinent to the merits determination." Comcast Corp. v. Behrend, 569 U.S. at 34. Justice Scalia said that

> it is clear that, under the proper standard for evaluating certification, respondents' model falls far short of establishing that damages are capable of measurement on a classwide basis. Without presenting another methodology, respondents cannot show Rule 23(b)(3) predominance: Questions of individual damage calculations will inevitably overwhelm questions common to the class.

569 U.S. at 34. Justice Scalia stated that, under the Third Circuit's logic, "at the class-certification stage, *any* method of measurement is acceptable so long as it can be applied classwide, no matter how arbitrary the measurements may be. Such a proposition would reduce rule 23(b)(3)'s predominance requirement to a nullity." 569 U.S. at 35 (emphasis in original).

32. It is clear that Comcast Corp. v. Behrend applies to classwide damages. It is less clear that Comcast Corp. v. Behrend's language applies to the determination of individual

damages. There are three ways that the Court could deal with Comcast Corp. v. Behrend and the determination of individual damage awards. First, the Court could decide that Comcast Corp. v. Behrend applies only to classwide damages and is not controlling at all in the determination of individual damages. Second, the Court could decide that everything that Justice Scalia said about classwide damages also applies to the determination of individual damages. Third, the Court could decide that Justice Scalia said some things relating to the determination of individual damages, but not the same things which apply to classwide damages. As to the first option, while much could be said for limiting Justice Scalia's opinion to classwide damages -- even from the opinion's language and from the wording of the question presented -- the Court is reluctant to say that it has nothing to say that might be relevant to the determination of individual damage awards. Some of Justice Scalia's concerns about admissible evidence to determine damages -- whether classwide or individual damage awards -- still seem relevant to whether damages are classwide or individual. While Justice Scalia was not addressing the determination of individual damage awards, some of what he said -- and how he said it -- causes the Court to be cautious in determining a methodology for calculating individual damage awards. On the other hand, the Court is not convinced that it should or even can apply Comcast Corp. v. Behrend's language to the individual determination of damages as it does to classwide damages. The dissent stated that "[r]ecognition that individual damage calculations do not preclude class certification under Rule 23(b)(3) is well nigh universal." Comcast Corp. v. Behrend, 569 U.S. at 42 (Ginsburg, J., dissenting). Justice Scalia did not refute this proposition, and the Court has no reason to think the dissent's statement -- which is accurate -- does not remain good law. See Menocal v. GEO Group, Inc., 882 F.3d at 927 (stating that the determination of individualized damages does not

defeat class certification). Accordingly, different amounts of damages for plaintiffs and class members, and separate calculations of damages do not defeat class certification.

33. What the Court thinks that Comcast Corp. v. Behrend says that is relevant to the individual determination of damages is threefold. First, at the class certification stage, the Court cannot ignore how individual damages, if any are appropriate, are to be decided. In other words, the Court cannot ignore the possible complexities of the individual damages determinations in making the predominance calculation. See Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc., 725 F.3d at 1220 ("[T]he district court should consider the extent to which material differences in damages determinations will require individualized inquiries."). A class can have individual damage calculations, but the Court has to look at the issues of individual damage calculations at the class certification stage. Second, the methodology for all class members needs to be common or, if there are different methodologies for some plaintiffs and class members, the Court must take these differences into account at the class certification stage in the predominance analysis. In other words, if the Court is going to use different methodologies for different class members, it must decide: (i) whether these differences create questions affecting only individual members; and (ii) whether these individual questions predominate over the questions of law or fact common to the class. Third, even if the methodology is common to the class, the Court must decide whether it will operate in a consistent way for each individual class member. The law and methodology may be the same, but when applied to the class, they may create issues for one class member or group of class members that they do not create for other class members or groups. The predominance analysis must identify precisely the common issues and uncommon issues that application of the class methodology or methodologies raise, and then determine whether, in the total issue mix, the common issues predominate over the individual

ones. See Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc., 725 F.3d at 1220 (describing that individualized damages issues might destroy predominance).

34. A defendant's desire to assert individual counterclaims[38] does not typically defeat predominance. See Phillips Petrol. Co. v. Shutts, 472 U.S. at 810; Allapattah Servs., Inc. v. Exxon Corp., 333 F.3d 1248, 1259-60 (11th Cir. 2003). A defendant's desire to assert individual affirmative defenses also often does not defeat predominance, see Smilow v. Sw. Bell Mobile Sys., Inc., 323 F.3d at 39 ("Courts traditionally have been reluctant to deny class action status under Rule 23(b)(3) simply because affirmative defenses may be available against individual members."),[39] but this statement is less true after Wal-Mart. Affirmative defenses may be

---

[38]Generally speaking, counterclaims, even common ones, are not permitted against absent class members. See Phillips Petrol. Co. v. Shutts, 472 U.S. 797, 810 (1985).

[39]Limitations defenses are an especially common breed of affirmative defense. Limitations defenses generally present common questions, rather than individual ones, because a limitations defense's merits rest on two facts: (i) the date on which the claim accrued; and (ii) the date on which the action was filed. Fact (ii) is a common issue in virtually every class action, because the entire class gets credit for the filing date of the class action complaint. Fact (i) may not be truly common, but it might be, if, for example, the discovery rule delays accrual of a claim until the cause of action is discovered, and all class members' causes of action are discovered at the same time, or if a single act by the defendant breached contracts with all class members at once. Even if the question is individual -- for example, if a class is defined as encompassing only preexisting filed claims, or if the discovery rule might delay the accrual of the claim for some class members but not others -- it still typically does not defeat predominance.

> Although a necessity for individualized statute-of-limitations determinations invariably weighs against class certification under Rule 23(b)(3), we reject any per se rule that treats the presence of such issues as an automatic disqualifier. In other words, the mere fact that such concerns may arise and may affect different class members differently does not compel a finding that individual issues predominate over common ones. As long as a sufficient constellation of common issues binds class members together, variations in the sources and application of statutes of limitations will not automatically foreclose class certification under Rule 23(b)(3). Predominance under Rule 23(b)(3) cannot be reduced to a mechanical, single-issue test.

considered as one factor in the class certification calculus. See Donaca v. Dish Network, LLC., 303 F.R.D. 390, 400 (D. Colo. 2014)(Jackson, J.)(describing that affirmative defenses are relevant considerations for class certification); Miller v. Farmers Ins. Grp., No. CIV-10-466-F, 2012 WL 8017244, at *16 (W.D. Okla. March 22, 2012)(Friot, J.)(describing that affirmative defenses are relevant to the class certification inquiry and stating that Wal-Mart clarifies that the question for class certification "is whether it can fairly and lawfully be said that plaintiff's win, if he wins *his* case, can fairly and lawfully be replicated for every member of the class")(emphasis in original); Mulford v. Altria Grp., Inc., 242 F.R.D. 615, 629-30 (D.N.M. 2007)(Vazquez, J.)("While the existence of affirmative defenses that may require individualized evidence does not compel a finding that individual issues predominate over common ones, it does weigh against class certification."). Other recurring issues present serious challenges to predominance, such as: (i) the prima facie element of reliance or due diligence in common-law fraud and other cases;[40] (ii) differences in the applicable law in a multi-state, state-law-based

---

Waste Mgmt. Holdings, Inc. v. Mowbray, 208 F.3d 288, 296 (1st Cir. 2000)(citing 5 James W. Moore et al., Moore's Federal Practice ¶ 23.46[3] (3d ed. 1999)). See Newberg, § 4:57 (confirming that the above passage "reflects the law in most circuits" (footnote omitted)).

[40]The advisory committee's notes to rule 23 state that

> a fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action, and it may remain so despite the need, if liability is found, for separate determination of the damages suffered by individuals within the class. On the other hand, although having some common core, a fraud case may be unsuited for treatment as a class action if there was material variation in the representations made or in the kinds or degrees of reliance by the persons to whom they were addressed.

Fed. R. Civ. P. 23 advisory committee's notes to the 1966 amendment (citing Miller v. Nat'l City Bank of N.Y., 166 F.2d 723 (2d Cir. 1948); Oppenheimer v. F. J. Young & Co., Inc., 144 F.2d 387 (2d Cir. 1944)).

class action,[41] see Castano v. Am. Tobacco Co., 84 F.3d at 741; and (iii) the need to determine individual personal injury damages, see Amchem Prods., Inc. v. Windsor, 521 U.S. at 625.

---

> Despite the generalized concern about the individual nature of the misrepresentations and/or reliance inquiry in fraud cases, there are at least three recurring situations in which courts have found common issues predominant in fraud cases: (1) those in which reliance is common across the class; (2) those in which courts have excused a showing of individual reliance; and (3) those in which the underlying law does not require a showing of individual reliance.

Newberg, supra, § 4:58. Reliance may be a common issue when the same misrepresentation is made to the entire class; some circuits have held that written misrepresentations may be common issues while oral misrepresentations are presumed to be individualized. See, e.g., Moore v. PaineWebber, Inc., 306 F.3d 1247, 1253 (2d Cir. 2002)(listing Courts of Appeals that "have held that oral misrepresentations are presumptively individualized"); In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions, 148 F.3d 283, 319 (3d Cir. 1998)(certifying class where alleged misrepresentations were written and uniform); Spencer v. Hartford Fin. Servs. Grp., Inc., 256 F.R.D. 284, 297 (D. Conn. 2009)(Hall, J.)(certifying class where class definition was narrowed to include only those who had received written communications from defendant). The requirement that plaintiffs show reliance is most often presumed or excused in so-called fraud-on-the-market securities cases, in which class members -- investors in the defendant company -- are presumed to be rational, fully informed actors who use all of the information available to the general public, but are also presumed to not possess insider information.

> We have found a rebuttable presumption of reliance in two different circumstances. First, if there is an omission of a material fact by one with a duty to disclose, the investor to whom the duty was owed need not provide specific proof of reliance. Second, under the fraud-on-the-market doctrine, reliance is presumed when the statements at issue become public. The public information is reflected in the market price of the security. Then it can be assumed that an investor who buys or sells stock at the market price relies upon the statement.

Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, 552 U.S. 148, 159 (2008)(citing Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 153 (1972); Basic Inc. v. Levinson, 485 U.S. 224, 245 (1988)).

[41]In In re Bridgestone/Firestone, Inc., 288 F.3d 1012 (7th Cir. 2002), the Honorable Frank H. Easterbrook, United States Circuit Judge for the Seventh Circuit, in an opinion that predates Wal-Mart and Comcast Corp. v. Behrend, states:

> No class action is proper unless all litigants are governed by the same legal rules. Otherwise the class cannot satisfy the commonality and superiority requirements of Fed. R. Civ. P. 23(a), (b)(3). Yet state laws about theories such as those presented by our plaintiffs differ, and such differences have led us to hold

> that other warranty, fraud, or products-liability suits may not proceed as nationwide classes

288 F.3d at 1015. Judge Easterbrook then discussed how variations in tires defeat class treatment:

> Because these claims must be adjudicated under the law of so many jurisdictions, a single nationwide class is not manageable. Lest we soon see a Rule 23(f) petition to review the certification of 50 state classes, we add that this litigation is not manageable as a class action even on a statewide basis. About 20% of the Ford Explorers were shipped without Firestone tires. The Firestone tires supplied with the majority of the vehicles were recalled at different times; they may well have differed in their propensity to fail, and this would require sub-subclassing among those owners of Ford Explorers with Firestone tires. Some of the vehicles were resold and others have not been; the resales may have reflected different discounts that could require vehicle-specific litigation. Plaintiffs contend that many of the failures occurred because Ford and Firestone advised the owners to underinflate their tires, leading them to overheat. Other factors also affect heating; the failure rate (and hence the discount) may have been higher in Arizona than in Alaska. Of those vehicles that have not yet been resold, some will be resold in the future (by which time the tire replacements may have alleviated or eliminated any discount) and some never will be resold. Owners who wring the last possible mile out of their vehicles receive everything they paid for and have claims that differ from owners who sold their Explorers to the second-hand market during the height of the publicity in 2000. Some owners drove their SUVs off the road over rugged terrain, while others never used the "sport" or "utility" features; these differences also affect resale prices.
>
> Firestone's tires likewise exhibit variability; that's why fewer than half of those included in the tire class were recalled. The tire class includes many buyers who used Firestone tires on vehicles other than Ford Explorers, and who therefore were not advised to underinflate their tires.
>
> . . . .
>
> When courts think of efficiency, they should think of market models rather than central-planning models.
>
> Our decision in In re Rhone-Poulenc Rorer, Inc., made this point, and it is worth reiterating: only "a decentralized process of multiple trials, involving different juries, and different standards of liability, in different jurisdictions" (51 F.3d [1293,] 1299)[(1995)] will yield the information needed for accurate evaluation of mass tort claims.
>
> . . . .

There is little uniform guidance on how to assess when common issues predominate over individual ones, and the Court's statements to this point have, obviously, done more to disavow various tempting but fallacious rules than they have to set forth a usable standard.

35. There is currently a split of authority between the United States Courts of Appeals over the proper way to analyze predominance. The Honorable Richard A. Posner, former United States Circuit Judge for United States Court of Appeals for the Seventh Circuit, concludes that the predominance inquiry boils down to "a question of efficiency." Butler v. Sears, Roebuck & Co., 702 F.3d 359, 362 (7th Cir. 2012), vacated, 569 U.S. 1015 (2013). Judge Posner poses the predominance question as: "Is it more efficient, in terms both of economy of judicial resources and of the expense of litigation to the parties, to decide some issues on a class basis or all issues in separate trials?" Butler v. Sears, Roebuck & Co., 702 F.3d at 362. In Butler v. Sears, Roebuck & Co., the Seventh Circuit reversed a district court's denial of certification of a class of washing-machine owners who alleged that Sears' washing machines were prone to cultivate

---

> No matter what one makes of the decentralized approach as an original matter, it is hard to adopt the central-planner model without violence not only to Rule 23 but also to principles of federalism. Differences across states may be costly for courts and litigants alike, but they are a fundamental aspect of our federal republic and must not be overridden in a quest to clear the queue in court. See BMW v. Gore, 517 U.S. [559, 568-73 (1996)]; Szabo[v. Bridgeport Machines, Inc., 249 F.3d 672 (7th Cir. 2001)](reversing a nationwide warranty class certification); Spence v. Glock, Ges.m.b.H., 227 F.3d 308 (5th Cir. 2000)(reversing a nationwide tort class certification); Larry Kramer, Choice of Law in Complex Litigation, 71 N.Y.U. L. Rev. 547, 579 (1996); Linda S. Mullenix, Mass Tort Litigation and the Dilemma of Federalization, 44 DePaul L. Rev. 755, 781 (1995); Robert A. Sedler, The Complex Litigation Project's Proposal for Federally-Mandated Choice of Law in Mass Torts Cases: Another Assault on State Sovereignty, 54 La. L .Rev. 1085 (1994). Tempting as it is to alter doctrine in order to facilitate class treatment, judges must resist so that all parties' legal rights may be respected.

288 F.3d at 1018-20.

mold and affirmed the district court's certification of the same class to pursue a claim that the machines' control units were defective. See 702 F.3d at 360-61, 363-64. The Seventh Circuit certified the class -- which spanned six states -- to pursue its mold claim under state breach-of-warranty law:

> A class action is the more efficient procedure for determining liability and damages in a case such as this, involving a defect that may have imposed costs on tens of thousands of consumers yet not a cost to any one of them large enough to justify the expense of an individual suit. If necessary a determination of liability could be followed by individual hearings to determine the damages sustained by each class member (probably capped at the cost of replacing a defective washing machine -- there doesn't seem to be a claim that the odors caused an illness that might support a claim for products liability as distinct from one for breach of warranty). But probably the parties would agree on a schedule of damages based on the cost of fixing or replacing class members' mold-contaminated washing machines. The class action procedure would be efficient not only in cost, but also in efficacy, if we are right that the stakes in an individual case would be too small to justify the expense of suing, in which event denial of class certification would preclude any relief.
>
> . . . .
>
> [T]he district court will want to consider whether to create different classes of the control unit class for the different states. That should depend on whether there are big enough differences among the relevant laws of those states to make it impossible to draft a single, coherent set of jury instructions should the case ever go to trial before a jury.

Butler v. Sears, Roebuck & Co., 702 F.3d at 362. Along with numerous other class actions pending appeal before the Supreme Court, the Supreme Court vacated Butler v. Sears, Roebuck & Co., and remanded it to the Seventh Circuit "for reconsideration in light of Comcast Corp. v. Behrend." Butler v. Sears, Roebuck & Co., 727 F.3d 796, 797 (7th Cir. 2013). On reconsideration, the Seventh Circuit reaffirmed its prior decision, again in an opinion written by Judge Posner:

> Sears thinks that predominance is determined simply by counting noses: that is, determining whether there are more common issues or more individual issues, regardless of relative importance. That's incorrect. An issue "central to

> the validity of each one of the claims" in a class action, if it can be resolved "in one stroke," can justify class treatment. [Wal-Mart, 564 U.S. at 338]. That was said in the context of Rule 23(a)(2), the rule that provides that class actions are permissible only when there are issues common to the members of the class (as of course there are in this case). But predominance requires a qualitative assessment too; it is not bean counting. In Amgen Inc. v. Connecticut Retirement Plans & Trust Funds, [568 U.S. at 468], the Court said that the requirement of predominance is not satisfied if "individual questions . . . overwhelm questions common to the class," and in Amchem Products, Inc. v. Windsor, 521 U.S. . . . [at] 623 . . . , it said that the "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." And in In re Inter-Op Hip Prosthesis Liability Litigation, 204 F.R.D. 330, 345 (N.D. Ohio 2001)[(O'Malley)], we read that "common issues need only predominate, not outnumber individual issues." . . .
> As we noted in Carnegie v. Household Int'l., Inc., 376 F.3d 656, 661 (7th Cir. 2004), "the more claimants there are, the more likely a class action is to yield substantial economies in litigation. It would hardly be an improvement to have in lieu of this single class 17 million suits each seeking damages of $15 to $30. . . . The *realistic* alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30" (emphasis in original). The present case is less extreme: tens of thousands of class members, each seeking damages of a few hundred dollars. But few members of such a class, considering the costs and distraction of litigation, would think so meager a prospect made suing worthwhile.
>
> There is a single, central, common issue of liability: whether the Sears washing machine was defective. Two separate defects are alleged, but remember that this class action is really two class actions. In one the defect alleged involves mold, in the other the control unit. Each defect is central to liability. Complications arise from the design changes and from separate state warranty laws, but can be handled by the creation of classes. See, e.g., Johnson v. Meriter Health Services Employee Retirement Plan, 702 F.3d [364,] 365[ 7th Cir. 2012] (10 classes).

Butler v. Sears, Roebuck & Co., 727 F.3d at 801-02 (emphasis in original).[42]

---

[42]In addition to articulating the Seventh Circuit's construction of the predominance inquiry, Judge Posner addressed Comcast Corp. v. Behrend's impact on the Seventh Circuit's case:

> So how does the Supreme Court's Comcast decision bear on the rulings . . . in our first decision?
>
> Comcast holds that a damages suit cannot be certified to proceed as a class action unless the damages sought are the result of the class-wide *injury* that the suit alleges. Comcast was an antitrust suit, and the Court said that "if [the

plaintiffs] prevail on their claims, they would be entitled only to damages resulting from reduced overbuilder competition, since that is the only theory of antitrust impact accepted for class-action treatment by the District Court. It follows that a model purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory. If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." "[A] methodology that identifies damages *that are not the result of the wrong*" is an impermissible basis for calculating class-wide damages. [569 U.S. at 37] (emphasis added). "For all we know, cable subscribers in Gloucester County may have been overcharged because of petitioners' alleged elimination of satellite competition (*a theory of liability that is not capable of classwide proof*)." And on the next page of its opinion the Court quotes approvingly from Federal Judicial Center, Reference Manual on Scientific Evidence 432 (3d ed. 2011), that "the first step in a damages study is the translation of the legal theory of the harmful event into an analysis of the economic impact *of that event*." (emphasis the [Supreme] Court's). None of the parties had even challenged the district court's ruling that class certification required "that the damages resulting from . . .[the antitrust violation] were measurable 'on a class-wide basis' through use of a 'common methodology.'"

Unlike the situation in Comcast, there is no possibility in this case that damages could be attributed to acts of the defendants that are not challenged on a class-wide basis; all members of the mold class attribute their damages to mold and all members of the control-unit class to a defect in the control unit.

Sears argues that Comcast rejects the notion that efficiency is a proper basis for class certification, and thus rejects our statement that "predominance" of issues common to the entire class, a requirement of a damages class action under Rule 23(b)(3), "is a question of efficiency." But in support of its argument Sears cites only the statement in the dissenting opinion in Comcast that "economies of time and expense" favor class certification, -- a statement that the majority opinion does not contradict. Sears is wrong to think that anything a dissenting opinion approves of the majority must disapprove of.

Sears compares the design changes that may have affected the severity of the mold problem to the different antitrust liability theories in Comcast. But it was not the existence of multiple theories in that case that precluded class certification; it was the plaintiffs' failure to base all the damages they sought on the antitrust impact -- the injury -- of which the plaintiffs were complaining. In contrast, any buyer of a Kenmore washing machine who experienced a mold problem was harmed by a breach of warranty alleged in the complaint.

Furthermore and fundamentally, the district court in our case, unlike Comcast, neither was asked to decide nor did decide whether to determine

36. The United States Court of Appeals for the Sixth Circuit handled essentially the same case -- a class action against Sears for defective washing machines -- in In re Whirlpool Corp. Front-Loading Washing Products Liability Litigation, 678 F.3d 409 (6th Cir. 2012), and also elected to certify the mold-based claim.[43]

> [W]e have no difficulty affirming the district court's finding that common questions predominate over individual ones and that the class action mechanism is the superior method to resolve these claims fairly and efficiently. This is especially true since class members are not likely to file individual actions because the cost of litigation would dwarf any potential recovery. See Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 617 (1997)(finding that in drafting Rule 23(b)(3), "the Advisory Committee had dominantly in mind vindication of 'the rights of groups of people who individually would be without effective strength to bring their opponents into court at all'"); Carnegie v. Household Int'l, Inc., 376 F.3d 656, 661 (7th Cir. 2004) (Posner, J.)(noting that "[t]he realistic alternative to a class action is not 17 million individual suits, but zero individual suits" because of litigation costs). Further, [as] the district court observed, any class member who wishes to control his or her own litigation may opt out of the class under Rule 23(b)(3)(A).

In re Whirlpool Corp. Front-Loading Washing Prods. Liab. Litig., 678 F.3d at 421 (citation omitted). That case was also vacated after Comcast Corp. v. Behrend, and, like the Seventh Circuit, the Sixth Circuit reaffirmed its prior decision, fleshing out the predominance inquiry in more detail than it had done in its prior opinion:

---

> damages on a class-wide basis. As we explained in McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 672 F.3d 482, 491-92 (7th Cir. 2012), a class action limited to determining liability on a class-wide basis, with separate hearings to determine -- if liability is established -- the damages of individual class members, or homogeneous groups of class members, is permitted by Rule 23(c)(4) and will often be the sensible way to proceed.

Butler v. Sears, Roebuck & Co., 727 F.3d at 799-800 (emphasis in Butler v. Sears, Roebuck & Co. but not Comcast Corp. v. Behrend, except as noted)(citations omitted).

[43]The Sixth Circuit's class "did not involve the other claim in [the Seventh Circuit's] case, the control unit claim." Butler v. Sears, Roebuck & Co., 727 F.3d at 802.

> Whirlpool does not point to any "fatal dissimilarity" among the members of the certified class that would render the class action mechanism unfair or inefficient for decision-making. *See Amgen* [Inc. v. Conn. Retirement Plans & Tr. Funds, 568 U.S. at 471 ]. Instead, Whirlpool points to "a fatal similarity -- [an alleged] failure of proof as to an element of the plaintiffs' cause of action." *Id.* (quoting Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U.L. Rev. 97, 107 (2009)). That contention, the Supreme Court instructs, "is properly addressed at trial or in a ruling on a summary-judgment motion. The allegation should not be resolved in deciding whether to certify a proposed class." *Id.* Tracking the Supreme Court's reasoning, we conclude here that common questions predominate over any individual ones. Simply put, this case comports with the "focus of the predominance inquiry" -- it is "sufficiently cohesive to warrant adjudication by representation." *Id.* at 1196 (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 . . . (1997)).

In re Whirlpool Corp. Front-Loading Washing Prods. Liab. Litig., 722 F.3d 838, 859 (7th Cir. 2013). The Sixth Circuit and Seventh Circuit, thus, define predominance in much the same way: if the district court can design a mechanism for trying the case that is fair to the defendants and more efficient than individual litigation of the same dispute, then predominance is satisfied. See Butler v. Sears, Roebuck & Co., 727 F.3d at 802. This styling of the predominance inquiry is in keeping with the styling a leading class action treatise gave many years earlier:

> [A] court addressing predominance must determine whether the evidence about the putative class representative's circumstances and the opposing evidence from the defense will enable a jury to make across-the-board "yes" or "no" factual determinations that fairly resolve the claims of the entire class. Where the right to recover for each class member would "turn . . . on facts particular to each individual plaintiff," class treatment makes little sense. If the resolution of the common issues devolves into an unmanageable variety of individual issues, then the lack of increased efficiency will prohibit certification of the class.
>
> The predominance and efficiency criteria are of course intertwined. When there are predominant issues of law or fact, resolution of those issues in one proceeding efficiently resolves those issues with regard to all claimants in the class. When there are no predominant issues of law or fact, however -- as in the instant case -- class treatment would be either singularly inefficient, as one court attempts to resolve diverse claims from around the country in its own courtroom, or unjust, as the various factual and legal nuances of particular claims are lost in the press to clear the lone court's docket.

McLaughlin on Class Actions § 5:23 (11th ed. 2016)(omission in original)(footnotes omitted)(quoting Jackson v. Motel 6 Multipurpose, Inc., 130 F.3d 999, 1006 n.12 (11th Cir. 1997)).

37. Although the Sixth Circuit and the Seventh Circuit may agree about the definition of predominance, the Third Circuit, the Tenth Circuit, and the United States Court of Appeals for the Eleventh Circuit stake out a different test.

> 'Whether an issue predominates can only be determined after considering what value the resolution of the class-wide issue will have in each class member's underlying cause of action.' *Rutstein v. Avis Rent-A-Car Sys., Inc.*, 211 F.3d 1228, 1234 (11th Cir. 2000). Common issues of fact and law predominate if they '"ha[ve] a *direct impact* on every class member's effort to establish liability" *that is more substantial than the impact of individualized issues* in resolving the claim or claims of each class member.' *Vega* [*v. T-Mobile USA, Inc.*], 564 F.3d [1256,] 1270 [(11th Cir. 2009)](emphasis added)(quoting *Klay* [*v. Humana, Inc.*], 382 F.3d [1241,] 1255 [(11th Cir. 2004)]). If "after adjudication of the classwide issues, plaintiffs must still introduce a great deal of individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individual claims, [their] claims are not suitable for class certification under Rule 23(b)(3)." *Klay* [*v. Humana, Inc.*], 382 F.3d at 1255. In practical terms, while "[i]t is not necessary that all questions of fact or law be common," *id.* at 1254 (citation omitted), "the addition or subtraction of any of the plaintiffs to or from the class [should not] have a substantial effect on the substance or quantity of evidence offered." *Id.* at 1255 (quoting *Alabama v. Blue Bird Body Co.*, 573 F.2d 309, 322 (5th Cir. 1978)).

Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Serv., Inc., 601 F.3d at 1170 (emphasis in original)(first, eighth, tenth, and eleventh alterations in original).[44] See Menocal v.

[44] The Eleventh Circuit first adopted this test -- relying on district court decisions -- in 2004 in Klay v. Humana, Inc., and gave renewed articulations of the test in 2009 in Vega v. T-Mobile USA, Inc., and, in 2010, in Sacred Heart Health Systems, Inc. v. Humana Healthcare Services, Inc. See Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Serv., Inc., 601 F.3d at 1170; Vega v. T-Mobile USA, Inc., 564 F.3d at 1270; Klay v. Humana, Inc., 382 F.3d at 1255. In each case, the Eleventh Circuit made some reference to additionally adopting a United States Court of Appeals for the Fifth Circuit rule-of-thumb test:

GEO Group, Inc., 882 F.3d at 915; CGC Holding Co. v. Broad & Cassel, 773 F.3d at 1087-88; Marcus v. BMW of N. Am., LLC, 687 F.3d at 600. The Eleventh Circuit, however, imposes a different, more rigorous, second step: the district court's trial plan must spend more time adjudicating the common questions than it does adjudicating the individual questions. See Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Serv., Inc., 601 F.3d at 1170. The Eleventh Circuit's test may not be best -- the Court sees little reason why negative-value cases

---

> An alternate formulation of this test was offered in Alabama v. Blue Bird Body Co . . . In that case, we observed that if common issues truly predominate over individualized issues in a lawsuit, then "the addition or subtraction of any of the plaintiffs to or from the class [should not] have a substantial effect on the substance or quantity of evidence offered." Put simply, if the addition of more plaintiffs to a class requires the presentation of significant amounts of new evidence, that strongly suggests that individual issues (made relevant only through the inclusion of these new class members) are important. Id. ("If such addition or subtraction of plaintiffs does affect the substance or quantity of evidence offered, then the necessary common question might not be present."). If, on the other hand, the addition of more plaintiffs leaves the quantum of evidence introduced by the plaintiffs as a whole relatively undisturbed, then common issues are likely to predominate.

Klay v. Humana, Inc., 382 F.3d at 1255. See Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Serv., Inc., 601 F.3d at 1170 ("In practical terms, while '[i]t is not necessary that all questions of fact or law be common,' 'the addition or subtraction of any of the plaintiffs to or from the class [should not] have a substantial effect on the substance or quantity of evidence offered.'")(quoting Klay v. Humana, Inc., 382 F.3d at 1255); Vega v. T-Mobile USA, Inc., 564 F.3d at 1270 (quoting the above portion of Klay v. Humana, Inc.).

The Fifth Circuit, however, was not setting forth a test for when predominance is satisfied so much as a test for when an issue is common versus individualized. The Fifth Circuit's full quote -- without the Eleventh Circuit's alterations -- is:

> We only point out that in a situation wherein one seeks to represent a nationwide class in order to obtain redress for harm done from a nationwide conspiracy consideration should be given to whether the addition or subtraction of any of the plaintiffs to or from the class will have a substantial effect on the substance or quantity of evidence offered. If such addition or subtraction of plaintiffs does affect the substance or quantity of evidence offered, then the necessary common question might not be present.

Alabama v. Blue Bird Body Co., 573 F.2d at 322 (footnote omitted).

that can be fairly and efficiently adjudicated via class action should not be certified[45] -- but it is commendable in that it is a test that district courts can use, rather than yet another meaningless

---

[45]In fairness to the Eleventh Circuit, Judge Posner's test merges the predominance and superiority inquiries -- effectively reading out predominance -- in negative-value cases. Thus, the Eleventh Circuit's test is truer to rule 23's text than Judge Posner's. "Predominate," the word that rule 23 uses, means "[t]o be of greater quantity or importance; preponderate." Predominate, The American Heritage Dictionary of the English Language, (5th ed. 2019), https://www.ahdictionary.com/word/search.html?q=predominate (last visited September 12, 2019). Rule 23's text thus arguably suggests a direct comparison of common and individual issues, and not -- as Judge Posner suggests -- an indirect comparison that decides the predominance question on the basis of an economic analysis. There are, however, two other rule 23 provisions whose impact on predominance is not often discussed: (i) the issue class-action clause, see Fed. R. Civ. P. 23(c)(4) ("When appropriate, an action may be brought or maintained as a class action with respect to particular issues."); and (ii) the subclassification clause, see Fed. R. Civ. P. 23(c)(5) ("When appropriate, a class may be divided into subclasses that are each treated as a class under this rule."). These provisions are unfortunate for those who wish to read rule 23 as containing the seeds of its own destruction. Rule 23(c)(4) allows for adjudication of common issues, even if these issues do not add up to a common claim. Rule 23(c)(5) allows for collective adjudication, even if it falls short of being completely "classwide" adjudication. Judge Posner's test explicitly admits of subclasses and issue classes. Even these classes had not been allowed, their impact in Judge Posner's analysis would be obvious: the district court uses the tools of subclassification and issue classification -- along with other management tools, such as polyfurcation -- to design a class-action management plan, and then decide whether the plan is more or less efficient than separate trials.

The impact that these provisions have on the Eleventh Circuit's approach is less clear. The Eleventh Circuit's best discussion of subclasses comes from Sacred Heart Health Systems, Inc. v. Humana Military Healthcare Services, Inc.:

> [W]e cannot accept the district court's proposal to use subclasses corresponding to the hospitals' six categories of payment clauses. Certification Order, at 8 n.12, 18 n.22. We recognize the long and venerated practice of creating subclasses as a device to manage complex class actions, but the six subclasses proposed here mask a staggering contractual variety. The sixth proposed subclass -- a miscellaneous residue of numerous payment clauses that are insusceptible of ready classification -- alone is fatal to predominance. When this "potpourri" subclass, as Humana has termed it, is broken down into its disparate component parts, the illusion of uniformity gives way to nearly thirty subclasses.
>
> Common sense tells us that "[t]he necessity of a large number of subclasses may indicate that common questions do not predominate," Manual for Complex Litigation, § 21.23 (4th ed. 2004); *see also Harding v. Tambrands Inc.*,

> 165 F.R.D. 623, 630 (D. Kan. 1996)[(Theis, J.)]("The potential for numerous different subclasses weighs against a finding of predominance of common issues."). Here, the necessary recourse to a "miscellaneous" subclass readily indicates the lack of a predominant question.
>
> Ultimately, after examining the many individualized payment clauses contained in the network agreements, we perceive a "distinct possibility that there was a breach of contract with some class members, but not with other class members." *Broussard* 155 F.3d at 340. Subclasses are no answer to this problem, meaning that the efficiency of a class action will be lost entirely unless the hospitals are allowed "to stitch together the strongest contract case based on language from various [contracts], with no necessary connection to their own contract rights." *Broussard* 155 F.3d at 344. The hospitals, however, may not lawfully "amalgamate" their disparate claims in the name of convenience. *Id.* at 340. The Rules Enabling Act, 28 U.S.C. § 2072 -- and due process -- prevents the use of class actions from abridging the substantive rights of any party. Yet, from the record before us, an abridgment of the defendant's rights seems the most likely result of class treatment. By glossing over the striking differences in the material terms of the agreements, the district court created an "unnecessarily high risk," *Vega* [*v. T-Mobile USA, Inc.*], 564 F.3d at 1279, of such unlawful results, and thereby abused its discretion.

Sacred Heart Health Systems, Inc. v. Humana Military Healthcare Services, Inc. 601 F.3d at 1176. These statements imply that, but for the sixth "category" of payment clauses -- really a catchall for all contracts that did not fit into one of the five real categories -- the class would be certifiable. Sacred Heart Health Systems, Inc. v. Humana Military Healthcare Services, Inc. 601 F.3d at 1176. The only "abridgement of the defendant's rights" that the district court's plan would produce would be the "'amalgamat[ion]'" of different contractual language into a single category -- the sixth category. Sacred Heart Health Systems, Inc. v. Humana Military Healthcare Services, Inc. 601 F.3d at 1176. That case, thus, leaves open the question whether subclassification and issue certification can aid in satisfying predominance, or if these techniques are separate from the predominance inquiry.

The Fifth Circuit staked out a clear answer to this question in its much-discussed Castano v. American Tobacco Company case, deciding the issue in a way one might expect:

> Severing the defendants' conduct from reliance under rule 23(c)(4) does not save the class action. A district court cannot manufacture predominance through the nimble use of subdivision (c)(4). The proper interpretation of the interaction between subdivisions (b)(3) and (c)(4) is that a cause of action, as a whole, must satisfy the predominance requirement of (b)(3) and that (c)(4) is a housekeeping rule that allows courts to sever the common issues for a class trial. See *In re N.D. Cal. Dalkon Shield IUD Prods. Liability Litig.*, 693 F.2d 847, 856 (9th Cir. 1982)(balancing severed issues against the remaining individual issues) . . .; *see also Jenkins* [*v. Raymark Indus. Inc.*], 109 F.R.D. [269,] 278

> [(E.D. Tex. 1985)(Parker, J.)](comparing state of the art defense to individual questions of exposure and degree of injury in a class action certified only on the common issue of the state of the art defense). Reading rule 23(c)(4) as allowing a court to sever issues until the remaining common issue predominates over the remaining individual issues would eviscerate the predominance requirement of rule 23(b)(3); the result would be automatic certification in every case where there is a common issue, a result that could not have been intended.

Castano v. Am. Tobacco Co. 84 F.3d at 745 n.21. This logic is hardly unassailable. Namely, the result of reading rules 23(c)(4) and (c)(5) as bearing on the predominance inquiry would not be "automatic certification in every case where there is a common issue," because superiority must still be satisfied. Castano v. Am. Tobacco Co., 84 F.3d at 745 n.21. If a proposed class action is superior -- e.g., if it lacks the value to be brought on an individual basis -- and individual issues can be pared away via rules 23(c)(4) and (c)(5), then it is not clear why certification "could not have been intended" by the rule. Castano v. Am. Tobacco Co., 84 F.3d at 745 n.21. Moreover, it is a poor reading of the rule's text. Presumably, even if rules 23(c)(4) and (c)(5) are mere "housekeeping rule[s]," they would still alleviate the "likely difficulties in managing a class action." Castano v. Am. Tobacco Co., 84 F.3d at 745 n.21; Fed. R. Civ. P. 23(b)(3)(D). Because rule 23 directs that "[t]he matters pertinent to these findings of [predominance and superiority] include: . . .likely difficulties in managing a class action," the Court, if it were writing on a clean slate, would think that rules 23(c)(4) and (c)(5) would play a part in the predominance determination, Fed. R. Civ. P. 23(b)(3), and that this result thus "could not have been intended," Castano v. Am. Tobacco Co., 84 F.3d at 745 n.21. The Fifth Circuit's approach attracted the adherence of a revered jurist on the Fourth Circuit -- although not the Fourth Circuit itself. The Honorable Paul V. Niemeyer, United States Circuit Judge for the Fourth Circuit, endorsed the Fifth Circuit's view in an opinion concurring in part and dissenting in part from an opinion in which the Fourth Circuit adopted the opposing view:

> Despite the overwhelming predominance of these individualized issues and claims over the common issue that the majority now certifies for class treatment, the majority has adopted an inventive approach to Rule 23 that allows certification of a class where the predominance requirement of Rule 23(b)(3) is admittedly unmet in the context of the case as a whole. According to the majority, to require the certified issue in this case to predominate over the individualized issues in the action as a whole ignores Rule 23(c)(4)(A), which it appears to view as a fourth avenue for class certification, on equal footing with Rules 23(b)(1), 23(b)(2), and 23(b)(3). In doing so, the majority glorifies Rule 23(c)(4)(A) -- a housekeeping rule that authorizes a court to certify for class treatment "particular issues" in a case that otherwise satisfies Rule 23(a) and 23(b) -- with the effect of materially rewriting Rule 23 such that Rule 23(b)(3)'s requirements no longer need be applied to "[a]n action," see Fed. R. Civ. P. 23(b), but rather to any single issue, no matter how small.

Not only does the majority's approach expand Rule 23 beyond its intended reach, but it also creates a direct conflict with the Fifth Circuit which has held:

> A district court cannot manufacture predominance through the nimble use of subdivision (c)(4). The proper interpretation of the interaction between subdivisions (b)(3) and (c)(4) is that a cause of action, as a whole, must satisfy the predominance requirement of (b)(3) in that (c)(4) is a housekeeping rule that allows courts to sever the common issues for a class trial.

Castano v. [Am.] Tobacco Co., 84 F.3d [at ]745 n.21 . . ..

Gunnells v. Healthplan Servs., Inc., 348 F.3d 417, 446-47 (4th Cir. 2003)(Niemeyer, J., concurring in part and dissenting in part). Despite Judge Niemeyer's concern with creating a circuit split, disagreement among Courts of Appeals exist. See Robinson v. Metro-North Commuter R.R., 267 F.3d 147, 167-69 (2d Cir. 2001)(stating that the district court abused its discretion in not considering partial certification); Zinser v. Accufix Research Inst., Inc. 253 F.3d 1180, 1189-90, 1192 n.8 (9th Cir. 2001)(discussing subclasses); Jefferson v. Ingersoll Int'l Inc., 195 F.3d 894, 898 (7th Cir. 1999)(treating "[d]ivided certification" as "worth consideration"). The Eleventh Circuit has refrained from taking a side on this question:

> Some have been critical of the piecemeal certification of class action status for claims within a case. See Gunnells v. Healthplan Servs., Inc., 348 F.3d . . .446-47 . . .(Niemeyer, J., dissenting)(arguing that the predominance requirement in Fed. R. Civ. P. 23(b) applies to the action as a whole, not to individual subclasses or claims); Castano v. Am. Tobacco Co., 84 F.3d [at] 745 n.21 . . .("The proper interpretation of the interaction between [Fed. R. Civ. P. 23] subdivisions (b)(3) and (c)(4) is that a cause of action, as a whole, must satisfy the predominance requirement of (b)(3) and that (c)(4) is a housekeeping rule that allows courts to sever the common issues for a class trial."). We did not directly address the legality of such partial certification in Klay.

Borrero v. United Healthcare of N.Y., Inc., 610 F.3d 1296, 1310 n.5 (11th Cir. 2010)(alterations in original). The Tenth Circuit also appears to have refrained from taking a side:

> Plaintiffs urge us to consider a "hybrid" certification whereby the liability stage might be certified for class treatment under Rule 23(b)(2) even if the damages stage does not qualify for such treatment. See Robinson v. Metro-North Commuter R.R., 267 F.3d 147, 167-69 (2d Cir. 2001). Compare Lemon v. Int'l Union of Operating Engr's, Local No. 139, AFL-CIO, 216 F.3d 577, 581 (7th Cir. 2000), and Jefferson v. Ingersoll Int'l Inc., 195 F.3d . . .898 . . ., with Allison v. Citgo Petroleum Corp., 151 F.3d 402, 420-22 (5th Cir. 1998). We do not need to rule on a hybrid possibility because in the instant case, the liability stage does not satisfy either Rules 23(b)(2) or 23(b)(3). The district court's ruling that plaintiffs

recitation, see CGC Holding Co. v. Broad & Cassel, 773 F.3d at 1087 ("[T]he predominance prong 'asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation defeating, individual issues.'" (quoting William B. Rubenstein, Newberg on Class Actions § 4:49 (5th ed. 2017)("Newberg"))), circular axiom, see, e.g., Amchem Prods., Inc. v. Windsor, 521 U.S. at 623 ("The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."), obvious guidepost, see Reed v. Bowen, 849 F.2d at 1309 ("Each case must be decided on its own facts, on the basis of 'practicalities and prudential considerations.'" (quoting Roper U.S. Parole Comm'n v. Geraghty, 445 U.S. 388, 406 n.11 (1980)), self-evident comparison, see Monreal v. Potter, 367 F.3d at 1237 ("[T]he predominance criterion of Rule 23(b)(3) [i]s 'far more demanding' tha[n] the Rule 23(a) commonality requirement[.]")(quoting Amchem Prods., Inc. v. Windsor, 521 U.S. at 623-24)), or worthless slogan, see Marcus v. BMW of N. Am., LLC, 687 F.3d at 600 (exhorting district courts to examine claims "'through the prism' of Rule 23(b)(3)").

38. The Tenth Circuit followed the Eleventh Circuit's approach in CGC Holding Co., LLC v. Broad and Cassel.

> Predominance regularly presents the greatest obstacle to class certification, especially in fraud cases. Accordingly, the issues disputed in this case are not unusual. And given our obligation to ensure that the district court did not err in conducting its rigorous analysis, we must *characterize* the issues in the case as common or not, and then *weigh* which issues predominate. Here, that task requires us to survey the elements of the class's RICO claims to consider (1) which of those elements are susceptible to generalized proof, and (2) whether those that are so susceptible predominate over those that are not. Stated another

---

> did not allege a sufficient policy, practice or pattern of discrimination to warrant class treatment for liability determination is not an abuse of discretion.

Monreal v. Potter, 367 F.3d at 1237 n.12.

> way, consideration of how the class intends to answer factual and legal questions to prove its claim -- and the extent to which the evidence needed to do so is common or individual -- will frequently entail some discussion of the claim itself.
>
> In this context, it is worth reiterating that our review on appeal is limited. For the purposes of class certification, our primary function is to ensure that the requirements of Rule 23 are satisfied, not to make a determination on the merits of the putative class's claims. But it is impractical to construct "an impermeable wall" that will prevent the merits from bleeding into the class certification decision to some degree. So, although class certification does not depend on the merits of the suit, "[e]valuation of many of the questions entering into determination of class action questions is intimately involved with the merits of the claims."
>
> With these legal principles in mind, "[c]onsidering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action." For this limited purpose, we consider the proposed class's claim for a RICO conspiracy.

CGC Holding Co., LLC v. Broad & Cassel, 773 F.3d at 1087-88 (emphasis in original). See Menocal v. GEO Group, Inc., 882 F.3d at 915 (reiterating the test that the Tenth Circuit articulates in CGC Holding Co., LLC v. Broad & Cassel); Anderson Living Tr. v. WPX Energy Prod., LLC, 306 F.R.D. at 397 (distinguishing the Tenth Circuit test from other circuits' tests).

**b. Superiority.**

39. The second requirement for certifying a (b)(3) class is superiority, which means that a class action would be superior to -- not merely just as good as or more convenient than -- all other available procedural mechanisms, including: (i) individual actions by class members; (ii) ordinary joinder rules, see Fed. R. Civ. P. 18-20; (iii) multidistrict litigation, see 28 U.S.C. § 1407; (iv) multiparty multiforum litigation, see 28 U.S.C. § 1369; and (v) the use of bellwether cases. The superiority requirement thus sets a high bar, but there are two ways that a proposed class can get an immediate leg up on certification, both of which involve rendering the aforementioned procedural devices impractical for the task at hand.

40. First, the suit can consist of so-called negative value claims -- claims in which the cost of litigation exceeds the likely recovery, rendering them economically non-viable without aggregation. These claims are the heart and soul of the class action, as the Supreme Court recently reaffirmed:

> "The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights. A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor."

Amchem Prods., Inc. v. Windsor, 521 U.S. at 617 (quoting Mace v. Van Ru Credit Corp., 109 F.3d 338, 344 (7th Cir. 1997)). The class action absolves absent plaintiffs of the otherwise prohibitive obligations of having to hire their own attorneys, devote time and energy to their own discovery, and potentially testify on their own behalf.

41. Second, the class may consist of such a large volume of similar cases that the judiciary would be overwhelmed if it had to treat each separately. While this consideration militates against individual treatment and counsels towards aggregation, the court must carefully consider whether another mass-aggregation form -- such as multidistrict litigation -- might be better suited to the task.

42. In addressing whether a proposed class action is superior to other available methods of adjudicating the controversy, courts start with the four factors that rule 23(b)(3)(A)-(D) enumerates, although those factors are not exhaustive. See Fed. R. Civ. P. 23 advisory committee's notes ("Factors (A)-(D) are listed, non-exhaustively, as pertinent to the findings."); Amchem Prods., Inc. v. Windsor, 521 U.S. at 615-16 ("Rule 23(b)(3) includes a nonexhaustive list of factors pertinent to a court's 'close look' at the predominance and superiority criteria."). The first factor, "the class members' interests in individually controlling the prosecution or

defense of separate actions," closely tracks the individual cases' money value. Fed. R. Civ. P. 23(b)(3)(A). When individual actions are practical, they are preferred; the United States has a "'deep-rooted historic tradition that everyone should have his own day in court,'" and adjudicating individual disputes is our federal judicial system's core activity. Martin v. Wilks, 490 U.S. 755, 762 (1989)(quoting 18C Charles Alan Wright, et al., Federal Practice Procedure, Jurisdiction & Related Matters § 4449, at 417 (1981)). The proposed class members' emotional connection to the case may also be relevant: the stronger the attachment, the more reticent the court should be to certify the case. See Vassalle v. Midland Funding, LLC, 708 F.3d 747, 758 (6th Cir. 2013); Abby v. City of Detroit, 218 F.R.D. 544, 549-50 (E.D. Mich. 2003)(Duggan, J.). Courts should also consider the likelihood that proposed class members know they have a claim, and whether they are savvy enough to pursue it.[46] See Hicks v. Client Servs., Inc., 257 F.R.D. 699, 701 (S.D. Fla. 2009)(Dimitrouleas, J.)(finding superiority because "class members [most likely do not] understand the provisions well enough to know that it may be financially worthwhile to spend the time and effort to litigate these matters").

43. Such questions arise particularly where the statute under which a plaintiff sues provides greater remedies for individual suits than for class suits, either by imposing a damage cap for class actions which does not apply to individual actions or by granting statutory damages

[46]It is often the case that a plaintiff would receive greater remuneration -- damages or settlement less attorneys' fees and other expenses of litigation --- from an individual action than he would from his proportional share of the class recovery. If the number of proposed class members likely to file individual claims (*n*), multiplied by the likely remuneration each would receive from an individual action (*i*), exceeds the entire class' recovery less attorneys' fees and expenses (*c*), then the Court will be hesitant to find superiority. Thus, if $n \cdot i > c$, the Court will not generally certify a (b)(3) class. The Court should bear in mind, however, that *n* includes only those individuals who: (i) would, in the event of certification, become class members, i.e., they would not opt out; and (ii) would, nonetheless, in the event the class was not certified, file an individual action. Thus, *n* is likely to be a small number in most cases.

to individual plaintiffs while requiring class plaintiffs to prove actual damages. See, e.g., Fair Debt Collection Practices Act, 15 U.S.C. § 1692k(2)(B) (capping individual damages at $1,000.00 and class action damages at $500,000.00); Truth in Lending Act, 15 U.S.C. § 1640(a) (capping individual damages at $5,000.00 and class action damages at $500,000.00). Although claims under these statutes may be more lucratively brought as individual actions, courts should assess the real-world likelihood that class members would bring their own actions. As the Honorable Loretta A. Preska, Chief United States District Judge for the Southern District of New York, wrote:

> [W]hile the potential for higher individual recoveries exists, realizing that potential requires assuming that each putative class member is "aware of her rights, willing to subject herself to all the burdens of suing and able to find an attorney willing to take her case." *Mace v. Van Ru Credit Corp.*, 109 F.3d [at] 344 . . . . Those transaction costs are not insubstantial and have prompted other courts in this Circuit to conclude that litigating as a class is superior

Kalish v. Karp & Kalamotousakis, LLP, 246 F.R.D. 461, 464 (S.D.N.Y. 2007)(Preska, C.J.). See Jancik v. Cavalry Portfolio Servs., LLC, No. CIV 06-3104 MJD/AJB, 2007 WL 1994026, at *11 (D. Minn. July 3, 2007)(Davis, J.)("[T]he truth is that the putative plaintiffs in this case are not likely to know their rights and are therefore not likely to pursue these claims on their own.").

44. The second enumerated (b)(3) factor, "the extent and nature of any litigation concerning the controversy already begun by . . . class members," is closely linked to the first factor. Fed. R. Civ. P. 23(b)(3)(B). The advisory notes to the rules state that "[t]he court is to consider the interests of individual members of the class in controlling their own litigations and carrying them on as they see fit. In this connection the court should inform itself of any litigation actually pending by or against the individuals." Fed. R. Civ. P. 23 advisory committee's notes (citations omitted). This passage suggests that the extent to which proposed

class members -- or individuals who would otherwise be proposed class members but for being specifically excluded from the definition by virtue of their individual claims -- have already filed individual claims is probative evidence of the extent to which they will continue to file individual claims in the event of certification denial and indicates a higher "interest[] in individually controlling the prosecution." Fed. R. Civ. P. 23(b)(3)(A). It is also probative evidence whether the claims are truly negative value or whether the plaintiffs' counsel is merely representing that they are to enhance his argument for certification.

45. In evaluating the (b)(3)(A) and (b)(3)(B) factors, the court must keep in mind a powerful fact that counsels strongly in favor of finding superiority: (b)(3) class actions give all proposed class members the opportunity to opt out of inclusion in the class. See Fed. R. Civ. P. 23(c)(2)(B). The individual actions that rule 23(b)(3)(B) directs the court to consider would not be swept under the class action's umbrella, nor would certification interfere with the litigation autonomy of any proposed class member who plans to file an individual claim but has yet to do so. The sole group that rule 23(b)(3)(A) and (b)(3)(B) protects consists only of those individuals who (i) have not yet filed an individual action, (ii) but are identifiable by proposed class counsel as having a claim, (iii) who are sent notice of their claim, (iv) who still, upon receiving notice, fail to meet with an attorney to file an individual claim or even to opt out of the class, and (v) only later develop an interest in pursuing an individual claim, and find themselves unable to do so because of the res judicata effect that a class action has on its members. As a practical matter, in most instances, this group contains few people, if any. Individuals interested in litigating their claims individually will most likely have already filed suit; at the very latest, receipt of the class notice will spur them into action, and they will opt out of the class. For this

reason, the Court believes that concerns about (b)(3) class actions' intrusions into litigant autonomy are overblown and even somewhat paternalistic.

46. The Court does not write off the rule 23(b)(3)(B) factor entirely, however, as it does provide one piece of useful, specific guidance. The rule speaks not only of assessing the "extent . . . of any litigation . . . already begun" -- presumably meaning the raw number of cases filed relative to the size of the proposed class -- but also of the "nature of any litigation . . . already begun." Fed. R. Civ. P. 23(b)(3)(B). The Court interprets this language to mean that it must look at what procedural forms the already-filed cases have taken. For example, if a group of asbestos plaintiffs file for class certification, the court should decline to certify on the ground that asbestos cases are consolidated in multidistrict litigation in the United States District Court for the Eastern District of Pennsylvania. See In re Asbestos Prods. Liability Litig. (No. VI), MDL No. 875 (E.D. Pa. 2013)(Robreno, J.). Furthermore, the Court concludes that, if a class has already been certified to pursue certain claims, redundant classes should generally not be certified.[47] See Newberg § 4:70 ("[I]f a *class action* case is already pending, certification of

[47]The Court makes this statement confidently as it relates to "horizontally" competing class actions: the Court should always strive to avoid having multiple overlapping or competing class actions certified in the federal court system. It is less clear how to handle a proposed class action when there are one or more class actions pending in state court(s) whose outcome would have res judicata impact on the Court's proposed class members. Although the presence of vertically competing class actions certainly bears on the superiority determination, the Court must carefully evaluate such circumstances on a case-by-case basis. The Court can envision a scenario in which numerous heavily overlapping class actions languished across multiple state courts without making progress, and in which the Court is capable of expeditiously certifying and resolving a nationwide class action, and, in such circumstances, superiority might be met.

Under the Anti-Injunction Act, 28 U.S.C. § 2283, federal courts generally may not stay or enjoin state court cases on the ground that they would interfere with a proposed class action or even a certified class action. See 28 U.S.C. § 2283 ("A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments."). There are possible exceptions, however, including that, pursuant to the All Writs

Act, 28 U.S.C. § 1651, a district court may enjoin state court proceedings which would interfere with an imminent settlement agreement. See In re Diet Drugs, 282 F.3d 220, 233-39 (3d Cir. 2002). In the seminal case of In re Diet Drugs, the Honorable Anthony J. Scirica, United States Circuit Judge for the Court of Appeals for the Third Circuit, noted that, although in personam cases may generally proceed in parallel in state and federal courts, a fully-formed and imminent settlement in a federal case constituted the equivalent of a res, thus permitting the federal court to enjoin the state court from entertaining litigation which could destroy the settlement:

> [C]ourts have analogized complex litigation cases to actions in rem. As one court reasoned, "the district court had before it a class action proceeding so far advanced that it was the virtual equivalent of a res over which the district judge required full control." In re Baldwin-United Corp. (Single Premium Deferred Annuities Ins. Litig.), 770 F.2d 328, 337 (2d Cir. 1985). See also Wesch v. Folsom, 6 F.3d 1465, 1470 (11th Cir. 1993); Battle v. Liberty Nat'l Life Ins. Co., 877 F.2d 877, 882 (11th Cir. 1989)("[I]t makes sense to consider this case, involving years of litigation and mountains of paperwork, as similar to a res to be administered."). The in rem analogy may help to bring into focus what makes these cases stand apart. In cases in rem, "the jurisdiction over the same res necessarily impairs, and may defeat, the jurisdiction of the federal court already attached." Kline v. Burke Const. Co., 260 U.S. 226, 229 (1922). Similarly, where complex cases are sufficiently developed, mere exercise of parallel jurisdiction by the state court may present enough of a threat to the jurisdiction of the federal court to justify issuance of an injunction. See In re Baldwin-United Corp. (Single Premium Deferred Annuities Ins. Litig.), 770 F.2d at 337 (noting such cases, like cases in rem, are ones in which "it is intolerable to have conflicting orders from different courts"). What is ultimately important, in any event, is that in both kinds of cases state actions over the same subject matter have the potential to "so interfer[e] with a federal court's consideration or disposition of a case as to seriously impair the federal court's flexibility and authority to decide the case." Atl. Coast Line R.R. Co. v. Bhd. of Locomotive Eng'rs, 398 U.S. 281, 295 (1970).

In re Diet Drugs, 282 F.3d at 235 n.12. See Winkler v. Eli Lilly & Co., 101 F.3d 1196, 1202 (7th Cir. 1996)(holding that a federal injunction is proper "[w]here a litigant's success in a parallel state court action would make a nullity of the district court's [discovery] ruling, and render ineffective its efforts effectively to manage the complex litigation at hand"); Carlough v. Amchem Prods., 10 F.3d 189, 203 (3d Cir. 1993)(affirming an injunction against a state-court class action where the "the stated purpose of the [state] suit [was] to challenge the legality of the federal class action"). Cf. In re Corrugated Container Antitrust Litig., 659 F.2d 1332, 1335 (5th Cir. 1981)(affirming an injunction against a South Carolina class action where the state court enjoined the defendants -- who also were defendants in a federal multidistrict suit -- from entering any settlement that contained any release of claims under South Carolina law, thereby "clearly interfer[ing] with the [federal] multidistrict court's ability to dispose of the broader action pending before it"). But see In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods.

another class suit might not be sensible or superior to the current litigation posture." (emphasis in original)). Subsequent proposed classes should either be defined to avoid class member-overlap with previously certified classes or else should assert different claims.[48]

---

Liability Litig., 134 F.3d 133 (3d Cir. 1998)(refusing to enjoin a Louisiana state court from approving a class settlement, even though a similar proposed class was pending certification in federal multidistrict litigation, because: (i) the federal court lacked personal jurisdiction over the absent class members, given that the federal class had not yet been certified nor notice served on the absent class members; (ii) the Full Faith and Credit Clause of the Constitution, and the Rooker-Feldman doctrine, barred review of the state court's approval of the settlement, because approval had already been finalized and final judgment entered; and (iii) the Anti-Injunction Act would have barred the federal court from enjoining the state court even if the state court's judgment were not finalized, as protecting the viability of a pre-certification class action is not "necessary in aid of [the federal court's] jurisdiction," nor is it necessary "to protect or effectuate its judgments"). See Dibble v. Wells Fargo Bank, Nat'l Ass'n, 226 F. Supp. 3d 1226, 1229 (D.N.M. 2016)(Browning, J.)(explaining that the three situations in which state proceedings have ended under the Rooker-Feldman doctrine are: (i) the highest court in the state has affirmed judgment below and all matters are resolved, (ii) neither party seeks further action in the state action, and (iii) the state court proceedings have resolved all federal matters but left state law or factual questions unresolved)(citing Federacion de Maestros de Puerto Rico v. Junta de Relaciones del Trabajo de Puerto Rico, 410 F.3d 17, 26 (1st Cir. 2005)); *Calvert v. Safranek,* Nos. 06–1051, 06–1123, 2006 WL 3735508 at *1 (10th Cir. Dec. 20, 2006) (affirming that the Rooker–Feldman doctrine removes the district court's jurisdiction to grant relief that would effectively negate a state court's judgement). In light of General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litigation, it is generally safe to assume that a district court may never enjoin a state court from certifying or going forward with an overlapping class when the federal court has not yet certified and noticed its own class.

As a practical matter, many of the questions raised relating to competing state and federal class actions, CAFA's passage has obviated and has resulted in most truly nationwide class actions being immediately removable to federal court, see 28 U.S.C. § 1332(d), which defendants do so reliably that plaintiffs have begun filing them in federal court, rather than filing them in state court and waiting for them to be removed, see Emery G. Lee III & Thomas E. Willging, The Impact of the Class Action Fairness Act of 2005 on the Federal Courts 1-2 (Federal Judicial Center ed., 2008).

[48]If a class has already been certified relating to a matter, and a new plaintiff seeks both (i) certification of a larger class than was previously certified and (ii) to assert claims for which the previous class was not certified, then the new plaintiff could avoid overlap between the new and old class actions by splitting the new class into different classes or subclasses. The already certified class action's claims could be asserted in the proposed class action only by individuals excluded from the already certified class' definition. The entirety of the proposed class,

47. The third rule 23(b)(3) factor is "the desirability or undesirability of concentrating the litigation of the claims in the particular forum," which can be split into two prongs: (i) whether aggregation is desirable; and (ii) whether the particular court at issue is a desirable forum to adjudicate the aggregated dispute. Fed. R. Civ. P. 23(b)(3)(C). The first prong, whether aggregation is desirable, is considered a recitation of the general superiority inquiry; all of the aforementioned factors and considerations apply, and courts should, additionally, consider the interest of judicial economy -- from this perspective, the more cases that can be aggregated, the better. See Newberg § 4:71. The second prong is whether the particular court at issue is a desirable forum for the litigation. Some issues that reliably influence the determination of this prong include: (i) the parties', witnesses', and class counsel' geographic convenience, see Zinser v. Accufix Research Inst., Inc., 253 F.3d at 1191-92; (ii) the harm's locus, as well as any other events forming the basis of the action, see Winkler v. DTE, Inc., 205 F.R.D. 235, 245 (D. Ariz. 2001)(Bolton, J.); (iii) the location of the bulk of the proposed class, see Macarz v. Transworld Sys., Inc., 193 F.R.D. 46, 57 (D. Conn. 2000)(Arterton, J.); and (iv) whether the defendant is located in the forum state, see In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 534 (3d Cir. 2004). "The particular court at issue" does not refer only to the desirability of the United States District Court for the District of New Mexico, or even of the Albuquerque division, but, rather, the prong's inquiry extends all the way down to the level of the individual district judge. For example, if a district judge has already made several pre-certification preliminary rulings, see Klay v. Humana, Inc., 382 F.3d at 1271; if he or she has other, similar actions consolidated in his court, see Beaulieu v. EQ Indus. Servs., Inc., No. 5:06-CV-00400-BR, 2009 WL 2208131, at *23

---

including those individuals who are also members of the already certified class, could assert claims not included in the already certified class action.

(E.D.N.C. July 22, 2009)(Britt, J.); In re Relafen Antitrust Litig., 218 F.R.D. 337, 347 (D. Mass. 2003); or even if he or she possesses particular expertise at handling the claims alleged by the proposed class, the judge may weigh those facts in favor of a finding of superiority, see Anderson Living Tr. v. WPX Energy Prod., LLC, 306 F.R.D. at 411.

48. The fourth, final, and most important[49] factor a court must consider in assessing superiority is the extent to which the court will be able to manage the class action, if certified, through pre-trial litigation and trial, accurately adjudicating the class' claims -- in particular the individual issues -- and fairly distributing relief among the class members. See Fed. R. Civ. P. 23(b)(3)(D). The manageability factor "encompasses the whole range of practical problems that may render the class action format inappropriate for a particular suit." Eisen v. Carlisle & Jacquelin, 417 U.S. at 164. The principal concern in a manageability inquiry is individualization. A proposed class's size, on its own, does not affect manageability; increasing the size of a proposed class only hurts manageability if it introduces new proposed class members with individual issues. See Carnegie v. Household Int'l, Inc., 376 F.3d at 660-61. Accordingly, several courts have held that, if the predominance requirement is met, then the court should not decline to certify the class on manageability grounds alone.

> [T]he predominance analysis has a "tremendous impact on the superiority analysis . . . for the simple reason that, the more common issues predominate over individual issues, the more desirable a class action lawsuit will be as a vehicle for adjudicating the plaintiffs' claims," Klay v. Humana, Inc., 382 F.3d at 1269, both relative to other forms of litigation such as joinder or consolidation, and in absolute terms of manageability, *see* Fed. R. Civ. P. 23(b)(3)(D).

[49]Newberg writes that the "manageability factor . . .is, by the far, the most critical concern in determining whether a class action is a superior means of adjudication. Indeed, the superiority discussion has, to this point, been playing *Hamlet* without the prince, and now, it is time to usher the prince onstage." Newberg § 4:72.

Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc., 601 F.3d at 1184. See Klay v. Humana, Inc., 382 F.3d at 1272 ("[W]here a court has already made a finding that common issues predominate over individualized issues, we would be hard pressed to conclude that a class action is less manageable than individual actions.").

49. When it comes to designing a fair management plan for trying a class action, district courts have myriad tools which can be customized to suit the needs of individual cases: "[W]hen a judge becomes convinced that a case is 'complex,' procedural innovation often replaces procedural conservatism." Jay Tidmarsh & Roger H. Trangsrud, Modern Complex Litigation 34 (2d ed. 2010). Most techniques that are truly "procedural" are fair game: cases can be bifurcated,[50] trifurcated, or polyfurcated; trials can be conducted in multiple stages or phases; and, provided that each defendant's overall monetary liability can be ascertained, the sometimes difficult question of how to distribute the damages among the class can be addressed with less formality.[51]

---

[50]"Vertical" polyfurcation, which is what is typically meant when bifurcation is discussed, is so named because the separately tried elements build on top of each other, and a negative verdict in one trial obviates the need for the second trial. For example, if the jury comes back for the defendant on a liability-only trial, then there is no need for a trial on damages. Vertical polyfurcation also often requires that the separate trials be performed in a certain sequence. "Horizontal" polyfurcation is so named because the trials do not build on one another, but rather sit analytically side-by-side. "Severance" is similar to the criminal procedural maneuver in which a defendant whose case is joined to be tried with another defendant's or defendants' petitions the court for his or her own separate trial. Fed. R. Crim. P. 14(a), 12(b)(3)(D).

[51]Defendants have a due-process right to have any damages against them proven in court. The question of how to distribute those damages among the class, however, does not implicate the defendants' rights at all, and, thus, that process can be conducted in a non-adversary fashion, with the court supervising the class counsel's administration of an approved damages-distribution scheme. The judicial oversight and scrutiny that should apply to this process is more analogous to a rule 23(e) settlement review than it is to a trial. The relevant inquiry at the certification stage is one of superiority: whether the class would be better off with an imperfect

damages-distribution scheme or with another available procedural device -- in negative value cases, this question often equates to asking whether something is better than nothing.

District courts have leeway to be creative when it comes to devising processes for managing the distribution of class damages. The Court is willing to go along with innovative and cost-effective mechanisms for distributing class damages, even if they are imperfect, especially when the alternative is denying certification. One device of increasing popularity that the Court is loath to use, however, is cy pres relief.

> The cy pres doctrine is an equitable doctrine under which courts "distribute unclaimed portions of a class-action judgment or settlement funds to a charity that will advance the interests of the class." Black's Law Dictionary 444 (9th ed. 2009). It derives from the French expression "*cy pres comme possible*," which means "as near as possible," and developed out of the law of trusts. M. Redish, P. Julian, & S. Zyontz, Cy Pres Relief and the Pathologies of the Modern Class Action: a Normative and Empirical Analysis, 62 Fla. L. Rev. 617 (2010).
>
> . . ..
>
> The Court has a basic disagreement with the application of this doctrine for several reasons: (i) class actions are disputes between parties and the money damages should remain among the parties, rather than be distributed to some third party; (ii) it is unseemly for judges to engage in the selection of third[-]party beneficiaries and to distribute class action damages to third parties; (iii) judges are often not in the best position to choose a charitable organization that would best approximate the unpaid class members' interests; and (iv) the doctrine encourages charitable organizations, and plaintiffs' lawyers, to lobby the court for cy pres awards.

Lane v. Page, 862 F. Supp. 2d at 1230-31 (citations omitted). See In re Thornburg Mortg., Inc. Sec. Litig., 885 F. Supp. at 1105-12 (denying a joint request by the class representatives and the defendants to distribute much of the class damages to the Center for Civic Values). The Tenth Circuit has never discussed cy pres relief in detail, see Tennille v. W. Union Co., 809 F.3d 555, 560 (10th Cir. 2015)(describing a fact pattern with a cy pres fund but not discussing the legal implications of the cy pres doctrine); United States v. New Mexico, 536 F.2d 1324, 1326 (10th Cir. 1976)(mentioning without elaboration, in a non-class action, that the district court had "refused to apply the doctrine of cy pres") -- but many scholars, see Martin H. Redish, Peter Julian & Samantha Zyontz, Cy Pres Relief and the Pathologies of the Modern Class Action: A Normative and Empirical Analysis, 62 Fla. L. Rev. 617, 641 (2010); Myriam Gilles & Gary B. Friedman, Exploding the Class Action Agency Costs Myth: The Social Utility of Entrepreneurial Lawyers, 155 U. Pa. L. Rev. 103, 153-154 (2006); Sam Yospe, Cy Pres Distribution in Class Action Settlements, 2009 Colum. Bus. L. Rev. 1014 (2009), have raised questions about its constitutionality, its compliance with the Rules Enabling Act, 28 U.S.C. § 2072, or both. See also Robles v. Brake Masters Sys., Inc., No. CIV 10-0135 JB/WPL, 2011 WL 9717448, at *16-17 (D.N.M. Jan. 21, 2011)(Browning, J.). The Court would be more likely to let unused or

50. Techniques that merely presume away substantive elements that a plaintiff normally has to prove, or that would impair a defendant's due-process rights, however, are impermissible. In particular, the Supreme Court has expressly disavowed "trials by statistics" or "trials by formula," either as to liability or damages. Wal-Mart, 564 U.S. at 367. A trial by statistics involves a small but representative sample of class members presenting evidence on individual questions in their own cases and then inviting the jury to extrapolate its conclusions from the sample to the entire class. See Wal-Mart, 564 U.S. at 367. For example, counsel for a class of 5,000 might present fifty class members' cases in the same way he would if he or she were trying them individually. Counsel would additionally present expert testimony that those fifty class members were representative of the class -- generally meaning that they were selected at random -- and that both (i) the proportion of the sample to which the defendant is liable, and (ii) the damage inflicted on the average individual in the sample, could be generalized to the entire class to a certain confidence interval and level.[52] The defendants might put on their own

---

undisbursable funds escheat to the state or revert to the defendant --- although reversion undermines the deterrent value of the class action -- than it is to use cy pres relief. If the fund is disbursed under a claim system, and the total of the claims does not exhaust the entire fund, the Court would likely first look to distributing the unclaimed funds to the claimants on a pro rata basis.

Still, the fact that cy pres relief is a commonly used method of distributing class damages underscores the point that courts need not approach the distribution of class damages with the same perfectionism with which they approach adversarial proceedings. Even if the distribution is not completely fair -- if, for instance, a class member who sustained $100.00 in damage receives the same distribution as another class member who sustained $800.00 -- it is still better than cy pres relief, which gives the entire pot of damages to an interloper.

[52]A confidence interval for a proportion estimate is also known as a "margin of error." It is the "plus or minus" figure often displayed next to the proportion estimate in, e.g., public polling data. See, e.g., Confidence Intervals, Yale University Department of Statistics, http://www.stat.yale.edu/Courses/1997-98/101/confint.htm; Confidence Interval, Wikipedia, http://en.wikipedia.org/wiki/Confidence_interval; Margin of Error, Wikipedia, http://en.wikipedia.org/wiki/Margin_of_error (collectively, "CI/CL Websites"). A confidence

sample, attack the representativeness of the plaintiffs' sample, or put on non-randomly selected class members whose cases were weak; they would almost certainly also present evidence defending against the individual cases of the plaintiffs' sample. The jury, if it bought into the plaintiff's theory, might decide that the defendant was liable to twenty members of the sample for a total of $100,000.00, extrapolate from the sample to the entire class, and award the class ten million dollars in damages.[53]

51. The Supreme Court bars this method of trying cases, because it violates the defendant's right to have each element of each claim asserted against it by each class member specifically proven. See Wal-Mart, 564 U.S. at 367.[54] When issues are truly common, multiple

---

level is the percent certainty that the actual proportion fall within the margin of error of the stated estimate. See CI/CL Websites. For example, if Gallup, Inc. says that 39% of Americans -- with a confidence interval of +/- 3% and a confidence level of 95% -- approve of President Barack H. Obama's job performance, then there is less than a 5% chance that the actual percentage of Americans who approve of President Obama's performance falls outside of the 36% to 42% range.

Even with the same sampling data, a confidence interval can be improved at the expense of confidence level and vice versa. See CI/CL Websites. For example, Gallup, Inc. might be able -- and the Court has not conducted the actual calculations -- to display the same data as having a +/- 8% margin of error and a 99% confidence level, or a +/- 1% margin of error and a 90% confidence level. The use of a 95% confidence level, however, is a scientific and industry standard.

[53]The class contains 100 times as many individuals as the sample, and ten million dollars is 100 times $100,000.00. The mathematics work out the same way if one considers only the twenty meritorious class members: the twenty sample class members were determined to be owed an average of $5,000.00 apiece, which, multiplied by the expected 2,000 meritorious class members in the entire class, again comes to ten million dollars.

The class could then devise a way, subject only to judicial approval, to divide up the ten million dollars -- or whatever remained of it after deducting class counsel's expenses and fees -- among the class. That plan might include an equal division among class members of $2,000.00 apiece, or an attempt to administratively determine the relative levels of harm suffered by each class member and distribute the damages proportionately.

[54]The Supreme Court based its holding -- or, more precisely, its dicta -- disclaiming trials by formula on the Rules Enabling Act, 28 U.S.C. § 2072(b), stating that trials by statistics

class members' claims -- or at least elements thereof -- can be specifically proven in one fell swoop; that this common determination can be done forms the basis of the class action. Truly individual issues, on the other hand, must be adjudicated individually and not by statistical inference.[55] In formulating a workable trial plan, the Court must also ensure that it does not run afoul of the Seventh Amendment. The Seventh Amendment contains two clauses:

---

effectively alter the substance of the law being applied, but there may additionally be Due Process concerns under the Fifth Amendment to the United States Constitution. See Wal-Mart, 564 U.S. at 367 (citing Ortiz v. Fireboard Corp., 527 U.S. 815, 845 (1999)).

[55]While the Court fully agrees with Justice Scalia that courts cannot sacrifice the defendant's rights for the plaintiffs' economic convenience, the Court is not convinced that it, as Wal-Mart seems to suggest, should forego the advantages of class certification merely to convenience the defendant in carrying burdens which the defendant would have to carry even if the litigation was conducted individually. If the defendant ordinarily bears the burden to produce certain evidence or prove certain allegations, that the burden might be exceptionally inconvenient for it do so on an individual basis against an enormous number of class members should not, in the Court's opinion, weigh against class certification. For example, if a defendant is sued in a breach-of-contract class action in which 1,000 class members allege that the defendant was not properly performing a term in an identical form contract executed between the defendant and every class member, the defendant might wish to introduce individualized parole evidence -- such as oral communications contemporaneous with the signing of the written instrument explaining the disputed term -- or inject individual issues into the case by asserting affirmative defenses. In the Court's opinion, the defendant would be free to pursue these strategies, but, just as it would in 1,000 individual suits, it must discover and present proof against each individual class member to whom these theories apply. In the Court's view, just as plaintiffs cannot conduct trials by statistics, the defendant could not put one-hundred class members on the stand to testify to waiver and then expect anything more than a ten-percent decrease in class damages as a result. Although this burden may seem unfair to the defendant, the defendant would have to expend the same energy and resources if the 1,000 suits were brought individually. That such suits might never be brought -- because they would not be economically viable for the plaintiffs or because the plaintiffs are not aware of their claims -- should not, in the Court's view, excuse the defendant of its ordinary litigation burdens. In short, the issues that should most cut against a finding of predominance are those individual questions that would ordinarily be the plaintiff's burden to answer at trial: elements of the prima facie case and individualized rebuttals of any common affirmative defenses that the defendant asserts. The Court must, however, faithfully and fully apply Supreme Court and Tenth Circuit law. The Court concludes that Comcast Corp. v. Behrend and Wal-Mart require the Court to count time spent adjudicating individual affirmative defenses against the predominance finding.

> In Suits at common law, where the value in controversy shall exceed twenty dollars, [(i)] the right of trial by jury shall be preserved, and [(ii)] no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law.

U.S. Const. amend. VII.

52. These clauses are known as the trial-by-jury clause and the reexamination clause, respectively, and bifurcation has been challenged under both. Plaintiffs often dislike bifurcation, because it lowers their odds of success by excluding damages evidence from the liability phase -- evidence of the plaintiff's injuries that is often evocative -- and necessitating that they win two trials instead of one. They have, accordingly, argued that bifurcation -- a procedural innovation which post-dates the Founding -- violates the trial-by-jury clause. Whatever the merits of this argument, the Supreme Court has rejected it:

> [W]e are not now concerned with the form of the ancient rule. It is the Constitution which we are to interpret; and the Constitution is concerned, not with form, but with substance. All of vital significance in trial by jury is that issues of fact be submitted for determination with such instructions and guidance by the court as will afford opportunity for that consideration by the jury which was secured by the rules governing trials at common law. Beyond this, the Seventh Amendment does not exact the retention of old forms of procedure. It does not prohibit the introduction of new methods for ascertaining what facts are in issue . . . .

Gas. Prods. Co. v. Champlin Refining Co., 283 U.S. 494, 498 (1931)(citing Herron v. S. Pac. Co., 283 U. S. 91 (1931); Walker v. N.M. & S. Pac. R., 165 U. S. 593, 596 (1897); In re Peterson, 253 U. S. 300, 309 (1920)). The only restriction that the trial-by-jury clause places on trial-separation schemes is that, when a case contains both legal and equitable issues -- the former of which must be submitted to a jury and the latter of which a judge can decide -- the judge may not rule on the equitable issues before trial in such a way as to preclude the jury from trying the legal issues. See Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 510-11 (1959).

> The court should take care when deciding which issues may and should be severed for separate trial and the order in which to try them[, as] the right to trial by jury on legal claims may not (except under "the most imperative circumstances") be lost by a prior determination of equitable claims.

Manual for Complex Litigation § 11.632, at 122 (quoting Beacon Theatres, Inc. v. Westover, 359 U.S. at 510-511).

53. The reexamination clause presents more formidable difficulties to polyfurcation. Relatively few appellate judges have invalidated lower-court judgments or class-management plans on this ground, by far the most famous being Judge Posner:

> [T]he district judge . . . exceeded his authority [at] the point at which his plan of action proposes to divide the trial of the issues that he has certified for class-action treatment from the other issues involved in the thousands of actual and potential claims of the representatives and members of the class. Bifurcation and even finer divisions of lawsuits into separate trials are authorized in federal district courts. And a decision to employ the procedure is reviewed deferentially. However, as we have been at pains to stress recently, the district judge must carve at the joint. Of particular relevance here, the judge must not divide issues between separate trials in such a way that the same issue is reexamined by different juries. The problem is not inherent in bifurcation. It does not arise when the same jury is to try the successive phases of the litigation. But most of the separate "cases" that compose this class action will be tried, after the initial trial in the Northern District of Illinois, in different courts, scattered throughout the country. The right to a jury trial in federal civil cases, conferred by the Seventh Amendment, is a right to have juriable issues determined by the first jury impaneled to hear them (provided there are no errors warranting a new trial), and not reexamined by another finder of fact. This would be obvious if the second finder of fact were a judge. But it is equally true if it is another jury. In this limited sense, a jury verdict can have collateral estoppel effect.
>
> The plan of the district judge in this case is inconsistent with the principle that the findings of one jury are not to be reexamined by a second, or third, or *n*th jury. The first jury will not determine liability. It will determine merely whether one or more of the defendants was negligent under one of the two theories. The first jury may go on to decide the additional issues with regard to the named plaintiffs. But it will not decide them with regard to the other class members. Unless the defendants settle, a second (and third, and fourth, and hundredth, and conceivably thousandth) jury will have to decide, in individual follow-on litigation by class members not named as plaintiffs in the Wadleigh case, such issues as comparative negligence -- did any class members knowingly continue to

> use unsafe blood solids after they learned or should have learned of the risk of contamination with HIV? -- and proximate causation. Both issues overlap the issue of the defendants' negligence. Comparative negligence entails, as the name implies, a comparison of the degree of negligence of plaintiff and defendant. Proximate causation is found by determining whether the harm to the plaintiff followed in some sense naturally, uninterruptedly, and with reasonable probability from the negligent act of the defendant. It overlaps the issue of the defendants' negligence even when the state's law does not (as many states do) make the foreseeability of the risk to which the defendant subjected the plaintiff an explicit ingredient of negligence. A second or subsequent jury might find that the defendants' failure to take precautions against infection with Hepatitis B could not be thought the proximate cause of the plaintiffs' infection with HIV, a different and unknown blood-borne virus. How the resulting inconsistency between juries could be prevented escapes us.

In re Rhone-Poulenc Rorer, Inc., 51 F.3d at 1302-03 (citations omitted).

54. By and large, other courts have not accepted Judge Posner's Seventh Amendment concerns with polyfurcation. The Tenth Circuit has not addressed the Seventh Amendment's impact on polyfurcation. The Court nonetheless concludes it can make three statements confidently on the issue. First, Seventh Amendment concerns are sidestepped entirely when the same jury is used for both phases of the trial. See In re Rhone-Poulenc Rorer, Inc., 51 F.3d at 1303 ("The problem is not inherent in bifurcation. It does not arise when the same jury is to try the successive phases of the litigation."); Manual for Complex Litigation § 11.632, at 122 ("Generally, when issues are severed for separate trials, they should be tried before the same jury unless they are entirely unrelated."). Second, the Court must be cautious that no subsequent jury disturbs any issue that a prior jury definitively decided -- and the Court will use the test from the collateral-estoppel analysis to determine whether a prior jury definitively established an issue.[56]

[56] The Seventh Amendment defines collateral estoppel's contours. See, e.g., SEC v. Monarch Funding Corp., 192 F.3d 295, 304 (2d Cir. 1999)(cited by Lab. Corp. of Am. Holdings v. Metabolite Labs., Inc., 410 F. App'x 151, 159 (10th Cir. 2011)(unpublished)).

This requirement does not imply a need to "carve at the joint" -- whatever that means[57] -- but merely to do as the Seventh Amendment says, and prevent "reexamination." Third, most minor reexamination issues -- i.e., issues submitted to different juries that overlap somewhat -- can be resolved by instructing the subsequent jury to adhere to the prior jury's findings and by carefully crafting the verdict form to reflect the prior jury's findings. See In re Paoli R.R. Yard PCB Litig., 113 F.3d 444, 452 n.5 (3d Cir. 1997); EEOC v. Foster Wheeler Constructors, Inc., No. 98-C-1601, 1999 WL 528200, at *3 (N.D. Ill. July 13, 1999)(Coar, J.)("[A] well-constructed bifurcation scheme, used in tandem with clear instructions to the juries can delineate the roles of the two juries in order to avoid reexamination of any factual issues . . . ."); Steven S. Gensler, Bifurcation Unbound, 75 Wash. L. Rev. 705, 735-37 (2000); See also Zuniga v. Bernalillo Cty., 319 F.R.D. 640, 686 (D.N.M. 2016)(Browning, J.).

## ANALYSIS

55. The Plaintiffs seek damages from the Defendants based on consumer protection, warranty, and unjust enrichment claims. See Certification Motion at 5. The Plaintiffs seek to certify twenty-one classes: the California Class and California Menthol Subclass, the Colorado Class and Colorado Menthol Subclass, the Florida Class and Florida Menthol Subclass, the Illinois Class and Illinois Menthol Subclass, the Massachusetts Class, the Michigan Class, the New Jersey Class and New Jersey Menthol Subclass, the New Mexico Class and New Mexico Menthol Subclass, the New York Class and New York Menthol Subclass, the North Carolina

[57]The Tenth Circuit has never used this term. It seems to imply that every case only has certain points at which it can be bifurcated, e.g., if a claim contains elements *A* through *E*, but the "joint" is between *C* and *D*, then the case cannot be bifurcated into a trial on *A* and *B* and a separate trial on *C* through *E*. Maybe the Court is reading too much into the metaphor. In the Court's view, however, separate trials for *A* and *B* and *C* through *E* would be acceptable, so long as the *C*-through-*E* jury respects the prior jury's findings on *A* and *B*.

Class and North Carolina Menthol Subclass, the Ohio Class, the Washington Class, and the Nationwide Menthol Subclass. See Certification Motion at 6. The Plaintiffs seek specific state menthol subclasses certification only in the alternative to the Nationwide Menthol Subclass. See Certification Motion at 6 n.3. The Plaintiffs contend that the Defendants' labeling on Natural American cigarettes conveys to consumers that Natural American cigarettes are less harmful than other cigarettes. See Certification Motion at 3.

56. The Plaintiffs contend that they present common questions whether: (i) the Defendants' marketing and labeling of Natural American cigarettes was uniform and commonly presented to class members; and (ii) the Defendants' labelling misled reasonable consumers that Natural American cigarettes may be less harmful than other cigarettes. See Certification Motion at 4. The Plaintiffs also contend that they present common evidence to the issues at hand and that the common questions predominate over any individualized issues. See Certification Motion at 4. Moreover, the Plaintiffs argue that class-wide damages can be calculated based on a common methodology for each class member. See Certification Motion at 4.

57. The Defendants contend that the Court should not certify the Plaintiffs' proposed classes for several reasons. First, the Defendants assert that, independent of rule 23, four claims are not eligible for certification. See Certification Opposition at 17. Specifically, they argue: (i) that the Court dismissed the New Jersey classes' unjust enrichment claim; (ii) that the IUDTPA does not allow the Illinois classes' injunctive relief and monetary damages claims; (iii) that the Court dismissed the Ohio class' claim for failure to satisfy the OCSPA's notice requirement, and (iv) that the NMFAA does not provide a private right of action for the New Mexico classes' NMFAA claims. See Certification Opposition at 17-19. Second, the Defendants assert that two additional claims are ineligible for certification under rule 23(b)(3).

See Certification Opposition at 19. Specifically, they argue that: (i) the CCPA bars monetary damages for class actions under Colorado law; and (ii) the NMUPA provides named plaintiffs with different damages than unnamed class members, precluding a damages class' certification. See Certification Opposition at 19. According to the Defendants, "this leaves thirteen statutory causes of action under the laws of nine States, the ten unjust-enrichment claims, and the nationwide express-warranty claim." Certification Opposition at 19-20. Third, the Defendants assert that the Plaintiffs cannot meet rule 23(a)'s commonality and typicality requirements, or rule 23(b)(3)'s predominance and superiority requirements for the remaining classes. See Certification Opposition at 20, 24. Finally, the Defendants argue that the Court should not certify the Plaintiffs' proposed classes under rule 23(b)(2), because their request for injunctive relief is moot and the named Plaintiffs do not have standing. See Certification Opposition at 84, 86. The Defendants do not dispute that the Plaintiffs satisfy rule 23(a)'s numerosity and adequacy requirements. See Certification Opposition at 20.

## I. THE COURT WILL NOT CERTIFY THE NATIONWIDE MENTHOL SUBCLASS.

58. The Plaintiffs' proposed Nationwide Menthol Subclass "seeks to represent a nationwide subclass of NAS Menthol Cigarette purchasers in the U.S." and "seeks recovery for Defendants' breach of express warranty." Certification Motion at 80 (citing SAC ¶ 127, at 43; id. ¶¶ 451-59, at 103-05). Because the Plaintiffs seek the individual state menthol subclasses' certification as an alternative to the Nationwide Menthol Subclass's certification, the Court will consider first the Nationwide Menthol Subclass. The Court determines that the Plaintiffs have established that the Nationwide Menthol Subclass satisfies rule 23(a)'s requirements, but that the have not shown that the Nationwide Menthol Subclass satisfies rule 23(b)(3)'s requirements.

Accordingly, the Court will not certify the Nationwide Menthol Subclass under rule 23(b)(3).

**A. THE NATIONWIDE MENTHOL SUBCLASS SATISFIES RULE 23(a)'S NUMEROSITY REQUIREMENT.**

59. The Plaintiffs assert that their proposed classes "readily meet" rule 23(a)'s numerosity requirement. Certification Motion at 43. A proposed class meets rule 23(a)'s numerosity requirement when "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "The Tenth Circuit has stated that there is 'no set formula' to determine whether the numerosity requirement is met; instead, it is a fact-specific inquiry best left to the district court's discretion." Gonzales v. City of Albuquerque, 2010 WL 4053947, at *7 (quoting Rex v. Owens, 585 F.2d at 436). The Court previously has found that joinder of "several hundred tenants and homeowners" is impracticable, and thus that the proposed class met rule 23(a)(1)'s numerosity requirement. Lowery v. City of Albuquerque, 273 F.R.D. at 682-83.

60. Here, the Plaintiffs have presented evidence that the "Defendants sold over 2 billion NAS Cigarettes in 2009, over 5.6 billion NAS Cigarettes in 2017, and over 5.8 billion NAS Cigarettes in 2018." Certification Motion at 43 (citing Natural American Spirit Market Share and Financial Information (dated June 29, 2018), filed July 23, 2020 (Doc. 280-2)). See Dewhirst Report at 17; Proctor Report at 61. In 2018, Santa Fe Tobacco had thirteen million people on its active mailing list. See Huyett Depo. at 163:15-16 (Huyett). Accordingly, the Plaintiffs assert that "there are millions of class members; surely there are, at minimum, tens of thousands of class members in each state for which Plaintiffs seek certification." Certification Motion at 44. Given a standard twenty-cigarette pack, 5.8 billion cigarettes sold is equivalent to approximately 290 million cigarette packs sold in 2018. That number is enough for more than

794,500 people to purchase one pack per day. Using an even distribution of smokers among the fifty States, this number would be enough for more than 15,890 people to purchase a one pack per day in each State. At least until 2016, menthol cigarettes generated seven percent of Natural American cigarette sales. See Dubé Report at 14-15. Extending the Court's rough calculations, these sales numbers suggest that the Defendants sold approximately 406 million menthol cigarette sticks, or 20.3 million menthol cigarette packs, a number sufficient for 1,112 people in each State to have purchased one pack of menthol cigarettes per day. These estimates exceed the "several hundred tenants and homeowners" whose joinder the Court previously has concluded is impracticable. Lowery v. City of Albuquerque, 273 F.R.D. at 682-83. Although the Plaintiffs do not estimate specifically how many customers purchased Natural American cigarettes in each State per year, the Court concludes that the joinder of each individual class member is "impracticable." Fed. R. Civ. P. 23(a)(1). For these reasons, and because the Defendants do not dispute that the Plaintiffs have met rule 23(a)'s numerosity requirement, see Certification Opposition at 20, the Court concludes that the Nationwide Menthol Subclass is sufficiently numerous to satisfy rule 23(a)(1).

**B. THE NATIONWIDE MENTHOL SUBCLASS SATISFIES RULE 23(a)'S COMMONALITY REQUIREMENT.**

61. Rule 23(a)(2) requires that "there [be] questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). While "factual differences in the claims of the individual putative class members should not result in a denial of class certification where common questions of law exist," In re Intelcom Grp. Sec. Litig., 169 F.R.D. at 148, the common question must be "central to the validity of each claim," Wal-Mart v. Dukes, 564 U.S. at 350, and must be able to "'generate common *answers* apt to drive the resolution of litigation,'" Wal-Mart v.

Dukes, 564 U.S. at 350 (quoting Nagareda, Class Certification in the Age of Aggregate Proof at 132)(emphasis added in Wal-Mart v. Dukes). "[F]or purposes of Rule 23(a)(2) '[e]ven a single [common] question' will do." Wal-Mart v. Dukes, 564 U.S. at 359 (quoting Nagareda, The Preexistence Principle and the Structure of the Class Action, 103 Colum. L. Rev. 149, 176 n.110 (2003))(first alteration added). The Court previously has noted that, in light of Wal-Mart v. Dukes, "[f]or better or for worse, the commonality inquiry now focuses on quality rather than quantity." Anderson Living Trust v. WPX Energy Prod., LLC, 306 F.R.D. at 437.

62. The Plaintiffs assert that their proposed classes, including the Nationwide Menthol Subclass, satisfy rule 23(a)'s commonality requirement, because they have "identified questions with common answers that 'would "resolve an issue that is central to the validity of each of one of the claims in one stroke."'" Certification Motion at 44 (quoting Menocal v. GEO Grp., Inc., 822 F.3d at 916 (quoting Wal-Mart v. Dukes, 564 U.S. at 350)). They assert that false advertising claims meet the commonality requirement because

> (1) whether Defendants' statements are false, deceptive, or misleading can be determined without having to consider Plaintiffs' individual circumstances; (2) Plaintiffs will be able to prove Defendants' violations of law through common evidence; (3) Defendants' conduct and scienter will not vary by Plaintiffs and class members; and (4) the amount of any improper premiums incorporated into an item's price (i.e. Plaintiffs' injuries) will not vary by Plaintiffs and class members.

Certification Motion at 45 (citing Daye v. Cmty. Fin. Serv. Ctrs., LLC, 313 F.R.D. at 178). Specifically, the Plaintiffs suggest that the following questions are both common and central to resolving their claims:

- Defendants' practices in labeling and marketing NAS Cigarettes as "natural" and "additive-free" tends to mislead reasonable consumers into believing that NAS Cigarettes may be less harmful than other cigarettes;

- Defendants engaged in deceptive or misleading acts or practices by labeling NAS Cigarettes as "natural" and "additive-free";
- NAS Menthol Cigarettes are in fact "additive-free" given that they contain the additive menthol;
- NAS Cigarettes are less harmful than other cigarettes;
- As a result of Defendants' misrepresentations, class members suffered an ascertainable loss;
- Class members either paid a price premium for the NAS Cigarettes that they would not have paid but for the false labeling and marketing of the NAS Cigarettes or would not have purchased them at all.
- Defendants should be enjoined from continuing to sell NAS Cigarettes as currently labeled.

Certification Motion at 45-46.

63. The Defendants dispute that the Plaintiffs' proposed classes satisfy rule 23(a)(2)'s commonality requirement, instead insisting that "Plaintiffs' claims hinge on individualized issues." Certification Opposition at 20. They argue that the Plaintiffs' seven suggested common questions are neither "'central'" to the claims' validity nor "'capable of a common answer.'" Certification Opposition at 21 (citing Payne v. Tri-State CareFlight, 332 F.R.D. at 659). The Defendants argue that the first, second, fifth, and sixth questions "can be resolved only individually," for example, "by assessing what representations each putative class member actually saw over time," among other factual inquiries. Certification Opposition at 21. They then argue that the third and fourth questions are not "'central to the validity'" of the Plaintiffs' claims, in part because the Defendants "do not dispute Plaintiffs' contention that NAS cigarettes are not safer than other cigarettes," and because the "Plaintiffs can prevail only by establishing that consumers were *actually* misled into purchasing NAS cigarettes *based on* a belief . . . that menthol is *not* an additive . . . ." Certification Opposition at 21 (emphasis in original).

64. In response, the Plaintiffs state that "[a]t the heart of Plaintiffs' claims is the question of whether Defendants' *uniform* marketing representations are false, deceptive, or misleading to a *reasonable consumer*." Certification Reply at 4 (emphasis in original). Further, the Plaintiffs assert that "substantial common evidence will *answer*," among other questions, "whether Defendants uniformly market NAS Cigarettes; whether Defendants' marketing leads a reasonable consumer to understand that NAS Cigarettes may be less harmful than other cigarettes; and whether and in what amount are economic damages attributable to Defendants' misrepresentations." Certification Reply at 4 (emphasis in original). The Plaintiffs also critique as inapposite the caselaw upon which Defendants rely, asserting that "[t]he facts of . . . employment discrimination cases are completely contrary to the facts of this consumer fraud case and, thus, not helpful." Certification Reply at 5. They refer specifically to the Defendants' reliance on Zuniga v. Bernalillo Cnty., 319 F.R.D. 640, arguing that it denied class certification on the basis of a policy that allowed discretion over employment matters. See Certification Reply at 4. Instead, the Plaintiffs call the Court's attention to cases that "mak[e] it clear that misrepresentations that evoke a common theme, including with varying words or images, can satisfy the commonality requirement." Certification Reply at 5 (citing Miller v. Basic Rsch., LLC, 285 F.R.D. 647, 651-52 (D. Utah 2010)(Stewart, J.); Broomfield v. Craft Brew All., Inc., 2018 WL 4952519, at *1-2, *6).

65. For the commonality analysis' purposes, the Court concludes that the Plaintiffs have made a showing sufficient to support the Nationwide Menthol Subclass' commonality. The Court acknowledges the Defendants' argument that individual concerns undercut the Court's

ability to apply common answers to these questions[58]; however, that argument's consideration is more appropriate for the Court's predominance analysis, which it undertakes below. Instead, at this stage in its analysis, the Court considers whether there is "'[e]ven a single'" common question capable of generating a common answer that is central to the Nationwide Menthol Subclass' breach-of-express-warranty claim. Wal-Mart v. Dukes, 564 U.S. at 359 (quoting Nagareda, The Preexistence Principle and the Structure of the Class Action at 176 n.110). "An express warranty generally consists of affirmations of fact or of promises by the seller to the buyer that relate to the goods and become part of the basis of the bargain, including sales by description . . . ." Defense Against a Prima Facie Case § 3:1 (Thomson Reuters rev. ed. 2022). In this action and throughout the class period, the Defendants marketed Natural American cigarettes using common descriptions and themes. See Findings of Fact, supra ¶ 35, at 9 ("Natural American's PPOD, at least until 2017, has been '100% additive-free natural tobacco' and, for its organic line, 'organic.'"); id. ¶ 36, at 10 ("[O]ther elements of Natural American labels and advertising . . . include themes like 'Made with Organic Tobacco,' 'Tobacco and Water,' and 'Grown on American Soil.'"); id. ¶ 40, at 11 ("Santa Fe Tobacco used the phrase '100% additive-free natural tobacco' on its packaging to describe the tobacco used in Natural American cigarettes from 1985 until 2017."). Because the Defendants displayed these descriptions and themes uniformly on the Natural American cigarette packaging and advertisement, see Findings of Fact, supra ¶ 46, at 12 ("The labels did not, and do not, vary from state to state."); id. ¶ 38, at 11 ("During the class periods, Santa Fe has uniformly labeled every

[58]In their predominance analysis, the Defendants assert that the Court must consider the breach-of-express-warranty claims under the laws of each State in which a class member purchased Natural American Spirit cigarettes -- for a nationwide class, all fifty States -- and, thus, there is no common answer whether the Defendants created an express warranty when they printed certain representations on the cigarette packaging. See Certification Opposition at 66.

pack of Natural American cigarettes as 'natural,' including in the brand name -- Natural American Spirit Cigarettes -- and corporate name -- Santa Fe Natural Tobacco Company."), the Court can look at these representations and determine in a single stroke, for example, whether they would mislead a reasonable consumer or whether a reasonable buyer would rely on them in purchasing Natural American cigarettes over other brands. These are "questions of law or fact" that are central to the Plaintiffs' breach-of-express-warranty claim at this stage of the rule 23(a) analysis, even if individualized concerns ultimately predominate upon the Court's rule 23(b)(3) analysis. Fed. R. Civ. P. 23(a)(2). Accordingly, the Court concludes that the Nationwide Menthol Subclass meets rule 23(a)(2)'s commonality requirement.

### C. THE NATIONWIDE MENTHOL SUBCLASS SATISFIES RULE 23(a)'S TYPICALITY REQUIREMENT.

66. Rule 23(a)(3) requires that the representative parties' claims or defenses be "typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Factual differences among some of the proposed class members will "not defeat typicality under Rule 23(a)(3) so long as the claims of the class representative and putative class members are based on the same legal or remedial theory." Adamson v. Bowen, 855 F.2d at 676. If a representative plaintiff "is subject to a unique defense that is likely to become a major focus of the litigation," however, that representative is not typical for rule 23(a)(3)'s purposes. In re Crocs, Inc. Sec. Litig., 306 F.R.D. at 687 (quoting Marcus v. BMW of N. Am., LLC, 687 F.3d at 599). With that exception in mind, however, "[t]he commonality and typicality requirements of Rule 23(a) tend to merge." Gen. Tele. Co. of the Sw. v. Falcon, 457 U.S. at 157 n.13. See Milonas v. Williams, 691 F.2d at 938 ("In determining whether the typicality . . . requirement[] ha[s] been fulfilled, either common questions of law or fact presented by the class will be deemed sufficient.")).

67. The Plaintiffs argue that "[t]ypicality is satisfied when commonality is satisfied." Certification Motion at 47 (citing Anderson Living Tr. v. WPX Energy Prod., LLC, 306 F.R.D. at 382-83). They assert further that the "Plaintiffs' claims are typical of the class members' claims because they are all based on the same underlying conduct and legal theories." Class Certification Moton at 47. They argue that the Plaintiffs were regular purchasers of Natural American cigarettes, which the Defendants labelled and marketed uniformly, and that this labelling and marketing conveyed to the Plaintiffs that Natural American cigarettes are less harmful than other brands. See Certification Motion at 47. The Plaintiffs also assert that they were unfamiliar with the menthol cigarette manufacturing process or whether menthol is a tobacco additive. See Certification Motion at 47.

68. The Defendants dispute that the Plaintiffs meet the typicality requirement, instead echoing their commonality argument and asserting that the named Plaintiffs' claims hinge on individualized issues. See Certification Opposition at 22. The Defendants additionally assert that several of the named Plaintiffs are "'subject to one or more unique defenses that likely will be central to the litigation.'" Certification Opposition at 22 (quoting Payne v. Tri-State CareFlight, LLC, 332 F.R.D. at 697. Although they discuss several of the named Plaintiffs, two, Robert Litwin and Joshua Horne, stand as proposed representatives for the Nationwide Menthol Subclass. See Certification Opposition at 23; SAC ¶ 127, at 43. The Defendants argue that Litwin and Horne "admitted facts undermining their claim that they were misled into purchasing NAS cigarettes at a premium price. These individuals' interests are not 'sufficiently aligned' with those of the class members . . . ." Certification Opposition at 23 (quoting Payne v. Tri-State CareFlight, LLC, 332 F.R.D. at 661). The Defendants argue that Litwin and Horne "acknowledged that they have continued purchasing NAS cigarettes even after filing suit in this

litigation -- expressly acknowledging their belief that NAS cigarettes are not healthier or safer than others," and that, thus, "[t]hese named Plaintiffs cannot claim to have been misled into purchasing NAS cigarettes on the basis of a health misperception," which puts them in opposition to the proposed class, whom Plaintiffs argue "*were* misled into purchasing NAS cigarettes . . . ." Certification Opposition at 23 (emphasis in original). Additionally, the Defendants assert that Litwin "acknowledged that the 'majority of the time' he did not pay a premium for NAS because he used coupons." Certification Opposition at 24 (quoting Deposition Transcript of Robert Litwin at 96:15-98:7 (taken May 23, 2018), filed July 23, 2020 (Doc. 287-14)(Biersteker, Haberman, Litwin)) Accordingly, the Defendants argue that Litwin and Horne's interests are not aligned with the other proposed class members. See Certification Opposition at 24.

69. The Plaintiffs in reply argue that their recovery theory, namely that, on the basis of common evidence, "*reasonable consumers* were misled by NAS Cigarettes' labeling such that they suffered economic damage . . . does not require inquiry into the subjective thinking of individual consumers." Certification Reply at 6-7 (emphasis in original). They argue that the Plaintiffs' claims are typical, because "the named Plaintiffs assert the same causes of action as the absent Class Members, and their claims are all based on the purchase of NAS Cigarettes, whose marketing implies to a reasonable consumer that they may be less harmful than other cigarettes . . . ." Certification Reply at 7. With respect to the Defendants' arguments that Horne and Litwin are atypical class representatives, the Plaintiffs argue that "the fact that consumers may have *continued* smoking NAS Cigarettes after having been deceived by Defendants does not mean that their claims are atypical," and that Litwin's belief that he "did not pay a price premium is irrelevant . . . because a price premium is the difference between what the consumer actually

paid and what they would have paid in the but-for world in which Defendants had not fraudulently marketed the product." Certification Reply at 8. The Plaintiffs also note that Horne and Litwin are not the sole named Plaintiffs in the Nationwide Menthol Subclass, and that, if the Court to determines that their claims are atypical, the Defendants have not challenged remaining representatives' typicality. See Certification Reply at 8-9 nn. 4-5.[59]

70. The Court concludes that the Nationwide Menthol Subclass satisfies rule 23(a)(3)'s typicality requirement. The Court determines above that the Nationwide Menthol Subclass satisfies rule 23(a)(2)'s commonality requirement, and acknowledges that "[t]he commonality and typicality requirements of Rule 23(a) tend to merge." Gen. Tele. Co. of the Sw. v. Falcon, 457 U.S. at 157 n.13. Thus, the Court looks primarily to whether Horne or Litwin, the two proposed named Plaintiffs whose typicality the Defendants have disputed, are "subject to a unique defense that is likely to become a major focus of the litigation." In re Crocs, Inc. Sec. Litig., 306 F.R.D. at 687 (quoting Marcus v. BMW of N. Am., LLC, 687 F.3d at 599).

71. Regarding the Defendants' first argument, that Horne and Litwin continued to smoke Natural American cigarettes after commencing this litigation, the Court concludes that this contention does not bear on whether their claims -- i.e., that, at some point prior to this litigation and during the proposed class period, Natural American cigarettes' marketing and labelling deceived them into purchasing the product on the basis that it was healthier than other brands -- are typical or atypical for absent class members. If these Plaintiffs never had learned that Natural American cigarettes were, in fact, not healthier than other cigarettes, they never would have felt deceived, and, thus, presumably never would have brought this action before the

[59]The Plaintiffs also have requested that, should the Court determine that any of the proposed named Plaintiffs' claims are atypical, the Court grant leave to substitute new class representatives. See Class Certification Reply at 9 n. 6.

Court to begin with.

72. Regarding the Defendants' second argument, that Litwin often paid for his cigarettes using coupons and, thus, did not pay a price premium for the product, the Court disagrees that this defense is one that would render Litwin an atypical class representative. As Dr. Dubé notes, "[t]he Price Premium measures the difference between the price that Class Members actually paid for the Challenged Products and the price they would have paid but for the Challenged Claims on the labels." Dubé Report ¶ 23, at 9. See Certification Reply at 8. Thus, that Litwin may have paid less than other class members because he used coupons does not detract from the Plaintiffs' claims. Under Dr. Dubé's price premium theory, the price that Litwin paid -- using a coupon -- for a package of Natural American cigarettes with the allegedly misleading statements still is higher compared to what he would have paid -- using a coupon -- for a package of Natural American cigarettes that did not contain the allegedly misleading statements. Accordingly, the Court concludes that "all putative class members are at risk of being subjected to the same harmful practices, regardless of any class member's individual circumstances," DG ex rel. Stricklin v. Devaughn, 594 F.3d at 1199, and that neither Horne nor Litwin are subject to a unique defense that would become one of the litigation's major focuses, see In re Crocs, Inc. Sec. Litig., 306 F.R.D. at 687 (quoting Marcus v. BMW of N. Am., LLC, 687 F.3d at 599). The Court, therefore, determines that "a sufficient nexus exists between the claims of the named representatives and those of the class at large," Thompson v. Jiffy Lube Int'l, Inc., 250 F.R.D. at 622 (citing Busby v. JRHBW Realty, Inc., 513 F.3d at 1320), and concludes that the named Nationwide Menthol Subclass members satisfy rule 23(a)(3)'s typicality requirement.

### D. THE NATIONWIDE MENTHOL SUBCLASS SATISFIES RULE 23(a)'S ADEQUACY REQUIREMENT.

73. The final rule 23(a) prerequisite that the Court must consider is whether "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The Tenth Circuit has identified two questions relevant to the adequacy-of-representation inquiry: (i) whether the named plaintiffs and their counsel have any conflicts with other proposed class members; and (ii) whether the named plaintiffs and their counsel will vigorously prosecute the action on the class' behalf. See Rutter & Wilbanks Corp. v. Shell Oil Co., 314 F.3d at 1187-88. The Defendants do not dispute that the representative parties satisfy rule 23(a)(4)'s adequacy requirement. See Certification Opposition at 20. Nevertheless, because intra-class conflicts "may negate adequacy under Rule 23(a)(4)," Langbecker v. Elec. Data Sys. Corp., 476 F.3d at 315-16 (holding that the district court erred in certifying a class without evaluating intra-class conflicts), the Court will evaluate the Plaintiffs' assertions that the proposed Nationwide Menthol Subclass representatives represent adequately the proposed class.[60]

---

[60]Traditionally, the adequacy-of-counsel analysis formed a part of the rule 23(a)(4) inquiry; however, rule 23(g) now encompasses this analysis instead. See Fed. R. Civ. P. 23(g) (permitting courts, in addition to considering certain required factors, to "consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class"). Upon amending rule 23 in 2003 to add subparagraph (g), the Advisory Committee on Rules of Civil Procedure stated:

> Until now, courts have scrutinized proposed class counsel as well as the class representative under Rule 23(a)(4). This experience has recognized the importance of judicial evaluation of the proposed lawyer for the class, and this new subdivision builds on that experience rather than introducing an entirely new element into the class certification process. Rule 23(a)(4) will continue to call for scrutiny of the proposed class representative, while this subdivision will guide the court in assessing proposed class counsel as part of the certification decision.

74. The Plaintiffs asserts that they "all share the same interests as the proposed classes they seek to represent because they all have the same claims." Certification Motion at 48. Specifically, "they paid money for NAS Cigarettes that they would not have paid but for Defendants' false, deceptive, and misleading advertising and breach of warranty." Certification Motion at 48. The Plaintiffs avow that their interests are "wholly aligned" with the unnamed class members' interests, and that "they are committed to prosecuting this action for the benefit of the class as a whole." Certification Motion at 49 (citing Declaration of Melissa S. Weiner in Support of Plaintiffs' Motion for Class Certification at 9-10, filed July 23, 2020 (Doc. 280)). The Plaintiffs state that they have "g[iven] depositions, produced documents, answered interrogatories, and are prepared to testify at trial," and that they are, therefore, adequate representatives. Certification Motion at 49. The Defendants do not dispute that the representative parties satisfy rule 23(a)(4)'s or rule 23(g)'s adequacy requirement. See Certification Opposition at 20.

75. The Court concludes that the Nationwide Menthol Subclass' named Plaintiffs represent adequately the unnamed class members. First, as discussed above, the Court considers the named Plaintiffs to present common questions that are typical of the questions that the class

---

Fed. R. Civ. P. 23(g) Advisory Committee Notes to the 2003 Amendment. This note suggests that the rule 23(a)(4) adequacy-of-class-representative analysis is distinct from the rule 23(g) adequacy-of-counsel analysis. See Benedict v. Altria Grp., Inc., 241 F.R.D. 668, 673 (D. Kan. 2007)(O'Hara, M.J.)(" In 2003 . . . , Rule 23 was amended to add subparagraph (g) which governs the manner in which courts should supervise the appointment of class counsel. Thus, the court will analyze separately the adequacy of counsel and of . . . the named plaintiff."). Rule 23(a)(4)'s language, which refers to the "representative parties," however, has not changed in the versions previous to and after the 2003 amendment. Fed. R. Civ. P. 23(a)(4). Accordingly, although the Tenth Circuit issued its opinion in Rutter & Wilbanks Corp. v. Shell Oil Co. in 2002, before rule 23(g)'s addition, the Court will continue to apply the Tenth Circuit's two-factor test to determine the representative class members' adequacy. See Rutter & Wilbanks Corp. v. Shell Oil Co., 314 F.3d at 1187-88.

members present. The Defendants have not asserted, and that Court on its own has not identified, any conflicts between the named Plaintiffs and the unnamed class members. See Rutter & Wilbanks Corp. v. Shell Oil Co., 314 F.3d at 1187-88. Second, the Court acknowledges that the named Plaintiffs have participated in the litigation process and are prepared to testify at trial. In the absence of contrary evidence, the Court considers that the named Plaintiffs will remain engaged in further proceedings and will vigorously prosecute the action on the class' behalf. See Rutter & Wilbanks Corp. v. Shell Oil Co., 314 F.3d at 1187-88. Accordingly, the Court concludes that the Nationwide Menthol Subclass' named Plaintiffs have satisfied rule 23(a)(4)'s adequacy requirement. See Fed. R. Civ. P. 23(a)(4); Rutter & Wilbanks Corp. v. Shell Oil Co., 314 F.3d at 1187-88.

**E. THE NATIONWIDE MENTHOL SUBCLASS DOES NOT SATISFY RULE 23(b)(3)'S PREDOMINANCE REQUIREMENT.**

76. Having determined that the Nationwide Menthol Subclass satisfies all four rule 23(a) requirements, the Court turns to the additional rule 23(b)(3) predominance and superiority requirements. Regarding predominance for all of the proposed classes, the Plaintiffs note that they must show that the underlying cause of action presents common questions of law or fact, and then that class "damages are 'measurable on a class-wide basis through use of a common methodology.'" Certification Motion at 50 (quoting Comcast Corp. v. Behrend, 569 U.S. at 30). The Plaintiffs argue that "predominance is satisfied[] when the driving issues in the case relate to the defendants' conduct or can be determined with respect to the class as a whole based on an objective standard." Certification Motion at 51. They note that materiality, for example, "is an objective question based on the reasonable person standard, and thus, it 'can be proved through evidence common to the class.'" Certification Motion at 51 (quoting Amgen Inc. v. Conn. Ret.

Plans & Tr. Funds, 568 U.S. at 467). They assert that "the elements [for every State's consumer protection laws] are substantially the same -- and in every instance, established by proof common to the class as a whole -- common issues predominate." Certification Motion at 51. The Plaintiffs also state that their "evidence focuses on Defendants' conduct and . . . will apply to all claims to prove objective issues . . . . There is no need for any Plaintiffs or class members to present evidence regarding their individual circumstances to prove any of the claims." Certification Motion at 53.

77. With respect to the Nationwide Menthol Subclass, the Plaintiffs state that the Nationwide Menthol Subclass "seeks recovery for Defendants' breach of express warranty." Certification Motion at 80. They state further that, "[b]ecause this is a diversity action," the Court should use New Mexico's choice-of-law rules to determine which forum's law should apply to the nationwide claim. See Certification Motion at 80. They argue that, because the breach-of-express-warranty claims sound in contract, New Mexico applies the most-significant-relationship test "'to determine which state has the most significant relationship to the transaction and to the parties.'" Certification Motion at 81 (quoting Ferrell v. Allstate Ins. Co., 2008-NMSC-042, ¶ 55, 144 N.M. 405, 421, 188 P.3d 1156, 1172). In addition to asserting that breach-of-express-warranty claims rely on the same "core elements" in any State, the Plaintiffs assert that New Mexico State contract law should apply to the claims, because New Mexico has the most significant relationship to the transaction. Certification Motion at 81-82. Accordingly, they argue that, under New Mexico law, "'[a] breach of warranty presents an objective claim that the goods do not conform to a promise, affirmation, or description,'" and, thus, individualized questions will not predominate. Certification Motion at 83 (quoting Nowell v. Medtronic, Inc., 372 F. Supp. 3d 1166, 1222 (D.N.M. 2019)(Browning, J.)(quoting Badilla v. Wal-Mart Stores E.

Inc., 2015-NMSC-029, ¶ 21, 357 P.3d 936, 941)).

78. The Plaintiffs also assert that they will prove class-wide damages. Certification Motion at 53. They argue that "individualized questions about damages [do not] defeat predominance." Certification Motion at 53 (citing Naylor Farms, Inc. v. Chaparral Energy, LLC, 923 F.3d 779, 798 (10th Cir. 2019)). They note that "Courts routinely certify consumer class actions under Rule 23(b)(3) when the plaintiff presents expert testimony based on conjoint analysis designed to isolate the portion of the payment attributable to the misrepresented product attribute." Certification Motion at 54 (citing Hadley v. Kellogg Sales Co., 324 F. Supp. 3d 1084, 1103-06 (N.D. Cal. 2018)(Koh, J.); In re Arris Cable Modem Consumer Litig., 327 F.R.D. 334, 366-70 (N.D. Cal. 2018)(Koh, J.); Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc., 326 F.R.D. at 601, 614-16; In re Dial Complete Mktg. & Sales Practices Litig., 320 F.R.D. 326, 331-33 (D.N.H. 2017)(McAuliffe, J.); Sanchez-Knutson v. Ford Motor Co., 310 F.R.D. 529, 538-39 (S.D. Fla. 2015)(Dimitrouleas, J.); Khoday v. Symantec Corp., 93 F. Supp. 3d 1067, 1082 (D. Minn. 2015)(Tunheim, J.)). The Plaintiffs state that they have submitted the Dubé Report, which concludes that "conjoint analysis can be used to determine class-wide economic damages." Certification Motion at 56 (citing Dubé Report ¶ 3, at 4). According to the Plaintiffs, conjoint analysis involves surveying cigarette smokers and allows Dr. Dubé to calculate price premiums and consumers' willingness to pay to estimate damages. See Certification Motion at 57-58 (citing Dubé Report ¶¶ 17-50, at 8-21).

79. The Defendants argue that the Plaintiffs have not satisfied the predominance requirement for several reasons. First, they argue that Plaintiffs have not demonstrated "an administratively feasible method of proving who purchased the products," and assert that "such proof would require individualized litigation." Certification Opposition at 25 (citing Abraham v.

WPX Prod. Prods., LLC, 317 F.R.D. at 254). Second, they argue that, even if the class members readily are ascertainable, questions regarding which class members saw what representations predominate, particularly regarding those class members who saw pre-October 1, 2017 descriptors and those who saw descriptors after that date, as well as who within each time period saw which descriptors. See Certification Opposition at 30-32. Additionally, they argue that the Plaintiffs cannot show that even those class members who saw the same messaging "understood those messages in the same way." Certification Opposition at 42. Third, regarding specifically the Nationwide Menthol Subclass, the Defendants argue that the relevant choice-of-law rules require the Court to apply each transferor jurisdiction's choice-of-law rules, which support applying the place of purchase's substantive law. See Certification Opposition at 66-68. The Defendants argue that these choice-of-law rules point to the express warranty laws of each of the fifty States, which the Defendants assert contain material variations, thus defeating predominance. See Certification Opposition at 69 (citing MTD MOO at 231-39). They argue further that, even if New Mexico law applies, New Mexico's express warranty requirements do not turn entirely on objective considerations, but turn also on the existence of the seller's assertion that form "'part of the basis of the bargain,'" which the Defendants assert the Plaintiffs cannot show. Certification Opposition at 70-71 (quoting N.M.S.A. § 55-2-313(1)(a)-(b)). Finally, the Defendants argue that the Plaintiffs have not put forth a valid damages calculation method that aligns with their liability theories. See Certification Opposition at 72. Specifically, they contend that this failure is because the methods do not measure damages attributable to the alleged deceptions -- i.e., instead of measuring the price premium attributable to the belief that natural cigarettes are safer, it measures the price premium attributable to all of the word natural's associations, such as its eco-friendly connotations -- and because willingness-to-pay is not a

valid damages measure in consumer-fraud cases. See Certification Opposition at 73-79.

80. The Plaintiffs maintain that all their proposed classes are readily identifiable, and that the "class definitions show class membership is based on . . . objective criteria -- specifically: (i) whether a person purchased one or more NAS Cigarette product, (ii) the state in which the person purchased the . . . product(s), and (iii) when they purchased the . . . product(s)." Certification Reply at 11 (citing Kumar v. Salov N. Am. Corp., No 14-cv-2411 YGR, 2016 WL 3844334, at *7 (N.D. Cal. July 15, 2016)(Rogers, J.)). They also argue that the class members all saw "substantially similar" representations that conveyed the same core marketing message and that the class members' subjective understandings are irrelevant. Certification Reply at 14. See id. at 13-19. Regarding the Nationwide Menthol Subclass, the Plaintiffs argue that "the only relevant forum state is New Mexico" and that its choice-of-law rules apply. Certification Reply at 37. They also assert that the Defendants are incorrect that, "even if New Mexico substantive law applies, individualized inquiries will predominate," because New Mexico law "presumes that a representation is 'part of the basis of the bargain' when a reasonable consumer would rely on it in purchasing the product." Certification Reply at 39 (no citation given for quotation). They cite to the Court's MTD MOO for the proposition "that 'Natural American's additive-free descriptor on menthol cigarettes . . . misleads a reasonable consumer' and that the commingling of the menthol with the tobacco 'makes the menthol modifier inherently misleading.'" Certification Reply at 39 (quoting In re Santa Fe Nat. Tobacco, 288 F. Supp. 3d at 1241). Finally, they reiterate that their proposed damages model aligns with their liability theories and relies on common evidence, and that the willingness-to-pay and price-premium models are valid. See Certification Reply at 39-43.

**1. The Nationwide Menthol Subclass Members Are Readily Ascertainable Using Objective Criteria, but Administrative Feasibility Concerns Tilt Against a Conclusion that the Nationwide Menthol Subclass Satisfies Rule 23(b)(3)'s Predominance Requirement.**

81. The Defendants contend that, because the Plaintiffs have not proposed an administratively feasible method to ascertain class members, and because the class members' identities can be proven only on an individual basis, they have not met the ascertainability prerequisite to class certification. See Certification Opposition at 25-26 (citing Abraham v. WPX Prod. Prods., LLC, 317 F.R.D. at 254). Specifically, they assert that consumers purchase cigarettes from retailers, and not from the Defendants, and that the Defendants do not have information that identifies cigarette purchasers. See Certification Opposition at 26. According to the Defendants, this lack of information means that each class member must prove on an individual basis that he or she purchased the product for which that class member seeks damages, "focusing on evidence from each separate claimant." Certification Opposition at 26-27. They argue that, "where no objective records can reliably identify the purchasers of the retail product at issue . . . the ascertainability requirement is unsatisfied." Certification Opposition at 27 (citing In re Tropicana Orange Juice Mktg. & Sales Practices Litig., 2018 WL 497071, at *11 (D.N.J. January 22, 2018)(Martini, J.); Ault v. J.M. Smucker Co., 310 F.R.D. 69, 64-65 (S.D.N.Y. 2015) (Crotty, J.); In re Wellbutrin XL Antitrust Litig., 308 F.R.D. 134, 150 (E.D. Pa. 2015) (McLaughlin, J.); Bello v. Beam Glob. Spirits & Wine, Inc., 2015 WL 3613723, at *11 (D.N.J. June 9, 2015)(Hillman, J.); Randolph v. J.M. Smucker Co., 313 F.R.D. 679, 689-90 (S.D. Fla. 2014)(Bloom, J.). The Defendants note that, while the Plaintiffs have discussed a consumer mailing list, that list does not identify who purchased specifically which brands of Natural American cigarettes. See Certification Opposition at 28. Finally, the Defendants assert that a

"non-trial, post-litigation administrative process" would be inconsistent with Walmart Stores, Inc. v. Dukes' requirement that each class member's claim be proved, avoiding trials by formula. Certification Opposition at 29 (citing Walmart Stores, Inc. v. Dukes, 564 U.S. at 367).

82. The Plaintiffs respond that requiring an "'administratively feasible method of proving who purchased the products'" is a heightened ascertainably requirement which courts "routinely find . . . inconsistent with Rule 23." Certification Reply at 9 (quoting Certification Opposition at 25). They argue that the class "need only be readily identifiable according to objective criteria" and assert that their proposed classes are so identifiable. Certification Reply at 9. The Plaintiffs argue that, instead of requiring a heightened ascertainability requirement, Tenth Circuit law "has instead emphasized that the district court has significant discretion to determine the method for trial of a case based on its particular facts, including to certify classes as appropriate," and note that other Courts of Appeals are in accord with giving the district courts such discretion. Certification Reply ay 10 (citing Davoll v. Webb, 194 F.3d 1116 (10th Cir. 1999); Briseno v. ConAgra Foods, Inc., 844 F.3d 1121, 1123 (9th Cir. 2017); In re Petrobras Sec., 862 F.3d 250, 268 (2d Cir. 2017); Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc., 821 F.3d 992, 995-96 (9th Cir. 2016); Rikos v. Procter & Gamble Co., 799 F.3d 497, 525 (6th Cir. 2015); Mullins v. Direct Digital, LLC, 795 F.3d 654, 658 (7th Cir. 2015)). The Plaintiffs highlight the Third Circuit as being one of "a few courts" to have imposed an administratively-feasible requirement, Certification Reply at 10 (citing Byrd v. Aaron's Inc., 784 F.3d 154 (3d Cir. 2015)), and note that the Honorable Daniel D. Crabtree, United States District Judge for the United States District Court for the United States District of Kansas has "'predict[ed] that the Tenth Circuit, if confronted with this question, would decline to recognize ascertainability as a separate, unstated requirement of rule 23 requiring certification movants to satisfy the more

stringent ascertainability standard adopted by the Third Circuit,'" Certification Reply at 10 (quoting In re EpiPen Mktg., Sales Practices & Antitrust Litig., No. 17-md-2785-DDC-TJJ, 2020 WL 1180550, at *11 (D. Kan. March 10, 2020)(Crabtree, J.))(alteration added in Certification Reply). The Plaintiffs argue that class member identification, "as in similar class actions, can take place at the claims administration stage with self-identification using, *inter alia*, sworn affidavits, claim forms, receipts, and other purchase records." Certification Reply at 11. The Plaintiffs advocate against giving ascertainability "'absolute priority,'" as a heightened standard will be redundant to the other explicit rule 23 requirements. Certification Reply at 11 (quoting Mullins v. Direct Digital, LLC, 795 F.3d at 658). Finally, the Plaintiffs assert that the Defendants' reliance on Walmart Stores, Inc. v. Dukes is misplaced, because they have not proposed to use a sampling method to prove the class members' claims, which was the method with caused the Supreme Court to deny the use of trial by formula. See Certification Reply at 12; Walmart Stores, Inc. v. Dukes, 564 U.S. at 367. They also distinguish the Defendants' reliance on the Court's opinion in Abraham v. WPX Production Productions, LLC, given that there will be no "tracing problem" in identifying who purchased Natural American cigarettes, contrary to the difficult task of determining which leases' gas had been processed at which processing plants. Certification Reply at 12-13 (citing Abraham v. WPX Prod. Prods., LLC, 317 F.R.D. at 255).

83. As both the Plaintiffs and the Defendants have noted, the Court previously has used both the "objective criteria" and the "administratively feasible" standards in evaluating whether a proposed class is readily ascertainable. See Abraham v. WPX Prod. Prods., LLC, 317 F.R.D. at 254-58. In Abraham v. WPX Production Productions, LLC, the Court explains the ascertainability requirement's objectives:

> First, it eliminates "serious administrative burdens that are incongruous with the efficiencies expected in a class action" by insisting on the easy identification of class members. Marcus v. BMW of N. Am., LLC, 687 F.3d at 593 (quoting Sanneman v. Chrysler Corp., 191 F.R.D. 441, 446 (E.D. Pa.2000) (Van Antwerpen, J.)). Second, it protects absent class members by facilitating the "best notice practicable" under rule 23(c)(2) in a rule 23(b)(3) action. See Manual for Complex Litigation, § 21.222 (4th ed. 2004). Third, it protects defendants by ensuring that those persons who will be bound by the final judgment are clearly identifiable. See Xavier v. Phillip Morris USA, Inc., 787 F.Supp.2d 1075, 1089 (N.D.Cal.2011)(Alsup, J.)("Ascertainability is needed for properly enforcing the preclusive effect of final judgment. The class definition must be clear in its applicability so that it will be clear later on whose rights are merged into the judgment . . . ."); 1 William B. Rubenstein et al., Newberg on Class Actions, § 3:1 (5th ed.).

Abraham v. WPX Prod. Prods., LLC, 317 F.R.D. at 254. The Court notes in Abraham v. WPX Production Productions, LLC, that the proposed class "raises problematic ascertainability issues," notably that the plaintiffs could not identify which leases' gas had been delivered to certain processing plants for natural gas liquid extraction and marketing, because some gas was not processed at all, and some gas was collected and, in some cases, redirected to more than one plant. 317 F.R.D. at 254-257. The Court concludes in Abraham v. WPX Production Productions, LLC that the Court's inability to "determine where one substantial category of gas flowed renders the class unascertainable." 317 F.R.D. at 257 & n.63 (distinguishing Anderson Living Trust v. WPX Energy Production, LLC, 306 F.R.D. 312, where "individual issues surrounding which gas was processed did not prevent class certification," because the plaintiffs in that case did not "tie their class definition to the gas being processed at certain plants"). Additionally, the Court in Abraham v. WPX Production Productions, LLC notes that determining whether gas flowed through certain gathering systems would not be "'administratively feasible,'" which the Court defined as "'mean[ing] that identifying class members is a manageable process that does not require much, if any, individual factual inquiry.'"

317 F.R.D. at 258 (quoting Carrera v. Bayer Corp., 727 F.3d 300, 307-08 (3d Cir. 2013)). The Court cites additionally to EQT Production Co. v. Adair, 764 F.3d 347 (4th Cir. 2014), noting that the Fourth Circuit did not certify the proposed class on the basis of ascertainability, because, although "some class members were easy to identify . . . others 'could be determined by reference to local land records.'" Abraham v. WPX Prod. Prods., LLC, 317 F.R.D. at 258 (quoting EQT Prod. Co. v. Adair, 764 F.3d at 359). Further, even though the plaintiffs feasibly could have combed through the land records, "the Fourth Circuit concluded that it would 'be a complicated and individualized process,' which 'pose[s] a significant administrative barrier to ascertaining the ownership classes.'" Abraham v. WPX Production Productions, LLC, 317 F.R.D. at 258 (quoting EQT Prod. Co. v. Adair, 764 F.3d at 359)(alteration added in Abraham v. WPX Prod. Prods., LLC).

84. A split has developed among the Courts of Appeals whether to apply an administrative feasibility requirement for a proposed class.[61] The Third Circuit developed its ascertainability analysis first in Marcus v. BMW of N. Am., LLC, 687 F.3d 583, where it insisted on administrative feasibility and the need for "easy identification of class members." 687 F.3d at 593 (citing Sanneman v. Chrysler Corp., 131 F.R.D. at 446). This requirement is a more stringent standard than that which other courts use to determine ascertainability. See C. Wright & A. Miller, Federal Practice & Procedure § 1760 & n.13 (4th ed. 2023)(calling the Third Circuit's requirement "enhanced"). The Third Circuit, in remanding the case, cautioned "against approving a method that would amount to no more than ascertaining by potential class members' say so . . . . Forcing [defendants] to accept as true absent persons' declarations that

[61]The United States Court of Appeals for the D.C. Circuit and the United States Court of Appeals for the Federal Circuit have not addressed whether to include an administrative feasibility requirement in the ascertainability analysis.

they are members of the class, without further indicia of reliability, would have serious due process implications." Marcus v. BMW of N. Am., LLC, 687 F.3d at 594. "'Administrative feasibility means that identifying class members is a manageable process that does not require much, if any, individual factual inquiry.'" Carrera v. Bayer Corp., 727 F.3d at 307-08 (quoting Newberg on Class Actions § 3:3). The Third Circuit in Carrera v. Bayer Corp. rejected the plaintiff's arguments that: (i) the claims' low value would mean that class members likely would not submit fraudulent affidavits; (ii) determining a fixed liability amount would prevent prejudice to the defendant and, thus, the Third Circuit should relax the ascertainability requirement; and (iii) screening methods could weed out unreliable affidavits. See 727 F.3d at 309-12. The First Circuit cited Carrera v. Bayer Corp. positively, noting that, "[a]t the class certification stage, the court must be satisfied that, prior to judgment, it will be possible to establish a mechanism for distinguishing the injured from the uninjured class members. The court may proceed with certification so long as this mechanism will be 'administratively feasible' . . . ." In re Nexium Antitrust Litig., 777 F.3d 9, 19 (1st Cir. 2015)(quoting Carrera v. Bayer Corp., 727 F.3d at 307). As mentioned above, the Fourth Circuit previously vacated and remanded the district court's class certification, because the certified class was not ascertainable. See EQT Prod. Co. v. Adair, 764 F.3d at 359-60. In explaining the ascertainability standard, the Fourth Circuit cited Wright & Miller's Federal Practice & Procedure for the proposition that "'[t]he requirement that there be a class will not be deemed satisfied unless . . . it is administratively feasible for the court to determine whether a particular individual is a member.'" EQT Prod. Co. v. Adair, 764 F.3d at 358 (quoting Federal Practice & Procedure § 1760). See Krakauer v. Dish Network, LLC, 925 F.3d 643, 658 (4th Cir. 2019)("The goal is not to 'identify every class member at the time of certification,' . . . but to define a class in such a

way as to ensure that there will be some 'administratively feasible [way] for the court to determine whether a particular individual is a member' at some point." (quoting EQT Prod. Co. v. Adair, 764 F.3d at 358)).

85. Other Courts of Appeals, on the other hand, have opted not to apply an administrative feasibility requirement. The Seventh Circuit, for example, has specifically rejected heightening the ascertainability requirement, stating that the administratively feasible requirement "erect[s] 'a nearly insurmountable hurdle' for class certification," and "'does not further any interest of Rule 23 that is not already adequately protected by the Rule's explicit requirements . . . . The stringent version of ascertainability effectively bars low-value consumer class actions, at least where plaintiffs do not have documentary proof of purchases, and sometimes even when they do.'" Federal Practice & Procedure § 1760 (quoting Mullins v. Direct Digital, LLC, 795 F.3d 654, 662 (7th Cir. 2015), cert. denied 136 S. Ct. 1161). Other Courts of Appeals also have rejected the heightened requirement. For example, the Second Circuit notes that "creating [an administrative feasibility prerequisite] would upset the careful balance of competing interests codified in the explicit requirements of Rule 23. In declining to adopt an administrative feasibility requirement, we join a growing consensus that now includes the Sixth, Seventh, Eighth, and Ninth Circuits." In re Petrobras Secs., 862 F.3d at 265, 268 (citing Briseno v. ConAgra Foods, Inc., 844 F.3d at 1123 (stating that "[w]e have never interpreted Rule 23 to require such a showing [of administrative feasibility], and, like the Sixth, Seventh, and Eighth Circuits, we decline to do so now," but also noting that administrative feasibility is a factor to consider in determining predominance and superiority); Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc., 821 F.3d at 995-96 ("Since Ihrke [v. N. States Power Co., 459 F.2d 566 (8th Cir.1972)], this court has not addressed ascertainability as a separate,

preliminary requirement. Rather, this court adheres to a rigorous analysis of the Rule 23 requirements, which includes that a class 'must be adequately defined and clearly ascertainable.'" (quoting Ihrke v. N. States Power Co., 459 F.2d at 573 n.3)); Rikos v. Procter & Gamble Co., 799 F.3d at 525 ("We see no reason to follow *Carrera*, particularly given the strong criticism it has attracted from other courts."), cert. denied, 136 S. Ct. 1493 (2016); Mullins v. Direct Digital, LLC, 775 F.3d at 657-58 (stating that "[w]e decline to [apply an administrative feasibility requirement] and will stick with our settled law. Nothing in Rule 23 mentions or implies this heightened requirement under Rule 23(b)(3), which has the effect of skewing the balance that district courts must strike when deciding whether to certify classes," and noting that rule 23's existing requirements "already address the balance of interests that Rule 23 is designed to protect"); Byrd v. Aaron's Inc., 784 F.3d at 177 (Rendell, J., concurring)(suggesting that the Third Circuit eliminate the administrative feasibility prong)).

86. The Fifth Circuit has applied the administrative feasibility standard in some cases, but not in others. In Seeligson v. Devon Energy Production Co., 761 F. App'x 329 (5th Cir. 2019), the Fifth Circuit concludes that the lower court "did not abuse its discretion in determining that the class . . . was ascertainable." 761 F. App'x at 334. In reaching that conclusion, the Fifth Circuit states that it "has not adopted [the Third Circuit's] heightened standard" in Carrera v. Bayer Corp., although the standard to which the Fifth Circuit refers states that a plaintiff must show, "'by a preponderance of the evidence, that the class is '*currently* and readily ascertainable based on objective criteria.''" Seeligson v. Devon Energy Prod. Co., 761 F. App'x at 334 (quoting Carrera v. Bayer Corp., 727 F.3d at 306 (quoting Marcus v. BMW of N. Am., 687 F.3d at 593))(emphasis added in Seeligson v. Devon Energy Prod. Co.). The Fifth Circuit also notes that it is "not convinced" by the defendant's argument "that Plaintiffs'

proposed alternative -- reviewing property and title records -- is not administratively feasible and therefore fails to satisfy Rule 23's ascertainability requirements." Seeligson v. Devon Energy Prod. Co., 761 F. App'x at 334 n.22. More recently, however, the Fifth Circuit stated that, "[u]ltimately, 'the touchstone of ascertainability is whether the class is 'sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member.''" A.A. by and through P.A. v. Phillips, No. 21-30580, 2013 WL 334010, at *2 (5th Cir. January 20, 2023)(quoting Brecher v. Republic of Argentina, 806 F.3d 22, 24 (2d Cir. 2015)(quoting Federal Practice & Procedure, supra § 1760)).[62] The Fifth Circuit in A.A. by and through P.A. v. Phillips, however, did not determine that the proposed class was not ascertainable on administrative feasibility grounds, but because the district court's class definition was "too vague to identify class members." 2023 WL 334010, at *3.

87. Finally, the Tenth Circuit only tangentially has referred to the Third Circuit's heightened standard. In In re Urethane Antitrust Litigation, 768 F.3d 1245 (10th Cir. 2014), for example, the defendant cited Carrera v. Bayer Corp. in asserting "an interest in the allocation of damages to ensure that all class members are bound by the judgment." In re Urethane Antitrust Litig., 768 F.3d at 1269. The Tenth Circuit states that Carrera v. Bayer Corp. is inapplicable in that context:

> *Carrera v. Bayer Corp.* likewise involved a class-wide judgment with an uncertain binding effect. 727 F.3d 300, 310 (3d Cir. 2013). The class there had been decertified because there was insufficient evidence of an ascertainable class. As a result, the class members could argue that they were not bound by the judgment. *Id.*
>
> Unlike the defendants in . . . *Carrera*, Dow has not identified any reason

[62]The Second Circuit issued its opinion in Brecher v. Republic of Argentina in 2015, two years before its opinion in In re Petrobras Secs., where it explicitly declined to apply the administrative feasibility requirement. See In re Petrobras Secs., 862 F.3d at 265

to believe that the judgment here would fail to bind all class members.

768 F.3d at 1269. The only other case in which the Tenth Circuit has referenced the administrative feasibility requirement is in Davoll v. Webb, in which it concludes that the district court did not abuse its discretion in determining that "the individualized consideration required to determine whether each class member was disabled under the ADA rendered the proposed definition 'untenable.'" 194 F.3d at 1146 (quoting Davoll v. Webb, 160 F.R.D. 142, 146 (D. Colo. 1995)(Kane, Sr. J.)). The Tenth Circuit notes that "'[t]he district court has broad discretion to determine whether the class description is sufficiently definite,'" Davoll v. Webb, 194 F.3d at 1146 (quoting Moore's Federal Practice § 23.21[5] at 23-61), and, accordingly, "it was within the district court's discretion to decide that determining class membership under the proposed definition would be administratively infeasible," 194 F.3d at 1146. Thus, although the Tenth Circuit has not adopted the Third Circuit's administrative feasibility requirement, it has made clear that the district courts do not err when they determine that individualized inquiries render class certification administratively infeasible.

88. As the Court notes above, it has considered ascertainability once before this case, in Abraham v. WPX Prods. Prod., LLC, where the Court concluded that the class was not ascertainable, because "no existing database can identify the proposed class. Moreover, it is not feasible for the Court to identify which wells' gas was processed in each year. Doing so is an individual and time-consuming inquiry."[63] 317 F.R.D. at 258. Within the Tenth Circuit, several

[63]On reconsideration, the plaintiffs submitted a new proposed class definition, which the Court determined was ascertainable, because "the Defendants appear to have records showing who they pay on the keep-whole methodology, [and so] there is 'a readily discernible, clear, and precise statement of the parameters defining the class or classes to be certified.'" Abraham v. WPX Energy Prod., LLC, 322 F.R.D. 592, 642 (D.N.M. 2017)(Browning, J.)(quoting Wachtel v. Guardian Life Ins. Co., 453 F.3d 179, 187 (3d Cir. 2006)).

district courts -- in addition to the Court -- have addressed whether to apply the administrative feasibility requirement. In Smith v. LifeVantage Corp., 341 F.R.D. 82 (D. Utah 2022), the Honorable David B. Barlow, United States District Judge for the United States District Court for the United States District of Utah, reviewed the same Court of Appeals split that the Court has reviewed above. See 341 F.R.D. at 91-96. Judge Barlow states that "the court need not resolve the issue [of which ascertainability standard to apply and whether ascertainability is required] because the substance of those concerns either are not present here or are relevant to and addressed by the predominance and superiority requirements." 341 F.R.D. at 94. Although he does not adopt the administrative feasibility requirement, Judge Barlow considers any administrative feasibility question to be inherent to the predominance and superiority analysis, stating:

> [T]he court finds that whether identifying which distributors meet the class criterion of financial loss at the damages stage is administratively feasible depends on whether it can be done without destroying the predominance of common issues or the superiority of the class action mechanism. If common issues predominate and a class action would be superior despite the need for individualized damages determinations, the court would be reluctant to declare those individualized determinations an administratively infeasible method for ascertaining class membership. On the other hand, if the individualized damages determinations needed to identify class members destroy the predominance of common issues and superiority of the class action, identifying class members would be de facto administratively infeasible.
>
> Therefore, whether the proposed class is ascertainable will rise or fall with the court's findings regarding predominance and superiority. For that reason, the court declines to deny certification in this case on grounds of ascertainability alone.

341 F.R.D. at 96. In Evans v. Brigham Young University, Case No. 1:20-CV-100-TS, 2022 WL 596862 (D. Utah February 28, 2022), however, the Honorable Ted Stewart, United States District Judge for the United States District Court for the United States District of Utah,

acknowledges the different requirements between the Third and Seventh Circuits, but concludes that the plaintiffs in that case did not demonstrate ascertainability under either an administrative-feasibility theory or under an objective-criteria theory. See 2022 WL 596862, at *3-*4. In Lavigne v. First Community Bancshares, Inc., No. 1:15-cv-00934-WJ/LF, 2018 WL 2694457 (D.N.M. June 5, 2018), the Honorable William P. Johnson, Chief United States District Judge for the United States District Court for the United States District of New Mexico, states that, "[f]or a class definition to be ascertainable, identifying class members must be administratively feasible," but concluded that ascertaining the proposed class members in that case was administratively feasible. 2018 WL 2694457, at *7. Courts within each of Oklahoma's three judicial districts also have applied the administrative feasibility requirement. See Cline v. Sunoco, Inc., 333 F.R.D. 676, 688 (E.D. Okla. 2019)(Gibney, J.)(citing Federal Practice & Procedure, supra § 1760; Carrera v. Bayer Corp., 727 F.3d at 306-07); In re Cox Enterprises, Inc. Set-Top Cable Television Box Antitrust Litig., No. 12-ML-2048-C, 2014 WL 104964, at *2 (W.D. Okla. January 9, 2014)(Cauthron, J.)(quoting Hayes v. Wal-Mart Stores, Inc., 725 F.3d 349, 355 (3d Cir. 2013)); Cole v. ASARCO Inc., 256 F.R.D. 690, 696 (N.D. Okla. 2009)(Frizzell, J.)(quoting Joseph v. Gen. Motors Corp., 109 F.R.D. 635, 639 (D. Colo. 1986)(Kane, J.); Cherokee Nation of Oklahoma v. United States, 199 F.R.D. 357, 360 (E.D. Okla. 2001)(Seay, J.)). Finally, the Honorable Nancy D. Freudenthal, Chief United States District Judge for the United States District Court for the District of Wyoming, has cited Carrera v. Bayer Corp. for the proposition that a class must be readily ascertainable, "such that the Court can easily understand who and what is in, or our of, the class," and has offered plaintiffs seeking class certification an opportunity to revise the class definition "to be sufficiently precise and objective so that it is administratively feasible for the Court to ascertain" who are the class members. Belmont v. BP

Am. Prod. Co., No. 13-CV-0063, 2015 WL 11019026, at *5 (D. Wyo. January 8, 2015) (Freudenthal, C.J.)(citing Carrera v. Bayer Corp., 727 F.3d at 305-12).

89. When determining whether identifying a proposed class' members is administratively feasible, the Third Circuit has stated that "[a]ffidavits from potential class members, standing alone, without 'records to identify class members or a method to weed out unreliable affidavits,' will not constitute a reliable and administratively feasible means of determining class membership." City Select Auto Sales Inc. v. BMW Bank of N. Am. Inc., 867 F.3d 434, 441 (3d Cir. 2017)(quoting Byrd v. Aaron's Inc., 784 F.3d at 171). "Some courts have held that where nothing in company databases shows or could show whether individuals should be included in the proposed class, the class definition fails." Marcus v. BMW of N. Am., LLC, 687 F.3d at 593 (citing Clavell v. Midland Funding LLC, No. 10–3593, 2011 WL 2462046, at *4 (E.D. Pa. June 21, 2011)(Dalzell, J.); Sadler v. Midland Credit Mgmt., Inc., No. 06–C–5045, 2008 WL 2692274, at *5 (N.D. Ill. July 3, 2008)(Pallmeyer, J.); In re Wal–Mart Stores, Inc. Wage & Hour Litig., No. C 06–2069 SBA, 2008 WL 413749, at *8 (N.D. Cal. February 13, 2008)(Armstrong, J.); Deitz v. Comcast Corp., No. C 06–06352 WHA, 2007 WL 2015440, at *8 (N.D. Cal. July 11, 2007)(Alsup, J.)). In Meyer v. BMW of North America, LLC, the Third Circuit concluded that a class definition of BMW owners whose tires had gone flat and been replaced was not administratively feasible, given that BMW did not have records of all BMW owners whose tires fit that definition, because not all BMW owners went to the dealership to replace their tires. 687 F.3d at 593-94. The Third Circuit also "caution[s] . . . against approving a method that would amount to no more than ascertaining by potential class members' say so. For example, simply having potential class members submit affidavits that their Bridgestone RFTs have gone flat and been replaced may not be 'proper or just.'" Meyers v. BMW of N.

Am., LLC, 687 F.3d at 594 (citing Xavier v. Philip Morris USA Inc., 787 F. Supp. 2d 1075, 1089 (N.D. Cal. 2011)(Alsup, J.)(concluding that the plaintiffs' proposed class definition was not ascertainable, because, "[u]nlike in many cases, there are no defendant records on point to identify class members," and because individual affidavits regarding the number of cigarettes a potential class member has smoked are unreliable)). That a defendant does not have reliable records with which plaintiffs can identify readily the proposed class members does not relieve those plaintiffs of their burden to meet the ascertainability requirement. See Hayes v. Wal-Mart Stores, Inc., 725 F.3d at 356.

90. As the Seventh Circuit has noted, the administrative feasibility requirement erects a high barrier for potential class actions, particularly in the low-value consumer class action context. See Mullins v. Direct Digital, LLC, 795 F.3d at 662 ("[S]ome courts have used [the administrative feasibility] requirement to erect a nearly insurmountable hurdle at the class certification stage in situations where a class action is the only viable way to pursue valid but small individual claims."). This assertion has proven true in several consumer class actions regarding products like orange juice, see In re Tropicana Orange Juice Mktg. & Sales Practices Litig., 2018 WL 497071, at *11 (rejecting a proposed class, because several orange juice retailers did not maintain adequate records regarding who purchased their products), cooking oil, see Ault v. J.M. Smucker Co., 310 F.R.D. at 64-65 (concluding that a proposed class of consumers who purchased a certain cooking oil brand was not ascertainable where defendant did not sell its products to end users and defendant sold multiple brands with different labels at different times), and beverages, see Bello v. Beam Glob. Spirits & Wine, Inc., 2015 WL 3613723, at *9-12 (rejecting the use solely of claim forms without verifiable records or documents, and asserting that "acceptance of receipts as evidence of purchase would not necessarily prevent the

submission of fraudulent claims"). The Seventh Circuit notes that, although courts "must consider 'the likely difficulties in managing a class action,' . . . in doing so [they] must balance countervailing interests to decide whether a class action 'is superior to other available methods for fairly and efficiently adjudicating the controversy.'" Mullins v. Direct Digital, LLC, 795 F.3d at 658 (quoting Fed. R. Civ. P. 23(b)(3)).

91. Judges within the Third Circuit have echoed the Seventh Circuit's concerns that requiring plaintiffs to meet an administrative feasibility requirement "undermines the 'very core' of cases that the class action device was designed to bring to court: cases where many consumers have been injured, but none have suffered enough to make individual actions possible." City Select Auto Sales Inc. v. BMW Bank of N. Am. Inc., 867 F.3d at 444 (Fuentes, J., concurring); Byrd v. Aaron's Inc., 784 F.3d at 172 (Rendell, J., concurring). The Honorable Julio M. Fuentes, United States Circuit Judge for the Third Circuit, has argued that administrative feasibility is not necessary to serve the values which the Third Circuit in Marcus v. BMW of N. Am., LLC recognized -- namely "absent plaintiffs' opt-out rights and interest in not having future claims diluted," "a defendant's due process rights," and "the efficiency of the class action mechanism" -- because rule 23's existing predominance and superiority requirements already protect those values sufficiently. City Select Auto Sales Inc. v. BMW Bank of N. Am. Inc., 867 F.3d at 444 (Fuentes, J., concurring). Judge Fuentes notes first that the concern that false or fraudulent claims will dilute absent class members' recovery is misaligned with class administration's reality, because: (i) the number of eligible class members who submit claims in most consumer cases is low, so fraudulent claims are unlikely to dilute class members' recovery; (ii) "'[t]he chances that someone would, under penalty of perjury, sign a false affidavit stating that he or she bought Bayer aspirin for the sake of receiving a windfall of $1.59 are far-fetched at

best,'" City Select Auto Sales Inc. v. BMW Bank of N. Am. Inc., 867 F.3d at 444-45 (Fuentes, J., concurring)(quoting Byrd v. Aaron's Inc., 784 F.3d at 175 (Rendell, J., concurring))(alteration in City Select Auto Sales Inc. v. BMW Bank of N. Am. Inc., but not in Byrd v. Aaron's Inc.)(citing Briseno v. ConAgra Foods, Inc., 844 F.3d at 1130); (iii) courts have tools to screen fraudulent claims, such as claims administrators, audits, random sampling to detect fraud, and follow-up notices, among other techniques; and (iv) the Third Circuit accepts cy pres remedies in class actions, which allow "the distribution of unclaimed class action damages to non-class members," City Select Auto Sales Inc. v. BMW Bank of N. Am. Inc., 867 F.3d at 444-45 (Fuentes, J., concurring)(quoting Briseno v. ConAgra Foods, Inc., 844 F.3d at 1129)(citing Mullins v. Direct Digital, LLC, 795 F.3d at 667; Newberg on Class Actions § 12:32; In re Baby Prod. Antitrust Litig.y Prod. Antitrust Litig., 708 F.3d 163, 172 (3d Cir. 2013); Geoffrey C. Shaw, Note, Class Ascertainability, 124 Yale L.J. 2354, 2371 (2015)).

92. Second, Judge Fuentes asserts that the arguments that an administrative feasibility requirement protects defendants by identifying clearly those plaintiffs whom the final judgment binds and by securing the defendant's due process right to raise individual defenses are flawed. See City Select Auto Sales Inc. v. BMW Bank of N. Am. Inc., 867 F.3d at 446. Judge Fuentes asserts that the existing objective-criteria requirement, which demands that "a class must be defined in reference to objective criteria, already allows courts to determine whether a plaintiff in a future action was a member of a prior class and thus is precluded from relitigation." City Select Auto Sales Inc. v. BMW Bank of N. Am. Inc., 867 F.3d at 446 (Fuentes, J., concurring)(citing Briseno v. ConAgra Foods, Inc., 844 F.3d at 1130 n.9). Additionally, he asserts that a defendant may challenge individual class members and individual damages later in the litigation, and "does not have a due process right to the most '*cost-effective*' method for

challenging individual claims . . . and these challenges are more appropriately addressed after certification." City Select Auto Sales Inc. v. BMW Bank of N. Am. Inc., 867 F.3d at 447 (Fuentes, J., concurring)(citing Mullins v. Direct Digital, LLC. 795 F.3d at 671 (italics added in City Select Auto Sales Inc. v. BMW Bank of N. Am. Inc.); Briseno v. ConAgra Foods, Inc., 844 F.3d at 1132; Wal-Mart Stores Inc. v. Dukes, 564 U.S. at 364-65).

93. Judge Fuentes asserts finally that rule 23(b)'s superiority requirement addresses already any efficiency concerns. "Specifically, Rule 23(b)(3) requires that the class device be 'superior to other available methods for fairly and efficiently adjudicating the controversy' and considers 'the likely difficulties in managing a class action.' Thus, imposing a separate manageability requirement within ascertainability 'renders the manageability criterion of the superiority requirement superfluous.'" City Select Auto Sales Inc. v. BMW Bank of N. Am. Inc., 867 F.3d at 447 (Fuentes, J., concurring)(quoting Fed. R. Civ. P. 23(b); Mullins v. Direct Digital, LLC, 795 F.3d at 663 (citing Daniel Luks, Note, Ascertainability in the Third Circuit: Name That Class Member, 82 Fordham L. Rev. 2359, 2395 (2014))). Judge Fuentes notes that courts must "weigh the costs *and* benefits of certification," and that placing the administrative feasibility requirement in the ascertainability analysis as a prerequisite "forces courts to consider the costs 'in a vacuum' without considering the realistic alternatives available to plaintiffs for bringing their claims." City Select Auto Sales Inc. v. BMW Bank of N. Am. Inc., 867 F.3d at 447 (Fuentes, J., concurring)(quoting Mullins v. Direct Digital, LLC, 795 F.3d at 663)(emphasis in original). Judge Fuentes asserts that district courts are capable of managing their cases at the claims administration stage, and should be permitted to wait until the claims administration process has begun, "'when much more may be known about available records, response rates, and other relevant factors'" to determine whether to decertify a class, in the event that the class

becomes unmanageable. City Select Auto Sales Inc. v. BMW Bank of N. Am. Inc., 867 F.3d at 448 (Fuentes, J., concurring)(quoting Mullins v. Direct Digital, LLC, 798 F.3d at 664)(citing Carrera v. Bayer Corp., Br. of Amici Curiae Professors of Civil Procedure & Complex Litigation at 7-8; Byrd v. Aaron's Inc., 784 F.3d at 175).

94. While an administrative feasibility requirement is not an express requirement in rule 23's language, it is built into 23(b)(3)(D). Rule 23(b)(3) states:

> The matters pertinent to [the predominance and superiority] findings include
>
> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3). Determining whether a proposed class's members will be administratively feasible is a question inherent to the Court's consideration of "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(D). Further, although the ascertainability requirement threatens to block some low-value consumer classes from certification, it by no means blocks all -- just some. The choice is really between considering the difficulties in managing a class action now and the difficulty of identifying class members now, or kicking the issue down the road to the claim administration stage -- which is after the case has been certified. This gives plaintiffs the advantage of trying to secure a settlement without the district court ever deciding the difficulties in managing a class action. While plaintiffs prefer not to bother about the difficulties of managing a class action, the rule requires the district court to

consider difficulties at class certification, and not just postpone them.

95. An administrative-feasibility requirement does not endanger all low-value consumer classes. In many low-value consumer cases, the consumer is readily ascertainable and administratively feasible to identify. The requirement only endangers classes where the consumers are not ascertainable. Many times, the defendant knows its customers, and the information can be ascertained from the defendant's documents. It is only cases where the actual consumer cannot be ascertained that this requirement creates problems. And when it does create problems, the question is why the class action -- largely manufactured by attorneys -- should go forward when the actual victims cannot be determined.

96. On a clean slate, as the Court did in Abraham v. WPX Production Productions, LLC, the Court would adopt the Third Circuit's administrative-feasibility requirement.[64] Given, here, the extensive debate in the Court of Appeals, the Court does not believe the Tenth Circuit will follow the Third Circuit's rule. The Court determines that it is more likely that the Tenth Circuit will conclude that administrative feasibility is a part of the rule 23(b)(3)(A)-(D) considerations, and, accordingly, weigh administrative feasibility in its analysis of rule 23(b)(3)'s

[64]The Court would adopt the Third Circuit's rule for similar reasons that the Third Circuit identified in announcing the rule. See Marcus v. BMW of N. Am., LLC, 687 F.3d at 593. First, an administrative-feasibility requirement ensures that the Court and the parties easily can identify class members. Engaging in prolonged class certification litigation only to end up with a claims administration process that struggles to identify class members without engaging in individualized inquiries is not an efficient use of time and resources. Second, an administrative feasibility requirement protects class members' rights, because such a requirement limits fraudulent claims and ensures that only valid class members obtain relief, which is important particularly where defendants are ordered to pay a lump-sum judgment of which each class member takes a share. Third, an administrative feasibility requirement protects defendants' rights, because requiring clear records and documentation avoids "mask[ing] individual issues" and enables defendants to exercise their rights under the Seventh Amendment to challenge individual claimants. Carrera v. Bayer Corp., 727 F.3d at 307.

predominance and superiority analysis, but not view administrative feasibility as a prerequisite the failure of which dooms a proposed class.[65] The Defendants raise their administrative

---

[65]In this regard, the Court predicts that the Tenth Circuit will align with the Eleventh Circuit's formulation of this rule, and determine that ascertainability requires a class definition that relies on objective criteria, but that the 23(b)(3) predominance and superiority analyses encompass the administrative feasibility determinations. See Shook v. El Paso Cnty., 386 F.3d 963, 972 (10th Cir. 2004)(listing "identifiability" as one of rule 23(b)(3)'s elements); Cherry v. Dometic Corp., 986 F.2d 12996, 1301-05 (11th Cir. 2021). In Cherry v. Dometic Corp., the Eleventh Circuit concludes that ascertainability is a rule 23(a) prerequisite and that administrative feasibility is not relevant to ascertainability, but rather is a part of a court's consideration under rule 23(b)(3)(D)'s manageability criteria. See 986 F.3d at 1303-05. The Eleventh Circuit notes that it previously applied an administrative feasibility requirement in Karhu v. Vital Pharms., Inc., 621 F. App'x 945, 946 (11th Cir. 2015)(citing Bussey v. Macon Cnty. Greyhound Park, Inc., 562 F. App'x 782, 787 (11th Cir. 2014)), but that this line of cases is unpublished and therefore not binding precedent. See Cherry v. Dometic Corp., 986 F.3d at 1302. In walking back from its previous analysis, the Eleventh Circuit states:

> Our ascertainability precedents though do not mandate proof of administrative feasibility. A class is "clearly ascertainable" if we are certain that its membership is "capable of being" determined. *Ascertain*, *Webster's New International Dictionary* (3d ed. 1993); *Ascertainable*, *Webster's New International Dictionary* (3d ed. 1993). But membership can be capable of determination without being capable of *convenient* determination. Administrative feasibility is not an inherent aspect of ascertainability.
>
> . . . .
>
> Administrative feasibility does not follow from the text of Rule 23(a). Unlike traditional ascertainability, administrative feasibility does not bear on the ability of a district court to consider the enumerated elements of that subsection. A plaintiff proves administrative feasibility by explaining how the district court can locate the remainder of the class *after* certification. *See, e.g.*, *In re Cmty. Bank of N. Va. Mortg. Lending Pracs. Litig.*, 795 F.3d 380, 396-97 (3d Cir. 2015). The plaintiff satisfies this requirement if the district court concludes that the proposed process will be manageable and successful. *Byrd*, 784 F.3d at 163-64. But neither foreknowledge of a method of identification nor confirmation of its manageability says anything about the qualifications of the putative class representatives, the practicability of joinder of all members, or the existence of common questions of law or fact. Fed. R. Civ. P. 23(a). Because administrative feasibility has no connection to Rule 23(a), it is not part of the ascertainability inquiry.

Nor does a requirement of administrative feasibility follow from Rule 23(b). To be sure, administrative feasibility has relevance for Rule 23(b)(3) classes, in the light of the manageability criterion of Rule 23(b)(3)(D). *See* Rubenstein, 2 *Newberg on Class Actions* § 4:76, at 301 (5th ed. 2012). Rule 23(b)(3)(D) instructs the district court, in deciding whether "a class action [would be] superior to other available methods for fairly and efficiently adjudicating the controversy," to consider "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3). A difficulty in identifying class members is a difficulty in managing a class action. *See Briseno*, 844 F.3d at 1126. But because Rule 23(b)(3) requires a balancing test, it does not permit district courts to make administrative feasibility a requirement. The manageability inquiry focuses on whether a class action "will create relatively more management problems than any of the alternatives," not whether it will create manageability problems in an absolute sense. *Klay v. Humana, Inc.*, 382 F.3d 1241, 1273 (11th Cir. 2004), *abrogated in part on other grounds by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 . . . (2008). And the district court must balance its manageability finding against other considerations. Fed. R. Civ. P. 23(b)(3). So administrative difficulties -- whether in class-member identification or otherwise -- do not alone doom a motion for certification. Indeed, we have made clear that manageability problems will "rarely, if ever, be in [themselves] sufficient to prevent certification." *Klay*, 382 F.3d at 1272.

Cherry v. Dometic Corp., 986 F.3d at 1303-04 (emphasis and alterations in original). This formulation is a variance from the Court's earlier writing on the subject in Abraham v. WPX Production Productions, LLC, in which the Court determined that administrative feasibility issues in identifying which gas was processed in which processing plants prevented the proposed class from meeting the ascertainability requirement. See Abraham v. WPX Prod. Prods., LLC, 317 F.R.D. at 254-58. In its analysis in that case, the Court references rule 23(c)'s requirement that the Court "'define the class and the class claims, issues, or defenses.'" Abraham v. WPX Prod. Prods., LLC, 317 F.R.D. at 254 (quoting Fed. R. Civ. P. 23(c)). The Court next asserts that "[a]nother 'essential' prerequisite to a rule 12(b)(3) class action is that the 'class must be currently and readily ascertainable based on objective criteria.'" Abraham v. WPX Prod. Prods., LLC, 317 F.R.D. at 254 (quoting Marcus v. BMW of N. Am., LLC, 687 F.3d at 592-93). The objective criteria which the Court references stand in opposition to subjective criteria, such as a class composed of individuals "'who 'believe' they were discriminated against." Abraham v. WPX Prod. Prods., LLC, 317 F.R.D. at 254 (quoting Chiang v. Veneman, 385 F.3d 256, 271 (3d Cir. 2004)). The Court finally states that, "'[i]f class members are impossible to identify without extensive and individualized factfinding or 'mini-trials,' then a class action is inappropriate.'" Abraham v. WPX Prod. Prods., LLC, 317 F.R.D. at 254 (quoting Marcus v. BMW of N. Am., LLC, 687 F.3d at 593). The Court's subsequent analysis includes a reference to Carrera v. Bayer Corp.'s administrative-feasibility language alongside a consideration of the administrative difficulties in identifying which gas flowed to which wells, at the conclusion of which the Court states that "identify[ing] which wells' gas was processed in each year . . . is an individual and time-consuming inquiry." Abraham v. WPX Prod. Prods, LLC, 317 F.R.D. at 258. Although the

feasibility argument under the predominance umbrella, see Certification Opposition at 25, and so the Court here considers administrative feasibility as part of its predominance analysis, rather than as part of the ascertainability prerequisite.

---

Court frames its analysis in Abraham v. WPX Production Productions, LLC, as an ascertainability question, given the extensive review of the caselaw the Court has performed in the text above, the Court concludes that the Tenth Circuit would find that administrative feasibility is more appropriately a predominance and superiority analysis, investigating whether identifying which wells' gas was processed where would be an individualized and time-consuming inquiry, such that the individualized questions predominate over any common questions, and whether the class action is the superior vehicle for the plaintiffs to bring their claims. Although the Court now believes the Tenth Circuit would consider the Court's analysis in Abraham v. WPX Production Productions, LLC, to be an analysis under rule 23(b)(3) -- predominance and superiority -- rather than 23(c) -- ascertainability -- the Court would have reached the same conclusion in that case, given the overwhelming administrative difficulties in identifying the processed gas's source wells.

While the Court still thinks that the Third Circuit's rule is the best, the Court believes the Tenth Circuit will not adopt that rule, so the Court clarifies here the basic analysis for a proposed rule 23(b)(3) class that it believes the Tenth Circuit will use. Rule 23(c) requires the Court to "define the class" in its class certification order. Fed. R. Civ. P. 23(c)(1)(B). When identifying definiteness, "Courts generally treat the requirement as a precursor to Rule 23 and therefore examine the implicit requirements before proceeding to the Rule's explicit requirements." Newberg on Class Actions § 3:3. Additionally, "[a]ll courts essentially focus on the question of whether the class can be ascertained by objective criteria. A class definition that depends on subjective criteria, such as class members' state of mind, will fail for lack of definiteness." Newberg on Class Actions § 3:3. After determining the proposed class' definiteness -- because the class is or is not ascertainable on the basis of objective criteria -- the Court examines the explicit rule 23(a) requirements: numerosity, commonality, typicality, and adequacy. See Fed. R. Civ. P. 23(a). Once the Court has determined that the proposed class satisfies the rule 23(a) criteria, the Court turns to the rule 23(b)(3) predominance and superiority requirements, which direct the Court to consider, among other factors, "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(D). In analyzing the likely difficulties in managing the class action, the Court considers whether it will be administratively feasible for each proposed class member to prove that they are a class member. Even where a proposed class relies on objective criteria for its definition -- in Abraham v. WPX Production Productions, LLC, whether gas was processed at a particular plant -- determining whether an individual proposed class member satisfies those objective criteria may be so burdensome or require significant individualized inquiry such that the individualized inquiries predominate over common questions or the class action is not superior to other adjudication methods -- the case in Abraham v. WPX Production Productions, LLC, where the Court determined that identifying where each wells' gas was processed would have been "an individual and time-consuming inquiry. Abraham v. WPX Prod. Prods., LLC, 317 F.R.D. at 258.

97. The Defendants assert that consumers purchase cigarettes from retailers, and not from the Defendants and that the Defendants do not have information that identifies cigarette purchasers. See Certification Opposition at 26. According to the Defendants, this lack of information means that each class member must prove on an individual basis that he or she purchased the product for which that class member seeks damages. See Certification Opposition at 26-27. The Defendants note that, while the Plaintiffs have discussed a consumer mailing list, that list does not identify who purchased specifically which brands of Natural American cigarettes. See Certification Opposition at 28. The Plaintiffs argue that class member identification, "as in similar class actions, can take place at the claims administration stage with self-identification using, *inter alia*, sworn affidavits, claim forms, receipts, and other purchase records." Certification Reply at 11 (italics in original). They also distinguish the Defendants' reliance on the Court's opinion in Abraham v. WPX Production Productions, LLC, given that there will be no "tracing problem" in identifying who purchased Natural American cigarettes, contrary to the difficult task of determining which leases' gas had been processed at which processing plants. Certification Reply at 12-13 (citing Abraham v. WPX Prod. Prods., LLC, 317 F.R.D. at 255).

98. Courts which use administrative feasibility in determining whether to grant class certification are hesitant to rely solely on potential class members' "say-so" without "further indicia of reliability." Marcus v. BMW of N. Am., 687 F.3d at 594. Class members ideally would be able to refer to the defendant's records and documents, such as call logs or sales records. For example, the Third Circuit, which applies administrative feasibility as a threshold requirement for class certification, has noted:

> Affidavits from potential class members, standing alone, without "records

> to identify class members or a method to weed out unreliable affidavits," will not constitute a reliable and administratively feasible means of determining class membership. *Byrd*, 784 F.3d at 171. However, *Marcus* and our other cases do not imply "*no* level of inquiry as to the identity of class members can ever be undertaken." *Id.* Affidavits, in combination with records or other reliable and administratively feasible means, can meet the ascertainability standard. *Id.* at 170-71.

City Auto Select Sales, Inc. v. BMW Bank of N. Am. Inc., 867 F.3d at 441. In that case, the records at issue consisted of the defendant's customer database from which the defendants identified targets to send faxes. See City Auto Select Sales, Inc. v. BMW Bank of N. Am. Inc., 867 F.3d at 437. The Third Circuit determined that the database "defines a limited set of potential claimants," even though not every dealership in the database received a fax, and that the only subsequent factual inquiry, therefore, was whether a dealership received the fax on the class dates. City Auto Select Sales, Inc. v. BMW Bank of N. Am. Inc., 867 F.3d at 442. "A plaintiff proposing ascertainment via self-identification, then, must establish how the self-identification method proposed will avoid the potential problems [of requiring mini-trials or infringing on a defendant's due process rights]." Karhu v. Vital Pharms., Inc., 621 F. App'x at 949. "A plaintiff might establish that self-identification-based ascertainment is administratively feasible and otherwise unproblematic by proposing a case-specific and demonstrably reliable method for screening each self-identification." Karhu v. Vital Pharms., Inc., 621 F. App'x at 949 n.5 (citing Carrera v. Bayer Corp., 727 F.3d at 311).

99. The Plaintiffs, other than asserting that proposed class members will be able to demonstrate their class membership by use of sworn affidavits, claim forms, receipts, or purchase records, have not demonstrated that any class members have retained receipts or purchase records. Similarly, they have not identified a method or model which would allow the Defendants or the Court to screen affidavits for authenticity, and have not suggested that such a

method or model even exists. Additionally, the Court concludes that it is unlikely that the proposed class members will have retained purchase records, particularly given the proposed class period's extensiveness, with the earliest period beginning in 2009 and the most recent period beginning in 2013. See Stewart v. Beam Glob. Spirits & Wine, Inc., 2014 WL 2920806, at *7 ("Without any independently verifiable proof of purchase through receipts, retail records, or otherwise, the Court finds it unlikely that putative class members will accurately remember every . . . purchase they made during the class period, let alone where these purchases were made and the prices they paid each time."); Tucios v. Carma Lab'ys, Inc., 296 F.R.D. 638, 649 (N.D. Cal. 2014)(Bernal, J.)("[I]t is highly unlikely that class members have kept their receipts for the product at issues . . . . Plaintiff has not presented the Court with any method of verifying the self-identified class members suffered the alleged injury, or the amount of damages to which each class member is entitled."); Defendants' FOFs ¶ 22, at 7; Plaintiffs' FOFs ¶ 3, at 1-2; Certification Motion at 3, n.1. Accordingly, the Court concludes that the proposed National Menthol Subclass will face substantial administrative difficulties at the claims administration stage. This conclusion alone does not doom the proposed class, however, see Cherry v. Dometic Corp., 986 F.3d at 1305, and the Court continues its predominance analysis below to identify whether individualized questions predominate over common inquiries.

**2. If an Objective Standard Applies to All Class Members' Claims, That Class Members Have Seen Different Representations Does Not Mean that Individualized Inquiries Will Predominate Over Common Questions.**

100. The Defendants next argue that individualized inquiries predominate over common questions, because "[a] class action alleging fraudulent advertising depends on the existence of common representations; otherwise, the need for individual inquiries to determine

who received what message would necessarily defeat predominance." Certification Opposition at 30 (citing Goldenberg v. Johnson & Johnson Consumer Co., 317 F.R.D. at 389). The Defendants first assert that potential class members saw different Natural American advertising and product descriptors before October 1, 2017, and after October 1, 2017, which is the date that Natural American products no longer used the word natural and additive-free, and began containing language that "Natural American Spirit cigarettes are not safer than other cigarettes." Certification Opposition at 31. Accordingly, the Defendants assert that "[t]here was no common classwide representation" and that individualized inquiries will be the only method to determine which consumers purchased cigarettes in which time period. See Certification Opposition at 31.

101. The Defendants further assert that, even within each time period, the class members will differ in "[w]hether they were able to see, before purchasing NAS cigarettes, Santa Fe's disclaimers dispelling the notion that NAS cigarettes are safer than other cigarettes." Certification Opposition at 31. They cite the Court's MTD MOO, which explains that the disclaimers may not have been visible to all consumers before purchasing the product, and argue that "consumers who saw [the natural and organic labels] in conjunction with a health disclaimer differ considerable from those who saw *only* the descriptors." Certification Opposition at 31 (emphasis in original)(citing MTD MOO at 170-172). Additionally, the Defendants note that, with respect to the additive-free label, the Court concluded previously that a reasonable consumer who saw the disclaimer that additive-free does not mean a safer cigarette "'would understand . . . that the lack of additives does not make Natural American cigarettes healthier.'" Certification Opposition at 33 (quoting MTD MOO at 170-172 and citing Trujillo v. Apple Computer, Inc., 581 F. Supp. 2d 935, 938 (N.D. Ill. 2008)(Kennelly, J.), Fermin v. Pfizer Inc., 215 F. Supp. 3d 209, 212 (E.D.N.Y. 2016)(Johnson, J.))(ellipsis in Certification Opposition, but

not in MTD MOO). The Defendants state that, since March 31, 2010, all Natural American advertising has included a disclaimer explaining that organic tobacco does not mean a safer cigarette, and that Santa Fe Tobacco adjusted its disclaimer again in 2017, stating that "'Natural American Spirit cigarettes are not safer than other cigarettes.'" Certification Opposition at 33 (no citation given for quotation). The Defendants argue that, accordingly, "no consumer who saw [this disclaimer] could reasonably claim to be deceived by *any* descriptor," and that the Plaintiffs have not explained how a consumer who saw this disclaimer reasonably could have believed -- on the basis of a representation from Santa Fe Tobacco -- that Natural American cigarettes are or could be safer than other cigarettes. Certification Opposition at 33 (emphasis in original). The Defendants argue that consumers make no distinction between additive-free and other descriptors, like natural, which the pre-2017 disclaimer does not address, and that the disclaimer that additive-free cigarettes are not safer than other cigarettes therefore disabuses consumers of the notion that other descriptors imply a healthier cigarette. See Certification Opposition at 34 (citing Van Liere Report at ¶¶ 65-66, tables 13-14). Finally, the Defendants argue that, even where consumers distinguish the natural descriptor from the additive-free descriptor, language indicating that additive-free cigarettes are not safer should give those consumers pause before concluding that any packaging descriptors meant that the cigarettes are safer. See Certification Opposition at 34. The Defendants assert that this mix of representations means that it is necessary to determine which, if any, disclaimer a proposed class members saw before purchasing a cigarette pack, and that such a determination requires "claimant-by-claimant inquiries that would overwhelm any common issues." Certification Opposition at 35 (citing Tucker v. Pac. Bell Mobile Servs., 208 Cal. App. 4th 201, 225 (2012)).

102. The Defendant next argue that, even if all class members saw the same text, the

allegedly misleading inference is open to multiple interpretations, and the Plaintiffs have not shown that the representations are subject to a uniform definition among class members, thus requiring individualized inquiries into the misleading statements' nature. See Certification Opposition at 32 (quoting Astiana v. Kashi Co., 291 F.R.D. 493, 508 (S.D. Cal. 2013)(Huff, J.) and citing Jones v. ConAgra Foods, Inc., 204 WL 2702726, at *17). The Defendant argue that, here, "the alleged misunderstandings derived *not* from Defendants actually claiming health benefits, but from consumers' *inferences* based on their individual understandings of the benefits of natural, additive-free, or organic tobacco," which vary based on a consumer's subjective beliefs regarding the supposed benefits of natural, additive-free, or organic tobacco. Certification Opposition at 32 (emphasis in original). The Defendants highlight two of the Plaintiffs' theories: the safer-cigarette theory, and the menthol theory. See Certification Opposition at 35-42. The Defendants argue that, under both theories, the Plaintiffs must show that a "'significant portion of the general consuming public . . . , acting reasonably in the circumstances, could be misled'" and that it is insufficient that Plaintiffs assert a cause of action that relies on an objective standard for deception. Certification Opposition at 36 (quoting Becerra v. Dr. Pepper/Seven Up, Inc., 945 F.3d 1225, 1228-29 (9th Cir. 2019), and citing Certification Motion at 59-80).

103. The Defendants assert that the Plaintiffs' safer-cigarette theory does not contend that the descriptors are untrue, "but that consumers' own beliefs about 'natural' products and additives generally will be applied to tobacco -- a product known to be hazardous to health -- and lead them to incorrect inferences." Certification Opposition at 35 (citing Certification Motion at 4). According to the Defendants, this theory means that the descriptors at issue could mislead only individuals who hold that belief and that the packaging would not deceive other consumers.

See Certification Opposition at 36. The Defendants assert that the challenged descriptors do not carry a uniform meaning of comparative safety, and that the Court has stated that words like natural are context dependent. See Certification Opposition at 37 (quoting MTD MOO at 176). They note that some of the Plaintiffs' witnesses could not provide a definition of natural and that those named Plaintiffs who could provide a definition provided varying definitions. See Certification Opposition at 37-38 (citing Haskal Depo. at 94:10-19 (Haksal); Blevins Depo. at 201:1-20 (Blevins); Chavez Depo. at 27:7-22 (Chavez); Hebert Depo. at 82:17-93:9 (Hebert); Murphy Depo. at 128:22-129:5 (Murphy)). The Defendants also criticize the Plaintiffs for changing their theory from an allegation that the statements misled consumers into believing that Natural American cigarettes "are" safer to an allegation that the statements misled consumers into believing that Natural American cigarettes "may be" safer, highlighting that there may be many interpretations of the descriptors' meaning. Certification Opposition at 38. Finally, the Defendants argue that the Plaintiffs' experts, Dr. Pearson and Dr. Cummings, who assert that the descriptors cause consumers to misperceive Natural American cigarettes' health risks, have not tested the disclaimers properly, and that the Defendants expert, Dr. Van Liere, demonstrates that the majority of surveyed consumers believe that Natural American cigarettes are at least as harmful as other brands. See Certification Opposition at 39-40. The Defendants argue that, accordingly, the Plaintiffs "cannot show that 'a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled' by the challenged descriptors into believing that NAS cigarettes are (or 'may be') safer than other cigarettes." Certification Opposition at 40 (quoting Becerra v. Dr. Pepper/Seven Up, Inc., 945 F.3d 1225 at 1228-29).

104. The Defendants assert that the Plaintiffs' menthol theory is that "consumers are

misled because menthol is a *tobacco* additive by virtue of some menthol 'migrating' from the filter of NAS menthols (where it is placed at the time of manufacture) 'into the tobacco in the cigarette rod.'" Certification Opposition at 40-41 (quoting Certification Motion at 35-36)(emphasis in original). The Defendants acknowledge that the Court previously has concluded that this comingling "'makes the menthol modifier inherently misleading,'" but argue that the Plaintiffs admit that the proposed menthol plaintiffs lacked any belief regarding the menthol's location in the cigarette. Certification Opposition at 41 (quoting MTD MOO at 184 and citing Certification Motion at 40-41 & n.13). The Defendants insist that, because the class members had no opinion on the menthol's location, they could not have been misled, and argue that the Plaintiffs have not attempted to show that class members held a common understanding that the cigarettes' tobacco was menthol free. See Certification Opposition at 41. The Defendants critique Dr. Pearson's report, which they assert does not offer an opinion on "how consumers interpreted 'additive-free' in connection with NAS menthol cigarettes." Certification Opposition at 41 (citing Pearson Report at 3). The Defendants admit that the Plaintiffs have pointed to a Natural American focus group study for the proposition that consumers are misled, because they do not know what menthol is, but argue that Dr. Van Liere has critiqued the use of focus group studies to make conclusions about the broader populations, and that the focus group study which the Plaintiffs cite reports additionally that "participants 'don't know, or care, how the menthol and the tobacco come together to create a menthol cigarette,'" language which the Defendants asserts refutes the Plaintiffs' assertion that the additive-free language misleads consumers. Certification Opposition at 42 (citing Summary of Learning (dated June 27, 2012) at 5, filed September 23, 2020 (Doc. 281-32)).

105. The Plaintiffs argue in response that the Defendants' argument -- that differences

in class members' subjective understandings defeat predominance -- ignores the case's basis, namely "that Defendants' marketing, *in toto*, gave the impression to reasonable consumers of health reassurance, *i.e.*, that NAS Cigarettes may be less harmful than other cigarettes." Certification Reply at 13. The Plaintiffs argue that this reasonable-consumer standard is an objective test. See Certification Reply at 13-14 (citing Proctor Report; Pearson Report; Dewhirst Report; In re Santa Fe Nat. Tobacco Co., 288 F. Supp. 3d at 1233-34; Disc. Tobacco & Lottery, Inc. v. United States, 674 F.3d 509, 536 (6th Cir. 2012)). The Plaintiffs also assert that "courts in consumer protection cases will 'presume class members who purchased products with misleading packaging . . . were exposed to misleading statements on that packaging.'" Certification Reply at 14 (quoting Davidson v. Apple, Inc., 2018 WL 2325426, at *18. The Plaintiffs assert that all of the alleged misrepresentations "are all the same or substantially similar," and that the "Defendants uniformly marketed their NAS Cigarettes as 'natural' and 'additive-free,' and in some cases 'organic,'" descriptors which the Plaintiffs argue "are effectively the same and all convey to the reasonable consumer the same core marketing message: NAS Cigarettes may be less harmful than other brands of cigarettes." Certification Reply at 14 (quoting Certification Motion at 10-15, 23-28, 52, 62-63, and citing Broomfield v. Craft Brew Alliance, Inc., 2018 WL 4952519, at *11-12).

106. The Plaintiffs reassert that they "present common evidence showing that the reasonable consumer's understanding of Defendants' misrepresentations connotes a cigarette that may be less harmful, *including that such understanding is not impacted by any disclaimer*." Certification Reply at 15 (citing Certification Motion at 25-31)(emphasis in original). The Plaintiffs criticize the Defendants' reference to the packaging's disclaimers as a "red herring," and argue that the Defendants contend that individual understandings prevent consumers from

understanding Natural American cigarette labels as presenting a common message about the cigarettes' relative harmlessness, but simultaneously contend that these individualized consumers "nevertheless all saw and understood the product disclaimers, which changed over time." Certification Reply at 15 n.11. The Plaintiffs note that the FDA previously has "concluded that Defendants' disclaimer on their NAS Cigarette packages did not mitigate the effects of 'health reassurance conveyed by the packages' affirmative claims.'" Certification Reply at 15 (citing Motion at 1, 4; Davidson v. Apple, Inc., 2018 WL 2325426, at *18).

107. The Plaintiffs also assert that they "do not need to prove their entire case at class certification. Rather, they need only present evidence to show that these issues can be adjudicated together." Certification Reply at 15 (citing Rikos v. Procter & Gamble Co., 2014 WL 11370455, at *3; Elkies v. Johnson & Johnson Servs., Inc., No. CV 17-7320-GW(JEMX), 2018 WL 11223465, at *8-9 (C.D. Cal. Oct. 18, 2018)(Wu, J.)). Put differently, the Plaintiffs argue that, at the class certification stage, the relevant inquiry is "whether there is common evidence in support of [consumers' health reassurance] understanding -- which there indisputably is." Certification Reply at 15 (citing Rikos v. Procter & Gamble Co., 2014 WL 11370455, at *3). The Plaintiffs quote Hadley v. Kellogg Sales Co. for the proposition that

> "deception and materiality . . . are governed by an objective 'reasonably consumer' test . . . . Plaintiff 'has no burden to establish that there is a uniform understanding among putative class members as to the meaning of 'the challenged health statements, 'or that all or nearly all of [the class members] shared any specific belief.' [] Plaintiff need only make 'an objective showing of a probability that a "significant portion" of the relevant consumers acting reasonably "could be misled"'"

Certification Reply at 16 (quoting Hadley v. Kellogg Sales Co., 324 F. Supp. 3d at 1116-18) (ellipses in Certification Reply but not in Hadley v. Kellogg Sales Co.; first alteration in Hadley v. Kellogg Sales Co.).

108. The Plaintiffs next turn to the Defendants' arguments about the disclaimer's effect and the Defendants' critiques of the Plaintiff's safer-cigarette and menthol theories. See Certification Reply at 16. The Plaintiffs argue that the Defendants "focus on dicta" in the MTD MOO, and that the MTD MOO instead "emphasized that the 'additive-free' disclaimer 'says nothing about the natural or organic descriptors . . . [--] two terms [that] have an independent connotation that a product is healthier or safer . . . . *The natural and organic descriptors, accordingly, are deceptive to a reasonable consumer*.'" Certification Reply at 16 (quoting In re Santa Fe Nat. Tobacco Co., 288 F. Supp. 3d at 1233-34)(emphasis, second alteration, and ellipses in Certification Reply, but not in In re Santa Fe Nat. Tobacco Co.). The Plaintiffs also note that the Court has stated that, "because tobacco products are often purchased without the ability of the consumer to inspect the product package, 'the Court cannot conclude that the package's [additive-free disclaimer] would cure a deception inflicted upon a reasonable consumer.'" Certification Reply at 17 (quoting In re Santa Fe Nat. Tobacco Co., 288 F. Supp. 3d at 1233). The Plaintiffs next argue that the Defendants' citations to Dr. Van Liere's report and to Plaintiff testimony, and the Defendants' postulation whether consumers would be able to see disclaimers at point of purchase, are merits challenges and not attacks on the predominance of the Plaintiffs' proposed class claims. See Certification Reply at 17. The Plaintiffs further argue that the "Defendants' misrepresentations in the Challenged Claims are *affirmative*," and that, "consistent with the Court's discussion on the 'additive-free' disclaimer not being sufficiently specific to meet such affirmative misrepresentations, the visibility of the disclaimer at the point of sale . . . is actually irrelevant as a matter of law to the reasonable consumer's understanding of the Challenged Claims . . . ." Certification Reply at 18 (emphasis in original).

109. The Plaintiffs next argue that the Defendants have ignored common evidence that

the Defendants leveraged the idea of natural tobacco being less harmful to build their brand identity, and that consumers view natural and additive-free descriptors as conveying that meaning. See Certification Reply at 18. They assert that the relevant inquiry for their State law claims is the reasonable consumer test, "'which requires a plaintiff to show that a "reasonable consumer" is likely to be deceived by the business practice or advertising at issue.'" Certification Reply at 18 (quoting Kosta v. Del Monte Foods, Inc., 308 F.R.D. 217, 224 (N.D. Cal. 2015)(Thrash, J.)(quoting Williams v. Gerber Prods., 552 F.3d 934, 938 (9th Cir. 2008)), and citing United States v. Easley, 911 F.3d 1074, 1081 (10th Cir. 2018)). They argue that the United States District Court for the Southern District of New York, on whose case the Defendants rely, has explained that the Plaintiffs do not need to assert a definition of natural, but that a fact finder must determine whether the natural label is misleading to a reasonable consumer. See Certification Reply at 18-19 (quoting Petrosino v. Stearn's Prods., Inc., No. 16-CV-7735 (NSR), 2018 WL 1614349, at *7 (S.D.N.Y. March 30, 2018)(Roman, J.), and citing United States v. Philip Morris USA, Inc., 449 F. Supp. 2d 1, 27 (D.D.C. 2006)(Kessler, J.); Disc. Tobacco & Lottery v. United States, 674 F.3d at 536). The Plaintiffs conclude by arguing that the Defendants "are improperly asking to strip the trier of fact of the opportunity to consider Plaintiffs' experts' conclusions about the effect of Defendants' product claims, and instead substitute in Defendants' experts' conclusion." Certification Reply at 19 (citing Certification Opposition at 39-40; Singleton v. Fifth Generation, Inc., No. 515CV474BKSTWD, 2017 WL 5001444, at *18 (N.D.N.Y. September 27, 2017)(Sannes, J.)).

110. At the outset, the Court notes that the Plaintiffs bring a breach-of-express-warranty claim on the Nationwide Menthol Subclass's behalf and argue under the menthol theory that the Defendants warranted that Natural American menthol cigarettes are additive-free

despite that they contain menthol, a substance that, although placed originally in the cigarette filter, migrates to the tobacco because of its volatility. See Certification Motion at 83. In the MTD MOO, the Court concludes, based on the Plaintiffs' allegations, that "Natural American's additive-free descriptor on menthol cigarettes . . . misleads a reasonable consumer." MTD MOO at 173. The Plaintiffs define the Nationwide Menthol Subclass as "[a]ll persons who purchased Natural American Spirit menthol cigarettes in the United States . . . ." Complaint ¶ 126, at 43. The proposed class period for the Nationwide Menthol Subclass runs from September 30, 2009, to the present -- July 23, 2020, the date on which the Plaintiffs filed the Certification Motion. See Certification Motion at 3 n.1. This period includes, therefore, the time frame within which the Defendants ceased using the additive-free language, pursuant to the Memo. Of Agreement with the FDA. See Findings of Fact, supra ¶ 93, at 21 (citing Memo. of Agreement ¶¶ 1-3, at 1; Defendants FOFs ¶ 37, at 9; Plaintiffs' FOFs ¶ 31, at 8; id. ¶ 104, at 23). Accordingly, consumers who purchased Natural American cigarettes before the 2017 change will have seen the additive-free language, while consumers who purchased Natural American cigarettes after the 2017 change will not have seen that language. Even if the Court uses an objective standard for the Nationwide Menthol Subclass's breach-of-express-warranty claim, an analysis which the Court undertakes below, it will need to determine whether each proposed class member made his or her purchase before or after 2017 to determine whether the Defendants expressly warranted that their product was additive-free.

111. In their discussion on the relevance of certain disclaimers, the Plaintiffs assert that, "[e]ven if the 2017 disclaimer were deemed sufficiently significant, that issue could easily be resolved by subclassing; specifically, there can be a subclass for consumers who purchased NAS Cigarettes before the 2017 disclaimer appeared, and one for those who purchased after."

Certification Reply at 16. A similar logic applies to the additive-free descriptor's disappearance from the packaging. In other words, the Plaintiffs could subdivide the Nationwide Menthol Subclass into those who purchased cigarettes with the additive-free language before 2017 and those who purchased cigarettes without such language, or the Plaintiffs could redefine the Nationwide Menthol Subclass class period to exclude consumers who purchased menthol cigarettes after 2017, because their current proposed class definition includes those consumers "who purchased Natural American Spirit menthol cigarettes in the United States," which does not limit the class to those who saw additive-free language. Complaint ¶ 126, at 43.

112. The Court also has discretion to redefine the Nationwide Menthol Subclass to reflect this change. See Diaz v. Romer, 961 F.2d 1508, 1511 (10th Cir. 1992)("This court has previously recognized that 'the district court may redefine the class to include several subclasses.'" (quoting Sears v. Atchison, Topeka & Santa Fe Ry., 749 F.2d 1451, 1456 (10th Cir. 1984), and citing Fed. R. Civ. P. 23(c)(4)(B)[66])). Although the Tenth Circuit has not held that the district courts may redefine a proposed class without creating new subclasses -- here, limiting the Nationwide Menthol Subclass to those consumer who purchased Natural American cigarettes before the Defendants removed the additive-free language from the packaging, as opposed to creating a subclass of menthol smokers who purchased Natural American cigarettes before 2017 and a subclass of menthol smokers who purchased them after 2017 -- based on the Plaintiffs' argument that the Defendants harmed the proposed Nationwide Menthol Subclass members by asserting that their tobacco products were additive-free when they in reality contained menthol, the Court will redefine the Nationwide Menthol Subclass period to include only purchasers

[66]The rule 23 language which the Tenth Circuit cites in Diaz v. Romer is located today in rule 23(c)(5), which states: "When appropriate, a class may be divided into subclasses that are each treated as a class under this rule." Fed. R. Civ. P. 23(c)(5).

before October 1, 2017, when the Defendants stopped using the additive-free language. See Calderon Decl. ¶ 15, at 4. Because the Plaintiffs' breach-of-express-warranty claim is premised on the Defendants' objective use of this language and that the goods do not conform to the affirmation that they are additive-free, see Certification Motion at 83, this change means that the individualized question whether a proposed class member purchased Natural American cigarettes with this label does not predominate over other common questions.[67] The Court turns next, however, to its analysis whether determining that an objective standard is the correct standard for the Nationwide Menthol Subclass's breach-of-express-warranty claim is a common question.

### 3. The Transferor Courts' Choice-of-Law Rules Require That the Laws of All Fifty States Apply to the Nationwide Menthol Subclass' Breach-of-Express-Warranty Claim.

113. The Plaintiffs assert that New Mexico law should apply to the Nationwide Menthol Subclass' express warranty claims, because this is a diversity action and the Court should look to the forum state's -- i.e., New Mexico's -- choice-of-law rules. See Certification Motion at 80 (quoting Guidance Endodontics, LLC v. Dentsply Int'l, Inc., 663 F. Supp. 2d 1138, 1150 (D.N.M. 2009)(Browning, J.)). They argue that, under New Mexico law, the express warranty claim sounds in contract and that New Mexico uses the most-significant-relationship test to determine which state's substantive law to apply. See Certification Motion at 80-81 (citing Ferrell v. Allstate Ins. Co., 2008-NMSC-042, ¶ 15, 144 N.M. 405, 413, 188 P.3d 1156, 1164; Robey v. Parnell, 2017-NMCA-038, ¶¶ 12-18, 392 P.3d 642, 648-49). The Plaintiffs assert that there are certain "core elements of an express warranty claim in any state," specifically:

[67]The Court analyzes the effect of the disclaimers on the Plaintiffs' Safer-Cigarette Theory in its analysis of the classes to which that theory applies below.

> An express warranty arises where there is an affirmation of fact or promise to the buyer of goods, which includes any description of the goods that becomes a part of the benefit of the bargain. N.M. Stat. § 55-2-313. When the goods do not conform to that promise, affirmation, or description, there is a breach of express warranty. *Nowell v. Medtronic Inc.,* 372 F. Supp. 3d 1166, 1222 (D.N.M. 2019)(Browning, J.).

Certification Motion at 81. The Plaintiffs argue that, even if there are conflicts between the various State laws on breach of express warranty, the Court nevertheless should apply New Mexico law, because New Mexico has the most significant relationship to the claim, because Santa Fe Tobacco is headquartered in New Mexico, most decision-making takes place in the State, and relevant events took place in the State. See Certification Motion at 82. The Plaintiffs argue that, accordingly, the Court should apply New Mexico law to the Nationwide Menthol Subclass' claims. See Certification Motion at 82 (citing Simon v. Philip Morris, Inc., 124 F. Supp. 2d 46, 53 (E.D.N.Y. 2000)(Weinstein, Sr. J.)).

114. The Defendants dispute that the Court should apply a standard choice-of-law framework for diversity cases, asserting instead that multidistrict litigation ("MDL") cases have special rules in determining that forum state. See Certification Opposition at 66 (quoting In re Volkswagen & Audi Warranty Extension Litig., 692 F.3d 4, 17 (1st Cir. 2012)). They assert that, "[i]n such cases, 'courts typically apply the choice of law rules of each of the transferor courts.'" Certification Opposition at 66 (quoting In re Volkswagen & Audi Warranty Extension Litig., 692 F.3d at 17, and citing Piper Aircraft Co. v. Reyno, 454 U.S. 235, 244 n.8 (1981)). The Defendants note that the case presently before the Court includes cases with named plaintiffs that transferred from New Mexico, North Carolina, and Florida, as well as cases without named plaintiffs from California, the District of Columbia, New York, and the Virgin Islands. See Certification Opposition at 66 & n.49.

115. The Defendants argue that, applying New Mexico, North Carolina, and Florida's choice-of-law rules, each state would apply the law of each place of purchase. See Certification Opposition at 66-68. The Defendants argue that, because the claim covers all fifty States, the Court would have to consider each State's express warranty laws, which "vary in meaningful ways." Certification Opposition at 69. They note that the Court has recognized that the States' laws differ in its MTD MOO, where it dismissed express-warranty claims brough under Florida, Illinois, and New York law, see Certification Opposition at 69 (citing MTD MOO at 231-39), and that some States have differing reliance requirements, including Colorado and North Carolina, which require reliance, New York, which "may not" require reliance, and California, which requires reliance "only where privity is lacking," see Certification Opposition at 69 (citing Porcell v. Lincoln Wood Prods., Inc., 713 F. Supp. 2d 1305, 1318 (D.N.M. 2010)(Armijo, J.); Prichard Enters. v. Adkins, 858 F. Supp. 2d 576,585 (E.D.N.C. 2012)(Dever, J.); Keegan v. Am. Honda Motor Co., Inc., 284 F.R.D. 504, 547 (C.D. Cal. 2012)(Morrow, J.)). They argue that "[b]oth 'the prima facie element of reliance' and 'differences in the applicable law in a multi-state, state-law-based class action' 'present serious challenges to predominance.'" Certification Opposition at 69 (quoting Payne v. Tri-State CareFlight, LLC, 332 F.R.D. at 669-70).

116. The Defendants argue further that, even if New Mexico law governs the nationwide express warranty claim, the Plaintiffs cannot prove their theory with common evidence, because New Mexico express warranty claims "do[] not turn entirely on objective considerations," but rather require that the allegedly incorrect affirmation "be 'part of the basis of the bargain.'" Certification Opposition at 70-71 (quoting Perfetti v. McGhan Med., 1983-NMCA-032, ¶ 36, 99 N.M. 645, 642, 662 P.2d 646, 653, and citing Two Old Hippies, LLC v. Catch the Bus, LLC, 784 F. Supp. 2d 1200, 1211 (D.N.M. 2011)(Browning, J.); Lovington Cattle

Feeders, Inc. v. Abbott Lab'ys, 1982-NMCA-027, ¶ 18, 97 N.M. 564, 567-68, 642 P.2d 167, 170-71). The Defendants assert that determining whether being additive-free tobacco is part of the consumers' bargain is a "subjective fact question" and that the Plaintiffs cannot demonstrate that all class members considered the tobacco's additive-free qualities as part of the bargain, and do not address how consumers understood the additive-free label and, therefore, "what they understood themselves to be bargaining for." Certification Opposition at 71. Accordingly, the Defendants assert that, even under the Plaintiffs' preferred choice-of-law analysis, individual questions predominate. See Certification Opposition at 71.

117. The Plaintiffs reassert that, because New Mexico is the forum state, using New Mexico's choice-of-law rules and the relevant-contacts test leads to a conclusion that New Mexico law should apply. See Certification Reply at 38. They argue that the Defendants' reliance on where the sales took place is an application of the First Restatement of Conflict of Laws' place-of-contracting rule, which the Supreme Court of New Mexico expressly has rejected for multi-state contract actions. See Certification Reply at 38 (citing Ferrell v. Allstate Ins. Co., 2008-NMSC-042, ¶ 57, 144 N.M. at 422, 188 P.3d at 1173). Particularly, the Plaintiffs note that such a rule would create manageability problems contrary to the policy behind class actions. See Certification Reply at 38 (citing Ferrell v. Allstate Ins. Co., 2008-NMSC-042, ¶ 52, 144 N.M. at 421, 188 P.3d at 1172). The Plaintiffs also contend that the Defendants' concern that the Court will have to review every transaction to determine whether the representations were a part of the bargain is unfounded. See Certification reply at 39. They argue instead that "[t]he law presumes that a representation is 'part of the basis of the bargain' when a reasonable consumer would rely on it in purchasing the product." Certification Reply at 39 (no citation given for quotation). The Plaintiffs argue that they "meet all elements of the model rule, as approved by the New Mexico

Supreme Court, as to all class members without the need for individualized proof," Certification Reply at 39 (citing N.M.R.A. Rule 13-1428), and note that the Court already has determined that the additive-free descriptor is misleading when it appears on menthol cigarettes, see Certification Reply at 39 (quoting In re Santa Fe Nat. Tobacco, 288 F. Supp. 3d at 1234, 1241).

118. The Plaintiffs are incorrect in their assertion that, because the Court ordinarily applies the forum state's choice-of-law rules in diversity actions, the Court should look only to New Mexico choice-of-law rules. Instead, as the Defendants note, special considerations arise in the multidistrict litigation context. The Judicial Panel on Multidistrict Litigation ("JPML") has noted that, "[w]hile in the MDL, the action generally remains subject to the substantive law and choice of law rules to which it would have been subject in the transferor court." In re Delta Dental Antitr. Litig., 509 F. Supp. 3d 1377, 1380 (J.P.M.L. 2020)(citing In re Volkswagen & Audi Warranty Extension Litig., 692 F.3d 4, 17-18 (1st Cir. 2012)). See In re Dow Co. Sarabond Prods. Liab. Litig., 664 F. Supp. 1403, 1405-06 (D. Colo. 1987)(Kane, J.)("'Cases commenced in other districts are treated as if they are pending in those other districts . . . .'")(quoting In re Agent Orange Prod. Liab. Litig., 580 F. Supp. 690, 695 (E.D.N.Y. 1984)(Weinstein, C.J.), and citing In re Nucorp Energy Secs. Litig., 772 F.2d 1486, 1491-921 (9th Cir. 1985); In re E. Airlines, Inc., Engine Failure, 629 F. Supp. 307, 315-16 (S.D. Fla. 1986)(Davis, J.); Sentner v. Amtrak, 540 F. Supp. 557, 559 n.5 (D.N.J. 1982)(Whipple, S.J.); In re Haven Indus., Inc., 462 F. Supp. 172, 179 (S.D.N.Y. 1978)(Gagliardi, J.)). Accordingly, the Court first must determine which district courts are the transferor courts for the nationwide menthol subclass. The SAC and the Certification Motion do not identify specifically which of the consolidated claims arise from

which cases out of which federal judicial districts,[68] but a review of the seventeen consolidated actions reveals twelve cases which have sought to certify a nationwide class: (i) Okstad v. Santa Fe Nat. Tobacco Co., No. CIV 16-0323 JB/LF (M.D. Fla.), which brings claims for fraud, negligent misrepresentation, unjust enrichment, and injunctive relief on a nationwide class' behalf; (ii) Hebert v. Santa Fe Nat. Tobacco Co., No CIV 16-1394 JB/LF (M.D.N.C.), which brings a claim for breach of express warranty on a nationwide menthol subclass' behalf; (iii) Waldo v. Santa Fe Nat. Tobacco Co., No. CIV 16-0324 JB/LF (M.D. Fla.), which brings claims for unjust enrichment and injunctive relief on a nationwide class' behalf; (iv) Dunn v. Santa Fe Nat. Tobacco Co., No. CIV 15-1142 JB/LF (D.N.M.), which brings claims for violations of the New Mexico Unfair Trade Practices Act, N.M.S.A. § 57-12-1 ("NMUTPA"), negligent misrepresentation, and unjust enrichment on a nationwide class' behalf; (v) Haksal v. Santa Fe Nat. Tobacco Co., No. CIV 15-1163 JB/LF (D.N.M.), which brings claims for intentional misrepresentation, negligent misrepresentation, and unjust enrichment on a nationwide class' behalf; (vi) Sproule v. Santa Fe Nat. Tobacco Co., No. CIV 0296 JB/LF (S.D. Fla.), which brings claims for violations of the FDUTPA, fraud, negligent misrepresentation, unjust enrichment, injunctive relief, aiding and abetting, and vicarious liability on a nationwide class' behalf; (vii) White v. Santa Fe Nat. Tobacco Co., No. CIV 16-0209 JB/LF (D.N.M.), which brings claims for violations of the NMUTPA, negligent misrepresentation, and unjust enrichment on a nationwide class' behalf; (viii) Cuebas v. Santa Fe Nat. Tobacco Co., No. CIV

[68]Although the Plaintiffs filed the SAC directly in the master docket, which contains all of the filings related to the multidistrict litigation, the Court considers this filing to be immaterial for purposes of determining which State's choice-of-law rules apply. See, e.g., In re Conagra Peanut Butter Prods. Liab. Litig., 251 F.R.D. 689, 694-95 (N.D. Ga. 2008) (Thrash, J.)(concluding that the master complaint is a procedural device only, and that the choice-of-law rules of the states in which the parties originally filed their actions should apply).

16-0320 JB/LF (S.D.N.Y.), which brings claims for fraud, negligent misrepresentation, and unjust enrichment on a nationwide class' behalf; (ix) Cole v. Santa Fe Nat. Tobacco Co., No. CIV 16-0810 JB/LF (M.D.N.C.), which brings claims for unjust enrichment and injunctive relief on a nationwide class' behalf; (x) Johnston v. Santa Fe Nat. Tobacco Co., No. CIV 16-0474 JB/LF (S.D. Fla.), which brings a claim for unjust enrichment on a nationwide class' behalf; (xi) Ruggiero v. Santa Fe Nat. Tobacco Co., No. CIV 16-0329 JB/LF (D.D.C.), which brings claims for unjust enrichment and injunctive relief on a nationwide class' behalf; and (xii) Grandison v. Santa Fe Nat. Tobacco Co., No. CIV 16-0319 JB/LF (E.D.N.Y.), which brings claims for unjust enrichment on a nationwide class' behalf. Of these twelve cases, two have class representatives that are named Plaintiffs in the SAC: (i) Okstad v. Santa Fe Nat. Tobacco Co., which has Blevins and Litwin as named plaintiffs; and (ii) Hebert v. Santa Fe Nat. Tobacco Co., which has Chavez, Horne, and Lopez as named Plaintiffs.

119. The Court concludes that it must look to the choice-of-law rules of each State in which the Plaintiffs propose a nationwide class. The Supreme Court has explained:

> Parties may elect to file a "master complaint" and a corresponding "consolidated answer," which supersede prior individual pleadings. In such a case, the transferee court may treat the master pleadings as merging the discrete actions for the duration of the MDL pretrial proceedings. *In re Refrigerant Compressors Antitrust Litigation*, 731 F.3d 586, 590–592 (C.A.6 2013). No merger occurs, however, when "the master complaint is not meant to be a pleading with legal effect but only an administrative summary of the claims brought by all the plaintiffs." *Id.*, at 590.

Gelboim v. Bank of America Corp., 574 U.S. 405, 413 n.3 (2015). Here, there is no indication that the Plaintiffs intended the master complaint -- here, the SAC -- to merge all of the individual class actions, as opposed to serving as "an administrative summary of the claims brought by all the plaintiffs." Gelboim v. Bank of America Corp., 574 U.S. at 413 n.3. Indeed, the SAC states

in its caption: "This Document Relates To All Actions," which the Court interprets as indicating that the original actions remain active. SAC at 1 (capitalization in original). Accordingly, the Court will consider the choice-of-law rules of the forum States in which the Plaintiffs filed each original action -- here, Florida, North Carolina, New Mexico, New York, and the District of Columbia -- to determine which State's or States' substantive law applies to the Nationwide Menthol Subclass' express-warranty claim.[69]

120. Florida courts "traditionally have applied the doctrine of *lex loci contractus* and held that the law of the state where the contract was made or to have been performed governs the interpretation of the contract." U.S. Fidelity & Guar. Co. v. Liberty Surplus Ins. Grp., 550 F.3d 1031, 1033 (11th Cir. 2008). See David v. Am. Suzuki Motor Corp., 629 F. Supp. 2d 1309, 1315-16 (S.D. Fla. 2009)(Gold, J.)(noting that the plaintiff's express warranty claim sounds in contract and that Florida law therefore would apply the law of the State in which the contract was executed). Under this standard, the Court would have to apply all fifty States' express-warranty laws. See Karhu v. Vital Pharms., Inc., 2014 WL 815253, at *7 (S.D. Fla. 2014)(Cohn, J.)("In the case of a consumer product, the place of contracting is generally where the consumer purchased the product." (quoting David v. Am. Suzuki Motor Corp., 629 F. Supp. 2d at 1316)), aff'd, 621 F. App'x 945 (11th Cir. 2015). North Carolina applies the

---

[69]Only one of these cases, Hebert v. Santa Fe Nat. Tobacco Co., brings a claim that is identical to the claim in the SAC, i.e., a breach-of-express-warranty claim on a nationwide menthol subclass' behalf. Because the Plaintiffs have included named Plaintiffs from Okstad v. Santa Fe Nat. Tobacco Co., which does not bring a menthol-related nationwide claim, and otherwise have not indicated that they are discarding the other Plaintiffs' claims who are not named in the SAC, the Court does not limit its review only to North Carolina's choice-of-law rules. The Court notes, however, that even if it did limit its review to North Carolina, its conclusion below that North Carolina law requires the Court to look at each of the fifty States' breach-of-express-warranty and therefore tilts against concluding that common questions predominate would remain unchanged.

most-significant-relationship test to warranty claims. See Cochran v. Volvo Grp. N. Am., LLC, No. 1:11-CV-927, 2013 WL 1729103, at *3 (M.D.N.C. April 22, 2013)(Eagles, J.). North Carolina's most-significant-contacts test similarly requires applying each of the fifty States' express-warranty laws. See Boudreau v. Baughman, 322 N.C. 331, 338, 368 S.E.2d 849, 855-86 (1988)("Applying this [most-significant-relationship] analysis to the case at bar, we find Florida -- the place of sale, distribution, delivery, and use of the product, as well as the place of injury -- to be the state with the most significant relationship to the warranty claims.").

121. The analysis does not change if the Court expands its analysis to the choice-of-law rules of the other transferor districts with nationwide claims -- New Mexico, New York, and the District of Columbia -- because the Court concludes that each district's choice-of-law rules point to the substantive law of the States in which the proposed class member purchased the product. As the Plaintiffs note, New Mexico applies the Restatement (Second) of Conflict of Laws' most-significant-relationship test to multistate contract actions, which directs courts to consider "'(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil [sic], residence, nationality, place of incorporation and place of business of the parties.'" Ferrell v. Allstate Ins. Co, 2008-NMSC-042, ¶ 55, 144 N.M. at 421-22. 188 P.3d at 1172-73. Although New Mexico State courts have not considered this test's application to express warranty claims, the Court of Appeals of New Mexico has required plaintiffs in a breach-of-contract action to address the laws of "each state included within the proposed class definition" to determine whether the laws conflict. Berry v. Federal Kemper Life. Assur. Co., 2004-NMCA-116, ¶ 80,

136 N.M. 454, 476, 99 P.3d 1166, 1188.[70] Specifically, the Court of Appeals of New Mexico states:

> Plaintiffs bear the burden of demonstrating that a case is appropriate for class treatment. It is the plaintiffs' responsibility in the first instance to provide the district court with appropriate law surveys for each state included within the proposed class definition. The surveys should be detailed enough to show the current state of the law in each state with regard to the legal claims subject to certification. If the law is not uniform and consistent with New Mexico law, plaintiffs must catalog the differences and provide the district court with a plan for managing the differences through trial. If defendants disagree with the plaintiffs' survey results, or interpretations, it is incumbent on defendants to inform the district court of any errors they perceive. The district court cannot be faulted if "clearly established" contradictory law is not brought to its attention. [*Sun Oil Co. v.*] *Wortman*, 486 U.S. [717,] 730–31 . . . [(1988)]. Generalizations about the general state of the law will not do, whether presented by plaintiffs or defendants.[[71]]

Berry v. Federal Kemper Life Assur. Co., 2004-NMCA-116, ¶ 80, 136 N.M. at 475-76, 99 P.3d at 1187-88. The Court concludes, therefore, that a New Mexico State court considering a multistate breach-of-express-warranty claim would look first to laws of each place of purchase.

122. The Court has not identified a New York State court case that applies its choice-of-law framework specifically to express warranty claims. Nevertheless, New York courts apply a "center of gravity" or "grouping of contract" approach to resolving conflicts-of-laws issues in contract cases. Babcock v. Jackson, 12 N.Y.2d 473, 481, 191 N.E.2d 279, 283 (1963). Federal

[70]Berry v. Federal Kemper Life Assurance Co. is a Court of Appeals of New Mexico case. The Court predicts, however, that the Supreme Court of New Mexico would follow the Court of Appeals of New Mexico's rule, because the Supreme Court of New Mexico has cited with approval Berry v. Federal Kemper Life Assurance Co.'s process of determining whether State laws conflict in multistate class actions. See Ferrell v. Allstate Ins. Co., 2008-NMSC-042, ¶ 37, 144 N.M. at 418, 188 P.3d at 1169 ("We agree . . . that *Berry* sets forth the preferable analysis.").

[71]The Court notes that the Plaintiffs have not provided a survey regarding every State's express warranty laws. Thus, to the extent that the Plaintiffs advocate for the application of New Mexico's choice-of-laws rules, they have not met the burden for plaintiffs seeking class certification which New Mexico imposes.

courts applying this New York standard to express warranty claims in consumer actions have determined that the State of purchase governs these claims, because they are "the places of contracting and performance." In re Frito-Law N. Am., Inc. All Nat. Litig., No. 12-MD-2413 (RRM)(RLM), 2013 WL 4647512, at *19 (E.D.N.Y. August 29, 2013)(Mauskopf, J.). See Solak v. Hain Celestial Grp., Inc., 3:17-CV-0704 (LEK/DEP), 2018 WL 1870474, at *10 (N.D.N.Y. April 17, 2018)(Kahn, J.).

123. The District of Columbia cites favorably the Restatement (Second) of Conflict of Laws, and "conduct[s] a 'governmental interest' analysis to determine which jurisdiction's law controls the interpretation and enforcement" of a contract. Adolph Coors Co. v. Truck Ins. Exchange, 960 A.2d 617, 620 (D.C. 2008)(citing Holmes v. Brethren Mut. Ins. Co., 868 A.2d 155, 157 n.2 (D.C. 2005); Vaughan v. Nationwide Mut. Ins. Co., 702 A.2d 198, 202 (D.C. 1997)). "This analysis requires us to consider several factors, including: (1) the place of contract; (2) the place of negotiation of the contract; (3) the place of performance; (4) the location of the subject matter of the contract; [and] (5) the residence and place of business of the parties . . . ." Adolph Coors Co. v. Truck Ins. Exchange, 960 A.2d at 620 (citing Restatement (Second) of Conflict of Laws §§ 188, 193 (1971); Vaughan v. Nationwide Mut. Ins. Co., 702 A.2d at 200-03). These factors similarly point to consumers' place of purchase as the applicable State law.

124. Thus, no matter which transferor State's choice-of-law rules the Court applies, the Court will have to consider the elements of all fifty States' express-warranty laws, which, as the Defendants note, and as the Court also has decided, differ in the terms of pre-litigation notice, privity, and reliance requirements. See MTD MOO at 231-39 (explaining, e.g., that, "in every state but Illinois" plaintiffs must provide notice for breach-of-express-warranty claims, and that

Florida and Illinois require privity, while New York does not); Certification Opposition at 69 (citing MTD MOO at 231-39; Cox House Moving, Inc. v. Ford Motod Co., 2006 WL 3230757, at *6 (D.S.C. November 6, 2006)(Herlong, J.); Porcell v. Lincoln Wood Prods., Inc., 713 F. Supp. 2d at 1318; Prichard Enters. v. Adkins, 858 F. Supp. 2d at 585; Keegan v. Am. Honda Motor Co., Inc., 284 F.R.D. at 547). These problems accompany nationwide consumer class actions frequently,[72] and the Court concludes that common questions do not predominate over

[72]Judge Easterbrook has been critical of the manageability challenges that nationwide consumer class actions present at the certification stage where those class actions implicate the laws of each of the fifty States. See In re Bridgestone/Firestone, Inc., 28 F.3d at 1019-21. Specifically, he states:

> The district judge did not doubt that differences within the class would lead to difficulties in managing the litigation. But the judge thought it better to cope with these differences than to scatter the suits to the winds and require hundreds of judges to resolve thousands of claims under 50 or more bodies of law. Efficiency is a vital goal in any legal system -- but the vision of "efficiency" underlying this class certification is the model of the central planner. Plaintiffs share the premise of the ALI's *Complex Litigation Project* (1993), which devotes more than 700 pages to an analysis of means to consolidate litigation as quickly as possible, by which the authors mean, before multiple trials break out. The authors take as given the benefits of that step. Yet the benefits are elusive. The central planning model -- one case, one court, one set of rules, one settlement price for all involved -- suppresses information that is vital to accurate resolution. What is the law of Michigan, or Arkansas, or Guam, as applied to this problem? Judges and lawyers will have to guess, because the central planning model keeps the litigation far away from state courts . . . . And if the law were clear, how would the facts (and thus the damages per plaintiff) be ascertained? One suit is an all-or-none affair, with high risk even if the parties supply all the information at their disposal. Getting things right the first time would be an accident. Similarly Gosplan [the Soviet Union's economic planning committee] or another central planner may hit on the price of wheat, but that would be serendipity. Markets instead use diversified decisionmaking to supply and evaluate information. Thousands of traders affect prices by their purchases and sales over the course of a crop year. This method looks "inefficient" from the planner's perspective, but it produces more information, more accurate prices, and a vibrant, growing economy. See Thomas Sowell, *Knowledge and Decisions* (1980). When courts think of efficiency, they should think of market models rather than central-planning models.

individualized inquiries with regard to the Nationwide Menthol Subclass.

**4. <u>The Plaintiffs' Proposed Damages Model Is Not an Adequate Fit with the Plaintiffs' Safer-Cigarette Theory, but Is an Adequate Fit with the Plaintiffs' Menthol Theory</u>.**

125. The Defendants' final argument in opposition to the Plaintiffs' assertion that common inquiries predominate over individualized inquiries concerns the Plaintiffs' proposed damages model. <u>See</u> Certification Opposition at 72-82. The Plaintiffs' expert, Dr. Dubé, has proposed to use a conjoint analysis to determine class-wide economic damages. <u>See</u> Certification Motion at 56 (citing Dubé Report ¶ 3, at 4). The Plaintiffs assert that Dr. Dubé's model will control for differences in competitors' pricing on the market's supply side, "can be used to implement a marketplace simulation to measure the price premium paid by consumers, which will account for the oligopoly competition between Defendants and other supply-side competitors," and can measure consumers' willingness to pay. Certification Motion at 57 (citing

---

. . . .

> No matter what one makes of the decentralized approach as an original matter, it is hard to adopt the central-planner model without violence not only to Rule 23 but also to principles of federalism. Differences across states may be costly for courts and litigants alike, but they are a fundamental aspect of our federal republic and must not be overridden in a quest to clear the queue in court. See *BMW v. Gore,* 517 U.S. at 568-73 . . . ; *Szabo*[*v. Bridgeport Machines, Inc.*, 249 F.3d at 672] (reversing a nationwide warranty class certification); *Spence v. Glock, G.m.b.H.,* 227 F.3d 308 (5th Cir.2000)(reversing a nationwide tort class certification); Larry Kramer, *Choice of Law in Complex Litigation*, 71 N.Y.U. L.Rev. 547, 579 (1996); Linda S. Mullenix, *Mass Tort Litigation and the Dilemma of Federalization*, 44 DePaul L.Rev. 755, 781 (1995); Robert A. Sedler, *The Complex Litigation Project's Proposal for Federally–Mandated Choice of Law in Mass Torts Cases: Another Assault on State Sovereignty*, 54 La. L.Rev. 1085 (1994). Tempting as it is to alter doctrine in order to facilitate class treatment, judges must resist so that all parties' legal rights may be respected. *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 613 . . . (1997).

<u>In re Bridgestone/Firestone, Inc.</u>, 288 F.3d at 1019-21.

Dubé Report ¶¶ 17-20). The Plaintiffs assert that Dr. Dubé will calculate a price premium, which "measures the difference between the price class members actually paid for NAS Cigarettes and the price they would have paid but for the Challenged Claims," and the class members' willingness to pay, "which measure the incremental economic value class members perceive from the Challenged Claims." Certification Motion at 57-58 (citing Dubé Report ¶¶ 23, 25-27, at 9-10). The Plaintiffs assert that Dr. Dubé intends to create his model using surveys which presents survey respondents with a variety of products, product profiles, labels, and prices, and evaluates which product the respondent would purchase. See Certification Motion at 58 (citing Dubé Report ¶¶ 34-43, 50, 52-54).

126. The Defendants contend that Dr. Dubé's methodology does not fit the Plaintiffs' liability theories and that, therefore, the Plaintiffs cannot use his model to determine classwide damages without relying on individualized inquiries, thus defeating predominance. See Certification Opposition at 72. Regarding the Safer-Cigarette Theory, the Defendants argue that the Plaintiffs do not measure the value of the alleged belief that Natural American cigarettes are safer, and regarding the Menthol Theory, the Defendants argue that the Plaintiffs "disdain any effort to measure the price effect of the allegedly mistaken beliefs about menthol." Certification Opposition at 72. They argue that, under Comcast v. Behrend, "'[a] model purporting to serve as evidence of damages in this class action must measure *only* those damages attributable to [the operative] theory [of liability].'" Certification Opposition at 72 (quoting Comcast v. Behrend, 569 U.S. at 35)(emphasis, second and third alterations in Certification Opposition, but not in Comcase v. Behrend). The Defendants argue that Dr. Dubé's model does not measure only those damages attributable to the Plaintiffs' specific theories of liability, that his model would yield an invalid measure of damages, and that he has not determined how he will design the conjoint

survey.[73] See Certification Opposition at 73.

127. The Defendants' first argument is that Dr. Dubé's model does not measure the damages which are attributable to the specific statements that the Plaintiffs have alleged are deceptive. See Certification Opposition at 73-79. They argue that district courts applying Comcast v. Behrend have required damages models to calculate only those damages that are directly attributable to the specific liability theories that plaintiffs put forward, and have rejected models that do not isolate why a given statement creates a price premium. See Certification Opposition at 73 (quoting In re ConAgra Foods, Inc., 302 F.R.D. at 579; In re POM Wonderful LLC, No. ML 10–02199 DDP (RZx), 2014 WL 1225184, at *5 (C.D. Cal. March 25, 2014)(Pregerson, J.)). Put differently, they argue that, "[u]nder *Comcast*, Plaintiffs' model must quantify the price premium that resulted from the specific false beliefs that the descriptors allegedly induced." Certification Opposition at 74. For the Safer-Cigarette Theory, the Defendants assert that this standard requires the "Plaintiffs' damages model [to] identify how much the price of NAS Cigarettes was inflated by a belief that NAS cigarettes are or may be safer and healthier -- and nothing else." Certification Opposition at 75. The Defendants argue that Dr. Dubé's model instead will "estimate the *entire* value of each descriptor -- without accounting for how much of that value is attributable to other, perfectly permissible, reasons that a consumer may value a product's being 'natural,' or being made solely from tobacco with no additives (*e.g.*, quality, taste, eco-conscious farming practices, etc.)." Certification Opposition at 75 (emphasis in original). They assert that this inability to distinguish between the various

---

[73]The Defendants include this last deficiency to argue that the Court should exclude Dr. Dubé's report and opinions. See Certification Opposition at 73 n.52. The Court has considered this argument above and has determined that it will not exclude Dr. Dubé's report or opinions.

beliefs that contribute to a price premium based on certain descriptors could "compensate class members for an injury that this Court has deemed uncompensable," namely that the natural descriptor leads consumers to believe incorrectly that Natural American cigarettes are unprocessed. Certification Opposition at 76-77 (citing MTD MOO at 132). The Defendants argue that the issue is similar with the Menthol Theory, in that the model will calculate a price premium for all of the values attributable to the additive-free descriptor, but will not be able to isolate a price premium for the specific harmful belief that the Plaintiffs have alleged. See Certification Opposition at 78. The Defendants argue that the Menthol Theory gives rise to an additional deficiency, because the phrase has two allegedly misleading meanings: (i) "that NAS cigarettes are safer"; and (ii) that, in Natural American menthol cigarettes, "no menthol has migrated to the cigarette's tobacco." Certification Opposition at 78-79 (citing Dubé Depo. at 159:19-162:13; Teece Report ¶ 88, at 68).

128. The Plaintiffs assert that the Defendants make these same arguments in the Motion to Exclude Dr. Dubé and incorporate by reference the Motion to Exclude Dr. Dubé Opposition. See Certification Reply at 40. There, they argue that Dr. Dubé's proposed measurement fits with their damages theory, because the Plaintiffs' other experts, including Drs. Pearson, Proctor, and Cummings, provide opinions that the challenged descriptors are false, misleading, or deceptive, and that Dr. Dubé starts with that assumption and "isolates the economic damages associated with removing the Challenged Claims from the labels to determine the economic value of the Challenged products to Class members, but for the Challenged Claims." Motion to Exclude Dr. Dubé Opposition at 13. In response to the Defendants' argument that other beliefs associated with the challenged descriptors could have contributed to the price premium, and that Dr. Dubé's model does not isolate these variables, the Plaintiffs

argue that, because their other experts "establish that reasonable consumers interpret the Challenged Claims to mean that NAS Cigarettes may be less harmful than other cigarettes," it therefore is "not necessary to decompose the effect of the Challenged Claims into a component that created economic damages and a component that did not." Motion to Exclude Dr. Dubé Opposition at 14. The Plaintiffs assert that Dr. Dubé and other experts have submitted this methodology or similar methodologies in other consumer class actions, and that courts have accepted these methodologies in certifying those classes. See Motion to Exclude Dr. Dubé Opposition at 15-17 (citing Goldemberg v. Johnson & Johnson Consumer Cos., Inc., 317 F.R.D. at 393-96; Price v. L'Oreal USA, Inc., 2018 WL 3869896, at *9; Hadley v. Kellogg Sales Co., 324 F. Supp. 3d at 1106; In re Dial Complete Mktg. & Sales Practices Litig., 320 F.R.D. at 335; Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc., 326 F.R.D. at 606; Broomfield v. Craft Brew All., Inc., No. 17-01027, 2018 WL 4952519, at *19; Krommenhock v. Post Foods, LLC, 334 F.R.D. 552, 576 (N.D. Cal. 2020)(Orrick, J.); Kurtz v. Kimberly-Clark Corp., 321 F.R.D. at 524; Martinelli v. Johnson & Johnson, No. 15-01733, 2019 WL 1429653, at *4 (E.D. Cal. March 29, 2019)(England, J.); Hilsley v. Ocean Spray Cranberries, Inc., No. 17-2335, 2018 WL 6300479, at *15 (S.D. Cal. November 29, 2018)(Curiel, J.)). The Plaintiffs contend that the defendants in these cases, like the Defendants here, "argued that consumers attribute multiple benefits to the challenged representations." Motion to Exclude Dr. Dubé Opposition at 17-18. The Plaintiffs dispute that it is a problem that Dr. Dubé does not consider alternative interpretations of the challenged representations, because Dr. Dubé assumes that the challenged representations are false and then "'calculat[es] the economic damages associated with claims that should not have appeared on the labels.'" Motion to Exclude Dr. Dubé Opposition at 18 (quoting Dubé Aug. 1 Depo. at 181:10-21). The Plaintiffs argue that their use of an objective theory of liability -- that

the challenged representations mislead a reasonable consumer -- ensures that Dr. Dubé's model fits their theory of liability, because "[b]oth the but-for market-clearing price and Plaintiffs' theory of liability are based on what the Challenged Claims mean to the reasonable consumer." Certification Reply at 41-42.

129. The Court concludes that Dr. Dubé's conjoint analysis is not an adequate fit with the Plaintiffs' Safer-Cigarette liability theory, because it incorporates all possible values which consumers may associate with the challenged labels and which may contribute to Natural American cigarettes' price premium, as opposed to isolating the understandings which the Plaintiffs allege the challenged labels cause Safer-Cigarette Theory, but that the model is an adequate fit with the Plaintiffs' Menthol Theory. The Plaintiffs' liability theories are premised on the assertion that the Defendants' labeling practices are misleading to a reasonable consumer, convincing them either that Natural American cigarettes are safer than other cigarettes when they are not or that Natural American menthol cigarettes do not contain additives, when they contain menthol, an additive. First, the Court notes, as do the Plaintiffs, that courts often have allowed experts' use of conjoint analysis -- and Dr. Dubé's conjoint analysis methodology specifically -- to calculate classwide damages in consumer class actions. See, e.g., Goldemberg v. Johnson & Johnson Consumer Cos., Inc., 317 F.R.D. at 392-96.

130. The Defendants argue that Dr. Dubé's methodology does not account for differences in the subjective meaning which consumers attribute to these labels. See Certification Opposition at 73. As an initial matter, the Court agrees with the Defendants that, if the challenged labels have many possible meanings, such as "natural" or "organic" meaning "ecologically friendly," then potential class members who purchased Natural American cigarettes on the basis of their belief that they were more ecologically friendly have not been

injured in the same way as those consumers who believed the cigarettes were safer. Accordingly, a conjoint analysis or other methodology must identify a way to isolate the specific belief that the cigarettes were safer than others. See In re ConAgra Foods, Inc., 302 F.R.D. at 578-79 ("Plaintiffs' specific theory of liability . . . is that the '100% Natural' label misled consumers and caused them to believe that Wesson Oils contained no genetically modified organisms or GMO ingredients. Under *Comcast*, therefore, Weir must be able to isolate the price premium associated with misleading consumers in that particular fashion.").

131. Although the Plaintiffs cite to several cases in which courts have permitted conjoint analyses to assess classwide damages for misleading-labeling claims, see Motion to Exclude Dr. Dubé Opposition at 15-17, most of those cases are not helpful here. Some do not consider Comcast v. Behrend's requirement that the conjoint analysis be linked to the plaintiffs' theories of liability at all. See Martinelli v. Johnson & Johnson, 2019 WL 1429653, at *3-4 (concluding that the conjoint analysis was appropriate for a claim that a food product contained "No Trans Fats" when it necessarily contained trans fats); Kurtz v. Kimberly-Clark Corp., 321 F.R.D. at 551 (acknowledging conjoint analysis as an appropriate methodology, but concluding that the methodology was "beside the point," because the claim involved statutory damages); Hadley v. Kellogg Sales Co., 324 F. Supp. 3d at 1103-06 (considering only whether the conjoint analysis addressed adequately supply-side factors, although the plaintiff argued that the conjoint analysis isolated the challenged claims in a case where the plaintiff's theory of liability was that cereal products made specific, misleading health-related claims that induced consumers to pay more). Other cases involve misleading labels that do not rely on the consumers' interpretation of the label such that the plaintiffs' damages model needs to worry about different categories of harm. See Hilsley v. Ocean Spray Cranberries, Inc., 2018 WL 6300479, at *2, *13-15

(permitting conjoint analysis where the plaintiffs' claim was that a juice's label indicated it contained "No artificial flavors or preservatives" and that she "would not have purchased the Products if she had known they contained artificial ingredients," and focusing instead on Comcast v. Behrend's requirement that conjoint analysis consider supply-side market factors); Broomfield v. Craft Brew All., Inc., 2018 WL 4952519, at *14-16 (considering -- in a case about beer whose label misled consumers into paying a price premium, because they believed defendant brewed the beer in Hawaii -- the model's connection to the plaintiff's theory of harm, but only insofar as the defendants criticized its methodology -- e.g., whether the expert should have shown survey respondents labels instead of bare statements, whether the survey should have used a different reference for mainland brewing locations, and whether it would award damages to all consumers instead of awarding damages only to those who actually believed the product was brewed in Hawaii); In re Dial Complete Mktg. & Sales Practices Litig., 320 F.R.D at 327, 333 (explaining that a damages model "'must control for product features other than the [challenged claim] when calculating the price premium,'" and permitting conjoint analysis where the plaintiffs' theory of liability was that the plaintiffs "were damaged . . . because they paid a price premium attributable to the falsely claimed product features," namely that the soap product had antibacterial properties)(quoting In re Scotts EZ Seed Litig., 304 F.R.D. at 412); Price v. L'Oreal USA, Inc., 2018 WL 3869896, at *9 (permitting conjoint analysis where the challenged shampoo products stated they contained keratin where they did not, and the plaintiffs would not have purchased the products if they had known they did not contain keratin).

132. Notable among this latter group of cases is the Plaintiffs' citation to Goldemberg v. Johnson & Johnson Consumer Cos. In that case, the "Plaintiffs challenge ninety different Aveeno products bearing the Active Naturals label that 'contain unnatural, synthetic ingredients,'

which in their view renders the Active Naturals label false, deceptive, and misleading to consumers since the products are, in fact, 'not natural.'" 317 F.R.D. at 382. The plaintiffs in that case argue that they were harmed, because they would not have paid a price premium or purchased the products at all had they known that the products were not natural. See 317 F.R.D. at 383. Dr. Dubé also was involved in proposing a conjoint analysis in that case, and his "purported damages methodology assumes that the inclusion of the Active Naturals label on packaging or in advertising is *in and of itself* objectively misleading." 317 F.R.D. at 387 (emphasis in original). Although that case bears similarities to the Plaintiffs' case here, namely that both sets of plaintiffs bring suit on the basis of a product's being labeled natural, the key difference is that the plaintiffs in Goldemberg v. Johnson & Johnson Consumer Cos. argue that they were harmed, because the challenged products, despite their natural label, are not in fact natural, see 317 F.R.D. at 383, while the Plaintiffs here argue that they have been harmed, because the challenged products, despite their natural label, are not in fact safer to consume, see SAC ¶ 4, at 2 ("By uniformly using the terms 'Natural' and 'Additive-Free' . . . , Defendants intentionally and successfully convey to reasonable consumers that Natural American Spirit cigarettes are safer and healthier to smoke than other competing cigarettes. But smoking any cigarette is dangerous and hazardous to health . . . ."). Thus, the issue here is not merely that the cigarettes are not natural or additive-free, and thus that Dr. Dubé can rely on expert assertions that the packaging is objectively misleading to conduct a conjoint analysis that surveys consumers on their preferences for products with and without those labels, but that these labels connote certain meanings, some of which suggest that the cigarette may be healthier, and some of which may suggest that the cigarette has other desirable qualities.

133. The Plaintiffs cite to two cases which consider specifically and reject the

defendants' assertions that the plaintiffs' proposed conjoint analyses calculate price premiums associated with all of a challenged label's possible values. First, in Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc., the Honorable Nathaniel M. Cousins, United States Magistrate Judge for the United States District Court for the Northern District of California, notes, in a case involving claims that the defendant, Dr. Pepper Snapple Group, Inc., sold Canada Dry Ginger Ale with the misleading label that it is "Made From Real Ginger," 326 F.R.D. at 598, that:

> The most interesting argument Dr. Pepper presents against the price premium survey under predominance is that "it does not match [plaintiffs'] theory of liability. The survey purports to calculate a price premium associated with misleading consumers to believe the drink contains powdered or chopped ginger, but it does not do so -- it calculates the premium associated with all possible meanings of the claim."

326 F.R.D. at 614-15 (internal record cites omitted). Magistrate Judge Cousins explains that, although Canada Dry contains some ginger-based flavoring compounds, the plaintiffs' argument is that the label presents an "actionable misrepresentation because even if it is literally true that Canada Dry has ginger in it, the ginger is not what a reasonable consumer would expect." 326 F.R.D. at 615. Accordingly, Magistrate Judge Cousins concludes that "what plaintiffs' price premium measures is how much the 'Made From Real Ginger' claim is worth" and that the challenged claim's worth "will only matter in the future if a jury does find that the claim is misleading (i.e., the jury will determine what the meaning of 'Made From Real Ginger' is), based on the allegedly microscopic amount of ginger root in Canada Dry." 326 F.R.D. at 615. Because it does not matter what the "Made From Real Ginger" label's possible interpretations were -- because the jury would decide whether the ginger in Canada Dry was what a reasonable consumer would expect -- Magistrate Judge Cousins determines that the damages model fits the plaintiffs' theory of liability. 326 F.R.D. at 615. Here, however, even if a jury determines that

Natural American's labels mislead a reasonable consumer to believe that the cigarettes are safer, other interpretations of the label nevertheless may contribute to the cigarettes' price premium.

134. The Plaintiffs also cite to Krommenhock v. Post Foods, LLC, which considers forty-one challenged claims, based on the cereal products' sugar content. See 334 F.R.D. at 560. The defendant, Post Foods, argued that, "because plaintiffs challenge only the implication of healthiness from the Challenged Statements, plaintiffs cannot challenge the many other truthful or non-actionable statements on the Products," and that "the model fails because plaintiffs' experts did not try and isolate and test the Challenged Statements separate and apart from the value of the unchallenged or truthful statements." 334 F.R.D. at 575. The Honorable William H. Orrick, United States District Judge for the Northern District of California, rejects this argument as an "overreach[]." 334 F.R.D. at 575. Judge Orrick concludes that, because the "question under California law is whether the Challenged Statements are false or misleading to an objective reasonable consumer," the plaintiffs' consumer impact model is "an appropriate starting point for a damages model," because it assumes that statement is true. 334 F.R.D. at 575 (citing Williams v. Gerber Prods. Co., 552 F.3d 934, 938 (9th Cir. 2008); Hadley v. Kellogg Sales Co., 324 F. Supp. 3d at 1106). The Court here disagrees that a damages model that does not isolate the challenged claims' meaning is adequate, even where the legal question presented is whether the claims mislead a reasonable consumer. While the answer to that legal question does not require a fact finder to look beyond the challenged claim's misleading nature, the analysis is not the same for purposes of calculating damages based on a price premium, because allowing a model to calculate a price premium without isolating the challenged claims may allow for an inflated damage amount depending on the value associated with the unchallenged or truthful claims.

135. The Court is not alone in requiring Dr. Dubé's conjoint analysis to distinguish between the price premium of the term natural or additive-free generally and the meanings associated with those terms specifically is not an insurmountable task. In In re ConAgra Foods, Inc., for example, the Honorable Margaret Morrow, United States District Judge for the United States District Court for the Central District of California, examined an expert's proposed hedonic regression analysis of the term "100% Natural." 302 F.R.D. at 578. The plaintiffs' theory of liability in that case was that the natural label "misled consumers and caused them to believe that Wesson Oils contained no genetically modified organisms or GMO ingredients," and the expert, Dr. Weir, conceded that the phrase all natural "'has many implications,'" which additional studies confirmed. 302 F.R.D. at 578-79 (quoting Hawk Decl. at 66). Because Dr. Weir proposed only to calculate the price premium attributable to the label and all of its connotations, Judge Morrow determined that "[t]his does not suffice under *Comcast*," and, in addition to other problems, determined that the plaintiffs had not satisfied rule 23(b)(3)'s predominance requirement.[74] 302 F.R.D. at 579.

[74]Later in the case, the plaintiffs filed an amended motion for class certification which included a hybrid damages model. See In re ConAgra Foods, Inc., 90 F. Supp. 919, 1023-31 (C.D. Cal. 2015)(Morrow, J.)("ConAgra II"). First, the plaintiffs re-proffered Dr. Weir's hedonic regression analysis of the "100% Natural" label which Judge Morrow previously had rejected and which she again concludes "does not satisfy *Comcast* because it does not isolate the price premium attributable to consumers' belief that ConAgra's products did not contain GMOs." ConAgra II, 90 F. Supp. 3d at 1024-25 (citing Vaccarino v. Midland Nat. Life Ins. Co., No. 2:11-cv-05858-CAS (MANx), 2014 WL 572365, *7 (C.D. Cal. February 3, 2014)(Snyder, J.)). What the plaintiffs did differently in ConAgra II, however, was to incorporate an additional analytical step: in addition to using Dr. Weir's hedonic regression analysis to determine that total price premium attributable to the 100% Natural label, the plaintiffs proposed that a second expert, Dr. Howlett, would conduct a conjoint analysis to determine how much of that total price premium could be explained by consumers' belief that the label meant that the product was GMO-free. See ConAgra II, 90 F. Supp. 3d at 1025. In essence, Dr. Howlett

136. The problem with Dr. Dubé's conjoint analysis does not apply to both theories equally, however. Both theories argue that the Defendants acted deceptively by labelling their products as natural and as additive-free when the products were not natural and contained additives. Under the Safer Cigarette Theory, the "Defendants can and do charge a price premium for Natural American Spirit cigarettes because consumers believe that they are healthier and safer." SAC ¶ 89, at 36. The Plaintiffs assert that they and Dr. Dubé rely on their other experts' conclusions that these labels are misleading in the specific ways that give rise to this liability theories here.[75] See Motion to Exclude Dr. Dubé Opposition at 14. This assertion

---

> proposes to take the total price premium calculated by Weir and multiply it by the percentage derived from her conjoint analysis. Such a calculation would necessarily produce a damage figure attributable *solely to ConAgra's alleged misconduct* -- i.e., misleading consumers to believe that Wesson Oils contain no GMOs by placing a "100% Natural" label on the products.

90 F. Supp. 3d at 1025 (emphasis in original). With this new, hybrid methodology in place, Judge Morrow determines that the plaintiff's damages model satisfies Comcast v. Behrend's requirement that the damages model fit the plaintiffs' theory of liability. ConAgra II, 90 F. Supp. 3d at 1031. See Briseno v. ConAgra Foods, Inc., 674 F. App'x 654, 657 (9th Cir. 2017)(determining on appeal that Judge Morrow did not abuse her discretion in concluding that the hybrid model tracked the plaintiffs' theory of liability under Comcast v. Behrend). The Plaintiffs here do not add another expert to make this additional analytical step, so the faults with Dr. Dubé's conjoint analysis remain.

[75]Specifically, the Plaintiffs assert that "Drs. Pearson, Proctor, and Cummings opine that the reasonable consumer interprets the Challenged Claims to mean NAS Cigarettes may be less harmful than other brands of cigarettes." Certification Reply at 40. Of these three experts, the Defendants have moved under Daubert to exclude Dr. Pearson's expert report and opinions in their entirety. See Motion to Exclude Dr. Pearson at 1-42. The Defendants argue that Dr. Pearson's opinions are not reliable under Daubert for two reasons, namely that: (i) she does not report objectively and accurately the findings of the studies which she has conducted and of others' published works, and instead acts as an advocate instead of a scientist; and (ii) she relies on "'unfounded extrapolation[s]'" that make her methodology and conclusions unreliable. Motion to Exclude Dr. Pearson at 1-3 (quoting White v. Town of Hurley, No. CIV 17-0983 JB/KRS, 2019 WL 1411135, at *28 (D.N.M. March 28, 2019)(Browning, J.)). Further, regarding Daubert's relevance prong, the Defendants argue that Dr. Pearson's opinions are not helpful to the Court, because the studies which she cites "do not identify or analyze data on NAS

consumers," who are the relevant consumers in this case. Motion to Exclude Dr. Pearson at 3-4.

Regarding their first reliability argument, the Defendants argue that Dr. Pearson "consistently fails to disclose data and findings that conflict with her position, and instead cherry-picks data that she views as supporting it -- violating both the basic requirements of the scientific method and authoritative survey research standards." Motion to Exclude Dr. Pearson at 10. They pose two arguments in support of this assertion, that: (i) Dr. Pearson has omitted data and studies that are inconsistent with her preferred conclusions; and (ii) her analyses are results-driven and therefore are contrary to the scientific method and the survey standards on which she purports to rely. See Motion to Exclude Dr. Person at 11-21. In support of their first argument, the Defendants assert that the scientific method demands objectivity and that establishing first a firm conclusion, and then conducting research to reach that conclusion, is antithetical to the scientific method and a clear example of applying a methodology unreliably. See Motion to Exclude Dr. Person at 11 (quoting In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Prods. Liab. Litig. (No II), 892 F.3d 624, 634 (4th Cir. 2018); Pueblo of Jemez v. United States, 430 F. Supp. 3d at 1162; United States v. Rodriguez, 125 F. Supp. 3d 1216, 1233-34 (D.N.M. 2015)(Browning, J.)). Similarly, they assert that the American Association for Public Opinion Research's Best Practices for Survey Research, which Dr. Pearson has offered as authoritative, directs researchers to report contradictory or unfavorable findings. See Motion to Exclude Dr. Person at 11 (quoting AAPOR, Best Practices for Survey Research, and citing Pearson Depo. at 92:23-93:8). The Defendants assert that Dr. Pearson: [redacted]

The Plaintiffs counter that "that Defendants disagree with Dr. Pearson's opinions, and believe they should have been based on other data, is not grounds to exclude her testimony." Motion to Exclude Dr. Pearson Opposition at 10 (citing General Elec. Co. v. Joiner, 522 U.S. at 146). They argue that Dr. Pearson's opinions satisfy the Daubert criteria, including that her theories and techniques have been tested and follow established standards, that her theories have been subject to peer-review and statistical analysis, and that the scientific community accepts her methodologies. See Motion to Exclude Dr. Pearson Opposition at 10-12. With respect to the Defendants' first argument, the Plaintiffs contend that Dr. Pearson did not omit data selectively, and that any concerns regarding the data's completeness go towards its weight and not to its admissibility. See Motion to Exclude Dr. Pearson Opposition at 10-17. [redacted]

[redacted]

The Court concludes that Dr. Pearson's omissions are not fatal to the Pearson Report's reliability on the grounds that they do not comport with the methodologies which the AAPOR establishes as best practices. The Defendants are correct that Dr. Pearson endorses the AAPOR's set of best practices for survey research, see Pearson Depo. at 83:14-20 (Pearson, Reisman), but the Defendants' reliance on the AAPOR's best practices is misplaced here. Those standards apply to designing and conducting surveys, and then to communicating the data obtained from those surveys. See Best Practices for Survey Research. Thus, if Dr. Pearson had conducted a survey study and purposely had omitted questionnaires from respondents whose responses did not align with her desired conclusion, for example, she would have violated these best practices. The Defendants do not attack, however, the underlying studies on which Dr. Pearson relies, but argue that she did not discuss certain studies or survey results in completing the Pearson Report. Dr. Pearson did not conduct novel survey research in creating the Pearson Report, but rather "was asked to render opinions on what the research to date shows . . . ." Pearson Report at 3. In other words, she engages in a form of meta-analysis, in which she compiles various studies and summarizes their conclusions. See Pearson Report at 1-25. That the Defendants assert that she has omitted studies or survey data in reaching her conclusions on what the scientific literature says is not an attack on Dr. Pearson's adherence to the AAPOR's survey standards.

What is troubling, however, is that the Pearson Report does not explain Pearson's methodology for collecting these studies, such as whether she limited her search in terms of scope or time, or whether she focused broadly on the impacts of cigarette labeling in the industry at large or specifically on Natural American's labeling practices. The Defendants' assertion that Dr. Pearson omits relevant studies is particularly concerning given that the Pearson Report's sole focus is to summarize the studies that academics have conducted in the field. Regarding the three studies with which the Defendants take issue, however, only [redacted] Study is of concern. Dr. Pearson does not omit the 2019 study and Pearson in Preparation from the Pearson Report, and discusses their findings. See Pearson Report at 6, 12. To the extent that the Defendants disagree with Dr. Pearson's presentation of the studies' conclusions or believe that she has not summarized them accurately, such concerns are appropriate grounds for cross-examination, but do not weigh on her opinion's admissibility. The Court acknowledges that the Pearson Report does not include [redacted] Study's results, but accepts Dr. Pearson's deposition testimony that she did not have access to the study's preliminary analyses before submitting the Pearson Report. See Pearson Depo. at 56:11-25 (Pearson, Reisman, Schultz). Accordingly, the Court will not exclude Dr. Pearson's opinions on this ground.

The Defendants argue next that, setting aside any study data which Dr. Pearson did not disclose, "even the data and studies on which she 'relies' do not support her conclusions," because she extrapolates excessively, and there is too large of an analytical gap between the data and her conclusions. Motion to Exclude Dr. Pearson at 21 (citing White v. Town of Hurley, 2019 WL 1411135, at *28; Dodge v. Cotter Corp., 328 F.3d 1212, 1221-22 (10th Cir. 2004)). They argue that, of the studies on which she relies, only two report data that is specific to Natural American smokers, and that they stem from a single study that used as its subjects individuals

who smoke Natural American cigarettes as their usual brand. See Motion to Exclude Dr. Pearson at 22. They analogize her extrapolations to cases in which courts have excluded expert opinions that extrapolate animal test results to humans, and assert that "'[a] court is not required "to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."'" Motion to Exclude Dr. Pearson at 22 (quoting Pueblo of Jemez v. United States, 430 F. Supp. 3d at 1162 (quoting General Elec. Co. v. Joiner, 522 U.S. at 146, and citing Tyler v. Sterling Drug, Inc., 19 F. Supp. 2d 1239, 1244 (N.D. Okla. 1998)(Cook, J.)), and citing Hollander v. Sandoz Pharma. Corp., 289 F.3d 1193, 1207-09 (10th Cir. 2002)). The problem with this extrapolation, the Defendants assert, is that the proposed classes -- and sixty-percent of Natural American smokers -- are not limited to those who usually smoke Natural American cigarettes, and that Dr. Pearson uses studies that focus only on usual Natural American smokers and studies that do not report conclusions regarding Natural American smokers at all. See Motion to Exclude Dr. Pearson at 23-25. They also argue that the studies which Dr. Pearson cites do not test Natural American descriptors as they actually appear, and that it is too great of an analytical leap to extrapolate from a study which evaluated whether consumers thought Natural American cigarettes "*might*" be safer to a conclusion that consumers believe Natural American cigarettes "*are*" safer. Motion to Exclude Dr. Pearson at 30 (emphasis in original). See id. at 26-30. Finally, they argue that the study which Dr. Pearson cites to support her opinion that these misperceptions impact consumers' purchasing behavior refutes that conclusion. See Motion to Exclude Dr. Pearson at 33.

The Plaintiffs respond that what the Defendants view as improper extrapolation is really a disagreement with Dr. Pearson's conclusions, and argue that, "[i]f an opposing party perceives weaknesses in the factual basis of an expert's opinion, the testimony is nevertheless admissible and should instead be the subject of cross-examination." Motion to Exclude Dr. Pearson Opposition at 20 (citing Hertz Corp. v. Gaddis-Walker Elec., Inc., 125 F.3d 862 (table), 1997 WL 606800 (10th Cir. October 2, 1997); Duke Energy Field Serv., LP v. Gandy Corp., Nos. CV 05–1342 WPL/RLP, CV 06–0318 WPL/CEG, 2006 WL 5186540, at *3 (D.N.M. December 27, 2006)(Lynch, M.J.)). They argue that extrapolation is common in scientific research and that Dr. Pearson's extrapolation here is reasonable. See Motion to Exclude Dr. Pearson Opposition at 21-22 (citing Joiner, 522 U.S. at 146; Mitchell v. Gencorp Inc., 165 F.3d 778, 781 (10th Cir. 1999)). They argue that "the perceptions of people who do not smoke NAS are relevant because all, and particularly smokers of other brands, are potential NAS consumers . . . ." Motion to Exclude Dr. Pearson Opposition at 21.

The Court concludes that Dr. Pearson's extrapolations are not unreasonable and that, to the extent that the Defendants disagree with her ultimate conclusions based on those extrapolations, they may interrogate them on cross-examination. The extrapolations that courts have concluded create too great of an analytical gap often involve untested hypotheses and the importing of animal-test results into the human context. See Pueblo of Jemez v. United States, 430 F. Supp. 3d at 1162 (citing Norris v. Baxter Healthcare Corp., 397 F.3d at 887; In re Breast Implant Litig., 11 F. Supp. 2d 1217, 1228 (D. Colo. 1998)(Sparr. J.); Gen. Elec. Co. v. Joiner, 522 U.S. at 146; Tyler v. Sterling Drug, Inc., 19 F. Supp. 2d at 1244, and citing Hollander v. Sandoz Pharma. Corp., 289 F.3d at 1207-09). Although the cases which Dr. Pearson cites may not focus specifically on the exact cigarette-smoker whom the Defendants contend should be at issue here, the Court does not conclude that Dr. Pearson's extrapolations of these survey data to

does not rebut the Defendants' argument that consumers may be willing to pay a price premium based on the non-health-related implications of labels like natural, organic, and additive-free. Indeed, the Defendants note that Dr. Dubé concedes that his model does not consider other possible interpretations of the label's language. See Certification Opposition at 75 (quoting Dubé Depo. at 175:20-175:20).

137. Regarding the Menthol Theory, however, the Plaintiffs argue that, "[c]ontrary to the explicit claim on every label that Natural American Spirit cigarettes contain 'additive-free natural tobacco,' Defendants add additive to Natural American Spirit menthol cigarettes." SAC ¶ 68, at 31. In the Certification Reply, the Plaintiffs frame this theory as arguing that the "Defendants warranted that the Menthol NAS Cigarettes were additive-free. There is substantial common evidence that this representation is false, and therefore actionable, as well as misleading to a reasonable consumer." Certification Reply at 42. This theory aligns more closely with the group of cases which the Court discusses above that involve misleading labels which do not rely on the consumers' interpretation of the label such that the plaintiffs' damages model needs to worry about different categories of harm. See Hilsley v. Ocean Spray Cranberries, Inc., 2018 WL 6300479, at *2, *13-15; Broomfield v. Craft Brew All., Inc., No. 17-01027, 2018 WL 4952519, at *14-16; In re Dial Complete Mktg. & Sales Practices Litig., 320 F.R.D at 327, 333; Price v. L'Oreal USA, Inc., 2018 WL 3869896, at *9. The Defendants' effort to argue that the Menthol Theory fails under Comcast v. Behrend, because additive-free could stand for a belief that menthol is not an additive and that the cigarettes are free of other, non-menthol additives, goes too far. See Certification Opposition at 78. The Court already has concluded that the

---

interpret other smokers' and non-smokers' behavior and beliefs renders her conclusions unreliable. Accordingly, the Court denies the Motion to Exclude Dr. Pearson.

additive-free description on Natural American's menthol products plausibly misleads a reasonable consumer and notes that menthol is an additive. See MTD MOO at 173. Thus, to the extent that consumers believed that Natural American menthol cigarettes did not contain additives based on the additive-free label's assertion to that effect, Dr. Dubé's model is designed to calculate the price premium associated with that label. See Dubé Report ¶ 46(iii), at 19. Accordingly, the Court concludes that Dr. Dubé's damages model is not an adequate fit with the Plaintiffs' Safer-Cigarette theory, but is an adequate fit for their Menthol Theory.

138. The Defendants' second argument is that, even if Dr. Dubé's model is tied to the Plaintiffs' liability theories, it measures willingness-to-pay, which the Defendants assert is not a valid measure of damages in consumer-fraud cases. See Certification Opposition at 79-82. The Defendants assert that, instead, the appropriate damages measure should be "'determined by taking the difference between the market price actually paid by consumers and the true market price that reflects the impact of the unlawful, unfair, or fraudulent business practices.'" Certification Opposition at 79 (quoting In re 5-Hour Energy Mktg. & Sales Pracs. Litig., 2017 WL 2559615, at *10). The Defendants assert that, to calculate this value, Dr. Dubé must consider supply-side variables -- namely, the market's willingness-to-sell -- in addition to consumers' willingness-to-pay, which is a demand-side variable. See Certification Opposition at 80. The Defendants acknowledge that Dr. Dubé has proposed a marketplace simulation to address the supply-side variables, but argue that his calculations will not fit the Plaintiffs' liability theories, and criticize his assertion that he has not reviewed Santa Fe's cost data but instead will infer those data as lacking support. See Certification Opposition at 81.

139. The Plaintiffs assert that Dr. Dubé has suggested two ways to measure economic damages: (i) the price premium; and (ii) willingness-to-pay. See Certification Reply at 42 (citing

Dubé Report ¶¶ 29-33, at 11-13). They assert that willingness-to-pay is "the relevant measure of compensation to consumers." Certification Reply at 43 (citing Dubé Report ¶ 21, at 8). The Plaintiffs also assert that Dr. Dubé accounts for supply-side factors, because he acknowledges that competitor brands sell and differentiate their products based in part on price and incorporates this phenomenon in his model. See Certification Reply at 43 (citing Dubé Report ¶¶ 17, 27, 33, at 8. 10, 13).

140. In the Dubé Report, Dr. Dubé asserts that there are two components to economic damages that misled consumers confront: (i) a price premium, because the product's price would have been lower but-for the misleading labels; and (ii) willingness-to-pay, because consumers do not receive the full value for which they paid. See Dubé Report ¶ 22, at 9. He asserts that he will compute both values to determine the damages applicable to the Plaintiffs' proposed class members. See Dubé Report ¶¶ 25, 29, at 9, 11. According to Dr. Dubé, calculating the price premium involves conducting a marketplace simulation that simulates a market in which competitors compete on price, and assumes "that each firm sets its prices to maximize the profits from the sale of its brands in this competitive marketplace." Dubé Report ¶ 25, at 9-10. The Court agrees with the Plaintiffs that this methodology considers supply-side willingness-to-sell and addresses adequately the Defendants' concerns that his calculations do not consider the supply-side in calculating the market price.

141. Although the Defendants contend that this marketplace simulation is an inadequate fit to the Plaintiffs' liability theories, the Court has considered this argument above and determined that Dr. Dubé's proposed methodology is an adequate fit for class certification purposes. The Defendants argue further that Dr. Dubé has not reviewed cost data and instead will make inferences about those data. See Certification Opposition at 81. That Dr. Dubé has

not reviewed this data yet is not relevant to the Court's predominance analysis, as it does not bear on whether individualized inquiries predominate over common questions and, in any event, the Plaintiffs do not need to be able to calculate each class member's damages at the class certification state. See In re Rail Freight Fuel Surcharge Antitr. Litig., 292 F. Supp. 3d 14, 142 (D.D.C. 2017)(Friedman, J.). To the extent that Santa Fe produces cost data through discovery, Dr. Dubé will be able to review it, addressing the Defendants' concerns. Further, the Court above has permitted Dr. Dubé's methodology in the face of the Defendants' Daubert challenge, and, if Santa Fe's cost data is not discoverable, has accepted the methodology with which Dr. Dubé plans infer Santa Fe's cost data. Accordingly, the Defendants' argument on this point does not disrupt the Court's conclusion above that Dr. Dubé's damages model is not an adequate fit with the Plaintiffs' Safer-Cigarette theory, but is an adequate fit for their Menthol Theory.

142. In summary, the Court concludes with respect to the Nationwide Menthol Subclass' predominance inquiry that: (i) the Nationwide Menthol Subclass members are readily ascertainable using objective criteria; (ii) administrative feasibility concerns tilt against a conclusion that common questions predominate; (iii) if an objective standard applies to all class members' claims, that class members may have seen different representations does not mean that individualized inquiries will predominate over common questions with respect to the express-warranty claim, because the Court limits the Nationwide Menthol Subclass period to 2017, when the Defendants ceased using additive-free labels on their cigarette products; (iv) the transferor courts' choice-of-law provisions direct the Court to apply the express-warranty laws of each State in which class members purchased Natural American cigarettes, which tilts against a conclusion that common questions predominate; and (v) to the extent that the Plaintiffs bring their claims for the Nationwide Menthol Subclass under the Menthol Theory and not the Safer-

Cigarette Theory, Dr. Dubé's proposed damages model does not require individualized inquiries that will predominate over common questions. The Court has serious concerns regarding the Nationwide Menthol Subclass' administrative feasibility, and because the Nationwide Menthol Subclass requires the application of the laws of each State in which consumers purchase Natural American cigarettes, concerns which, in addition to implicating "the likely difficulties in managing a class action," Fed. R. Civ. P. 23(b)(3)(D), lead the Court to conclude that common questions do not predominate over individualized inquiries. Accordingly, the Nationwide Menthol Subclass does not satisfy rule 23(b)(3)'s predominance requirement, and the Court will not certify the Nationwide Menthol Subclass.

**F. THE NATIONWIDE MENTHOL SUBCLASS DOES NOT SATISFY RULE 23(b)(3)'S SUPERIORITY REQUIREMENT.**

143. Rule 23(b)(3)'s second requirement is that the proposed class action be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Rule 23(b)(3) provides a non-exhaustive list of factors to consider, including:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3)(A)-(D). Both parties agree that manageability is the most important factor for the superiority analysis. See Certification Motion at 84 (quoting Daye v. Cmty. Fin. Serv. Ctrs., LLC, 313 F.R.D. at 173); Certification Opposition at 82 (quoting Payne v. Tri-State

CareFlight, 332 F.R.D. at 682). The Plaintiffs assert that negative-value class actions establish superiority and that each of these factors support additionally a conclusion that the nationwide menthol class action is a superior litigation vehicle. See Certification Motion at 84-85. Specifically, they state that: (i) litigation costs dwarf each class members' claim; (ii) because of this cost imbalance, class members have little interest in controlling the actions, and if they had a greater interest, they could opt out of the class; (iii) there are no similar matters pending outside of this multidistrict litigation; (iv) concentrating the class members' claims is desirable, because it provides economies of scale; and (v) trial is manageable, because the cases will return to their transferor courts or otherwise will be consolidated. See Certification Motion at 84-85 (citing Fed. R. Civ. P. 23(b)(3); Anderson Living Tr. v. WPX Energy Prod., LLC, 306 F.R.D. at 407; Daye v. Cmty. Fin. Serv. Ctrs., LLC, 313 F.R.D. at 171). The Defendants argue that the presence of individualized issues that predominate over common questions suggests that the class action also will be a less desirable vehicle to resolve the class members' claims. See Certification Opposition at 82 (quoting Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Serv., Inc., 601 F.3d at 1184). They point to the same factors which they raised in the predominance inquiry -- that the classes are not readily ascertainable, that class members received different information, that the class members suffered different injuries -- to argue that they also make the litigation unmanageable, even where negative-value claims are at stake. See Certification Opposition at 82-83. The Defendants also attack the Nationwide Menthol Subclass' express-warranty claim, because certification requires applying the laws of all fifty States. See Certification Opposition at 83 (quoting Pilgrim v. Universal Health Card, LLC, 660 F.3d 943, 948 (6th Cir. 2011), and citing In re OnStar Contract Litig., 278 F.R.D. 352, 386 (E.D. Mich. 2011)(Cox, J.)).

144. The Court previously has recognized two factors which give the Plaintiffs a "leg up" in establishing superiority: (i) that these claims are negative-value claims, meaning that they individually would not be worth pursuing; and (ii) that the class consists of so many similar cases and potential individual plaintiffs that the judiciary would struggle to handle them all separately. Anderson Living Tr. v. WPX Energy Prod., LLC, 306 F.R.D. at 407. The first factor is part of "[t]he policy at the very core of the class action mechanism . . . ." Anderson Living Tr. v. WPX Energy Prod., LLC, 306 F.R.D. at 407 (quoting Amchem Prods., Inc. v. Windsor, 521 U.S. at 617).

145. The Court additionally reviews the four factors that rule 23(b)(3) provides, beginning with the class members' interest in controlling the litigation individually. See Fed. R. Civ. P. 23(b)(3)(A). In analyzing this factor, the Court considers the likelihood that class members would bring their own claims or that they would be savvy enough to know that they can bring their claims in the first place. See Hicks v. Client Servs., Inc., 257 F.R.D. at 701. The Court agrees with the Plaintiffs that, for the Nationwide Menthol Subclass, litigation costs dwarf the value of each class members' individual express-warranty claims, see Certification Motion at 84, and considers it likely that most individual plaintiffs would not know that they have an actionable express-warranty claim in the first place. The Plaintiffs also are correct that, because they move to certify the Nationwide Menthol Subclass, if the Court were to certify the class, rule 23(c)(2)(B)(v) directs the Court to, in providing notice to potential class members, inform them that they may opt out of the class. See Fed. R. Civ. P. 23(c)(2)(B)(v). Thus, to the extent that individual class members have a particularly strong interest in controlling the litigation, they may opt out of the Nationwide Menthol Subclass and pursue their claims individually. Cf. In re Petrobras Secs., 862 F.3d at 268 n.19 (noting that "due process concerns regarding notice to

absent class members," which rule 23(b)(2)(B) addresses, properly fall under a court's superiority analysis).

146. Regarding the second and third factors -- the extent to which class members have begun similar litigation elsewhere and the desirability of concentrating litigation in this district -- the JPML addressed these considerations to some extent already when it consolidated these actions before the Court. See Transfer Order at 1, filed April 11, 2016 (Doc. 1)("[W]e find that these actions involve common questions of fact, and that centralization will serve the convenience of the parties and witnesses and promote the just and efficient conduct of this litigation."). The Defendants have not demonstrated that any potential class members have begun litigation elsewhere, and the Court has not identified such ongoing litigation. The Court notes, however, that twelve of the seventeen consolidated class actions propose some form of nationwide class. See supra, at 283-84 (listing the consolidated actions which propose a nationwide class). Thus, to the extent that the Court will remand some or all of these class actions at the certification process' conclusion, there will be several ongoing classes, although it does not appear that any of them are individual actions. Nevertheless, the Court determines the JPML's consolidation of a total of seventeen class actions and tag-along actions to be a strong indicator of the desirability of consolidating these claims. Even if the JPML had not taken such action, the Court would determine that it is desirable to consolidate these claims, because, as it notes in its discussion on numerosity, there are potentially millions of class members. Assuming that every potential class member would bring his or her claim individually, the millions of claims would overwhelm the courts, and consolidating the individual claims into class actions avoid that result.

147. The Defendants assert, however, that many of the same issues that implicate

predominance make the class action a less-superior means of adjudicating the proposed class members' claims. See Certification Opposition at 82-83. These issues include that the classes are not readily ascertainable, that class members received different information, that the class members suffered different injuries and that, regarding the Nationwide Menthol Subclass' express-warranty claim, certification requires applying the laws of all fifty States. See Certification Opposition at 82-83 (quoting Pilgrim v. Universal Health Card, LLC, 660 F.3d at 948, and citing In re OnStar Contract Litig., 278 F.R.D. at 386). The Court concludes above that the information that class members received and their differing injuries are not individualized inquiries that will predominate over common questions and, for the same reasons, does not consider that these issues make the Nationwide Menthol Subclass an inferior litigation vehicle.

148. The Court also concludes above, however, that there are serious administrative feasibility concerns in identifying proposed class members, and that applying the law of all fifty States regarding express-warranty claims tilts against concluding that common questions predominate over individualized inquiries. In reaching this conclusion, the Court notes that those concerns implicate "'the likely difficulties in managing a class action.'" Supra, at 299 (quoting Fed. R. Civ. P. 23(b)(3)(D)). The need to apply each of the fifty States' express-warranty laws tilts especially against a conclusion that the Nationwide Menthol Subclass is manageable, and other courts have concluded that nationwide class actions are unmanageable where many jurisdictions' laws apply and where the plaintiffs have not shown conclusively that those laws do not conflict. See In re Bridgestone/Firestone, Inc., 288 F.3d at 1018 ("Because these claims must be adjudicated under the law of so many jurisdictions, a single nationwide class is not manageable."); Powers v. Lycoming Engines, 272 F.R.D. 414, 427 (E.D. Pa. 2011)(Savage, J.)(citing In re Bridgestone/Firestone, Inc., 288 F.3d at 1018; In re Am. Medical

Sys., Inc., 75 F.3d at 1085); Cole v. Gen. Motors Corp., 484 F.3d 717, 724-25 (5th Cir. 2007)(establishing that the plaintiffs burden to demonstrate predominance in a nationwide class action includes demonstrating that different jurisdictions' laws do not differ meaningfully). The Plaintiffs here have not made this demonstration. Because the "manageability factor . . . is, by the far, the most critical concern in determining whether a class action is a superior means of adjudication," Newberg and Rubenstein on Class Actions § 4:72 that the Court determines that the Plaintiffs have not shown that the Nationwide Menthol Subclass is manageable leads the Court to conclude that the Nationwide Menthol Subclass is not a superior vehicle for litigating these claims, even though this action consists of negative-value claims. In addition to the Court's determination above that the Plaintiffs have not demonstrated that common claims predominate over individualized inquiries, the Court concludes that, because the Plaintiffs have not demonstrated that the Nationwide Menthol Subclass is a superior litigation method, it will not certify the Nationwide Menthol Subclass for that reason. Because the Plaintiffs move for class certification for a variety of State menthol subclasses in the alternative to the Nationwide Menthol Subclass, the Court will consider those subclasses in its analysis on each of the State classes below.

## II. THE COURT CERTIFIES UNDER RULE 23(B)(3) THE CALIFORNIA MENTHOL SUBCLASS TO THE EXTENT THAT IT IS PREMISED ON THE MENTHOL THEORY BUT DOES NOT CERTIFY THE CALIFORNIA CLASS OR THE CALIFORNIA MENTHOL SUBCLASS TO THE EXTENT THAT IT IS PREMISED ON THE SAFER-CIGARETTE THEORY.

149. The Court turns to the Plaintiffs' proposed California Class and California Menthol Subclass (the "California Classes"). The Court first reviews whether the proposed classes satisfy rule 23(a)'s numerosity, commonality, typicality, and adequacy requirements. The Court next reviews whether the proposed classes satisfy rule 23(b)(3)'s predominance and

superiority requirements. Because the California Class members and the California Menthol Subclass members seek injunctive relief, the Court also will consider whether the proposed classes satisfy rule 23(b)(2)'s requirements.

**A. THE CALIFORNIA CLASSES SATISFY RULE 23(a)'S REQUIREMENTS.**

150. The Court first considers rule 23(a)'s numerosity, commonality, typicality, and adequacy requirements. See Fed. R. Civ. P. 23(a). The Defendants do not dispute that the Plaintiffs' proposed classes satisfy rule 23(a)'s numerosity and adequacy requirements, and the Court reiterates its analysis for the Nationwide Menthol Subclass above, concluding that the Plaintiffs' proposed classes satisfy these two requirements. See Certification Opposition at 20. Accordingly, the Court focuses its analysis here on the commonality and typicality requirements.

**1. The California Classes Satisfy Rule 23(a)'s Commonality Requirement.**

151. Neither the Plaintiffs nor the Defendants raise any commonality arguments that are unique to the California Classes. In considering whether the Nationwide Menthol Subclass satisfies rule 23(a)'s commonality requirement, the Court discusses whether common questions exist that go to the resolution of the express-warranty claim which the Nationwide Menthol Subclass alleges. Here, the California Classes bring four claims: (i) a violation of the Consumers Legal Remedies Act, Cal. Civ. Code § 1750 ("CLRA"), alleging that the Defendants used deceptive representations with respect to Natural American cigarettes under Cal. Civ. Code §§ 1770(a)(4)-(5), (7), which they knew likely were to mislead consumers to believe that the cigarettes were healthier than other brands and that they did not contain additives, see SAC ¶¶ 136-50, at 46-49; (ii) a violation of the False Advertising Law, Cal. Bus. & Prof. Code § 17500 ("FAL"), alleging that the Defendants labeled, marketed, or disseminated information

through public advertising that was deceptive and misleading, see SAC ¶¶ 151-60, at 49-50; (iii) a violation of the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 ("UCL"), alleging that the Defendants' deceptive conduct constitutes an unfair and fraudulent business practice, see SAC ¶¶161-70, at 50-53; and (iv) a claim for unjust enrichment, alleging that, as a result of the Defendants' conduct, they obtained unjust benefits, see SAC ¶¶ 171-76, at 53-54.

152. The Court concludes that there exist "questions of law or fact" that are central to the Plaintiffs' claims that are capable of generating a common answer. Fed. R. Civ. P. 23(a)(2). For example, whether the Defendants' labels misrepresented the cigarettes' qualities or ingredients, whether the labels likely were to deceive a reasonable consumer, and whether the Defendants knew that these labels likely were to mislead the public, are all questions capable of generating common answers that are central to the Plaintiffs' California State-law claims. See Wal-Mart v. Dukes, 564 U.S. at 350; Kumar v. Salov N. Am. Corp., 2016 WL 3844334, at *4 (noting that, under the CLRA, UCL, and FAL, "[t]he central question here is whether [the] labels were likely to deceive a reasonable consumer"). Given the CLRA, UCL, and FAL's reliance on a reasonable consumer standard, see Kumar v. Salov N. Am. Corp., 2016 WL 3844334, at *4, the Court is not concerned at the commonality stage with the Defendants' argument that individual consumers may have understood and interpreted the labels differently. See Certification Opposition at 20. The California Classes' unjust enrichment claim similarly is predicated on the Defendants' deceptive conduct under the CLRA, UCL, and FAL. See SAC ¶ 172, at 53. Accordingly, similar questions are central to that claim's resolution. The Court concludes, therefore, that the Plaintiffs' proposed California Classes satisfy rule 23(a)'s commonality requirement.

**2. The California Classes Satisfy Rule 23(a)'s Typicality Requirement.**

153. As the Court discusses above in its discussion on typicality for the Nationwide Menthol Subclass, "[t]he commonality and typicality requirements of Rule 23(a) tend to merge." Gen. Tele. Co. of the Sw. v. Falcon, 457 U.S. at 157 n.13. The Defendants dispute the Plaintiffs' showing of typicality for the same reasons that they dispute commonality and for specific reasons relating to individual named Plaintiffs, none of whom represent the California Classes. See Certification Opposition at 22-24. Thus, aside from the arguments regarding typicality which the Court addresses in its discussion on the Nationwide Menthol Subclass above, neither the Plaintiffs nor the Defendants raise typicality arguments that are unique to the California Classes. Without argument to the contrary, the Court concludes that "the claims of the class representative[s] and class members are based on the same legal or remedial theory," and that the California Classes satisfy rule 23(a)'s typicality requirement. Adamson v. Bowen, 855 F.2d at 676.

**B. THE CALIFORNIA CLASS DOES NOT SATISFY RULE 23(b)(3)'S PREDOMINANCE REQUIREMENT, AND THE CALIFORNIA MENTHOL SUBCLASS SATISFIES IN PART RULE 23(b)(3)'S REQUIREMENTS.**

154. Having determined that the California Classes satisfy rule 23(a)'s requirements, the Court next turns to rule 23(b)(3)'s requirements. The Court first considers whether individual questions will predominate over common issues. Next, the Court considers whether a class action is a superior method of litigating the California Classes' claims.

**1. The California Class Does Not Satisfy Rule 23(b)(3)'s Predominance Requirement, But the California Menthol Subclass Satisfies the Predominance Requirement to the Extent that Its Claims Are Premised on the Menthol Theory.**

155. The Defendants raise a number of objections to the Plaintiffs' assertion that the

California Classes satisfy rule 23(b)(3)'s predominance requirement, specifically that: (i) the proposed class members are not readily ascertainable; (ii) the proposed class members may have seen different labels and representations, and their interpretations of those labels and representations may differ; (iii) the Plaintiffs' statutory and unjust enrichment claims require proof that the labels misled each class member, and, where materiality is at issue, the Plaintiffs have not shown classwide materiality; and (iv) the Plaintiffs' liability theories do not align with their proposed method for proving classwide damages. See Certification Opposition at 25-82. The Court has analyzed some of these objections in considering the Nationwide Menthol Subclass above. There, the Court concludes that: (i) the proposed Nationwide Menthol Subclass members are identifiable by objective criteria but that administrative feasibility concerns tilt against a conclusion that the Nationwide Menthol Subclass satisfies the predominance requirement; (ii) to the extent that the Nationwide Menthol Subclass relies on an objective standard for determining liability, how individuals interpreted the labels does not defeat predominance[76]; and (iii) the Plaintiffs' proposed damages methodology is not an adequate fit with the Plaintiffs' Safer-Cigarette Theory, but is an adequate fit with the Plaintiffs' Menthol Theory. The Court also redefines the Nationwide Menthol Subclass period to include only purchasers before 2017, when the Defendants stopped using the additive-free language. The Court concludes that, for the same reasons it applies to the Nationwide Menthol Subclass, administrative feasibility concerns tilt against a conclusion that the California Classes satisfy predominance and that the Plaintiffs' proposed damages model is not an adequate fit with the Plaintiffs' Safer-Cigarette Theory -- applicable to both of the California Classes -- but that it is

[76]The Court concludes, however, that, because the Nationwide Menthol Subclass requires the application of all fifty States' express-warranty laws, determining the answer to this question raises individualized questions and makes the Nationwide Menthol Subclass unmanageable.

an adequate fit with the Plaintiffs' Menthol Theory -- applicable only to the California Menthol Subclass. The Court considers here in more depth the Defendants' arguments that: (i) the proposed class members may have seen different labels and representations, and their interpretations of those labels and representations may differ; and (ii) the Plaintiffs' statutory and unjust enrichment claims require proof that the labels misled each class member, and, where materiality is at issue, the Plaintiffs have not shown classwide materiality.

156. First, regarding whether the proposed class members saw different labels, the Court reiterates its agreement with the Defendants' assertion that needing to determine which class members saw Natural American cigarette packaging before October 1, 2017, and which class members saw the packaging after October 1, 2017, when it no longer contained the natural and additive-free labels aside from the brand name, would require individualized inquiry that would tilt against a finding of predominance. See Certification Opposition at 31. The Court notes, however, that it has shortened the class periods to end on October 1, 2017, simplifying this determination and reducing the impact of individualized inquiries. The Court turns, therefore, to the Defendants' argument that, because different consumers may or may not have seen the disclaimers on the cigarettes' packaging and advertisements, whether an individual saw a disclaimer is an individualized question that defeats predominance. See Certification Opposition at 30.

157. The Court agrees that whether an individual consumer saw a disclaimer before purchasing a pack of Natural American cigarettes affects whether that consumer is entitled to damages. The Court summarizes its relevant conclusions in the MTD MOO, namely that: (i) Natural American cigarettes include a disclaimer that "No additives in our tobacco does NOT mean a safer cigarette," MTD MOO at 172 (quoting FTC Consent Order at 4); (ii) this disclaimer

appears both on advertisements and on the cigarettes' packaging; (iii) reasonable consumers would have seen and understood the disclaimer on an advertisement, but often would not have seen the disclaimer on a cigarette package before purchase, because of the disclaimer's location on advertisements as compared to on packaging, as well as the packages' location in a store; (iv) reasonable consumers who saw the disclaimer would understand that a lack of additives does not make Natural American cigarettes healthier; (v) the disclaimer does not cure a reasonable consumer's understanding that the natural label implies that Natural American cigarettes are safer; and (vi) the disclaimer does not cure a reasonable consumer's understanding that menthol is not an additive. See MTD MOO at 171-75.

158. These conclusions create a number of different possible consumers. Under the Safer-Cigarette Theory, the natural label deceives a reasonable consumer into thinking that Natural American cigarettes are healthier than other cigarettes, regardless whether they saw the disclaimer on advertising or packaging. Also under the Safer-Cigarette Theory, the additive-free label deceives reasonable consumers who purchase Natural American cigarettes without seeing the disclaimer, which might happen if they purchase a pack in the store, into believing that Natural American cigarettes are healthier than other cigarettes, but which would not happen if they first saw the disclaimer on an advertisement before purchasing a pack. Under the Menthol Theory, the additive-free label would mislead a reasonable consumer into believing that menthol is not an additive, regardless whether they saw the disclaimer on advertising or packaging. Accordingly, the Safer-Cigarette Theory's applicability to a proposed class member depends on whether they purchased Natural American cigarettes based on the package's natural or additive-free representation, and, if based on the additive-free representation, whether they saw the disclaimer before purchase, because the labeling would not have misled a reasonable consumer

who purchased Natural American cigarettes based on believing that the additive-free label indicated that the cigarettes were healthier if the reasonable consumer also saw the disclaimer before purchase. Accordingly, applying the Safer-Cigarette Theory requires individualized questions which tilt against a conclusion that common questions predominate. Because the Menthol Theory does not hinge on whether a reasonable consumer viewed the disclaimer, however, it does not require individualized inquiries.[77]

159. The Court next considers whether each of the California Classes' statutory and unjust enrichment claims satisfy the predominance requirement. Regarding the UCL, FAL, and CLRA claims, the Plaintiffs argue that courts consider these claims together and that they focus on whether the challenged labeling likely would deceive a reasonable consumer. See Certification Motion at 60 (citing Fitzhenry-Russel v. Dr. Pepper Snapple Grp., Inc., 345 F. Supp. 3d at 1115; Kumar v. Salov N. Am. Corp., 2016 WL 3844334, at *4). They further argue that the statutory claims do not require individualized showings of materiality or reliance. See Certification Motion at 61 (citing Kumar v. Salov N. Am. Corp., 2016 WL 3844334, at *7). The Plaintiffs assert that "[p]roof of materiality requires showing that 'a reasonable consumer would attach importance' to the representations at issue, *or* that 'the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his choice of action.'" Certification Motion at 61 (quoting Kumar v.

[77]The Defendants further argue regarding the Menthol Theory that class members do not hold uniform understandings of the additive-free label's meaning and that some class members lack any belief entirely about the location of menthol in a cigarette. See Certification Opposition at 40-42. To the extent that the Plaintiffs rely properly on objective standards for the California Menthol Subclasses' claim, however, the Court has concluded that the additive-free label misleads a reasonable consumer in this way, see MTD MOO at 173, and will not preclude the California Menthol Subclass from certification on this ground.

Salov N. Am. Corp., 2016 WL 3844334, at *7 (quoting Hinojos v. Kohl's Corp., 718 F.3d 1098, 1107 (9th Cir. 2013))). The Plaintiffs argue that, because they can establish reliance and materiality using objective standards, the California statutory claims are suited to a conclusion that common questions predominate. See Certification Motion at 62-64.

160. The Defendants agree that the Plaintiffs must show materiality on a class-wide basis, but argue that the Plaintiffs have not made this showing. See Certification Opposition at 58. They argue that "[t]his inquiry unavoidably overlaps with the merits of Plaintiffs' claims." Certification Opposition at 59. They argue that the Plaintiffs have not shown evidence that they can show materiality on a class-wide basis under either of their theories of liability. See Certification Opposition at 60-65.

161. First, the Court considers whether the UCL, FAL, and CLRA are subject to class-wide proof. The UCL prohibits "unfair competition," including "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by [the FAL]." Cal. Bus. & Prof. Code § 17200. The FAL, meanwhile, makes it unlawful to disseminate in any advertising device any statement which is known to be untrue or misleading in connection with the selling of products. See Cal. Bus. & Prof. Code § 17500. The CLRA makes unlawful a list of activities, including advertising goods or services with the intent not to sell them as advertised, among other "unfair or deceptive acts or practices." Cal. Civ. Code § 1770(a)(9). These statutes apply a reasonable-consumer test which asks whether "'members of the public are likely to be deceived.'" Williams v. Gerber Prods. Co., 552 F.3d 934, 938 (9th Cir. 2008)(quoting Freeman v. Time. Inc., 68 F.3d 285, 289 (9th Cir. 1995)). Under the UCL and FAL, "this inquiry does not require 'individualized proof of deception, reliance and injury.'" Pulaski & Middleman, LLC v. Google, Inc., 802 F.3d 979, 986 (quoting In

re Tobacco II Cases, 46 Cal. 4th 298, 320, 93 Cal. Rptr. 3d 559, 027 P.3d 20 (Cal. 2009)). Regarding the CLRA, the Ninth Circuit explains:

> A CLRA claim warrants an analysis different from a UCL claim because the CLRA requires each class member to have an actual injury caused by the unlawful practice. *Steroid Hormone Prod. Cases*, 181 Cal. App. 4th 145, 155-56, 104 Cal. Rptr.3d 329, 337 (2010). But "[c]ausation, on a classwide basis, may be established by materiality. If the trial court finds that material misrepresentations have been made to the entire class, an inference of reliance arises as to the class." [In re Vioxx Class Cases], 180 Cal. App. 4th [116,] 129, 103 Cal. Rptr. 3d [83,] 95 [(Cal. Ct. App. 2009)]; *see also Vasquez v. Superior Court*, 4 Cal. 3d 800, 814, 484 P.2d 964, 973, 94 Cal. Rptr. 796, 805 (1971); *Steroid*, 181 Cal. App. 4th at 156-57, 104 Cal. Rptr. 3d at 338 . . . .
>
> Under California law, a misrepresentation or omission is material
>
> > if a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question, and as such materiality is generally a question of fact unless the fact misrepresented is so obviously unimportant that the jury could not reasonably find that a reasonable man would have been influenced by it.
>
> *Steroid*, 181 Cal. App. 4th at 157, 104 Cal. Rptr. 3d at 338-39 (internal quotation marks omitted); s*ee also Engalla v. Permanente Med. Grp., Inc.*, 15 Cal. 4th 951, 977, 938 P.2d 903, 919, 64 Cal. Rptr. 2d 843, 859 (1997).

Stearns v. Ticketmaster Corp., 655 F.3d 1013, 1022-23 (first alteration in Stearns v. Ticketmaster Corp., but not in In re Vioxx Class Cases). Because California law permits a reasonable-consumer standard to satisfy all of the UCL, FLA, and CLRA's elements, they are susceptible to common proof, tilting in favor of a finding of predominance.

162. Second, the Court concludes that, to the extent that the Defendants argue that the Plaintiffs have not proven that the alleged misrepresentations in fact were material on a class-wide basis, this assertion is not a barrier to a finding of predominance as long as the claims themselves are susceptible to class-wide proof. The Court considers the Supreme Court's conclusion in Amgen Inc. v. Conn. Ret. Plan & Tr. Funds instructive:

> The District Court did not err, we agree with the Court of Appeals, by disregarding Amgen's rebuttal evidence in deciding whether Connecticut Retirement's proposed class satisfied Rule 23(b)(3)'s predominance requirement. The Court of Appeals concluded, and Amgen does not contest, that Amgen's rebuttal evidence aimed to prove that the misrepresentations and omissions alleged in Connecticut Retirement's complaint were immaterial. [Connecticut Ret. Plans & Tr. Funds v. Amgen Inc.,] 660 F.3d[ 1170,] 1177 [(9th Cir. 2011)](characterizing Amgen's rebuttal evidence as an attempt to present a "'truth-on-the-market' defense," which the Court of Appeals explained "is a method of refuting an alleged misrepresentation's materiality"). See also Reply Brief 17 (Amgen's evidence was offered to rebut the "materiality predicate" of the fraud-on-the-market theory). As explained above, however, the potential immateriality of Amgen's alleged misrepresentations and omissions is no barrier to finding that common questions predominate . . . . If the alleged misrepresentations and omissions are ultimately found immaterial, the fraud-on-the-market presumption of classwide reliance will collapse. But again, as earlier explained . . . individual reliance questions will not overwhelm questions common to the class, for the class members' claims will have failed on their merits, thus bringing the litigation to a close.

Amgen Inc. v. Conn. Ret. Plan & Tr. Funds, 568 U.S. at 481 (internal cross-references omitted). Here, too, to the extent that the Defendants argue that the Plaintiffs' experts have not proven that all Natural American consumers construed the challenged labels to imply health benefits, or that the Defendants' experts demonstrate instead that health was not a factor in the majority of purchases, see Certification Opposition at 62 (citing Van Liere Report ¶ 59, at 38-39), these assertions are rebuttal evidence. If the factfinder concludes that the majority of consumers do not associate the challenged labels with health benefits, or that a reasonable consumer would not have interpreted the labels in that way, the Plaintiffs will not prevail on their claims. As the Supreme Court explains, "just as a plaintiff class's inability to prove materiality creates no risk that individual questions will predominate, so even a definitive rebuttal on the issue of materiality would not undermine the predominance of questions common to the class." Amgen Inc. v. Conn. Ret. Plan & Tr. Funds, 568 U.S. at 481. Accordingly, to the extent that a State's consumer protection statute's materiality requirement permits common evidence, that the

Defendants contest that the Plaintiffs have not shown at this stage that they definitively have satisfied that requirement is not an obstacle to a finding of predominance.

163. The Defendants next argue that the California Classes' unjust enrichment claims fail, because they require individualized proof. See Certification Opposition at 43-44. The Defendants argue that, under California law, "certification is inappropriate where the unjustness of a defendant's retention of a benefit will depend on individual circumstances." Certification Opposition at 51 (citing Savaglio v. Wal-Mart Stores, Inc., No. C-835687, 2003 WL 25676640; In re Ford Motor Co. E-350 Van Prod. Liab. Litig. (No. II), 2012 WL 379944, at *29, 32 (D.N.J. February 6, 2012)(Salas, J.)). The Plaintiffs, conversely, argue that unjust enrichment or quasi-contract claims, require common proof of the Defendants' conduct, and involve common legal issues for all class members. See Certification Motion at 62 (quoting Astiana v. Kashi Co., 291 F.R.D. 493, 505 (S.D. Cal. 2013)(Huff, J.)).

164. In Astiana v. Kashi Co., the Honorable Marilyn L. Huff, United States District Judge for the United States District Court for the Southern District of California, concludes that common issues predominate regarding a class suit based on quasi-contract claims over a product labeled "Nothing Artificial." 291 F.R.D. at 505. Judge Huff concludes that "quasi-contract claims are appropriate for class certification as they require common proof of the defendant's conduct and raise the same legal issues for all class members." 291 F.R.D. at 505 (citing Keilholtz v. Lennox Hearth Prods., Inc, 268 F.R.D. 330, 344 (N.D. Cal. 2010)(Wilken, J.); Cartwright v. Viking Indus., Inc., No. 2:07-CV-02159, 2009 WL 2982887, at *12-13 (E.D. Cal. September 14, 2009)(Damrell Jr., J.)). Here, that the California Classes rely wholly on objective standards to determine whether the Defendants' labelling was deceptive suggests that their claims are amenable to common proof and raise common legal issues for the proposed class

members in determining whether each class member's purchase occurred under unjust circumstances. See Astiana v. Kashi Co., 291 F.R.D. at 505. Accordingly, the Court concludes that the Plaintiffs' unjust enrichment claims will not cause individualized inquiries to predominate over common questions.

165. In summary, the Court concludes first that administrative feasibility concerns -- namely difficulties in determining whether an individual purchased Natural American cigarettes -- tilt against a conclusion that the California Classes satisfy predominance. Second, the Court concludes that the Plaintiffs' proposed damages model is not an adequate fit with the Plaintiffs' Safer-Cigarette Theory -- applicable to both of the California Classes -- but that it is an adequate fit with the Plaintiffs' Menthol Theory -- applicable only to the California Menthol Subclass. Third, the Court concludes that answering the question whether an individual proposed class member viewed a disclaimer tilts against a finding of predominance for the California Classes' claims based on the Safer-Cigarette Theory, but that it does not tilt against a finding of predominance for the California Menthol Subclass' claim based on the Menthol-Theory. Fourth, the Court concludes that the California Classes' statutory and unjust enrichment claims do not tilt against a finding of predominance. Accordingly, because the Court's only concern with the California Menthol Subclass is its administrative feasibility, Cherry v. Dometic Corp., 986 F.3d at 1303-04 ("[M]anageability problems will 'rarely, if ever, be in [themselves] sufficient to prevent certification.'" (quoting Klay v. Humana, Inc., 382 F.3d at 1272)), the Court concludes that the California Menthol Subclass satisfies rule 23(b)(3)'s predominance requirement to the extent that it brings its claims under the Menthol Theory, but concludes that the California Menthol Subclass does not satisfy the predominance requirement with respect to the Safer-Cigarette Theory, and that the California Class does not satisfy the predominance

requirement.

**2. <u>The California Classes Satisfy Rule 23(b)(3)'s Superiority Requirement</u>.**

166. The second rule 23(b)(3) requirement is that the class action be a superior method of litigating the proposed class members' claims. <u>See</u> Fed. R. Civ. P. 23(b)(3). The Plaintiffs and the Defendants do not raise any arguments regarding superiority that are unique to the California Classes. In concluding above that the Nationwide Menthol Subclass is not a superior vehicle for litigation, the Court acknowledges that the majority of the rule 23(b)(3) factors tilt in favor of concluding that a class action is the superior vehicle for the Nationwide Menthol Subclass' claims, but gives substantial weight to manageability concerns, noting the administrative feasibility issues inherent in determining whether a proposed class member belongs to the class and the additional difficulties in managing a nationwide class where each of the fifty States' laws could require unique jury instructions and other manageability difficulties. For the California Classes, the Court reiterates its conclusion above that most of the rule 23(b)(3) factors tilt again in favor of concluding that the class actions are the superior litigation vehicles. Additionally, because the inordinate difficulties of applying each of the fifty States' laws are not present for the California Classes, which rely solely on California law, the only manageability difficulty that remains is the administrative feasibility question. As the Court notes in its conclusion regarding the California Classes' predominance, however, a single manageability problem typically is insufficient on its own to prevent class certification. <u>See</u> <u>Cherry v. Dometic Corp.</u>, 986 F.3d at 1303-04. Accordingly, the Court concludes that the class action is a superior vehicle to litigate the California Classes' claims. Because the Court concludes above, however, that only the California Menthol Subclass satisfies rule 23(b)(3)'s predominance requirement to

the extent that its claims are premised on the Menthol Theory, the Court certifies under rule 23(b)(3) only the California Menthol Subclass to the extent that its claims are premised on the Menthol Theory, does not certify the California Class, and does not certify the California Menthol Subclass to the extent that its claims are premised on the Safer-Cigarette Theory.

### C. THE CALIFORNIA CLASSES DO NOT SATISFY RULE 23(b)(2)'S REQUIREMENTS.

167. The Plaintiffs also move to certify the California Classes under rule 23(b)(2), because "'the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.'" Certification Motion at 85 (quoting Fed. R. Civ. P. 23(b)(2)). Specifically, under the California Classes' statutory claims, they seek: (i) under the CLRA, "an order enjoining Defendants' unlawful business practices as alleged herein," SAC ¶ 147, at 48; (ii) under the FAL, "injunctive relief to compel Defendant to stop advertising Natural American Spirit cigarettes as natural and additive free to prevent Defendants from engaging in these wrongful acts in the future," SAC ¶ 160, at 50; and (iii) under the UCA, "an order of this Court enjoining Defendants from continuing to engage in unlawful, unfair, and deceptive business practices and any other act prohibited by law, including those set forth in this Complaint," SAC ¶ 169, at 52. The Supreme Court notes in Wal-Mart:

> The key to the (b)(2) class is "the indivisible nature of the injunctive or declaratory remedy warranted -- the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." Nagareda, 84 N.Y.U.L. Rev., at 132. In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant.

Wal-Mart, 564 U.S. at 360. The Tenth Circuit has stated:

> By its terms . . . , Rule 23(b)(2) imposes two independent but related requirements. In the first place, the defendants' actions or inactions must be based on grounds generally applicable to all class members. The second requirement is more restrictive . . . . The latter half of Rule 23(b)(2) requires that final injunctive relief be appropriate for *the class as a whole*.

Shook v. Bd. of Cnty. Comm'rs of Cnty. of El Paso, 543 F.3d 597, 604 (10th Cir. 2008)(emphasis in original).

168. The Plaintiffs argue that injunctive relief is necessary, because the Defendants' marketing continues to deceive and mislead consumers. See Certification Motion at 87. They argue that the Defendants continue to use misleadingly: (i) the term natural in Natural American's brand name; (ii) the term organic; and (iii) the phrase Ingredients: Tobacco & Water in lieu of additive-free, and assert that this deception will continue without an injunction. See Certification Motion at 87 (citing Philip Morris, 449 F. Supp. 2d at 938. Specifically, they argue that this advertising conveys a reduced risk of harm, even after the Defendants removed the additive-free descriptor, and that the disclaimer which the Defendants included on Natural American cigarettes' packaging in 2017 is inadequate, because it applies only to the additive-free descriptor and not the natural descriptor. See Certification Motion at 88. The Defendants contest that injunctive relief is appropriate and argue instead that injunctive relief is moot given the Defendants' adjustments to their labels and disclaimers, and that the named Plaintiffs do not have standing, because the Defendants' past misrepresentations do not impose a continuing injury or threat of future harm. See Certification Opposition at 83-90.

169. The Court considers first the Defendants' argument that the Plaintiffs' requested injunctive relief is moot. The Defendants argue that the Court's MTD MOO indicates that the Defendants' Memo. of Agreement with the FDA would moot the Plaintiffs' request to enjoin the use of natural and additive-free descriptors, and that the Plaintiffs accordingly seek to enjoin

only the use of the word natural in Natural American's brand name, as well as the organic and tobacco-and-water labels. See Certification Opposition at 84-85 (citing MTD MOO at 242). With respect to those descriptors, the Defendants assert that, since 2017 and in response to the FTC Informal Guidance, every Natural American package and advertisement "representing in any terms that NAS cigarettes 'ha[ve] no additives or chemicals,' has included a disclaimer stating, without qualification, that 'Natural American Spirit cigarettes are not safer than other cigarettes.'" Certification Opposition at 85 (quoting Calderon Decl. ¶¶ 17-18, and citing Memo. of Agreement ¶ 2; FTC Information Guidance at 3). They note that the disclaimer with which the Plaintiffs take issue is the disclaimer associated with the additive-free language, and that the Defendants' new disclaimer is not tied to a particular descriptor and states unequivocally that there are no health benefits associated with Natural American cigarettes. See Certification Opposition at 85. Regarding the word natural in Natural American's brand name, the Defendants argue that the new disclaimer mitigates any misleading effect associated with the brand names. See Certification Opposition at 85 n.56.

170. The Plaintiffs reply that the Defendants misinterpret the Court's MTD MOO's conclusion on mootness and reassert that the labels against which they seek injunctive relief are labels which the MTD MOO does not cover. See Certification Reply at 49. The Plaintiffs also dispute that the Defendants' new disclaimer moots the Plaintiffs' injunctive relief request. See Certification Reply at 49-50. They argue that their "request for certification is in regard to the reasonable consumer's understanding of NAS Cigarettes' labeling," and contend that the Defendants' current labeling and advertising continues to mislead consumers regarding the cigarettes' relative health benefits despite the disclaimer's presence. Certification Reply at 50. Finally, they assert that the Ninth Circuit has concluded that the threat of future harm can be the

consumer's plausible allegation that he or she will not be able to rely on a company's advertising in the future, or that he or she could purchase the product in the future believing it had been improved. See Certification Reply at 50 (quoting Davidson v. Kimberly Clark Corp., 889 F.3d at 969-70).

171. The Court first restates its conclusions in the MTD MOO regarding mootness. In the MTD MOO, the injunctive relief at issue was the Plaintiffs' "request [for] an injunction prohibiting the Defendants from advertising Natural American cigarettes as natural and additive free." MTD MOO at 239 (citing First Amended Complaint ¶ 159, at 50; id., Prayer for Relief ¶ C, at 105). There, the Court concludes that the Memo. of Agreement "would render moot the Plaintiffs' requested injunctive relief, except for an injunction on the term Natural in the brand name." MTD MOO at 242 (citing Utah Animal Rts. Coalition v. Salt Lake City Corp., 371 F.3d at 1257). The Court explains that, without the Memo. of Agreement in place -- the validity of which then-ongoing litigation threatened -- the Defendants could not show that they would not reimplement the challenged labels. See MTD MOO at 242. Here, the Plaintiffs seek injunctive relief on the basis of the word natural as used in Natural American's brand name as well as the organic and tobacco-and-water descriptors. See Certification Motion at 87. Accordingly, to the extent that the Memo. of Agreement moots injunctive relief against the use of additive-free and natural in non-brand-name locations, it does not moot the Plaintiffs' requested injunctive relief here.

172. Regarding whether the new disclaimer -- regardless what descriptors the labels, branding, and advertising may use -- indicates that Natural American cigarettes are not healthier than other cigarettes, the Court does not conclude that this disclaimer's presence moots the Plaintiffs' request for injunctive relief. In the MTD MOO, the Court concludes that the Plaintiffs

showed plausibly that the terms natural, organic, and additive-free mislead reasonable consumers to believe that Natural American cigarettes are healthier than others. See MTD MOO at 166-67. Further, the Court concludes in the MTD MOO that, although the additive-free disclaimer would dispel a reasonable consumer's misled belief, the disclaimer would not have that effect for the natural and additive-free labels, and would not have that effect for consumers who could not read the disclaimer before purchasing it. See MTD MOO at 170-72. The Plaintiffs have shown evidence that some consumers interpret the natural, organic, and tobacco-and-water labels to convey health benefits. See Certification Motion at 24-26 (citing Pearson Report at 3, 10-16; Cummings Report at 5); id. at 21 (citing Dewhirst Report at 31; Creative Testing at 3; Work In Progress: Additive Free and Organic at 9, filed July 23, 2020 (Doc. 281-27)(demonstrating that the tobacco-and-water label has similar connotations to additive-free)). Because there remain situations in which a reasonable consumer would not have the chance to read the disclaimer, that the disclaimer may dispel some consumers' mistaken beliefs is not sufficient to moot the Plaintiffs' requests for injunctive relief. Accordingly, the Court will not deny certification on mootness grounds.

173. The Defendants next argue that injunctive relief is not appropriate, because the named Plaintiffs do not have standing, because they are not suffering a continuing injury or facing an imminent threat of injury. See Certification Opposition at 86 (quoting DG ex rel. Stricklin v. Devaughn, 594 F.3d at 1197). The Defendants argue that the Plaintiffs refer to deceptions as they affect class members, people, or reasonable consumers, but do not refer to the named Plaintiffs' risks. See Certification Opposition at 86. The Defendants argue that, because the named Plaintiffs have filed a lawsuit on the basis that Natural American cigarettes are not in fact safer than other cigarettes, they cannot represent that they continue to be misled or are at risk

of being misled in the future, and that past harm cannot serve as the basis for standing. See Certification Opposition at 86-87 (citing Baca v. Colo. Dep't of State, 935 F.3d 887, 911 (10th Cir. 2019), rev'd on other grounds, 140 S. Ct. 2316 (2020)). The Defendants anticipate the Plaintiffs' citation to the Ninth Circuit's opinion in Davidson v. Kimberly-Clark Corp., which allows some consumers to bring injunctive false advertising claims even after they learn the truth, and contend that, even under that standard, the named Plaintiffs do not have standing, because they have not testified that they no longer purchase Natural American cigarettes out of an inability to rely on their branding, and because they now know that Natural American cigarettes are not safer and cannot be made safer. See Certification Opposition at 89-90.

174. The Plaintiffs argue that such a narrow view of standing would mean that courts could never grant injunctive relief in false advertising cases. See Certification Reply at 45. They argue, therefore, that the Court should adopt the Ninth Circuit's conclusion in Davidson v. Kimberly-Clark Corp. See Certification Reply at 45 (quoting Davidson v. Kimberly-Clark Corp., 889 F.3d at 969-70).[78] They argue that the Ninth Circuit in Davidson v. Kimberly-Clark Corp. does not limit injunctive relief only to the two scenarios which the Defendant contest, but instead uses those two scenarios as examples of when injunctive relief would be available. See Certification Reply at 46. The Plaintiffs assert that, by focusing on whether the named Plaintiffs have stopped buying Natural American cigarettes or know that they are not safer, the Defendants mischaracterize the Plaintiffs' argument, which is that the Defendants' labeling and advertising mislead reasonable consumers. See Certification Reply at 46-47 (citing SAC ¶ 82, at 34;

---

[78]The Plaintiffs also point to an opinion from the United States District Court for the District of Kansas, which allows injunctive relief after the named plaintiffs became aware of the alleged misrepresentation. See Certification Reply at 45-46 (citing In re: EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitr. Litig., 336 F. Supp. 3d 1256, 1340-41 (D. Kan. 2018)(Crabtree, J.)).

Davidson v. Kimberly-Clark Corp., 889 F.3d at 969). The Plaintiffs argue that injunctive relief is important, because without injunctive relief, there is nothing to stop the Defendants from continuing to use the current language or similarly misleading language in the future, and because the Defendants are likely to continue using such language. See Certification Reply at 47-48 (citing United States v. Philip Morris USA, Inc., 449 F. Supp. 2d at 1, for the proposition that cigarette deception will continue).

175. The Court concludes that the named Plaintiffs do not have standing to bring their injunctive relief claim. Although the Court acknowledges the Plaintiffs' argument that injunctive relief Could serve government interests, see MTD MOO at 190, and play an important role in addressing misleading advertising in the tobacco industry, the named plaintiffs in a class action seeking injunctive relief nevertheless must have standing to bring the action, see DG ex rel. Stricklin v. Devaughn, 594 F.3d at 1197 (citing Warth v. Seldin, 422 U.S. 490, 502 (1975); Tandy v. City of Wichita, 380 F.3d 1277, 1283 (10th Cir. 2004)). To show standing "[t]o seek prospective relief, the [named Plaintiffs] must be suffering a continuing injury or be under a real and immediate threat of being injured in the future." Tandy v. City of Wichita, 380 F.2d at 1283 (citing City of Los Angeles v. Lyons, 461 U.S. 95, 101-02 (1983)). "The threatened injury must be 'certainly impending' and not merely speculative." Tandy v. City of Wichita, 380 F.2d at 1283 (quoting Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 190 (2000)). The Court agrees with the Defendants that, because the named Plaintiffs in this case are aware that Natural American cigarettes are not safer than other cigarettes, see SAC ¶ 60, at 29 ("Natural American Spirit cigarettes are not safer or healthier than other cigarettes, a truth that Defendants do not deny. Nor can they."), Natural American cigarettes' labeling is not likely to continue misleading the named Plaintiffs, despite the Plaintiffs' argument that it will continue

mislead reasonable consumers. Accordingly, any future harm to the named Plaintiffs resulting from the Defendants' labeling practices is merely speculative. See Tandy v. City of Wichita, 380 F.2d at 1283.

176. The Court declines the Plaintiffs' invitation to adopt the Ninth Circuit's analysis and holding in Davidson v. Kimberly-Clark Corp., 889 F.3d at 969. In Davidson v. Kimberly-Clark Corp., the plaintiff alleged that the defendants had deceived her by marketing certain brands of wipes as flushable when they were not flushable. See 889 F.3d at 964-65. In response to the district court's conclusion that the plaintiff did not have standing, because she alleged that she had no intention of purchasing the wipes again, the Ninth Circuit concludes that the plaintiff "properly alleged that she faces a threat of imminent or actual harm by not being able to rely on Kimberly-Clark's labels in the future, and that this harm is sufficient to confer standing to seek injunctive relief." 889 F.3d at 967. The Ninth Circuit explains that "[k]knowledge that the advertisement or label was false in the past does not equate to knowledge that it will remain false in the future," and posits that, "[i]n some cases, the threat of future harm may be the consumer's plausible allegations that she will be unable to rely on the product's advertising or labeling in the future, and so will not be able to purchase the produce although she would like to," while in other cases, the future harm "may be the consumer's plausible allegations that she might purchase the product in the future, despite the fact it was once marred by false advertising or labeling, as she may reasonably, but incorrectly, assume the product was improved." 889 F.3d at 969-70 (citing Ries v. Arizona Beverages USA LLC, 287 F.R.D. 523, 533 (N.D. Cal. 2012) (Seeborg, J.); Lilly v. Jamba Juice Co., No. 13-cv-02998 KST, 2015 WL 1248027, at *4 (N.D. Cal. March 18, 2015)(Tigar, J.); Richardson v. L'Oreal, 911 F. Supp. 2d 181 194-95 (D.D.C. 2013)(Bates, J.)).

177. The Court disagrees with the Ninth Circuit's characterization of these potential future injuries as "'actual and imminent, not conjectural or hypothetical.'" Davidson v. Kimberly-Clark Corp., 889 F.3d at 969 (quoting Summers v. Earth Island Inst., 555 U.S. 488, 493 (2009)). Where the plaintiff's claim alleges that the defendant's product has misled him or her, that plaintiff carries that knowledge going forward. The Ninth Circuit contends that present knowledge that a product's label is false is not the same as knowledge that the product's label will remain false into the future. See Davidson v. Kimberly-Clark Corp., 889 F.3d at 969. This assertion demonstrates the problem: a plaintiff who asserts that a product's label has misled him or her cannot predict whether the label will change or stay the same, or whether the product will change or stay the same. This uncertainty is conjectural or hypothetical, and not actual or imminent. The Ninth Circuit notes that, if it denies standing in these cases, defendants could defeat State consumer protection suits for injunctive relief by removing cases to federal court and then moving to dismiss for lack of standing. See Davidson v. Kimberly-Clark Corp., 889 F.3d at 970. The Court disagrees, because courts may remand cases removed from State courts in lieu of dismissing them. See Buscema v. Wal-Mart Stores East LP, 485 F. Supp. 3d 1319, 1331 (D.N.M. 2020)(Vasquez, J.)(remanding the case to State court, because the plaintiff, who had learned of the defendant's "false and deceptive conduct," no longer had standing to pursue injunctive relief). Additionally, the Court's decision not to grant standing for injunctive relief in these cases does not mean that misleading advertisements can never be addressed. First, damages claims and awards can and do cause defendants to alter behavior. Second, the Defendants' responses to the Memorandum of Agreement and the FTC Informal Guidance are examples of processes through which product labels change to become more honest. State laws also may provide avenues for injunctive relief; in Davidson v. Kimberly-Clark Corp., for

example, the Ninth Circuit notes that "California law also permits [a consumer who pays extra for a falsely labeled product] to seek a court order requiring the manufacturer of the product to halt its false advertising." 889 F.3d at 960-61. Accordingly, the Court concludes that the named Plaintiffs in this case do not have standing to bring their claims for injunctive relief under rule 23(b)(2) and will not certify any of the classes seeking certification under that rule.

## III. THE COURT DOES NOT CERTIFY THE COLORADO CLASS AND THE COLORADO MENTHOL SUBCLASS.

178. The Court turns to the Plaintiffs' proposed Colorado Class and Colorado Menthol Subclass (the "Colorado Classes"). The Court first reviews whether the proposed classes satisfy rule 23(a)'s numerosity, commonality, typicality, and adequacy requirements. The Court next reviews whether the proposed classes satisfy rule 23(b)(3)'s predominance and superiority requirements. Because the Colorado Classes do not seek injunctive relief, the Court will not consider whether the proposed classes satisfy rule 23(b)(2)'s requirements.

179. Before beginning the rule 23(a) and (b)(3) analyses, the Court first considers the Defendants' challenge that the Colorado Classes are ineligible for certification under rule 23(b)(3). The Plaintiffs seek certification for the Colorado Classes on two counts: (i) for a violation of the CCPA, Col. Rev. Stat. § 6-1-101; and (ii) for unjust enrichment. See SAC ¶¶ 177-194, at 54-57. The Defendants argue that the CCPA bars money damages in class actions. See Certification Opposition at 19 (quoting Friedman v. Dollar Thrifty Auto. Grp., Inc., 2015 WL 4036319, at *6); Colo. Rev. Stat. § 6-1-113(2); Davidson v. Apple, Inc., 2018 WL 2325426, at *10-11). In the Certification Reply, the Plaintiffs state that they "preserve their right to appeal dismissal of their . . . Colorado Consumer Protection Act monetary damage claims, but are not seeking certification of classes for those claims at this time." Certification Reply at 3 n.2.

See Certification Reply at 8 n.4 ("Per footnote 2, Colorado Count I . . . [is] not being pursued for class certification at this time."). The Court agrees with the Defendants that the CCPA bars money damages in class actions. See MTD MOO at 216 ("The CCPA's statutory language, however, expressly prohibits class action recovery for damages.")(citing Colo. Rev. Stat. Ann. § 6-1-113(2); Friedman v. Dollar Thrifty Auto. Grp. Inc., 2015 WL 4036319, at *3-6; Martinez v. Nash Finch Co., 886 F. Supp. 2d 1212, 1218-19 (D. Colo. 2012)(Krieger, J.)). Accordingly, the Court considers whether to certify only the Colorado Classes' unjust enrichment claim.

**A. THE COLORADO CLASSES SATISFY RULE 23(a)'S REQUIREMENTS.**

180. The Court first considers rule 23(a)'s numerosity, commonality, typicality, and adequacy requirements with respect to the Colorado Classes' unjust enrichment claim. See Fed. R. Civ. P. 23(a). The Defendants do not dispute that the Plaintiffs' proposed classes satisfy rule 23(a)'s numerosity and adequacy requirements, and the Court reiterates its analysis for the Nationwide Menthol Subclass above, concluding that the Plaintiffs' proposed classes satisfy these two requirements. See Certification Opposition at 20. Accordingly, the Court focuses its analysis here on the commonality and typicality requirements.

**1. The Colorado Classes Satisfy Rule 23(a)'s Commonality Requirement.**

181. The Defendants do not raise any issues related to commonality that are unique to the Colorado Classes. The Court acknowledges the Defendants' later argument that individualized questions regarding unjust enrichment claims predominate over common questions, but for purposes of rule 23(a)'s commonality analysis, considers whether there exist "questions of law or fact" that are central to the Plaintiffs' claims that are capable of generating a common answer. Fed. R. Civ. P. 23(a)(2). The Court concludes that such questions are present here. For example, whether the Defendants misrepresented the facts concerning the health

benefits of Natural American cigarettes is necessary to determine whether unjust enrichment supplies a remedy. See SAC ¶ 193, at 57. Similarly, whether the Defendants' marketing practices benefitted unjustly from their misleading marketing is a question amenable to a common answer. See SAC ¶ 191, at 57. Accordingly, because there are questions of law or fact that are central to the validity of the Colorado Classes' unjust enrichment claim, the Court concludes that the Colorado Classes satisfy rule 23(a)'s commonality requirement.

**2. The Colorado Classes Satisfy Rule 23(a)'s Typicality Requirement.**

182. As the Court discusses above in its discussion on typicality for the Nationwide Menthol Subclass, "[t]he commonality and typicality requirements of Rule 23(a) tend to merge." Gen. Tele. Co. of the Sw. v. Falcon, 457 U.S. at 157 n.13. The Defendants dispute the Plaintiffs' showing of typicality for the same reasons that they dispute commonality and for specific reasons relating to individual named Plaintiffs, one of whom -- Horne -- represents the Colorado Menthol Subclass. See Certification Opposition at 22-24; SAC ¶ 120, at 42. The Defendants argue that Horne "expressly acknowleg[ed his] belief that NAS cigarettes are not healthier or safer than others," because he continued smoking Natural American cigarettes after commencing this lawsuit. Certification Opposition at 23 (citing Deposition of Joshua Horne at 34:5-35:3 (taken June 12, 2018), filed October 8, 2020 (Doc. 315-6)(Horne)("Horne Depo."). The Defendants argue that, because Horne has continued to buy Natural American cigarettes despite knowing now that they are not safer than other brands, he cannot represent that he purchased them based on a health misperception, unlike the unnamed proposed class members. See Certification Opposition at 23. The Plaintiffs counter that typicality requires that the class representative's claims by "'reasonably co-extensive with those of absent class members,'" and that the claim which Horne brings on the Colorado Menthol Subclass' behalf is premised on the

theory that Natural American's labeling misled reasonable consumers such that they suffered economic damage. Certification Reply at 6 (quoting 1 Newberg on Class Actions § 3:29 (5th ed.)).

183. The Court previously has stated:

> Class representatives, however, can still have factual circumstances that differ from those of the bulk of the absent portion of the class, or their claims could be subject to defenses that do not apply to many absent class members, and, in extreme cases, this dissimilarity might make the proposed class representatives unsuitable under rule 23(a)(3). This inquiry is necessarily an imprecise, "eye-test" standard, in which the Court tries to discern whether the putative class counsel has made a reasonable effort to collect class representatives who fairly reflect the absent class members' posture in the litigation.

Anderson Living Tr. v. WPX Energy Prod., LLC, 306 F.R.D. at 440-41. That Horne continued to smoke Natural American cigarettes after learning that they are not healthier than other cigarettes does not make his claims atypical, because his claims nevertheless are based on the same legal theory as the rest of the class, namely, that Natural American's labeling led him to believe that the cigarettes were safer. Particularly given cigarettes' highly addictive nature, see Proctor Report at 9, the Court is unwilling to conclude that, because a consumer continued to smoke a certain brand after learning that those cigarettes did not contain certain desirable qualities, he or she no longer has claims that are typical of the remaining class members. The Court concludes that whether Horne continued smoking Natural American cigarettes after learning that they were not healthier than other brands is not such an extreme case as to warrant his claims atypical of the rest of the Colorado Menthol Subclass. Additionally, the Defendants do not raise any specific issues regarding Benson, the Colorado Class representative. Accordingly, the Court concludes that the Colorado Classes satisfy the typicality requirement.

**B. THE COLORADO CLASSES SATISFY RULE 23(b)(3)'S SUPERIORITY REQUIREMENT, BUT DO NOT SATISFY RULE 23(b)(3)'S PREDOMINANCE REQUIREMENTS.**

184. The Court next considers whether the Colorado Classes satisfy rule 23(b)(3)'s predominance and superiority requirements. The Court concludes that the Colorado Classes do not satisfy the predominance requirement, based on the Court's concerns regarding administrative feasibility, the Plaintiffs' proposed damages model, whether individuals have seen certain disclaimers, and whether unjust enrichment will require individualized inquiries. The Court concludes that the Colorado Classes satisfy the superiority requirement.

**1. <u>The Colorado Classes Do Not Satisfy Rule 23(b)(3)'s Predominance Requirement</u>.**

185. As with the California Classes above, the Defendants raise four arguments to support their contention that individualized inquiries predominate over Colorado Classes' common questions. Specifically, they argue that: (i) ascertainability issues require individualized inquiries; (ii) different class members may have seen different representations and disclaimers, requiring individualized inquiries; (iii) the unjust enrichment claims require individualized inquiries to prove that each class member was misled; and (iv) the Plaintiffs' damages model does not fit their liability theories. <u>See</u> Certification Opposition at 25-83. The arguments on the issues of ascertainability, differing representations and disclaimers, and the damages model are not unique to the California class, and the parties have not raised arguments unique to Colorado on those issues. Accordingly, the Court adopts its conclusions above in its considerations of the Colorado Classes, specifically that: (i) administrative feasibility concerns -- namely difficulties in determining whether an individual purchased Natural American cigarettes -- tilt against a conclusion that the Colorado Classes satisfy predominance;

(ii) the Plaintiffs' proposed damages model is not an adequate fit with the Plaintiffs' Safer-Cigarette Theory -- applicable to both of the Colorado Classes -- but that it is an adequate fit with the Plaintiffs' Menthol Theory -- applicable only to the Colorado Menthol Subclass; and (iii) answering the question whether an individual proposed class member viewed a disclaimer tilts against a finding of predominance for the Colorado Classes' claims based on the Safer-Cigarette Theory, but that it does not tilt against a finding of predominance for the Colorado Menthol Subclass' claim based on the Menthol-Theory. Because the parties raise specific arguments whether Colorado law requires individualized inquiries for unjust enrichment claims, the Court considers those arguments here.

186. The Plaintiffs contend that Colorado law requires a party alleging unjust enrichment to prove that "'(1) the defendant received a benefit, (2) at the plaintiff's expense, (3) under circumstances that would make it unjust for the defendant to retain the benefit without commensurate compensation." Certification Motion at 65 (quoting Lewis v. Lewis, 189 P.3d 1134, 1141 (Colo. 2008)). They assert that unjust enrichment claims are well suited to class certification, because they focus on the Defendants' wrongdoing and on objective elements, and note that the Tenth Circuit previously has upheld the certification of a Colorado unjust enrichment claim. See Certification Motion at 65-66 (citing Menocal v. GEO Grp., Inc., 882 F.3d at 925).

187. The Defendants contend that determining whether a defendant's receipt of a benefit is unjust is a fact-intensive inquiry that will require extensive factual findings. See Certification Opposition at 51-52 (quoting Dudding v. Norton Frickey & Assocs., 11 P.3d 441, 445 (Colo. 2000)(en banc), and Lewis v. Lewis, 189 P.3d at 1140). They argue that, accordingly, unjust enrichment claims based on misleading advertising are not susceptible to

class treatment, because courts will have to conduct individualized inquiries into the motivations behind each class member's purchase. See Certification Opposition at 52 (quoting In re ConAgra Foods, Inc., 90 F. Supp. 3d at 990). The Plaintiffs dispute the Defendants' citation to In re ConAgra Foods, Inc., because they assert that the Tenth Circuit's opinion in Menocal v. GEO Group, Inc. addresses the district court's concerns in the former. See Certification Reply at 26-27.

188. The Tenth Circuit's opinion in Menocal v. GEO Group, Inc. is not a blanket authorization to grant any unjust enrichment class certification motions; there, the Tenth Circuit explains that "the unjust enrichment class members intend to rely on facts that are shared amongst the class and thus are susceptible to class-wide proof." 882 F.3d at 925. Specifically, the plaintiffs in that case argued that "GEO's retention of the benefit is unjust because GEO utilized a policy [of] paying extremely low wages to workers who were all detained, uniquely vulnerable as immigrants, and subject to GEO's physical control." 882 F.3d at 925 (citation to record omitted)(alteration in Menocal v. GEO Grp., Inc.). There are some uniformities in this case, such as what labels Natural American cigarettes used in a given time period. The Court nevertheless concludes that individualized inquiries will predominate, particularly around the third unjust enrichment prong under Colorado law, that the circumstances make it unjust for the Defendants to retain the benefit without compensation. See Lewis v. Lewis, 189 P.3d at 1141. The Colorado Classes comprise many possible class members who purchased a pack of cigarettes with the allegedly misleading labels, but not all of these purchases occur in unjust circumstances. For instance, individuals may have purchased Natural American cigarettes not based on the challenged labels, or may not have believed that they were healthier or that Natural American menthol cigarettes did not contain additives. In those circumstances, it is not clear that

a jury would determine that those purchases are unjust such that purchasers in those circumstances have met the standards of an unjust enrichment claim. Accordingly, a jury would have to review the facts surrounding each purchase to determine whether its circumstances were unjust, in spite of the common questions that the Plaintiffs seek to present. These individualized inquiries would overwhelm the common inquiries and thus tilt against a finding of predominance. Accordingly, based on the Court's concerns regarding administrative feasibility, the Plaintiffs' proposed damages model, whether individuals have seen certain disclaimers, and whether unjust enrichment will require individualized inquiries, the Court concludes that the Colorado Classes do not satisfy rule 23(b)(3)'s predominance requirement.

### 2. The Colorado Classes Satisfy Rule 23(b)(3)'s Superiority Requirement.

189. The second rule 23(b)(3) requirement is that the class action be a superior method of litigating the proposed class members' claims. See Fed. R. Civ. P. 23(b)(3). The Plaintiffs and the Defendants do not raise any arguments regarding superiority that are unique to the Colorado Classes. In concluding above that the Nationwide Menthol Subclass is not a superior vehicle for litigation, the Court acknowledges that the majority of the rule 23(b)(3) factors tilt in favor of concluding that a class action is the superior vehicle for the Nationwide Menthol Subclass' claims, but gives substantial weight to manageability concerns, noting the administrative feasibility issues inherent in determining whether a proposed class member belongs to the class, and the additional difficulties in managing a nationwide class where each of the fifty States' laws could require unique jury instructions and other manageability difficulties. For the Colorado Classes, the Court reiterates its conclusion above that most of the rule 23(b)(3) factors tilt again in favor of concluding that the class actions are the superior litigation vehicles.

Additionally, because the inordinate difficulties of applying each of the fifty States' laws are not present for the Colorado Classes, which rely solely on Colorado law, the only manageability difficulty that remains is the administrative feasibility question. As the Court has noted, however, a single manageability problem typically is insufficient on its own to prevent class certification. See Cherry v. Dometic Corp., 986 F.3d at 1303-04. Accordingly, the Court concludes that the class action is a superior vehicle to litigate the Colorado Classes' unjust enrichment claim. Because the Court concludes, however, that the Colorado Classes have not satisfied rule 23(b)(3)'s predominance requirement, the Court will not certify the Colorado Class or the Colorado Menthol Subclass.

## IV. THE COURT DOES NOT CERTIFY THE FLORIDA CLASS AND CERTIFIES IN PART THE FLORIDA MENTHOL SUBCLASS.

190. The Court next considers the Plaintiffs' proposed Florida Class and Florida Menthol Subclass (the "Florida Classes"). The Florida Classes allege two claims: (i) a violation of the FDUTPA; and (ii) an unjust enrichment claim. See SAC ¶¶ 195-216, at 58-62. The Court first reviews whether the proposed classes satisfy rule 23(a)'s numerosity, commonality, typicality, and adequacy requirements. The Court next reviews whether the proposed classes satisfy rule 23(b)(3)'s predominance and superiority requirements.[79]

### A. THE FLORIDA CLASSES SATISFY RULE 23(a)'S REQUIREMENTS.

191. The Court first considers rule 23(a)'s numerosity, commonality, typicality, and

[79]The Florida Classes seek injunctive relief on their FDUTPA claim. See SAC ¶ 209, at 60-61. As the Court discusses with respect to the California Classes' proposed injunctive relief class action under rule 23(b)(2), however, the Court concludes that these named Plaintiffs do not have standing to pursue their injunctive-relief claims. The parties have not made arguments unique to the Florida Classes, and the Court concludes that the named Plaintiffs for the Florida Classes do not have standing to pursue injunctive relief, and it will not certify the Florida Classes for that purpose.

adequacy requirements with respect to the Florida Classes' statutory and unjust enrichment claims. See Fed. R. Civ. P. 23(a). The Defendants do not dispute that the Plaintiffs' proposed classes satisfy rule 23(a)'s numerosity and adequacy requirements, and the Court reiterates its analysis for the Nationwide Menthol Subclass above, concluding that the Plaintiffs' proposed classes satisfy these two requirements. See Certification Opposition at 20.

**1. The Florida Classes Satisfy Rule 23(a)'s Commonality Requirement.**

192. The parties do not raise any arguments related to commonality that are unique to the Florida Classes. The Court concludes that there exist "questions of law or fact" that are central to the Plaintiffs' claims that are capable of generating a common answer. Fed. R. Civ. P. 23(a)(2). For the FDUTPA claim, for example, the Plaintiffs allege that the Defendants' labels and statements constitute deceptive acts or practices, and that they employed these acts or practices with the intent that consumers rely on their statements. See SAC ¶¶ 200-201, at 58. The Plaintiffs also allege that these deceptive acts or practice likely were to deceive and in fact deceived reasonable consumers. See SAC ¶ 203, at 59. Similarly, the Florida Classes' unjust enrichment claim asks whether the Defendants benefitted from purchases of the misleadingly labelled products. These questions are central to the Plaintiffs' claims and are capable of generating common answers. The Court concludes therefore that the Florida Classes satisfy rule 23(a)'s commonality requirement.

**2. The Florida Classes Satisfy Rule 23(a)'s Typicality Requirement.**

193. As the Court has discussed above, "[t]he commonality and typicality requirements of Rule 23(a) tend to merge." Gen. Tele. Co. of the Sw. v. Falcon, 457 U.S. at 157 n.13. The Defendants dispute the Plaintiffs' showing of typicality for the same reasons that they dispute commonality and for specific reasons relating to individual named Plaintiffs, one of

whom -- Horne -- represents the Florida Menthol Subclass. See Certification Opposition at 22-24; SAC ¶ 121, at 42. The Defendants' argument with respect to Horne is the same argument which they raise in disputing that his claims are typical of the Colorado Menthol Subclass, namely, that he continued purchasing Natural American menthol cigarettes after knowing that they are not safer than other brands and therefore cannot represent that he purchased the cigarettes based on a health misperception. See Certification Opposition at 23 (citing Horne Depo. at 34:5-35:3 (Horne). The Court, in considering that argument, concludes that whether Horne continued smoking Natural American cigarettes after learning that they were not healthier than other brands is not such an extreme case as to warrant his claims atypical of the rest of the Colorado Menthol Subclass, because his claims are premised on the same legal theories -- that the Defendants' labeling practice was deceitful-- and the Court is unwilling to penalize Plaintiffs for continuing to use a highly addictive product even after they learn of its health effects. See Anderson Living Tr. v. WPX Energy Prod., LLC, 306 F.R.D. at 440-41. Because the Defendants have not raised arguments specific to Horne's representing the Florida Menthol Subclass, and because they do not raise any arguments with respect to Sproule, the Florida Class representative, the Court concludes that the Florida Classes satisfy rule 23(a)'s typicality requirement.

### B. THE FLORIDA MENTHOL SUBCLASS' FDUTPA CLAIM SATISFIES RULE 23(b)(3)'S REQUIREMENTS TO THE EXTENT THAT IT IS PREMISED ON THE MENTHOL THEORY, AND THE FLORIDA CLASS SATISFIES RULE 23(b)(3)'S TYPICALITY REQUIREMENT BUT NOT THE RULE'S PREDOMINANCE REQUIREMENT.

194. The Court next considers whether the Florida Classes satisfy rule 23(b)(3)'s predominance and superiority requirements. The Court concludes that common inquiries predominate for the Florida Classes' FDUTPA claim but not for their unjust enrichment claim.

After considering other arguments regarding predominance, the Court concludes that the Florida Class does not satisfy the predominance requirement, and that the Florida Menthol Subclass' FDUTPA claim, but not the unjust enrichment claim, satisfies the predominance requirement to the extent that the FDUTPA claim is premised on the Menthol Theory and not on the Safer-Cigarette Theory. The Court concludes that the Florida Classes satisfy the superiority requirement.

**1. The Florida Class Does Not Satisfy Rule 23(b)(3)'s Predominance Requirement, but the Florida Menthol Subclass' FDUTPA Claim Satisfies the Predominance Requirement to the Extent That It Is Premised on the Menthol Theory.**

195. The Court first considers whether the Florida Classes satisfy rule 23(b)(3)'s predominance requirement. As with the proposed State classes above, the Defendants raise four arguments to support their contention that individualized inquiries predominate over the Florida Classes' common questions. Specifically, they argue that: (i) ascertainability issues require individualized inquiries; (ii) different class members may have seen different representations and disclaimers, requiring individualized inquiries; (iii) the statutory and unjust enrichment claims require individualized inquiries; and (iv) the Plaintiffs' damages model does not fit their liability theories. See Certification Opposition at 25-83. The Court has considered above the arguments on the issues of ascertainability, differing representations, and the damages model, and the parties have not raised arguments unique to Florida on those issues. Accordingly, the Court adopts its conclusions above in its considerations of the Florida Classes, specifically that: (i) administrative feasibility concerns -- namely difficulties in determining whether an individual purchased Natural American cigarettes -- tilt against a conclusion that the Florida Classes satisfy predominance; (ii) the Plaintiffs' proposed damages model is not an adequate fit with the

Plaintiffs' Safer-Cigarette Theory -- applicable to both of the Florida Classes -- but that it is an adequate fit with the Plaintiffs' Menthol Theory -- applicable only to the Florida Menthol Subclass; and (iii) answering the question whether an individual proposed class member viewed a disclaimer tilts against a finding of predominance for the Florida Classes' claims based on the Safer-Cigarette Theory, but that it does not tilt against a finding of predominance for the Florida Menthol Subclass' claim based on the Menthol-Theory. Because the parties raise specific arguments whether Florida law requires individualized inquiries for the Florida Classes' statutory and unjust enrichment claims, the Court considers those arguments here.

196. With regard to the FDUTPA, the Plaintiffs assert that they must establish three objective elements: "'(1) a deceptive act or unfair practice; (2) causation; and (3) actual damages.'" Certification Motion at 66 (quoting Carriuolo v. Gen. Motors Co., 823 F.3d 977, 985-86 (11th Cir. 2016)). They contend that courts have certified classes bringing FDUTPA claims. See Certification Motion at 67 (citing Carriuolo v. Gen. Motors Co., 823 F.3d at 985-89; Nelson v. Mead Jonson Nutrition Co., 270 F.R.D. 689, 697 (S.D. Fla. 2010)).

197. The Defendants argue that the FDUTPA requires individualized proof of causation or why consumers purchased the challenged products. See Certification Opposition at 45 (citing Philip Morris USA Inc. v. Hines, 883 So. 2d at 294-95; Green v. McNeil Nutritionals, LLC, 2005 WL 3388158, at *8). The Defendants cite to Philip Morris USA Inc. v. Hines to suggest that whether a smoker received the benefits he or she thought that he or she was getting from cigarettes marketed as light or low-tar depended on how the smoker smoked the cigarette, and what that smoker chose the product in question, thus requiring individualized inquiries. See Certification Opposition at 45 (citing Philip Morris USA Inc. v. Hines, 883 So. 2d at 294-95). The Defendants also dispute that the Plaintiffs' citations to Carriuolo v. Gen. Motors Co. and

Nelson v. Mead Johnson Nutrition Co. are apposite, because those cases rely on David v. Powertel, Inc., 776 So. 2d 971, 973 (Fla. Dist. Ct. 2000), a fraudulent omissions case in which consumers all purchased phones with reduced market value due to a common deceptive practice. See Certification Opposition at 45 n.30 (citing Philip Morris USA Inc. v. Hines, 883 So. 2d at 294; Black Diamond Props., Inc. v. Haines, 940 So. 2d 1176, 1179 (Fla. Dist. Ct. 2006); Pop's Pancakes, Inc. v. NuCO2, Inc., 251 F.R.D. 677, 686-87 (S.D. Fla. 2008)(Graham, J.)). The Defendants argue that "[t]he better reading of Florida law is that Plaintiffs cannot evade the causation requirement in this case centered on *affirmative* misrepresentations." Certification Opposition at 45-46 n.30 (emphasis in original).

198. The Plaintiffs rebut that they base their claims on the objective reasonable consumer standard and an objective price premium model, such that the Florida Classes satisfy predominance even if some proposed class members did not believe that the cigarettes were less harmful or did not believe they were paying a price premium. See Certification Reply at 19-20. They distinguish the Defendants' citation to Philip Morris USA Inc. v. Hines, arguing that the plaintiffs in that case alleged that the plaintiffs would not have purchased the defendant's cigarettes at all if they had known the light cigarettes were not safer than other cigarettes, and that those plaintiffs sought a return of the purchase price, because they did not receive what they paid for. See Certification Reply at 20 (citing Philip Morris USA Inc. v. Hines, 883 So 2d at 293). The Plaintiffs also contest the Defendants' citation to Green v. McNeil Nutritionals, LLC, because the plaintiff there did not have any causation theory, and argue that the case instead supports class certification under FDUTPA. See Certification Reply at 20 (citing Green v. McNeil Nutritionals, LLC, 2005 WL 3388158, at *3, 7). The Plaintiffs assert that the Defendants' cases "simply stand for the proposition that a plaintiff must prove that pecuniary

injury was caused by the alleged practice," a showing that they argue they have made. Certification Reply at 20 n.19.

199. The Court concludes that common questions predominate under the FDUTPA claim to the extent that it is premised on the Menthol Theory. The Eleventh Circuit repeatedly has explained that rule 23(b)(3)'s predominance requirement is not a barrier to classes asserting a claim under the FDUTPA. See Tershakovec v. Ford Motor Co., -- F.4th --, 2023 WL 4377585, at *6 (11th Cir. July 7, 2023)("Dispositively here, 'a plaintiff asserting a FDUTPA claim need not show actual reliance on the representation or omission at issue.' Because a FDUTPA plaintiff needn't prove that he or she relied on any alleged misstatement, Ford's reliance-based predominance objection fails.")(quoting Carriuolo v. Gen. Motors Co., 823 F.3d at 983); Carriuolo v. Gen. Motors Co., 823 F.3d at 985-86 (stating that "General Motors is incorrect to suggest that the plaintiffs must prove that every class member saw the sticker and was subjectively deceived by it. Instead, under FDUTPA, the plaintiff must only establish three *objective* elements . . . ," and noting that, "because the injury is not determined by the plaintiffs' subjective reliance on the alleged inaccuracy, causation and damages may also be amendable to class-wide resolution")(emphasis in original). In a consumer-goods case involving yogurt labels that suggested health benefits, the Eleventh Circuit explains that, "should the class prevail on the liability issue, each putative class member would only need to show that he or she paid a premium for YoPlus to be entitled to damages under the FDUTPA." Fitzpatrick v. Gen. Mills, Inc., 635 F.3d 1279, 1283 (11th Cir. 2011). Contrary to the Defendants' suggestion, the Court does not read Davis v. Powertel, Inc. as limiting its holding only to fraudulent-omissions cases such that it does not apply to affirmative misrepresentations. There, the District Court of Appeals of Florida for the First Judicial District states that "[a] party asserting a deceptive trade

practice claim need not show actual reliance on the representation or omission at issue." Davis v. Powertel, Inc., 776 So. 2d at 973 (emphasis added). Accordingly, the Court concludes that Davis v. Powertel, Inc.'s holding applies as well to affirmative representations, and the Eleventh Circuit's citations thereto are not inapposite here. Thus, to the extent that the Plaintiffs' damages model measures the price premium associated with a challenged claim -- which the Court has addressed in-depth above in determining that the damages model appropriately is tailored only as to the Menthol Theory -- the Court concludes that the FDUTPA claim will not require individualized inquiries that will predominate over common analysis.

200. Regarding unjust enrichment, the Plaintiffs assert that they can establish an unjust enrichment claim by showing that there is "'a benefit conferred upon a defendant by the plaintiff, the defendant's appreciation of the benefit, and the defendant's acceptance and retention of the benefit under circumstances that make it inequitable for him to retain it without paying the value thereof.'" Certification Motion at 66-67 (quoting Fla. Power Corp. v. City of Winter Park, 887 So. 2d 1237, 1241 n.4 (Fla. 2004)). They contend that courts have certified classes bringing unjust enrichment claims. See Certification Motion at 67 (citing In re Checking Account Overdraft Litig., 307 F.R.D. 656, 675 (S.D. Fla. 2015)(King, J.); In re Terazosin Hydrochloride Antitrust Litig., 220 F.R.D 672, 698 (S.D. Fla. 2004)(Seitz, J.)).

201. The Defendants argue that, because unjust enrichment claims are fact-specific, they generally are not suitable for class certification. See Certification Opposition at 52 (quoting Kunzelmann v. Wells Fargo Bank, N.A., 2013 WL 139913, at *9; Vega v. T-Mobile USA, Inc., 564 F.3d at 1274; Justice v. Rheem Mfg. Co., 318 F.R.D. 687, 697-98 (S.D. Fla. 2016)(Dimitrouleas, J.)). The Defendants argue that the cases which the Plaintiffs cite are inapposite, because the courts in those cases made specific findings that there were no

differences among class members relevant to the unjustness analysis. See Certification Opposition at 52 n.39 (citing In re Checking Account Overdraft Litig., 307 F.R.D. at 676; In re Terazosin Hydrochloride Antitrust Litig., 220 F.R.D at 698). The Plaintiffs assert that there are no relevant difference among the class members, because "[w]hat matters to the 'unjustness analysis' is *Defendants' uniform conduct* designed to mislead consumers." Certification Reply at 27 (emphasis in original)(citing In re Terazosin Hydrochloride, 220 F.R.D. at 698).

202. The Court concludes, as it has concluded above, that determining whether the Defendants' retention of any benefit is unjust requires individualized inquiry, and therefore the Florida Classes' unjust enrichment claims do not satisfy rule 23(b)(3)'s predominance requirement. The caselaw to which the parties cite indicates that unjust enrichment claims are suitable for class certification where the court does not have to review the plaintiffs' actions, because the benefit's unjustness is apparent from the defendant's conduct alone. See Vega v. T-Mobile USA, Inc., 564 F.3d at 1274-75 (rejecting lower court's certification of an unjust enrichment claim where the defendants presented evidence that different employees had different levels of awareness regarding the challenged compensation scheme, such that determining whether the scheme was unjust as to each employee depended on how much that employee knew about the scheme); In re Checking Account Overdraft Litig., 307 F.R.D. at 675-676 (approving certification for an unjust enrichment claim and noting that the defendant concealed its overdraft fee policies and systems from its customers, and that none of the customers had learned about the alleged scheme); In re Terazosin Hydrochloride, 220 F.R.D. at 698 (approving certification for an unjust enrichment claim where the defendant used invalid patents and attempted to block generic competition, increasing the price of medications for end-payers); Muzuco v. Re$ubmitIt, LLC, 297 F.R.D. 504, 521 (S.D. Fla. 2013)(Scola, J.)(certifying an unjust enrichment claim

where the defendants' business practices were the same to all members of the class, and the defendants collected fees in the same manner for each class member). As the Court has discussed, even though the Defendants' marketing was uniform, to determine whether the retention of the benefit resulting from a given purchase was unjust requires answering whether an individual consumer believed that a given label meant that Natural American cigarettes were safer or healthier or that menthol was not an additive, and whether that consumer purchased the cigarettes on that basis. Accordingly, determining whether an individual consumer has a valid unjust enrichment claim requires individualized analyses that will predominate over common questions. Accordingly, the Court concludes that the Florida Classes' unjust enrichment claims do not satisfy rule 23(b)(3)'s predominance requirement.

203. In summary, the Court concludes that: (i) administrative feasibility concerns -- namely difficulties in determining whether an individual purchased Natural American cigarettes -- tilt against a conclusion that the Florida Classes satisfy predominance; (ii) the Plaintiffs' proposed damages model is not an adequate fit with the Plaintiffs' Safer-Cigarette Theory -- applicable to both of the Florida Classes -- but that it is an adequate fit with the Plaintiffs' Menthol Theory -- applicable only to the Florida Menthol Subclass; (iii) answering the question whether an individual proposed class member viewed a disclaimer tilts against a finding of predominance for the Florida Classes' claims based on the Safer-Cigarette Theory, but that it does not tilt against a finding of predominance for the Florida Menthol Subclass' claim based on the Menthol Theory; (iv) the FDUTPA claim will not require individualized inquiries to the extent that the Plaintiffs' damages model can calculate the price premium associated with each challenged claim, which tilts in favor of a finding of predominance for the Florida Menthol Subclass but against a finding of predominance for the Florida Class; and (v) the Florida Classes'

unjust enrichment claims require individualized inquiries, tilting against a finding of predominance.

**2. The Florida Classes Satisfy Rule 23(b)(3)'s Typicality Requirement.**

204. The second rule 23(b)(3) requirement is that the class action be a superior method of litigating the proposed class members' claims. See Fed. R. Civ. P. 23(b)(3). The Plaintiffs and the Defendants do not raise any arguments regarding superiority that are unique to the Florida Classes. In concluding above that the Nationwide Menthol Subclass is not a superior vehicle for litigation, the Court acknowledges that the majority of the rule 23(b)(3) factors tilt in favor of concluding that a class action is the superior vehicle for the Nationwide Menthol Subclass' claims, but gives substantial weight to manageability concerns, noting the administrative feasibility issues inherent in determining whether a proposed class member belongs to the class and the additional difficulties in managing a nationwide class where each of the fifty States' laws could require unique jury instructions and other manageability difficulties. For the Florida Classes, the Court reiterates its conclusion above that most of the rule 23(b)(3) factors tilt again in favor of concluding that the class actions are the superior litigation vehicles. Additionally, because the inordinate difficulties of applying each of the fifty States' laws are not present for the Florida Classes, which rely solely on Florida law, the only manageability difficulty that remains is the administrative feasibility question. As the Court has noted, however, a single manageability problem typically is insufficient on its own to prevent class certification. See Cherry v. Dometic Corp., 986 F.3d at 1303-04. Accordingly, the Court concludes that the class action is a superior vehicle to litigate the Florida Classes' statutory and unjust enrichment claims. Because the Court has concluded that only the Florida Menthol Class satisfies predominance to the extent that its claims are premised on the Menthol Theory,

however, the Court certifies the Florida Menthol Class' FDUTPA claim to the extent that it is premised on the Menthol Theory, and will not certify the Florida Class, the Florida Menthol Class to the extent that its claims are premised on the Safer-Cigarette Theory, or the Florida Menthol Class' unjust enrichment claim.

## V. THE COURT CERTIFIES ONLY THE ILLINOIS MENTHOL SUBCLASS' IUDTPA CLAIM TO THE EXTENT THAT IT IS BASED ON THE MENTHOL THEORY.

205. The Court next considers the Plaintiffs' proposed Illinois Class and Illinois Menthol Subclass (the "Illinois Classes"). The Illinois Classes allege three claims: (i) a violation of the ICFA; (ii) a violation of the IUDTPA; and (iii) unjust enrichment. See SAC ¶¶ 217-249, at 62-68. In the MTD MOO, the Court dismisses the Plaintiffs' Illinois ICFA and IUDTPA claims "to the extent that they are premised on the theory that the terms 'natural' and 'additive-free' in the Defendants' advertising" -- but not its labeling -- "mislead a reasonable consumer into believing that Natural American cigarettes are safer or healthier than other cigarettes." MTD MOO at 201. See id. at 244. The Court first reviews whether the proposed classes satisfy rule 23(a)'s numerosity, commonality, typicality, and adequacy requirements. The Court next reviews whether the proposed classes satisfy rule 23(b)(3)'s predominance and superiority requirements.[80]

---

[80]Although the Illinois Classes have alleged claims for injunctive relief under the ICFA and the IUDTPA, they seek certification for injunctive relief on their ICFA claim only. See SAC ¶ 232, at 65; id. ¶ 242, at 67. In its MTD MOO, the Court dismisses the Plaintiffs' IUDTPA claim for injunctive relief, because the Plaintiffs cannot allege likelihood of future harm to themselves. See MTD MOO at 202, 244. Accordingly, the Plaintiffs note that they do not seek certification for injunctive relief on that claim, but preserve their right to appeal its dismissal. See Certification Reply at 3 n.2. As the Court discusses with respect to the California Classes' proposed injunctive relief class action under rule 23(b)(2), however, the Court concludes that these named Plaintiffs do not have standing to pursue their injunctive relief claims. The parties have not made arguments unique to the Illinois Classes, and the Court concludes that the named

206. Before beginning the rule 23 analysis, however, the Court considers the Defendants' argument that the IUDTPA does not permit money damages and that, because the Court has dismissed the Plaintiffs' injunctive IUDTPA claim, there is no claim left for class certification under the IUDTPA. See Certification Opposition at 18 (quoting Kensington's Wine Auctioneers & Brokers, Inc. v. John Hart Fine Wine, Ltd., 909 N.E.2d 848, 857 (Ill. App. Ct. 2009)). The Plaintiffs first dispute that this assertion is correct, arguing that the ICFA authorizes the recovery of damages for IUDTPA violations. See Certification Reply at 2-3 (quoting Dorr-Oliver Inc. v. Fluid-Quip, Inc., 834 F. Supp. 1008, 1014-15 (N.D. Ill. 1993)). The Plaintiffs argue additionally that, even if the IUDTPA does not authorize damages, that assertion "is a defense that . . . would be applicable to *all* Class Members and, thus, does not undermine certification of the Illinois Class." Certification Reply at 2 (citing Thrope v. State of Ohio, 173 F.R.D. 483, 490 (S.D. Ohio 1997))(emphasis in original).

207. The IUDTPA § 3 states: "A person likely to be damaged by a deceptive trade practice of another may be granted injunctive relief . . . ," but is silent as to damages remedies. 815 Ill. Comp. Stat. Ann. 510/3. Although § 3 does not authorize damages relief explicitly, it notes that "[t]he relief provided in this Section is in addition to remedies otherwise available against the same conduct under the common law or other statutes of this State." 815 Ill. Comp. Stat. Ann. 510/3. The ICFA, meanwhile, authorizes courts to award damages to "[a]ny person who suffers actual damage as a result of a violation of this Act committed by any other person . . . ." 815 Ill. Comp. Stat. Ann. 505/10a. The ICFA incorporates the IUDTPA in its definition of "[u]nfair methods of competition and unfair or deceptive acts or practices," which

Plaintiffs for the Illinois Classes do not have standing to pursue injunctive relief and that it will not certify the Illinois Classes for that purpose.

includes "the use or employment of any practice described in Section 2 of the 'Uniform Deceptive Trade Practices Act', approved August 5, 1965, in the conduct of any trade or commerce . . . ." 815 Ill. Comp. Stat. Ann. 505/2. Although the Defendants are correct that the IUDTPA does not itself permit damages remedies, the Court will not decline to certify the Illinois Classes' IUDTPA claims on that ground, because the Court agrees with the Plaintiffs that what remedy, if any, the IUDTPA provides is a question common to the whole class.

**A. THE ILLINOIS CLASSES SATISFY RULE 23(a)'S REQUIREMENTS.**

208. The Court first considers rule 23(a)'s numerosity, commonality, typicality, and adequacy requirements with respect to the Illinois Classes' statutory and unjust enrichment claim. See Fed. R. Civ. P. 23(a). The Defendants do not dispute that the Plaintiffs' proposed classes satisfy rule 23(a)'s numerosity and adequacy requirements, and the Court reiterates its analysis for the Nationwide Menthol Subclass above, concluding that the Plaintiffs' proposed classes satisfy these two requirements. See Certification Opposition at 20. The Court considers in more detail below whether the Illinois Classes satisfy the commonality and typicality requirements.

**1. The Illinois Classes Satisfy Rule 23(a)'s Commonality Requirement.**

209. The parties do not raise any arguments related to commonality that are unique to the Illinois Classes. The Plaintiffs assert that the ICFA requires the Plaintiffs to show "'(1) a deceptive act or practice by the defendant; (2) the defendant intended that the plaintiff rely on the deception; (iii) the deceptive act occurred in a course of conduct involving trade or commerce; and (4) actual damage to the plaintiff; (5) proximately caused by the deceptive act.'" Certification Motion at 67-68 (quoting Philadelphia Indem. Ins. Co. v. Chicago Title Ins. Co., 771 F.3d 391, 402 (7th Cir. 2014)). The Plaintiffs also assert that the IUDTPA claim prohibits

deceptive practices, "including representing that products have benefits they do not have, representing that products are of a particular standard or quality when they are not, advertising products with the intent not to sell them as advertised, or engaging in other conduct that creates a likelihood of confusion." Certification Motion at 68 (citing 815 Ill. Comp. Stat. 510/2(a)(5), (7), (9), (12)). Finally, the Plaintiffs assert that an unjust enrichment claim "arises when a 'defendant voluntarily accepted a benefit which would be inequitable for him to retain without payment.'" Certification Motion at 68 (quoting People ex rel. Hartigan v. E & E. Hauling, Inc., 607 N.E.2d 165, 177 (Ill. 1992), and citing HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc., 545 N.E.2d 672, 679 (Ill. 1989)).

210. The Court concludes that there exist "questions of law or fact" that are central to the Plaintiffs' claims that are capable of generating a common answer. Fed. R. Civ. P. 23(a)(2). For the ICFA claim, these questions include whether the advertising was deceptive and whether the Defendants intended the Plaintiffs to rely on the deception in purchasing their products. For the IUDTPA claim, these questions include whether the Defendants' labels represented benefits that the cigarettes did not have or whether their conduct created a likelihood of confusion. For the unjust enrichment claim, common questions include whether the Defendants received a benefit from the allegedly misleading labeling. Because there exist common questions that are central to the Plaintiffs' claims and that are capable of generating common answers, the Court concludes that the Illinois Classes satisfy the commonality requirement.

**2. The Illinois Classes Satisfy Rule 23(a)'s Typicality Requirement.**

211. As the Court discusses above in its discussion on typicality for the Nationwide Menthol Subclass, "[t]he commonality and typicality requirements of Rule 23(a) tend to merge." Gen. Tele. Co. of the Sw. v. Falcon, 457 U.S. at 157 n.13. The Defendants dispute the Plaintiffs'

showing of typicality for the same reasons that they dispute commonality and for specific reasons relating to individual named Plaintiffs, none of whom represent the Illinois Classes. See Certification Opposition at 22-24. Thus, aside from the arguments regarding typicality which the Court addresses in its discussion on the Nationwide Menthol Subclass above, neither the Plaintiffs nor the Defendants raise typicality arguments that are unique to the Illinois Classes. Without argument to the contrary, the Court concludes that "the claims of the class representative[s] and class members are based on the same legal or remedial theory," and that the Illinois Classes satisfy rule 23(a)'s typicality requirement. Adamson v. Bowen, 855 F.2d at 676.

**B. THE ILLINOIS CLASSES SATISFY RULE 23(b)(3)'S SUPERIORITY REQUIREMENT, BUT ONLY THE ILLINOIS MENTHOL SUBCLASS SATISFIES IN PART THE PREDOMINANCE REQUIREMENT.**

212. Having determined that the Illinois Classes satisfy rule 23(a)'s requirements, the Court next turns to rule 23(b)(3)'s requirements. The Court first considers whether individual questions will predominate over common issues. Next, the Court considers whether a class action is a superior method of litigating the Illinois Classes' claims.

**1. Only the Illinois Menthol Subclass' IUDTPA Claim Satisfies Rule 23(b)(3)'s Predominance Requirement to the Extent That It Is Premised on the Menthol Theory.**

213. The Court first examines whether common questions predominate over individualized inquiries. The Defendants, having argued above that the Plaintiffs' IUDTPA claim is not suitable for certification, because it does not admit damages remedies, and because the Court dismisses the Plaintiffs' request for injunctive relief under the IUDTPA, do not dispute whether the Plaintiffs can prove their IUDTPA claim with predominately common evidence. The Defendants raise arguments, however, against the Plaintiffs' showing of predominance for their ICFA and unjust enrichment claims. See Certification Opposition at 46, 53. Because the

Court does not decline to certify the IUDTPA claim based on the Defendants' argument, it considers whether common questions predominate for all three claims.

214. First, the Court concludes that the ICFA claims do not satisfy rule 23(b)(3)'s predominance requirement. The Plaintiffs argue that the ICFA focuses on objective elements and that the Defendants' conduct makes the claims amenable to class certification. See Certification Motion at 68 (citing Rikos v. Procter & Gamble Co., 799 F.3d 497, 514-15 (6th Cir. 2015); In re ConAgra Foods, Inc., 90 F. Supp. 3d at 1001; Clark v. TAP Pharm. Prods., Inc., 343 Ill. App. 3d 538, 548-49, 798 N.E.2d 123, 131-32 (Ill. Ct. App. 2003); Morse v. Bankers Life & Cas. Co., No 99 C 0193, 2000 WL 246245, at *1 (N.D. Ill. February 24, 2000); Tylka v. Gerber Prods. Co., 178 F.R.D. 493, 499 (N.D. Ill. 1998)). The Defendants contest that an ICFA claimant must allege that her or she was deceived. See Certification Opposition at 46 (quoting Oliveira v. Amoco Oil Co., 201 Ill. 2d 134, 155, 776 N.E.2d 151, 164 (Ill. 2002)). They argue that the Seventh Circuit has relied on that proposition in denying certification of a class which included members who were not deceived and therefore had no ICFA grievance. See Certification Opposition at 46 (citing Oshana v. Coca-Cola Co., 472 F.3d at 514; Langendorf v. Skinnygirl Cocktails, LLC, 3060 F.R.D. 574, 582 (N.D. Ill. 2014)(Shah, J.); Price v. Philip Morris, Inc., 219 Ill.2d 182, 269-71, 848 N.E.2d 1, 52-53 (Ill. 2005)). They contend that the caselaw which the Plaintiffs cite suggests that ICFA claims do not require individualized inquiries in every case, including where a defendant makes uniform representations, but that the Seventh Circuit nevertheless has concluded that similar cases require individualized inquiry. See Certification Opposition at 46 n.31.

215. The Plaintiffs rebut the Defendants' arguments, asserting that the Supreme Court of Illinois in Oliveira v. Amoco Oil Co. dismissed the plaintiff's complaint, because he did not

allege that the defendant's advertisements had deceived him at all and that the Supreme Court of Illinois did not reach the class certification issue. See Certification Reply at 21 (quoting Oliveira v. Coca-Cola Co., 776 N.E.2d at 155, 165). The Plaintiffs also argue that the Seventh Circuit in Oshana v. Coca-Cola Co. declined certification, because of typicality concerns, and limited its holding on class certification to that case only. See Certification Reply at 21 (quoting Pella Corp. v. Saltzman, 606 F.3d 391, 393 (7th Cir. 2010)). The Plaintiffs argue that they can show causation under the ICFA by showing that "there is a uniform material representation seen by class members (materiality being determined by the reasonable consumer standard), and that class members paid more for the product at issue as a result." Certification Reply at 21 (citing In re ConAgra Foods, Inc., 90 F. Supp. 3d at 996, 998; In re Dial Complete Mktg. & Sales Practices Litig., 312 F.R.D. 36, 65-66 (D.N.H. 2015); Rikos v. Procter & Gamble Co., 799 F.3d at 514-15; S37 Mgmt., Inc. v. Advance Refrigeration Co., 356 Ill. Dec. 172, 961 N.E.2d 6, 16 (Ill. App. Ct. 2011)).

216. The Court agrees with the Seventh Circuit's reasoning in Oshana v. Coca-Cola Co., 472 F.3d at 513-15.[81] There, the plaintiff brought a class action arguing that the Coca-Cola Company advertised that Diet Coke contained only aspartame as a sweetener, but that fountain Diet Coke contained both aspartame and saccharin, thereby tricking people into believing that bottled Diet Coke and fountain Diet Coke contained the same ingredients. See 472 F.3d at 509. The plaintiff's proposed class "required only the purchase of a fountain Diet Coke from March

[81]The Plaintiffs argue that the Seventh Circuit references Oshana v. Coca-Cola Co., stating that it does not hold that consumer fraud cases never are appropriate for class certification, and instead denies certification on typicality grounds. See Certification Reply at 21 (quoting Pella Corp. v. Saltzman, 606 F.3d at 393). This interpretation of the Seventh Circuit's holding in Oshana v. Coca-Cola Co. is correct; however, the Court concludes that the Seventh Circuit's interpretation of the Illinois statutory scheme and its requirements is persuasive, and relies on it here.

12, 1999, forward." 472 F.3d at 514. As the Seventh Circuit explains, "a damages claim under the ICFA requires that the plaintiff was deceived in some manner and damaged by the deception." 472 F.3d at 513-14 (quoting Oliveira v. Amoco Oil Co., 267 Ill. Dec. 14, 776 N.E.2d at 164 (citing Zekman v. Direct Am. Marketers, 182 Ill. 2d 359, 231 Ill. Dec. 80, 695 N.E.2d 853 (Ill. 1998)). The Seventh Circuit concludes, therefore:

> Such a class could include millions who were not deceived and thus have no grievance under the ICFA. Some people may have bought fountain Diet Coke *because* it contained saccharin, and some people may have bought fountain Diet Coke *even though* it had saccharin. Countless members of Oshana's putative class could not show any damage, let alone damage proximately caused by Coke's alleged deception. *See Oliveira*, 267 Ill. Dec. 14, 776 N.E.2d at 164 (holding that those who "knew the truth" do not have valid ICFA claims because they cannot claim to have been deceived).

Oshana v. Coca-Cola Co., 472 F.3d at 514 (emphasis in original). The Seventh Circuit concludes that the plaintiff's claims are not typical of the proposed class, because she alleged that she was deceived and injured. See 472 F.3d at 514.

217. The Court concludes that, although the Seventh Circuit concludes that the ICFA's requirement that plaintiffs prove they were deceived results in the named plaintiff's claims being atypical of the class' claims, the same concerns are relevant to the predominance argument. Here, the Plaintiffs seek certification for a class of all purchasers of Natural American cigarettes and menthol cigarettes in Illinois in the relevant time period. See SAC ¶¶ 110, 122, at 40, 42. The Illinois Classes as defined includes individuals whom the labels did not deceive, because they knew that the cigarettes were not safer or knew that menthol was an additive, or who did not purchase Natural American cigarettes based on the challenged labels. As the Supreme Court of Illinois has stated, "to properly plead the element of proximate causation in a private cause of action for deceptive advertising brought under the [ICFA], a plaintiff must allege that he was, in

some manner, deceived." Oliveira v. Amoco Oil Co., 776 N.E.2d at 155. Although the Plaintiffs contend that these differences do not matter, because they are relying on objective standards for deception, that the ICFA requires proof of deception for each plaintiff means that each class member will have to demonstrate deception to substantiate his or her ICFA claim. Accordingly, the Court concludes that the ICFA's proximate cause requirement tilts against a finding of predominance. Similarly, "the Seventh Circuit has recognized that where, as here, an unjust enrichment claim is based on the same alleged wrongdoing that forms the basis for an ICFA claim, the 'unjust enrichment claim will stand or fall with the related [ICFA] claim.'" In re ConAgra Foods, Inc., 90 F. Supp. 3d at 1000 (quoting Cleary v. Philip Morris, Inc., 656 F.3d 511, 517 (7th Cir. 2011)). See Oshana v. Coca-Cola Co., 472 F.3d at 515 ("Oshana cannot show Coke was unjustly enriched unless she shows that Coke benefitted to her detriment . . . . [I]n this case Coke cannot have been unjustly enriched without proof of deception."). Accordingly, the Court concludes that the Illinois Classes' unjust enrichment claim, like their ICFA claim, requires individualized inquiries that tilt against a finding of predominance.

218. Second, the Court concludes that the IUDTPA claims satisfy rule 23(b)(3)'s predominance requirement. Unlike the ICFA, the IUDTPA's language refers solely to a defendant's conduct. See, e.g., 815 Ill. Comp. Stat. Ann. 510/2(a)(12) ("A person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation, the person . . . engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding.") "In order to prevail in an action under this Act, a plaintiff need not prove . . . actual confusion or misunderstanding." 815 Ill. Comp. Stat. Ann. 510/2(b). Because the IUDTPA focuses on a defendant's conduct and does not require proof that any plaintiff was

misled, the IUDTPA claim's common questions predominate.[82]

219. As with the proposed State classes above, the Defendants raise three additional arguments to support their contention that individualized inquiries predominate over the Illinois Classes' common questions. Specifically, they argue that: (i) ascertainability issues require individualized inquiries; (ii) different class members may have seen different representations and disclaimers, requiring individualized inquiries; and (iii) the Plaintiffs' damages model does not fit their liability theories. See Certification Opposition at 25-83. The Court has considered above the arguments on the issues of ascertainability, differing representations, and the damages model, and the parties have not raised arguments unique to Illinois on those issues. Accordingly, the Court adopts its conclusions above in its considerations of the Illinois Classes, specifically that: (i) administrative feasibility concerns -- namely difficulties in determining whether an individual purchased Natural American cigarettes -- tilt against a conclusion that the Illinois Classes satisfy predominance; (ii) the Plaintiffs' proposed damages model is not an adequate fit with the Plaintiffs' Safer-Cigarette Theory -- applicable to both of the Illinois Classes -- but that it is an adequate fit with the Plaintiffs' Menthol Theory -- applicable only to the Illinois Menthol Subclass; and (iii) answering the question whether an individual proposed class member viewed a disclaimer tilts against a finding of predominance for the Illinois Classes' claims based on the Safer-Cigarette Theory, but that it does not tilt against a finding of predominance for the Florida Menthol Subclass' claim based on the Menthol-Theory. Because the Court concludes that individualized inquiries will predominate over common questions for the ICFA and unjust enrichment claims, the Court concludes that only the Illinois Menthol Class' IUDTPA claim

[82]As discussed above, although the Defendants are correct that the IUDTPA claim does not allow for damages relief, what relief is available under the IUDTPA is a common question and thus does not defeat predominance.

satisfies the predominance requirement to the extent that it is premised on the Menthol Theory.

**2. The Illinois Classes Satisfy Rule 23(b)(3)'s Superiority Requirement.**

220. The second rule 23(b)(3) requirement is that the class action be a superior method of litigating the proposed class members' claims. See Fed. R. Civ. P. 23(b)(3). The Plaintiffs and the Defendants do not raise any arguments regarding superiority that are unique to the Illinois Classes. In concluding above that the Nationwide Menthol Subclass is not a superior vehicle for litigation, the Court acknowledges that the majority of the rule 23(b)(3) factors tilt in favor of concluding that a class action is the superior vehicle for the Nationwide Menthol Subclass' claims, but gives substantial weight to manageability concerns, noting the administrative feasibility issues inherent in determining whether a proposed class member belongs to the class and the additional difficulties in managing a nationwide class where each of the fifty States' laws could require unique jury instructions and other manageability difficulties. For the Illinois Classes, the Court reiterates its conclusion above that most of the rule 23(b)(3) factors tilt again in favor of concluding that the class actions are the superior litigation vehicles. Additionally, because the inordinate difficulties of applying each of the fifty States' laws are not present for the Illinois Classes, which rely solely on Illinois law, the only manageability difficulty that remains is the administrative feasibility question. As the Court has noted, however, a single manageability problem typically is insufficient on its own to prevent class certification. See Cherry v. Dometic Corp., 986 F.3d at 1303-04. Accordingly, the Court concludes that the class action is a superior vehicle to litigate the Illinois Classes' statutory and unjust enrichment claim. Because the Court concludes above that only the Illinois Menthol Class' IUDTPA claim satisfies the predominance requirement to the extent that it is premised on the Menthol Theory, the Court certifies only the Illinois Menthol Class' IUDTPA claim to the

extent that it is premised on the Menthol Theory and does not certify the Illinois Class, the Illinois Menthol Class' ICFA and unjust enrichment claims, or the Illinois Menthol Class' IUDTPA claim to the extent that it is premised on the Safer-Cigarette Theory.

## VI. THE COURT DOES NOT CERTIFY THE MASSACHUSETTS CLASS.

221. The Court next considers the Plaintiffs' proposed Massachusetts Class. The Massachusetts Class alleges two claims: (i) an unfair and deceptive business practices claim under Mass. Gen. Law ch. 93A, §§ 2 and 9 ("Chapter 93A"); and (ii) an unjust enrichment claim. See SAC ¶¶ 250-266, at 69-71. The Court first reviews whether the proposed classes satisfy rule 23(a)'s numerosity, commonality, typicality, and adequacy requirements. The Court next reviews whether the proposed classes satisfy rule 23(b)(3)'s predominance and superiority requirements.[83]

### A. THE MASSACHUSETTS CLASS SATISFIES RULE 23(a)'S REQUIREMENTS.

222. The Court first considers rule 23(a)'s numerosity, commonality, typicality, and adequacy requirements with respect to the Massachusetts Class' statutory and unjust enrichment claim. See Fed. R. Civ. P. 23(a). The Defendants do not dispute that the Plaintiffs' proposed classes satisfy rule 23(a)'s numerosity and adequacy requirements, and the Court reiterates its analysis for the Nationwide Menthol Subclass above, concluding that the Plaintiffs' proposed classes satisfy these two requirements. See Certification Opposition at 20. The Court considers

[83]The Massachusetts Class seeks injunctive relief on its Chapter 93A claim. See SAC ¶ 259, at 70. As the Court discusses with respect to the California Classes' proposed injunctive relief class action under rule 23(b)(2), however, the Court concludes that these named Plaintiffs do not have standing to pursue their injunctive-relief claims. The parties have not made arguments unique to the Massachusetts Class, and the Court concludes that Hebert, the named Plaintiff for the Massachusetts Class, does not have standing to pursue injunctive relief, and the Court will not certify the Massachusetts Class for that purpose.

in more detail below whether the Massachusetts Class satisfies the commonality and typicality requirements.

**1. The Massachusetts Class Satisfies Rule 23(a)'s Commonality Requirement.**

223. The Court concludes that both of the Massachusetts Class' claims satisfy the commonality requirement. As the Plaintiffs note, a Chapter 93A claim "requires showing (1) that the defendant committed an unfair or deceptive act or practice, (2) a loss of money or property suffered as a result, and (3) a 'causal connection' between the two." Certification Motion at 69 (quoting Auto Flat Car Crushers, Inc. v. Hanover Ins. Co., 469 Mass. 813, 820, 17 N.E.3d 1066, 1074-75 (Mass. 2014)). Additionally, under Massachusetts law, an unjust enrichment claimant "'must establish not only that the defendant received a benefit, but also that such a benefit was unjust, "a quality that turns on the reasonable expectations of the parties."'" Certification Motion at 69 (quoting Metro. Life Ins. Co v. Cotter, 464 Mass. 623, 644, 984 N.E.2d 835, 850 (Mass. 2013)(quoting Global Investors Agent Corp. v. Nat'l Fire Ins. Co., 76 Mass. App. Ct. 812, 826, 927 N.E.2d 480, 494 (Mass. App. Ct. 2010))). Accordingly, whether the Defendants' conduct here was deceptive or unfair is a common question apt to drive the litigation's resolution, and, as the Court has concluded above with other unjust enrichment claims, whether the Defendants' allegedly misleading labeling caused them to derive a benefit also is a common question central to the litigation. The Court concludes, therefore, that the Massachusetts Class satisfies rule 23(a)'s commonality requirement.

**2. The Massachusetts Class Satisfies Rule 23(a)'s Typicality Requirement.**

224. As the Court discusses above in its discussion on typicality for the Nationwide Menthol Subclass, "[t]he commonality and typicality requirements of Rule 23(a) tend to merge."

Gen. Tele. Co. of the Sw. v. Falcon, 457 U.S. at 157 n.13. The Defendants dispute the Plaintiffs' showing of typicality for the same reasons that they dispute commonality and for specific reasons relating to individual named Plaintiffs, none of whom represent the Massachusetts Class. See Certification Opposition at 22-24. Thus, aside from the arguments regarding typicality which the Court addresses in its discussion on the Nationwide Menthol Subclass above, neither the Plaintiffs nor the Defendants raise typicality arguments that are unique to the Massachusetts Class. Without argument to the contrary, the Court concludes that "the claims of the class representative[s] and class members are based on the same legal or remedial theory," and that the Illinois Classes satisfy rule 23(a)'s typicality requirement. Adamson v. Bowen, 855 F.2d at 676.

### B. THE MASSACHUSETTS CLASS SATISFIES RULE 23(b)(3)'S SUPERIORITY REQUIREMENT, BUT DOES NOT SATISFY THE PREDOMINANCE REQUIREMENT.

225. Having determined that the Massachusetts Class satisfies rule 23(a)'s requirements, the Court next turns to rule 23(b)(3)'s requirements. The Court first considers whether individual questions will predominate over common issues. Next, the Court considers whether a class action is a superior method of litigating the Massachusetts Class' claims.

#### 1. The Massachusetts Class Does Not Satisfy Rule 23(b)(3)'s Predominance Requirement.

226. The Plaintiffs contend that their Chapter 93A claim focuses on objective elements and the Defendants' conduct and is therefore suitable for class treatment. See Certification Motion at 70 (citing Smilow v. Sw. Bell Mobile Sys., Inc., 323 F.3d 32, 42 (1st Cir. 2003); Hebert v. Vantage Travel Serv., Inc., 334 F.R.D. 362, 373 (D. Mass. 2019); Overka v. Am. Airlines, Inc., 265 F.R.D. 14, 20-21 (D. Mass. 2010); Aspinall v. Philip Morris Co., 442 Mass. 381, 813 N.E.2d 476 (Mass. 2004)). The Defendants contest that the Plaintiffs' citation to

Aspinall v. Philip Morris Co. is apposite, because, although Chapter 93A claims do not require proof of reliance, they require proof of causation, an analysis which requires individualized proof into whether each of the challenged labels caused class members to purchase Natural American cigarettes. See Certification Opposition at 47 (citing Markarian v. Conn. Mut. Life. Ins Co., 202 F.R.D. 60, 69 (D. Mass. 2001)(Wolf, J.); Plastic Surgery Assocs., S.C. v. Cynosure, Inc., 407 F. Supp. 3d 59, 73 (D. Mass. 2019)(Casper, J.); Kwaak v. Pfizer, Inc., 881 N.E.2d 812, 8188 (Mass. App. Ct. 2008)). They argue that, although Aspinall v. Philip Morris Co. asserted that misleading advertising causes a per-se injury on purchasers, the Supreme Judicial Court of Massachusetts has moved away from this standard and now require plaintiffs to establish identifiable harms linked to the deceptive act that are distinct from the violation. See Certification Opposition at 47 (citing Rule v. Ft. Dodge Animal Health, Inc., 607 F.3d 250, 254 (1st Cir. 2010); Shaulis v. Nordstrom, Inc., 865 F.3d 1, 10 (1st Cir. 2017)). The Plaintiffs contend that it is sufficient to show that a product bears a uniform, misleading label, see Certification Reply at 22 (citing Aspinall v. Philip Morris Co., 442 Mass. at 402, 813 N.E.2d at 492), that they do not need to show actual reliance on the misleading statements, see Certification Reply at 22 (citing Int'l Fidelity Ins. Co. v. Wilson, 387 Mass. 841, 850 (Mass. 1983)), that they must show a causal relationship between the misrepresentation and their injury, see Certification Reply at 22 (citing Fraser Eng'g Co. v. Desmond, 26 Mass. App. Ct. 99, 104 (Mass. App. Ct. 1988)), and that a price-premium theory of causation is cognizable, see Certification Reply at 22 (citing Lee v. Conagra Brands, Inc., 958 F.3d at 80-81; Allen v. Conagra Foods, Inc., 331 F.R.D. at 667).

227. The Court concludes that, given its determination that the Plaintiffs' damages model is not an adequate fit with its theory of liability, the Massachusetts Class' Chapter 93A

claims does not satisfy predominance to the extent that the Massachusetts Class relies on a price-premium theory of damages to establish causation. The Supreme Judicial Court has explained that its

> recent decisions generally establish the following. The invasion of a consumer's legal right (a right, for example, established by statute or regulation), without more, may be a violation of G.L. c. 93A, § 2, and even a per se violation of § 2, but the fact that there is such a violation does not necessarily mean the consumer has suffered an injury or a loss entitling her to at least nominal damages and attorney's fees; instead, the violation of the legal right that has created the unfair or deceptive act or practice must cause the consumer some kind of separate, identifiable harm arising from the violation itself. *See Rhodes v. AIG Dom. Claims, Inc.*, 461 Mass. 486, 496 n.16, 961 N.E.2d 1067 (2012)(*Rhodes*); *Casavant v. Norwegian Cruise Line Ltd.*, 460 Mass. 500, 504-505, 952 N.E.2d 908 (2011)(*Casavant*); *Iannacchino v. Ford Motor Co.*, 451 Mass. 623, 632-633, 888 N.E.2d 879 (2008)(*Iannacchino*); *Hershenow v. Enterprise Rent-A-Car Co. of Boston*, 445 Mass. 790, 801-802, 840 N.E.2d 526 (2006)(*Hershenow*). To the extent that the quoted passage from *Leardi* can be read to signify that "invasion" of a consumer plaintiff's established legal right in a manner that qualifies as an unfair or deceptive act under G.L. c. 93A, § 2, automatically entitles the plaintiff to at least nominal damages (and attorney's fees), we do not follow the *Leardi* decision. Rather, as the *Rhodes*, *Casavant*, *Iannacchino*, and *Hershenow* decisions indicate, a plaintiff bringing an action for damages under c. 93A, § 9, must allege and ultimately prove that she has, as a result, suffered a distinct injury or harm that arises from the claimed unfair or deceptive act itself.

Tyler v. Michaels Stores, Inc., 464 Mass. 492, 503, 984 N.E.2d 737, 745-46 (Mass. 2013). In Bellermann v. Fitschburg Gas & Elec. Light Co., 475 Mass. 67, 54 N.E.3d 1106 (Mass. 2016), the Supreme Judicial Court of Massachusetts states: "We stated clearly . . . that to meet the injury requirement under G.L. c. 93A, § 9(1) or 11, a plaintiff must have suffered a 'separate, identifiable harm arising from the [regulatory] violation' that is distinct 'from the claimed unfair or deceptive conduct itself.'" Bellermann v. Fitchburg Gas & Elec. Light Co., 475 Mass. at 73, 54 N.E.3d at 1111 (quoting Tyler v. Michaels Stores, Inc., 464 Mass. at 503, 984 N.E. at 745). The Court acknowledges that the First Circuit has allowed the "classic benefit-of-the-bargain injury," or an injury "for which the measure of damages is 'the monetary difference between the

actual value of the product at the time of purchase and what its value would have been if the representations had been true,'" to satisfy Chapter 93A's causation requirement. Lee v. Conagra Brands, Inc., 958 F.3d at 80-81 (quoting Aspinall v. Philip Morris Co., 813 N.E.2d at 490). Nevertheless, the Court has concluded that the Plaintiffs do not present a damages model that can measure that difference in value adequately. Accordingly, the Court concludes that the Massachusetts Class has not satisfied Chapter 93A's causation requirement and therefore would require individualized inquiries whether each class member suffered injury from the alleged deception. The Court concludes, therefore, that the Massachusetts Class' Chapter 93A claim does not satisfy rule 23(b)(3)'s predominance requirement.

228. Regarding the Massachusetts Class' unjust enrichment claim, the Court repeatedly has expressed its skepticism above that common questions related to these claims predominate over individualized inquiries. Similarly, the Court concludes that the Massachusetts Class' unjust enrichment claim does not satisfy the predominance requirement. As the Plaintiffs note, "[w]hether the enrichment or detriment is unjust 'equates with the defeat of someone's reasonable expectations.'" Certification Motion at 69 (quoting Metro. Life Ins. Co. v. Cotter, 984 N.E.2d at 850). "[S]omeone's reasonable expectations," Metro. Life Ins. Co. v. Cotter, 984 N.E.2d at 850, are the individual class members' reasonable expectations and not some generalized reasonable expectation, and the Plaintiffs cannot rely on common proof or a showing that the Defendants' labels are misleading to a reasonable consumer to prove with common evidence that each class member's reasonable expectations were that they were purchasing a relatively healthy product when they purchased Natural American cigarettes. The Plaintiffs would need to demonstrate that each class member expected reasonably that they were buying a product they did not receive. This is an individualized inquiry that overtakes any common

questions. Accordingly, the Court concludes that the Massachusetts Class' unjust enrichment claim does not satisfy rule 23(b)(3)'s predominance requirement.

229. As with the other proposed State classes above, the Defendants raise three additional arguments to support their contention that individualized inquiries predominate over the Massachusetts Class' common questions. Specifically, they argue that: (i) ascertainability issues require individualized inquiries; (ii) different class members may have seen different representations, requiring individualized inquiries; and (iii) the Plaintiffs' damages model does not fit their liability theories. See Certification Opposition at 25-83. The Court has considered above the arguments on the issues of ascertainability, differing representations, and the damages model, and the parties have not raised arguments unique to Massachusetts on those issues. Accordingly, the Court adopts its conclusions above in its considerations of the Massachusetts Class, specifically that: (i) administrative feasibility concerns -- namely difficulties in determining whether an individual purchased Natural American cigarettes -- tilt against a conclusion that the Massachusetts Class satisfies predominance; (ii) the Plaintiffs' proposed damages model is not an adequate fit with the Plaintiffs' Safer-Cigarette Theory -- applicable to the Massachusetts Class -- but that it is an adequate fit with the Plaintiffs' Menthol Theory, which is not applicable here, because the Plaintiffs do not seek certification for a Massachusetts Menthol Subclass; and (iii) answering the question whether an individual proposed class member viewed a disclaimer tilts against a finding of predominance for the Massachusetts Class' claims based on the Safer-Cigarette Theory. Because the Court also concludes that the Massachusetts Class' claims do not satisfy the predominance requirement to the extent that it is premised on the Menthol Theory, the Court concludes that the Massachusetts Class does not satisfy rule 23(b)(3)'s predominance requirement.

### 2. **The Massachusetts Class Satisfies Rule 23(b)(3)'s Superiority Requirement.**

230. The second rule 23(b)(3) requirement is that the class action be a superior method of litigating the proposed class members' claims. See Fed. R. Civ. P. 23(b)(3). The Plaintiffs and the Defendants do not raise any arguments regarding superiority that are unique to the Massachusetts Class. In concluding above that the Nationwide Menthol Subclass is not a superior vehicle for litigation, the Court acknowledges that the majority of the rule 23(b)(3) factors tilt in favor of concluding that a class action is the superior vehicle for the Nationwide Menthol Subclass' claims, but gives substantial weight to manageability concerns, noting the administrative feasibility issues inherent in determining whether a proposed class member belongs to the class and the additional difficulties in managing a nationwide class where each of the fifty States' laws could require unique jury instructions and other manageability difficulties. For the Massachusetts Class, the Court reiterates its conclusion above that most of the rule 23(b)(3) factors tilt again in favor of concluding that the class actions are the superior litigation vehicles. Additionally, because the inordinate difficulties of applying each of the fifty States' laws are not present for the Massachusetts Class, which relies solely on Massachusetts law, the only manageability difficulty that remains is the administrative feasibility question. As the Court has noted, however, a single manageability problem typically is insufficient on its own to prevent class certification. See Cherry v. Dometic Corp., 986 F.3d at 1303-04. Accordingly, the Court concludes that the class action is a superior vehicle to litigate the Massachusetts Class' statutory and unjust enrichment claims. Nevertheless, given the Court's conclusion on the Massachusetts Class' predominance, the Court does not certify the Massachusetts Class.

## VII. THE COURT DOES NOT CERTIFY THE MICHIGAN CLASS.

231. The Court next considers the Plaintiffs' proposed Michigan Class. The Michigan Class alleges two claims: (i) a violation of the Michigan Consumer Protection Act, Mich. Comp. Laws §§ 445.901-922 ("MCPA"); and (ii) an unjust enrichment claim. See SAC ¶¶ 267-289, at 71-76. The Court first reviews whether the proposed classes satisfy rule 23(a)'s numerosity, commonality, typicality, and adequacy requirements. The Court next reviews whether the proposed classes satisfy rule 23(b)(3)'s predominance and superiority requirements.[84]

### A. THE MICHIGAN CLASS SATISFIES RULE 23(a)'S REQUIREMENTS.

232. The Court first considers rule 23(a)'s numerosity, commonality, typicality, and adequacy requirements with respect to the Michigan Class' statutory and unjust enrichment claims. See Fed. R. Civ. P. 23(a). The Defendants do not dispute that the Plaintiffs' proposed classes satisfy rule 23(a)'s numerosity and adequacy requirements, and the Court reiterates its analysis for the Nationwide Menthol Subclass above, concluding that the Plaintiffs' proposed classes satisfy these two requirements. See Certification Opposition at 20. The Court considers in more detail below whether the Michigan Class satisfies the commonality and typicality requirements.

#### 1. The Michigan Class Satisfies Rule 23(a)'s Commonality Requirement.

233. The Court concludes that the Michigan Class' claims satisfy the commonality requirement. Under the MCPA, "[u]nfair, unconscionable, or deceptive methods, acts, or

[84]The Michigan Class seeks injunctive relief on its MCPA claim. See SAC ¶ 278, at 74. As the Court discusses with respect to the California Classes' proposed injunctive relief class action under rule 23(b)(2), however, the Court concludes that these named Plaintiffs do not have standing to pursue their injunctive-relief claims. The parties have not made arguments unique to the Michigan Class, and the Court concludes that the named Plaintiff for the Michigan Class does not have standing to pursue injunctive relief. Accordingly, the Court will not certify the Michigan Class for that purpose.

practices in the conduct of trade or commerce are unlawful," and include, among other acts, "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another." Mich. Comp. Laws § 445.903(1)(e). Under Michigan law, an unjust enrichment claimant must show: "'(1) the receipt of a benefit by the defendant from the plaintiff and (2) an inequity resulting to the plaintiff because of the retention of the benefit by the defendant.'" Certification Motion at 71 (quoting Landstar Express Am., Inc.. v. Nexteer Auto. Corp., 900 N.W.2d 650, 657 (Mich. Ct. App. 2017)). These standards are similar to the statutory and common-law standards the Court has examined below, and there are similar common questions that are central to each claim, such as whether the Defendants have engaged in trade practices that are unfair, unconscionable, or deceptive, and whether the Defendants have received a benefit from the Plaintiffs. Accordingly, the Court concludes that the Michigan Class satisfies rule 23(a)'s commonality requirement.

**2. The Michigan Class Satisfies Rule 23(a)'s Typicality Requirement.**

234. As the Court discusses above in its discussion on typicality for the Nationwide Menthol Subclass, "[t]he commonality and typicality requirements of Rule 23(a) tend to merge." Gen. Tele. Co. of the Sw. v. Falcon, 457 U.S. at 157 n.13. The Defendants dispute the Plaintiffs' showing of typicality for the same reasons that they dispute commonality and for specific reasons relating to individual named Plaintiffs, none of whom represent the Michigan Class. See Certification Opposition at 22-24. Thus, aside from the arguments regarding typicality which the Court addresses in its discussion on the Nationwide Menthol Subclass above, neither the Plaintiffs nor the Defendants raise typicality arguments that are unique to the Michigan Class. Without argument to the contrary, the Court concludes that "the claims of the class representative[s] and class members are based on the same legal or remedial theory," and that the

Michigan Class satisfies rule 23(a)'s typicality requirement. Adamson v. Bowen, 855 F.2d at 676.

**B. THE MICHIGAN CLASS SATISFIES RULE 23(b)(3)'s SUPERIORTY REQUIREMENT, BUT DOES NOT SATISFY THE PREDOMINANCE REQUIREMENT.**

235. Having determined that the Michigan Class satisfies rule 23(a)'s requirements, the Court next turns to rule 23(b)(3)'s requirements. The Court first considers whether individual questions will predominate over common issues. Next, the Court considers whether a class action is a superior method of litigating the Michigan Class' claims.

**1. The Michigan Class Does Not Satisfy Rule 23(b)(3)'s Predominance Requirement.**

236. The Court first turns to whether the Michigan Class satisfies rule 23(b)(3)'s predominance requirement. To establish a claim for misrepresentation, "a plaintiff must establish: 1) that the defendant made a material misrepresentation that was false; 2) the defendant knowingly made the false representation with the intent that the plaintiff would act upon it; 3) that the plaintiff acted in reliance upon it; and 4) resulting damages." In re OnStar Contract Litig., 278 F.R.D. 352, 376 (E.D. Mich. 2011)(Cox, J.)(citing Baker v. Arbor Drugs, Inc., 215 Mich. App. 198, 544 N.W.2d 727 (Mich. Ct. App. 1996)). The Supreme Court of Michigan has held "that members of a class proceeding under the Consumer Protection Act need not individually prove reliance on the alleged misrepresentations. It is sufficient if the class can establish that a reasonable person would have relied on the representation." Dix v. Am. Bankers Life Assur. Co. of Fla., 429 Mich. 410, 418, 415 N.W.2d 206, 209 (Mich. 1987). The Court of Appeals of Michigan has interpreted the MCPA consistently with common-law fraud, which requires that the misrepresentation be material. See Zine v. Chrysler Corp., 236 Mich. App. 261,

283, 600 N.W.2d 384, 398 (Mich. Ct. App. 1999)(citing Mayhall v. A.H. Pond Co., 129 Mich. App. 178, 182-83, 341 N.W.2d 268 (1983); Hi-Way Motor Co. v. Int'l Harvester Co., 398 Mich. 330, 336, 247 N.W.2d 813 (Mich. 1976)). "[A] material fact for purposes of the MCPA would . . . be one that is important to the transaction or affects the consumer's decision to enter into the transaction." Zine v. Chrysler Corp., 236 Mich. App. at 283, 600 N.W.2d at 398. In interpreting common-law fraud's elements under Michigan law, the Honorable Thomas J. Tucker, United States Bankruptcy Judge for the United States District Court for the Eastern District of Michigan, explains that "the [jury] instruction that defines what a 'material fact' is states, in pertinent part, that . . . '[a] material fact must be of enough importance in the matter that a reasonable person would be likely to rely on it.'" In re Pixley, 456 B.R. 770, 782 (E.D. Mich. 2011)(Tucker, J.)(quoting Mich. Standard Civ. Jury Instruction 128.10)(alteration in In re Pixley but not in Civ. Jury Instruction 128.10). See also Speerly v. Gen. Motors, LLC, 343 F.R.D. 493, 521 (E.D. Mich. 2023)(Lawson, J.)(concluding that the MCPA's materiality requirement is susceptible to classwide proof)(citing Mich. Comp. Laws § 445.903(1)(s); Zine v. Chrysler Corp., 236 Mich. App. at 284, 600 N.W.2d at 398). The Honorable Sean F. Cox, United States District Judge for the United States District Court for the Eastern District of Michigan, notes, however, that, "[w]ith respect to class actions . . . , the damages that may be recovered by a class member are limited to the 'actual damages' caused by the violation of the" MCPA. In re OnStar Contract Litig., 278 F.R.D at 378-79 (quoting Mich. Comp. Laws § 445.911(3))(agreeing with the defendants "that determining whether any given member of the proposed class can establish actual damages, and what such damages would be, would require inherently individual inquiries").

237. The Court concludes that the MCPA allows for common proof as to its first three

elements, i.e., whether the Defendants made a misleading statement, whether the Plaintiffs relied on that statement, and whether the statement was material.[85] With regards to damages, the Court concludes that the Plaintiffs have not shown that common questions will predominate. To the extent that the Plaintiffs suggest that all Natural American misleading labels harmed all consumers on the basis of a price-premium, the Court has concluded above that the Plaintiffs' current damages model does not align with the Safer-Cigarette Theory of liability. Accordingly, with respect to the Safer-Cigarette Theory, the Plaintiffs have not shown that they can demonstrate damages on a classwide basis, and the Court concludes that the MCPA claim does not predominate.

238. Regarding unjust enrichment, the Plaintiffs assert that Michigan law "requires '(1) the receipt of a benefit by the defendant from the plaintiff and (2) an inequity resulting to the plaintiff because of the retention of the benefit by the defendant.'" Certification Motion at 71 (quoting Landstar Express Am. Inc. v. Nexteer Auto. Corp., 900 N.W.2d at 657). Whether an unjust enrichment claim satisfies the predominance requirement depends on each case's facts. See In re Terazosin Hydrochloride Antitrust Litig., 220 F.R.D. at 698 (certifying an unjust enrichment claim where the defendant delayed the labeling of generic medication resulting in increased profits); Jackson v. Wal-Mart Stores, Inc., 2005 WL 3191394, at *5 (denying certification of an unjust enrichment claim where the claim's success depended on why individual employees missed rest or meal breaks). As the Court has discussed, whether an individual consumer's purchase was unjust hinges on the reasons why they purchased Natural American cigarettes, and whether they would have been willing to pay the same price without

[85]The Court reiterates its conclusion from its analysis on the California Classes that whether the Plaintiffs ultimately will prove classwide materiality to a factfinder is a merits issue and does not preclude a finding of predominance.

the allegedly misleading labeling or with knowledge that the cigarettes were not safer or contained additives. Accordingly, the Court concludes that the Michigan Class' unjust enrichment claim involves individualized inquiries which preclude a finding of predominance.

239. As with the other proposed State classes above, the Defendants raise three additional arguments to support their contention that individualized inquiries predominate over the Michigan Class' common questions. Specifically, they argue that: (i) ascertainability issues require individualized inquiries; (ii) different class members may have seen different representations, requiring individualized inquiries; and (iii) the Plaintiffs' damages model does not fit their liability theories. See Certification Opposition at 25-83. The Court has considered above the arguments on the issues of ascertainability, differing representations, and the damages model, and the parties have not raised arguments unique to Michigan on those issues. Accordingly, the Court adopts its conclusions above in its considerations of the Michigan Class, specifically that: (i) administrative feasibility concerns -- namely difficulties in determining whether an individual purchased Natural American cigarettes -- tilt against a conclusion that the Michigan Classes satisfy predominance; (ii) the Plaintiffs' proposed damages model is not an adequate fit with the Plaintiffs' Safer-Cigarette Theory, applicable to the Michigan Class; and (iii) answering the question whether an individual proposed class member viewed a disclaimer tilts against a finding of predominance for the Michigan Class' claims based on the Safer-Cigarette Theory. Having additionally determined that the Michigan Class' claims do not predominate, the Court concludes that the Michigan Class does not satisfy the predominance requirement.

**2. <u>The Michigan Class Satisfies Rule 23(b)(3)'s Superiority Requirement</u>.**

240. The second rule 23(b)(3) requirement is that the class action be a superior method of litigating the proposed class members' claims. See Fed. R. Civ. P. 23(b)(3). The Plaintiffs and the Defendants do not raise any arguments regarding superiority that are unique to the Michigan Class. In concluding above that the Nationwide Menthol Subclass is not a superior vehicle for litigation, the Court acknowledges that the majority of the rule 23(b)(3) factors tilt in favor of concluding that a class action is the superior vehicle for the Nationwide Menthol Subclass' claims, but gives substantial weight to manageability concerns, noting the administrative feasibility issues inherent in determining whether a proposed class member belongs to the class and the additional difficulties in managing a nationwide class where each of the fifty States' laws could require unique jury instructions and other manageability difficulties. For the Michigan Class, the Court reiterates its conclusion above that most of the rule 23(b)(3) factors tilt again in favor of concluding that the class actions are the superior litigation vehicles. Additionally, because the inordinate difficulties of applying each of the fifty States' laws are not present for the Michigan Class, which rely solely on Michigan law, the only manageability difficulty that remains is the administrative feasibility question. As the Court has noted, however, a single manageability problem typically is insufficient on its own to prevent class certification. See Cherry v. Dometic Corp., 986 F.3d at 1303-04. Accordingly, the Court concludes that the class action is a superior vehicle to litigate the Michigan Class' statutory and unjust enrichment claim. Because the Court concludes above, however, that the Michigan Class does not satisfy the predominance requirement, the Court does not certify the Michigan Class.

## VIII. THE COURT CERTIFIES THE NEW JERSEY MENTHOL SUBCLASS TO THE EXTENT THAT ITS CLAIMS ARE BASED ON THE MENTHOL THEORY, AND DOES NOT OTHERWISE CERTIFY THE NEW JERSEY MENTHOL SUBCLASS OR THE NEW JERSEY CLASS.

241. The Court next considers the Plaintiffs' proposed New Jersey Class and New Jersey Menthol Subclass (the "New Jersey Classes"). The New Jersey Classes allege three claims: (i) a violation of the NJCFA; (ii) a violation of the TCCWNA; and (iii) an unjust enrichment claim. See SAC ¶¶ 290-315, at 76-81. As the Defendants note, the Court dismissed the New Jersey Classes' unjust enrichment claim in its MTD MOO, and the Plaintiffs do not seek certification on that claim. See Certification Opposition at 17 (citing MTD MOO at 223-24); Certification Reply at 3 n.2. Accordingly, the Court considers only the New Jersey Classes' statutory claims. The Court first reviews whether the proposed classes satisfy rule 23(a)'s numerosity, commonality, typicality, and adequacy requirements. The Court next reviews whether the proposed classes satisfy rule 23(b)(3)'s predominance and superiority requirements.[86]

### A. THE NEW JERSEY CLASSES SATISFY RULE 23(a)'S REQUIREMENTS.

242. The Court first considers rule 23(a)'s numerosity, commonality, typicality, and adequacy requirements with respect to the New Jersey Classes' statutory claims. See Fed. R. Civ. P. 23(a). The Defendants do not dispute that the Plaintiffs' proposed classes satisfy rule 23(a)'s numerosity and adequacy requirements, and the Court reiterates its analysis for the

[86]The New Jersey Classes seek injunctive relief on their NJCFA claim. See SAC ¶ 298, at 78. As the Court discusses with respect to the California Classes' proposed injunctive relief class action under rule 23(b)(2), however, the Court concludes that these named Plaintiffs do not have standing to pursue their injunctive-relief claims. The parties have not made arguments unique to the New Jersey Classes, and the Court concludes that the named Plaintiffs for the New Jersey Classes, Litwin and Emmons, do not have standing to pursue injunctive relief. Accordingly, the Court will not certify the New Jersey Classes for that purpose.

Nationwide Menthol Subclass above, concluding that the Plaintiffs' proposed classes satisfy these two requirements. See Certification Opposition at 20. The Court considers in more detail below whether the New Jersey Classes satisfy the commonality and typicality requirements.

#### 1. The New Jersey Classes Satisfy Rule 23(a)'s Commonality Requirement.

243. The Plaintiffs assert that, under the NJCFA, "'[a] consumer who can prove (1) an unlawful practice, (2) an ascertainable loss, and (3) a causal relationship between the unlawful conduct and the ascertainable loss, is entitled to legal and/or equitable relief, treble damages, and reasonable attorneys' fees.'" Certification Motion at 72 (quoting Gonzalez v. Wilshire Credit Corp., 25 A.3d 1103, 1115 (N.J. 2011). Section 56:8-2 makes "any commercial practice that is unconscionable or abusive, deception, fraud . . . , [or] misrepresentation . . . an unlawful practice." N.J. Stat. § 56:8-2. Thus, whether the Defendants' labeling practices constitute deception or misrepresentation is a common question central to the Plaintiffs' NJCFA claim. The Plaintiffs additionally assert that the TCCWNA requires a showing that "(1) the defendant was a seller; (2) the defendant offered or entered into a written consumer contract; (3) that writing contained a provision that violated 'any clearly established legal right of a consumer or responsibility of a seller'; and (4) the plaintiff is an 'aggrieved consumer.'" Certification Motion at 72 (quoting Kauffman v. New England Fitness S., Inc., No. A-1789-17T1, 2019 WL 1752922, at *2 (N.J. Super. Ct. App. Div. April 17, 2019)). The TCCWNA itself provides:

> No seller . . . shall in the course of his business offer to any consumer or prospective consumer or enter into any written consumer contract or give or display any written consumer warranty, notice or sign . . . which includes any provision that violates any clearly established legal right of a consumer or responsibility of a seller . . . as established by State or Federal law at the time the offer is made or the consumer contract is signed or the warranty, notice or sign is given or displayed.

N.J. Stat. § 56:12-15. Thus, whether the Defendants' labeling constituted a written consumer warranty, notice, or sign, and whether it included a provision that violated a consumer's clearly established legal right, are common questions central to the New Jersey Classes' claims. Accordingly, the Court concludes that the New Jersey Classes' statutory claims satisfy rule 23(a)'s commonality requirement.

### 2. The New Jersey Classes Satisfy Rule 23(a)'s Typicality Requirement.

244. As the Court has discussed above, "[t]he commonality and typicality requirements of Rule 23(a) tend to merge." Gen. Tele. Co. of the Sw. v. Falcon, 457 U.S. at 157 n.13. The Defendants dispute the Plaintiffs' showing of typicality for the same reasons that they dispute commonality and for specific reasons relating to individual named Plaintiffs, two of whom -- Emmons and Litwin -- represent the New Jersey Class and the New Jersey Menthol Subclass, respectively. See Certification Opposition at 22-24; SAC ¶¶ 113, 123, at 40, 42. The Defendants challenge Emmons' typicality, because she "acknowledged that she did not pay more for NAS than other brands and in all events never paid more based on a belief that NAS cigarettes are somehow better." Certification Opposition at 23-24 (citing Deposition of Abigail Emmons (taken July 10, 2018) at 187:25-191:5, filed October 8, 2020 (Doc. 315-8)(Emmons, Gallucci, Reisman)("Emmons Depo.")). Similarly, they challenge Litwin's typicality, because he paid for Natural American cigarettes using coupons and therefore did not pay full price. See Certification Opposition at 24 (quoting Deposition of Robert Litwin (taken May 23, 2018) at 96:15-98:7, filed October 8, 2020 (Doc. 315-7)(Haberman, Litwin, Marker)("Litwin Depo."). They also challenge Litwin's typicality, because he continued smoking Natural American cigarettes after commencing this litigation, and therefore cannot represent that he has been misled. See Certification Opposition at 23 (citing Litwin Depo. at 101:21-103:8 (Litwin,

Marker)).

245. Regarding Litwin, that he continued to smoke Natural American cigarettes after learning that they are not healthier than other cigarettes does not make his claims atypical, because his claims nevertheless are based on the same legal theory as the rest of the class, namely, that Natural American's labeling led him to believe that the cigarettes were safer.[87] Additionally, as the Court discusses above in considering the Nationwide Menthol Subclass, that he used coupons to purchase his cigarettes does not mean he did not pay more for those cigarettes than he otherwise would have if they did not bear the allegedly misleading labels. Although the Court has concluded that Dr. Dubé's damages model is not an adequate fit with the Plaintiffs' Safer-Cigarette Theory, it nevertheless suggests that there is a price premium associated with the Defendants' challenged labels. Dubé Report ¶ 23, at 9. For the same reason, the Court does not conclude that Emmons' assertion that she did not pay more for Natural American cigarettes compared to other cigarettes, Emmons Depo. at 188:19-189:5 (Emmons, Reisman), undercuts the Plaintiffs' argument that Natural American cigarettes commanded a price premium compared to what they would have been valued without the challenged labels. Accordingly, the Court concludes that Litwin's and Emmons' claims rest on the same legal theory as the proposed class members, and concludes that their differing factual circumstances do not defeat typicality. See Adamson v. Bowen, 855 F.2d at 676 ("[D]iffering fact situations of class members do not defeat typicality under Rule 23(a)(3) so long as the claims of the class

---

[87]Litwin notes that, after commencing this action, Natural American cigarettes no longer constituted the majority of the cigarettes that he smokes. See Litwin Depo. at 102:6-12 (Litwin, Marker). As the Court has noted, given cigarettes' highly addictive nature, see Proctor Report at 9, the Court is unwilling to conclude that, because a consumer continued to smoke a certain brand after learning that those cigarettes did not contain certain desirable qualities, he or she no longer has claims that are typical of the remaining class members.

representative and class members are based on the same legal or remedial theory."). The Court therefore concludes that the New Jersey Classes satisfy rule 23(a)'s typicality requirement.

**B. THE NEW JERSEY CLASSES SATISFY IN PART RULE 23(b)(3)'S REQUIREMENTS.**

246. Having determined that the New Jersey Classes satisfy rule 23(a)'s requirements, the Court next turns to rule 23(b)(3)'s requirements. The Court first considers whether individual questions will predominate over common issues. Next, the Court considers whether a class action is a superior method of litigating the New Jersey Classes' claims.

**1. The New Jersey Class and the New Jersey Menthol Subclass -- to the Extent That Its Claims Are Based on the Safer-Cigarette Theory -- Do Not Satisfy Rule 23(b)(3)'s Predominance Requirement, but the New Jersey Menthol Subclass Satisfies Rule 23(b)(3)'s Predominance Requirement to the Extent that Its Claims Are Based on the Menthol Theory.**

247. The Plaintiffs argue that "[t]he test for deception turns on the reasonable consumer." Certification Motion at 72 (citing Barry v. Arrow Pontiac, Inc., 494 A.2d 804, 810 (N.J. 1985)). Accordingly, they contend that the NJCFA focuses on objective elements and the Defendants' conduct and therefore is suitable for class treatment. See Certification Motion at 73. The Defendants contend that "the NJFCA 'essentially replaces reliance, an element of proof traditional to any fraud claim, with the requirement that plaintiff prove ascertainable loss,'" and that the Plaintiffs must also demonstrate a causal link between the unlawful conduct and the Plaintiffs' ascertainable loss. Certification Opposition at 48 (quoting Int'l Union of Operating Eng'rs Loc. No. 68 Welfare Fund v. Merck & Co., 192 N.J. 372, 389, 929 A.2d 1076, 1086 (N.J. 2007)("Local No. 68")). They note that New Jersey courts have declined to certify other cigarette class actions, because success on the claim would require individual inquiries into each smoker's reasons for choosing the challenged brand. See Certification Opposition at 48 (citing

Stern v. Philip Morris USA, Inc., 2007 WL 4841057, at *13 (N.J. Super. Ct. November 16, 2007)). The Plaintiffs rebut that they need only show a causal relationship, which does not require individual reliance and which requires only that the Plaintiffs suffered an ascertainable loss due to the Defendants' conduct. See Certification Reply at 23 (citing Lee v. Carter-Reed Co., 203 N.J. 496, 528, 4 A.3d 561, 580 (N.J. 2010)). The Plaintiffs assert that they demonstrate ascertainable loss on a class-wide basis, because the challenged labels cause Natural American cigarettes to be more expensive than they would be without the claims. See Certification Reply at 23 (citing Hudock v. LG Elecs. USA, Inc., No. 16-1220, 2018 WL 626527, at *4 (D. Minn. January 30, 2018); Dzielak v. Whirlpool Corp., No. 12-89, 2017 WL 6513347, at *9-10 (D.N.J. December 20, 2017)).

248. The parties are in agreement that the NJCFA requires a showing of causation linking the Defendants' conduct with the Plaintiffs' ascertainable loss. The Court agrees with this assertion. See Loc. No. 68, 192 N.J. at 389, 929 A.2d at 1086; Lee v. Carter-Reed Co., 203 N.J. at 528, 4 A.3d at 580. The Supreme Court of New Jersey has suggested that a benefit-of-the-bargain claim can prove the Plaintiffs' ascertainable loss, but notes that claim's viability hinges on the proof's quality. See Thiedemann v. Mercedes-Benz USA, LLC, 183 N.J. 234, 253 n.8, 872 A.2d 783, 795 n.8 (N.J. 2005)("We do not suggest that a benefit-of-the-bargain claim cannot support an ascertainable loss sufficient to allow a CFA claim to proceed to the factfinder; rather, it is the quality of the proofs that will determine a claim's viability."). As the Court discussed above with the Massachusetts Classes' Chapter 93A claim, however, the Plaintiffs' damages model does not measure the price premium associated with the belief that the challenged labels signified health benefits, and the Plaintiffs have not shown, therefore, that this price premium is identifiable, undercutting their showing of causation. Accordingly, the Court

concludes that the Plaintiffs' NJCFA claim is susceptible to individualized inquiries, tilting against a finding of predominance for the Plaintiffs' NJCFA claim premised on the Safer-Cigarette Theory.

249. Regarding the TCCWNA the Plaintiffs assert again that focuses on objective elements and the Defendants' conduct and therefore is suitable for class treatment. See Certification Motion at 73 (citing United Consumer Fin. Servs. Co. v. Carbo, 982 A.2d 7, 23 (N.J. Ct. App. 2009)). The Defendants contest that the Plaintiffs have shown legal authority that a TCCWNA claim is susceptible to common proof, and argue that the Plaintiffs' citation to United Consumer Fin. Servs. Co. v. Carbo is inapposite, because the appellants contested only that they were not involved in the case, and did not challenge the TCCWNA class' certification in particular. See Certification Opposition at 49 (citing United Consumer Fin. Servs. Co. v. Carbo, 982 A.2d at 15). The Plaintiffs point to the statute and argue that it includes no reliance requirement and that they do not need to prove individualized causation. See Certification Reply at 24 (citing Browne v. Capital One Bank (USA), N.A., 2020 WL 4045271, at *7; Korrow v. Aaron's Inc., No CIV.A. 10-6317 MAS, 2013 WL 5811496, at *13(D.N.J. July 31, 2013)).

250. To bring a TCCWNA claim, a plaintiff must be an "aggrieved consumer," and, "[i]n the absence of evidence that the consumer suffered adverse consequences as a result of the defendant's regulatory violation, a consumer is not an 'aggrieved consumer' for purposes of the TCCWNA." Spade v. Select Comfort Corp., 232 N.J. 504, 524, 181 A.3d 969, 981 (N.J. 2018).[88] This statute, therefore, contains a causation requirement, i.e., that the Defendants'

[88]Although the parties have not raised the issue, the Court also notes that it is not clear that the TCCWNA is the appropriate vehicle to address a seller's deceptive-labeling practice. The statute provides: "No seller . . . shall . . . offer to any consumer or prospective consumer or enter into any written consumer contract or give or display any written consumer warranty,

violation caused the Plaintiffs to suffer adverse consequences. To the extent that the Plaintiffs assert that they have demonstrated class-wide causation on the basis of Dr. Dubé's price-premium analysis, the Court reiterates its conclusion that the Plaintiffs have not shown that this analysis will identify the price-premium associated with the Safer-Cigarette Theory, but that it is sufficient for the Menthol Theory. The Plaintiffs therefore must rely on individualized inquiries to determine whether a given class member is an aggrieved consumer under the TCCWNA.

---

notice or sign . . . which includes any provision that violates any clearly established legal right of a consumer or responsibility of a seller." N.J. Stat. § 56:12-15. As the Supreme Court of New Jersey notes:

> The TCCWNA is intended "to prevent deceptive practices in consumer contracts." Dugan v. TGI Fridays, Inc., 231 N.J. 24, 67, 171 A.3d 620 (2017)(quoting Kent Motor Cars, Inc. v. Reynolds & Reynolds Co., 207 N.J. 428, 457, 25 A.3d 1027 (2011)). When it enacted the TCCWNA in 1981, the Legislature acknowledged the presence of legally invalid provisions in "[f]ar too many consumer contracts, warranties, notices and signs," which acted to "deceive[ ] a consumer into thinking [the provisions] are enforceable," and deterred consumers from enforcing their legal rights. Sponsor's Statement to A. 1660 2 (1980).

Spade v. Select Comfort Corp., 232 N.J. at 515, 181 A.3d at 975-76. The types of writings that have been the subject of litigation under the TCCWNA generally include provisions in written contracts, see Spade v. Select Comfort Corp., 232 N.J. at 511, 181 A.3d at 973; Shelton v. Restaurant.com, Inc., 214 N.J. 419, 443, 70 A.3d 544, 559 (N.J. 2013); Annecharico v. Raymour & Flanigan, 2016 WL 7015615, at *6 (D.N.J. November 30, 2016)(Wolfson, J.). The Supreme Court of New Jersey has expressed skepticism towards other writings with which consumers interact. See Dugan v. TGI Fridays, Inc., 231 N.J. at 74, 171 A.3d at 650 ("Moreover, even if a menu lacking beverage prices were to constitute a 'contract,' 'warranty,' 'notice' or 'sign' within the meaning of the TCCWNA, it is far from clear that the statute was intended to apply as plaintiffs contend that it should."). The Superior Court of New Jersey has concluded explicitly that the TCCWNA does not cover labels on food products. See Cameron v. Monkey Joe's Big Nut Co., 2008 WL 6084192, at *3-5 (N.J. Super. Ct. Law Div. August 4, 2008)(concluding that food labels are not included in the TCCWNA's plain language and are not a warranty or notice for the TCCWNA's purposes). The Court has not identified any cases, and the parties have not provided the Court with any cases, in which a court has certified a TCCWNA class on the basis of an allegedly misleading product label. If the parties had raised this issue, the Court would conclude that the Supreme Court of New Jersey likely would not permit a TCCWNA claim for the Plaintiffs' factual situation, but, because the parties do not raise this issue, the Court reaches only its conclusion on predominance.

Accordingly, the Court concludes that the New Jersey Classes' TCCWNA claim does not satisfy the predominance requirement as to the Safer-Cigarette Theory, but that, to the extent that the TCCWNA applies to product-labeling claims, the New Jersey Classes' Menthol Theory satisfies the predominance requirement.

251. As with the other proposed State classes above, the Defendants raise three additional arguments to support their contention that individualized inquiries predominate over the New Jersey Classes' common questions. Specifically, they argue that: (i) ascertainability issues require individualized inquiries; (ii) different class members may have seen different representations, requiring individualized inquiries; and (iii) the Plaintiffs' damages model does not fit their liability theories. See Certification Opposition at 25-83. The Court has considered above the arguments on the issues of ascertainability, differing representations, and the damages model, and the parties have not raised arguments unique to New Jersey on those issues. Accordingly, the Court adopts its conclusions above in its considerations of the New Jersey Classes, specifically that: (i) administrative feasibility concerns -- namely difficulties in determining whether an individual purchased Natural American cigarettes -- tilt against a conclusion that the New Jersey Classes satisfy predominance; (ii) the Plaintiffs' proposed damages model is not an adequate fit with the Plaintiffs' Safer-Cigarette Theory -- applicable to both of the New Jersey Classes -- but that it is an adequate fit with the Plaintiffs' Menthol Theory -- applicable to the New Jersey Menthol Subclass; and (iii) answering the question whether an individual proposed class member viewed a disclaimer tilts against a finding of predominance for the New Jersey Classes' claims based on the Safer-Cigarette Theory, but that it does not tilt against a finding of predominance for the New Jersey Menthol Subclass' claim based on the Menthol Theory. These conclusions are in addition to the Court's conclusions

above that the New Jersey Classes' statutory claims do not satisfy predominance insofar as they are based on the Safer-Cigarette Theory, but that they satisfy predominance insofar as they are based on the Menthol Theory. Accordingly, the Court concludes that the New Jersey Class does not satisfy the predominance requirement, but that the New Jersey Menthol Class satisfies the predominance requirement to the extent that its claims are based on the Menthol Theory.

**2. The New Jersey Classes Satisfy Rule 23(b)(3)'s Superiority Requirement.**

252. The second rule 23(b)(3) requirement is that the class action be a superior method of litigating the proposed class members' claims. See Fed. R. Civ. P. 23(b)(3). The Plaintiffs and the Defendants do not raise any arguments regarding superiority that are unique to the New Jersey Classes. In concluding above that the Nationwide Menthol Subclass is not a superior vehicle for litigation, the Court acknowledges that the majority of the rule 23(b)(3) factors tilt in favor of concluding that a class action is the superior vehicle for the Nationwide Menthol Subclass' claims, but gives substantial weight to manageability concerns, noting the administrative feasibility issues inherent in determining whether a proposed class member belongs to the class and the additional difficulties in managing a nationwide class where each of the fifty States' laws could require unique jury instructions and other manageability difficulties. For the New Jersey Classes, the Court reiterates its conclusion above that most of the rule 23(b)(3) factors tilt again in favor of concluding that the class actions are the superior litigation vehicles. Additionally, because the inordinate difficulties of applying each of the fifty States' laws are not present for the New Jersey Classes, which rely solely on New Jersey law, the only manageability difficulty that remains is the administrative feasibility question. As the Court has noted, however, a single manageability problem typically is insufficient on its own to prevent

class certification. See Cherry v. Dometic Corp., 986 F.3d at 1303-04. Accordingly, the Court concludes that the class action is a superior vehicle to litigate the New Jersey Classes' statutory claims. Because the Court concludes that the New Jersey Class does not satisfy the predominance requirement, but that the New Jersey Menthol Class satisfies the predominance requirement to the extent that its claims are based on the Menthol Theory, the Court certifies the New Jersey Menthol Subclass to the extent that its claims are based on the Menthol Theory, but does not certify the New Jersey Menthol Subclass to the extent that its claims are based on the Safer-Cigarette Theory, and does not certify the New Jersey Class.

## IX. THE COURT CERTIFIES THE NEW MEXICO MENTHOL SUBCLASS NMUPA CLAIM TO THE EXTENT THAT IT IS PREMISED ON THE MENTHOL THEORY.

253. The Court next considers the Plaintiffs' proposed New Mexico Class and New Mexico Menthol Subclass (the "New Mexico Classes"). The New Mexico Classes allege three claims: (i) violations of the New Mexico Unfair Practices Act, N.M.S.A. §§ 57-12-1 to -26 ("NMUPA"); (ii) violations of the NMFAA, N.M.S.A. §§ 57-15-1 to -10; and (iii) an unjust enrichment claim. See SAC ¶¶ 316-342, at 81-86. Before examining whether the New Mexico Classes' claims satisfy rule 23's requirements, the Court addresses the Defendants' arguments that the Plaintiffs may not pursue a class action under their two statutory claims. The Defendants argue that the Plaintiffs may not bring their NMFAA claim, because the NMFAA does not authorize a private right of action. See Certification Opposition at 18-19 (citing Ahlgrim v. Keefe Grp., LLC, 2016 WL 9819520, at *4. The Plaintiffs contend that the NMFAA authorizes a private right of action on behalf of similarly situated individuals and that the Defendants' argument does not undermine certification even if it is correct. See Certification Reply at 3 (citing Thrope v. Ohio, 173 F.R.D. at 490; Fiser v. Dell Computer Corp, 2008-NMSC-046, ¶¶ 9-

10, 144 N.M. at 467-68, 188 P.3d at 1218).

254. The Plaintiffs are correct that the Supreme Court of New Mexico in Fiser v. Dell Computer Corp. acknowledges a private right of action for certain remedies under the NMFAA. See Fiser v. Dell Computer Corp., 2008-NMSC-046, ¶¶ 9-10, 144 N.M. at 467-68, 188 P.3d at 1218. In Fiser v. Dell Computer Corp., however, the NMFAA section for which the Supreme Court of New Mexico acknowledges a private right applies only to injunctive relief claims. See 2008-NMSC-046, ¶ 10, 144 N.M. at 467-68, 188 P.3d at 1218 (citing N.M.S.A. § 57-15-5). Section 57-15-5 is titled "Injunctions to prevent violation," and provides that "a private citizen may bring an action in the name of the state against any person to retrain and prevent any violation of this act. Any proceeding initiated under this section by a private citizen shall be initiated on his behalf on all others similarly situated." N.M.S.A. § 57-15-5. Section 57-15-8, meanwhile, provides that, "[i]n order to promote the uniform administration of [the NMFAA] in New Mexico, the attorney general is to be responsible for its enforcement, but he may in appropriate cases delegate this authority to the district attorneys of the state . . . ." N.M.S.A. § 57-15-8.

255. The NMFAA's statutory scheme contrasts, for example, with the NMUPA, which includes a section titled "Private remedies" which authorizes that "[a]ny person who suffers any loss of money or property . . . as a result of any employment by another person of a method, act or practice declared unlawful by the Unfair Practices Act may bring an action to recover actual damages or the sum of one hundred dollars . . . ." N.M.S.A. § 57-12-10. That the New Mexico Legislature authorized private remedies explicitly under the NMUPA but provided only private injunctive remedies under the NMFAA indicates that the New Mexico Legislature did not intend to permit a private right of action for damages under the NMFAA. Accordingly, the Court

concludes that the NMFAA does not provide the Plaintiffs here with a private right of action to bring a damages claim against the Defendants. The Court will not certify, therefore, the New Mexico Classes' NMFAA claims for damages. The Court will review only whether the proposed classes' NMUPA and unjust enrichment claims satisfy rule 23(a)'s numerosity, commonality, typicality, and adequacy requirements, as well as rule 23(b)(3)'s predominance and superiority requirements.[89]

### A. THE NEW MEXICO CLASSES SATISFY RULE 23(a)'S REQUIREMENTS.

256. The Court first considers rule 23(a)'s numerosity, commonality, typicality, and adequacy requirements with respect to the New Mexico Classes' NMUPA and unjust enrichment claims. See Fed. R. Civ. P. 23(a). The Defendants do not dispute that the Plaintiffs' proposed classes satisfy rule 23(a)'s numerosity and adequacy requirements, and the Court reiterates its analysis for the Nationwide Menthol Subclass above, concluding that the Plaintiffs' proposed classes satisfy these two requirements. See Certification Opposition at 20. The Court considers in more detail below whether the New Mexico Classes satisfy the commonality and typicality requirements.

---

[89]The New Mexico Classes seek "all other proper and just relief available under N.M. Stat. Ann. § 57-12-10," SAC ¶ 328, at 83, for their NMUPA claim, and bring their NMFAA claim under N.M.S.A. § 57-15-5 "to restrain and prevent violations of" the NMFAL, SAC ¶ 333, at 84. Section 57-12-10 authorizes the Court to grant a injunctive relief to "[a] person likely to be damaged by an unfair or deceptive trade practice . . . ." N.M.S.A. § 57-12-10(A). As the Court discusses with respect to the California Classes' proposed injunctive relief class action under rule 23(b)(2), however, the Court concludes that these named Plaintiffs do not have standing to pursue their injunctive-relief claims. The parties have not made arguments unique to the New Mexico Classes, and the Court concludes that the named Plaintiffs for the New Mexico Classes, Haksal and Horne, do not have standing to pursue injunctive relief and, to the extent that the New Mexico Classes seek injunctive relief, the Court will not certify the New Mexico Classes for that purpose.

**1. The New Mexico Classes Satisfy Rule 23(a)'s Commonality Requirement.**

257. The NMUPA makes unlawful "[u]nfair or deceptive trade practices and unconscionable trade practices in the conduct of any trade or commerce." N.M.S.A. § 57-12-3. The NMUPA defines unfair or deceptive trade practices to be

> an act specifically declared unlawful pursuant to the Unfair Practices Act, a false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale, lease, rental or loan of goods or services or in the extension of credit or in the collection of debts by a person in the regular course of the person's trade or commerce, that may, tends to or does deceive or mislead any person . . . .

N.M.S.A. § 57-12-2(D). The Supreme Court of New Mexico has indicated that there are four elements required to establish a claim under the NMUPA:

> First, the complaining party must show that the party charged made an "oral or written statement, visual description or other representation" that was either false or misleading. Second, the false or misleading representation must have been "knowingly made in connection with the sale, lease, rental or loan of goods or services in the extension of credit or . . . collection of debts." Third, the conduct complained of must have occurred in the regular course of the representer's trade or commerce. Fourth, the representation must have been of the type that "may, tends to or does, deceive or mislead any person."

Stevenson v. Louis Dreyfus Corp., 1991-NMSC-051, ¶ 13, 112 N.M. 97, 100, 811 P.2d 1308, 1311 (quoting Ashlock v. Sunwest Bank of Roswell, N.A., 1988-NMSC-026, ¶ 4, 107 N.M. 100, 101, 753 P.3d 346, 347, overruled on other grounds by Gonzales v. Surgidev Corp., 1995-NMSC-036, 120 N.M. 133, 899 P.2d 576). Regarding unjust enrichment, New Mexico law requires a plaintiff to show that "'(1) another has been knowingly benefitted at one's expense (2) in a manner such that allowance of the other to retain the benefit would be unjust.'" City of Rio Rancho v. Amrep Southwest Inc., 2011-NMSC-037, ¶ 54, 150 N.M. 428, 442-43, 260 P.2d 414, 428-29 (quoting Ontiveros Insulation Co. v. Sanchez, 2000-NMCA-051, ¶ 11, 129 N.M.

200, 3 P.3d 695).

258. The Court concludes that there are common questions central to the New Mexico Classes' NMUPA and unjust enrichment claims. Regarding the NMUPA claim, whether the Defendants' labels contained false or misleading representations, and whether they knowingly made those false or misleading representations, are questions susceptible to common proof that are central to the NMUPA claim. Regarding the unjust enrichment claim, whether the Defendants benefitted at the Plaintiffs' expense is a common question central to the unjust enrichment claim's resolution. See Menocal v. GEO Grp. Inc., 882 F.3d at 924. Because there are common questions central to the New Mexico Classes' claims, the Court concludes that the New Mexico Classes satisfy rule 23(a)'s commonality requirement.

**2. The New Mexico Classes Satisfy Rule 23(a)'s Typicality Requirement.**

259. As the Court has discussed above, "[t]he commonality and typicality requirements of Rule 23(a) tend to merge." Gen. Tele. Co. of the Sw. v. Falcon, 457 U.S. at 157 n.13. The Defendants dispute the Plaintiffs' showing of typicality for the same reasons that they dispute commonality and for specific reasons relating to individual named Plaintiffs, two of whom -- Haksal and Horne -- represent the New Mexico Class and the New Mexico Menthol Subclass, respectively. See Certification Opposition at 22-24; SAC ¶¶ 114, 124, at 41-42. They contend that both Haksal and Horne continued smoking Natural American cigarettes after having initiated this lawsuit, and therefore cannot represent that they were misled into purchasing Natural American cigarettes based on a health misperception. See Certification Opposition at 23 (citing Deposition of Ceyhan Haksal (taken July 9, 2018) at 66:21-68:1, filed October 8, 2020 (Doc. 315-5)(Haksal, Reisman); Horne Depo. at 34:5-35:3 (Biersteker, Haberman, Horne)).

260. As the Court has discussed, that named Plaintiffs continued to smoke Natural

American cigarettes does not make their claims atypical, because the claims nevertheless are based on the same theory that Natural American's labeling led them to believe the cigarettes were safer in the first instance. The Court also has been unwilling to penalize these named Plaintiffs for continuing to smoke Natural American cigarettes given their highly addictive nature. See supra n.87. Accordingly, the Court concludes that whether Haksal and Horne continued smoking Natural American cigarettes after commencing this litigation is not such an "extreme case[]" as to render their claims atypical. Anderson Living Tr. v. WPX Energy Prod., LLC, 306 F.R.D. at 440-41. The Court therefore concludes that the New Mexico Classes satisfy rule 23(a)'s typicality requirement.

**B. THE NEW MEXICO CLASSES SATISFY RULE 23(b)(3)'S SUPERIORITY REQUIREMENT, BUT ONLY THE NEW MEXICO MENTHOL SUBCLASS' NMUPA CLAIM SATISFIES THE PREDOMINANCE REQUIREMENT TO THE EXTENT THAT IT IS PREMISED ON THE MENTHOL THEORY.**

261. Having determined that the New Mexico Classes satisfy rule 23(a)'s requirements, the Court next turns to rule 23(b)(3)'s requirements. The Court first considers whether individual questions will predominate over common issues. Next, the Court considers whether a class action is a superior method of litigating the New Mexico Classes' claims.

**1. The New Mexico Class and the New Mexico Menthol Subclass -- to the Extent That Its Claims Are Premised on the Safer-Cigarette Theory -- Do Not Satisfy Rule 23(b)(3)'s Predominance Requirement, but the New Mexico Menthol Subclass' NMUPA Claim Satisfies the Predominance Requirement to the Extent That It Is Premised on the Menthol Theory.**

262. The Court first considers whether common questions will predominate over individualized inquiries. The Plaintiffs assert that common issues will predominate under their NMUPA and unjust enrichment claims. See Certification Motion at 73-74 (citing Payne v. Tri-

State CareFlight, LLC, 332 F.R.D at 710; Armijo v. Wal-Mart Stores, Inc., 2007-NMCA-120, ¶ 38, 142 N.M. 557, 569, 168 P.3d 129, 141; Yazzie v. Ray Vickers' Special Cars, Inc., 180 F.R.D. 411, 416-17 (D.N.M. 1998)(Vasquez, J.)). The Defendants contest the Plaintiffs' assertion. See Certification Opposition at 43-44.

263. The Court previously has noted that the NMUPA does not require proof of detrimental reliance to sustain a claim. See Guidance Endodontics, LLC v. Dentsply Int'l, Inc., 728 F. Supp. 2d 1170 (D.N.M. 2010)(Browning, J.)(citing Lohman v. Daimler-Chrysler Corp., 2007-NMCA-100, ¶ 35 142 N.M. 437, 444, 166 P.3d 1091, 1098; Smoot v. Physicians Life Ins. Co., 2004-NMCA-027, ¶ 21, 135 N.M. 265, 270-71, 87 P.3d 545, 550-51). Nevertheless, "the UPA . . . require[s] proof of a causal link between conduct and loss . . . ." Smoot v. Physicians Life Ins. Co., 2004-NMCA-027, ¶ 21, 135 N.M. at 271, 87 P.3d at 551 (citing N.M.S.A. § 57-12-10(B)). See N.M.S.A. § 57-12-10(B) (authorizing damages for "[a]ny person who suffers any loss of money or property . . . as a result of any employment by another person of a method, act or practice declared unlawful by the Unfair Practices Act")(emphasis added). The Plaintiffs seek to show class-wide causation using Dr. Dubé's analysis, arguing that the Defendants were able to sell Natural American cigarettes at a higher price point as a result of misleading consumers into believing that their cigarettes contained health benefits and were therefore worth more than they otherwise would have been without those benefits. See Certification Motion at 35. As the Court has explained, however, the Plaintiffs model does not fit adequately with their Safer-Cigarette Theory of injury, because it calculates a price premium associated with all possible interpretations of labels like natural and organic. The Plaintiffs therefore have not demonstrated a method of determining causation on a class-wide basis, and would need to engage in individualized inquiries to determine whether a given consumer purchased Natural American

cigarettes for more than he or she otherwise would have paid if he or she had known the cigarettes were not actually safer or healthier. The Court has concluded that Dr. Dubé's model fits adequately with the Menthol Theory. To the extent that the Plaintiffs bring a claim under the NMUPA based on the Menthol Theory, therefore, causation is susceptible to class-wide proof. Accordingly, the Court concludes that the New Mexico Class' NMUPA claim and the New Mexico Menthol Subclass' NMUPA claim -- to the extent it is based on the Safer-Cigarette Theory -- do not satisfy predominance, but that the New Mexico Menthol Subclass' NMUPA claim satisfies predominance to the extent that it is premised on the Menthol Theory.

264. Regarding the New Mexico Classes' unjust enrichment claim, the Plaintiffs assert that several courts, including the Court, have certified unjust enrichment claims in New Mexico, and that the predominating presence of objective, common questions counsels certification here. See Certification Motion at 74 (citing Payne v. Tri-State CareFlight, LLC, 332 F.R.D at 710; Armijo v. Wal-Mart Stores, Inc., 2007-NMCA-120, ¶ 38, 142 N.M. 557, 569, 168 P.3d 129, 141). The Court first notes that its opinion in Payne v. Tri-State CareFlight, LLC concerns a different issue than the issue present here. In Payne v. Tri-State CareFlight, LLC, the Court concludes that the plaintiffs' unjust enrichment claim satisfies predominance to the extent that the Court would need to answer only whether a fourteen-hour duty day is unlawful. See 332 F.R.D at 707-08 (noting that determining whether a fourteen-hour duty day is unlawful is a question that "may even be resolved on a summary judgment motion," but asserting that, "[t]o the extent that the Plaintiffs aver that the Defendants actually contemplated a duty day of twelve hours, individualized issues predominate"). Similarly, while it may be a straightforward and common question to determine whether the Defendants' labels were misleading, determining whether an individual consumer's purchase renders the Defendants' retention of the benefit

unjust requires individualized inquiries, because an individual consumer may have many reasons for purchasing Natural American cigarettes or even for paying a higher price for Natural American cigarettes. Accordingly, the Court concludes that the New Mexico Classes' unjust enrichment claims do not satisfy the predominance requirement.

265. As with the other proposed State classes above, the Defendants raise three additional arguments to support their contention that individualized inquiries predominate over the New Mexico Classes' common questions. Specifically, they argue that: (i) ascertainability issues require individualized inquiries; (ii) different class members may have seen different representations, requiring individualized inquiries; and (iii) the Plaintiffs' damages model does not fit their liability theories. See Certification Opposition at 25-83. The Court has considered above the arguments on the issues of ascertainability, differing representations, and the damages model, and the parties have not raised arguments unique to New Mexico on those issues. Accordingly, the Court adopts its conclusions above in its considerations of the New Mexico Classes, specifically that: (i) administrative feasibility concerns -- namely difficulties in determining whether an individual purchased Natural American cigarettes -- tilt against a conclusion that the New Mexico Classes satisfy predominance; (ii) the Plaintiffs' proposed damages model is not an adequate fit with the Plaintiffs' Safer-Cigarette Theory -- applicable to both of the New Mexico Classes -- but that it is an adequate fit with the Plaintiffs' Menthol Theory -- applicable to the New Mexico Menthol Subclass; and (iii) answering the question whether an individual proposed class member viewed a disclaimer tilts against a finding of predominance for the New Mexico Classes' claims based on the Safer-Cigarette Theory, but that it does not tilt against a finding of predominance for the New Mexico Menthol Subclass' claim based on the Menthol Theory. Given its additional analysis on the New Mexico Classes'

statutory and unjust enrichment claims, the Court concludes that the New Mexico Class and the New Mexico Menthol Subclass' unjust enrichment claim do not satisfy rule 23(b)(3)'s predominance requirement, that the New Mexico Menthol Subclass' NMUPA claim does not satisfy the predominance requirement to the extent that it is premised on the Safer-Cigarette Theory, and that the New Mexico Menthol Subclass' NMUPA claim satisfies the predominance requirement to the extent that it is premised on the Menthol Theory.

### 2. The New Mexico Classes Satisfy Rule 23(b)(3)'s Superiority Requirement.

266. The second rule 23(b)(3) requirement is that the class action be a superior method of litigating the proposed class members' claims. See Fed. R. Civ. P. 23(b)(3). Unlike the other classes, the Defendants raise a superiority argument unique to the New Mexico Classes. See Certification Opposition at 19. Specifically, they argue that, because the NMUPA provides named plaintiffs with the greater of actual damages or statutory damages, as well as treble damages if the deception is willful, but provides unnamed class members only with actual damages, it is less fair to absent class members to pursue a class action under the NMUPA, and the class action is not a superior vehicle for litigating the absent class members' claims. See Certification Opposition at 19 (quoting Brooks v. Norwest Corp., 2004-NMCA-134, ¶ 45, 136 N.M. 599, 613, 103 P.3d 39, 53; Mulford v. Altria Grp., Inc., 242 F.R.D. at 631).

267. The Plaintiffs assert correctly that the Court previously has rejected the proposition that a class action is not superior where statutes provide higher damages for named plaintiffs compared to unnamed class members. See Certification Reply at 3 (citing Daye v. Cmty. Fin. Serv. Ctrs., LLC, 313 F.R.D. at 171; Tullie v. Quick Cash, Inc., No. 14-0491, 2014 WL 12782961, at *4 (D.N.M. December 2, 2014)(Vidmar, M.J.)). In Daye v. Community

Financial Service Centers, LLC, the Court, in considering the class members' individual interest in controlling the litigation, states:

> Although claims under these statutes may be more lucratively brought as individual actions, courts should assess the real-world likelihood that class members would bring their own actions, which implicates another factor the court should consider: the likelihood that proposed class members know they have a claim and whether they are savvy enough to pursue it. *See Hicks v. Client Servs., Inc.*, 257 F.R.D. 699, 701 (S.D. Fla. 2009)(finding superiority, because "class members [most likely do not] understand the provisions well enough to know that it may be financially worthwhile to spend the time and effort to litigate these matters"). As the Honorable Loretta A. Preska, Chief United States District Judge for the Southern District of New York, wrote,
>
>> while the potential for higher individual recoveries exists, realizing that potential requires assuming that each putative class member is aware of her rights, willing to subject herself to all the burdens of suing and able to find an attorney willing to take her case. Those transaction costs are not insubstantial and have prompted other courts in this Circuit to conclude that litigating as a class is superior.
>
> *Kalish v. Karp & Kalamotousakis, LLP*, 246 F.R.D. 461, 464 (S.D.N.Y.2007). *See Jancik v. Cavalry Portfolio Servs., LLC*, No. CIV 06-3104 MJD/AJB, 2007 WL 1994026, at *11 (D. Minn. July 3, 2007)(Davis, J.)("[T]he truth is that the putative plaintiffs in this case are not likely to know their rights and are therefore not likely to pursue these claims on their own.").

Daye v. Cmty. Fin. Servs. Ctrs., LLC, 313 F.R.D. at 171 (alteration in Daye v. Cmty. Fin. Servs. Ctrs., LLC, but not in Hicks v. Client Servs., Inc.). The Court agrees that it may be unfair to some unnamed class members who will receive lower damages amounts than they would if they were to bring similar litigation on their own. Additionally, the Court of Appeals of New Mexico has emphasized that the New Mexico Legislature envisioned individual plaintiffs bringing low-value claims when it enacted the NMUPA, and that the NMUPA provides for attorney fees and costs to successful litigants, minimizing the burden of bringing claims with low damages values. See Brooks v. Norwest Corp., 2004-NMCA-134, ¶ 45, 136 N.M. at 613, 103 P.3d at 53. The

Court notes, nevertheless, that a class action brought under rule 23(b)(3) requires that unnamed class members have the option to opt out of the class. See Fed. R. Civ. P. 23(c)(2)(B)(v). Thus, to the extent that unnamed class members are aware that they have a potential claim and wish to seek the benefit of a larger damages amount, they have the opportunity to opt out of the class mechanism and pursue their claims individually. Accordingly, the Court concludes that the difference in damages which the NMUPA awards named plaintiffs compared to unnamed class members does not make the New Mexico Classes' NMUPA claim inferior.

268. Additionally, in concluding above that the Nationwide Menthol Subclass is not a superior vehicle for litigation, the Court acknowledges that the majority of the rule 23(b)(3) factors tilt in favor of concluding that a class action is the superior vehicle for the Nationwide Menthol Subclass' claims, but gives substantial weight to manageability concerns, noting the administrative feasibility issues inherent in determining whether a proposed class member belongs to the class and the additional difficulties in managing a nationwide class where each of the fifty States' laws could require unique jury instructions and other manageability difficulties. For the New Mexico Classes, the Court reiterates its conclusion above that most of the rule 23(b)(3) factors tilt again in favor of concluding that the class actions are the superior litigation vehicles. Because the inordinate difficulties of applying each of the fifty States' laws are not present for the New Mexico Classes, which rely solely on New Mexico law, the only manageability difficulty that remains is the administrative feasibility question. As the Court has noted, however, a single manageability problem typically is insufficient on its own to prevent class certification. See Cherry v. Dometic Corp., 986 F.3d at 1303-04. Accordingly, the Court concludes that the class action is a superior vehicle to litigate the New Mexico Classes' NMUPA and unjust enrichment claims. Consistent with the Court's conclusions regarding predominance,

however, the Court certifies the New Mexico Menthol Subclass' NMUPA claim to the extent that it is premised on the Menthol Theory, but does not certify the New Mexico Class, and does not certify the New Mexico Menthol Subclass' unjust enrichment claim, or its NMUPA claim to the extent that it is premised on the Safer-Cigarette Theory.

## X. THE COURT CERTIFIES ONLY THE NEW YORK MENTHOL SUBCLASS' STATUTORY CLAIMS TO THE EXTENT THAT THEY ARE PREMISED ON THE MENTHOL THEORY.

269. The Court next considers the Plaintiffs' proposed New York Class and New York Menthol Subclass (the "New York Classes"). The New York Classes allege three claims: (i) a violation of New York General Business Law § 349; (ii) a violation of New York General Business Law § 350; and (iii) an unjust enrichment claim. See SAC ¶¶ 343-374, at 86-91. The Court first reviews whether the proposed classes satisfy rule 23(a)'s numerosity, commonality, typicality, and adequacy requirements. The Court next reviews whether the proposed classes satisfy rule 23(b)(3)'s predominance and superiority requirements.[90]

### A. THE NEW YORK CLASSES SATISFY RULE 23(a)'S REQUIREMENTS.

270. The Court first considers rule 23(a)'s numerosity, commonality, typicality, and adequacy requirements with respect to the New York Classes' statutory and unjust enrichment claims. See Fed. R. Civ. P. 23(a). The Defendants do not dispute that the Plaintiffs' proposed classes satisfy rule 23(a)'s numerosity and adequacy requirements, and the Court reiterates its analysis for the Nationwide Menthol Subclass above, concluding that the Plaintiffs' proposed

[90]The New York Classes seek injunctive relief on their § 349 and § 350 claims. See SAC ¶¶ 352-53, 364-65, at 87-89. As the Court discusses with respect to the California Classes' proposed injunctive relief class action under rule 23(b)(2), however, the Court concludes that these named Plaintiffs do not have standing to pursue their injunctive-relief claims. The parties have not made arguments unique to the New York Classes, and the Court concludes that the named Plaintiffs for the New York Classes do not have standing to pursue injunctive relief. Accordingly, the Court will not certify the New York Classes for that purpose.

classes satisfy these two requirements. See Certification Opposition at 20. The Court considers in more detail below whether the New York Classes satisfy the commonality and typicality requirements.

**1. The New York Classes Satisfy Rule 23(a)'s Commonality Requirement.**

271. Section § 349 of New York's General Business Law declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce . . . ." N.Y. Gen. Bus. Law § 349(a). Additionally, any person who suffers injury "by reason of any violation of this section" is entitled to actual damages. N.Y. Gen. Bus. Law § 349(h). Section 350, meanwhile, declares unlawful "[f]alse advertising in the conduct of any business, trade or commerce . . . ." N.Y. Gen. Bus. Law § 350. The Court of Appeals of New York has explained that "[a] plaintiff under section 349 must prove three elements: first, that the challenged act or practice was consumer-oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act." Stutman v. Chemical Bank, 95 N.Y.2d 24, 29, 731 N.E.2d 608, 611 (N.Y. 2000)(citing Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, 85 N.Y.2d 20, 25, 647 N.E.2d 741 (1995); Gaidon v. Guardian Life Ins. Co., 94 N.Y.2d 330, 344, 725 N.E.2d 598 (1999); Small v. Lorillard Tobacco Co., 94 N.Y.2d 43, 55-56, 720 N.E.2d 892 (1999)). The elements for a claim under § 350 are identical to the elements for a § 349 claim. See Orlander v. Staples, Inc., 802 F.3d 289, 300 (2d Cir. 2015)(quoting Koch v. Acker, Merrall & Candit Co., 18 N.Y.3d 940, 944 N.Y.S.2d 452, 967 N.E.2d 675 (N.Y. 2012)). A claim for unjust enrichment requires a plaintiff to establish: "1) that the defendant benefitted; 2) at the plaintiff's expense; and 3) that 'equity and good conscience' require restitution." Kaye v. Grossman, 202 F.3d 611, 616 (2d Cir. 2000)(quoting Dolmetta v.

Uintah Nat'l Corp., 712 F.2d 15, 20 (2d Cir. 1983)).

272. The Court concludes that the New York Classes' statutory and unjust enrichment claims satisfy rule 23(a)'s commonality requirement. Under the statutory claims, there are common questions surrounding whether the labels were misleading in a material way. See Orlander v. Staples, Inc., 802 F.3d at 300 ("As for the 'materially misleading' prong, '[t]he New York Court of Appeals has adopted an objective definition of "misleading," under which the alleged act must be "likely to mislead a reasonable consumer acting reasonably under the circumstances."'")(quoting Cohen v. JP Morgan Chase & Co., 498 F.3d 111, 126 (2d Cir. 2007)(quoting Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, 85 N.Y.2d at 26, 623 N.Y.S.2d 529, 647 N.E.2d 741)). Regarding unjust enrichment, a common question is whether the Defendants benefitted as a result of their allegedly deceptive practices. Each of these questions are central to the Plaintiffs' claims and can be answered in a single stroke. Accordingly, the Court concludes that the New York Classes have satisfied the commonality requirement.

**2. The New York Classes Satisfy Rule 23(a)'s Typicality Requirement.**

273. As the Court has discussed above, "[t]he commonality and typicality requirements of Rule 23(a) tend to merge." Gen. Tele. Co. of the Sw. v. Falcon, 457 U.S. at 157 n.13. The Defendants dispute the Plaintiffs' showing of typicality for the same reasons that they dispute commonality and for specific reasons relating to individual named Plaintiffs, one of whom -- Litwin -- represents the New York Menthol Subclass. See Certification Opposition at 22-24; SAC ¶ 125, at 42. The Court has addressed the Defendants' challenges to Litwin's typicality -- that he paid with coupons and continued to smoke Natural American cigarettes after commencing this litigation -- in analyzing the New Jersey Classes above. The Defendants do not

raise any other arguments regarding Litwin or regarding Hebert, the New York Class representative. The Court therefore concludes that "the claims of the class representative[s] and class members are based on the same legal or remedial theory," and that the New York Classes satisfy rule 23(a)'s typicality requirement. Adamson v. Bowen, 855 F.2d at 676.

### B. THE NEW YORK CLASSES SATISFY RULE 23(b)(3)'S SUPERIORITY REQUIREMENT, BUT ONLY THE NEW YORK MENTHOL SUBCLASS' STATUTORY CLAIMS SATISFY RULE 23(b)(3)'S PREDOMINANCE REQUIREMENT TO THE EXTENT THAT THEY ARE PREMISED ON THE MENTHOL THEORY.

274. Having determined that the New York Classes satisfy rule 23(a)'s requirements, the Court next turns to rule 23(b)(3)'s requirements. The Court first considers whether individual questions will predominate over common issues. Next, the Court considers whether a class action is a superior method of litigating the New York Classes' claims.

#### 1. Only The New York Menthol Subclass' Statutory Claims Satisfy Rule 23(b)(3)'s Predominance Requirement to the Extent That They Are Premised on the Menthol Theory.

275. The elements for a claim under § 350 are identical to the elements for a § 349 claim, and courts consider the two claims using the same language. See Orlander v. Staples, Inc., 802 F.3d at 300 (quoting Koch v. Acker, Merrall & Candit Co., 18 N.Y.3d 940, 944 N.Y.S.2d 452, 967 N.E.2d 675). As the Court mentions above, the Court of Appeals of New York has explained that "[a] plaintiff under section 349 must prove three elements: first, that the challenged act or practice was consumer-oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act." Stutman v. Chemical Bank, 95 N.Y.2d at 29, 731 N.E.2d at 611 (citing Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, 85 N.Y.2d at 25, 647 N.E.2d 741; Gaidon v. Guardian Life Ins. Co., 94 N.Y.2d 330, 725 N.E.2d 598; Small v. Lorillard Tobacco Co., 94 N.Y.2d at 55-56, 720

N.E.2d 892). To state a § 349 claim, "a plaintiff must allege that the defendant has engaged 'in an act or practice that is deceptive or misleading in a material way and that plaintiff has been injured by reason thereof.'" Small v. Lorillard Tobacco Co., 94 N.Y.2d at 55, 720 N.E.2d at 987 (quoting Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, 85 N.Y.2d at 25, 647 N.E.2d 741). Regarding the materially misleading prong, "'[t]he New York Court of Appeals has adopted an objective definition of "misleading," under which the alleged act must be "likely to mislead a reasonable consumer acting reasonably under the circumstances."'" Orlander v. Staples, Inc., 802 F.3d at 300 (quoting Cohen v. JP Morgan Chase & Co., 498 F.3d at 126 (quoting Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, 85 N.Y.2d at 26, 623 N.Y.S.2d 529, 647 N.E.2d 741)). See Hasemann v. Gerber Prods. Co., 331 F.R.D. 239, 274 (E.D.N.Y. 2019)(Brodie, J.)("'The materiality of potentially deceptive representations is similarly subject to objective proof.'")(quoting Goldemberg v. Johnson & Johnson Consumer Cos., 317 F.R.D at 389). The Court of Appeals of New York has noted that intent to defraud and justifiable reliance are not element of a claim under § 349, but that "proof that 'a material deceptive act or practice *caused actual, although not necessarily pecuniary, harm*' is required to impose compensatory damages." Small v. Lorillard Tobacco Co., 94 N.Y.2d at 55, 720 N.E.2d at 987 (quoting Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, 85 N.Y.2d at 26, 647 N.E.2d 741)(emphasis added in Small v. Lorillard Tobacco Co.). "Payment of a price premium serves as proof of injury under the laws of" New York. Goldemberg v. Johnson & Johnson Consumer Cos., 317 F.R.D. at 393.

276. The Court concludes that §§ 349 and 350 allow for common and class-wide proof, including as to damages, but that, as the Court has discussed, the Plaintiffs damages model does not fit adequately with their Safer-Cigarette Theory. The Court recognizes the Second Circuit's

conclusion that "it is still 'clear that individualized monetary claims belong in Rule 23(b)(3),'" Sykes v. Mel S. Harris & Assocs. LLC, 780 F.3d 70, 88 (2d Cir. 2015)(quoting Wal-Mart Stores, Inc. v. Dukes, 564 U.S. at 362, but notes, as does the Second Circuit, that "'the plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability,'" Sykes v. Mel S. Harris & Assocs. LLC, 780 F.3d at 88 (quoting Leyva v. Medline Indus. Inc., 716 F.3d 510, 514 (9th Cir. 2013)). The Court has concluded above that the Plaintiffs' damages model does not show how their damages stem from the Safer-Cigarette Theory, but that it is an adequate fit with the Menthol Theory. Accordingly, the Court concludes that §§ 349 and 350 predominate with respect to the Plaintiffs' Menthol Theory, but not with respect to their Safer-Cigarette Theory.

277. Regarding unjust enrichment, the Court concludes that common questions will not predominate. As the Court explains above, a claim for unjust enrichment requires a plaintiff to establish: "1) that the defendant benefitted; 2) at the plaintiff's expense; and 3) that 'equity and good conscience' require restitution." Kaye v. Grossman, 202 F.3d at 616 (quoting Dolmetta v. Uintah Nat'l Corp., 712 F.2d at 20). To state a claim for unjust enrichment, a plaintiff must also make an "allegation that the benefits that the members of the plaintiffs' class received were less than what they bargained for." Vigiletti v. Sears, Roebuck & Co., 838 N.Y.S.2d 785, 785, 42 A.D.3d 497, 498 (N.Y. App. Div. 2007)(citing Smith v. Chase Manhattan Bank, USA, 293 A.D.2d 598, 600, 741 N.Y.S.2d 100 (N.Y. App. Div. 2002)). As the Court has discussed, determining whether equity and good conscience require restitution, because the Plaintiffs did not receive the value for which they bargained, necessitates individualized inquiry. The Court agrees with the reasoning of the Honorable Denise Cote, United States District Judge for the United States District Court for the Southern District of New York, who concludes that

individualized inquiries predominate in a class action suit regarding a beverage labeled using "All Natural":

> [P]laintiffs do not address the issue of how they would prove, on a class-wide basis, whether the benefits that putative class members received were "less than what they bargained for." Individualized inquiries would be required to determine, for instance, whether class members were fully informed about the inclusion of [high fructose corn syrup ("HFCS")] in Snapple beverages, whether they believed HFCS to be natural, and whether they continued to purchase Snapple despite their beliefs concerning HFCS. Such individual issues would also dwarf any issues of law or fact common to the class. Thus, plaintiffs have failed to show that the Rule 23(b)(3) predominance requirement is satisfied with respect to their unjust enrichment claim.

Weiner v. Snapple Beverage Corp., 2010 WL 3119452, at *11. For similar reasons, the Court concludes that it is unlikely that common questions predominate where the Court will have to inquire as to each consumer's state of mind when purchasing Natural American cigarettes. Accordingly, the Court concludes that the New York Classes' unjust enrichment claims do not satisfy rule 23(b)(3)'s predominance requirement.

278. As with the other proposed State classes above, the Defendants raise three additional arguments to support their contention that individualized inquiries predominate over the New York Classes' common questions. Specifically, they argue that: (i) ascertainability issues require individualized inquiries; (ii) different class members may have seen different representations, requiring individualized inquiries; and (iii) the Plaintiffs' damages model does not fit their liability theories. See Certification Opposition at 25-83. The Court has considered above the arguments on the issues of ascertainability, differing representations, and the damages model, and the parties have not raised arguments unique to New York on those issues. Accordingly, the Court adopts its conclusions above in its considerations of the New York Classes, specifically that: (i) administrative feasibility concerns -- namely difficulties in

determining whether an individual purchased Natural American cigarettes -- tilt against a conclusion that the New York Classes satisfy predominance; (ii) the Plaintiffs' proposed damages model is not an adequate fit with the Plaintiffs' Safer-Cigarette Theory -- applicable to both of the New York Classes -- but that it is an adequate fit with the Plaintiffs' Menthol Theory -- applicable to the New York Menthol Subclass; and (iii) answering the question whether an individual proposed class member viewed a disclaimer tilts against a finding of predominance for the New York Classes' claims based on the Safer-Cigarette Theory, but that it does not tilt against a finding of predominance for the New York Menthol Subclass' claim based on the Menthol Theory. In combination with its conclusions regarding the New York Classes' statutory and unjust enrichment claims, the Court concludes that the New York Class does not satisfy the predominance requirement, the New York Menthol Subclass' unjust enrichment claim does not satisfy the predominance requirement and its statutory claims do not satisfy the requirement to the extent that they are premised on the Safer-Cigarette Theory, and the New York Menthol Subclass' statutory claims satisfy the predominance requirement to the extent that it is premised on the Menthol Theory.

**2. The New York Classes Satisfy Rule 23(b)(3)'s Superiority Requirement.**

279. The second rule 23(b)(3) requirement is that the class action be a superior method of litigating the proposed class members' claims. See Fed. R. Civ. P. 23(b)(3). The Plaintiffs and the Defendants do not raise any arguments regarding superiority that are unique to the New York Classes. In concluding above that the Nationwide Menthol Subclass is not a superior vehicle for litigation, the Court acknowledges that the majority of the rule 23(b)(3) factors tilt in favor of concluding that a class action is the superior vehicle for the Nationwide Menthol

Subclass' claims, but gives substantial weight to manageability concerns, noting the administrative feasibility issues inherent in determining whether a proposed class member belongs to the class and the additional difficulties in managing a nationwide class where each of the fifty States' laws could require unique jury instructions and other manageability difficulties. For the New York Classes, the Court reiterates its conclusion above that most of the rule 23(b)(3) factors tilt again in favor of concluding that the class actions are the superior litigation vehicles. Additionally, because the inordinate difficulties of applying each of the fifty States' laws are not present for the New York Classes, which rely solely on New York law, the only manageability difficulty that remains is the administrative feasibility question. As the Court has noted, however, a single manageability problem typically is insufficient on its own to prevent class certification. See Cherry v. Dometic Corp., 986 F.3d at 1303-04. Accordingly, the Court concludes that the class action is a superior vehicle to litigate the New York Classes' statutory and unjust enrichment claims. Given the Court's conclusion regarding predominance, however, the Court certifies only the New York Menthol Subclass' statutory claims to the extent that they are premised on the Menthol Theory, and does not certify the New York Class, the New York Subclass' unjust enrichment claim, or the New York Subclass' statutory claims to the extent that they are premised on the Safer-Cigarette Theory.

## XI. THE COURT WILL NOT CERTIFY THE NORTH CAROLINA CLASS AND NORTH CAROLINA MENTHOL SUBCLASS.

280. The Court next considers the Plaintiffs' proposed North Carolina Class and North Carolina Menthol Subclass (the "North Carolina Classes"). The North Carolina Classes allege two claims: (i) a violation of the NCUDTPA; and (ii) an unjust enrichment claim. See SAC ¶¶ 375-395, at 91-95. As the Plaintiffs note in their Certification Reply, however, they "are not

at this time pursuing the certification of a class asserting a North Carolina Unfair and Deceptive Trade Practices Act Claim." Certification Reply at 31 n.25. Accordingly, the Court considers certification for only the North Carolina Classes' unjust enrichment claim. The Court first reviews whether the proposed classes satisfy rule 23(a)'s numerosity, commonality, typicality, and adequacy requirements. The Court next reviews whether the proposed classes satisfy rule 23(b)(3)'s predominance and superiority requirements.[91]

**A. THE NORTH CAROLINA CLASSES SATISFY RULE 23(a)'S REQUIREMENTS.**

281. The Court first considers rule 23(a)'s numerosity, commonality, typicality, and adequacy requirements with respect to the North Carolina Classes' statutory and unjust enrichment claims. See Fed. R. Civ. P. 23(a). The Defendants do not dispute that the Plaintiffs' proposed classes satisfy rule 23(a)'s numerosity and adequacy requirements, and the Court reiterates its analysis for the Nationwide Menthol Subclass above, concluding that the Plaintiffs' proposed classes satisfy these two requirements. See Certification Opposition at 20. The Court considers in more detail below whether the North Carolina Classes satisfy the commonality and typicality requirements.

**1. The North Carolina Classes Satisfy Rule 23(a)'s Commonality Requirement.**

282. The Court concludes that both the North Carolina Classes' unjust enrichment

[91]Although the Plaintiffs note that they are not seeking certification of an NCUDTPA class, see Certification Reply at 31 n.25, in the SAC, the North Carolina Classes seek injunctive relief for their § 75-1.1(a) claim. See SAC ¶ 386, at 93. To the extent that the North Carolina Classes seek injunctive certification on this claim, the Court refers to its conclusion in consideration of the California Classes' injunctive relief claim that these named Plaintiffs do not have standing to pursue their injunctive-relief claims. The parties have not made arguments unique to the North Carolina Classes, and the Court concludes that the named Plaintiffs for the North Carolina Classes, Miller and Blevins, do not have standing to pursue injunctive relief. Accordingly, the Court will not certify the North Carolina Classes for that purpose.

claim presents common questions that are central to their claims. To demonstrate an unjust enrichment claim, the Supreme Court of North Carolina has stated that: (i) "a party must have conferred a benefit on the other party"; (ii) "[t]he benefit must not have been conferred officiously, that is it must not be conferred by an interference in the affairs of the other party in a manner that is not justified in the circumstances"; (iii) "the benefit must not be gratuitous"; (iv) the benefit "must be measurable"; and (v) "the defendant must have consciously accepted the benefit." Booe v. Shadrick, 322 N.C. 567, 570, 369 S.E.2d 554, 556 (N.C. 1988). Thus, whether consumers conferred a benefit on the Defendants from their purchases and whether that benefit is measurable are common questions. The Court therefore concludes that the North Carolina Classes satisfy rule 23(a)'s predominance requirement.

**2. The North Carolina Classes Satisfy Rule 23(a)'s Typicality Requirement.**

283. As the Court discusses above in its discussion on typicality for the Nationwide Menthol Subclass, "[t]he commonality and typicality requirements of Rule 23(a) tend to merge." Gen. Tele. Co. of the Sw. v. Falcon, 457 U.S. at 157 n.13. The Defendants dispute the Plaintiffs' showing of typicality for the same reasons that they dispute commonality and for specific reasons relating to individual named Plaintiffs, none of whom represent the North Carolina classes. See Certification Opposition at 22-24. Thus, aside from the arguments regarding typicality which the Court addresses in its discussion on the Nationwide Menthol Subclass above, neither the Plaintiffs nor the Defendants raise typicality arguments that are unique to the North Carolina Classes. Without argument to the contrary, the Court concludes that "the claims of the class representative[s] and class members are based on the same legal or remedial theory," and that the North Carolina Classes satisfy rule 23(a)'s typicality requirement. Adamson v.

Bowen, 855 F.2d at 676.

### B. THE NORTH CAROLINA CLASSES SATISFY RULE 23(b)(3)'S SUPERIORITY REQUIREMENT, BUT DO NOT SATISFY RULE 23(b)(3)'S PREDOMINANCE REQUIREMENT.

284. Having determined that the North Carolina Classes satisfy rule 23(a)'s requirements, the Court next turns to rule 23(b)(3)'s requirements. The Court first considers whether individual questions will predominate over common issues. Next, the Court considers whether a class action is a superior method of litigating the North Carolina Classes' claims.

#### 1. **The North Carolina Classes Do Not Satisfy Rule 23(b)(3)'s Predominance Requirement.**

285. Regarding the unjust enrichment claim, the Defendants contend that North Carolina courts have recognized "that certification is inappropriate where the unjustness of a defendant's conduct will depend on individual circumstances." Certification Opposition at 56 (citing Harrison v. Wal-Mart Stores, Inc., 2004 WL 5202760 at ¶¶ 32-33. The Plaintiffs assert that all the class members were exposed to the same challenged claims on Natural American labels in the same context. See Certification Reply at 30-31 (citing Pitts v. Am. Sec. Ins. Co., 144 N.C. App. 1, 5, 550 S.E.2d 179, 184 (2001), aff'd, 356 N.C. 292, 569 S.E.2d 647 (2002)).[92]

---

[92]The Court notes that the Supreme Court of North Carolina did not issue an opinion affirming the Plaintiffs' cited case on the merits, writing:

> Justices ORR, WAINWRIGHT, and EDMUNDS did not participate in the consideration or decision of this case. The remaining members of the Court were equally divided, with two members voting to affirm the decision of the Court of Appeals and two members voting to reverse. Therefore, the decision of the Court of Appeals is left undisturbed and stands without precedential value.

Pitts v. Am. Sec. Ins. Co., 356 N.C. at 293, 569 S.E.2d at 647. The Court recognizes that the Court of Appeals of North Carolina's opinion may have persuasive value, but the Court does not treat it as having precedential value.

The Court agrees that determining whether each consumer's purchase occurred under unjust circumstances requires individualized inquiries into why each consumer purchases Natural American cigarettes. As the Court has discussed above, if a consumer was willing to pay a price premium based on the belief that Natural American cigarettes were ecologically friendly, for example, that purchase is not necessarily unjust. Because proving the North Carolina Classes' unjust enrichment claim requires individualized inquiry, the Court concludes that the unjust enrichment claim does not satisfy rule 23(b)(3)'s predominance requirement.[93]

286. As with the other proposed State classes above, the Defendants raise three additional arguments to support their contention that individualized inquiries predominate over the North Carolina Classes' common questions. Specifically, they argue that: (i) ascertainability issues require individualized inquiries; (ii) different class members may have seen different representations, requiring individualized inquiries; and (iii) the Plaintiffs' damages model does not fit their liability theories. See Certification Opposition at 25-83. The Court has considered

[93]Although the Plaintiffs do not seek certification of any class under the NCUDTPA, the Court notes that the Supreme Court of North Carolina has explained that the Plaintiffs must demonstrate reliance on the misrepresentation to satisfy the NCUDTPA's proximate-cause requirement. See Bumpers v. Comm. Bank of N. Va., 367 N.C. 81, 88, 747 S.E.2d 220, 226 (N.C. 2013)("Such a requirement has been the law of this state for quite some time."). Further, the Supreme Court of North Carolina explains: "In the context of a misrepresentation claim brought under section 75-1.1, actual reliance requires that the plaintiff have affirmatively incorporated the alleged misrepresentation into his or her decision-making process: if it were not for the misrepresentation, the plaintiff would likely have avoided the injury altogether." Bumpers v. Comm. Bank of N. Va., 367 N.C. at 90, 747 S.E.2d at 227 (citing Hageman v. Twin City Chrysler-Plymouth Inc., 681 F. Supp. 303, 308 (M.D.N.C. 1988)(Gordon, S.J.); Tucker v. Boulevard at Piper Glen LLC, 150 N.C. App. 150, 154, 564 N.E.2d 248, 251 (N.C. Ct. App. 2002)). The Plaintiffs have not demonstrated using class-wide proof that each class member took the allegedly misleading statements into account when deciding whether to purchase a pack of Natural American cigarettes, and the Court doubts that such proof could exist on a class-wide basis. Because the Plaintiffs cannot show a violation under the NCUDTPA without examining each consumer's motivations for purchasing Natural American cigarettes, if the Plaintiffs were to seek certification on this claim, the Court would conclude that the North Carolina Classes' NCUDTPA claim does not satisfy rule 23(b)(3)'s predominance requirement.

above the arguments on the issues of ascertainability, differing representations, and the damages model, and the parties have not raised arguments unique to North Carolina on those issues. Accordingly, the Court adopts its conclusions above in its considerations of the North Carolina Classes, specifically that: (i) administrative feasibility concerns -- namely, difficulties in determining whether an individual purchased Natural American cigarettes -- tilt against a conclusion that the North Carolina Classes satisfy predominance; (ii) the Plaintiffs' proposed damages model is not an adequate fit with the Plaintiffs' Safer-Cigarette Theory -- applicable to both of the North Carolina Classes -- but that it is an adequate fit with the Plaintiffs' Menthol Theory -- applicable to the North Carolina Menthol Subclass; and (iii) answering the question whether an individual proposed class member viewed a disclaimer tilts against a finding of predominance for the North Carolina Classes' claims based on the Safer-Cigarette Theory, but that it does not tilt against a finding of predominance for the North Carolina Menthol Subclass' claim based on the Menthol Theory. Given the Court's additional conclusions that neither of the North Carolina Classes' claims satisfy the predominance requirement, the Court concludes that the North Carolina Class and the North Carolina Menthol Subclass do not satisfy rule 23(b)(3)'s predominance requirement.

**2. The North Carolina Classes Satisfy Rule 23(b)(3)'s Superiority Requirement.**

287. The second rule 23(b)(3) requirement is that the class action be a superior method of litigating the proposed class members' claims. See Fed. R. Civ. P. 23(b)(3). The Plaintiffs and the Defendants do not raise any arguments regarding superiority that are unique to the North Carolina Classes. In concluding above that the Nationwide Menthol Subclass is not a superior vehicle for litigation, the Court acknowledges that the majority of the rule 23(b)(3) factors tilt in

favor of concluding that a class action is the superior vehicle for the Nationwide Menthol Subclass' claims, but gives substantial weight to manageability concerns, noting the administrative feasibility issues inherent in determining whether a proposed class member belongs to the class and the additional difficulties in managing a nationwide class where each of the fifty States' laws could require unique jury instructions, and other manageability difficulties. For the North Carolina Classes, the Court reiterates its conclusion above that most of the rule 23(b)(3) factors tilt again in favor of concluding that the class actions are the superior litigation vehicles. Additionally, because the inordinate difficulties of applying each of the fifty States' laws are not present for the North Carolina Classes, which rely solely on North Carolina law, the only manageability difficulty that remains is the administrative feasibility question. As the Court has noted, however, a single manageability problem typically is insufficient on its own to prevent class certification. See Cherry v. Dometic Corp., 986 F.3d at 1303-04. Accordingly, the Court concludes that the class action is a superior vehicle to litigate the North Carolina Classes' unjust enrichment claims. Nevertheless, because the Court concludes that the North Carolina Classes' unjust enrichment claims do not satisfy rule 23(b)(3)'s predominance requirement, the Court does not certify the North Carolina Class and does not certify the North Carolina Menthol Subclass.

## XII. THE COURT DOES NOT CERTIFY THE OHIO CLASS.

288. The Court next considers the Plaintiffs' proposed Ohio Class. The Ohio Class alleges three claims: (i) a violation of the OCSPA; (ii) a violation of the Ohio Deceptive Trade Practices Act, Ohio Rev. Code ch. 4165 ("ODTPA"); and (iii) an unjust enrichment claim. See SAC ¶¶ 396-427, at 95-99. In its MTD MOO, the Court: (i) dismisses the Plaintiffs' OCSPA claim without prejudice, because the Plaintiffs did not satisfy the OCSPA's pre-suit notice

requirement, see MTD MOO at 206, 244; (ii) dismisses the Plaintiffs' ODTPA claim with prejudice, because the ODTPA does not provide standing for consumers to sue, see MTD MOO at 209, 244; and (iii) dismisses the Plaintiffs' unjust enrichment claim with prejudice, because the Plaintiffs did not have a direct economic transaction with the Defendants, see MTD MOO at 223, 244. In their Certification Motion, the Plaintiffs seek certification only for the Ohio Class' OCSPA claim. See Certification Motion at 77. In their Certification Reply, however, the Plaintiffs assert that the "Plaintiffs preserve their right to appeal dismissal of their . . . Ohio Consumer Sales Practices Act . . . claim[], but are not seeking certification of classes for [that] claim[] at this time." Certification Reply at 3 n.2. Because the Plaintiffs are not seeking certification of any claims for the Ohio Class, the Court does not certify the Ohio Class.[94]

## XIII. THE COURT DOES NOT CERTIFY THE WASHINGTON CLASS.

289. The Court finally considers the Plaintiffs' proposed Washington Class. The Washington Class alleges two claims: (i) a violation of the WCPA; and (ii) an unjust enrichment claim. See SAC ¶¶ 428-450, at 99-103. The Court first reviews whether the proposed classes satisfy rule 23(a)'s numerosity, commonality, typicality, and adequacy requirements. The Court next reviews whether the proposed classes satisfy rule 23(b)(3)'s predominance and superiority requirements.[95]

---

[94]The Ohio Class seeks injunctive relief on its OCSPA and ODTPA claims. See SAC ¶¶ 409, 418, at 97-98. As the Court discusses with respect to the California Classes' proposed injunctive relief class action under rule 23(b)(2), however, the Court concludes that these named Plaintiffs do not have standing to pursue their injunctive-relief claims. The parties have not made arguments unique to the Ohio Class, and the Court concludes that the named Plaintiff for the Ohio Class, Hebert, does not have standing to pursue injunctive relief, and the Court will not certify the Ohio Class for that purpose.

[95]The Washington Class seeks injunctive relief on its WCPA claim. See SAC ¶¶ 443, 418, at 102. As the Court discusses with respect to the California Classes' proposed injunctive

### A. THE WASHINGTON CLASS SATISFIES RULE 23(a)'S NUMEROSITY REQUIREMENT.

290. The Court first considers rule 23(a)'s numerosity, commonality, typicality, and adequacy requirements with respect to the Washington Class' statutory and unjust enrichment claims. See Fed. R. Civ. P. 23(a). The Defendants do not dispute that the Plaintiffs' proposed classes satisfy rule 23(a)'s numerosity and adequacy requirements, and the Court reiterates its analysis for the Nationwide Menthol Subclass above, concluding that the Plaintiffs' proposed classes satisfy these two requirements. See Certification Opposition at 20. The Court considers in more detail below whether the Washington Class satisfies the commonality and typicality requirements.

#### 1. The Washington Class Satisfies Rule 23(a)'s Commonality Requirement.

291. The Plaintiffs assert that, "'[t]o prevail in a private CPA claim, the plaintiff must prove (1) an unfair or deceptive act or practice, (2) occurring in trade or commerce, (3) affecting the public interest, (5) injury to a person's business or property, and (5) causation.'" Certification Motion at 79 (quoting Panag v. Farmers Ins. Co. of Washington, 166 Wash. 2d 27, 37, 204 P.3d 885, 889 (Wash. 2009)). The Plaintiffs assert that "[u]njust enrichment occurs when '(1) the defendant receives a benefit, (2) the received benefit is at the plaintiff's expense, and (3) the circumstances make it unjust for the defendant to retain the benefit without payment.'" Certification Motion at 79 (quoting Young v. Young, 164 Wash. 2d 477, 484-85, 191 P.3d 1258, 1262 (Wash. 2008)). Whether the Defendants' actions were unfair or deceptive,

---

relief class action under rule 23(b)(2), however, the Court concludes that these named Plaintiffs do not have standing to pursue their injunctive-relief claims. The parties have not made arguments unique to the Washington Class, and the Court concludes that the named Plaintiffs for the Washington Class, Murphy and Pontusson, do not have standing to pursue injunctive relief; the Court will not certify the Washington Class for that purpose.

and whether they affect the public interest are common questions central to the Plaintiffs' WCPA claim, and, as the Court has concluded above, whether the Defendants' received a benefit from their labeling practices is a common question central to the Plaintiffs' unjust enrichment claim. Accordingly, the Court concludes that the Washington Class' claims satisfy rule 23(a)'s commonality requirement.

**2. The Washington Class Satisfies Rule 23(a)'s Typicality Requirement.**

292. As the Court discusses above in its discussion on typicality for the Nationwide Menthol Subclass, "[t]he commonality and typicality requirements of Rule 23(a) tend to merge." Gen. Tele. Co. of the Sw. v. Falcon, 457 U.S. at 157 n.13. The Defendants dispute the Plaintiffs' showing of typicality for the same reasons that they dispute commonality and for specific reasons relating to individual named Plaintiffs, none of whom represent the Washington Class. See Certification Opposition at 22-24. Thus, aside from the arguments regarding typicality which the Court addresses in its discussion on the Nationwide Menthol Subclass above, neither the Plaintiffs nor the Defendants raise typicality arguments that are unique to the Washington Class. Without argument to the contrary, the Court concludes that "the claims of the class representative[s] and class members are based on the same legal or remedial theory," and that the Washington Class satisfies rule 23(a)'s typicality requirement. Adamson v. Bowen, 855 F.2d at 676.

**B. THE WASHINGTON CLASS DOES NOT SATISFY RULE 23(b)(3)'S PREDOMINANCE REQUIREMENT, BUT IT SATISFIES RULE 23(b)(3)'S SUPERIORITY REQUIREMENT.**

293. Having determined that the Washington Class satisfies rule 23(a)'s requirements, the Court next turns to rule 23(b)(3)'s requirements. The Court first considers whether individual questions will predominate over common issues. Next, the Court considers whether a

class action is a superior method of litigating the Washington Class' claims.

**1. The Washington Class Does Not Satisfy Rule 23(b)(3)'s Predominance Requirement.**

294. The Plaintiffs argue that the Washington Class' WCPA claim's common questions predominate over individual inquiries, because determining whether a statement is deceptive relies on a reasonable consumer standard, and because the WCPA does not require a showing of individualized requirement. See Certification Motion at 79 (citing Panag v. Farmers Ins. Co. of Washington, 166 Wash. 2d at 37, 204 P.3d at 889; Schall v. AT&T Wireless Servs., Inc., 171 Wash. 2d 260, 277, 259 P.3d 129, 137 (Wash. 2011)). They contend that, instead, they need to show only that the injury which they assert would not have happened but for the Defendants' violative acts. See Certification Motion at 79 (quoting Schnall v. AT&T Wireless Servs., Inc., 171 Wash. 2d at 277, 259 P.3d at 137 (quoting Indoor Billboard/Washington, Inc. v. Integra Telecom of Washington, Inc., 162 Wash. 2d 59, 82, 170 P.3d 10, 21 (Wash. 2007)("Indoor Billboard"))). The Defendants argue that the WCPA requires proof of causation for each claimant and that, "'[a]bsent a showing that 'but for' the Defendant's alleged deceptive practices a class member would not have purchased light cigarettes, causation would fail in this case.'" Certification Opposition at 50 (quoting Davies v. Philip Morris U.S.A., Inc., 2006 WL 1600067, at *2-3 (Wash. Super. Ct. May 26, 2006), and citing Kelley v. Microsoft Corp., 251 F.R.D. at 558; Indoor Billboard, 170 P.3d at 23). The Plaintiffs argue that a price-premium theory of causation is an adequate method of showing class-wide causation for a WCPA class. See Certification Reply at 24-25 (citing Kelley v. Microsoft Corp., 251 F.R.D. at 557-59; Blough v. Shea Homes, Inc., No. 2:12-CV-01493-RSM, 2013 WL 6276450, at *8-9 (W.D. Wash. December 4, 2013)(Martinez, J.)).

295. The Supreme Court of Washington has "firmly rejected the principle that reliance is necessarily an element of the plaintiff's case." Schnall v. ST&T Wireless Servs., Inc., 171 Wash. 2d at 277, 259 P.3d at 137 (referencing Indoor Billboard, 162 Wash. 2d at 82, 170 P.3d at 10). The Supreme Court of Washington explains that "[t]he plaintiff must merely show that the 'injury complained of . . . would not have happened' if not for defendant's violative acts." Schnall v. ST&T Wireless Servs., Inc., 171 Wash. 2d at 278, 259 P.3d at 137 (referencing Indoor Billboard, 162 Wash. 2d at 82, 170 P.3d at 10). To the extent that the Plaintiffs assert that they can prove a but-for injury using the price-premium theory of harm, the Court reiterates its conclusion that Dr. Dubé's model does not demonstrate an ability to ascertain the price premium associated with the belief that the challenged labels imply health benefits. The Court concludes therefore that the Plaintiffs have not demonstrated that they can prove class-wide causation based on their price-premium theory. Accordingly, the Court concludes that the Plaintiffs' WCPA claim is subject to individualized inquiries which tilt against a determination of predominance.

296. Regarding the Washington Class' unjust enrichment claim, the Defendants argue that the case which the Plaintiffs cite as having certified an unjust enrichment claim, Kelley v. Microsoft Corp., "noted that the outcome would differ '[i]f the inequity is that Microsoft deceived consumers' -- in which case 'the trier of fact will need to inquire whether Microsoft actually deceived consumers (an individualized inquiry) to determine whether any benefit conferred on Microsoft was unjust.'" Certification Opposition at 57 (quoting Kelley v. Microsoft Corp., 251 F.R.D at 559, and citing Converse v. Vizio, Inc., 2020 WL 729804, at *8 (W.D. Wash. February 13, 2020)(Settle, J.)). The Plaintiffs contend that the facts in Kelley v. Microsoft Corp. are similar to those here. See Certification Reply at 31.

297. The Honorable Marsha J. Pechman, United States District Judge for the United

States District Court for the Western District of Washington, explains:

> If the inequity is that Microsoft deceived consumers, the trier of fact will need to inquire whether Microsoft actually deceived consumers (an individualized inquiry) to determine whether any benefit conferred on Microsoft was unjust. Common issues will not predominate on that type of unjust enrichment claim. *See Oshana*, 225 F.R.D. at 586. But for the same reasons as explained in regards to Plaintiffs' CPA claim, Plaintiffs may maintain an unjust enrichment claim on the theory that Microsoft's marketing campaign artificially inflated the demand for and price of "Windows Vista Capable" PCs. Common issues -- whether Microsoft retained a benefit (increased or sustained XP license sales), whether Microsoft knew of that benefit, and whether Plaintiffs paid more than they should have -- will predominate.

Kelley v. Microsoft Corp., 251 F.R.D. at 559. The Court agrees, as it has discussed above, that unjust enrichment claims based on a deception theory require individualized inquiries to determine whether a plaintiff was in fact deceived. As the Court notes regarding the Washington Class' WCPA claim, the Plaintiffs have not put forward a method of computing the price-premium associated specifically with the belief that Natural American cigarettes are healthier. The Plaintiffs therefore must rely on individualized inquiries into whether each consumer's purchase took place under unjust circumstances. The Court concludes, therefore, that the Washington Class' unjust enrichment claim does not satisfy rule 23(b)(3)'s predominance requirement.

298. As with the other proposed State classes above, the Defendants raise three additional arguments to support their contention that individualized inquiries predominate over the Washington Class' common questions. Specifically, they argue that: (i) ascertainability issues require individualized inquiries; (ii) different class members may have seen different representations, requiring individualized inquiries; and (iii) the Plaintiffs' damages model does not fit their liability theories. See Certification Opposition at 25-83. The Court has considered above the arguments on the issues of ascertainability, differing representations, and the damages

model, and the parties have not raised arguments unique to Washington on those issues. Accordingly, the Court adopts its conclusions above in its considerations of the Washington Class, specifically that: (i) administrative feasibility concerns -- namely difficulties in determining whether an individual purchased Natural American cigarettes -- tilt against a conclusion that the Washington Class satisfies predominance; (ii) the Plaintiffs' proposed damages model is not an adequate fit with the Plaintiffs' Safer-Cigarette Theory -- applicable to the Washington Class; and (iii) answering the question whether an individual proposed class member viewed a disclaimer tilts against a finding of predominance for the Washington Class' claims based on the Safer-Cigarette Theory. Having determined additionally that the Washington Class' WCPA and unjust enrichment claims do not satisfy rule 23(b)(3)'s predominance requirement, the Court concludes that the Washington Class similarly does not satisfy rule 23(b)(3)'s predominance requirement.

**2. The Washington Class Satisfies Rule 23(b)(3)'s Superiority Requirement.**

299. The second rule 23(b)(3) requirement is that the class action be a superior method of litigating the proposed class members' claims. See Fed. R. Civ. P. 23(b)(3). The Plaintiffs and the Defendants do not raise any arguments regarding superiority that are unique to the Washington Class. In concluding above that the Nationwide Menthol Subclass is not a superior vehicle for litigation, the Court acknowledges that the majority of the rule 23(b)(3) factors tilt in favor of concluding that a class action is the superior vehicle for the Nationwide Menthol Subclass' claims, but gives substantial weight to manageability concerns, noting the administrative feasibility issues inherent in determining whether a proposed class member belongs to the class and the additional difficulties in managing a nationwide class where each of

the fifty States' laws could require unique jury instructions and other manageability difficulties. For the Washington Class, the Court reiterates its conclusion above that most of the rule 23(b)(3) factors tilt again in favor of concluding that the class actions are the superior litigation vehicles. Additionally, because the inordinate difficulties of applying each of the fifty States' laws are not present for the Washington Class, which rely solely on Washington law, the only manageability difficulty that remains is the administrative feasibility question. As the Court has noted, however, a single manageability problem typically is insufficient on its own to prevent class certification. See Cherry v. Dometic Corp., 986 F.3d at 1303-04. Accordingly, the Court concludes that the class action is a superior vehicle to litigate the Washington Class' statutory and unjust enrichment claims. Because the Court has concluded that the Washington Class does not satisfy rule 23(b)(3)'s predominance requirement, however, the Court will not certify the Washington Class.

**IT IS ORDERED** that: (i) the Plaintiffs' Motion for Class Certification, filed July 23, 2020 (Doc. 278), is granted in part and denied in part; (ii) the Court adopts the following class definitions: (a) the California Class, defined as all persons who purchased Natural American Spirit cigarettes in California; (b) the Colorado Class, defined as all persons who purchased Natural American Spirit cigarettes in Colorado; (c) the Florida Class, defined as all persons who purchased Natural American Spirit cigarettes in Florida; (d) the Illinois Class, defined as all persons who purchased Natural American Spirit cigarettes in Illinois; (e) the Massachusetts Class, defined as all persons who purchased Natural American Spirit cigarettes in Massachusetts; (f) the Michigan Class, defined as all persons who purchased Natural American Spirit cigarettes in Michigan; (g) the New Jersey Class, defined as all persons who purchased Natural American Spirit cigarettes in New Jersey; (h) the New Mexico Class, defined as all persons who purchased

Natural American Spirit cigarettes in New Mexico; (i) the New York Class, defined as all persons who purchased Natural American Spirit cigarettes in New York; (j) the North Carolina Class, defined as all persons who purchased Natural American Spirit cigarettes in North Carolina; (k) the Ohio Class, defined as all persons who purchased Natural American Spirit cigarettes in Ohio; (*l*) the Washington Class, defined as all persons who purchased Natural American Spirit cigarettes in Washington; (m) the California Menthol Subclass, defined as all persons who purchased Natural American Spirit menthol cigarettes in California; (n) the Colorado Menthol Subclass, defined as all persons who purchased Natural American Spirit menthol cigarettes in Colorado; (o) the Florida Menthol Subclass, defined as all persons who purchased Natural American Spirit menthol cigarettes in Florida; (p) the Illinois Menthol Subclass, defined as all persons who purchased Natural American Spirit menthol cigarettes in Illinois; (q) the New Jersey Menthol Subclass, defined as all persons who purchased Natural American Spirit menthol cigarettes in New Jersey; (r) the New Mexico Menthol Subclass, defined as all persons who purchased Natural American Spirit menthol cigarettes in New Mexico; (s) the New York Menthol Subclass, defined as all persons who purchased Natural American Spirit menthol cigarettes in New York; (t) the North Carolina Menthol Subclass, defined as all persons who purchased Natural American Spirit menthol cigarettes in North Carolina; and (u) the Nationwide Menthol Class, defined as all persons who purchased Natural American Spirit menthol cigarettes in the United States; (iii) the Court adopts the following class periods: (a) September 30, 2009, to October 1, 2017, for the Nationwide Menthol Class, the New York Class, the New York Menthol Subclass, the New Mexico Class, the New Mexico Menthol Subclass, the New Jersey Class, the New Jersey Menthol Subclass, the Michigan Class, and the Massachusetts Class; (b) September 30, 2010, to October 1, 2017, for the Illinois Class and the

Illinois Menthol Subclass; (c) September 30, 2011, to October 1, 2017, for the California Class, the California Menthol Subclass, the Florida Class, the Florida Menthol Subclass, and the Washington Class; (d) September 30, 2012, to October 1, 2017, for the Colorado Class and the Colorado Menthol Subclass; (e) September 30, 2013, to October 1, 2017, for the Ohio Class; (iv) the Court does not certify under rule 23(b)(2) of the Federal Rules of Civil Procedure (a) the California Class, (b) the California Menthol Subclass, (c) the Florida Class, (d) the Florida Menthol Subclass, (e) the Illinois Class, (f) the Illinois Menthol Subclass, (g) the Massachusetts Class, (h) the Michigan Class, (i) the New Jersey Class, (j) the New Jersey Menthol Subclass, (k) the New Mexico Class, (*l*) the New Mexico Menthol Subclass, (m) the New York Class, (n) the New York Menthol Subclass, (o) the North Carolina Class, (p) the North Carolina Menthol Subclass, (q) the Ohio Class, and (r) the Washington Class; (v) the Court does not certify under rule 23(b)(3) the Nationwide Menthol Class; (vi) the Court (a) certifies under rule 23(b)(3) the California Menthol Subclass to the extent that its claims are premised on the Menthol Theory, and (b) does not certify the California Class or the California Menthol Subclass to the extent that its claims are premised on the Safer-Cigarette Theory; (vii) the Court does not certify under rule 23(b)(3) the Colorado Class and the Colorado Menthol Subclass; (viii) the Court (a) certifies under rule 23(b)(3) the Florida Menthol Subclass' statutory claim to the extent that it is premised on the Menthol Theory, and (b) does not certify the Florida Class, the Florida Menthol Subclass' unjust enrichment claim, and the Florida Menthol Subclass' statutory claim to the extent that it is premised on the Safer-Cigarette Theory; (ix) the Court (a) certifies under rule 23(b)(3) the Illinoi Menthol Subclass' Illinois Unfair and Deceptive Trade Practices Act claim to the extent that it is premised on the Menthol Theory, and (b) does not certify the Illinois Class, the Illinois Menthol Subclass' Illinois Consumer Fraud Act and unjust enrichment claims, and

the Illinois Menthol Subclass' Illinois Unfair and Deceptive Trade Practices Act claim to the extent that it is premised on the Safer-Cigarette Theory; (x) the Court does not certify under rule 23(b)(3) the Massachusetts Class; (xi) the Court does not certify under rule 23(b)(3) the Michigan Class; (xii) the Court (a) certifies under rule 23(b)(3) the New Jersey Menthol Subclass to the extent that its claims are premised on the Menthol Theory, and (b) does not certify the New Jersey Class and the New Jersey Menthol Subclass to the extent that its claims are based on the Safer-Cigarette Theory; (xiii) the Court (a) certifies under rule 23(b)(3) the New Mexico Menthol Subclass' New Mexico Unfair Practices Act claim to the extent that it is premised on the Menthol Theory, and (b) does not certify the New Mexico Class, the New Mexico Menthol Subclass' New Mexico False Advertising Act and unjust enrichment claims, and the New Mexico Menthol Subclass' New Mexico Unfair Practices Act claim to the extent that it is premised on the Safer-Cigarette Theory; (xiv) the Court (a) certifies under rule 23(b)(3) the New York Menthol Subclass' statutory claims to the extent that they are premised on the Menthol Theory, and (b) does not certify the New York Class, the New York Menthol Subclass' unjust enrichment claim, and the New York Menthol Subclass' statutory claims to the extent that they are premised on the Safer-Cigarette Theory; (xv) the Court does not certify under rule 23(b)(3) the North Carolina Class and the North Carolina Menthol Subclass; (xvi) the Court does not certify under rule 23(b)(3) the Ohio Class; (xvii) the Court does not certify under rule 23(b)(3) the Washington Class; (xviii) the Defendants' Motion to Exclude in Their Entirety the Expert Report and Opinions of Plaintiff Rebuttal Expert Dr. J. Michael Dennis and Incorporated Memorandum of Law, filed July 23, 2020 (Doc. 277), is denied; (xix) the Plaintiff's Motion to Exclude the Opinions and Testimony of Charles D. Garner, Ph.D, DABT, filed July 23, 2020 (Doc. 282), is denied; (xx) the Plaintiffs' Motion to Exclude the Expert Testimony of Dr.

Joannes Evangelista Steenkamp, filed July 23, 2020 (Doc. 283), is granted in part and denied in part; (xxi) the Court excludes Dr. Steenkamp's opinions that: (a) Natural American Spirit's packaging has never implied that Natural American Spirit products are safer or healthier than other cigarettes, and (b) the brand attribute of authenticity has driven Natural American Spirit cigarettes' sales; (xxii) the Plaintiffs' Motion to Exclude the Expert Testimony of Dr. David J. Teece, filed July 23, 2020 (Doc. 284), is granted in part and denied in part; (xxiii) the Court excludes Dr. Teece's opinion that Dr. Dubé's opinion and methodologies are not reliable; (xxiv) the Plaintiffs' Motion to Exclude the Opinions and Testimony of Dr. Kent Van Liere, filed July 23, 2020 (Doc. 286), is denied; (xxv) the Plaintiffs' Motion to Exclude the Opinions and Testimony of W. Kip Viscusi, filed July 23, 2020 (Doc. 290), is denied; (xxvi) the Defendants' Motion to Exclude in Their Entirety the Expert Report and Opinions of Dr. Jennifer Pearson and Incorporated Memorandum of Law, filed July 23, 2020 (Doc. 303), is denied; and (xxvii) the Defendants' Motion to Exclude in Their Entirety the Expert Report and Opinions of Dr. Jean-Pierre Dubé and Incorporated Memorandum of Law, filed July 23, 2020 (Doc. 291), is denied.

UNITED STATES DISTRICT JUDGE

*Counsel:*

Scott P. Schlesinger
Jonathan Gdanski
Schlesinger Law Offices, P.A.
Fort Lauderdale, Florida

*Attorneys for Plaintiffs Justin Sproule, Steve Okstad, Michael Anderson, Brooke Balocca, Elijah Bent, Charlene Blevins, Sam Bowman, Matokie Brim, Terry Cliver, Christos Christolow, George Coon, Gary Cruse, Margie Harris, Charles Honse, Clinton Horton, Collin Jass, Christopher Jensen, Shereen Keith, Kelly Keiser, Asher King,*

*Marilyn Komarinski, Jodi Kumpula, Tom Kurtz, Richard Kusick, Mike Lair, Tracy Lee, Kathleen Lelli, Robert Litwin, Linda MacDonald-Lewis, Rudolph Miller, Richard Morelock, Deborah Orrtim Paulson, Richard Peavy, Concetta Schultz, Judy Sell, Harrison Thomas, Dani Weir, Tom Weir, Kyle Wiebe, and Vicki Wilson*

Jeffrey Louis Haberman
Schlesinger Law Offices, P.A.
Fort Lauderdale, Florida

*Attorney for Plaintiffs Justin Sproule, Patrick Scott, Victoria Cuebas, Steve Okstad, Michael Anderson, Brooke Balocca, Elijah Bent, Charlene Blevins, Sam Bowman, Matokie Brim, Terry Cliver, Christos Christolow, George Coon, Gary Cruse, Margie Harris, Charles Honse, Clinton Horton, Collin Jass, Christopher Jensen, Shereen Keith, Kelly Keiser, Asher King, Marilyn Komarinski, Jodi Kumpula, Tom Kurtz, Richard Kusick, Mike Lair, Tracy Lee, Kathleen Lelli, Robert Litwin, Linda MacDonald-Lewis, Rudolph Miller, Richard Morelock, Deborah Orrtim Paulson, Richard Peavy, Concetta Schultz, Judy Sell, Harrison Thomas, Dani Weir, Tom Weir, Kyle Wiebe, and Vicki Wilson*

Kas Gallucci
Law Officers of Ronald A. Marron
San Diego, California

-- and --

Melissa Weiner
Pearson Warshaw, LLP
Wayzata, Minnesota

-- and --

Nancy Ruth Long
Longer, Komer & Associates
Santa Fe, New Mexico

-- and --

Richard W. Hughes I
Rothstein Law Firm
Santa Fe, New Mexico

-- and --

Katherine Meyer
Meyer, Glitzenstein & Eubanks, LLP
Washington, D.C.

*Attorneys for Plaintiffs Anthony Dunn, Ceyhan Haksal, Michael Robinson, Harry Vartanyan, Michael Yang, Doug Pyle, Nick Vadis, Theodore Rothman, Justin Sproule, Patrick Scott, Russel Brattain, Shannon White, C.M. LeCompte, Danae Grandison, Michael Laboon, Dave Moyer, Victoria Cuebas, Ashley Waldo, Steve Okstad, Michael Anderson, Brooke Balocca, Elijah Bent, Charlene Blevins, Sam Bowman, Matokie Brim, Terry Cliver, Christos Christolow, George Coon, Gary Cruse, Maggie Harris, Charles Honse, Clinton Horton, Collin Jass, Cristopher Jensen, Shereen Keith, Kelly Keiser, Asher King, Marilyn Komarinski, Jodi Kumpula, Tom Kurtz, Richard Kusick, Mike Lair, Tracy Lee, Kathleen Lelli, Robert Litwin, Linda MacDonald-Lewis, Rudolph Miller, Richard Morelock, Deborah Orrtim Paulson, Richard Peavy, Concetta Schultz, Judy Sell, Harrison Thomas, Dani Weir, Tom Weir, Kyle Wiebe, Vicki Wilson, Timothy Ruggiero, Desire Gudmundson, Scott Johnston, Jason Cole, Rachael King, Jacques-Rene Hebert, Sara Benson, Carol Murphy, Francisco Chavez, Joshua Horne, Albert Lopez, and Abigail Emmons*

Jonathan D. Woods
Prince, Schmidt, Korte & Baca, LLP
Santa Fe, New Mexico

Attorneys for Plaintiff Shannon White

Charles J. LaDuca
Cuneo Gilbert & LaDuca, LLP
Washington, DC

--and--

Charles D Moore
Halunen Law
Minneapolis, Minnesota

--and--

Michael Robert Reese
Carlos Ramirez
Reese LLP
New York, New York

--and--

Nicholas Koluncich
Law Offices of Nicholas Koluncich LLC
Albuquerque, New Mexico

*Attorneys for Plaintiff Anthony Dunn*

John C. Bienvenu
Bienvenu Law Office
Santa Fe, New Mexico

--and--

Mark H Donatelli
Rothstein Donatelli LLP
Santa Fe, New Mexico

--and--

Ronald Marron
Law Offices of Ronald A. Marron
San Diego, California

*Attorneys for Plaintiffs Ceyhan Haskal, Michael Robinson, Harry Vartanyan, Michael Yang, Doug Pyle, and Nick Vadis*

Caleb Marker
Zimmerman Reed
Manhattan Beach, California

--and--

Nancy Ruth Long
Long Komer & Associates, P.A.
Santa Fe, New Mexico

*Attorneys for Plaintiffs Theodore Rothman and C.M. LeCompte*

Douglas Gregory Blankinship
Finkelstein Blankinship, Frei-Pearson & Garber, LLP
White Plains, New York

*Attorney for Theodore Rothman*

Kim Eleazer Richman
Richman Law Group
Brooklyn, New York

*Attorney for Theodore Rothman, Danae Grandison, Michael Laboon, and Dave Moyer*

Benjamin Michael Lopatin
Eggnatz, Lopatin, & Pascucci, LLP
San Francisco, California

*Attorney for Plaintiff Russell Brattain*

Daniel L. Warshaw
Pearson, Simon & Warshaw, LLP
Sherman Oaks, California

--and--

Erika E Anderson
Law Offices of Erika E. Anderson
Albuquerque, New Mexico

*Attorneys for Plaintiff Shannon White*

Gretchen Mary Elsner
Elsner Law & Policy, LLC
Santa Fe, New Mexico

*Attorney for Plaintiffs Danae Grandison, Michael Laboon, and Dave Moyer*

John Allen Yanchunis, Sr.
Scott W. Weinstein
Keith R. Mitnik
Marisa Kendra Glassman
Morgan & Morgan, PA
Fort Myers, Florida
Orlando, Florida
Tampa, Florida

*Attorneys for Plaintiff Ashley Waldo*

Steven William Teppler
Abbott Law Group, P.A.
Jacksonville, Florida

*Attorney for Plaintiff Timothy Ruggiero*

John Russell Bart Pate
J.R. Pate, PC - Law Office
St Thomas, Virgin Islands

*Attorney for Plaintiff Desire Gudmundson*

Matthew David Schultz
Levin Papantonio Thomas P.A.
Pensacola, Florida

*Attorney for Plaintiff Scott Johnston*

Joel R. Rhine
Rhine Law Firm, P.C.
Wilmington, North Carolina

*Attorney for Jason Cole and Rachael King*

Chad C. Messier
Dudley Topper & Feuerzeig
St. Thomas, United States Virgin Islands

--and--

Andrew G. Schultz
Rodey Dickason Sloan Akin & Robb, P.A.
Albuquerque, New Mexico

--and--

David B. Alden
David M. Monde
Sharyl Reisman
Mark R. Seiden
Debra R. Belott
Feder Meir
Charles R. A. Morse
David Craig Kiernan
Michael Fraser Stoer
Jennifer Bunting-Graden
William D Coglianese
Jon Gregory Heintz
Troy A. Fuhrman
Jones Day
San Francisco, California
Washington, DC
Atlanta, Georgia
Miami, Florida
Tampa Florida
New York, New York
Cleveland, Ohio

*Attorneys for the Defendants*

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

| | |
|---|---|
| **In Re: Santa Fe Natural Tobacco Company Marketing & Sales Practices Litigation and Sales Practices Litigation**<br><br>*This Document Relates To All Actions* | Lead Case No. 1:16-md-02695-JB-LF<br><br>Second Consolidated Amended Class Action Complaint |

## CONSOLIDATED COMPLAINT

Plaintiffs Jacques-Rene Hebert, Sara Benson, Justin Sproule, Rudolph Miller, Ceyhan Haksal, Carol Murphy, Clive Pontusson, Robert Litwin, Francisco Chavez, Joshua Horne, Albert Lopez, Charlene Blevins and Abigail Emmons, as and for their class action complaint, allege, with personal knowledge as to their own actions, and upon information and belief as to those of others, as follows:

## NATURE OF THE CASE

1. This action seeks to redress Defendants Santa Fe Natural Tobacco Company, Inc. ("SFNT"), Reynolds American Inc. ("Reynolds") and R.J. Reynolds Tobacco Company's ("RJR," collectively, "Defendants") deceptive marketing of their "Natural American Spirit" brand cigarettes as "Natural" and "Additive-Free."

2. The history of tobacco marketing is replete with deception. First, tobacco companies, including Reynolds' predecessors, told the American people that smoking actually improved health. When that claim became untenable, tobacco companies told the American people that adding filters would make smoking safe. When that claim became untenable, tobacco



Exhibit B

companies told the American people that smoking low tar or light cigarettes were safer, until they were prohibited from doing so.

3. The growing popularity and sales of Natural American Spirit, the brand owned and controlled by Reynolds, represents the latest chapter in tobacco companies' attempt to deceive American consumers into thinking that there are ways to reduce the dangers of smoking if only the smoker smokes a certain brand of cigarette.

4. By uniformly using the terms "Natural" and "Additive-Free" on each and every label, Defendants intentionally and successfully convey to reasonable consumers that Natural American Spirit cigarettes are safer and healthier to smoke than other competing cigarettes. But smoking any cigarette is dangerous and hazardous to health, and there is no safe cigarette commercially available within the United States.

5. Defendants reinforce these misleading labeling claims by prominently using the terms "Natural" and "Additive-Free" through a pervasive nationwide marketing and advertising campaign. This campaign perpetuates the false impression that Natural American Spirit is a safer, healthier cigarette.

6. This misleading message is further reinforced through the use of the term "Organic" on many of the labels and advertisements. In addition, extensive use of Native American imagery in advertisements and on all labels of Natural American Spirit cigarettes reinforces the naturalness impressions of the labels.

7. This misleading message is also reinforced by the numerous environmental claims made by Defendants' packaging and advertising. The backs of all Natural American Spirit packages prominently state "RESPECT FOR THE EARTH™" next to an image of three feathers

or leaves that closely resemble the well-known triple-arrow symbol for recycling. Certain packages make additional recycling and environmental claims including "Pack Recycling," "Earth-Friendly Tobacco," "Supporting Farmers," "U.S. Grown Tobacco," and "Reducing Butt Litter."

8. Natural American Spirit cigarettes are not healthier or safer than other cigarettes.

9. Compared to other major brands, Natural American Spirit cigarettes have substantially higher levels of certain known carcinogens and heavy metals. Natural American Spirit cigarettes also release exceedingly high levels of "free-base" nicotine, which makes them at least as addictive as other cigarettes.

10. The claim that the tobacco used in Natural American Spirit cigarettes is "Additive-Free" is also false, because Defendants use the filter as a means of adding menthol to the purportedly additive-free tobacco. Because menthol is highly volatile, it migrates from the filter to the tobacco.

11. This suit is brought pursuant to the consumer protection statutes of California, Colorado, Florida, Illinois, Massachusetts, Michigan, North Carolina, New Jersey, New Mexico, New York, Ohio and Washington and the common law on behalf of classes of consumers who purchased Natural American Spirit cigarettes. This suit seeks, *inter alia*, actual damages and refunds, statutory and punitive damages, injunctive relief, restitution, attorneys' fees, and the costs of this suit.

**PARTIES**

12. Plaintiff Jacques-Rene Hebert is a citizen of the State of Illinois residing in Cook County. During the proposed class period, Mr. Hebert viewed Defendants' labels and packaging

for Natural American Spirit cigarettes, representing those cigarettes as "Natural" and "Additive-Free." Mr. Hebert regularly purchased varieties of Natural American Spirit cigarettes, including purchases in California, Florida, Illinois, Massachusetts, Michigan, New York and Ohio. The Natural American Spirit cigarettes Mr. Hebert purchased were all uniformly labeled as "Natural" and "Additive-Free," and he made those purchases at a price premium compared to other cigarettes because he believed that they were in fact made with additive-free tobacco and were safer and healthier because Natural American Spirit cigarettes were represented to be "Natural" and "Additive-Free." On December 7, 2016, Mr. Hebert filed a Complaint in the United States District Court for the Middle District of North Carolina arising out of the same facts underlying this litigation. *Hebert, et al. v. Santa Fe Natural Tobacco Co. Inc.*, No. 16-1390 (M.D.N.C.), Dkt. No. 1. On December 22, 2016, that case was transferred to the United States District Court of New Mexico in connection with this Multidistrict Litigation. *See id.*, Dkt. Nos. 3-4; *Hebert, et al. v. Santa Fe Natural Tobacco Co. Inc.*, No. 16-1394 (D.N.M.).

13. Plaintiff Sara Benson is a citizen of the State of Colorado residing in Jefferson County. During the proposed class period, Ms. Benson viewed Defendants' labels and packaging for Natural American Spirit cigarettes, representing those cigarettes as "Natural" and "Additive-Free." Ms. Benson regularly purchased varieties of Natural American Spirit cigarettes including purchases in Colorado. The Natural American Spirit cigarettes Ms. Benson purchased were all uniformly labeled as "Natural" and "Additive-Free," and she made those purchases at a price premium compared to other cigarettes because she believed that they were in fact made with additive-free tobacco and were safer and healthier because Natural American Spirit cigarettes were represented to be "Natural" and "Additive-Free." On December 7, 2016, Ms. Benson filed a

Complaint in the United States District Court for the Middle District of North Carolina arising out of the same facts underlying this litigation. *Hebert, et al. v. Santa Fe Natural Tobacco Co. Inc.*, No. 16-1390 (M.D.N.C.), Dkt. No. 1. On December 22, 2016, that case was transferred to the United States District Court of New Mexico in connection with this Multidistrict Litigation. *See id.*, Dkt. Nos. 3-4; *Hebert, et al. v. Santa Fe Natural Tobacco Co. Inc.*, No. 16-1394 (D.N.M.).

14. Plaintiff Justin Sproule is a citizen of the State of Florida residing in Palm Beach County. During the proposed class period, Mr. Sproule viewed Defendants' labels and packaging for Natural American Spirit cigarettes, representing those cigarettes as "Natural" and "Additive-Free." Mr. Sproule regularly purchased varieties of Natural American Spirit cigarettes, including purchases in Florida. The Natural American Spirit cigarettes Mr. Sproule purchased were all uniformly labeled as "Natural" and "Additive-Free," and he made those purchases at a price premium compared to other cigarettes because he believed that they were in fact made with additive-free tobacco and were safer and healthier because Natural American Spirit cigarettes were represented to be "Natural" and "Additive-Free." On September 30, 2015, Mr. Sproule filed a Complaint in the United States District Court for the Southern District of Florida arising out of the same facts underlying this litigation. *Sproule v. Santa Fe Natural Tobacco Co. Inc.*, No. 15-62064 (S.D. Fl.), Dkt. No. 1. On April 13, 2016, that case was transferred to the United States District Court of New Mexico in connection with this Multidistrict Litigation. *See id.*, Dkt. No. 36; *Sproule v. Santa Fe Natural Tobacco Co. Inc.*, No. 16-296 (D.N.M.).

15. Plaintiff Abigail Emmons is a citizen of the State of New Mexico residing in Bernalillo County. During the proposed class period, Ms. Emmons viewed Defendants' labels and packaging for Natural American Spirit cigarettes, representing those cigarettes as "Natural" and

"Additive-Free." Ms. Emmons regularly purchased varieties of Natural American Spirit cigarettes including purchases in New Jersey, New Mexico, and New York. The Natural American Spirit cigarettes Ms. Emmons purchased were all uniformly labeled as "Natural" and "Additive-Free," and she made those purchases at a price premium compared to other cigarettes because she believed that they were in fact made with additive-free tobacco and were safer and healthier because Natural American Spirit cigarettes were represented to be "Natural" and "Additive-Free." On December 7, 2016, Ms. Emmons filed a Complaint in the United States District Court for the Middle District of North Carolina arising out of the same facts underlying this litigation. *Hebert, et al. v. Santa Fe Natural Tobacco Co. Inc.*, No. 16-1390 (M.D.N.C.), Dkt. No. 1. On December 22, 2016, that case was transferred to the United States District Court of New Mexico in connection with this Multidistrict Litigation. *See id.*, Dkt. Nos. 3-4; *Hebert, et al. v. Santa Fe Natural Tobacco Co. Inc.*, No. 16-1394 (D.N.M.).

16. Plaintiff Rudolph Miller is a citizen of the State of North Carolina residing in Currituck County. During the proposed class period, Mr. Miller viewed Defendants' labels and packaging for Natural American Spirit cigarettes, representing those cigarettes as "Natural" and "Additive-Free." Mr. Miller regularly purchased varieties of Natural American Spirit cigarettes, including purchases in North Carolina. The Natural American Spirit cigarettes Mr. Miller purchased were all uniformly labeled as "Natural" and "Additive-Free," and he made those purchases at a price premium compared to other cigarettes because he believed that they were in fact made with additive-free tobacco and were safer and healthier because Natural American Spirit cigarettes were represented to be "Natural" and "Additive-Free." On January 28, 2016, Mr. Miller filed a Complaint in the United States District Court for the Middle District of Florida arising out

of the same facts underlying this litigation. *Okstad v. Santa Fe Natural Tobacco Co. Inc.*, No. 16-84 (M.D. Fl.), Dkt. No. 1. On April 20, 2016, that case was transferred to the United States District Court of New Mexico in connection with this Multidistrict Litigation. *See id.*, Dkt. No. 9; *Okstad v. Santa Fe Natural Tobacco Co. Inc.*, No. 16-323 (D.N.M.).

17. Plaintiff Ceyhan Haksal is a citizen of the State of New Mexico residing in Santa Fe County. During the proposed class period, Mr. Haksal viewed Defendants' labels and packaging for Natural American Spirit cigarettes, representing those cigarettes as "Natural" and "Additive-Free." Mr. Haksal regularly purchased varieties of Natural American Spirit cigarettes including purchases in New Mexico. The Natural American Spirit cigarettes Mr. Haksal purchased were all uniformly labeled as "Natural" and "Additive-Free," and he made those purchases at a price premium compared to other cigarettes because he believed that they were in fact made with additive-free tobacco and were safer and healthier because Natural American Spirit cigarettes were represented to be "Natural" and "Additive-Free." On December 22, 2015, Mr. Haksal filed a Complaint in the United States District Court for the District of New Mexico arising out of the same facts underlying this litigation. *Haksal v. Santa Fe Natural Tobacco Co. Inc.*, No. 15-1163 (D.N.M.), Dkt. No. 1.

18. Plaintiff Carol Murphy is a citizen of the State of Idaho with residence in Canyon County. During the proposed class period, Ms. Murphy viewed Defendants' labels and packaging for Natural American Spirit cigarettes, representing those cigarettes as "Natural" and "Additive-Free." Ms. Murphy regularly purchased varieties of Natural American Spirit cigarettes including purchases in the state of Washington. The Natural American Spirit cigarettes Ms. Murphy purchased were all uniformly labeled as "Natural" and "Additive-Free," and she made those

purchases at a price premium compared to other cigarettes because she believed that they were in fact made with additive-free tobacco and were safer and healthier because Natural American Spirit cigarettes were represented to be "Natural" and "Additive-Free." On December 7, 2016, Ms. Murphy filed a Complaint in the United States District Court for the Middle District of North Carolina arising out of the same facts underlying this litigation. *Hebert, et al. v. Santa Fe Natural Tobacco Co. Inc.*, No. 16-1390 (M.D.N.C.), Dkt. No. 1. On December 22, 2016, that case was transferred to the United States District Court of New Mexico in connection with this Multidistrict Litigation. *See id.*, Dkt. Nos. 3-4; *Hebert, et al. v. Santa Fe Natural Tobacco Co. Inc.*, No. 16-1394 (D.N.M.).

19. Plaintiff Clive Pontusson is a citizen of the State of Washington with residence in Thurston County. During the proposed class period, Mr. Pontusson viewed Defendants' labels and packaging for Natural American Spirit cigarettes, representing those cigarettes as "Natural" and "Additive-Free." Mr. Pontusson regularly purchased varieties of Natural American Spirit cigarettes including purchases in the state of Washington. The Natural American Spirit cigarettes Mr. Pontusson purchased were all uniformly labeled as "Natural" and "Additive-Free," and he made those purchases at a price premium compared to other cigarettes because he believed that they were in fact made with additive-free tobacco and were safer and healthier because Natural American Spirit cigarettes were represented to be "Natural" and "Additive-Free." On July 6, 2018, Mr. Pontusson filed a Complaint in the United States District Court for the Middle District of North Carolina arising out of the same facts underlying this litigation. *Pontusson v. Santa Fe Natural Tobacco Co. Inc.*, No. 18-594 (M.D.N.C.), Dkt. No. 1. On August 17, 2018, that case was transferred to the United States District Court of New Mexico in connection with this Multidistrict

Litigation. *See id*., Dkt. Nos. 4-5; *Pontusson v. Santa Fe Natural Tobacco Co. Inc*., No. 18-789 (D.N.M.).

20. Plaintiff Robert Litwin is a citizen of the State of Maryland residing in Carroll County. During the proposed class period, Mr. Litwin viewed Defendants' labels and packaging for Natural American Spirit menthol cigarettes, representing those cigarettes as "Natural" and "Additive-Free." Mr. Litwin regularly purchased varieties of Natural American Spirit menthol cigarettes, including purchases in California, New Jersey and New York. The Natural American Spirit menthol cigarettes Mr. Litwin purchased were all uniformly labeled as "Natural" and "Additive-Free," and Mr. Litwin made those purchases at a price premium compared to other menthol cigarettes because he believed that they were in fact made with additive-free tobacco and were safer and healthier because Natural American Spirit cigarettes were represented to be "Natural" and "Additive-Free." On January 28, 2016, Mr. Litwin filed a Complaint in the United States District Court for the Middle District of Florida arising out of the same facts underlying this litigation. *Okstad v. Santa Fe Natural Tobacco Co. Inc*., No. 16-84 (M.D. Fl.), Dkt. No. 1. On April 20, 2016, that case was transferred to the United States District Court of New Mexico in connection with this Multidistrict Litigation. *See id*., Dkt. No. 9; *Okstad v. Santa Fe Natural Tobacco Co. Inc*., No. 16-323 (D.N.M.).

21. Plaintiff Francisco Chavez is a citizen of the State of California residing in Los Angeles County. During the proposed class period, Mr. Chavez viewed Defendants' labels and packaging for Natural American Spirit menthol cigarettes, representing those cigarettes as "Natural" and "Additive-Free." Mr. Chavez regularly purchased varieties of Natural American Spirit menthol cigarettes, including purchases in California. The Natural American Spirit menthol

cigarettes Mr. Chavez purchased were all uniformly labeled as "Natural" and "Additive-Free," and Mr. Chavez made those purchases at a price premium compared to other menthol cigarettes because he believed that they were in fact made with additive-free tobacco and were safer and healthier because Natural American Spirit cigarettes were represented to be "Natural" and "Additive-Free." On December 7, 2016, Mr. Chavez filed a Complaint in the United States District Court for the Middle District of North Carolina arising out of the same facts underlying this litigation. *Hebert, et al. v. Santa Fe Natural Tobacco Co. Inc*., No. 16-1390 (M.D.N.C.), Dkt. No. 1. On December 22, 2016, that case was transferred to the United States District Court of New Mexico in connection with this Multidistrict Litigation. *See id*., Dkt. Nos. 3-4; *Hebert, et al. v. Santa Fe Natural Tobacco Co. Inc*., No. 16-1394 (D.N.M.).

22. Plaintiff Joshua Horne is a citizen of the State of Florida residing in Polk County. During the proposed class period, Mr. Horne viewed Defendants' labels and packaging for Natural American Spirit menthol cigarettes, representing those cigarettes as "Natural" and "Additive-Free." Mr. Horne regularly purchased varieties of Natural American Spirit menthol cigarettes, including purchases in Colorado, Florida, Illinois and New Mexico. The Natural American Spirit menthol cigarettes Mr. Horne purchased were all uniformly labeled as "Natural" and "Additive-Free," and Mr. Horne made those purchases at a price premium compared to other menthol cigarettes because he believed that they were in fact made with additive-free tobacco and were safer and healthier because Natural American Spirit cigarettes were represented to be "Natural" and "Additive-Free." On December 7, 2016, Mr. Horne filed a Complaint in the United States District Court for the Middle District of North Carolina arising out of the same facts underlying this litigation. *Hebert, et al. v. Santa Fe Natural Tobacco Co. Inc*., No. 16-1390 (M.D.N.C.), Dkt.

No. 1. On December 22, 2016, that case was transferred to the United States District Court of New Mexico in connection with this Multidistrict Litigation. *See id.*, Dkt. Nos. 3-4; *Hebert, et al. v. Santa Fe Natural Tobacco Co. Inc.*, No. 16-1394 (D.N.M.).

23. Plaintiff Albert Lopez is a citizen of the State of Illinois residing in Cook County. During the proposed class period, Mr. Lopez viewed Defendants' labels and packaging for Natural American Spirit menthol cigarettes, representing those cigarettes as "Natural" and "Additive-Free." Mr. Lopez regularly purchased varieties of Natural American Spirit menthol cigarettes, including purchases in Illinois. The Natural American Spirit menthol cigarettes Mr. Lopez purchased were all uniformly labeled as "Natural" and "Additive-Free," and Mr. Lopez made those purchases at a price premium compared to other menthol cigarettes because he believed that they were in fact made with additive-free tobacco and were safer and healthier because Natural American Spirit cigarettes were represented to be "Natural" and "Additive-Free." On December 7, 2016, Mr. Lopez filed a Complaint in the United States District Court for the Middle District of North Carolina arising out of the same facts underlying this litigation. *Hebert, et al. v. Santa Fe Natural Tobacco Co. Inc.*, No. 16-1390 (M.D.N.C.), Dkt. No. 1. On December 22, 2016, that case was transferred to the United States District Court of New Mexico in connection with this Multidistrict Litigation. *See id.*, Dkt. Nos. 3-4; *Hebert, et al. v. Santa Fe Natural Tobacco Co. Inc.*, No. 16-1394 (D.N.M.).

24. Plaintiff Charlene Blevins is a citizen of the State of North Carolina residing in McDowell County. During the proposed class period, Ms. Blevins viewed Defendants' labels and packaging for Natural American Spirit menthol cigarettes, representing those cigarettes as "Natural" and "Additive-Free." Ms. Blevins regularly purchased varieties of Natural American

Spirit menthol cigarettes, including purchases in North Carolina. The Natural American Spirit menthol cigarettes Ms. Blevins purchased were all uniformly labeled as "Natural" and "Additive-Free," and she made those purchases at a price premium compared to other menthol cigarettes because she believed that they were in fact made with additive-free tobacco and were safer and healthier because Natural American Spirit cigarettes were represented to be "Natural" and "Additive-Free." On January 28, 2016, Ms. Blevins filed a Complaint in the United States District Court for the Middle District of Florida arising out of the same facts underlying this litigation. *Okstad v. Santa Fe Natural Tobacco Co. Inc*., No. 16-84 (M.D. Fl.), Dkt. No. 1. On April 20, 2016, that case was transferred to the United States District Court of New Mexico in connection with this Multidistrict Litigation. *See id*., Dkt. No. 9; *Okstad v. Santa Fe Natural Tobacco Co. Inc*., No. 16-323 (D.N.M.).

25. Defendant Santa Fe Natural Tobacco Company, Inc. is a New Mexico corporation whose principal place of business is in Santa Fe, New Mexico. All named Plaintiffs named SFNT as a defendant in the Complaints of their respective cases.

26. Defendant Reynolds American Inc. is a North Carolina corporation whose principal place of business is in Winston-Salem, North Carolina. SFNT is an operating subsidiary of Reynolds. All named Plaintiffs named RAI as a defendant in the Complaints of respective cases.

27. Defendant R.J. Reynolds Tobacco Company is a North Carolina corporation whose principal place of business is in Winston-Salem, North Carolina. Like SFNT, RJR is an operating subsidiary of Reynolds. On December 7, 2016, Plaintiffs Hebert, Benson, Murphy, Chavez, Horne, Lopez and Emmons named RJR as a defendant in their Complaint in *Hebert, et al. v. Santa Fe Natural Tobacco Co. Inc*., No. 16-1390 (M.D.N.C.), Dkt. No. 1. On July 6, 2018, Plaintiff

Pontusson named RJR as a defendant in his Complaint in *Pontusson v. Santa Fe Natural Tobacco Co., Inc.*, No. 18-594 (M.D.N.C.).

28. Reynolds and RJR are intimately involved in the marketing, advertising, and overall business development of Natural American Spirit cigarettes.

29. Reynolds not only approves all decisions made by SFNT with respect to the marketing, design, and composition of Natural American Spirit cigarettes, but it plays a central role in developing Natural American Spirit's advertising. For example, in addressing the recent Natural American Spirit advertising blitz, Reynolds issued a statement to Convenience Store News: "Reynolds has said the company believes the new cigarette and snus ads 'are in full compliance' with the Master Settlement Agreement. 'We review readership data and analyze the editorial content of the publications over time to be sure the topics covered have a predominant adult appeal and focus, and only advertise in magazines that have adult readership of 85 percent or higher,' RAI said in a statement to the news outlet."[1]

30. RJR has service agreements with SFNT and other Reynolds subsidiaries, which according to Reynolds, enables an "integrated" system where the executives from Reynolds and RJR "collaborate to develop, coordinate, and execute programs to achieve company-wide goals and targets, and guidelines through which initiatives are reviewed and approved."[2]

---

[1] *National Ad Campaign Promotes RAI's Natural American Spirit*, CONVENIENCE STORE NEWS (July 14, 2015), http://www.csnews.com/product-categories/tobacco/national-ad-campaign-promotes-rais-natural-american-spirit (last visited Aug. 4, 2016).

[2] Supplier Guide: Reynolds American Inc. and its subsidiaries, *available at* http://sustainability.reynoldsamerican.com/documents/Supplier_Guide.pdf (last visited Sept. 14, 2016).

31. In effect since at least 2010, the RJR-SFNT service agreement provides for various functions that RJR performs for SFNT. These include consulting on market research and planning, consumer engagement, and research and development.

32. RJR employees consult with SFNT on, among other things, brand equity research studies, consumer perception studies, consumer concept studies, and direct mail advertising.

33. SFNT uses RJR's Standard Operating Procedures – an 800-page document – on consumer engagement. RJR employees consult with SFNT on that as well.

34. RJR employees also assist SFNT in managing SFNT's smoker database.

35. Reynolds' financial strength depends, in part, on SFNT's financial strength and Reynolds exercises control over SFNT's corporate decision-making.

36. Reynolds considers SFNT an operating segment: SFNT's assets are Reynolds' assets. Reynolds essentially controls the financial operations of SFNT, including SFNT's business initiatives and capital expenditures. SFNT employees are considered Reynolds' employees; board members between SFNT and Reynolds overlap; Reynolds controls pricing for its subsidiaries; Reynolds owns its operating subsidiaries' executive offices and manufacturing facilities; Reynolds reports SFNT's financial statements in its SEC filings; and Reynolds requires SFNT to make capital investments to support other Reynolds' brands such as VUSE.

37. Reynolds' involvement and control over SFNT's advertising is exhibited in Reynolds response to the Food and Drug Administration's (the "FDA") August 27, 2015 Warning Letter concerning the advertising of Natural American Spirit cigarettes. Mitchell A Neuhauser, Vice President and Assistant General Counsel for Reynolds, responded to the FDA on September 18, 2015 on SFNT's behalf. Mr. Neuhauser also requested an in-person meeting with the FDA for

mid-November. Mr. Neuhauser designated various Reynolds and Reynolds' affiliated representatives to address the issues raised in the Warning Letter. The vast majority of proposed attendees were from Reynolds or RJR. Accordingly, the November 2015 meeting, and upon information and belief, all subsequent FDA interaction regarding Natural American Spirit labeling and advertising, were predominantly conducted by Reynolds and RJR representatives.

## JURISDICTION AND VENUE

38. This court has jurisdiction pursuant to 28 U.S.C. § 1332(d) because the aggregate claims of the Class (as defined below) exceed the sum or value of $5,000,000.00, and there is minimal diversity of citizenship between Plaintiffs and proposed class members, and Defendants.

39. This Court has personal jurisdiction over Defendants because they intentionally avail themselves of the rights and privileges of conducting business in New Mexico and the other Districts in which the actions that comprise this multi-district litigation originated and in which members of the Classes reside, and they have continuous and systematic contacts with New Mexico and those other states, owing to Defendants' advertising and sales targeting citizens in all fifty states, the District of Columbia, and U.S. territories.

40. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because substantial acts in furtherance of the alleged improper conduct giving rise to the claims herein, including the dissemination of false and misleading information regarding Natural American Spirit cigarettes, occurred within this District, and because SFNT is headquartered in this District.

## FACTUAL ALLEGATIONS

### A. Defendants Prominently Label Natural American Spirit Cigarettes With "Natural" And "Additive-Free" Representations.

41. Defendants sell Natural American Spirit cigarettes in differently-colored packs, all of which Defendants uniformly and prominently label and advertise with representations that the cigarettes are "Natural" and "100% Additive-Free."






42. The primary differentiators of Natural American Spirit cigarettes from other cigarettes are Defendants' claims that they are "Natural" and "Additive-Free."

**B. Defendants Reinforce The "Natural" and "Additive-Free" <u>Label Claims With A Uniform And Pervasive Marketing Campaign.</u>**

43. Defendants' advertising for Natural American Spirit cigarettes has been replete with the uniform representations that cigarettes are "Natural" and "100% Additive-Free."

44. A collection of Defendants' print advertisements for Natural American Spirit cigarettes shows Defendants' prominent and uniform use of the central message of the claims that the cigarettes are "Natural" and "Additive-Free":

**2015**



**2015**


©2015 SFNTC (3)
100% ADDITIVE-FREE NATURAL TOBACCO
NATURAL AMERICAN SPIRIT
INGREDIENTS: ORGANIC TOBACCO ORGANIC MENTHOL
No additives in our tobacco does NOT mean a safer cigarette.
TRY 1 PACK FOR $2.00*
VISIT NASCIGS.COM OR CALL 1-800-435-5515
PROMO CODE 96312
Organic tobacco does NOT mean a safer cigarette.
CIGARETTES
SURGEON GENERAL'S WARNING: Cigarette Smoke Contains Carbon Monoxide.

**2013**


TOBACCO
& WATER
100%
ADDITIVE
FREE
NATURAL
TOBACCO
No additives in our tobacco does NOT mean a safer cigarette.
CIGARETTES
AMERICAN SPIRIT
SURGEON GENERAL'S WARNING: Smoking Causes Lung Cancer, Heart Disease, Emphysema, And May Complicate Pregnancy.
GET YOUR TRIAL OFFER.
TryAmericanSpirit.com
1-800-435-5515
CODE:

**2013**


CIGARETTES
TOBACCO & WATER
100%
ADDITIVE-FREE
NATURAL TOBACCO
AMERICAN SPIRIT
NATURAL AMERICAN SPIRIT
GET YOUR TRIAL OFFER.
CODE: 89914
TryAmericanSpirit.com

2013




45. "Natural" and "Additive-Free" advertising claims have been used by SFNT throughout the history of the company. In 2015, for example, Defendants launched a nationwide ad campaign targeting such popular magazines as Sports Illustrated, Time, Field and Stream, Southern Living, Architectural Digest, Vanity Fair and US Weekly. As Seth Moskowitz, a spokesman for SFNT, explained: "The aim is to drive brand awareness, highlight Natural

American Spirit's 100-percent additive-free natural tobacco proposition, and generate trial among adult smokers."

46. This marketing approach has been wildly successful for Defendants.

a. Sales of Natural American Spirit cigarettes increased by 86% from 2009 to 2014, compared to an overall 17% decline in cigarette sales in the United States over the same time period.

b. Natural American Spirit's share of market more than doubled between 2010 and 2015.

c. Natural American Spirit saw a 21.4% increase in sales volume from 2014 to 2015, selling 900 million more cigarettes in 2015 than in 2014 for a total of 4.8 billion cigarettes sold. It had grown 10% between 2013 and 2014, i.e., its most recent annual growth more than doubles its previous year's growth.

d. Reynolds recently sold the international rights to the Natural American Spirit brand name and trademarks for $5 billion.

47. The advertising and marketing campaign for the Natural American Spirit cigarettes is systematic and pervasive such that Defendants ensured that all consumers purchasing the cigarettes were exposed to the "Natural" and "Additive-Free" representations.

**C. Defendants' Mislead Reasonable Consumers Into Believing That Natural American Spirit Cigarettes Are Less Harmful Than Other Cigarettes.**

48. Tobacco companies, led by Reynolds, have long sought to sell cigarettes by promising safer and healthier smoking options. First tobacco companies touted the use of filters as a safer and healthier alternative, and then it was "low tar" or "light" cigarettes. Indeed, the holy

grail of tobacco companies is the creation and marketing of a cigarette that the public believes is safer and healthier.

49. Capitalizing on the growing desire of American consumers to use products that are natural and not filled with additives, Reynolds and SFNT have deliberately and misleadingly built their brand around their "Natural" and "Additive-Free" claims in order to deceive consumers into thinking that their cigarettes are safer or healthier than other cigarettes.

50. The claims "Natural" and "Additive-free" connote safer and healthier cigarettes because consumers associate smoking cigarettes with non-natural additives as being dangerous and unhealthy. Indeed, research demonstrates that consumers believe that Natural American Spirit cigarettes are safer, healthier and less harmful to smoke because they purport to be "Natural" and "Additive-Free."

51. As one study conducted by researchers at the University of California found, "[t]he idea that cigarettes are natural may also help smokers down-play the risks of smoking, as 'natural' risks inspire less concern that unnatural ones . . . smokers . . . frequently concluded that 'natural' cigarettes must be healthier or safer than cigarettes containing chemicals . . ."[3]

52. The study's authors concluded that "[t]he tobacco industry is adept at easing smokers' health concerns through such product modifications as filters and (seemingly) reduced

[3] McDaniel, Patricia A. & Ruth E. Malone, *"I Always Thought They Were All Pure Tobacco": American Smokers' Perceptions of "Natural" Cigarettes and Tobacco Industry Advertising Strategies*, 16 TOBACCO CONTROL e7 (2007), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2807204/ (last visited Nov. 2, 2015).

tar. American tobacco companies have understood, for decades, that 'natural' is similarly misleading and implies unwarranted health claims."[4]

53. Another study published in December 2016, conducted by researchers at the Schroeder Institute for Tobacco Research and Policy Studies. found that:

> Natural American Spirit (NAS), produced by Santa Fe Natural Tobacco Company (SFNTC), is owned by Reynolds American and sells cigarettes and roll your own tobacco with labeling and advertising that features the descriptors 'natural', 'organic' and 'additive free'. Consumers believe that cigarettes marketed with these and similar descriptors are significantly more appealing, healthier or less harmful than packages without these descriptors. Such misperceptions may encourage smokers to switch cigarette brands rather than quit smoking entirely, or may increase intent to try a product. No research has determined that NAS cigarettes are less harmful to human health than other cigarette brands. Carbon monoxide, tar, heavy metals and other particulate matter are present in conventional and in 'organic', 'natural' or 'additive free' cigarette smoke.[5]

The study's authors presented data regarding "the proportions of current NAS and other brand smokers who believe that their preferred brand is less harmful, 'no difference' or more harmful than other cigarette brands," and they concluded that:

> Among smokers of other brands, 8.3% (95% CI 7.66% to 8.94%) believed their brand was less harmful than other brands; 82.8% (95% CI 81.91% to 83.69%) believed their brand to be as harmful as other brands and 8.4% believed their brand was more harmful than other brands (95% CI 9.95% to 9.01%). In comparison, 63.9% (95% CI 56.72% to 70.56%) of NAS smokers believed their brand was less harmful than other brands; 35.6% (95% CI 29.04% to 42.66%) believed their brand to be as harmful as other brands and 0.5% believed their brand was more harmful than other brands (95% CI 0.06% to 3.77%) . . . the final adjusted multivariable logistic regression model of NAS brand preference among current cigarette smokers, controlling for significant covariates in the stepwise models [shows that]

---

[4] *Id.*

[5] Pearson, Jennifer L., et al., *Misperceptions of harm among Natural American Spirit smokers: results from wave 1 of the Population Assessment of Tobacco and Health (PATH) study (2013–2014).* TOBACCO CONTROL (Dec. 6, 2016) at 1.

> [a]mong current cigarette smokers, the strongest correlate of NAS brand preference before and after adjustment was the perception that their usual brand was less harmful than other cigarette brands (aOR 22.82, 95% CI 15.98 to 32.59).[6]

The study's authors concluded that the use of descriptors such as "natural" and "additive free" caused consumers to believe that America Spirit cigarettes are less harmful than other cigarettes, notwithstanding the disclaimer on the packs:

> Nearly 1 million US adult smokers prefer NAS. NAS smokers are 22 times more likely than other smokers to believe that their brand is less harmful than other cigarette brands. Taken in context with prior research, these results suggest that NAS smokers are concerned about the harms associated with their smoking. Adult NAS smokers may choose the NAS brand because they perceive it as a less harmful cigarette product as a result of NAS branding and/or the descriptors 'organic', 'natural' and 'additive free' on product packaging and advertising. These findings directly support FDA's assertion in their 2015 letter to SFNTC that American Spirit cigarettes "sell or distribute cigarette products, the label, labeling, or advertising of which represents explicitly and/or implicitly that the products or their smoke do not contain or are free of a substance and/or that the products present a lower risk of tobacco related disease or are less harmful than one or more other commercially marketed tobacco products." The prevalence of reduced harm perceptions among NAS smokers also clearly demonstrates that the disclaimer statements on NAS packs and advertisements, which have been in their most recent form since 2010 and predate data collection for the current study by several years, are not an effective means to correct consumers' inappropriate harm perceptions.[7] The study, using data from a nationally representative survey of over 32,000 adults in the USA conducted over a sixteen-month period, determined that while only 8.3% of current smokers of other cigarette brands believed that their brand was less harmful than other cigarettes, 63.9% of Natural American Spirit cigarette smokers believed their brand was less harmful.[8]

54. Other studies confirm that consumers believe that additive-free cigarettes are safer and healthier than other cigarettes. For example, in a survey of more than 1000 smokers in the

---

[6] *Id.* at 3.

[7] *Id.* at 3-4.

[8] *Id*. at 3.

United States, 60% thought that removing additives made a cigarette less dangerous to smoke, and 73% believe that cigarettes with additives were more harmful than those that did not have the additives.[9]

55. Another study conducted by researchers at, among other institutions, The Schroeder Institute for Tobacco Research and Policy Studies, the Johns Hopkins Bloomberg School of Public Health, and Global Public Health, New York University, determined that "[e]vidence suggests that youth and adults rate cigarette packages with 'organic,' 'natural,' or 'additive-free' descriptors as significantly more appealing, healthier, or less harmful than packages without these descriptors." [10] The study's authors concluded that:

> Findings from our study demonstrate that the pack descriptors "Made with Organic Tobacco," "100% Additive-Free," and "100% US Grown Tobacco," as well as other aspects of the American Spirit pack design, communicated lower risk to study participants. Additionally, our findings suggest that "100% Additive Free" has the greatest impact on reduced harm perceptions of American Spirit cigarettes—both compared to Marlboro Red cigarettes and to a modified version of the same American Spirit pack without the additive-free descriptor . . . These results support and extend prior research demonstrating that brand descriptors can enhance tobacco product appeal broadly, as well as specific data indicating that "organic," "natural," or "additive-free" cigarette pack descriptors are considered less harmful or less risky than regular cigarettes . . . it is plausible that the reduced harm messages conveyed by the tested descriptors increase the appeal of American Spirit cigarettes. Indeed, the cross sectional association between perceived reduced harm and prior use of American Spirit cigarettes suggests that these descriptors may drive experimentation or use of this brand.[11]

---

[9] Cummings, K.M., et al., *Are smokers adequately informed about the health risks of smoking and medicinal nicotine?*, NICOTINE & TOBACCO RESEARCH 6(3): S333-340 (2004).

[10] Pearson, Jennifer L., et al., *American Spirit Pack Descriptors and Perceptions of Harm: A Crowdsourced Comparison of Modified Packs*, NICOTINE & TOBACCO RESEARCH 18(8): 1749-1756, 1750 (2016).

[11] *Id.* at 1755.

The study's authors also concluded that the repetitive use of brand descriptors on cigarette packaging shapes how consumers view the relative harmfulness of American Spirit cigarettes:

> With increasing restrictions on tobacco advertising, pack descriptors are quickly emerging as a prime way for the tobacco industry to advertise its product, and influence consumer response and appeal.4,28–31. More so than with traditional advertisements, repetitive exposure to messages conveyed via packs and their descriptors likely shape how consumers view the product.[12]

56. Reynolds has long known and understood that marketing any cigarette as "Additive-free" would "reduce the perceived primary health concern" involved in smoking.[13] In fact, in the 1990s, Reynolds regarded a natural version of Winston as appealing to "concerned smokers" worried about "ingredients, yield, risk factors."[14]

57. Expecting that regulators would express concern over marketing an additive-free cigarette (because it implies untruthful health claims), Reynolds conducted marketing studies to show that people do not think that "Additive-Free" means safer or healthier (so it could deflect regulators' attention). But the result was not what Reynolds expected; to the contrary, the research showed that even when answering leading and biased questions designed to elicit responses showing consumers do not think additive free is safer or healthier, consumers believed that additive-free cigarettes were safer or healthier.[15]

---

[12] *Id.*

[13] Memorandum from T.C. Hayes & W.J. Moore (July 22, 1983), *available at* http://legacy.library.ucsf.edu/tid/siz55f00 (last visited Aug. 24, 2016).

[14] RJ Reynolds Segmentation/Positioning Memorandum (Apr. 21, 1995), *available at* http://legacy.library.ucsf.edu/tid/hjw66d00 (last visited Aug. 24, 2016).

[15] Cummings at 6.

58. The deceptive nature of Defendants' claims is further confirmed by a 2006 ruling by United States District Court Judge for the District of Columbia Judge Gladys Kessler. *See United States v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 1 (D.D.C. 2006). The Department of Justice brought a RICO action against numerous tobacco companies, including predecessor companies and subsidiaries of Defendant Reynolds, relating to the use of deceptive brand descriptors, such as "natural," "light" and "mild." Following a bench trial, Judge Kessler issued a 1,652 page decision which found, among other things, that the defendants' use of the brand descriptor "natural" misleadingly conveyed to consumers that the cigarettes were less hazardous to health. Judge Kessler specifically found that defendant Brown & Williamson, which Reynolds' predecessor R.J. Reynolds Tobacco Holdings, Inc. acquired in 2005, developed "natural" branded cigarettes with knowledge that "market research show[s] that consumers incorrectly interpret the word 'natural' to mean that the cigarettes are safer and healthier than conventional cigarettes . . ." *Id.* at 924. As a result of these findings, Judge Kessler enjoined the defendants from using the brand descriptor "natural." Judge Kessler's ruling was affirmed by the United States Court of Appeals, District of Columbia Circuit. *United States v. Philip Morris USA Inc.*, 556 F.3d 1095, 1150 (D.C. Cir. 2009).

59. The FDA agrees that labeling Natural American Spirit cigarettes as "Natural" and "Additive-Free" conveys to reasonable consumers that Defendants' cigarettes are safer and healthier than the alternative. On August 27, 2015, the FDA sent a Warning Letter to SFNT declaring that several of its cigarette products are "adulterated" under section 902(8) of the FD&C Act, 21 U.S.C. § 387b(8), and unapproved "modified risk tobacco products" under section 911(g) of the FD&C Act, 21 U.S.C. § 387k(g). The FDA concluded that:

> Your product labeling for Natural American Spirit cigarettes, which uses the descriptors "Natural" and "Additive Free," represents explicitly and/or implicitly that the products or their smoke do not contain or are free of a substance and/or that the products present a lower risk of tobacco-related disease or are less harmful than one or more other commercially marketed tobacco products.

**D. Natural American Spirit Cigarettes Are Not <u>Safer Or Less Harmful Than Other Cigarettes.</u>**

60. Natural American Spirit cigarettes are not safer or healthier than other cigarettes, a truth that Defendants do not deny. Nor can they.

61. There is no scientific support for the claim that Natural American Spirit cigarettes are safer or healthier.[16]

62. In fact, research suggests that Natural American Spirit cigarettes contain more harmful ingredients or substances than other cigarettes. In one 2015 study, scientists from the Center for Tobacco Products and the Tobacco and Volatiles Branch of the Centers for Disease Control and Prevention examined polycyclic aromatic hydrocarbons (PAHs), a class of known carcinogenic compounds in cigarette smoke. PAHs do not occur naturally in the tobacco plant; rather, they are formed during the smoking process. Of the 50 mainstream U.S. cigarettes tested, the Natural American Spirit cigarettes from the blue box had the highest total PAH yields. These cigarettes delivered from 60% to 170% higher PAH yields that the average PAH yields of all cigarettes analyzed.[17]

---

[16] FDA Warning Letter to Santa Fe Natural Tobacco Company, Inc. (Aug. 27, 2015), *available at* http://www.fda.gov/ICECI/EnforcementActions/WarningLetters/2015/ucm459778.htm (last visited Nov. 2, 2015).

[17] An T. Vu et al., "Polycyclic Aromatic Hydrocarbons in the Mainstream Smoke of Popular U.S. Cigarettes," National Center for Biotechnological Information (July 30, 2015) *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC4540633/ (last visited Aug. 30, 2016).

63. Natural American Spirit cigarettes also contain more heavy metals than other cigarettes. Researchers from the Centers for Disease Control and Prevention recently tested 50 varieties of cigarettes available in the United States. They concluded that Natural American Spirit cigarettes "had the highest mean concentrations for cadmium and mercury."[18] Cadmium is not only a known carcinogen; it is also associated with chronic obstructive pulmonary disease and nephrotoxicity.[19] Mercury causes a wide array of well-known deleterious health effects.

64. The danger and health effects of any cigarette are also determined by the extent to which it is addictive. The more people smoke, the greater the risk of health harms like cancer and emphysema. Defendants intentionally engineered Natural American Spirit cigarettes to be at least as addictive as other cigarettes by creating "free-base" nicotine.

65. Nicotine occurs naturally in tobacco plants as either an acid or a base. The acidic form is more stable, and therefore more concentrated. The basic form, known as "free-base" nicotine, is volatile, especially when smoked. As a result, it is absorbed quickly and efficiently into the lungs when a person smokes, where it quickly reaches the brain. Acidic nicotine, conversely, clings to the particles of smoke as they settle into the lungs, and is slowly absorbed before it is transported to the brain. The difference between free-base and naturally occurring nicotine is analogous to the difference between powder and crack cocaine.

---

[18] Mark R. Fresquez, R. Steven Pappas, and Clifford H. Watson, "Establishment of Toxic Metal Reference Range in Tobacco from U.S. Cigarettes," J. Anal Toxicol. 2013 Jun; 37(5): 298–304.

[19] *Id.*

66. Defendants manipulate the design and manufacture of the cigarettes to maximize the amount of free-base nicotine.

67. James Pankow of Oregon Health and Science University in Portland compared the levels of free-base nicotine found in the most common brands of American cigarettes. Natural American Spirit cigarettes contained the most free-base form of nicotine: 36 percent free-base nicotine, compared with 9.6 percent in a Marlboro, 2.7 percent in a Camel, and 6.2 percent in a Winston.[20] These high levels of free-base nicotine do not occur naturally; instead, Defendants engineer their so-called natural cigarette to boost free-base nicotine.

**E. <u>Natural American Spirit Menthol Cigarettes Contain Additives.</u>**

68. Contrary to the explicit claim on every label that Natural American Spirit cigarettes contain "additive-free natural tobacco," Defendants add additives to Natural American Spirit menthol cigarettes.

69. Defendants place menthol in the cigarette filters. Because menthol is highly volatile, it migrates into the tobacco and throughout the cigarette, providing the menthol flavor. As the FDA has noted, "menthol diffuses throughout the cigarette irrespective of where it was applied."[21] Thus, by adding menthol to the filter, Defendants add menthol (an additive) to the tobacco, making their "Additive-Free" claims literally false.

---

[20] Pankow, J., Barsanti, K., & Peyton, D., *Fraction of Free-Base Nicotine in Fresh Smoke Particulate Matter from the Eclipse Cigarette by 1H NMR Spectroscopy*, CHEM. RES. IN TOXICOLOGY 16(1): 23-27 (2003).

[21] Draft Paper: Chapter III: The Physiological Effects of Menthol Cigarettes, FDA.gov, *available at:* http://www.fda.gov/downloads/AdvisoryCommittees/CommitteesMeetingMaterials/TobaccoProductsScientificAdvisoryCommittee/UCM244975.pdf (last visited Sept. 14, 2016).

70. As shown in an early Liggett experiment ("10 by 10", a brand intended to have 10 menthol and 10 non-menthol cigarettes in the pack), menthol contaminates everything in a pack: "[I]t didn't work out. Needless to say, the menthol moved or equilibrated making all cigarettes taste the same. But Liggett learned from this brand. Today no menthol is applied to their filler. Instead they apply menthol to their brands at the packer. Menthol is applied to the paper side of the foil and allowed to equilibrate in the pack."[22]

**F. <u>Defendants Use Of The Term "Natural" Is Deceptive.</u>**

71. Defendants proclaim on every package of Natural American Spirit cigarettes that they are "Natural." Defendants reinforce this concept through advertisements like "Tobacco + Water," tobacco leafs covered in drops of dew or rain and Native American imagery, i.e. the Natural American Spirit smoker is smoking what Native Americans are thought to have smoked hundreds of years ago.

72. The Natural American Spirit cigarette is anything but "Natural." Defendants subject the tobacco in Natural American Spirit cigarettes to various complex, highly technical and unnatural engineering processes, rendering this representation false and misleading.

73. For example, the tobacco in Natural American Spirit cigarettes is flue-cured. This is a technical process where the tobacco is heated to unnaturally seal in sugars and thereby artificially lower the pH of the cigarette smoke. In its natural state, tobacco has a high pH

---

[22] "Menthol Loss from Application to Customer" Memorandum from R.M. Gohmann (Dec. 7, 1978), *available at* https://www.industrydocumentslibrary.ucsf.edu/tobacco/docs/fnln0130 (last visited Sept. 14, 2016).

content, which makes inhalation too harsh. By lowering the pH, the cigarette becomes inhalable.[23]

74. The tobacco in Natural American Spirit cigarettes is also artificially blended.

75. The flue-curing, blending and other engineering processes are no different than that of other cigarettes, yet Defendant's use of the word "Natural" deceives Natural American Spirit smokers into thinking that they are different.

76. Reasonable consumers, including Plaintiffs and the class members, value natural products for important reasons, including the belief that they are safer and healthier than alternative cigarettes that are not represented as being natural.

77. Whether Defendants' labeling of the cigarettes as "Natural" is deceptive is judged by whether it would deceive or mislead a reasonable person.

78. Consumers lack the meaningful ability to test or independently ascertain or verify whether a product is natural, especially at the point of sale. Consumers would not know the true nature of the ingredients merely by reading the ingredients label.

79. Defendants failed to disclose that the cigarettes are not, in fact, natural, and have thus violated the law as described below.

---

[23] "Tobacco smoke was rarely inhaled prior to the nineteenth century; it was too harsh, too alkaline. Smoke first became inhalable with the invention of *flue curing*, a technique by which the tobacco leaf is heated during fermentation, preserving the sugars naturally present in the unprocessed leaf. Sugars when they burn produce acids, which lower the pH of the resulting smoke, making it less harsh, more inhalable. There is a certain irony here, since these 'milder' cigarettes were actually far more deadly, allowing smoke to be drawn deep into the lungs." Robert N. Proctor, "Why ban the sale of cigarettes? The case for abolition," Tobacco Control (Jan. 17, 2013), *available at* http://tobaccocontrol.bmj.com/content/22/suppl_1/i27.full (last visited Sept. 8, 2016) (emphasis in original).

80. The marketing of the Natural American Spirit as "Natural" in a prominent location on the labels of Natural American Spirit evidences Defendants' awareness that "Natural" claims are material to consumers.

81. Defendants' deceptive representations and omissions are material in that a reasonable person would attach importance to such information and would be induced to act upon such information in making purchase decisions.

82. Defendants' false, misleading, and deceptive misrepresentations and omissions are likely to continue to deceive and mislead reasonable consumers and the general public, as they have already deceived and misled Plaintiffs and the class members.

83. In making the false, misleading, and deceptive representations and omissions described herein, Defendants knew and intended that consumers would pay a premium for Products labeled "Natural" over comparable products not so labeled.

84. As an immediate, direct, and proximate result of Defendants' false, misleading, and deceptive representations and omissions, Defendants injured Plaintiffs and the class members in that they:

a. Paid a sum of money for Natural American Spirit cigarettes that were not "Natural" and "Additive-Free" as Defendants represented;

b. Paid a premium price for Natural American Spirit cigarettes that were not "Natural" and "Additive-Free" as Defendants represented;

c. Were deprived of the benefit of the bargain because the Natural American Spirit cigarettes they purchased were different from what Defendants warranted;

d. Were deprived of the benefit of the bargain because the Natural American Spirit cigarettes they purchased had less value than what Defendants represented;

e. Ingested a substance that was of a different quality than what Defendants promised; and

f. Were denied the benefit of the beneficial properties of the natural cigarettes Defendants promised.

85. Had Defendants not made these false, misleading, and deceptive representations and omissions, Plaintiffs and the class members would not have been willing to pay the same amount for the Natural American Spirit cigarettes they purchased.

86. Plaintiffs and the class members paid for Natural American Spirit cigarettes that were "Natural" and "Additive-Free" but received Natural American Spirit cigarettes that were not natural or, in the case of menthols, free of additives. The Natural American Spirit cigarettes Plaintiff and the class members received were worth less than the Natural American Spirit cigarettes for which they paid.

87. Based on Defendants' misleading and deceptive representations, Defendants were able to, and did, charge a premium price for the Natural American Spirit cigarettes over the cost of competitive products not bearing a "Natural" label.

88. Plaintiffs and the class members all paid money for the Natural American Spirit cigarettes. However, Plaintiffs and the class members did not obtain the full value of the advertised Natural American Spirit cigarettes due to Defendants' misrepresentations and omissions. Plaintiffs and the class members purchased, purchased more of, and/or paid more for, Natural American Spirit cigarettes than they would have had they known the truth. Consequently, Plaintiffs and the class members have suffered injury in fact and lost money as a result of Defendants' wrongful conduct.

**G. Defendants Are Able To And Do Charge A Price Premium For Natural American Spirit Cigarettes Because Consumers Believe That They Are Less Harmful Than Other Cigarettes.**

89. Defendants can and do charge a price premium for Natural American Spirit cigarettes because consumers believe that they are healthier and safer. As a result, Natural American Spirit is the most expensive of the major brands.

90. As Reynolds proudly informs its shareholders:

> Santa Fe competes in the U.S. cigarette market with its NATURAL AMERICAN SPIRIT brand, which is the fastest growing super-premium cigarette brand and is a top 10 best-selling cigarette brand. It is priced higher than most other competitive brands, and is differentiated from key competitors through its use of all natural, additive-free tobacco, including styles made with organic tobacco.[24]

91. Defendants' deceptive marketing of Natural American Spirit cigarettes has helped the brand increase sales by 86 percent from 2009 to 2014, even as overall cigarette sales in the United States fell by 17 percent during the same period.[25]

**H. Defendants' Deceptive Claims Are Intentional And Willful.**

92. Based on decades of market research and experience, Defendants know full well that consumers understand and believe from the prominent and central use of the terms "Natural" and "Additive-Free" that Natural American Spirit cigarettes are safer and healthier than other

[24] Reynolds American, Inc. Form 10-Q United States Securities and Exchange Commission Filing for the Quarterly Period Ended March 31, 2016 (Apr. 26, 2016) *available at* http://s2.q4cdn.com/129460998/files/doc_financials/2016/RAI-Q116-10-Q.pdf (last visited Aug. 26, 2016).

[25] Matthew L. Meyers, "FDA Warning About Deceptive Marketing of Natural American Spirit Cigarettes, Other Brands Is Critically Important to Protect Consumers," PRNewsire-USNewswire (Aug. 27, 2015), *available at* http://www.prnewswire.com/news-releases/fda-warning-about-deceptive-marketing-of-natural-american-spirit-cigarettes-other-brands-is-critically-important-to-protect-consumers-300134309.html (last visited Nov. 2, 2015).

cigarettes. Indeed, Defendants intentionally capitalize on consumers' hope for a healthy life by selling "Natural" and additive-free cigarettes and charging a handsome premium accordingly.

93. Defendants also know full well that their cigarettes are no safer or healthier than any other cigarette. In fact, Defendants intentionally engineer Natural American Spirit cigarettes to be at least as addictive as other cigarettes so that they can ensure a captive and profitable market for their cigarettes, notwithstanding that they know consumers will die as a result.

94. Defendants' use of an unfair and deceptive scheme to prioritize their profits at the expense of consumers demonstrates that they acted with intentional and willful intent to the disregard of the health and safety of others.

95. Defendants' violations present a continuing risk to Plaintiffs, the Classes, as well as to the general public, not only because consumers are overpaying for goods as a direct result of Defendants' deceptive and unfair acts and omissions, but because Defendants' acts and omission have a direct and deleterious effect on public health. Defendants' unlawful acts and practices complained of herein affect the public interest.

96. Plaintiffs and the Classes seek punitive damages against Defendants because Defendants' conduct was malicious, willful, reckless, wanton, and in bad faith. Defendants willfully misrepresented the ingredients and nature of Natural American Spirit cigarettes, deceived class members on matters involving a substantial risk of adverse health effects, and concealed material facts that only they knew, all to reap profits by portraying Natural American Spirit cigarettes as a healthy or less harmful cigarette and also by making the literally false claims that the cigarettes are "Natural" and "Additive-Free." Defendants' malicious, willful, reckless, wanton, and bad faith conduct warrants punitive damages.

## TOLLING

**I. Plaintiffs Are Entitled To Equitable Tolling Under The Discovery Rule.**

97. Class members had no way of knowing about the deceptive practices complained of herein.

98. At no time could Plaintiffs and the other class members have discovered through the exercise of reasonable diligence that Defendants were concealing and misrepresenting the true quality and nature of Natural American Spirit cigarettes.

99. Plaintiffs and the other class members did not discover, and did not know of facts that would have caused a reasonable person to suspect, that Defendants' Natural American Spirit cigarettes are not safer or healthier than other cigarettes.

100. Plaintiffs and other class members also did not discover, and did not know facts that would have caused a reasonable person to suspect, that Defendants' Natural American Spirit cigarettes did contain additives and were manufactured using non-natural ingredients or processes.

101. All applicable statutes of limitation have been tolled by operation of the discovery rule.

**J. Plaintiffs Are Entitled To Equitable Tolling Because Of Defendants' Fraudulent Concealment.**

102. All applicable statutes of limitation have also been tolled by Defendants' knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action.

103. Instead of adequately disclosing that Natural American Spirit cigarettes are no safer or healthier than other cigarettes, Defendants falsely represented that their cigarettes were, among other things, "Natural," and "Additive-Free."

**K. Defendants Are Estopped From Relying On Any Statutes Of Limitations Defense.**

104. Defendants are, and at all relevant times have been, under a continuous duty to disclose to Plaintiffs and the other class members the true character, quality, and nature of Natural American Spirit cigarettes.

105. Defendants knowingly, affirmatively, and actively concealed the true nature, quality, and character of Natural American Spirit cigarettes from consumers.

106. Based on the foregoing, Defendants are estopped from relying on any statutes of limitations in defense of this action.

## CLASS ACTION ALLEGATIONS

107. Pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, Plaintiff Jacques-Rene Hebert (the "California Plaintiff") brings this class action on behalf of himself and the following Class of similarly-situated individuals:

> All persons who purchased Natural American Spirit cigarettes in California (the "California Class").

108. Pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, Plaintiff Sara Benson (the "Colorado Plaintiff") brings this class action on behalf of herself and the following Class of similarly-situated individuals:

> All persons who purchased Natural American Spirit cigarettes in Colorado. (the "Colorado Class").

109. Pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, Plaintiff Justin Sproule (the "Florida Plaintiff") brings this class action on behalf of himself and the following Class of similarly-situated individuals:

> All persons who purchased Natural American Spirit cigarettes in Florida (the "Florida Class")

110. Pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, Plaintiff Jacques-Rene Hebert (the "Illinois Plaintiff") brings this class action on behalf of himself and the following Class of similarly-situated individuals:

> All persons who purchased Natural American Spirit cigarettes in Illinois (the "Illinois Class").

111. Pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, Plaintiff Jacques-Rene Hebert (the "Massachusetts Plaintiff") brings this class action on behalf of himself and the following Class of similarly-situated individuals:

> All persons who purchased Natural American Spirit cigarettes in Massachusetts (the "Massachusetts Class").

112. Pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, Plaintiff Jacques-Rene Hebert (the "Michigan Plaintiff") brings this class action on behalf of himself and the following Class of similarly-situated individuals:

> All persons who purchased Natural American Spirit cigarettes in Michigan (the "Michigan Class").

113. Pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, Plaintiff Abigail Emmons (the "New Jersey Plaintiff") brings this class action on behalf of herself and the following Class of similarly-situated individuals:

> All persons who purchased Natural American Spirit cigarettes in New Jersey (the "New Jersey Class").

114. Pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, Plaintiff Ceyhan Haksal (the "New Mexico Plaintiff") brings this class action on behalf of herself and the following Class of similarly-situated individuals:

> All persons who purchased Natural American Spirit cigarettes in New Mexico (the "New Mexico Class).

115. Pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, Plaintiff Jacques-Rene Hebert (the "New York Plaintiff") brings this class action on behalf of himself and the following Class of similarly-situated individuals:

> All persons who purchased Natural American Spirit cigarettes in New York (the "New York Class").

116. Pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, Plaintiff Rudolph Miller (the "North Carolina Plaintiff") brings this class action on behalf of himself and the following Class of similarly-situated individuals:

> All persons who purchased Natural American Spirit cigarettes in North Carolina (the "North Carolina Class").

117. Pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, Plaintiff Jacques-Rene Hebert (the "Ohio Plaintiff") brings this class action on behalf of himself and the following Class of similarly-situated individuals:

> All persons who purchased Natural American Spirit cigarettes in Ohio (the "Ohio Class").

118. Pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, Plaintiffs Carol Murphy and Clive Pontusson (the "Washington Plaintiffs") brings this class action on behalf of themselves and the following Class of similarly-situated individuals:

> All persons who purchased Natural American Spirit cigarettes in Washington (the "Washington Class").

119. Plaintiff Francisco Chavez (the "California Menthol Plaintiff") also seeks to represent a subclass defined as:

> All persons who purchased Natural American Spirit menthol cigarettes in California (the "California Menthol Subclass").

120. Plaintiff Joshua Horne (the "Colorado Menthol Plaintiff") also seeks to represent a subclass defined as:

> All persons who purchased Natural American Spirit menthol cigarettes in Colorado (the "Colorado Menthol Subclass").

121. Plaintiff Joshua Horne (the "Florida Menthol Plaintiff") also seeks to represent a subclass defined as:

> All persons who purchased Natural American Spirit menthol cigarettes in Florida (the "Florida Menthol Subclass").

122. Plaintiff Albert Lopez (the "Illinois Menthol Plaintiff") also seeks to represent a subclass defined as:

> All persons who purchased Natural American Spirit menthol cigarettes in Illinois (the "Illinois Menthol Subclass").

123. Plaintiff Robert Litwin (the "New Jersey Menthol Plaintiff") also seeks to represent a subclass defined as:

> All persons who purchased Natural American Spirit menthol cigarettes in New Jersey (the "New Jersey Menthol Subclass").

124. Plaintiff Joshua Horne (the "New Mexico Menthol Plaintiff") also seeks to represent a subclass defined as:

> All persons who purchased Natural American Spirit menthol cigarettes in New Mexico (the "New Mexico Menthol Subclass").

125. Plaintiff Robert Litwin (the "New York Menthol Plaintiff") also seeks to represent a subclass defined as:

> All persons who purchased Natural American Spirit menthol cigarettes in New York (the "New York Menthol Subclass").

126. Plaintiff Charlene Blevins (the "North Carolina Menthol Plaintiff") also seeks to represent a subclass defined as:

> All persons who purchased Natural American Spirit menthol cigarettes in North Carolina (the "North Carolina Menthol Subclass").

127. Plaintiffs Francisco Chavez, Joshua Horne, Albert Lopez, Robert Litwin, and Charlene Blevins (collectively, the "Nationwide Menthol Plaintiffs") also seek to represent a subclass defined as:

> All persons who purchased Natural American Spirit menthol cigarettes in the United States (the "Nationwide Menthol Class").

128. Excluded from the above "Classes" and "Subclasses" are Defendants, any entity in which Defendants have a controlling interest or that has a controlling interest in Defendants, and Defendants' legal representatives, assignees, and successors. Also excluded are the Judge to whom this case is assigned and any member of the Judge's immediate family.

129. Numerosity. The Classes each consist of many thousands of persons and are therefore so numerous that joinder of all members, whether otherwise required or permitted, is impracticable.

130. Commonality. There are questions of law or fact common to the Classes that predominate over any questions affecting only individual members, including:

i. whether Defendants violated state consumer protection laws;

ii. whether Defendants engaged in deceptive or misleading acts or practices by labeling Natural American Spirit cigarettes as "Natural" and "Additive-Free";

iii. whether Plaintiffs and members of the Classes paid a price premium for Natural American Spirit cigarettes because they are labeled as "Natural" and "Additive-Free";

iv. whether Natural American Spirit cigarettes are in fact "Additive-Free";

v. whether Defendants are being unjustly enriched by their deceptive or misleading acts or practices;

vi. whether Plaintiffs and the Classes have sustained damages and, if so, the proper measure thereof;

vii. whether Plaintiffs and the Classes are entitled to restitution, and if so, the proper measure thereof; and

viii. whether Defendants should be enjoined from continuing to sell Natural American Spirit cigarettes as currently labeled;

131. Typicality. Plaintiffs' claims are typical of the claims of the Classes. Plaintiffs suffered the same injury as members of the Classes -- i.e., Plaintiffs purchased Natural American Spirit cigarettes after seeing Defendants' misleading representations about the quality and nature of those products and paid more money than they otherwise would have as a direct result of Defendants' deceptive labeling.

132. Adequacy. Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs have retained competent and capable attorneys with significant experience in complex and class action litigation, including consumer class actions. Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the Classes and have the financial resources to do so. Neither Plaintiffs nor their counsel have interests that are contrary to or that conflict with those of the proposed Classes.

133. Predominance. Defendants have engaged in a common course of conduct toward Plaintiffs and members of the Classes. The common issues arising from this conduct that affect Plaintiffs and class members predominate over any individual issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

134. Superiority. A class action is superior to other available methods for the fair and efficient adjudication of the controversy, for at least the following reasons:

i. Absent a class action, class members as a practical matter will be unable to obtain redress, Defendants' violations of their legal obligations will continue without remedy, additional consumers and purchasers will be harmed, and Defendants will continue to retain their ill-gotten gains;

ii. It would be a substantial hardship for most individual members of the Classes if they were forced to prosecute individual actions;

iii. Once the liability of Defendants has been adjudicated, the Court will be able to determine the claims of all members of the Classes;

iv. A class action will permit an orderly and expeditious administration of the Classes' claims, foster economies of time, effort, and expense, and ensure uniformity of decisions;

v. The lawsuit presents no difficulties that would impede its management by the Court as a class action; and

vi. Defendants have acted on grounds generally applicable to members of the Classes, making class-wide relief appropriate.

135. Injunctive and Declaratory Relief Appropriate. A class action is appropriate under Fed. R. Civ. P. 23(b)(2) because Defendant has acted or refused to act on grounds that apply generally to members of the Classes, so that final injunctive relief or corresponding declaratory relief is appropriate as to all members of the Classes.

## CAUSES OF ACTION

### CALIFORNIA COUNT I

**(Violation Of The Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.* On Behalf Of The California Class And The California Menthol Subclass)**

136. Plaintiffs reallege and incorporate by reference each preceding paragraph as though fully set forth herein.

137. The California Plaintiff and The California Menthol Plaintiff and each member of the California Class and California Menthol Subclass are "Consumer[s]" as that term is defined by Cal. Civ. Code §1761(d).

138. Natural American Spirit cigarettes are each a "Good" as that term is defined by Cal. Civ. Code §1761(a).

139. Defendants are "Person[s]" as defined by Cal. Civ. Code §1761(c).

140. The transaction(s) involved here are "Transaction(s)" as defined by Cal. Civ. Code §1761(e).

141. The California Plaintiff, California Menthol Plaintiff, California Class Members and California Menthol Subclass Members are consumers who purchased the Products for personal use within the applicable statute of limitations period.

142. The California Plaintiff and California Menthol Plaintiff have standing to pursue this cause of action because they have suffered injury-in-fact and have lost money or property as a result of Defendants' action as set forth herein.

143. Defendants have engaged in and continue to engage in business practices in violation of the Consumers Legal Remedies Act in at least the following ways:

a. Defendants have used deceptive representations with respect to Natural American Spirit cigarettes in violation of Cal. Civ. Code §1770(a)(4);

b. Defendants have misrepresented the sponsorship, approval, characteristics, or ingredients of Natural American Spirit cigarettes in violation of Cal. Civ. Code §1770(a)(5);

c. Defendants have misrepresented the standard, quality, or grade of Natural American Spirit cigarettes in violation of Cal. Civ. Code §1770(a)(7).

144. Defendants knew or should have known that their representations of fact concerning Natural American Spirit cigarettes were material and likely to mislead consumers.

145. Defendants' practices, acts, and course of conduct in marketing and selling Natural American Spirit cigarettes were, and are, likely to mislead a reasonable consumer acting reasonably under the circumstances to his or her detriment. The California Plaintiff, California

Menthol Plaintiff, California Class Members and California Menthol Subclass Members would not have purchased Natural American Spirit cigarettes, or they would not have paid as much for the cigarettes as they did, had they know they were not safer or healthier than other cigarettes or that they contained additives.

146. The California Plaintiff, California Menthol Plaintiff, California Class Members and California Menthol Subclass Members have been directly and proximately damaged by Defendants' actions.

147. Pursuant to California Civil Code § 1780(a) and (e), the California Plaintiff, California Menthol Plaintiff, California Class Members and California Menthol Subclass Members seek: (1) an order enjoining Defendants' unlawful business practices as alleged herein; (2) actual damages; (3) restitution; (4) ancillary relief; and (5) attorneys' fees and costs to the full extent allowed by law.

148. There is no other adequate remedy at law, and the California Plaintiff, California Menthol Plaintiff, California Class Members and California Menthol Subclass Members will suffer irreparable harm unless Defendants' conduct is enjoined.

149. Defendants were provided with written notice that their conduct is in violation of the Consumers Legal Remedies Act at least thirty days prior to the filing of this Complaint. Thus, pursuant to Cal. Civ. Code § 1782, Plaintiffs may maintain this action for damages.

150. Defendants have engaged in, and continue to engage in, business practices in violation of the Consumers Legal Remedies Act by continuing to make false and deceptive representations concerning the ingredients contained in Natural American Spirit cigarettes. These business practices are misleading and/or likely to mislead consumers and should be

enjoined.

**CALIFORNIA COUNT II**
**(Violation Of False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq.* On Behalf Of The California Class And The California Menthol Subclass)**

151. Plaintiffs reallege and incorporate by reference each preceding paragraph as though fully set forth herein.

152. The California Plaintiff, California Menthol Plaintiff, California Class Members and California Menthol Subclass Members have standing to pursue a cause of action for false advertising under the False Advertising Law, because they have suffered an injury-in-fact and lost money as a result of Defendants' actions as set forth herein.

153. Defendants labeled, marketed, and otherwise disseminated information to the public through advertising mediums statements to the effect that Natural American Spirit cigarettes are natural and additive-free and less harmful, safer and healthier than other cigarettes.

154. Defendants' statements were and are deceptive and misleading.

155. Defendants know and knew that these statements are deceptive and misleading, or could have discovered their deceptiveness and misleading effect with the exercise of reasonable care.

156. Defendants' deceptive and misleading statements were part of a scheme or plan to sell Natural American Spirit cigarettes to the public at a premium without disclosing that they are not safer or healthier than other cigarettes or that they contain additives.

157. Defendants' actions violate the False Advertising Law.

158. As a direct and proximate result of Defendants' actions, as set forth herein, Defendants have received ill-gotten gains and/or profits, including but not limited to money from

California Plaintiff, California Menthol Plaintiff, California Class Members and California Menthol Subclass Members who paid a premium for Natural American Spirit cigarettes. Therefore, Defendants have been unjustly enriched.

159. The California Plaintiff, California Menthol Plaintiff, California Class Members and California Menthol Subclass Members seek injunctive relief, restitution, and restitutionary disgorgement of Defendants' ill-gotten gains as provided for by Cal. Bus. & Prof. Code § 17535.

160. The California Plaintiff, California Menthol Plaintiff, California Class Members and California Menthol Subclass Members seek injunctive relief to compel Defendant to stop advertising Natural American Spirit cigarettes as natural and additive free to prevent Defendants from engaging in these wrongful practices in the future. No other adequate remedy at law exists. If an injunction is not ordered, the California Plaintiff, California Menthol Plaintiff, California Class Members and California Menthol Subclass Members will suffer irreparable harm and/or injury.

**CALIFORNIA COUNT III**
**(Violation Of The Unfair Competition Act, Cal. Bus. & Prof. Code § 17200, *et seq.* On Behalf Of The California Class And The California Menthol Subclass)**

161. Plaintiffs reallege and incorporate by reference each preceding paragraph as though fully set forth herein.

162. Defendants' actions as described herein constitute unfair competition within the meaning of the Unfair Competition Act, insofar as the Unfair Competition Act prohibits "any unlawful, unfair or fraudulent business act or practice" or "unfair, deceptive, untrue or misleading advertising."

163. Defendants' misrepresentations and omissions of material fact as alleged herein constitute unlawful, unfair, and fraudulent business practices in that they have the capacity to deceive the California Plaintiff, California Menthol Plaintiff, California Class Members and California Menthol Subclass Members into believing that Natural American Spirit cigarettes were healthier and safer than other cigarettes and that they contained no additives.

164. Defendants' conduct constitutes an "unlawful" business practice within the meaning of the Unfair Competition Act because it violates the Consumer Legal Remedies Act, the Fair Advertising Law, and California's Sherman Food, Drug, and Cosmetic Law, Cal. Health & Safety Code § 109875, *et seq*.

165. Defendants' conduct constitutes an "unfair" business practice within the meaning of the Unfair Competition Act because it is immoral, unethical, oppressive, unscrupulous and/or substantially injurious to consumers. Reasonable consumers purchased Natural American Spirit cigarettes believing they were healthier and safer than other cigarettes and that they contained no additives. They were not aware and could not have reasonably been aware that Natural American Spirit cigarettes were not safer or healthier or that they contained additives. Defendants' conduct in falsely labeling and packaging Natural American Spirit cigarettes and selling them as such has no utility or countervailing benefit and consumers could not have reasonably avoided their injury.

166. Defendants' conduct constitutes a "fraudulent" business practice within the meaning of the Unfair Competition Act insofar as Defendants' misrepresentations and omissions regarding the health, characteristics, composition, and quality of Natural American Spirit cigarettes were and are likely to deceive members of the public.

167. As a direct and proximate result of Defendants' wrongful business practices in violation of the Unfair Competition Act, the California Plaintiff, California Menthol Plaintiff, California Class Members and California Menthol Subclass Members have suffered injury in fact and lost money or property as a result of Natural American Spirit cigarettes. The California Plaintiffs and California Class Members would not have purchased or paid as much for Natural American Spirit cigarettes had they known that they are not safer or healthier than other cigarettes or that they contained additives.

168. Defendants' wrongful business practices constitute a continuing course of conduct of unfair competition since Defendants are labeling, marketing, and selling Natural American Spirit cigarettes in a manner likely to deceive the public.

169. Pursuant to Cal. Bus. & Prof. Code § 17203, the California Plaintiff, California Menthol Plaintiff, California Class Members and California Menthol Subclass Members seek an order of this Court enjoining Defendants from continuing to engage in unlawful, unfair, and deceptive business practices and any other act prohibited by law, including those set forth in this Complaint. The California Plaintiff, California Menthol Plaintiff, California Class Members and California Menthol Subclass Members also seek an order requiring Defendants to make full restitution of all moneys it wrongfully obtained from the California Plaintiff, California Menthol Plaintiff, California Class Members and California Menthol Subclass Members.

170. Pursuant to Cal. Bus. & Prof. Code § 17203, the California Plaintiff, California Menthol Plaintiff, California Class Members and California Menthol Subclass Members seek an injunction enjoining Defendant from continuing to market, advertise, and sell Natural American

Spirit cigarettes and to prevent Defendants from continuing to engage in unfair competition or any other act prohibited by law.

**CALIFORNIA COUNT IV**
**(Unjust Enrichment On Behalf Of The California Class And The California Menthol Subclass)**

171. Plaintiffs reallege and incorporate by reference each preceding paragraph as though fully set forth herein.

172. Because of their wrongful acts and omissions, Defendants charged a higher price for Natural American Spirit cigarettes than their true value and Defendants obtained monies that rightfully belong to California Plaintiff, California Menthol Plaintiff, California Class Members and California Menthol Subclass Members.

173. The California Plaintiff, California Menthol Plaintiff, California Class Members and California Menthol Subclass Members conferred a benefit on Defendants by purchasing Defendants' Natural American Spirit cigarettes.

174. Defendants received a direct benefit from the California Plaintiff, California Menthol Plaintiff, California Class Members and California Menthol Subclass Members in the form of a price premium, increased sales and increased market share.

175. Defendants knowingly accepted the unjust benefits of their fraudulent conduct, including increased financial gains, to the detriment of the California Plaintiff, California Menthol Plaintiff, California Class Members and California Menthol Subclass Members. It would be inequitable and unjust for Defendants to retain these wrongfully obtained profits.

176. The California Plaintiff and California Menthol Plaintiff therefore, seek an order requiring Defendants to make restitution to them and the California Class Members and California Menthol Subclass Members.

**COLORADO COUNT I**
**(Violation Of Colorado Consumer Protection Act, Col. Rev. Stat. § 6–1–101, *et seq*. On Behalf Of The Colorado Class And The Colorado Menthol Subclass)**

177. Plaintiffs reallege and incorporate by reference each preceding paragraph as though fully set forth herein.

178. The Colorado Plaintiff, the Colorado Menthol Plaintiff and each Member of the Colorado Class and Colorado Menthol Subclass are "Person[s]" as that term is defined by Col. Rev. Stat. § 6–1–102(6).

179. Defendants are "Person[s]" as that term is defined by Col. Rev. Stat. § § 6–1–102 (6).

180. In the course of their business in Colorado, Defendants have engaged and continue to engage in unfair and deceptive trade practices in violation of the Colorado Consumer Protection Act in at least the following ways:

a. Defendants have knowingly made false misrepresentations as to the characteristics, ingredients, uses, benefits, and alterations of the Natural American Spirit cigarettes in violation of Col. Rev. Stat. § 6–1–105(e);

b. Defendants have represented the Natural American Spirit cigarettes as being of a particular standard, quality, or grade when they knew or should have known that the Natural American Spirit cigarettes are of another in violation of Col. Rev. Stat. § 6–1–105(g);

c. Defendants have advertised Natural American Spirit cigarettes with the intent not to sell them as advertised in violation of Col. Rev. Stat. § § 6–1–105(i); and

d. Defendants have failed to disclose material information concerning the ingredients of the Natural American Spirit cigarettes known to them at the time they advertised and sold the Natural American Spirit cigarettes, with the intent to induce consumers to enter into transactions based on their failure to disclose in violation of Col. Rev. Stat. § § 6–1–105(u).

181. Defendants knew their representations regarding the ingredients in Natural American Spirit cigarettes were false.

182. Defendants' unfair and deceptive trade practices significantly impacted the public and actual consumers of Defendants' goods, including the Colorado Plaintiff, Colorado Menthol Plaintiff and other Colorado Class and Colorado Menthol Subclass Members. Thousands of Colorado consumers, including the Colorado Plaintiff and Colorado Menthol Plaintiff, have purchased Natural American Spirit cigarettes based on Defendants' misrepresentations and other unfair and deceptive practices identified herein and have thus been directly affected by Defendants' conduct identified herein. These consumers and other potential consumers will continue to be directly affected and impacted in the future should Defendants' acts continue.

183. The Colorado Plaintiff and Colorado Menthol Plaintiff were actual consumers and purchasers of Defendants' Natural American Spirit cigarettes during the time that Defendants utilized the above unfair and deceptive trade practices. Members of the Colorado Class and Colorado Menthol Subclass were actual consumers and purchasers or are potential consumers

and purchasers of Defendants' Natural American Spirit cigarettes during the time that Defendants utilized the above unfair and deceptive trade practices.

184. The Colorado Plaintiff, Colorado Menthol Plaintiff and all other Colorado Class Members and Colorado Menthol Subclass Members suffered injury in fact to a legally protected interest.

185. Defendants' unfair and deceptive trade practices caused actual damages and losses to the Colorado Plaintiff, Colorado Menthol Plaintiff and all other Colorado Class Members and Colorado Menthol Subclass Members.

186. Plaintiffs suffered damages and losses as described above as a result of Defendants' deceptive trade practices.

187. Defendants have engaged in, and continue to engage in, unfair and deceptive trade practices in violation of the Colorado Consumer Protection Act by continuing to make false and deceptive representations concerning the ingredients contained in Natural American Spirit cigarettes.

**COLORADO COUNT II**
**(Unjust Enrichment**
**On Behalf Of The Colorado Class And The Colorado Menthol Subclass)**

188. Plaintiffs reallege and incorporate by reference each preceding paragraph as though fully set forth herein.

189. At the expense of the Colorado Plaintiff, Colorado Menthol Plaintiff, Colorado Class Members, and Colorado Subclass Members, Defendants received a benefit under circumstances that make it unjust for Defendants to retain the benefit without paying the

Colorado Plaintiff, Colorado Menthol Plaintiff, Colorado Class Members, and Colorado Subclass Members.

190. The Colorado Plaintiff, Colorado Menthol Plaintiff, Colorado Class Members and Colorado Menthol Subclass Members conferred a benefit on Defendants by purchasing Defendants' Natural American Spirit cigarettes.

191. Defendants received a direct benefit from the Colorado Plaintiff, Colorado Menthol Plaintiff, Colorado Class Members and Colorado Menthol Subclass Members in the form of a price premium, increased sales and increased market share.

192. Defendants knowingly accepted the unjust benefits of their fraudulent conduct, including increased financial gains, to the detriment of Colorado Plaintiff, Colorado Menthol Plaintiff, Colorado Class Members and Colorado Menthol Subclass Members.

193. Retention by Defendants of the increased financial gains is unjust and inequitable because Defendants misrepresented the facts concerning the natural quality, health, characteristics, and composition of Natural American Spirit cigarettes to the Colorado Plaintiff, Colorado Menthol Plaintiff, Colorado Class Members and Colorado Menthol Subclass Members and caused the Colorado Plaintiff, Colorado Menthol Plaintiff, Colorado Class Members and Colorado Menthol Subclass Members to lose money as a result thereof.

194. The Colorado Plaintiff and Colorado Menthol Plaintiff therefore seek an order requiring Defendants to make restitution to them and the Colorado Class Members and Colorado Menthol Subclass Members in an amount to be proven at trial.

**FLORIDA COUNT I**
**(Violation Of Florida's Unfair & Deceptive Trade Practices Act, Fla. Stat. § 501.201, *et seq*. On Behalf Of The Florida Class And The Florida Menthol Subclass)**

195. Plaintiffs reallege and incorporate by reference each preceding paragraph as though fully set forth herein.

196. The Florida Plaintiff and Florida Menthol Plaintiff and each member of the Florida Class and Florida Menthol Subclass are "consumers" within the meaning of the Florida Unfair and Deceptive Trade Practices Act, Fla. Stat. § 501.203(7).

197. Defendants are engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8).

198. The Florida Unfair and Deceptive Trade Practices Act prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce . . ." Fla. Stat. § 501.204(1).

199. Defendants have violated the Florida Unfair and Deceptive Trade Practices Act by engaging in the unfair and deceptive practices described herein, which are unconscionable and which offend public policy and which are substantially injurious to consumers.

200. Defendants' misrepresentations and false, deceptive, and misleading statements with respect to Natural American Spirit cigarettes, as described above, constitute deceptive acts or practices.

201. Defendants thus employ deception, deceptive acts or practices, misrepresentations, or concealment, suppression or omission of material facts with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Natural American Spirit cigarettes.

202. Defendants' actions described above and herein are also "unconscionable trade practices" in violation of the Florida Unfair and Deceptive Trade Practices Act because Defendants took advantage of the lack of knowledge, ability, experience or capacity of the Florida Plaintiff, Florida Menthol Plaintiff, Florida Class Members and Florida Menthol Subclass Members to a grossly unfair degree, and those actions resulted in a gross disparity between the value received by the Florida Plaintiff, Florida Menthol Plaintiff, Florida Class Members and Florida Menthol Subclass Members and the price paid for Natural American Spirit cigarettes.

203. Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including the Florida Plaintiffs and Florida Class Members, into believing that Natural American Spirit cigarettes were safer, healthier or less harmful than other cigarettes and contained no additives and failed to adequately inform the Florida Plaintiff, Florida Menthol Plaintiff, Florida Class Members and Florida Menthol Subclass Members that these cigarettes contain additives, provide no benefits and are just as dangerous and unhealthy as other cigarettes.

204. Defendants unfair or deceptive trade practices were concealed and likely to, and did, deceive reasonable consumers, including the Florida Plaintiff, Florida Menthol Plaintiff, Florida Class Members and Florida Menthol Subclass Members, into believing that Natural American Spirit cigarettes were a safer, healthier or less harmful alternative to regular cigarettes and that they contained no additives. Defendants intentionally and knowingly misrepresented and/or omitted material facts regarding its Natural American Spirit cigarettes with the intent of deceiving the Florida Plaintiff, Florida Menthol Plaintiff, Florida Class Members and Florida Menthol Subclass Members.

205. The Florida Plaintiff, Florida Menthol Plaintiff, Florida Class Members and Florida Menthol Subclass Members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and their concealment of and failure to disclose material information. The Florida Plaintiff, Florida Menthol Plaintiff, Florida Class Members and Florida Menthol Subclass Members who purchased Natural American Spirit cigarettes would not have purchased those cigarettes, or alternatively, would have paid less for them.

206. The Florida Plaintiff, Florida Menthol Plaintiff, Florida Class Members and Florida Menthol Subclass Members risk irreparable injury as a result of Defendants' acts and omissions in violation of the Florida Unfair and Deceptive Trade Practices Act, and these violations present a continuing risk to the Florida Plaintiff, Florida Menthol Plaintiff, Florida Class Members and Florida Menthol Subclass Members as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

207. As a direct and proximate result of Defendants' violations of the Florida Unfair and Deceptive Trade Practices Act, the Florida Plaintiff, Florida Menthol Plaintiff, Florida Class Members and Florida Menthol Subclass Members have suffered injury-in-fact and/or actual damage.

208. The Florida Plaintiff, Florida Menthol Plaintiff, Florida Class Members and Florida Menthol Subclass Members are entitled to recover their actual damages under Fla. Stat. § 501.211(2) and attorneys' fees under Fla. Stat. § 501.2105(1).

209. The Florida Plaintiff and Florida Menthol Plaintiff also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and

any other just and proper relief available under the Florida Unfair and Deceptive Trade Practices Act.

**FLORIDA COUNT II**
**(Unjust Enrichment**
**On Behalf Of The Florida Class And The Florida Menthol Subclass)**

210. Plaintiffs reallege and incorporate by reference each preceding paragraph as though fully set forth herein.

211. Defendants have been unjustly enriched in retaining the revenues derived from the Florida Plaintiff, Florida Menthol Plaintiff, Florida Class Members and Florida Menthol Subclass Members' purchases of Natural American Spirit cigarettes. Such retention is unjust and inequitable because Defendants misrepresented the facts concerning the natural quality, health, characteristics, and composition of Natural American Spirit cigarettes to the Florida Plaintiff, Florida Menthol Plaintiff, Florida Class Members and Florida Menthol Subclass Members, and caused the Florida Plaintiff, Florida Menthol Plaintiff, Florida Class Members and Florida Menthol Subclass Members to lose money as a result thereof.

212. The Florida Plaintiff, Florida Menthol Plaintiff, Florida Class Members and Florida Menthol Subclass Members have been injured as a direct and proximate result of Defendants' wrongful conduct and unjust enrichment. The Florida Plaintiff, Florida Menthol Plaintiff, Florida Class Members and Florida Menthol Subclass Members would not have purchased, or paid as much for, Natural American Spirit cigarettes if they had known the true facts regarding their natural quality, health, characteristics, and composition.

213. Defendants received a direct benefit from the Florida Plaintiff, Florida Menthol Plaintiff, Florida Class Members and Florida Menthol Subclass Members in the form of a price premium, increased sales and increased market share.

214. Defendants have received and retained unjust benefits from the Florida Plaintiff, Florida Menthol Plaintiff, Florida Class Members and Florida Menthol Subclass Members, and inequity has resulted.

215. It is inequitable and unconscionable for Defendants to retain these benefits. Defendants knowingly accepted the unjust benefits of their fraudulent conduct.

216. As a result of Defendants' misconduct, the amount of its unjust enrichment should be disgorged and returned to the Florida Plaintiff, Florida Menthol Plaintiff, Florida Class Members and Florida Menthol Subclass Members, in an amount to be proven at trial.

**ILLINOIS COUNT I**
**(Violation Of Illinois Consumer Fraud And Deceptive Business Practices Act, 815 ILCS 505/1, *Et Seq.* On Behalf Of The Illinois Class And The Illinois Menthol Subclass)**

217. Plaintiffs reallege and incorporate by reference each preceding paragraph as though fully set forth herein.

218. The Illinois Plaintiff, Illinois Menthol Plaintiff and each member of the Illinois Class and Illinois Menthol Subclass are "person[s]" as that term is defined in 815 ILCS 505/1(c).

219. The Illinois Plaintiff, Illinois Menthol Plaintiff, Illinois Class Members and Illinois Menthol Subclass Members are "consumers" as that term is defined in 815 ILCS 505/1(e).

220. The Illinois Consumer Fraud and Deceptive Business Practices Act prohibits "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression

or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of any material fact . . . in the conduct of any trade or commerce . . . whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2.

221. In the course of their business, Defendants misrepresented, concealed and suppressed material facts concerning Natural American Spirit cigarettes.

222. Defendants' misrepresentations and false, deceptive, and misleading statements with respect to Natural American Spirit cigarettes, as described above, constitute deceptive acts or practices.

223. Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including the Illinois Plaintiff, Illinois Menthol Plaintiff, Illinois Class Members and Illinois Menthol Subclass Members, into believing that Natural American Spirit cigarettes were somehow safer, healthier or less harmful than other cigarettes and that they contained no additives and failed to adequately inform the Illinois Plaintiff, Illinois Menthol Plaintiff, Illinois Class Members and Illinois Menthol Subclass Members that these cigarettes contained additives, provide no benefits and are just as dangerous as other cigarettes.

224. Defendants' unfair or deceptive trade practices were fraudulently concealed and likely to, and did, deceive reasonable consumers, including the Illinois Plaintiff, Illinois Menthol Plaintiff, Illinois Class Members and Illinois Menthol Subclass Members, into believing that Natural American Spirit cigarettes were a safer, healthier or less harmful alternative to other cigarettes and that they contained no additives. Defendants intentionally and knowingly misrepresented and/or omitted material facts regarding its Natural American Spirit cigarettes with

the intent of deceiving the Illinois Plaintiff, Illinois Menthol Plaintiff, Illinois Class Members and Illinois Menthol Subclass Members.

225. The Illinois Plaintiff, Illinois Menthol Plaintiff, Illinois Class Members and Illinois Menthol Subclass Members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and their concealment of and failure to disclose material information. The Illinois Plaintiff, Illinois Menthol Plaintiff, Illinois Class Members and Illinois Menthol Subclass Members who purchased Natural American Spirit cigarettes would not have purchased those cigarettes, or alternatively, would have paid less for them.

226. Defendants intentionally and knowingly misrepresented material facts regarding Natural American Spirit cigarettes with intent to mislead the Illinois Plaintiff, Illinois Menthol Plaintiff, Illinois Class Members and Illinois Menthol Subclass Members.

227. Defendants knew or should have known that its conduct violated the Consumer Fraud and Deceptive Business Practices Act.

228. Defendants' misrepresentation of the "natural" and "additive-free" quality of its Natural American Spirit cigarettes was material to the Illinois Plaintiff, Illinois Menthol Plaintiff, Illinois Class Members and Illinois Menthol Subclass Members.

229. Defendants' violations present a continuing risk to the Illinois Plaintiff, Illinois Menthol Plaintiff, Illinois Class Members and Illinois Menthol Subclass Members as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

230. As a direct and proximate result of Defendants' violations of the Consumer Fraud and Deceptive Business Practices Act, the Illinois Plaintiff, Illinois Menthol Plaintiff, Illinois Class

Members and Illinois Menthol Subclass Members have suffered injury-in-fact and/or actual damage.

231. Pursuant to 815 ILCS 505/10a(a), the Illinois Plaintiff, Illinois Menthol Plaintiff, Illinois Class Members and Illinois Menthol Subclass Members seek monetary relief against Defendants in the amount of actual damages, as well as punitive damages because Defendants acted with fraud and/or malice and/or were grossly negligent.

232. The Illinois Plaintiff, Illinois Menthol Plaintiff, Illinois Class Members and Illinois Menthol Subclass Members also seek an order enjoining Defendants' unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, and any other just and proper relief available under 815 ILCS § 505/1 *et seq*.

**ILLINOIS COUNT II**

**(Violation Of The Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/1, *Et Seq.* On Behalf Of The Illinois Class And The Illinois Menthol Subclass)**

233. Plaintiffs reallege and incorporate by reference each preceding paragraph as though fully set forth herein.

234. Illinois's Uniform Deceptive Trade Practices Act ("Illinois UDTPA"), 815 ILCS 510/2(a), prohibits deceptive trade practices, including among others, "(2) caus[ing] likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services; … (5) represent[ing] that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have …; (7) represent[ing] that goods or services are of a particular standard, quality, or grade … if they are of another; … (9) advertis[ing] goods or services with intent not to sell them as advertised; … [and] (12) engag[ing] in any other conduct which similarly creates a likelihood of confusion or misunderstanding."

235. Defendants are "persons" as defined in 815 ILCS 510/1(5).

236. In the course of their business, Defendants misrepresented, concealed and suppressed material facts concerning Natural American Spirit cigarettes.

237. Defendants' misrepresentations and false, deceptive, and misleading statements with respect to Natural American Spirit cigarettes, as described above, constitute deceptive acts or practices.

238. Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including the Illinois Plaintiff, Illinois Menthol Plaintiff, Illinois Class Members and Illinois Menthol Subclass Members, into believing that Natural American Spirit cigarettes were somehow safer, healthier or less harmful than other cigarettes and that they contained no additives and failed to adequately inform the Illinois Plaintiff, Illinois Menthol Plaintiff, Illinois Class Members and Illinois Menthol Subclass Members that these cigarettes contained additives, provide no benefits and are just as dangerous as other cigarettes.

239. Defendants' unfair or deceptive trade practices were fraudulently concealed and likely to, and did, deceive reasonable consumers, including the Illinois Plaintiff, Illinois Menthol Plaintiff, Illinois Class Members and Illinois Menthol Subclass Members, into believing that Natural American Spirit cigarettes were a safer, healthier or less harmful alternative to other cigarettes and that they contained no additives. Defendants intentionally and knowingly misrepresented and/or omitted material facts regarding its Natural American Spirit cigarettes with the intent of deceiving the Illinois Plaintiff, Illinois Menthol Plaintiff, Illinois Class Members and Illinois Menthol Subclass Members.

Appellate Case: 23-705 Document: 010110921360 Date Filed: 09/15/2023 Page: 528 Sealed

240. Defendants' violations present a continuing risk to the Illinois Plaintiff, Illinois Menthol Plaintiff, Illinois Class Members and Illinois Menthol Subclass Members as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

241. As a direct and proximate result of Defendants' violations of the Consumer Fraud and Deceptive Business Practices Act, the Illinois Plaintiff, Illinois Menthol Plaintiff, Illinois Class Members and Illinois Menthol Subclass Members have suffered injury-in-fact and/or actual damage.

242. The Illinois Plaintiff, Illinois Menthol Plaintiff, Illinois Class Members and Illinois Menthol Subclass Members also seek an order enjoining Defendants' unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, and any other just and proper relief available under 815 ILCS § 510 *et seq*a.

**ILLINOIS COUNT III**
**(Unjust Enrichment**
**On Behalf Of The Illinois Class And The Illinois Menthol Subclass)**

243. Plaintiffs reallege and incorporate by reference each preceding paragraph as though fully set forth herein.

244. Defendants have been unjustly enriched in retaining the revenues derived from the Illinois Plaintiff's, Illinois Menthol Plaintiff's, Illinois Class Members' and Illinois Menthol Subclass Members' purchases of Natural American Spirit cigarettes. Such retention is unjust and inequitable because Defendants misrepresented the facts concerning the natural quality, health, characteristics, and composition of Natural American Spirit cigarettes to the Illinois Plaintiff, Illinois Menthol Plaintiff, Illinois Class Members and Illinois Menthol Subclass Members, and

caused the Illinois Plaintiff, Illinois Menthol Plaintiff, Illinois Class Members and Illinois Menthol Subclass Members to lose money as a result thereof.

245. The Illinois Plaintiff, Illinois Menthol Plaintiff, Illinois Class Members and Illinois Menthol Subclass Members have been injured as a direct and proximate result of Defendants' wrongful conduct and unjust enrichment. The Illinois Plaintiff, Illinois Menthol Plaintiff, Illinois Class Members and Illinois Menthol Subclass Members would not have purchased, or paid as much for, Natural American Spirit cigarettes if they had known the true facts regarding their natural quality, health, characteristics, and composition.

246. Defendants received a direct benefit from the Illinois Plaintiff, Illinois Menthol Plaintiff, Illinois Class Members and Illinois Menthol Subclass Members in the form of a price premium, increased sales and increased market share.

247. Defendants have received and retained unjust benefits from the Illinois Plaintiff, Illinois Menthol Plaintiff, Illinois Class Members and Illinois Menthol Subclass Members, and inequity has resulted.

248. It is inequitable and unconscionable for Defendants to retain these benefits. Defendants knowingly accepted the unjust benefits of its fraudulent conduct.

249. As a result of Defendants' misconduct, the amount of its unjust enrichment should be disgorged and returned to the Illinois Plaintiff, Illinois Menthol Plaintiff, Illinois Class Members and Illinois Menthol Subclass Members, in an amount to be proven at trial.

**MASSACHUSETTS COUNT I**
**(Unfair And Deceptive Business Practices**
**Mass. Gen. Laws c. 93A, §§ 2 And 9 On Behalf Of The Massachusetts Class)**

250. Plaintiffs reallege and incorporate by reference each preceding paragraph as though fully set forth herein

251. The Massachusetts Plaintiff brings this claim on behalf of the Massachusetts Class.

252. At all relevant times, Defendants were engaged in commerce for purposes of Mass. Gen. Laws c. 93A.

253. Mass. Gen. Laws c. 93A, § 2 provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." G. L. c. 93A, § 9 permits any consumer injured by a violation of c. 93A, § 2 to bring a civil action, including a class action, for damages and injunctive relief.

254. Defendants' misrepresentations and false, deceptive, and misleading statements with respect to Natural American Spirit cigarettes, as described above, constitute unfair and deceptive acts or practices.

255. The Massachusetts Plaintiff and Massachusetts Class Members were injured by Defendants' conduct as alleged herein.

256. The Massachusetts Plaintiff and Massachusetts Class Members suffered damages, including the purchase price of the Natural American Spirit cigarettes they purchased or an amount equal to the price premium Defendants can and do charge as a result of their unfair and deceptive misrepresentations and omissions.

257. Defendants' unfair and deceptive acts or practices, as alleged herein, were and are willful and knowing violations of c. 93A, § 2, within the meaning of c. 93A, § 9(3).

258. On September 6, 2016, the Massachusetts Plaintiff made a demand for relief, in writing, to Defendants, as required by G. L. c. 93A, § 9(3). The demand letter explained in detail the nature of the unfair and deceptive acts or practices, the injuries suffered by the Massachusetts Plaintiff and Massachusetts Class Members, as well as demanding compensation for those injuries and other relief. Defendants failed to tender a reasonable offer of relief in response to Plaintiff's written demand.

259. Based on the foregoing, the Massachusetts Plaintiff and Massachusetts Class Members are entitled to all remedies available pursuant to c. 93A, §9, including, but not limited to actual damages, statutory damages in the amount of $25 per purchase (to the extent that they are greater than actual damages), double or treble damages, disgorgement of Defendants' profits derived from its unlawful activities, injunctive relief, attorneys' fees and other reasonable costs.

## MASSACHUSETTS COUNT II
**(Unjust Enrichment On Behalf Of The Massachusetts Class)**

260. Plaintiffs reallege and incorporate by reference each preceding paragraph as though fully set forth herein.

261. Defendants have been unjustly enriched in retaining the revenues derived from the Massachusetts Plaintiff's and Massachusetts Class Members' purchases of Natural American Spirit cigarettes. Such retention is unjust and inequitable because Defendants misrepresented the facts concerning the natural quality, health, characteristics, and composition of Natural American Spirit cigarettes to the Massachusetts Plaintiff and Massachusetts Class Members, and caused the Massachusetts Plaintiff and Massachusetts Class Members to lose money as a result thereof.

262. The Massachusetts Plaintiff and Massachusetts Class Members have been injured as a direct and proximate result of Defendants' wrongful conduct and unjust enrichment. The

Massachusetts Plaintiff and Massachusetts Class Members would not have purchased, or paid as much for, Natural American Spirit cigarettes if they had known the true facts regarding their natural quality, health, characteristics, and composition.

263. Defendants received a direct benefit from the Massachusetts Plaintiff and Massachusetts Class Members in the form of a price premium, increased sales and increased market share.

264. Defendants have received and retained unjust benefits from the Massachusetts Plaintiff and Massachusetts Class Members, and inequity has resulted.

265. It is inequitable and unconscionable for Defendants to retain these benefits. Defendants knowingly accepted the unjust benefits of their fraudulent conduct.

266. As a result of Defendants' misconduct, the amount of its unjust enrichment should be disgorged and returned to the Massachusetts Plaintiff and Massachusetts Class Members, in an amount to be proven at trial.

**MICHIGAN COUNT I**
**(Violation Of Michigan Consumer Protection Act,**
**Mich. Comp. Laws §§ 445.901, *et seq.* On Behalf Of The Michigan Class)**

267. Plaintiffs reallege and incorporate by reference each preceding paragraph as though fully set forth herein.

268. The Michigan Plaintiff brings this claim for Violations of the Michigan Consumer Protection Act, Mich. Comp. Laws §§ 445.901, et seq. ("Mich. CPA"), on behalf of each member of the Michigan Class.

269. The Michigan Plaintiff and Michigan Class Members are "persons" within the meaning of Mich. Comp. Law § 445.902(c).

270. Natural American Spirit cigarettes are "goods" and "property" that were sold, distributed, designed, packaged, and marketed by Defendants to the Michigan Plaintiff and Michigan Class Members primarily for personal, family, or household purposes within the meaning of Mich. Comp. Law § 445.902(d).

271. The Michigan Plaintiff and Michigan Class Members have suffered a loss because of Defendants' violations of the Mich. CPA.

272. Defendants, by selling, distributing, designing, packaging and marketing the Natural American Spirit cigarettes, as set forth above, engaged in the following unfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce, including but not limited to the following unconscionable, or deceptive methods, acts, or practices in violation of the following subsections of Mich. Comp. Law § 445.903:

(a) Causing a probability of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services by representing that the Natural American Spirit cigarettes and the tobacco within the cigarettes are derived from a natural source when they are not;

(b) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has sponsorship, approval, status, affiliation, or connection that he or she does not have by representing that the Natural American Spirit cigarettes have "Natural," "100% Natural," and/or "Additive-Free" tobacco and other ingredients that they do not have.

(c) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has

sponsorship, approval, status, affiliation, or connection that he or she does not have by representing that the Natural American Spirit cigarettes have characteristics, uses, benefits, and qualities that make them less harmful than other brands of cigarettes when they are not.

(d) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another by representing that Natural American Spirit cigarettes are "Natural," "100% Natural," and/or "Additive-Free" when they are not.

(e) Advertising or representing goods or services with intent not to dispose of those goods or services as advertised or represented by advertising and representing that Natural American Spirit cigarettes are "Natural," "100% Natural," and/or "Additive-Free" when they are not.

(f) Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer by failing to reveal material facts about the ingredients in the Natural American Spirit cigarettes in that they contain ingredients that are not "Natural," not "100% Natural," and/or not "Additive-Free."

(g) Charging the consumer a price that is grossly in excess of the price at which similar property or services are sold by charging a "super premium-price" for the Natural American Spirit cigarettes as a result of representations that Natural American Spirit cigarettes are "Natural," "100% Natural," and/or "Additive-Free" when they are not.

273. The Michigan Plaintiff and Michigan Class Members are bringing a class action to obtain a declaratory judgment that each method, act, or practice described above is unlawful pursuant Mich. Comp. Law § 445.911(1)(a).

274. The Michigan Plaintiff and Michigan Class Members are bringing a class action to enjoin each unlawful method, act, or practice described above pursuant to Mich. Comp. Law § 445.911(1)(b).

275. The Michigan Plaintiff and Michigan Class Members are bringing a class action to recover actual damages or $250.00, whichever is greater, together with reasonable attorneys' fees pursuant to Mich. Comp. Law § 445.911(2).

276. The Michigan Plaintiff and Michigan Class Members are bringing a class action to recover their actual damages pursuant to Mich. Comp. Law § 445.911(3)(a).

277. The Michigan Plaintiff and Michigan Class Members intend to petition the court to require the defendants to bear the cost of notice pursuant to Mich. Comp. Law § 445.911(5).

278. Based on the foregoing, the Michigan Plaintiff and Michigan Class Members are entitled to all remedies available pursuant to the Michigan Consumer Protection Act, including, but not limited to actual damages, statutory damages, disgorgement of Defendants' profits derived from its unlawful activities, declaratory relief, injunctive relief, attorneys' fees and other reasonable costs, including the costs of class notice.

**MICHIGAN COUNT II**
**(Unjust Enrichment On Behalf Of The Michigan Class)**

279. Plaintiffs reallege and incorporate by reference each preceding paragraph as though fully set forth herein.

280. The Michigan Plaintiff brings this claim for unjust enrichment on behalf of each member of the Michigan Class.

281. The elements of a claim for unjust enrichment are (1) receipt of a benefit by the defendant from the plaintiff, and (2) an inequity resulting to plaintiff from defendant's retention of the benefit.

282. The Michigan Plaintiff and Michigan Class Members purchased the Natural American Spirit cigarettes and thereby conferred a benefit on Defendants.

283. Defendants received a direct benefit from the Michigan Plaintiff and Michigan Class Members in the form of a price premium, increased sales and increased market share. An inequity would result to the Michigan Plaintiff and Michigan Class Members from Defendants' retention of the benefit.

284. Such retention is inequitable because Defendant misrepresented the facts concerning the natural quality, health, characteristics, and composition of Natural American Spirit cigarettes to the Michigan Plaintiff and Michigan Class Members causing them to lose money as a result thereof.

285. The Michigan Plaintiff and Michigan Class Members have been injured as a direct and proximate result of Defendants' wrongful conduct and unjust enrichment. The Michigan Plaintiff and Michigan Class Members would not have purchased, or paid as much for, Natural American Spirit cigarettes if they had known the true facts regarding their natural quality, health, characteristics, and composition.

286. Defendants have received and retained unjust benefits from the Michigan Plaintiff and Michigan Class Members, and inequity has resulted.

287. It is inequitable for Defendants to retain these benefits.

288. Defendants knowingly accepted the unjust benefits of their fraudulent conduct.

289. As a result of Defendants' misconduct, the amount of its unjust enrichment should be disgorged and returned to the Michigan Plaintiff and Michigan Class Members in an amount to be proven at trial.

**NEW JERSEY COUNT I**
**(Violation Of The New Jersey Consumer Fraud Act , N.J.S.A. § 56:8-1, *et seq.* On Behalf Of The New Jersey Class And The New Jersey Menthol Subclass)**

290. Plaintiffs reallege and incorporate by reference each preceding paragraph as though fully set forth herein.

291. New Jersey Plaintiff and New Jersey Menthol Plaintiff bring this claim on behalf of each member of New Jersey Class and New Jersey Menthol Subclass.

292. Defendants, by selling, distributing, designing, packaging and marketing the Natural American Spirit cigarettes, as set forth above, engaged in deceptive practices and acts in violation of the New Jersey Consumer Fraud Act.

293. Defendants used unconscionable commercial practices, deception, false pretense, false promises, misrepresentations, or the knowing, concealment, suppression, or omission of material facts with intent that others, including the New Jersey Plaintiff, New Jersey Menthol Plaintiff, New Jersey Class Members and New Jersey Menthol Subclass Members, would rely upon such concealment, suppression or omission, in connection with the sale and advertisement of the Natural American Spirit cigarettes, which are "merchandise" under the New Jersey Consumer Fraud Act.

294. Defendants' misrepresentations and false, deceptive, and misleading statements with respect to Natural American Spirit cigarettes, as described above, constitute deceptive acts or practices.

295. Defendants engaged in an unconscionable commercial practice because Defendants knew the contents and ingredients in the Natural American Spirit cigarettes, and therefore Defendants' sale and labeling of the Natural American Spirit cigarettes demonstrates a lack of good faith, and disregard for honesty and fair dealing.

296. Defendants engaged in acts of omission, including, but not limited to knowing concealment, suppression and omission of material facts, including the true composition of and ingredients in Natural American Spirit cigarettes. Defendant knew the contents and ingredients in each of the Natural American Spirit cigarettes and knew the Natural American Spirit cigarettes were manufactured with unnatural additives. Nonetheless, Defendant knowingly concealed, suppressed, and/or omitted the true contents of the Natural American Spirit cigarettes, given consumers' desire for additive-free, safer, healthier or less harmful cigarettes. Defendants intended that consumers rely upon its incomplete, misleading representations in purchasing the products.

297. The New Jersey Plaintiff, New Jersey Menthol Plaintiff, New Jersey Class Members and New Jersey Menthol Subclass Members suffered an ascertainable loss caused by Defendants' misrepresentations, unconscionable commercial practices, and knowing omissions because (a) they would not have purchased Natural American Spirit cigarettes on the same terms if the true facts concerning their actual composition had been known; and (b) they paid a price premium due to the misrepresentation of the Natural American Spirit cigarettes.

298. Based on the foregoing, the New Jersey Plaintiff, New Jersey Menthol Plaintiff, New Jersey Class Members and New Jersey Menthol Subclass Members are entitled to all remedies available pursuant to the New Jersey Consumer Fraud Act, including, but not limited to actual damages, treble damages, disgorgement of Defendants' profits derived from its unlawful activities, injunctive relief, attorneys' fees and other reasonable costs.

**NEW JERSEY COUNT II**
**(Violations Of The New Jersey Truth-In-Consumer Contract, Warranty And Notice Act "TCCWNA," New Jersey Stat. §§ 56:12-14 To 56:12-18 On Behalf Of The New Jersey Class And The New Jersey Menthol Subclass)**

299. Plaintiffs reallege and incorporate by reference each preceding paragraph as though fully set forth herein.

300. New Jersey Stat. §§ 56:12-15 (the "TCCWNA") provides:

> No seller . . . shall in the course of his business offer to any consumer or prospective consumer or enter into any written consumer contract or give or display any written consumer warranty, notice or sign . . . which includes any provision that violates any clearly established legal right of a consumer or responsibility of a seller, lessor, creditor, lender or bailee as established by State or Federal law at the time the offer is made or the consumer contract is signed or the warranty, notice or sign is given or displayed.

301. The labels and marketing materials for the Natural American Spirit cigarettes are written consumer warranties, notices, and/or signs that are offered, given, and/or displayed to consumers and prospective consumers subject to the TCCWNA.

302. The New Jersey Plaintiff, New Jersey Menthol Plaintiff, New Jersey Class Members and New Jersey Menthol Subclass Members are "consumer[s] or prospective consumer[s]" within the meaning of N.J.S.A. § 56:12-15.

303. Defendants are "sellers" within the meaning of N.J.S.A. § 56:12-15.

304. The right of consumers to truthful and accurate statements on the labels and marketing materials for Natural American Spirit cigarettes, as well as the right to avoid deception caused by false and misleading statements on such labels and marketing materials, are "clearly established legal rights" under N.J.S.A. § 56:8-2.

305. The responsibility of a seller to refrain from the employment of any unconscionable commercial practice, deception, fraud, false pretense, and/or misrepresentation, and to refrain from the knowing concealment, suppression, and/or omission of any material fact with intent that others rely upon such concealment, suppression, and/or omission in connection with the sale of merchandise, and to refrain from selling products with labels that make false statements about the products, is clearly established under N.J.S.A. § 56:8-2.

306. Defendants violated the TCCWNA by implying that Natural American Spirit cigarettes are safer, healthier or less harmful than other cigarettes and that they contain no additives.

307. Pursuant to N.J.S.A. § 56:12-17, Defendants are liable to the New Jersey Plaintiff, New Jersey Menthol Plaintiff, New Jersey Class Members and New Jersey Menthol Subclass Members for civil penalties or for actual damages, or both, at the election of the consumer. In addition, the New Jersey Plaintiff and New Jersey Menthol Plaintiff are entitled to reimbursement for all reasonable attorneys' fees and court costs incurred as a result of bringing this action.

**NEW JERSEY COUNT III**
**(Unjust Enrichment**
**On Behalf Of The New Jersey Class And The New Jersey Menthol Subclass)**

308. Plaintiffs reallege and incorporate by reference each preceding paragraph as

though fully set forth herein.

309. Defendants have been unjustly enriched in retaining the revenues derived from the New Jersey Plaintiff's, New Jersey Menthol Plaintiff's, New Jersey Class Members' and New Jersey Menthol Subclass Members' purchases of Natural American Spirit cigarettes. Such retention is unjust and inequitable because Defendant misrepresented the facts concerning the natural quality, health, characteristics, and composition of Natural American Spirit cigarettes to the New Jersey Plaintiff, New Jersey Menthol Plaintiff, New Jersey Class Members and New Jersey Menthol Subclass Members, and caused the New Jersey Plaintiff, New Jersey Menthol Plaintiff, New Jersey Class Members and New Jersey Menthol Subclass Members to lose money as a result thereof.

310. The New Jersey Plaintiff, New Jersey Menthol Plaintiff, New Jersey Class Members and New Jersey Menthol Subclass Members have been injured as a direct and proximate result of Defendants' wrongful conduct and unjust enrichment. The New Jersey Plaintiff, New Jersey Menthol Plaintiff, New Jersey Class Members and New Jersey Menthol Subclass Members would not have purchased, or paid as much for, Natural American Spirit cigarettes if they had known the true facts regarding their natural quality, health, characteristics, and composition.

311. Defendants received a direct benefit from the New Jersey Plaintiff, New Jersey Menthol Plaintiff, New Jersey Class Members and New Jersey Menthol Subclass Members in the form of a price premium, increased sales and increased market share.

312. Defendants have received and retained unjust benefits from the New Jersey Plaintiff, New Jersey Menthol Plaintiff, New Jersey Class Members and New Jersey Menthol

Subclass Members, and inequity has resulted.

313. It is inequitable and unconscionable for Defendants to retain these benefits.

314. Defendants knowingly accepted the unjust benefits of their fraudulent conduct.

315. As a result of Defendants' misconduct, the amount of its unjust enrichment should be disgorged and returned to the New Jersey Plaintiff, New Jersey Menthol Plaintiff, New Jersey Class Members and New Jersey Menthol Subclass Members, in an amount to be proven at trial.

**NEW MEXICO COUNT I**
**(Violations Of The New Mexico Unfair Practices Act, N.M. Stat. Ann. §§ 57-12-1, *et seq*. On Behalf Of The New Mexico Class And The New Mexico Menthol Subclass)**

316. Plaintiffs reallege and incorporate by reference each preceding paragraph as though fully set forth herein.

317. The New Mexico Plaintiff and New Mexico Menthol Plaintiff bring this claim on behalf of each member of the New Mexico Class and New Mexico Menthol Subclass.

318. Defendants, the New Mexico Plaintiff, New Mexico Menthol Plaintiff, New Mexico Class Members and New Mexico Menthol Subclass Members are or were "person[s]" under the New Mexico Unfair Practices Act, N.M. Stat. Ann. § 57-12-2.

319. Defendants' actions as set forth herein occurred in the conduct of trade or commerce as defined under N.M. Stat. Ann. § 57-12-2.

320. The Unfair Practices Act makes unlawful "a false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale, rental or loan of goods or services . . . by a person in the regular course of the person's trade or commerce, that may, tends to or does deceive or mislead any person," including

but not limited to "failing to state a material fact if doing so deceives or tends to deceive." N.M. Stat. Ann. § 57-12-2(D). Defendants' acts and omissions described herein constitute unfair or deceptive acts or practices under N.M. Stat. Ann. § 57-12-2(D).

321. Defendants' misrepresentations and false, deceptive, and misleading statements with respect to Natural American Spirit cigarettes, as described above, constitute deceptive acts or practices.

322. Defendants also engaged in unlawful trade practices by willfully and knowingly employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, and/or omission of material facts with intent that others rely upon such concealment, suppression, and/or omission, in connection with the sale of Natural American Spirit cigarettes.

323. Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable New Mexico consumers, including the New Mexico Plaintiff, New Mexico Menthol Plaintiff, New Mexico Class Members and New Mexico Menthol Subclass Members, about the true nature of Natural American Spirit cigarettes.

324. Defendants knew or should have known that its conduct violated the Unfair Practices Act.

325. As a consequence of Defendants' wrongful actions, the New Mexico Plaintiff, New Mexico Menthol Plaintiff, New Mexico Class Members and New Mexico Menthol Subclass Members suffered an ascertainable loss of monies based on either the purchase price of Natural American Spirit cigarettes or the price premium Defendants are able to charge, and that the New Mexico Plaintiff, New Mexico Menthol Plaintiff, New Mexico Class Members and

New Mexico Menthol Subclass Members pay, as a direct result of Defendants' deceptive marketing scheme.

326. Defendants' violations present a continuing risk to the New Mexico Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

327. New Mexico Plaintiff, New Mexico Menthol Plaintiff, New Mexico Class Members and New Mexico Menthol Subclass Members seek punitive damages against Defendants because Defendants' conduct was malicious, willful, reckless, wanton, fraudulent, and in bad faith. Defendants fraudulently and willfully misrepresented the ingredients and nature of Natural American Spirit cigarettes, deceived the New Mexico Plaintiff, New Mexico Menthol Plaintiff, New Mexico Class Members and New Mexico Menthol Subclass Members on matters involving a substantial risk of adverse health effects, and concealed material facts that only they knew, all to reap profits from portraying Natural American Spirit cigarettes as a healthy or less harmful cigarette and as additive-free. Defendants' malicious, willful, reckless, wanton, fraudulent, and bad faith conduct warrants punitive damages.

328. Because Defendants' unconscionable, willful conduct caused actual harm to the New Mexico Plaintiff, New Mexico Menthol Plaintiff, New Mexico Class Members and New Mexico Menthol Subclass Members, Plaintiffs seek recovery of actual damages or $100 per purchase, whichever is greater, discretionary treble damages, punitive damages, and reasonable attorneys' fees and costs, as well as all other proper and just relief available under N.M. Stat. Ann. § 57- 12-10.

**NEW MEXICO COUNT II**

**(Violations Of The New Mexico False Advertising Law, N.M. Stat. Ann. §§ 57-15-1, *et seq.* On Behalf Of The New Mexico Class And The New Mexico Menthol Subclass)**

329. Plaintiffs reallege and incorporate by reference each preceding paragraph as though fully set forth herein.

330. Defendants have violated N.M. Stat. Ann. §§ 57-15-1 *et seq.* by falsely advertising Natural American Spirit cigarettes in the conduct of a business, trade, or commerce within the state of New Mexico.

331. The advertising, including labeling, of Natural American Spirit cigarettes was and is misleading in material respects.

332. The advertising of Natural American Spirit cigarettes failed to reveal facts material in the light of such representations with respect to the commodity to which the advertising relates under the conditions prescribed in said advertisement, or under such conditions as are customary or usual.

333. The New Mexico Plaintiff and New Mexico Menthol Plaintiff are bringing this claim as private citizens on behalf of all others similarly situated to restrain and prevent violations of this act. N.M. Stat. Ann. § 57-15-5.

334. This is an exceptional case in which the defendant has willfully engaged in false advertising, thus making an award of costs or attorneys' fees an appropriate remedy. N.M. Stat. Ann. § 57-15-5.

**NEW MEXICO COUNT III**
**(Unjust Enrichment**
**On Behalf Of The New Mexico Class And The New Mexico Menthol Subclass)**

335. Plaintiffs reallege and incorporate by reference each preceding paragraph as though fully set forth herein.

336. Defendants have been unjustly enriched in retaining the revenues derived from New Mexico Plaintiff's, New Mexico Menthol Plaintiff's, New Mexico Class Members' and New Mexico Menthol Subclass Members' purchases of Natural American Spirit cigarettes. Such retention is unjust and inequitable because Defendants misrepresented the facts concerning the natural quality, health, characteristics, and composition of Natural American Spirit cigarettes to the New Mexico Plaintiff, New Mexico Menthol Plaintiff, New Mexico Class Members and New Mexico Menthol Subclass Members, and caused the New Mexico Plaintiff, New Mexico Menthol Plaintiff, New Mexico Class Members and New Mexico Menthol Subclass Members to lose money as a result thereof.

337. The New Mexico Plaintiff, New Mexico Menthol Plaintiff, New Mexico Class Members and New Mexico Menthol Subclass Members have been injured as a direct and proximate result of Defendants' wrongful conduct and unjust enrichment. The New Mexico Plaintiff, New Mexico Menthol Plaintiff, New Mexico Class Members and New Mexico Menthol Subclass Members would not have purchased, or paid as much for, Natural American Spirit cigarettes if they had known the true facts regarding their natural quality, health, characteristics, and composition.

338. Defendants received a direct benefit from the New Mexico Plaintiff, New Mexico Menthol Plaintiff, New Mexico Class Members and New Mexico Menthol Subclass Members in the form of a price premium, increased sales and increased market share.

339. Defendants have received and retained unjust benefits from the New Mexico Plaintiff, New Mexico Menthol Plaintiff, New Mexico Class Members and New Mexico Menthol Subclass Members, and inequity has resulted.

340. It is inequitable and unconscionable for Defendants to retain these benefits.

341. Defendants knowingly accepted the unjust benefits of their fraudulent conduct.

342. As a result of Defendants' misconduct, the amount of its unjust enrichment should be disgorged and returned to the New Mexico Plaintiff, New Mexico Menthol Plaintiff, New Mexico Class Members and New Mexico Menthol Subclass Members, in an amount to be proven at trial.

**NEW YORK COUNT I**
**(Violation Of N.Y. G.B.L. § 349**
**On Behalf Of The New York Class And The New York Menthol Subclass)**

343. Plaintiffs reallege and incorporate by reference each preceding paragraph as though fully set forth herein.

344. The New York Plaintiff and New York Menthol Plaintiff bring this claim on behalf of each member of the New York Class and New York Menthol Subclass.

345. N.Y. G.B.L. § 349 provides, *inter alia*:

> Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful.

346. The New York Plaintiff, New York Menthol Plaintiff, New York Class Members and New York Menthol Subclass Members are consumers who purchased Natural American Spirit cigarettes in New York.

347. As sellers of goods to the consuming public whose conduct affects similarly situated consumers and has a broad impact on consumers at large, Defendants are engaged in consumer-oriented conduct within the intended ambit of G.B.L. § 349.

348. Defendants' misrepresentations and false, deceptive, and misleading statements with respect to Natural American Spirit cigarettes, as described above, constitute deceptive acts or practices in the conduct of business, trade, or commerce in violation of the New York General Business Law.

349. Defendants' deceptive acts were knowing and intentional.

350. Defendants' actions have caused direct, foreseeable, and proximate damages to the New York Plaintiff, New York Menthol Plaintiff, New York Class Members and New York Menthol Subclass Members.

351. As a consequence of Defendants' wrongful actions, the New York Plaintiff, New York Menthol Plaintiff, New York Class Members and New York Menthol Subclass Members suffered ascertainable loss of monies based on either the purchase price of Natural American Spirit cigarettes or the price premium Defendants are able to charge, and that the New York Plaintiff, New York Menthol Plaintiff, New York Class Members and New York Menthol Subclass Members pay, as a direct result of Defendants' deceptive marketing scheme.

352. By reason of the foregoing, Defendants are liable to the New York Plaintiff, New York Menthol Plaintiff, New York Class Members and New York Menthol Subclass Members

for actual damages or fifty dollars ($50) for each sale of Natural American Spirit cigarettes (whichever is greater), injunctive relief, attorneys' fees, and the costs of this suit.

353. The New York Plaintiff, New York Menthol Plaintiff, New York Class Members and New York Menthol Subclass Members further seek to enjoin the unlawful and deceptive acts and practices described above.

354. Absent injunctive relief, Defendants will continue to deceptively market their cigarettes.

**NEW YORK COUNT II**
**(Violation Of N.Y. G.B.L. § 350**
**On Behalf Of The New York Class And The New York Menthol Subclass)**

355. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

356. The N.Y. G.B.L. § 350 provides, *inter alia*:

> False advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful.

357. N.Y. G.B.L. § 350-a defines "false advertising," in relevant part, as "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect."

358. The New York Plaintiff, New York Menthol Plaintiff, New York Class Members and New York Menthol Subclass Members are consumers who purchased Natural American Spirit cigarettes in New York.

359. As sellers of goods to the consuming public, Defendants are engaged in the conduct of business, trade or commerce within the intended ambit of N.Y. G.B.L. § 350.

360. Defendants' representations made by statement, word, design, device, sound, or any combination thereof, and also the extent to which the Defendants' advertising fails to reveal

material facts with respect to Natural American Spirit cigarettes, as described above, constitute false advertising in violation of the New York General Business Law.

361. Defendants' false advertising was knowing and intentional.

362. Defendants' actions have caused direct, foreseeable, and proximate injury to the New York Plaintiff, New York Menthol Plaintiff, New York Class Members and New York Menthol Subclass Members.

363. As a consequence of Defendants' wrongful actions, the New York Plaintiff, New York Menthol Plaintiff, New York Class Members and New York Menthol Subclass Members suffered an ascertainable loss of monies based on either the purchase price of Natural American Spirit cigarettes or the price premium Defendants are able to charge, and that the New York Plaintiff, New York Menthol Plaintiff, New York Class Members and New York Menthol Subclass Members pay, as a direct result of Defendants' deceptive marketing scheme.

364. By reason of the foregoing, Defendants are liable to the New York Plaintiff, New York Menthol Plaintiff, New York Class Members and New York Menthol Subclass Members for actual damages or five hundred dollars ($500) for each sale of Natural American Spirit cigarettes (whichever is greater), injunctive relief, attorneys' fees, and the costs of this suit.

365. The New York Plaintiff, New York Menthol Plaintiff, New York Class Members and New York Menthol Subclass Members further seek to enjoin the false advertising described above.

366. Absent injunctive relief, Defendants will continue to deceptively market Natural American Spirit cigarettes.

**NEW YORK COUNT III**
**(Unjust Enrichment**
**On Behalf Of The New York Class And The New York Menthol Subclass)**

367. Plaintiffs reallege and incorporate by reference each preceding paragraph as though fully set forth herein.

368. Defendants have been unjustly enriched in retaining the revenues derived from the New York Plaintiff's, New York Menthol Plaintiff's, New York Class Members' and New York Menthol Subclass Members' purchases of Natural American Spirit cigarettes. Such retention is unjust and inequitable because Defendant misrepresented the facts concerning the natural quality, health, characteristics, and composition of Natural American Spirit cigarettes to the New York Plaintiff, New York Menthol Plaintiff, New York Class Members and New York Menthol Subclass Members, and caused the New York Plaintiff, New York Menthol Plaintiff, New York Class Members and New York Menthol Subclass Members to lose money as a result thereof.

369. The New York Plaintiff, New York Menthol Plaintiff, New York Class Members and New York Menthol Subclass Members have been injured as a direct and proximate result of Defendants' wrongful conduct and unjust enrichment. The New York Plaintiff, New York Menthol Plaintiff, New York Class Members and New York Menthol Subclass Members would not have purchased, or paid as much for, Natural American Spirit cigarettes if they had known the true facts regarding their natural quality, health, characteristics, and composition.

370. Defendants received a direct benefit from the New York Plaintiff, New York Menthol Plaintiff, New York Class Members and New York Menthol Subclass Members in the form of a price premium, increased sales and increased market share.

371. Defendants have received and retained unjust benefits from the New York Plaintiff, New York Menthol Plaintiff, New York Class Members and New York Menthol Subclass Members, and inequity has resulted.

372. It is inequitable and unconscionable for Defendants to retain these benefits.

373. Defendants knowingly accepted the unjust benefits of their fraudulent conduct.

374. As a result of Defendants' misconduct, the amount of its unjust enrichment should be disgorged and returned to the New York Plaintiff, New York Menthol Plaintiff, New York Class Members and New York Menthol Subclass Members, in an amount to be proven at trial.

**NORTH CAROLINA COUNT I**
**(Violation Of N.C. Gen. Stat. § 75-1.1(a).**
**On Behalf Of The North Carolina Class And The North Carolina Menthol Subclass)**

375. Plaintiffs reallege and incorporate by reference each preceding paragraph as though fully set forth herein.

376. The North Carolina Plaintiff and North Carolina Menthol Plaintiff bring this claim on behalf of each member of the North Carolina Class and North Carolina Menthol Subclass.

377. The North Carolina Unfair and Deceptive Trade Practices Act provides that "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce are declared unlawful." N.C. Gen. Stat. § 75-1.1(a).

378. Defendants' misrepresentations and false, deceptive, and misleading statements with respect to Natural American Spirit cigarettes, as described above, constitute deceptive acts or practices affecting commerce.

379. Defendants knew or should have known that the Natural American Spirit cigarettes do not conform to Defendants' representations and promises.

380. By making these false and misleading misrepresentations and omissions, and by concealing the true facts from the North Carolina Plaintiff, North Carolina Menthol Plaintiff, North Carolina Class Members and North Carolina Menthol Subclass Members, Defendants intended that the North Carolina Plaintiff, North Carolina Menthol Plaintiff, North Carolina Class Members and North Carolina Menthol Subclass Members would rely on its false statements and material omissions, and intended to induce the North Carolina Plaintiff, North Carolina Menthol Plaintiff, North Carolina Class Members and North Carolina Menthol Subclass Members to purchase the Natural American Spirit cigarettes.

381. Defendants' unfair and deceptive conduct, as herein alleged, occurred in the course of the sale of a consumer good, to wit, the Natural American Spirit cigarettes, and thus are "in or affecting commerce," for the purpose of establishing liability under Chapter 75 of the North Carolina General Statutes.

382. As a consequence of Defendants' wrongful actions, the North Carolina Plaintiff, North Carolina Menthol Plaintiff, North Carolina Class Members and North Carolina Menthol Subclass Members suffered an ascertainable loss of monies based on either the purchase price of Natural American Spirit cigarettes or the price premium Defendants are able to charge, and that the North Carolina Plaintiff, North Carolina Menthol Plaintiff, North Carolina Class Members and North Carolina Menthol Subclass Members pay, as a direct result of Defendants' deceptive marketing scheme.

383. Defendants' misrepresentations, material omissions, and/or business practices, as alleged in this Complaint, constitute unfair and/or deceptive acts or practices in violation of the provisions of Chapter 75 of the North Carolina General Statutes.

384. Defendants' misrepresentations, concealments, and/or unfair and deceptive acts or practices proximately caused actual injury/damage to the North Carolina Plaintiff, North Carolina Menthol Plaintiff, North Carolina Class Members and North Carolina Menthol Subclass Members.

385. The North Carolina Plaintiff, North Carolina Menthol Plaintiff, North Carolina Class Members and North Carolina Menthol Subclass Members are entitled to receive compensation for these damages, in an amount to be determined at trial.

386. The North Carolina Plaintiff, North Carolina Menthol Plaintiff, North Carolina Class Members and North Carolina Menthol Subclass Members further seek to enjoin the unlawful and deceptive acts and practices described above.

387. As a direct and proximate result of Defendants' unfair and/or deceptive acts and practices, in or affecting commerce, the North Carolina Plaintiff, North Carolina Menthol Plaintiff, North Carolina Class Members and North Carolina Menthol Subclass Members are entitled to recover treble damages from Defendant, pursuant to N.C. Gen. Stat. § 75-16, and to recover their reasonable attorneys' fees as provided for in N.C. Gen. Stat. § 75-16.1.

**NORTH CAROLINA COUNT II**
**(Unjust Enrichment**
**On Behalf Of The North Carolina Class And The North Carolina Menthol Subclass)**

388. Plaintiffs reallege and incorporate by reference each preceding paragraph as though fully set forth herein.

389. Defendants have been unjustly enriched in retaining the revenues derived from the North Carolina Plaintiff's, North Carolina Menthol Plaintiff's, North Carolina Class Members' and North Carolina Menthol Subclass Members' purchases of Natural American Spirit cigarettes. Such retention is unjust and inequitable because Defendant misrepresented the facts concerning the natural quality, health, characteristics, and composition of Natural American Spirit cigarettes to the North Carolina Plaintiff, North Carolina Menthol Plaintiff, North Carolina Class Members and North Carolina Menthol Subclass Members, and caused the North Carolina Plaintiff, North Carolina Menthol Plaintiff, North Carolina Class Members and North Carolina Menthol Subclass Members to lose money as a result thereof.

390. The North Carolina Plaintiff, North Carolina Menthol Plaintiff, North Carolina Class Members and North Carolina Menthol Subclass Members have been injured as a direct and proximate result of Defendants' wrongful conduct and unjust enrichment. The North Carolina Plaintiff, North Carolina Menthol Plaintiff, North Carolina Class Members and North Carolina Menthol Subclass Members would not have purchased, or paid as much for, Natural American Spirit cigarettes if they had known the true facts regarding their natural quality, health, characteristics, and composition.

391. Defendants received a direct benefit from the North Carolina Plaintiff, North Carolina Menthol Plaintiff, North Carolina Class Members and North Carolina Menthol Subclass Members in the form of a price premium, increased sales and increased market share.

392. Defendants have received and retained unjust benefits from the North Carolina Plaintiff, North Carolina Menthol Plaintiff, North Carolina Class Members and North Carolina Menthol Subclass Members, and inequity has resulted.

393. It is inequitable and unconscionable for Defendants to retain these benefits.

394. Defendants knowingly accepted the unjust benefits of their fraudulent conduct.

395. As a result of Defendants' misconduct, the amount of its unjust enrichment should be disgorged and returned to the North Carolina Plaintiff, North Carolina Menthol Plaintiff, North Carolina Class Members and North Carolina Menthol Subclass Members, in an amount to be proven at trial.

**OHIO COUNT I**
**(Ohio Consumers Sales Practice Act,**
**Ohio Revised Code Chapter 1345 On Behalf Of The Ohio Class)**

396. Plaintiffs reallege and incorporate by reference each preceding paragraph as though fully set forth herein.

397. The Ohio Plaintiff brings this claim on behalf of each member of the Ohio Class.

398. This cause of action is brought pursuant to Ohio's Consumers Sales Practice Act, Ohio Revised Code § 1345, *et seq*.

399. The Ohio Plaintiff and Ohio Class Members are consumers as defined by Ohio Revised Code § 1345.01(D).

400. Defendants are suppliers as defined by Ohio Revised Code §1345.01(C).

401. Defendants' conduct described herein involves consumer transactions as defined in Ohio Revised Code §1345.01(A).

402. Defendants' misrepresentations and false, deceptive, and misleading statements with respect to Natural American Spirit cigarettes, as described above, constitute deceptive acts or practices.

403. Defendants violated and continue to violate the Consumers Sales Practice Act by

engaging in the following practices prohibited by Ohio Revised Code §1345.02 in consumer transactions with the Ohio Plaintiff and Ohio Class Members, which were intended to result in, and did result in, the sale of the Natural American Spirit cigarettes to the Ohio Plaintiff and Ohio Class Members by committing and unfair or deceptive act or practice in connection with a consumer transaction; representing that Natural American Spirit cigarettes have performance characteristics uses, or benefits that they do not have; representing that Natural American Spirit cigarettes are of a particular standard, quality, grade, style, prescription when they are not; and representing that Natural American Spirit cigarettes are being supplied in accordance with a previous representation, when they are not.

404. As a direct and proximate result of Defendants' violation of Ohio Revised Code § 1345.02, the Ohio Plaintiff and Ohio Class Members have suffered actual damages, the full amount of which will be proven at trial.

405. Defendants further violated and continues to violate the Consumers Sales Practice Act by engaging in the following practices proscribed by Ohio Revised Code §1345.03 in consumer transactions with the Ohio Plaintiff and Ohio Class Members, which were intended to result in, and did result in, the sale of the Natural American Spirit cigarettes to the Ohio Plaintiff and Ohio Class Members by engaging in an unconscionable act or practice in connection with a consumer transaction; knowing at the time the consumer transaction was entered into of the inability of the consumer to receive a substantial benefit from the subject of the consumer transaction; and knowingly [making] a misleading statement of opinion on which the consumer was likely to rely to the consumer's detriment.

406. Defendants violated the Consumers Sales Practice Act and Ohio Administrative

Code by representing through its advertisements the Natural American Spirit cigarettes as described above when Defendants knew, or should have known, that the representations and advertisements were false and misleading.

407. As a direct and proximate result of Defendants' violation of Ohio Revised code §1345.03, the Ohio Plaintiff and Ohio Class Members have suffered actual damages, the full extent of which will be proven at trial.

408. Pursuant to Ohio Revised Code §1345.09(A) and Fed. R. Civ. P. 23, the Ohio Plaintiff and Ohio Class Members are entitled to rescind the consumer transactions or recover actual damages, plus an amount not exceeding $5,000 in non-economic damages.

409. Pursuant to Ohio Revised Code §1345.09(D), the Ohio Plaintiff and Ohio Class Members seek an order enjoining the above-described wrongful acts and practices of the Defendants and for restitution and disgorgement.

410. Pursuant to Ohio Revised Code §1345.09(F), the Ohio Plaintiff seeks attorneys fees and costs.

411. Pursuant to Section 1345.09(D), this Complaint will be served upon the Ohio Attorney General.

412. The Ohio Plaintiff and Ohio Class Members reserve the right to allege further violations of Ohio's Consumers Sales Practice Act as Defendants' conduct is ongoing.

**OHIO COUNT II**
**(Ohio's Deceptive Trade Practices Act,**
**Ohio Revised Code Section 4165, *et seq.* On Behalf Of The Ohio Class)**

413. Plaintiffs reallege and incorporate by reference each preceding paragraph as though fully set forth herein.

414. Defendants are persons as defined in Ohio Revised Code §4165.01(D).

415. Defendants' misrepresentations and false, deceptive, and misleading statements with respect to Natural American Spirit cigarettes, as described above, constitute deceptive acts or practices.

416. Defendants are engaged in unfair, deceptive, untrue and misleading advertising in violation of Ohio's Deceptive Trade Practices Act §4165.02 because Defendants are using, and in the past have used, deceptive representations in connection with goods; represent that goods have sponsorship, approval, characteristics, ingredients, uses, benefits that they do not have; represent that goods are of a particular standard, quality, or grade when they are of another; and advertise goods with intent not to sell them as advertised.

417. Defendants' violations of Ohio's Deceptive Trade Practices Act have caused the Ohio Plaintiffs and Ohio Class Members actual damages.

418. The Ohio Plaintiff seeks actual damages and/or equitable relief, attorneys' fees and costs, and to enjoin Defendants on the terms that the Court considers reasonable.

**OHIO COUNT III**
**(Unjust Enrichment On Behalf Of The Ohio Class)**

419. Plaintiffs reallege and incorporate by reference each preceding paragraph as though fully set forth herein.

420. The Ohio Plaintiff brings this Count on behalf of himself and the Ohio Class against all Defendants.

421. Defendants have been unjustly enriched in retaining the revenues derived from the Ohio Plaintiff's and Ohio Class Members' purchases of Natural American Spirit cigarettes. Such retention is unjust and inequitable because Defendant misrepresented the facts concerning

the natural quality, health, characteristics, and/or composition of Natural American Spirit cigarettes to the Ohio Plaintiff and Ohio Class Members, and caused the Ohio Plaintiff and Ohio Class Members to lose money as a result thereof.

422. The Ohio Plaintiff and Ohio Class Members have been injured as a direct and proximate result of Defendants' wrongful conduct and unjust enrichment. The Ohio Plaintiff and Ohio Class Members would not have purchased, or paid as much for, Natural American Spirit cigarettes if they had known the true facts regarding their natural quality, health, characteristics, and composition.

423. Defendants received a direct benefit from the Ohio Plaintiff and Ohio Class Members in the form of a price premium, increased sales and increased market share.

424. Defendants have received and retained unjust benefits from the Ohio Plaintiff and Ohio Class Members, and inequity has resulted.

425. It is inequitable and unconscionable for Defendants to retain these benefits.

426. Defendants knowingly accepted the unjust benefits of their fraudulent conduct.

427. As a result of Defendants' misconduct, the amount of its unjust enrichment should be disgorged and returned to the Ohio Plaintiff and Ohio Class Members, in an amount to be proven at trial.

**WASHINGTON COUNT I**
**(Violation Of The Washington Consumer Protection Act,**
**Wash. Rev. Code Ann. §§ 19.86.010, e*t seq.* On Behalf Of The Washington Class)**

428. Plaintiffs reallege and incorporate by reference each preceding paragraph as though fully set forth herein.

429. The Washington Plaintiffs bring this action on behalf of themselves and the Washington Class against all Defendants.

430. The Washington Consumer Protection Act prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Wash. Rev. Code Ann. § 19.86.020.

431. The Washington Plaintiffs and Washington Class Members are "persons" within the meaning of Wash. Rev. Code Ann. § 19.86.010(1). The Washington Plaintiffs and Washington Class Members each purchased one or more packs of Natural American Spirit cigarettes.

432. Defendants are also "persons" within the meaning of Wash. Rev. Code Ann. § 19.86.010(1).

433. Defendants have violated the Consumer Protection Act by knowingly and intentionally engaging in the untrue, deceptive, and misleading practices described herein, which are unconscionable and which offend public policy and which are immoral, unethical, unscrupulous and substantially injurious to consumers.

434. Defendants' misrepresentations and false, deceptive, and misleading statements with respect to Natural American Spirit cigarettes, as described above, constitute deceptive acts or practices.

435. Defendants intentionally and knowingly misrepresented material facts regarding Natural American Spirit cigarettes with intent to mislead the Washington Plaintiffs and Washington Class Members.

436. Defendants knew or should have known that their conduct violated the Consumer Protection Act.

437. Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Washington Plaintiffs and Washington Class Members, into believing that Natural American Spirit cigarettes were somehow safer, healthier or less harmful than other cigarettes and that they contained no additives and failed to adequately inform the Washington Plaintiffs and Washington Class Members that these cigarettes contain additives, provide no benefits and are just as dangerous as regular cigarettes.

438. Defendants unfair or deceptive trade practices were fraudulently concealed and likely to, and did, deceive reasonable consumers, including the Washington Plaintiffs and Washington Class Members, into believing that Natural American Spirit cigarettes were a safer, healthier or less harmful alternative to other cigarettes and that they contained no additives. Defendants intentionally and knowingly misrepresented and/or omitted material facts regarding its Natural American Spirit cigarettes with the intent of deceiving the Washington Plaintiffs and Washington Class Members.

439. Defendants' violations present a continuing risk to the Washington Plaintiffs and Washington Class Members, as well as to the general public who risk irreparable injury as a result of Defendants' acts and omissions in violation of the Consumer Protection Act. Defendants' unlawful acts and practices complained of herein affect the public interest.

440. The Washington Plaintiffs and Washington Class Members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and their concealment of and failure to disclose material information. The Washington Plaintiffs and Washington Class Members who purchased Natural American Spirit cigarettes would not have purchased those cigarettes, or alternatively, would have paid less for them.

441. As a direct and proximate result of Defendants' violations of the Consumer Protection Act, the Washington Plaintiffs and Washington Class Members have suffered injury-in-fact and/or actual damage.

442. The Washington Plaintiffs and Washington Class Members are entitled to recover three times actual damages, attorneys' fees, costs and other relief under Wash. Rev. Code Ann. § 19.86.090.

443. The Washington Plaintiffs and Washington Class Members also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, declaratory relief, and any other just and proper relief available under the Consumer Protection Act.

**WASHINGTON COUNT II**
**(Unjust Enrichment On Behalf Of The Washington Class)**

444. Plaintiffs reallege and incorporate by reference each preceding paragraph as though fully set forth herein.

445. Defendants have been unjustly enriched in retaining the revenues derived from the Washington Plaintiffs and Washington Class Members' purchases of Natural American Spirit cigarettes. Such retention is unjust and inequitable because Defendant misrepresented the facts concerning the natural quality, health, characteristics, and composition of Natural American Spirit cigarettes to the Washington Plaintiffs and Washington Class Members, and caused the Washington Plaintiffs and Washington Class Members to lose money as a result thereof.

446. The Washington Plaintiffs and Washington Class Members have been injured as a direct and proximate result of Defendants' wrongful conduct and unjust enrichment. The Washington Plaintiffs and Washington Class Members would not have purchased, or paid as much

for, Natural American Spirit cigarettes if they had known the true facts regarding their natural quality, health, characteristics, and composition.

447. Defendants received a direct benefit from the Washington Plaintiffs and Washington Class Members in the form of a price premium, increased sales and increased market share.

448. Defendants have received and retained unjust benefits from the Washington Plaintiffs and Washington Class Members, and inequity has resulted.

449. It is inequitable and unconscionable for Defendants to retain these benefits.

450. Defendants knowingly accepted the unjust benefits of their fraudulent conduct. As a result of Defendants' misconduct, the amount of its unjust enrichment should be disgorged and returned to the Washington Plaintiffs and Washington Class Members, in an amount to be proven at trial.

**NATIONWIDE COUNT I**
**(Express Warranty On Behalf Of The Nationwide Menthol Subclass)**

451. Plaintiffs reallege and incorporate by reference each preceding paragraph as though fully set forth herein.

452. The Nationwide Menthol Plaintiffs bring this claim individually and on behalf of the Nationwide Menthol Subclass against Defendants.

453. Through their labeling of Natural American Spirit menthol cigarettes, Defendants provided the Nationwide Menthol Plaintiffs and Nationwide Menthol Subclass Members with written express warranties including, but not limited to, warranties that the cigarettes contain "100% Additive Free" tobacco.

454. These representations became part of the basis of the bargain between the Nationwide Menthol Plaintiffs and Nationwide Menthol Subclass Members, on one hand, and Defendants, on the other.

455. Defendants breached that warranty because the Natural American Spirit menthol cigarettes do not contain "100% Additive Free" tobacco. Instead, Defendants add menthol to the filters as a means of adding menthol to the tobacco used in Natural American Spirit cigarettes.

456. Defendants made the above-described representations to induce the Nationwide Menthol Plaintiffs and Nationwide Menthol Subclass Members to purchase the Natural American Spirit cigarettes, and Nationwide Menthol Plaintiffs and Nationwide Menthol Subclass Members did so because they believed that the tobacco in these cigarettes did not contain any additives.

457. All conditions precedent to Defendants' liability have been performed by the Nationwide Menthol Plaintiffs and Nationwide Menthol Subclass Members, who paid the premium price charged by Defendants to purchase their cigarettes.

458. The Nationwide Menthol Plaintiffs and Nationwide Menthol Subclass Members were harmed by Defendants' breach of this express warranty because they were deprived of the benefit of their bargain. The Nationwide Menthol Plaintiffs and Nationwide Menthol Subclass Members did not receive the goods as warranted and suffered ascertainable loss of monies based on either the purchase price of Natural American Spirit cigarettes or the price premium Defendants are able to charge, and that the Nationwide Menthol Plaintiffs and Nationwide Menthol Subclass Members pay, as a direct result of Defendants' warranty. Alternatively,

Nationwide Menthol Plaintiffs and Nationwide Menthol Subclass Members would not have purchased the cigarettes had they known that the tobacco contained additives.

459. The Nationwide Menthol Plaintiffs therefore seek an order requiring Defendants to make restitution to them and the Nationwide Menthol Subclass Members.

THEREFORE, Plaintiff prays for relief as set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the other Class members, respectfully request that the Court enter judgment against Defendants as follows:

A. Certifying this action as a class action, with Classes and Subclasses as defined above;

B. Requiring that Defendants pay for notifying the Class members of the pendency of this suit;

C. Awarding Plaintiffs and the Classes injunctive relief;

D. Awarding Plaintiffs and the Classes monetary damages in an amount to be determined at trial, together with prejudgment interest;

E. Awarding Plaintiffs and the Classes statutory damages in the maximum amount provided by law;

F. Awarding Plaintiffs and the Classes restitution of Defendants' ill-gotten gains;

G. Awarding Plaintiffs and the other Classes members the reasonable costs and expenses of suit, including their attorneys' fees; and

H. For any further relief that the Court may deem appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all claims in this action.

Dated: November 15, 2018

Respectfully submitted,

***/s/ Randi McGinn***
Randi McGinn
Kathy Love
**MCGINN, CARPENTER, MONTOYA and LOVE, P.A.**
201 Broadway Boulevard SE
Albuquerque, New Mexico 87102
Telephone: (505) 843-6161
Facsimile: (505) 242-8227
randi@mcginnlaw.com
kathy@mcginnlaw.com

***Liaison Counsel***

**SCHLESINGER LAW OFFICES, P.A.**
Scott P. Schlesinger
Jonathan R. Gdanski
Jeffrey L. Haberman
1212 SE 3rd Avenue
Fort Lauderdale, FL 33316
Telephone: (954) 467-8800
Facsimile: (954) 320-9509
scott@schlesingerlaw.com
jgdanski@schlesingerlaw.com
jhaberman@schlesingerlaw.com

**MORGAN & MORGAN COMPLEX LITIGATION GROUP**
John A. Yanchunis
Scott W. Weinstein
Marisa K. Glassman
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
Telephone: (813) 223-5505
Facsimile: (813) 223-5402
jyanchunis@forthepeople.com
sweinstein@forthepeople.com
mglassman@forthepeople.com

**HALUNEN LAW**
Melissa Wolchansky
Amy E. Boyle
1650 IDS Center 80 South 8th Street
Minneapolis, Minnesota 55402
Telephone: (612) 605-4098
Facsimile: (612) 605-4099
wolchansky@halunenlaw.com
boyle@halunenlaw.com

**ZIMMERMAN REED, LLP**
Caleb Marker
2381 Rosecrans Avenue, Suite 328
Manhattan Beach, CA 90254
Telephone: (877) 500-8780
caleb.marker@zimmreed.com
Hart L. Robinovitch
14646 N. Kierland Blvd., Suite 145
Scottsdale, AZ 85254
Telephone: (800) 493-2827
hart.robinovitch@zimmreed.com

**CUNEO GILBERT & LADUCA, LLP**
Charles J. LaDuca
8120 Woodmont Avenue - Suite 810
Bethesda, Maryland 20814
Telephone: (202) 789-3960
Facsimile: (202) 789-1813
charles@cuneolaw.com

**FINKELSTEIN, BLANKINSHIP, FREI-PEARSON & GARBER, LLP**
D. Greg Blankinship
445 Hamilton Avenue - Suite 605
White Plains, New York 10605
Telephone: (914) 298-3281
Facsimile: (914) 824-1561
gblankinship@fbfglaw.com
jfrei-pearson@fbfglaw.com
tgarber@fbfglaw.com

**PEARSON, SIMON & WARSHAW, LLP**
Daniel L. Warshaw
Alexander R. Safyan
15165 Ventura Boulevard, Suite 400
Sherman Oaks, California 91403
Telephone: (818) 788-8300
Facsimile: (818) 788-8104
dwarshaw@pswlaw.com
asafyan@pswlaw.com

**SEARCY, DENNEY, SCAROLA, BARNHART & SHIPLEY, P.A.**
James W. Gustafson
517 N. Calhoun St.
Tallahassee, FL 32301
Tel: (850) 224-7600
Facsimile: (561) 383-9454
jwg@searcylaw.com

**REESE LLP**
Michael R. Reese
100 West 93rd Street, 16th Floor
New York, New York 10025
Telephone: (212) 643-0500
Facsimile: (212) 253-4272
mreese@reesellp.com

**LEVIN, PAPANTONIO, THOMAS, MITCHELL, RAFFERTY & PROCTOR, P.A.**
Matthew D. Schultz
316 S. Baylen St., Suite 600
Pensacola, FL 32502
Telephone: (850) 435-7140
Facsimile: (850) 436-7141
mschultz@levinlaw.com

**LAW OFFICES OF RONALD A. MARRON**
Ronald A. Marron
651 Arroyo Drive
San Diego, California 92103
Telephone: (619) 696-9006
Facsimile: (619) 564-6665
ron@consumersadvocates.com

***Counsel for Plaintiffs***

**CERTIFICATE OF SERVICE**

I certify that a copy of the foregoing was filed using this Court's CM/ECF service, which will send notification of such filing to all counsel of record on this the 15th day of November, 2018.

***/s/ Randi McGinn***
Randi McGinn

# EXHIBIT C

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

| | |
|---|---|
| IN RE: SANTA FE NATURAL TOBACCO COMPANY MARKETING & SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION<br><br>This Document Relates to All Cases | LEAD CASE NO. MD 16-2695 JB/LF<br><br>**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |

**Exhibit C**

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ..... 1
II. FACTUAL BACKGROUND ..... 6
A. The Rise of NAS Cigarettes ..... 7
B. Defendants Sold Uniformly Labeled NAS Cigarettes During the Class Periods ..... 10
C. Defendants' Uniform Advertising Was Pervasive and Corroborated the "Natural" and "Additive-Free" Label Claims During the Class Periods ..... 11
D. The NAS Brand's PPODs Are "Natural" and "Additive-Free" ..... 12
E. The 2017 Settlement Did Not Change the NAS Brand Identity ..... 20
F. Defendants' Marketing of NAS Cigarettes as "Natural" and "Additive-Free" Led to Significant Increasing Sales in an Otherwise Shrinking Market ..... 22
G. Reasonable Consumers Believe That NAS Cigarettes May Be Less Harmful Because They Are Marketed as "Natural" and "Additive-Free" ..... 23
H. The Disclaimer Did Not Change Reasonable Consumers' Perceptions ..... 28
I. Plaintiffs Will Use Common Proof to Show That NAS Cigarettes Are Not Less Harmful Than Other Cigarettes ..... 31
J. Plaintiffs Can Use Common Proof to Show That Class Members Incurred Pecuniary Injury Because of Defendants' Deceptive Labeling and Advertising ..... 34
K. Plaintiffs Will Use Common Evidence to Prove That NAS Menthol Cigarettes' "Additive-Free" Claim Is Literally False ..... 35
L. Plaintiffs' NAS Cigarettes Purchases Were Typical of Reasonable Consumers ..... 37
III. ARGUMENT ..... 42
A. Plaintiffs Satisfy All Rule 23 Requirements for Class Certification ..... 42
B. Plaintiffs Have Satisfied the Requirements of Rule 23(a) ..... 43
1. The Class Is Sufficiently Numerous ..... 43
2. Common Questions Will Be Answered with Common Evidence ..... 44
3. Plaintiffs' Claims Are Typical ..... 47
4. Adequacy ..... 48
C. The Requirements of Rule 23(b)(3) Are Satisfied ..... 50

1. Predominance ..... 50

(a) Plaintiffs Will Prove the Elements of Their Claims on a Class-Wide Basis Through Evidence Common to the Class ..... 50

(b) Plaintiffs Will Demonstrate Class-Wide Damages Through a Methodology Common to the Class ..... 53

(c) The Elements of Plaintiffs' Claims Are Capable of Class-Wide Proof ..... 59

(i) California Class and California Menthol Subclass ..... 60

(ii) Colorado Class and Colorado Menthol Subclass ..... 64

(iii) Florida Class and Florida Menthol Subclass ..... 66

(iv) Illinois Class and Illinois Menthol Subclass ..... 67

(v) Massachusetts Class ..... 69

(vi) Michigan Class ..... 70

(vii) New Jersey Class and New Jersey Menthol Subclass ..... 71

(viii) New Mexico Class and New Mexico Menthol Subclass ..... 73

(ix) New York Class and New York Menthol Subclass ..... 75

(x) North Carolina Class and North Carolina Menthol Subclass ..... 76

(xi) Ohio Class ..... 77

(xii) Washington Class ..... 78

(i) Nationwide Menthol Subclass ..... 80

2. Superiority ..... 84

D. The Requirements of Rule 23(b)(2) Are Satisfied ..... 85

IV. CONCLUSION ..... 88

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abante Rooter & Plumbing, Inc. v. Alarm.com Inc.*,
No. 15-CV-6314-YGR, 2017 WL 1806583 (N.D. Cal. May 5, 2017) ....56

*Adamson v. Bowen*,
855 F.2d 668 (10th Cir. 1988) ....47

*Alpine Bank v. Hubbell*,
555 F.3d 1097 (10th Cir. 2009) ....65

*Altria Grp., Inc. v. Good*,
555 U.S. 70 (2008) ....78

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013) ....51, 83

*Anderson Living Tr. v. WPX Energy Prod., LLC*,
306 F.R.D. 312 (D.N.M. 2015) (Browning, J.) .... *passim*

*Armijo v. Wal-Mart Stores, Inc.*,
168 P.3d 129 (N.M. Ct. App. 2007) ....74

*In re Arris Cable Modem Consumer Litig.*,
327 F.R.D. 334 (N.D. Cal. 2018) ....55, 61, 62

*Aspinall v. Philip Morris Cos., Inc.*,
813 N.E.2d 476 (Mass. 2004) ....69, 70

*Astiana v. Kashi Co.*,
291 F.R.D. 493 (S.D. Cal. 2013) ....52, 61, 62

*Auto Flat Car Crushers, Inc. v. Hanover Ins. Co.*,
17 N.E.3d 1066 (Mass. 2014) ....69

*Barry v. Arrow Pontiac, Inc.*,
494 A.2d 804 (N.J. 1985) ....72

*Booe v. Shadrick*,
369 S.E.2d 554 (N.C. 1988)....................77

*Carriuolo v. Gen. Motors Co.*,
823 F.3d 977 (11th Cir. 2016)....................66, 67

*CGC Holding Co., LLC v. Broad & Cassel*,
773 F.3d 1076 (10th Cir. 2014)....................50

*Charrons v. Pinnacle Group N.Y. LLC*,
269 F.R.D. 221 (S.D.N.Y. 2010)....................86

*In re Checking Account Overdraft Litig.*,
286 F.R.D. 645 (S.D. Fla. 2012)....................52

*In re Checking Account Overdraft Litig.*,
307 F.R.D. 656 (S.D. Fla. 2015)....................67, 73

*Clark v. TAP Pharm. Prods., Inc.*,
798 N.E.2d 123 (Ill. Ct. App. 2003)....................68

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013)....................50, 53, 55

*In re ConAgra Foods, Inc.*,
90 F. Supp. 3d 919 (C.D. Cal. 2015)....................63, 68, 86

*Cox v. Am. Cast Iron Pipe, Co.*,
784 F.2d 1546 (11th Cir. 1986)....................86

*Cox v. Sears Roebuck & Co.*,
647 A.2d 454 (N.J. 1994)....................72

*Davidson v. Apple, Inc.*,
No. 16-cv-4942, 2018 WL 2325426 (N.D. Cal. May 8, 2018)....................63

*Daye v. Community Financial Service Centers, LLC*,
313 F.R.D. 147 (D.N.M. 2016) (Browning, J.).................... *passim*

*Deposit Guar. Nat'l Bank, Jackson, Miss. v. Roper*,
445 U.S. 326 (1980)....................42

*In re Dial Complete Mktg. & Sales Practices Litig.*,
320 F.R.D. 326 (D.N.H. 2017)....................55

*Disc. Tobacco & Lottery, Inc. v. United States*,
674 F.3d 509 (6th Cir. 2012) ....................5

*Dix v. Am. Bankers Life Assur. Co. of Fla.*,
415 N.W.2d 206 (Mich. 1987) ....................70, 71

*Ebin v. Kangadis Food, Inc.*,
297 F.R.D. 561 (S.D.N.Y. 2014) ....................73

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig.*,
No. 17-MD-2785-DDC-TJJ, 2020 WL 1180550 (D. Kan. Mar. 10, 2020) ....................55

*Erica P. John Fund, Inc. v. Haliburton Co.*,
563 U.S. 804 (2011) ....................50, 60

*Eubanks v. Billington*,
110 F.3d 87 (D.C. Cir. 1997) ....................86

*Ferrell v. Allstate Ins. Co.*,
188 P.3d 1156 (N.M. 2008) ....................81, 82, 83

*Fiser v. Dell Computer Corp.*,
188 P.3d 1215 (N.M. 2008) ....................74

*Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*,
326 F.R.D. 592 (N.D. Cal. 2018) ....................55, 61

*Fitzhenry-Russell v. Dr. Pepper Snapple Grp. Inc.* (*Fitzhenry-Russell II*),
345 F. Supp. 3d 1111 (N.D. Cal. 2018) ....................60

*Fla. Power Corp. v. City of Winter Park*,
887 So. 2d 1237 (Fla. 2004) ....................67

*Garcia v. Medved Chevrolet, Inc.*,
263 P.3d 92 (Colo. 2011) ....................65

*Gen. Tel. Co. of Sw. v. Falcon*,
457 U.S. 147 (1982) ....................47

*Goldemberg v. Johnson & Johnson Consumer Cos., Inc.*,
317 F.R.D. 374 (S.D.N.Y. 2016) ....................75

*Gonzalez v. Wilshire Credit Corp.*,
25 A.3d 1103 (N.J. 2011) ....................72

*Gray v. Hearst Commc'ns, Inc.*,
444 F. App'x 698 (4th Cir. 2011) ....................77

*Gray v. N. Carolina Ins. Underwriting Ass'n*,
529 S.E.2d 676 (N.C. 2000)....................76, 77

*Grays Harbor Adventist Christian Sch. v. Carrier Corp.*,
242 F.R.D. 568 (W.D. Wash. 2007) ....................80

*Guidance Endodontics, LLC v. Dentsply Int'l, Inc.*,
663 F. Supp. 2d 1138 (D.N.M. 2009) (Browning, J.)....................80

*Guidance Endodontics, LLC v. Dentsply Int'l, Inc.*,
728 F. Supp. 2d 1170 (D.N.M. 2010) (Browning, J.)....................74

*Gulf Oil Co. v. Bernard*,
452 U.S. 89 (1981)....................42

*Hadley v. Kellogg Sales Co.*,
324 F. Supp. 3d 1084 (N.D. Cal. 2018) ....................52, 54

*Hamilton v. TBC Corp.*,
328 F.R.D. 359 (C.D. Cal. 2018)....................65

*Harris Grp., Inc. v. Robinson*,
209 P.3d 1188 (Colo. App. 2009)....................65

*Hartford Cas. Ins. Co. v. J.R. Mktg., L.L.C.*,
353 P.3d 319 (Cal. 2015) ....................62

*People ex rel. Hartigan v. E. & E. Hauling, Inc.*,
607 N.E.2d 165 (Ill. 1992)....................68

*Hasemann v. Gerber Prods. Co.*,
331 F.R.D. 239 (E.D.N.Y. 2019)....................75, 76

*Hebert v. Vantage Travel Serv., Inc.*,
334 F.R.D. 362 (D. Mass. 2019)....................70

*HPI Health Care Servs., Inc. v. Mt. Vernon Hops., Inc.*,
545 N.E.2d 672 (Ill. 1989)....................68

*Johnson v. Microsoft Corp.*,
834 N.E.2d 791 (Ohio 2005) ....................78

*Kauffman v. New England Fitness S., Inc.*,
No. A-1789-17T1, 2019 WL 1752922 (N.J. Super. Ct. App. Div. Apr. 17, 2019) ....72

*Kaye v. Grossman*,
202 F.3d 611 (2d Cir. 2000)....76

*Kelley v. Microsoft Corp.*,
251 F.R.D. 544 (W.D. Wash. 2008) ....79

*Kent Motor Cars, Inc. v. Reynolds & Reynolds Co.*,
207 N.J. 428, 25 A.3d 1027 (N.J. 2011) ....72

*Khoday v. Symantec Corp.*,
93 F. Supp. 3d 1067 (D. Minn. 2015)....55

*Kumar v. Salov N. Am. Corp.*,
No. 14-cv-2411, 2016 WL 3844334 (N.D. Cal. July 15, 2016) ....60, 61, 62

*Kurtz v. Kimberly-Clark Corp.*,
321 F.R.D. 482 (E.D.N.Y. 2017)....56

*Landstar Express Am., Inc. v. Nexteer Auto. Corp.*,
900 N.W.2d 650 (Mich. Ct. App. 2017) ....71

*Lane v. Page*,
272 F.R.D. 558 (D.N.M. 2011) (Browning, J.)....43

*Lewis v. Lewis*,
189 P.3d 1134 (Colo. 2008)....65

*Linkage Corp. v. Trustees of Boston Univ.*,
679 N.E.2d 191 (Mass. 1997) ....69

*Lliadis v. Wal-Mart Stores, Inc.*,
922 A.2d 710 (N.J. 2007)....72

*Lowery v. City of Albuquerque*,
273 F.R.D. 668 (D.N.M. 2011) (Browning, J.)....43, 48

*Mantikas v. Kellogg Co.*,
910 F.3d 633 (2d Cir. 2018)....29

*Marrone v. Philip Morris USA, Inc.*,
850 N.E.2d 31 (Ohio 2006) ....78

*Menocal v. GEO Grp., Inc.*,
882 F.3d 905 (10th Cir. 2018) ....................44, 65

*In re Mercedes-Benz Tele Aid Contract Litig.*,
257 F.R.D. 46 (D.N.J. 2009)....................73

*Metropolitan Life Ins. Co. v. Cotter*,
984 N.E.2d 835 (Mass. 2013) ....................69

*Miller v. Basic Research, LLC*,
285 F.R.D. 647 (D. Utah 2010) ....................45

*Morse v. Bankers Life & Cas. Co.*,
No. 99 C 0193, 2000 WL 246245 (N.D. Ill. Feb. 24, 2000)....................68

*In re Motor Fuel Temperature Sales Practices Litig.*,
292 F.R.D. 652 (D. Kan. 2013)....................45, 86, 87

*Mulford v. Altria Group, Inc.*,
242 F.R.D. 615 (D.N.M. 2007) (Vazquez, J.)....................45

*Naylor Farms, Inc. v. Chaparral Energy, LLC*,
923 F.3d 779 (10th Cir. 2019) ....................53, 54

*Nelson v. Mead Johnson Nutrition Co.*,
270 F.R.D. 689 (S.D. Fla. 2010)....................67

*Nowell v. Medtronic Inc.*,
372 F. Supp. 3d 1166 (D.N.M. 2019) (Browning, J.)....................81, 83

*In re OnStar Contract Litig.*,
278 F.R.D. 352 (E.D. Mich. 2011) ....................71

*Ontiveros Insulation Co. v. Sanchez*,
3 P.3d 695 (N.M. Ct. App. 2000) ....................74

*Overka v. Am. Airlines, Inc.*,
265 F.R.D. 14 (D. Mass. 2010)....................70

*Panag v. Farmers Ins. Co. of Washington*,
204 P.3d 885 (Wash. 2009)....................79

*Payne v. Tri-State CareFlight, LLC*,
332 F.R.D. 611 (D.N.M. 2019) (Browning, J.).................... *passim*

*Pearce v. Am. Def. Life Ins. Co.*,
343 S.E.2d 174 (N.C. 1986) ... 77

*Philadelphia Indem. Ins. Co. v. Chicago Title Ins. Co.*,
771 F.3d 391 (7th Cir. 2014) ... 68

*PNR, Inc. v. Beacon Prop. Mgmt., Inc.*,
842 So. 2d 773 (Fla. 2003) ... 66

*Reichert v. Keefe Commissary Network, L.L.C.*,
331 F.R.D. 541 (W.D. Wash. 2019) ... 48, 49, 79

*Rhino Linings USA, Inc. v. Roby Mountain Rhino Lining, Inc.*,
62 P.3d 142 (Colo. 2003) ... 64

*Ries v. Ariz. Beverages USA, LLC*,
287 F.R.D. 523 (N.D. Cal. 2012) ... 87

*Rikos v. Procter & Gamble Co.*,
799 F.3d 497 (6th Cir. 2015) ... 52, 68

*Robey v. Parnell*,
392 P.3d 642 (N.M. Ct. App. 2017) ... 80

*Robinson v. Colo. State Lottery Div.*,
179 P.3d 998 (Colo. 2008) ... 65

*Rodriguez v. It's Just Lunch, Int'l*,
300 F.R.D. 125 (S.D.N.Y. 2014) ... 76

*Sali v. Corona Reg'l Med. Ctr.*,
909 F.3d 996 (9th Cir. 2018) ... 56

*Sanchez-Knutson v. Ford Motor Co.*,
310 F.R.D. 529 (S.D. Fla. 2015) ... 55

*In re Santa Fe Natural Tobacco Co. Mktg., Sales Practices, & Prods. Liab. Litig.*,
Case MDL No. 2695 (J.P.M.L. Jan. 27, 2016) ... 13, 18, 82

*Schnall v. AT & T Wireless Servs., Inc.*,
259 P.3d 129 (Wash. 2011) ... 79

*In re Scotts EZ Seed Litig.*,
304 F.R.D. 397 (S.D.N.Y. 2015) ... 75, 76

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
559 U.S. 393 (2010)....78

*Shook v. Bd. of Cty. Comm'n, Cty. of El Paso*,
543 F.3d 597 (10th Cir. 2008)....85

*Shumaker v. Hamilton Chevrolet, Inc.*,
920 N.E.2d 1023 (Ohio Ct. App. 2009)....78

*Simon v. Philip Morris, Inc.*,
124 F. Supp. 2d 46 (E.D.N.Y. 2000)....82

*Smilow v. Sw. Bell Mobile Sys., Inc.*,
323 F.3d 32 (1st Cir. 2003)....70

*Stevenson v. Louis Dreyfus Corp.*,
811 P.2d 1308 (N.M. 1991)....74

*Stutman v. Chemical Bank*,
731 N.E.2d 608 (N.Y. 2000)....75

*Suchanek v. Sturm Foods, Inc.*,
764 F.3d 750 (7th Cir. 2014)....51

*In re Terazosin Hydrochloride Antitrust Litig.*,
220 F.R.D. 672 (S.D. Fla. 2004)....52, 67, 71

*Tkachik v. Mandeville*,
790 N.W.2d 260 (Mich. 2010)....71

*Trevizo v. Adams*,
455 F.3d 1155 (10th Cir. 2006)....43

*Tylka v. Gerber Prods. Co.*,
178 F.R.D. 493 (N.D. Ill. 1998)....69

*Tyson Foods, Inc. v. Bouaphakeo*,
136 S. Ct. 1036 (2016)....54

*United Consumer Fin. Servs. Co. v. Carbo*,
982 A.2d 7 (N.J. Ct. App. 2009)....73

*United States v. Philip Morris USA, Inc.*,
449 F. Supp. 2d 1 (D.D.C. 2006)....5, 7, 87

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011)....................42

*Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc.*,
725 F.3d 1213 (10th Cir. 2013)....................48

*Whitaker v. M.T. Auto., Inc.*,
855 N.E.2d 825 (Ohio 2006)....................78

*Williams v. Gerber Prods. Co.*,
552 F.3d 934 (9th Cir. 2008)....................29

*Yazzie v. Ray Vickers' Special Cars, Inc.*,
180 F.R.D. 411 (D.N.M. 1998)....................74

*Young v. Young*,
191 P.3d 1258 (Wash. 2008)....................79

*Zlotnick v. Premier Sales Group, Inc.*,
480 F.3d 1281 (11th Cir. 2007)....................66

*In re Zurn Pex Plumbing Prod. Liab. Litig.*,
644 F.3d 604 (8th Cir. 2011)....................56

**Statutes**

28 U.S.C. § 1407....................82

Colo. Rev. Stat. §§ 6-1-105(e), (g)....................64

Colorado Consumer Protection Act, Colo. Rev. Stat. § 6-1-101, *et seq.*....................64

Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.*....................60, 87

False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq.*....................60

Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq.*....................66, 67

Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1,
*et seq.*....................67, 68, 69

Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/1, *et seq.*....................67, 68, 69

Mass. Gen. Laws Ch. 93A....................69, 70

Michigan Consumer Protection Act, Mich. Comp. Laws § 445.901 *et seq.*....................70, 71

N.M. Stat. § 55-2-313 ....................81

New Jersey Consumer Fraud Act, N.J. Stat. § 56:8-1 et seq. ....................71, 72, 73

New Jersey Truth-in-Consumer Contract, Warranty and Notice Act, N.J. Stat. §§ 56:12-14 to 56:12-18....................71, 72, 73

New Mexico False Advertising Act, N.M. Stat. § 57-15-1 *et seq.* ....................73, 74

New Mexico Unfair Practices Act, N.M. Stat. § 57-12-1 *et seq.*....................73, 74

New York General Business Law § 349....................75, 76

New York General Business Law § 350....................75

North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1(a) ....................76

Ohio's Consumers Sales Practices Act, Ohio Revised Code § 1345....................77

Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*....................60, 87

Washington Consumer Protection Act, Wash. Rev. Code §§ 19.86.010, *et seq.* ....................79, 80

**Other Authorities**

Fed. R. Civ. P. 23(a) ....................43, 44, 47, 48, 49

Fed. R. Civ. P. 23(b)(2)....................84, 85, 86, 87

Fed. R. Civ. P. 23(b)(3)....................84, 85

Fed. R. Civ. P. 49(a) ....................85

Fed. R. Civ. P. 23(g) ....................49

Restatement (Second) of Conflict of Laws (1971) ....................81

## I. INTRODUCTION

> The cigarette is the deadliest artifact in the history of human civilization. Cigarettes today cause about 500,000 deaths per year just in the United States, and that number has grown dramatically over time. Cigarettes killed only about 30 *thousand* Americans in the nineteenth century, whereas cigarettes killed about 30 *million* Americans in the twentieth century. That thousand-fold increase in cigarette death is largely the result of three historical forces: mass production, mass marketing, and mass deception.

Decl. of Melissa S. Weiner in Supp. of Pls.' Mot. for Class Certification ("Weiner Decl.") Ex. 1 (Proctor Report 2).

This case addresses the mass deception of Natural American Spirit cigarettes ("NAS Cigarettes"), made and marketed by Defendants Santa Fe Natural Tobacco Company ("Santa Fe"), R.J. Reynolds Tobacco Company ("RJR") and Reynolds American, Inc. ("RAI").

Defendants have capitalized on the misperception that cigarettes made with "natural" tobacco that is "additive-free" may be less harmful than other cigarettes. Weiner Decl. Ex. 2 (Graph of Increased Market Share, 2002 – Present). While overall cigarette consumption in the U.S. is declining, sales of NAS Cigarettes have been rapidly growing because reasonable consumers are misled by Defendants' uniform misrepresentations. Proctor Report 61 (Figure 1); Weiner Decl. Ex. 3 (SF_MDL0015708-5710). As the U.S. Food and Drug Administration ("FDA") concluded: NAS Cigarette descriptors ("100% Additive Free" and "Natural Tobacco") caused consumers to rate the product lower in terms of comparative risk and comparative harm, and Defendants' disclaimer that "No additives in our tobacco does NOT mean a safer cigarette" (the "Disclaimer") did not mitigate the effects of the health reassurance. Weiner Decl. Ex. 4 (FDA 2015 NAS Report).

The uniformity and pervasiveness of Defendants' deceptive conduct will be proven through reliable expert testimony, peer-reviewed studies, and Defendants' own documents and employees' testimony. Plaintiffs' experts include Dr. Robert Proctor, a Professor of the History of Science at Stanford University, leading authority on tobacco industry conduct, and scientific reviewer of the 2014 U.S. Surgeon General's fiftieth anniversary report on the health consequences of smoking. *See* Proctor Report 2-4. Dr. Proctor provides a historical overview of the tobacco industry's decades-long fraudulent health reassurance campaigns, and he opines that Defendants' use of "natural," "additive-free," and their substitutes in the labeling and advertising of NAS Cigarettes implies that those cigarettes are less harmful than others. *See generally id.* Additionally, Dr. Jennifer Pearson, an Assistant Professor at the School of Community Health Services at the University of Nevada and an Adjunct Assistant Professor at the Johns Hopkins Bloomberg School of Public Health, opines that most smokers of NAS Cigarettes erroneously believe that NAS Cigarettes may be less harmful than other cigarettes; that descriptors like "natural" and "additive-free" affect misperceptions about the harmfulness of NAS Cigarettes; that it is common to believe that the harmful aspects of cigarettes come from "additives"; and that the Disclaimer does not correct misperceptions. *See generally* Weiner Decl. Ex. 5 (Pearson Report). Dr. Michael Cummings, a Professor in the Department of Psychiatry and Behavioral Sciences and co-leader of the Tobacco Research Program in the Hollings Cancer Center at the Medical University of South Carolina, opines that there is no evidence NAS Cigarettes are less harmful than others; that the imagery, text, and brand descriptors used in NAS Cigarette marketing contributed to NAS consumers falsely perceiving that their NAS Cigarettes may be less harmful than other brands of cigarettes; and that the Disclaimer is not effective in correcting product misperceptions. *See*

*generally* Weiner Decl. Ex. 6 (Cummings Report). Dr. Timothy Dewhirst, an Associate Professor and Senior Research Fellow in Marketing and Public Policy in the Department of Marketing and Consumer Studies at the University of Guelph, opines that NAS Cigarettes' marketing employed common marketing techniques, including an overriding focus on the primary point of differentiation ("PPOD") that NAS Cigarettes are "100% additive-free" and "natural" (such as the description "100% additive-free natural tobacco"); that these PPODs drove trial and sales at a premium price; and that Defendants supported their PPODs by promoting harmonious aspects of brand identity, such as the company's focus on sustainability and "eco-consciousness." *See generally* Weiner Decl. Ex. 7 (Dewhirst Report). Finally, Dr. Jean-Pierre Dubé, the Sigmund E. Edelstone Professor of Marketing at the University of Chicago Booth School of Business, confirms that damages can be calculated on a class-wide basis by utilizing a conjoint analysis to calculate class members' economic damages by measuring both the price premium associated with Defendants' misleading representations and consumers' willingness to pay for the perceived benefits associated with those representations. *See generally* Weiner Decl. Ex. 8 (Dubé Report).

This case is perfectly suited for class certification. During the class periods,[1] Defendants uniformly labeled every pack of NAS Cigarettes to convey to consumers that they may be less harmful than other cigarettes by labeling them as "natural," including in the brand name.

[1] Because the statutes of limitations vary under different states' laws, so do the class periods. Based on the longest applicable limitations period for each state, and the initial filing date of the first complaint of September 30, 2015, the class periods are September 30, 2009 to the present for the Nationwide Menthol Subclass, New York Class, New Mexico Class, New Jersey Class, Michigan Class, and Massachusetts Class; September 30, 2010 to the present for the Illinois Class; September 30, 2011 to the present for the California Class, Florida Class, and Washington Class; September 30, 2012 to the present for the Colorado Class; and September 30, 2013 to the present for the Ohio Class.

Additionally, until 2017, every single pack also conveyed to consumers that the tobacco was "additive-free."[2] Defendants poured millions of dollars into a national marketing campaign with a primary message that NAS Cigarettes are made with natural, additive-free tobacco. Every element of Defendants' labeling and marketing campaign served to reinforce that message.

At class certification, Plaintiffs need not answer every fact and liability question at issue. Rather, Plaintiffs must, and do, present common questions as to whether (1) Defendants' marketing and labeling of the NAS Cigarettes was uniform and commonly presented to class members and (2) reasonable consumers were misled that the NAS Cigarettes may be less harmful than other cigarettes. Plaintiffs present common evidence to answer those questions, which predominate over any individualized issues. Finally, Plaintiffs demonstrate that class-wide damages can be calculated based on a methodology that does not vary from class member to class member.

Plaintiffs present extensive evidence that reasonable consumers understand from these prominent and conspicuous messages that NAS Cigarettes may be less harmful than other cigarettes, because they believe that a cigarette with natural tobacco that is without additives is less harmful than non-natural cigarettes with additives. The FDA conducted a thorough and careful study, and it determined that consumers do, in fact, believe that NAS Cigarettes conveyed modified

[2] Demonstrating that the additive-free message is misleading, Defendants and the FDA reached a settlement in 2017, pursuant to which Defendants removed the "additive-free" message from labels and advertising. *See* Weiner Decl. Ex. 9 (FDA Settlement). However, the name of the product remains "Natural American Spirits," and the natural message is still central and prominent. In addition, as set forth below, aware that their use of "additive-free" was likely to be the subject of regulatory action, Defendants long planned on swapping the phrase "Tobacco ingredients: tobacco and water" in place of "additive-free" because it meant the same thing to consumers.

risk because they are marketed as being made with natural tobacco that is additive-free and the Disclaimer does not offset the influence of the descriptors. *See* Weiner Decl. Ex. 4 (FDA 2015 NAS Report). Reliable peer-reviewed scientific studies reach the same conclusion. *See infra* §§ II.G, E. The same is true for the tobacco industry, which long knew that smokers considered a natural or additive-free cigarette to be less harmful. *See infra* § II.A. And the courts agreed. *See United States v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 1, 27 (D.D.C. 2006) (enjoining RJR from marketing cigarettes as "natural" because it "implicitly convey[s] to the smoker and potential smoker that they are less hazardous to health"); *Disc. Tobacco & Lottery, Inc. v. United States*, 674 F.3d 509, 536 (6th Cir. 2012) ("[C]ommon sense dictates the conclusion that [consumers who prefer natural or organic products] prefer such products *precisely because they believe that natural and organic products confer health advantages over conventional products*." (emphasis added)).

However, there is no dispute that NAS Cigarettes are *not* less harmful than other cigarettes. If anything, NAS Cigarettes may be more harmful because on average they deliver more nicotine and certain carcinogenic compounds than most other cigarettes. Nonetheless, because Defendants market NAS Cigarettes with the central message that they are made with natural tobacco that is additive-free, and because consumers are willing to, and do, pay more for cigarettes that may be less harmful, NAS Cigarettes sell at a substantially higher price than they would but for Defendants' misleading use of the terms "natural" and "additive-free."

Using common proof, Plaintiffs will establish each element of their consumer protection, warranty, and unjust enrichment claims. First, Plaintiffs will prove that the primary brand attribute that drives sales of NAS Cigarettes is the promise of natural, additive-free tobacco. They will do so using (1) Defendants' internal studies and analyses, which conclude that the "natural" and

"additive-free" attributes are the main driver of NAS Cigarette sales, and (2) Plaintiffs' experts' opinions. Second, Plaintiffs will prove that reasonable consumers believe that NAS Cigarettes may be less harmful than other cigarettes because of the "natural" and "additive-free" claims. They will do so using a plethora of peer-reviewed scientific studies, expert testimony, and industry documents. Third, Plaintiffs will prove that consumers overpay for NAS Cigarettes as a direct result of Defendants' misrepresentations, and they will do so using Defendants' internal studies and analysis. Plaintiffs also proffer an economics expert who will use a conjoint analysis to isolate the price premium attributable to Defendants' misleading natural and additive-free message and, separately, consumers' willingness to pay for the perceived benefits associated with those representations. Finally, Plaintiffs will prove entitlement to injunctive relief because, absent an injunction, class members will continue to be deceived.

Plaintiffs now seek certification of the following classes: the California Class and California Menthol Subclass, the Colorado Class and Colorado Menthol Subclass, the Florida Class and Florida Menthol Subclass, the Illinois Class and Illinois Menthol Subclass, the Massachusetts Class, the Michigan Class, the New Jersey Class and New Jersey Menthol Subclass, the New Mexico Class and New Mexico Menthol Subclass, the New York Class and New York Menthol Subclass, the North Carolina Class and North Carolina Menthol Subclass, the Ohio Class, the Washington Class, and the Nationwide Menthol Subclass.[3] *See* Second Am. Consolidated Class Action Compl. ¶¶ 107-127, ECF No. 219 ("SAC") (defining classes).

## II. FACTUAL BACKGROUND

[3] Plaintiffs seek certification of the state menthol subclasses only in the alternative to the Nationwide Menthol Subclass.

A. **The Rise of NAS Cigarettes**

Cigarettes are dangerous by design: their smoke is designed to be inhaled, and the cigarette industry worked to make smoke progressively easier to inhale. Proctor Report 7. Second, inhaleability—routing smoke through the lungs to the brain—causes addiction. *Id.* Cigarettes are as addictive as heroin and cocaine. *Id.* at 8. The nicotine in cigarettes is carefully calibrated: kept at levels sufficient to create and sustain addiction. *Id.* at 7.

The tobacco industry has celebrated the success of nicotine addiction since the 1950s. *Id.* In 1953, industry leaders met at the Plaza Hotel in New York City to plan a response to growing evidence that cigarette smoke caused disease, especially lung cancer. *Id.* at 6. A research director present commented, with regard to cigarette smokers, that "fortunately for us, it's a habit they can't break." *Id.* at 7. That meeting kicked off an industry movement to deceive the public, including with claims that cigarettes with certain novel design features were safer than conventional cigarettes. *Id.* at 6.

> Over the course of the twentieth century, many different tricks were used to get people to smoke cigarettes advertised as having safer-seeming novelties. The most important of these reassurance gimmicks were: toasting (of the leaf, said to drive off poisons), menthols (said to lessen irritation), king sizes (said to "travel the smoke," trapping poisons), filters (said to trap poisons), low tars (said to reduce the toxic dose), lights (ditto), ultralights (ultra-ditto), milds (to reduce irritation), slims (to prevent obesity), and cigarettes advertised as "natural," "organic," or "additive free" (to yield a "cleaner smoke" free of "chemicals"). None of these made cigarettes any safer, but all were used to reassure the public that smoking a cigarette with one or another of these features would prove less deadly than some alternative product. Which was false.

*Id.* at 6-7; *see also id.* at 28-42; Mem. Op. & Order. 167-68, ECF No. 146 ("MTD Order") ("The terms natural and organic have long been used across the country to convey products' health benefits. Additives have also long been known to or believed to potentially increase health risks.

With that backdrop, the reasonable consumer is not expected to defy decades of marketing, which has conveyed that natural, organic, and additive-free products are healthier." (citations omitted)).

NAS Cigarettes were first manufactured in 1985. Proctor Report 9. Santa Fe's original founders believed that an additive-free cigarette would prove less harmful than the chemicalized brands cranked out by "Big Tobacco." *Id.* at 11-12. This belief gained popularity in the 1970s and '80s, in response to growing fears that "chemicals" in food and water were causing cancer and other maladies. During that time, various press articles even decried the "chemicals" being added to cigarettes. *Id.* at 12. The release of the industry's previously confidential list of 600 cigarette additives in 1994 further popularized this belief. *Id.* at 28. "Publicity of this long and frightening list of additives made it easier to believe that the true horror of cigarettes lay in their myriad additives." *Id.*

"Big Tobacco" was dialed into this sentiment as well. In 1984, the American Tobacco Company commissioned a detailed study of attitudes toward cigarettes made from "additive-free" tobacco. It found that the "no additives" proposition had "significant appeal," due to the fact that "a 'no additives' cigarette has large health implications." *Id.* at 20. The study "recognized that smokers needed 'reassurances,' and that a 'no additives' cigarette could have relevancy 'to fully 1 of every 2 smokers,' especially when conjoined with marketing themes like 'fine tobacco' and 'natural ingredients.'" *Id.* In exploring an "all natural" cigarette in the 1990s, Philip Morris explained: "'Natural' has never been a more compelling word than it is today—in areas of nutrition and health. Its expanded meaning in advertising and labelling has become a by-word for quality and wholesomeness." *Id.* at 15.

Accordingly, between the 1970s and '90s, major industry players developed or planned to develop "natural," "organic," or "additive-free" cigarettes.

- RJR, in 1972, proposed a tobacco product that was "100% natural tobacco, containing no flavoring, no preservatives, no chemicals." *Id.* at 13.
- RJR launched its "Real" cigarette brand and advertised it as "additive-free" to acquire business from "highly concerned urbane smokers," meaning the "worrier" segment of smokers with "health concerns." *Id.* at 14.
- Brown and Williamson marketed its Kool Natural Menthol brand as "natural." *Id.*
- Philip Morris contemplated a Marlboro Natural brand, a Player's Navy Cut natural, or a new free-standing brand that would tout "quality" and "wholesomeness." *Id.* at 15.
- Lorillard tested a "natural" line extension for its low-tar True brand to convert it to a "No Additive (all natural)" brand. *Id.* at 16.
- Nat Sherman (later acquired by Philip Morris's parent company, Altria) sold a brand called "Naturals" advertised as "100% Natural." *Id.* at 15.

By the late '90s the tobacco industry took notice of NAS Cigarettes' health-based appeal. Brown and Williamson hired consultants to research NAS Cigarettes, which found that a key selling point drawing smokers to the brand was their perception as being less harmful. *Id.* at 17. Safety and quality were intertwined in this appeal, much like natural foods advertised as "all natural" or with "no chemical additives," which imply that such a brand "might not be as bad for you." *Id.* Philip Morris recognized that NAS Cigarettes were marketed and perceived as a "safer" cigarette as "they were additive free and therefore a more healthful cigarette." *Id.* at 23. RJR launched its "Winston Natural" brand, advertised as "No Additives" and "No Bull," to capture the success of NAS Cigarettes' rapid market growth. *Id.* at 17. Santa Fe employed a top-down strategy of taking advantage of the country's "increasing demand for healthier products." *Id.* at 25.

After years of monitoring its success, RAI purchased Santa Fe in 2002. *Id.* at 58. It believed Santa Fe was "in an excellent position" to handle "the pressure . . . against the tobacco industry as a whole because of its continued use of additives," and that it emphasize to as substantial "a cross section of the smoking public as possible" that NAS Cigarettes are "additive free." Weiner Decl. Ex. 10 (SFN_MDL000012421-27). Maintaining and building upon concepts like "natural" and "additive-free" and their substitutes (e.g., the more recent "Ingredients: Tobacco and Water"), the market share and volume of sales of NAS Cigarettes grew significantly in an otherwise declining market. NAS Cigarettes' share of the U.S. cigarette market increased from .27% in 2002 to 2.68% in 2019. Weiner Decl. Ex. 11 (SF_MDL00714547). Defendants sold over 2 billion NAS Cigarettes in 2009, over 5.6 billion NAS Cigarettes in 2017, and over 5.8 billion NAS Cigarettes in 2018. *Id.* As of May 2018, Santa Fe had 13 million people on its active mailing list. Weiner Decl. Ex. 11 (Huyett Dep. 163:15-16).

**B. <u>Defendants Sold Uniformly Labeled NAS Cigarettes During the Class Periods</u>**

Defendants developed a sophisticated and pervasive marketing campaign whose primary purpose was to convey to consumers that NAS Cigarettes are made with tobacco that is "natural" and "additive-free." The terms "natural" and "additive-free" have been prominently displayed on the labeling of NAS Cigarettes throughout the class periods, implying to reasonable consumers that they may be less harmful than other cigarettes.

Until 2017, Defendants uniformly and prominently labeled and advertised all NAS Cigarettes with representations that the cigarettes were "natural" and "100% Additive-Free." *See* Weiner Decl. Ex. 12 (SF_MDL00180213). The labels did not, and do not, vary from state to state. *See* Weiner Decl. Ex. 13 (Trujillo Dep. 151:14-152:9, 155:10-15).

On August 27, 2015, the FDA sent a warning letter advising Defendants that their use of the terms "natural" and "additive-free" on NAS Cigarettes' labeling "represents explicitly and/or implicitly that the products or their smoke do not contain or are free of a substance and/or that the products present a lower risk of tobacco-related disease or are less harmful than one or more other commercially marketed tobacco products." SAC ¶ 59. In 2017, following a settlement with the FDA, Defendants removed the "100% additive-free" representation from NAS Cigarettes' labels and advertisements. However, that did not change the widespread consumer impression, reinforced by decades of marketing, that NAS Cigarettes may be less harmful than other cigarettes. *See infra* § II.E. Defendants' labeling and marketing continues to imply to reasonable consumers that NAS Cigarettes may be less harmful through the term "natural" (which the FDA concluded was misleading in itself) and the substitute language "Ingredients: Tobacco and Water," which is equivalent to the "additive-free" representation.

**C. <u>Defendants' Uniform Advertising Was Pervasive and Corroborated the "Natural" and "Additive-Free" Label Claims During the Class Periods</u>**

Defendants' use of the "natural" and "additive-free" representations on the NAS Cigarettes' labels systematically caused reasonable consumers to believe that NAS Cigarettes may be less harmful than other cigarettes. This belief was reinforced through Defendants' pervasive use of the same terms and concepts in other advertising materials.

Dr. Dewhirst provides expert testimony regarding general marketing principles and their application to the marketing of NAS Cigarettes during the class periods. Dewhirst Report 2. Dr. Dewhirst conducted a thorough review of NAS Cigarette labeling and concluded that Defendants' "natural" and "additive-free" claims were "key points of differentiation" that "drove trial and sales of the product at a premium price." *Id.*

Even a quick glance at Defendants' advertisements makes clear that they uniformly emphasize that NAS Cigarettes are made with "natural" and "additive-free" tobacco. and contain only "tobacco and water." *See id.* at 38-42 (depicting labeling). In many instances the labels add the descriptor "tobacco & water," such as by prominently stating in bold font: "TOBACCO & WATER: 100% ADDITIVE-FREE NATURAL TOBACCO." *See id.* at 40-41. Defendants also combined their "organic" message with the "100% additive-free natural tobacco" message in the advertisements relating to their organic NAS Cigarettes. *See id.* at 43.

Defendants' witnesses confirm the pervasive nature of the "natural" and "additive-free" claims. Santa Fe's former Director of Consumer Marketing, David DePalma, was involved in creating or approving every NAS Cigarette advertisement from 2000 through early 2017. Weiner Decl. Ex. 14 (DePalma Dep. 30:10-23). Mr. DePalma could cite no descriptor used more often in the advertisements than "100% additive-free natural tobacco." *Id.* at 60:4-16.

### D. <u>The NAS Brand's PPODs Are "Natural" and "Additive-Free"</u>

Brands achieve success primarily through differentiation. As Dr. Dewhirst explained:

> *Positioning*—a core marketing concept—is the act of designing the company's offering and image to occupy a distinctive place in the mind of the target market. The goal is to locate the brand in the minds of consumers to maximize the potential benefit to the firm. Key to positioning is the concept of *differentiation*, which involves *differentiating* the company's marketing offer so it will give consumers more value than competitors' offers do. Strategically, companies identify optimal *points of difference* . . . which are attributes or benefits consumers strongly associate with a brand, positively evaluate, and believe that they could not find to the same extent with a competitive brand.

Dewhirst Report 5 (quotation omitted). As Dr. Dewhirst noted, that Defendants have adopted this marketing concept under the term "PPOD." *Id.* "For NAS, the key PPOD has been '100% additive-

free natural tobacco' (and 'organic' for its organic line)." *Id.*; *see also* Weiner Decl. Exs. 15 (SF_MDL002511116), 3 (SF_MDL00015708 at 21-24).

As far back as 1999, Henry Sicignano (a Santa Fe marketing executive) wrote to Santa Fe's president and board of directors: "[O]ur 'positioning' is what our brand stands for . . . what makes Natural American Spirit unique . . . why our product is better than other premium brands . . . '100% Additive-Free Natural Tobacco' is unmistakably the primary point of differentiation that has come to define our brand." Weiner Decl. Ex. 16 (SF_MDL00720240 at 6).

Indeed, as Dr. Dewhirst explains, "[t]he NAS brand name itself refers to 'natural,' and this product attribute is further reinforced by the name of the brand's producer, Santa Fe *Natural* Tobacco Company." Dewhirst Report 20. Defendants' own marketing documents state that "Natural American Spirit without Santa Fe Natural Tobacco Company lacks the credibility to make it truly differentiated." *Id.* The term "natural" is "central to both the brand name and that of its producer," and thus it is "the fundamental differentiating feature of the product offering." *Id.* Even Defendants' corporate filings confirm that NAS Cigarettes are "differentiated from key competitors through its use of all natural, additive-free tobacco." Weiner Decl. Exs. 17 (RAI Form 10-K (FY Ending 12/31/11) at 9), 18 (RAI Form 10-K (FY Ending 12/31/12) at 8), 19 (RAI Form 10-K (FY Ending 12/31/13) at 9), 20 (RAI Form 10-K (FY Ending 12/31/14) at 10), 21 (RAI Form 10-K (FY Ending 12/31/15) at 8).

Defendants' internal documents repeatedly identify "natural" and "additive-free" as the NAS brand's PPOD. For example, the Santa Fe marketing department's "2013 Strategic Plan" was "focused on building the business for the long-term by <u>accelerating</u> brand and proposition awareness with the goal of informed trial and conversion." Weiner Decl. Ex. 22

(SF_MDL00625004 at 5006). The strategy involved a point-of-sale "refresh" with "[s]imple messaging, bold presentation, big impact," an "[e]xpanded media program—both reach and frequency," and "[e]xpanded [adult mailing list]." *Id.* at 5009. As Dr. Dewhirst explains, "[t]he 'simple message' was indeed simple—focus on the PPODs of natural, additive-free, and (eventually) organic to drive trial of the product." Dewhirst Report 38.

These descriptors were so important to Defendants' marketing that Defendants viewed loss of these "key words" as "Key Risks" to the brand. Weiner Decl. Exs. 3 (SF_MDL0015708 at 5732), 23 (SF_MDL00982936 at 2959), 24 (SF_MDL00575547 at 5587). And in case they lost them, Defendants planned on using substitute descriptors, asking "How do you speak "organic" without organic[?]" and answering, "Respect for the Environment" leaf logo. Weiner Decl. Ex. 25 (SF_MDL00893973).

Defendants' internal marketing materials leave no doubt that Defendants intended to make "natural" and "additive-free" the NAS brand PPOD. They succeeded:




Weiner Decl. Ex. 26 (SF_MDL01251440 at 1464).

Santa Fe's Director of Brand Equity, Kim Gonzales, confirmed that the NAS brand PPOD is natural and additive-free. *See* Weiner Decl. Ex. 27 (Gonzales Dep. 60:12-21) (stating their PPOD was "during this time period 100 percent additive-free natural tobacco"). Gonzales confirmed that "100% additive-free tobacco" is the "core proposition" for NAS, noting it is "something the company has been saying for a very long time, and it is something we can say across all styles." *Id.* at 160:5-17; *see also id.* at 168:6-13 (confirming that the PPOD for all styles until 2017 was "100% additive-free natural tobacco").

All other elements of NAS labels and advertising reinforce, strengthen, and build upon these PPODs. This is best captured by Santa Fe's "campaignable umbrella" where various marketing themes like, "Made with Organic Tobacco," "Tobacco and Water," "Grown on American Soil," etc. all support the central PPOD: "100% Additive-Free Natural Tobacco." Weiner Decl. Ex. 28 (SF_MDL00173920 at slide 7). The entire brand identity associated with NAS Cigarettes was self-reinforcing and "reinforces the individual PPODS."




*Id.*

Plaintiffs' experts confirm that these are functioned as complementary messages. Proctor Report 39. As Dr. Dewhirst opines, "SFNTC supported its key points of differentiation by

promoting harmonious aspects of brand identity, such as the company's focus on sustainability and 'eco-consciousness.'" Dewhirst Report 2, 47-50. Indeed, despite being owned by the second-largest tobacco company in the U.S., Santa Fe projected an image as a small company focused on sustainability. This gave Santa Fe an air of credibility to sell "natural" and "additive-free" cigarettes that consumers expected may be less harmful—a credibility Big Tobacco lacked. *See* Weiner Decl. Ex. 24 (SF_MDL00575547 at 5604) (DePalma stated large brands were experiencing a "trust gap" and that companies wanted their brands to be "small-business, mom and pop values that resonate with consumers"); Dewhirst Report 8 ("SFNTC's high-visibility commitment to environmental sustainability . . . lends credibility to the company and thereby strengthening and deepening the additive-free and 'natural' claims. The same claims would carry far less weight and credibility (and thus have little value) if made by a 'Big Tobacco' company that demonstrated no commitment to environmental sustainability or 'eco-conscious' causes.").

Similarly, the relatively natural look and feel of the packaging reinforces the core message that NAS Cigarettes are natural and additive-free, and therefore may be less harmful than other cigarettes:

> SFNTC elevates this differentiation by giving the entire brand a 'natural' look and feel, e.g., through use of recycled card stock in the packages. As Director of Brand Equity, Ms. Kim Gonzales testified, SFNTC sought "visibility with heart" in its point-of-sale pieces and this referred to using recycled materials, avoiding plastics . . . and striving to ensure that was apparent to consumers. . . . [Defendants] sought to align every aspect of every touchpoint to emphasize the brand's core identity as additive-free, natural tobacco.

Dewhirst Report 25. Other advertisements convey and reinforce the same message through, for example, pictures of "clean sunny fields, healthy farming, and customers being in safe hands." Proctor Report 26, 64 (Figure 4). "By suggesting links to organic farming and organic foods . . .

the brand fuses a sense of environmental responsibility ('healthy earth') with personal responsibility ('healthy body')." *Id.* at 39, 79 (Figure 16). Defendants' marketing campaigns and PPOD targeted consumers focused on lifestyles of health and sustainability (or "LOHAS," as Defendants often put it). Weiner Decl. Ex. 29 (SF_MDL00329451 at 9480). These consumers have a "[c]lear connection of personal and planetary health—drives purchase of natural products and highest likelihood to think that the environment affects their health." Weiner Decl. Exs. 30, (Lozano Dep. Ex. 7), 31 (SF_MDL00036012 at 6019-21).

Defendants' use of Native American imagery further reinforces that NAS Cigarettes are supposed to be natural, and therefore less harmful. As one internal presentation put it: "Market research has found that our consumers are connected to our packaging in a very personal way. The Tobacco Chief, Thunderbird, and the NAS typographical logo all evoke a sense of spiritual connection to our brand." Weiner Decl. Ex. 32 (SF_MDL01069183 at 77). The Thunderbird, as seen at the top of the packaging, has "prominent significance in Native American culture" and "is a constant reminder of our shared belief that tobacco should be enjoyed in its *natural* state, *without any additives*." Weiner Decl. Ex. 33 (SF_MDL00582790 at slide 57).

Earlier invocations of the "natural" theme show that this has been a consistent and core aspect of NAS brand identity since its earliest days. After a thorough review of Santa Fe's use of Native American imagery, Dr. Dewhirst concluded:

> Such publicity distinguished NAS from cigarettes with synthetic additives, thus offering it as an alternative to those cigarettes while implying that Native American Tobacco and Natural American Spirit were equivalent (although NAS is flue-cured and not air-dried tobacco and is not ordinarily limited to occasional ceremonial pipe use). Thus, these appeals to supposed Native American culture reinforced the "natural" differentiation of the NAS brand.

Dewhirst Report 26. Native American imagery in this context also evokes the reduced risk of harm associated with traditional Native American tobaccos, as there is "virtually no record of lung cancer anywhere in the world prior to the rise of the modern industrial cigarette." Proctor Report 26.

As Dr. Dewhirst put it, Santa Fe created a "symbolic identity" and "institutional identity" for itself that "support," "enrich," and "reinforce" the branding of NAS Cigarettes as "natural" and "additive-free." Dewhirst Report 48. This conclusion is based on Santa Fe's internal marketing documents, which note, for example:

- "We must actively pursue innovative environmental and socially progressive initiatives, beyond the norm, that support the company vision, build upon our emotional connections and set us apart from all other [consumer packaged goods] brands." Weiner Decl. Ex. 34 (SF_MDL00185658 at 71-72).

- "Sustainability is the cornerstone of our brand/company.—Essential to brand proposition [PPOD] & strategy—Focuses and builds upon additive-free and all natural proposition." Weiner Decl. Ex. 35 (SF_MDL00624407 at 4439).

- "Objective: Becoming an environmentally positive company. Current State: Supports and enriches the brand proposition." *Id.* at 4445.

- "We have always been in a unique leadership position with our all natural, additive-free, and sustainability platforms, and our total proposition of Company + NAS . . . The most important way we can continue to differentiate ourselves in a relevant manner from a company standpoint is to ensure that we remain on the cutting edge of environmental sustainability." Weiner Decl. Ex. 36 (SF_MDL00016901 at 6905).

- "Develop a consistent and systematic plan to communicate our company, our products, our philosophy, and our vision to external communities—building our credibility and reputation so that SFNTC is regarded as the most trusted natural tobacco company in the world." Weiner Decl. Ex. 32 (SF_MDL01069183 at slide 81).

- "If we lose integrity in the eyes of the consumer anywhere along the way, the brand positioning is compromised. Now for NAS, that positioning is pretty transparent. Environmentally aware & liberal in its leanings (freedom, social justice,

sustainability, natural as opposed to legal rights).” Weiner Decl. Ex. 37 SF_MDL01051806 at 1824).

- “SFNTC/NAS Values add credibility to our PPOD and can strengthen messaging that drives awareness, improves perceptions and engages [adult tobacco consumers].” Weiner Decl. Ex. 38 (SF_MDL00165831 at slide 54).

- “Santa Fe Natural is known as an environmentally friendly company due to our natural and additive-free brand positioning. This is further reinforced by the earth friendly and organic growing practices that have been pioneered by our company.” Weiner Decl. Ex. 39 (SF_MDL01052611 at 2619).

In other words, “Sustainability enriches the brand proposition.” Dewhirst Report 49 (quoting DePalma Dep. 127:19-24).

### E. <u>The 2017 Settlement Did Not Change the NAS Brand Identity</u>

“Additive-free” contributes to the health reassurance fraud cemented in consumers’ minds through years of pervasive marketing. Although Defendants were required to remove the “additive-free” phrase in 2017, they continue to market NAS Cigarettes as a less harmful product through the continued use of label descriptors such as “natural” and “Ingredients: Tobacco & Water.” Defendants retained the PPODs of “natural” and “additive-free” by using different words that meant the same. As Dr. Dewhirst explains, Santa Fe “transitioned toward use of new but consonant descriptors by integrating those descriptors while retaining the existing additive-free/natural descriptors. Thus, the packs sported a new silver lining around the chief logo and SFNTC began integrating ‘Organic Tobacco’ and ‘U.S. Grown Tobacco’ along with the ‘natural’ and ‘100% additive-free’ descriptors.” Dewhirst Report 30. As noted above, Defendants had been preparing for losing these descriptors. Even in 2009, Defendants knew using “organic” would “elevate the proposition and serve[] as a halo for the entire brand.” Weiner Decl. Ex. 40 (RAI_2MDL00006237 at 6313). And “as early as 2013, SFNTC was measuring whether

consumers would view 'Ingredients: Tobacco & Water' as synonymous with 'additive-free.'" Dewhirst Report 17.

Following the FDA settlement, Defendants continued to convey similar reassurances and began putting "Tobacco Ingredients: Tobacco & Water" on NAS Cigarette labels with the expectation that consumers would interpret that phrase to mean that NAS cigarettes are additive-free. Proctor Report 39. That expectation was based on marketing studies that concluded that consumers do indeed have that understanding. Dewhirst Report 31; Weiner Decl. Ex. 41 (SF_MDL01106204 at 6237) ("AS like the specificity of 'Tobacco and Water' . . . and also the fact that it seems to rule out other ingredients."); Weiner Decl. Ex. 42 (SF_MDL01142457 at 2465) ("Additive free is 100% whole leaf tobacco and water and that means no additives or flavorings and no stems or scrap tobacco."). Any distinction is marginally relevant as Defendants had achieved their goal of cornering the market as the less harmful alternative, and the key brand differentiator, "natural," remains on the label.

As Dr. Dewhirst explains, "By 2017 SFNTC had evolved to 'Tobacco Ingredients: Tobacco and Water,' while retaining the 'natural' PPOD through the brand name Natural American Spirit. NAS marketing continues to emphasize 'difference': differentiation through a PPOD that is synonymous with 'additive-free' ('two ingredients are all we've ever needed')." Dewhirst Report 36.

Despite the minor language tweak, this continued course of conduct and clear messaging is still health reassurance fraud. For example, Defendants' testing of "100% U.S. Grown" "yielded remarkably positive connotations . . . such as "wholesome," "safe," "organic," "hard-working" and "quality." Weiner Decl. Ex. 43 (SF_MDL01498255 at 8260). Defendants further observed

that it would be a "mistake" to dismiss the symbolism of iconic American imagery as "simple patriotism." *Id.* at 8267.

### F. Defendants' Marketing of NAS Cigarettes as "Natural" and "Additive-Free" Led to Significant Increasing Sales in an Otherwise Shrinking Market

Defendants spent hundreds of millions of dollars on marketing and advertising, ensuring that the NAS Cigarettes' PPODs of "natural" and "additive-free" were widely promoted throughout the U.S. As Dr. Dewhirst recounts, "[t]he company estimated that it spent $223 million on marketing between 2009 and 2014, and noted in 2012 and 2013, that their per-pack marketing spend 'far exceeds competition.'" Dewhirst Report 17. David DePalma testified that the 2016 budget was $78 million for consumer marketing alone (i.e., excluding trade marketing). DePalma Dep. 54:10-20. And Kim Gonzales noted that in the fourth quarter of 2013 alone, print ads for NAS Cigarettes reached more than 78.7 million tobacco consumers. Gonzales Dep. 182:16-183:6.

As Gonzales testified, the purpose of this massive marketing spend was to enhance proposition awareness, i.e., awareness of the PPOD "100% additive-free natural tobacco." *Id.* at 75:8-23. Driven by their persuasive "natural," "additive-free," and "organic" claims, Defendants were wildly successful, generating approximately $4.3 billion in net sales domestically between 2010 and 2016 and enjoying 275% growth in a declining domestic cigarette market. *See* Weiner Decl. Ex. 44 (SF_MDL00810879 at 0915) ("[W]e grow every year in an industry that is in a constant state of decline."); *see also* Exs. 17-21 (RAI 10-Ks). The market share of NAS Cigarettes was .27% when RAI acquired Santa Fe in 2002. Weiner Decl. Ex. 2 (SF_MDL00714547). By June 2019, NAS market share skyrocketed to 2.68%. *Id.* "NAS is the only growing brand of conventional cigarette, with sales increasing by double digit percentages every year." Proctor Report 42. As Cressida Lozano, Santa Fe's former vice president, explained, this growth happened

because of the brand differentiation of NAS Cigarettes, which is based on everything "[f]rom our core proposition of additive free . . . to organic styles." Weiner Decl. Ex. 29 (SF_MDL00329451 at 9479).

Defendants are well aware that consumers purchase NAS Cigarettes because of the "natural" and "additive-free" claims. Indeed, Kim Gonzales conceded that she has no basis to disagree with the company's internal "Santa Fe 101" document, which states that PPODs are "the first motivators for people to try our brand." Gonzales Dep. 123:14-124:2. Defendants' internal documents indicate that the PPODs of "natural," "additive-free," and "organic" account for 74% of initial trials of NAS Cigarettes. Dewhirst Report 6 (citation omitted).

Defendants have long known that their "additive-free" and "natural" claims drive NAS Cigarettes' sales and are responsible for their increasing market share. In the mid-1990s, Santa Fe surveyed consumers on various issues, including whether "additive-free" was the "primary reason" for requesting NAS samples; between 89 and 100% of responding NAS consumers claimed the "absence of additives" was the "primary reason" for trying NAS Cigarettes. Weiner Decl. Ex. 45 (SF_MDL00221202 at 1207-08). In April 1996, that number was 100%. Weiner Decl. Ex. 46 (SF_MDL00138876 at 8878). Similarly, a review of commissioned focus groups concluded that the "vast majority" of consumers who usually smoke NAS Cigarettes "claim to choose the brand because it is '100% No Additives' or 'All Natural.'" Weiner Decl. Ex. 47 (SF_MDL00034642 at 4643). And another internal marketing study concluded that "[a]mong Natural American Spirit smokers 21+, the core descriptors '100% Additive-Free Tobacco' and 'Natural Tobacco' are relatively more important." Weiner Decl. Ex. 48 (SF_MDL00022286 at slide 58).

**G. <u>Reasonable Consumers Believe That NAS Cigarettes May Be Less Harmful Because They Are Marketed as "Natural" and "Additive-Free"</u>**

Capitalizing on the interest of American consumers to use products that are natural and smokers' reasonable desire to smoke cigarettes that may be less harmful than other brands, Defendants deliberately and misleadingly built their brand around their "natural" and "additive-free" claims. Using common proof, Plaintiffs will show that the claims "natural" and "additive-free" falsely imply that NAS Cigarettes may be less harmful than other cigarette brands.

Dr. Proctor provides an overview of the industry's decades-long health reassurance frauds and opines that Defendants' use of "natural," "additive-free," and their substitutes deceives NAS Cigarette smokers into thinking that NAS Cigarettes are less harmful than other cigarettes. Proctor Report 50-51.

Following an exhaustive survey regarding consumer perceptions of NAS Cigarettes, and based on her own extensive research, Dr. Pearson opines that:

- Many American adults erroneously believe that "natural" or "additive-free" cigarettes are or may be less harmful than other brands.
- This is more so among NAS smokers. Significantly, the majority of NAS consumers erroneously believe that NAS Cigarettes may be less harmful than other cigarette brands.
- There is no question that the descriptors "natural," "additive-free," and "organic" create misperceptions about the harmfulness of NAS Cigarettes.
- US adults commonly believe that the harmful aspects of cigarettes mostly come from "additives" introduced by tobacco companies.

Pearson Report 3.

Dr. Pearson's report includes citations and summaries of voluminous peer-reviewed literature, which forms a basis for her expert opinions. In particular, Dr. Pearson's conclusions are supported by peer-reviewed, published epidemiological studies. For example, a 2019 epidemiological study establishes that most NAS Cigarette smokers believe NAS Cigarettes may

be less harmful than other cigarette brands. *Id.* at 5-6. Similarly, a 2016 study found that more than two-thirds of NAS Cigarette smokers believe their brand may be less harmful than other brands of cigarettes. *Id.* at 7. NAS smokers are more than 22 times more likely to believe their brand of cigarettes may be less harmful than other brands (compared to smokers of non-NAS cigarettes). *Id.* And a 2017 study found that the majority of NAS Cigarette smokers believe their cigarettes may be less harmful than other brands. *Id.* at 8.

Dr. Pearson's conclusions are also supported by peer-reviewed, published experimental and observational studies. For example, a 2016 experimental study found that the descriptors "100% Additive Free" and "Made with Organic Tobacco" communicate reduced harm to study participants. *Id.* at 10-11 (citation omitted). Similarly, a 2017 study concluded: "Consumers perceived cigarettes marketed as 'natural' or 'additive-free' as less harmful, and this influenced their perceptions of advertising claims and intention to purchase, controlling for other factors." *Id.* at 14 (citation omitted). A 2014 study found that "youth rated cigarette packages with the word 'natural' as significantly more appealing to people their age and less harmful than packages without this term." *Id.* (citation omitted). A 2018 online experimental study concluded that "organic," "natural," or "additive-free" claims in NAS Cigarettes' marketing reduced study participants' perceived harm associated with NAS Cigarettes. *Id.* at 15 (citation omitted). Further, disclaimers did not offset misperceptions of harm caused by the advertising. *Id.* at 16. And another 2018 study concluded that "NAS cigarette packaging conveys that its cigarettes are 'safer' and that such perceptions are lower with standardized packaging, both with and without warning images." *Id.* (citation omitted).

Dr. Cummings also confirmed that Defendants' use of the "natural" and "additive-free" descriptors is misleading because consumers believe natural and additive-free cigarettes may be less harmful than other cigarettes: "The imagery, text, and brand descriptors used in NAS cigarette product marketing have contributed to NAS consumers falsely perceiving that their NAS cigarettes were less harmful compared to other brands of cigarettes." Cummings Report 5. Dr. Cummings's opinion is likewise supported by numerous peer-reviewed, published studies. *Id.* at 9 (citing and discussing peer-reviewed research and research commissioned by the FDA's Center for Tobacco Products, which "demonstrated that smokers of NAS cigarette brands believe that NAS cigarettes are, or may be, less harmful than other brands").

In addition, a 2015 experimental study by the FDA found that adult smokers who saw packs of NAS Cigarettes labeled as "additive-free" perceived the NAS Cigarettes as less risky than other cigarettes and concluded that the terms "natural" and "additive-free" "imply a modified risk by associating the cigarette with nature and health." Pearson Report 13 (citing and describing study). Yet another 2015 study by the FDA found that Nat Sherman cigarettes labeled as "100% natural" or "finest natural tobacco" were perceived by adult smokers as less risky than other cigarettes. *Id.* at 13-14. Notably, the Nat Sherman disclaimer—which is similar to the Disclaimer on NAS Cigarettes' labeling—"does not work to offset the influence of the descriptors." *Id.* at 14 (citing and describing study).

Moreover, Defendants' use of the "organic" descriptor reinforces the false impression that all NAS Cigarettes may be less harmful than other brands. An internal RAI presentation from 2009 noted: "Organic elevates the total proposition and serves as a halo for the entire brand." Weiner Decl. Ex. 40 (RAI_2MDL00006237 at 6313); *see also* Weiner Decl. Ex. 49 (SF_MDL01088001)

("The additive-free blend is the core of our portfolio. The organic styles act as a 'halo' to the brand . . . ."). Indeed, Defendants "focus[ed] on the Organic line proposition as an additional point of differentiation to strengthen and elevate the existing additive-free, natural tobacco product point of difference for NAS." Weiner Decl. Ex. 3 (SF_MDL00015708). And as Dr. Dewhirst opines, "the organic PPOD not only differentiates the organic line from non-NAS brands, but has what SFNTC describes as a 'halo' effect for the entire NAS brand." Dewhirst Report 5.

Indeed, Defendants' own internal market research concluded that the "NAS organic line offers adult cigarette consumers who value smoking but are more wholesome an alternative to traditional cigarettes." Weiner Decl. Ex. 50 (SF_MDL00768518 at 8524). Dr. Pearson opines that the "organic" descriptor causes consumers to believe that NAS Cigarettes may be less harmful than other brands, and she relies upon numerous peer-reviewed, published studies to support that conclusion. Pearson Report 9. Dr. Cummings agrees. Cummings Report 10, 12 ("[T]he findings from the FDA study are consistent with those reported by academic investigators who have found that the use of brand descriptors such as natural, additive-free, and organic in cigarette advertising, including advertising for NAS cigarettes, is perceived by consumers to mean the cigarettes are safer to smoke compared to other brands."). Accordingly, Plaintiffs have presented significant expert testimony, based upon peer-reviewed evidence, that Defendants' use of the pervasive descriptors "natural" and "additive-free" causes reasonable consumers to believe NAS Cigarettes may be less harmful than other cigarettes.[4]

[4]As the Court noted previously, the "terms natural and organic have long been used across the country to convey products' health benefits," and therefore, "the reasonable consumer is not expected to defy decades of marketing, which has conveyed that natural, organic, and additive-free products are healthier." MTD Order 167-68.

Plaintiffs further prove this through Defendants' own documents, some of which are discussed above. *See supra* § II.A. In addition, for example, a 1990 memo to Santa Fe president Robin Sommers and the board of directors stated that "SFNTC has become aware that some regulatory authorities may construe the statement "100% Additive-Free Natural Tobacco" to read as an implied health claim." RJR has noted that NAS "appeal to smokers turned on by a new-agey alternative consciousness and who are concerned about their health, even if resigned to their addiction. Weiner Decl. Ex. 51 (RJRT 526300361 at 7). In September 2000, Sommers is quoted in an interview discussing additive-free NAS Cigarettes: "People are going to smoke, I don't care what you do, so let's make the best product for people who have chosen to smoke or can't stop smoking." *Id.* at 4. Recent ad concept studies conducted by third parties on Defendants' behalf showed that many respondents reported that the NAS Cigarette advertisements conveyed that they were "safer," "healthier," "free of chemicals," "pure," and "clean." Cummings Report 14-15.

Because consumers are deceived into believing NAS Cigarettes are less harmful, Defendants train their employees on "eliminating common misconceptions." Weiner Decl. Ex. 52 (Proctor Dep. Ex. 37 at 8-9). These include misconceptions of a "healthy" cigarette; that no additives or organic may mean safer. *Id.* As one group wrote to Santa Fe:

> Question: We are beginning a campaign to promote your products among smokers desiring to shift to healthier smoking choices. We recognize that smoking any tobacco products still presents some potential health risks, but common sense dictates that removing over 100 carcinogenic chemicals and additives should help.

Weiner Decl. Ex. 53 (SFN_MDL000012563 at 2568).

### H. <u>The Disclaimer Did Not Change Reasonable Consumers' Perceptions</u>

Defendants will likely rely heavily on the contention that no consumer can be deceived into thinking that NAS Cigarettes are less harmful than other brands because of the small print disclaimer on one side of the pack. *See* MTD Order 169 ("The Defendants do not contest that the descriptors convey to a reasonable consumer that Natural American cigarettes are healthier than other cigarettes. Rather, they contend that the disclaimer cures any deceptions."). Common evidence will answer (and disprove) Defendants' contention.

Plaintiffs present evidence that can be applied across the classes as a whole. After reviewing numerous peer-reviewed, published studies regarding the effectiveness of the Disclaimer, Dr. Pearson opines:

> There is no evidence to suggest that the small, text-only disclaimer on the side of the NAS pack is adequate to inform consumers or correct misperceptions. In general, small text-only warnings on the side of packs are associated with lower levels of awareness and recall compared to larger, more prominent warnings located on the face of cigarette packs.

Pearson Report 18.

Dr. Pearson's opinion is supported by various credible studies.[5] For example, in a recent review from researchers at the University of Pennsylvania, researchers found that corrective

[5] It is also supported by common sense and the realities of consumer transactions. *See* MTD Order 171 ("Cigarettes are often sold, however, in a manner such that a consumer cannot inspect the packaging in detail before purchasing, *e.g.*, the cigarettes are kept locked in a display next to or behind the counter. The display shows the cigarette pack's front, but not the sides or back. A store clerk sometimes does not even hand the cigarette pack to the consumer before purchase, but places the pack directly in a shopping bag. Based on this, even though a reasonable consumer would inspect other items before purchase, it is not clear that they would have the opportunity to inspect Natural American cigarettes' labeling. Accordingly, the Court cannot conclude that the package's disclosure would cure a deception inflicted upon a reasonable consumer."); *see also Mantikas v. Kellogg Co.*, 910 F.3d 633, 637 (2d Cir. 2018) "[R]easonable consumers should [not] be expected to look beyond misleading representations on the front of the box to discover the truth from the ingredient list in small print on the side of the box."); *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 939-40 (9th Cir. 2008) ("We do not think that the FDA requires an ingredient list so that

statements concerning misconceptions about tobacco products are rarely effective at correcting the emotional basis of beliefs about tobacco products. *See* Pearson Report 18 (discussing Cappella study). As Dr. Pearson explains, "while consumers might be able to accurately report 'additive-free' cigarettes are no less harmful than other cigarettes, they still harbor the belief that these products *might* be less harmful than other brands." *Id.*

At least three quantitative studies of NAS Cigarette packaging directly address the effect of the Disclaimer on consumer perceptions. In Pearson et al (in preparation), the authors conclude that enlarging the size of the NAS Cigarettes' Disclaimer statement to the size of the Surgeon General's Warning did not correct study participants' misperceptions of harm or addictiveness. *Id.* at 19. In the FDA's 2015 study of NAS Cigarettes, the authors concluded that the Disclaimer "No additives in our tobacco does NOT mean a safer cigarette" did not correct study participants' misperceptions that NAS Cigarettes are less harmful than other brands.[6] *Id.* at 13 (discussing study). The FDA found the same result for the Nat Sherman brand of cigarettes, which also features "natural" descriptors and an identical disclaimer. *Id.* at 13-14 (discussing study). Further, the FDA concluded that the "disclaimer had an unintended consequence. When the disclaimer was present on the pack label, consumers rated comparative exposure *lower* than when the disclaimer was absent. Rather than having no effect, the disclaimer influenced perceptions of exposure in a way

---

manufacturers can mislead consumers and then rely on the ingredient list to correct those misinterpretations and provide a shield for liability for the deception. Instead, reasonable consumers expect that the ingredient list contains more detailed information about the product that confirms other representations on the packaging.").

[6] Notably, the Disclaimer is limited to additives and "says nothing about the natural or organic descriptors." MTD Order 172.

that is opposite of the intention of the disclaimer." Weiner Decl. Ex. 54 (FDA 2015 Nat Sherman Report at 2). Even if Plaintiffs did not have expert testimony on this issue, the FDA 2015 Reports are common evidence sufficient to prove the Disclaimer is ineffective.

Similarly, Dr. Cummings opines that the "warnings and disclaimers on NAS product packaging and marketing are not effective in correcting product misperceptions." Cummings Report 5. Dr. Cummings concluded that "[f]or a health warning and/or disclaimer to be effective it needs to be noticed, read, cognitively processed and remembered," which the Disclaimer on NAS Cigarettes is not. *Id.* at 18 (citing studies). Accordingly, common evidence exists as to the impact of the Disclaimer on reasonable consumers' beliefs that the NAS Cigarettes may be less harmful than other cigarettes.

### I. **Plaintiffs Will Use Common Proof to Show That NAS Cigarettes Are Not Less Harmful Than Other Cigarettes**

Despite the widespread misperception created by NAS marketing and labeling, NAS Cigarettes indisputably are *not* less harmful than other cigarette brands.

What's worse, compared to other major brands, NAS Cigarettes have substantially higher levels of certain known carcinogens and heavy metals. NAS Cigarettes also deliver exceedingly high levels of "free-base" nicotine, which makes them at least as addictive as other cigarettes. As Dr. Cummings explains:

> [I]nternal business records show that NAS cigarette brands generate many harmful chemicals when smoked and in some cases the harmful chemicals isolated in the smoke of NAS cigarettes are in higher concentrations compared to other popular R.J. Reynolds brands (Camel filtered, Newport, Pall Mall) and non-R.J. Reynolds cigarette brands (Marlboro) (SFNTC, Report on Harmful and Potentially Harmful Constituents, September 2012). This internal report acknowledged the higher concentrations of harmful and potentially harmful chemicals isolated in the smoke of NAS cigarettes.

Cummings Report 6.

Defendants have confirmed internally that NAS Cigarettes are particularly rich with certain carcinogens and other toxicants as compared to other brands. In 2009 and 2011, Santa Fe performed an internal comparison of deliveries of harmful constituents in NAS Cigarettes versus those in the leading competitive brands. Weiner Decl. Ex. 55 (SFN_MDL000490879). Only NAS brands delivered more than 40mg of tar, and all 10 NAS styles delivered more nicotine than all "leading competition."




*Id.* at slide 7.

Santa Fe's 2009 and 2011 studies also show that NAS Cigarettes deliver relatively higher levels of toxins than competitive brands, including the powerful carcinogens benzo(a)pyrene,

benzene, and 1,3 butadiene, and toxic aldehydes including formaldehyde and croton-aldehyde:




*Id.* at slide 13.

Not surprisingly, the FDA also concluded that there is no scientific support for the claim that NAS Cigarettes are safer or healthier than other cigarettes. Weiner Decl. Ex. 56 (FDA Warning Letter).

That conclusion is backed by peer-reviewed, published studies. In one 2015 study, scientists from the FDA's Center for Tobacco Products and the Centers for Disease Control and Prevention's ("CDC") Tobacco and Volatiles Branch examined polycyclic aromatic hydrocarbons ("PAHs"), a class of known carcinogenic compounds in cigarette smoke, such as benzo(a)pyrene and napthalene. PAHs do not occur naturally in the tobacco plant; rather, they are formed through incomplete combustion during the smoking process. Of the 50 mainstream U.S. cigarettes tested, the NAS Cigarettes from the blue box had the highest total PAH yields, delivering 60% to 170% higher PAH yields that the average PAH yields of all cigarettes analyzed. Weiner Decl. Ex. 57 (An

T. Vu et al., *Polycyclic Aromatic Hydrocarbons in the Mainstream Smoke of Popular U.S. Cigarettes*).

NAS Cigarettes also contain higher concentrations of heavy metals than other cigarettes. CDC researchers tested 50 varieties of cigarettes available in the U.S. and concluded that NAS Cigarettes "had the highest mean concentrations for cadmium and mercury." Weiner Decl. Ex. 58 (Mark R. Fresquez et al., *Establishment of Toxic Metal Reference Range in Tobacco from U.S. Cigarettes*). Cadmium is both a known carcinogen and associated with chronic obstructive pulmonary disease and nephrotoxicity. *Id.* Mercury causes a wide array of well-known, deleterious health effects.

As a result of these and other materials he reviewed, Dr. Cummings concludes that there is "no evidence that NAS cigarettes are less harmful compared to other cigarette brands." Cummings Report 9. Thus, common evidence shows NAS Cigarettes are not less harmful than other cigarettes.

### J. Plaintiffs Can Use Common Proof to Show That Class Members Incurred Pecuniary Injury Because of Defendants' Deceptive Labeling and Advertising

Plaintiffs will proffer common evidence demonstrating that NAS Cigarettes command their "super premium" price point because the PPOD is "natural" and "additive-free." As Dr. Dewhirst opined, "[t]hese key points of differentiation drove trial and sales of the product at a premium price." Dewhirst Report 2. And Defendants agree. As RAI states in its 10-K filings, "[a]s a super premium brand, Santa Fe's cigarette brand, NATURAL AMERICAN SPIRIT, is priced at a premium compared with most other competitive brands, and is differentiated from key competitors through its use of all natural, additive-free tobacco." Weiner Decl. Exs. 17-21. Similarly, Defendants' 2012 Strategic Plan noted that, "we set the standard in the market place for 'natural.' The standard we set allows us to command a higher price point." Weiner Decl. Ex. 36

(SF_MDL00016901 at 6918). And at no discounting. Weiner Decl. Ex. 24 (SF_MDL00575547 at 5591).

To confirm damages can be calculated on a class-wide basis, Dr. Dubé will use a conjoint analysis to measure both the price premium associated with Defendants' misleading representations (including "natural," "additive-free," and "Tobacco Ingredients: Tobacco and Water") and, separately, consumers' perceived benefits associated with those representations and their willingness to pay for those perceived benefits—that is, the isolated value represented by the benefits conveyed through Defendants' use of descriptors like "additive-free" and "natural." *See generally* Dubé Report. Under the price premium measure, Dr. Dubé will determine the amount consumers overpaid for NAS Cigarettes based on the fact that prices would have been lower but for use of the "natural" and "additive-free" descriptors. *Id.* ¶¶ 22-26. Dr. Dubé will also use the willingness-to-pay measure of economic damages, "which measures the incremental economic value to Class Members from the benefits they perceive to receive from" Defendants' use of the "natural" and "additive-free" claims. *Id.* ¶¶ 29-33. As discussed in more detail below, both measures of economic damages are generally accepted economic methods for determining the economic damages consumers incur from particular claims on product labels.

### K. <u>Plaintiffs Will Use Common Evidence to Prove That NAS Menthol Cigarettes' "Additive-Free" Claim Is Literally False</u>

Defendants' use of the label descriptors "natural" and "additive-free" is the underpinning of its health reassurance campaign that conveys to reasonable consumers that the NAS Cigarettes may be less harmful than other cigarettes. However, in addition to that mass deception, Defendants' "additive-free" claim is literally false as the tobacco in NAS Menthol Cigarettes contains the additive menthol—contrary to marketing claims that the menthol is encapsulated in

the filter. *See* MTD Order 184 ("Menthol is an additive. Therefore an additive-free cigarette cannot have menthol. It is not possible for some other cigarette manufacturer to produce a menthol cigarette that is additive free and truthfully advertise it as such."). Defendants' expert toxicologist on the subject, Dr. Garner (an RJR employee), admitted as much. When asked to define a cigarette, Dr. Garner replied: "A cigarette is tobacco wrapped in paper that is intended to be smoked by a consumer." Weiner Decl. Ex. 59 (Garner Dep. 50:23-51:7). He then agreed that "anything added to the cigarette is an additive." *Id.* at 51:4-7. Because menthol is added to the cigarette, menthol must be an additive.

Defendants place menthol in the cigarette filters, and because menthol is highly volatile, it migrates into the tobacco in the cigarette rod. *See* Cummings Report 16-18. Indeed, the FDA concludes that "menthol diffuses throughout the cigarette irrespective of where it was applied." Weiner Decl. Ex. 60 (TPSAC Report). Santa Fe's corporate representative confirmed that Defendants add menthol to the filter fully realizing that it will volatilize to the tobacco, making their "additive-free" tobacco claims literally false. *See* Weiner Decl. Ex. 61 (DeLoach Dep. 122:19-25; 123:12-124:5) (Santa Fe's corporate designee on the issue of menthol engineering testified that "not all of the menthol would still be in the filter" by the time NAS Cigarettes are sold at retail); *see also* Weiner Decl. Ex. 62 (Little Dep. 37:14-20) (Santa Fe's former president testified that "it's my understanding that menthol does migrate" into the tobacco rod); DePalma Dep. 21:5-16 (Santa Fe's former senior director of marketing testified that "migration happens over a period of time" even though Defendants do not add or spray menthol directly onto the tobacco).

Plaintiffs also will use common proof to show that reasonable consumers are literally misled by the "100% additive-free tobacco," statement. As Dr. Cummings explains:

> Another aspect of misleading marketing of NAS cigarettes has to do with the addition of menthol in NAS cigarette brands. Menthol is a non-tobacco flavor additive that SFNTC applies to the filters of its menthol cigarettes with full knowledge that, due to its volatility, it will migrate to the tobacco. Internal SFNTC documents suggest a "two week menthol equilibration" period after manufacture.

Cummings Report 16 (citing internal documents).

Defendants' own documents establish that consumers are misled. Consumers do not know what menthol is. *See* Weiner Decl. Ex. 47 (SF_MDL00034642 at 4645). Thus, they cannot reasonably be expected to know that it is an additive when the labeling of NAS Cigarettes plainly provides that they are "additive-free." *See* MTD Order 173 ("Natural American's additive-free descriptor on menthol cigarettes also misleads a reasonable consumer. . . . Menthol's properties are not commonly known, even among cigarette users.").

Accordingly, the common question as to whether reasonable consumers are literally misled by the "additive-free" claim due to the migration of the menthol into the NAS Cigarettes can be resolved in one fell swoop. Indeed, this Court has already concluded that "this eventual commingling makes the menthol modifier inherently misleading." *See* MTD Order 184. Furthermore, Dr. Dubé can determine the willingness to pay for NAS Cigarettes based upon the inclusion of the "additive-free" claim, which is not dependent on the subjective meaning of this term for each consumer. Rather, the market commands a particular price because Defendants include the "additive-free" claim.

## L. **<u>Plaintiffs' NAS Cigarettes Purchases Were Typical of Reasonable Consumers</u>**

Each Plaintiff purchased NAS Cigarettes on a regular basis for a period of a year or more and smoked NAS Cigarettes exclusively or primarily for extended periods.[7] Each was exposed to Defendants' advertising of the NAS Cigarettes, whether in store windows, online, in store display counters, in print media, or via direct mailings.[8] And each Plaintiff and every class member was exposed to the packaging and labeling at the point of sale prior to purchase.[9]

Having viewed the "natural" and "additive-free" representations at every point of purchase, Plaintiffs also observed the corresponding imagery on the packages of all NAS Cigarettes to mean that they may be less harmful than other cigarettes, and Plaintiffs all relied upon this impression

[7] *See* Weiner Decl. Exs. 63 (Sproule Dep. 49:9-50:15, 61:24-64:2), 64 (Litwin Dep. 89:5-90:20, 93:8-96:14, 299:12-17, 74:15-77:17; 101:4-102:12), 65 (Emmons Dep. 19:11-17, 71:3-8, 88:15-19, 88:23-89:19, 92:2-11; 94:24-95:1; 99:25-100:8), 66 (Benson Dep. 25:8-26:19, 58:5-59:7, 166:1-177:3), 67 (Murphy Dep. 35:12-22, 38:10-42:6, 45:1-6), 68 (Pontusson Dep. 42:1-6, 139:24-140:5, 142:1-4, 146:4-16, 146:20-147:1, 224:2-7), 69 (Haksal Dep. 41:15-25; 50:3-16. 51:10-53:16, 112:9-16, 113:5-18, 115:16-116:2, 213:13-214:18, 215:6-20, 222:1-25, 235:25-236:2), 70 (Hebert Dep. 64:9-68:16), 71 (Miller Dep. 139:15-19), 72 (Chavez Dep. 97:9-14, 21:8-25), 73 (Horne Dep. 33:14-34:8), 74 (Blevins Dep. 91:2-6, 106:11-22, 126:22-127:3), 75 (Lopez Dep. 110:12-111:21).

[8] *See* Sproule Dep. 19:7-21:24, 31:21-37:20; Litwin Dep. 78:6-79:15, 87:1-14, 88:14-93: 9, 95:7-98:17, 109:6-110:2, 128:10-133:9, 195:114-17, 283:21-287:12; Emmons Dep. 92:20-25, 126:8-128:16; Benson Dep. 28:11-17, 120:8-122:20; Murphy Dep. 28:9-33:25, 116:8-20;186:2-190:23; Pontusson Dep. 242:23-245:16, 209:8-217:8, 167:23-168:5, 175:12-176:3, 170:14-24; Haksal Dep. 38:7-39:11; Hebert Dep. 102:12-21; Miller Dep. 66:14-21, 69:5-14; Chavez Dep. 101:21-102:24; Horne Dep. 32:22-33:5; Blevins Dep. 74:6-77:23, 79:1-8, 153:19-20, 229:4-10; Lopez Dep. 110:10-14, 103:13-20 (advertising for NAS has been "pervasive"), 108:3-15, 128:8-24.

[9] *See* Sproule Dep. 40:12-24; Litwin Dep. 132:6-11, 94:5-16; Emmons Dep. 23:17-29:15, 83:20-87:25, 92:20-25, 119:20-120:17, 126:8-128:16, 135:7-136:21, 149:2-150:10, 185:4-9; Benson Dep. 92:20-94:11, 175:7-21, 199:3-210:20; Murphy Dep. 25:13-27:23,117:8-120:12, 124:3-23, 143:8-152:11; Pontusson Dep. 142:1-9, 209:8-217:8, 175:12-176:3, 259:1-268:1; Haksal Dep. 44:16-25, 92:9-17, 109:24-110:17, 116:13-23; Hebert Dep. 38:24-45:25, 166:2-21; Miller Dep. 63:15-20, Chavez Dep. 22:1-23:16, 106:1-11, 101:21-102:24; Horne Dep. 31:1-23; Blevins Dep. 119:18-25, 146:19-21, 67:20-24; Lopez Dep. 118:17-19, 110:3-12.

in making their purchasing decision.[10] While not all Plaintiffs choose to smoke the organic variety, the presentation of these varieties alongside other NAS Cigarette varieties, and the inclusion on the organic packs and advertisements of the terms "natural" and "100% additive-free," had the effect of contributing to the overall perception that NAS Cigarettes may be less harmful. In many instances the terms "natural" and "organic" were conflated, and they both conveyed that NAS Cigarettes may be less harmful than other cigarettes.[11]

[10] *See* Sproule Dep. 18:14-24, 19:7-16, 20:17-21:1, 22:24-24:15, 29:4-30:4, 139:10-23; Litwin Dep. 50:9-54:8, 92:1-93:7, 107:18-113:7, 119:20--133:16, 283:21- 284:13, 285:8-287:12, 300:10-301:17; Emmons Dep. 68:14-23, 87:4-89:22, 91:1-20, 95:14-25, 119:20-120:17, 125:12-20, 134:13-135:6, 158:1-159:13, 177:3-9; Benson Dep. 58:5-60:1, 62:20-65:4, 65:24-66:-20, 91:19-94:11, 124:22-125:25, 160:19-161:21, 169:1-173:24, ; Murphy Dep. 45:1-6, 46:1-12, 117:8-120:12, 124:3-23, 167:8-18, 170:15-171:13, 182:10-15; Pontusson Dep. 142:1-9, 49:15-50:18, 167:23-168:5, 143:4-:16, 174:14-175:1, 170:14-24; Haksal Dep. 92:9-110:17, 236:3-21, 182:25-183:25, 116:13-117:9, 126:2-24, 128:8-24, 166:18-24, 182:25-183:25; Hebert Dep. 166:10-169:2, 58:7-21, 71:24-72:24, 96:2-18; Miller Dep. 102:3-16, 104:17-105:20, 155:1-15, 38:18-21; Chavez Dep. 25:3-6, 105:22-106:3, 116:18-25, 122:13-16, 19:2-7; Horne Dep. 79:15-20, 96:10-22, 102:5-8, 31:8-14; Blevins Dep. 139:23-140:2, 62:6-14, 64:20-22, 67:20-24, 89:14-16, 93:18-94:1, 123:13-21, 208:2-3; Lopez Dep. 178:17-19, 154:2-34, 45:24-46:6, 108:16-18, 125:22-23.

[11] Sproule Dep. 54:15-56:15, 92:10-93:3; Litwin Dep. 107:18-110:2, 133:1-133:16, 305:18-314:15 ("I couldn't give you a good distinction" because "organic is natural. Natural is organic, I would argue," "[b]ut then additive free, it either gets additives or it doesn't during the manufacturing process, one of which is menthol, I thought"); Emmons Dep. 87:4-88:22, 92:20-25, 126:8-128:16 (generally understood natural, organic, and additive free to mean the same thing: healthier); Benson Dep. 83:18-84:4 (believed organic meant safer), 124:22-125:25; Murphy Dep. 119:9-120:12, 124:3-23 ("natural", "organic", and "additive-free" reassured her of safety); Pontusson Dep. 209:8-217:8 ("it all sort of adds up to a sense of these are healthy and good and better cigarettes" and "the tobacco is additive-free, natural, and in some cases organic, which are all things I associate with health benefits"); Haksal Dep. 166:18-24 ("additive-free", "natural", and "organic" are "all words that promote" a belief that NAS are better for you); Hebert Tr. 86:14-87:13; Miller Tr. 105:21-106:18, 117:2-12; Chavez Dep. 91:23-92:7 (believed loose leaf meant "more organic" and therefore "less processing"), 36:11-37:6 (believed addition of menthol and organic status mutually exclusive); Horne Dep. 76:14-77:8; Blevins Dep. 66:2-4 ("Organic is healthier, additive free is healthier, natural is healthier"), 159:9-24, 208:2-3, 159:22-24 ("we all thought that natural meant organic"); Lopez Dep. 156:18-24 (unsure if ever smoked an organic NAS style), 30:10-12 (confusing "no additives, less carbon, less milligrams of nicotine, no

Defendants' promotion of NAS Cigarettes as containing only natural and additive-free tobacco, and the incorrect belief that this meant that NAS Cigarettes may be less harmful, caused all Plaintiffs to buy NAS Cigarettes, despite their greatly higher cost compared with other brands, despite actively disliking their taste, despite believing them to be frequently defective, and even despite being made to feel physically unwell by the sensation of smoking them, such that the experience of smoking NAS Cigarettes for the average smoker might be equated to something like eating healthy food or exercising—not necessarily cheap, pleasant, or rewarding, but something that one does for the sake of their health and their families.[12]

Plaintiffs were unfamiliar with the menthol cigarette manufacturing process, including the specifics of whether, when, how, or where menthol is added to NAS Menthol Cigarettes, and the terms "natural" and "100% additive-free" caused confusion as to this issue.[13]

---

chemicals. Basically, I took it like they were organic, I mean, that they were better than your normal cigarettes"), 150:4-151:1, 148:2-6 (no difference between additive-free and organic).

[12] For discussion of higher cost paid for NAS, *see* Sproule Dep. 139:10-23; Litwin Dep. 89:5-96:14, 107:18-110:2, 146:11-147:5, 199:1-200:19 299:19-300:9; Benson Dep. 58:5-59:7, 124:22-125:25, 169:1-173:24, 177:4-11; Murphy Dep. 45:1-6, 182:10-15, 117:21-119:4; Pontusson Dep. 70:16-25, 71:18-72:8; Haksal Dep. 222:1-25, 223:11-225:25, 228:25-230:13; Hebert Dep. 150:1-8; *see also* Sproule Dep. 22:24-23:8 (disliking the taste at first but sticking with NAS because "nothing healthy tastes good"); Litwin Dep. 107:18-110:2 (discussing experiences with defective NAS); Emmons Dep. 68:14-23 (discussing how NAS made her feel congested as if breathing polluted air); Hebert Dep. 152:14-153:9 152:19-153:10 (at first NAS make one feel nauseous but faith in "organic" and "natural" gets one past that), Miller Dep. 142:11-143:8, 70:2-14; 66:2-13 (stating that NAS cigarettes tasted "okay" but that he thought they were "more natural," "better for you"); Chavez Dep. 107:7-15, 122:13-16, 19:2-7; Horne Dep. 55:18-20, 101:18-21, 102:5-8, 46:15-20; Blevins Dep. 139:23-140:2, 187:21-24, 195:10-13; Lopez Dep. 180:16-181:6 (had to "accustom" himself to the taste of NAS but did so for supposed health benefits), 164:3-24.

[13] *See* Chavez Dep. 39:9-15 (never knew what part of the cigarette the menthol was in), 40:6-41-5 (used to believe that menthol was part of tobacco plant, or at least didn't know either way); 18:8-18 (as soon as he discovered menthol was added, he moved to a different brand to save money), 14:14-16:16 (learned menthol is an additive and not part of the tobacco plant in 2015 from the

All of the Plaintiffs believed that because they are made from natural additive-free tobacco, NAS Cigarettes may be less harmful notwithstanding the small-print Disclaimer on the side of the packaging.[14]

---

internet), 16:17-17:2 (before looking online did not know where the menthol was located in NAS or other brands), 18:8-19:7 (as soon as he discovered that menthol is an additive he quit NAS completely and smoked cheaper menthol brands, thinking "if it's all going to be the same type of tobacco, I might as well buy cheaper"), 144:12-14 (believes that adding menthol means it is no longer natural); Horne Dep. 78:1-79:14 (never thought of menthol as an additive, but doesn't know how they make cigarettes menthol, and never thought about what part of the cigarette it is in); Blevins Dep. 140:3-9 (location of menthol in filter not a material consideration in choice of NAS), 146:22-23 (doesn't know what organic menthol is); Lopez Dep. 157:18-23 (first learned that menthol is an additive from the lawsuit); Litwin Dep. 256:11-21 (believes menthol is an additive); 260:3-9 (has no idea how menthol gets into a cigarette or what part it is in), 298:12-16 (doesn't know what menthol is or how it gets into cigarettes), 314:13-15 (understands menthol as an additive), 318:21-322:12 (always understood menthol to be an additive, did not know how it is put in but assumed it was towards the end of the manufacturing process); Benson Dep. 150:21-152:1 (doesn't know how menthol is added to cigarette; unclear as to how that relates to NAS being "additive-free"); Murphy Dep. 178:24-179:19 (doesn't know how menthol gets into cigarette or what part it is in).

[14] Sproule Dep. 24:23-27:12, 31:16-42:17 (describing warnings as "small print . . . it's made for you to not read it"); Litwin Dep. 87:5-88:4, 119:20-129:11, 191:8-198:6, 199:1-200:19, 253:15-255:1, 300:10-301:10; Emmons Dep. 23:17-30:13 ("I would say that if they were serious about having these read, then they should have appeared more prominently on packaging instead of shoved next to a bar code on the side, which is about this big"); 86:11-15, 135:7-136:21, 139:3-142:8, 146:13-147:23, 148:4-150:10, 151:16-152:2, 177:3-9; Benson Dep. 83:18-89:13, 110:6-1118, 115:1-6; Murphy Tr. 130:22-133:6; Pontusson Tr. 186:20-188:20, 175:12-176:3; Haksal Dep. 133:1-21, 124:5-128:24; Hebert Dep. 134:10-20 (warnings "blend into the packaging"), 137:24-138:6; Miller Dep. 85:13-90:1 ("did not ever notice" the disclaimer in emails, ads, or packaging until the lawsuit), 128:21-129:11 (discussing effect of font and color on disclaimer misperception); 91:19-21, 114:2-17, 131:17-132:10, 134:1-11 (thought disclaimer was a government requirement and part of Surgeon General's warning); Chavez Dep. 103:18-23 (disclaimer "blended in with the package"), 126:23-127:2, 130:7; Horne Dep. 32:8-33:13 (never noticed disclaimers until litigation), 38:7-39:21, 70:6-17, 94:6-96:22 ("these are going to be at the very bottom of the screen probably in very, very small font that you are never going to pay attention to"); Lopez Dep. 108:22-24, 142:2-19, 151:11-14, 181:8-182:4 (not aware of the authorship or origin of disclaimers as between SFNTC or the government); Blevins Dep. 42:7-19 ("You know, it's human nature to disregard things, especially if it's in 4 or 6-point type"), 44:3-9, 84:10-12, 86:10-17, 91:2-6, 92:18-20, 106:23-107:11, 108:2-4, 230:16-231:10; Pontusson Dep. 215:1-216:3 (discussing general practice of only taking in the main points of an advertisement rather than

## III. ARGUMENT

### A. Plaintiffs Satisfy All Rule 23 Requirements for Class Certification

"Class actions serve an important function in our system of civil justice." *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 99 (1981). This is especially true for cases such as this one involving low-dollar consumer purchases because individual claims would be dwarfed by the cost of litigation. *See Deposit Guar. Nat'l Bank, Jackson, Miss. v. Roper*, 445 U.S. 326, 339 (1980).

Parties seeking class certification must satisfy each of the four requirements of Rule 23(a)—numerosity, commonality, typicality, and adequacy—and at least one of the requirements of Rule 23(b). Fed. R. Civ. P. 23. The court should conduct a "rigorous analysis" to determine these requirements have been met, which may involve consideration of the merits of the underlying claim to the extent it bears on the suitability of the plaintiff's claims for class treatment. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011).

However, the Supreme Court has "cautioned district courts not to decide the case's merits at the class certification stage" and instructed that "[m]erits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Payne v. Tri-State CareFlight, LLC*, 332 F.R.D. 611, 657 (D.N.M. 2019) (Browning, J.) (quoting *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013)). "In determining the legality of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but

reviewing every advertisement in detail), 216:5-18 (describing the disclaimer as "super fine print").

rather whether the requirements of Rule 23 are met." *Payne*, 332 F.R.D. at 657 (quoting *Anderson v. City of Albuquerque*, 690 F.2d 796, 799 (10th Cir. 1982)). Here, those requirements are met.

### B. Plaintiffs Have Satisfied the Requirements of Rule 23(a)

#### 1. The Class Is Sufficiently Numerous

Numerosity exists when "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). There is no set formula or specific number of class members at which numerosity is presumptively satisfied. *Trevizo v. Adams*, 455 F.3d 1155, 1162 (10th Cir. 2006) (holding 84 class members presented a "judgment call" within the district court's discretion). Numerosity is concerned with: (1) "manageability, *i.e.*, the Court's ability to handle the case as a non-class action"; and (2) "protecting absent plaintiffs from the dangers that inhere in class litigation's foregoing of meaningful, face-to-face attorney-client representation." *Anderson Living Tr. v. WPX Energy Prod., LLC*, 306 F.R.D. 312, 436 (D.N.M. 2015) (Browning, J.). This Court has previously found that joinder of "several hundred tenants and homeowners" would be impracticable, *Lowery v. City of Albuquerque*, 273 F.R.D. 668, 682-83 (D.N.M. 2011) (Browning, J.), as would joinder of 6,100 members class members in a securities action, *Lane v. Page*, 272 F.R.D. 558, 574 (D.N.M. 2011) (Browning, J.).

Plaintiffs readily meet Rule 23(a)(1)'s numerosity requirement in this case. NAS Cigarettes are a top 10 best-selling cigarette brand. Weiner Decl. Ex. 76 (RAI Form 10-K (FY Ending 12/31/16)). NAS Cigarettes' share of the U.S. cigarette market increased from .27% in 2002 to 2.68% in 2019. Weiner Decl. Ex. 2 (SF_MDL00714547). Defendants sold over 2 billion NAS Cigarettes in 2009, over 5.6 billion NAS Cigarettes in 2017, and over 5.8 billion NAS Cigarettes in 2018. *Id.* As of May 2018, SFNTC had 13 million people on its active mailing list. Huyett Dep.

163:15-16. This evidence suggests there are millions of class members; surely there are, at minimum, tens of thousands of class members in each state for which Plaintiffs seek certification. Management of non-class litigation involving likely millions (or even tens of thousands) of plaintiffs would be virtually impossible, as would meaningful, face-to-face attorney client representation. *See Anderson Living Tr.*, 306 F.R.D. at 436. Accordingly, joinder of all class members is "impracticable." Fed. R. Civ. P. 23(a)(1).

**2. Common Questions Will Be Answered with Common Evidence**

Plaintiffs also satisfy commonality for each class. Commonality is usually a minimal burden for plaintiffs to shoulder because it is met whenever a plaintiff identifies "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). This occurs when plaintiffs have identified questions with common answers that "would 'resolve an issue that is central to the validity of each of one of the claims in one stroke.'" *Menocal v. GEO Grp., Inc.*, 882 F.3d 905, 916 (10th Cir. 2018) (quoting *Wal-Mart*, 564 U.S. at 350). Moreover, "[a] finding of commonality requires only a single question of law or fact common to the entire class." *Id*. at 914 (citation and internal quotation marks omitted). The common question must be "central to the validity of each claim that the proposed class brings" and must be "capable of a common answer." *Payne*, 332 F.R.D. at 659 (citing *Wal-Mart*, 564 U.S. at 348-52). "Even factual differences in the claims of the individual putative class members should not result in a denial of class certification where common questions of law exist." *Payne*, 332 F.R.D. at 659 (quotation omitted).

Courts in this Circuit routinely find that the commonality requirement is met in cases, like the present one, alleging false advertising by a defendant.[15] This is because (among other things) (1) whether Defendants' statements are false, deceptive, or misleading can be determined without having to consider Plaintiffs' individual circumstances; (2) Plaintiffs will be able to prove Defendants' violations of law through common evidence; (3) Defendants' conduct and scienter will not vary by Plaintiffs and class members; and (4) the amount of any improper premiums incorporated into an item's price (i.e. Plaintiffs' injuries) will not vary by Plaintiffs and class members. *Daye*, 313 F.R.D. at 176, 178.

This case presents several common questions that are central to resolving the claims in one stroke, including whether:

- Defendants' practices in labeling and marketing NAS Cigarettes as "natural" and "additive-free" tends to mislead reasonable consumers into believing that NAS Cigarettes may be less harmful than other cigarettes;
- Defendants engaged in deceptive or misleading acts or practices by labeling NAS Cigarettes as "natural" and "additive-free";
- NAS Menthol Cigarettes are in fact "additive-free" given that they contain the additive menthol;

[15] *See Daye v. Community Financial Service Centers, LLC*, 313 F.R.D. 147, 178 (D.N.M. 2016) (finding commonality had been met where plaintiffs' injuries stemmed from defendant's false and misleading statements contained in contracts that were materially similar across the class) (Browning, J.); *In re Motor Fuel Temperature Sales Practices Litig.*, 292 F.R.D. 652, 670 (D. Kan. 2013) (finding commonality had been met in a false advertising case where "[p]laintiffs allege a common practice that caused class members a common injury"); *Miller v. Basic Research, LLC*, 285 F.R.D. 647, 656 (D. Utah 2010) (finding commonality had been met where the class was exposed to some variation of the slogan "Eat all you want and still lose weight"); *Mulford v. Altria Group, Inc.*, 242 F.R.D. 615, 623 (D.N.M. 2007) (finding commonality had been met in a case alleging defendant's deceptive and misleading use of "lights" and "lowered in tar and nicotine" on their cigarette packages) (Vazquez, J.).

- NAS Cigarettes are less harmful than other cigarettes;
- As a result of Defendants' misrepresentations, class members suffered an ascertainable loss;
- Class members either paid a price premium for the NAS Cigarettes that they would not have paid but for the false labeling and marketing of the NAS Cigarettes or would not have purchased them at all.
- Defendants should be enjoined from continuing to sell NAS Cigarettes as currently labeled.

The resolution of each of these questions is driven by common legal and factual issues, which will dictate the ultimate resolution of this action. Common evidence regarding the labeling and marketing of the NAS Cigarettes will answer whether they are uniformly marketed to promote health reassurance. *See supra* §§ II.B-C (discussing uniform labeling and pervasive advertising of NAS Cigarettes), II.D (discussing PPODs of NAS brand), II.G (discussing consumer perceptions of NAS Cigarettes' health reassurances, including expert opinions and peer-reviewed research). Common evidence will also answer whether Defendants' labeling and marketing of the NAS Cigarettes was misleading and false because they are not actually safer or healthier than other cigarettes. Finally, economic damages attributed to Defendants' misrepresentations can be determined on a class-wide basis. *See generally* Dubé Report.

Each of these questions involves common factual and legal issues concerning Defendants' marketing and labeling of NAS Cigarettes which apply uniformly to all class members. Commonality is therefore established. *See Daye*, 313 F.R.D. at 177-78 (commonality established where lender used standard loan contracts and procedures); *Payne*, 332 F.R.D. at 694-696 (commonality established where unjust enrichment claim based on a common employment policy).

### 3. Plaintiffs' Claims Are Typical

Typicality requires the class representatives' claims to be typical of those of the absent class members. Fed. R. Civ. P. 23(a)(3). "The typicality requirement ensures that absent proposed class members are adequately represented by evaluating whether the named plaintiff's interests are sufficiently aligned with the class' interest." *Anderson Living Tr.*, 306 F.R.D. at 382. "The commonality and typicality requirements of Rule 23(a) tend to merge." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982). When the class representatives' and absent class members' claims "are based on the same legal or remedial theory," even "differing fact situations of class members do not defeat typicality." *Adamson v. Bowen*, 855 F.2d 668, 676 (10th Cir. 1988). Typicality is satisfied when commonality is satisfied. *Anderson Living Tr.*, 306 F.R.D. at 382-83.

Plaintiffs' claims are typical of the class members' claims because they are all based on the same underlying conduct and legal theories. Specifically, Plaintiffs were regular purchasers of NAS Cigarettes, which Defendants uniformly marketed and labeled. Plaintiffs were all exposed to the NAS Cigarette labeling and advertising at the point of purchase. The labeling and marketing of the NAS Cigarettes consistently reinforced to Plaintiffs that they may be less harmful than other cigarettes, and they relied upon this impression in making their purchases. Plaintiffs paid the premium price for NAS Cigarettes specifically as a result of their belief that they may be less harmful than competing cigarettes. With respect to menthol, Plaintiffs were unfamiliar with the cigarette manufacturing process, including the status of menthol as an additive to tobacco. *See supra* § II.L. Finally, despite having been theoretically exposed to disclaimers and warnings on each pack and in each advertisement, no Plaintiff ceased their belief that the NAS Cigarettes are less harmful than other cigarettes. *Id.* Accordingly, typicality is also satisfied.

**4. Adequacy**

Rule 23(a)(4) requires that "representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "The requirement of typicality dovetails into the requirement of adequacy of representation." *Payne*, 331 F.R.D. at 662 (quoting *Penn v. San Juan Hospital, Inc.*, 528 F.2d 1181, 1189 (10th Cir. 1975)); *see also Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc.*, 725 F.3d 1213, 1219 (10th Cir. 2013) (noting that "the commonality, typicality, and adequacy requirements of Rule 23(a) 'tend to merge'" (quoting *Wal-Mart*, 564 U.S. at 349 n.5)).

"The adequacy requirement protects the interests of unnamed proposed class members who are bound by any judgment in the action." *Payne*, 331 F.R.D. at 662. "The Tenth Circuit has identified two questions relevant to the adequacy of representation inquiry: (i) whether the named plaintiffs and their counsel have any conflicts with other proposed class members; and (ii) whether the named plaintiffs and their counsel will vigorously prosecute the action on the class' behalf." *Id.* (citing *Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1187-88 (10th Cir. 2002)). Notably, "not every potential disagreement between a class representative and the putative class members" amounts to a conflict of interest. *Lowery*, 273 F.R.D. at 680.

Here, as explained above in the sections regarding commonality and typicality, Plaintiffs all share the same interests as the proposed classes they seek to represent because they all have the same claims: they paid money for NAS Cigarettes that they would not have paid but for Defendants' false, deceptive, and misleading advertising and breach of warranty. *See supra* §§ III.B.2-3 (discussing commonality and typicality). Plaintiffs' interests are wholly aligned with those of the putative class members they seek to represent, and they are committed to prosecuting

this action for the benefit of the class as a whole. Weiner Decl. Exs. 77-89 (Class Representative Declarations). This is borne out by Plaintiffs' vigorous prosecution of this action, as shown by, for example, the fact that they gave depositions, produced documents, answered interrogatories, and are prepared to testify at trial. *See id.* Plaintiffs are therefore adequate representatives.

Plaintiffs' counsel are also adequate, whether judged as part of the analysis under Rule 23(a)(4) or 23(g). *See Payne*, 331 F.R.D. at 662 ("Although Tenth Circuit precedent suggests that the adequacy-of-counsel analysis is conducted as a part of the rule 23(a)(4) inquiry, this analysis has now been moved to rule 23(g)." (citation omitted)). Specifically, Plaintiffs seek appointment of Lead Counsel and the attorneys comprising the Plaintiffs' Executive Committee ("PEC") as class counsel.[16] These attorneys and their firms have deep experience in tobacco litigation and class action litigation. Weiner Decl. ¶¶ 93-102; Decls. of Attorneys Schlesinger, Blankinship, Reese, Schultz, Marker, LaDuca, Warshaw, Gustafson, Marron, Gdanski, and Long. Indeed, the Court recognized as much when it appointed these firms to leadership positions in this MDL pursuant to Rule 23(g)(3). *See* Order Granting Joint Application for Appointment of Pls.' Leadership Structure, ECF No. 24.[17] Their adequacy is further shown by their skill,

[16] These attorneys are Scott P. Schlesinger, Melissa S. Weiner, Greg Blankinship, Michael Reese, Matthew Schultz, Caleb Marker, Charles LaDuca, Daniel L. Warshaw, James W. Gustafson, Jr., Ronald Marron, and Jonathan Gdanski. Since the time that Plaintiffs' applied for appointment of leadership, Randi McGinn has withdrawn from the action and been replaced by Nancy Long as Liaison Counsel and Charles Zimmerman passed away.

[17] At the Court's direction, on January 31, 2018, Plaintiffs submitted an ex parte Protocol for Plaintiffs' Leadership Structure, which includes the individuals previously appointed by this Court in ECF No. 24.

professionalism, and vigorous representation of Plaintiffs and class members throughout this litigation. Accordingly, they are adequate as class counsel.

**C. The Requirements of Rule 23(b)(3) Are Satisfied**

**1. Predominance**

The Rule 23(b)(3) predominance inquiry tests whether "questions common to the class predominate over those questions that are individualized." *Payne*, 332 F.R.D. at 665. "A question is common when the same evidence will suffice for each member to make a prima facie showing,' or when the issue is susceptible to generalized, class-wide proof." *Id*. (quotations omitted). "A question is individual when the members of a proposed class will need to present evidence that varies from member to member." *Id*. (quotation omitted). Under Rule 23(b)(3), "class status is appropriate as long as plaintiffs can establish an aggregation of legal and factual issues, the uniform treatment of which is superior to ordinary one-on-one litigation." *CGC Holding Co., LLC v. Broad & Cassel*, 773 F.3d 1076, 1086 (10th Cir. 2014). Predominance requires courts to "*characterize* the issues in the case as common or not, and then *weigh* which issues predominate." *Id.* at 1087. Thus, "the presence of some individual questions does not destroy predominance." *Anderson Living Tr.*, 306 F.R.D. at 386.

"Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Haliburton Co.*, 563 U.S. 804, 809 (2011). Predominance also requires the plaintiffs to show that damages are "measurable 'on a class-wide basis' through use of a 'common methodology.'" *Comcast Corp. v. Behrend*, 569 U.S. 27, 30 (2013).

(a) Plaintiffs Will Prove the Elements of Their Claims on a Class-Wide Basis Through Evidence Common to the Class

Plaintiffs bring claims for violations of consumer protection statutes, unjust enrichment, and breach of express warranty under the laws of twelve different states. *See* SAC ¶¶ 136-459. The details of these claims are discussed in more detail below. *See infra* § III.C.1.c. For purposes of an overarching analysis, however, it is sufficient to note that the elements of Plaintiffs' claims generally are similar from state to state, and Plaintiffs will prove them with common evidence. In particular, the elements of these claims are based on an objective standard and focus on Defendants' conduct, or the impact of Defendants' conduct on a reasonable consumer. *See* MTD Order 163-65 (concluding that "the reasonable consumer standard governs" all the consumer protection statutes at issue).

Class certification is appropriate, and predominance is satisfied, when the driving issues in the case relate to the defendants' conduct or can be determined with respect to the class as a whole based on an objective standard. For instance, as the Supreme Court has explained, materiality is an objective question based on the reasonable person standard, and thus, it "can be proved through evidence common to the class." *Amgen*, 568 U.S. at 467. This makes materiality a common question for purposes of Rule 23(b)(3), and there is no risk that a failure of proof will result in individual questions predominating because "the failure of proof on the element of materiality would end the case for one and all." *Id.* at 467-68.

Objective questions, or questions focusing on the defendants' conduct, are the driving issues for all of Plaintiffs' claims here. First, state consumer protection statutes generally impose liability when the defendants' marketing "is likely to mislead a reasonable consumer, even if the statement is literally true." *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 762 (7th Cir. 2014). Class-wide proof "that the alleged misrepresentation is material and was made in a generally

uniform manner as to all class members" is sufficient to establish predominance. *Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 518 (6th Cir. 2015). Second, "[u]njust enrichment claims can be certified for class treatment where there are common circumstances bearing on whether the defendant's retention of a benefit received from class members was just or not." *In re Checking Account Overdraft Litig.*, 286 F.R.D. 645, 657 (S.D. Fla. 2012); *see also In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 698 (S.D. Fla. 2004) (emphasizing that "common evidence will focus on the defendant's gain and not on the plaintiff's loss"). Finally, a breach-of-warranty claim is susceptible to the same common proof as consumer fraud claims. *See Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1118 (N.D. Cal. 2018); *Astiana v. Kashi Co.*, 291 F.R.D. 493, 505 (S.D. Cal. 2013).

The specific laws at issue are discussed in more detail below on a state-by-state basis, in accordance with Plaintiffs' proposed class definitions. Because the elements are substantially the same—and in every instance, established by proof common to the class as a whole—common issues predominate.

Evidence common to all class members—including Defendants' own documents and employee testimony, as well as Plaintiffs' experts' testimony—shows that Defendants uniformly advertised and labeled the NAS Cigarettes as "natural" and "additive-free" during the class periods. *See supra* §§ II.B-C. Claims that NAS Cigarettes are "natural" and "additive-free" are the PPODs for Defendants' NAS brand, both before and after Defendants' settlement with the FDA in 2017. *See supra* §§ II.D-E. Defendants' marketing strategy worked. Defendants invested heavily in marketing, and the sales of NAS Cigarettes increased significantly even as the tobacco market as a whole shrunk. *See supra* § II.F.

Common evidence also shows that Defendants' marketing claims misled reasonable consumers into believing the NAS Cigarettes are less harmful than other cigarettes. *See supra* §§ II.G-H. They are not. If anything, the NAS Cigarettes are more carcinogenic than competitors' cigarettes. *See supra* § II.I. But because of their reasonable beliefs (based on Defendants' labeling and marketing), consumers suffered a quantifiable economic injury in paying for NAS Cigarettes sold not as advertised in the form of (1) a price premium for those attributes and (2) willingness to pay for those attributes. *See supra* § II.J. The same is true of the literally false claim, and breached warranty, that the NAS Menthol Cigarettes are additive-free. *See supra* § II.K.

In short, the evidence focuses on Defendants' conduct and is common to all class members. The evidence will apply to all claims to prove objective issues, such as the impact on a reasonable consumer based on Defendants' uniform labeling and advertising of NAS Cigarettes. There is no need for any Plaintiffs or class members to present evidence regarding their individual circumstances to prove any of the claims. These common issues easily will be the focus of trial, and accordingly, predominate over any individualized issues. *See Daye*, 313 F.R.D. 147 (predominance satisfied where plaintiff alleged uniform loans violated UPA and other statutes).

(b) <u>Plaintiffs Will Demonstrate Class-Wide Damages Through a Methodology Common to the Class</u>

To prove class-wide damages, plaintiffs must put forth a damages model seeking to measure the damages attributable to their damages theory. *Comcast*, 569 U.S. at 35. However, damages "[c]alculations need not be exact." *Id.* Nor do individualized questions about damages defeat predominance. *Naylor Farms, Inc. v. Chaparral Energy, LLC*, 923 F.3d 779, 798 (10th Cir. 2019). This is true even if the district court must "later divide the class into subclasses for purposes of determining damages." *Id.* Indeed, predominance may be satisfied even if "other important

matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (quotation omitted).

A damages model may be based on a "representative or statistical sample," even if it is not based on, and does not attempt to prove, each class member's individual damages. *Id.* at 1046. Instead, the question is whether "the evidence is reliable in proving or disproving the elements of the relevant cause of action." *Id.* Representative, statistical evidence can be used in a class proceeding just like it could in an individual proceeding. *Id.* at 1047. Evidence that an expert will be able to determine class-wide damages "through use of a model" is sufficient to satisfy Rule 23(b)(3), at least when the defendant "fails to explain why that model is inaccurate or unworkable." *Naylor Farms*, 923 F.3d at 798.

"The predominance question applies to both macro damages—the total class damages—and to the micro damages—the individual damages." *Payne*, 332 F.R.D. at 666. "A class can have individual damage calculations, but the Court has to look at the issues of individual damage calculations at the class certification stage." *Id*. at 668. The "methodology for all class members needs to be common or, if there are different methodologies for some plaintiffs and class members, the Court must take these differences into account at the class certification state in the predominance analysis." *Id*. Finally, "even if the methodology is common to the class, the Court must decide whether it will operate in a consistent way for each individual class member." *Id*.

Courts routinely certify consumer class actions under Rule 23(b)(3) when the plaintiff presents expert testimony based on conjoint analysis designed to isolate the portion of the payment attributable to the misrepresented product attribute. *See, e.g.*, *Hadley. Kellogg Sales Co.*, 324 F.

Supp. 3d 1084, 1103-06 (N.D. Cal. 2018) (discussing proposed conjoint analysis and finding it satisfies *Comcast*); *In re Arris Cable Modem Consumer Litig.*, 327 F.R.D. 334, 366-70 (N.D. Cal. 2018) (same); *Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*, 326 F.R.D. 592, 601, 614-16 (N.D. Cal. 2018) (discussing price premium survey and choice-based conjoint analysis and finding common issues predominate); *In re Dial Complete Mktg. & Sales Practices Litig.*, 320 F.R.D. 326, 331-33 (D.N.H. 2017) (denying motion to exclude expert testimony based on conjoint analysis under both *Daubert* and *Comcast* theories); *Sanchez-Knutson v. Ford Motor Co.*, 310 F.R.D. 529, 538-39 (S.D. Fla. 2015) ("The Court accepts Plaintiff's proffered expert's proposed conjoint analysis damages model for purposes of class certification, finding that it is sufficiently tied to Plaintiff's legal theory and her proffered evidence that her Explorer shares the same defect as all others in its product line, and meets the predominance requirement under the Supreme Court's holding in *Comcast*."); *Khoday v. Symantec Corp.*, 93 F. Supp. 3d 1067, 1082 (D. Minn. 2015), ("The Court finds that Gaskin's conjoint analysis is generally a permissible method for calculating damages."). Generally, a conjoint analysis asks survey respondents to choose between different sets of product attributes, aggregates those responses, and uses statistical methods to determine the value that consumers attach to each specific attribute. *In re Arris*, 327 F.R.D. at 367.

At class certification, an expert need not put forth a final damages analysis that would be admissible at trial. Rather, the question is whether the expert's testimony is helpful for determining whether the requirements of Rule 23 are met. *See In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig.*, No. 17-MD-2785-DDC-TJJ, 2020 WL 1180550, at *24 (D. Kan. Mar. 10, 2020) (certifying class where plaintiffs' experts "proposed a methodology" for determining aggregate damages and noting "whether plaintiffs' expert reports actually prove

classwide damages" is not a proper determination for class certification); *see also Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1004-06 (9th Cir. 2018) (explaining that although a *Daubert* analysis is appropriate to evaluate the admissibility of an expert's testimony, "[i]nadmissibility alone is not a proper basis to reject evidence submitted in support of class certification" because "admissibility should go to the weight that evidence is given" in determining whether the requirements of Rule 23 are met); *In re Zurn Pex Plumbing Prod. Liab. Litig.*, 644 F.3d 604, 614 (8th Cir. 2011) (finding "a focused *Daubert* analysis" proper that was limited to determining whether requirements of Rule 23 are met); *Abante Rooter & Plumbing, Inc. v. Alarm.com Inc.*, No. 15-CV-6314-YGR, 2017 WL 1806583, at *3 (N.D. Cal. May 5, 2017) ("[A]t this early stage, robust gatekeeping of expert evidence is not required; rather, the court should ask only if expert evidence is useful in evaluating whether class certification requirements have been met."); *Kurtz v. Kimberly-Clark Corp.*, 321 F.R.D. 482, 551 (E.D.N.Y. 2017) (finding methodology report proposing to use hedonic regression analysis sufficient for class certification).

In this case, Plaintiffs have submitted an expert report and response declaration from Jean-Pierre H. Dubé, Ph.D. *See generally* Dubé Report; Weiner Decl. Ex. 90 (Dubé Response). He opines on whether a methodology exists to determine economic damages based on certain of Defendants' misrepresentations (referred to as the "Challenged Claims"). Dubé Report ¶ 2. In particular, in Dr. Dubé's opinion, conjoint analysis can be used to determine class-wide economic damages. *Id.* ¶ 3.

Dr. Dubé is qualified in this area. He is the Sigmund E. Edelstone Professor of Marketing at the University of Chicago Booth School of Business, where he has been on the faculty since 2000. *Id.* ¶¶ 5-6. He completed a Ph.D. in economics from Northwestern University in 2000 and a

B.S. in quantitative methods in economics from the University of Toronto in 1995. *Id.* ¶ 5. During his teaching career, Dr. Dubé has taught MBA and executive courses in areas including marketing strategies, marketing analytics, and pricing strategies, several of which cover frameworks for modeling and empirically estimating consumer willingness to pay and consumer demand, as well as conjoint analysis and its use for demand estimation. *Id.* ¶ 7. His research focuses broadly on topics related to consumer demand for branded goods, including demand-side and supply-side issues. *Id.* ¶ 10. He has also worked as an expert witness in the area of marketing and packaging claims, including for Australia's Attorney General regarding the Tobacco Plain Packaging Act. *Id.* ¶¶ 13-14. He has consulted with firms in a variety of industries about consumer preferences and willingness to pay. *Id.* ¶ 15.

Dr. Dubé concluded that a choice-based conjoint analysis is appropriate to measure consumers' preferences for cigarette product features, including the Challenged Claims. *Id.* ¶ 17. The conjoint analysis will control for the presence of differentiated competing brands charging different prices on the supply side of the market. *Id.* The conjoint analysis's preference estimates can be used to implement a marketplace simulation to measure the price premium paid by consumers, which will account for the oligopoly competition between Defendants and other supply-side competitors. *Id.* ¶ 19. They also can be used to measure consumers' willingness to pay, which is "the microeconomic measure of total incremental classwide economic value from the benefits associated with the Challenged Claims on the labels of the Challenged Products." *Id.* ¶ 20.

Dr. Dubé will calculate a price premium, which measures the difference between the price class members actually paid for NAS Cigarettes and the price they would have paid but for the

Challenged Claims. *Id.* ¶ 23. This will include a "marketplace simulation of the oligopoly market in which the Defendants and their main competitors compete on prices," with the assumption that each firm sets its prices to maximize the profits from the sale of its brands. *Id.* ¶ 25. It will also include consideration of each firm's demand and marginal costs, and the use of a conjoint analysis to determine consumer demand in the but-for world. *Id.* ¶ 26.

Dr. Dubé will also calculate willingness to pay, which measures the incremental economic value class members perceive from the Challenged Claims. *Id.* ¶ 27. This accounts for different ways in which consumers suffer economic harm: (1) they lose the perceived benefits of the Challenged Claims; (2) they might change their purchase decision; and (3) they might not purchase cigarettes at all. *Id.* Again, a conjoint analysis will measure consumer preferences based on survey data and a statistical procedure to estimate consumers' preferences using the survey data. *Id.* ¶ 29.

The conjoint survey will seek responses from cigarette smokers in the states where class members reside. *Id.* ¶¶ 34-35. The survey will ask about Defendants' Products as well as their competitors' cigarettes. *Id.* ¶¶ 36-42. The survey will ask respondents to choose one option among several product alternatives, sometimes including a no-purchase alternative. *Id.* ¶ 43. The analyst changes the set of products, the level of the features and the prices in the choice set, which lets the analyst observe how consumers trade off features and prices. *Id.* Varying the labeling claims and the prices in the survey allows the analyst to isolate their respective effects, as well as to control for features like brand. *Id.* ¶ 50.

Dr. Dubé will employ a choice-based conjoint analysis, which is one of the most widely used conjoint techniques in the world. *Id.* ¶ 52. This mimics the purchase process for consumers by presenting a set of product profiles and asking which the respondent would purchase and is

rooted in "random utility theory," a well-tested theory of choice behavior. *Id.* ¶¶ 52-54. This approach will allow Dr. Dubé to estimate consumer preferences and utilize a standard microeconomic approach to calculate economic damages. *Id.* ¶¶ 56-59.

Dr. Dubé considered the report of Defendants' expert, David J. Teece, which criticizes Dr. Dubé's conclusions, and was able to respond to—and in most cases discredit—Dr. Teece's generalized conclusions regarding the appropriateness of the use of conjoint in this context. Dubé Response ¶¶ 9-10. Dr. Teece's argument that willingness to pay does not provide an appropriate measure of economic damages is likewise without merit because, as a large body of academic research shows, a price premium alone may not fully compensate class members who may not have purchased NAS Cigarettes but for the Challenged Claims on the labels. *Id.* ¶¶ 21-24. Further, Dr. Teece's analysis of historic data in fact suggests that some of the Challenged Claims do have an effect on demand for NAS Cigarettes—thereby *supporting* the appropriateness of Dr. Dubé's methodology. *Id.* ¶¶ 29-32.

This analysis readily satisfies the requirements of Rule 23 through a qualified expert's use of a methodology to calculate class-wide damages that measures the class members' injuries incurred as a result of paying for NAS Cigarettes sold not as advertised. As the Court found in *Daye*, Plaintiffs here "present[] a damages model capably of reliably and properly calculating classwide (and individual) damages that tracks [plaintiffs'] liability theory, meaning that the Court need not devote more time to individual questions than to common questions." *Daye*, 313 F.R.D. at 183.

(c) <u>The Elements of Plaintiffs' Claims Are Capable of Class-Wide Proof</u>

As noted above, predominance requires examination of "the elements of the underlying cause of action." *Erica P. John Fund*, 563 U.S. at 809. As shown below, the elements of all causes of action will be established by class-wide proof, and therefore, common issues predominate.

(i) *California Class and California Menthol Subclass*

The California Class and California Menthol Subclass bring claims under the Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.* ("CLRA"); the False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq.* ("FAL"); the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.* ("UCL"); and common law unjust enrichment, or quasi-contract. SAC ¶¶ 136-76.

"Courts generally consider claims under [the UCL, FAL, and CLRA] together." *Fitzhenry-Russell v. Dr. Pepper Snapple Grp. Inc.* (*Fitzhenry-Russell II*), 345 F. Supp. 3d 1111, 1115 (N.D. Cal. 2018) (quoting *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 982 (C.D. Cal. 2015)). "The central question here is whether [the defendants'] labels were likely to deceive a reasonable consumer." *Kumar v. Salov N. Am. Corp.*, No. 14-cv-2411, 2016 WL 3844334, at *4 (N.D. Cal. July 15, 2016). These statutes prohibit advertising that is actually false as well as advertising that, "although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public.'" *Id.* (quoting *Kasky v. Nike, Inc.*, 45 P.3d 243, 250 (Cal. 2002)). Because a plaintiff need only show that members of the public are likely to be deceived, "the answer to the reasonable consumer question [is] based on common facts, that is, identical statements on the labels of the products at issue." *Id.* Thus, "it is well-settled that where 'numerous consumers are exposed to the same dubious practice by the same seller . . . proof of the prevalence of the practice as to one consumer would provide proof for all.'" *Id.* (quoting *Vasquez v. Superior Court*, 484 P.2d 964, 968 (Cal. 1971)) (alteration in original).

These claims require a showing of materiality and reliance "based upon the reasonable consumer standard, not the subjective understandings of individual plaintiffs." *Id.* at *7. Proof of materiality requires showing that "a reasonable consumer would attach importance" to the representations at issue, *or* that "the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his choice of action." *Id.* (quoting *Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1107 (9th Cir. 2013)). The materiality of deceptive representations can be established as a matter of law without the need for expert testimony or consumer surveys. *See id.* at *8 (holding that a label that misleads consumers about the product's origin is material to the consumer's injury as a matter of law).

These consumer protection claims are "ideal for class certification because they will not require the court to investigate class members' individual interaction with the product." *In re Arris*, 327 F.R.D. at 365 (quotations omitted). "For the purposes of class certification, it is sufficient that the alleged material misstatement and omission was part of a common advertising scheme to which the entire class was exposed, and is a sufficiently definite representation whose accuracy has been legitimately called into question." *Astiana v. Kashi Co.*, 291 F.R.D. 493, 505 (S.D. Cal. 2013). Materiality may generally be established by common proof because it is an objective standard and the misrepresentations would be either material or immaterial for the class as a whole. *Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.* (*Fitzhenry-Russell I*), 326 F.R.D. 592, 613 (N.D. Cal. 2018) (alterations in original) (citation omitted). This "standard requires only that the Court find there is a probability that reasonable consumers could be misled, not that they all believed [the representation at issue] means the same thing." *Id.* "Materiality can be shown by a third party's,

or defendant's own, market research showing the importance of such representations to purchasers." *Kumar*, 2016 WL 3844334, at *8.

Reliance is similarly susceptible to common proof because the relevant question is "[w]hether a reasonable consumer would have seen the phrase and been misled." *Id.* at *9. The plaintiff need not rely on consumer surveys or expert testimony as long as the language at issue is not "inherently ambiguous." *Id.*

"An individual who has been unjustly enriched at the expense of another may be required to make restitution." *Hartford Cas. Ins. Co. v. J.R. Mktg., L.L.C.*, 353 P.3d 319, 326 (Cal. 2015). Like consumer fraud and breach-of-warranty claims, "quasi-contract claims are appropriate for class certification as they require common proof of the defendant's conduct and raise the same legal issues for all class members." *Astiana*, 291 F.R.D. at 505.

Common proof will establish the elements of all the California Class members' causes of action in this case. At its core, this is a case about Defendants' misleading labeling of NAS Cigarettes as "natural" and "additive-free," which implies to reasonable consumers that they may be less harmful than other cigarettes. Common evidence demonstrates that NAS Cigarettes' labeling and marketing consistently centers on a strategic marketing campaign touting these core attributes that imply a less deleterious health impact to reasonable consumers. *See In re Arris*, 327 F.R.D. at 366 (noting existence of substantially similar representations on packaging was sufficient to satisfy predominance requirement and no individualized inquiry was needed into which class members read box and warranty information).

In this case, evidence common to all class members will prove each of these elements. This common evidence shows that Defendants uniformly advertised and labeled NAS Cigarettes as

"natural" and "additive-free" during the class period. *See supra* § II.B. Other labels claims and descriptors reinforced that the NAS Cigarettes may be less harmful than other cigarettes. *See supra* § II.C; *see also Davidson v. Apple, Inc.*, No. 16-cv-4942, 2018 WL 2325426, at *18 (N.D. Cal. May 8, 2018) ("Courts . . . presume class members who purchased products with misleading packaging . . . were exposed to misleading statements on that packaging."). Cosmetic differences in the packaging do not defeat predominance because the representations at issue all relate to the core marketing theme that NAS Cigarettes are "natural" and "additive-free." *See Broomfield*, No. 17-cv-1027, 2018 WL 4952519, at *12 (N.D. Cal. Sept. 25, 2018) (holding various imagery of Hawaii was "sufficiently comparable to create common questions of fact about the nature of the alleged misrepresentation").

Claims that NAS Cigarettes are "natural" and "additive-free" are the PPODs for Defendants' NAS brand, both before and after Defendants' settlement with the FDA in 2017. *See supra* §§ II.D-E. Defendants' marketing strategy worked. Defendants invested heavily in marketing, and NAS Cigarettes' sales increased significantly even as the tobacco market as a whole shrunk. *See supra* § II.F. Because materiality is determined by the reasonable person standard, the issue of causation is common to all class members and does not require individualized proof. *In re ConAgra*, 90 F. Supp. 3d at 983.

Common evidence also shows that Defendants' marketing claims misled reasonable consumers. In particular, reasonable consumers believe that NAS Cigarettes may be less harmful than competitors' cigarettes because they are "natural" and "additive-free." *See supra* §§ II.G-H. They are not. If anything, NAS Cigarettes are more carcinogenic than competitors' cigarettes. *See supra* § II.I. But because of their reasonable beliefs (based on Defendants' marketing), consumers

suffered a quantifiable economic injury in paying for NAS Cigarettes sold not as advertised in the form of (1) a price premium for those attributes and (2) willingness to pay for those attributes. *See supra* §§ II.J, III.C.1.b. The same is true of the literally false claim, and breached warranty, that the NAS Menthol Cigarettes are additive-free. *See supra* § II.K.

In short, the relevant evidence focuses on Defendants' conduct and is common to all class members. It will prove objective issues, such as the impact on a reasonable consumer and the terms of a warranty based on NAS Cigarettes' labeling. These common issues easily will be the focus of trial, and accordingly, predominate over any individualized issues.

(ii) *Colorado Class and Colorado Menthol Subclass*

The Colorado Class and Colorado Menthol Subclass bring claims for violation of the Colorado Consumer Protection Act, Colo. Rev. Stat. § 6-1-101, *et seq.* ("CCPA"), and common law unjust enrichment. SAC ¶¶ 177-94.

The CCPA prohibits deceptive trade practices, including false statements about the qualities or characteristics of products. *See* Colo. Rev. Stat. §§ 6-1-105(e), (g). "A plaintiff may satisfy the deceptive trade practices requirement of section 6-1-105(1)(e) by establishing either a misrepresentation or that the false representation had the capacity or tendency to deceive, even if it did not." *Rhino Linings USA, Inc. v. Roby Mountain Rhino Lining, Inc.*, 62 P.3d 142, 147 (Colo. 2003). A misrepresentation is "a false or misleading statement that induces the recipient to act or refrain from acting . . . [and] is made 'either with knowledge of its untruth, or recklessly and willfully made without regard to its consequences, and with an intent to mislead and deceive the plaintiff." *Id.* (quoting *Parks v. Bucy*, 211 P. 638, 639 (Colo. 1922)). To establish liability under the CCPA, plaintiffs must show: (1) an unfair or deceptive trade practice; (2) the practice occurred

in the course of the defendant's business; (3) the practice significantly impacts the public as actual or potential consumers of the defendant's products; (4) injury in fact; and (5) causation. *Alpine Bank v. Hubbell*, 555 F.3d 1097, 1112 (10th Cir. 2009) (citing *Hall v. Walter*, 969 P.2d 224, 235 (Colo. 1998)).

"[A] party claiming unjust enrichment must prove that (1) the defendant received a benefit, (2) at the plaintiff's expense, (3) under circumstances that would make it unjust for the defendant to retain the benefit without commensurate compensation." *Lewis v. Lewis*, 189 P.3d 1134, 1141 (Colo. 2008). "The proper remedy upon a finding of unjust enrichment is to restore the harmed party 'to the position he formerly occupied either by the return of something which he formerly had or by the receipt of its monetary equivalent.'" *Id.* (quoting Restatement (First) of Restitution § 1, cmt. a). "The scope of the remedy is broad, cutting across both contract and tort law, with its application guided by the underlying principle of avoiding the unjust enrichment of one party at the expense of another." *Robinson v. Colo. State Lottery Div.*, 179 P.3d 998, 1007 (Colo. 2008). The existence of damages for a legal claim does not mean "that a party had an adequate legal remedy that precludes further equitable relief," particularly when "the objectives of the two remedies are different." *Harris Grp., Inc. v. Robinson*, 209 P.3d 1188, 1205 (Colo. App. 2009).

These claims are well suited to class treatment because they focus on the defendants' wrongdoing and objective elements. *See Garcia v. Medved Chevrolet, Inc.*, 263 P.3d 92, 99 (Colo. 2011) (noting certification of consumer fraud class actions is appropriate "where causation can be established with circumstantial evidence common to a class"). Thus, courts have certified these claims for class treatment. *See Hamilton v. TBC Corp.*, 328 F.R.D. 359, 389 (C.D. Cal. 2018) (certifying Colorado class asserting CCPA claim); *Menocal v. GEO Grp., Inc.*, 882 F.3d 905, 925

(10th Cir. 2018) (finding predominance as "the unjustness element is susceptible to generalized proof," and affirming certification of unjust enrichment claim under Colorado law).

As discussed above, common evidence will prove these elements, including Defendants' wrongful and deceptive conduct, the aggregate injury to the class, and the benefit Defendants thereby obtained. Therefore, common issues predominate with respect to the Colorado Class and Colorado Menthol Subclass.

(iii) *Florida Class and Florida Menthol Subclass*

The Florida Class and Florida Menthol Subclass bring claims for violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq.* ("FDUTPA"), and unjust enrichment. SAC ¶¶ 195-216.

"[U]nder FDUTPA, the plaintiff must only establish three *objective* elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 985-86 (11th Cir. 2016). An unfair practice is "one that 'offends established public policy' and one that is 'immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.'" *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003) (citation omitted). "[D]eception occurs if there is a representation, omission, or practice that is likely to mislead consumers acting reasonably in the circumstances, to the consumers' detriment." *Zlotnick v. Premier Sales Group, Inc.*, 480 F.3d 1281, 1284 (11th Cir. 2007) (quotation omitted).

Unjust enrichment is established when there is "a benefit conferred upon a defendant by the plaintiff, the defendant's appreciation of the benefit, and the defendant's acceptance and retention of the benefit under circumstances that make it inequitable for him to retain it without

paying the value thereof." *Fla. Power Corp. v. City of Winter Park*, 887 So. 2d 1237, 1241 n.4 (Fla. 2004) (quotation omitted).

Because these claims focus on objective elements and the defendants' conduct, they are well suited to class treatment. *See Carriuolo*, 823 F.3d at 985-89 (class certification of FDUTPA claim proper because deception, injury and causation are all determined by objective standard and common evidence); *In re Checking Account Overdraft Litig.*, 307 F.R.D. 656, 675 (S.D. Fla. 2015) (certifying multi-state unjust enrichment class, including Florida, "where common circumstances bear upon whether the defendant's retention of a benefit from class members was unjust"); *Nelson v. Mead Johnson Nutrition Co.*, 270 F.R.D. 689, 697 (S.D. Fla. 2010) (certifying FDUTPA claim); *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. at 698 (certifying multi-state unjust enrichment class, including Florida).

As discussed above, common evidence will prove these elements, including Defendants' wrongful and deceptive conduct, causation, class-wide the aggregate injury to the class, and the benefit Defendants thereby obtained. Therefore, common issues predominate with respect to the Florida Class and Florida Menthol Subclass.

(iv) *Illinois Class and Illinois Menthol Subclass*

The Illinois Class and Illinois Menthol Subclass bring claims for violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.* ("ICFA"), Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/1, *et seq.* ("IUDTPA"), and unjust enrichment. SAC ¶¶ 217-49.

The ICFA prohibits "unfair or deceptive acts or practices." 815 ILCS 505/2. To state a claim, plaintiffs must show "(1) a deceptive act or practice by the defendant; (2) the defendant

intended that the plaintiff rely on the deception; (3) the deceptive act occurred in a course of conduct involving trade or commerce; and (4) actual damage to the plaintiff; (5) proximately caused by the deceptive act." *Philadelphia Indem. Ins. Co. v. Chicago Title Ins. Co.*, 771 F.3d 391, 402 (7th Cir. 2014) (citing *De Bouse v. Bayer*, 922 N.E.2d 309, 313 (Ill. 2009)). The IUDTPA similarly prohibits deceptive practices, including representing that products have benefits they do not have, representing that products are of a particular standard or quality when they are not, advertising products with the intent not to sell them as advertised, or engaging in other conduct that creates a likelihood of confusion. 815 ILC 510/2(a)(5), (7), (9), (12).

Unjust enrichment, or a contract implied in law, arises when a "defendant voluntarily accepted a benefit which would be inequitable for him to retain without payment." *People ex rel. Hartigan v. E. & E. Hauling, Inc.*, 607 N.E.2d 165, 177 (Ill. 1992); *see also HPI Health Care Servs., Inc. v. Mt. Vernon Hops., Inc.*, 545 N.E.2d 672, 679 (Ill. 1989) ("To state a cause of action based on a theory of unjust enrichment, a plaintiff must allege that the defendant unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience.").

Because these claims focus on objective elements and the defendants' conduct, they are well suited to class treatment. *See Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 514–15 (6th Cir. 2015) (affirming certification of ICFA claims); *In re ConAgra*, 90 F. Supp. 3d at 1001 (certifying ICFA and unjust enrichment claims); *Clark v. TAP Pharm. Prods., Inc.*, 798 N.E.2d 123, 131-32 (Ill. Ct. App. 2003) (affirming certification of ICFA and unjust enrichment classes); *Morse v. Bankers Life & Cas. Co.*, No. 99 C 0193, 2000 WL 246245, at *1 (N.D. Ill. Feb. 24, 2000)

(certifying IUDTPA and ICFA claims); *Tylka v. Gerber Prods. Co.*, 178 F.R.D. 493, 499 (N.D. Ill. 1998) (finding predominance and certifying ICFA claims).

As discussed above, common evidence will prove these elements, including Defendants' wrongful and deceptive conduct, causation, class-wide the aggregate injury to the class, and the benefit Defendants thereby obtained. Therefore, common issues predominate with respect to the Illinois Class and Illinois Menthol Subclass.

(v) *Massachusetts Class*

The Massachusetts Class brings claims for violation of the consumer protection law, Mass. Gen. Laws Ch. 93A ("Chapter 93A"), and for unjust enrichment. SAC ¶¶ 250-66.

Chapter 93A prohibits "unfair or deceptive acts or practices." Mass. Gen. Laws. Ch. 93A, § 2(a). This requires showing (1) that the defendant committed an unfair or deceptive act or practice, (2) a loss of money or property suffered as a result, and (3) a "causal connection" between the two. *Auto Flat Car Crushers, Inc. v. Hanover Ins. Co.*, 17 N.E.3d 1066, 1074-75 (Mass. 2014). Unfairness is defined broadly. *See Linkage Corp. v. Trustees of Boston Univ.*, 679 N.E.2d 191, 209 (Mass. 1997). Deception is based on the reasonable consumer standard. *Aspinall v. Philip Morris Cos., Inc.*, 813 N.E.2d 476, 488 (Mass. 2004).

"A plaintiff asserting a claim for unjust enrichment must establish not only that the defendant received a benefit, but also that such a benefit was unjust, 'a quality that turns on the reasonable expectations of the parties.'" *Metropolitan Life Ins. Co. v. Cotter*, 984 N.E.2d 835, 850 (Mass. 2013) (quoting *Global Investors Agent Corp. v. National Fire Ins. Co.*, 927 N.E.2d 480, 494 (Mass. App. Ct. 2010)). Whether the enrichment or detriment is unjust "equates with the defeat of someone's reasonable expectations." *Id.* 984 N.E.2d at 850 (internal citation omitted).

Because these claims focus on objective elements and the defendants' conduct, they are well suited to class treatment. *See Smilow v. Sw. Bell Mobile Sys., Inc.*, 323 F.3d 32, 42 (1st Cir. 2003) (reversing decertification of Chapter 93A class); *Hebert v. Vantage Travel Serv., Inc.*, 334 F.R.D. 362, 373 (D. Mass. 2019) (certifying unjust enrichment and Chapter 93A class); *Overka v. Am. Airlines, Inc.*, 265 F.R.D. 14, 20-21 (D. Mass. 2010) (certifying nationwide unjust enrichment class, including Massachusetts workers); *Aspinall v. Philip Morris Co.*, 813 N.E.2d 476 (Mass. 2004) (certifying class of "light" cigarette smokers under Chapter 93A).

As discussed above, common evidence will prove these elements, including Defendants' wrongful and deceptive conduct, causation, class-wide the aggregate injury to the class, and the benefit Defendants thereby obtained. Therefore, common issues predominate with respect to the Massachusetts Class.

(vi) *Michigan Class*

The Michigan Class brings claims for violation of the Michigan Consumer Protection Act, Mich. Comp. Laws § 445.901 *et seq.* ("MCPA"), and for unjust enrichment. SAC ¶¶ 267-89.

The MCPA prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce." Mich. Comp. Laws § 445.903. Like the other states' consumer protection laws, the MCPA is more liberal than common law fraud. *See Dix v. Am. Bankers Life Assur. Co. of Fla.*, 415 N.W.2d 206, 209 (Mich. 1987) ("So construing the Consumer Protection Act should obviate some of the practical difficulties that [may arise] when an action is brought on a common-law fraud theory."). Individual reliance on misrepresentations or omissions need not be shown as long as "the class can establish that a reasonable person would have relied on the representations." *Id.* Similarly, a representation is material if it is "important to the transaction or

affects the consumer's decision to enter into the transaction." *In re OnStar Contract Litig.*, 278 F.R.D. 352, 377 (E.D. Mich. 2011) (quoting *Zine v. Chrysler Corp.*, 600 N.W.2d 384, 398 (Mich. Ct. App. 1999)).

"Unjust enrichment is defined as the unjust retention of 'money or benefits which in justice and equity belong to another.'" *Tkachik v. Mandeville*, 790 N.W.2d 260, 266 (Mich. 2010) (quoting *McCreary v. Shields*, 52 N.W.2d 853, 855 (Mich. 1952)). Unjust enrichment requires "(1) the receipt of a benefit by the defendant from the plaintiff and (2) an inequity resulting to the plaintiff because of the retention of the benefit by the defendant." *Landstar Express Am., Inc. v. Nexteer Auto. Corp.*, 900 N.W.2d 650, 657 (Mich. Ct. App. 2017) (quotation omitted).

Because these claims focus on objective elements and the defendants' conduct, they are well suited to class treatment. *See, e.g.*, *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. at 698 (certifying multi-state unjust enrichment class, including Michigan, because "common evidence will focus on the defendant's gain and not on the plaintiff's loss"); *Dix*, 415 N.W.2d at 209 (holding MCPA claim were should be certified);

As discussed above, common evidence will prove these elements, including Defendants' wrongful and deceptive conduct, causation, class-wide the aggregate injury to the class, and the benefit Defendants thereby obtained. Therefore, common issues predominate with respect to the Michigan Class.

(vii) *New Jersey Class and New Jersey Menthol Subclass*

The New Jersey Class and New Jersey Menthol Subclass bring claims for violations of the New Jersey Consumer Fraud Act, N.J. Stat. § 56:8-1 et seq. ("NJCFA"), the New Jersey Truth-in-

Consumer Contract, Warranty and Notice Act, N.J. Stat. §§ 56:12-14 to 56:12-18 ("TCCWNA"), and unjust enrichment. SAC ¶¶ 290-315.

Under the NJCFA, "[a] consumer who can prove (1) an unlawful practice, (2) an ascertainable loss, and (3) a causal relationship between the unlawful conduct and the ascertainable loss, is entitled to legal and/or equitable relief, treble damages, and reasonable attorneys' fees." *Gonzalez v. Wilshire Credit Corp.*, 25 A.3d 1103, 1115 (N.J. 2011) (quotations omitted). An unlawful practice under the NJCFA includes the use of any "deception, fraud, false pretense, false promise, [or] misrepresentation." N.J. Stat. § 56:8-2. "A practice can be unlawful even if no person was in fact misled or deceived thereby." *Cox v. Sears Roebuck & Co*., 647 A.2d 454, 462 (N.J. 1994). The test for deception turns on the perception of a reasonable consumer. *See Barry v. Arrow Pontiac, Inc.*, 494 A.2d 804, 810 (N.J. 1985) ("[W]e are dealing with whether the ad itself is misleading to the average consumer, not whether it can later be explained to the more knowledgeable, inquisitive consumer.").

The TCCWNA is intended "to prevent deceptive practices in consumer contracts." *Kent Motor Cars, Inc. v. Reynolds & Reynolds Co.*, 207 N.J. 428, 457, 25 A.3d 1027 (N.J. 2011). Plaintiffs must show: (1) the defendant was a seller; (2) the defendant offered or entered into a written consumer contract; (3) that writing contained a provision that violated "any clearly established legal right of a consumer or responsibility of a seller"; and (4) the plaintiff is an "aggrieved consumer." *Kauffman v. New England Fitness S., Inc.*, No. A-1789-17T1, 2019 WL 1752922, at *2 (N.J. Super. Ct. App. Div. Apr. 17, 2019) (citation omitted)

"To establish a claim for unjust enrichment, 'a plaintiff must show both that defendant received a benefit and that retention of that benefit without payment would be unjust.'" *Lliadis v.*

*Wal-Mart Stores, Inc.*, 922 A.2d 710, 723 (N.J. 2007) (quoting *VRG Corp. v. GKN Realty Corp.*, 641 A.2d 519, 526 (N.J. 1994)).

Because these claims focus on objective elements and the defendants' conduct, they are well suited to class treatment. *See, e.g.*, *In re Checking Account Overdraft Litig.*, 307 F.R.D. 656, 676 (S.D. Fla. 2015) (certifying multi-state unjust enrichment class, including New Jersey); *Ebin v. Kangadis Food, Inc.*, 297 F.R.D. 561, 568-69 (S.D.N.Y. 2014) (certifying NJCFA class where defendant made uniform misrepresentations to all class members on the product packaging); *United Consumer Fin. Servs. Co. v. Carbo*, 982 A.2d 7, 23 (N.J. Ct. App. 2009) (affirming certification of TCCWNA class and imposition of civil penalties); *In re Mercedes-Benz Tele Aid Contract Litig.*, 257 F.R.D. 46, 73 (D.N.J. 2009) (certifying nationwide unjust enrichment and NJCFA classes under New Jersey law).

As discussed above, common evidence will prove these elements, including Defendants' wrongful and deceptive conduct, causation, class-wide the aggregate injury to the class, and the benefit Defendants thereby obtained. Therefore, common issues predominate with respect to the New Jersey Class and New Jersey Menthol Subclass.

(viii) *New Mexico Class and New Mexico Menthol Subclass*

The New Mexico Class and New Mexico Menthol Subclass bring claims for violation of the New Mexico Unfair Practices Act, N.M. Stat. § 57-12-1 *et seq.* ("NMUPA"), the New Mexico False Advertising Act, N.M. Stat. § 57-15-1 *et seq.* ("NMFAA"), and unjust enrichment. SAC ¶¶ 316-42.

The NMUPA makes unlawful any "[u]nfair or deceptive trade practices [or] unconscionable trade practices in the conduct of any trade or commerce." N.M. Stat. § 57-12-3.

The NMUPA applies to oral or written statements, visual descriptions or other representations knowingly made in connection with the sale or goods that may tend to "deceive or mislead any person." *Stevenson v. Louis Dreyfus Corp.*, 811 P.2d 1308, 1311 (N.M. 1991). A statement need not be false to be misleading. *Guidance Endodontics, LLC v. Dentsply Int'l, Inc.,* 728 F. Supp. 2d 1170, 1194-95 (D.N.M. 2010) (Browning, J.). Similarly, the NMFAA prohibits "advertising, including labeling, which is misleading in any material respect." N.M. Stat. § 57-15-2.

An unjust enrichment plaintiff "must show that: (1) another has been knowingly benefitted at one's expense (2) in a manner such that allowance of the other to retain the benefit would be unjust." *Ontiveros Insulation Co. v. Sanchez*, 3 P.3d 695, 698 (N.M. Ct. App. 2000) (citing Restatement (First) of Restitution §§ 1, 40, 41 (1937)).

Because these claims focus on objective elements and the defendants' conduct, they are well suited to class treatment. *See, e.g.*, *Payne*, 332 F.R.D. at 710 (D.N.M. 2019) (certifying unjust enrichment class); *Fiser v. Dell Computer Corp.*, 188 P.3d 1215, 1218-19 (N.M. 2008) ("The fundamental New Mexico policy of providing consumers a mechanism for dispute resolution is also seen in the False Advertising Act, which specifically empowers private individuals to bring rights of action in the name of the state and for 'all others similarly situated.'" (quoting N.M. Stat. § 57-15-5)); *Armijo v. Wal-Mart Stores, Inc.*, 168 P.3d 129, 141 (N.M. Ct. App. 2007) (certifying unjust enrichment class as questions about whether defendant received a benefit and whether its retention was unjust were common questions); *Yazzie v. Ray Vickers' Special Cars, Inc.*, 180 F.R.D. 411, 416-17 (D.N.M. 1998) (certifying Federal Truth in Lending Act claim based on standardized course of conduct).

As discussed above, common evidence will prove these elements, including Defendants' wrongful and deceptive conduct, causation, class-wide the aggregate injury to the class, and the benefit Defendants thereby obtained. Therefore, common issues predominate with respect to the New Mexico Class and New Mexico Menthol Subclass.

(ix) *New York Class and New York Menthol Subclass*

The New York Class and New York Menthol Subclass bring claims for violation of New York General Business Law § 349 ("GBL § 349"), New York General Business Law § 350 ("GBL § 350"), and unjust enrichment. SAC ¶¶ 343-74.

New York's consumer protection statutes, GBL §§ 349 and 350, "are meant to act as a strong deterrent against deceptive business practices." *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 415 (S.D.N.Y. 2015) (quotation omitted). Stating a claim requires a plaintiff to "prove three elements: first, that the challenged act or practice was consumer oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act." *Stutman v. Chemical Bank*, 731 N.E.2d 608, 611 (N.Y. 2000). Deception is based on whether the conduct is "likely to mislead a reasonable consumer acting reasonably under the circumstances." *Id.* at 611-12 (quotation omitted). "The materiality of potentially deceptive representations is similarly subject to objective proof." *Hasemann v. Gerber Prods. Co.*, 331 F.R.D. 239, 274 (E.D.N.Y. 2019) (quotation omitted). Injury simply requires showing that the plaintiffs paid money they otherwise would not have paid based on the defendants' misrepresentations, such as a price premium. *Goldemberg v. Johnson & Johnson Consumer Cos., Inc.*, 317 F.R.D. 374, 393 (S.D.N.Y. 2016).

"To prevail on a claim for unjust enrichment in New York, a plaintiff must establish 1) that the defendant benefitted; 2) at the plaintiff's expense; and 3) that 'equity and good conscience' require restitution." *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000) (citation omitted).

Because these claims focus on objective elements and the defendants' conduct, they are well suited to class treatment. *See, e.g.*, *Hasemann*, 331 F.R.D. at 279 (certifying GBL §§ 349 and 350 claims); *In re Scotts EZ Seed Litig.*, 304 F.R.D. at 403, 409, 416 (certifying GBL §§ 349 and 350 claims and New York unjust enrichment claims); *Rodriguez v. It's Just Lunch, Int'l*, 300 F.R.D. 125, 147-48 (S.D.N.Y. 2014) (certifying GBL § 349 and New York unjust enrichment claims).

As discussed above, common evidence will prove these elements, including Defendants' wrongful and deceptive conduct, causation, class-wide the aggregate injury to the class, and the benefit Defendants thereby obtained. Therefore, common issues predominate with respect to the New York Class and New York Menthol Subclass.

(x) *North Carolina Class and North Carolina Menthol Subclass*

The North Carolina Class and the North Carolina Menthol Subclass bring claims for violation of the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1(a) ("NC UDTPA"), and common law unjust enrichment. SAC ¶¶ 375-95.

Under the NC UDTPA, "unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." N.C. Gen. Stat. § 75-1.1(a). Establishing a violation of the NC UDTPA requires showing "(1) an unfair or deceptive act or practice, (2) in or affecting commerce, and (3) which proximately caused injury to plaintiffs." *Gray v. N. Carolina Ins. Underwriting Ass'n*, 529 S.E.2d 676, 681 (N.C. 2000). A practice is deceptive "if it has the tendency to deceive." *Id.* A

practice is unfair if it "is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *Id.* (quotation omitted). "Unlike a claim based upon fraud, proof of actual deception is not necessary." *Pearce v. Am. Def. Life Ins. Co.*, 343 S.E.2d 174, 180 (N.C. 1986). "In determining whether a representation is deceptive, its effect on the average consumer is considered." *Pearce v. Am. Def. Life Ins. Co.*, 316 N.C. 461, 471, 343 S.E.2d 174, 180 (1986).

A cause of action for unjust enrichment exists when "a party [has] conferred a benefit on the other party," the benefit "is not justified in the circumstances," the benefit is "measurable," and the benefit is not "gratuitous." *Booe v. Shadrick*, 369 S.E.2d 554, 556 (N.C. 1988). Unjust enrichment can be either "a claim in quasi contract or a contract implied in law." *Id.* The measure of damages is "the reasonable value of the goods and services to the defendant." *Id.*

Because these claims focus on objective elements and the defendants' conduct, they are well suited to class treatment. *See, e.g.*, *Gray v. Hearst Commc'ns, Inc.*, 444 F. App'x 698, 702 (4th Cir. 2011) (affirming certification of NC UDTPA claims).

As discussed above, common evidence will prove these elements, including Defendants' wrongful and deceptive conduct, causation, class-wide the aggregate injury to the class, and the benefit Defendants thereby obtained. Therefore, common issues predominate with respect to the North Carolina Class and North Carolina Menthol Subclass.

(xi) *Ohio Class*

The Ohio Class brings claims for violations of Ohio's Consumers Sales Practices Act, Ohio Revised Code § 1345 ("OCSPA"). SAC ¶¶ 396-412.

The OCSPA prohibits unfair or deceptive acts or practices in connection with consumer transactions. Ohio Rev. Code § 1345.02(A). Acts are deceptive when a supplier represents that the

subject of a consumer transaction has "sponsorship, approval, performance characteristics, accessories, uses, or benefits that it does not have" or that it is "of a particular standard, quality, grade, style, prescription, or model, if it is not." Ohio Rev. Code Ann. § 1345.02(B)(1)-(2). In general, unfair or deceptive acts or practices under the OCSPA are "those that mislead consumers about the nature of the product they are receiving."[18] *Johnson v. Microsoft Corp.*, 834 N.E.2d 791, 800 (Ohio 2005). The OCSPA "is a remedial law which is designed to compensate for traditional consumer remedies and so must be liberally construed." *Whitaker v. M.T. Auto., Inc.*, 855 N.E.2d 825, 829 (Ohio 2006).

Courts apply an objective standard to determine whether conduct is deceptive and material to reasonable consumers. *Shumaker v. Hamilton Chevrolet, Inc.*, 920 N.E.2d 1023, 1031, 1033 (Ohio Ct. App. 2009). For the same reasons discussed above, this objective standard is perfectly suited to class-wide determination, and all elements of the Ohio class members' claims will be proven with evidence common to the class as a whole.

(xii) *Washington Class*

[18] Under Ohio law, a consumer may maintain a class action when a supplier violates the OCSPA "in the face of prior notice that its conduct was deceptive or unconscionable." *Marrone v. Philip Morris USA, Inc.*, 850 N.E.2d 31, 34 (Ohio 2006). This notice may come from a pronouncement of the Ohio Attorney General or a court decision as long as it involves "similar industries and conduct." *Id.* at 36. However, this procedural requirement does not apply in federal court because Federal Rule of Civil Procedure 23 "creates a categorical rule entitling a plaintiff whose suit meets the specified criteria to pursue his claim as a class action." *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010). When state law "attempts to answer the same question . . . it cannot apply in diversity suits." *Id.* at 399. In any event, even if *Marrone* applies, unfair and deceptive marketing by the tobacco industry to consumers has long been litigated, thereby satisfying this requirement. *See, e.g.*, *Altria Grp., Inc. v. Good*, 555 U.S. 70, 73-74 (2008) (discussing allegations that "light" cigarette marketing deceives consumers who believe the cigarettes deliver less tar and nicotine and are therefore less harmful than other cigarettes, and concluding district court incorrectly granted summary judgment in favor of defendants).

The Washington Class brings claims for violation of the Washington Consumer Protection Act, Wash. Rev. Code §§ 19.86.010, *et seq.* ("WCPA"), and common law unjust enrichment. SAC ¶¶ 428-50.

The WCPA prohibits "unfair, deceptive, and fraudulent acts or practices." Wash. Rev. Code § 19.86.920. "To prevail in a private CPA claim, the plaintiff must prove (1) an unfair or deceptive act or practice, (2) occurring in trade or commerce, (3) affecting the public interest, (4) injury to a person's business or property, and (5) causation." *Panag v. Farmers Ins. Co. of Washington*, 204 P.3d 885, 889 (Wash. 2009). A communication is deceptive if it is "'likely to mislead' a reasonable consumer." *Id.* at 895 (quoting *Sw. Sunsites, Inc. v. Fed. Trade Comm'n*, 785 F.2d 1431, 1435 (9th Cir. 1986)). A showing of individual reliance is not required; instead, "[t]he plaintiff must merely show that the 'injury complained of . . . would not have happened' if not for defendant's violative acts." *Schnall v. AT & T Wireless Servs., Inc.*, 259 P.3d 129, 137 (Wash. 2011) (quoting *Indoor Billboard/Washington, Inc. v. Integra Telecom of Washington, Inc.*, 170 P.3d 10, 21 (Wash. 2007)).

Unjust enrichment occurs when "(1) the defendant receives a benefit, (2) the received benefit is at the plaintiff's expense, and (3) the circumstances make it unjust for the defendant to retain the benefit without payment." *Young v. Young*, 191 P.3d 1258, 1262 (Wash. 2008).

Because these claims focus on objective elements and the defendants' conduct, they are well suited to class treatment. *See, e.g.*, *Reichert v. Keefe Commissary Network, L.L.C.*, 331 F.R.D. 541, 556 (W.D. Wash. 2019) (finding common issues predominate for WCPA claim); *Kelley v. Microsoft Corp.*, 251 F.R.D. 544, 559 (W.D. Wash. 2008) (certifying unjust enrichment class);

*Grays Harbor Adventist Christian Sch. v. Carrier Corp.*, 242 F.R.D. 568, 573 (W.D. Wash. 2007) (finding predominance met for WCPA claim).

As discussed above, common evidence will prove these elements, including Defendants' wrongful and deceptive conduct, causation, class-wide the aggregate injury to the class, and the benefit Defendants thereby obtained. Therefore, common issues predominate with respect to the Washington Class.

(i) *Nationwide Menthol Subclass*

In addition to the state subclasses identified above, Plaintiffs seek to represent a nationwide subclass of NAS Menthol Cigarette purchasers in the U.S. *See* SAC ¶ 127. The Nationwide Menthol Subclass seeks recovery for Defendants' breach of express warranty. *See id.* ¶¶ 451-59.

Plaintiffs submit that New Mexico law should apply to the express warranty claims of the Nationwide Menthol Subclass. Because this is a diversity action, "the court looks to the forum state's choice-of-law rules to determine which state's substantive law to apply." *Guidance Endodontics, LLC v. Dentsply Int'l, Inc*., 663 F. Supp. 2d 1138, 1150 (D.N.M. 2009) (Browning, J.) (citation omitted). The "first step in a New Mexico choice-of-law analysis is to characterize the claim by area of substantive law—e.g., torts, contracts, domestic relations—to which the law of the forum state assigns a particular claim or issue." *Id.* (quotation omitted). The express warranty claim asserted on behalf of the Nationwide Menthol Subclass sounds in contract. *See Robey v. Parnell*, 392 P.3d 642, 648-49 (N.M. Ct. App. 2017) (finding statements created an express warranty and defendant breached contract when product failed to meet that warranty). Step two is to determine what substantive law New Mexico would apply to these multi-state contract claims. *Guidance Endodontics*, 663 F. Supp. 2d at 1151.

The New Mexico Supreme Court has determined that a "district court's choice to apply forum law is appropriate if (1) the choice to apply forum law is constitutional or (2) an application of the forum's choice-of-law rules leads to the selection of forum law." *Ferrell v. Allstate Ins. Co.*, 188 P.3d 1156, 1164 (N.M. 2008). A forum state's decision to apply its own law is constitutional if there is no actual conflict of laws or if the forum state has "a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair." *Id*. (citing *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 816 (1985); *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 312-13 (1981)). New Mexico courts apply the principles of the Restatement (Second) of Conflict of Laws (1971) to determine what law applies to disputed issues in contract actions. *Ferrell*, 188 P.3d at 422. The "Restatement (Second) relies on the 'most significant relationship' test which is used to determine which state has the most significant relationship to the transaction and to the parties." *Id*.

An express warranty arises where there is an affirmation of fact or promise to the buyer of goods, which includes any description of the goods that becomes a part of the benefit of the bargain. N.M. Stat. § 55-2-313. When the goods do not conform to that promise, affirmation, or description, there is a breach of express warranty. *Nowell v. Medtronic Inc.*, 372 F. Supp. 3d 1166, 1222 (D.N.M. 2019) (Browning, J.). Plaintiffs submit that these are the core elements of an express warranty claim in any state. But even if there is a conflict in the laws of the different states, New Mexico law should apply to the Nationwide Menthol Subclass members' express warranty claim.

Relevant contacts to determining which state has the most significant relationship to the transaction and the parties include "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e)

the domicile, residence, nationality, place of incorporation and place of business of the parties." *Ferrell*, 188 P.3d at 422. These contacts are evaluated by reference to: "(a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the basic policies underlying the particular field of law, (e) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied." *Id.*

Here, these factors all point to New Mexico as the state with the most significant relationship to the nationwide express warranty claims. In their Response to the Motion of the *Haksal* Plaintiffs for Transfer of Actions to this District, Defendants represented that Santa Fe was incorporated and headquartered in New Mexico, and that the "employees and decision makers tasked with the development and execution of product labeling, marketing and advertising are located primarily at Santa Fe's headquarters in New Mexico." Santa Fe and RAI's Response to Mot. for Transfer Pursuant to 28 U.S.C. § 1407, ECF No. 24, at 8, *In re Santa Fe Natural Tobacco Co. Mktg., Sales Practices, & Prods. Liab. Litig.*, Case MDL No. 2695 (J.P.M.L. Jan. 27, 2016). Further, "events relevant to the allegations in the Consumer Actions occurred there." *Id.* Thus, New Mexico has the most significant relationship to the transaction and to the parties, and New Mexico law should apply to the nationwide express warranty claims. *See Simon v. Philip Morris, Inc.*, 124 F. Supp. 2d 46, 53 (E.D.N.Y. 2000) (applying New York law to a nationwide class of cigarette smokers where the defendants' principal place of business and headquarters were in New York, much of the alleged conduct took place in New York, and corporate entities were incorporated in New York).

Once the court determines which law applies, "the court should must then determine whether the application of that chosen law is constitutional," which it is if the state has a significant aggregation of contacts to the claims creating state interests in the application of its law such that the application of its law is neither arbitrary nor unfair. *Ferrell*, 188 P.3d at 422. Here, New Mexico has strong state interests in having its laws applied to the express warranties made by a New Mexico corporation headquartered in New Mexico through decisions made in New Mexico. Applying New Mexico law to the nationwide class is therefore constitutional.

Having determined that New Mexico law applies to the Nationwide Menthol Subclass, it is apparent that the standards of Rule 23 are met for certification of this subclass, for all the reasons set forth herein with respect to the other subclasses. "A breach of warranty presents an objective claim that the goods do not conform to a promise, affirmation, or description." *Nowell*, 372 F. Supp. 3d at 1222 (D.N.M. 2019) (quoting *Badilla v. Wal-Mart Stores E. Inc.*, 357 P.3d 936, 941 (N.M. 2015)). As noted above, objective elements are perfectly suited for satisfying the predominance requirement. *Amgen*, 568 U.S. at 467-68. And the elements of a straightforward express warranty claim here will undoubtedly be proven by common evidence. Defendants warranted that the NAS Menthol Cigarettes are "additive-free" or contain "additive-free" tobacco, but that is flatly untrue. As Defendants are well aware, the menthol they place menthol in the cigarette filters, and because menthol is highly volatile, it migrates into the tobacco in the cigarette rod. *See supra* § II.K. This literally false promise, affirmation, or description on the label of the NAS Menthol Cigarettes is a breached warranty, and it applies to every member of the Nationwide Menthol Subclass.

Accordingly, Plaintiffs respectfully request that the Court certify the Nationwide Menthol Subclass under Rule 23(b)(3) and 23(b)(2) and apply New Mexico law to the express warranty claims of the Nationwide Menthol Subclass Members.[19]

**2. Superiority**

Superiority requires that a class action be superior to other available methods for fairly and efficiently adjudicating the controversy. Fed. R. Civ. P. 23(b)(3). Superiority is established when the claims at issue are "so-called negative value claims—claims in which the cost of litigation exceeds the likely recovery, rendering them economically non-viable without aggregation." *Anderson Living Tr.*, 306 F.R.D. at 407. Negative value claims are "the heart and soul of the class action." *Id.* Superiority is also established when the class "consist[s] of such a large volume of similar cases that the judiciary would be overwhelmed if it had to treat each separately." *Id.* Courts also consider the factors enumerated in Rule 23(b)(3)(A)-(D). *Daye v. Cmty. Fin. Serv. Centers, LLC*, 313 F.R.D. 147, 171 (D.N.M. 2016). The "most important" of those factors "is the extent to which the court will be able to manage the class action, if certified, through pretrial litigation and trial, accurately adjudicating the class' claims—in particular the individual issues—and fairly distributing relief among the class members." *Id.* at 173.

The superiority requirement is easily met here. First, each class member's claim for a refund of perhaps a few dollars per purchase is dwarfed by the costs of litigating against well-funded tobacco companies. *See Anderson Living Tr.*, 306 F.R.D. at 407. Second, and for the same

[19] If the Court declines to certify the Nationwide Menthol Subclass, then Plaintiffs request, in the alternative, that the Court certify the state law menthol subclasses instead. But if the Court certifies the Nationwide Menthol Subclass, then there is no need to consider the certification of the state menthol subclasses identified above.

reason, class members have little interest in individually controlling the prosecution of separate actions—and if a particular class member did, he or she could simply opt out. *See* Fed. R. Civ. P. 23(b)(3)(A). Third, there is no other consumer fraud, unjust enrichment, or breach-of-warranty litigation pending concerning the same subject matter outside this MDL. *See* Fed. R. Civ. P. 23(b)(3)(B). Fourth, concentrating the class members' claims in a single forum is desirable because it will help achieve economies of scale, without which, no litigation would be feasible. *See* Fed. R. Civ. P. 23(b)(3)(C). Finally, trial is eminently manageable as the cases will either return to the home jurisdiction for trial or will be consolidated. *See Daye*, 313 F.R.D. at 173; Fed. R. Civ. P. 23(b)(3)(D). In fact, no procedural hurdle will preclude this Court from trying one or more of these cases. Because, as shown above, all class members' claims will be proven through evidence common to the class as a whole, no particular difficulties in managing this class action are likely to arise. *See Daye*, 313 F.R.D. at 184 ("The Court can manage the common issues, all of which arise from Speedy Loan's standard, uniform lease agreements and lending practices."). If any issues require it, the jury may return a special verdict to ensure its answers are consistent. *See* Fed. R. Civ. P. 49(a).

**D. <u>The Requirements of Rule 23(b)(2) Are Satisfied</u>**

Class certification is appropriate under Rule 23(b)(2) where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "The rule therefore authorizes an inquiry into the relationship between the class, its injuries, and the relief sought, and we have interpreted the rule to require that a class must be amenable to uniform group remedies." *Shook v. Bd. of Cty. Comm'n, Cty. of El Paso*, 543 F.3d

597, 604 (10th Cir. 2008) (quotation omitted). Put simply, "under Rule 23(b)(2) the class members' injuries must be sufficiently similar that they can be addressed in a[] single injunction that need not differentiate between class members." *Id.* (emphasis added). "The key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'" *Payne*, 332 F.R.D. at 664 n.16 (quoting *Wal-Mart*, 564 U.S. at 360-61).

Courts may, and frequently do, certify classes seeking injunctive relief under Rule 23(b)(2) alongside classes seeking damages under Rule 23(b)(3). The key is that each class—the (b)(2) class and the (b)(3) class—must be separately and independently certifiable.[20] As one court put it, courts "can separately certify an injunctive relief class and, if appropriate, also certify a Rule 23(b)(3) damages class." *In re ConAgra*, 90 F. Supp. 3d at 977.

As one court in this Circuit held, it is appropriate to "certify a (b)(2) class for injunctive relief," including when the plaintiffs seek certification of a damages class under Rule 23(b)(3), because "[u]nder plaintiffs' dual certification request, the (b)(2) class will not contain their request for damages." *In re Motor Fuel Temperature Sales Practices Litig.*, 292 F.R.D. 652, 673-74 (D. Kan. 2013) ("For these reasons, under Rule 23(b)(2), the Court certifies plaintiffs' claims for injunctive relief based on unjust enrichment and breach of the duty of good faith and fair dealing,

[20] *See, e.g.*, *Eubanks v. Billington,* 110 F.3d 87 (D.C. Cir. 1997) (discussing district court's discretion to certify a class pursuant to Rule 23(b)(2) for injunctive and declaratory relief and a class under Rule 23(b)(3) for monetary relief); *Cox v. Am. Cast Iron Pipe, Co.,* 784 F.2d 1546, 1554 (11th Cir. 1986) (describing what it called "hybrid" class actions "in which class members seek individual monetary relief in addition to class-wide injunctive or declaratory relief."); *Charrons v. Pinnacle Group N.Y. LLC*, 269 F.R.D. 221 (S.D.N.Y. 2010) (holding a court may "certify a Rule 23(b)(2) class for the portion of the case addressing equitable relief and a Rule 23(b)(3) class for the portion of the case addressing damages").

and for violation of the UCL and CLRA."). In that case, the plaintiffs challenged the defendant's business practice of selling "motor fuel at retail to plaintiffs by the gallon without disclosing or adjusting for temperature and its effects on motor fuel." *Id.* at 673. The court found certification for injunctive relief appropriate because this "practice applied uniformly to all class members and could therefore be remedied by a single injunction applicable to them all." *Id.* at 673. Importantly, so would an injunction. *See id.* ("The Court could craft an injunction requiring Chevron to implement ATC, disclose the temperature of fuel and/or disclose the effect of temperature on fuel in specific terms that describe in reasonable detail the act or acts restrained or required.").

Class certification of Plaintiffs' injunctive relief claims is appropriate. Here, by continuing to describe NAS Cigarettes as "Natural" by way of its brand name, and by stating "Ingredients: Tobacco & Water," Defendants have acted on grounds that apply generally to the class and continue to deceive class members by implying that NAS Cigarettes may be less harmful than other brands. *See* Fed. R. Civ. P. 23(b)(2); *Ries v. Ariz. Beverages USA, LLC*, 287 F.R.D. 523, 541 (N.D. Cal. 2012) (finding the threat of ongoing or future violations sufficient to warrant class certification under Rule 23(b)(2)).

Enjoining Defendants from marketing their cigarettes as "Natural" is necessary due to the fact that people continue to be deceived and misled by Defendants' fraudulent marketing. To this day, Defendants continues to use the term "natural" in the very name of NAS Cigarettes, and they continue to use the deceptive term "organic." Furthermore, they have replaced the phrase "additive-free" with the statement "Ingredients: Tobacco & Water" on their product labels, advertisements, and promotional materials. If not enjoined, the Defendants' deceptive marketing will continue. *See, e.g.*, *Philip Morris*, 449 F. Supp. 2d at 938 (D.D.C. 2006) (holding the term

"natural" plainly connotes health messages, adjudicated the term a "forbidden health descriptor," and permanently enjoined its use). Defendants' current labeling and pervasive advertising of NAS Cigarettes still inaccurately convey a reduced risk of harm to reasonable consumers, even after Defendants removed the "additive-free" descriptor in 2017. *See supra* § II.E. In addition, certification for injunctive relief is necessary and appropriate to cure Defendants' inadequate Disclaimer, which applies only to the "additive-free" descriptor and not the "natural" descriptor. *See* MTD Order 190 ("The Court concludes that, in light of the disclosures' placement underneath the barcode and divorced from the Surgeon General's warning, money damages or an injunction would materially advance the state's interest even as to the 'additive-free' term, because a substantial number of consumers would not think to look there for that disclosure, or would not even the disclaimer until after they were deceived into paying a premium for Natural American Cigarettes.").

## IV. CONCLUSION

For the reasons stated above, and on the basis of the entire record in this litigation, Plaintiffs respectfully request that the Court grant Plaintiffs' Motion for Class Certification, certify the classes as described herein, appoint Plaintiffs as the class representatives, and appoint the undersigned counsel as class counsel.

**Certificate of Compliance with Local Rule 7.1**

I hereby certify that pursuant to D.N.M.LR-Civ. 7.1(a), counsel for Plaintiffs conferred in good faith with counsel for Defendants to determine whether the foregoing motion is opposed. Defendants oppose the relief requested.

Dated: July 23, 2020

Respectfully submitted,

By /s/ Scott. P. Schlesinger
Scott P. Schlesinger
Jeffrey L. Haberman
Jonathan R. Gdanski
SCHLESINGER LAW OFFICES, P.A.
1212 SE Third Avenue
Ft. Lauderdale, FL 33316
Telephone: 954-467-8800
Email: scott@schlesingerlaw.com
Email: jhaberman@schlesingerlaw.com
Email: jgdanski@schlesingerlaw.com

By /s/ Melissa S. Weiner
Melissa S. Weiner
PEARSON SIMON WARSHAW, LLP
800 LaSalle Ave., Suite 2150
Minneapolis, MN 55402
Telephone: (612) 389-0600
Facsimile: (612) 389-0610
Email: mweiner@pswlaw.com

Matthew D. Shultz
LEVIN, PAPANTONIO, ET AL.
316 S. Baylen St., Suite 600
Pensacola, FL 32502
Telephone: (850) 435-7140
Facsimile: (850) 436-6140
Email: mschultz@levinlaw.com

D. Greg Blankinship
FINKELSTEIN, BLANKINSHIP, FREI-PEARSON & GARBER, LLP
One North Broadway, Suite 900
(914) 298-3290
Email: gblankinship@fbfglaw.com

Caleb Marker
ZIMMERMAN REED LLP
2381 Rosecrans Avenue, Suite 328
Manhattan Beach, CA 90245
(877) 500-8780 Telephone
(877) 500-8781 Facsimile
Email: caleb.marker@zimmreed.com

Michael R. Reese
REESE LLP
100 West 93rd Street, 16th Floor
New York, New York 10025
Telephone: (212) 643-0500
Facsimile: (212) 253-4272
Email: mreese@reesellp.com

James W. Gustafson, Jr.

SEARCY DENNEY SCAROLA BARNHART
& SHIPLEY, P.A.
The Towle House
517 North Calhoun Street
Tallahassee, FL 32301
Telephone: (850) 224-7600
Email: gustafsonteam@searcylaw.com

Ronald A. Marron
LAW OFFICES OF RONALD A. MARRON
651 Arroyo Drive
San Diego, California 92103
Telephone: (619) 696-9006
Facsimile: (619) 564-6665
Email: ron@consumersadvocates.com

Daniel L. Warshaw
PEARSON, SIMON & WARSHAW, LLP
15165 Ventura Blvd., Suite 400
Sherman Oaks, CA 91403
Telephone: (818) 788-8300
Facsimile: (818) 788-8104
Email: dwarshaw@pswlaw.com

Nancy R. Long
LONG, KOMER & ASSOCIATES, P.A.
2200 Brothers Road
Santa Fe, NM 87505-6903
Telephone: (505) 982-8405
Facsimile: (505) 982-8513
Email: nancy@longkomer.com

Charles J. LaDuca
CUNEO GILBERT & LADUCA, LLP
4725 Wisconsin Avenue NW, Suite 200
Washington, DC 20016
Telephone: (202) 789-3960
Facsimile: (202) 589-1813
Email: claduca@cuneolaw.com

***Counsel for Plaintiffs and Proposed Class Counsel***

# **EXHIBIT D**

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

| | |
|---|---|
| IN RE: SANTA FE NATURAL TOBACCO COMPANY MARKETING & SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION<br><br>This Document Relates to All Cases | LEAD CASE NO. MD 16-2695 JB/LF<br><br>**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR CLASS CERTIFICATION** |

**Exhibit D**

# TABLE OF CONTENTS

**Page**

I. The Specific Legal Claims Defendants Challenge are Appropriate for Class Treatment ... 2

II. Plaintiffs Satisfy the Requirements of Rule 23(a) ... 3

A. Plaintiffs Satisfy the Commonality Requirement ... 3

B. Plaintiffs Satisfy the Typicality Requirement ... 6

III. Plaintiffs Satisfy the Requirements of Rule 23(b)(3) ... 9

A. Individual Issues Do Not Predominate ... 9

1. The Class is Readily Identifiable ... 9

2. Minimal Differences in Defendants' Misrepresentations to Class Members Do Not Create Predominance Issues that Defeat Certification ... 13

(a) Plaintiffs and Class Members All Saw Substantially Similar Misrepresentations, and Their Individual, Subjective Understandings are Irrelevant ... 13

3. The Statutory and Unjust Enrichment are Not Defeated by "Individualized Inquiries" ... 19

(a) "Individualized inquiries" do not defeat the statutory claims ... 19

(b) "Individualized inquiries" do not defeat the unjust enrichment claims ... 25

(c) Materiality is an Objective Inquiry Subject to Common Proof ... 31

4. Nationwide Express Warranty Claim ... 37

5. Plaintiffs Demonstrate a Valid Method of Proving Class Members' Damages That Aligns With Their Theories of Liability ... 39

(a) Plaintiffs Can Prove Class-Wide Damages with Common Evidence ... 39

(i) Plaintiffs' Damages Model Measures the Damages Attributable to Their Theory of Liability ... 40

(ii) Both the Willingness-to-Pay and Price-Premium Damages Models are Valid ... 42

B. Superiority ... 44

IV. Plaintiffs Have Satisfied the Requirements of Rule 23(b)(2) ... 44

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Abbott Labs. Norvir Anti-Trust Litig.*,
No. C 04-1511 CW, 2007 WL 1689899 (N.D. Cal. June 11, 2007)....26

*Abla v. Briner Rest. Corp.*,
279 F.R.D. 51 (D. Mass. 2011)....28, 29

*Abraham v. WPX Prod. Prods., LLC*,
317 F.R.D. 169 (D.N.M. 2016)....12, 13

*Akinmeji v. Jos A. Bank Clothiers, Inc.*,
399 F. Supp. 3d 466 (D. Md. 2019)....46

*Allen v. Conagra Foods, Inc.*,
331 F.R.D. 641 (N.D. Cal. 2019)....22, 25

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013)....31

*Anderson Living Tr. v. Energen Res. Corp.*,
No. 13-cv-00909-WJ-CG, 2019 WL 6618168 (D.N.M. Dec. 5, 2019)....9

*Anderson Living Trust v. WPX Energy Prod., LLC*,
306 F.R.D. 312 (D.N.M. 2015)....6, 7, 44

*Archuleta v. City of Santa Fe*,
No. CIV 13-363....37

*Armijo v. Wal-Mart Stores, Inc.*,
168 P.3d 129 (N.M. Ct. App. 2007)....30

*ARP v. Nat'l Sur. Corp.*,
No. 98-820589-CZ, 2001 WL 1530348 (Mich. Cir. Ct. Oct. 23, 2001)....29

*Aspinall v. Philip Morris Cos., Inc.*,
442 Mass. 381, 813 N.E.2d 476 (2004)....22

*Astiana v. Kashi Co.*,
291 F.R.D. 493 (S.D. Cal. 2013)....26

*Baker v. Equity Residential Mgmt., L.L.C.*,
390 F. Supp. 3d 246 (D. Mass. 2019) ....................29

*Blough v. Shea Homes, Inc.*,
No. 2:12-CV-01493-RSM, 2013 WL 6276450 (W.D. Wash. Dec. 4, 2013) ....................24

*Bohn v. McManaman*,
No. CIV. 10-00680 DAE, 2011 WL 5190899 (D. Haw. Oct. 11, 2011) ....................9

*Borum v. Brentwood Vill., LLC*,
No. CV 16-1723 (RC), 2019 WL 2437686 (D.D.C. June 11, 2019) ....................9

*Bradach v. Pharmavite, LLC*,
735 F. App'x 251 (9th Cir. May 17, 2018) ....................32, 33

*Briseno v. ConAgra Foods, Inc.*,
844 F.3d 1121 (9th Cir. 2017) ....................10, 13, 37

*Brockey v. Moore*,
107 Cal. App. 4th 86 (2003) ....................36

*Broomfield v. Craft Brew All., Inc.*,
No. 17-cv-01027-BLF, 2018 WL 4952519 (N.D. Cal. Sept. 25, 2018) ....................5, 14, 33

*Browne v. Capital One Bank (USA), N.A.*,
No. A-2102-19T1, 2020 WL 4045271 (N.J. Super. Ct. App. Div. July 20, 2020) ....................24

*Byrd v. Aaron's Inc.*,
784 F.3d 154 (3d Cir. 2015) ....................10

*Campbell v. Freshbev LLC*,
322 F. Supp. 3d 330 (E.D.N.Y. 2018) ....................46

*Carnegie v. Household Int'l, Inc.*,
376 F.3d 656 (7th Cir. 2004) ....................44

*CGC Holding Co., LLC v. Broad & Cassel*,
773 F.3d 1076 (10th Cir. 2014) ....................6

*Clark v. TAP Pharm. Prods., Inc.*,
343 Ill. App. 3d 538 (2003) ....................28

*Cleary v. Philip Morris Inc.*,
656 F.3d 511 (7th Cir. 2011) ....................28

*Clemens v. DaimlerChrysler Corp.*,
534 F.3d 1017 (9th Cir. 2008) ....................................................................................36

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013)....................................................................................39, 40, 41

*In re ConAgra Foods, Inc.*,
302 F.R.D. 537 (C.D. Cal. 2014) ....................................................................5, 27, 33

*In re ConAgra Foods, Inc.*,
90 F. Supp. 3d 919 (C.D. Cal. 2015) ........................................................................ *passim*

*Curran v. Bayer Healthcare LLC*,
No. 17 C 7930, 2019 WL 398685 (N.D. Ill. Jan. 31, 2019) ............................................46

*Davidson v. Apple, Inc.*,
No. 16-CV-04942-LHK, 2018 WL 2325426 (N.D. Cal. May 8, 2018) ...........................14, 15

*Davidson v. Kimberly-Clark Corp.*,
889 F.3d 956 (9th Cir. 2018) ...........................................................................45, 46, 47, 50

*Davies v. Philip Morris U.S.A., Inc.*,
No. 04-2-08174-2, 2006 WL 1600067 (Wash. Super. May 26, 2006) ............................24, 25

*Davoll v. Webb*,
194 F.3d 1116 (10th Cir. 1999) ...................................................................................10

*Daye v. Cmty. Fin. Serv. Ctrs., LLC*,
313 F.R.D. 147 (D.N.M. 2016)..................................................................................3, 5, 39

*In re Dial Complete Mktg. & Sales Practices Litig.*,
312 F.R.D. 36 (D.N.H. 2015) ......................................................................................21

*Disc. Tobacco & Lottery, Inc. v. United States*,
674 F.3d 509 (6th Cir. 2012) ...................................................................14, 19, 34

*Dorr-Oliver Inc. v. Fluid-Quip, Inc.*,
834 F. Supp. 1008 (N.D. Ill. 1993) ..................................................................................3

*Dzielak v. Whirlpool Corp.*,
No. 12-89, 2017 WL 6513347 (D.N.J. Dec. 20, 2017).....................................................23

*Elkies v. Johnson & Johnson Servs., Inc.*,
No. CV 17-7320-GW(JEMX), 2018 WL 11223465 (C.D. Cal. Oct. 18, 2018)...............15, 17

*In re: EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig.*,
336 F. Supp. 3d 1256 (D. Kan. 2018)....................45

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig.*,
No. 17-md-2785-DDC-TJJ, 2020 WL 1180550 (D. Kan. Mar. 10, 2020)....................10, 11

*In re FCA US LLC Monostable Electronic Gearshift Litig.*,
334 F.R.D. 96 (E.D. Mich. 2019)....................32

*Ferrell v. Allstate Ins. Co.*,
188 P.3d 1156 (N.M. 2008)....................38

*Fiser v. Dell Computer Corp.*,
144 N.M. 464, 188 P.3d 1215 (N.M. 2008)....................3

*Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*,
326 F.R.D. 592 (N.D. Cal. 2018)....................36

*In re Ford Motor Co. E-350 Van Prod. Liab. Litig.* (No. II),
No. CIV.A. 03-4558, 2012 WL 379944 (D.N.J. Feb. 6, 2012)....................26

*Fraser Eng'g Co., Inc. v. Desmond*,
26 Mass. App. Ct. 99 (Mass. App. Ct. 1988)....................22

*Green v. McNeil Nutritionals, LLC*,
Case No. 2004-0379-CA, 2005 WL 3388158 (Fla. Cir. Ct. Nov. 16, 2005)....................20

*Guidance Endodontics, LLC v. Dentsply Intern., Inc.*,
663 F. Supp. 2d 1138 (D.N.M. 2009)....................37

*Hadley v. Kellogg Sales Co.*,
324 F. Supp. 3d 1084 (N.D. Cal. 2018)....................7, 16, 17, 36

*Hargrove v. Sleepy's LLC*,
974 F.3d 467 (3d Cir. 2020)....................11

*Hasemann v. Gerber Prods. Co.*,
331 F.R.D. 239 (E.D.N.Y. 2019)....................32

*Hebert v. Vantage Travel Serv., Inc.*,
334 F.R.D. 362 (D. Mass 2019)....................28

*Henderson v. Gruma Corp.*,
No. CV 10-04173 AHM AJWX, 2011 WL 1362188 (C.D. Cal. Apr. 11, 2011)....................45

*Hinojos v. Kohl's Corp.*,
718 F.3d 1098 (9th Cir. 2013) ....................34

*Hoving v. Lawyers Title Ins. Co.*,
256 F.R.D. 555 (E.D. Mich. 2009) ....................29

*Hudock v. LG Elecs. U.S.A., Inc.*,
No. 16-1220, 2018 WL 626527 (D. Minn. Jan. 30, 2018)....................23

*Indoor Billboard/Washington, Inc. v. Integra Telecom of Washington, Inc.*,
162 Wash. 2d 59, 170 P.3d 10 (2007)....................24, 31

*Int'l Fidelity Ins. Co. v. Wilson*,
387 Mass. 841 (Mass. 1983) ....................22

*International Union of Operating Engineers Local No. 68 Welfare Fund v. Merck & Co.*,
192 N.J. 372, 929 A.2d 1076 (2007)....................23

*Jackson v. Wal-Mart Stores, Inc.*,
No. 258498, 2005 WL 3191394 (Mich. Ct. App. Nov. 29, 2005)....................29

*Jermyn v. Best Buy Stores, L.P.*,
256 F.R.D. 418 (S.D.N.Y. 2009) ....................30

*Johnson v. Gen. Mills, Inc.*,
278 F.R.D. 548 (C.D. Cal. 2012) ....................8, 49

*Jones v. ConAgra Foods, Inc.*,
No. C 12-01633 CRB, 2014 WL 2702726 (N.D. Cal. June 13, 2014) ....................32

*Keilholtz v. Lennox Hearth Prod. Inc.*,
268 F.R.D. 330 (N.D. Cal. 2010)....................26

*Kelley v. Microsoft Corp.*,
251 F.R.D. 544 (W.D. Wash. 2008) ....................24, 31

*Korrow v. Aaron's Inc.*,
No. CIV.A. 10-6317 MAS, 2013 WL 5811496 (D.N.J. July 31, 2013) ....................24

*Kosta v. Del Monte Foods, Inc.*,
308 F.R.D. 217 (N.D. Cal. 2015)....................18

*Krommenhock v. Post Foods, LLC*,
334 F.R.D. 552 (N.D. Cal. 2020)....................33, 37

*Kumar v. Salov N. Am. Corp.*,
No. 14-cv-2411-YGR, 2016 WL 3844334 (N.D. Cal. July 15, 2016)........................11, 13, 32

*Kwaak v. Pfizer, Inc.*,
71 Mass. App. Ct. 293, 881 N.E.2d 812 (2008) ..........................................................23

*Lee v. Carter-Reed Co.*,
4 A.3d 561 (N.J. 2010)...................................................................................................23

*Lee v. Conagra Brands, Inc.*,
958 F.3d 70 (1st Cir. 2020)........................................................................................22, 23

*Markarian v. Connecticut Mut. Life Ins. Co.*,
202 F.R.D. 60 (D. Mass. 2001)........................................................................................22

*In re McCormick & Co., Inc., Pepper Prod. Mktg. & Sales Practices Litig.*,
422 F. Supp. 3d 194 (D.D.C. 2019) ..........................................................20, 31, 33

*Mednick v. Precor, Inc.*,
320 F.R.D. 140 (N.D. Ill. 2017).......................................................................................17

*Menocal v. GEO Grp., Inc.*,
882 F.3d 905 (10th Cir. 2018) ..........................................................................6, 25, 26, 27

*In re Mercedes-Benz Tele Aid Contract Litig.*,
257 F.R.D. 46 (D.N.J. 2009)......................................................................................25, 26

*Midland Funding, LLC v. Brent*,
No. 3:08 CV 1434, 2010 WL 4628593 (N.D. Ohio Nov. 4, 2010) ..........................................8

*Milan v. Clif Bar & Co.*,
No. 18-CV-02354-JD, 2020 WL 5760450 (N.D. Cal. Sept. 28, 2020) ................................46

*Miller v. Basic Research, LLC*,
285 F.R.D. 647 (D. Utah 2010) ..........................................................................................5

*Montgomery v. Kraft Foods Glob., Inc.*,
No. 1:12-CV-00149, 2014 WL 1875022 (W.D. Mich. May 9, 2014)....................................32

*In re Motor Fuel Temperature Sales Practices Litig.*,
292 F.R.D. 652 (D. Kan. 2013)...........................................................................................5

*In re Motor Fuel Temperature Sales Practices Litig.*,
Nos. 17-MD-1840-KHV, 07-3248-KHV, 2009 WL 3122501 (D. Kan. Sept. 24, 2009) ..........................................................................................................37

*Mulford v. Altria Grp., Inc.*,
242 F.R.D. 615 (D.N.M. 2007)....................7

*Mullins v. Direct Digital, LLC*,
795 F.3d 654 (7th Cir. 2015)....................10, 11, 12, 13

*Mullins v. Premier Nutrition Corp.*,
No. 13-CV-01271-RS, 2016 WL 1535057 (N.D. Cal. Apr. 15, 2016)....................35

*Naylor Farms, Inc. v. Chaparral Energy, LLC*,
923 F.3d 779 (10th Cir. 2019)....................39

*In re NJOY, Inc. Consumer Class Action Litig.*,
120 F. Supp. 3d 1050 (C.D. Cal. 2015)....................36

*Oliveira v. Amoco Oil Co.*,
201 Ill. 2d 134, 776 N.E.2d 151 (2002)....................21

*In re OnStar Contract Litig.*,
278 F.R.D. 352 (E.D. Mich. 2011)....................32

*In re Oppenheimer Rochester Funds Grp. Sec. Litig.*,
318 F.R.D. 435 (D. Colo. 2015)....................7

*Oshana v. Coca–Cola Co.*,
No. 04 C 3596, 2005 WL 1661999 (N.D. Ill. July 13, 2005)....................36

*Oshana v. Coca-Cola Co.*,
472 F.3d 506 (7th Cir. 2006)....................21, 28

*Overka v. American Airlines, Inc.*,
265 F.R.D. 14 (D. Mass. 2010)....................28

*Payne v. Tri-State CareFlight*,
LLC, 332 F.R.D. 611 (D.N.M. 2019)....................6, 29, 30

*Pella Corp. v. Saltzman*,
606 F.3d 391 (7th Cir. 2010)....................21

*In re Petrobras Sec.*,
862 F.3d 250 (2d Cir. 2017)....................10, 13

*Petrosino v. Stearn's Prods., Inc.*,
No. 16-CV-7735 (NSR), 2018 WL 1614349 (S.D.N.Y. Mar. 30, 2018)....................19

*Philip Morris USA Inc. v. Hines*,
883 So.2d 292 (Fla. Dist. Ct. App. 2003) ....................20

*Phillips v. Ford Motor Co.*,
No. 99-L-1041, 2003 WL 23353492 (Ill. Cir. Ct. Sept. 15, 2003) ....................21

*Pitts v. Am. Sec. Ins. Co.*,
144 N.C. App. 1, 550 S.E.2d 179 (2001) ....................30, 31

*Plastic Surgery Assocs. S.C. v. Cynosure, Inc.*,
407 F. Supp. 3d 59 (D. Mass. 2019) ....................22

*Pop's Pancakes, Inc. v. NuCO2, Inc.*,
251 F.R.D. 677 (S.D. Fla. 2008) ....................20

*Reed v. Gen. Mills, Inc.*,
No. C19-0005-JCC, 2019 WL 2475706 (W.D. Wash. June 13, 2019) ....................18

*Ries v. Arizona Beverages USA LLC*,
287 F.R.D. 523 (N.D. Cal. 2012) ....................45

*Rikos v. Procter & Gamble Co.*,
799 F.3d 497 (6th Cir. 2015) .................... *passim*

*Rodarte v. Bd. of Cty. Comm'rs of Bernalillo Cty.*,
No. 14-CV-193 JAP/SCY, 2014 WL 10298032 (D.N.M. Oct. 20, 2014) ....................30

*S37 Mgmt., Inc. v. Advance Refrigeration Co.*,
356 Ill. Dec. 172, 961 N.E.2d 6 (Ill. App. Ct. 2011) ....................22

*Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*,
821 F.3d 992 (8th Cir. 2016) ....................10

*In re Santa Fe Nat. Tobacco Co. Mktg. & Sales Practices & Prod. Liab. Litig.*,
288 F. Supp. 3d 1087 (D.N.M. 2017) .................... *passim*

*Savaglio v. Wal-Mart Stores, Inc.*,
No. C-835687, 2003 WL 25676640 (Cal. Super. Ct. Nov. 6, 2003) ....................26

*Schneider v. Chipotle Mexican Grill, Inc.*,
328 F.R.D. 520 (N.D. Cal. 2018) ....................8

*In re Scotts EZ Seed Litig.*,
304 F.R.D. 397 (S.D.N.Y. 2015) ....................30

*Simon v. Philip Morris, Inc.*,
124 F. Supp. 2d 46 (E.D.N.Y. 2000) ....................39

*Singleton v. Fifth Generation, Inc.*,
No. 515CV474BKSTWD, 2017 WL 5001444 (N.D.N.Y. Sept. 27, 2017)....................19

*Smith v. Bank of Hawaii*,
No. CV 16-00513 JAO-RLP, 2019 WL 3297301, (D. Haw. Jan. 30, 2019) ....................7

*Stern v. Philip Morris USA, Inc.*,
No. MID-L-2584-03, 2007 WL 4841057 (N.J. Super. Ct. Nov. 16, 2007) ....................23

*Tait v. BSH Home Appliances Corp.*,
289 F.R.D. 466 (C.D. Cal. 2012)....................7, 9

*In re Terazosin Hydrochloride Antitrust Litig.*,
220 F.R.D. 672 (S.D. Fla. 2004)....................27, 29

*Thrope v. State of Ohio*,
173 F.R.D. 483 (S.D. Ohio 1997) ....................2, 3

*In re Tobacco II Cases*,
46 Cal. 4th 298 (2009) ....................32

*Townsend v. Monster Beverage Corp.*,
303 F. Supp. 3d 1010 (C.D. Cal. 2018) ....................32

*Tullie v. Quick Cash, Inc.*,
No. 14-0491, 2014 WL 12782961 (D.N.M. Dec. 2, 2014)....................3

*United States v. Easley*,
911 F.3d 1074 (10th Cir. 2018) ....................18

*United States v. Philip Morris USA, Inc.*,
449 F. Supp. 2d 1 (D.D.C. 2006)....................19, 34, 48

*In re Urethane Antitrust Litig.*,
768 F.3d 1245 (10th Cir. 2014) ....................12

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011)....................4, 5, 12

*Weiner v. Snapple Beverage Corp.*,
No. 07 CIV. 8742 DLC, 2010 WL 3119452 (S.D.N.Y. Aug. 5, 2010) ....................19, 30

*Zuniga v. Bernalillo Cty.*,
319 F.R.D. 640 (D.N.M. 2016).....4, 5

**Rules**

Federal Rule of Civil Procedure 21 .....37

Federal Rule of Civil Procedure 23 ..... *passim*

Federal Rule of Civil Procedure 23(a)(3) .....7

Federal Rule of Civil Procedure 23(b)(2) .....4, 44, 49, 50

Federal Rule of Civil Procedure 23(b)(3) .....4, 9, 25

Federal Rule of Civil Procedure 23(b)(4) .....32

Federal Rule of Civil Procedure 23(c) .....9

Federal Rule of Civil Procedure 23(c)(1)(B) .....9

NMRA, Rule 13-1428.....39

# INTRODUCTION

Plaintiffs move for certification of an archetypical class seeking monetary damages and injunctive relief as a result Defendants' intentional use of misleading and deceptive health reassurance messaging to promote the sale of NAS Cigarettes as less harmful then other cigarettes. This results in Class Members[1] paying too much for products that were no safer than the deadliest artifact in the history of human civilization, the combustible cigarette. Indeed, Defendants are correct when they say Plaintiffs' claims "center on the idea that, by describing the tobacco in Natural American Spirit [] cigarettes as 'natural,' 'additive-free,' and (where appropriate) 'organic,' Defendants misled consumers into believing those cigarettes are safer or healthier than others." Defendants' Opposition to Plaintiffs' Motion for Class Certification, ECF No. 315 ("Opp.") 1. Defendants may refuse to acknowledge the merit of Plaintiffs' claims—even though every governmental agency, public health authority, and regulatory body that has looked at the question has reached the unanimous and unequivocal conclusion that Defendants' marketing is, in fact, deceptive. But by properly framing the key "idea" in this case as whether Defendants' product marketing was misleading, Defendants effectively admit that class certification is warranted.

Therefore, despite such admission (or perhaps because of such admissions), Defendants' arguments in opposition to certification must seek to ignore well-established case law explaining that circumstances such as these—consumers claiming small amounts based on a defendant's deceptive marketing—are precisely those for which Rule 23 was designed. Similarly, Defendants' arguments must also seek to avoid the fact that Plaintiffs properly ground their request for certification on two

[1] Unless otherwise noted, capitalized terms are defined as set forth in Plaintiffs' Second Consolidated Amended Class Action Complaint ("SAC"), and references to terms defined in prior briefing on Plaintiffs' Motion for Class Certification ("Motion" or "Mot.") are again used here; *e.g.*, "Weiner Decl."

well-recognized principles that allow for class-wide resolution of claims based on common evidence: (i) the objective, "reasonable consumer" standard; and, (ii) an objective, "price premium" measure of damages—a premium created by Defendants' product misrepresentations. As a result, Defendants' efforts to attack predominance and other requirements for certification amount to improper attempts to: (i) inject notions of "individual inquiry" into the certification analysis; (ii) ignore the facts surrounding Defendants' misrepresentations; (iii) mischaracterize Plaintiffs' theories of recovery; and, (iv) prematurely attack the merits of common evidence that should be weighed after certification.

In the end, Defendants' arguments cannot ignore what, at the outset, Defendants concede—this case hinges on whether Defendants' well-executed and targeted claims about their cigarettes being "'natural,' 'additive-free,' and . . . 'organic,'" are, in fact, misleading product claims. And therefore, this Court should grant Plaintiffs' Motion for Class Certification.

## ARGUMENT

## I. The Specific Legal Claims Defendants Challenge are Appropriate for Class Treatment

Defendants contend that Plaintiffs' Illinois Unfair and Deceptive Trade Practices Act ("IUDTPA"), New Mexico False Advertising Act ("NMFAA") and New Mexico Unfair Practices Act ("NMUPA") claims cannot be certified. *See* Opp. 17-19. Defendants are wrong.

**IUDTPA.** Defendants improperly and incorrectly contend that monetary damages are not recoverable under the IUDTPA. *See* Opp. 17-18. *First*, Defendants' claim that the IUDTPA precludes monetary damages is a defense that, if true, which it is not, would be applicable to *all* Class Members and, thus, does not undermine certification of the Illinois Class. *See Thrope v. State of Ohio*, 173 F.R.D. 483, 490 (S.D. Ohio 1997) (certifying class where "the common issues involving the interpretation of the ADA and the Ohio statutory scheme predominate over any individual issues."). *Second*, Defendants are wrong because "the [Illinois] Consumer Fraud and Deceptive Business Practices Act

authorizes recovery of damages from violations of the Uniform Deceptive Trade Practices Act." *Dorr-Oliver Inc. v. Fluid-Quip, Inc.*, 834 F. Supp. 1008, 1014-15 (N.D. Ill. 1993) (citing *Duncavage v. Allen*, 147 Ill. App. 3d 88, 100 Ill. Dec. 455, 462-63, 497 N.E.2d 433, 440-41 (1986)).

**NMFAA.** Similarly, Defendants improperly and incorrectly contend that the NMFAA does not provide consumers with a right of action. *See* Opp. 17-18. *First*, Defendants' argument, if true, does not undermine certification. *See Thrope*, 173 F.R.D. at 490. *Second*, and again, there is a private right of action for consumers under the NMFAA. *See Fiser v. Dell Computer Corp.*, 144 N.M. 464, 467-68, 188 P.3d 1215, 1218–19 (N.M. 2008) ("private individuals [empowered] to bring rights of action in the name of … 'all others similarly situated.'") (quoting N.M. Stat. Ann. § 57-15-5).

**NMUPA.** Finally, focusing on just one factor considered when determining certification, Defendants contend that a class action is not superior because Class Members cannot recover statutory damages available to individual litigants under the NMUPA. *See* Opp. 19. However, this Court has addressed this precise issue and acknowledged certification is proper. *Daye v. Cmty. Fin. Serv. Ctrs., LLC*, 313 F.R.D. 147, 171-74 (D.N.M. 2016) (Browning, J.) (certifying NMUPA class); *Tullie v. Quick Cash, Inc.*, No. 14-0491, 2014 WL 12782961, at *4 (D.N.M. Dec. 2, 2014) (rejecting defense argument that "[b]ecause successful individual claimants would receive greater monetary damages … it would therefore be 'less fair' to certify the class action….'").[2]

## II. Plaintiffs Satisfy the Requirements of Rule 23(a)

### A. Plaintiffs Satisfy the Commonality Requirement

[2] Plaintiffs preserve their right to appeal dismissal of their (i) New Jersey unjust enrichment, (ii) IUDTPA injunctive relief, (iii) Ohio Consumer Sales Practices Act, and (iv) Colorado Consumer Protection Act monetary damage claims, but are not seeking certification of classes for those claims at this time.

Defendants incorrectly argue that Plaintiffs' claims "hinge on individualized issues." Opp. 20. The law, however, is clear that a single common question may satisfy the commonality requirement. *See* Mot. 44 (citing *Menocal v. GEO Grp., Inc.*, 882 F.3d 905, 914 (10th Cir. 2018)). For this reason, courts in the Tenth Circuit routinely find commonality met in false advertising cases. *See id.* 45, n.15 (collecting cases). Here, Plaintiffs have identified several common questions, which all focus on issues that are central to all Class Members' claims. *See id.* 45-46. At the heart of Plaintiffs' claims is the question of whether Defendants' *uniform* marketing representations are false, deceptive, or misleading to a *reasonable consumer*—not particular, individual consumers. Other common questions central to the litigation of this case include: whether there was a price premium paid (or economic loss suffered) by Class Members (for the Rule 23(b)(3) Class); and, whether the Court should enjoin Defendants' deceptive conduct (for the Rule 23(b)(2) Class). *See* Mot. 59-80, 85-88. In particular, substantial common evidence will *answer* whether Defendants uniformly market NAS Cigarettes; whether Defendants' marketing leads a reasonable consumer to understand that NAS Cigarettes may be less harmful than other cigarettes; and, whether and in what amount are economic damages attributable to Defendants' misrepresentations. This evidence includes Defendants' internal documents and Plaintiffs' experts' opinions. *See* Mot. 11-35.

Defendants seek to rely on employment discrimination cases such as *Zuniga v. Bernalillo County*, 319 F.R.D. 640 (D.N.M. 2016) (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011)) (Browning, J.). *See* Opp. 21-22. But *Zuniga* is inapposite, as it is in line with *Dukes*, where there was a "'policy' of *allowing discretion* by local supervisors over employment matters," a policy deemed "the opposite of a uniform employment practice that would provide the commonality needed for a class action; it is a policy *against having* uniform employment practices." *Dukes*, 564 U.S. at 355 (emphasis in original).

The facts of such employment discrimination cases are completely contrary to the facts of this consumer fraud case and, thus, not helpful. Notably, Defendants wholly fail to discuss any of the numerous on-point misrepresentation cases cited by Plaintiffs—each of which finds that a defendant's uniform, or "materially similar," misrepresentations are sufficient to establish commonality. *See* Mot. 45-46. That is because the uniform defendant conduct in consumer fraud cases is precisely the opposite of the variable defendant conduct in employment discrimination cases like *Zuniga* and *Dukes*. *See Daye*, 313 F.R.D. at 176-78; *see also In re Motor Fuel Temperature Sales Practices Litig.*, 292 F.R.D. 652, 668 (D. Kan. 2013). Also completely unaddressed by Defendants are cases cited by Plaintiffs (*see* Mot. 45) making it clear that misrepresentations that evoke a common theme, including with varying words or images, can satisfy the commonality requirement. *See, e.g.*, *Miller v. Basic Research, LLC*, 285 F.R.D. 647, 651-52 (D. Utah 2010) (finding commonality where weight-loss product's marketing had gone through "several revisions" but always stressed that users could lose weight without changing their eating habits); *see also Broomfield v. Craft Brew All., Inc.*, No. 17-cv-01027-BLF, 2018 WL 4952519, at *1-2, 6 (N.D. Cal. Sept. 25, 2018) (finding commonality with thematically similar representations). Common evidence demonstrates all purchasers of NAS Cigarettes were exposed to the at-issue labeling at the point of purchase. *See, e.g.*, SAC ¶ 78; Mot. 11-28 (citing Weiner Decl., ECF Nos. 280-81, 287, Ex. 22), 17 (citing Dewhirst Report 25), 39, n.9 (citing collected deposition testimony).

Courts across the country routinely find that alleged misrepresentations on a product's packaging "raise[] the common question of whether the packaging would mislead a *reasonable consumer*." *Broomfield*, 2018 WL 4952519, at *5 (emphasis added); *see also, e.g.*, *In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 569 (C.D. Cal. 2014) ("Because all class members were exposed to the statement and purchased

Wesson Oil products, there is a common core of salient facts."). The existence of Defendants' false, deceptive, or misleading representations is central to *each* class member's claim.[3]

**B. Plaintiffs Satisfy the Typicality Requirement**

Defendants are correct that commonality and typicality rise or fall together. *See* Opp. 22; *Anderson Living Trust v. WPX Energy Prod., LLC*, 306 F.R.D. 312, 440 (D.N.M. 2015) (Browning, J.). So, because there is commonality, there is also typicality. Indeed, this Court explained this precise point in *Payne v. Tri-State CareFlight*, LLC, 332 F.R.D. 611, 661 (D.N.M. 2019) (Browning, J.), *leave to appeal denied,* No. 19-702, 2019 WL 8329300 (10th Cir. Dec. 3, 2019) (typicality satisfied when claims are based on the same legal or remedial theory).

Relatedly, it is well-established that the typicality requirement is a "permissive standard[]" and a class representative's claims need only be "reasonably co-extensive with those of absent class members." *See* § 3:29. Typicality: applicable standard, 1 Newberg on Class Actions § 3:29 (5th ed.) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)). Defendants only attack two discrete fact patterns with regard to the class representatives—patterns for which they have no supporting case law: (1) three class representations purchased NAS Cigarettes after the filing of the lawsuit; and, (2) two class representatives expressed a subjective recollection that they did not pay a premium for NAS Cigarettes.

Defendants misunderstand (or misrepresent) the claims Plaintiffs seek to certify. Plaintiffs seek to demonstrate with common evidence that *reasonable consumers* were misled by NAS Cigarettes' labeling such that they suffered economic damage. This theory of recovery does not require inquiry

---

[3] To the extent Defendants imply that individual questions outweigh common questions (*see* Opp. 20-22), that weighing goes towards the issue of predominance, not commonality. *See Menocal*, 882 F.3d at 914; *see also CGC Holding Co., LLC v. Broad & Cassel*, 773 F.3d 1076, 1087 (10th Cir. 2014).

into the subjective thinking of individual consumers. *See, e.g.*, *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1120 (N.D. Cal. 2018) ("Plaintiff's claims will be evaluated according to an objective 'reasonable consumer' standard. … [T]he 'activities' in which Plaintiff engaged that might have physically affected Plaintiff are irrelevant … and therefore cannot render Plaintiff 'subject to' any 'unique defenses.'"); *Mulford v. Altria Grp., Inc.*, 242 F.R.D. 615, 623 (D.N.M. 2007) ("Differing fact situations of class members do not defeat typicality under Rule 23(a)(3) so long as the claims of the class representative and class members are based on the same legal or remedial theory.") (quoting *Adamson v. Bowen*, 855 F.2d 668, 676 (10th Cir. 1988)); *see also Anderson Living Trust*, 306 F.R.D. at 382; *Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 480 (C.D. Cal. 2012). As this Court has observed, it is only "*in extreme cases*, [that] this dissimilarity [between class representatives and putative class members] might make the proposed class representatives unsuitable under rule 23(a)(3)." *Anderson Living Trust*, 306 F.R.D. at 440-41 (emphasis added).

Plaintiffs readily meet the typicality standard as reflected in cases such as *Anderson Living Trust* and *Hadley*: the named Plaintiffs assert the same causes of action as the absent Class Members, and their claims are all based on the purchase of NAS Cigarettes, whose marketing implies to a reasonable consumer that they may be less harmful than other cigarettes, even though, in fact, they are not.

The ostensible affirmative defenses Defendants point to do not defeat typicality. *First*, the fact that consumers may have *continued* smoking NAS Cigarettes after having been deceived by Defendants does not mean that their claims are atypical. *See, e.g.*, *In re Oppenheimer Rochester Funds Grp. Sec. Litig.*, 318 F.R.D. 435, 444 (D. Colo. 2015) (rejecting argument that class representative was "atypical because he is subject to unique defenses," including merits defense of knowledge of alleged fraud); *Smith v. Bank of Hawaii*, No. CV 16-00513 JAO-RLP, 2019 WL 3297301, (D. Haw. Jan. 30, 2019) (typicality challenge defeated where even where the plaintiff continued to utilize the defendant's

services); *Midland Funding, LLC v. Brent*, No. 3:08 CV 1434, 2010 WL 4628593, at *4 (N.D. Ohio Nov. 4, 2010) ("a debt collector may not escape liability simply because certain wary debtors … were not actually fooled by the false statements at issue, *or chose to ignore them* …") (emphasis added); *Johnson v. Gen. Mills, Inc.*, 278 F.R.D. 548, 552 (C.D. Cal. 2012) (typicality satisfied despite continued purchase).[4]

*Second*, the testimony of two Plaintiffs that they subjectively *believe* they did not pay a price premium is irrelevant. That is because a price premium is the difference between what the consumer actually paid and what they would have paid in the but-for world in which Defendants had not fraudulently marketed the product. *See* Weiner Decl. Ex. 8 (Dubé Report) ¶¶ 23-26; *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 989 (C.D. Cal. 2015) (noting "price premium" was measure of economic damages "attributable to use of the '100% Natural' label"). So, under Plaintiffs' theory of recovery, *all* consumers paid too much for NAS Cigarettes. *See id.* As Plaintiffs' expert Dr. Dennis explains, consumers' "perceptions of paying relatively more or relatively less for NAS products is irrelevant with respect to measuring any price premium." ECF No. 277-001 (Dennis Rebuttal Report) ¶ 59; *see also Schneider v. Chipotle Mexican Grill, Inc.*, 328 F.R.D. 520, 537 (N.D. Cal. 2018) (typicality satisfied

[4] Although the Court should reject any argument based on Plaintiffs' continued purchases, Plaintiffs note that the argument applies only to Ceyhan Haksal, Joshua Horne, and Robert Litwin. So, even if these Plaintiffs' claims were deemed atypical, that would only apply to the following claims for which they are the only named plaintiffs: Colorado Counts I-II (Menthol Subclass), Florida Counts I-II (Menthol Subclass), New Jersey Counts I-III (Menthol Subclass), New Mexico Counts I-III, New York Counts I-III (Menthol Subclass). Per footnote 2, Colorado Count I and New Jersey Count III are not being pursued for class certification at this time.
It is noteworthy that Defendants selectively cite to transcript passages that distort Plaintiffs' testimony. For example, Mr. Haksal testified that when he was doing his best to be healthier, he struggled with cigarette use as "nicotine is very addictive." Reply Declaration of Melissa Weiner in Support of Plaintiffs' Motion for Class Certification ("Weiner Reply Decl."), Ex. 92 (Haksal Dep. 193).

"even though [] Plaintiffs may believe themselves entitled to damages larger than Plaintiffs currently seek [for the class].").[5, 6]

## III. Plaintiffs Satisfy the Requirements of Rule 23(b)(3)

### A. Individual Issues Do Not Predominate

Defendants are wrong that Rule 23(b)(3)'s predominance requirement is not met because the issues in this case are ostensibly "overwhelmed by the individualized inquiries." Opp. 24-25.

#### 1. The Class is Readily Identifiable

Defendants argue that certification is not warranted on the grounds that the proposed Classes are not ascertainable because Plaintiffs have not shown "an administratively feasible method of proving who purchased the products," and that such proof of purchase would require "individualized litigation" that would defeat predominance. Opp. 25. The Court should reject these arguments. Courts routinely find a heightened ascertainability requirement as inconsistent with Rule 23, and classes need only be readily identifiable according to objective criteria, which they are.

Rule 23(c) only requires that a court's certification order "define the class and the class claims, issues, or defenses" (Fed. R. Civ. P. 23(c)(1)(B)), and that such class be defined according to "objective criteria." *Anderson Living Tr. v. Energen Res. Corp.*, No. 13-cv-00909-WJ-CG, 2019 WL 6618168, at *8

---

[5] Although the Court should reject any argument based on Plaintiffs' beliefs on price, Plaintiffs note that the argument applies only to Abigail Emmons and Robert Litwin. So, even if these Plaintiffs' claims were deemed atypical, that would only apply to the following claims for which they are the only named plaintiffs: New Jersey Counts I-III (Class), New Jersey Counts I-III (Menthol Subclass), New York Counts I-III (Menthol Subclass). Per footnote 2, New Jersey Count III is not being pursued for class certification at this time.

[6] If the Court determines that any of the Plaintiffs identified by Defendants are atypical, then Plaintiffs are entitled to request, and do request, leave to substitute new class representatives. *See, e.g.*, *Borum v. Brentwood Vill., LLC*, No. CV 16-1723 (RC), 2019 WL 2437686, at *1 (D.D.C. June 11, 2019); *Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 477 (C.D. Cal. 2012); *Bohn v. McManaman*, No. CIV. 10-00680 DAE, 2011 WL 5190899, at *3 (D. Haw. Oct. 11, 2011).

(D.N.M. Dec. 5, 2019). Relatedly, while Rule 23 contains an "implicit threshold requirement" that the members of a proposed class be "readily identifiable" (*id.* (internal quotation marks omitted)), under Tenth Circuit law, these Rule 23 standards *do not mandate* a heightened ascertainability requirement.

Rather, the Tenth Circuit has instead emphasized that the district court has significant discretion to determine the method for trial of a case based on its particular facts, including to certify classes as appropriate. *See Davoll v. Webb*, 194 F.3d 1116 (10th Cir. 1999). Other Circuits are in accord. *See Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1123 (9th Cir. 2017) ("A separate administrative feasibility prerequisite to class certification is not compatible with the language of Rule 23."); *accord In re Petrobras Sec.*, 862 F.3d 250, 268 (2d Cir. 2017) ("We conclude that an implied administrative feasibility requirement would be inconsistent with the careful balance struck in Rule 23"); *Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*, 821 F.3d 992, 995-96 (8th Cir. 2016); *Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 525 (6th Cir. 2015); *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 658 (7th Cir. 2015).

Contrary to these authorities, a few courts, notably the Third Circuit, have required that plaintiffs demonstrate an "administratively feasible" method to determine who is in the class. *See e.g.*, *Byrd v. Aaron's Inc.*, 784 F.3d 154 (3d Cir. 2015). However, in a consumer purchaser case with several facts similar to those present here, the District of Kansas recently "predict[ed] that the Tenth Circuit, if confronted with this question, would decline to recognize ascertainability as a separate, unstated requirement of Rule 23 requiring certification movants to satisfy the more stringent ascertainability standard adopted by the Third Circuit." *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig.*, No. 17-md-2785-DDC-TJJ, 2020 WL 1180550, at *11 (D. Kan. Mar. 10, 2020) ("*EpiPen*"). The *EpiPen* court went on to conclude that the plaintiffs' class definitions—similar to those present in this case—were sufficient because they were "based on objective criteria—*i.e.*, each

one defines a class member as a person or entity who paid part of the purchase price for an EpiPen during a specific date range." *Id.* (emphasis added).[7]

Here, Plaintiffs' class definitions show class membership is based on such objective criteria—specifically: (i) whether a person purchased one or more NAS Cigarette product, (ii) the state in which the person purchased the NAS Cigarette product(s), and (iii) when they purchased the NAS Cigarette product(s). *See, e.g.*, *Kumar v. Salov N. Am. Corp.*, No. 14-cv-2411-YGR, 2016 WL 3844334, at *7 (N.D. Cal. July 15, 2016). Moreover, identification of Class Members in this case, as in similar class actions, can take place at the claims administration stage with self-identification using, *inter alia*, sworn affidavits, claim forms, receipts, and other purchase records. *See, e.g.*, *Mullins*, 795 F.3d at 667; *Kumar*, 2016 WL 3844334, at *7 (finding "no barriers to ascertainability" where "[t]hough it is unlikely that this class of consumers will be able to produce evidence of purchase such as receipts or store/club card data to verify a purchase, this is no impediment to their offering evidence of purchase by affidavit on a claim form.").

Contrary to Defendants' arguments, "a stricter view of ascertainability furthers no interest not already protected by Rule 23's explicit requirements, nor is it necessary to prevent unfairness to absent class members." *EpiPen*, 2020 WL 1180550, at *11; *see also Mullins*, 795 F.3d at 667; *Kumar*, 2016 WL 3844334, at *7 ("requiring consumer class members to produce receipts … would essentially preclude relief for most consumer injuries … .").[8]

---

[7] Also, even judges of the Third Circuit have expressed concern that the Third Circuit's imposition of a heightened ascertainability requirement does not accord with Rule 23, stating, for example, that the "heightened ascertainability requirement . . . narrows the availability of class actions in a way that the drafters of Rule 23 could not have intended." *Hargrove v. Sleepy's LLC*, 974 F.3d 467, 479, n.7 (3d Cir. 2020) (reversing district court's denial of class certification on ascertainability grounds) (quoting *Byrd*, 784 F.3d at 172 (Rendell, J., concurring)).

[8] In a footnote, Defendants also argue that the question of whether ascertainability is a standalone requirement, an element of predominance or superiority, or part of another hybrid approach, "is of

Defendants are asking that the Court to give ascertainability "absolute priority," however that ignores the comparative inquiry required in a case like the present. *Mullins*, 795 F.3d at 658 ("These are cases where the class device is often essential 'to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights.'") (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997)); *Abraham v. WPX Prod. Prods., LLC*, 317 F.R.D. 169, 242 (D.N.M. 2016) ("[S]everal courts have held that, if the predominance requirement is met, then the court should not decline to certify the class on manageability grounds alone.").

Finally, Defendants' argument that *Dukes* requires each element of each claim of each class member to be "*specifically* proven" (Opp. 29-30 (emphasis in original)) is misguided; in particular, because Plaintiffs do not propose the use of sampling to prove the Class Members' claims. In this case, however, as discussed further in Sections II.A., *supra,* and III.A.2., *infra*, Plaintiffs' common evidence applies to the claims of *all* Class Members, not merely a sample.[9]

Defendants rely heavily on the order denying class certification in *Abraham*, 317 F.R.D. 169 (*see* Opp. 25-27, 29-30), but that case addressed facts substantially different than here. In *Abraham*, there were issues determining class membership given the particular underlying facts. *Id.* at 188, 256-

---

no practical consequence here." Opp. 25, n.14. Defendants are wrong. As the Seventh Circuit explained in *Mullins*, imposing a separate, heightened ascertainability requirement upsets the balance struck in Rule 23 because "[i]n effect, [a heightened ascertainability requirement] gives one factor in the balance absolute priority, with the effect of barring class actions where class treatment is often most needed: in cases involving relatively low-cost goods or services, where consumers are unlikely to have documentary proof of purchase." *Mullins*, 795 F.3d at 658.

[9] In fact, when plaintiffs seek to calculate a total damages amount for a class, a defendant's supposed concerns relating to the identification of class members who will recover are simply not warranted. *See, e.g.*, *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1269 (10th Cir. 2014) ("[defendant had] no interest in the method of distributing the aggregate damages award among the class members.").
Also, contrary to Defendants' argument, a product purchase is not an "element" of any claim before the Court. *See* Opp. 26, 27, n.15, 29. A product purchase *may* be a *part* of a fact pattern that establishes the elements of, for example, one of Plaintiffs' claims.

57. As the court explained, this led to an intractable problem identifying class members, "The Plaintiffs did not identify by a preponderance of the evidence which leases' gas is or has been processed at the named processing plants, and therefore, which interests burdening leases and wells are part of the Plaintiffs' proposed class." *Id.* at 255.

Here, no similar tracing problem exists in identifying Class Members. Consumers either did or did not purchase NAS Cigarettes—if consumers spent money on NAS Cigarettes during the relevant period, they *are* Class Members. Class Members can self-identify simply and economically at the claims administration stage using sworn affidavits, claim forms, receipts, or purchase information. *See Mullins*, 795 F.3d at 667; *Kumar*, 2016 WL 3844334, at *7. So, the Court should follow cases such as *Mullins*, *Briseno*, *In re Petrobras*, *Sandusky Wellness Center*, *Rikos* and *Kumar* and not impose any heightened ascertainability requirement.[10]

2. Minimal Differences in Defendants' Misrepresentations to Class Members Do Not Create Predominance Issues that Defeat Certification

Defendants incorrectly argue that Class Members may have seen different marketing representations requiring individual analysis. Opp. 30-42.

(a) *Plaintiffs and Class Members All Saw Substantially Similar Misrepresentations, and Their Individual, Subjective Understandings are Irrelevant*

*First,* Defendants' argument requires one to ignore the entire basis for this case: that Defendants' marketing, *in toto*, gave the impression to reasonable consumers of health reassurance, *i.e.* that NAS Cigarettes may be less harmful than other cigarettes. So, the NAS Cigarettes labeling (which includes all brands during the Class Period) either *is* (or *is not*) misleading to a reasonable consumer,

[10] Defendants have produced their NAS customer database, which consists of about 13 million people who are on an "active mailing list" and, for the relevant periods, identifies "about a million people" who self-reported as NAS Cigarette smokers. *See* Weiner Reply Decl. Ex. 93 (Huyett Dep. 161-164). The NAS database can be leveraged to identify Class Members.

an objective standard. *See* Weiner Decl. Ex. 1 (Proctor Report), Ex. 5 (Pearson Report), Ex. 7 (Dewhirst Report); *In re Santa Fe Nat. Tobacco Co. Mktg. & Sales Practices & Prod. Liab. Litig.*, 288 F. Supp. 3d 1087, 1233-34 (D.N.M. 2017) ("[T]hose two terms ['natural' and 'organic'] have an independent connotation that a product is healthier or safer …. The natural and organic descriptors, accordingly, are deceptive to a reasonable consumer"; "Natural American's additive-free descriptor on menthol cigarettes also misleads a reasonable consumer"); *Disc. Tobacco & Lottery, Inc. v. United States*, 674 F.3d 509, 536 (6th Cir. 2012) ("[C]ommon sense dictates the conclusion that [consumers who prefer natural or organic products] prefer such products precisely because they believe that natural and organic products confer health advantages over conventional products.").

*Second*, as a general principle, courts in consumer protection cases will "presume class members who purchased products with misleading packaging . . . were exposed to misleading statements on that packaging." *Davidson v. Apple, Inc.*, No. 16-CV-04942-LHK, 2018 WL 2325426, at *18 (N.D. Cal. May 8, 2018) (collecting cases). This reinforces the first point above.

*Third*, and perhaps most important, the representations on NAS Cigarettes' packaging that are at issue here (often referred to as "Challenged Claims," *see, e.g.*, Mot. 56) are all the same or substantially similar. Defendants uniformly marketed their NAS Cigarettes as "natural" and "additive-free," and in some cases "organic." *See* Mot. 10-15, 52, 62-63. And these representations (and other similar representations on the packaging from the Class Period, such as "organic," or "tobacco + water") are effectively the same and all convey to the reasonable consumer the same core marketing message: NAS Cigarettes may be less harmful than other brands of cigarettes. *See, e.g.*, *Broomfield*, 2018 WL 4952519, at *11-12 (predominance satisfied where beer packaging conveyed variations of the theme that beer was brewed in Hawaii, when it was not); Mot. 23-28.

*Finally*, Plaintiffs present common evidence showing that the reasonable consumer's understanding of Defendants' misrepresentations connotes a cigarette that may be less harmful, *including that such understanding is not impacted by any disclaimer*.[11] *See* Mot. 25-31. Plaintiffs do not need to prove their entire case at class certification. Rather, they need only present evidence to show that these issues can be adjudicated together. *See, e.g.*, *Rikos*, 2014 WL 11370455, at *3; *Elkies v. Johnson & Johnson Servs., Inc.*, No. CV 17-7320-GW(JEMX), 2018 WL 11223465, at *8-9 (C.D. Cal. Oct. 18, 2018). Although, the U.S. Food and Drug Administration ("FDA") concluded that Defendants' disclaimer on their NAS Cigarette packages did not mitigate the effects of "health reassurance conveyed by the packages' affirmative claims." *See* Mot. 1, 4 (citing Weiner Decl. Ex. 4); *see also Davidson*, 2018 WL 2325426, at *18 (explaining presumption that "class members who purchased products with misleading packaging . . . were exposed to misleading statements on that packaging.").

Again, while it is the trier of fact who will ultimately decide whether reasonable consumers would actually have such a health reassurance understanding (including the supposed effect of a product disclaimer), the relevant inquiry at the class certification stage is not whether Plaintiffs will prevail on their argument as to that understanding, but whether there is common evidence in support of such understanding—which there indisputably is. *See, e.g.*, *Rikos*, 2014 WL 11370455, at *3 ("**[i]n determining the propriety of a class action, the question is not whether the** . . . **plaintiffs** . . . **will**

[11] The disclaimer issue is truly a red herring. Defendants want it both ways—on the one hand subjective, individual understandings ostensibly overwhelm common issues and, accordingly consumers' viewing and understanding of the NAS Cigarettes' labeling could not all possibly point to a single message: that NAS Cigarettes may be less harmful than other cigarettes. Yet, also according to Defendants, consumers with varied individual beliefs nevertheless all saw and understood the product disclaimers, which changed over time. Defendants' arguments that the disclaimers are viewed and understood simply proves Plaintiffs' theories here. Furthermore, Defendants' disclaimer arguments have been rejected by regulatory agencies and experts and should be rejected by this Court.

**prevail on the merits, but rather whether the requirements of Rule 23 are met.**") (quoting *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178, (1974)) (emphasis in original). Whether Plaintiffs will ultimately prevail on the merits under their theory is not the question; so, Defendants' premature merits attacks and disclaimer arguments (*see* Opp. 33-34) do not change the relevant analysis.[12] Much of the above is reflected in the court's discussion of predominance in *Hadley*, a consumer fraud class action based on product packaging:

> deception and materiality… are governed by an objective "reasonable consumer" test…. Plaintiff "has no burden to establish that there is a uniform understanding among putative class members as to the meaning of" the challenged health statements, "or that all or nearly all of [the class members] shared any specific belief." …Plaintiff need only make "an objective showing of a probability that a 'significant portion' of the relevant consumers acting reasonably 'could be misled'" . . . .

*Id.,* 324 F. Supp. 3d at 1116-18 (internal citations omitted).

Defendants' other specific arguments about the supposed effect of the disclaimer, and the supposed shortcomings of the "Safer-Cigarette" and "Menthol" theories, are without merit. *See* Opp. 33-35, 36-40, 40-42. *First*, Defendants focus on dicta in the Court's order denying Defendants' motion to dismiss the SAC ("MTD Order"), related to the "additive-free" disclaimer. *Id.* 33 (quoting *In re Santa Fe Nat. Tobacco Co.*, 288 F. Supp. 3d at 1233). In fact, the MTD Order emphasized that the "additive-free" disclaimer "says nothing about the natural or organic descriptors . . . two terms [that] have an independent connotation that a product is healthier or safer . . . . *The natural and organic descriptors, accordingly, are deceptive to a reasonable consumer*." *In re Santa Fe Nat. Tobacco Co.*, 288 F. Supp. 3d at 1233-34 (emphasis added); *see also id.* at 1234 ("Natural American's additive-free descriptor on menthol cigarettes also misleads a reasonable consumer"). In addition, the Court explained that,

[12] Even if the 2017 disclaimer were deemed sufficiently significant, that issue could easily be resolved by subclassing; specifically, there can be a subclass for consumers who purchased NAS Cigarettes before the 2017 disclaimer appeared, and one for those who purchased after.

because tobacco products are often purchased without the ability of the consumer to inspect the product package, "the Court cannot conclude that the package's [additive-free disclaimer] would cure a deception inflicted upon a reasonable consumer." *Id.* at 1233. So, the Court's discussion about disclaimers in its MTD Order, actually supports proceeding on a class basis to prove what the reasonable consumer understood.[13]

*Second,* Defendants' attempts to cite (i) Dr. Van Liere's survey evidence, (ii) selected testimony from Plaintiffs, and/or (iii) Defendants' own opinions about the interplay between the misrepresentations in the Challenged Claims and the "additive-free" disclaimer, including the ability to view the disclaimer at the point of purchase (*see* Opp. 34-35) are all textbook examples of, at best, merits-based challenges to whether or not a reasonable consumer would be deceived by Defendants' product misrepresentations. *See, e.g.*, *Rikos*, 2014 WL 11370455, at *3; *Elkies*, 2018 WL 11223465, at *8-9; *see also Hadley*, 324 F. Supp. 3d at 1116-18; *Mednick v. Precor, Inc.*, 320 F.R.D. 140, 152 (N.D. Ill. 2017) ("because [defendant's] disclaimers are relevant to the extent that they lessen the impact … the effect of the disclaimers is properly left to the merits stage of the case.") (citing *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013)).

*Third*, because Plaintiffs allege that Defendants' misrepresentations in the Challenged Claims are *affirmative*, consistent with the Court's discussion of the "additive-free" disclaimer not being sufficiently specific to meet such affirmative misrepresentations, the visibility of the disclaimer at the point of sale (*see* Opp. 35) is actually irrelevant as a matter of law to the reasonable consumer's

---

[13] Defendants' single reference to an "organic" tobacco disclaimer (*see* Opp. 33), does nothing to undermine the Court's view that a disclaimer needs to be specific, and, thus, that additional disclaimer would not apply to dispel misrepresentations about NAS Cigarettes being "natural." Moreover, as with the "additive-free" disclaimer, the "organic" tobacco disclaimer on product packaging would not necessarily have been seen by a consumer prior to purchase.

understanding of the Challenged Claims. *See, e.g.*, *Reed v. Gen. Mills, Inc.*, No. C19-0005-JCC, 2019 WL 2475706, at *5 (W.D. Wash. June 13, 2019).[14]

*Fourth*, Defendants seek to ignore substantial evidence common to all Class Members that (i) Defendants built their NAS Cigarettes' brand identity on the very idea of "natural" tobacco being less harmful than other tobacco, *see* Mot. 7-23 (citing Proctor, Dewhirst Reports), and (ii) consumers view the "natural" and "additive-free" product descriptors as conveying such meaning, *see* Mot. 23-31 (citing Proctor, Pearson, Cummings Reports, as well as FDA studies).[15] Defendants misunderstand the relevant inquiry under the reasonable consumer test. "The standard for these state law claims is the 'reasonable consumer' test, which requires a plaintiff to show that a 'reasonable consumer' is likely to be deceived by the business practice or advertising at issue." *Kosta v. Del Monte Foods, Inc.*, 308 F.R.D. 217, 224 (N.D. Cal. 2015) (quoting *Williams v. Gerber Prods.* 552 F.3d 934, 938 (9th Cir. 2008)); *United States v. Easley*, 911 F.3d 1074, 1081 (10th Cir. 2018), *cert. denied*, 139 S. Ct. 1644 (2019) ("Indeed, the Tenth Circuit has specifically disclaimed considerations that could inject the objective reasonable person analysis with subjective considerations….").

In fact, the Federal District Court for the Southern District of New York (the court issuing the decision that Defendants primarily rely upon) recently explained, "the Court need not find whether Defendant's products are 'natural' *within any given definition*. [The statute] employs an objective standard under which a fact finder must find if the 'natural' label, is misleading to a reasonable consumer acting

[14] Also, to the extent the meaning and effect of the "additive-free" disclaimer may need to be resolved later as a merits issue, insofar as Plaintiffs prevail on the issue (*i.e.* the disclaimer is deemed to not cure the misrepresentations in the Challenged Claims), the question of whether or not a consumer saw such disclaimer at the point of purchase would be irrelevant and, thus, not impede certification.
[15] Defendants similarly seek to ignore substantial evidence common to all Class Members relating to the idea of "additive-free" playing a significant role in the growth of Defendants' brand image for menthol products—also predicated on the notion that "additive-free" may be less harmful, as well as consumers' view of that phrase. *See* Mot. 23-31 (citing Cummings Report).

reasonably." *Petrosino v. Stearn's Prods., Inc.*, No. 16-CV-7735 (NSR), 2018 WL 1614349, at *7 (S.D.N.Y. Mar. 30, 2018) (emphasis added); *see also United States v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 1, 27 (D.D.C. 2006) (enjoining RJR from marketing cigarettes as "natural" because it "implicitly convey[s] to the smoker and potential smoker that they are less hazardous to health"); *Disc. Tobacco & Lottery*, 674 F.3d at 536 ("[C]ommon sense dictates the conclusion that [consumers who prefer natural or organic products] prefer such products *precisely because they believe that natural and organic products confer health advantages over conventional products*." (emphasis added).[16]

*Finally*, Defendants are improperly asking to strip the trier of fact of the opportunity to consider Plaintiffs' experts' conclusions about the effect of Defendants' product claims, and instead substitute in Defendants' experts' conclusions. *See* Opp. 39-40 (discussing defense expert Dr. Van Liere's findings); *Singleton v. Fifth Generation, Inc.*, No. 515CV474BKSTWD, 2017 WL 5001444, at *18 (N.D.N.Y. Sept. 27, 2017).[17]

3. <u>The Statutory and Unjust Enrichment are Not Defeated by "Individualized Inquiries"</u>

(a) *"Individualized inquiries" do not defeat the statutory claims*

Relying on cases concerning theories of injury and causation not proffered here, Defendants contend that certain statutes require individualized proof of deception or causation. Not so.

***<u>Florida Unfair and Deceptive Trade Practice Act ("FDUTPA").</u>*** Plaintiffs do not need to prove that every Class Member was induced to purchase NAS Cigarettes based on the Challenged

[16] The older case from that Southern District of New York that Defendants primarily rely upon, *Weiner v. Snapple Beverage Corp.*, No. 07 CIV. 8742 DLC, 2010 WL 3119452 (S.D.N.Y. Aug. 5, 2010), is also readily distinguishable, including because that case involved a flawed damages methodology, and court's discussion of "individualized inquiries" into consumers' understanding of "natural" was aimed at that flawed methodology. *See id.* at *6-7, *11.

[17] For the same reasons that Defendants' argument against the "Safer-Cigarette Theory" are without merit, so too is their argument against the "Menthol Theory."

Claims. Rather, Plaintiffs' theory of recovery is based on the objective reasonable consumer standard, and an objective price premium model—even if some members of the Class did not purchase based on the belief that the NAS Cigarettes might be less harmful, or believed that they were not paying a premium, Plaintiffs can prevail on behalf of the Class. *See* Weiner Decl. Ex. 8 (Dubé Report) ¶¶ 23-26.

Cases cited by Defendant do not address this theory of injury and causation. The plaintiffs in *Philip Morris USA Inc. v. Hines*, 883 So.2d 292 (Fla. Dist. Ct. App. 2003) alleged—differently than here—that they would not have purchased the defendant's cigarettes at all if they knew that "light" cigarettes were not less harmful than other cigarettes. Accordingly, the *Hines* plaintiffs sought the "return of the purchase price…, on the theory that they did not receive what they paid for." *Id.* at 293. *Green v. McNeil Nutritionals, LLC*, Case No. 2004-0379-CA, 2005 WL 3388158 (Fla. Cir. Ct. Nov. 16, 2005) is likewise unavailing. The plaintiff there did not have *any* theory of causation because he contended causation is not an element of a FDUTPA claim. Unlike here, the plaintiff proffered no proof that reasonable consumers were deceived. *Id.* at *3.[18] In fact, *Green* supports certification of Plaintiffs' FDUTPA claim, holding that class-wide injury could be proven by demonstrating that each class member suffered a pecuniary injury. *Id.* at *7 (citing Florida cases).[19]

[18] *Pop's Pancakes, Inc. v. NuCO2, Inc.*, 251 F.R.D. 677, 679 (S.D. Fla. 2008) is inapposite because the class there was not exposed to the same misrepresentations. *See In re McCormick & Co., Inc., Pepper Prod. Mktg. & Sales Practices Litig.*, 422 F. Supp. 3d 194, 261-62 (D.D.C. 2019) (certifying FDUTPA claims and distinguishing *Pop's Pancakes* because "unlike the present case, different representations were made to different class members").

[19] Defendants assert that only FDUTPA claims involving fraudulent omissions can be certified. *See* Opp. 45, n.30. But none of the cases they cite actually stand for that proposition. Rather, they simply stand for the proposition that a plaintiff must prove that pecuniary injury was caused by the alleged practice. As noted, Plaintiffs here do exactly that.

***Illinois Consumer Fraud Act ("ICFA").*** Relying on *Oliveira v. Amoco Oil Co.*, 201 Ill. 2d 134, 776 N.E.2d 151, 155 (2002) and *Oshana v. Coca-Cola Co.*, 472 F.3d 506 (7th Cir. 2006), Defendants contend that the ICFA requires individualized proof that every Class Member was deceived. *See* Opp. 46. But the *Oliveira* court affirmed dismissal of the complaint because, unlike here, "Plaintiff does not allege that he was, in any manner, deceived by defendant's advertisements." *Oliveira*, 776 N.E.2d at 155; *cf. Phillips v. Ford Motor Co.*, No. 99-L-1041, 2003 WL 23353492, at *5 (Ill. Cir. Ct. Sept. 15, 2003) Indeed, the *Oliveira* court cautioned that "we express no opinion on the appropriateness of class certification in this case." *Oliveira*, 776 N.E.2d at 165.

Defendants' reliance on *Oshana* is likewise misplaced. As the Seventh Circuit later explained, *Oshana*, "did not opine that class certification was *never* appropriate in consumer fraud cases, only that it was inappropriate in the circumstances before it" and, in fact, only found "class certification inappropriate because the proposed class representative's claims were not typical of putative class." *Pella Corp. v. Saltzman*, 606 F.3d 391, 393 (7th Cir. 2010).

To show causation under the ICFA, it is enough to show that there is a uniform material representation seen by class members (materiality being determined by the reasonable consumer standard), and that class members paid more for the product at issue as a result. *See, e.g.*, *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d at 996. Numerous courts have certified ICFA classes where, as here, the plaintiffs show a material misrepresentation on a product label or in advertising is capable of misleading reasonable consumers; thus nullifying Defendants' contention that courts must individually assess whether each class member was deceived. *See, e.g.*, *id.* at 998 (certifying ICFA class where the plaintiff proffered a conjoint analysis addressing labels on cooking oil); *In re Dial Complete Mktg. & Sales Practices Litig.*, 312 F.R.D. 36, 65-66 (D.N.H. 2015) (certifying ICFA class and class-wide

causation) (citations omitted); *Rikos*, 799 F.3d at 514-15; *S37 Mgmt., Inc. v. Advance Refrigeration Co.*, 356 Ill. Dec. 172, 961 N.E.2d 6, 16 (Ill. App. Ct. 2011).

***Massachusetts Chapter 93A.*** Defendants wrongfully contend that courts "consistently hold" that showing causation under Chapter 93A requires individualized proof, thus precluding certification. Opp. 46. It is sufficient to show a product has a uniformly deceptive label. *See, e.g.*, *Aspinall v. Philip Morris Cos., Inc.*, 442 Mass. 381, 402, 813 N.E.2d 476, 492 (2004). It is also well settled that a plaintiff need not show proof of actual reliance on the challenged misrepresentation or deceptive act. *See Int'l Fidelity Ins. Co. v. Wilson*, 387 Mass. 841, 850 (Mass. 1983). Rather, all that Chapter 93A requires is a "causal relationship between the misrepresentation and the injury to the plaintiff." *Fraser Eng'g Co., Inc. v. Desmond*, 26 Mass. App. Ct. 99, 104 (Mass. App. Ct. 1988). The First Circuit recently made clear that a price premium theory of causation, such as that proffered by Plaintiffs here, is cognizable under Chapter 93A. *See Lee v. Conagra Brands, Inc.*, 958 F.3d 70, 80-81 (1st Cir. 2020); *see also Allen v. Conagra Foods, Inc.*, 331 F.R.D. 641, 667 (N.D. Cal. 2019).[20]

Defendants' reliance on *Plastic Surgery Associates, S.C. v. Cynosure, Inc.*, 407 F. Supp. 3d 59, 73 (D. Mass. 2019), is misplaced. The *Cynosure* court found individual issues predominated because the representations at issue were conveyed orally and they differed, which is not what we have here. *See id.* at 73. Indeed, the *Cynosure* court noted that certification was upheld in *Aspinall* because the "class of consumers [] purchased cigarettes with the same misleading statements about the 'light' nature of those cigarettes on the boxes." *Id.* at 74. *Markarian* is also inapposite; in that case, the district court merely observed that class certification is frequently denied on causation grounds in "vanishing premiums cases." *Markarian v. Connecticut Mut. Life Ins. Co.*, 202 F.R.D. 60, 68 (D. Mass. 2001). In

[20] The *Conagra* court did not certify a Chapter 93A class only because there was no Massachusetts class representative. *See Conagra*, 331 F.R.D. at 667.

*Kwaak*, the court found the plaintiffs were exposed to unique and variable representations not found here. *Kwaak v. Pfizer, Inc.*, 71 Mass. App. Ct. 293, 300, 881 N.E.2d 812, 818 (2008).

***New Jersey Consumer Fraud Act ("NJCFA").*** Defendants concede that causation under the NJCFA only requires showing a causal relationship between Defendants' unlawful conduct and class members' injury. *See* Opp. 48. And it is well settled that showing that causal relationship does not require individual reliance. *See, e.g.*, *Lee v. Carter-Reed Co.*, 4 A.3d 561, 580 (N.J. 2010) ("Causation under the CFA is not the equivalent of reliance.") (citing cases).[21] "To establish causation, a consumer merely needs to demonstrate that he or she suffered an ascertainable loss 'as a result of' the unlawful practice." *Id.* (quoting N.J.S.A. 56:8–19). Plaintiffs show that Defendants' use of uniform Challenged Claims causes NAS Cigarettes to be more expensive than they would be but for the deception. *See, e.g.*, *Hudock v. LG Elecs. U.S.A., Inc.*, No. 16-1220, 2018 WL 626527, at *4 (D. Minn. Jan. 30, 2018); *Dzielak v. Whirlpool Corp.*, No. 12-89, 2017 WL 6513347, at *9-10 (D.N.J. Dec. 20, 2017) (certifying, *inter alia*, NJCFA class "on the price-premium theory of injury.").[22]

***New Jersey Truth-in-Consumer Contract, Warranty & Notice Act ("TCCWNA")***. Defendants offer no authority to support their assertion that the TCCNWA requires "proof that each

[21] Notably, the *Lee* court distinguished *International Union of Operating Engineers Local No. 68 Welfare Fund v. Merck & Co.*, 192 N.J. 372, 376, 929 A.2d 1076 (2007), because that case "involved a proposed class of diverse entities, which the plaintiff did not suggest reacted in a uniform or even similar manner to the same information broadcast by Merck." *Lee*, 203 N.J. at 532. Here, Plaintiffs have proffered common evidence that reasonable consumers are misled by the Challenged Claims.

[22] *Stern v. Philip Morris USA, Inc.*, No. MID-L-2584-03, 2007 WL 4841057 (N.J. Super. Ct. Nov. 16, 2007) is inapposite. In that case, the plaintiffs alleged that the cigarettes they purchased were not "light" because no one in the class received a healthier cigarette that delivered less tar. Accordingly, the "determination of whether any individual member of the putative class failed to receive what defendant allegedly represented Marlboro Lights to be, *i.e.*, a cigarette that delivered less tar and nicotine when smoked than a full flavor Marlboro, is dependent upon a number of issues unique to each individual class member." *Id.* Here, there is no dispute that NAS Cigarettes are not healthier or less dangerous than other cigarettes.

class member was deceived into purchasing NAS cigarettes." Opp. 49. Nor can they. The statute includes no reliance requirement, and there is no need to prove a causal connection on an individual basis. *See Browne v. Capital One Bank (USA), N.A.*, No. A-2102-19T1, 2020 WL 4045271, at *7 (N.J. Super. Ct. App. Div. July 20, 2020) (providing elements); *see, e.g.*, *Korrow v. Aaron's Inc.*, No. CIV.A. 10-6317 MAS, 2013 WL 5811496, at *13 (D.N.J. July 31, 2013).

***Washington Consumer Protection Act ("WCPA").*** Washington law recognizes a distinction between a theory of causation that turns on every class member being induced to buy a product for the alleged deceptive reason and a theory of causation that turns on a price premium. Under the latter, individual issues do not predominate. Indeed, *Kelley v. Microsoft Corp.*, 251 F.R.D. 544, 557-59 (W.D. Wash. 2008), oddly cited by Defendants, confirms that a price inflation causation theory is viable in Washington when certifying a WCPA class. *See also Blough v. Shea Homes, Inc.*, No. 2:12-CV-01493-RSM, 2013 WL 6276450, at *8-9 (W.D. Wash. Dec. 4, 2013) ("[T]his Court has accepted Plaintiffs' 'price inflation' theory where consumers paid more for a good or service than they would have without the defendant's alleged deception....").

*Indoor Billboard* does not support Defendants' argument that every claim arising under the WCPA requires individualized proof of causation. In that case, the Washington Supreme court simply held that there is in fact a causation requirement under the CPA. *See Indoor Billboard/Washington, Inc. v. Integra Telecom of Washington, Inc.*, 162 Wash. 2d 59, 83-85, 170 P.3d 10, 22-23 (2007). Plaintiffs meet that standard; but for Defendants' Challenged Claims, Plaintiffs would have paid less for NAS Cigarettes. The *Kelley* court considered *Indoor Billboard* and certified a class on the "price inflation" theory (read price premium theory). *Kelley*, 251 F.R.D. at 557.[23]

---

[23] *Davies* is not helpful to Defendants. The plaintiff's theory was that every class member was damaged because they thought they were buying safer cigarettes when they were not. *See Davies v. Philip Morris*

In *Conagra*, a multi-district litigation involving misleading statements on cooking spray labels, the court certified a WCPA class where the plaintiffs proffered a conjoint analysis to prove class-wide injury based on a price premium. *Conagra Foods, Inc.*, 331 F.R.D.at 665-66.

(b) *"Individualized inquiries" do not defeat the unjust enrichment claims*

Defendants' argument that common questions will "rarely, if ever, predominate" in an unjust enrichment claim begins with the assertion that "[t]he Tenth Circuit has not addressed the issue." Opp. 50. But the Tenth Circuit did address this issue in *Menocal, supra*, holding that an unjust enrichment class was properly certified; in doing so, the Tenth Circuit rejected the argument Defendants make here and found that "the unjustness element is susceptible to generalized proof and thus cannot defeat class certification under Rule 23(b)(3)'s predominance standard." 882 F.3d at 925.

Moreover, courts in every other district and state whose laws are implicated in this case have also certified classes bringing claims for unjust enrichment. *See* Mot. 60-80. When, as here, the claims for unjust enrichment focus on the conduct of the defendant (not individual class members), then predominance can be established and the class properly certified. *See, e.g.*, *Menocal*, 882 F.3d at 926.

As stated by the Tenth Circuit (applying Colorado law): "a party claiming unjust enrichment must prove that (1) the defendant received a benefit (2) at the plaintiff's expense (3) under circumstances that would make it unjust for the defendant to retain the benefit without commensurate compensation." *Id.* at 923. These elements are essentially the same in all the relevant states. *See* Mot. 60-80; *accord In re Mercedes-Benz Tele Aid Contract Litig.*, 257 F.R.D. 46, 58 (D.N.J. 2009). Where, as here, the claim rests on the misconduct of the defendants, common questions predominate. This conclusion has also been reached by courts certifying nationwide unjust enrichment classes. *See, e.g.*,

---

*U.S.A., Inc.*, No. 04-2-08174-2, 2006 WL 1600067, at *1 (Wash. Super. May 26, 2006). So, the court concluded that individual purchasing decisions precluded predominance. *See id.* at *3.

*In re Mercedes-Benz*, 267 F.R.D. at 72-73; *In re Abbott Labs. Norvir Anti-Trust Litig.*, No. C 04-1511 CW, 2007 WL 1689899, at *9-10 (N.D. Cal. June 11, 2007). This same conclusion has also been reached under relevant state law as follows:

***California.*** As Plaintiffs noted in their Motion, the court in *Astiana v. Kashi Co.*, 291 F.R.D. 493, 505 (S.D. Cal. 2013), certified a class bringing a claim under quasi-contract (*i.e.*, unjust enrichment) for misrepresentations in labeling products with the words "Nothing Artificial." *See* Mot. 62. Defendants attempt to diminish this outcome by pointing out that the same court also denied class certification for separate claims relating to the marketing of certain products as "All Natural." *See* Opp. 51, n.37. However, the court denied certification for those claims not because unjust enrichment requires individualized inquiries, but because the plaintiffs had failed to show that the "All Natural" label was materially misleading. *See Astiana*, 291 F.R.D. at 509.

The additional authorities cited by Defendants do not help their argument. *Savaglio v. Wal-Mart Stores, Inc.*, No. C-835687, 2003 WL 25676640 (Cal. Super. Ct. Nov. 6, 2003), is distinguishable as the defenses of waiver or compromise are not available. *In re Ford Motor Co. E-350 Van Prod. Liability Litigation* (No. II), No. CIV.A. 03-4558, 2012 WL 379944, at *29, *32 (D.N.J. Feb. 6, 2012), does not apply as it involved differences in the representations made to different plaintiffs not susceptible to common proof. *See also Keilholtz v. Lennox Hearth Prod. Inc.*, 268 F.R.D. 330, 342 (N.D. Cal. 2010) (common question of whether defendants' failure to warn plaintiffs and class members of defects in product induced plaintiffs and class members to make purchase predominates over questions affecting only individual members making class certification appropriate for claim of unjust enrichment).

***Colorado.*** Defendants rely on *ConAgra, supra*, 90 F. Supp. 3d 919, to argue that "Colorado unjust-enrichment claims are not susceptible to class-wide proof . . ." Opp. 52. However, since that decision, the concerns expressed by the court have been definitively answered in *Menocal*, where the

Tenth Circuit held that unjust enrichment claims under Colorado law are "susceptible to generalized proof." *Menocal*, 882 F.3d at 926.[24]

***Florida.*** As noted in the Motion, courts in Florida have repeatedly found that unjust enrichment claims are appropriately certified where common circumstances bear upon whether the defendants' retention of benefits from class members was unjust. *See* Mot. 67 (citing *In re Checking Account Overdraft Litig.*, 307 F.R.D. 656, 676 (S.D. Fla. 2015), *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 698 (S.D. Fla. 2004)). Defendants attempt to distinguish such authority on the basis that in those cases "there were no differences among class members relevant to the unjustness analysis." Opp. 52, n.39. But this is precisely the point here: there are no relevant differences among Class Members. What matters to the "unjustness analysis" is *Defendants' uniform conduct* designed to mislead consumers. *See In re Terazosin Hydrochloride*, 220 F.R.D. at 698. Defendants' citations to other cases in which there *were* relevant differences among class members are misplaced for the same reason.

***Illinois.*** *ConAgra*, *supra*, 90 F. Supp. 3d 919, which Defendants rely upon to argue that unjust enrichment claims under Colorado law are not amenable to class certification, found that unjust enrichment claims under Illinois law *are* properly certified for class treatment. *See id.* at 1000-1001. Defendants attempt to evade this precedent by tying the Illinois unjust enrichment claim to the ICFA claim and contending that the unjust enrichment claim cannot be certified for the simple reason that the ICFA claim cannot be certified. *See* Opp. 53, n.40. But as set forth above, *see* Section III.A.3.a., *supra*, the ICFA claim is certifiable, so Defendants' argument fails.

---

[24] Reliance on *ConAgra* on this issue is also misplaced for the additional reason that the *ConAgra* court came to the opposite conclusions with respect to unjust enrichment claims under Illinois, Indiana, Nebraska, Oregon and South Dakota law—under all those state laws, the court concluded that predominance was satisfied as the unjust enrichment claims "require resolution of substantially the same question—whether ConAgra received some benefit from plaintiffs that it would be inequitable to allow it to keep in light of its conduct." *Id.* at 1034.

Defendants' attempt to distinguish *Clark v. TAP Pharmaceutical Products, Inc.*, 343 Ill. App. 3d 538 (2003), is also unavailing. Defendants argue that in *Clark*, the "defendant's alleged conduct—inflating the price of a medication—applied 'in the same basic manner as to the entire class,' without any need to consider each consumer's particular circumstances." Opp. 53, n.40. This description does not distinguish *Clark*, but instead demonstrates its applicability to the facts here—where Defendants' conduct was also the same as to all Class Members.

Defendants also cite to *Oshana*, *supra,* 472 F.3d at 514-15 and *Cleary v. Philip Morris Inc.*, 656 F.3d 511, 519 (7th Cir. 2011). *See* Opp. 53. Both of these cases are easily distinguished. In *Oshana*, the Seventh Circuit merely held that the defendant "cannot have been unjustly enriched without proof of deception," and on that basis found that the proposed class was not sufficiently identifiable nor was the class representative's claim sufficiently typical. 472 F.3d at 515. Here, on the other hand, Plaintiffs have adequately shown that common evidence exists to demonstrate uniform deceptive conduct on the part of Defendants. And in *Cleary*, the Seventh Circuit found it "crucial to note that the plaintiffs do not allege that they suffered any harm, that they relied on the defendants' marketing, or that they would have acted differently had the defendants been truthful…" 656 F.3d at 518. Again, this is unlike the case at hand, where Plaintiffs have made all of these allegations.

***Massachusetts.*** As set forth in Plaintiffs' Motion, courts have certified claims for unjust enrichment under Massachusetts law. *See* Mot. 70 (citing, *e.g.*, *Hebert v. Vantage Travel Serv., Inc.*, 334 F.R.D. 362, 372-74 (D. Mass 2019); *Overka v. American Airlines, Inc.*, 265 F.R.D. 14, 20 (D. Mass. 2010). *Overka* specifically held that "issues common to all class members will predominate. Thus, the predominance requirement is satisfied [with respect to unjust enrichment]." 265 F.R.D. at 23.

Defendants also rely on *Abla v. Briner Rest. Corp.*, 279 F.R.D. 51 (D. Mass. 2011). But in that case, the court held that whether a restaurant group was unjustly enriched by its charges to customers

would require "an examination of the context of each individual transaction." *Id.* at 58. No such inquiry is necessary here. Similarly, in *Baker v. Equity Residential Mgmt., L.L.C.*, 390 F. Supp. 3d 246 (D. Mass. 2019), the court held that "whether [the defendant] was unjustly enriched by a tenant's rent payments … depends on the specific conditions in his or her apartment." *Id.* at 261. Again, no such specific circumstances underly the unjust enrichment claims here.

***Michigan.*** Defendants argue that "Michigan courts have recognized that deciding whether inequity has occurred requires individualized evidence, making unjust-enrichment claims inappropriate for class certification." Opp. 54. However, the cases they cite are inapposite. For example, *Jackson v. Wal-Mart Stores, Inc.*, No. 258498, 2005 WL 3191394 (Mich. Ct. App. Nov. 29, 2005), was an employment class action where the court found that "whether inequity would result from retention of that benefit necessarily requires inquiry into the reasons why each individual member of the proposed class performed work off the clock or missed rest or meal breaks." *Id.* at *5. Defendants also cite to *ARP v. Nat'l Sur. Corp.*, No. 98-820589-CZ, 2001 WL 1530348 (Mich. Cir. Ct. Oct. 23, 2001), where the court found that the unjust enrichment "inquiry can only be resolved on an individual basis given the fact that the policies were the product of individual negotiations." *Id.* at *12. Here, there are no individualized inquires because the Class Members were exposed to a common advertising scheme. Courts have often certified unjust enrichment claims under Michigan law where, like here, common evidence exits. *See, e.g.*, *In re Terazosin Hydrochloride*, 220 F.R.D. 672; *Hoving v. Lawyers Title Ins. Co.*, 256 F.R.D. 555, 570 (E.D. Mich. 2009).

***New Mexico.*** Defendants acknowledge that this Court certified an unjust enrichment class in *Payne v. Tri-State CareFlight, LLC*, 332 F.R.D. 611. *See* Opp. 54. Similar to the "uniform pay and scheduling policy" in *Payne*, Plaintiffs here were exposed to a uniform common advertising scheme, and individualized issues will not predominate. *See Payne*, 332 F.R.D. at 696. That common advertising

scheme "applies uniformly to the proposed class" and, therefore, certification of the New Mexico Class's unjust enrichment claim is appropriate. *Id*; *see also Armijo v. Wal-Mart Stores, Inc.*, 168 P.3d 129, 141 (N.M. Ct. App. 2007) (certifying unjust enrichment class as questions about whether defendant received a benefit and whether its retention was unjust were common questions); *Rodarte v. Bd. of Cty. Comm'rs of Bernalillo Cty.*, No. 14-CV-193 JAP/SCY, 2014 WL 10298032, at *8 (D.N.M. Oct. 20, 2014) (certifying unjust enrichment class under New Mexico law).

***New York.*** Defendants argue that *Weiner v. Snapple, supra*, 2010 WL 3119452, forecloses certification of Plaintiffs' New York unjust enrichment claim. *See* Opp. 56. Unlike in *Weiner*, Plaintiffs here have shown that the price premium damages model applies in this action and that common evidence will show the amount of restitution to which the Class Members will be entitled. *See* Mot. 34-35. This case is more akin to *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397 (S.D.N.Y. 2015), where the court certified an unjust enrichment class and found that the plaintiffs' price premium damages model matched their theory of liability. *See id.* at 413.

This case is also similar to *Jermyn v. Best Buy Stores, L.P.*, 256 F.R.D. 418 (S.D.N.Y. 2009), where the court certified an unjust enrichment class finding that "[t]he predominant issue for the unjust enrichment claim is whether Best Buy was enriched at the class' expense by using an undisclosed policy of aggressively discouraging and denying customers' valid price match requests." *Id.* at 436. Like the uniform price match policy in *Jermyn,* Plaintiffs were exposed to an effectively uniform common advertising scheme.

***North Carolina.*** Defendants argue that "Plaintiffs do not identify any decision certifying an unjust-enrichment class under North Carolina law." Opp. 56. However, a North Carolina appeals court did reverse the denial of class certification of an unjust enrichment claim. *See, e.g.*, *Pitts v. Am. Sec. Ins. Co.*, 144 N.C. App. 1, 5, 550 S.E.2d 179, 184 (2001), *aff'd*, 356 N.C. 292, 569 S.E.2d 647 (2002).

In *Pitts*, the court found that common issues existed, including that "the language in the promissory notes is the same for all potential class members" and that "the policies issued by the American Security Defendants were all substantially the same." Here, all Class members were exposed to the Challenged Claims on the labels of the NAS Cigarettes in the same context.

***Washington.*** Defendants acknowledge that the court in *Kelley v. Microsoft Corporation*, 251 F.R.D. 544, 559 (W.D. Wash. 2008), certified an unjust enrichment class under Washington law. *See* Opp. 57. The *Kelley* court found that common issues predominate under the same facts set forth here: Plaintiffs allege they paid more than they should have for the NAS Cigarettes because of the misrepresentations. *See* Mot. 34-35.[25]

(c) *Materiality is an Objective Inquiry Subject to Common Proof*

Defendants argue that Plaintiffs cannot show materiality on a class-wide basis with respect to their claims under the laws of California, Michigan, and New York. Opp. 57-65. Defendants are mistaken. As the Supreme Court has explained that materiality is an objective question based on the reasonable person standard, and thus it "can be proved through evidence common to the class." *Amgen*, 568 U.S. at 467.

Since *Amgen*, California courts have concluded "no evidence of materiality is necessary for purposes of class certification," where alleged misrepresentations are common to the class, such as here. *In re McCormick & Co., Inc., Pepper Prod. Mktg. & Sales Practices Litig.*, 422 F. Supp. 3d 194, 252 (D.D.C. 2019) (citing *Werdebaugh v. Blue Diamond Growers*, No. 12-CV-2724-LHK, 2014 WL 2191901, at *14 (N.D. Cal. May 23, 2014) (finding that materiality is a common question to the class); *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1115 (N.D. Cal. 2018) ("because deception and materiality are

---

[25] Plaintiffs are not at this time pursuing the certification of a class asserting a North Carolina Unfair and Deceptive Trade Practices Act claim.

objective questions, they are 'common question[s] for purposes of Rule 23(b)(3)'")). The same is true under Michigan and New York law. *See, e.g.*, *In re FCA US LLC Monostable Electronic Gearshift Litig.*, 334 F.R.D. 96, 116-17 (E.D. Mich. 2019) (finding that under California, Michigan and New York law, materiality is "evaluated on an objective basis by considering common proofs, without involving the circumstances of any of the prospective class, members' individual transactions" and thus certification is appropriate under Rule 23(b)(4)).

Again, materiality is an objective standard, which "is generally a question of fact." *In re Tobacco II Cases*, 46 Cal. 4th 298, 327 (2009); *see also In re OnStar Contract Litig.*, 278 F.R.D. 352, 377 (E.D. Mich. 2011) (a representation is material if it is "important to the transaction or affects the consumer's decision to enter into the transaction."); *Hasemann v. Gerber Prods. Co.*, 331 F.R.D. 239, 274 (E.D.N.Y. 2019) (finding materiality subject to objective proof).

Proof of materiality requires showing that "a reasonable consumer would attach importance" to the representations at issue, *or* that "the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his choice of action." *Kumar*, 2016 WL 3844334, at *7 (quotation omitted). Significantly, the materiality of deceptive representations can be established as a matter of law without the need for expert testimony or consumer surveys. *See id.* at *8.

Defendants cited cases are distinguishable.[26] Moreover, "all of these cases were decided before the Ninth Circuit's decision in *Bradach*, which holds (albeit in an unpublished opinion) that it is an error of law for courts at class certification to require extrinsic evidence of materiality to prove

---

[26] Defendants rely upon *Jones v. ConAgra Foods, Inc.,* No. C 12-01633 CRB, 2014 WL 2702726, at *15 (N.D. Cal. June 13, 2014), *Montgomery v. Kraft Foods Glob., Inc.*, No. 1:12-CV-00149, 2014 WL 1875022, at *3 (W.D. Mich. May 9, 2014) and *Townsend v. Monster Beverage Corp.*, 303 F. Supp. 3d 1010, 1044 (C.D. Cal. 2018).

predominance." *In re McCormick & Co., Inc., Pepper Prod. Mktg. & Sales Practices Litig.*, 422 F. Supp. 3d at 255 (discussing *Bradach v. Pharmavite, LLC*, 735 F. App'x 251 (9th Cir. May 17, 2018). This case is more akin to *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 1018 (C.D. Cal. 2015), *aff'd sub nom. Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017), where the court concluded that the plaintiff presented sufficient evidence of materiality through survey evidence and defendant's own internal documents. The *ConAgra* court held that "Plaintiffs need not prove at this stage that every ConAgra customer would find the '100% Natural' claim material or would believe that it meant the products contained no GMOs. Rather, they need only demonstrate that a reasonable consumer would understand it in that way and find it material." *Id.* at 1019; *see also Krommenhock v. Post Foods, LLC*, 334 F.R.D. 552, 565-66 (N.D. Cal. 2020) (materiality "to be ultimately resolved by the jury").

As detailed above, common questions of materiality as properly suited for a jury. Nonetheless, Plaintiffs have presented common evidence demonstrating materiality.

Plaintiffs' expert, Dr. Timothy Dewhirst, opines that that Defendants' marketing employed common marketing techniques, including an overriding focus that NAS Cigarettes are "100% additive-free" and "natural" and that these descriptors drove sales at a premium price. *See generally* Weiner Decl. Ex. 7 (Dewhirst Report). Plaintiffs' expert, Dr. Pearson, also opines that many American adults erroneously believe that "natural" or "additive-free" cigarettes are or may be less harmful than other brands. *See generally* Weiner Decl. Ex. 5 (Pearson Report). Defendants attacks on Plaintiffs' experts are improper as to materiality. "[T]hough both Plaintiffs and Defendants spend most of their time disagreeing as to whether [an expert's] declaration sufficiently proves materiality, the question at this stage is not whether Plaintiffs have successfully proven materiality, but rather whether the materiality inquiry is a common question susceptible to common proof that helps to establish predominance." *Broomfield*, 2018 WL 4952519, at *11 (citing *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1115 (N.D.

Cal. 2018) ("even if Kellogg is correct in its assertion that Plaintiff has failed to provide sufficient evidence of deception and materiality, that failure has no bearing on whether common questions will predominate over individual questions in the instant case.").

In addition to the Dewhirst and Pearson Reports, Plaintiffs offer other evidence showing that Defendants' claims are material. For example, the FDA determined that consumers do, in fact, believe that NAS Cigarettes conveyed modified risk because they are marketed as being made with natural tobacco that is additive-free, and the Disclaimer does not offset the influence of the descriptors. *See* Weiner Decl. Ex. 4 (FDA 2015 NAS Report). The FDA found that the "terms "natural" and "additive-free on NAS Cigarettes' labeling "represents explicitly and/or implicitly that the products or their smoke do not contain or are free of a substance and/or that the products present a lower risk of tobacco-related disease or are less harmful than one or more other commercially marketed tobacco products." SAC ¶ 59. Defendants then removed the "100% additive-free" representation from NAS Cigarettes' labels and advertisements in a settlement with the FDA. These facts alone demonstrate materiality. *Cf. Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1107 (9th Cir. 2013) ("the legislature's decision to prohibit a particular misleading advertising practice is evidence that the legislature has deemed that the practice constitutes a 'material' misrepresentation, and courts must defer to that determination."). Courts agree with the FDA's conclusions. *See United States v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 1, 27 (D.D.C. 2006) (enjoining RJR from marketing cigarettes as "natural" because it "implicitly convey[s] to the smoker and potential smoker that they are less hazardous to health"); *Disc. Tobacco & Lottery, Inc.*, 674 F.3d at 536 ("[C]ommon sense dictates the conclusion that [consumers who prefer

natural or organic products] prefer such products precisely because they believe that natural and organic products confer health advantages over conventional products." (emphasis added)).[27]

Defendants own internal documents support a finding of materiality. *See, e.g.*, *Mullins v. Premier Nutrition Corp.*, No. 13-CV-01271-RS, 2016 WL 1535057, at *3 (N.D. Cal. Apr. 15, 2016). For example, in the mid-1990s, Santa Fe surveyed consumers on various issues, including whether "additive-free" was the "primary reason" for requesting NAS samples; between 89 and 100% of responding NAS consumers claimed the "absence of additives" was the "primary reason" for trying NAS Cigarettes. Weiner Decl. Ex. 45 (SF_MDL00221202 at 1207-08). In April 1996, that number was 100%. *See id.* Ex. 46 (SF_MDL00138876 at 8878). Similarly, a review of commissioned focus groups concluded that the "vast majority" of consumers who usually smoke NAS Cigarettes "claim to choose the brand because it is '100% No Additives' or 'All Natural.'" *Id.* Ex. 47 (SF_MDL00034642 at 4643). And another internal marketing study concluded that "[a]mong Natural American Spirit smokers 21+, the core descriptors '100% Additive-Free Tobacco' and 'Natural Tobacco' are relatively more important." *Id.* Ex. 48 (SF_MDL00022286 at slide 58). This evidence supports a finding that the descriptors "natural" and "additive-free" are material to consumers, which applies to both the "safer cigarette" theory as well as the menthol theory.[28]

---

[27] *See also In re Santa Fe Nat. Tobacco Co.*, 288 F. Supp. 3d at 1231 ("The terms natural and organic have long been used across the country to convey products' health benefits. With that backdrop, the reasonable consumer is not expected to defy decades of marketing, which has conveyed that natural, organic, and additive-free products are healthier. Two federal agencies' findings buttress the Court's conclusion, as both the FDA and the FTC determined that the Defendants' descriptors conveyed a message that their cigarettes were less harmful that other cigarettes.") (internal citations omitted).

[28] Defendants' contention that materiality requires a showing that consumers care how the tobacco and menthol came together (*see* Opp. 64-65) is unavailing. All that matters is that the descriptor "additive-free" is material. As the Court has already found, "Menthol is an additive. Therefore an additive-free cigarette cannot have menthol ... The Court concludes that this eventual commingling makes the menthol modifier inherently misleading." *In re Santa Fe Nat. Tobacco Co.*, 288 F. Supp. 3d at 1241.

Although survey evidence is not required for a finding of materiality,[29] Plaintiffs have produced survey evidence showing that Defendants' marketing claims are material. *See* Mot. 24-31. This evidence of materiality is more than sufficient at the class certification stage. Defendants' reliance on Dr. Van Liere's survey findings is likewise unavailing. Opp. 60. Courts have found a representation material even when a small percentage of consumers rely on the misrepresentation. *See Oshana v. Coca–Cola Co.*, No. 04 C 3596, 2005 WL 1661999, *9 (N.D. Ill. July 13, 2005) (finding 24% of consumers behaving differently supports a finding of materiality); *In re NJOY, Inc. Consumer Class Action Litig.*, 120 F. Supp. 3d 1050, 1112 (C.D. Cal. 2015) (finding class-wide materiality where "22.7% and 27.5% of respondents understood NJOY's statement that 'Smokers finally have a real alternative' to mean that NJOY's e-cigarettes were 'alternative to/better than cigarettes while 14.4% and 14% viewed the statement as an indication that NJOY e-cigarettes were 'Safe/Safer/Better for Health/Risk Free."); *Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*, 326 F.R.D. 592, 614 (N.D. Cal. 2018) (25% establishes materiality). Moreover, as discussed in Plaintiffs' Motion to Exclude Dr. Van Liere's Report, his study does not address materiality, and Dr. Van Liere actually disclaims his study's ability to measure materiality. ECF No. 286, Mot. to Exclude Van Liere Report 11-12.

Defendants' remaining arguments regarding Plaintiffs' safer cigarette theory and menthol theory are also without merit because the question of whether a misrepresentation or omission is

---

[29] *Brockey v. Moore*, 107 Cal. App. 4th 86, 99-100 (2003) (rejecting argument that survey required, holding that the advertising statements, along with defendant's apparent intent to mislead consumers, were sufficient evidence of materiality); *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1026 (9th Cir. 2008) ("surveys and expert testimony regarding consumer assumptions and expectations may be offered but are not required; anecdotal evidence may suffice"); *Hadley*, 324 F. Supp. 3d at 1115 ("California courts have explicitly 'reject[ed] the view that a plaintiff must produce' extrinsic evidence 'such as expert testimony or consumer surveys' in order 'to prevail on a claim that the public is likely to be misled by a representation.' " (quoting *Colgan v. Leatherman Tool Grp., Inc.*, 135 Cal. App. 4th 663, 38 Cal. Rptr. 3d 36, 48 (2006))).

material is a fact question to be resolved by a jury. *Briseno*, 674 F. App'x at 657 (defendant may "may advance those arguments at the merits stages of this litigation, but they do not bear on predominance.") (citing *Amgen*, 568 U.S. at 459 ("While [plaintiff] certainly must prove materiality to prevail on the merits, we hold that such proof is not a prerequisite to class certification."); *Krommenhock*, 334 F.R.D. at 565-66 ("Post's experts Hanssens and Van Liere dispute Silverman's materiality conclusions, but those are issues to be ultimately resolved by the jury.").

4. Nationwide Express Warranty Claim

In addition to the state subclasses, Plaintiffs ask the Court to certify a Nationwide Menthol Subclass seeking restitution for the Nationwide Menthol Subclass Plaintiffs and Members based on breach of express warranty and seek to apply New Mexico Law to those claims. *See* SAC ¶¶ 127, 451-459; Mot. 80-84. Neither of Defendants' grounds withstands scrutiny. *See* Opp. 65.

Here, the only relevant forum state is New Mexico. *See Guidance Endodontics, LLC v. Dentsply Intern., Inc.*, 663 F. Supp. 2d 1138, 1150 (D.N.M. 2009) (Browning, J.). The three separate cases in this MDL that originated in New Mexico will presumably be consolidated for trial in this Court. Plaintiffs seek to certify the Nationwide Menthol Subclass to be tried here. Accordingly, the forum state for purposes of the Nationwide Menthol Subclass is New Mexico, and New Mexico's choice-of-law rules apply.[30]

[30] The Nationwide Menthol Subclass Plaintiffs that were selected (somewhat arbitrarily, for the SAC) were not plaintiffs in the three cases originally filed in New Mexico. If deemed necessary for class certification purposes, one or more of these Nationwide Menthol Subclass Plaintiffs can simply be added to one of the New Mexico cases to represent the nationwide class. *See* Fed. R. Civ. P. 21. Alternatively, a plaintiff from one of the New Mexico cases can be substituted as a Nationwide Menthol Subclass Class Representative. Either approach is consistent with the Federal Rules of Civil Procedure and common in class actions. *See e.g. Archuleta v. City of Santa Fe*, No. CIV 13-363 JAP-SCY, 2014 WL 12782788 (D.N.M. December 22, 2014) (granting motion to amend to substitute new class representatives); *In re Motor Fuel Temperature Sales Practices Litig.*, Nos. 17-MD-1840-KHV, 07-3248-KHV, 2009 WL 3122501, at *2, n.17 (D. Kan. Sept. 24, 2009) ("[c]ourts in the Tenth Circuit

Defendants do not dispute that New Mexico's choice-of-law rules applies, and hence the Court must look to the five "relevant contacts" set forth in the Restatement (Second) test. Mot. 81-82 (citing *Ferrell v. Allstate Ins. Co.*, 188 P.3d 1156, 1172-73 (N.M. 2008)). And Defendants admit that during the time period relevant to these claims: (1) SFNTC was a New Mexico corporation; (2) SFNTC was headquartered at Santa Fe, New Mexico; (3) the "employees and decision makers tasked with the development and execution of product labeling, marketing and advertising are located primarily at Santa Fe's headquarters in New Mexico"; and, (4) events during the relevant to the allegations in the Consumer Actions took place" in New Mexico. Mot. 82 (citing ECF No. 24 (Santa Fe and RAI's Response to Transfer Motion) 8, *In re Santa Fe Natural Tobacco Co. Mktg., Sales Practices, & Prods. Liab. Litig.*, Case MDL No. 2695 (J.P.M.L. Jan. 27, 2016)). Accordingly, New Mexico law should apply.

The cases relied on by Defendants focus instead on where the sale took place, which is in effect an application of the "place of contracting" rule set forth in the Restatement (First) of Conflict of Laws and expressly rejected for multi-state contract actions by the New Mexico Supreme Court. *See Ferrell*, 188 P.3d at 1173 (finding that the "rigidity" of the place of contracting rule is "particularly ill-suited for the complexities present in multi-state class actions."). As the New Mexico Supreme Court noted, applying the place of contracting rule would require the district court to apply the separate law of each state involved, which would lead to manageability problems that conflict with the policy behind class actions. *See id.* at 1172. It was for this very reason that the New Mexico Supreme Court adopted the Restatement (Second) test for multi-state class actions, so that the law of a single

---

have … taken a rather liberal approach in permitting the substitution of class representatives at various stages in the proceeding.").

state—the one with the most significant contacts—may be applied. *See, e.g.*, *Simon v. Philip Morris, Inc.*, 124 F. Supp. 2d 46, 53 (E.D.N.Y. 2000).

Defendants' alternative argument, that even if New Mexico substantive law is applied, individualized inquiries will predominate over common questions, is also unavailing. The law presumes that a representation is "part of the basis of the bargain" when a reasonable consumer would rely on it in purchasing the product. Plaintiffs meet all elements of the model rule, as approved by the New Mexico Supreme Court, as to all class members, without the need for individualized proof. *See* NMRA, Rule 13-1428. In fact, this Court has already said in the MTD Order that "Natural American's additive-free descriptor on menthol cigarettes . . . misleads a reasonable consumer" and that the commingling of the menthol with the tobacco "makes the menthol modifier inherently misleading." *In re Santa Fe Nat. Tobacco*, 288 F. Supp. 3d at 1234, 1241. Accordingly, no individual inquiries are necessary, and certification is proper.

5. <u>Plaintiffs Demonstrate a Valid Method of Proving Class Members' Damages That Aligns With Their Theories of Liability</u>

Defendants argue that Plaintiffs fail to put forth a valid measure of damages that aligns with their theories of liability.[31] *See* Opp. 72. Defendants arguments are incorrect.

(a) *Plaintiffs Can Prove Class-Wide Damages with Common Evidence*

[31] Defendants frame their argument as one in which "individualized inquiries into damages will predominate over common questions." Opp. 72. But subsequent to both the Supreme Court's decision in *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), and this Court's decision in *Daye*, 313 F.R.D. 147, the Tenth Circuit held that individual questions about damages do not defeat predominance. *See Naylor Farms, Inc. v. Chaparral Energy, LLC*, 923 F.3d 779, 798 (10th Cir. 2019). More to the point, Defendants do not really contend that individualized damages inquiries are the problem here. Rather, they contend that the proposed class-wide measure of damages does not fit the theory of liability and is not a valid measure of class-wide damages at all. So, Defendants' arguments actually have nothing to do with individualized damages questions. Nor do any such questions pose a hurdle to class certification here—Plaintiffs' damages model addresses class-wide damages, and its results would then be used to determine individual class members' damages—at the appropriate stage of the litigation.

(i) *Plaintiffs' Damages Model Measures the Damages Attributable to Their Theory of Liability*

Predominance requires the plaintiffs to show that damages are "measurable 'on a class-wide basis' through use of a 'common methodology.'" *Comcast Corp.*, 569 U.S. at 30. To prove class-wide damages, the plaintiffs must put forth a damages model seeking to measure the damages attributable to their damages theory. *See id.* at 35. However, damages "[c]alculations need not be exact." *Id.* Plaintiffs satisfy this standard with the expert opinion testimony of Dr. Dubé. *See, e.g.*, Mot. 34-35.

Defendants argue that Plaintiffs' damages model does not measure damages attributable to Plaintiffs' theories of liability. Opp. 74. Defendants also made this argument in their motion to exclude the testimony of Dr. Dubé. *See* ECF No. 291 (Motion to Exclude Dubé). Plaintiffs responded in detail in their opposition to such exclusion, and they incorporate by reference those arguments here. *See* ECF No. 311 (Opposition to Motion to Exclude Dubé). Most notably, Defendants confuse the purpose and content of Dr. Dubé's proposed conjoint analysis, and they ignore the other evidence in the case. Plaintiffs' other experts, as well as Defendants' own documents, can establish at trial that the Challenged Claims are false, misleading, and deceptive.[32] In particular, Drs. Pearson, Proctor, and Cummings opine that the reasonable consumer interprets the Challenged Claims to mean NAS Cigarettes may be less harmful than other brands of cigarettes. *See* Mot. 23-27. In fact, Defendants' own documents further support this conclusion—explicitly recognizing that consumers turn to NAS Cigarettes as a safer, healthier product, and that Defendants intend exactly that result. *See id.* 28 (citing Weiner Decl. Exs. 51, 53).

[32] As noted, the Challenged Claims are the labeling (mis)representations at issue in this case (*i.e.*, "natural" and "additive-free"), and Dr. Dubé can measure the damages associated with those claims if liability is established with respect to them. *See* Wiener Decl. Ex. 8 (Dubé Report) ¶ 2.

Dr. Dubé's analysis assumes that Plaintiffs will prevail on their liability cases, and if that is so, then he will calculate class-wide economic damages. As Plaintiffs have noted, numerous courts have found conjoint analyses provide an appropriate measure of economic damages in class actions such as this one. *See* Mot. 54-55 (collecting cases); ECF No. 311 (Opposition to Motion to Exclude Dubé) 17, 20 (collecting cases and discussing case law). Indeed, courts have upheld Dr. Dubé's testimony based on the same methodology in other cases. ECF No. 311 (Opposition to Motion to Exclude Dubé) 16 (citing *Price v. L'Oréal USA, Inc.*, No. 17 CIV. 614 (LGS), 2018 WL 3869896, at *9 (S.D.N.Y. Aug. 15, 2018); *Goldemberg v. Johnson & Johnson Consumer Cos., Inc.*, 317 F.R.D. 374, 394 (S.D.N.Y. 2016)). If Defendants are correct, Plaintiffs could never prove damages in a class case.[33]

The opposite result is also why the reasonable consumer standard exists. It is an *objective* standard that asks what the representations and omissions at issue mean to a hypothetical "ordinary" or "reasonable" consumer—the opposite of the *subjective* inquiry into each consumer's particular understanding that Defendants now seek to require. *See* Sections II.B and III.A.2., *supra*.

Simply put, because Plaintiffs will establish that the Challenged Claims on the packaging of NAS Cigarettes in fact convey to the reasonable consumer that the cigarettes may be less harmful than other brands of cigarettes, and this Court has already recognized as much (*see In re Santa Fe Nat. Tobacco Co.*, 288 F. Supp. 3d at 1234, 1241), it follows that Dr. Dubé's assessment of the economic damages associated with the Challenged Claims "fits" Plaintiffs' liability case. *See Comcast*, 569 U.S. at 35. Both

[33] Defendants cite two antitrust cases that stand for the unremarkable proposition that a competitor driven out of business by exclusionary conduct must measure its lost profits in order to recover them as damages. *See* Opp. 77-78 (citing *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1056 (8th Cir. 2000), *Prepaid Wireless Servs., Inc. v. Sw. Bell Wireless, Inc.*, No. CIV.A. M-00-302, 2002 WL 34367328, at *4 (S.D. Tex. July 23, 2002)). So, those cases do nothing to advance Defendants' argument.

the but-for market-clearing price and Plaintiffs' theory of liability are based on what the Challenged Claims mean to the reasonable consumer.

The analysis for the menthol subclass is the same—or even simpler. Defendants warranted that the Menthol NAS Cigarettes were additive-free. There is substantial common evidence that this representation is false, and therefore actionable, as well as misleading to a reasonable consumer. *See* Mot. 35-37. Plaintiffs' experts, Defendants' witnesses, and even the FDA have confirmed that Defendants place menthol (an additive) in the cigarette filters, and because it is highly volatile, the menthol migrates into the tobacco in the cigarette rod. *See id.* 36 (citing Cummings Report; Weiner Decl. Exs. 60-62). Indeed, Defendants' own documents establish that consumers are misled by the "additive-free" claim on Menthol NAS Cigarettes. *See id.* 37 (citing Weiner Decl. Ex. 47). Even the Court reached the same conclusion. *See* ECF No. 146 (Mem. Op. & Order) 173.

(ii) *<u>Both the Willingness-to-Pay and Price-Premium Damages Models are Valid</u>*

First, Defendants concede that "[t]he price premium attributable to the fraud is the difference between that market price and what consumers actually paid." Opp. 80. Yet Defendants claim that Dr. Dubé has not proposed a model for measuring the price premium attributable to the Challenged Claims. *See id.* 79 Dr. Dubé specifically proposed a model for measuring the price premium and explained how it would work. *See* Weiner Decl. Ex. 8 (Dubé Report) ¶¶ 22-26.

To be clear, Dr. Dubé suggested there are two separate ways to measure economic damages: a price premium (which Defendants admit is proper) *and* willingness to pay. *Id.* ¶¶ 29-33. Defendants take issue with the latter, willingness to pay, which measures the incremental economic value class members perceived from the Challenged Claims. *Id.* ¶ 27. This measure accounts for different ways in which consumers suffered economic harm: losing the perceived benefits of the Challenged Claims,

purchasing other brands of cigarettes, or not purchasing cigarettes at all. *Id.*; *see also* Weiner Decl. Ex. 90 (Dubé Response) ¶¶ 21-24. Indeed, standard microeconomics textbooks discussing willingness to pay, or "compensating variation," as the relevant measure of compensation to consumers. *See id.* ¶ 21 (citing examples).

In addition, contrary to Defendants' contention, Dr. Dubé's conjoint analysis adequately accounts for supply-side factors. *See* ECF No. 311 (Opposition to Motion to Exclude Dubé) 29-34 (discussing this argument at length). It will "control for the presence of differentiated competing brands charging different prices on the supply side of the market." Weiner Decl. Ex. 8 (Dubé Report) ¶ 17. As Dr. Dubé noted, his willingness-to-pay model acknowledges that "several competitors sell substitute brands of differentiated cigarette products that compete with the Challenged Products, often at different prices," on the supply side of the market. *Id.* ¶ 27. Willingness to pay measures damages by accounting for consumers who "might substitute their purchases to one of these competing products." *Id.*; *see also id.* ¶ 33 ("WTP not only accounts for the loss of benefits to Class Members but for the Challenged Claims, on the demand side, it also accounts for the presence of competitors selling differentiated cigarette products at different prices, on the supply side, and the potential for Class Members to change their purchase behavior either to one of these competing brands or to non-purchase in the but for scenario.").

Defendants also do not challenge Dr. Dubé's consideration of the supply side with respect to a price premium. Nor could they. *See id.* ¶ 19 ("The price premium will account for the oligopoly competition between the Defendants and competitors on the supply side of the market.").

In sum, Defendants do not even challenge Dr. Dubé's conjoint analysis, and they do not adequately challenge his willingness-to-pay analysis—either of those failings is grounds to uphold Plaintiffs' method of proving Class Members' damages that aligns with their theories of liability.

**B. Superiority**

Defendants argue that a class action is not superior to individual actions because the class action is not manageable, but their manageability argument is nothing more than a recast of their predominance argument—in particular, the misplaced contention that the driving issues are individual questions of class membership and subjective understanding of the misrepresentations on the packaging of NAS Cigarettes. *See* Opp. 82-83. Therefore, as explained above, *see* Sections II.A. and III.A.2, *supra*, Defendants' argument on this issue is without merit. Simply put, because predominance is met, the Court should find the class action approach superior, and the Court "should not decline to certify the class on manageability grounds alone." *Anderson Living Trust*, 306 F.R.D. at 411.

Defendants further contend that Plaintiffs' "express-warranty class is doubly unmanageable" because of choice-of-law concerns. *See* Opp. 83. As explained in more detail above, *see* Section III.A.4, *supra*, the Court should also reject this argument because the Court can and should apply New Mexico law to such claims.

In sum, as the Court has explained, superiority is established when the claims are "so-called negative value claims—claims in which the cost of litigation exceeds the likely recovery, rendering them economically non-viable without aggregation." *Anderson Living Trust*, 306 F.R.D. at 407. That is true here. The realistic alternative to a class action is no actions at all, although the possibility of millions of individual actions is also inferior from a manageability perspective. *See Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) ("It would hardly be an improvement to have in lieu of this single class action 17 million suits each seeking damages of $15 to $30. . . . The *realistic* alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30."). (Emphasis in original).

**IV. <u>Plaintiffs Have Satisfied the Requirements of Rule 23(b)(2)</u>**

Defendants argue that Plaintiffs can no longer claim that they risk being deceived into believing NAS Cigarettes may be less harmful since they filed a lawsuit premised on the recognition that NAS Cigarettes are not less harmful than other cigarettes. *See* Opp. 86-87. That argument is incorrect and based on a mistaken understanding of the law. *First*, Defendants' argument would mean that injunctive relief would *never* be available in false advertising cases. *See Ries v. Arizona Beverages USA LLC*, 287 F.R.D. 523, 533–34 (N.D. Cal. 2012). "In other words, if the Court were to construe Article III standing for [injunctive relief] claims as narrowly as Defendants advocate, federal courts would be precluded from enjoining false advertising under consumer protection laws . . . and would never have Article III Standing." *Henderson v. Gruma Corp.*, No. CV 10-04173 AHM AJWX, 2011 WL 1362188, at *7 (C.D. Cal. Apr. 11, 2011).

The Court can and should consider precedent in other circuits where this issue has been hotly litigated. Specifically, the Ninth Circuit, in interpreting requests for injunctive relief under the California Consumer Legal Remedies Act ("CLRA") and the California False Advertising Law ("FAL") rejected this defense argument, finding:

> We hold that a previously deceived consumer may have standing to seek an injunction against false advertising or labeling, even though the consumer now knows or suspects that the advertising was false at the time of the original purchase…. Either way, we share one district court's sentiment that we are 'not persuaded that injunctive relief is never available for a consumer who learns after purchasing a product that the label is false."

*Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 969-70 (9th Cir.), *cert. denied*, 139 S. Ct. 640 (2018).

While the Tenth Circuit does not appear to have directly addressed this issue, courts within this circuit have allowed consumers in false advertising to pursue injunctive relief on behalf of a class even after they became aware of the alleged misrepresentation. *See, e.g.*, *In re: EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig.*, 336 F. Supp. 3d 1256, 1340–41 (D. Kan. 2018)

(finding that class representatives had stated a claim for injunctive relief in connection with their claims under state consumer protection laws where the complaint sought to stop the defendant's "continued deceptive and unconscionable practices of selling the EpiPen 2-Pak at an inflated price"). Because refusing injunctive relief in false advertising cases would gut the various consumer protection statutes, this Court—consistent with the Ninth Circuit and other courts[34]—should allow Plaintiffs to pursue injunctive relief.

Defendants contend that neither of the two scenarios identified in *Davidson* in which a past purchaser might be able to establish standing for injunctive relief is applicable. *See* Opp. 89. However, the Ninth Circuit's analysis was not teaching the two-test method that Defendants would have. Instead, the *Davidson* Court was simply offering *two illustrations* of how a plaintiff who has learned the hard way that a company's statements were deceptive could have Article III standing to enjoin the deceptive practice. *See Milan v. Clif Bar & Co.*, No. 18-CV-02354-JD, 2020 WL 5760450, at *2 (N.D. Cal. Sept. 28, 2020) ("This is not the teaching of a two-test method, as [defendant] would have it."). If anything, *Davidson* amply demonstrates that Plaintiffs may pursue injunctive relief against Defendants.

Defendants also argue that Plaintiffs lack standing under the scenarios in *Davidson* because "none of the named Plaintiffs testified that they have ceased purchasing NAS due to an inability to rely on NAS advertisements or labeling" or that Plaintiffs now know "that NAS cigarettes are not safer than other cigarettes, and that NAS cigarettes cannot be made safe because they share the risks

---

[34] *See Akinmeji v. Jos A. Bank Clothiers, Inc.*, 399 F. Supp. 3d 466, 478 (D. Md. 2019); *Campbell v. Freshbev LLC*, 322 F. Supp. 3d 330, 338 (E.D.N.Y. 2018); *Curran v. Bayer Healthcare LLC*, No. 17 C 7930, 2019 WL 398685, at *5 (N.D. Ill. Jan. 31, 2019).

inherent in all cigarettes." *See* Opp. 89-90. But these contentions are based on mischaracterizations. Plaintiffs expressly allege that "Defendants' false, misleading, and deceptive misrepresentations and omissions are likely to continue to deceive and mislead reasonable consumers . . . ." SAC ¶ 82; *see also Davidson,* 889 F.3d at 969.

Injunctive relief is critical here because there is nothing to prevent Defendants from continuing to market NAS Cigarettes with a variation of its misleading "natural" representation that deceives past purchasers into believing that NAS Cigarettes may somehow be safer.[35] But an injunction will undeniably provide relief to Plaintiffs by preventing such deception and the continued harm to Plaintiffs by the lingering impressions of the Defendants' advertising campaign. To that end, Plaintiffs have demonstrated the pervasiveness of tobacco labeling and marketing such that without a change to the label and descriptors, ongoing harm *will* continue. For instance, Plaintiffs tobacco historian expert, Dr. Proctor, issued a comprehensive report on the pervasive nature and lasting impressions of the cigarette industry's advertising campaigns. Specifically, he stated that messages by

---

[35] In the MTD Order, the Court recognized the value of injunctive relief requested here: "an injunction or damages would still materially advance the government's interest in dissuading deception arising from the natural and organic adjectives" and "money damages or an injunction would materially advance the state's interest even as to the 'additive-free' term…" *In re Santa Fe Nat. Tobacco Co.*, 288 F. Supp. 3d at 1244. The Court also recognized the value of injunctive relief related to the menthol claim, especially as to younger smokers: "The Court notes here that many menthol users are young, inexperienced smokers. The Court concludes that menthol smokers' relative youth or inexperience makes it more likely that governmental interference would materially advance their stated goal of dispelling deception, because younger and inexperienced smokers are less likely to know what menthol is." *Id.* at 1245, n.53 (internal citations omitted). The Court also recognized that injunctive relief may be necessary in addition to monetary relief to cure the deceptions: "Money damages encourage the Defendants to add additional disclosures or move their current disclosures to a more prominent location, lest they be exposed to additional liability. Yet moving or adding disclosures might not be enough to fully serve the governmental interest in protecting consumers from the deceptions at issue. At this stage in the litigation, the Court cannot decide on the pleadings alone whether an injunction would be more prohibitive than necessary, but it is plausible that it would not be." *Id.* at 1245 (internal citations omitted).

the cigarette industry have been so pervasive and "thoroughly impressed upon consumer culture, that even when a reassurance disappears . . . its . . . semiotic surrogates can often carry on the same deceptive work." *See* Weiner Decl. Ex. 1 (Proctor Report) 41. For example, "even though NAS can no longer state expressly that its tobacco is 'additive free,' this same basic message can be conveyed through claims to be using only 'Tobacco & Water.'" *Id.* Further, terms such as "natural" convey a sense of safety—by virtue of their resonance with such terms being used in the organic food and health movement. *Id.* 38-39. Defendants do not have to say "brand X is safer," which is "the whole point of implied reassurance; the message can be conveyed through subtle cues—color patterns, cultural symbolism, and images that suggest safety." *Id.*

In *United States v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 1, Judge Kessler acknowledged the necessity of injunctive relief as an available remedy, and the court enjoined the future use of health reassurance descriptors as the *only way* to restrain Defendants from their "longstanding and continuing fraudulent efforts to deceive smokers, potential smokers, and the American public about 'light' and 'low tar' cigarettes." *Id.* at 924.

> By using descriptors such as "lights" and "low tar," Defendants knowingly convey the false impression that cigarettes with those labels are less harmful than other cigarettes. Consumers' false belief is so *pervasive and longstanding*, and has been exploited and promoted by Defendants for so long, *that preventing and restraining Defendants' future fraud requires a ban on any future use of descriptors which convey a health message.*

*Id.* at 924-25 (emphasis added). NAS Cigarettes' marketing is 21st Century health reassurance fraud and a perpetuation of longstanding tobacco company tactics that are revealed in the internal archives of the industry.[36] As Judge Kessler noted, "Defendants have developed new descriptors to convey

[36] *See* Weiner Reply Decl. Ex. 94, Bates Nos. 2040452500-2040452523, ("The illusion of filtration is as important as the fact of filtration"); *see also* Weiner Reply Decl. Ex. 95, Bates Nos. 502041366-502041415, ("Some described [the star shaped filter] as another gimmick"), Weiner Reply Decl. Ex. 96, Bates Nos. 1005038559-561; Weiner Reply Decl. Ex. 97, Bates Nos. 3990491977-3990491981;

implied health reassurance messages. B & W developed and marketed the "Kool Natural Lights" brand extension in 1998 … *[d]espite having market research showing that consumers incorrectly interpret the word "natural" to mean that the cigarettes are safer than conventional cigarettes…*" *Id.* at 924 (emphasis added). Accordingly, this Court should find that certification is appropriate to all Class members, and certify a Rule 23(b)(2) Class for injunctive relief. *See also Johnson*, 278 F.R.D. at 551 *citing Consumers Union of U.S., Inc. v. Alta–Dena Certified Dairy*, 4 Cal. App. 4th 963, 972–73 (1992) (stating that "California law permits him to seek relief for future purchasers of the product who were misled by the *lingering impressions made by the advertising campaign*.") (emphasis added).

Finally, Defendants argue that Plaintiffs' request for injunctive relief is moot since "[t]his Court's MTD Order made clear that the Memorandum of Agreement that Santa Fe entered into with the FDA moots any request to enjoin the use of the "natural" and "additive-free" descriptors." Opp. 84. However, that argument is incorrect and, as Defendants point out in their Response (*see* Opp. 85), Plaintiffs seek Rule 23(b)(2) certification to pursue an injunction against descriptors *not covered by the MTD Order*—specifically (1) the use of "natural" in the "Natural American Spirits" brand name; (2) the "organic" descriptor; and (3) the "tobacco & water" descriptors. *See* Mot. 87. Defendants also argue that Plaintiffs' request for injunctive relief is still moot because every NAS Cigarette advertisement has included a disclaimer stating that "Natural American Spirit cigarettes are not safer than other cigarettes." Opp. 85. Nonetheless, this argument must fail as well. Defendants may have changed their disclaimer to include, without qualification, that "Natural American Spirit cigarettes are not safer than other cigarettes," but that fact neither moots the issue nor deprives Plaintiffs of

---

Weiner Reply Decl. Ex. 98, Bates Nos. 1005112459-2461 ("Our basic position…[is] that we are making false or misleading statements to promote the sale of cigarettes"); Weiner Reply Decl. Ex. 99, Bates Nos. 680099136-9145; Weiner Reply Decl. Ex. 100, Bates No. 501650188.

standing. Plaintiffs' request for certification is in regard to the reasonable consumer's understanding of NAS Cigarettes' labeling, and Plaintiffs allege—and provide evidence both in the way of documents and expert testimony—that Defendants' current labeling and pervasive advertising of NAS Cigarettes continue to inaccurately convey a reduced risk of harm to Plaintiffs and reasonable consumers *despite the existence of a disclaimer*. Further, as the Ninth Circuit stated in *Davidson*, "In some cases, the threat of future harm may be the consumer's *plausible allegations* that she will be unable to rely on the product's advertising or labeling in the future… [and] [i]n other cases, the threat of future harm may be the consumer's plausible allegations that she might purchase the product in the future, despite the fact it was once marred by false advertising or labeling, as she may reasonably, but incorrectly, assume the product was improved." *Davidson,* 889 F.3d, at 969-70 (emphasis added). Therefore, since Defendants continue to actively deceive class members by their advertising, labeling and descriptors, Defendants' mootness argument must fail. Accordingly, this Court should find that certification is appropriate to all Class Members, and certify a Rule 23(b)(2) Class.

**CONCLUSION**

For the reason stated herein, and in Plaintiffs' Motion, the Court should grant certification of the proposed Classes.

Dated: November 19, 2020

Respectfully submitted,

By */s/ Scott. P. Schlesinger*
Scott P. Schlesinger
Jeffrey L. Haberman
Jonathan R. Gdanski
SCHLESINGER LAW OFFICES, P.A.
1212 SE Third Avenue
Ft. Lauderdale, FL 33316
Telephone: 954-467-8800
Email: scott@schlesingerlwaw.com
Email: jhaberman@schlesingerlaw.com
Email: jgdanski@schlesingerlaw.com

By */s/ Melissa S. Weiner*
Melissa S. Weiner
PEARSON, SIMON & WARSHAW, LLP
800 LaSalle Ave., Suite 2150
Minneapolis, MN 55402
Telephone: (612) 389-0600
Facsimile: (612) 389-0610
Email: mweiner@pswlaw.com

Matthew D. Shultz
LEVIN, PAPANTONIO, ET AL.
316 S. Baylen St., Suite 600
Pensacola, FL 32502
Telephone: (850) 435-7140
Facsimile: (850) 436-6140
Email: mschultz@levinlaw.com

D. Greg Blankinship
FINKELSTEIN, BLANKINSHIP, FREI-PEARSON & GARBER, LLP
One North Broadway, Suite 900
(914) 298-3290
Email: gblankinship@fbfglaw.com

Caleb Marker
ZIMMERMAN REED LLP
2381 Rosecrans Avenue, Suite 328
Manhattan Beach, CA 90245
(877) 500-8780 Telephone
(877) 500-8781 Facsimile
Email: caleb.marker@zimmreed.com

Michael R. Reese
REESE LLP
100 West 93rd Street, 16th Floor
New York, New York 10025
Telephone: (212) 643-0500
Facsimile: (212) 253-4272
Email: mreese@reesellp.com

James W. Gustafson, Jr.
SEARCY DENNEY SCAROLA BARNHART & SHIPLEY, P.A.
The Towle House
517 North Calhoun Street
Tallahassee, FL 32301
Telephone: (850) 224-7600
Email: gustafsonteam@searcylaw.com

Ronald A. Marron
LAW OFFICES OF RONALD A. MARRON
651 Arroyo Drive
San Diego, California 92103
Telephone: (619) 696-9006
Facsimile: (619) 564-6665
Email: ron@consumersadvocates.com

Daniel L. Warshaw
PEARSON, SIMON & WARSHAW, LLP
15165 Ventura Blvd., Suite 400
Sherman Oaks, CA 91403
Telephone: (818) 788-8300
Facsimile: (818) 788-8104
Email: dwarshaw@pswlaw.com

Nancy R. Long
LONG, KOMER & ASSOCIATES, P.A.
2200 Brothers Road
Santa Fe, NM 87505-6903
Telephone: (505) 982-8405
Facsimile: (505) 982-8513
Email: nancy@longkomer.com

Charles J. LaDuca
CUNEO GILBERT & LADUCA, LLP
4725 Wisconsin Avenue NW, Suite 200
Washington, DC 20016
Telephone: (202) 789-3960
Facsimile: (202) 589-1813
Email: claduca@cuneolaw.com

***Counsel for Plaintiffs and Proposed Class Counsel***

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on November 19, 2020, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

Dated: November 19, 2020

Respectfully submitted,

By /s/ Melissa S. Weiner
Melissa S. Weiner
PEARSON, SIMON & WARSHAW, LLP
800 LaSalle Ave., Suite 2150
Minneapolis, MN 55402
Telephone: (612) 389-0600
Facsimile: (612) 389-0610
Email: mweiner@pswlaw.com

***Counsel for Plaintiffs and Proposed Class Counsel***

# EXHIBIT E

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

IN RE: SANTA FE NATURAL TOBACCO
COMPANY MARKETING & SALES
PRACTICES AND PRODUCTS
LIABILITY LITIGATION

No. MD 16-2695 JB/LF

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court on: (i) the Defendants' Request for Judicial Notice in Support of Motion to Dismiss, filed November 18, 2016 (Doc. 71)("First JN Motion"); (ii) Defendants' Second Motion for Judicial Notice in Support of the Motion to Dismiss the Consolidated Amended Complaint, filed February 23, 2017 (Doc. 91)("Second JN Motion"); (iii) Defendants' Third Motion for Judicial Notice in Support of the Motion to Dismiss the Consolidated Amended Complaint, filed May 30, 2017 (Doc. 109)("Third JN Motion"); and (iv) the Defendants' Motion to Dismiss the Consolidated Amended Complaint and Incorporated Memorandum of Law, filed February 23, 2017 (Doc. 90)("MTD"). The Court held hearings on June 16, 2017 and July 20, 2017. The primary issues are: (i) whether the Court may consider the items presented in the First JN Motion, the Second JN Motion, and the Third JN Motion without converting the MTD into one for summary judgment; (ii) whether the Court may exercise personal jurisdiction over Reynolds American, Inc. for claims that were not brought in a North Carolina forum; (iii) whether the Federal Trade Commission's Decision and Order, In re Santa Fe Nat. Tobacco Co., No. C-3952 (FTC June 12, 2000), filed November 18, 2016 (Doc. 71)("Consent Order"), requiring Defendant Santa Fe Natural Tobacco Company, Inc. to use a disclosure that "No additives in our tobacco does **NOT** mean a safer cigarette" impliedly preempts the Plaintiffs'[1] claims

[1]There are twelve named Plaintiffs in this action: Jacques-Rene Hebert and Albert Lopez, citizens of the State of Illinois; Sara Benson, a citizen of the State of Colorado; Justin Sproule and

**Exhibit E**

to the extent that the Defendants' advertising misled the Plaintiffs into believing that Natural American cigarettes are safer or healthier than other cigarettes; (iv) whether "natural," "additive-free," and "substantially similar terms" mislead a consumer into believing: (a) that Natural American cigarettes are safer or healthier than other cigarettes, (b) that Natural American's menthol cigarettes do not include any additives; or (c) that Natural American cigarettes undergo fewer engineering processes than other cigarettes; (v) whether the Defendants' use of those descriptors is protected commercial speech under the First Amendment to the Constitution of the United States of America; (vi) whether state law safe harbors shield the Defendants from liability; (vii) whether the Plaintiffs' unjust-enrichment claims fail, because: (a) the descriptors did not deceive consumers, so there is no injustice for equity to correct; (b) the Plaintiffs have an adequate legal remedy under the various state consumer statutes; or (c) state specific law otherwise bars them; (viii) whether the Plaintiffs' breach-of-express-warranty claims are barred, because: (a) the FDA-mandated disclosure and the menthol ingredient modify the warranty such that there is no breach; (b) the Plaintiffs' Consolidated Complaint, filed January 12, 2017 (Doc. 82)("Amended Complaint") does not serve as the requisite pre-litigation notice under California, Florida, Illinois, New Mexico, New York, and North Carolina law; and (c) the Plaintiffs failed to allege privity of contract with the Defendants as required by Florida, Illinois, and New York law; and (ix) whether the Memorandum of Agreement Between the United States Food and Drug Administration's (FDA) Center for Tobacco Products (CTP) and RAI Services Company (RAIS)/Santa Fe Natural Tobacco Company, Inc. (Santa Fe), dated January 19, 2017, filed February 23, 2017 (Doc. 91-1)("Memorandum of Agreement), in which the Defendants

---

Joshua Horne, citizens of the State of Florida; Abigail Emmons and Ceyhan Haskal, citizens of the State of New Mexico; Rudolph Miller and Charlene Blevins, citizens of the State of North Carolina; Carol Murphy, a citizen of the State of Idaho; Robert Litwin, a citizen of the State of Maryland; and Francisco Chavez, a citizen of the State of California. See Amended Complaint ¶¶ 12-23, at 4-11, filed January 12, 2017 (Doc. 82).

agree to remove the descriptors from its packaging and labeling, except for the term natural in its brand name, renders the Plaintiffs' request for injunctive relief moot.

The Court concludes that: (i) the Court may consider all but one of the documents the Defendants submit without converting the MTD into one for summary judgment, because the documents are incorporated in the Amended Complaint by reference, or they are government documents publically available and capable of ready and accurate determination; (ii) the Court lacks personal jurisdiction over Reynolds American, as to the claims filed outside of North Carolina; (iii) the Consent Order does not preempt the Plaintiffs' claims, because (a) a consent order is not a "law" under the Supremacy Clause, (b) the Consent Order -- as an agreement not to enforce a federal statute -- does not permit conduct; (c) the Consent Order only binds the parties to it, so does not bind all of the Defendants; and (d) the Consent Order covers only the Defendants' advertising, so cannot preempt the Plaintiffs' claims targeting the Defendants' labeling; (iv) the descriptors "natural," "organic," and "additive-free" would mislead a reasonable consumer into believing that: (a) Natural American Cigarettes are healthier or safer than other cigarettes, because decades of marketing have equated those terms with healthy products; and (b) Natural American menthol cigarettes have no additives, because menthol is a substance that a reasonable consumer would not know much about; (v) the First Amendment does not protect the Defendants' use of the descriptors at issue, because the state action doctrine precludes a First Amendment defense to the claims premised on mutual assent, and the government has a substantial interest in regulating deceptive commercial speech regarding tobacco products; (vi) the state-law safe harbors do not preclude relief, except in Illinois, because the Consent Order does not permit conduct, and the Ohio consumer protection claims are barred for state-specific reasons; (vii) Rule 8 allows pleading in the alternative, but New Jersey and Ohio law do not permit the Plaintiffs' unjust-enrichment claims, because the Plaintiffs cannot allege a

remuneration nor can they allege that they conferred a direct benefit on the Defendants; (viii) Florida, Illinois, and New York law preclude the Plaintiffs' express warranty claims, because the Plaintiffs Amended Complaint cannot serve as the requisite pre-litigation notice, and are independently defective under Florida and Illinois law, because there is no privity between the Plaintiffs and the Defendants; and (ix) the Plaintiffs' request for injunctive relief is not rendered moot, because the Memorandum of Agreement is subject to a lawsuit that might invalidate it. The Court therefore grants the MTD in part and denies it in part.

## FACTUAL BACKGROUND

The Court takes the facts from the Amended Complaint. As the Court must, it accepts all factual allegations in the Amended Complaint as true for the purposes of a motion to dismiss. See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007); Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). The Court may also consider facts judicially noticed on a motion to dismiss without converting the motion into one for summary judgment. See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 322 (2007)("[C]ourts must consider the complaint in its entirety, as well as . . . matters of which a court may take judicial notice."); S.E.C. v. Goldstone, 952 F. Supp. 2d 1060, 1191 (D.N.M. 2013)(Browning, J.). The Court recites facts from the documents included in the First JN Motion, the Second JN Motion, and the Third JN Motion to the extent that the Court concludes that it can consider those documents. See infra § I ("The Court concludes that it may consider all of the documents, which the Defendants submit, except the FTC Letter, without converting the MTD into one for summary judgment.").

Santa Fe Tobacco is a New Mexico corporation that sells Natural American Spirit cigarettes and uniformly advertises them as "Natural" and "100% Additive Free." Amended Complaint ¶¶ 1, 24, 40, at 1, 12, 15. Those same descriptors appear on Natural American cigarettes' packaging.

Amended Complaint ¶ 4, at 2. The twelve named Plaintiffs believed that, based on those terms and others, Natural American cigarettes were "safer and healthier" than other cigarettes. Amended Complaint ¶¶ 12-23, at 4-11. Because of that belief, the Plaintiffs purchased Natural American cigarettes at a premium over other cigarettes. See Amended Complaint ¶¶ 11-23, at 3-11.

Reynolds American -- Santa Fe Tobacco's parent corporation -- is heavily involved in Natural American cigarette advertising, and approves "all decisions" that Santa Fe Tobacco makes "with respect to the marketing, design, and composition." Amended Complaint ¶ 28, at 12. Reynolds American actively monitors the publications in which Natural American cigarettes are advertised. See Amended Complaint ¶ 28, at 12-13. Santa Fe Tobacco's and Reynolds American's assets are identical, and Reynolds American "essentially controls" Santa Fe Tobacco's business initiatives, capital expenditures, and financial operations. Amended Complaint ¶ 35, at 13-14.

Natural American advertisements from 2013 through 2015 include images of water and plants, along with statements like: "When you work with the best materials, you don't need to add anything else. That's why we use only tobacco and water. We stick with premium quality, whole leaf natural tobacco that's 100% additive-free for a very simple reason -- it's all we need." Tobacco & Water Advertisement at 113-114, filed November 18, 2016 (Doc. 71-1)("Tobacco & Water Advertisement"). See Complaint ¶ 43, at 17-21. Advertisements from that period also state in large bold writing, "**100% ADDITIVE-FREE NATURAL TOBACCO**," and advertisements include, in smaller writing, "No additives in our tobacco does **NOT** mean a safer cigarette." Tobacco and Water Advertisement (all caps, bold, and emphasis in original); Complaint ¶ 43, at 17-21(all caps, bold, and emphasis in original). In 2015, the Defendants launched a nationwide advertising campaign and targeted Sports Illustrated, Time, Field and Stream, Southern Living, Architectural Digest, Vanity Fair, and US Weekly magazines. See Amended Complaint ¶ 44, at 21. Regarding

that advertising campaign, a spokesman for Santa Fe Tobacco explained: "The aim is to drive brand awareness, highlight Natural American Spirit's 100-percent additive-free natural tobacco proposition." Amended Complaint ¶ 45, at 21-22.

Natural American cigarettes are the most expensive major brand of cigarette. See Complaint ¶ 88, at 36. Reynolds American explains that the higher price stems from "its use of all natural, additive-free tobacco." Complaint ¶ 89, at 36 (citing Reynolds American, Inc. Form 10-Q United States Securities and Exchange Commission Filing for the Quarterly Period Ended March 31, 2016, available at http://s2.q4cdn.com/129460998/files/doc_financials/2016/RAI-Q116-10-Q.pdf (last visited Oct. 28, 2017)). Despite their higher price, Natural American cigarette sales increased eighty-six percent from 2009 through 2014, while cigarette sales in the United States of America declined overall by seventeen percent. See Amended Complaint ¶ 45, at 22. Its market share during a similar period "more than doubled." Amended Complaint ¶ 45, at 22. Between 2014 and 2015 alone, Natural American cigarette sales increased by 21.4%. See Amended Complaint ¶ 45, at 22.

The Plaintiffs cite numerous studies regarding the popularity and consumer perceptions of cigarettes branded as "natural." Amended Complaint ¶¶ 50-54, at 23-27.[2] On August 27, 2015, the

---

[2]The Amended Complaint notes that, in 2007, researchers at the University of California performed a study regarding the ways in which smokers "down-play the risks" by determining that "natural" cigarettes are safer or healthier than other cigarettes containing chemicals. Amended Complaint ¶ 50, at 23 (quoting McDaniel, Patricia A. & Ruth E. Malone, "I Always Thought They Were All Pure Tobacco": American Smokers' Perceptions of "Natural" Cigarettes and Tobacco Industry Advertising Strategies, 16(6) Tobacco Control (2007), available at http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2807204/. The study, according to the Plaintiffs, concludes that tobacco companies seek to alleviate smokers' concerns about health by modifying products and describing them as "natural." Amended Complaint ¶ 51, at 22-23. The Amended Complaint notes that a study from the Schroeder Institute, a non-profit that researches tobacco and policy with a goal of reducing tobacco use, observes that consumers rely on companies' branding of cigarettes as "'natural, organic, and additive free,'" so such branding possibly encourages consumers to try a product that they otherwise would not try or to switch to Natural American cigarettes rather than quitting smoking. Amended Complaint ¶ 52, at 24 (quoting Pearson, Jennifer L., et al., Misperceptions of harm among Natural American Spirit smokers: results from wave 1 of the

Food and Drug Administration ("FDA") sent a Warning Letter, filed November 18, 2016 (Doc. 71-1)(Ex. 8)("Warning Letter") to Santa Fe Tobacco asserting that some of the Defendants' cigarette labeling practices "explicitly and/or implicitly" represent that Natural American cigarettes do not contain certain materials, so they represent that Natural American cigarettes pose less of a risk than other tobacco products. Amended Complaint ¶ 58, at 28-29 (quoting Warning Letter at 2). Santa Fe Tobacco previously entered into a Consent Order with the FTC regarding its advertising practices, because the FTC had concerns that the Defendants' advertising mislead consumers into believing that "Additive-Free" or "Chemical-Free" cigarettes are safer or less harmful than other tobacco products. Consent Order at 1-10 [on CM/ECF at 10-19]. The Consent Order requires that, "beginning no later than (30) days after the date of service of this order," Santa Fe Tobacco's advertisements must display the warning: "No additives in our tobacco does NOT mean a safer cigarette." Consent Order, at 4 [at 13 on CM/ECF]. Among other requirements, this statement must be "[i]n the same style and type size as that required for health warnings for tobacco cigarettes." Consent Order at 3 [at 12 on CM/ECF]. A later "Assurance of Voluntary Compliance" stipulates that, effective March 1, 2010, all advertisements found in either "display or distribution" of any Santa Fe Tobacco cigarette made with organic tobacco should display the statement "Organic

---

Population Assessment of Tobacco and Health (PATH) study (2013-2014) at 1, Tobacco Control (Dec. 6, 2016)("Misperceptions"). The study further finds, according to the Plaintiffs, that 8.3 percent of other cigarette brand smokers believe that their brand is "less harmful than other brands" whereas 63.9 percent of Natural American smokers believe that their brand is less harmful. Amended Complaint ¶ 52, at 24 (quoting Misperceptions, at 1). Additionally, the study determines that Natural American smokers believe their brand is less harmful, because the branding has "natural" and "additive free" descriptors. Amended Complaint ¶ 52, at 25 (citing Misperceptions, at 1). In a recent survey of 1000 smokers in the United States, sixty percent believe that cigarettes without additives are safer to smoke than other cigarettes, and seventy-three percent think that cigarettes containing additives are more dangerous than cigarettes that do not contain additives. See Amended Complaint ¶ 53, at 25-26 (citing Cummings, K.M., et al., Are smokers adequately informed about the health risks of smoking and medicinal nicotine?, Nicotine & Tobacco Research 6(3), 333-340 (2004)).

Appellate Case: 23-705 Document: 010110921360 Date Filed: 09/15/2023 Page: 749 Sealed

tobacco does NOT mean a safer cigarette." Assurance of Voluntary Compliance at 5-6 [on CM/ECF at 33-34], (dated March 1, 2010), filed November 18, 2016 (Doc. 71-1)(ex. F)("Voluntary Compliance Agreement").

Neither the Plaintiffs nor the Defendants allege that Natural American cigarettes are in any way safer than other cigarettes. See Amended Complaint ¶ 59, at 29. One scientific study, according to the Plaintiffs, found that Natural American blue box cigarettes contain the highest level of polycyclic aromatic hydrocarbons[3] of fifty United States cigarette brands tested. See Amended Complaint ¶ 61, at 29 (citing An T. Vu et al., Polycyclic Aromatic Hydrocarbons in the Mainstream Smoke of Popular U.S. Cigarettes, National Center for Biotechnological Information (July 30, 2015) available at http://www.ncbi.nlm.nih.gov/pmc/articles/PMC4540633/). Also according to the Plaintiffs, the Centers for Disease Control and Prevention found that Natural American cigarettes contain higher concentrations of both cadmium and mercury than the other fifty varieties of United States cigarettes tested.[4] See Amended Complaint ¶ 62, at 30 (citing Mark R. Fresquez, R. Steven Pappas, and Clifford H. Watson, Establishment of Toxic Metal Reference Range in Tobacco from U.S. Cigarettes, J. Analytical Toxicology, 37(5) 298-304 (2013)). Another study evaluated the levels of "free-base" nicotine in United States cigarettes, and the Plaintiffs allege that it determined that Natural American cigarettes has a higher nicotine concentration than Camel, Marlboro, and

---

[3]Polycyclic aromatic hydrocarbons are "the sooty part of smoke or ash." Polycyclic Aromatic Hydrocarbons (PAHs), Wisconsin Department of Health Services (March 13, 2017) available at https://www.dhs.wisconsin.gov/chemical/pah.htm (last accessed October 27, 2017).

[4]Cadmium and mercury are both heavy metals that have adverse health effects. See Amended Complaint ¶ 62, at 30. Cadmium is a carcinogen that is linked to chronic obstructive pulmonary disease and nephrotoxicity -- a toxicity of the kidneys. See Amended Complaint ¶ 62, at 30.

Winston-brand cigarettes.[5] Amended Complaint ¶ 66, at 31 (citing Pankow, J., Barsanti, K., & Peyton, D., Fraction of Free-Base Nicotine in Fresh Smoke Particulate Matter from the Eclipse Cigarette by 1H NMR Spectroscopy, Chem. Res. in Toxicology 16(1): 23-27 (2003)).

Although labeled as "additive free," the Defendants add menthol in certain varieties of Natural American cigarettes. See Amended Complaint ¶ 68, at 31. Natural American cigarettes are also "flue-cured," meaning that the Defendants process the tobacco with heat to secure the sugars, which synthetically lowers the cigarette smoke's pH[6] and makes it easier to inhale. Amended Complaint ¶ 72, at 32. The tobacco in the Defendants' cigarettes is artificially blended and modified, much like other cigarettes in the industry. See Amended Complaint ¶¶ 73-74, at 33. Despite these alterations to the tobacco product, the Natural American cigarettes are labeled "Natural." Amended Complaint ¶¶ 74-76, at 33.

**PROCEDURAL BACKGROUND**

The Plaintiffs brought thirteen separate actions in eight federal district courts, alleging similar liability theories. See In re Santa Fe Nat. Tobacco Co. Mktg. & Sales Practices Litig., 178 F. Supp. 3d 1377, 1378 (U.S. Jud. Pan. Mult. Lit. 2016)("Transfer Order").[7] One Plaintiff with an action pending in the District of New Mexico, Ceyhan Haskal, moved for centralization under 28 U.S.C §

[5]Free-base nicotine is a basic form of nicotine that is more volatile, particularly when smoked. See Amended Complaint ¶ 64, at 30. Free-base nicotine is therefore more quickly absorbed into the lungs when smoking, and as a result, reaches the brain faster. See Amended Complaint ¶ 64, at 30. Elevated concentrations of free-base nicotine do not arise naturally. See Amended Complaint ¶ 66, at 31.

[6]pH is a measure of hydrogen ion concentration in a solution, and signals a solution's acidity or alkalinity. See Anne Marie Helmenstine, pH Definition and Equation in Chemistry, Chemistry Glossary Definition of pH at 1 (August 31, 2017) available at https://www.thoughtco.com/definition-of-ph-in-chemistry-604605.

[7]The Court now has sixteen separate actions before it. See In Re Santa Fe Natural Tobacco Co. Marketing and Sales Practice Litig., No. 16-2695 (Apr. 11, 2016).

1407. See Transfer Order, 178 F. Supp. 3d at 1378. Santa Fe Tobacco and Reynolds American opposed centralization, but agreed that the District of New Mexico was an appropriate transferee forum. See Transfer Order, 178 F. Supp. 3d at 1378. All responding Plaintiffs agreed on centralization, but disagreed upon the transferee district.[8] See Transfer Order, 178 F. Supp. 3d at 1378. The Judicial Panel on Multidistrict Litigation concluded that the actions presented "involve common questions of fact, and that centralization will serve the convenience of the parties," and ordered consolidation. Transfer Order, 178 F. Supp. 3d at 1378-79. The Panel further concluded that the District of New Mexico was an appropriate transferee district because: (i) Santa Fe Natural Tobacco is headquartered in the District of New Mexico; (ii) key witnesses reside in the District of New Mexico; (iii) four actions were pending in the District of New Mexico; (iv) the Defendants agreed that the District of New Mexico provides a "convenient and accessible location for the geographically dispersed litigation"; and (v) centralizing before the Court allowed the Panel "to assign [the] litigation to an able and experienced jurist who has not had the opportunity to preside over [a multidistrict litigation]." Transfer Order, 178 F. Supp. 3d at 1379.

**1. The Motion to Dismiss.**

The Defendants move to dismiss all claims under rule 12(b)(6) of the Federal Rules of Civil Procedure. See MTD at 1. The Defendants marshal ten arguments in favor of full or partial

---

[8]Section 1407 (c) provides as follows:

> The panel shall give notice to the parties in all actions in which transfers for coordinated or consolidated pretrial proceedings are contemplated, and such notice shall specify the time and place of any hearing to determine whether such transfer shall be made. . . . The panel's order of transfer shall be based upon a record of such hearing at which material evidence may be offered by any party to an action pending in any district that would be affected by the proceedings under this section, and shall be supported by findings of fact and conclusions of law based upon such record.

28 U.S.C. § 1407(c).

dismissal: (i) the Consent Order preempts the Plaintiffs' claims; (ii) the First Amendment shields the Defendants from liability; (iii) state statutory safe harbors protect the Defendants from the Plaintiffs' unfair and deceptive practice claims; (iv) the unfair and deceptive practice claims fail, because the Defendants' statements do not mislead a reasonable consumer; (v) the unjust-enrichment claims fail, because the Defendants' cigarette advertising is not misleading; (vi) unjust-enrichment is improperly pled, because the Plaintiffs either have a legal remedy or state law otherwise bars the claims; (vii) the Defendants did not breach an express warranty; (viii) the Plaintiffs did not give pre-litigation notice and fail to establish privity; (ix) the Plaintiffs' request for injunctive relief is rendered moot; and (x) the Court does not have specific or general personal jurisdiction over Reynolds America with respect to the Plaintiffs' claims who were not parties to the North Carolina suit. See MTD at 6-80.

Before addressing the Defendants' arguments, some context to the Plaintiffs' claims would aid in understanding the issues before the Court. The Plaintiffs allege that the Defendants packaging, labeling, and advertising deceived them in three ways. The three theories of deception are as follows:

**(1)** **The Safer-Cigarette Theory**: the Plaintiffs argue that the use of the terms organic, natural, and additive-free mislead tobacco consumers into believing that Natural American cigarettes are safer and healthier. See Amended Complaint ¶¶ 4-8, 47-66, at 2-3, 22-31; MTD at 22-24.

**(2)** **The Menthol Theory**: the Plaintiffs argue that, by labeling Natural Americans cigarettes with menthol "additive-free" and "natural," the Defendants mislead menthol consumers, because menthol is an additive. See Amended Complaint ¶¶ 10, 67-69 at 3, 31-32; MTD at 24-25.

**(3)** **The Unprocessed-Cigarette Theory:** the Plaintiffs argue that, by labeling Natural American cigarettes as Natural, the Defendants mislead consumers into believing that Natural American cigarettes are not subjected to rigorous engineering processes during production. See Amended Complaint ¶¶ 9, 70-74, at 3, 32-33; MTD at 25.

Turning to the Defendants' arguments, first, the Defendants assert that the Consent Order

preempts the Plaintiffs' state law claims premised on the Safer-Cigarette Theory. See MTD at 6-7. According to the Defendants, the Consent Order "authorized Santa Fe [Tobacco]'s use of 'Additive Free' and all other 'substantially similar terms' (such as 'Natural')" in Santa Fe Tobacco's advertisement, as long as it also disclosed in those advertisements that no additives does not mean a safer cigarette. MTD at 6-7.[9] The Defendants conclude that, because the Consent Order authorized the terms, it preempts the Plaintiffs' state claims under the Supremacy Clause. MTD at 8-10 (citing Chamber of Commerce of United States v. Edmondson, 594 F.3d 742, 765 (10th Cir. 2010)).

The Defendants also declare that the Consent Order is not a "minimum 'floor' that state law can supplant." MTD at 14. They argue that the FTC, in making its determination, reconciled "competing interests" -- the speaker's right to make truthful representations versus the consumers' right not to be misled -- and that the Plaintiffs seek, with their state claims, to undercut the balance that the FTC struck. MTD at 14. According to the Defendants, the Consent Order, thus, does not set a floor, but creates a scale that the Supremacy Clause prevents from tipping toward the Plaintiffs. See MTD at 14.

The Defendants also assert that the FDA's Warning Letter does not undermine their preemption arguments. See MTD at 15. The Defendants note that, the Warning Letter states that Santa Fe Tobacco's advertising language violated the Family Smoking Prevention and Tobacco Control Act, 21 U.S.C. § 387 ("Tobacco Control Act"). See MTD at 15. Nevertheless, the Defendants argue that the Warning Letter does not change the preemption analysis, because the Warning Letter does not state that the terms "Natural" and "Additive-Free" are false or misleading; rather, it requires the Defendants to obtain FDA approval before using those terms. MTD at 17. The

[9]The Defendants also argue that their use of the term "organic" does not give rise to liability, because the United States Department of Agriculture regulations govern the use of the term "organic," and the Assurance of Voluntary Compliance requires the Defendants to disclose that "Organic Tobacco does **NOT** mean a safer cigarette." MTD at 12 n.3 (emphasis in original).

Defendants also assert that the Warning Letter cannot overrule the Consent Order, because the Tobacco Control Act cannot reasonably "be construed as limiting or diminishing the authority of the Federal Trade Commission." MTD at 17 (quoting 21 U.S.C. § 387n(a)(1)). Although they concede that the Tobacco Control Act states that "'[a]ny advertising that violates' the Act 'is an unfair or deceptive act or practice,'" the Defendants maintain that the Warning Letter is not a "binding determination" that the Defendants have violated the Tobacco Control Act, nor does it abrogate the Consent Order. MTD at 17 (quoting 21 U.S.C. § 387n(a)(1)).

Second, the Defendants argue that the First Amendment shields them from liability. See MTD at 20. The Defendants contend that the First Amendment is relevant here, even though it typically protects speakers only from government action, because the First Amendment protects speakers also from state tort suits "that seek to stifle or punish protected speech." MTD at 20 (citing Snyder v. Phelps, 562 U.S. 443, 451 (2011); Hill v. Pub. Advocate of the U.S., 35 F. Supp. 3d 1347, 1357 (D. Colo. 2014)(Daniel, J.)). They then aver that Central Hudson & Gas Electric Corporation v. Public Service Commission of New York, 447 U.S. 557 (1980)("Central Hudson") demonstrates that they are shielded from liability, because: (i) their advertising is not misleading; (ii) there is no substantial interest in silencing the Defendants' speech; (iii) silencing the Defendants' speech does not advance a legitimate governmental interest; and (iv) the Plaintiffs' requests are not narrowly tailored. See MTD at 21.

The Defendants argue that their speech is "lawful" and "not misleading." MTD at 21. First, they aver that adult cigarette usage is lawful. See MTD at 21 (citing Lorillard Tobacco Co. v. Reilly, 533 U.S. 525, 564 (2001)). Second, they argue that the "natural" and "additive-free" labeling is not misleading, given their disclosure that: "No additives in our tobacco does **NOT** mean a safer cigarette." MTD at 21 (emphasis in original). Third, they assert that the Plaintiffs' three theories of

deception do not demonstrate that the Defendants' speech is inherently misleading. See MTD at 22. They contend that, under established caselaw, the First Amendment does not protect inherently misleading speech, and inherently misleading speech is speech that is incapable of being presented in a non-deceptive way such that it would be misleading under all circumstances. See MTD at 22 (citing Revo v. Disciplinary Bd. of the N.M. S. Ct., 106 F.3d 929, 933 (10th Cir. 1997); Bioganic Safety Brands, Inc. v. Ament, 174 F. Supp. 2d 1168, 1181 (D. Colo. 2001)(Babcock, J.)). The Defendants argue that "Natural" and "Additive-Free" can be presented in non-deceptive way, because the FTC-approved disclosure that additive-free cigarettes are not inherently healthier repudiates the inference that Natural American cigarettes are healthier than other cigarettes. MTD at 22-23. The Defendants also argue that it is not inherently misleading to label their menthol cigarettes "additive-free," because "consumers are not misled by a product's inclusion of an ingredient that serves as one of its primary distinguishing and desired characteristics." MTD at 24. They also argue that the "additive-free" labeling is not misleading, because it refers to additive-free tobacco and the menthol is added to the cigarette filters and not to the tobacco. MTD at 24. Finally, they assert that the "Natural" labeling is not misleading, even though the Defendants subject the cigarettes to an engineering process during production, because "Natural" is too expansive a concept to mislead any consumers. MTD at 25-26 (citing Grocery Assoc. v. Sorrell, 102 F. Supp. 3d 583 (D. Vt. 2015)(Reiss, C.J.)).

The Defendants next contend that there is not a substantial interest in silencing their speech, because it is truthful and the Government has no interest in preventing truthful speech. See MTD at 27. They also argue that preventing the Defendants from using "natural" and "additive-free" does not materially advance the Plaintiffs' interest in preventing consumer deception, because the FTC-mandated disclosure already prevents deception, so imposing liability will not "*further* advance their

interest . . . to a *material degree*." MTD at 28-29 (emphasis in original). Finally, the Defendants argue that the relief requested is not narrowly tailored, because an additional disclosure would suffice. See MTD at 29-30.

Third, the Defendants argue that state safe harbors shield them from the Plaintiffs' statutory claims. See MTD at 30. The Defendants argue that the California, Colorado, Florida Count 1, Illinois, Massachusetts, Michigan, New York, Ohio, and Washington claims fail, because federal law -- specifically, the Consent Order -- permits the Defendants' advertising, and the various states' safe harbors foreclose liability for conduct that federal law permits. See MTD at 31-35, 37-39. The Defendants also argue that the New Jersey and North Carolina claims fail, because those states' safe harbors preclude liability for conduct that has been concretely or pervasively regulated, and, according to the Defendants, the Consent Order "deal[t] specifically, concretely, and pervasively" with their advertising. MTD at 35-36, 38.

Fourth, the Defendants aver that fourteen of the Plaintiffs' nineteen state statutory claims fail, because their advertising is not false or misleading to a reasonable consumer. See MTD at 39-40. The Defendants contend that a reasonable consumer would not believe that Natural American cigarettes are healthier than other cigarettes based on the "Natural" and "Additive-Free" labeling, because the labeling disclaims that their cigarettes are safer than other cigarettes. MTD at 42-46. Regarding the Menthol Theory, the Defendants also argue that "a reasonable consumer . . . could not have been misled into believing that [Natural American] cigarettes labeled 'menthol' on the package *would not* contain menthol." MTD at 46 (emphasis in original). Finally, the Defendants argue that a reasonable consumer would not believe that the tobacco in Natural American cigarettes was unprocessed even though Natural American cigarettes are labeled as "Natural," because "virtually *all* manufactured products undergo some form of processing." MTD at 47-48 (emphasis in original).

The Defendants also assert that four of the Plaintiffs' statutory claims fail, because the relevant statutes do not provide relief under these circumstances. See MTD at 49. They contend that: (i) the injunctive relief requested under the Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. 510, is inappropriate, because injunctive relief requires a likelihood of future harm, and the Plaintiffs admit they will not purchase Natural American cigarettes again; (ii) the Plaintiffs' New Jersey Truth in Consumer Contract Warranty and Notice Act, N.J. Stat. Ann. § 56:12-14 ("TCCWNA"), claim fails, because a predicate act is needed, and there can be no predicate act, because the Defendants' advertising would not mislead a reasonable consumer; (iii) the Ohio Consumer Sales Practice Act, Ohio Rev. Code Ann. § 1345 ("OCSPA"), claim fails, because the Plaintiffs do not allege that they notified the Defendants of their unlawful conduct; and (iv) the Ohio Deceptive Trade Practices Act, Ohio Rev. Code Ann. § 1345.02, ("ODTPA") claim fails, because that law does not create a private right of action for consumers. See MTD at 50-52.

Fifth, the Defendants contend that the unjust-enrichment claims fail, because the Plaintiffs have not alleged any misleading conduct. See MTD at 52. As an initial matter, the Defendants argue that the three transferor courts' choice-of-law approaches dictate that the laws of the twelve states where the Plaintiffs purportedly purchased their cigarettes govern the unjust-enrichment analysis. See MTD at 53-54. According to the Defendants, the unjust-enrichment claims fail, because the "Plaintiffs received precisely what they paid for -- cigarettes made with additive-free, natural tobacco -- and so there is no injustice to be remedied." MTD at 53.

Sixth, the Defendants argue that ten of the twelve unjust-enrichment claims fail, because the Plaintiffs have an adequate legal remedy -- a state law damages claim. See MTD at 55. The Defendants also argue that the Michigan, New Jersey, North Carolina, and Ohio unjust-enrichment claims fail, because the Plaintiffs do not allege that they directly purchased the Natural Americans

from any of the Defendants. See MTD 60-61. The Defendants also argue that the New Jersey unjust-enrichment claim fails, because it sounds in tort, and the New York unjust-enrichment claim fails, because it duplicates the Plaintiffs' statutory claims. See MTD at 62-63.

Seventh, the Defendants argue that they did not breach an express warranty by selling menthol cigarettes. See MTD at 64. They argue that, under California and New York Law, a breach of an express warranty requires the Plaintiffs to have reasonably relied on a warranty, and the Plaintiffs did not do so here. See MTD at 64. The Defendants also argue that the Plaintiffs' breach-of-express-warranty claims fare no better under Colorado, Florida, Illinois, New Jersey, New Mexico, or North Carolina law, because those states require a court to read the "alleged express warranties" in conjunction with "potentially limiting language." MTD at 65. They argue that, thus, the "menthol" language "necessarily modified any warranty," such as the "Additive-Free tobacco" warranty to mean that "the product, in fact, contains menthol." MTD at 66.

Eighth, the Defendants argue that the express warranty claims fail under California, Florida, Illinois, New Mexico, New York, and North Carolina law, because the Plaintiffs did not give the Defendants notice before filing suit. See MTD at 66. The Defendants assert that Florida, Illinois, and New York law preclude the express warranty claims, because "privity is required," and the Plaintiffs cannot establish privity. MTD at 67.

Ninth, the Defendants argue that the Plaintiffs' request for injunctive relief is rendered moot. See MTD at 68. The Defendants maintain that, because they have entered a Memorandum of Agreement with the FDA, see Memorandum of Agreement, under which Santa Fe Tobacco will cease using "additive-free" and "natural" going forward (except for the "Natural" in the "Natural American Spirit" brand name), an injunction is inappropriate, because the Defendants have already

undertaken the action that the Plaintiffs have requested. MTD at 68-69.[10] The Defendants aver that the Plaintiffs' requested injunction does not satisfy the mootness doctrine's voluntary-cessation

---

[10]The Memorandum of Agreement reads in relevant part:

> [The FDA's Center for Tobacco Products ("CTP")] and Santa Fe [Tobacco] agree to the following steps and conditions:
>
> 1. Santa Fe will remove the phrase "Additive-Free" from all Natural American Spirit cigarette product labels, labeling, advertising, and promotional materials.
>
> 2. Santa Fe will remove the term "natural" from all Natural American Spirit cigarette product labels, labeling advertising, and promotional materials, except as provided in Paragraph Three (3) below.
>
> . . . .
>
> CTP recognizes that Santa Fe will need to coordinate with its vendors to print and implement new product labeling and advertising. However, CTP expects that this process would be completed and that changes to the labels, labeling, advertising, and promotional materials would be implemented within seven (7) months from the date Santa Fe receives in writing the agreement reached between FTC and FDA regarding the necessity, and, if applicable, wording of a disclosure, and the process for effectuating it, as a result of the discussions among Santa FE, FTC, and FDA. Following the seven (7) month deadline, Santa Fe will not utilize the terms "additive free" or "natural" except as allowed under Paragraph 3 of this Agreement on the labels, labeling, advertising, or promotional materials for Natural American Spirit cigarette products.
>
> . . . .
>
> 3. Santa Fe may retain the use of the term "Natural" in the "Natural American Spirit" brand name and trademarks.
>
> . . . .
>
> If Santa Fe agrees to the conditions outlined above, CTP will commit to not initiating enforcement action against Santa Fe related to the August 27, 2015 Warning Letter during the Seven (7) month timeframe set forth in Paragraph 2.

exception,[11] because, if they resumed using "Natural" or "Additive-Free," the Defendants would expose themselves to an FDA enforcement action. MTD at 69-70 n.26. The Defendants argue, accordingly, that the Memorandum of Agreement renders "moot[] Plaintiffs' requests for injunctive relief." MTD at 68.

Tenth, the Defendants assert that the Court lacks personal jurisdiction over Reynolds American with respect to the five Plaintiffs'[12] claims who were not parties to the North Carolina suit. See MTD at 70. In sum, the Defendants argue that the Court lacks both specific and general personal jurisdiction over Reynolds America. See MTD at 73. Turning first to specific personal jurisdiction, they contend that Reynolds American has not purposefully directed its activities at any of the transferor court states. See MTD at 74. They argue that the Plaintiffs' allegation that Reynolds America is "intimately involved in the marketing, advertising, and overall business development," Amended Complaint ¶ 27, at 12, of Natural American cigarettes is conclusory, and that the "mere involvement in nationwide advertising" does not amount to the requisite directed activity, MTD at 74. Turning to general personal jurisdiction, the Defendants say that general personal jurisdiction is proper only in North Carolina, because Reynolds America has no continuous and systematic contacts with any other state. See MTD at 75. Specifically, they contend that Reynolds America "does not do business in any of the transferor States other than North Carolina, does not have any registered agents in any of those States, and does not employ[] any employees in

---

Memorandum of Agreement ¶¶ 1-3, at 1-3.

[11]Under the voluntary-cessation doctrine, a request for injunctive relief is not rendered moot when the party voluntarily stops the challenged conduct. See Brown v. Buhman, 822 F.3d 1151, 1166 (10th Cir. 2016). Nevertheless, a defendant's voluntary cessation may render a case moot, if "the defendant carries the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." Brown v. Buhman, 822 F.3d at 1166 (quoting Already, LLC v. Nike, Inc., 568 U.S. 85, 91 (2013)).

[12]Those five Plaintiffs are: Sproule, Miller, Haskal, Litwin, and Blevins.

any of those States. . . . Nor does RAI maintain bank accounts in any of those states." MTD at 75-76. The Defendants also argue that Santa Fe Tobacco's contacts cannot be imputed onto Reynolds America. See MTD at 76. They contend that, to impute a subsidiary's contact onto a parent corporation, the parent company must control the subsidiary's day-to-day activities, and, here, the allegations that Reynolds America "'exercises control over [Santa Fe's] corporate decisionmaking' and involves itself in Santa Fe's business by treating it as 'an operating segment'" are conclusory. MTD at 77 (quoting Amended Complaint ¶¶ 34-35, at 13-14)(brackets in MTD). They add that Reynolds American is not involved in Santa Fe Tobacco's day-to-day operations nor is it controlling those operations. See MTD at 78.

**2. The Response.**

The Plaintiffs responded by filing the Plaintiffs' Opposition to Defendants' Motion to Dismiss the Consolidated Amended Class Action Complaint and Incorporated Memorandum of Law, filed April 6, 2017 (Doc. 98)("Response"). First, they contend that the Consent Order does not impliedly preempt their claim based on the Safer-Cigarette Theory, because: (i) the FTC's governing statute states that "remedies provided in this section are in addition to, and not in lieu of, any other remedy or right of action provided by state or federal law," Response at 7, (emphasis omitted)(citing 15 U.S.C. § 57b(e)); and (ii) the Supreme Court rejected the same arguments that the Defendants bring, namely that an FTC Consent Order requiring a disclosure on a tobacco product impliedly preempts a state deceptive practices claim, see Response at 9 (citing Altria Group, Inc. v. Good, 555 U.S. 70, 89 (2008)("Altria II")). The Plaintiffs also refute the Defendants' argument that the United States Department of Agriculture's regulations governing entities' use of "organic" preempts their Safer-Cigarette Theory premised on the term "organic." Response at 15 (citing Segedie v. Hain Celestial Grp., Inc., No. 14-5029, 2015 WL 2168374, at *2-7 (S.D.N.Y. May 7, 2015)(Roman, J.);

Jones v. ConAgra Foods, Inc., 912 F. Supp. 2d 889, 894-96 (N.D. Cal. 2012)(Breyer, J.); Brown v. Hain Celestial Grp., Inc., No. 11-3082, 2012 WL 3138013, at *6-12 (N.D. Cal. Aug. 1, 2012)(Beeler, J.)).

The Plaintiffs also aver that the First Amendment does not protect the Defendants from liability. See Response at 16. They argue broadly that dismissing their false and misleading marketing claims is inappropriate on a motion to dismiss as "such a determination [of falsehood] is for the trier of fact." Response at 16-17. The Plaintiffs also argue that the Central Hudson test does not apply to sellers or manufacturers who lie about a product in advertising. See Response at 18 (citing Fed. Trade Comm'n v. Wellness Support Network, Inc., No. 10-4879, 2014 WL 644749, at *10 (N.D. Cal. Feb. 19, 2014)(Spero, M.J.)). They continue, however, that, if Central Hudson applies, they still satisfy the test. See Response at 18. They argue that, under Central Hudson's first prong, the Defendants' advertising is misleading, so the Defendants' speech "does not merit any First Amendment protection." Response at 19. The Plaintiffs refute the Defendants' contention that they must show that the Defendants' speech is "inherently misleading," because they challenge the statute "as applied" to specific representations to Plaintiffs. Response at 20 (citing John Doe No. 1 v. Reed, 561 U.S. 186, 194 (2010)). The Plaintiffs also argue that, under Central Hudson, the government has a substantial interest in protecting consumers from deceptive business practices. See Response at 21.

The Plaintiffs next contend that no safe harbors protect the Defendants from liability. See Response at 23. First, they argue that, in Altria II, the Supreme Court determined that "FTC consent orders only 'enjoin enforcement' of 15 U.S.C. § 45 and should not be construed as authorizing any specific conduct," and that "agency nonenforcement of a federal statute is not the same as a policy of approval." Response at 23-24 (citing Altria II, 555 U.S. at 89-90). They argue that, therefore, the

Consent Order "simply enjoined the FTC from enforcing the FTC Act against Defendants so long as they complied with its terms." Response at 24. The Plaintiffs add that the Consent Order does not provide complete immunity from suit, because they allege both false advertising and false packaging, and the Consent Order applies only to advertising. See Response at 25-26. They also argue, in a similar vein, that the Consent Order does not address the use of "natural" and "organic," so the Consent Order cannot permit the Defendants' use of those terms. Response at 26. They contend that the Consent Order's catch-all "substantially similar terms" language does not capture "natural" and "organic," because the Consent Order does not list "those two key terms," and the exclusion "cannot be an oversight as the terms are literally contained in the names of the products" and the term "natural" was included in the original FTC investigation. Response at 27.[13]

The Plaintiffs argue that, even if the Consent Order governed the packaging, the Consent Order would not shield the Defendants from liability. See Response at 28. They aver that the Defendants "buried the [required] disclaimer in small text to avoid" consumer attention, flouting the Consent Order's "equal text size requirement"[14] in some instances -- particularly on the packaging.

---

[13]The Consent Order reads in relevant part that:

> [T]his provision shall not prohibit respondent from truthfully representing, through the use of such phrases as "no additives," "no chemicals," "additive-free," "chemical-free," "chemical-additive-free," "100% tobacco," "pure tobacco," or substantially similar terms, that a tobacco product has no additives or chemicals, where such representation is accompanied by the disclosure mandated by this provision.

Consent Order at 5 [at 14 on CM/ECF].

[14]The Consent Order requires the Defendants to "display in advertisements as specified below, clearly and prominently, the following disclosures (including the line breaks, punctuation, bold font and capitalization illustrated:

In cigarette advertisements:

Response at 28. They add that the Defendants did not bold the word "not" on the packaging as the Consent Order commands. Response at 28.

The Plaintiffs argue that the Consent Order does not trigger any state safe harbors, because it does not permit the Defendants' conduct; rather, the Consent Order does not prohibit it. See Response at 30. The Plaintiffs continue that their statutory claims are meritorious, because the Defendants' advertising and packaging would mislead a reasonable consumer. See Response at 39. First, they aver that, in most of the relevant jurisdictions, a statement's capacity to deceive or mislead is a fact question, inappropriate for a motion to dismiss. See Response at 39-42 (citing e.g., Williams v. Gerber Prods. Co., 552 F.3d 934, 938-39 (9th Cir. 2008); Guidance Endodontics, LLC v. Dentsply Int'l, Inc., 708 F. Supp. 2d 1209, 1241 (D.N.M. 2010)(Browning, J.); Foster v. Chattem, Inc., No. 14-0346, 2014 WL 3687129, at *3 (M.D. Fla. July 23, 2014)(Dalton, J.); Biffar v. Pinnacle Foods Grp., LLC, No. 16-0873, 2016 WL 7429130, at *8 (S.D. Ill. Dec. 26, 2016)(Herndon, J.). Second, they argue that reasonable consumers are not required to look beyond a cigarette package's frontal disclosures to uncover the cigarette's safety disclaimer on the package's side. See Response at 42-43. The Plaintiffs continue that, for many jurisdictions, the relevant reasonable consumer test is to analyze the marketing "as a whole" and not to zoom in on one disclaimer. Response at 48. See Response at 46-49.

Addressing some of the Defendants' state-specific arguments, the Plaintiffs argue that they

---

> No additives in our tobacco
> does **NOT** mean a safer cigarette

In advertisement for any other tobacco product:

> No additives in our tobacco
> does **NOT** mean safer."

Consent Order at 4 [at 13 on CM/ECF] (emphasis in original).

are entitled to injunctive relief under Illinois law, because there is a "continuing risk to reasonable consumers." Response at 55. They also aver that, contrary to the Defendants' contention, they are not required to give pre-suit notice under Ohio law, because pre-suit notice is a procedural rule inapplicable in federal court. See Response at 59. They continue that, even if pre-suit notice was required, they satisfy the requirement, because their Amended Complaint provides sufficient written notice. See Response at 60. Responding to the Defendants' argument that the Plaintiffs do not have standing under Ohio law to sue under ODTPA, the Plaintiffs argue that the statute's express language grants them standing and that courts have affirmed that position. See Response at 61 (citing Schumacher v. State Auto Mut. Ins. Co., 47 F. Supp. 3d 618, 630-32 (S.D. Ohio 2014)(Spiegel, J.); Bower v. IBM, 495 F. Supp. 2d 837, 843 (S.D. Ohio 2004)(Rice, J.)).

The Plaintiffs continue that they have properly pled their unjust-enrichment claim. See Response at 62.[15] The Plaintiffs contend that the Defendants' argument that the Plaintiffs' available legal remedy bars their unjust-enrichment claim is premature under rule 8(d) at the motion-to-dismiss stage. See Response at 63 (citing In re Dial Complete Mktg. & Sales Practices Litig., No. 11-2263, 2013 WL 1222310, at *8 (D.N.H. March 26, 2013)(McAuliffe, J.)). They add that the Defendants "adequate remedy at law" arguments flout the presumption that state statutes should not be interpreted to displace common-law claims, unless there is specific legislative intent to the contrary. Response at 63. The Plaintiffs also argue that, under the common law for ten relevant states, their unjust-enrichment claims prevail, notwithstanding the Defendants' arguments to the contrary, because: (i) they request equitable relief distinct from a legal remedy; (ii) there was no express contract; (iii) statutory relief's availability does not bar equitable relief; or (iv) dismissal at

[15]The Plaintiffs agree with the Defendants that the substantive law of the state in which the cigarettes are purchased governs the unjust-enrichment claims. See Response at 62. The Court concludes that both parties are correct and applies the law of the forum in which the cigarettes were purchased.

the motion to dismiss stage is premature. See Response at 63-68. They argue that they have alleged a direct benefit to the Defendants, sufficient to satisfy the unjust-enrichment standard in Michigan, North Carolina, New Jersey, and Ohio, "in the form of a price premium, increased sales and increased market share." Response at 69. The Plaintiffs add that, contrary to the Defendants' argument that the Plaintiffs unjust-enrichment allegation fails in New Jersey because it sounds in tort, New Jersey law has no such requirement and that, regardless, their claim is viable, "because it could properly be construed as an equitable remedy" under rule 8(a)(3). Response at 70.

The Plaintiffs also aver that they properly pled their breach-of-express-warranty claims. See Response at 72. They contend that product labels create "actionable express warranties," that the Defendants breached an express warranty by adding menthol to their "additive-free" cigarettes, and, alternatively, that dismissal is premature. Response at 72. They also say that the Defendants had adequate pre-litigation notice of the breach-of-express-warranty claims, because their Amended Complaint put the Defendants on notice, the Defendants "have not been prejudiced, and they had an opportunity to cure the defect -- they knew that their claims that their menthol cigarettes are '100% Additive Free' are false." Response at 73 (citing Amended Complaint ¶ 68, at 30). The Plaintiffs add that, even if they did not meet the pre-suit notice requirement, they meet several state law exceptions to the notice requirement. See Response at 74. They argue that: (i) under New York law, no notice is required for suits involving goods that people consume; (ii) under California law, the notice requirement is inapplicable against manufacturers with whom consumers have not dealt; and (iii) under North Carolina and Illinois law, filing a lawsuit meets the notice requirement. See Response at 74-75.

The Plaintiffs argue that the Memorandum of Agreement does not render moot their injunctive relief request, because the Memorandum of Agreement exists outside the Amended

Complaint's four corners. See Response at 76. They also contend that the Memorandum of Agreement does not cover the Plaintiffs' request that the term natural be removed from their packaging and labeling, so injunctive relief cannot be rendered moot. See Response at 76.

Finally, the Plaintiffs contend that the Court has personal jurisdiction over Reynolds American. See Response at 77. They argue that Reynolds American has substantial involvement in the activities giving rise to their claims. See Response at 78. They contend that: (i) Reynolds American has an integrated system where executives amongst the three Defendants collaborated; (ii) Reynolds American essentially controls Santa Fe Tobacco's operations, and the two entities share assets and board members; (iii) Santa Fe Tobacco's employees are considered Reynolds American employees; and (iv) Reynolds American is involved in and controls Santa Fe Tobacco's advertising campaign. See Response at 78 (citing Amended Complaint ¶¶ 29, 35-36, at 13-14). They conclude that, because of Reynolds American's active participation in its subsidiaries, the Court has "specific personal jurisdiction over [the] parent company" -- Reynolds American. Response at 79.

**3. The Reply.**

On May 30, 2017, the Defendants replied to the Plaintiffs' Response. See Defendants' Reply in Support of Motion to Dismiss the Consolidated Amended Complaint at 1, filed May 30, 2017 (Doc. 107)("Reply"). The Defendants maintain that the Consent Order preempts the Plaintiffs' Safer-Cigarette Theory, because the Consent Order "authorizes the *exact* representations at issue here by *this* exact manufacturer." Reply at 2 (emphasis in original). They refute that Altria II undermines their argument, because, the Consent Order in this case, unlike the Consent Order in Altria II, "affirmatively permits" the terms at issue by stating that it will not prohibit terms such as natural or additive-free. Reply at 4. They also contend that, in Altria II, the United States of

America expressly disavowed any policy authorizing the terms at issue in an amicus brief. See Reply at 5 (citing Brief for the United States as Amicus Curiae Supporting Respondents at 15, No. 07-562, 555 U.S. 70, available at https://goo.gl/6VvJzA). The Defendants also refute that 15 U.S.C. § 57b(e) undercuts their preemption argument, because that statute applies only to FTC rules or an FTC cease-and-desist order and not to Consent Orders under 15 U.S.C. § 45(b). See Reply at 6. The Defendants also state that the Plaintiffs never pled an "organic-based" deception claim, but if they had pled one, such a theory would fail, because the Defendants have complied with regulations under the Organic Food Production Act, 7 U.S.C. § 6501(2), which allow advertising and labeling to have the term organic -- subject to certain conditions. Reply at 9 (citing 7 U.S.C. § 6501(2)).

Turning to their First Amendment arguments, the Defendants maintain their previous arguments, see Reply at 10-13, and contend that the Plaintiffs' argument that Central Hudson does not apply to false or misleading advertising is flawed, because the Defendants found only one unpublished decision supporting that argument and that decision does not explain why the First Amendment protects commercial speech limitations imposed via government regulation, but leaves exposed the same speech via a lawsuit, see Reply at 11 n.7. The Defendants also argue that the Plaintiffs address only one of Central Hudson's factors. See Reply at 13. They continue that the Plaintiffs' argument as to that one factor is flawed, because the Defendants' speech is not deceptive. See Reply at 13.

The Defendants' reassert their arguments that state safe harbors shield them from liability, because the Consent Order permits their conduct. See Reply at 14. The Defendants also argue that the term "natural" falls within the Consent Order's purview, because an FTC letter confirms that "natural" is substantially similar to "additive free." Reply at 15 (citing MTD at 8). The Defendants also assert that, contrary to the Plaintiffs' position, the Court can conclude, on a rule 12(b)(6)

motion, whether a reasonable consumer would be misled. See Reply at 20 (citing Fink v. Time Warner Cable, 714 F.3d 739, 741 (2d Cir. 2013)(per curiam)). They continue that the packaging would not mislead a reasonable consumer, because the terms "natural" and "additive-free" do not, on their face, contradict the package's safety disclosure. Reply at 22. The Defendants also maintain that Santa Fe Tobacco manufactures cigarettes with additive-free tobacco and contends that the Plaintiffs' arguments that the "additive free" label is misleading, because menthol migrates into the tobacco post-production is incorrect as a matter of law, because the Plaintiffs concede that menthol "migration is *inevitable*." Reply at 23 (emphasis in original)(citing Response at 52). Responding to state-specific refutations, the Defendants counter that pre-suit notice requirements are substantive law under Erie R. Co. v. Tomkins, 304 U.S. 64 (1938), so Ohio pre-suit notice law binds the Court here. See Reply at 25 (citing Curry v. High Springs Family Practice Clinic & Diagnosis Ctr. Inc., No. 8-0008, 2008 WL 5157683, at *9 (N.D. Fla. Dec. 9, 2008)(Paul, J.)) They also contend that filing a complaint does not satisfy the notice requirement. See Reply at 25.

Turning to the Plaintiffs' unjust-enrichment claims, the Defendants argue that the Plaintiffs may not plead an unjust-enrichment claim in the alternative to a legal claim. See Reply at 27. First, the Defendants contend that the Plaintiffs' reliance on express-contract cases where the contract's existence was at issue doom their unjust-enrichment-in-the-alternative theory, because those cases do not speak to available statutory remedies. See Reply at 27. Second, the Defendants aver that courts have rejected unjust-enrichment-in-the-alternative theories in similar circumstances. See Reply at 28 (citing In re Ford Tailgate Litig., No. 11-2953, 2014 WL 1007066, at *5 (N.D. Cal. March 12, 2014)(Seeborg, J.)).

The Defendants also contend that the Plaintiffs failed to give the requisite pre-suit notice for their breach-of-express-warranty claims. See Reply at 34. Regarding state specific statutes, the

Defendants argue that general knowledge of general facts giving rise to the lawsuit are insufficient under Illinois law to provide notice. See Reply at 35. They also contend that the exceptions to notice that the Plaintiffs invoke under Illinois, North Carolina, and New York Law are inapplicable, because those exceptions apply only in personal injury cases. See Reply at 35. The Defendants argue that, similarly, California's exception applies only to tort cases and not to contract cases. See Reply at 36.

Regarding the Plaintiffs' requested injunctive relief, the Defendants note that they have not finalized changes to their label. See Reply at 37-38. The Defendants argue, however, that the requested relief is still rendered moot, because the label changes will occur by December, 2017, "long before this case reaches judgment." Reply at 38. See Reply at 37-38. Regarding the voluntary-cessation doctrine, the Defendants argue that the Plaintiffs have pointed to no supportable reason to suggest that the Defendants would resume their prior labeling in the future. See Reply at 38. From that premise, the Defendants conclude that the voluntary cessation doctrine is inapplicable. See Reply at 38.

Finally, the Defendants argue that the Plaintiffs conceded that the Court does not have general personal jurisdiction over Reynolds American. See Reply at 39. They also argue that the Plaintiffs' allegations do not rise to the level needed for specific jurisdiction, because they do not plausibly support that Reynolds American benefitted from some purposive conduct directed at the forum state sufficient to establish consent to the forum's jurisdiction. See Reply at 39. They also argue that the Plaintiffs' cannot impute Santa Fe Tobacco's contacts onto Reynolds American, because Reynolds American does not have control or de facto dominance over Santa Fe Tobacco. See Reply at 39-40. The Defendants argue that there is no exception to the normal jurisdictional rules for tobacco companies. See Reply at 40. They conclude that, therefore, the Court does not

have personal jurisdiction over Reynolds American. See Reply at 40.

**4. The June 9, 2017 Hearing.**

The Court held a hearing on June 9, 2017. See Transcript of Motion Proceedings (taken June 9, 2017), filed June 16, 2017 ("June Tr."). Taking each argument in turn, the Defendants began by arguing that FTC Consent Orders, even in light of Altria II, still have preemptive effect. See June Tr. at 15:11-17 (Biersteker). The Defendants maintain, as they argued in their Reply, that Altria II applies only to the consent order at issue in Altria II and not to consent orders generally. See June Tr. at 15:24-16:5 (Biersteker). Responding to the Court's observation that "the Supreme Court is so divided on preemption these days," June Tr. at 16:18-19 (Court), the Defendants noted that the Supreme Court focused on only the FTC cease and desist order at issue in Altria II, and did not "enunciate some sort of blanket rule that consent decrees cannot be afforded preemptive effect," June Tr. at 16:25-17:1 (Biersteker). See June Tr. at 16:22-18:11 (Biersteker). The Defendants also argued that, in contrast to the Altria II consent order, the parties have abided by the Consent Order at issue here, the FTC has not questioned the Consent Order's mandated disclosure, and the Consent Order here, unlike Altria II's consent order, has language permitting the advertising language. See June Tr. at 18:12-18 (Biersteker); id. at 19:17-20:19 (Biersteker). The Court pressed that Consent Orders change based on different administrations, and it queried how a federal judge could choose, in a principled manner, which Consent Orders preempted state law and which did not. See June Tr. 22:22-23:10 (Court); id. at 23:16-23 (Court). The Defendants responded that, because federal regulatory action is generally given preemptive effect, the principled response would be to scrutinize Consent Orders on a case-by-case basis to determine whether the regulatory agency has considered the conduct at issue. See June Tr. at 24:4-12 (Biersteker).

The Plaintiffs responded that caselaw clearly signals that the Consent Order does not preempt

their claims. See June Tr. at 25:2-26:6 (Reese)(citing Pueblo of Pojoaque v. New Mexico, 214 F. Supp. 3d 1028 (D.N.M. 2016)(Browning, J.)). They further averred that the Consent Order does not apply to the Defendants' cigarette labeling, because the Consent Order's text does not mention labeling, and the FTC's regulatory structure forbade them from regulating labeling when the Consent Order was entered. See June Tr. at 29:1-7 (Reese). The Plaintiffs also pressed their argument from briefing that 15 U.S.C. § 57b(e) precludes consent decrees from barring other litigation. See June Tr. at 31:20-32:13 (Reese).

The Defendants responded that the Plaintiffs' statutory interpretation is flawed, because a different section governs FTC consent decrees. See June Tr. at 33:10-13 (Biersteker). The Defendants continued that, although the United States Court of Appeals for the First Circuit, in Good v. Altria, 501 F.3d 29 (1st Cir. 2007), adopted reasoning similar to the Plaintiffs' reasoning here, the Supreme Court did not adopt that reasoning in Altria II, so the Court should disregard the First Circuit's reasoning. See June Tr. at 34:14-23 (Biersteker). The Defendants added that the First Circuit's reasoning -- and the Plaintiffs' -- is flawed, because it ignores the statutory text. See June Tr. at 33:24-34-9 (Biersteker). The Defendants also argued that a reasonable consumer would know to look at the side of a cigarette pack for warnings given that the Surgeon General's warning on the side of a pack is adequate under the Federal Cigarette Labeling and Advertising Act, 15 U.S.C. §§ 1331-1341 ("FCLAA"). See June Tr. at 35:11-24 (Biersteker); 15 U.S.C. § 1331.

Turning full-force to the reasonable consumer arguments, the Defendants contended that the Court can consider whether the contested advertising language is deceptive or misleading as a matter of law under rule 12(b)(6), and the Court agreed. See June Tr. at 39:4-9 (Court, Schultz). The Defendants maintained their position from their briefing that no reasonable consumer would believe that additive-free menthol cigarettes would not contain menthol. See June Tr. at 40:19-23 (Schultz).

The Court responded with an analogy and asked whether a reasonable consumer would be deceived if Coca-Cola bottle's front labeling stated that there was no sugar in the product, but the back labeling stated there was sugar. See June Tr. at 42:5-15 (Court). The Defendants replied that the important difference between its case and the Court's analogy is the particular wording on Natural American's labeling; they averred that the language "menthol-flavored" and "the ingredients are organic tobacco and menthol" would alert "a consumer who chooses a menthol cigarette." June Tr. at 42:16-25 (Schultz). The Defendants again stressed that the one-hundred-percent additive-free tobacco labeling is true, because the menthol is "part of the cigarette," but "not part of the tobacco," June Tr. at 43:15-16 (Schultz), yet conceded that, when the cigarette is smoked, inevitably the menthol "is part of and touches the tobacco," id. at 43:19-23 (Court, Schultz). See June Tr. at 43:6-8 (Schultz).

The Plaintiffs responded that there is a body of caselaw ruling that a reasonable consumer is not required to turn around a label to verify whether a representation on the front is truthful. See June Tr. at 51:25-52:7 (Wolchansky). The Plaintiffs also argued that consumers may not know much about menthol. See June Tr. at 79:18-24 (Wolchansky). The Plaintiffs added that, even if the Court accepts the Defendants' argument that tobacco is separate from the menthol while the cigarette remains unsmoked, it is still disingenuous to suggest that the tobacco is additive-free when, "the minute that you light that cigarette," the menthol, the chemicals, and "everything in that cigarette goes into your mouth and into your lungs." June Tr. at 53:18-54:4 (Wolchansky). The Plaintiffs explained that menthol is an "organic molecule . . . derived from mint," although it "it can [also] be synthesized chemically in a lab," June Tr. at 64:13-16 (Schlesinger), it "acts as an anesthetic," id. at 56:18 (Schlesinger), "numbs the throat," id. at 56:23-24 (Schlesinger), and makes the smoke "inhalable," id. at 57:4 (Schlesinger). See June Tr. at 56:15-57:9 (Schlesinger). The Plaintiffs also

argued that the Honorable Judge Gladys Kessler of the United States District Court for the District of Columbia already determined that Natural American's use of "the term 'natural' is unlawful," because it suggests that it "confer[s] health benefits," and the Plaintiffs ask the Court to "enforce her order." June Tr. at 58:8-21 (Schlesinger). See United States v. Philip Morris USA, Inc., 449 F. Supp. 2d 1 (D.D.C. 2006)(Kessler, J.).

The Plaintiffs argued that the natural, additive-free, and organic advertising misleads consumers into believing Natural Americans are safer or healthier. See June Tr. at 65:19-24 (Wolchansky). They contended that the disclaimer "does not mean that the front of the pack isn't misleading," June Tr. at 67:5-6 (Wolchansky), because the disclaimer is "buried," id. at 67:25 (Wolchansky), as "tiny text on the side of the pack," id. at 67:22-23 (Wolchansky), underneath the barcode and is phrased in a double negative, see June Tr. at 67:18-68:15 (Wolchansky). The Plaintiffs added that the FDA's Warning Letter[16] buttresses their position, because it tells the

---

[16]The Warning Letter reads, in pertinent part:

> Your product labeling for Natural American Spirit cigarettes, which uses the descriptors "Natural" and "Additive Free," represents explicitly and/or implicitly that the products or their smoke do not contain or are free of a substance and/or that the products present a lower risk of tobacco related disease or are less harmful than one or more other commercially marketed tobacco products. As such, these products are modified risk tobacco products. As such, these products are modified risk tobacco products. Because these products are sold or distributed to customers in the United States without an appropriate FDA order in effect under section 911(g) of the FD&C Act (21 U.S.C. § 387k(g)), these products are adulterated under section 902(8) of the FD&C Act (21 U.S.C. § 387b(8))
>
> . . . .
>
> The violations discussed in this letter do not necessarily constitute an exhaustive list. You should immediately correct the violations that are referenced above, as well as violations that are the same as or similar to those stated above, and take any necessary actions to bring your tobacco products into compliance with the FD&C Act.

Defendants that "Natural and Additive-free represents explicitly and/or implicitly that the products or their smoke do not contain or are free from a substance and/or that the products present a lower risk of tobacco-related disease or are less harmful." June Tr. at 69:3-14 (Wolchansky)(quoting Warning Letter at 2). The Plaintiffs continued that, in addition to the Warning Letter, peer-reviewed articles conclude that consumers believe that Natural American cigarettes are healthier based on the terms natural, organic, and additive-free. See June Tr. at 70:19-22 (Wolchansky); id. at 72:23-73:4 (Wolchansky). See also June Tr. at 74:17-23 (Wolchansky)(noting that 63.9 percent of Natural American smokers think that Natural American cigarettes are less harmful than other brands); id. at 76:14-20 (Wolchansky)(noting that sixty percent of consumers believe that removing additives from cigarettes make them less dangerous to smoke). The Plaintiffs argued that the caselaw the Defendants cite is inapposite, because, in those cases, the disclaimer is prominent, unlike Natural American's disclaimer. See June Tr. at 82:6-19 (Wolchansky).

Returning to the Menthol Theory, the Court, again emphasized its concerns that the one-hundred-percent additive-free labeling misleads consumers. See June Tr. at 87:5-6 (Court). It also posited that the "100% Additive-Free" and "Natural Tobacco" labeling is not on one line, but two lines, and that the Plaintiffs might argue that the labeling conveys two separate messages. June Tr. at 87:12-22 (Court). The Defendants disagreed and argued that the labeling conveys one message. See June Tr. at 87:23-88:1 (Schultz). The Court also noted that the package's disclaimer focuses only on the advertising's additive term "and doesn't really address the issue about the natural" term. June Tr. at 89:23-24 (Court). See June Tr. at 89:9-24 (Court). It further noted that the advertising disclaimers diverge from the packaging disclaimers. See June Tr. at 91:2-10 (Court). The Defendants rejoined that the FTC Consent Order does not require a packaging disclaimer, so, by

Warning Letter at 2-3.

inserting any disclaimer at all, they went beyond FTC's requirements. See June Tr. at 91:23-92:3 (Schultz). The Defendants added that the Amended Complaint does not address the FTC disclaimer, and argued that a reasonable consumer looks at both the advertising labels and the disclaimer. See June Tr. at 92:13-93:3 (Schultz). They also argued that the disclaimer does not contradict the natural or additive-free language, but "helps to amplify the meaning." June Tr. at 94:4-9 (Schultz). They continued that "natural" is a word with no meaning under the reasonable consumer standard, because "it can have different meanings in different contexts," so it cannot have a "safer cigarette" meaning that the Plaintiffs ascribe to it. June Tr. at 96:1-9 (Schultz).

The Court disagreed and thought that natural had some meaning, otherwise corporations would not use it on products, but it was not convinced that the natural term necessarily signals to a reasonable consumer that the cigarettes are safer. See June Tr. at 100:19-101:5. The Plaintiffs argued that, even if natural does not have a precise and fixed meaning, it still suggests to a reasonable consumer that Natural American cigarettes are not produced through human alteration or engineering. See June Tr. at 102:16-20 (Schlesinger). The Plaintiffs persisted that the natural labeling conveys a message that the Defendants wrap up the tobacco from the plants and sell the product as-is, and that additives associated with tobacco products "are gone" from Natural American cigarettes. See June Tr. at 102:21-103:10 (Schlesinger). The Court responded that natural's meaning might turn on the product sold; for example, a natural marshmallow might be different from a natural orange. See June Tr. at 123:15-25 (Court). The Plaintiffs rejoined that the "natural here means safer and healthier, and it also means that it is manufactured in a way that is natural," but "the truth is, it's not." June Tr. at 124:1-4 (Wolchansky). The Plaintiffs conceded that a reasonable consumer does not think that natural means that the cigarettes are hand rolled, see June Tr. at 124:16-17 (Wolchansky), but argued that whether flue curing the cigarettes or packing the cigarettes

with nicotine is a "natural" processes "is a question of fact for a jury," June Tr. at 124:19-20 (Wolchansky). The Plaintiffs explained that, in its natural state, tobacco or cigarettes are uninhalable; it is only when the cigarettes are flue cured that cigarettes become inhalable. See June Tr. at 128:8-20 (Schlesinger). The Plaintiffs acknowledged that there is no defined meaning for what a natural manufacturing process is, but emphasized that no reasonable consumer believes that flue curing and the other processes, which the Defendants use to make their cigarettes, are natural. See June Tr. at 126:14-25 (Wolchansky). The Court concluded that it was inclined to let the Menthol Theory proceed, but to dismiss the other two theories. See June Tr. at 133:10-21 (Court).

Turning to the common-law claims, the Defendants argued that rule 8(b) does not allow the Plaintiffs to plead unjust enrichment in the alternative, because a federal rule of civil procedure cannot alter state substantive law. See June Tr. at 144:14-18 (Biersteker). They explained that equity fills in the gaps that legal remedies leave, and that, because the Plaintiffs have an available legal remedy from the state statutes, unjust enrichment is improperly pled. See June Tr. at 145:8-21 (Biersteker). The Defendants concluded that there is no dispute that legal statutory remedies exist. See June Tr. at 146:7-8 (Biersteker).

**5. The Supplemental Brief.**

On June 30, 2017, the Plaintiffs filed a supplemental brief addressing several issues raised during the June Hearing. See Plaintiffs' Supplemental Brief in Opposition to Defendants' Motion to Dismiss and Consolidated Amended Class Action Complaint and Incorporated Memorandum of Law at 1, filed June 30, 2017 (Doc. 117)("Supp. Brief"). They assert three arguments: (i) whether a reasonable consumer is misled is typically a fact question that survives a motion to dismiss; (ii) the Defendants' disclaimer arguments are misplaced; and (iii) they have adequately pled their complaint to survive the rule 12(b)(6) standard. See Supp. Brief at 1-4. First, they assert that the Court's

function is not to weigh the evidence, but to assess whether the Plaintiffs have plausibly stated a claim. See Supp. Brief. at 4 (citing Walker v. THI of N.M. at Hobbs Ctr., 803 F. Supp. 2d 1287, 1330 (D.N.M. 2011)(Browning, J.)). They also aver that "the unanimous weight of case law authority holds that use of terms 'natural,' 'organic,' or 'additive-free' do mislead consumers into believing that cigarettes so labeled are safer or healthier." Supp. Brief at 5 (citing Disc. Tobacco & Lottery, Inc. v. United States, 674 F.3d 509, 536 (6th Cir. 2012); United States v. Phillip Morris USA, Inc., 449 F. Supp. 2d 1, 27 (D.D.C. 2006)(Kessler, J.); United States v. Philip, 477 F. Supp. 2d 191, 197-98 (D.D.C. 2007)(Kessler, J.); Hunter v. Philip Morris USA Inc., 364 P.3d 439 (Alaska 2015)).

Second, the Plaintiffs argue that consumers are misled notwithstanding the disclaimer. See Supp. Brief at 11 (citing Amended Complaint ¶ 52, at 25). They contend that, under longstanding false advertising law, representations must be viewed in the context of the packaging or advertising as a whole, see Supp. Brief. at 11 (citing Penrod Ricard USA, LLC v. Bacardi U.S.A., Inc., 653 F.3d 241, 250 (4th Cir. 2011)), and "how consumers view these claims . . . as a whole . . . are questions of fact not appropriate for resolution at this stage," Supp. Brief at 11. They also argue that the disclaimer is so obscured on the package that it ineffectively warns a reasonable consumer. See Supp. Brief. at 12. Finally, they argue that a reasonable consumer is "impervious to health warnings and disclaimers," because Natural American smokers had "certainly seen and ignored health disclaimers on the packs of other brands" before switching, so the Court "should give little, if any, weight" to the disclaimers in deciding the Motion to Dismiss. Supp. Brief at 13.

Third, the Plaintiffs clarify that they do not argue that natural is misleading "simply because manufacturing steps must be taken to put their tobacco in cigarette form"; rather, they argue that the Defendants manufacturing processes do not conform to a reasonable consumers' understanding of

the natural term. Supp. Brief at 13. They maintain that the term natural is misleading, because Natural Americans undergo flue-curing processing, artificial blending, and engineering to boost nicotine. See Supp. Brief at 14 (citing Amended Complaint ¶¶ 63-66, 72-73, at 30, 32-33). They conclude, thus, that it is plausible that a reasonable consumer would believe that Natural American cigarettes were less chemically enhanced and less nicotine-laced than other cigarettes. See Supp. Brief at 14.

**6. The Supplemental Response.**

The Defendants responded to the Supp. Brief on July 14, 2017. See Defendants' Response to Plaintiffs' Supplemental Brief at 1, filed July 14, 2017 (Doc. 124)("Supp. Resp."). The Defendants argue that the Court can, and must, rule on the reasonable consumer arguments on a Motion to Dismiss. See Supp. Resp. at 2-3 (citing Fink v. Time Warner Cable, 714 F.3d 739, 741 (2d Cir. 2013)(per curiam)(ruling that it is "well settled that a court may determine as a matter of law that an allegedly deceptive advertisement would not have misled a reasonable consumer")). The Defendants also state that the administrative and academic findings on the Defendants' advertising do not bind the Court on a motion to dismiss, and many of their findings are inapposite, because the reports did not consider the warning disclosure or are not final determinations. See Supp. Resp. at 6-7. The Defendants also argue that the Court can disregard survey data as immaterial where a reasonable consumer would acknowledge that the advertising is not false or misleading. See Supp. Resp. at 8. The Defendants aver that their disclaimer still wards against the Plaintiffs' deceptive arguments as to the natural term, even though the disclaimer does not mention natural, because the disclaimer makes clear that the cigarettes are not safer than any other cigarette. See Supp. Resp. at 10. The Defendants conclude that the Plaintiffs' Amended Complaint does not support the refined processing theory that the Plaintiffs assert in their Supp. Brief. See Supp. Resp. at 11.

**7. The July Hearing.**

The Court held a hearing on July 20, 2017. See Transcript of Motion Proceedings (taken July 20, 2017), filed August 10, 2017 (Doc. 126)("July Tr."). The Defendants argued that, as to four states' laws, the Plaintiffs' unjust-enrichment claims fail, because the Plaintiffs do not properly allege that the advertising conveys a direct benefit to the Defendants. See July Tr. at 35:6-17 (Biersteker). They add that unjust enrichment is a "gap filler," and it is likely that those four states' laws narrow the unjust-enrichment remedy, "because numerous legal remedies already exist for consumers who have suffered as a result of deceptive advertising." July Tr. at 11-17 (Biersteker). The Plaintiffs rejoined that, as to Michigan, the direct benefit element is no longer required. See July Tr. at 37:10-18 (Wolchansky)(citing In re Automotive Parts Antitrust Litig., 29 F. Supp. 3d 982, 1021 (E.D. Mich. 2014)(Battani, J.)). They also countered that there are cases from the other three states that similarly obviate the direct-benefit requirement. See July Tr. at 38:11-40:1 (Wolchansky)(citing Stewart v. Beam Global Spirits & Wine, Inc., 877 F. Supp. 2d 192 (D.N.J. 2012)(Hillman, J.); Paika v. General Motors Corp., No. 07-0892, 2009 WL 275761 (E.D. Cal. Feb. 5, 2009)(Darmell, J.)).

Regarding the pre-suit notice requirement for the express warranty claims, the Defendants admitted that the Amended Complaint alleges that the Plaintiffs performed "all conditions precedent to defendants' liability," July Tr. at 41:3-6 (Biersteker)(quoting Amended Complaint ¶ 456, at 104), but the Defendants contended that the Amended Complaint's allegation is "legally insufficient," July Tr. at 41:13-14 (Biersteker). The Defendants added that filing the Amended Complaint is insufficient for pre-suit notice in Illinois, North Carolina, and New York. See July Tr. at 43:11-14 (Biersteker). They argue that the Plaintiffs' cases to the contrary are personal injury cases, so are inapplicable here. See July Tr. at 43:14-15 (Biersteker); id. at 44:12-18 (Biersteker). The Plaintiffs

countered that their Amended Complaint serves as pre-suit notice as do the FDA and FTC letters on these issues, see July Tr. at 48:12-13 (Wolchansky), and that "there is unquestionably knowledge here," July Tr. at 49:25-50:1 (Wolchansky).

Turning to the privity requirement, the Defendants admitted that three states grant an exception to the privity requirement, see July Tr. at 45:14-15 (Biersteker), but the Defendants averred that courts routinely dismiss express warranty claims "based on product packaging and labels," which involve economic loss, as here, July Tr. at 45:15-18 (Biersteker). The Plaintiffs rejoined that recent federal Florida cases have denied motions to dismiss for breaches of express warranties on similar facts. See July Tr. at 50:2-52:4 (Wolchansky)(citing Hill v. Hoover, 899 F. Supp. 2d 1259 (N.D. Fla. 2012)(Mickle, J.); Smith v. Wm. Wrigley Jr. Co., 663 F. Supp. 2d 1336 (S.D. Fla. 2009)(Cohn, J.); Garcia v. Kashi, 43 F. Supp. 3d 1359 (S.D. Fla. 2014)(Leonard, J.)). The Plaintiffs continued that other courts provide similar authority for their position. See July Tr. at 52:11-53:23 (Wolchansky)(citing Mednick v. Precor, Inc., No. 14-4231, 2014 WL 6474915 (N.D. Ill Nov. 13, 2014)(Leinenweber, J.); Baldwin v. Star Scientific, Inc., 78 F. Supp. 3d 724 (N.D. Ill. 2015)(Pallmeyer, J.); Mahoney v. Endo Health Solutions, Inc., No. 15-9841, 2016 U.S. Dist. LEXIS 94732 (S.D.N.Y. July 20, 2016)(Cote, J.)).

Turning to the injunctive relief requested, the Defendants conceded that the Memorandum of Agreement does not cover their use of "natural" in Natural American's brand name, so the requested injunctive relief, as to that specific use of natural, is not rendered moot. July Tr. at 55:4-56:24 (Biersteker). The Plaintiffs also argued that the Memorandum of Agreement is not a "final document," so it does not render moot their request for injunctive relief. July Tr. at 59:20-21 (Wolchansky). They continued that the FDA was recently sued over Santa Fe Tobacco's use of natural, and that litigation places the Memorandum of Agreement in jeopardy. See July Tr. at 60:3-

13 (Wolchansky); id. at 60:16-20 (Wolchansky); id. at 60:24-61:4 (Wolchansky). The Defendants rejoined that the Memorandum of Agreement "is final," July Tr. at 62:23-24 (Biersteker), but conceded that, if the pending lawsuit against the FDA is successful, "it would vacate the memorandum," July Tr. at 64:3-4 (Biersteker). They also asserted, however, that the Defendants will not "risk alienating the FDA" by contravening the Memorandum of Agreement. July Tr. at 66:6-11 (Biersteker).

The Court asked the Defendants whether, in light of the Plaintiffs' supplemental argumentation that, based on studies that terms, such as natural, mislead many consumers, it should reconsider its earlier inclination that the Plaintiffs' safer-cigarette theory is flawed. See July Tr. at 67:2-16 (Court); id. at 27:25-68:8 (Court). The Defendants countered that the studies, which the Plaintiffs present, do not stand for the proposition that the Plaintiffs suggest that they support. See July Tr. at 68:13-19 (Schultz). The Plaintiffs rejoined that, although they cite only one study in their Amended Complaint, there are numerous studies supporting their position and that they will file those studies with the Court. See July Tr. at 74:7-16 (Wolchansky).

**8. Continued Oral Argument.**

On July 21, 2017, the Plaintiffs filed a Notice of Filing Hearing Exhibit, filed July 21, 2017 (Doc.125), which includes their Continued Oral Argument on Defendants' Motion to Dismiss, see Continued Oral Argument on Defendant's Motion to Dismiss, filed July 21, 2017 (Doc. 125-1)("Cont. Arg."). The Plaintiffs argue that a 2016 study supports their argument that Natural American cigarettes' disclaimers ineffectively warn consumers. See Cont. Arg. at 3 (citing Misperceptions, at 1-4). The Plaintiffs explain that the study concludes that many Natural American cigarette smokers believe that Natural American cigarettes are less harmful than other cigarettes, and, thus, the disclaimer ineffectively corrects consumers' perceptions. See Cont. Arg. at 3-4

(noting that 63.9 percent of Natural American cigarette smokers believe their brand is less harmful). The Plaintiffs also cite a 2007 study for the proposition that "consumers frequently conclude 'natural' cigarettes must be healthier, and tobacco companies have understood this for decades." Cont. Arg. at 4 (citing Patricia McDaniel & Ruth E. Malone, I Always Thought they were all Pure Tobacco: American Smokers' Perceptions of "Natural" Cigarettes and Tobacco Industry Advertising Strategies, 16 Tobacco Control e7 (2007), available at http://www.ncbi.nlm.gov/pmc/articles/PMC2807204/). They continue that a 2004 survey demonstrates that sixty percent of smokers think that removing additives makes cigarettes safer. See Cont. Arg. at 5 (citing K.M. Cummings, Are Smokers Adequately Informed About the Health Risks of Smoking and Medicinal Nicotine?, Nicotine & Tobacco Research 6(3): S333-340 (2004)). They also aver that Reynolds American market research confirms that consumers believe that the additive-free descriptor conveys a safer or healthier message, and that a 2016 study reveals that the "100% Additive Free" descriptor communicates lower health risks to consumers. Cont. Arg. at 5. The Plaintiffs argue that, despite the healthier message that consumers perceive from Natural American's natural and additive-free descriptors, studies show that Natural American cigarettes have higher ash and heavy-metal levels than other cigarettes. See Cont. Arg. at 6.

The Plaintiffs also argue that several cases, not previously cited, support their position. See Cont. Arg. at 3, 10-19. For example, the Plaintiffs cite to Discount Tobacco City & Lottery, Inc., 674 F.3d 509 (6th Cir. 2012), for the proposition that "naturalists prefer" products with organic and natural labeling, "because they believe the product confer health advantages." Cont. Arg. at 3 (citing Discount Tobacco City & Lottery, Inc., 674 F.3d at 536). They also argue that the United States Court of Appeals for the Seventh Circuit has ruled that a literal falsehood is not required for liability to attach. See Cont. Arg. at 10 (citing Suchanek v. Sturm Foods, Inc., 764 F.3d 750, 761 (7th Cir.

2014)("[The district court] appears to assume that a package cannot be misleading if it does not contain literal falsehoods. But that is not the law.")(alterations in original)). The Plaintiffs also argue that four federal district courts have determined that a natural descriptor misleads a reasonable consumer. See Cont. Arg. at 12-19 (citing Martin v. Tradewinds Beverage Co., No. 16-9249, 2017 U.S. Dist. LEXIS 72698 (C.D. Cal. Apr. 27, 2017)(Gutierrez, J.); In re Frito-Lay N. Am., Inc., No. 12-2413, 2013 WL 4647512 (E.D.N.Y. Aug. 29, 2013)(Mauskopf, J.); Burton v. Hodgson Mill, Inc., No. 16-1081, 2017 WL 1282882 (S.D. Ill. Apr. 6, 2017)(Reagan, J.); Segedie v. Hain Celestial Grp. Inc., No. 14-5029, 2015 WL 2168374 (S.D.N.Y. May 7, 2015)(Roman, J.)).

Regarding their unjust-enrichment claims, the Plaintiffs argue that their allegations are viable in every state for various reasons. See Cont. Arg. at 23. They argue that: (i) it is premature to dismiss their unjust-enrichment claims at the rule 12(b)(6) stage in Massachusetts, Michigan, North Carolina, and Washington; (ii) their claims satisfy the requisite elements in New Jersey and New York; (iii) their Colorado claim may proceed as a restitution-based remedy; (iv) no New Mexico statute expressly bars their New Mexico claim; and (v) Ohio law allows the Plaintiffs to plead their unjust-enrichment claim in the alternative. See Cont. Arg. at 23. They also argue that, under New Jersey, North Carolina, and Ohio unjust-enrichment law, they do not need to show that the Defendants receive a direct benefit. See Cont. Arg. at 26-28 (citing Metric Constructors, Inc. v. Bank of Tokyo-Mitsubishi, Ltd., 72 F. App'x 916, 921 (4th Cir. 2003)(unpublished); Stewart v. Beam Global Spirits, 877 F. Supp. 3d 192, 200 (D.N.J. 2012)(Hillman, J.)). Finally, the Plaintiffs assert that the privity requirement does not bar their breach-of-express-warranty claims in Florida, New York, and Illinois, because the requirement is relaxed in packaging and economic damage cases. See Cont. Arg. at 32-35.

9. **Supplemental brief on the Memorandum of Agreement.**

On November 29, 2017, the Defendants filed a supplemental brief concerning the Memorandum of Agreement. See Santa Fe Natural Tobacco Company's Supplemental Brief in Support of Motion to Dismiss Responding to the Court's Question Regarding Status of Agreement with FDA Regarding NAS Product Labeling and Advertising, filed November 29, 2017 (Doc. 136)("Supp. Brief on Mem."). The Defendants argue that they complied with the Memorandum of Agreement and are no longer utilizing additive-free and natural on their labeling, advertising, and promotional material except for natural in the Natural American brand name. See Supp. Brief on Mem. ¶ 6, at 3. They conclude that the Memorandum of Agreement's paragraph two does not require them to remove or recall products that still have the terms natural and additive-free on them. See Supp. Brief on Mem. ¶ 7, at 3.

**LAW REGARDING RULE 12(B)(6)**

Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994). The Complaint's sufficiency is a question of law, and, when considering a rule 12(b)(6) motion, a court must accept as true all well-pled factual allegations in the complaint, view those allegations in the light most favorable to the nonmoving party, and draw all reasonable inferences in the plaintiff's favor. See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)("[O]nly if a reasonable person could not draw . . . an inference [of plausibility] from the alleged facts would the defendant prevail on a motion to dismiss."); Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true

all well-pled factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff.")(citing Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006)).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient. Ashcroft v. Iqbal, 556 U.S. at 678 (2009)(citing Bell Atl. Corp. v. Twombly, 550 U.S. at 555). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. at 678. "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atl. Corp. v. Twombly, 550 U.S. at 555.

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face. See Bell Atl. Corp. v. Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 556). "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(emphasis omitted). The United States Court of Appeals for the Tenth Circuit has stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible." The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(citations omitted)(quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570). See Gallegos v. Bernalillo Cty. Board of Cty. Comm'rs, __ F. Supp. 3d __, 2017 WL 4402422, at *9 (D.N.M. 2017)(Browning, J.).

"When a party presents matters outside of the pleadings for consideration, as a general rule 'the court must either exclude the material or treat the motion as one for summary judgment.'" Brokers' Choice of America, Inc. v. NBC Universal, Inc., 861 F.3d 1081, 1103 (10th Cir. 2017)(quoting Alexander v. Oklahoma, 382 F.3d 1206, 1214 (10th Cir. 2004)). There are three limited exceptions to this general principle: (i) documents that the complaint incorporates by reference, see Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007); (ii) "documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity," Jacobsen v. Deseret Book Co., 287 F.3d at 941; and (iii) "matters of which a court may take judicial notice," Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322. See also Brokers' Choice of America, Inc. v. NBC Universal, Inc., 861 F.3d at 1103 (holding that the district court did not err by reviewing a seminar recording and a TV episode on a rule 12(b)(6) motion, which were "attached to or referenced in the amended complaint" "central to [the plaintiff's] claim," and "undisputed as to their accuracy and authenticity"). "[T]he court is permitted to take judicial notice of its own files and records, as well as facts which are a matter of public record." Van Woudenberg v. Gibson, 211 F.3d 560, 568 (10th Cir. 2000), abrogated on other grounds by McGregor v. Gibson, 248 F.3d 946, 955 (10th Cir. 2001).

In Gee v. Pacheco, 627 F.3d 1178 (10th Cir. 2010), the defendants "supported their motion with numerous documents, and the district court cited portions of those motions in granting the [motion to dismiss]." 627 F.3d at 1186. The Tenth Circuit held that "[s]uch reliance was improper" and that, even if "the district court did not err initially in reviewing the materials, the court

improperly relied on them to refute Mr. Gee's factual assertions and effectively convert the motion to one for summary judgment." Gee v. Pacheco, 627 F.3d at 1186–87. In other cases, the Tenth Circuit has emphasized that, "[b]ecause the district court considered facts outside of the complaint, however, it is clear that the district court dismissed the claim under Rule 56(c) and not Rule 12(b)(6)." Nard v. City of Okla. City, 153 F. App'x. 529, 534 n.4 (10th Cir. 2005)(unpublished).[17] In Douglas v. Norton, 167 F. App'x. 698 (10th Cir. 2006)(unpublished), the Tenth Circuit addressed an untimely filed charge with the Equal Employment Opportunity Commission -- which the Court analogized to a statute of limitations -- and concluded that, because the requirement was not jurisdictional, the district court should have analyzed the question under rule 12(b)(6), and "because the district court considered evidentiary materials outside of Douglas' complaint, it should have treated Norton's motion as a motion for summary judgment." 167 F. App'x. at 704–05.

The Court has previously ruled that, when a plaintiff references and summarizes statements from defendants in a complaint for the purpose of refuting the statements in the complaint, the Court cannot rely on documents the defendants attach to a motion to dismiss which contain their un-redacted statements. See Mocek v. City of Albuquerque, No. Civ. 11-1009, 2013 WL 312881, at *50-51 (D.N.M. Jan. 14, 2013)(Browning, J.). The Court reasoned that the statements were neither

[17]Nard v. City of Okla. City is an unpublished Tenth Circuit opinion, but the Court can rely on an unpublished Tenth Circuit opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished opinions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated: "In this circuit, unpublished orders are not binding precedent, . . . and . . . citation to unpublished opinions is not favored. . . . However, if an unpublished opinion . . . has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision." United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005). The Court concludes that Nard v. City of Okla. City, Douglas v. Norton, How v. City of Baxter Springs, Good v. Fuji Fire & Marine, Ins. Co., Hodgson v. Farmington City, and FTC v. LoanPointe, LLC have persuasive value with respect to a material issue, and will assist the Court in its preparation of this Memorandum Opinion and Order.

incorporated by reference nor central to the plaintiff's allegations in the complaint, because the plaintiff only cited the statements to attack their reliability and truthfulness. See 2013 WL 312881, at *50-51. The Court has also previously ruled that, when determining whether to toll a statute of limitations in an action alleging fraud and seeking subrogation from a defendant, the Court may not use interviews and letters attached to a motion to dismiss, which evidence that a plaintiff was aware of the defendant's alleged fraud before the statutory period expired, in the Court's ruling. See Great Am. Co. v. Crabtree, No. 11-1129, 2012 WL 3656500, at *3, *22-23 (D.N.M. Aug. 23, 2012)(Browning, J.). The Court determined that the documents did not fall within any of the Tenth Circuit's exceptions to the general rule that a complaint must rest on the sufficiency of its contents alone, as the complaint did not incorporate the documents by reference, or refer to the documents. See 2012 WL 3656500, at *22-23; Mocek v. City of Albuquerque, No. 11-1009, 2013 WL 312881, at *50 (D.N.M. 2013)(Browning, J.)(refusing to consider statements that were not "central to [the Plaintiff's] claims").

On the other hand, in a securities class action, the Court has ruled that a defendant's operating certification, to which plaintiffs refer in their complaint, and which is central to whether the plaintiffs' adequately alleged a loss, falls within an exception to the general rule, so the Court may consider the operating certification when ruling on the defendant's motion to dismiss without converting the motion into one for summary judgment. See Genesee Cty. Emps.' Retirement Sys. v. Thornburg Mortg. Secs. Trust 2006–3, 825 F. Supp. 2d 1082, 1150-51 (D.N.M. 2011)(Browning, J.); Mata v. Anderson, 760 F. Supp. 2d 1068, 1101 (D.N.M. 2009)(Browning, J.)(relying on documents outside of the complaint because they were "documents that a court can appropriately view as either part of the public record, or as documents upon which the Complaint relies, and the authenticity of which is not in dispute"); S.E.C. v. Goldstone, 952 F. Supp. 2d 1060, 1217-18

(D.N.M. 2013)(Browning, J.)(considering, on a motion to dismiss, electronic mail transmissions referenced in the complaint as "documents referred to in the complaint," which are "central to the plaintiff's claim" and whose authenticity the plaintiff did not challenge).

**LAW REGARDING JUDICIAL NOTICE OF DOCUMENTS WHEN RULING ON A MOTION TO DISMISS**

Rule 201 of the Federal Rules of Evidence allows a court to, at any stage of the proceeding, take notice of "adjudicative" facts that fall into one of two categories: (i) facts that are "generally known within the territorial jurisdiction of the trial court;" or (ii) facts that are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b), (f). "Adjudicative facts are simply the facts of the particular case." United States v. Wolny, 133 F.3d 758, 764 (10th Cir. 1998)(quoting Advisory Committee Notes to rule 201). A court has discretion to take judicial notice of such facts, regardless whether requested. See Fed. R. Evid. 201(c). On the other hand, if a party requests that the court take judicial notice of certain facts, and supplies the necessary information to the court, judicial notice is mandatory. See Fed. R. Evid. 201(d). Also, if the parties timely request an opportunity to be heard, the Court must grant such an opportunity "as to the propriety of taking judicial notice and the tenor of the matter noticed." Fed. R. Evid. 201(e). That judicial notice may be taken during any stage of the judicial proceeding includes the motion to dismiss stage. See 21 B C. Wright & K. Graham, Jr., Fed. Prac. & Proc. Evid. § 5110, at 294 & n.17 (2d ed. 2005). Moreover, while ordinarily, a motion to dismiss must be converted to a motion for summary judgment when the court considers matters outside the Complaint, see Fed. R. Civ. P. 12(d), matters that are judicially noticeable do not have that effect, see Duprey v. Twelfth Judicial Dist. Court, No. 08–0756, 2009 WL 2482171, at *7 (D.N.M. July 27, 2009)(Browning, J.)(citing Grynberg v. Koch Gateway Pipeline Co., 390 F.3d 1276, 1279 n.1 (10th Cir. 2004)). Also, when considering a motion to dismiss, "the court is permitted to take judicial

notice of its own files and records, as well as facts which are a matter of public record." Van Woudenberg v. Gibson, 211 F.3d 560, 568 (10th Cir. 2000) abrogated on other grounds, McGregor v. Gibson, 248 F.3d 946, 955 (10th Cir. 2001). The documents judicially noticed, however, should not be considered for the truth of the matters asserted therein. See Tal v. Hogan, 453 F.3d 1244, 1265 n.24 (10th Cir. 2006). The Court has previously judicially noticed news publications and public filings with the Securities and Exchange Commission. See S.E.C. v. Goldstone, 952 F. Supp. 2d at 1219-20; In re Thornburg Mortg., Inc. Securities Litig., 2009 WL 5851089, at *3-4. See also Gallegos v. Bernalillo Cty. Bd. of Cty. Comm'rs, __ F. Supp. 3d __, 2017 WL 4402422, at *18-19 (D.N.M. 2017)(Browning, J.)(ruling that the Court may take judicial notice of state court orders); A.M ex rel. Youngers v. New Mexico Dep't of Health, 117 F. Supp. 3d 1220, 1232 n.6 (D.N.M. 2015)(Browning, J.).

## LAW REGARDING PREEMPTION

Article VI, clause 2, of the Constitution provides that the United States of America's laws "shall be the Supreme Law of the Land; . . . any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Consistent with the Supremacy Clause, the Supreme Court has "long recognized that state laws that conflict with federal law are 'without effect.'" Altria II, 555 U.S. at 75 (quoting Maryland v. Louisiana, 451 U.S. 725, 746 (1981)). The Supreme Court has summarized the following situations in which preemption is likely to be found:

> Pre-emption may be either expressed or implied, and is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose. Absent explicit pre-emptive language, we have recognized at least two types of implied pre-emption: field pre-emption, where the scheme of federal regulation is so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it, and conflict pre-emption, where compliance with both federal and state regulations is a physical impossibility, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

Gade v. Nat'l Solid Wastes Mgmt. Assoc., 505 U.S. 88, 98 (1992).

As noted, preemption may be express or implied. See Gade v. Nat'l Solid Wastes Mgmt. Assoc., 505 U.S. at 98. When faced with express preemption -- where a statute expressly states that it preempts certain areas of state law -- a court must determine the scope of the preemption that Congress intended. See Medtronic, Inc. v. Lohr, 518 U.S. 470, 485 (1996)(stating that "the purpose of Congress is the ultimate touch-stone in every pre-emption case"). "Congress may indicate pre-emptive intent through a statute's express language or through its structure and purpose." Altria II, 555 U.S. at 77. When the preemption clause's text is susceptible to more than one plausible reading, courts ordinarily "accept the reading that disfavors pre-emption." Bates v. Dow Agrosciences, LLC, 544 U.S. 431, 449 (2005). Preemption arguments are analyzed under rule 12(b)(6), 12(c), or 56. See Fisher v. Halliburton, 667 F.3d 602, 609 (5th Cir. 2012); Harris v. Kellog Brown & Root Servs., Inc., 724 F.3d 458, 464 n.1 (3d Cir. 2013).[18]

---

[18] There may be a conflict between the United States Courts of Appeals regarding which rule governs a district court's review of preemption arguments. The United States Court of Appeals for the Fifth Circuit has noted that preemption is not a jurisdictional question, so rule 12(b)(1) is inappropriate. See Fisher v. Halliburton, 667 F.3d 602, 609 (5th Cir. 2012). Instead, it has held that

> Federal preemption is an affirmative defense that a defendant must plead and prove. Unless the complaint itself establishes the applicability of a federal-preemption defense -- in which case the issue may properly be the subject of a Rule 12(b)(6) motion -- a defendant should ordinarily raise preemption in a Rule 12(c) motion for judgment on the pleadings or a Rule 56 motion for summary judgment.

Fisher v. Haliburton, 667 F.3d at 609. See Harris v. Kellog Brown & Root Servs., Inc., 724 F.3d 458, 464 n.1 (3d Cir. 2013)("[T]he appropriate procedural device for reviewing the § 2680(j) preemption argument is not a motion pursuant to Rule 12(b)(1), but rather a motion under either Rule 12(b)(6) or for summary judgment."). The United States Court of Appeals for the Sixth Circuit has explained that preemption "does not normally concern the subject-matter jurisdiction of a court to hear a claim, which is what is relevant to the resolution of a Rule 12(b)(1) motion." Trollinger v. Tyson Foods, Inc., 370 F.3d 602, 608 (6th Cir. 2004). See Boler v. Earley, 865 F.3d 391, 400 n.3 (6th Cir. 2017)("We have not found other comparable cases using a Rule 12(b)(1) motion to address statutory preemption of § 1983 claims; it appears that the district court incorrectly addressed this issue as jurisdictional."). "Rather, the doctrine generally concerns the merits of the claim itself."

Determining express preemption's scope entails scrutinizing the statutory text in light of two presumptions. First,

> [i]n all pre-emption cases, and particularly in those in which Congress has legislated . . . in a field which the States have traditionally occupied, we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.

Medtronic, Inc. v. Lohr, 518 U.S. at 485. Second, "[t]he purpose of Congress is the ultimate touchstone in every pre-emption case." Medtronic, Inc. v. Lohr, 518 U.S. at 485.

> Congress' intent, of course, primarily is discerned from the language of the pre-emption statute and the statutory framework surrounding it. Also relevant, however, is the structure and purpose of the statute as a whole, as revealed not only in the text, but through the reviewing court's reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law.

Medtronic, Inc. v. Lohr, 518 U.S. at 486.

Implied conflict preemption is found when it is impossible for a private party to comply with

---

Trollinger v. Tyson Foods, Inc., 370 F.3d at 608. See also Metropolitan Edison Co. v. Pennsylvania Public Utility Com'n, 767 F.3d 335, 362 (3d Cir. 2014)(noting that "pre-emption arguments do not ordinarily raise issues of subject matter jurisdiction" but that "'[d]octrines of federal pre-emption . . . may in some contexts be controlling' over 'the general rule of finality of jurisdictional determinations.'")(quoting Durfee v. Duke, 375 U.S. 106, 114 (1963)).

The United States Court of Appeals for the Ninth Circuit, however, has affirmed a case's dismissal on preemption grounds under rule 12(b)(1) without comment as to the appropriateness of that rule to preemption arguments. See Cedars-Sinai Medical Center v. National League of Postmasters of U.S., 497 F.3d 972, 975 (9th Cir. 2007). The United States Court of Appeals for the Seventh Circuit has also dismissed a claim under rule 12(b)(1) on preemption grounds, but only where the federal law preempted the state law claim, and the federal law did not provide a private right of action. Slaney v. The Int'l Amateur Athletic Fed'n, 244 F.3d 580, 594-96 (7th Cir. 2001). The Tenth Circuit does not appear to have taken a definitive position on the issue. In Ryan v. Donley, 511 F. App'x 687 (10th Cir. Feb. 14, 2013), the Tenth circuit affirmed a district court's dismissal of a Whistleblower Protection Act, 5 U.S.C. §§ 1201-1209, claim pursuant to rule 12(b)(1) noting that "there can be no such claim, due to preemption by the Civil Service Reform Act." 511 F. App'x at 690. Dismissal for lack of subject matter under rule 12(b)(1) in that case appears proper, however, because the Civil Service Reform Act's "preemption" means that the Whistleblower Protection Act does not provide a private right of action, so there is no federal question jurisdiction. The Tenth Circuit has not otherwise commented on this issue.

both state and federal requirements, see English v. General Elec. Co., 496 U.S. 72, 78-79 (1990), or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," Hines v. Davidowitz, 312 U.S. 52, 67 (1941). "Pre-emptive intent may also be inferred if the scope of the statute indicates that Congress intended federal law to occupy the legislative field, or if there is an actual conflict between state and federal law." Hines v. Davidowitz, 312 U.S. at 67 (citing Freightliner Corp. v. Myrick, 514 U.S. 280, 287 (1995)).

Obstacle preemption is one form of implied preemption. Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 373 (2000)(holding that preemption is appropriate where the challenged state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress"); Pharm. Research and Mfrs. of Am. v. Walsh, 538 U.S. 644, 679 (2003)(Thomas, J., concurring)("Obstacle pre-emption turns on whether the goals of the federal statute are frustrated by the effect of the state law."). The Supreme Court instructed that, in obstacle preemption cases, "there is no federal pre-emption in vacuo, without a constitutional text or a federal statute to assert it." P.R. Dep't of Consumer Affairs v. Isla Petroleum Corp., 485 U.S. 495, 503 (1988). See Gade v. Nat'l Solid Wastes Mgmt. Assoc., 505 U.S. at 98. A reviewing court must still "examine the explicit statutory language and the structure and purpose of the statute." Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 138 (1990). In 2000, the Supreme Court decided Geier v. Am. Honda Motor Co., 529 U.S. 861 (2000), which held, in a five-to-four decision, that a federal regulation which permitted, but did not require, airbags to be installed in passenger vehicles preempted claims that a car was defective because it lacked an airbag. See 529 U.S. at 874. The majority found: "The rule of state tort law for which petitioners argue would stand as an 'obstacle' to the accomplishment of [the federal regulation's] objective. And the statute foresees the application of ordinary principles of pre-emption in cases of actual conflict. Hence, the tort action is pre-empted." 529 U.S. at 886. Justice

Stevens, in dissent, expressed a desire to eliminate obstacle preemption. He argued that the presumption against preemption

> [s]erves as a limiting principle that prevents federal judges from running amok with our potentially boundless (and perhaps inadequately considered) doctrine of implied conflict pre-emption based on frustration of purposes -- i.e., that state law is pre-empted if it stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

529 U.S. at 907-08 (Stevens, J., dissenting).

The Supreme Court has begun to back away from finding implied preemption based on an alleged conflict with the purposes underlying federal regulations. In 2003, the Supreme Court issued a unanimous decision in Sprietsma v. Mercury Marine, 537 U.S. 51 (2002), rejecting implied conflict preemption of state law claims that a boat engine was defective because it lacked a propeller guard. See 537 U.S. at 70. In so doing, the Supreme Court considered and rejected an argument that the Coast Guard's decision not to adopt a regulation requiring propeller guards impliedly preempted state-law claims, which inflicted liability for lack of a propeller guard. See 537 U.S. at 65. It explained:

> The decision in 1990 to accept the subcommittee's recommendation to take no regulatory action left the law applicable to propeller guards exactly the same as it had been before the subcommittee began its investigation. Of course, if a state common-law claim directly conflicted with a federal regulation promulgated under the Act, or if it were impossible to comply with any such regulation without incurring liability under state common law, pre-emption would occur. This, however, is not such a case.

537 U.S. at 65.

In Altria II, the Supreme Court again considered the implied preemption doctrine and rejected the defendants' obstacle-preemption argument that the FCLAA, preempted a similar state act, Maine's Unfair Practices Act, Me. Rev. Stat. Ann., Tit. 5, § 207 (2008). See 555 U.S. at 90-91. In Altria II, the plaintiffs filed suit against defendant cigarette manufactures for deceptively

marketing their Marlboro and Cambridge Light cigarettes as containing lower tar and nicotine to convey that their light cigarettes were less harmful than regular cigarettes. See 555 U.S. at 73. The Supreme Court concluded that the FCLAA, which forbids state law from requiring or prohibiting language with respect to cigarette advertising and promotion, presented no obstacle to the plaintiffs' lawsuit, because the federal law ultimately regulated warning labels, and did not regulate false or misleading statements. See 555 U.S. at 82-83. The Supreme Court also considered whether an FTC guidance statement, which noted that "a factual statement of the tar and nicotine content . . . would not violate the FTC Act," impliedly preempted the Plaintiffs' claims. 555 U.S. at 87. The Supreme Court contemplated and rejected the cigarette manufacturers' argument that the FTC's statement "authorized them to use descriptors" such as "light or low tar," because the FTC statements did not require that cigarette manufacturers disclose their tar and nicotine yields, and the United States "Government itself disavows any policy authorizing the use of light and low tar descriptors." 555 U.S. at 88. Moreover, the Supreme Court determined that an FTC consent order that prevents the cigarette manufacturers from using "light" and "low tar" descriptors, unless they are accompanied "by a clear and conspicuous disclosure of the cigarettes' tar and nicotine content" does not preempt the plaintiffs' claims, because "the decree only enjoined conduct," and "a consent order is in any event only binding on the parties to the agreement." 555. U.S. at 589 n.13. The Supreme Court concluded, thus, that federal law and regulations did not preempt the plaintiffs' state-law claims. See 555 U.S. at 90.

In Wyeth v. Levine, 555 U.S. 555 (2009), six Justices of the Supreme Court, including Justices Breyer and Kennedy, who joined in the majority decision in Geier v. Am. Honda Motor Co. rejected the plaintiff's two implied preemption arguments -- impossibility preemption and obstacle preemption. See Wyeth v. Levine, 555 U.S. at 581. The Supreme Court held that

> it is not impossible for Wyeth to comply with its state and federal law obligations and that Levine's common-law claims do not stand as an obstacle to the accomplishment of Congress' purposes in the [Federal Food, Drug, and Cosmetic Act, 21 U.S.C.A. §§ 301, 321, 331-337, 341-350, 361-364, and 381-399; 21 C.F.R. § 201.80(e)("FDCA")].

Wyeth v. Levine, 555 U.S. at 581. In so ruling, Justice Stevens, writing for the majority, narrowly limited Geier v. Am. Honda Motor Co. to its facts, noting that the decision in that case is based on the substantive regulation's "complex and extensive" history at issue. 555 U.S. at 566. The Supreme Court rejected obstacle preemption, stating: "If Congress thought state-law suits posed an obstacle to its objectives, it surely would have enacted an express pre-emption provision at some point during the FDCA's 70-year history." 555 U.S. at 609. Justice Stevens quoted Justice O'Connor's explanation in Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. 141, 109 (1989): "The case for federal pre-emption is particularly weak where Congress has indicated its awareness of the operation of state law in a field of federal interest, and has nonetheless decided to stand by both concepts and to tolerate whatever tension there is between them." Wyeth v. Levine, 555 U.S. at 575 (quoting Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. at 166–67). Of particular import for the current status of implied obstacle preemption is Justice Thomas' concurring opinion in Wyeth v. Levine, in which he wrote:

> I write separately, however, because I cannot join the majority's implicit endorsement of far-reaching implied pre-emption doctrines. In particular, I have become increasingly skeptical of this Court's "purposes and objectives" pre-emption jurisprudence. Under this approach, the Court routinely invalidates state laws based on perceived conflicts with broad federal policy objectives, legislative history, or generalized notions of congressional purposes that are not embodied within the text of federal law. Because implied pre-emption doctrines that wander far from the statutory text are inconsistent with the Constitution, I concur only in the judgment.

555 U.S. at 583 (Thomas, J., concurring in the judgment). Justice Thomas continued:

> Under the vague and potentially boundless doctrine of purposes and objectives pre-emption . . . the Court has pre-empted state law based on its interpretation of broad federal policy objectives, legislative history, or generalized notions of congressional

> purposes that are not contained within the text of federal law . . . Congressional and agency musings, however, do not satisfy the Art. I, § 7 requirements for enactment of federal law and, therefore, do not pre-empt state law under the Supremacy Clause.

555 U.S. at 587. Justice Thomas emphasized that, when analyzing the federal statutes' or regulations' preemptive effect, "[e]vidence of pre-emptive purpose must be sought in the text and structure of the provision at issue" to comply with the Constitution. 555 U.S. at 588 (citing CSX Transp., Inc. v. Easterwood, 507 U.S. 658, 664 (1993)).[19]

Moreover, the Supreme Court has put renewed emphasis on the presumption against preemption. See Bates v. Dow Agrosciences, LLC, 544 U.S. 431, 449 (2005). "In areas of traditional state regulation, [the Supreme Court] assume[s] that a federal statute has not supplanted state law unless Congress has made such an intention clear and manifest." Bates v. Dow Agrosciences, LLC, 544 U.S. at 449. If confronted with two plausible interpretations of a statute, the court has "a duty to accept the reading that disfavors pre-emption." Bates v. Dow Agrosciences, LLC, 544 U.S. at 449. See Wyeth v. Levine, 555 U.S. at 565; Cipollone v. Liggett Grp., Inc., 505 U.S. 504, 518 (1992)(plurality opinion). In Arizona v. United States, 567 U.S. 387 (2012), the Supreme Court once again emphasized the importance of clear Congressional intent when applying obstacle preemption. See 567 U.S. at 398-99. The Supreme Court struck down provisions of an Arizona immigration law that would penalize aliens who sought, or engaged in, unauthorized employment, because it "would interfere with the careful balance struck by Congress with respect to unauthorized employment of aliens." 567 U.S. at 406. With Justice Kagan taking no part in the

---

[19]Justice Thomas, writing for the five-to-four majority in PLIVA, Inc. v. Mensing, 564 U.S. 604 (2011), recently concluded, however, that federal law preempted inconsistent state laws on generic drug labeling, because it was impossible to comply with both federal law and the states' law. See 564 U.S. at 617–618. The Supreme Court sought to reconcile Wyeth v. Levine, however, recognizing that the respective statutory schemes in each case are distinguishable. See PLIVA, Inc. v. Mensing, 564 U.S. at 626 ("It is beyond dispute that the federal statutes and regulations that apply to brand-name drug manufacturers are meaningfully different than those that apply to generic drug manufacturers.").

consideration or decision of the case, writing for a five-to-three majority, which included Chief Justice Roberts and Justices Ginsburg, Breyer, and Sotomayor, Justice Kennedy wrote: "The correct instruction to draw from the text, structure, and history of [the Immigration Reform and Control Act of 1986, 8 U.S.C. § 1101] is that Congress decided it would be inappropriate to impose criminal penalties on aliens who seek or engage in unauthorized employment." 567 U.S. at 406. The Supreme Court ruled that Congressional intent was clear; Congress had considered and rejected penalizing aliens who sought unauthorized employment. See 567 U.S. at 405. Federal immigration law therefore preempted the Arizona law that would have penalized aliens seeking unauthorized employment, because it would have created a penalty that Congress had clearly and intentionally omitted. See 567 U.S. at 407.

The Tenth Circuit has recognized federal preemption of state law in three categories: (i) when a federal statute expressly preempts state law ("express preemption"); (ii) where Congress intends to occupy a field ("field preemption"); and (iii) to the extent that a state law conflicts with a federal law ("conflict preemption"). Colo. Dept. of Pub. Health and Env't., Hazardous Materials and Waste Mgmt. Div. v. United States, 693 F.3d 1214, 1222 (10th Cir. 2012). As the defendant in Colo. Dept. of Pub. Health and Env't., Hazardous Materials and Waste Mgmt. Div. v. United States, the United States invoked only conflict preemption to dismiss Colorado's claims against it. See 693 F.3d at 1222. "To avoid conflict preemption, 'it is not enough to say that the ultimate goal of both federal and state law is the same. A state law also is pre-empted if it interferes with the methods by which the federal statute was designed to reach this goal." Chamber of Commerce v. Edmondson, 594 F.3d 742, 769 (10th Cir. 2010)(quoting Int'l Paper Co. v. Ouellette, 479 U.S. 481, 494 (1987)(alterations, citation omitted)). In Colo. Dept. of Pub. Health and Env't., Hazardous Materials and Waste Mgmt. Div. v. United States, the state of Colorado created a schedule for the United

States to follow in the destruction of hazardous waste stored in the state, in an attempt to prohibit the storage of hazardous waste within the state. See 693 F.3d at 1223. The Tenth Circuit held that the state statute creating this schedule conflicted with a federal statute, which mandated a deadline for the destruction of the materials. See 693 F.3d at 1224. The Tenth Circuit reasoned that allowing Colorado to set a deadline for the destruction of the materials would impede the flexibility with which Congress had intended in its deadline. See 693 F.3d at 1224. Because the Colorado deadline would interfere with the method that Congress had intended for the waste's disposal, the Tenth Circuit concluded that the state law is in conflict with the federal law, and therefore, that the federal law preempts Colorado's schedule. See 693 F.3d at 1224.

**LAW REGARDING DIVERSITY JURISDICTION AND ERIE**

Under Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1938)("Erie"), a federal district court sitting in diversity applies "state law with the objective of obtaining the result that would be reached in state court." Butt v. Bank of Am., N.A., 477 F.3d 1171, 1179 (10th Cir. 2007). Accord Mem. Hosp. v. Healthcare Realty Trust Inc., 509 F.3d 1225, 1229 (10th Cir. 2007). The Court has held that if a district court exercising diversity jurisdiction cannot find a Supreme Court of New Mexico "opinion that [governs] a particular area of substantive law . . . [the district court] must . . . predict how the Supreme Court of New Mexico would [rule]." Guidance Endodontics, LLC v. Dentsply Int'l., Inc., 708 F. Supp. 2d 1209, 1224-25 (D.N.M. 2010)(Browning, J.). "Just as a court engaging in statutory interpretation must always begin with the statute's text, a court formulating an Erie prediction should look first to the words of the state supreme court." Peña v. Greffet, 110 F. Supp. 3d 1103, 1132 (D.N.M. 2015)(Browning, J.).[20] If the Court finds only an opinion from the Court of

[20]In performing its Erie-mandated duty to predict what a state supreme court would do if faced with a case, see Comm'r v. Estate of Bosch, 387 U.S. 456 (1987), a federal court may sometimes contradict the state supreme court's own precedent if the federal court concludes that the

Appeals of New Mexico, the Court "certainly may and will consider the Court of Appeal[s'] decision in making its determination, [but] the Court is not bound by the Court of Appeal[s'] decision in the same way that it would be bound by a Supreme Court decision." Mosley v. Titus, 762 F. Supp. 2d at 1332 (noting that where the only opinion on point is "from the Court of Appeals, [] the Court's task, as a federal district court sitting in this district, is to predict what the Supreme Court of New Mexico would do if the case were presented to it")(citing Wade v. EMCASCO Ins. Co., 483 F.3d 657, 666 (10th Cir. 2007)(explaining that, "[w]here no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do," and that, "[i]n doing so, it may seek guidance from decisions rendered by lower courts in the relevant state")).[21] The Court may also rely on Tenth Circuit decisions interpreting New Mexico law. See

---

state supreme court would, given the opportunity, overrule its earlier holding, see Anderson Living Trust v. WPX Energy Prod., LLC, 27 F. Supp. 3d 1188, 1247 n.30 (D.N.M. 2014)(Browning, J.). Courts should be reticent to formulate an Erie prediction that conflicts with state-court precedent; even if the prediction turns out to be correct; such predictions produce disparate results between cases filed in state and federal courts, because state supreme court precedent, even when it is outdated, usually binds state trial courts. The factors to which a federal court should look before predicting that a state supreme court will overrule its precedent vary depending upon the case, but such factors consistently include: (i) the age of the state supreme court decision in question -- the younger the state case, the less likely departure is warranted; (ii) the doctrinal reliance, or lack thereof, that the state courts -- especially the state supreme court -- have placed on the state decision; (iii) apparent shifts away from the doctrine that the state decision articulates, especially more recent state supreme court decisions that explicitly call an older case's holding into question; (iv) changes in the composition of the state supreme court, especially if most of the dissenting justices from the earlier state decision remain on the court; and (v) the decision's patent illogic or its inapplicability to modern times. See Peña v. Greffet, 110 F. Supp. 3d at 1132 n.17. In short, if a federal court predicts that a state supreme court decision would be overruled, that decision is likely to be very old, neglected by subsequent state-court cases -- perhaps because it is in a dusty corner of the common law which does not get much attention or have much application -- and clearly wrong.

[21]The Supreme Court of the United States has addressed what the federal courts may use when there is not a decision on point from the state's highest court:

> The highest state court is the final authority on state law, but it is still the duty of the federal courts, where the state law supplies the rule of decision, to ascertain and apply that law even though it has not been expounded by the highest court of the

Anderson Living Trust v. WPX Energy Prod., LLC, 27 F. Supp. 3d at 1243 & n.30.[22] Ultimately, "the Court's task is to predict what the state supreme court would do." Wade v. EMCASCO Ins.

---

> State. An intermediate state court in declaring and applying the state law is acting as an organ of the State and its determination, in the absence of more convincing evidence of what the state law is, should be followed by a federal court in deciding a state question. We have declared that principle in *West v. American Telephone and Telegraph Co.*, 311 U.S. 223 (1940), decided this day. It is true that in that case an intermediate appellate court of the State had determined the immediate question as between the same parties in a prior suit, and the highest state court had refused to review the lower court's decision, but we set forth the broader principle as applicable to the decision of an intermediate court, in the absence of a decision by the highest court, whether the question is one of statute or common law.
>
> . . . .
>
> We have held that the decision of the Supreme Court upon the construction of a state statute should be followed in the absence of an expression of a countervailing view by the State's highest court, and we think that the decisions of the Court of Chancery [the New Jersey trial court] are entitled to like respect as announcing the law of the State.
>
> . . . .
>
> The question has practical aspects of great importance in the proper administration of justice in the federal courts. It is inadmissible that there should be one rule of state law for litigants in the state courts and another rule for litigants who bring the same question before the federal courts owing to the circumstance of diversity of citizenship. In the absence of any contrary showing, the rule [set forth by two New Jersey trial courts, but no appellate courts] appears to be the one which would be applied in litigation in the state court, and whether believed to be sound or unsound, it should have been followed by the Circuit Court of Appeals.

Fid. Union Trust Co. v. Field, 311 U.S. 169, 177-80 (1940)(footnotes and citations omitted). The Supreme Court has softened this position over the years; federal courts are no longer bound by state trial or intermediate court opinions, but "should attribute [them] some weight . . . where the highest court of the State has not spoken on the point." Comm'r v. Estate of Bosch, 387 U.S. at 465 (citing King v. Order of United Commercial Travelers, 333 U.S. 153, 159 (1948)). See 17A James Wm. Moore et al., Moore's Federal Practice § 124.20 (3d ed. 1999)("Decisions of intermediate state appellate courts usually must be followed . . . [and] federal courts should give some weight to state trial courts decisions.")(emphasis and title case omitted).

[22]In determining the proper weight to accord Tenth Circuit precedent interpreting New Mexico law, the Court must balance the need for uniformity between federal court and state court interpretations of state law with the need for uniformity among federal judges. If the Court adheres

too rigidly to Tenth Circuit case law, ignoring changes undergone by a state's law in the ensuing years, then parties litigating state-law claims will be subject to a different body of substantive law, depending on whether they litigate in state court or federal court. This result frustrates the purpose of Erie, which held that federal courts must apply state court interpretations of state law, rather than their own, in part so that parties achieve a consistent result regardless of the forum. This consideration pulls the Court toward according Tenth Circuit precedent less weight and according state court decisions issued in the ensuing years more weight. On the other hand, when the state law is unclear, it is desirable for there to at least be uniformity among federal judges as to its proper interpretation. Otherwise, different federal judges within the same circuit -- or even the same district, as district courts' decisions are not binding, even upon themselves -- would be free to adopt differing interpretations of a state's law. This consideration pulls the Court towards a stronger respect for vertical stare decisis, because a Tenth Circuit decision on point -- regardless whether it accurately reflects state law -- at least provides consistency at the federal level, so long as federal district judges are required to follow it.
The Court must decide how to weigh Tenth Circuit case law against more-recent state court decisions, choosing a point on the spectrum between the two extremes: rigidly adhering to Tenth Circuit precedent unless there is intervening case law directly on point from the state's highest court, on one end; and independently interpreting the state law, regarding the Tenth Circuit precedent as no more than persuasive authority, on the other. In striking this balance, the Court notes that it is generally more concerned about systemic inconsistency between the federal courts and the state courts than it is about inconsistency among federal judges. Judges, even those within a jurisdiction with ostensibly identical governing law, sometimes interpret and apply the law differently from one another; this inconsistency is part and parcel of a common-law judicial system. More importantly, litigants seeking to use forum selection to gain a substantive legal advantage cannot easily manipulate such inconsistency: cases are assigned randomly to district judges in this and many federal districts; and, regardless, litigants cannot know for certain how a given judge will interpret the state law, even if they could determine the judge's identity pre-filing or pre-removal. All litigants know in advance is that whomever federal district judge they are assigned will look to the entirety of the state's common law in making his or her determination -- the same as a state judge would. Systemic inconsistency between the federal courts and state courts, on the other hand, not only threatens the principles of federalism, but litigants may more easily manipulate the inconsistency. When the Tenth Circuit issues an opinion interpreting state law, and the state courts subsequently shift away from that interpretation, litigants -- if the district courts strictly adhere to the Tenth Circuit opinion -- have a definite substantive advantage in choosing the federal forum over the state forum, or vice versa.

The Court further notes that district courts may be in a better position than the Tenth Circuit to be responsive to changes in state law. Tenth Circuit decisions interpreting a particular state's law on a specific issue are further apart in time than the collective district courts' are. More importantly, the Tenth Circuit does not typically address such issues with the frequency that the state's courts themselves do. Accordingly, Tenth Circuit precedent can lag behind developments in state law -- developments that the district courts may be nimble enough to perceive and adopt. Additionally, much of the benefit of having a consistent Tenth Circuit-wide interpretation of a particular state's law is wasted. Other than Oklahoma, every state encompassed by the Tenth Circuit contains only one federal judicial district, and there is relatively little need for federal judges in Wyoming and Kansas to have a uniform body of New Mexico law to which to look. Last, the Court

notes, respectfully, that district courts may be in a better position than the Tenth Circuit to develop expertise on the state law of the state in which they sit. Every federal judicial district in the nation, except the District of Wyoming, covers at most one state. It is perhaps a more workable design for each district court to keep track of legal developments in the state law of its own state(s) than it is for the Tenth Circuit to monitor separate legal developments in eight states.

Having outlined the relevant considerations, the Court concludes that the proper stance on vertical stare decisis in the context of federal court interpretations of state law is as follows: the Tenth Circuit's cases are binding as to their precise holding -- what the state law was on the day the opinion was published -- but lack the positive precedential force that its cases interpreting a federal statute or the Constitution of the United States of America possess. A district court considering a state law issue after the publication of a Tenth Circuit opinion on point may not come to a contrary conclusion based only on state court cases available to and considered by the Tenth Circuit, but it may come to such a conclusion based on intervening state court cases.

When interpreting state law, the Tenth Circuit does not and cannot issue a case holding that *x* is the law in New Mexico; it holds that the proper interpretation of New Mexico law, at the time the opinion is released, is *x*. Its holdings are descriptive, not prescriptive -- interpretive, not normative. Because federal judicial opinions lack independent substantive force on state law issues, but possess such force regarding federal law issues, the Court concludes that the following is not an unfair summary of the judicial interpretive process: (i) when interpreting federal law, the federal appellate courts consider the existing body of law, and then issue a holding that both reflects and influences the body of law; that holding subsequently becomes a part of the body of law; but (ii) when interpreting state law, the federal appellate courts consider the existing body of law, and then issue a holding that only reflects the body of law; that holding does not subsequently become a part of the body of law. The federal district courts are bound to conclude that the Tenth Circuit's reflection of the then-existing body of law was accurate. The question is whether they should build a doctrine atop the case and use the existence of the Tenth Circuit's case to avoid any responsibility to independently consider the whole body of state law that exists when the time comes that diversity litigants raise the issue in their courtrooms. Giving such effect to the Tenth Circuit's interpretations of state law is at tension with Erie, giving independent substantive effect to federal judicial decisions -- i.e., applying federal law -- in a case brought in diversity.

The purpose of Erie is well-known and simple, and the Court should not complicate it beyond recognition: it is that the same substantive law governs litigants' cases regardless whether they are brought in a federal or state forum. For simplicity's sake, most courts have settled on the formulation that "the federal court must attempt to predict how the states' highest court would rule if confronted with the issue." Moore's § 124.22[3] (citing Comm'r v. Estate of Bosch, 387 U.S. at 465 ("[A]n intermediate appellate state court [decision] is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.")(citation and internal quotation marks omitted). This formulation may not be the most precise one if the goal is to ensure identical outcomes in state and federal court -- the Honorable Milton I. Shadur, United States District Judge, looks to state procedural rules to determine in which state appellate circuit the suit would have been filed were it not in federal court, and then applies the state law as that circuit court interprets it, see Abbott Laboratories v. Granite State Ins. Co., 573 F. Supp. 193, 196-200 (N.D. Ill. 1983)(noting that the approach of predicting the state supreme court's holdings will often lead to litigants obtaining a different result in federal court than they would in state court, where only the law of the circuit in

which they filed -- and certainly not nonexistent, speculative state supreme court law -- governs) -- but it is a workable solution that has achieved consensus. See Allstate Ins. Co. v. Menards, Inc., 285 F.3d 630, 637 (7th Cir. 2002)("[W]e adhere today to the general rule, articulated and applied throughout the United States, that, in determining the content of state law, the federal courts must assume the perspective of the highest court in that state and attempt to ascertain the governing substantive law on the point in question."). This formulation, built out of ease-of-use, does not relieve courts of their Supreme Court-mandated obligation to consider state appellate and trial court decisions. To the contrary, even non-judicial writings by influential authors, statements by state supreme court justices, the closeness of the vote on a prior case addressing the issue, and personnel changes on the court -- considerations that would never inform a federal court's analysis of federal law -- may validly come into play. The question is whether the district courts must abdicate, across-the-board, the "would decide" aspect of the Erie analysis to their parent appellate courts when the Court of Appeals has declared an interpretation of state law.

The Erie doctrine results in federal cases that interpret state law withering with time. While cases interpreting federal law become more powerful over time -- forming the groundwork for doctrines, growing upward from one application (Congress may create a national bank) to many (Congress may set quotas on wheat-growing for personal consumption), expanding outward from the general (states must grant criminal jury trials) to the specific (the jury need not be twelve people, nor must it be unanimous) -- federal cases interpreting state law often become stale. New state court cases -- even when not directly rebuking the federal court's statement of law -- alter the common-law legal landscape with their dicta, their insinuations, and their tone. The Supreme Court, which picks its cases sparingly and for maximum effect, almost never grants certiorari to resolve issues of state law.

The Court's views on Erie, of course, mean little if the Tenth Circuit does not agree. In Wankier v. Crown Equipment Corp., 353 F.3d 862 (10th Cir. 2003)(McConnell, J.), the Tenth Circuit said that,

> [w]here no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do. In performing this ventriloquial function, however, the federal court is bound by ordinary principles of *stare decisis*. Thus, when a panel of this Court has rendered a decision interpreting state law, that interpretation is binding on district courts in this circuit, and on subsequent panels of this Court, unless an intervening decision of the state's highest court has resolved the issue.

Wankier v. Crown Equip. Corp, 353 F.3d at 866. From this passage, it seems clear the Tenth Circuit only permits a district court to deviate from its view of state law on the basis of a subsequent case "of the state's highest court." The American Heritage Dictionary of the English Language 1402 (William Morris ed., New College ed. 1976)(defining "unless" as "[e]xcept on the condition that; except under the circumstances that"). A more aggressive reading of the passage -- namely the requirement that the intervening case "resolv[e] the issue" -- might additionally compel the determination that any intervening case law must definitively and directly contradict the Tenth Circuit interpretation in order to be considered "intervening."

It is difficult to know whether Judge McConnell's limitation of "intervening decision" to cases from the highest state court was an oversight or intentional. Most of the Tenth Circuit's previous

Co., 483 F.3d at 666. Accord Mosley v. Titus, 762 F. Supp. 2d at 1332 (citation omitted); Rimbert v. Eli Lilly & Co., 577 F. Supp. 2d 1174, 1188-89 (D.N.M. 2008)(Browning, J.)(quoting Wade v. EMCASCO Ins. Co., 483 F.3d at 665-66).

## LAW REGARDING ERIE AND THE RULES ENABLING ACT

"In diversity cases, the Erie doctrine instructs that federal courts must apply state substantive law and federal procedural law." Racher v. Westlake Nursing Home Ltd. P'ship, 871 F.3d 1152, 1162 (10th Cir. 2017)("Racher"). "If a federal rule of civil procedure answers the question in

---

formulations of this rule have defined intervening decisions inclusively as all subsequent decisions of "that state's courts," a term which seems to include trial and intermediate appellate courts. Even Koch v. Koch Industries, Inc., 203 F.3d 1202, 1231 (10th Cir. 2000), the primary authority upon which Wankier v. Crown Equipment Corp. relies, uses the more inclusive definition. In fact, Wankier v. Crown Equipment Corp. quotes its relevant passage:

> In the absence of intervening Utah authority indicating that a plaintiff is not required to prove a safer, feasible alternative design, we are bound to follow the rule of *Allen* [v. Minnstar, Inc., 8 F.3d 1470 (10th Cir. 1993), a Tenth Circuit case interpreting an issue of Utah law], as was the district court. "Following the doctrine of stare decisis, one panel of this court must follow a prior panel's interpretation of state law, absent a supervening declaration to the contrary by that state's courts or an intervening change in the state's law." Koch v. Koch Indus., Inc., 203 F.3d at 1231.

Wankier v. Crown Equip. Corp., 353 F.3d at 867.

Regardless whether the decision to limit the intervening authority a district court can consider was intentional, the Tenth Circuit has picked it up and run with it. In Kokins v. Teleflex, Inc., the Tenth Circuit, quoting Wankier v. Crown Equipment Corp., refused to consider an opinion from the Court of Appeals of Colorado holding directly the opposite of an earlier Tenth Circuit interpretation of Colorado law. See Kokins v. Teleflex, Inc., 621 F.3d 1290, 1297 (10th Cir. 2010)(Holmes, J.)("[T]he Colorado Court of Appeals decided *Biosera*[*, Inc. v. Forma Scientific, Inc.*, 941 P.2d 284 (Colo. Ct. App. 1998)], so it is not an 'intervening decision of the state's *highest court*.'")(emphasis in original)(quoting Wankier v. Crown Equip. Corp., 353 F.3d at 866).
The Tenth Circuit has set forth a stringent restriction on its district courts' ability to independently administer the Erie doctrine. More importantly, the Tenth Circuit's view may be at tension with the above-quoted Supreme Court precedent, as well as its own prior case law. Moore's lists the Tenth Circuit as having been, at one time, a "court[ that] hold[s] that a prior federal appellate decision [interpreting state law] is persuasive." Moore's § 124.22[4] (citing State Farm Mut. Auto. Ins. Co. v. Travelers Indem. Co., 433 F.2d 311, 312 (10th Cir. 1970)). Still, the Court is bound to abide by the Tenth Circuit's interpretation of Erie.

dispute, that rule governs our decision so long as it does not 'exceed[] statutory authorization or Congress's rulemaking power.'" Racher, 871 F.3d at 1162 (quoting Shady Grove Orthopedic Assocs. v. Allstate Ins. Co, 559 U.S. 393, 398 (2010)("Shady Grove")). "When faced with a choice between a state law and an allegedly conflicting federal rule," the Tenth Circuit "follow[s] the framework described by the Supreme Court in Shady Grove, as laid out by Justice Stevens in his concurring opinion." Racher, 871 F.3d at 1162. "First, the court must decide whether the scope of the federal rule is sufficiently broad to control the issue before the court, thereby leaving no room for the operation of seemingly conflicting state law." Racher, 871 F.3d at 1162 (citations and quotations omitted). There is a conflict between federal and state law if there is a "direct collision" that is "unavoidable," but there is no collision if the state and federal rules "can exist side by side . . . each controlling its own sphere of coverage." Racher, 871 F.3d at 1163 (citations omitted). If there is no direct collision, "there is no need to consider whether the federal rule is valid, and instead, the analysis must proceed under Erie." Racher, 871 F.3d at 1163. If there is a direct collision, a court must follow the federal rule if it is a valid exercise of the Supreme Court's authority pursuant to the Rules Enabling Act, i.e., it must "not abridge, enlarge or modify a substantive right." 28 U.S.C. § 2072(b). See Racher, 871 F.3d at 1163-64. A state law is substantive if after examining "the language and policy of the rule in question . . . the primary objective is directed to influencing conduct through legal incentives," and a state law is procedural if the law's purpose is to "achiev[e] fair, accurate, and efficient resolutions of disputes." Sims v. Great American Life Ins. Co., 469 F.3d 870, 883 (10th Cir. 2006). See Leon v. FedEx Ground Package Sys., Inc., 313 F.R.D. 615, 641 (D.N.M. 2016)(Browning, J.). The Tenth Circuit recently added: "If a state law 'concerns merely the manner and means' by which substantive rights are enforced, it is procedural, but if its application would 'significantly affect the result of litigation, it is substantive.'" Racher, 871 F.3d at

1164 (quoting Guaranty Trust Co. v. York, 326 U.S. 99, 109 (1945)).

**LAW REGARDING SEVERANCE UNDER RULE 21**

A district court may sever a case under Rule 21 to "transfer one action while retaining jurisdiction over the other." Chrysler Credit Corp. v. Country Chrysler, Inc., 928 F.2d 1509, 1519 (10th Cir. 1991)(citing Wyndham Assoc. v. Bintliff, 398 F.2d 614, 618 (2d Cir.1968)). Courts are mindful of judicial efficiency concerns, however, and might not sever and transfer a case when doing so results in two venues hearing virtually the same case based on the same set of facts. See, e.g., Gallery House, Inc. v. Yi, 587 F. Supp. 1036, 1039-40 (N.D.Ill.1984)("When the most efficient administration of justice in a copyright infringement action compelled the continuation of the action against both defendants in a single forum, severance of the claim against one defendant as to whom transfer would have been permissible was inappropriate.").

> [T]he court must weigh carefully whether the inconvenience of splitting the suit outweighs the advantages to be gained from the partial transfer [and] should not sever if the defendant over whom jurisdiction is retained is so involved in the controversy to be transferred that partial transfer would require the same issue to be litigated in two cases.

Liaw Su Teng v. Skaarup Shipping Corp., 743 F.2d 1140, 1148 (5th Cir.1984), overruled on other grounds by In re Air Crash Disaster Near New Orleans, La.. on July 9, 1982, 821 F.2d 1147 (5th Cir.1987). When the granting of a motion to sever and transfer claims would require two separate sets of discovery proceedings with regard to events surrounding a single [event], and when the moving defendants were alleged to have acted singly and in concert with other defendants in the commission of securities law violations, severance prior to the completion of discovery was denied. Sec. & Exchange Comm'n v. Nat'l Student Mktg. Corp., 360 F. Supp. 284, 296 (D.D.C. 1973)(Parker, J.).

## LAW REGARDING THE FIRST AMENDMENT

"Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. This clause -- the Free Speech Clause -- may act as a shield to liability in instances where otherwise illegal or unlawful conduct implicates a party's freedom of speech. See Marsh v. Alabama, 326 U.S. 501, 509 (1946)(ruling that the Free Speech clause shielded a Jehovah's witness who distributed religious material on a company town's sidewalk from criminal trespass charges). "It is, of course, commonplace that the constitutional guarantee of free speech is a guarantee only against abridgment by government, federal or state." Hudgens v. N.L.R.B, 424 U.S. 507, 513 (1976). State action, thus, is typically a prerequisite for First Amendment protections. See Hudgens v. N.L.R.B, 424 U.S. at 520-21.

### 1. The First Amendment and State Action.

For most of American history, enforcing the common law was not thought to implicate state action. See Daniel J. Solove & Neil M. Richards, Rethinking Free Speech and Civil Liability, 109 Colum. L. Rev. 1650, 1656 (2009). In Coppage v. Kansas, 236 U.S. 1, 17 (1915), the Supreme Court ruminated:

> [I]t is self evident that, unless all things are held in common, some persons must have more property than others, it is from the nature of things impossible to uphold freedom of contract and the right of private property without at the same time recognizing as legitimate those inequalities of fortune that are the necessary result of the exercise of those rights.

Coppage v. Kansas, 236 U.S. at 17 overruled in part Phelps Dodge Corp. v. N.L.R.B., 313 U.S. 177, 187 (1941). After the New Deal, the state action doctrine underwent a radical transformation, and the Supreme Court ruled that various judicial actions amounted to state action where, previously, those actions likely would not have. See Shelley v. Kraemer, 334 U.S. 1, 18-19 (1948)(ruling that judicial enforcement of racially restrictive covenants is state action); New York Times Co. v.

Sullivan, 376 U.S. 254, 265 (1964)(holding that state adjudication of a libel lawsuit is state action); Cohen v. Cowles Media Co., 501 U.S. 663, 668 (1991)("Our cases teach that the application of state rules of law in state courts in a manner alleged to restrict First Amendment freedoms constitutes 'state action'"). In Shelley v. Kraemer, the Supreme Court explained:

> The short of the matter is . . . the action of the States to which the [Fourteenth] Amendment has reference, includes action of state courts and state judicial officials. Although, in construing the terms of the Fourteenth Amendment, differences have from time to time been expressed as to whether particular types of state action may be said to offend the Amendment's prohibitory provisions, it has never been suggested that state court action is immunized from the operation of those provisions simply because the act is that of the judicial branch of the state government.

334 U.S. at 18. Thus, as the Supreme Court has recently reaffirmed, the Free Speech Clause "can serve as a defense in state tort suits." Snyder v. Phelps, 562 U.S. 443, 451 (2011). See N.A.A.C.P. v. Claiborne Hardware Co., 458 U.S. 886 n.51 (1982)("Although this is a civil lawsuit between private parties, the application of state rules of law by the Mississippi state courts in a manner alleged to restrict First Amendment freedoms constitutes 'state action' under the Fourteenth Amendment.")

The state action doctrine as applied to judicial enforcement of statutory and common-law claims has limits. See Solove & Richards, Rethinking Free Speech and Civil Liability, 109 Colum. L. Rev. at 1664. For example, the Supreme Court has limited the same state action rationale in the property-law context. See Hudgens v. N.L.R.B., 424 U.S. at 513; Lloyd Corp., Ltd. v. Tanner, 407 U.S. 551, 570 (1972). In Hudgens v. N.L.R.B., the Supreme Court considered whether the First Amendment protected union members picketing in a privately owned shopping center from a threat of criminal trespass charges. See Hudgens v. N.L.R.B., 424 U.S. at 508. In considering that issue, the Supreme Court explained:

> It is, of course, a commonplace that the constitutional guarantee of free speech is a guarantee only against abridgement by government, federal or state. Thus, while

> statutory or common law may in some situations extend protection or provide redress against a private corporation or person who seeks to abridge the free expression of others, no such protection or redress is provided by the Constitution itself.

Hudgens v. N.L.R.B., 424 U.S. at 513 (citation omitted). In ruling that the First Amendment did not apply, the Supreme Court emphasized that: "In addressing this issue, it must be remembered that the First and Fourteenth Amendments safeguard the rights of free speech and assembly by limitations on State action, not on action by the owner of private property used nondiscriminatorily for private purposes only." Hudgens v. N.L.R.B., 424 U.S. at 519 (quoting Lloyd Corp., Ltd. v. Tanner, 407 U.S. at 567). See Central Hardware Co. v. N.L.R.B., 407 U.S. 539, 547 (1972)("The First and Fourteenth Amendments are limitations on state action, not action by the owner of private property used only for private purposes."). The Supreme Court concluded, thus, that the First Amendment offered no protection to the picketers, because the shopping center was a private entity and not "the functional equivalent of a municipality." Hudgens v. N.L.R.B., 424 U.S. at 520.

The Supreme Court has also stated that private party conduct may be deemed state action when the "conduct allegedly causing the deprivation of a federal right may be fairly attributable to the State." Lugar v. Edmondson Oil Co., Inc., 457 U.S. 922, 937 (1982). Whether the conduct may in fact be "fairly attributed" to the state requires a two-part inquiry. "First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible." Lugar v. Edmondson Oil Co., Inc., 457 U.S. at 937. "Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor." Lugar v. Edmondson Oil Co., Inc., 457 U.S. at 937. See West v. Atkins, 487 U.S. 42, 48 (1988)(explaining that, to state a claim under § 1983, the plaintiff must show: (i) deprivation of a right that the federal constitution or federal laws secure; and (ii) that a person acting under color of state law caused the deprivation).

In Lugar v. Edmondson Oil Co., Inc., the Supreme Court explained that the two prongs merge when the claim is "directed against a party whose official character is such as to lend the weight of the State to his decisions," whereas they remain distinct when analyzing the private parties' conduct. 457 U.S. at 937. The Lugar v. Edmondson Oil Co., Inc. test's first prong -- that the deprivation of a right is attributable to the state -- is satisfied when "the authority of state officials . . . put the weight of the State behind [the] Defendant's private decision." 457 U.S. at 940. The Supreme Court, in Lugar v. Edmondson Oil Co., Inc., further instructed that the second prong, identification of a defendant as a state actor, may arise, "because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the state." 457 U.S. at 937.

In Lugar v. Edmondson Oil Co., Inc., the Supreme Court determined that the plaintiff's allegation that the defendants unlawfully deprived the plaintiff of his property without due process under state law failed to state a claim under 42 U.S.C. § 1983. See 457 U.S. at 940. The Supreme Court also held that the plaintiff's claim alleging that the private parties had invoked a state statute maliciously or without valid grounds did not give rise to state action. See 457 U.S. at 940. Instead, that claim amounted to nothing more than the private misuse or abuse of a state statute. See 457 U.S. at 940-41.

For a private individual to be acting under color of state law, the deprivation of a federal right "must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible," and "the party charged with the deprivation must be a person who may fairly be said to be a state actor . . . because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State." Lugar v. Edmondson Oil Co.,

457 U.S. at 937.

> Congress did not, in using the term "under the color of state law," intend to subject private citizens, acting as private citizens, to a federal lawsuit whenever they seek to initiate a prosecution or seek a remedy involving the judicial system. To hold otherwise would significantly disregard one purpose of the state action requirement, which is to "preserve[ ] an area of individual freedom by limiting the reach of federal law and federal judicial power." *Lugar*, 457 U.S. at 936. . . . Instead, in enacting § 1983, Congress intended to provide a federal cause of action primarily when the actions of private individuals are undertaken with state authority. *See id.* . . . Thus, absent more, causing the state, or an arm of the state, to initiate a prosecution or serve process is insufficient to give rise to state action.

How v. City of Baxter Springs, 217 F. App'x. 787, 793 (10th Cir. 2007)(unpublished).

The Tenth Circuit has described the determination of state action as "particularly fact-sensitive, so the circumstances must be examined in their totality." Marcus v. McCollum, 394 F.3d 813, 819 (10th Cir. 2004). According to the Tenth Circuit, "[t]he Supreme Court has counseled us that the state action inquiry, although a legal determination to be made by the court, [see Gilmore v. City of Montgomery, 417 U.S. 556, 570 (1974),] requires the 'sifting [of] facts and weighing [of] evidence.'" Phelps v. Wichita Eagle–Beacon, 886 F.2d 1262, 1271 (10th Cir.1989)(quoting Burton v. Wilmington Parking Auth., 365 U.S. 715, 722(1961)). In Gilmore v. City of Montgomery, the Supreme Court ruled that, although it was the Court's role to determine whether the use of zoos, museums, parks, and other recreational facilities by private school groups and private non-school organizations "involved government so directly in the actions of those users as to warrant court intervention on constitutional grounds," the factual record before the Supreme Court "[did] not contain sufficient facts upon which to predicate legal judgments of this kind." 417 U.S. at 570.

On the other hand, leaving the determination of state action to the jury has shown to be ill-advised. The cases in which the acts of private entities have been held to constitute state action or to be under color of law, and cases in which they have not, tend to be distinguished "by fine shadings in the sometimes complex interrelationships that develop between the state and private bodies."

Adams v. Vandemark, 787 F.2d 588, 1986 WL 16606, at *2 (6th Cir.1986)(unpublished). In Adams v. Vandemark, the United States Court of Appeals for the Sixth Circuit reviewed a jury instruction from the United States District Court for the Eastern District of Michigan, instructing the jury on when to find state action. 1986 WL 16606, at *1. The Sixth Circuit concluded that the few words that were given to the jury on when to find state action "gave the jury little to guide it in making its determination on this crucial element of the claim for relief." 1986 WL 16606, at *2. The Sixth Circuit noted that the application of the state action test is a "very difficult and complex question[]," and, "[t]o the extent a jury is to decide upon the proper factual predicates for this essentially legal determination, it must be given instructions that are clear, precise and informative as to the factors involved and the factual issues to be determined." 1986 WL 16606, at *2. The Sixth Circuit found that the defendants were entitled to a new trial, because the jury was given no direction that could have enabled it to make the necessary underlying factual determination regarding state action. See 1986 WL 16606, at *2-3.

The Supreme Court has articulated four different tests for courts to use in determining whether conduct by an otherwise private party is state action: (i) the public-function test; (ii) the nexus test; (iii) the symbiotic-relationship test; and (iv) the joint-action test. See Johnson v. Rodrigues (Orozco), 293 F.3d 1196, 1202-03 (10th Cir. 2002)(reviewing the various tests); Gallagher v. Neil Young Freedom Concert, 49 F.3d 1442, 1447 (10th Cir.1995)(noting that "[a]pplication of the state action doctrine has been characterized as one of the more slippery and troublesome areas of civil rights litigation")(internal quotation marks omitted)). Under the public-function test, a court determines whether a private party has exercised "powers traditionally exclusively reserved to the State." Jackson v. Metro. Edison Co., 419 U.S. 345, 352 (1974). The public-function test is difficult to satisfy, because while many functions may be traditionally

governmental, few are "exclusively" governmental functions, as the test requires. Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1456. The courts have found exclusive government functions to include holding elections, performing necessary municipal functions, and running a nursing facility. See Johnson v. Rodrigues (Orozco), 293 F.3d at 1203.

Under the nexus test, state action is present if the state has ordered the private conduct, or "exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." Blum v. Yaretsky, 457 U.S. 991, 993 (1982). A court determines, under the nexus test, whether there is a sufficiently close nexus between the state and the challenged conduct, such that the conduct "may be fairly treated as that of the state itself." Jackson v. Metro. Edison Co., 419 U.S. at 351. "Private use of state-sanctioned private remedies or procedures does not rise to the level of state action. . . . But when private parties make use of state procedures with the overt, significant assistance of state officials, state action may be found." Tulsa Professional Collection Servs., Inc. v. Pope, 485 U.S. 478, 486 (1988)(internal citations omitted).

Under the symbiotic-relationship test, state action is present if the state "has so far insinuated itself into a position of interdependence" with a private party that "it must be recognized as a joint participant in the challenged activity." Burton v. Wilmington Parking Authority, 365 U.S. 715, 725, (1961). "[E]xtensive regulation, receipt of substantial state funds, and the performance of important public functions do not necessarily establish the kind of symbiotic relationship between the [state] and a private [party] that is required for state action." Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1451.

> The applicable decisions clearly establish no bright-line rule for determining whether a symbiotic relationship exists between a government agency and a private entity. Questions as to how far the state has insinuated itself into the operations of a

> particular private entity and when, if ever, the operations of a private entity become indispensable to the state are matters of degree.

Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1452.

State action exists under the joint-action test if the private party is a "willful participant in joint action with the State or its agents." Dennis v. Sparks, 449 U.S. 24, 27 (1980). Courts look to "whether state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights." Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1453. "[I]f there is a substantial degree of cooperative action between state and private officials . . . or if there is overt and significant state participation, in carrying out the deprivation of the plaintiff's constitutional rights, state action is present." Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1454 (internal quotation marks and citations omitted). Joint participation can also take the form of a conspiracy between public and private actors; in such cases, the plaintiff must show that the public and private actors shared a common, unconstitutional goal. See Sigmon v. CommunityCare HMO, Inc., 234 F.3d 1121, 1126 (10th Cir. 2000). Even a conspiracy claim requires a sufficient level of state involvement to constitute joint participation in the unconstitutional actions. See Soldal v. Cook Cty., 506 U.S. 56, 60 n.6 (1992). The Tenth Circuit has previously dismissed constitutional claims against a private individual where the plaintiff did not give specific facts showing a conspiracy evidencing state action. See Martinez v. Winner, 771 F.2d 424, 445 (10th Cir.1985)("Beyond the bare conclusory allegation that [the defendant], a private citizen, conspired with the other defendants to deprive plaintiff of his constitutional and civil rights, no facts are stated indicating that [the defendant] did anything.").

In Gallagher v. Neil Young Freedom Concert, the Tenth Circuit surveyed several instances in which courts have found action "under color of state law" where governmental and private parties have acted together in joint-action:

> We have applied the joint action test in several cases involving allegations that private citizens acted in concert with police officers in making arrests. In both *Carey v. Continental Airlines Inc.,* 823 F.2d 1402 (10th Cir. 1987), and *Lee v. Town of Estes Park,* 820 F.2d 1112 (10th Cir. 1987), we held that citizens who made complaints to police officers that resulted in arrests were not state actors. We found nothing in the record in either case from which we could infer that the allegedly unconstitutional arrests "resulted from any concerted action, whether conspiracy, prearranged plan, customary procedure, or policy that substituted the judgment of a private party for that of the police or allowed a private party to exercise state power." *Carey,* 823 F.2d at 1404. In both cases, the record indicated that the police officers had made an independent decision to make the challenged arrest. In contrast, in *Lusby v. T.G. & Y. Stores, Inc.,* 749 F.2d 1423, 1429 (10th Cir. 1984), *cert. denied,* 474 U.S. 818, 106 S. Ct. 65, 88 L.Ed.2d 53 (1985), we concluded that a store security guard who reported a suspected shoplifter to the police was a state actor. We noted that the officer that made the arrest did not make an independent investigation but relied on the judgment of the security guard. In *Coleman v. Turpen,* 697 F.2d 1341 (10th Cir. 1982) (per curiam), we applied the joint action test by focusing on the manner in which the alleged constitutional deprivation was carried out. There, the plaintiff challenged the seizure and sale of his property and named as defendants not only state officials but also the wrecking company that towed his truck and subsequently sold it. We found the company to be a state actor because it had "jointly participated in seizing the truck by towing it away" and because the company's sale of the plaintiff's property was "an integral part of the deprivation." *Id.* at 1345.

Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1453-56. The Tenth Circuit noted that, "just as with the other tests for state action, the mere acquiescence of a state official in the actions of a private party is not sufficient." 49 F.3d at 1453. The Tenth Circuit ruled that the joint-action test can be satisfied where police are involved in cooperative action with a private party when "the police have substantially assisted in the allegedly wrongful conduct." 49 F.3d at 1455. Joint participation typically arises when the authorities agree to facilitate private parties' acts that, if a state conducted, would be unconstitutional, through affirmative action. See Soldal v. Cook Cty., 506 U.S. at 60 n.4.

**2. Commercial Speech.**

The Supreme Court's First Amendment decisions create a rough hierarchy in the constitutional protection of speech. See Snyder v. Phelps, 562 U.S. at 452; R.A.V. v. St. Paul, 505 U.S. 377, 422 (1992)(Stevens, J. dissenting). "Core political speech occupies the highest, most

protected position; commercial speech and nonobscene, sexually explicit speech are regarded as a sort of second-class expression; obscenity and fighting words receive the least protection of all." R.A.V. v. St. Paul, 505 U.S. at 422 (Stevens, J. dissenting). Commercial speech is "speech that does no more than propose a commercial transaction." Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc., 425 U.S. 748, 762 (1976). See Central Hudson, 447 U.S. at 561("The Commission's order restricts only commercial speech, that is, expression related solely to the economic interests of the speaker and its audience."). The following characteristics indicate that speech is commercial speech: (i) if the speech is contained in an advertisement; (ii) if it is made with an economic motive; or (iii) if it refers to a specific product. See Proctor & Gamble Co. v. Haugen, 222 F.3d 1262, 1274 (10th Cir. 2000). A representation, however, is not automatically commercial speech because it contains one or more of the preceding characteristics. See Proctor & Gamble Co. v. Haugen, 222 F.3d at 1274.

The Supreme Court, in Central Hudson, provided the analytical framework to determine what kind of commercial speech is entitled to First Amendment protection. See Central Hudson, 447 U.S. at 564. It explained:

> The First Amendment's concern for commercial speech is based on the informational function of advertising. Consequently, there can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public about lawful activity. The government may ban forms of communication more likely to deceive the public than to inform it, or commercial speech related to illegal activity.

Central Hudson, 447 U.S. at 563. The government has, accordingly, the power to regulate deceptive or commercial speech related to an illegal activity, but less power to regulate lawful and non-misleading commercial speech. See Central Hudson, 447 U.S. at 564. Before proceeding to the Central Hudson balancing test, a court must perform a threshold inquiry to determine whether the speech is non-misleading and concerns lawful activity. See Central Hudson, 447 U.S. at 566. "At

the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading." Central Hudson, 447 U.S. at 566. See Revo v. Disciplinary Bd. of the Supreme Court for the State of N.M., 106 F.3d 929, 932 (10th Cir. 1997)("Revo").

If a court determines that the speech is commercial, lawful, and not deceptive, the Court proceeds to a three-part balancing test. See Central Hudson, 447 U.S. at 564-66. "If the communication is neither misleading nor related to unlawful activity . . . we ask whether the asserted governmental interest is substantial. . . . [W]e must [next] determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest." Central Hudson, 447 U.S. at 564, 566. See Revo, 106 F.3d at 932. The Tenth Circuit has expressed the Central Hudson test in following manner:

> As a threshold inquiry under *Central Hudson,* we must determine whether the particular advertisement is protected speech -- *i.e.,* whether it concerns lawful activity and is not misleading. If not, the speech may be freely regulated. Protected commercial speech may also be regulated, but only if the government can show that (1) it has a substantial state interest in regulating the speech, (2) the regulation directly and materially advances that interest, and (3) the regulation is no more extensive than necessary to serve the interest.

Revo, 106 F.3d at 932 (citations omitted). "[T]he regulation may not be sustained if it provides only ineffective or remote support for the government's purpose." Central Hudson, 447 U.S. at 565.

In considering the threshold inquiry -- whether the speech concerns lawful activity and is not misleading -- Supreme Court jurisprudence has drawn distinctions between misleading commercial speech, potentially misleading commercial speech, and truthful commercial speech. See e.g., In re

R.M.J., 455 U.S. 191, 203 (1982).[23] Misleading commercial speech may be prohibited entirely without a Central Hudson analysis. See In re R.M.J., 455 U.S. at 203.[24] The Central Hudson balancing test, however, applies when the speech is potentially misleading or when it is truthful. See In re R.M.J., 455 U.S. at 203. See also Revo, 106 F.3d at 933. Potentially misleading speech occurs when "the information also may be presented in a way that is not deceptive." In re R.M.J., 455 U.S. at 203. Commercial speech is not "potentially misleading" simply with the "rote invocation of the words"; the party asserting that the speech is potentially misleading must "point to . . . harm that is potentially real, not purely hypothetical." Ibanez v. Florida Dept. of Business and Professional Regulation, Bd. of Accountancy, 512 U.S. 136, 146 (1994). In contrast, inherently misleading speech is "incapable of being presented in a way that is not deceptive." Revo, 106 F.3d at 929. In Revo, for example, the Tenth Circuit considered whether direct mailing advertisements from a personal injury attorney "inevitably convey a false message that soliciting lawyers are more experienced, tougher, more skillful, and better qualified than non-soliciting lawyers, notwithstanding the fact that the letters themselves make no reference to those attributes." Revo, 106 F.3d at 933. The Tenth Circuit concluded that the mailings could not be inherently misleading, because the defendants "offer[ed] no proof that some other qualified lawyer who could superbly represent

[23]Although In re R.M.J., considered commercial speech "in the context of advertising for professional services," In re. R.M.J., 455 U.S. at 203, Courts of Appeals have applied the case to other commercial speech contexts, see e.g., Discount Tobacco City & Lottery Inc., v. United States, 674 F.3d 509, 524 (6th Cir. 2012)(citing In re R.M.J., 455 U.S. at 203).

[24]Justice Marshall subsequently suggested, more broadly, that "[s]tates may prohibit actually or inherently misleading commercial speech entirely." Peel v. Attorney Registration and Disciplinary Com'n of Ill., 496 U.S. 91, 111 (1990)(Marshall, J. concurring). Whether speech is "actually misleading" requires a separate, factual inquiry from the inherently misleading analysis, and, if the record reveals that someone has been misled, the state can prohibit the speech entirely. See Peel v. Attorney Registration and Disciplinary Com'n of Ill., 496 U.S. at 111. See also Revo, 106 F.3d at 933 ("In addition, the Board offers no evidence that anyone was actually deceived by Mr. Revo's letters.").

personal injury victims would nevertheless be misleading potential clients simply by sending a direct mail solicitation." 106 F.3d at 933. Thus, to determine whether speech is inherently misleading, the proper inquiry is to consider whether there are any circumstances under which the speech could be truthful; if it could possibly be truthful, the speech is not inherently misleading. See 106 F.3d at 933.

When applying the Central Hudson test, the Supreme Court and the Tenth Circuit have identified several substantial governmental interests in regulating speech. See Central Hudson, 447 U.S. at 568 (ruling that the government has a substantial governmental interest in energy conservation); Florida Bar v. Went For It, Inc., 515 U.S. 618, 625-26 (1995)(holding that "protecting the privacy and tranquility of personal injury victims and their loved ones against intrusive, unsolicited contact by lawyers" is a substantial interest); Posadas de Puerto Rico Associates v. Tourism Co. of Puerto Rico, 478 U.S. 328, 341 ("We have no difficulty in concluding that the Puerto Rico Legislature's interest in the health, safety, and welfare of its citizens constitutes a 'substantial' governmental interest."); Utah Licensed Beverage Ass'n v. Leavitt, 256 F.3d 1061, 1070 (10th Cir. 2001)(holding that promoting temperance and supplying revenue are substantial governmental interests). The Supreme Court has concluded, however, that "the Government's interest in preserving state authority is not sufficiently substantial to meet the requirements of *Central Hudson*." Rubin v. Coors Brewing, Co., 514 U.S. 476, 486 (1995). See Matal v. Tam, 137 S. Ct. 1744, 1764 (2017)(ruling that "preventing speech expressing ideas that offend" is not a substantial governmental interest); Bolger v. Youngs Drug Products Corp., 463 U.S. 60, 70 (1983)(ruling that shielding citizens from offensive speech is not a substantial governmental interest); Utah Licensed Beverage Ass'n v. Leavitt, 256 F.3d at 1070 (holding that protecting nondrinkers from alcohol-related speech is not a substantial state interest); U.S. West, Inc. v. F.C.C., 182 F.3d 1224, 1235 (10th Cir. 1999)(ruling that protecting dissemination of private information

"does not necessarily rise to the level of a substantial state interest under *Central Hudson*"). In the tobacco context, the Supreme Court has recognized that there is a substantial governmental interest in preventing minors from using tobacco. See Lorillard Tobacco Co. v. Reilly, 533 U.S. 525, 555 (2001). "Unlike rational basis review, the Central Hudson standard does not permit [a court] to supplant the precise interests put forward by the State with other suppositions." Florida Bar v. Went For It, Inc., 515 U.S. 618, 624 (1995)(quoting Edenfield v. Fane, 507 U.S. 761, 768 (1993)).

Central Hudson's third step -- determining whether the speech restriction directly and materially advances the asserted government interest -- requires more than just "mere speculation or conjecture" that the speech restriction will advance the interest. Lorillard Tobacco Co. v. Reilly, 533 U.S. at 555. "[R]ather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." Lorillard Tobacco Co. v. Reilly, 533 U.S. at 555 (quoting Greater New Orleans, 527 U.S. 173, 188 (1999)). To satisfy the third step,

> [w]e do not, however, require that "empirical data come . . . accompanied by a surfeit of background information. . . . [W]e have permitted litigants to justify speech restrictions by reference to studies and anecdotes pertaining to different locales altogether, or even, in a case applying strict scrutiny, to justify restrictions based solely on history, consensus, and "simple common sense."

Lorillard Tobacco Co. v. Reilly, 533 U.S. at 555 (quoting Florida Bar v. Went For It, Inc., 515 U.S. at 628). In Lorillard Tobacco Co. v. Reilly, for example, the Supreme Court considered whether a regulation prohibiting smokeless tobacco or cigar advertising within a 1,000-foot radius of a school or playground directly advances the governmental interest in preventing minors from using tobacco. See 533 U.S. at 556-57. The tobacco company argued, in part, that there is no link between the regulation and the substantial governmental interest in preventing minor tobacco use, because the government had only identified a problem with underage cigarette smoking and not a problem with

smokeless tobacco use. See Lorillard Tobacco Co. v. Reilly, 533 U.S. at 556-57. The company further averred that the government could not prove that there is a causal link between advertising and tobacco use. See 533 U.S. at 557. After considering those arguments, the Supreme Court concluded that the regulation banning the advertising advances the governmental interest identified, because many studies support the claim that minors' smokeless tobacco use has increased, and other studies demonstrate a link between advertising and a demand for smokeless tobacco products. See 533 U.S. at 557-61.

In considering the final factor -- that the regulation is no more extensive than necessary to serve the governmental interest -- the Supreme Court has cautioned that it is not a "least-restrictive-means requirement." Board of Trustees of the State University of New York v. Fox, 492 U.S. 469, 478 (1989). Rather, as "commercial speech [enjoys] a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values," the "ample scope of regulatory authority suggested . . . would be illusory if it were subject to a least-restrictive-means requirement, which imposes a heavy burden on the State." Board of Trustees of the State University of New York v. Fox, 492 U.S. at 477 (alteration in original).

> What our decisions require is a "'fit' between the legislature's ends and the means chosen to accomplish those ends," a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is "in proportion to the interest served," that employs not necessarily the least restrictive means but, as we have put it in the other contexts discussed above, a means narrowly tailored to achieve the desired objective.

Board of Trustees of State University of the New York v. Fox, 492 U.S. at 480 (citations omitted). "It is far different, of course, from the 'rational basis' test used for Fourteenth Amendment equal protection analysis." Board of Trustees of the State University of New York v. Fox, 492 U.S. at 480.

> There it suffices if the law could be thought to further a legitimate governmental goal, without reference to whether it does so at inordinate cost. Here we require the government goal to be substantial, and the cost to be carefully calculated. Moreover,

> since the State bears the burden of justifying its restrictions, it must affirmatively establish the reasonable fit we require.

Board of Trustees of the State University of New York v. Fox, 492 U.S. at 480. See Utah Licensed Beverage Ass'n v. Leavitt, 256 F.3d 1061, 1066 (10th Cir. 2001)("Under *Central Hudson*, laws restricting commercial speech are subject to an 'intermediate' level of scrutiny.").

In Lorillard Tobacco Co. v. Reilly, for example, the Supreme Court determined that a tobacco advertising ban within 1,000 feet of schools or playgrounds in Massachusetts was not reasonably fitted to the legislature's goal -- preventing minors' tobacco use. See Lorillard Tobacco Co. v. Reilly, 533 U.S. at 561. The Lorillard Tobacco Co v. Reilly Court determined that the ban was unreasonable, because, in effect, the ban would "prevent advertising in 87% to 91% of Boston, Worcester, and Springfield Massachusetts." Lorillard Tobacco Co. v. Reilly, 533 U.S. at 562. The Supreme Court reasoned:

> In some geographical areas, these regulations would constitute nearly a complete ban on the communication of truthful information about smokeless tobacco and cigars to adult consumers. The breadth and scope of the regulations, and the process by which the Attorney General adopted the regulations, do not demonstrate a careful calculation of the speech interests involved.

533 U.S. at 562. It concluded, therefore, that the government "has failed to show that the outdoor advertising regulations . . . are not more extensive than necessary to advance the State's substantial interest in preventing underage tobacco use." Lorillard Tobacco Co. v. Reilly, 533 U.S. at 565.

## STATE LAW REGARDING UNFAIR AND DECEPTIVE PRACTICES

### 1. California Law.

The California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 ("UCL"), prohibits "any unlawful, unfair or fraudulent act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200. To bring suit under the UCL, a consumer must demonstrate that she suffered injury in fact and lost money or property as a result of the unfair

competition. See Kwikset Corp. v. Superior Court, 246 P.3d 877, 884 (Cal. 2011) "Under the statute 'there are three varieties of unfair competition: practices which are unlawful, unfair or fraudulent.'" In re Tobacco II Cases, 207 P.3d 20, 29 (Cal. 2009). "[C]laims of deceptive advertisements and misrepresentations" fall under the fraudulent variety of unfair competition. In re Tobacco II Cases, 207 P.3d at 29. "[T]o state a claim under either the UCL or the false advertising law, based on false advertising or promotional practices, 'it is necessary only to show that members of the public are likely to be deceived.'" In re Tobacco II Cases, 207 P.3d at 29 (quoting Kasky v. Nike, Inc., 45 P.3d 243, 250 (Cal. 2002)). Whether the public is likely to be deceived "is judged by the effect [the challenged conduct] would have on a reasonable consumer," unless "the challenged conduct targets a particular disadvantaged or vulnerable group." Puentes v. Wells Fargo Home Mortg., 160 Cal. App. 4th 638, 645 (2008)(citations omitted). See Ebner v. Fresh, Inc., 838 F.3d 958, 965 (9th Cir. 2016); Quelimane Co. v. Stewart Title Guaranty Co., 960 P.2d 513, 530 (Cal. 1998).

"A UCL action is equitable in nature; damages cannot be recovered. . . . We have stated under the UCL, "[p]revailing plaintiffs are generally limited to injunctive relief and restitution." In re Tobacco II Cases, 207 P.3d at 29 (quoting Korea Supply Co. v. Lockheed Martin Corp., 63 P.3d 937, 943 (Cal. 2003)).

UCL liability is subject to a safe harbor. See Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Telephone Co., 973 P.2d 527, 551 (Cal. 1999)("Cel-Tech"); Ebner v. Fresh, Inc., 838 F.3d at 963. "To forestall an action under the unfair competition law, another provision must actually 'bar' the action or clearly permit the conduct." Cel-Tech, 973 P.2d at 541. "Conversely, the Legislature's mere failure to prohibit an activity does not prevent a court from finding it unfair."

Cel-Tech, 973 P.2d at 542. "There is a difference between (1) not making an activity unlawful, and (2) making that activity lawful." Cel-Tech, 973 P.2d at 541.

**2. Colorado Law.**

The Colorado Consumer Protection Act, Colo. Rev. Stat. §§ 6-1-101-115 ("CCPA"), prohibits deceptive trade practices. See Colo. Rev. Stat. §§ 6-1-105, 6-1-113. Relevant to this Memorandum Opinion and Order, a deceptive trade practice occurs when

> in the course of the person's business . . . the person:
>
> (e) Knowingly makes a false representation as to the characteristics, ingredients, uses, benefits, alterations, or quantities of goods, food, services, or property;
>
> . . . .
>
> (g) Represents that goods, food, services, or property are of a particular standard, quality or grade . . . if he knows or should know they are of another.

Colo. Rev. Stat. § 6-1-105(1)(e), (g). "A plaintiff may satisfy the deceptive trade practices requirement of section 6-1-105(1)(e) by establishing either a misrepresentation or that the false representation had the capacity or tendency to deceive, even if it did not." Rhino Linings USA, Inc. v. Roby Mountain Rhino Lining, Inc., 62 P.3d 142, 147 (Colo. 2003)(en banc). A misrepresentation is "a false or misleading statement that induces the recipient to act or refrain from acting . . . [and] is made 'either with knowledge of its untruth, or recklessly and willfully made without regard to its consequences, and with an intent to mislead and deceive the plaintiff." Rhino Linings USA, Inc. v. Roby Mountain Rhino Lining, Inc., 62 P.3d at 147 (quoting Parks v. Bucy, 211 P.638, 639 (Colo. 1922)). To establish liability under the CCPA, "any person," as Colo. Rev. Stat. § 6-1-102(6) defines, must demonstrate:

> (1) that the defendant engaged in an unfair or deceptive trade practice; (2) that the challenged practice occurred in the course of defendant's business, vocation, or

> occupation; (3) that it significantly impacts the public as actual or potential consumers of the defendant's goods, services, or property; (4) that the plaintiff suffered injury in fact to a legally protected interest; and (5) that the challenged practice caused the plaintiff's injury.

Hall v. Walter, 969 P.2d 224, 235 (Colo. 1998)(en banc). See Alpine Bank v. Hubbell, 555 F.3d 1097, 1112 (10th Cir. 2009).

The CCPA does not apply to "[c]onduct in compliance with the orders or rules of, or a statute administered by, a federal, state, or local governmental agency." Colo. Rev. Code § 6-1-106(1)(a). "The plain meaning of the exclusion section of the [Colorado Consumer Protection Act] is that conduct *in compliance* with other laws will not give rise to a cause of action under section 6-1-106(1)(a)." Showpiece Homes Corp. v. Assurance Co. of America, 38 P.3d 47, 56 (Colo. 2001)(en banc)(emphasis in original). Only activities "specifically authorized by a regulation or another statute [are] exempt" from the safe harbor. Showpiece Homes Corp. v. Assurance Co. of America, 38 P.3d at 56.

**3. Florida Law.**

The Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.204 ("FDUTPA"), prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204. Trade or commerce includes "advertising . . . or distributing . . . any good or service, or any property . . . wherever situated." Fla Stat. § 501.203. "[U]nder FDUTPA, the plaintiff must only establish three *objective* elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." Carriuolo v. General Motors Co., 823 F.3d 977, 985-86 (11th Cir. 2016). See Soper v. Tire Kingdom, Inc., 124 So. 3d 804, 806 (Fla. 2013)(Canady, J. dissenting)("[C]onsumer claim[s] for damages under FDUTPA . . . require[] proof of: (1) a deceptive or unfair practice; (2) causation; and (3) actual damages."). FDUTPA has two distinct prongs: an unfair practice prong and a deceptive prong. See

PNR, Inc. v. Beacon Property Management, Inc., 842 So.2d 773, 777 (Fla. 2003). An unfair practice is "one that 'offends established public policy' and one that is 'immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.'" PNR, Inc. v. Beacon Property Management, Inc., 842 So.2d at 777. A deceptive practice "occurs if there is a representation, omission, or practice that is likely to mislead consumers acting reasonably in the circumstances, to the consumers' detriment." State v. Beach Blvd. Automotive Inc., 139 So. 3d 380 (Fla. Dist. Ct. App. 2014)(citing PNR, Inc. v. Beacon Property Management, Inc., 842 So.2d at 777). See Zlotnick v. Premier Sales Group, Inc., 480 F.3d 1281, 1284 (11th Cir. 2007). FDUTPA does not apply to "[a]n act or practice required or specifically permitted by federal or state law." Fla Stat. § 501.212(1).

**4. Illinois Law.**

The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/2 ("ICFA"), prohibits

> unfair or deceptive acts or practices, including but not limited to the use . . . of any deception, fraud, . . . misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment . . . in the conduct of any trade or commerce . . . whether any person has in fact been misled, deceived or damaged thereby.

815 Ill. Comp. Stat. 505/2. "[T]rade and commerce mean the advertising, offering for sale, sale, or distribution of any services and any property . . . and shall include any trade or commerce directly or indirectly affecting the people of this State." 815 Ill. Comp. Stat. 505/(1)(f) (quotations omitted). To sustain a claim under the ICFA, a plaintiff must show "(1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in a course of conduct involving trade or commerce, and (4) actual damage to the plaintiff that is (5) a result of the deception." De Bouse v. Bayer, 922 N.E.2d 309, 313 (Ill. 2009). See Philadelphia Indem. Ins. Co. v. Chicago Title Ins. Co., 771 F.3d 391, 402 (7th Cir. 2014).

The ICFA does not apply, however to "[a]ctions or transactions specifically authorized by laws administered by any regulatory body or officer acting under statutory authority of this State or the United States." 815 Ill. Comp. Stat. 505/10b(1). "The plain language of section 10b(1) requires that two separate conditions be present before a claim is barred." Price v. Philip Morris, Inc., 848 N.E. 2d 1, 36 (Ill. 2005). "First, a regulatory body or officer must be operating under statutory authority." Price v. Philip Morris, Inc., 848 N.E. 2d at 36. "Second, liability under the Consumer Fraud Act is barred by section 10b(1) only if the action or transaction at issue is 'specifically authorized by laws administered' by the regulatory body." 848 N.E. 2d at 36 (quoting 815 Ill. Comp. Stat. 505/10b(1)). In Price v. Philip Morris, the Supreme Court of Illinois determined that the FTC's use of the terms "low tar" and "ultra low tar" in its reports to Congress, did not "specifically authorize[] cigarette manufactures to use these terms in labeling or advertising." 848 N.E. 2d at 36. "Conduct is not specifically authorized merely because it has not been specifically prohibited." 848 N.E. 2d at 36. Moreover, "[c]onduct is not specifically authorized merely because it has been passively allowed to go on for a period of time without regulatory action being taken to stop it." 848 N.E. 2d at 36. The proper inquiry, instead, is to "look to the affirmative acts or expressions of authorization by the FTC." 848 N.E. 2d at 36. The Supreme Court of Illinois emphasized that "[t]he term 'specifically' indicates a legislative intent to require a certain degree of specificity or particularity in the authorization," see 848 N.E. 2d at 38, and that "mere compliance with applicable federal regulations is not necessarily a shield against liability under the Consumer Fraud Act," 848 N.E. 2d at 40. It concluded, however, that a regulatory body "may specifically authorize conduct . . . without engaging in formal rulemaking" and that while authorization must be specific "it need not be express." 848 N.E. 2d at 42. The Supreme Court of Illinois ruled, accordingly, that an FTC consent order "specifically authoriz[ing] all United States tobacco companies" to use "low,"

"lower," "reduced" and other similar words "so long as the descriptive terms are accompanied by a clear and conspicuous disclosure of the 'tar' and nicotine content" barred a plaintiff's claim under 815 Ill. Comp. Stat. 505/10b(1). 219 Ill. 2d at 265-66.

The Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. 510/2 ("IUDTPA"), similarly prohibits deceptive practices performed "in the course of his or her business" that

> (5) represents that goods or services have . . . benefits . . . that they do not have;
>
> . . . .
>
> (7) represents that goods or services are of a particular standard [or] quality;
>
> . . . .
>
> (9) advertises goods or services with intent not to sell them as advertised; and
>
> . . . .
>
> (12) engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding.

815 Ill. Comp. Stat. 510/2(a)(5),(7),(9),(12).

IUDTPA does not apply to "conduct in compliance with orders or rules of or a statute administered by a Federal, state or local governmental agency." 815 Ill. Comp. Stat. 510/4(1). The Supreme Court of Illinois, in Price v. Phillip Morris, concluded that, for the same reasons articulated above, an FTC consent order specifically authorizing conduct bars plaintiffs' claims under 815 Ill. Comp. Stat. 510/4(1). See Price v. Phillip Morris, Inc., 848 N.E. 2d at 54.

> Because we have concluded that the 1971 and 1995 consent orders provided specific authorization to all industry members to engage in the conduct permitted by the orders, these orders fall within the scope of [815 Ill. Comp. Stat. 510/4(1)], even though [Philip Morris] was not a party to either consent order.

848 N.E. 2d at 54.

5. **Massachusetts Law.**

Massachusetts law prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws. Ch. 93A, § 2(a). To establish a claim under Mass. Gen. Laws. Ch. 93A, § 2, a private plaintiff must show: "(1) that the defendant engaged in an unfair method of competition or committed an unfair or deceptive act or practice . . . (2) a loss of money or property suffered as a result; and (3) a causal connection between the loss suffered and the defendant's unfair or deceptive method, act, or practice. Auto Flat Car Crushers, Inc., 17 N.E.3d 1066, 1074-75 (Mass. 2014). The statute "does not provide [a] definition for 'unfair practice,' and '[t]he existence of unfair acts and practices must be determined from the circumstances of each case.'" 477 Harrison Ave., LLC v. Jace Boston, LLC, 74 N.E.3d 1237, 1247 (Mass. 2017)(quoting Commonwealth v. Decotis, 316 N.E.2d 748, 754 (Mass. 1974)). "A practice is unfair if it is 'within . . . the penumbra of some common-law, statutory, or other established concept of unfairness; . . . is immoral, unethical, oppressive, or unscrupulous; [and] . . . causes substantial injury." Linkage Corp. v. Trustees of Boston Univ., 679 N.E.2d 191, 209 (Mass. 1997)(alterations in original)(citations omitted). When construing acts that are purportedly deceptive, "Massachusetts courts . . . must be guided by interpretations of that term as found in the analogous Federal Trade Commission Act (FTC Act), 15 U.S.C. § 45(a)(1)." Aspinall v. Philip Morris Cos., Inc., 813 N.E.2d 476, 487 (Mass. 2004).

> Historically, the standard test for deception prohibited by the FTC Act was whether the act or practice had the capacity or tendency to deceive the general public, rather than whether it was relied on or resulted in actual deception. . . . The FTC later clarified that test as follows: "if, first, there is a representation, omission, or practice that, second, is likely to mislead consumers acting reasonably under the circumstances, and third, the representation, omission, or practice is material." *Matter of Cliffdale Assocs., Inc.*, 103 F.T.C. 110, 165 (1984). This standard, more difficult to satisfy because it depends on the likely reaction of a reasonable consumer rather than an ignoramus, appears to have been applied by Federal courts ever since.

Aspinall v. Philip Morris Cos., Inc., 813 N.E.2d at 487. "[A]n advertisement is deceptive when it has the capacity to mislead consumers, acting reasonably under the circumstances, to act differently from the way they otherwise would have acted." 813 N.E.2d at 488.

Mass. Gen. Laws. Ch. 93A has a safe harbor, which reads: "Nothing in this Chapter shall apply to transactions or actions otherwise permitted under laws as administered by any regulatory board or officer acting under statutory authority of the commonwealth of the United States." Mass. Gen. Laws. Ch. 93A, § 3.

> A defendant's burden in claiming the exemption "is a difficult one to meet. To sustain it, a defendant must show more than the mere existence of a related or even overlapping regulatory scheme that covers the transaction. Rather, a defendant must show that such scheme affirmatively *permits* the practice which is alleged to be unfair or deceptive."

Commonwealth v. Fremont Inv. & Loan, 897 N.E.2d 548, 561 (Mass. 2008)(quoting Fleming v. National Union Fire Ins. Co., 837 N.E.2d 1113, 1121 (Mass. 2005)(emphasis in both). In Aspinall v. Philip Morris, Inc., 902 N.E.2d 421 (Mass. 2009)("Aspinall II"), the Supreme Judicial Court of Massachusetts considered how the exemption might apply where a tobacco company argued that an FTC consent order "'condoned,' 'authorized,' and 'permitted' the use of descriptors" on their cigarette packages. Aspinall II, 902 N.E.2d at 424. Citing the Supreme Court in Altria II, the Supreme Court of Massachusetts, noted that the 1971 consent order, which the Defendants invoked, "only *enjoined* conduct" and that "a consent order is binding only on the parties to the agreement." 902 N.E.2d at 424 (emphasis in original)(citing Altria II, 555 U.S. at 89 n.13). The Aspinall II Court concluded, therefore, that "the defendants point to nothing approaching a showing that the FTC has affirmatively permitted the use of descriptors." 902 N.E.2d at 425 (footnote omitted).

**6. Michigan Law.**

The Michigan Consumer Protection Act, Mich. Comp. Laws §§ 445.901-902 ("MCPA"), prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce." Mich. Comp. Laws § 445.903. Relevant to this Memorandum Opinion and Order, it defines the following practices as unlawful under the act:

> (a) Causing a probability of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services.
>
> . . . .
>
> (c) Representing that goods or services have . . . characteristics, ingredients, uses, benefits, or quantities that they do not have.
>
> . . . .
>
> (e) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another.
>
> . . . .
>
> (g) Advertising or representing goods or services with intent not to dispose of those goods or services as advertised or represented.
>
> . . . .
>
> (s) Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer.
>
> . . . .
>
> (z) Charging the consumer a price that is grossly in excess of the price at which similar property or services are sold.

Mich. Comp. Laws § 445.903(a), (c), (e), (g), (s), (z).

The MCPA does not apply, however, to "transaction[s] or conduct specifically authorized under laws administered by a regulatory board or officer acting under statutory authority of this state or the United States." Mich. Comp. Laws § 445.904(1)(a). When considering whether the MCPA

applies, a court's focus should be directed at whether "the transaction at issue, not the alleged misconduct, is 'specifically authorized.'" Smith v. Globe Life Ins. Co., 597 N.W.2d 28, 37 (Mich. 1999). "When the Legislature said that transactions or conduct 'specifically authorized' by law are exempt from the MCPA, it intended to include conduct the legality of which is in dispute." 597 N.W.2d at 38.

**7. New Jersey Law.**

Under the New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1-56:8-206 ("NJCFA"), "[a] consumer who can prove (1) an unlawful practice, (2) an ascertainable loss, and (3) a causal relationship between the unlawful conduct and the ascertainable loss, is entitled to legal and/or equitable relief, treble damages, and reasonable attorneys' fees." Gonzalez v. Wilshire Credit Corp., 25 A.3d 1103, 1115 (N.J. 2011)(quotations omitted). See Harnish v. Widener University School of Law, 833 F.3d 298, 305 (3d Cir. 2016). An unlawful practice under the NJCFA is the

> use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged.

N.J. Stat. Ann. § 56:8-2. See Gonzalez v. Wilshire Credit Corp., 25 A.3d at 1115. "A practice can be unlawful even if no person was in fact misled or deceived thereby." Cox v. Sears Roebuck & Co., 647 A.2d 454, 462 (N.J. 1994). The Supreme Court of New Jersey has explained that the NJCFA "provides a private cause of action to consumers who are victimized by fraudulent practices in the market place," and that the statute "is intended to 'be applied broadly in order to accomplish its remedial purpose, namely to root out consumer fraud.'" Gonzalez v. Wilshire Credit Corp., 25 A.3d at 1114-15 (quoting Lemelledo v. Beneficial Mgmt. Corp. of Am., 696 A.2d 546, 551

(N.J. 1997)). "Any person who suffers any ascertainable loss of moneys or property, real or personal, as a result of the use" of an unconscionable commercial practice may bring a lawsuit seeking, among other things, treble damages. Gonzalez v. Wilshire Credit Corp., 25 A.3d at 1116 (emphasis omitted)(quoting N.J. Stat. Ann. § 56:8-19). Under the NJCFA, the test for deception turns on the perception of a reasonable consumer. See Barry v. Arrow Pontiac, Inc., 494 A.2d 804, 810 (N.J. 1985)("[W]e are dealing with whether the ad itself is misleading to the average consumer, not whether it can later be explained to the more knowledgeable, inquisitive consumer.")

The NJCFA is subject to a judicially created exception. See Lemelledo v. Beneficial Mgmt. Corp. of America, 696 A.2d 546, 554 (N.J. 1997)("Lemelledo"). There is a "presumption that the CFA applies to covered practices, even in the face of other existing sources of regulation." Lemelledo, 696 A.2d at 554. "In order to overcome the presumption that the CFA applies to a covered activity, a court must be satisfied . . . that a direct and unavoidable conflict exists between application of the CFA and application of the other regulatory scheme or schemes." 696 A.2d at 554.

> It must be convinced that the other source or sources of regulation deal specifically, concretely, and pervasively with the particular activity, implying a legislative intent not to subject parties to multiple regulations that, as applied, will work at cross-purposes. We stress that the conflict must be patent and sharp, and must not simply constitute a mere possibility of incompatibility. If the hurdle for rebutting the basic assumption of applicability of the CFA to covered conduct is too easily overcome, the statute's remedial measures may be rendered impotent as primary weapons in combatting clear forms of fraud simply because those fraudulent practices happen also to be covered by some other statute or regulation.

696 A.2d at 554.

**8. New Mexico Law.**

The New Mexico Unfair Practices Act, N.M. Stat. Ann. § 57-12-3 ("NMUPA"), makes unlawful any "[u]nfair or deceptive trade practices [or] unconscionable trade practices in the conduct

of any trade or commerce." N.M. Stat. Ann. § 57-12-3. The NMUPA defines the term "unfair or deceptive trade practice" as

> an act specifically declared unlawful pursuant to the Unfair Practices Act, a false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale, lease, rental or loan of goods or services . . . by a person in the regular course of the person's trade or commerce, that may, tends to or does deceive or mislead any person.

N.M. Stat. Ann. § 57-12-2D. The statute also provides examples of conduct that could potentially violate the NMUPA. See N.M. Stat. Ann. §§ 57-12-2D(1)-(18) (stating that "unfair or deceptive trade practice means . . . and includes. . ."). See also Stevenson v. Louis Dreyfus Corp., 1991-NMSC-051, ¶ 14, 811 P.2d 1308, 1311 (1991)("After defining an unfair trade practice, the statute then . . . list[s] examples of conduct which may constitute an unfair trade practice."). Relevant to this Memorandum Opinion and Order are the following: "(5) representing that goods or services have . . . benefits . . . that they do not have; . . . (8) disparaging the goods . . . of another by false or misleading representations; . . . (14) using . . . ambiguity as to a material fact . . . if doing so deceives or tends to deceive. N.M. Stat. Ann. § 57–12–2D.

A claim under the NMUPA has four elements:

> First, the complaining party must show that the party charged made an "oral or written statement, visual description or other representation" that was either false or misleading. Second, the false or misleading representation must have been "knowingly made in connection with the sale, lease, rental or loan of goods or services in the extension of credit or . . . collection of debts." Third, the conduct complained of must have occurred in the regular course of the representer's trade or commerce. Fourth, the representation must have been of the type that "may, tends to or does, deceive or mislead any person."

Stevenson v. Louis Dreyfus Corp., 1991-NMSC-051, ¶ 13, 811 P.2d at 1311. "The 'knowingly made' requirement is met if a party was actually aware that the statement was false or misleading when made, or in the exercise of reasonable diligence should have been aware that the statement was false or misleading." Stevenson v. Louis Dreyfus Corp., 1991-NMSC-051, ¶ 17, 811 P.2d at 1311-

12. See Atherton v. Gopin, 2015-NMCA-003, ¶ 47, 340 P.3d 630, 640-41. Notably, a plaintiff need not prove detrimental reliance upon the defendant's representations. See Lohman v. Daimler-Chrysler Corp., 2007-NMCA-100, ¶ 35, 166 P.3d at 1098; Smoot v. Physicians Life Ins. Co., 2004-NMCA-027, ¶¶ 2, 20-23, 87 P.3d 545, 550-51. The Court has previously construed NMUPA and has noted that "in the right circumstances, it could grant judgment as a matter of law on whether a statement is deceptive or misleading" though "generally the question is a matter of fact." Guidance Endodontics, LLC v. Dentsply Int'l, Inc., 728 F. Supp. 2d 1170, 1193 (D.N.M. 2010)(Browning, J.). The Court has also concluded that a communication can mislead even if it is not false. See Guidance Endodontics, LLC v. Dentsply Int'l, Inc., 728 F. Supp. 2d at 1194-95.

**9. New York Law.**

New York's Consumer Protection from Deceptive Acts and Practices, N.Y. Gen. Bus. Law §§ 349-350-F-1("NYCPDAP"), bars "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 349(a). To establish a NYCPDAP claim, "[a] plaintiff . . . must prove three elements: first, that the challenged act or practice was consumer oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act." Stutman v. Chemical Bank, 731 N.E.2d 608, 611 (N.Y. 2000). "Whether a representation or an omission, the deceptive practice must be 'likely to mislead a reasonable consumer acting reasonably under the circumstances.'" Stutman v. Chemical Bank, 731 N.E.2d at 611-612 (quoting Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, 647 N.E.2d 741, 745 (N.Y. 1995)).

NYCPDAP has a safe harbor that precludes

> any such action . . . that the act or practice is, or if in interstate commerce would be, subject to and complies with the rules and regulations of, and the statutes administered by, the federal trade commission or any official department, division, commission or agency of the United States as such rules, regulations or statutes are

Appellate Case: 23-705 Document: 010110921360 Date Filed: 09/15/2023 Page: 838 Sealed

> interpreted by the federal trade commission or such department, division, commission or agency or the federal courts.

N.Y. Gen. Bus. Law § 349(d). Additionally "[i]n such an action it shall be a complete defense that the advertisement is subject to and complies with the rules and regulations of, and the statutes administered by the Federal Trade Commission or any official department, division, commission or agency of the state of New York." N.Y. Gen. Bus. Law § 350-d.

**10. North Carolina Law.**

Under North Carolina law, "unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." N.C. Gen. Stat. § 75-1.1. "In order to establish a violation of N.C.G.S. § 75-1.1, a plaintiff must show: (1) an unfair or deceptive act or practice, (2) in or affecting commerce, and (3) which proximately caused injury to plaintiffs." Gray v. North Carolina Ins. Underwriting Ass'n, 529 S.E.2d 676, 681 (N.C. 2000). See Bumpers v. Cmty. Bank of Northern Virginia, 747 S.E.2d 220, 226 (N.C. 2013). "In determining whether a representation is deceptive, its effect on the average consumer is considered." Pearce v. American Defender Life Ins., 343 S.E.2d 174, 180 (N.C. 1986).

The Supreme Court of North Carolina has eschewed applying N.C. Gen. Stat. § 75-1.1 to situations in which it would "create overlapping supervision, enforcement, and liability in [an] area, which is already pervasively regulated by state and federal statutes and agencies." HAJMM Co. v. House of Raeford Farms, Inc., 403 S.E.2d 483, 493 (N.C. 1991). See Champion Pro Consulting Group, Inc. v. Impact Sports Football, LLC, 845 F.3d 104, 110-111 (4th Cir. 2016). In Ellis v. Northern Star Co., 388 S.E.2d 127 (N.C. 1990), the Supreme Court of North Carolina recognized that, "[i]n limitation, we have held that certain transactions already subject to pervasive and intricate statutory regulation, such as securities transactions, were not intended by the legislature to be included within the scope of [N.C. Gen. Stat. § 75-1.1]." Ellis v. Norther Star Co., 388 S.E.2d at

131. Construing a libel claim, the Ellis v. Northern Star Co. Court determined that such a pervasive statutory or regulatory scheme did not exist. See 388 S.E.2d at 131.

**11. Ohio Law.**

The OCSPA mandates that "[n]o supplier shall commit an unfair or deceptive act or practice in connection with a consumer transaction." Ohio Rev. Code Ann. § 1345.02(A). Relevant to this Memorandum Opinion and Order "any of the following is deceptive: (1) That the subject of a consumer transaction has . . . performance characteristics, accessories, uses, or benefits that it does not have; (2) That the subject of a consumer transaction is of a particular standard, quality, grade, style prescription, or model, if it is not." Ohio Rev. Code Ann. § 1345.02(B)(1)-(2). "The CSPA 'is a remedial law which is designed to compensate for traditional consumer remedies and so must be liberally construed.'" Whitaker v. M.T. Automotive, Inc., 855 N.E. 2d 825, 829 (Ohio 2006)(quoting Einhorn v. Ford Motor Co., 548 N.E.2d 933, 935 (Ohio 1990)). "In general, the OCSPA defines 'unfair or deceptive consumer sales practices' as those that mislead consumers about the nature of the product they are receiving." Johnson v. Microsoft Corp., 834 N.E. 2d 791, 800 (Ohio 2005). "[C]ourts shall apply a reasonableness standard in determining whether an act amounts to deceptive, unconscionable, or unfair conduct." Shumaker v. Hamilton Chevrolet, Inc., 920 N.E.2d 1023, 1031 (Ohio Ct. App. 2009)(citations omitted).[25]

For a class-action plaintiff to state a claim under the OCSPA, the plaintiff must allege pre-litigation notice. See Marrone v. Philip Morris USA, Inc., 850 N.E. 2d 31, 33 (Ohio 2006). For a court decision to provide adequate notice, the case must involve similar industries and conduct.

---

[25]The Court is aware that, under Erie, it is not bound to follow Court of Appeals of Ohio if the Court concludes that the Supreme Court of Ohio would decide the issue differently. See supra n.21. The Court will follow the Court of Appeals of Ohio's decision in Shumaker v. Hamilton Chevrolet, Inc., however, because the Court has found no indication that the Supreme Court of Ohio would apply a contrary rule.

See Marrone v. Philip Morris USA, Inc., 850 N.E. 2d at 36. See also id. ("[W]e hold that a consumer may qualify for class-action certification . . . only if the defendant's alleged violation of the Act is substantially similar to an act or practice previously declared to be deceptive.").

Ohio Rev. Code Ann. § 1345.02(A) is inapplicable if "a violation was an act or practice required or specifically permitted by federal trade commission orders." Ohio Rev. Code Ann. § 1345.11. In Marrone v. Philip Morris USA, Inc., the Supreme Court of Ohio noted that, "although the FTC is well aware of the years of litigation and debate over cigarette manufactures' marketing strategies, to date it has not directed manufacturers to refrain from using quantifier adjectives -- terms such as 'low.' 'lower,' and 'reduced' -- in describing tar and nicotine levels in advertisements for their cigarettes." 850 N.E. 2d at 38.

**12. Washington Law.**

The Washington Consumer Protection Act, Wash. Rev. Code §§ 19.86.010-19.86.920 ("WCPA"), prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Wash Rev. Code § 19.86.020. "The purpose of the CPA is to complement the body of federal law governing restraints of trade, unfair competition and unfair, deceptive and fraudulent acts and practices in order to protect the public and foster fair and honest competition." Panag v. Farmers Ins. Co. of Wash., 204 P.3d 885, 889 (Wash. 2008)(en banc)(citations omitted). "To prevail in a private CPA claim, the plaintiff must prove (1) an unfair or deceptive act or practice, (2) occurring in trade or commerce, (3) affecting the public interest, (4) injury to a person's business or property, and (5) causation." Panag v. Farmers Ins. Co. of Wash., 204 P.3d at 889. "Deception exists 'if there is a representation, omission or practice that is likely to mislead' a reasonable consumer." 204 P.3d at 895 (quoting Southwest Sunsites, Inc. v. F.T.C., 785 F.2d 1431, 1435 (9th Cir. 1986)).

The WCPA does not apply "to actions or transactions otherwise permitted, prohibited or regulated under laws administered by . . . any other regulatory body or officer acting under statutory authority of this state or the United States." Wash. Rev. Code § 19.86.170. "Exemption under the Consumer Protection Act is applied only after determining whether the specific action is permitted, prohibited, regulated or required by a regulatory body or statute." Vogt v. Seattle-First Nat. Bank, 817 P.2d 1364, 1370 (Wash. 1991)(en banc). "Overly broad construction of 'permission' may conflict with the legislature's intent that the Consumer Protection Act be liberally construed so that its beneficial purposes may be served." Vogt v. Seattle-First Nat. Bank, 817 P.2d at 1370. "The test articulated was whether under the circumstances of a particular case, state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Vogt v. Seattle-First Nat. Bank, 817 P.2d at 1371. The Supreme Court of Washington ruled accordingly, that the Currency Comptroller's regulatory and supervisory authority alone did not preempt a claim under the WCPA. See Vogt v. Seattle-First Nat. Bank, 817 P.2d at 1371.

**LAW REGARDING UNJUST ENRICHMENT**

"A person who is unjustly enriched at the expense of another is subject to liability in restitution." Restatement (Third) of Restitution and Unjust Enrichment § 1. "[T]he paradigm case of unjust enrichment is one in which the benefit on one side of the transaction corresponds to an observable loss on the other." Restatement (Third) of Restitution and Unjust Enrichment § 1, cmt. a. "The usual consequence of a liability in restitution is that the defendant must restore the benefit in question or its traceable product, or else pay money in the amount necessary to eliminate unjust enrichment." Restatement (Third) of Restitution and Unjust Enrichment § 1, cmt. a.

**1. California Law.**

Under California law, "[a]n individual who has been unjustly enriched at the expense of another may be required to make restitution." Hartford Cas. Ins. Co. v. J.R. Marketing, L.L.C., 353 P.3d 319, 326 (Cal. 2015). See Restatement (Third) of Restitution and Unjust Enrichment § 1. "Restitution is not mandated merely because one person has realized a gain at another's expense." Hartford Cas. Ins. Co. v. J.R. Marketing, L.L.C., 353 P.3d at 326. "Rather, the obligation arises when the enrichment obtained lacks any adequate legal basis and thus 'cannot conscientiously be retained.'" Hartford Cas. Ins. Co. v. J.R. Marketing, L.L.C., 353 P.3d at 326 (quoting Restatement (Third) of Restitution and Unjust Enrichment § 1, cmt. b). "A person is unjustly enriched if the retention of the benefit would be unjust." Western Steamship Lines, Inc. v. San Pedro Peninsula Hosp., 876 P.2d 1062, 1066 (Cal. 1994). "Though this restitutionary obligation is often described as quasi-contractual, a privity of relationship between the parties is not necessarily required." Hartford Cas. Ins. Co. v. J.R. Marketing, L.L.C., 353 P.3d at 326. "When a person acts simply as she would have done in any event, out of duty or self-interest, she cannot equitably claim compensation from anyone who merely happens to benefit as a result." Hartford Cas. Ins. Co. v. J.R. Marketing, L.L.C., 353 P.3d at 327.

**2. Colorado Law.**

"A person is unjustly enriched when he benefits as a result of an unfair detriment to another." Lewis v. Lewis, 189 P.3d 1134, 1141 (Colo. 2008)(en banc)(citing Salzman v. Bacharach, 996 P.2d 1263, 1265 (Colo. 2000)(en banc)). "The proper remedy upon a finding of unjust enrichment is to restore the harmed party 'to the position he formerly occupied either by the return of something which he formerly had or by the receipt of its monetary equivalent.'" Lewis v. Lewis, 189 P.3d at 1141 (quoting Restatement (First) of Restitution § 1, cmt. a). "The scope of the remedy is broad,

cutting across both contract and tort law, with its application guided by the underlying principle of avoiding the unjust enrichment of one party at the expense of another." Robinson v. Colorado State Lottery Div., 179 P.3d 998, 1007 (Colo. 2008). "[A] party claiming unjust enrichment must prove that (1) the defendant received a benefit, (2) at the plaintiff's expense, (3) under circumstances that would make it unjust for the defendant to retain the benefit without commensurate compensation." Lewis v. Lewis, 189 P.3d at 1141. See Salzman v. Bachrach, 996 P.2d at 1266 n.2 (explaining that the Supreme Court of Colorado "reformulated the elements of unjust enrichment . . . to remove the test language that the defendant must appreciate and accept the benefit conferred"). Unjust enrichment "does not depend on any contract, oral or written," and "does not require any promise or privity between the parties." Salzman v. Bachrach, 996 P.2d at 1265. "A benefit denotes any form of advantage." Dudding v. Norton Frickey & Assocs., 11 P.3d 441, 444 (Colo. 2000). "The notion of what is or is not unjust is an inherently malleable and unpredictable standard." DCB Const. Co., Inc. v. Central City Dev. Co., 965 P.2d 115, 120 (Colo. 1998)(quotations omitted). Accordingly, "[u]njust enrichment claims require that courts make extensive factual findings to determine whether a party has been unjustly enriched." Lewis v. Lewis, 189 P.3d at 1140. In analyzing the third prong, whether the defendant was unjustly enriched, the Supreme Court of Colorado has "looked to the intentions, expectations, and behavior of the parties to determine whether recovery in unjust enrichment is appropriate." Lewis v. Lewis, 189 P.3d at 1143. See Dudding v. Norton Frickey & Assocs., 11 P.3d at 444 ("Whether injustice results often will turn on whether a party engaged in some kind of wrongdoing.").

"[E]quity will not act if there is a plain, speedy, adequate remedy at law." Szaloczi v. John R. Behrmann Revocable Trust, 90 P.3d 835, 842 (Colo. 2004). See Dudding v. Norton Frickey & Assocs., 11 P.3d at 445 ("[C]ourts will refuse quantum meruit recovery when expressly contrary to

the provisions of the written contract between the parties."). "In the tort context, the recovery of damages does not automatically lead to a conclusion that a party had an adequate legal remedy that precludes further equitable relief." Harris Grp., Inc. v. Robinson, 209 P.3d 1188, 1205 (Colo. App. 2009).[26] If "[t]he objectives of the two remedies are different," such as when the plaintiff seeks to recover both for the harm done to him and to recover the defendant's ill-gotten gain, an unjust enrichment claim may still lie. Harris Grp., Inc. v. Robinson, 209 P.3d at 1205.

**3. Florida Law.**

"The elements of an unjust enrichment claim are 'a benefit conferred upon a defendant by the plaintiff, the defendant's appreciation of the benefit, and the defendant's acceptance and retention of the benefit under circumstances that make it inequitable for him to retain it without paying the value thereof.'" Fla. Power Corp. v. City of Winter Park, 887 So. 2d 1237, 1241 n.4 (Fla. 2004)(quoting Ruck Bros. Brick, Inc. v. Kellogg & Kimsey, Inc., 668 So. 2d 205, 207 (Fla. Dist. Ct. App. 1995). See Virgilio v. Ryland Grp., Inc., 680 F.3d 1329, 1337 (11th Cir. 2012). "[T]o prevail on an unjust enrichment claim, the plaintiff must directly confer a benefit to the defendant." Kopel v. Kopel, __ So. 3d __, 2017 WL 372074, at *5 (Fla. 2017)(ruling that an unjust-enrichment claim failed, "because there was no evidence of a benefit being conferred directly to Respondents, rather than indirectly to corporations owned by them"). "This Court is committed to the rule that where the only relief sought by a bill in equity is one for which a plain, adequate and complete remedy at law exists -- then a court of equity has no jurisdiction and a resort thereto is improper and unnecessary." Greenfield Villages v. Thompson, 44 So. 2d 679, 683 (Fla. 1950). From that principle, Courts of

[26] The Court is aware that, under Erie, it is not bound to follow Court of Appeals of Colorado if the Court concludes that the Supreme Court of Colorado would decide the issue differently. See supra n.21. The Court will follow the Court of Appeals of Colorado's decision in Harris Grp., Inc. v. Robinson, however, because the Court has found no indication that the Supreme Court of Colorado would apply a contrary rule.

Appeal of Florida have noted that "a party may simultaneously allege the existence of an express contract and alternatively plead a claim for unjust enrichment," but, "[o]f course, upon a showing that an express contract concerning the same subject matter exists, the unjust enrichment claim necessarily fails." Real Estate Value Co., Inc. v. Carnival Corp., 92 So. 3d 255, 263 n.2 (Fla. Dist. Ct. App. 2012)(citing Hazen v. Cobb, 117 So. 853, 857-58 (Fla. 1928)).

**4. Illinois Law.**

"The theory of unjust enrichment is based on a contract implied in law." People ex rel. Hartigan v. E. & E. Hauling, Inc., 607 N.E.2d 165, 177 (Ill. 1992). "To recover under this theory, plaintiffs must show that [a] defendant voluntarily accepted a benefit which would be inequitable for him to retain without payment." People ex rel. Hartigan v. E. & E. Hauling, Inc., 607 N.E.2d at 177. See HPI Health Care Servs., Inc. v. Mt. Vernon Hops., Inc., 545 N.E.2d 672, 679 (Ill. 1989)("To state a cause of action based on a theory of unjust enrichment, a plaintiff must allege that the defendant unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience."); Cleary v. Philip Morris Inc., 656 F.3d 511, 516 (7th Cir. 2011). "Because unjust enrichment is based on an implied contract, 'where there is a specific contract which governs the relationship of the parties, the doctrine of unjust enrichment has no application.'" People ex rel. Hartigan v. E. & E. Hauling, Inc., 607 N.E.2d at 177 (quoting La Throp v. Bell Federal Savings & Loan Assoc., 370 N.E.2d 188, 195 (Ill. 1977)).

In adjudicating an unjust-enrichment claim against a tobacco company, the Seventh Circuit recounted:

> The plaintiffs' unjust enrichment theory rests on the allegation that they had a legal right to know about the true nature and hazards of cigarettes. The plaintiffs assert that the defendants violated this right by failing to disclose the full truth about cigarettes and that this failure to disclose was to the plaintiffs' detriment; and that

> defendants' retention of the benefit -- the cigarette revenue -- violates the fundamental principles of justice, equity, and good conscience. It is crucial to note that the plaintiffs do not allege that they suffered any harm, that they relied on the defendants' marketing, or that they would have acted differently had the defendants been truthful about the cigarettes they were selling. In fact, not only do the plaintiffs not make these allegations, but the plaintiffs also explicitly disavow any such allegations, claiming that they are entirely unnecessary to support their theory of unjust enrichment. In other words, the plaintiffs assert that their unjust enrichment claim does not require proof of deception, causation, or actual harm with regard to individual members of the plaintiff class.

Cleary v. Phillip Morris Inc., 656 F.3d at 518. Emphasizing that an unjust-enrichment claim "must show a detriment -- and, significantly, a connection between the detriment and the defendant's retention of the benefit," the Seventh Circuit reasoned that there was no unjust enrichment, because,

> since the plaintiffs disclaim any need to allege either personal damages, deception, or reliance with regard to any member of the class, it is difficult to see how the defendants' retention of the revenue paid by a consumer is to that consumer's detriment. According to the plaintiffs, the class of people with a valid unjust enrichment claim would include the consumer who bought cigarettes and was never injured in any manner by his purchase. It would include the consumer who was satisfied by his cigarette purchase and planned to continue purchasing cigarettes. It would include the consumer who would not have acted any differently had he been fully informed about cigarettes, but bought them anyway regardless of the defendants' marketing. It would include the consumer who was not deceived by the marketing because he was personally aware of the true nature of cigarettes, but still bought cigarettes despite their addictive and harmful nature -- or even because of it.

Cleary v. Phillip Morris Inc., 656 F.3d at 519. The Seventh Circuit noted, however, that "[t]his would be a different case if there was a greater connection between the defendants' retention of the cigarette revenue and a detriment to the plaintiffs. For example, . . . if the revenue was obtained by deceiving the plaintiffs." Clearly v. Philip Morris, 656 F.3d at 519.

**5. Massachusetts Law.**

"A plaintiff asserting a claim for unjust enrichment must establish not only that the defendant received a benefit, but also that such a benefit was unjust, 'a quality that turns on the reasonable expectations of the parties.'" Metropolitan Life Ins. Co. v. Cotter, 984 N.E.2d 835, 850

(Mass. 2013)(quoting Global Investors Agent Corp. v. National Fire Ins. Co., 927 N.E.2d 480, 494 (Mass. App. Ct. 2010)). "The injustice of the enrichment or detriment in quasi-contract equates with the defeat of someone's reasonable expectations." Metropolitan Life Ins. Co. v. Cotter, 984 N.E.2d at 850 (citation omitted). "Considerations of equity and morality play a large part in constructing a quasi contract." Salamon v. Terra, 477 N.E.2d 1029, 1031 (Mass. 1985). "An equitable remedy for unjust enrichment is not available to a party with an adequate remedy at law." Santagate v. Tower, 833 N.E.2d 171, 176 (Mass. App. Ct. 2005).[27] See Massachusetts Eye and Ear Infirmary v. QLT Phototherapeutics, Inc., 412 F.3d 215, 234 (1st Cir. 2005)("Unjust enrichment provides an equitable stopgap for occasional inadequacies in contractual remedies at law."); In re Lupron Marketing and Sales Practices Litig., F. Supp. 2d 148, 182 (D. Mass. 2003)(Stearns, J.)("[W]here a plaintiff has an adequate remedy at law, a claim of unjust enrichment is unavailable.").

**6. Michigan Law.**

"Even though no contract may exist between two parties, under the equitable doctrine of unjust enrichment, '[a] person who has been unjustly enriched at the expense of another is required to make restitution to the other.'" Kammer Asphalt Paving Co., Inc. v. East China Tp. Schools, 504 N.W.2d 635, 640 (Mich. 1993)(quoting Restatement (First) of Restitution § 1). "Unjust enrichment is defined as the unjust retention of 'money or benefits which in justice and equity belong to another.'" Tkachik v. Mandeville, 790 N.W.2d 260, 266 (Mich. 2010)(quoting McCreary v. Shields, 52 N.W.2d 853, 855 (Mich. 1952)). "A claim alleging unjust enrichment requires that a plaintiff

---

[27]The Court is aware that, under Erie, it is not bound to follow the Appeals Court of Massachusetts if it concludes that the Supreme Judicial Court of Massachusetts would decide the issue differently. See supra n.21. The Court will follow the Appeals Court of Massachusetts' decision in Santagate v. Tower, however, because the Court has found no indication that the Supreme Judicial Court of Massachusetts would apply a contrary rule.

establish (1) the receipt of a benefit by the defendant from the plaintiff and (2) an inequity resulting to the plaintiff because of the retention of the benefit by the defendant." Landstar Express America, Inc. v. Nexteer Automotive Corp., 900 N.W.2d 650, 657 (Mich. Ct. App. 2017)(citation omitted).[28] "Because this doctrine vitiates normal contract principles, the courts employ the fiction with caution, and will never permit it in cases where contracts, implied in fact, must be established, or substitute one promisor or debtor for another." Kammer Asphalt Paving Co., Inc. v. East China Tp. Schools, 504 N.W.2d at 640 (quotations omitted). "[L]egislative action that provides an adequate remedy by statute precludes equitable relief." Tkachik v. Mandeville, 790 N.W.2d at 265.

**7. New Jersey Law.**

"To establish a claim for unjust enrichment, 'a plaintiff must show both that defendant received a benefit and that retention of that benefit without payment would be unjust.'" Lliadis v. Wal-Mart Stores, Inc., 922 A.2d 710, 723 (N.J. 2007)(quoting VRG Corp. v. GKN Realty Corp., 641 A.2d 519, 526 (N.J. 1994)). See Thieme v. Aucoin-Thieme, 151 A.3d 545, 557 (N.J. 2016). "That quasi-contract doctrine also 'requires that plaintiff show that it expected remuneration from the defendant at the time it performed or conferred a benefit on defendant and that the failure of remuneration enriched defendant beyond its contractual rights.'" Lliadis v. Wal-Mart Stores, Inc., 922 A.2d at 723 (quoting VRG Corp. v. GKN Realty Corp., 641 A.2d at 526). "[E]quitable principles of estoppel or unjust enrichment . . . cannot be invoked to subvert [a] statutory scheme." Slurzberg v. City of Bayonne, 148 A.2d 171, 176 (N.J. 1959). "It is a well settled rule that an

[28]The Court is aware that, under Erie, it is not bound to follow the Court of Appeals of Michigan if it concludes that the Supreme Court of Michigan would decide the issue differently. See supra n.21. The Court will follow the Court of Appeals of Michigan's decision in Landstar Express America, Inc. v. Nexteer Automotive Corp., however, because the Court has found no indication that the Supreme Court of Michigan would apply a contrary rule.

express contract excludes an implied one." C.B. Snyder Realty Co. v. National Newark & Essex Banking Co. of Newark, 101 A.2d 544, 553 (N.J. 1953).

**8. New Mexico Law.**

To prevail in unjust enrichment, "one must show that: (1) another has been knowingly benefitted at one's expense (2) in a manner such that allowance of the other to retain the benefit would be unjust." Ontiveros Insulation Co. v. Sanchez, 2000-NMCA-051, ¶ 11, 3 P.3d at 698.[29] Equitable claims are not available if there is an adequate remedy at law. See Gen. Tel. Co. of the Sw. v. State Tax Comm'n, 1962-NMSC-005, ¶ 18, 367 P.2d 711, 715. See Sims v. Sims, 1996-NMSC-078, ¶ 28, 930 P.2d 153, 159 ("[E]quity will not act if there is a complete and adequate remedy at law"). Additionally, the "hornbook rule [is] that quasi-contractual remedies . . . are not to be created when an enforceable express contract regulates the relations of the parties with respect to the disputed issue." Elliott Industries Ltd. P'ship v. BP America Production Co., 407 F.3d, 1091, 1117 (10th Cir. 2005)("Elliott Indus.").[30] In Elliott Indus., for example, the Tenth Circuit held that the plaintiffs' leases with ConocoPhillips that defined ConocoPhillips' royalty obligations preluded the plaintiffs' claims that ConocoPhillips' royalty payment practices unjustly enriched it at the plaintiffs' expense. See 407 F.3d at 1117. The plaintiffs contended that the leases did not preclude their

[29]The Court is aware that, under Erie, it is not bound to follow the Court of Appeals of New Mexico if it concludes that the Supreme Court of New Mexico would decide the issue differently. See supra n.21. The Court will follow the Court of Appeals of New Mexico's decision in Ontiveros Insulation Co. v. Sanchez, however, because the Court has found no indication that the Supreme Court of New Mexico would apply a contrary rule.

[30]As the Tenth Circuit has explained, "when a panel of this Court has rendered a decision interpreting state law, that interpretation is binding on district courts in this circuit, and on subsequent panels of this Court, unless an intervening decision of the state's highest court has resolved the issue." Wankier v. Crown Equip. Corp., 353 F.3d 862, 866 (10th Cir.2003). The Court has critiqued the Elliott Indus. decision in the past, though on a different legal issue, and concluded that the Supreme Court of New Mexico would follow a different path. See Anderson Living Trust v. WPX Energy Production, LLC, 312 F.R.D. 620, 625-630 (D.N.M. 2015)(Browning, J.) The Court reiterates that interpretation here, though not on the issue quoted above.

unjust-enrichment claim, because they did not contain an express contractual provision covering ConocoPhillips' deduction of a thirty-nine percent processing fee from the plaintiffs' royalty payments. See 407 F.3d at 1117. The Tenth Circuit reasoned, however, that, although "the contracts may not delineate any specific deductions," the leases "control how royalties are to be paid." 407 F.3d at 1117. The Tenth Circuit concluded, therefore, that the district court properly granted ConocoPhillips summary judgment on the plaintiffs' unjust-enrichment claim, because "the claim for underpayment of royalties is grounded in the parties' contractual relationships." 407 F.3d at 1117.

**9. New York Law.**

Unjust enrichment is "a quasi-contract claim and contemplates an obligation imposed by equity to prevent injustice, in the absence of an actual agreement between the parties." Georgia Malone & Co., Inc. v. Rieder, 973 N.E.2d 743, 746 (N.Y. 2012)(citations omitted). "[I]n order to adequately plead such a claim, the plaintiff must allege that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered." Georgia Malone & Co., Inc. v. Rieder, 973 N.E.2d at 746. See Mandarin Trading Ltd. v. Wildenstein, 944 N.E.2d 1104, 1110 (N.Y. 2011). "[A] plaintiff cannot succeed on an unjust enrichment claim unless it has a sufficiently close relationship with the other party." Georgia Malone & Co., Inc. v. Rieder, 973 N.E.2d at 746. See Mandarin Trading Ltd. v. Wildenstein, 944 N.E.2d at 1110-11 ("Mandarin's unjust enrichment claim fails for the same deficiency as its other claims -- the lack of allegations that would indicate a relationship between the parties."). "A plaintiff need not," however, "be in privity with the defendant to state a claim for unjust enrichment." Sperry v. Crompton Corp., 863 N.E.2d 1012, 1018 (N.Y. 2007). Unjust-enrichment claims fail when a plaintiff has an adequate legal remedy. See Samiento v. World Yacht

Inc., 883 N.E.2d 990, 996 (N.Y. 2008). The Court of Appeals of New York has explained that "typical" unjust-enrichment cases "are those in which the defendant, though guilty of no wrongdoing, has received money to which he or she is not entitled." Corsello v. Verizon New York, Inc., 967 N.E.2d 1177, 1185 (N.Y. 2012). "An unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim." Corsello v. Verizon New York, Inc., 967 N.E.2d at 1185.

**10. North Carolina Law.**

Under North Carolina law, unjust enrichment is established when "a party [has] conferred a benefit on the other party," the benefit is measurable, is not gratuitous, and is not "conferred by an interference in the affairs of the other party in a manner that is not justified in the circumstances." Booe v. Shadrick, 369 S.E.2d 554, 556 (N.C. 1988). See Wright v. Wright, 289 S.E.2d 347, 351 (N.C. 1982). An unjust-enrichment claim "is neither in tort nor contract," but lies in "quasi-contract or a contract implied in law." Booe v. Shadrick, 369 S.E.2d at 556. "The court's equitable intervention is obviated when an adequate remedy at law is available to the plaintiff." Embree Const. Group, Inc. v. Rafcor, Inc., 411 S.E.2d 916, 920 (N.C. 1992). "Only in the absence of an express agreement of the parties will courts impose a quasi contract or a contract implied in law in order to prevent an unjust enrichment." Whitfield v. Gilchrist, 497 S.E.2d 412, 415 (N.C. 1998).

**11. Ohio Law.**

"Unjust enrichment occurs when a person 'has and retains money or benefits which in justice and equity belong to another.'" Johnson v. Microsoft Corp., 834 N.E.2d 791, 799 (Ohio 2005)(quoting Hummel v. Hummel, 14 N.E.2d 923, 927 (Ohio 1938)). An unjust-enrichment claim's purpose "is not to compensate the plaintiff for any loss or damage suffered by him but to compensate him for the benefit he has conferred on the defendant." Johnson v. Microsoft Corp., 834

N.E. at 799. "[A]n indirect purchaser cannot assert a common-law claim for restitution and unjust enrichment against a defendant without establishing that a benefit had been conferred upon that defendant by the purchaser." Johnson v. Microsoft Corp., 834 N.E. at 799 (ruling that a defendant is not unjustly enriched where there was no economic transaction between the plaintiff and the defendant). "To bring a cause within the jurisdiction of a court of equity, it is requisite that the primary right involved be an equitable right as distinguished from a legal right, or that the remedy at law as to the right involved is not full, adequate and complete." State ex rel. Lien v. House, 58 N.E.2d 675, 678 (Ohio 1944).

**12. Washington Law.**

"Unjust enrichment occurs when one retains money or benefits which in justice and equity belong to another." Young v. Young, 191 P.3d 1258, 1262 (Wash. 2008)(en banc)(citation omitted). Under Washington law, unjust enrichment exists when: "(1) the defendant receives a benefit, (2) the received benefit is at the plaintiff's expense, and (3) the circumstances make it unjust for the defendant to retain the benefit without payment." Young v. Young, 191 P.3d at 1262. "Equitable relief is available only if there is no adequate legal remedy." Orwick v. City of Seattle, 692 P.2d 793, 796 (Wash. 1984). In Seattle Professional Engineering Employees Association v. Boeing Co., 991 P.2d 1126 (Wash. 2000)(en banc), for example, the Supreme Court of Washington determined that the plaintiffs "are not entitled to pursue a remedy in equity" where they have an available statutory remedy. Seattle Professional Engineering Employees Association v. Boeing Co., 991 P.2d at 1134.

**LAW REGARDING BREACHES OF EXPRESS WARRANTIES**

Under the Uniform Commercial Code ("UCC"), there are three ways in which a seller can make an express warranty. See UCC § 2-313(1).

Express warranties by the seller are created as follows:

> (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.
>
> (b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.
>
> (c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

UCC § 2-313(1)(a)-(c). An express warranty does not need to include "formal words such as warrant or guarantee," and the seller does not need to have "a specific intention to make a warranty." UCC § 2-313(2). Relevant to this Memorandum Opinion and Order, California, Colorado, Florida, Illinois, New Jersey, New Mexico, New York, and North Carolina have adopted the UCC § 2-313. See Cal. Com. Code § 2313; Colo. Rev. Stat. § 4-2-313; Fla. Stat. § 672.313; 810 Ill. Comp. Stat. 5/2-313; N.J. Stat. Ann. § 12A:2-313; N.M. Stat. Ann. § 55–2–313; N.Y. U.C.C. Law § 2-313; N.C. Gen. Stat. § 25-2-313.[31]

**1. California Law.**

The Supreme Court of California has noted that "[t]he key under [the UCC] is that the seller's statements -- whether fact or opinion -- must become part of the basis of the bargain." Hauter v. Zogarts, 534 P.2d 377, 383 (Cal. 1975). It explained:

> The basis of the bargain requirement represents a significant change in the law of warranties. Whereas plaintiffs in the past have had to prove their reliance upon specific promises made by the seller (Grinnell v. Charles Pfizer & Co. (1969) 274 Cal.App.2d 424, 440, 79 Cal.Rptr. 369), the Uniform Commercial Code requires no such proof.

[31]Other states have adopted the UCC § 2-313. The Court lists the states above, because those states are the only states at issue on the express warranty claims in this case.

Hauter v. Zogarts, 534 P.2d at 383-84. "Privity is not required for an action based upon an express warranty." Hauter v. Zogarts, 534 P.2d at 383 n.8 (Cal. 1975). "Words of conduct relevant to the creation of an express warranty . . . shall be construed wherever reasonable as consistent with each other." Cal. Com. Code § 2316(1). A buyer must, "within a reasonable time after he or she discovers or should have discovered any breach, notify the seller of breach or be barred from any remedy." Cal. Com. Code § 2607(3)(A).

**2. Colorado Law.**

Under Colorado law, it is not "necessary for an express warranty that 'the seller use formal words such as 'warrant' or 'guarantee' or that he have a specific intention to make a warranty.'" Palmer v. A.H. Robins Co., Inc., 684 P.2d 187, 208 (Colo. 1984)(quoting Colo. Rev. Stat. § 7-2-313(2)). See Pegasus Helicopters, Inc. v. United Technologies Corp., 35 F.3d 507, 511 (10th Cir. 1994). "Whether a particular statement constitutes an express warranty is generally an issue of fact." Palmer v. A.H. Robins Co., Inc., 684 P.2d at 208. In Palmer v. A.H. Robins Co., Inc., for example, the Supreme Court of Colorado determined that a doctor's representations about the greater effectiveness of an intrauterine device over birth control pills is sufficient to establish "affirmations of fact and product descriptions" upon which the plaintiff "relied" to constitute an express warranty. 684 P.2d at 208. But see Lutz Farms v. Asgrow Seed Co., 948 F.2d 638, 645 (10th Cir. 1991)(suggesting that, under Colorado law, reliance is not a requirement for a breach-of-express-warranty claim).

A buyer must "notify" the seller "within a reasonable time after he discovers or should have discovered any breach . . . or be barred from any remedy." Colo. Rev. Stat. § 4-2-607(3)(a). See Palmer v. A.H. Robins Co., Inc., 684 P.2d at 205. A person "notifies" a seller "by takzing such steps as may be reasonably required to inform the other in ordinary course, whether or not the other person

actually comes to know of it." Colo. Rev. Stat. § 4-1-202(d); See Palmer v. A.H. Robins Co., Inc., 684 P.2d at 205-06.

> The notice requirement in a breach of warranty action serves three purposes: (1) affording the seller an opportunity to correct any defect; (2) affording the seller an opportunity to prepare for negotiation and litigation; and (3) providing the seller a safeguard against stale claims being asserted after it is too late to investigate them.

Palmer v. A.H. Robins Co., Inc., 684 P.2d at 206. "Compliance with the notice requirement is generally a condition precedent to recovery for a breach of warranty claim under the Uniform Commercial Code." Palmer v. A.H. Robins Co., Inc., 684 P.2d at 206. See Mullan v. Quickie Aircraft Corp., 797 F.2d 845, 847 (10th Cir. 1986). "As long as the buyer has given notice of the defect to his or her immediate seller, no further notification to those distributors beyond the immediate seller is required." Palmer v. A.H. Robins Co., Inc., 684 P.2d at 206.

### 3. **Florida Law.**

Florida Law states:

> (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise; (b) [a]ny description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description; and (c) [a]ny sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

Fla. Stat. § 672.313(1)(a)-(c). "The decisive test for whether a given representation is a warranty or merely an expression of the seller's opinion is whether the seller asserts a fact of which the buyer is ignorant or merely states an opinion or judgment on a matter of which the seller has no special knowledge and on which the buyer may be expected also to have an opinion and to exercise his judgment." Royal Typewriter Co., v. Xerographic Supplies Corp., 719 F.2d 1092, 1100 (11th Cir. 1983). To recover under a breach-of-express-warranty theory, "[t]he buyer must within a reasonable

time after he or she discovers or should have discovered any breach notify the seller of breach." Fla. Stat. § 672.607(3)(a).

**4. Illinois Law.**

"[A]n express warranty . . . obligates the seller to deliver goods that conform to the affirmation, promise, description, sample or model." Mydlach v. DaimlerChrysler Corp., 875 N.E.2d 1047, 1058 (Ill. 2007). "If the seller delivers nonconforming goods, the warranty is breached at that time. Even if the buyer is unaware that the goods, as delivered, do not conform to the seller's affirmation, promise, description, sample or model, the warranty has been breached." Mydlach v. DaimlerChrysler Corp., 875 N.E.2d at 1058 (ruling that a promise from a manufacturer to repair and replace defective parts is not an express warranty, because such a promise "does not warrant that the vehicle will conform to some affirmation, promise, description, sample or model"). "The warranty arises only because the warrantor has willed it into being by making the requisite affirmation as part of a contract to which it is an adjunct." Collins Co., Ltd. v. Carboline Co., 532 N.E.2d 834, 838 (Ill. 1988).

A buyer "must within a reasonable time after he discovery or should have discovered any breach notify the seller of the breach or be barred from any remedy." 810 Ill. Comp. Stat. 5/2-607(3)(a). "In general, buyers . . . must directly notify the seller of the troublesome nature of the transaction or be barred from recovering for a breach of warranty." Connick v. Suzuki Motor Co., Ltd., 675 N.E.2d 584, 589 (Ill. 1996). That general requirement is subject to the following two exceptions: "(1) the seller has actual knowledge of the defect of the particular product; or (2) the seller is deemed to have been reasonably notified by the filing of the buyer's complaint alleging breach of UCC warranty." Connick v. Suzuki Motor Co., Ltd., 675 N.E.2d at 589. "Only a consumer plaintiff who suffers a personal injury may satisfy the section 2–607 notice requirement by

filing a complaint stating a breach of warranty action against the seller." Connick v. Suzuki Motor Co., Ltd., 675 N.E.2d at 590.

5. **New Jersey Law.**

"[T]o state a claim for breach of express warranty under New Jersey Law, [a] plaintiff must allege (1) [the defendant] made an affirmation of fact, promise, or description about the produce; (2) this affirmation of fact, promise, or description became part of the basis of the bargain for the product; and (3) the product ultimately did not conform to the affirmation of fact, promise, or description." In re Avandia Marketing Sales Practices & Products Liability Litig., 558 F. App'x 171, 174 (3d Cir. 2014)(unpublished).[32] "[N]o specific intention to make a warranty is necessary if part of the basis of the bargain consists of the seller's affirmations of fact or descriptions of the goods." Gladden v. Cadillac Motor Car Div., General Motors Corp., 416 A.2d 394, 396 (N.J. 1980)("Particular reliance on such statements of description or quality need not be shown." In Gladden v. Cadillac Motor Car Division General Motors Corporation., for example, the Supreme Court of New Jersey determined that representations concerning tires in an owner's manual constituted an express warranty, because a purchaser, after reading the manual, "could reasonably expect that the tire if used in accordance with the [company's] instructions would not become unrepairable or unserviceable within the first 40,000 miles of normal use." 416 A.2d at 397-98.

6. **New Mexico Law.**

Under New Mexico law, a seller expressly warrants goods in a commercial transaction when it (i) makes an affirmation of fact or promise to the buyer "which relates to the goods and becomes

[32]The Court is not bound to follow a Third Circuit decision on matters of state law, but the Court concludes that it will follow this decision, because it has found no indication that the Supreme Court of New Jersey would apply a contrary rule, and because the Third Circuit has more experience with New Jersey law than the Court.

part of the basis of the bargain"; (ii) describes the goods in a way that "is made part of the basis of the bargain"; or (iii) provides a "sample or model which is made part of the basis of the bargain." N.M. Stat. Ann. § 55-2-313. "If the goods provided are not as warranted, the goods are in breach of warranty." Badilla v. Wal-Mart Stores East Inc., 2015-NMSC-029, ¶ 21, 357 P.3d at 941. "A breach of warranty presents an objective claim that the goods do not conform to a promise, affirmation, or description." Badilla v. Wal-Mart Stores East Inc., 2015-NMSC-029, ¶ 21, 357 P.3d at 941 (quotations omitted)). "A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach." Badilla v. Wal-Mart Stores East Inc., 2015-NMSC-029, ¶ 21, 357 P.3d at 941.

In Bellman v. NXP Semiconductors USA, Inc., 248 F. Supp. 3d 1081 (D.N.M. 2017)(Browning, J.), for example, the Court considered whether, under New Mexico's express warranty standard, the defendants had made any express affirmations or representations to the plaintiffs concerning chemical supplies purchased. See 248 F. Supp. 3d at 1153. The Court noted that, "aside from perfunctorily alleging in the Complaint that Rinchem Co. 'expressly' warranted the chemicals that it supplied," the plaintiffs did not explain the warranty or even identify "the warranty's precise terms." 248 F. Supp. 3d at 1153. The Court, accordingly, dismissed the plaintiffs' breach-of-express-warranty claim, because the Court could not conclude from the plaintiffs' conclusory allegations that the defendant had "made any express warranty." 248 F. Supp. 3d at 1153. See Two Old Hippies, LLC v. Catch the Bus, LLC, 784 F. Supp. 2d 1200, 1210-11 (D.N.M. 2011)(Browning, J.)(ruling that the plaintiffs had plausibly alleged an express warranty where the plaintiffs contended that the defendants had promised that two restored Volkswagen buses purchased would be "ready to go whether for daily driver or for cross-country trips" and "guaranteed . . . 100% satisfaction with the buses").

**7. New York Law.**

New York does not require the plaintiff to rely on the truth of the warrant for liability to attach. See CBS Inc. v. Ziff-Davis Pub. Co., 553 N.E.2d 997, 1000-01 (N.Y. 1990). Rather, "[t]he right to indemnification depends only on establishing that the warranty was breached." CBS Inc. v. Ziff-Davis Pub. Co., 553 N.E.2d at 1001. See Galli v. Metz, 973 F.2d 145, 150 (2d Cir. 1992). Construing and distinguishing CBS Inc. v. Ziff-Davis Publishing Co., the United States Court of Appeals for the Second Circuit ruled: "Where a buyer closes on a contract in the full knowledge and acceptance of facts disclosed by the seller which would constitute a breach of warranty under the terms of the contract, the buyer should be foreclosed from later asserting the breach." Galli v. Metz, 973 F.2d at 151. See Rogath v. Siebenmann, 129 F.3d 261, 265 (2d Cir. 1997).[33] "There can be no [express] warranty where there is no privity of contract," but "the technical privity requirement . . . should be dispensed with in a proper case in the interest of justice and reason." Randy Knitwear, Inc. v. American Cyanamid Co., 181 N.E.2d 399,401 (N.Y. 1962).

**8. North Carolina Law.**

An express warranty breach "occurs when the goods fail in any respect to conform to the express warranty given [by] the seller." Alberti Manufactured Homes, Inc., 407 S.E.2d 819, 825 (N.C. 1991). "Absent privity of contract, there can be no recovery for breach of warranty, except in those cases where the warranty is addressed to an ultimate consumer or user." Kinlaw v. Long Mfg. N.C., Inc., 259 S.E. 494, 498 (N.C. 1979).

> Authority from most other jurisdictions holds that a purchaser who relies upon a manufacturer's representations can recover for breach of an express warranty despite lack of privity. The bound procedure whereby the purchaser claims against the

[33]The Court is not bound to follow a Second Circuit decision on matters of state law, but the Court concludes that it will follow this decision, because it has found no indication that the Court of Appeals of New York would apply a contrary rule, and because the Second Circuit has more experience with New York law than the Court.

> retailer, the retailer against the distributor, and the distributor, in turn, against the manufacturer, is unnecessarily expensive and wasteful. We find no reason to inflict this drain on the court's time and the litigant's resources when there is an express warranty directed by its terms to none other than the plaintiff purchaser.

Kinlaw v. Long Mfg. N.C., Inc., 259 S.E.at 500-01. See Alberti v. Manufactured Homes, Inc., 407 S.E. 2d at 825 ("[O]ur case law has recognized that a direct contractual relationship in the sale of the product itself is not a prerequisite to recovery for breach of express warranty against the manufacturer.").

A buyer must notify the seller "within a reasonable time after he discovers or should have discovered any breach . . . or be barred from any remedy." N.C. Gen. Stat. § 25-2-607(3)(a). In Maybank v. S. S. Kresge Co., 273 S.E.2d 681, 683 (N.C. 1981), the Supreme Court of North Carolina considered whether the "filing of the suit and accompanying service upon defendant" three years after a buyer discovers a defect falls within a reasonable time frame to give seller notice. Maybank v. S. S. Kresge Co., 273 S.E.2d at 684. After emphasizing that reasonable time "can be determined only by examining the particular facts and circumstances of each case," the Supreme Court of North Carolina noted that there were two primary policy reasons fortifying the notice requirement. Maybank v. S. S. Kresge Co., 273 S.E.2d at 684. First, notice "enabl[es] the seller to make efforts to cure the breach by making adjustments or replacements in order to minimize the buyer's damages and the seller's liability." Maybank v. S. S. Kresge Co., 273 S.E.2d at 684. Second, notice "afford[s] the seller a reasonable opportunity to learn the facts so that he may adequately prepare for negotiation and defend himself in a suit." Maybank v. S. S. Kresge Co., 273 S.E.2d at 684. Notwithstanding these strong policy reasons, the Supreme Court of North Carolina ruled that, "[a]lthough a delay of three years is, undoubtedly, a long time, we are unable to conclude that it is unreasonable as a matter of law under the facts of this case." Maybank v. S. S. Kresge Co., 273 S.E.2d at 685. "An injured lay consumer has no reason to know, until he consults a lawyer, that

under the terms of the Uniform Commercial Code he is required to give the seller notice that the item sold was not satisfactory." Maybank v. S. S. Kresge Co., 273 S.E.2d at 685. Ultimately, the Maybank v. S.S. Kresge Co. court determined that "[f]airness to the consumer dictates that he be given reasonable time to learn of and to comply with this requirement. While three years might be conceivably be per se unreasonable delay in a commercial context, differing considerations applicable in retail situations may mean that a delay of three years by a consumer in giving notice to retail seller is within the bounds of a reasonable time." 273 S.E.2d at 685.

## LAW REGARDING PERMANENT INJUNCTIONS

> To attain a permanent injunction, a plaintiff must demonstrate:
>
> (i) that it has suffered an irreparable injury; (ii) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (iii) that, considering the balance of hardships between the plaintiff and the defendant, a remedy in equity is warranted; and (iv) that the public interest would not be disserved by a permanent injunction.

eBay, Inc. v. MercExchange, LLC, 547 U.S. 388, 391 (2006). The Tenth Circuit has formulated that test as: "(1) actual success on the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs the harm that the injunction may cause the opposing party; and (4) the injunction if issues, will not adversely affect the public interest." Southwest Stainless, LP v. Sappington, 582 F.3d 1176, 1191 (10th Cir. 2009). See Klein-Becker USA, LLC v. Englert, 711 F.3d 1153, 1164 (10th Cir. 2013). "The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court, reviewable on appeal for abuse of discretion." eBay, Inc. v. MercExchange, LLC, 547 U.S. at 391. See Southwest Stainless, LP v. Sappington, 582 F.3d at 1191 ("The district court's discretion in this context is necessarily broad and a strong showing of abuse must be made to reverse it."). "An injunction is an extraordinary remedy to prevent future violations, and should be used sparingly." Copar Pumice Co., Inc. v. Morris, No. 07-

0079, 2009 WL 5201799, at *15 (D.N.M. October 23, 2009)(Browning, J.)(citing Ute Indian Tribe of the Uintah & Ouray Reservation v. Utah, 144 F.3d 1513, 1522 (10th Cir. 1997)).

"A district court may find irreparable harm 'based upon evidence suggesting that it is impossible to precisely calculate the amount of damage plaintiff will suffer.'" Southwest Stainless, LP v. Sappington, 582 F.3d at 1191 (quoting Equifax Servs., Inc. v. Hitz, 905 F.2d 1355, 1361 (10th Cir. 1990)). In Copar Pumice Co., Inc. v. Morris, for example, the Court denied a permanent injunction, because the plaintiff did not demonstrate that damages could not compensate the Fourth-Amendment search injury it had suffered. See 2009 WL 5201799, at *15. The Court further concluded that the plaintiff had "shown few, if any, damages other than attorney's fees and costs," and, accordingly, the extraordinary remedy sought -- a permanent injunction -- was inappropriate. 2009 WL 5201799, at *15.

Injunctive relief requested is subject to Article III mootness. See WildEarth Guardians v. Public Service Co. of Colorado, 690 F.3d 1174, 1190-91 (10th Cir. 2012); State of N.N. ex rel. New Mexico State Highway Dept. v. Goldschmidt, 629 F.2d 665, 669 (10th Cir. 1980). A case becomes moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." Cty. of L.A. v. Davis, 440 U.S. 625, 631 (1979).

> Like Article III standing, mootness is oft-cited as a constitutional limitation on federal court jurisdiction. *E.g.*, *Building & Constr. Dep't v. Rockwell Int'l Corp.*, 7 F.3d 1487, 1491 (10th Cir. 1993)("Constitutional mootness doctrine is grounded in the Article III requirement that federal courts only decide actual, ongoing cases or controversies). . . . But although issues of mootness often bear resemblance to issues of standing, their conceptual boundaries are not coterminous. . . . [T]he Supreme Court has historically recognized what are often called 'exceptions' to the general rule against consideration of moot cases, as where a plaintiff's status is 'capable of repetition yet evading review,' *S. Pac. Terminal Co. v. Interstate Commerce Comm'n*, 219 U.S. 498 (1911), or where a defendant has ceased the challenged action but it is likely the defendant will 'return to his old ways' -- the latter often referred to as the voluntary cessation exception, *United States v. W.T. Grant Co.*, 345 U.S. 498, 515 (1911).

Lucero v. Bureau of Collection Recovery, Inc., 639 F.3d 1239, 1242 (10th Cir. 2011). When injunctive relief does not redress plaintiffs' particular injuries, the injunctive relief requested is rendered moot. See WildEarth Guardians v. Public Service Co., 690 F.3d at 1191 (citing United States v. Vera-Flores, 496 F.3d 1177, 1180 (10th Cir. 2007)). Similarly, if the injunction would have no present-day effect, the injunctive relief request is also rendered moot. See Utah Animal Rights Coalition v. Salt Lake City Corp., 371 F.3d 1248, 1257 (10th Cir. 2004)("The alleged violation took place in 2001, the Olympics have come and gone, and neither temporary restraining order, preliminary injunction, nor permanent injunction could have any present-day effect.").

As already noted, mootness is subject to the voluntary-cessation exception. See Brown v. Buhman, 822 F.3d 1151, 1166 (10th Cir. 2016). Under that exception, "voluntary cessation of challenged conduct does not ordinarily render a case moot because a dismissal for mootness would permit a resumption of the challenged conduct as soon as the case is dismissed." Brown v. Buhman, 822 F.3d at 1166. "This rule is designed to prevent gamesmanship. If voluntary cessation automatically mooted a case, 'a defendant could engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where he left off, repeating this cycle until he achieves his unlawful ends." Brown v. Buhman, 822 F.3d at 1166 (quoting Already, LLC v. Nike, Inc., 568 U.S. 85, 91 (2013)). Nevertheless, a defendant's voluntary cessation may render a case moot, if "the defendant carries the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." Brown v. Buhman, 822 F.3d at 1166 (quoting Already, LLC v. Nike, Inc., 568 U.S. 85, 91 (2013)).

## LAW REGARDING PERSONAL JURISDICTION

When contested,[34] the party asserting the claim has the burden of proving personal jurisdiction. See Wenz v. Memery Crystal, 55 F.3d 1503, 1505 (10th Cir.1995). To assert personal jurisdiction over a nonresident defendant, federal courts must satisfy state law and federal due process. See Doering v. Copper Mountain, Inc., 259 F.3d 1201, 1209-10 (10th Cir. 2001). Under due process, the Court's jurisdiction exists if the defendants have "minimum contacts" with the forum state, which may rest on specific or general personal jurisdiction, and the exercise of personal jurisdiction must comport with "traditional notions of fair play and substantial justice." Dudnikov v. Chalk & Vermilion Fine Arts Inc., 514 F.3d 1063, 1070 (10th Cir. 2008)(quotation marks omitted). See Bristol-Myers, Squibb Co. v. Superior Court of California, San Francisco Cty., 137 S. Ct. 1773, 1779-80 (2017)("Bristol-Myers"); Daimler AG v. Bauman, 134 S. Ct. 746, 754 (2014).

**1. Burden of Proof.**

As already noted, the Plaintiff bears the burden of proving personal jurisdiction. See Wenz v. Memery Crystal, 55 F.3d at 1505. When jurisdiction is "decided on the basis of affidavits and other written materials, the plaintiff need only make a prima facie showing" of facts that would support the assertion of jurisdiction. Wenz v. Memery Crystal, 55 F.3d at 1505. "The allegations in the complaint must be taken as true to the extent they are uncontroverted by the defendant's affidavit." Behagen v. Amateur Basketball Ass'n, 744 F.2d 731, 733 (10th Cir. 1984). When, however, a defendant presents credible evidence through affidavits or other materials suggesting the absence of personal jurisdiction, the plaintiff must come forward with sufficient evidence to create a genuine dispute of material fact on the issue. See Doe v. Nat'l Med. Servs., 974 F.2d 143, 145 (10th Cir.1992). Only if the plaintiff meets the obligation of contesting the credible evidence that the

[34] Personal jurisdiction can be waived. See Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 703 (1982).

defendant presents does the court resolve the factual disputes in the plaintiff's favor. See Wenz v. Memery Crystal, 55 F.3d at 1505; Behagen v. Amateur Basketball Ass'n, 744 F.2d at 733; Clark v. Meijer, Inc., 376 F. Supp. 2d 1077, 1082 (D.N.M.2004)(Browning, J.).

**2. Due Process and Personal Jurisdiction.**

The personal-jurisdiction due process analysis is two-fold. See Fabara v. GoFit, LLC, 308 F.R.D. 380, 400 (D.N.M. 2015)(Browning, J.). First, the defendant must have "minimum contacts" with the forum state such that it "should reasonably anticipate being haled into court there." Burger King Corp. v. Rudzewicz, 471 U.S. at 473-76. Second, exercising personal jurisdiction over the defendant must comport with "traditional notions of fair play and substantial justice." Dudnikov v. Chalk & Vermilion Fine Arts, Inc., 514 F.3d at 1070 (quotation marks omitted). A defendant may have "minimum contacts" with the forum state in one of two ways, providing a court with either general or specific personal jurisdiction. Trierweiler v. Croxton & Trench Holding Corp., 90 F.3d 1523, 1532-33 (10th Cir. 1996)(citations omitted).

> General jurisdiction is based on an out-of-state defendant's "continuous and systematic" contacts with the forum state, and does not require that the claim be related to those contacts. Specific jurisdiction, on the other hand, is premised on something of a *quid pro quo*: in exchange for "benefitting" from some purposive conduct directed at the forum state, a party is deemed to consent to the exercise of jurisdiction for claims related to those contacts.

Dudnikov v. Chalk & Vermilion Fine Arts, Inc., 514 F.3d at 1078. Thus, "[s]uch contacts may give rise to personal jurisdiction over a non-resident defendant either generally, for any lawsuit, or specifically, solely for lawsuits arising out of particular forum-related activities." Shrader v. Biddinger, 633 F.3d 1235, 1239 (10th Cir.2011).

For a court to exercise specific jurisdiction "'the suit' must 'aris[e] out of or relat[e] to the defendant's contacts with the *forum*." Bristol-Myers, 137 S. Ct. at 1780 (quoting Daimler AG v. Bauman, 134 S. Ct. at 754)(alterations and emphasis in Bristol-Myers). See Bristol-Myers, 137

S.Ct. at 1781 ("[T]here must be an 'affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State.")(quoting Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 919 (2011)("Goodyear")); Burger King Corp. v. Rudzewicz, 471 U.S. at 472 (ruling that a court may assert specific jurisdiction "if the defendant has purposefully directed his activities at residents of the forum, and the litigation results from alleged injuries that arise out of or relate to those activities.")(citations and quotation marks omitted). The Tenth Circuit has characterized this inquiry as a two part test: "[F]irst . . . the out-of-state defendant must have 'purposefully directed' its activities at residents in the forum state, and second, . . . the plaintiff's injuries must 'arise out of' defendant's forum-related activities." Dudnikov v. Chalk & Vermilion Fine Arts, Inc., 514 F.3d at 1071. The Supreme Court has recently emphasized that, "[f]or specific jurisdiction, a defendant's general connections with the forum are not enough." Bristol-Myers, 137 S. Ct. at 1781. In the tort context, a defendant has "purposefully directed" his activities at New Mexico or its residents when he or she has: (i) taken intentional action; (ii) the action was "expressly aimed" at New Mexico; and (iii) the action was taken with the knowledge that "the brunt of th[e] injury" would be felt in New Mexico. Dudnikov v. Chalk & Vermilion Fine Arts, Inc., 514 F.3d at 1072 (quoting Calder v. Jones, 465 U.S. 783, 789-90 (1984)).

Although agreements alone are likely to be insufficient to establish minimum contacts, "'parties who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to regulation and sanctions in the other state for the consequences of their activities.'" TH Agric. & Nutrition, LLC v. Ace Eur. Grp. Ltd., 488 F.3d 1282, 1287-88 (10th Cir.2007)(quoting Burger King Corp. v. Rudzewicz, 471 U.S. at 473, 478). The mere foreseeability of harm occurring in a particular forum will not support a finding of minimum contacts. See World-Wide Volkswagen Corp. v. Woodson, 444 U.S.at 295 (holding that,

although "an automobile is mobile by its very design and purpose," thus indicating that it is foreseeable that a particular automobile may cause injury in a forum state, "'foreseeability' alone has never been a sufficient benchmark for personal jurisdiction under the Due Process Clause"). "[T]he foreseeability that is critical to due process analysis is not the mere likelihood that a product will find its way into the forum State. Rather, it is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." World–Wide Volkswagen Corp. v. Woodson, 444 U.S. at 297. As the Tenth Circuit has further explained, because "mere foreseeability" is not sufficient to establish minimum contacts, a plaintiff "must establish . . . not only that defendants foresaw (or knew) that the effects of their conduct would be felt in the forum state, but also that defendants undertook intentional actions that were expressly aimed at that forum state." Dudnikov v. Chalk & Vermilion Fine Arts, Inc., 514 F.3d at 1077.

General personal jurisdiction jurisprudence has "followed a markedly different trajector[y]" than specific personal jurisdiction. Daimler AG v. Bauman, 134 S. Ct. at 757. The test for general personal jurisdiction turns on whether the defendant is "at home" within the forum State. Daimler AG v. Bauman, 134 S. Ct. at 760. For individuals, "the paradigm forum for the exercise of general jurisdiction is the individual's domicile." Daimler AG v. Bauman, 134 S. Ct. at 760 (quoting Goodyear, 564 U.S. at 924). For corporations, "the place of incorporation and principal place of business are 'paradig[m] . . . bases for general jurisdiction." Daimler AG v. Bauman, 134 S. Ct. at 760 (quoting Goodyear, 564 U.S. at 924). In Daimler AG v. Bauman, the Supreme Court rejected an argument that "continuous or systematic" contacts within a forum state were, in and of themselves, sufficient to subject a corporation to general personal jurisdiction. See Daimler AG v. Bauman, 134 S. Ct. at 761-62. In so doing, the Supreme Court reemphasized that a corporation is most often exposed to general personal jurisdiction only if that entity is incorporated in the forum state or if the

forum state hosts the entity's principal place of business. See Daimler AG v. Bauman, 134 S. Ct. at 761.

> If [the defendant] is found to have the requisite minimum contacts with [the forum state], then we proceed to the second step in the due process analysis: ensuring that the exercise of jurisdiction over him does not offend "traditional notions of fair play and substantial justice." See World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 292 (1980)(quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)). [The defendant] bears the burden at this stage to "present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." See Dudnikov v. Chalk & Vermilion Fine Arts, Inc., 514 F.3d 1063, 1080 (10th Cir. 2008). We consider the following five factors, . . . in deciding whether the exercise of jurisdiction would be fair:
>
> > (1) the burden on the defendant, (2) the forum state's interests in resolving the dispute, (3) the plaintiff's interest in receiving convenient and effectual relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states or foreign nations in furthering fundamental social policies.
>
> Id. (brackets omitted); see also OMI Holdings, Inc., 149 F.3d at 1095 (applying these factors in a case involving a Canadian corporation). "[T]he reasonableness prong of the due process inquiry evokes a sliding scale: the weaker the plaintiff's showing on minimum contacts, the less a defendant need show in terms of unreasonableness to defeat jurisdiction." TH Agric. & Nutrition, LLC, 488 F.3d at 1292 (internal quotation marks and brackets omitted).

Marcus Food Co. v. DiPanfilo, 671 F.3d 1159, 1167 (10th Cir. 2011). The Supreme Court has recently emphasized that, among these factors, the primary concern "is 'the burden on the defendant.'" Bristol-Myers, 137 S. Ct. at 1780 (quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 292 (1980)). "Assessing this burden obviously requires a court to consider the practical problems resulting from litigating in the forum, but it also encompasses the more abstract matter of submitting to the coercive power of a State that may have little legitimate interest in the claims in question." Bristol-Myers, 137 S. Ct. at 1780.

> Even if the defendant would suffer minimal or no inconvenience from being forced to litigate before the tribunals of another State; even if the forum State has a strong interest in applying its law to the controversy; even if the forum State is the most convenient location for litigation, the Due Process Clause, acting as an instrument of

> interstate federalism, may sometimes act to divest the State of its power to render a valid judgment.

Bristol-Myers, 137 S. Ct. at 1780-81 (quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. at 294).

In Silver v. Brown, 678 F. Supp. 2d 1187 (D.N.M.2009)(Browning, J.), aff'd in part and rev'd in part, 382 F. Appx. 723 (10th Cir.2010), the Court considered whether it had personal jurisdiction over defendants who allegedly slandered, defamed, and caused the plaintiff -- Michael Silver -- distress, by posting a blog on the internet that portrayed him in a negative light. See 678 F. Supp. 2d at 1204. The Court determined that it did not have personal jurisdiction over defendant Jack McMullen, because Silver failed to demonstrate that McMullen "was significantly associated with the blog or controlled it in any way." 678 F. Supp. 2d at 1212. The Court also concluded that it did not have personal jurisdiction over the blog post's author -- Matthew Brown -- because he was not domiciled in New Mexico, had not traveled to New Mexico, and did not transact business there. See 678 F. Supp. 2d at 1211. The Court said that Brown's blog posts similarly did not establish personal jurisdiction, because

> the blog is closer to an informative website than a commercial website. No services are offered, and Brown is not collecting revenue from the website. Brown does not interact with the people who post information on the blog. Brown, to the Court's knowledge, did not solicit negative postings on the website. Further, even though people in New Mexico can view the website, the blog is not a website that is directed solely at the people of New Mexico. The number of people who can access the website in New Mexico in comparison to those who are able to access the website throughout the world, or even in the United States, according to the statistics that Silver provided at the hearing, is nominal.

678 F. Supp. 2d at 1211-12.

On appeal, the Tenth Circuit affirmed the Court's holding as to McMullen, but reversed its decision as to Brown. See Silver v. Brown, 382 F. App'x. at 727-32. In an opinion that the Honorable Monrow G. McKay, United States Circuit Judge for the Tenth Circuit, authored, and

Judges Broby and Ebel joined, the Tenth Circuit applied the three-part test from Calder v. Jones to conclude that the Court had personal jurisdiction over Brown. See Silver v. Brown, 382 F. App'x. at 727-32. Judge McKay first explained that the posting of the blog was "clearly an intentional act" designed to damage the plaintiff's reputation. 382 F. App'x. at 729. Second, Judge McKay said that Brown had "expressly aimed his blog at New Mexico," where Silver, his business, and the majority of his customers were located. 382 F. App'x. at 729. Judge McKay noted: "It was about a New Mexico resident and a New Mexico company. The blog complained of Mr. Silver's and [his business'] actions in the failed business deal. Those actions occurred mainly in New Mexico." 382 F. App'x. at 729-30. Third, Judge McKay explained that Brown knew Silver would suffer the brunt of his injury in New Mexico, as the state was "unquestionably the center of his business activities." 382 F. App'x. at 730.

In several other recent cases, the Court grappled with whether it could assert general or specific jurisdiction over non-individual entities. In Fabara v. GoFit, LLC, 308 F.R.D. 380 (D.N.M.2015)(Browning, J.), a plaintiff -- injured by an allegedly defective exercise ball in New Mexico -- brought suit against the manufacturer, which was incorporated and headquartered in Oklahoma. See 308 F.R.D. at 408. The manufacturer moved to dismiss the complaint, under rule 12(b)(2), arguing that the Court lacked general jurisdiction because its contacts with New Mexico were neither continuous nor systematic. See 308 F.R.D. at 384. The plaintiff responded with photographs of the manufacturers' products in several stores, arguing that the manufacturer delivered the exercise balls into the stream of commerce with the expectation that New Mexico customers would purchase and use them. See 308 F.R.D. at 389. The Court rejected this theory, explaining that the manufacturer's contacts with New Mexico were not "so systematic and continuous as to make it essentially at home here." 308 F.R.D. at 397. The Court noted that the manufacturer had

almost no physical connections with New Mexico, and that its New Mexico internet sales -- roughly $20,000.00 over nine years -- were insufficiently "substantial" to support general jurisdiction. 308 F.R.D. at 402-03.

In Diener v. Trapeze Asset Management, Inc., No. 15-0566, 2015 WL 8332933 (D.N.M.)(Browning, J.), the Court considered whether it had specific jurisdiction over a Canadian asset-management firm that maintained a passive website, placed its name in a third party's money-manager listing, mailed marketing materials to New Mexico, had telephone conversations with plaintiffs located in New Mexico, and ultimately entered into a contract with plaintiffs located in New Mexico. See 2015 WL 8332933, at *1. The Court concluded that it did not have specific jurisdiction for four primary reasons. See 2015 WL 8332933, at *1. First, the website was wholly passive and did not allow visitors "the opportunity to invest or interact with the site." 2015 WL 8332933, at *15. Second, the third-party listing was similarly passive. See 2015 WL 8332933, at *15. Third, the Court noted that "phone calls and letters are not necessarily sufficient in themselves to establish minimum contacts," noting that the alleged torts occurred in Canada. 2015 WL 8332933, at *17 (quoting Benton v. Cameco Corp., 375 F.3d 1070, 1077 (10th Cir. 2004)). Fourth, the plaintiffs reached out to the defendants to create the contractual relationship, distinguishing the case from others finding purposeful availment. See 2015 WL 8332933, at *17 (citing Burger King Corp. v. Rudzewicz, 471 U.S. at 473).

Finally, in Resource Associates Grant Writing & Evaluation Servs., Inc. v. Southampton Union Free School Dist., 193 F. Supp. 3d 1200 (D.N.M. 2016)(Browning, J.), the Court considered whether it had personal jurisdiction over a union that had never conducted any business in New Mexico, had never sent a representative to New Mexico, and its only contacts with a New Mexico entity were via telephone and email correspondence that the New Mexico company had initiated.

See 193 F. Supp. 3d at 1239. Highlighting the contractual nature of the particular contacts at issue, and that due process may be satisfied in contractual relations if the defendant "'reache[s] out' to the forum state," the Court concluded it could not exercise personal jurisdiction over the union, because the union did not "not reach out to New Mexico to enter into an agreement"; rather, the New Mexico entity had initiated the communications and contract. 193 F. Supp. 3d at 1241-43 (citing Burger King Corp. v. Rudzewicz, 471 U.S. at 479-85).

## ANALYSIS

First, the Court concludes that it may properly consider all of the documents the Defendants request to be judicially noticed on a rule 12(b)(6) Motion, except the FTC Letter, because the United States has not publically recognized that document as its own. It concludes that the remaining documents may be properly considered, because they are either referenced in the Amended Complaint or are matters of public record. Second, the Court concludes that it lacks personal jurisdiction over Reynolds American vis-à-vis the Plaintiffs' claims brought in a non-North Carolina forum, because Reynolds American's involvement with its subsidiary, Santa Fe Tobacco -- e.g., its asset and board member overlap -- is not so extensive as to make Santa Fe Tobacco Reynolds American's alter ego. Nevertheless, it will exercise its authority under 28 U.S.C. § 1631 to transfer the claims, instead of dismissing them. Third, the Consent Order does not preempt the Plaintiffs' claims premised on the Safer-Cigarette Theory, because the Consent Order is not law, and an agreement not to enforce a federal law does not evince a clear and manifest purpose to supplant all state-law deceptive-practice claims. Fourth, the Court concludes that Natural American cigarettes' labeling and advertising misleads a reasonable consumer under the Plaintiffs' Safer-Cigarette and Menthol Theories, but not under the Plaintiffs' Unprocessed-Cigarette Theory. Decades-long marketing campaigns have infused the terms natural and organic with safety and health connotations,

such that the Defendants' use of the terms would deceive a reasonable consumer. In addition, menthol is not such a common substance that a reasonable consumer would understand that menthol is an additive when faced with a disclosure directly to the contrary. The Court, however, dismisses the claims to the extent that they are premised on the Unprocessed-Cigarette Theory. Fifth, the First Amendment does not shield the Defendant from liability, in part, because the state action doctrine precludes liability for contract-type claims, and, in part, because the descriptors plausibly deceived the plaintiffs. Sixth, the states' safe harbors, except for Illinois', do not preclude liability for largely the same reasons that the Consent Order did not preempt the Plaintiffs' claims. The Ohio statutory claims, nevertheless, must be dismissed, because the Plaintiffs do not satisfy OSCPA's notice requirement, and because consumers do not have standing to sue under ODTPA. Seventh, New Jersey precludes unjust-enrichment relief, because the Plaintiffs cannot allege a remuneration, and Ohio Law preclude unjust-enrichment relief, because the Plaintiffs cannot allege a direct benefit. However, the remaining claims may be pled in the alternative. Eighth, the express warranty claims under Florida, Illinois, and New York law must be dismissed, because the Plaintiffs' Amended Complaint cannot serve as the requisite notice, and must also be dismissed under Florida and Illinois law, because the Plaintiffs lack privity with the Defendants. Ninth, the Plaintiffs' requested injunctive relief is not yet rendered moot, because ongoing litigation may invalidate the Memorandum of Agreement.

## I. THE COURT MAY PROPERLY CONSIDER ALL BUT ONE DOCUMENT THAT THE DEFENDANTS HAVE SUBMITTED WITHOUT CONVERTING THE MOTION INTO ONE FOR SUMMARY JUDGMENT.

The Defendants move for judicial notice of eighteen items, and they are:

(1) The 2000 FTC Complaint filed against Santa Fe Tobacco. See In the Matter of Santa Fe Natural Tobacco Company, Inc., No. C-3952 Complaint ("FTC Complaint"), filed November 18, 2016 (Doc. 71-1)("First JN Motion Exhibits"); First JN Motion Exhibits at CM/ECF 2-4.

(2) Natural American Spirit Advertising attached to the FTC Complaint. See In the Matter of Santa Fe Natural Tobacco Company, Inc., No. C-3952, Exhibits A-C, filed November 18, 2016 (Doc. 71-1)("FTC Complaint's exhibits"); First JN Motion Exhibits at CM/ECF 6-8. The FTC Complaint's exhibits appear to be photocopied advertisings from magazines, and they advertise Natural American cigarettes as 100% free of chemical additives and natural.

(3) The Consent Order. See First JN Motion Exhibits at CM/ECF 10-19.

(4) An FTC press release announcing a proposed settlement agreement between the FTC and Santa Fe Tobacco. See FTC Accepts Settlements of Charges that "Alternative" Cigarette Ads are Deceptive, issues April 27, 2000, filed November 18, 2016 (Doc. 71-1)("Press Release 1"); First JN Motion Exhibits at CM/ECF 21-23.

(5) An FTC press release announcing a proposed settlement agreement concerning Reynolds American's no-additive advertising. See FTC Accepts Settlement of Charges that Ads for Winston "No Additive" Cigarettes are deceptive, issued March 3, 1999, filed November 18, 2016 (Doc. 71-1)("Press Release 2"); First JN Motion Exhibits at CM/ECF 25-27.

(6) An Assurance of Voluntary Compliance between Reynolds American and various States Attorneys General. See Assurance of Voluntary Compliance, (dated March 1, 2010), filed November 18, 2016 (Doc. 71-1)("Assurance of Voluntary Compliance"); First JN Motion at Exhibits at 29-49.

(7) Letter from Lisa Kopchik, an FTC attorney, to Robin Sommers, Santa Fe Tobacco's CEO, dated September 22, 1997. See Advertising for Natural American Cigarettes File Number 972-3235, dated September 22, 1997, filed November 18, 2016 (Doc. 71-1)("FTC Letter"); First JN Motion Exhibits at CM/ECF 51-57.

(8) A Food and Drug Administration Center for Tobacco Products Warning Letter to Santa Fe Tobacco, dated August 27, 2015. See Warning Letter, dated; First JN Motion at CM/ECF 59-62.

(9)-(15) Reproductions of Natural American cigarette labeling. See Natural American Spirit Dark Green 84mm CPB at CM/ECF 64-69, dated August 13, 2015, filed November 18, 2016 (Doc. 71-1)("Dark Green Label"); Natural American Spirit Blue 84mm CPB at CM/ECF 71-76, dated August 13, 2015, filed November 18, 2016 (Doc. 71-1)("Blue Label"); Natural American Spirit Gold 84 mm CPB at CM/ECF 78-83, dated August 13, 2015, filed November 18, 2016 (Doc. 71-1)("Gold Label"); Natural American Spirit Turquoise 84mm CPB at CM/ECF 85-90, dated August 13, 2015, filed November 18, 2016 (Doc. 71-1)("Turquoise Label"); Natural American Spirit Green 84mm

Appellate Case: 23-705 Document: 010110921360 Date Filed: 09/15/2023 Page: 875 Sealed

CPB at CM/ECF 92-97, dated August 13, 2015, filed November 16, 2016 (Doc. 71-1)("Green Label"); Natural American Spirit Yellow 84 mm CPB at CM/ECF 99-104, dated August 13, 2015, filed November 18, 2016 (Doc. 71-1)("Yellow Label"); Natural American Spirit Perique Robust 84 mm CPB at CM/ECF 106-111, dated August 13, 2015, filed November 18, 2016 (Doc. 171-1)("Perique Label"), (collectively "Natural American Labels"); First JN Motion Exhibits at CM/ECF 64-111.

(16) Natural American Tobacco and Water Advertising. See Tobacco & Water Advertisement; First JN Motion Exhibits at 113-14.

(17) Memorandum of Agreement. See Second JN Motion at 1; Second JN Motion Exhibit at CM/ECF 2-3.

(18) Request for Informal Staff Guidance Regarding Santa Fe Natural Tobacco Company's Consent Order (FTC Dkt. No. C-3952) dated May 9, 2017, filed May 30, 2017 (Doc. 109-1)("Staff Guidance Request"); Third JN Motion Exhibit at CM/ECF 2-4.

The Plaintiffs argue that items 17 and 18 are not judicially noticeable, but do not contest the first sixteen items. See Plaintiffs' Response in Opposition to Defendants' Second Motion for Judicial Notice at 2-4, filed April 6, 2017 (Doc. 97)("Second JN Resp."); Plaintiffs' Response in Opposition to Defendants' Third Motion to Take Judicial Notice at 1-2, filed June 7, 2017 (Doc. 111)("Third JN Resp."). The Court concludes that it may consider all of the documents, which the Defendants submit, except the FTC Letter, without converting the MTD into one for summary judgment.

Initially, the Court judicially notices the FTC Complaint, the FTC Complaint's Exhibits, the Consent Order, Press Release 1, Press Release 2, the Assurance of Voluntary Compliance, and the Warning Letter. The FTC Complaint, the FTC Complaint's Exhibits, and the Consent Order are matters of public record, so may be judicially noticed. See Hodgson v. Farmington City, 675 F. App'x 838, 840-41 (10th Cir. 2017)(unpublished)(concluding that a district court did not err "in taking judicial notice of public records from the parties' administrative and judicial proceedings"); Stan Lee Media, Inc. v. Walt Disney Co., 774 F.3d 1292, 1298 n.2 (10th Cir. 2014); Stephen

Saltzburg, Michael M. Martin & Daniel J. Capra, Federal Rules of Evidence Manual § 201.02[3] at 201-7 (10th Ed. 2011)("The reliability of judicial records is not in question."). Those three documents were filed publicly in an administrative proceeding, and therefore are properly judicial noticed. See In re Santa Fe Natural Tobacco Co., No. C-3952 (F.T.C. June 12, 2000). Independent from that determination, those three documents are properly judicially noticed, because they are available on a federal agency's website. See New Mexico ex rel. Richardson v. Bureau of Land Management, 565 F.3d 683, 702 n.22 (10th Cir. 2009)(ruling that judicial notice was proper for information referenced on two federal agency's websites); O'Toole v. Northrop Grumman Corp., 499 F.3d 1218, 1215 (10th Cir. 2007)("It is not uncommon for courts to take judicial notice of factual information found on the world wide web.").[35] That the Court judicially notices the documents' existence, however, does not mean that the Court judicially notices the documents' content for the truth of the matter asserted. See Saltzburg, Federal Rules of Evidence Manual § 201.02[3], at 201-8 ("[A] court can take judicial notice that court filings contained certain allegations . . . , [b]ut the truth of these allegations and findings are not proper subjects of judicial notice."). Indeed, any party can file a document in a proceeding, but that does not mean that the document's contents are beyond reproach.

The Court also judicially notices Press Release 1, Press Release 2, the Assurance of Voluntary Compliance, and the Warning Letter, because they are available on a governmental website.[36] The Court does not, however, judicially notice the FTC letter. The Court could not locate

---

[35]See https://www.ftc.gov/sites/default/files/documents/cases/2000/06/santafecmp.htm (FTC Complaint); https://www.ftc.gov/sites/default/files/documents/cases/2000/06/santafeexhibitsac.pdf (FTC Complaint's Exhibits); https://www.ftc.gov/sites/default/files/documents/cases/2000/06/santafe.do.htm (Consent Order).

[36]See https://www.ftc.gov/news-events/press-releases/2000/04/ftc-accepts-settlements-charges-alternative-cigarette-ads-are (Press Release 1); https://www.ftc.gov/news-events/press-

that document on any website, and certainly not a government website. Although the Defendants argue that the FTC letter is a "matter of public record," First JN Motion at 3, they do not inform the Court where the document may be publically located. The Defendants also argue that judicial notice is proper, because the FTC letter is an official "government document[]," First JN Motion at 3, which appears true on the document's face; the letter is typed on FTC letterhead, it references file number 972-3235, and Lisa Kopchik, an FTC attorney, has signed it, FTC letter at 1, 3 (at 51, 53 on CM/ECF). Nevertheless, the test for judicial notice is whether an adjudicative fact is "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned," Fed. R. Evid. 201(b)(2), and this source could be reasonably questioned, because the FTC has not publically acknowledged it as its document, see Duprey v. Twelfth Judicial Dist. Court, State of New Mexico, No. 08-0756, 2009 WL 2432483, at *2 (D.N.M. July 10, 2009)(Browning, J.)(ruling that a letter from a government employee to an aggrieved subordinate was not judicially noticeable without converting the motion to dismiss into one for summary judgment); Abercrombie v. Aetna Health, Inc., 176 F. Supp. 3d 1202, 1213 n.13 (D. Colo. 2016)(Arguello, J.)(declining to take judicial notice of a Colorado Division of Insurance, Department of Regulatory Agency's letter).

---

releases/1999/03/ftc-accepts-settlement-charges-ads-winston-no-additive-cigarettes (Press Release 2);https://oag.ca.gov/system/files/attachments/press_releases/n1865_santa_fe_natural_tobacco_co agreement.pdf (Assurance of Voluntary Compliance); https://www.fda.g ov/ICECI/ EnforcementActions/WarningLetters/2015/ucm459778.htm (Warning Letter). Although the Assurance of Voluntary Compliance is from a state agency's website, documents from those sources are also properly judicially noticed. See New Mexico ex rel. Richardson v. Bureau of Land Management, 565 F.3d at 702 n.22 (ruling that documents referenced in the New Mexico State Resource Advisory Council Minutes, which were available on the agency's website, were judicially noticeable). In addition, the Amended Complaint references the Warning Letter, so it is also properly considered without converting the Motion into one for Summary Judgment. See Amended Complaint ¶¶ 36, 58, at 14, 28-29.

The Court also concludes that it can consider the Natural American Labels and the Tobacco & Water Advertisement without converting the motion into one for summary judgment, because the Amended Complaint incorporates those documents by reference. The Amended Complaint, in fact, reproduces pictures of the labeling and the advertising that the Defendants seek to introduce. See Amended Complaint ¶¶ 40, 43, at 15, 19-21; First JN Motion at 4 (explaining that the Defendants seek to produce more legible pictures of the labeling and the second page of an advertisement featured in the Amended Complaint). Moreover, Natural American cigarette's labeling and advertising is central to this case and the Plaintiffs have not disputed those documents' authenticity, so the Court may properly consider them without converting the MTD into one for summary judgment. See Jacobsen v. Deseret Book Co., 287 F.3d at 941.

The Memorandum of Agreement is judicially noticeable. The Plaintiffs contend that the Memorandum of Agreement cannot be a matter of public record, because it is not published in the Federal Registry, it is not a government report, or a government press release, and it is stamped "Confidential - Not for Public Disclosure." Second JN Resp. at 2-3. The Defendants rejoin that, by producing a copy of the Memorandum of Agreement in response to a Freedom of Information Act ("FOIA") request, the FDA made the document a matter of public record. See Second JN Reply at 1. The Court concludes that the Memorandum of Agreement is a matter of public record, despite its confidential label and even though it is still not publically available online, because the FOIA disclosure makes the document "capable of accurate and ready determination by resort to [a] source[] whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). See New York Times Co. v. U.S. Dep't of Justice, 756 F.3d 100, 110 n.8 & 9 (2d Cir. 2014)(ruling that an official disclosure made in response to a FOIA request typifies the kind of document judicially noticeable); In re American Apparel, Inc. Shareholder Litig., 855 F. Supp. 2d 1043, 1064 (C.D. Cal.

2012)(Morrow, J.)("Because plaintiffs obtained the documents by making a FOIA request, the court will take judicial notice of them as matters of public record.").

The Plaintiffs also argue, however, that, even if the document is judicially noticeable, the Defendants want the Court to judicially notice the Memorandum of Agreement's contents for their truth value -- "a task inappropriate at the 12(b)(6) stage." Second JN Resp. at 4. In their MTD, the Defendants cite the Memorandum of Agreement to support their argument that injunctive relief is rendered moot, because they have already taken steps to the stop the actions that, purportedly, entitle the Plaintiffs to injunctive relief. See MTD at 68-69. The Court agrees with the Plaintiffs that it cannot consider the contents of the Memorandum of Agreement for the truth of the matters asserted therein. See Tal v. Hogan, 453 F.3d at 1265 n.24; Saltzburg, Federal Rules of Evidence Manual § 201.02[3], at 201-8 ("[A] court can take judicial notice that court filings contained certain allegations . . . , [b]ut the truth of these allegations and findings are not proper subjects of judicial notice."). The Memorandum of Agreement, however, speaks only to the parties' intent, which has truth value only to that intent. See Echo Acceptance Corp. v. Household Retail Servs., Inc., 267 F.3d 1068, 1088 (10th Cir. 2001)(citing United States v. Montana, 199 F.3d 947, 950 (7th Cir. 1999)(explaining that "performative . . . utterances . . . illustrated by a promise, offer, or demand -- commit the speaker to a course of action [and] are not within the scope of the hearsay rule, because they do not make any truth claims")). Within the Memorandum of Agreement, Santa Fe Tobacco commits to removing certain terms from its labels and advertising, and the FDA commits to "not initiating enforcement action" if Santa Fe Tobacco agrees to the Memorandum of Agreement's terms. Memorandum of Agreement at 1-2. The Court will not consider the Memorandum of Agreement for its truth value.

Finally, the Court judicially notices the Staff Guidance Request. In the document, the FTC advises the Defendants that it cannot say whether the phrases "Tobacco Ingredients: Tobacco and Water" and "Tobacco Filler Ingredients: Tobacco and Water" trigger the Consent Order's disclosure requirement, because the legal analysis turns on "an examination of the entire advertisement," so it cannot offer legal advice regarding the two phrases in a vacuum. Staff Guidance Request at 2. The FTC warns, however, that those phrases likely trigger the Consent Order's disclosure obligation. See Staff Guidance Request at 2. The FTC also notes that, if the Defendants modified their disclosure to "Natural American Spirit cigarettes are not safer than other cigarettes," the FTC would not recommend an enforcement action "*as long as* the disclosure was displayed clearly and prominently." Staff Guidance Request at 3 (emphasis in original). The Court judicially notices the Staff Guidance Request, because it is available on the FTC's website.[37]

## II. THE COURT LACKS PERSONAL JURISDICTION OVER REYNOLDS AMERICAN WITH RESPECT TO THE PLAINTIFFS' CLAIMS THAT WERE NOT FILED IN NORTH CAROLINA.

The Defendants argue that the Court has jurisdiction only over those claims against Reynolds American filed in North Carolina, because Reynolds American is headquartered and incorporated there, and Reynolds American otherwise lacks the minimum contacts necessary for specific or general jurisdiction in the other forums. See MTD at 71, 73-74. They also aver that the Plaintiffs cannot impute Reynolds American's subsidiaries' contacts onto it, because Reynolds American does not substantially controls its subsidiary's day-to-day activities. See MTD at 76-77.

The Court's jurisdiction in an MDL is coextensive with the transferor courts' jurisdiction. See, e.g., In re Automotive Refinishing Paint Antitrust Litig., 358 F.3d 288, 297 n.11 (3d Cir. 2004).

[37]See https://www.ftc.gov/system/files/documents/advisory_opinions/letter-mary-engle-associate-director-division-advertising-practices-mark-s-brown-esq/rai-santa_fe_staff_advisory_ opinion_and_incoming_request_5-9-17.pdf.

Accordingly, the Court must assess personal jurisdiction with respect to the Defendants' contacts to the forums in which the Plaintiffs filed suit. See, e.g., In re Automotive Refinishing Paint Antitrust Litig., 358 F.3d at 297 n.11. To assert personal jurisdiction over a nonresident defendant, federal courts must satisfy state law and federal due process. See Doering v. Copper Mountain, Inc., 259 F.3d at 1209-10.

The Defendants argue that asserting personal jurisdiction over the claims filed against Reynolds American outside of North Carolina would violate Due Process. See MTD at 72. The personal-jurisdiction due process analysis is two-fold. See Fabara v. GoFit, LLC, 308 F.R.D. at 400. A defendant must have "minimum contacts" with the forum state such that it "should reasonably anticipate being haled into court there," Burger King Corp. v. Rudzewicz, 471 U.S. at 473-76, and exercising personal jurisdiction over the defendant must comport with "traditional notions of fair play and substantial justice," Dudnikov v. Chalk & Vermilion Fine Arts, Inc., 514 F.3d at 1070 (quotation marks omitted). A defendant may have "minimum contacts" with the forum state in one of two ways, providing a court with either general or specific personal jurisdiction. Trierweiler v. Croxton & Trench Holding Corp., 90 F.3d at 1532-33 (citations omitted).

> General jurisdiction is based on an out-of-state defendant's "continuous and systematic" contacts with the forum state, and does not require that the claim be related to those contacts. Specific jurisdiction, on the other hand, is premised on something of a *quid pro quo:* in exchange for "benefitting" from some purposive conduct directed at the forum state, a party is deemed to consent to the exercise of jurisdiction for claims related to those contacts.

Dudnikov v. Chalk & Vermilion Fine Arts, Inc., 514 F.3d at 1078.

The test for general personal jurisdiction turns on whether the defendant is "at home" within the forum state. Daimler AG v. Bauman, 134 S. Ct. at 760. For individuals, "the paradigm forum for the exercise of general jurisdiction is the individual's domicile." Daimler AG v. Bauman, 134 S. Ct. at 760 (quoting Goodyear, 564 U.S. at 924). For corporations, "the place of incorporation and

principal place of business are 'paradig[m] . . . bases for general jurisdiction." Daimler AG v. Bauman, 134 S. Ct. at 760 (quoting Goodyear, 564 U.S. at 924).

The Court agrees with the Defendants that it cannot assert general personal jurisdiction over Reynolds American except for the Plaintiffs' claims that were filed in North Carolina. See Daimler AG v. Bauman, 134 S. Ct. at 760; Amended Complaint ¶¶ 12-13, 15, 18, 20-22, at 4-11 (alleging that Herbert, Benson, Emmons, Murphy, Chavez, Horne, and Lopez filed suit in the United States District Court for the Middle District of North Carolina). Reynolds American is a North Carolina corporation with its principal place of business in North Carolina, so it is at home in that state and subject to general personal jurisdiction for the claims asserted in a North Carolinian forum. See Amended Complaint ¶ 25, at 12. The Court cannot assert general personal jurisdiction over the claims alleged against Reynolds American originally filed in other states. See Amended Complaint ¶¶ 14, 16-17, 19, 23 at 5-9, 11.[38]

The Court also agrees with the Defendants that it cannot assert specific personal jurisdiction over Reynolds American regarding the remaining Plaintiffs' claims. The specific-jurisdiction inquiry is also a two-part test: "[F]irst . . . the out-of-state defendant must have purposefully directed its activities at residents in the forum state, and second, . . . the plaintiff's injuries must arise out of' defendant's forum-related activities." Dudnikov v. Chalk & Vermilion Fine Arts, Inc., 514 F.3d at 1071 (quotations omitted). See Burger King Corp. v. Rudzewicz, 471 U.S. at 472. "For specific jurisdiction, a defendant's general connections with the forum are not enough." Bristol-Myers, 137 S. Ct. at 1781. In the tort context, a defendant has "purposefully directed" his activities at a state or

[38]Although language in Daimler AG v. Bauman suggests that general jurisdiction over a corporation could be asserted in states where the Defendant corporation is not incorporated or headquartered in the state, see Daimler AG v. Bauman, 134 S. Ct. at 760-61, the Court reads Daimler AG v. Bauman as generally foreclosing that possibility except in unusual circumstances not present here. See Bristol-Myers, 137 S. Ct. 1780 ("[O]nly a limited set of affiliations with a forum will render a defendant amenable to general jurisdiction in that State.")(quotations omitted).

its residents when he or she has: (i) taken intentional action; (ii) the action was "expressly aimed" at the state; and (iii) the action was taken with the knowledge that "the brunt of th[e] injury" would be felt in that state. Dudnikov v. Chalk & Vermilion Fine Arts, Inc., 514 F.3d at 1072 (quoting Calder v. Jones, 465 U.S. at 789-90).

Reynolds American's alleged activities -- "intimate[] involve[ment] in the marketing, advertising, and overall business development of Natural American cigarettes," Amended Complaint ¶ 27, at 12 -- do not establish that it directed its activities at the non-North Carolina states. See Federated Rural Elec. Ins. Corp. v. Kootenai Elec. Co-op, 17 F.3d 1302, 1305 (10th Cir. 1994)(ruling that placing advertisements in national newspapers or journals do not amount to purposeful contact with a state). More explicit allegations demonstrating that Reynolds American targeted a specific state with its publications could potentially establish that it directed its activities at those states, but those allegations are not present in the Amended Complaint.

Nor may Reynolds American's subsidiaries' contacts be substituted for the ones that Reynolds American lacks. To impute a subsidiary's contacts onto a parent, the subsidiary must be the parent's general agent or alter ego. See Benton v. Cameco Corp., 375 F.3d 1070, 1081 (10th Cir. 2004)(ruling that an allegation of parent and subsidiary officer overlap was insufficient to impute subsidiary contacts onto the parent); Daimler AG v. Bauman, 134 S. Ct. at 759 ("[S]everal Courts of Appeals have held that a subsidiary's jurisdictional contacts can be imputed to its parent only when the former is so dominated by the latter as to be its alter ego."). The Plaintiffs allege that: (i) Reynolds American has service agreements with its subsidiaries, which enable executive collaboration; (ii) Reynolds American considers Santa Fe Tobacco an operating segment; (iii) Reynolds Americans assets are Santa Fe Tobacco's assets; (iv) Reynolds American controls Santa Fe's financial operations; (v) board members and other employees overlap; (vi) Reynolds

American controls pricing and owns its subsidiaries executive offices and manufacturing facilities; and (vii) Reynolds American reports Santa Fe Tobacco's financial statements in SEC filings. See Response at 78; Amended Complaint ¶¶ 29, 35, at 13-14. Although those allegations demonstrate that Reynolds American exhibits influence over its subsidiaries, influence alone is insufficient to demonstrate that the subsidiary is an alter ego. Parent companies typically monitor a subsidiary's performance, supervise its finances, and oversee some decisions. See Willis v. Government Emps. Ins. Co., No. 13-0280, 2016 WL 3946782, at *5 (D.N.M. February 1, 2016)(Gonzales, J.). In contrast, a subsidiary is an alter ego if it is a mere "instrumentality of the parent." Key v. Liquid Energy Corp., 906 F.2d 500, 503 (10th Cir. 1990). Construing state corporate law, the Tenth Circuit's analysis in Luckett v. Bethlehem Steel Corp., 618 F.2d 1373 (10th Cir. 1980), is instructive. In that case, the Tenth Circuit concluded that a subsidiary was not a parent's alter ego even though the parent owned seventy percent of the subsidiary's stock, appointed ten of the subsidiary's managers, some of whom had managerial posts at the parent as well, and had contracted to give the subsidiary technical services and manufacturing equipment. See Luckett v. Bethlehem Steel Corp., 618 F.2d at 1378; Good v. Fuji Fire & Marine, Ins. Co., 271 F. App'x 756, 759 (10th Cir. March 27, 2008)(unpublished)(ruling that a parent company owning twenty percent of the stock in a subsidiary was insufficient to impute the subsidiary's contacts onto the defendant for personal jurisdiction); Thompson v. THI of New Mexico at Casa Arena, No. 05-1331, 2008 WL 5999653, at *26 (D.N.M. December 24, 2008)(Browning, J.)(ruling that a subsidiary was not a parent's alter ego, in part, because it "was not intimately involved in the day-to-day operations" and "was independently financially stable and able to maintain its payroll"). The Tenth Circuit's conclusion applies with equal force here; although board members and assets overlap, and Reynolds American

supervises other aspects of its subsidiary, those facts are insufficient to create an alter-ego or general agency relationship.

Although the Court lacks personal jurisdiction as to those claims, there is still the question of the appropriate remedy. The Court notes that it can, under rule 21, sever the defective claims filed against Reynolds American and transfer that action to a North Carolina federal court, if the transfer "is in the interest of justice." 28 U.S.C. § 1631. See Fed. R. Civ. P. 21 ("On motion or on its own, the court may at any time, on just terms . . . sever any claim against a party."); Presbyterian Healthcare Servs. v. Goldman, Sachs & Co., 122 F. Supp. 3d 1157, 1214 (Browning, J.)("[A] district court may sever a case under Rule 21 to transfer one action while retaining jurisdiction over the other.")(citation and quotation omitted). A North Carolina federal court could exercise general personal jurisdiction over the claims. The Plaintiffs, however, have not argued for severance and transfer, so the Court would be acting sua sponte. The Court has authority, however, to sever and to transfer sua sponte. See Fed. R. Civ. P. 21; Trujillo v. Williams, 465 F.3d 1210, 1222 (10th Cir. 2006). The Court also has discretion to transfer, but the Tenth Circuit has indicated that the Court must weigh whether it is in the interests of justice to transfer a claim instead of dismissing it without prejudice. See Trujillo v. Williams, 465 F.3d at 1222-23.

There are three factors that the Court must consider on an "interests of justice" analysis: (1) whether the claims would be time barred; (2) the claims' merit; and (3) whether the original action was filed in good faith rather than after the Plaintiff realized or should have realized that the forum was improper. See Trujillo v. Williams, 465 F.3d at 1223 n.16. Many of the claims have merit as discussed below. The Court also concludes that the Plaintiffs filed their claims on the good-faith belief that they could establish contacts through Santa Fe Tobacco's actions.

As to the final factor, the Plaintiffs allege that the statute of limitations is equitably tolled under the discovery rule, i.e., the named and unnamed Plaintiffs could not have known of the deception, so the limitations period does not trigger until the plaintiffs discover the deception, and because the Defendants concealed their deception. See Amended Complaint ¶¶ 96-102, at 38-39. They also allege that the Defendants are estopped from relying on a statute of limitation defense, because the Defendants actively concealed "the true nature, quality, and character" of Natural American cigarettes. Amended Complaint ¶ 104, at 29. See id. at ¶¶ 103-05, at 39. The Court does not assess the merits of those allegations, but it notes that the applicable statute-of-limitations period for the consumer protection statutes, unjust-enrichment claims, and express warranty claims range from two to six years. See, e.g., Ohio Rev. Code. Ann. 1345.10 ("An action . . . may not be brought more than two years after the occurrence of the violation . . . ."); Mich. Comp. Laws 445.911(7) ("An action under this section shall not be brought more than 6 years after the occurrence . . . ."); Halver v. Welle, 266 P.2d 1053, 1057 (Wash. 1954)(holding that statute of limitations for unjust enrichment is three years); Alloway v. General Marine Inds., LP, 695 A.2d 264 270-71 (N.J. 1997)(holding that statute of limitations for breach of express warranty is four years). Of the named plaintiffs who did not file in the Middle District of North Carolina, Sproule filed earliest, on September 30, 2015, in the Southern District of Florida. See Amended Complaint ¶ 14, at 5. Even assuming that his claims were tolled under the discovery rule, the statute of limitations triggered more than two years ago, so would preclude, at least, his OCSPA claim. See Ohio Rev. Code. Ann. 1345.10. However, there is nothing in the Amended Complaint or the judicially noticed documents to suggest that the Defendants would be equitably estopped from asserting a statute of limitations defense. There is also nothing within the Amended Complaint suggesting when the Plaintiffs actually discovered their injuries, which may have been long before the named plaintiffs' complaints

were filed. Accordingly, the statute of limitations would likely defeat some, if not many, of the named Plaintiffs' claims. The Court concludes that, on balance, the interest of justice favor severance and transfer -- many of the claims have merit, the Plaintiffs filed in good faith, and there is a risk that the statute of limitations would bar those claims.

The Court accordingly will sever the claims, creating a new action, and transfer that new action under 28 U.S.C. § 1631. That statute provides that when the court transfers an action, that "action . . . shall proceed as if it had been filed in or noticed for the court to which it is transferred on the date upon which it was actually filed in or noticed for the court from which it is transferred." 28 U.S.C. § 1631. The action will be transferred to the Middle District of North Carolina and shall proceed as if it had been filed in the Middle District of North Carolina originally.[39] Although transferred, it appears that the Plaintiffs may file a Notice of Potential Tag-Along Actions with the MDL Clerk of the Panel, and have the claims reconsolidated here. See MDL Rule 7.1(a)

[39]The Court notes two federal cases that have held that an MDL transferee court may not transfer claims under 28 U.S.C. § 1631, which were consolidated under 28 U.S.C. § 1407. In re Chiquita Brands Int'l, Inc. Alien Tort Statute and Shareholder Derivative Litig., 190 F. Supp. 3d 1100, 1122-23 (S.D. Fla. 2016)(Marra, J.); In re Camp Lejeune North Carolina Water Contamination Litig., __ F. Supp. 3d __, 2016 WL 7049038 at *9 n.68 (N.D. Ga. 2016)(Thrash, J.). In so holding, they rely on Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach, 523 U.S. 26 (1998)("Lexecon"). Lexecon, however, is inapposite. There, the Supreme Court determined that an MDL transferee court could not transfer an MDL-consolidated case back to itself for trial, pursuant to 28 U.S.C. 1404(a) because it would interfere with Congress's clear command in 28 U.S.C. § 1407(a) that the MDL panel "shall . . . remand[] . . . at or before the conclusion of such pretrial proceeds to the district from which it was transferred." 28 U.S.C. § 1407(a). See Lexecon, 523 U.S. at 34-35. In so holding, the Supreme Court emphasized that 28 U.S.C. § 1407(a)'s "shall" language "creates an obligation impervious to judicial discretion," and the district court could not interfere with the MDL Panel's obligation. Lexecon, 523 U.S. at 35.

28 U.S.C. § 1631's language, however, also includes the obligatory "shall" language. 28 U.S.C. § 1631. The 28 U.S.C. § 1404(a) language, at issue in Lexecon, does not. See 28 U.S.C. § 1404(a). When faced with this obligation, the Court must transfer, if it is in the interest of justice. In so holding, the Court notes that 28 U.S.C. § 1631 was enacted after the 28 U.S.C. 1407.

## III. THE CONSENT ORDER DOES NOT PREEMPT THE PLAINTFFS' CLAIMS PREMISED ON THE SAFER-CIGARETTE THEORY.

The Defendants move to dismiss the Plaintiffs' claims, asserting that federal law impliedly preempts the state-law claims premised on the Safer-Cigarette Theory. See MTD at 6. The Court first considers below express preemption and then turns to implied preemption. It ultimately concludes that the Consent Order does not preempt the Plaintiffs' claims.

### A. THE FCLAA DOES NOT EXPRESSLY PREEMPT THE PLAINTIFFS' CLAIMS, BECAUSE THE PLAINTIFFS ALLEGE DECEPTION.

In analyzing preemption, there is an "assumption that the historic police powers of the States [are] not to be superseded by [federal law] unless that was the clear and manifest purpose of Congress." Medtronic, Inc. v. Lohr, 518 U.S. at 485. See Cipollone v. Liggett Grp., Inc., 505 U.S. 504, 518, 523 (1992)(applying a "presumption against the pre-emption of state police power regulations"). The fundamental standard for preemption is Congress' intent. See Wyeth v. Levine, 555 U.S. at 565. Unless it is evident that Congress intended to preempt state law causes of action, primarily where "Congress has 'legislated . . . in a field which the States have traditionally occupied,'" there is a presumption that the federal legislation does not displace the states' police powers. Medtronic, Inc. v. Lohr, 518 U.S. at 485 (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947)). Consumer protection law -- including cigarette advertising regulations -- is a field traditionally reserved for the states' historic police powers. See Packer Corp. v. State of Utah, 285 U.S. 105, 108 (1932)("[T]he state may, under the police power, regulate the business of selling tobacco products and the advertising connected therewith."); Lorillard Tobacco Co. v. Reilly, 533 U.S. at 541-42 ("Because 'federal law is said to bar state action in [a] fiel[d] of traditional state regulation,' namely, advertising, we 'wor[k] on the assumption that the historic police powers of the States [a]re not to be superseded by the Federal Act unless that [is] the clear and manifest purpose of

Congress.'")(quoting Packer Corp. v. State of Utah, 285 U.S. at 108)(internal citation omitted)). Commonly, when there is more than one way to read the text of a preemption clause, courts "accept the reading that disfavors pre-emption." Bates v. Dow Agrosciences LLC, 544 U.S. 431, 449 (2005). To prevail on their Motion to Dismiss, the Defendants must overcome a "strong presumption against pre-emption." Cipollone v. Liggett Grp., Inc. 505 U.S. at 518.

While neither party raises express preemption under FCLAA or under the FTC's authority over advertising and promotion, the Court deems it prudent to discuss the FCLAA. In 1965, Congress enacted the FCLAA in response to the Surgeon General's conclusion that cigarette smoking is harmful. See Cipollone v. Liggett Grp., Inc., 505 U.S. at 513-14. The FCLAA mandates that every cigarette pack sold in the United States have a warning label stating that cigarette smoking is dangerous to health, and may cause death from cancer and other diseases. See Cipollone v. Liggett Grp., Inc., 505 U.S. at 513-14. In the process, Congress expressly preempted state laws that may add supplemental requirements to the federally required warning. See 505 U.S. at 514. In 1969, Congress amended the FCLAA via the Public Health Cigarette Smoking Act of 1969, which strengthened the required warning and broadening the preemption provision. See Cipollone v. Liggett Group, Inc., 505 U.S. at 520. Congress has continued to amend the FCLAA, and, today, the FCLAA contains two express preemption provisions: 15 U.S.C. § 1334(a)-(b). The FCLAA's first preemption clause -- 15 U.S.C. § 1334(a) -- prohibits states from requiring additional statements on cigarette packages "relating to smoking and health" in an attempt to shield manufacturers from state labeling laws and their attendant costs. 15 U.S.C. § 1334(a); Altria II, 555 U.S. at 78. The FCLAA's second preemption clause -- 15 U.S.C. § 1334(b) -- states that "[n]o requirement or prohibition based on smoking and health shall be imposed under State law with respect to the

advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this chapter." 15 U.S.C. § 1334(b); Altria II, 555 U.S. at 78-79.

The FCLAA's labeling requirement, along with its preemption provisions, demonstrate Congress' intent that the FCLAA's mandated warnings are necessary and sufficient to promote Congress' goal. See Altria II, 555 U.S. at 79. Thus, states may not obstruct interstate commerce by implementing cigarette labeling rules based on the belief that federally mandated warnings are inadequate. See Altria II, 555 U.S. at 79. Cipollone v. Liggett Group Inc. is instructive and involved a smoker and spouse who brought suit against cigarette manufacturers after contracting lung cancer. See Cipollone v. Liggett Grp. Inc., 505 U.S. at 528-29. In ruling that the FCLAA does not preempt the plaintiffs' claims arising from a false advertising allegation, the Supreme Court derived a distinction between state laws premised on smoking and health and those based upon fraudulent misrepresentations. See Cipollone v. Liggett Group Inc., 505 U.S. at 528-29.

> Unlike state-law obligations concerning the warning necessary to render a product "reasonably safe," state-law proscriptions on intentional fraud rely on a single, uniform standard: falsity. Thus, [the FCLAA's express preemption clause] "based on smoking and health," fairly but narrowly construed does not encompass the more general duty not to make fraudulent statements.

Cipollone v. Liggett Group Inc., 505 U.S. at 528-29. Here, the FCLAA does not expressly preempt the Plaintiffs' claims, because their claims are premised on fraudulent misrepresentations. Indeed, the Defendants, rightfully, do not argue that the FCLAA expressly preempts the Plaintiffs' claims.

### B. THE CONSENT ORDER DOES NOT IMPLIEDLY PREEMPT THE PLAINTIFFS' CLAIMS.

Implied conflict preemption occurs where "compliance with both federal and state regulations is a physical impossibility," Fla. Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142-43 (1963), or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of congress," Hines v. Davidowitz, 312 U.S. 52, 67 (1941). See Pharm.

Research and Mfrs. Of Am. V. Walsh, 538 U.S. 644, 679 (2003)(Thomas, J., concurring)("Obstacle preemption turns on whether the goals of the federal statute are frustrated by the effect of the state law."). Whether an obstacle is sufficient for preemption purposes "is a matter of judgment, to be informed by examining the federal [law] as a whole and identifying its purpose and intended effects." Barber ex rel. Barber v. Colo. Dep't of Rev., 562 F.3d 1222, 1232 (10th Cir. 2009).

The Defendants do not argue that it is impossible to comply with both the Consent Order and state law. See MTD at 9-15. Instead, they contend that state law liability erects an obstacle to a federal objective. See MTD at 9-15. The Court concludes that the Consent Order does not impliedly preempt the Plaintiffs' claims for four reasons. First, the Consent Order cannot preempt state law, because it was not subject to the APA's or the FTC Act's rigorous procedural requirements for promulgating regulations. Second, even if a consent order could preempt state law without going through the APA or FTC procedural requirements, an agreement not to enforce a federal law does not evince intent to preclude all state law liability. Third, assuming that the Consent Order had preemptive effect, it would only bind parties to the agreement, so the consent order would only prohibit the plaintiffs from bringing suit against Santa Fe Tobacco. Finally, if the Consent Order had preemptive effect, it would only preempt the Plaintiffs' claims that target Natural American advertising and not their labeling, because the Consent Order does not govern labeling.

The Supreme Court has ruled that federal regulations preempt state laws. See Capital Cities Cables, Inc. v. Crisp, 467 U.S. 691, 699 (1984). Some United States Courts of Appeals have held that consent orders have preemptive force. See Motion to Dismiss at 11 (relying on, among others, Feikema v. Texaco, Inc., 16 F.3d 1408, 1416 (4th Cir. 1994); Gen. Motors Corp. v. Abrams, 897 F.2d 34, 39 (2d Cir. 1990)). The United States Court of Appeals for the Fourth Circuit, in Feikema v. Texaco, Inc., explained that when an agency "'acting within valid statutory authority . . . enters

into a consent order, that order will also preempt conflicting state regulation, including a federal court order based on state common law.'" Feikema v. Texaco, Inc., 16 F.3d at 1416 (emphasis omitted). Similarly, in Gen. Motors Corp. v. Abrams, the Second Circuit held that an FTC "'consent order reflecting a reasonable policy choice of a federal agency and issued pursuant to a congressional grant of authority may preempt state legislation.'" Gen. Motors Corp. v. Abrams, 897 F.2d at 39.

The Courts of Appeals do not, however, uniformly hold that consent orders grant preemptive effect. For example, the Fifth Circuit, relying on a United States Court of Appeals for the Eleventh Circuit case, has ruled that, "[a]s far as preemption is concerned, a voluntary consent decree has the same effect on state law as does a voluntary affirmative action program -- none." Dean v. City of Shreveport, 438 F.3d 448, 464 (5th Cir. 2006)(citing In re Birmingham Reverse Discrimination Employment Litig., 833 F.2d 1492, 1501 (11th Cir. 1987)). The Seventh Circuit has similarly suggested that a consent decree does not have preclusive effect, unless subjected to the APA's rigorous procedural requirements. See Wabash Valley Power Ass'n, Inc. v. Rural Electrification Admin., 903 F.2d 445, 454 (7th Cir. 1990).

> Because neither the state nor the consumers were parties to the FTC's case, it is hard to understand how the decree could blot out their claims based on state law. Whether the decree has such an effect should depend on whether it was adopted by the agency as its own policy following the procedures the APA requires; then the preemption would come from substantive rules rather than the parties' assent.

Wabash Valley Power Ass'n, Inc. v. Rural Electrification Admin., 903 F.2d at 454. The First Circuit, in expressing its skepticism that consent orders preempt state law, expanded on the Seventh Circuit's proposition that procedural protections must be recognized before agency action will acquire preemptive effect:

> Unlike many other exercises of agency authority, formal rulemaking comes with a host of procedural protections under the Administrative Procedure Act ("APA"), such as notice of the proposed rule, an opportunity for interested parties to participate, a statement of the basis and purpose of any rule adopted, and its

> publication in the Federal Register. 5 U.S.C. § 533 (2007). Limiting the preemptive power of federal agencies to exercises of formal rulemaking authority, then, ensures that the states will have enjoyed these protections before suffering the displacement of their laws. *See, e.g., Wabash Valley Power Ass'n,* 903 F.2d at 453-54; Richard J. Pierce, Jr., *Regulation, Deregulation, Federalism and Administrative Law,* 46 U. Pitt. L.Rev. 607, 664-65 (1985).

Good v. Altria Grp., Inc., 501 F.3d at 51. "This reasoning has particular force in the case of the FTC Act, which imposes procedural requirements on the Commission's rulemaking powers that exceed those of the APA. 15 U.S.C. §§ 57(c)-(e)." Good v. Altria Grp., Inc., 501 F.3d at 51. Accordingly, the First Circuit ruled that "we do not believe that the FTC can preempt state-law actions arising out of particular practices simply by entering into a consent order allowing them to continue." Good v. Altria Grp., Inc., 501 F.3d at 53. The United States Court of Appeals for the Third Circuit has ruled in accord with both the First and Seventh Circuits. See Fellner v. Tri-Union Seafoods, L.L.C., 539 F.3d 237, 245 (3d Cir. 2008)("We decline to afford preemptive effect to less formal measures lacking the fairness and deliberation which would suggest that Congress intended the agency's action to be a binding and exclusive application of state law.")(quotations omitted). It reasoned:

> Regularity of procedure -- whether it be the rulemaking and adjudicatory procedures of the APA or others which Congress may provide for a particular purpose -- not only ensures that state law will be preempted only by federal law, as the Supremacy Clause provides, but also imposes a degree of accountability on decisions which will have the profound effect of displacing state laws, and affords some protection to the states that will have their laws displaced and to citizens who may hold rights or expectations under those laws.

Fellner v. Tri-Union Seafoods, L.L.C., 539 F.3d at 245.

The Court finds the First, Third, Fifth, Seventh, and Eleventh Circuits' reasoning persuasive and concludes that the Consent Order should not and does not preempt state law. A voluntary agreement -- in short, a contract -- between two parties, even when one is a federal agency, cannot "blot out" a dual sovereign's law without procedural safeguards. Wabash Valley Power Ass'n, Inc. v. Rural Electrification Admin., 903 F.2d at 454. A consent order is no more than a voluntary

agreement between two parties. See Arvin Indus., Inc. v. Maremont Corp., No. IP 72-C-585, 1973 WL 784, at *3 (S.D. Ind. Mar. 9, 1973). Absent procedural protections, it follows that state law would be subject to an agency's caprice, so long as the agency could find some accommodating private party. Agencies inclinations, moreover, may change with administrations. In addition to the policy reasons that the Third Circuit articulated, the Court's interpretation is in accord with the Supremacy Clause's text that "the Laws" shall be supreme. See David S. Rubenstein, The Paradox of Administrative Preemption, 38 Harv. J.L. & Pub. Pol'y 267, 286 (2015)(arguing that "reading [the Supremacy Clause] in its textual, historical, and structural context rather plainly shows that it was intended to mean federal statutes -- and exclusively so"); Michael D. Ramsey, The Supremacy Clause, Original Meaning, and Modern Law, 74 Ohio St. L.J. 559, 564-65 (2013)(arguing that "law," as used in the Supremacy Clause, means "laws enacted through the Bicameralism and Presentment Clauses of Article I, Section 7"). Lawmaking requires more than mutual assent between two parties. Although the Consent Order here underwent some form of notice and comment, see Santa Fe Natural Tobacco Company, Inc. Analysis to Aid Public Comment, 65 Fed. Reg. 26.211-01 (May 5, 2000), that procedure is optional, it is not subject to the APA's informal rulemaking standards, and it does not require the agency to respond to public comments, compare 16 C.F.R. § 2.34(c) ("The Commission retains the discretion to issue . . . a Final Decision and Order, incorporating the order contained in a consent agreement, in appropriate cases before seeking public comment.") with 5 U.S.C. § 553(c); Perez v. Mortgage Bankers Ass'n, 135 S. Ct. 1199, 1203 (2015)("An agency must consider and respond to significant comments received during the period for public comment."); Sorenson Commc'n, Inc. v. F.C.C., 567 F.3d 1215, 1222 (10th Cir. 2009), nor is it as strict as the rulemaking standard that the FTC must meet to promulgate a regulation on unfair or deceptive acts or practices, see 15 U.S.C. § 57a(b)(1) (requiring, inter alia, that, before

prescribing a rule, the FTC allow notice and comment, provide an opportunity for an informal hearing, and provide a statement of basis and purpose). An APA rulemaking, for example, requires a statement of basis and purpose, which summarizes a rule's purpose and reason for adoption, and is, thus, a "very significant portion of a regulation when an issue arises as to its application and scope." United States v. Frontier Airlines, Inc., 563 F.2d 1008, 1013 (10th Cir. 1977). The Consent Order, on the other hand, has no such statement. A statement of basis and purpose "reveals and explains the perceived necessity for the rule" and does not leave the court "to guess at the reasoning process of the agency," Colorado Health Care Ass'n v. Colorado Dept. of Social Servs., 842 F.2d 1158, 1170 (10th Cir. 1988). With no such statement of basis and purpose, the Court is left to guess the Consent Order's scope and purpose. The Court concludes that the minimal notice and comment the Consent Order underwent are insufficient procedural safeguards to elevate the Consent Order to law that can have preemptive effect.[40]

Even if, however, a consent order could preempt state law, this Consent Order still fails to preempt the Plaintiffs' claim. The preemption analysis' guiding star is the FTC's intent and purpose. See Medtronic, Inc. v. Lohr, 518 U.S. at 485. The Consent Order mandates that Santa Fe Tobacco "display in advertisements," which use such phrases as "no additives, no chemicals, additive-free, chemical-free, chemical-additive-free, 100% tobacco, pure tobacco, or substantially similar terms," a

[40]Some academic commentators have suggested a similar holding. See Peter L. Strauss, Publication Rules in the Rulemaking Spectrum: Assuring Proper Respect for An Essential Element, 53 Admin L. Rev. 803, 849-50 (2001)("An agency that well understood the approaches explored here would restrict itself to using its guidance, interpretive and policy documents in a precedential way. It would never claim for them the force that we associate with statutes."); Richard J. Pierce Jr., Regulation, Deregulation, Federalism, and Administrative Law: Agency Power to Preempt State Regulation, 46 U. Pitt. L. Rev. 607, 611 (1985)("An agency should provide each state potentially affected by its action notice and an opportunity to participate in any proceeding in which the agency is considering a preemptive action."). Cf. Kent Barnett, Improving Agencies' Preemption Expertise with Chevmore Codification, 83 Ford. L. Rev. 587, 601 (2014)(noting that congressional language "strongly suggests that the OCC must preempt through formal adjudication or formal rulemaking under the APA").

disclosure that "[n]o additives in our tobacco does **NOT** mean a safer cigarette." Consent Order § 1, at 4-5 [at CM/ECF at 13-14] (quotations omitted)(emphasis in original). In a subsequent press release, the FTC's Director of its Bureau of Consumer Protection noted that "[t]he new disclosures should make it clear that . . . cigarettes without additives are not safe to smoke." Press Release 1 at 1. The Defendants argue that the FTC's intent with the Consent Order was to authorize the terms listed, so long as the disclosure mandated accompanies them. See MTD at 10-11. From that premise, they argue that imposing state liability for use of those terms erects an obstacle to the FTC's intent. See MTD at 11.

In analyzing those arguments, the Court proceeds with the backdrop of the presumption against preemption. The Defendants highlight the press release to contend that the Consent Order's purpose is to authorize the contested descriptors, or, potentially, to explain that the terms cannot be deceptive with the disclosure included. The Court perceives a potential different purpose evidenced from the press release: health and safety. The Director of the FTC's Bureau of Consumer Protections on-the-record comments demonstrate this. She writes: "These cigarettes are marketed with a natural aura, but they're neither healthy nor safe," and concludes with "[t]he fact is, there's no such thing as a safe smoke." Press Release 1 at 1 (quotations omitted). Even her comment that addresses how the disclosures should cure the advertising's deceptiveness is phrased in terms of overall cigarette safety. She says that the disclosures "make it clear that . . . cigarettes without additives are not safe to smoke." Press Release 1 at 1. Press Release 1 suggests, thus, that the Consent Order's purpose is to convey to consumers that cigarettes are unsafe. If health and safety is the Consent Order's purpose, the Consent Order poses no obstacle to the plaintiffs' deception-based claims, because the duty to refrain from making fraudulent statements diverges from a duty to warn. See Cipollone v. Liggett Grp., Inc., 505 U.S. at 528-29.

Assuming, however, that the Consent Order's purpose is, as the Defendants' contend, to authorize the contested terms, the Plaintiffs' claims are still not preempted. Altria II offers the appropriate guidance. In that case, the Supreme Court considered the implied preemption doctrine and rejected the defendants' obstacle-preemption claim that the FCLAA preempted a state statute similar to the statutes at issue in this case, Maine's Unfair Practices Act, Me. Rev. Stat. Ann., Tit. 5, § 207 (2008). See 555 U.S. at 90-91. In Altria II, the plaintiffs alleged that the defendant cigarette manufacturers deceptively marketing their Marlboro and Cambridge Light cigarettes as containing lower tar and nicotine to convey that their light cigarettes were less harmful than regular cigarettes. See 555 U.S. at 73. The Supreme Court concluded that the FCLAA, which forbids state laws from requiring or prohibiting language with respect to cigarette advertising and promotion, presents no obstacle to the plaintiffs' lawsuit, because the federal law ultimately regulates warning labels, and does not regulate false or misleading statements. See 555 U.S. at 82-83. Moreover, the Supreme Court determined that an FTC consent order, which prevents the cigarette manufacturers from using "light" and "low tar" descriptors, unless those terms are accompanied "by a clear and conspicuous disclosure of the cigarettes' tar and nicotine content," did not preempt the plaintiffs' claims, because "the decree only enjoined conduct," and "a consent order is in any event only binding on the parties to the agreement." 555. U.S. at 89 n.13. The Supreme Court concluded, thus, that federal law and regulations did not preempt the plaintiffs' state-law claims. See 555 U.S. at 90.

The FTC Consent Order at issue in Altria II is similar to the Consent Order here. See In the Matter of American Brands, Inc., 79 F.T.C. 255, 1971 WL 128779 (August 20, 1971). It orders that:

[R]espondent American Brands, Inc. . . . cease and desist from:

> Stating in advertising that any cigarette manufactured by it, or the smoke therefrom, is low or lower in "tar" by use of the words "low," "lower," or "reduced" or like qualifying terms, unless the statement is accompanied by a clear and conspicuous disclosure.

In the Matter of American Brands, Inc., 79 F.T.C. 255, 1971 WL 128779, at *3. The Consent Order here is similar in that it prohibits descriptors, unless a disclosure accompanies them. It reads:

> IT IS ORDERED that . . . [t]hese disclosures shall be displayed . . . in any advertisement that, through the use of such phrases as no additives, no chemicals, additive-free, chemical-free, chemical-additive-free, 100% tobacco, pure tobacco, or substantially similar terms, represents that a tobacco product has no additives or chemicals.

Consent Order at 5. The Defendants argue that the two Consent Orders' texts materially differ in that the Altria II order is "purely prohibitive, requiring the respondent to 'cease and desist from'" using descriptors unless a disclosure accompanies them, Reply at 4 (quoting In the Matter of American Brands, Inc., 1971 WL 128779, at *3), whereas the Consent Order here "affirmatively permits" descriptors by "specifically stating that it 'shall not prohibit'" the use of descriptors so long as the required disclosure is included, Reply at 4 (quoting Consent Order at 5).

The language difference between the two orders is not enough to distinguish this case from Altria II. Both consent orders prohibit descriptors unless a mandated disclosure accompanies them. Alternatively, using the Defendants' chosen rhetoric, both Consent Orders authorize those descriptors if a disclosure accompanies them. That authorization was insufficient for the Supreme Court in Altria II, so cannot be sufficient for the Court here. The Defendants' attempt to distinguish Altria II ultimately pivots on the Consent Orders' slightly different language -- the Altria II consent order phrases its order in terms of ceasing and desisting, and the Consent Order does not. Although the language enjoining the conduct might be slightly stronger in the Altria II order, the effect of the two orders is the same -- prohibiting conduct, unless a disclosure accompanies it. That language difference does not persuade the Court that the FTC's "clear and manifest purpose" with the Consent Order was to supplant all state law deception claims, whereas the FTC had no such purpose with the Altria II consent order. Medtronic, Inc. v. Lohr, 518 U.S. at 485.

The Defendants' other attempt to distinguish Altria II is equally unpersuasive. They argue that Altria II's reasoning relies, in part, on decades of post-consent-order enforcement actions demonstrating that the FTC had no policy authorizing the descriptors at issue in Altria II. See Reply at 4-5. They argue that, in contrast, here, no such history exists. See Reply at 5. In Altria II, however, the Supreme Court's historical analysis had no bearing on its consent-order analysis; rather, the Supreme Court conducted a historical analysis to rebut the tobacco companies' argument that the FTC has a longstanding regulatory policy of authorizing the use of "light" and "low tar" descriptors. See Altria II, 555 U.S. at 87-89 n.13 ("Even if such a regulatory policy could provide a bases for obstacle pre-emption, petitioners' description of the FTC's actions in this regard are inaccurate."). Also, an agency's subsequent history is not the most reliable evidence of the agency's intent when it enters a consent order, because an agency's goals, policies, and personnel change with administrations. Finally, subsequent history is not a factor on which a court may conclude that preemption exists. See Medtronic, Inc. v. Lohr, 518 U.S. at 485-86 ("Congress' intent, of course is primarily discerned from the language of the pre-emption statute and the statutory framework surrounding it. Also relevant, however, is the structure and purpose of the statute as a whole.")(quotations omitted); Altria II, 555 U.S. at 87 ("Even if such a regulatory policy could provide a basis for obstacle pre-emption . . .").[41]

Assuming, however, that the Consent Order preempts the Plaintiffs' claims premised on the Safer-Cigarette Theory, they would only preempt those claims against Santa Fe Tobacco. A consent order cannot impliedly preempt claims against third parties. See Altria II, 555 U.S. at 89 n.13

[41]The Defendants' reliance on Mulford v. Altria Grp. Inc., 506 F. Supp. 2d 733 (D.N.M. 2007)(Vazquez, J.), see MTD at 13-14, is misplaced, given that it construes the same consent order as Altria II does, and the Supreme Court's 2008 interpretation is binding, whereas Mulford v. Altria Group. Inc.'s interpretation is not.

Appellate Case: 23-705 Document: 010110921360 Date Filed: 09/15/2023 Page: 900 Sealed

("And a consent order is in any event only binding on the parties to the agreement. For all of these reasons, the consent order does not support the conclusion that respondents' claim is impliedly pre-empted.").[42] Cf. Liberty Bank F.S.B. v. D.J. Christie, Inc., 681 F. App'x 664, 668 (10th Cir. 2017)("[P]arties who choose to resolve litigation through settlement may not dispose of the claims of a third party."). Reynolds American was not a party to the Consent Order, so the Plaintiffs' claims against that entity are not preempted.

Finally, even if the Consent Order preempts the Plaintiffs' Safer-Cigarette Theory, it would preempt that claim only vis-à-vis the Defendants' advertisements, and not the Defendants' cigarette packaging and labeling. The Consent Order applies only to "advertisements." Consent Order at 4, [at 13 on CM/ECF] ("[R]espondent . . . shall display in advertisements . . . ."). The Defendants urge the Court to overlook the conspicuous absence of "packaging and labeling" from the Consent Order, because the "FTC could have imposed restrictions on [Natural American cigarette] packaging, but chose not to -- evidencing a conclusion that packaging did not present cause for concern." Reply at 10. The Court declines to read in the phrase "packing and labeling" into the Consent Order. The preemption test hinges on the agency's intent, which primarily turns on the Consent Order's language and structure. See Medtronic, Inc. v. Lohr, 518 U.S. at 485-86. The absence of language, accordingly, suggests an intent not to preempt claims based on those absent terms. See Bates v.

[42]The Supreme Court's holding here is somewhat ambiguous. The wording suggests two possible readings. First, it could mean that all non-parties to the agreement can pursue state law claims against all parties and non-parties to the agreement without the consent order preempting their claims. Under that reading, the Plaintiffs' claims would not be preempted, because they were not parties to the Consent Order. The other plausible reading is that non-parties claims against parties to the agreement can be preempted, but nonparties claims against non-parties cannot be preempted. The Court concludes that the second reading is the Supreme Court's most likely meaning. The first meaning limits a consent order's preemptive effect to such a degree that a consent order would almost never preempt state law claims. Although the Court concludes that consent orders should have limited preemptive effect, it determines that it is unlikely that the Supreme Court would make such an expansive holding without more elaboration.

Dow Agrosciences, LLC, 544 U.S. at 449 (ruling that when the preemption clause's text is susceptible to more than one plausible reading, courts ordinarily "accept the reading that disfavors pre-emption"). Although conceivable that the FTC chose not to include packaging and labeling in the Consent Order, because it was not concerned with the packages' deceptiveness, the Defendants offer no plausible explanation why that might be so, see Reply at 10, and, moreover, agency indifference cannot amount to preemption.

The Consent Order also cannot preempt the Plaintiffs' Safer-Cigarette Theory claims premised on the word organic.[43] Contrary to the Defendants' position that the Plaintiffs do not allege an organic-premised claim, see MTD at 12; Reply at 8-9, the Plaintiffs' Amended Complaint alleges that "[t]his misleading message is further reinforced through the use of the term 'Organic' on many of the labels and advertisements," Amended Complaint ¶ 6, at 2, and each Count re-alleges and incorporates by reference each preceding paragraph, see e.g., Amended Complaint ¶¶ 135, 150, 170 at 46, 49, 53. The Defendants do not argue that the Consent Order preempts such claims, but, instead contend that USDA regulations, 7 C.F.R. §§ 205.01-699, and the Organic Foods Product Act, 7 U.S.C. §§ 6501-24 ("OFPA") preempts those claims. See MTD at 12 n.3; Reply at 9-10. The Defendants specifically argue that their use of organic is "consistent with OFPA regulations." Reply at 9 (emphasis omitted). Consistency and preemption, however, are not equivalent concepts.

Because the Defendants do not specify which preemption doctrine they are invoking, the Court considers both express and implied preemption. First, the OFPA and 7 C.F.R. §§ 205.01-699 do not contain any express preemption provisions implicating state tort, contract, or consumer

[43]If the Consent Order preempts the Plaintiffs' Safer-Cigarette Theory claims, it would encompass the claims premised on the word natural. The Court concludes that natural is a "substantially similar term" to "additive-free," because natural's plain meaning would suggest that a tobacco product "has no additives or chemicals." Consent Order at 5. See Black's Law Dictionary at 1126 (9th Ed. 2009)("Brought about by nature as opposed to artificial means. Inherent; not acquired or assumed.").

protection claims, so the Plaintiffs' claims premised on the term "organic" are not expressly preempted. See In re Aurora Dairy Corp. Organic Milk Marketing and Sales Practices Litig., 621 F.3d 781, 792 (8th Cir. 2010)("In re Aurora"). Second, the Court considers implied field preemption. Field preemption exists if "[f]ederal statutory directive provide a full set of standards" or if "Congress occupies an entire field." Arizona v. United States, 567 U.S. at 401. See US Airways, Inc. v. O'Donnell, 627 F.3d 1318, 1324-25 (10th Cir. 2010)("Field preemption occurs when a 'state law . . . regulates conduct in a field that Congress intended the Federal Government to occupy exclusively."). "When conducting a field preemption analysis, we must first identify the legislative field that the state law at issue implicates." US Airways, Inc. v. O'Donnell, 627 F.3d at 1325. Congress designed the OFPA to "establish national standards governing the marketing of certain agricultural products as organically produced products" and to "assure customers that organically produced products meet a consistent standard." 7 U.S.C. § 6501(1)-(2). The Court concludes that the legislative field implicated in this analysis is the regulation of organic product marketing. See In re Aurora, 621 F.3d at 788. "Having identified the legislative field at issue, we must next evaluate whether Congress intended to occupy the field to the exclusion of the states." US Airways, Inc. v. O'Donnell, 627 F.3d at 1325. "[T]he purpose of Congress must be clear as we presume that 'Congress does not cavalierly pre-empt state-law causes of action.'" US Airways, Inc. v. O'Donnell, 627 F.3d at 1325 (quoting Medtronic, Inc. v. Lohr, 518 U.S. at 485). Construing claims that several companies deceptively labeled their milk as organic, the United States Court of Appeals for the Eighth Circuit recently considered whether the OFPA field preempted those state-law claims. See In re Aurora, 621 F.3d at 789, 793-94. Noting that the OFPA "requires states to seek approval from the USDA only if the State wishes to operate an organic certification program," the Eighth Circuit determined that "OFPA more modestly [than the Occupational Safety and Health

Act of 1970] contemplates a certification program designed to effect national standards and to eliminate the preexisting 'havoc for the industry' caused by balkanized state regulations," and, therefore OFPA's regulatory scheme is not so pervasive as to suggest field preemption. In re Aurora, 621 F.3d at 793-94. See Segedie v. Hain Celestial Grp., Inc., No. 14-5029, 2015 WL 2168374, at *4 (S.D.N.Y. May 7, 2015)(Roman, J.). This reasoning persuasive. Merely establishing a national certification program, in and of itself, does not overcome the presumption against preemption. Moreover, the statute itself contemplates that the states may impose stricter standards than the federal program. See 7 U.S.C. § 6507(b). The Court concludes, accordingly, that that the plaintiffs' organic-premised claims are not field preempted.

Impossibility and obstacle preemption similarly do not bar the Plaintiffs' organic-based claims. The OFPA allows products to be labeled organic if they are "produced and handled without the use of synthetic chemicals," and are produced on land that has not been exposed to synthetic chemicals for at least three years preceding harvest of the product. U.S.C. 7 § 6504 (1)-(2). See 7 C.F.R. §§ 205.101, 2502.202-207, 205.236-40. It is possible for the Defendants to adhere to these requirements without deceptively suggesting that their cigarettes are healthier than other cigarettes, so impossibility preemption is foreclosed. Regarding obstacle preemption, OFPA's purpose, as recounted previously, is to "establish national standards governing the marketing of certain agricultural products as organically produced products" and to "assure customers that organically produced products meet a consistent standard." 7 U.S.C. § 6501(1)-(2). To effect that goal, Congress seeks to create a standardized, national certification process. See 7 U.S.C. §§ 6503-6507; In re Aurora, 621 F.3d at 794-95. State-law claims premised on a manufacturer's purported deception pose no obstacle to that effect. As the Eighth Circuit explains:

> [P]reemption of state consumer protection law may actually diminish consumer confidence that organic products meet consistent standards as consumers become

> aware that otherwise meritorious claims are being preempted because the certifying agent has not suspended the certification in spite of clear facts to the contrary. Similarly, although broad factual preemption may increase organic production in the short term, consumers may well elect to avoid paying the premium for organic products upon realizing preemption grants organic producers a de facto license to violate state fraud, consumer protection, and false advertising laws with relative impunity, because the OFPA's only remedy for noncompliance is recourse to the USDA for revocation of certification and possibly for a civil penalty.

In re Aurora, 621 F.3d at 798. The Plaintiffs organic-premised claims are, thus, not preempted.

## IV. DECEPTIONS BASED ON THE PLAINTIFFS' SAFER-CIGARETTE AND MENTHOL THEORIES MISLEAD A REASONABLE CONSUMER, BUT DECEPTIONS PREMISED ON THE UNPROCESSED-CIGARETTE THEORY DO NOT.

The Defendants contend that fourteen of the Plaintiffs' nineteen statutory claims fail, because the Plaintiffs have not plausibly alleged that a deception premised on the Plaintiffs' three theories misleads a reasonable consumer. See MTD at 39-40. The Court concludes that the reasonable consumer standard governs those fourteen statutes. See Quelimane Co. v. Stewart Title Guaranty Co., 960 P.2d 513, 530 (Cal. 1998)(ruling that a reasonable consumer standard governed California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 ("UCL")); Williams v. Gerber Products Co., 552 F.3d at 938 (holding that California's UCL, California's False Advertising Law, Cal. Bus. & Prof. Code § 17500 ("CFAL"), and California's Consumer Legal Remedies Act, Cal. Civ. Code § 1770 ("CCLRA"), require a deception to mislead a reasonable consumer);[44] PNR, Inc. v.

[44]The Supreme Court of California has not determined the standard for the California CFAL, or CCLRA. The Ninth Circuit's state law interpretations bind Ninth Circuit district courts absent "any subsequent indication from the [state supreme court] that our interpretation was incorrect." Kona Enterp., Inc. v. Estate of Bishop, 229 F.3d 877, 884 n.7 (9th Cir. 2000). The Court concludes that, although the Ninth Circuit binds the Ninth Circuit lower courts on state law matters, it does not bind the Court, because the rationale, which binds the district courts on state law matters, is that Ninth Circuit decisions bind its lower courts. See Kona Enterp., Inc. v. Estate of Bishop, 229 F.3d at 884 n.7; Hasbrouck v. Texaco, Inc., 663 F.2d 930, 933 (9th Cir. 1981)("District Courts are bound by the law of their own circuit."). That reasoning does not apply to the Court, because it sits in the Tenth Circuit. The Court, nevertheless, concludes that the Ninth Circuit's state law interpretation is persuasive here, and also concludes that the Supreme Court of California would determine that the

Beacon Props. Mgmt., Inc., 842 So.2d 773, 777 (Fla. 2003)(holding that a deception occurs under FDUTPA if a consumer, acting reasonably under the circumstances, is misled); Barbara's Sales, Inc. v. Intel Corp., 879 N.E.2d 910, 927 (Ill. 2007)(ruling that the ICFA is subject to a reasonable consumer standard); Aspinall v. Philip Morris Cos., 813 N.E.2d at 487-88 (ruling that a reasonable consumer standard governs Massachusetts General Laws, Chapter 93A); Dix v. American Bankers Life Assur. Co. of Fla., 415 N.W. 2d 206, 209 (Mich. 1987)("It is sufficient, [under the MCPA], if the class can establish that a reasonable person would have relied on the representations."); Turf Lawnmower Repair, Inc. v. Bergen Record Corp., 655 A.2d 417, 430 (N.J. 1995)(ruling that the NJCFA is subject to an average consumer test); N.M. Stat. Ann. § 57-12-4 ("[I]n construing Section 3 of the Unfair Practices Act the courts to the extent possible will be guided by the interpretations given by the federal trade commission and the federal courts."); FTC v. LoanPointe, LLC, 525 F. App'x 696, 700 (10th Cir. 2013)(unpublished)("Under the FTC Act, a practice is deceptive if it entails a material misrepresentation or omission that is likely to mislead consumers acting reasonably under the circumstances.")(citation omitted); Stutman v. Chemical Bank, 731 N.E.2d 608, 611-12 (N.Y. 2000)("Whether a representation or an omission, the deceptive practice must be likely to mislead a reasonable consumer acting reasonably under the circumstances.")(quotation omitted); Marshall v. Miller, 276 S.E.2d 937, 939 (N.C. 1981)("It is established by earlier decisions of this Court that federal decisions interpreting the FTC Act may be used as guidance in determining the

---

reasonable consumer test applies to California's CFAL and CCLRA, because the great weight of California appellate authority has determined such a test would apply and the Supreme Court of California has held that a reasonable consumer standard applies, under the UCL -- a similar statute to the CFAL and CCLRA. See, e.g., Lavie v. Procter & Gamble Co., Cal. Rptr. 2d 486, 494 (Cal. Ct. App. 2003); Quelimane Co. v. Stewart Title Guaranty Co., 960 P.2d at 530. Cf. Kasky v. Nike, Inc., 45 P.3d 243, 304 (Cal. 2002)("We have also recognized that these laws prohibit not only advertising which is false, but also advertising . . . which has a capacity, likelihood or tendency to deceive or confuse the public."); In re Tobacco II Cases, 207 P.3d at 29.

scope and meaning of [N.C. Gen Stat.] 75-1.1.");[45] Struna v. Convenient Food Mart, 828 N.E.2d 647, 661 (Ohio Ct. App. 2005)("[C]ourts shall apply a reasonableness standard in determining whether an act amounts to deceptive unconscionable or unfair conduct.");[46] Panag v. Farmers Ins. Co. of Washington, 204 P.3d 885, 894 (Wash. 2009)(en banc)("A plaintiff need not show the act in question was intended to deceive, only that it had a capacity to deceive a substantial portion of the public.").

The plaintiffs articulate three theories of deception. These theories have already been discussed, see supra at 11, but, in brief summary, the three theories are:

**(1)** **The Safer-Cigarette Theory**: the Plaintiffs argue that the use of the terms organic, natural, and additive-free mislead tobacco consumers into believing that Natural American cigarettes are safer and healthier. See Amended Complaint ¶¶ 4-8, 47-66, at 2-3, 22-31; MTD at 22-24.

**(2)** **The Menthol Theory**: the Plaintiffs argue that, by labeling Natural Americans cigarettes with menthol "additive-free" and "natural," the Defendants mislead menthol consumers, because menthol is an additive. See Amended Complaint ¶¶ 10, 67-69 at 3, 31-32; MTD at 24-25.

**(3)** **The Unprocessed-Cigarette Theory:** the Plaintiffs argue that, by labeling Natural American cigarettes as Natural, the Defendants mislead consumers into believing that Natural American cigarettes are not subjected to rigorous

---

[45]The Supreme Court of North Carolina has not determined the standard for North Carolina General Statute 75-1.1. The Court concludes, however, that the Supreme Court of North Carolina would adopt a reasonable consumer standard, because it has signaled that it would use federal courts' interpretations of the FTC Act, 15 U.S.C. § 45(a), to guide its decision making, and several federal courts have adopted the a reasonable consumer standard for the FTC Act. See FTC v. LoanPointe, LLC, 525 F. App'x at 700 ("Under the FTC Act, a practice is deceptive if it entails a material misrepresentation or omission that is likely to mislead consumers acting reasonably under the circumstances.")(citation omitted); Farrin v. Thigpen, 173 F. Supp. 2d 427, 439 (M.D.N.C. 2001)(Osteen, J.)("[A]n advertisement is deceptive . . . if it is likely to mislead consumers, acting reasonably under the circumstances.")(citation omitted).

[46]The Court is aware that, under Erie, it is not bound to follow Court of Appeals of Ohio if it concludes that the Supreme Court of Ohio would decide the issue differently. See supra n.21. The Court will follow the Court of Appeals of Ohio's decision in Struna v. Convenient Food Mart, however, because the Court has found no indication that the Supreme Court of Ohio would apply a contrary rule.

engineering processes during production. See Amended Complaint ¶¶ 9, 70-74, at 3, 32-33; MTD at 25.

The Defendants marshal three attacks against the Plaintiffs' three theories of deception. See MTD at 42-49. First, they argue the Safer-Cigarette Theory is implausible, because a reasonable consumer would read the disclaimer stating that "no additives does **NOT** mean a safer cigarette" and would understand from that disclaimer that Natural American cigarettes were not safer or healthier. See MTD at 42-43 (emphasis in original). Second, they argue that the Menthol Theory is implausible, because a reasonable consumer knows that menthol cigarettes contain menthol, so would understand that the no-additive term does not encompass menthol. See MTD at 46-47. Third, they argue that the Unprocessed-Cigarette Theory is implausible, because a reasonable consumer would know that Natural American cigarettes are subjected to engineering processes. See MTD at 47-49.[47] The Court addresses each argument in turn.

At the outset, the Court determines that it is plausible that a reasonable consumer, seeing the terms organic, natural, and additive free, would erroneously believe that Natural American cigarettes are safer or healthier than other cigarettes. In pleading their Safer-Cigarette Theory, the Plaintiffs

[47]The Plaintiffs rejoin that whether a reasonable consumer would be deceived is a question of fact ordinarily not decided on a Motion to Dismiss. See Response at 39-42 (citing Williams v. Gerber Prods. Co., 522 F.3d at 939-40; Foster v. Chattem, Inc., No. 14-0346, 2014 WL 3687129, at *3 (M.D. Fla. July 23, 2014)(Dalton, J.); Biffar v. Pinnacle Foods Grp., LLC, No. 16-0873, 2016 WL 7429130, at *8 (S.D. Ill. Dec. 26, 2016)(Herndon, J.); Santosuosso v. Gibbs Ford, Inc., 1992 Mass. App. Div. 167, 170 (1992)); Supp. Brief at 4-10. Although those cases suggest that the inquiry is usually more appropriate for summary judgment, none of them foreclose deciding the issue on a motion to dismiss. Moreover, none are binding on the Court, and the Court declines to follow them. There is nothing in the statutes suggesting that they are insulated from a motion to dismiss or that the Court should forego the Supreme Court mandated plausibility analysis. See Bell Atl. Corp. v. Twombly, 550 U.S. at 555. The Court cannot weigh evidence on a rule 12(b)(6) motion, but determining whether the Plaintiffs have plausibly stated a claim does not require weighing the evidence. Rather, the question is whether a reasonable consumer could plausibly be deceived in the manner in which the Plaintiffs allege. Courts frequently determine this question at the motion to dismiss stage, see, e.g., Fink v. Time Warner Cable, 714 F.3d 739, 741 (2d Cir. 2013); Carrea v. Dreyer's Grand Ice Cream, Inc., 475 F. App'x 113, 115 (9th Cir. 2012), and the Court does so here.

Appellate Case: 23-705 Document: 010110921360 Date Filed: 09/15/2023 Page: 908 Sealed

rely heavily on several social science studies, which conclude that Natural American smokers are far more likely to believe that their brand is healthier than other cigarette brands, because of those descriptors. See Amended Complaint ¶¶ 50-54, at 23-27; Supp. Arg. at 4-6. For example, one study concludes that "[n]early 1 million US adult smokers prefer" Natural American cigarettes and they "are 22 times more likely than other smokers to believe that their brand is less harmful than other cigarette brands," leading the study authors to conclude that Natural American smokers may choose that brand because of the "descriptors organic, natural, and additive free on product packaging and advertising." Amended Complaint ¶ 52, at 25 (citing Misperceptions at 3). As surely as a Ph.D. cannot be swapped for an Article III commission, an academic study cannot take the place of the Court's judgment on a rule 12(b)(6) motion. See Ashcroft v. Iqbal, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief . . . requires the reviewing court to draw on its judicial experience and common sense."). There is a possibility that all of the consumers studied were unreasonable consumers and unreasonably believed that Natural Americans were healthier, because of the cigarettes' descriptors. Moreover, the subjective beliefs of the consumers studied, even if those consumers are generally reasonable, cannot blindly be swapped for the reasonable consumer's beliefs.

The Court concludes that, nevertheless, the Plaintiffs' allegations, accepted as true, advance their Safer-Cigarette Theory from a mere possibility into the realm of plausibility. The terms natural and organic have long been used across the country to convey products' health benefits. See, e.g., Discount Tobacco City & Lottery, Inc. v. United States, 674 F.3d 509, 536 (6th Cir. 2012)("[C]ommon sense dictates the conclusion that [naturalists] prefer such products precisely because they believe that natural and organic products confer health advantages over conventional products."); FTC v. Garvey, 383 F.3d 891, 895 (9th Cir. 2004)(noting that the defendants had

conflated an "all natural" diet with a "healthier, more active lifestyle"); Covington v. Arizona Beverage Co., LLC, 2009 WL 10668916, at *1 (S.D. Fla. September 11, 2009)(Seitz, J.)(concluding that "Natural" labeling would lead "consumers to believe that Defendants' products are healthier than others on the market"); Noble v. 93 University Place Corp., 303 F. Supp. 2d 365, 375 (S.D.N.Y. 2003)(Scheindlin, J.)("In the instant case, a credulous consumer would believe that food labeled 'organic' or 'natural' . . . is healthier than regular food."); National Nutritional Foods Ass'n v. Whelan, 492 F. Supp. 374, 378 (S.D.N.Y. 1980)(Sofaer, J.)("[A]dvocates of health foods have managed to convince a significant portion of the population that organically grown food is more nutritious and safer than 'regular' food."). Additives have also long been known to or believed to potentially increase health risks. See, e.g., Guttman v. Ole Mexican Foods, Inc., 2016 WL 9107426, at *3 (N.D. Cal. August 1, 2016)(Gilliam, J.)(noting that settlement removing additives from a food product "provides substantial health benefits to all purchasers"); Barnes v. American Tobacco Co., 984 F. Supp. 842, 870 (E.D. Pa. 1997)(Newcomer, J.)(ruling that additives used in cigarettes "increase the risk of harm" to smokers). With that backdrop, the reasonable consumer is not expected to defy decades of marketing, which has conveyed that natural, organic, and additive-free products are healthier. Two federal agencies' findings buttress the Court's conclusion, as both the FDA and the FTC determined that the Defendants' descriptors conveyed a message that their cigarettes were less harmful than other cigarettes. See FTC Complaint ¶ 5, at 2; Warning Letter at 2. See also United States v. Philip Morris USA, Inc., 449 F. Supp. 2d 1, 27 (D.D.C. 2006)(Kessler, J.)(enjoining a cigarette manufacturer from advertising its cigarettes as "natural," among other descriptors, which "implicitly or explicitly convey to the smoker and potential smoker that they are less hazardous to health than full flavor cigarettes").

The Defendants do not contest that the descriptors convey to a reasonable consumer that Natural American cigarettes are healthier than other cigarettes. Rather, they contend that the disclaimer cures any deception. See MTD at 42-46. The Plaintiffs rejoin that a reasonable consumer is still misled, because the packaging's disclaimer is hidden. See Response at 44 (citing e.g., Williams v. Gerber Products Co., 552 F.3d at 939; Ackerman v. Coca-Cola Co., No. 09-0395, 2010 WL 2925955, at *6-7, *16 (E.D.N.Y. July 21, 2010)(Gleeson, J.); Lam v. Gen. Mills, Inc., 859 F. Supp. 2d 1097, 1105 (N.D. Cal. 2012)(Conti, J.); Wilson v. Frito Lay N. Am., Inc., No. 12-1586, 2013 WL 1320468, at *12 (N.D. Cal. Apr. 1, 2013)(Conti, J.); Jou v. Kimberly Clark Corp., No. 13-3075, 2013 WL 6491158, at *1, *5 (N.D. Cal. December 10, 2013)(Corely, MJ.)). In Williams v. Gerber Products Co., the Ninth Circuit concluded that a reasonable consumer should not "be expected to look beyond misleading representations on the front of the box to discover the truth from the ingredient list in small print on the side of the box," because "reasonable consumers expect that the ingredient list contains more detailed information about the product that confirms other representations on the packaging." Williams v. Gerber Products Co., 552 F.3d at 939-40. The United States District Court cases that the Plaintiffs cite largely reiterate the Ninth Circuit's conclusion. See Ackerman v. Coca-Cola Co., 2010 WL 2925955, at *16 ("[T]he presence of a nutritional panel, though relevant, does not as a matter of law extinguish the possibility that reasonable consumers could be misled by vitamin water's labeling and marketing."); Lam v. General Mills, Inc., 859 F. Supp. 2d at 1105 ("Likewise, here, the Fruit Snacks' ingredients list cannot be used to correct the message that reasonable consumers may take from the rest of the packaging."); Wilson v. Frito-Lay N. Am., Inc., 2013 WL 1320468, at *13 ("Even though the nutrition box could resolve any ambiguity, the Court cannot conclude as a matter of law, in the context of a Rule 12(b)(6) motion, that no reasonable consumer would be deceived."); Jou v. Kimberly-Clark Corp.,

2013 WL 6491158, at *9 ("Thus, under *Williams*, Defendant cannot rely on disclosures on the back or side panels of the packaging to contend that any misrepresentation on the front of the packaging is excused."). Those cases turn on the presence of curative information in an ingredients list.[48] Here, the disclaimer is not an ingredient listed where "reasonable consumers expect . . . more detailed information about the product that confirms other representations on the packaging," Williams v. Gerber Products Co., 552 F.3d at 939-40; instead, the disclosure is divorced from the ingredients, and, unlike an ambiguous ingredient term, the disclosure is a clear statement that "no additives does **NOT** mean a safer cigarette." A reasonable consumer would understand that statement to modify the labeling's "additive-free" descriptor. Moreover, a reasonable consumer would look on the packages' sides and top for disclosures such as the one contained on Natural American's packaging. Product packaging commonly has additional information about the product on the back and sides, so a reasonable consumer would look there for disclaimers or qualifying information. A reasonable consumer would not look on the bottom of packaging in the same way, because relevant information is rarely there. That observation is not to say that a reasonable consumer is expected to understand every piece of information disclosed on a package's sides. The Court agrees with Williams v. Gerber Products Co.'s reasoning that some information may be too ambiguous to provide a reasonable consumer curative information. Here, however, there is no ambiguity. The disclaimer is clear and express.

The Plaintiffs also contend that the disclosure is hidden, tucked under barcode, so a reasonable consumer cannot be expected to find it. The Court agrees with this argument to a point.

---

[48] Jou v. Kimberly-Clark Corp. stands for the broader proposition that no side-packaging writing can cure deceptive labeling on the front. See 2013 WL 6491158, at *9 The Court concludes that the Honorable Jacqueline Corley, United States Magistrate Judge for the United States District Court of the Northern District of California, construed Williams v. Gerber Products Co., 552 F.3d at 939-40 too expansively, because Williams v. Gerber Products Co.'s language is cabined to ingredients lists and not to all side-packaging disclosures.




Above are two representative packages that the Court judicially noticed. See Gold Label at CM/ECF 78-83; Turquoise Label at CM/ECF 85-90. The disclaimer is located on the right-hand side, underneath the bar code, and, although it is not in the most prominent location, the disclaimer is legible, the Defendants have made the font color white on packaging where white text stands out, and black where black text stands out, and the disclaimer is not buried in a paragraph of text; instead, it is a single, separate sentence. See Gold Label at CM/ECF 78-83; Turquoise Label at CM/ECF 85-90. See also American Labeling at 64-111 on CM/ECF. On just those facts, the Court would conclude that a reasonable consumer would be expected to locate, read, and understand the disclosure.

Cigarettes are often sold, however, in a manner such that a consumer cannot inspect the packaging in detail before purchasing, e.g., the cigarettes are kept locked in a display next to or behind the counter. The display shows the cigarette pack's front, but not the sides or back. A store clerk sometimes does not even hand the cigarette pack to the consumer before purchase, but places the pack directly in a shopping bag. Based on this, even though a reasonable consumer would inspect other items before purchase, it is not clear that they would have the opportunity to inspect

Natural American cigarettes' labeling. Accordingly, the Court cannot conclude that the package's disclosure would cure a deception inflicted upon a reasonable consumer.

The Plaintiffs do not argue that a reasonable consumer would miss the disclosures on the Defendants' advertising, see Response at 43, and the Court concludes that a reasonable consumer would read and comprehend the advertising disclosures. Unlike the packaging, the advertisement's disclaimer is in a prominent location boxed over the Surgeon General's Warning, and a reasonable consumer would spot it easily. See Tobacco & Water Advertisement at 114 on CM/ECF.

Although a reasonable consumer would understand from the disclosure that the lack of additives does not make Natural American cigarettes healthier, that disclaimer says nothing about the natural or organic descriptors. As explained above, those two terms have an independent connotation that a product is healthier or safer. See, e.g., Discount Tobacco City & Lottery, Inc. v. United States, 674 F.3d at 536; Noble v. 93 University Place Corp., 303 F. Supp. 2d at 375. The Defendants' conflate the natural and additive-free terms, see Reply at 22, and also argue that "the disclosure plainly disclaims any notion that Natural American cigarettes are safer than alternatives," Supp. Resp. at 10. The Court disagrees. The Defendants' argument asks for a hefty inference in light of the disclosure's specificity. The disclaimer states: "No additives in our tobacco does **NOT** mean a safer cigarette." FTC Consent Order at 4. It says nothing about natural; it says nothing about organic. Specific language communicates a specific meaning and a reasonable consumer interprets it with that specific meaning. Cf. In re Universal Service Fund Telephone Billing Practice Litig., 619 F.3d 1188, 1218 (10th Cir. 2010)(ruling that specific terms in a contract governs the contract's meaning). The natural and organic descriptors, accordingly, are deceptive to a reasonable consumer.

Natural American's additive-free descriptor on menthol cigarettes also misleads a reasonable consumer. The crux of the Defendants' arguments against the Plaintiffs' Menthol Theory is that a reasonable consumer would know that menthol cigarettes contain menthol -- an additive. See MTD at 46. From that premise, they argue that an additive-free descriptor would not be deceptive, because a reasonable consumer knows that she is purchasing a menthol cigarette. See MTD at 46. That argument assumes, however, that a reasonable consumer is so secure in her knowledge that menthol is an additive that an express representation to the contrary, on a heavily regulated product, see Phillip Morris, Inc. v. Reilly, 312 F.3d 24, 26 (1st Cir. 2002), does not mislead her into thinking that menthol is not an additive. Menthol's properties are not commonly known, even among cigarette users. See Preliminary Scientific Evaluation of the Possible Public Health Effects of Menthol Versus Nonmenthol Cigarettes, Food and Drug Administration, 70-71 (2013) available at https://www.fda.gov/downloads/ScienceResearch/SpecialTopics/PeerReviewofScientificInformationandAsse/UCM361598.pdf (reporting that menthol users held diverging beliefs on menthol's health and addictive risks). Before this case, the Court did not know much, if anything, about menthol. It knew that it gave a smoother, milder smoking experience, and increased a cigarette's appeal and enjoyment to a broader consumer base, but it did not know what menthol is or whether it is a natural substance or additive. See June Tr. at 54:21 (Court)("What is menthol?"); id. at 64:10-12 (Court)("But menthol, what is it? Is it a plant? Is it a chemical that science has invented? What exactly is menthol?").[49] The Court concludes that it is plausible that a reasonable consumer would not know whether menthol naturally occurs in tobacco. Many goods have naturally occurring qualities that are prominently labeled separately on the good. For example, caffeine

[49]As explained above, Menthol is an organic molecule derived from mint. See June Tr. at 13-15 (Schlesinger).

naturally occurs in coffee. See Gwendolyn Prothro, The Caffeine Conundrum: Caffeine Regulation in the United States, 27 Cumb. L. Rev. 65, 66 (1996). Moreover, even if a reasonable consumer knows that menthol is an additive, it is nonetheless plausible that an additive-free descriptor undermines her knowledge, because menthol is an uncommon good. Unlike the Defendants' reasonable consumer examples, e.g., a reasonable consumer knows that almond milk contains no dairy milk and that veggie bacon contains no pork, see MTD at 47, menthol is not milk or bacon; its inherent qualities are not well known. It is plausible that, faced with a contrary descriptor, the reasonable consumer would conclude that her preconceived notions about menthol are mistaken. Indeed, she could conclude that menthol is a type of tobacco or tobacco grown in a specific location, such as perique tobacco.[50]

The ingredient's list on the product's back, which itemizes tobacco and menthol separately, does not dispel the deception. Without an unambiguous signal that the ingredients list is countermanding another representation on the package, "reasonable consumers expect that the ingredient list contains more detailed information about the product that confirms other representations on the packaging." Williams v. Gerber Products Co., 552 F.3d at 940. The Ninth Circuit's reasoning in Williams v. Gerber Products Co. is persuasive to the Court, and it concludes that the state Supreme Courts would also find it persuasive; the reasonable consumer is not hyper-vigilant and does not expect the product's packaging to deceive her. Ingredient itemization does not offer the same clear signal that the FTC-mandated disclosure does. It does not, for example, state that "Menthol is an additive." In this case, the packaging indicates only that organic menthol and organic tobacco are ingredients. There are many reasons why a reasonable consumer would conclude that the ingredients list does not contradict the additive-free descriptor. For example, a

[50]Perique tobacco is a type of tobacco associated with Louisiana.

reasonable consumer could presume that the FDA requires cigarette packaging to separately label menthol. Moreover, faced with conflicting representations, one clear and the other ambiguous, the reasonable consumer follows the clear one. Cf. In re Universal Service Fund Telephone Billing Practice Litig., 619 F.3d at 1218.[51]

---

[51]In concluding that the Safer-Cigarette and Menthol Theory may proceed, the Court notes a recent decision in which the Seventh Circuit, reviewing an opinion that the Honorable Lynn Adelman, United States District Judge for the Eastern District of Wisconsin wrote, reversed a district court's class-action settlement approval arising from Subway sandwich's purportedly deceptive conduct. See In re: Subway Footlong Sandwich Marketing and Sales Practices Litigation, 869 F.3d 551 (7th Cir. 2017)("Subway"). In Subway, the plaintiffs alleged that Subway had deceived them with their foot-long sandwich marketing campaign, because, sometimes, the bread was not 12 inches in length. See Subway, 869 F.3d at 553-54. The plaintiffs sought an injunctive class certification under rule 23(b)(2), and the district court approved a class-action settlement, which commanded Subway to institute procedures for four years to keep their bread measured at least 12 inches long. See 869 F.3d at 554. The Seventh Circuit, however, vacated that class-action settlement agreement, because it yielded no meaningful relief for the class. See 869 F.3d at 556. The Seventh Circuit reasoned that, regardless of sandwich length, consumers received the same food amount based on the bread's weight, Subway Sandwiches' standardized meat and cheese portions, and its liberal food topping policy. See 869 F.3d at 556. It also reasoned that the settlement's new bread-measuring protocols did nothing for the class, because "there's *still* the same small chance that Subway will sell a class member a sandwich that is slightly shorter than advertised," so "the injunctive relief approved by the district judge is utterly worthless" and the class-action "should have been dismissed out of hand." 869 F.3d at 556-57 (emphasis in original).

It is the Court's understanding that Subway never filed a motion to dismiss. See In re Subway Footlong Sandwich Marketing and Sales Practices Litig., No. 13-2439 (E.D. Wis. 2013)(Dkt.). It is clear that Judge Adelman thought the Subway case lacked merit, see In re Subway Footlong Sandwich Marketing and Sales Practices Litig., 316 F.R.D. 240, 242-43, 246-47 (E.D. Wis. 2016)(Adelman, J.), but Subway never filed a motion to dismiss the complaint, so the district court was never invited to pass on the wisdom of the case. The Seventh Circuit's opinion puts all district judges in a difficult position. If the defendant does not file a motion to dismiss and enters into a settlement, most district judges will not, sua sponte, dismiss a case because it is not a "good" case; such a dismissal will likely be reversed by most Courts of Appeals. The Court is inclined to think that the Subway case is unique and does not conclude that district courts have any roving, inherent ability to decide which class actions "should . . . [be] dismissed out of hand" as the Seventh Circuit suggests. Subway 869 F.3d at 557.

In any case, even at 30,000 feet, given that the Court is allowing two of the Plaintiffs' theories to proceed, the Court concludes that the Court should not dismiss the case as "utterly worthless" that "should . . . [be] dismissed out of hand." Subway 869 F.3d at 557. The Court allows the case to proceed, albeit with one theory of deception dismissed.

The packaging's and advertising's "natural" descriptors do not, however, plausibly mislead a reasonable consumer into believing that Natural American tobacco is less processed than tobacco in other cigarettes. As the Court discusses below, natural is a word with many meanings. See infra, at 188. Any meaning is, thus, context dependent. A reasonable consumer comes to the market with a degree of background knowledge. See Ibarrola v. Kind, LLC, 83 F. Supp. 3d 751, 757 (N.D. Ill. 2015)(Ellis, J.). In this case, a reasonable consumer knows that tobacco undergoes engineering processes before it is sold in cigarettes. Such awareness is clear from visually comparing a tobacco leaf to a cigarette. In order to mislead a reasonable consumer, the descriptor at issue must, thus, rebut the reasonable consumer's background knowledge. The natural descriptor found on Natural American cigarette's advertising and labeling is not enough to negate a reasonable consumer's understanding that turning tobacco into cigarettes requires processing, nor is it enough to suggest that Natural American tobacco undergoes less processing than other cigarette's tobacco. The term natural most often modifies "tobacco" on the Defendants' products and advertising. See Natural American Labeling at 64-111 on CM/ECF; Tobacco & Water Advertisement at 114 on CM/ECF. With that context, the natural descriptor says little, if anything, about the engineering processes; it says something about the type of tobacco. The Defendants' other use of natural is in the brand name: Natural American Spirit. Construing similar statutes, other federal courts have determined that brand names carry less persuasive impact on a reasonable consumer than other product labeling. See, e.g., Miller v. Ghirardelli Chocolate Co., 912 F. Supp. 2d 861, 874 (N.D. Cal. 2012)(Beeler, J.)(noting that the Froot Loops and Crunch Berry brand names did not deceive a reasonable consumer into believing that those cereals contained real fruit); Shaker v. Nature's Path Foods, Inc., No. 13-1138, 2013 WL 6729802, at *5 (C.D. Cal. December 16, 2013)(Wu, J.)("Aside from the fact that the 'OPTIMUM®' used here is a registered brand name, any reasonable consumer

would understand that the word is not a specific and objective representation."); Howard v. Bayer Corp., 2011 WL 13224118, at *1 (E.D. Ark. July 22, 2011)(Marshall Jr., J.)("A reasonable consumer of any medicine or medicine medicine-like substance such as vitamins would not stop with the brand name."). The underlying rationale is that reasonable consumers know that brand names are often creative and that substantive information about the product is less likely to be located there. Although conceivable that the natural term and the surrounding American Indian imagery communicates to some consumers that Natural American cigarette's tobacco is less processed than other cigarette's tobacco, the Court concludes that a reasonable consumer would not believe that Natural American tobacco is less processed from the brand name alone.

## V. THE FIRST AMENDMENT DEFENSE FAILS.

The Defendants argue that the First Amendment shields them from all liability. See MTD at 20. Their First Amendment defense fails, however, for two reasons. First, the state action doctrine precludes the claims premised on contract-related theories. Second, the tort-related claims may proceed, because those claims pass the Central Hudson balancing test. The Court considers each in turn.

### A. THE STATE ACTION DOCTRINE PRECLUDES THE DEFENDANTS' FIRST AMENDMENT DEFENSE FOR THE PLAINTIFFS' CONTRACT-RELATED CLAIMS, BECAUSE CONSENSUAL CONTRACTUAL RELATIONS DO NOT IMPLICATE STATE ACTION.

"Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I.[52] This clause -- the Free Speech Clause -- may act as a shield to liability when otherwise illegal or unlawful conduct implicates a party's freedom of speech. See Marsh v. Alabama, 326 U.S. at 509 (ruling that the Free Speech Clause shielded a Jehovah's Witness who distributed religious material

[52]The First Amendment is applicable to the states and their state legislatures via the Fourteenth Amendment's due process clause. See Virginia State Bd. of Pharm. v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 749 n.1. (1976)

on a company town's sidewalk from criminal trespass charges). "It is, of course, [] commonplace that the constitutional guarantee of free speech is a guarantee only against abridgment by government, federal or state." Hudgens v. N.L.R.B, 424 U.S. at 513. State action, thus, is typically a prerequisite for First Amendment protections. See Hudgens v. N.L.R.B, 424 U.S. at 520-21.

For most of American history, enforcing the common law was not thought to implicate state action. See Daniel J. Solove & Neil M. Richards, Rethinking Free Speech and Civil Liability, 109 Colum. L. Rev. 1650, 1656 (2009); Coppage v. Kansas, 236 U.S. at 17 overruled in part Phelps Dodge Corp. v. N.L.R.B., 313 U.S. 177, 187 (1941). After the New Deal, however, the state action doctrine underwent a radical transformation, and the Supreme Court ruled that various judicial actions amounted to state action where, previously, those actions likely would not have. See Shelley v. Kraemer, 334 U.S. 1, 18-19 (1948)(ruling that judicial enforcement of racially restrictive covenants is state action); New York Times Co. v. Sullivan, 376 U.S. 254, 265 (1964)(holding that state adjudication of a libel lawsuit is state action); Cohen v. Cowles Media Co., 501 U.S. 663, 668 (1991)("Our cases teach that the application of state rules of law in state courts in a manner alleged to restrict First Amendment freedoms constitutes 'state action.'"). Thus, as the Supreme Court has recently reaffirmed, the Free Speech Clause "can serve as a defense in state tort suits." Snyder v. Phelps, 562 U.S. 443, 451 (2011). See N.A.A.C.P. v. Claiborne Hardware Co., 458 U.S. 886 n.51 (1982)("Although this is a civil lawsuit between private parties, the application of state rules of law by the Mississippi state courts in a manner alleged to restrict First Amendment freedoms constitutes 'state action' under the Fourteenth Amendment."). The Supreme Court has also held that promissory estoppel claim, "enforced through the official power of the . . . courts," amounts to state action. Cohen v. Cowles Media Co., 501 U.S. at 668. In a similar vein, the Tenth Circuit has determined that a dispute over property rights, which arise from positive statutory law implicates

state action. See Cardtoons, L.C. v. Major League Baseball Players Ass'n, 95 F.3d at 968. See also L.L. Bean, Inc. v. Drake Publishers, Inc., 811 F.2d 26, 30 n.2 (1st Cir. 1987).

The state action doctrine as applied to judicial enforcement of common-law claims has limits. See Solove & Richards, Rethinking Free Speech and Civil Liability, 109 Colum. L. Rev. at 1664. For example, the Supreme Court has limited the same state action rationale in the common-law property-law context. See Hudgens v. N.L.R.B., 424 U.S. at 513; Lloyd Corp., Ltd. v. Tanner, 407 U.S. 551, 570 (1972). In Hudgens v. N.L.R.B., the Supreme Court considered whether the First Amendment protects union members picketing in a privately owned shopping center from a threat of criminal trespass charges. See 424 U.S. at 508. In considering that issue, the Supreme Court explained:

> It is, of course, a commonplace that the constitutional guarantee of free speech is a guarantee only against abridgement by government, federal or state. Thus, while statutory or common law may in some situations extend protection or provide redress against a private corporation or person who seeks to abridge the free expression of others, no such protection or redress is provided by the Constitution itself.

Hudgens v. N.L.R.B., 424 U.S. at 513 (citation omitted). In ruling that the First Amendment did not apply, the Supreme Court emphasized: "In addressing this issue, it must be remembered that the First and Fourteenth Amendments safeguard the rights of free speech and assembly by limitations on State action, not on action by the owner of private property used nondiscriminatorily for private purposes only." Hudgens v. N.L.R.B., 424 U.S. at 519 (quoting Lloyd Corp., Ltd. v. Tanner, 407 U.S. at 567). See Central Hardware Co. v. N.L.R.B., 407 U.S. 539, 547 (1972)("The First and Fourteenth Amendments are limitations on state action, not action by the owner of private property used only for private purposes."). The Supreme Court concluded, thus, that the First Amendment offers no protection to the picketers, because the shopping center was a private entity and not "the functional equivalent of a municipality." Hudgens v. N.L.R.B., 424 U.S. at 520. But see

Cardtoons, L.C. v. Major League Baseball Players Ass'n, 95 F.3d at 968 (ruling that adjudicating property rights arising from statutory law "satisfies the state action requirement").

Several United States Courts of Appeals have determined that state action is also not implicated when a court adjudicates a dispute between two parties that arises from a consensual contractual relationship. See, e.g., United Egg Producers v. Standard Brands, Inc., 44 F.3d 940, 943 (11th Cir. 1995)("United Egg"). In United Egg, for example, one private party to a settlement agreement challenged the settlement agreement on First Amendment grounds. See United Egg, 44 F.3d at 942. The Eleventh Circuit concluded that the state action doctrine barred the First Amendment defense. See 44 F.3d at 943. Although noting that Shelly v. Kraemer "held that court enforcement of an agreement between private parties can, in some circumstances, be considered governmental action," the Eleventh Circuit cabined that decision to "the racial discrimination context." 44 F.3d at 943. It explained: "That parties be able to enter into enforceable settlement agreements as a means of ending controversies is a good thing. And we, in the absence of compelling authority, are slow to interfere with or to undercut settlements of commercial disputes." 44 F.3d at 943. The Third Circuit has similarly explained that there are two categories of state action cases: "cases in which state courts enforced the right of private persons to take actions which are permitted but not compelled by law and . . . cases in which state courts enforced laws which require or forbid certain actions to be taken." Parks v. "Mr. Ford", 556 F.2d 132, 135 n.6a (5th Cir. 1977). In the first category of cases "state action has been found when the doctrine of Shelley and Barrows [v. Jackson, 346 U.S. 249 (1953)], has been found applicable, and that doctrine has been limited to cases involving racial discrimination," and, in the second category of cases, "state action has been found routinely." Parks v. "Mr. Ford", 556 F.2d at 135 n.6a. See Democratic Nat. Committee v. Republican Nat. Committee, 673 F.3d 192, 204 (3d Cir. 2012)("Although a court's enforcement of a

consent decree can constitute state action under *Shelley*, . . . [t]he Supreme Court has declined to find state action where the court action in question is a far cry from the court enforcement in *Shelley*.")(citing Blum v. Yaretsky, 457 U.S. 991, 1004-05 (1982)); Naoko Ohno v. Yuko Yasuma, 723 F.3d 984, 998 (9th Cir. 2013)("In the context of First Amendment challenges to speech-restrictive provisions in private agreements or contracts, domestic judicial enforcement of terms that could not be enacted by the government has not ordinarily been considered state action.")

In sum, state action exists if the dispute is tort-related or if the rights arise from a state statute, but does not exist if the dispute arises from a contractual relationship or involves common-law property rights, unless a non-judicial state actor is involved or if racial discrimination is implicated. One way to conceive of the state action test is to question whether consent existed for the underlying private relationship at issue. If yes, there is no state action. If no, state action exists.

With that test in mind, the state statutory claims implicate state action. See Cardtoons, L.C. v. Major League Baseball Players Ass'n, 95 F.3d at 968. The unjust-enrichment claims also implicate state action, because unjust enrichment arises from an absence of a consensual contractual relationship. See Restatement (Third) of Restitution and Unjust Enrichment § 1 cmt. b ("Unjust Enrichment is enrichment that lacks an adequate legal basis. . . . Broadly speaking . . . [it involves a transaction] that is *nonconsensual*.")(emphasis in original). Cf. Cohen v. Cowles Media Co., 501 U.S. at 668 (ruling that a promissory-estoppel claim implicates state action). The express warranty claim, however, arises from a consensual contractual relationship -- consumer contracts -- so they do not implicate state action. The First Amendment, therefore, is not a defense for the express warranty claims.

**B. THE FIRST AMENDMENT DOES NOT PRECLUDE THE STATUTORY AND UNJUST-ENRICHMENT CLAIMS BASED ON THE PLAINTIFFS' THREE THEORIES, BECAUSE NATURAL AMERICAN CIGARETTES' DESCRIPTORS ARE INHERENTLY OR ARE IN FACT MISLEADING.**

The speech at issue is commercial speech. As noted previously, the Supreme Court's First Amendment decisions have created a rough hierarchy in the constitutional protection of speech. See Snyder v. Phelps, 562 U.S. at 452. Commercial speech occupies a middle tier of protected speech, see Zaurderer v. Office of Disciplinary Counsel of Supreme Court of Ohio, 471 U.S. 626, 637 (1985), and the following characteristics indicate that speech is commercial: (i) if the speech is contained in an advertisement; (ii) if it is made with an economic motive; (iii) or if it refers to a specific product. See Proctor & Gamble Co. v. Haugen, 222 F.3d at 1274. The parties agree that the speech at issue is commercial, see MTD at 20; Response at 18, and the Court agrees. The speech is made with an economic motive, refers to a specific product, and some of it is contained within an advertisement. See Amendment Complaint ¶ 43, at 17-20 (displaying the print advertisements with the contested speech); id. ¶ 44, at 21-22 (alleging that the Defendants used the terms "additive-free" and "natural" as part of an advertisement campaign to increase sales)

There is a four-part test to determine whether the First Amendment shields commercial speech from governmental intervention. First, a court must determine "whether the particular advertisement is protected speech -- *i.e.*, whether it concerns lawful activity and is not misleading." Revo, 106 F.3d at 932. If the speech is inherently misleading, "the speech may be freely regulated." Revo, 106 F.3d at 932. If the speech is not misleading or is only potentially misleading, the state may regulate the speech as long as "the government can show that (1) it has a substantial state interest in regulating the speech, (2) the regulation directly and materially advances that interest, and (3) the regulation is no more extensive than necessary to serve the interest." Revo, 106 F.3d at 932 (citations omitted).

In considering the threshold inquiry -- whether the speech concerns lawful activity and is not misleading -- there is a distinction between inherently misleading speech, in-fact misleading speech, and potentially misleading speech. See In re R.M.J., 455 U.S. at 203 ("[W]hen the particular content or method of the advertising suggests that it is inherently misleading or when experience has proved that in fact such advertising is subject to abuse, the States may impose appropriate restrictions."). Inherently misleading speech is "incapable of being presented in a way that is not deceptive." Revo, 106 F.3d at 929. In Revo, for example, the Tenth Circuit considered whether direct mailing advertisements from a personal injury attorney "inevitably convey a false message that soliciting lawyers are more experienced, tougher, more skillful, and better qualified than non-soliciting lawyers, notwithstanding the fact that the letters themselves make no reference to those attributes." 106 F.3d at 933. The Tenth Circuit concluded that the mailings could not be inherently misleading, because the defendants "offer[ed] no proof that some other qualified lawyer who could superbly represent personal injury victims would nevertheless be misleading potential clients simply by sending a direct mail solicitation." 106 F.3d at 933. Thus, to determine whether speech is inherently misleading, the proper inquiry is to consider whether there are any circumstances under which the speech could be truthful; if it could possibly be truthful, the speech is not inherently misleading. See 106 F.3d at 933.

"Natural," "organic," and "additive-free" descriptors attached to Natural American cigarettes are not inherently misleading under Central Hudson and Revo with respect to the Safer-Cigarette Theory. Natural, organic, and additive-free do not, inherently, mean healthy or safe. See Oxford English Dictionary (online ed. 2017)(defining natural as "[e]xisting in or derived from nature; not made or caused by humankind"); id. (defining organic as "[r]elating to or derived from living matter"); id. (defining additive-free as "(especially of food), containing no additives"). The Court

concludes that a cigarette manufacturer could create, package, and sell cigarettes that were natural, organic, and additive-free without lying. The most ready example is a manufacturer who grows tobacco, wraps it up, and sells it.

The Menthol Theory, however, imposes liability for inherently misleading speech. This analysis diverges from the above, because additive-free's meaning exists in direct conflict with the menthol's presence in the cigarette. Menthol is an additive. Therefore an additive-free cigarette cannot have menthol. It is not possible for some other cigarette manufacturer to produce a menthol cigarette that is additive free and truthfully advertise it as such.

To rebut that conclusion, the Defendants argue that the menthol is added to the cigarette filters, and not the tobacco, so the additive-free natural tobacco label is truthful, because the menthol is not added to the tobacco. See MTD at 24. The Defendants admit, however, that, when the cigarette is smoked, inevitably the menthol intermingles with the tobacco. See June Tr. at 43:19-23 (Court, Schultz). See June Tr. at 43:6-8 (Schultz). The Court concludes that this eventual commingling makes the menthol modifier inherently misleading. The Court cannot see how another cigarette manufacturer could create a cigarette with menthol in the filter that never commingles with the tobacco. The Defendants' final argument that any misunderstanding could be dispelled through a new disclosure, see MTD at 24-25, misapprehends the inherently misleading test. The Court cannot assume in new disclosures otherwise no speech would be inherently misleading. Any assumed disclosure could cure deception with a simple explanation that the inherently misleading speech is a lie.

Finally, the descriptors are not inherently misleading with respect to the Unprocessed-Cigarette Theory. The analysis largely mirrors the Safer-Cigarette Theory analysis above. It is possible that a cigarette manufacturer could create a cigarette, label it natural, and not subject it to

rigorous engineering processes. As explained, a cigarette company could harvest the tobacco, roll it up without adding anything to it, and sell it. Accordingly, under Revo, that modifier is not inherently misleading.

Those conclusions do not end the Court's analysis, however. A court may also forego the remaining Central Hudson factors if the commercial speech is, in fact, misleading. See In re R.M.J., 455 U.S. at 203 ("[W]hen the particular content or method of the advertising suggests that it is inherently misleading or when experience has proved that in fact such advertising is subject to abuse, the States may impose appropriate restrictions."); Peel v. Attorney Registration and Disciplinary Com'n of Ill., 496 U.S. at 111 (1990)(Marshall, J. concurring)("States may prohibit actually or inherently misleading commercial speech entirely."); Revo, 106 F.3d at 933 ("In addition, the Board offers no evidence that anyone was actually deceived by Mr. Revo's letters."). The Court concludes that the Plaintiffs plausibly allege that they or others were in fact misled under the Safer-Cigarette Theory. As the Tenth Circuit's language in Revo suggests, the in-fact test diverges from whether a consumer or reasonable consumer is misled under the same theory; the standard here is subjective instead of objective. The Plaintiffs allege that the Defendants uniformly advertise and label their cigarettes as natural and additive-free, see Amended Complaint ¶¶ 42-43, at 16, and have done so throughout the Defendants' history, see Amended Complaint ¶ 44, at 21; the Natural American Labels and Tobacco & Water Advertisement judicially noticed, support that allegation, see First JN Motion at 1-2. The Court concludes that it is plausible that, because of the Defendants' pervasive advertising campaign and uniform labeling, the Plaintiffs were exposed to those terms when they purchased their Natural American cigarettes. The Plaintiffs also allege that a study supports the finding that "smokers . . . frequently concluded that 'natural' cigarettes must be healthier or safer than cigarettes containing chemicals." Amended Complaint ¶ 50, at 23 (citing McDaniel, Patricia A.

& Ruth E. Malone, I Always Thought They Were All Pure Tobacco: American Smokers' Perceptions of "Natural" Cigarettes and Tobacco Industry Advertising Strategies, 16 Tobacco Control e7 (2007), available at http://www.ncbi.nlm.nih.gov/p mc/articles/PMC2807204/. See id. ¶ 52, at 24 ("Consumers believe that cigarettes marketed with [natural, organic, and additive-free] and similar descriptors are significantly more appealing, healthier or less harmful than packages without these descriptors."). Another study which they cite also concludes that over sixty percent of Natural American smokers believed their brand was less harmful than other cigarette brands. See Amended Complaint ¶ 52, at 24 (Misperceptions at 1). Finally, the plaintiffs allege that Natural American cigarettes are not safer or healthier than other cigarette brands. See Amended Complaint ¶ 59, at 29. Based on the foregoing allegations, the Court concludes that it is plausible that the named plaintiffs were deceived into believing that Natural Americans cigarettes were safer or healthier than other cigarettes, because of Natural Americans branding and advertising. See Amended Complaint ¶¶ 12-23, at 4-11. The advertising and labeling disclosures do not undermine this conclusion, because there is no evidence that the plaintiffs read those disclosures. Moreover, even if they had read them, the disclosures speak only to the "no additive" modifier and not to the "organic" or "natural" terms. Natural American Labeling at 64-111 on CM/ECF; Tobacco and Water Advertising at 114 on CM/ECF.

Assuming that the Defendants' representations vis-à-vis the Menthol Theory were not inherently misleading, they were in fact misleading. Menthol cigarettes were also uniformly advertised and packaged as "additive-free." See Amended Complaint ¶¶ 42-43, at 16. See also Dark Green Label; Green Label. As explained above, the terms menthol and "additive-free" are at odds. The Court concludes it is plausible that the plaintiffs were deceived pursuant to the Menthol Theory.

The Court also concludes that the Plaintiffs were deceived pursuant to their Unprocessed-Cigarette Theory. The Unprocessed-Cigarette Theory's nub is that the term natural suggests that Natural American cigarettes are subjected to fewer engineering processes than other cigarettes. The Amended Complaint lacks allegations that the plaintiffs believed that Natural American cigarettes were less processed than other cigarettes. See Amended Complaint ¶¶ 12-23, at 4-11. Nevertheless, the Court concludes that it is plausible that the term "natural" alone would lead these particular plaintiffs, although not a reasonable consumer, to believe that Natural American cigarettes are subjected to fewer engineering processes than other cigarettes.

**C. THE FIRST AMENDMENT DEFENSE ALSO FAILS, BECAUSE EACH OF THE PLAINTIFFS' THEORIES SATISFIES THE CENTRAL HUDSON TEST.**

Assuming that the three theories are not inherently or factually misleading, those theories satisfy Central Hudson's intermediate scrutiny threshold. If speech is potentially misleading or not misleading, the state may regulate the speech as long as "the government can show that (1) it has a substantial state interest in regulating the speech, (2) the regulation directly and materially advances that interest, and (3) the regulation is no more extensive than necessary to serve the interest." Revo, 106 F.3d at 932 (citations omitted). See Central Hudson, 447 U.S. at 564.

When adjudicating the Central Hudson test, the Supreme Court and the Tenth Circuit have identified several substantial governmental interests in regulating speech. See Central Hudson, 447 U.S. at 568 (ruling that the government has a substantial governmental interest in energy conservation); Florida Bar v. Went For It, Inc., 515 U.S. 618, 625-26 (1995)(holding that "protecting the privacy and tranquility of personal injury victims and their loved ones against intrusive, unsolicited contact by lawyers" is a substantial interest); Utah Licensed Beverage Ass'n v. Leavitt, 256 F.3d 1061, 1070 (10th Cir. 2001)(holding that promoting temperance and supplying revenue are

substantial governmental interests). In the tobacco context, the Supreme Court has recognized that there is a substantial governmental interest in preventing minors from using tobacco. See Lorillard Tobacco Co. v. Reilly, 533 U.S. 525, 555 (2001). "Unlike rational basis review, the Central Hudson standard does not permit [a court] to supplant the precise interests put forward by the State with other suppositions." Florida Bar v. Went For It, Inc., 515 U.S. 618, 624 (1995)(quoting Edenfield v. Fane, 507 U.S. 761, 768 (1993)).

The Plaintiffs argue that there is a substantial governmental interest in protecting consumers from misleading speech, see Response at 19, 21, and the Court agrees that this interest suffices, see Central Hudson, 447 U.S. at 564; Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio, 471 U.S. at 650. The Defendants argue that there is no substantial interest in preventing deception under the Unprocessed-Cigarette Theory, because the term "natural" has no ascertainable meaning. See MTD at 28. The Defendants continue that the only way there could be a substantial interest in regulating that term would be if there is an interest in prohibiting every manufacturer of natural products. See MTD at 28. The Court concludes, however, that the government has an interest in regulating a word with an underdeterminate meaning. Although perhaps less dangerous than representations that are demonstrably false, words with many meanings or unclear meanings have a capacity to mislead, because consumers can interpret them in ways that do not reflect reality.

Central Hudson's next step -- determining whether the speech restriction directly and materially advances the asserted government interest -- requires more than just "mere speculation or conjecture" that the speech restriction will advance the interest. Lorillard Tobacco Co. v. Reilly, 533 U.S. at 555. "[R]ather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to

a material degree." Lorillard Tobacco Co. v. Reilly, 533 U.S. at 555 (quoting Greater New Orleans Broadcasting Assoc., Inc. v. United States, 527 U.S. at 188). To satisfy the third step,

> [w]e do not, however, require that "empirical data come . . . accompanied by a surfeit of background information. . . . [W]e have permitted litigants to justify speech restrictions by reference to studies and anecdotes pertaining to different locales altogether, or even, in a case applying strict scrutiny, to justify restrictions based solely on history, consensus, and "simple common sense."

Lorillard Tobacco Co. v. Reilly, 533 U.S. at 555 (quoting Florida Bar v. Went For It, Inc., 515 U.S. at 628). In Lorillard Tobacco Co. v. Reilly, for example, the Supreme Court concluded that a regulation banning smokeless tobacco advertising within 1,000 feet of schools advances a governmental interest in protecting minors from using tobacco, because many studies support the proposition that minors' smokeless tobacco use has increased, and other studies demonstrate a link between advertising and a demand for smokeless tobacco products. See 533 U.S. at 557-61.

Similarly, here, the Plaintiffs have alleged that several studies indicate that consumers connect natural, organic, and additive-free with a healthier product, see Amended Complaint ¶¶ 50-54, 23-27, so implementing an injunction requiring the Defendants to remove those terms or awarding money damages, which would likely lead to the Defendants removing or modifying those terms, would advance the government's interest in protecting consumers from that deceptive speech. Comparable reasoning holds true in the Menthol and Unprocessed-Cigarette Theory contexts as well, because removing or modifying the additive-free and natural terms directly targets the deception and would relieve it entirely. A consumer would not believe that a cigarette is additive-free or natural without those terms present. The Defendants contend, however, that money damages or an injunction do not materially advance the interest in protecting consumers from deception, because: (i) the pre-existing disclosures cure any deception whether Natural American cigarettes are safer or healthier; and (ii) the menthol labeling puts menthol purchasers on notice that they are purchasing

cigarettes with additives, even though the cigarettes are labeled with "no additives." In sum, they argue that there is no deception. Regarding the pre-existing disclosures, again, the disclosures refer only to the "no additive" descriptor, and not the "organic" or "natural" descriptors, so an injunction or damages would still materially advance the government's interest in dissuading deception arising from the natural and organic adjectives. Moreover, while disclosures or disclaimers usually dispel some deception, some representations are so misleading that disclaimers cannot dispel the misleading information, see Pearson v. Shalala, 164 F.3d 650, 659 (D.C. Cir. 1999), and some disclosures' size and placement limit their effectiveness, see F.T.C. v. Brown & Williamson Tobacco Corp., 778 F.2d 35, 43 (D.C. Cir. 1985)("This fine-print legend, moreover, often appears in virtually illegible form, placed in an inconspicuous corner of Barclay advertisements."). The Court concludes that, in light of the disclosures' placement underneath the barcode and divorced from the Surgeon General's warning, money damages or an injunction would materially advance the state's interest even as to the "additive-free" term, because a substantial number of consumers would not think to look there for that disclosure, or would not even see the disclaimer until after they were deceived into paying a premium for Natural American cigarettes. The Defendants' menthol labeling argument fails, because it assumes that a majority of menthol purchasers are so secure in their knowledge that menthol is an additive that an express representation to the contrary does not mislead them into thinking that menthol is not an additive.[53]

[53]The Court notes here that many menthol users are young, inexperienced smokers. See Michael Freiberg, The Minty Taste of Death: State and Local Options to Regulate Menthol in Tobacco Products, 64 Cath. U. L. Rev. 949, 951 (2015)("Menthol is consumed by nearly half of all youth smokers.")(citing National Survey on Drug Use and Health, Use of Menthol Cigarettes, at 2-3 (2009) available at https://archive.samhsa.gov/data/2k9/134/134MentholCigarettes.htm (noting that "[p]ast month use of menthol cigarettes was more likely among smokers who started in the past 12 months than among longer term smokers")). The Court concludes that menthol smokers' relative youth or inexperience makes it more likely that governmental interference would materially advance

In considering the final factor -- that the regulation is no more extensive than necessary to serve the governmental interest -- the Supreme Court has cautioned that it is not a "least-restrictive-means requirement." Board of Trustees of State University of New York v. Fox, 492 U.S. 469, 478 (1989). Rather, as "commercial speech [enjoys] a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values," the "ample scope of regulatory authority suggested . . . would be illusory if it were subject to a least-restrictive-means requirement, which imposes a heavy burden on the State." Board of Trustees of State University of New York v. Fox, 492 U.S. at 477 (alteration in original). The money damages requested meet this requirement. Money damages encourage the Defendants to add additional disclosures or move their current disclosures to a more prominent location, lest they be exposed to additional liability. Yet moving or adding disclosures might not be enough to fully serve the governmental interest in protecting consumers from the deceptions at issue, See Pearson v. Shalala, 164 F.3d at 659 (holding that some deceptions are so misleading that explanatory disclosures do not cure the deception), so an injunction, depending on whether the deceptive speech may be cured by disclosures, might also meet this requirement, see In re R.M.J., 455 U.S. at 203. At this stage in the litigation, the Court cannot decide on the pleadings alone whether an injunction would be more prohibitive than necessary, but it is plausible that it would not be. Accordingly, the Court concludes that the Plaintiffs' deception theories meet the Central Hudson standard, and the First Amendment is no bar to their case.

## VI. THE STATE STATUTES' SAFE HARBORS, EXCEPT FOR ILLINOIS' DO NOT BAR RELIEF.

The Defendants contend that the state statutes the Plaintiffs invoke are subject to safe harbors, which protect conduct that federal law or policy authorizes from liability. See MTD at 31.

---

their stated goal of dispelling deception, because younger and inexperienced smokers are less likely to know what menthol is.

They contend that the Consent Order authorizes the descriptors challenged, so the Plaintiffs' claims are barred. See MTD at 31. The Court concludes that the Illinois statutes bar the Plaintiff's claims insomuch as they are premised on the "additive-free" descriptor, but the remaining state statutes do not.

### A. CALIFORNIA'S SAFE HARBOR DOES NOT BAR RELIEF.

The Supreme Court of California has determined that the UCL is subject to a safe harbor that, "[i]f the Legislature has permitted certain conduct or considered a situation and concluded no action should lie, courts may not override that determination." Cel-Tech, 973 P.2d at 541. "To forestall an action under the unfair competition law, another provision must actually 'bar' the action or clearly permit the conduct." Cel-Tech, 973 P.2d at 541. "There is a difference between (1) not making an activity unlawful, and (2) making that activity lawful." Cel-Tech, 973 P.2d at 541. Since Cel-Tech, California Courts and federal courts reviewing California law have extended the safe harbor doctrine to CLRA and California's False Advertising law. See Parent v. MillerCoors LLC, No. 15-1204, 2015 WL 6455752, at *4 (S.D. Cal. October 26, 2015)(Curiel, J.); Lopez v. Nissan N. Am., Inc., 135 Cal. Rptr. 3d 116, 134 (Cal. Ct. App. 2011).[54]

In Cel-Tech the Supreme Court of California explained that "the Legislature's mere failure to prohibit an activity does not prevent a court from finding it unfair," and that, conversely, "courts may not use the unfair competition law to condemn actions the Legislature permits." Cel-Tech, 973 P.2d at 542. The question in this case is whether the Consent Order permits the descriptors at issue

[54]The Supreme Court of California has not determined whether the safe harbor should be extended to the CLRA and California's False Advertising Law. The Court concludes that the Supreme Court of California would extend the safe harbor to those two laws, because the great weight of authority interpreting those laws has extended the safe harbor to them, and the Supreme Court of California's rationale for creating a safe harbor to the UCL, i.e., the UCL's sweeping scope cannot be used to contradict the Legislature's express legislation to the contrary, applies with equal force to the CLRA and the False Advertising Law.

or prohibits them. California caselaw provides little guidance on that distinction, but the test appears to be one of degree and context. For example, legislation expressly immunizing conduct from liability amounts to permission, whereas a robbery law's failure to prohibit murder does not amount to permission to commit murder. See Cel-Tech, 973 P.2d at 541. Here, the Consent Order is an agreement that, subject to certain conditions, the FTC will not bring an enforcement action. The Consent Order is, thus, not as clearly permissive as the express immunity from suit is, but it also diverges from the robbery example, because the order bears directly on the Defendants' actions.

Bearing that test in mind, the Court concludes that the Supreme Court of California would rule that the Consent Order does not authorize the Defendants' allegedly misleading conduct. Although the context suggests that the Consent Order permits the descriptors, the Consent Order's degree of permission is dispositive. As already explained, the Consent Order does not expressly authorize conduct; it states only that the agency will not to bring an enforcement action. An agreement not to enforce conveys, at best, a minimum level of approval and, at worst, indifference. Moreover, a consent order is far more fragile than express legislative authorization. Agencies might disagree, as the FDA and FTC have in this case, or the agency may later change its position for some other reason. Accordingly, an agreement not enforce does not amount to permission. This conclusion is in accord with other federal and State Supreme Court cases. See, e.g., United States v. Philip Morris USA Inc., 566 F.3d 1095, 1125 (D.C. Cir. 2009)("Although the FTC never prevented Defendants from using misleading descriptors, 'agency nonenforcement of a federal statute is not the same as a policy of approval.'")(quoting Altria II, 555 U.S. at 89); Aspinall II, 902 N.E.2d at 424-26 (citing Altria II, 555 U.S. at 89 n.13). The Court concludes, thus, that the UCL's, the CLRA's, and California's false advertising law's safe harbors do not bar relief.

**B. COLORADO'S, FLORIDA'S, MASSACHUSETTS', MICHIGAN'S, NEW JERSEY'S, NEW MEXICO'S, NEW YORK'S, NORTH CAROLINA'S, AND WASHINGTON'S SAFE HARBORS DO NOT BAR RELIEF.**

The Defendants also contend that Colorado, Florida, Massachusetts, Michigan, New Jersey, New Mexico, New York, North Carolina, and Washington law bar relief for largely the same reason that California law does. See MTD at 32-39. Each of those states provides a safe harbor similar to California's. See Colo. Rev. Code § 6-1-106(1)(a); Fla Stat. § 501.212(1) Mass. Gen. Laws. Ch. 93A, § 3; Mich. Comp. Laws § 445.904(1)(a); Lemelledo, 696 A.2d at 554; N.M. Stat. Ann. § 57-12-7; N.Y. Gen. Bus. Law § 349(d), § 350-d; Ellis v. Norther Star Co., 388 S.E.2d at 131; Wash. Rev. Code § 19.86.170. After considering the states' Supreme Court caselaw on their respective safe harbors, the Court concludes that these safe harbors do not apply for largely the same reasons it concluded that the California safe harbors did not apply. The Court considers each state briefly in turn.

**1. Colorado Law Does Not Bar Relief.**

The CCPA does not apply to "[c]onduct in compliance with the orders or rules of, or a statute administered by, a federal, state, or local governmental agency." Colo. Rev. Code § 6-1-106(1)(a). The Supreme Court of Colorado has ruled that, "given the broad remedial purpose of the CCPA," the safe harbor "exempts only those actions that are 'in compliance' with other laws" and that "[c]onduct amounting to deceptive or unfair trade practices, however, would not appear to be in 'compliance' with other laws." Showpiece Homes Corp. v. Assurance Co. of America, 38 P.3d at 56. That ruling suggests that unfair or deceptive conduct never meets the safe harbor exception. Even if, however, the safe harbor is not so narrow, the reasoning applicable to the California safe harbor applies here, too. As the Supreme Court of Colorado explained

> the purpose of the exemption is to insure that a business is not subjected to a lawsuit under the Act when it does something required by law, or does something that would

> otherwise be a violation of the Act, but which is allowed under other statutes or regulations. It is intended to avoid conflict between laws, not to exclude form the Act's coverage that is regulated by another statute or agency.

Showpiece Homes Corp. v. Assurance Co. of America, 38 P.3d at 56. Compliance with a Consent Order, which represents that a federal agency has agreed not to enforce a statute, does not demonstrate that conduct is allowed under the Act -- it demonstrates only that which it represents, namely, that, subject to certain conditions, the agency will not enforce the statute.

**2. Florida Law Does Not Bar Relief.**

FDUTPA does not apply to "[a]n act or practice required or specifically permitted by federal or state law." Fla Stat. § 501.212(1). The Supreme Court of Florida has not interpreted the Safe Harbor's bounds. The Court concludes that, if confronted with the issue, the Supreme Court of Florida would rule that an agreement not to enforce does not amount to "specifically permit[ing]" conduct. Fla Stat. § 501.212(1). The Defendants direct the Court to two federal cases and a state case for the opposite conclusion, but those cases are inapposite, because they deal with an express authorization and not an agreement not to enforce. See MTD at 33 (citing Pye v. Fifth Generation Inc., No. 14-0493, 2015 WL 5634600, at *4 (N.D. Fla. September 23, 2015)(Hinkle, J.); Prohias v. Pfizer, Inc., 490 F. Supp. 2d 1228, 1234 (S.D. Fla. 2007)(Jordan, J.); Prohias v. AstaZeneca Pharm., L.P., 958 So.2d 1054, 1056 (Fla. Dist. Ct. App. 2007)).

**3. Massachusetts Law Does Not Bar Relief.**

Mass. Gen. Laws. Ch. 93A has a safe harbor, which reads: "Nothing in this Chapter shall apply to transactions or actions otherwise permitted under laws as administered by any regulatory board or officer acting under statutory authority of the commonwealth of the United States." Mass. Gen. Laws. Ch. 93A, § 3. In a factually similar case, the Supreme Judicial Court of Massachusetts determined that an FTC consent order only enjoined conduct and, therefore, "the defendants point to

nothing approaching a showing that the FTC affirmatively permitted the use of descriptors." Aspinall II, 902 N.E.2d at 425. The Court concludes that the Supreme Judicial Court of Massachusetts would rule similarly here.

**4. Michigan Law Does Not Bar Relief.**

The MCPA does not apply to "transaction[s] or conduct specifically authorized under laws administered by a regulatory board or officer acting under statutory authority of this state or the United States." Mich. Comp. Laws § 445.904(1)(a). The Supreme Court of Michigan has not given clear guidance on the safe harbor except that a court's focus should be directed at whether "the transaction at issue, not the alleged misconduct, is 'specifically authorized.'" Smith v. Globe Life Ins. Co., 597 N.W.2d at 37. Accordingly, the Court cannot properly focus on whether the purported deception was authorized, but instead must properly focus on whether the labeling and advertising was specifically authorized. With that only guidance in mind, the Court concludes that, if confronted with the issue, the Supreme Court of Michigan would rule that an agreement not to enforce does not amount to "specifically authoriz[ing]" conduct. Mich. Comp. Laws § 445.904(1)(a). The federal case that the Defendants cite is unpersuasive, because its conclusion rests on the "FTC's regulatory scheme impliedly authoriz[ing]" the descriptors a cigarette company used. Flanagan v. Altria Group, Inc., No.05-71697, 2005 WL 2769010, at *6 (E.D. Mich. October 25, 2005)(Edmunds, J.). The statute does not contemplate implicit authorization, only specific authorization. See Mich. Comp. Laws § 445.904(1)(a). Moreover, even if the statute encompassed implicit authorization, the Court concludes that the Supreme Court of Michigan would not read its safe harbor so expansively to exclude MCPA claims merely because the federal government had regulated in the area.[55]

---

[55]The Court also notes that the Supreme Court, in Altria II, rejected the reasoning used in

**5. New Jersey Law Does Not Bar Relief.**

The NJCFA is subject to a judicially created exception. See Lemelledo, 696 A.2d at 554. There is a "presumption that the CFA applies to covered practices, even in the face of other existing sources of regulation." Lemelledo, 696 A.2d at 554. "In order to overcome the presumption that the CFA applies to a covered activity, a court must be satisfied . . . that a direct and unavoidable conflict exists between application of the CFA and application of the other regulatory scheme or schemes." Lemelledo, 696 A.2d at 554. "We stress that the conflict must be patent and sharp, and must not simply constitute a mere possibility of incompatibility." 696 A.2d at 554. "If the hurdle for rebutting the basic assumption of applicability of the CFA to covered conduct is too easily overcome, the statute's remedial measures may be rendered impotent as primary weapons in combatting clear forms of fraud simply because those fraudulent practices happen also to be covered by some other statute or regulation." Lemelledo, 696 A.2d at 554. Given this precedent, the Court concludes that an agreement not to enforce does not conflict with the New Jersey CFA so "patent[ly] and sharp[ly]" as to bar liability. Lemelledo, 696 A.2d at 554.

**6. New Mexico Law Does Not Bar Relief.**

The NMUPA shields "actions or transactions expressly permitted under laws administered by a regulatory body of New Mexico or the United States." N.M. Stat. Ann. § 57-12-7. In interpreting that provision, the Supreme Court of New Mexico has held that "expressly" means "directly and distinctly stated or expressed *rather than implied or left to inference.*" Truong v. Allstate Ins. Co., 2010-NMSC-009, ¶ 38, 227 P.3d at 83 (emphasis in original)(citation omitted). In Truong v. Allstate Ins. Co., the Supreme Court of New Mexico concluded that the Superintendent of Insurance did not "expressly permit" a form of claims handling where the Superintendent of Insurance stated

---

Flanagan v. Altria Grp., Inc., albeit in its preemption analysis and not in a MCPA analysis.

"only that the claims appear to have been handled properly and that no claims handling abuses were noted," and that these statements were not the same as "an affirmative finding of proper handling." 2010-NMSC-009, ¶ 39, 227 P.3d at 83. Given that precedent, the Court concludes that the Supreme Court of New Mexico would rule that an agreement not to enforce does not amount to express permission, because it requires an inference.

The New Mexico False Advertising Law notes that "it shall be a complete defense that the advertisement is subject to and complies with the rules and regulations of, and the statutes administered by the federal trade commission." N.M. Stat. Ann. § 57-15-4. The Supreme Court of New Mexico has not construed this exception, nor has any other court. The Court concludes, however, that the Supreme Court of New Mexico would rule that the safe harbor does not apply where the rule or regulation is only an agreement not to enforce.

**7. New York Law Does Not Bar Relief.**

N.Y. Gen. Bus. Law § 349(d) and N.Y. Gen. Bus. Law § 350-d preclude suit for conduct that "is subject to and complies with the rules and regulations of, and the statutes administered by the federal trade commission." N.Y. Gen. Bus. Law § 349(d); N.Y. Gen. Bus. Law § 350-d (quoted language in both). The Court of Appeals of New York has not interpreted either of those statutes nor could the Court locate New York Supreme Court, Appellate Division cases interpreting the safe harbors. Several New York federal courts, however, have reasoned that the safe harbors cover "rules and regulations," which does not include informal agency action. See, e.g., Greene v. Gerber Products Co., __F. Supp. 3d__, 2017 WL 3327583, at *21-22 (E.D.N.Y. 2017)(Brodie, J.). At least one other New York federal court has concluded that the safe harbor analysis overlaps with a constitutional preemption analysis. See Stewart v. Riviana Foods, Inc., No.16-6157, 2017 WL 4045952, at *4-5 (S.D.N.Y. September 11, 2017)(Roman, J.). The Court concludes that, if

confronted with the issue, the Court of Appeals of New York would adopt the reasoning of those federal courts and rule that the Consent Order is not a rule or regulation, or that an agreement not to enforce a federal statute does not meet the conduct required for the safe harbor.

**8. North Carolina Law Does Not Bar Relief.**

In Ellis v. Northern Star Co., the Supreme Court of North Carolina recognized that, "[i]n limitation, we have held that certain transactions already subject to pervasive and intricate statutory regulation, such as securities transactions, were not intended by the legislature to be included within the scope of [N.C. Gen. Stat. § 75-1.1]." Ellis v. Northern Star Co., 388 S.E.2d at 131. Although the cigarette industry has been subject to regulation, the Court declines to extend this limited exception to an industry that, to the Court's knowledge, no North Carolina court has exempted from the statute. Moreover, the Court concludes it is unlikely that the Supreme Court of North Carolina would extend the doctrine in a context that the Supreme Court has rejected in the preemption field.

**9. Ohio Law Does Not Bar Relief.**

Ohio Rev. Code Ann. § 1345.02(A) is inapplicable if "a violation was an act or practice required or specifically permitted by federal trade commission orders." Ohio Rev. Code Ann. § 1345.11. In Marrone v. Philip Morris USA, Inc., the Supreme Court of Ohio noted that the "Ohio's consumer-protection laws defer to FTC pronouncements," but it concluded that, "although the FTC is well aware of the years of litigation and debate over cigarette manufactures' marketing strategies, . . . it appears that the FTC has neither permitted nor forbidden characterizations like 'low' tar." Marrone v. Philip Morris USA, Inc., 850 N.E.2d at 38. With that conclusion it implicitly recognized that an FTC consent order enjoining descriptor use, unless disclosures accompany the descriptors, does not permit descriptor use. Marrone v. Philip Morris USA, Inc., 850 N.E.2d at 38 (citing Flanagan v. Altria Group, Inc., 2005 WL 2769010, at *3-5). The Court is

concludes that, although the holding is dicta, the Supreme Court of Ohio would follow its conclusion from Marrone v. Philip Morris USA, Inc. and rule that the Consent Order does not permit the descriptor use here.

**10. Washington Law Does Not Bar Relief.**

The WCPA does not apply "to actions or transactions otherwise permitted, prohibited or regulated under laws administered by . . . any other regulatory body or officer acting under statutory authority of this state or the United States." Wash. Rev. Code § 19.86.170. The Supreme Court of Washington has stated that "[e]xemption under the Consumer Protection Act is applied only after determining whether the specific action is permitted, prohibited, regulated or required by a regulatory body or statute." Vogt v. Seattle-First Nat. Bank, 817 P.2d 1364, 1370 (Wash. 1991)(en banc). It has also noted that an "[o]verly broad construction of 'permission' may conflict with the legislature's intent that the Consumer Protection Act be liberally construed so that its beneficial purposes may be served." Vogt v. Seattle-First Nat. Bank, 817 P.2d at 1370. "The test articulated was whether under the circumstances of a particular case, state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Vogt v. Seattle-First Nat. Bank, 817 P.2d at 1371. Based on that precedent, the Court concludes that the Supreme Court of Washington would rule that an agreement not to enforce does not amount to permission under the safe harbor nor does the state statute stand as an obstacle to the FTC's purpose.

**C. ILLINOIS SAFE HARBORS BAR RELIEF FOR CONDUCT THE CONSENT ORDER SPECIFIES.**

Although the Court concludes broadly that the Consent Order does not establish a safe harbor for the Defendants' conduct under other States' law, the Supreme Court of Illinois dictates a

different outcome.[56] Under Illinois law, the IFCA does not apply to "[a]ctions or transactions specifically authorized by laws administered by any regulatory body or officer acting under statutory authority of this State or the United States." 815 Ill. Comp. Stat. 505/10b(1). Also under Illinois law, the IUDTPA does not apply to "conduct in compliance with orders or rules of or a statute administered by a Federal, state or local governmental agency." 815 Ill. Comp. Stat. 510/4(1). In Price v. Philip Morris, the Supreme Court of Illinois concluded that an FTC consent order enjoining the use "low," "lower," "reduced," and other similar words "so long as the descriptive terms are accompanied by a clear and conspicuous disclosure of the 'tar' and nicotine content" barred a plaintiff's claim under 815 Ill. Comp. Stat. 505/10b(1) and under 815 Ill. Comp. Stat. 510/4(1) -- the two safe harbors. Price v. Philip Morris, 848 N.E.2d at 50, 53. The Court concludes that Price v. Philip Morris controls the Illinois' claims outcome. The Consent Order, however, governs only Natural American cigarette's advertising and not its labeling. Accordingly, the Court dismisses the Plaintiffs' Illinois claims to the extent that they are premised on the theory that the terms "natural" and "additive-free" in the Defendants' advertising mislead a reasonable consumer into believing that Natural American cigarettes are safer or healthier than other cigarettes .

**D. THE COURT DISMISSES IN PART THE IUDTPA CLAIM AND THE OHIO STATUTORY CLAIMS FOR INDEPENDENT STATE REASONS.**

The Defendants argue that the Plaintiffs' IUDTPA, TCCWNA, OCSPA, and ODTPA claims fail for independent state reasons. The Court concludes that the Plaintiffs have adequately pled their TCCWNA claim, but that the other three claims fail. The Court considers each claim in turn.

[56]The Court disagrees with that court's conclusions for the reasons articulated in its analysis under California law, but is nevertheless bound by the Supreme Court of Illinois.

**1. The IUDTPA Claim for Injunctive Relief Fails, Because the Plaintiffs Will Not Suffer a Future Harm From the Deception at Issue.**

The Defendants argue that the Plaintiffs' claim for injunctive relief under IUDTPA fails, because the Plaintiffs cannot allege likelihood of future harm to themselves. See MTD at 49-50. According to the Defendants, now that the Plaintiffs know of the deception, the Defendants' sales and marketing practices cannot ever harm them again. See MTD at 50. In so arguing, the Defendants rely on several cases, including a Seventh Circuit decision, which ruled that, under IUDTPA, "[s]ince [the plaintiff] is now aware of [the defendant's deceptive] sales practices, he is not likely be harmed by the practices in the future," and, therefore, the plaintiff "is not entitled to injunctive relief." Camasta v. Jos. A. Bank Clothiers, Inc., 761 F.3d 732, 740-41 (7th Cir. 2014). See MTD at 49-50 (citing Aliano v. Louisville Distilling Co., LLC, 115 F. Supp. 3d 921, 928 (N.D. Ill. 2015)(Aspen, J.); Robinson v. Toyota Motor Credit Corp., 735 N.E.2d 724, 735 (Ill. App. Ct. 2000)); Reply at 24-25.

IUDTPA provides that "[a] person likely to be damaged by a deceptive trade practice of another may be granted injunctive relief upon terms that the court considers reasonable." 815 Ill. Comp. Stat. 510/3. The Supreme Court of Illinois has agreed with the Defendants' reasoning and has ruled that plaintiff consumers who know of the purported deception "can avoid it," and, thus, "are not persons who are likely to be damaged by the defendants' conduct in the future." Glazewksi v. Coronet Ins. Co., 483 N.E.2d 1263, 1267 (Ill. 1985)(quotations omitted)(concluding that the "plaintiffs are not eligible for injunctive relief"). See Brooks v. Midas-International Corp., 361 N.E.2d 815, 821 (Ill. App. Ct. 1977)("Whatever harm plaintiff may suffer from the advertisements has already occurred. The trial court, therefore was correct in ruling that such practices by defendant are not likely to damage plaintiff."); Kljajich v. Whirlpool Corp., No. 15-5980, 2015 WL 8481973, at *4-5 (N.D. Ill. December 10, 2015)(Eve, J.).

The Plaintiffs counter that, although the class representatives know of the deception, putative class members can still be deceived, so they still have standing to sue. See Response at 55 (citing Leiner v. Johnson & Johnson Consumer Cos., No. 15-5876, 2016 WL 128098, at *1 (N.D. Ill. January 12, 2016)). The Court concludes that the Supreme Court of Illinois would not agree with the Plaintiffs. Although not expressly considering the argument, in Glazewki v. Coronet Ins. Co., the Supreme Court of Illinois considered class-action representatives' suit for injunctive relief and determined that, because the representative plaintiffs knew of the deception, injunctive relief was foreclosed. See Glazewki v. Coronet Ins. Co., 483 N.E.2d at 1267. Leiner v. Johnson & Johnson Consumer Cos. does not bind the Court, and, even if it bound the Court, the case is inapposite, because it pivots on Article III standing requirements to bring a suit for injunctive relief under IUDTPA. See Leiner v. Johnson & Johnson Consumer Cos., 2016 WL 128098, at *1. In contrast, the Defendants here argue that the Plaintiffs have not sufficiently pled one of IUDTPA's elements, i.e., likelihood of future harm.[57] Accordingly, the Court dismisses the IUDTPA claim, Illinois Count II, for injunctive relief.

**2. The Plaintiffs Have Adequately Pled their TCCWNA Claim, Because They Have Plausibly Alleged a Predicate Violation Under the NJCFA.**

The Defendants argue that the Plaintiffs' TCCWNA claim fails, because they have not alleged a predicate statutory violation. See MTD at 50. They contend that the only predicate

[57]The Court notes the Plaintiffs' argument that Illinois' courts' interpretations gut the statute, because a plaintiff suing under IUDTPA will always know of the deception by the time he brings suit, so will never qualify for injunctive relief. That conclusion is false, because some deceptive conduct leads to repeated, hard-to-verify harms, such as deceptive billing practices. See Brennan v. AT&T Corp., No.04-0433, 2006 WL 306755, at *5 (S.D. Ill. February 8, 2006)(Herndon, J.). As that court reasoned, although a consumer might recognize incorrect charges once, it is not guaranteed that the consumer will recognize incorrect charges in the future. See Brennan v. AT&T Corp., 2006 WL 306755, at *5 ("Although it is true that Crawford recognized the Defendant's charges in the past, she may not be so fortunate in the future -- particularly when a charge may appear as nothing more than one line in a lengthy phone bill from another provider.").

possible is the Plaintiffs' NJCFA claim and, because the Plaintiffs fail to demonstrate that the Defendants' representations would deceive a reasonable consumer, that predicate claim fails. See MTD at 51. The Court concludes, however, that the Plaintiffs have plausibly alleged a NJCFA violation, see supra 163-77, so the Plaintiffs TCCWNA may proceed.

**3. The Plaintiffs have not Pled OSCPA's Substantive Notice Requirement, so the Court Dismisses the OSCPA Claim.**

Under the OSCPA, a consumer qualifies for class-action relief only when a supplier acts in the face of prior notice that its conduct was deceptive. See Marrone v. Philip Morris USA, Inc., 850 N.E.2d at 34, 38 (citing Ohio Rev. Code Ann. § 1345.09(B)). "The prior notice may be in the form of (1) a rule adopted by the Attorney General . . . or (2) a court decision made available for public inspection by the Attorney General." Marrone v. Philip Morris USA, Inc., 850 N.E.2d at 34. For a court decision to qualify as Notice, the prior court decision must be substantially similar to the cause of action brought. See Marrone v. Philip Morris USA, Inc., 850 N.E. at 36, 38 ("Cases that involve industries and conduct very different from the defendant's do not provide meaningful notice of specific acts or practices that violate the CSPA."). The requisite notice must be in the plaintiffs' complaint. See Volbers-Klarich v. Middletown Mgt., Inc., 929 N.E.2d 434, 502 (Ohio 2010); In re Porsche Cars N. Am., Inc., 880 F. Supp. 2d 801, 868 (S.D. Ohio 2012)(Frost, J.); Johnson v. Microsoft Corp., 802 N.E. 2d 712, 720 (Ohio Ct. App. 2003) aff'd, 834 N.E. 2d 791 (Ohio 2005).

Here, the Plaintiffs have not pled a specific court decision or Attorney General adopted rule to put the Defendants on notice. See Amended Complaint ¶¶ 395-411, at 95-98. The Plaintiffs contend, however, that such notice requirement is inapplicable here, because the requirement is procedural, so "ha[s] no effect in federal court." Response at 59 (citing Erie R.R. v. Tompkins, 304 U.S. 64 (1938)). According to Plaintiffs, because the pre-suit notice requirement is procedural and conflicts with rule 23, rule 23 must prevail. Response at 59-60.

"In diversity cases, the Erie doctrine instructs that federal courts must apply state substantive law and federal procedural law." Racher, 871 F.3d at 1162. "If a federal rule of civil procedure answers the question in dispute, that rule governs our decision so long as it does not 'exceed[] statutory authorization or Congress's rulemaking power.'" Racher, 871 F.3d at 1162 (quoting Shady Grove, 559 U.S. at 398). "When faced with a choice between a state law and an allegedly conflicting federal rule," the Tenth Circuit "follow[s] the framework described by the Supreme Court in Shady Grove, as laid out by Justice Stevens in his concurring opinion." Racher, 871 F.3d at 1162. "First, the court must decide whether the scope of the federal rule is sufficiently broad to control the issue before the court, thereby leaving no room for the operation of seemingly conflicting state law." Racher, 871 F.3d at 1162 (citations and quotations omitted). There is a conflict between federal and state law if there is a "direct collision" that is "unavoidable," but there is no collision if the state and federal rules "can exist side by side . . . each controlling its own sphere of coverage." Racher, 871 F.3d at 1163 (citations omitted). If there is no direct collision, "there is no need to consider whether the federal rule is valid, and instead, the analysis must proceed under Erie." Racher, 871 F.3d at 1163. If there is a direct collision, a court must follow the federal rule if it is a valid exercise of the Supreme Court's authority pursuant to the Rules Enabling Act, i.e., it must "not abridge, enlarge or modify a substantive right." 28 U.S.C. § 2072(b). See Racher, 871 F.3d at 1163-64. A state law is substantive if after examining "the language and policy of the rule in question . . . the primary objective is directed to influencing conduct through legal incentives," and a state law is procedural if the law's purpose is to "achiev[e] fair, accurate, and efficient resolutions of disputes." Sims v. Great American Life Ins. Co., 469 F.3d 870, 883 (10th Cir. 2006). See Leon v. FedEx Ground Package Sys., Inc., 313 F.R.D. 615, 641 (D.N.M. 2016)(Browning, J.). The Tenth Circuit recently added: "If a state law 'concerns merely the manner and means' by which substantive rights

are enforced, it is procedural, but if its application would 'significantly affect the result of litigation, it is substantive.'" Racher, 871 F.3d at 1164 (quoting Guaranty Trust Co. v. York, 326 U.S. 99, 109 (1945)).

Rule 23 does not directly conflict with the Ohio class-action pre-suit notice requirement. Rule 23 governs when a federal court may certify a class action. Fed. R. Civ. P. 23. Rule 23, however, does not purport to create a class action's only requisite procedural elements. Rule 23(b)'s language is framed permissively: "A class action may be maintained . . . ." Fed. R. Civ. P. 23(b) (emphasis added). Accordingly, both the federal conditions and the state condition can be met, so rule 23 and Ohio's pre-suit notice law may exist "side by side." Racher, 871 F.3d at 1163 (citations omitted).[58] Because there is no direct conflict, the Court proceeds under Erie. See Racher, 871 F.3d at 1163.

Under Erie, "federal courts sitting in diversity apply state substantive law and federal procedural law." Gasperini v. Center for Humanities, Inc., 518 U.S. 415, 427 (1996). Ohio federal courts construing Ohio's Consumer Sales Practice Act's notice requirement have determined that the rule is substantive, because it "is intimately interwoven with the substantive remedies available under the OSCPA." In re Whirlpool, 2010 WL 2756947 at *2 (citing Shady Grove, 559 U.S. at 429 (Stevens, J., concurring). See McKinney v. Bayer Corp., 744 F. Supp. 2d at 748-49; Phillips v. Philip Morris Cos., 290 F.R.D. 476, 480-81 (N.D. Ohio 2013)(Lioi, J.). The In re Whirlpool court

[58]The Court notes that some Ohio federal courts have concluded that Ohio's class-action pre-suit notice requirement directly conflicts with rule 23. See e.g., McKinney v. Bayer Corp., 744 F. Supp. 733, 748 (N.D. Ohio 2010)(O'Malley, J.); In re Whirlpool Corp. Front-Loading Washer Products Liability Litig., No. 08-65000, 2010 WL 2756947, at *1 (N.D. Ohio July 12, 2010)(Gwin, J.)("In re Whirlpool") judgment vacated on other grounds, 559 U.S. 901 (2013). The Court disagrees with their conclusions, because they interpret the rule's language that "[a] class action may be maintained" to suggest that rule 23 prescribes the exclusive requirements for class actions. Fed. R. Civ. P. 23(b). See In re Whirlpool, 2010 WL 2756947 at *1. "May" is a permissive term. It expresses both discretion and uncertainty. An action may proceed, but it does not mean that it must proceed.

explained that Ohio Rev. Code § 1345.09 "purports to define substantive rights and remedies by creating a cause of action for defrauded consumers," and the pre-suit notice requirement "applies only to 'a violation of Chapter 1345 of the [Ohio] Revised Code' -- indicating its substantive nature." In re Whirlpool, 2010 WL 2756947 at *2 (quoting Ohio Rev. Code § 1345.09). The notice rule, thus, is much more like an element to the claim and not a procedural requirement. See In re Whirlpool, 2010 WL 2756947 at *2. The Court agrees that Ohio's pre-suit notice requirement is substantive. First, because the requirement applies only to Ohio's Consumer Sales Practice Act, it acts more like a claim's element than a procedural hurdle. See Phillips v. Philip Morris Cos., 290 F.R.D. at 481. Second, pre-suit notice's purpose is typically to convince parties to negotiate before litigation, and "thus the primary objective is directed to influencing conduct through legal incentives." Sims v. Great American Life Ins. Co., 469 F.3d at 883. See Baber v. Edman, 719 F.2d 122, 123 (5th Cir. 1983)(concluding that a pre-suit notice requirement's purpose is to give parties an "opportunity to settle in advance of expensive litigation"). Finally, the rule, much like a statute of limitations, even though seemingly procedural, "significantly affect[s] the result of litigation," because failure to plead notice defeats the claim. Racher, 871 F.3d at 1164 (quoting Guaranty Trust Co. v. York, 326 U.S. at 109). Accordingly, the pre-suit notice requirement is substantive, and the Court must apply it. The Plaintiffs have not pled the pre-suit notice requirement, so the Court dismisses the Plaintiffs' OCSPA claim without prejudice with leave to plead, as required, the notice needed.

**4. The Plaintiffs' ODTPA Claim Fails, Because Consumers Do Not Have Standing to Sue Under That Statute.**

The Defendants argue that the ODTPA claim fails, because many Ohio Courts have concluded that the statute does not grant consumers standing to sue. See MTD at 52. The Plaintiffs counter that, notwithstanding the cases to the contrary, the statute's express language "affirmatively

grants the plaintiffs standing" as other federal courts have recognized. Response at 61. The statute provides that: "A person who is injured by a person who commits a deceptive trade practice . . . may commence a civil action." Ohio Rev. Code Ann. § 4165.03(A)(2). "Person means an individual, corporation, government . . . . or any other legal or commercial entity." Ohio Rev. Code Ann. § 4165.01(D). The Supreme Court of Ohio has not yet resolved the consumer standing issue, and there is a recognized split in authority on the topic, although the split lopsidedly favors the Defendants. See Terlesky v. Fifth Dimension Inc., 2015 WL 7254189, at *2 (S.D. Ohio November 17, 2015)(Dlott, J.); Phillips v. Philip Morris Cos., 290 F.R.D. at 482 (collecting cases). Many courts that reason a consumer has no standing to sue, despite the statute defining "person" as an "individual," conclude that the Ohio statute "is substantially similar to Section 43(a) of the Lanham Act and the Lanham Act protects the interests of a purely commercial class that does not include individual consumers." Terlesky v. Fifth Dimension Inc., 2015 WL 7254189, at *2. See, e.g., In re Porsche Cars N. Am., Inc., 880 F. Supp. 2d 801, 874 (S.D. Ohio 2012)(Frost, J.); Dawson v. Blockbuster, Inc., 2006 WL 1061769, at *4 (Ohio App. Ct. March 16, 2006), cert. denied, 852 N.E.2d 190 (Ohio 2006). Other courts, looking to the statute's language have concluded that the "any other legal or commercial entity" language in Ohio Rev. Code Ann. § 4165.01(D) qualifies the definition of individual such that it commands that the individual must be involved in commercial activity. See e.g., Phillips v. Philip Morris Cos., 290 F.R.D. at 483; Robins v. Global Fitness Holdings, LLC, 838 F. Supp. 2d 631, 650 (N.D. Ohio 2012)(Polster, J.). The Court concludes that Supreme Court of Ohio would adopt the majority position, because it "often look[s] to federal court interpretation of federal statutes analogous to Ohio Statutes," Williams v. Akron, 837 N.E.2d 1169, 1176 (Ohio 2005), and the Lanham Act, which is analogous to ODTPA, has been interpreted to bar consumer standing, see Phillips v. Philip Morris Cos., 290 F.R.D. at 483-84. The Court also

concludes that the minority position is incorrect, because it renders the OCSPA superfluous "as both statutes [would] regulate the same type of conduct." Robins v. Global Fitness Holdings, LLC, 838 F. Supp. 2d 631, 650 (N.D. Ohio 2012). In so ruling, the Court is mindful that, when sitting in diversity, a federal district judge should strive to ensure that a forum's location should not dictate a claim's outcome. See Butt v. Bank of Am., N.A., 477 F.3d at 1179. Given the majority position, if this case had been brought in Ohio, it is highly likely that the claim would be dismissed for lack of standing. The Court, accordingly dismisses the ODTPA claim.

## VII. THE PLAINTIFFS' NEW JERSEY AND OHIO UNJUST-ENRICHMENT CLAIMS FAIL, BECAUSE THE PLAINTIFFS CANNOT PLEAD A REMUNERATION FOR THE NEW JERSEY CLAIM AND THEY CANNOT PLEAD A DIRECT BENEFIT FOR THE OHIO CLAIM.

The Defendants argue that the some or all of the Plaintiffs unjust-enrichment claims fail for four reasons. First, the Defendants argue that all of the unjust-enrichment claims fail, because the plaintiffs have not pled an injustice -- there was no deception. See MTD at 52. Second, they assert that nine of twelve unjust-enrichment claims fail, because the Plaintiffs have an adequate legal remedy. See MTD at 53. Third, they contend that four of twelve fail, because the Plaintiffs did not directly confer a benefit to the Defendants. See MTD at 53. Finally, they conclude that two of twelve claims fail for state-specific reasons. See MTD at 53. The Court determines that the Plaintiffs have pled an injustice, and that unjust enrichment may be pled in the alternative under rule 8. The New Jersey and Ohio claims fail, however, for state specific reasons.

### A. THE PLAINTIFFS HAVE PLED AN INJUSTICE, BECAUSE THERE ARE TWO PLAUSIBLE THEORIES OF DECEPTION.

The Defendants argue that the Plaintiffs have failed to plausibly allege a deception, so the Plaintiffs' unjust-enrichment claims fail, because there has been no injustice. See MTD at 54-55. The Court concludes, however, that there are two plausible theories of deception. See supra at 163-

77. Accordingly, the Defendants' argument fails as to the Safer-Cigarette and Menthol Theories. The Court dismisses the Plaintiffs' unjust-enrichment claims to the extent that they rely on the Unprocessed-Cigarette Theory.

### B. THE PLAINTIFFS UNJUST-ENRICHMENT CLAIMS MAY BE PLED IN THE ALTERNATIVE EVEN THOUGH AN ADEQUATE LEGAL REMEDY MAY EXIST UNDER THE STATUTORY SCHEME.

The Defendants argue that, under Colorado, Florida, Massachusetts, Michigan, New Jersey, New York, North Carolina, Ohio, and Washington law, the Plaintiffs' unjust-enrichment claims fail, because the Plaintiffs' have an adequate and available legal remedy.[59] See MTD at 55-60.[60] The Plaintiffs counter that, under rule 8(d) of the Federal Rules of Civil Procedure, they may plead in the alternative their equitable claims. See Response at 63. They also argue that, for state-specific reasons, their unjust-enrichment claims do not fail. See Response at 64-69.

There is no binding Tenth Circuit precedent construing pleading in the alternative equitable claims under the Federal Rules of Civil Procedure, so the Court writes on a clean slate. Rule 8(d)(2) provides that: "A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient." Fed. R. Civ. P. 8(d)(2). Rule 8(d)(3) states: "A party may state as many separate claims or defenses as it has, regardless of consistency." Fed. R. Civ. P. 8(d)(3). Some United States District Courts have concluded that

[59]The Court recognizes that Plaintiffs pursuing unjust enrichment may also seek a legal remedy, which would obviate the available legal remedy argument. See Restatement (Third) of Restitution and Unjust Enrichment. The Plaintiffs, however, seek an equitable remedy with their unjust-enrichment claims. See Amended Complaint ¶¶ 175, 193, 215, 248, 265, 288, 314, 341, 373, 394, 426, 449, at 54, 57, 62, 68, 71, 76, 81, 86, 91, 95, 99-100, 103.

[60]In their MTD, the Defendants argue that the New Mexico unjust-enrichment claim failed for the same reason, see MTD at 58, but in their Reply, they withdrew argument on that ground, see Reply at 27 n.17.

equitable claims premised on the same factual deception as a consumer protection claims are not, under rule 8, alternative theories of relief. See In re Ford Tailgate Litig., No. 11-2953, 2014 WL 1007066, at *5 (N.D. Cal. March 12, 2014)(Seeborg, J.)("[W]here the unjust enrichment claim relies upon the same factual predicates as a plaintiff's legal causes of action, it is not a true alternative theory of relief, but rather is duplicative of those causes of action.")(quoting Licul v. Volkswagen Grp. of Am., Inc., No. 13-61686, 2013 WL 6328734, at *7 (S.D. Fla. December 5, 2013)(Cohn, J.)). The Court disagrees with the conclusion that an unjust-enrichment claim cannot be an alternative theory, under federal law, if it is premised on the same factual predicates. Cf. Sylvia v. Wisler, __ F.3d __, 2017 WL 5622916, at *10 (10th Cir. 2017)("[T]he same relationship between a client and her attorney may conceivably provide the basis for claims sounding in both contract and tort. . . . [T]here is nothing in the federal rules or in Kansas practice that prevented Mr. Sylvia from pleading in the alternative claims sounding in both tort and contract."); Abraham v. WPX Energy Production, LLC, 20 F. Supp. 3d 1244, 1273 (D.N.M. 2014)(Browning, J.)(rejecting a proposed rule that an unjust-enrichment claim must be dismissed under New Mexico law "when the claim involves the issues that are the subject of a contract"). For example, in the consumer protection or tort context, though the purported deception might be the same, the damages theory diverges. Unjust enrichment focuses on the Defendants' ill-gotten gains, whereas a tort theory focuses on the Plaintiffs' loss. See In re Light Cigarettes Marketing Sales Practices Litig., 751 F. Supp. 2d at 192 n.11; Harris Grp., Inc. v. Robinson, 209 P.3d at 1205. The Court concludes that such a divergence is enough to amount to an alternative theory under rule 8(d). The Court, thus, declines to hold that rule 8(d) necessarily forecloses pleading an equitable claim in the alternative, because factual predicates overlap.

Nevertheless, the Court must consider whether rule 8(d) allows plaintiffs to plead equitable theories in the alternative regardless whether state law precludes such a pleading. Many United States District Courts have held that rule 8 governs, unless state law provides an exclusive remedy. See, e.g., In re Light Cigarettes Marketing Sales Practices Litigation, 751 F. Supp. 2d 183, 192 (D. Me. 2010)(Woodcock, J.)(noting that, under rule 8(d)(2), pleading in the alternative fails "when the legal cause of action provides an exclusive remedy" and collecting cases); Maalouf v. Salomon Smith Barney, Inc., No. 02-4770, 2003 WL 1858153, at *7 (S.D.N.Y. April 10, 2003)(Scheindlin, J.). Thus, when a contract arguably covers the equitable claim's scope, i.e., a plaintiff sues for breach of contract and unjust enrichment based on the same factual predicates, many court have held that equitable claims may be pled in the alternative only if it is reasonably likely that the party will challenge the contract's validity. See Solo v. United Parcel Serv. Co., 819 F.3d 788, 796 (6th Cir. 2016); Maalouf v. Salomon Smith Barney, Inc., 2003 WL 1858153, at *7; Herazo v. Whole Foods Market, Inc., No. 14-61909, 2015 WL 4514510, at *3 (S.D. Fla. July 24, 2015)(Moreno, J.).

With that backdrop in mind, the Court concludes that, under Shady Grove, the court must apply rule 8(d). Rule 8(d) allows expansive alternative pleading and state law prohibits alternative pleading of equitable claims if there is an adequate remedy at law, so the two are in conflict. See, e.g., Szaloczi v. John R. Behrmann Revocable Trust, 90 P.3d 835, 842 (Colo. 2004)("[E]quity will not act if there is a plain, speedy, adequate remedy at law."); Greenfield Villages v. Thompson, 44 So.2d 679, 683 (Fla. 1950); Tkachik v. Mandeville, 790 N.W.2d 260 265 (Mich. 2010); Slurzberg v. City of Bayonne, 148 A.2d 171, 176 (N.J. 1959). The Court, thus, must determine whether the federal rule violates the Rules Enabling Act by abridging, modifying, or enlarging a substantive right. There are two possible interpretations of the rule that an adequate legal remedy bars equitable

relief. First, it could mean that, as part of providing a statutory, i.e., legal, remedy, the state legislature displaced judge-made remedies like unjust enrichment. See In re Light Cigarettes Marketing Sales Practices Litig., 751 F. Supp. at 192. Second, it could mean that equitable relief is unnecessary, because a legal claim exists, which makes pleading equitable relief redundant. Regarding the first possible interpretation, if a state legislature displaces all unjust enrichment claims rooted in consumer deception, then such claims will never survive a motion to dismiss for failure to state a claim; rule 8 would have no bearing on the analysis. Regarding the second possible interpretation, however, if state rules regarding the adequacy of remedies at law serve only to eliminate duplicative pleading, then such state rules conflict with rule 8(d). Applying rule 8(d) would grant the Plaintiffs a procedural right that would be unavailable in state court, i.e., the right to plead legal and equitable theories in the alternative. Granting the Plaintiffs a procedural right does not violate the Rules Enabling Act, which prohibits the Federal Rules of Civil Procedure from abridging, enlarging, or modifying substantive rights. Allowing the Plaintiffs to plead in the alternative does not create a new claim or permit double recovery, because, the legal claim will either prove meritorious and the equitable claim will be dismissed, or the legal claim will fail and the equitable claim will proceed.

The Court concludes that the state laws at issue serve only to eliminate duplicative pleading, so rule 8 applies. Surveying the consumer protection statutes at issue, none bar common-law equitable relief. See Colo. Rev. Stat. Ann. §§ 6-1-101-115; Fla. Stat. § 501.201-213; Mass. Gen. Laws Ch. 93A §§ 1-11; Mich. Comp. Laws §§ 445.901-922; N.J. Stat. Ann. § 56:8-1-56:8-206; N.Y. Gen. Bus. Law §§ 349-350-F-1; N.C. Gen. Stat. § 75-1-42; Ohio Rev. Code Ann. § 1345.01-13; Wash Rev. Code § 19.86.010-920. Indeed, many explicitly note that the statutes do not circumscribe the common law or other state laws. See Colo. Rev. Stat. § 6-1-105(c); Fla. Stat. § 501.213; Mich.

Comp. Laws § 445.916; N.Y. Gen. Bus. Law § 350-e(1); Ohio Rev. Code Ann. § 1345.13. Because none create an exclusive remedy, the adequate-legal-remedy rule must be construed as eliminating duplicative claims, and rule 8 applies.[61]

Under rule 8(d), the Court will not dismiss the Plaintiffs' equitable claims at this stage, because rule 8(d)(3)'s plain language allows them. It reads: "A party may state as many separate claims or defenses as it has, regardless of consistency." Fed. R. Civ. P. 8(d)(3). Rule 8(d)(2) also provides that claims may be pled in the alternative. See Fed. R. Civ. P. 8(d)(2). The Plaintiffs may, therefore, plead both equitable and legal relief, although they may not, under state law, ultimately recover under both theories. See In re Dial Complete Marketing and Sales Practices Litig., 2013 WL 1222310, at *8-9 ("[C]onsistent with Federal Rules, Plaintiffs have simply pled their claims in the alternative . . . the mere fact that plaintiffs have pled arguable inconsistent theories is not, standing alone, a sufficient basis to dismiss one of those claims."); In re Light Cigarettes Marketing Sales Practices Litig., 751 F. Supp. 2d at 192 ("At this stage, the Plaintiffs may assert multiple and duplicative legal and equitable claims for relief."); In re Celexa and Lexapro Marketing and Sales Practices Litig., 751 F. Supp. 2d 277, 297 (D. Mass. 2010)(Gorton, J.)("[I]t is inappropriate to

[61]In so ruling, the Court notes its Abraham v. WPX Energy Production, LLC, 20 F. Supp. 3d 1244 (D.N.M. 2014)(Browning, J.)("Abraham"). In that case, the Court considered whether plaintiffs could pursue an unjust-enrichment claim when a contract covered the same subject matter. See Abraham, 20 F. Supp. 3d at 1278. It concluded that unjust enrichment is foreclosed, under New Mexico law, when a plaintiff can pursue a contract claim, and there is no allegation that something is preventing the plaintiff from recovering under contract. See Abraham, 20 F. Supp. 3d at 1284. In that case, the plaintiffs did not argue whether rule 8 applied. The Court notes some tension in that case and this ruling, but the Court there was construing New Mexico law, and not rule 8. In addition, the Court determined there that the unjust-enrichment claim was prudently dismissed, because recovery on the contract claim against one party was highly likely, and preserving the equity claim would inflict an injustice on a third party who would otherwise be dismissed from the action. See 20 F. Supp. 3d at 1284-85. In contrast, here, the unjust enrichment is not targeting a third party, and the Defendants will remain in the action even if the Court dismissed the unjust-enrichment claims.

dismiss equitable remedies at the pleading stage on this basis. Under the Federal Rules of Civil Procedure, plaintiffs have the prerogative to plead alternative and even conflicting theories."); In re K-Dur Antitrust Litig., 338 F. Supp. 2d 517, 544 (D.N.J. 2004)(Greenaway, J.)("Plaintiffs, however, are clearly permitted to plead alternative theories of recovery. Consequently, it would be premature at this stage of the proceedings to dismiss the . . . unjust enrichment claims on this basis.")[62]

**C. IF RULE 8 DID NOT APPLY, THE FLORIDA, MASSACHUSETTS, MICHIGAN, NEW JERSEY, NEW YORK, NORTH CAROLINA, AND WASHINGTON CLAIMS WOULD FAIL, BECAUSE THE PLAINTIFFS HAVE AN ADEQUATE LEGAL REMEDY, BUT THE OHIO AND COLORADO CLAIMS WOULD NOT.**

Although the Court concludes that the Plaintiffs may plead their equitable claims in the alternative, the Court considers below whether state law would allow the unjust-enrichment claims to be pled in the absence of rule 8. It concludes that, under the appropriate state laws, except for Colorado's and Ohio's, the Plaintiffs claims would be dismissed. The Court considers each state briefly in turn.

**1. The Colorado Unjust-Enrichment Claim Would Succeed Regardless of Rule 8, Because the Plaintiffs Request a Remedy Unavailable Under the Statute.**

The Supreme Court of Colorado has ruled that "equity will not act if there is a plain, speedy, adequate remedy at law." Szaloczi v. John R. Behrmann Revocable Trust, 90 P.3d at 842. The Defendants argue that the Plaintiffs' Colorado unjust-enrichment claim must be dismissed, because the CCPA, which the Plaintiffs' invoke, amounts to a plain, speedy, and adequate remedy at law. See MTD at 56 (citing Francis v. Mead Johnson & Co., No. 10-0701, 2010 WL 5313540, at *9 (D. Colo. December 17, 2010)(Kane, J.)(dismissing an unjust-enrichment claims "because the CCPA

[62]The Court also concludes that the Defendants' argument that the unjust-enrichment claim must be independently dismissed in New York as duplicative fails, because of rule 8. The New York State rule is procedural, because it deals with duplicative pleading, so rule 8 governs.

provides an adequate legal remedy.")). The Defendants acknowledge that an unjust-enrichment claim may, nonetheless, proceed under Colorado law if the legal claim sounds in tort, and the equitable and legal claims seek alternative remedies, but argue that the Plaintiffs have not demonstrated that the equitable relief they seek diverges from the sought after legal remedy. See Reply at 28-29 (citing L-3 Commc'ns Corp. v. Jaxon Eng'g & Maint., Inc., 125 F. Supp. 3d 1155, 1175-76 (D. Colo. 2015)(Krieger, J.)). Although the Supreme Court of Colorado has not decided whether diverging legal and equitable remedies allow an equitable claim to move forward when an adequate legal claim, sounding in tort, covers the same conduct, the Court concludes that the Supreme Court of Colorado would follow the Court of Appeals of Colorado decision in Harris Grp., Inc. v. Robinson, which concluded that, "[i]n the tort context, the recovery of damages does not automatically lead to a conclusion that a party had an adequate legal remedy that precludes further equitable relief." Harris Grp., Inc. v. Robinson, 209 P.3d at 1205. The Plaintiffs request restitution for their Colorado unjust-enrichment claim. See Amended Complaint ¶ 193, at 57. The CCPA's statutory language, however, expressly prohibits class action recovery for damages. See Colo. Rev. Stat. Ann. § 6-1-113(2)("Except in a class action . . . any person who, in a private civil action, is found to have engaged in . . . any deceptive trade practice . . . shall be liable . . . equal to . . . : The amount of actual damages sustained."). Friedman v. Dollar Thrifty Automotive Grp., Inc., 2015 WL 4036319, at *3-6 (D. Colo. July 1, 2015)(Daniel, J.)(concluding "that monetary damages are barred in class actions under the CCPA"); Martinez v. Nash Finch Co., 886 F. Supp. 2d 1212, 1218-19 (D. Colo. 2012)(Krieger, J.)("[T]he CCPA creates no statutory liability for a defendant in a private class action.").[63] Because the CCPA claim provides no monetary remedy, and unjust

[63]The Court acknowledges a Court of Appeals of Colorado decision that notes, in dicta, that the CCPA "does not preclude class members from bringing an action for actual damages." Robinson v. Lynmar Racquet Club, Inc., 851 P.2d 274, 278 (Colo. Ct. App. 1993). The Court

enrichment provides one, the two claims offer diverging remedies. The Court concludes, accordingly, that the Supreme Court of Colorado would determine that the CCPA does not provide an adequate legal remedy, so the Plaintiffs may plead in the alternative their unjust-enrichment claim.

**2. The Florida Unjust-Enrichment Claim Would Fail, Because the Plaintiffs Have an Adequate Legal Remedy Under FDUTPA.**

Florida law prohibits equitable relief if "a plain, adequate and complete remedy at law exists." Greenfield Villages v. Thompson, 44 So.2d 679, 683 (Fla. 1950). The Defendants argue that FDUTPA is an adequate legal remedy that bars unjust-enrichment relief. See MTD at 56-57. Florida state and federal courts are split on this issue with no clear guidance from the Supreme Court of Florida. See State Farm Mut. Auto. Ins. Co. v. Physicians Injury Care Center, Inc., 427 F. App'x 714, 722 (11th Cir. 2011)(unpublished), rev'd in part on other grounds, 824 F.3d 1311 (11th Cir. 2014); Matthews v. American Honda Motor Co., No. 12-60630, 2012 WL 2520675, at *2 (S.D. Fla. June 6, 2012)("[B]ecause Matthews' unjust enrichment claim is predicated on the same wrongful conduct as her FDUTPA claim, she does not lack an adequate legal remedy."); Williams v. Bear Stearns & Co., 725 So.2d 397, 400 (Fla. Dist. Ct. App. 1998)(concluding that, "if adequate legal remedies exist, equitable remedies are not available . . . does not apply to claims for unjust enrichment")(citing Mobil Oil Corp. v. Dade County Esoil Management Co., Inc., 982 F. Supp. 873, 880 (S.D. Fla. 1997)(Highsmith, J.)); Harris v. Nordyne, LLC, 2014 WL 12516076, at *7 (S.D. Fla. 2014)(Bloom, J.)(collecting cases). The Defendants argue that the ruling from Williams v. Bear Stearns & Co. stems from a federal district court's misinterpretation of ThunderWave, Inc. v.

---

concludes, however, that the Supreme Court of Colorado would disregard that conclusion, because the Court of Appeals was interpreting old statutory language and the new language more clearly bars actual damage relief for class-action members. See Martinez v. Nash Finch Co., 886 F. Supp. 2d at 1219.

Carnival Corp., 954 F. Supp. 1562, 1566 (S.D. Fla. 1997)(Moreno, J.), which concludes only that the economic-loss doctrine does not apply to unjust-enrichment claims. See Reply at 29 n.20.

The Court concludes that the Florida court's rulings that the adequate-legal-remedy doctrine does not apply to unjust enrichment provide no sound reasoning for such a bright-line exception. See, e.g., Williams v. Bear Stearns & Co., 725 So.2d at 400. Although not in this specific context, the Supreme Court of Florida has ruled that, "[w]here the Legislature has created such a clear remedy for a specifically identified evil, a court of equity will enforce that remedy." Manatee Cty. V. Town of Longboat Key, 365 So.2d 143, 147 (Fla. 1978). The Court concludes that this Supreme Court of Florida case is controlling, and, if faced with this issue, it would dismiss the Plaintiffs' Florida unjust-enrichment claim, because FDUTPA provides an adequate remedy for the harm the plaintiffs alleged. In so ruling, the Court is mindful that FDUTPA provides recovery for actual damages, see Fla. Stat. Ann. § 501.211(2), and restitution and actual damages are identical in this case, see Carriulo v. General Motors Co., 823 F.3d 977, 986 (11th Cir. 2016)(defining FDUTPA damages as "the value of the product as promised minus the value of the product delivered").

### 3. The Massachusetts Unjust-Enrichment Claim Would Fail, Because the Plaintiffs Have an Adequate Legal Remedy under Mass. Gen. Laws. Ch. 93A.

"An equitable remedy for unjust enrichment is not available to a party with an adequate remedy at law." Santagate v. Tower, 833 N.E.2d 171, 176 (Mass. App. Ct. 2005).[64] Two federal courts facing an unjust-enrichment claim have determined that "the existence of [the Plaintiff's] statutory claim for unfair and deceptive acts and practices precludes her from bringing equitable

[64]The Court is aware that, under Erie, it is not bound to follow the Appeals Court of Massachusetts if it concludes that the Supreme Judicial Court of Massachusetts would decide the issue differently. See supra n.21. The Court will follow the Appeals Court of Massachusetts' decision in Santagate v. Tower, however, because the Court has found no indication that the Supreme Judicial Court of Massachusetts would apply a contrary rule.

claims for unjust enrichment and money had and received." Reed v. Zipcar, Inc., 883 F. Supp. 2d 329, 334 (D. Mass. 2012)(Gorton, J.). See Ferreira v. Sterling Jewelers, Inc., 130 F. Supp. 3d 471, 487 (D. Mass. 2015)(Woodlock, J.). The damage and restitutionary remedy requested appears to be identical in this case. See Mass. Gen. Laws. Ch. 93A § 9(1); Amended Complaint ¶ 265, at 71. The Court concludes that, if faced with this case, the Supreme Judicial Court of Massachusetts would follow these district court decisions and conclude that the presence of an adequate legal remedy in the form of Mass. Gen. Laws. Ch. 93A, § 2(a) precludes unjust-enrichment relief.

**4. The Michigan Unjust-Enrichment Claim Would Fail, Because the Plaintiffs Have an Adequate Legal Remedy under MCPA.**

According to the Supreme Court of Michigan, "[L]egislative action that provides an adequate remedy by statute precludes equitable relief." Tkachik v. Mandeville, 790 N.W.2d at 265. "A remedy at law, in order to preclude a suit in equity, must be complete and ample, and not doubtful and uncertain." Tkachik v. Mandeville, 790 N.W.2d at 265 (citation omitted). "[T]o preclude a suit in equity, a remedy at law, both in respect to its final relief and its modes of obtaining the relief, must be as effectual as the remedy which equity would confer under the circumstances." Tkachik v. Mandeville, 790 N.W.2d at 265 (citation omitted). The MCPA provides that class-action plaintiffs may bring an action for actual damages, see Mich. Comp. Law Ann. § 445.911(3)(a), which is identical to the restitutionary remedy requested, see Amended Complaint ¶ 288, at 76. The Court concludes, accordingly, that there is an adequate, complete and ample, legal remedy available, and that the Supreme Court of Michigan would, therefore, dismiss the Plaintiffs' Michigan unjust-enrichment claim.

**5. The New Jersey Unjust-Enrichment Claim Would Fail, Because the Plaintiffs Have an Adequate Legal Remedy Under NJCFA.**

"[E]quitable principles of estoppel or unjust enrichment . . . cannot be invoked to subvert [a] statutory scheme." Slurzberg v. City of Bayonne, 148 A.2d 171, 176 (N.J. 1959). The NJCFA provides the remedy that the Plaintiffs seek for unjust enrichment: "Any person violating the provisions of the within act shall be liable for a refund of all moneys acquired by means of any practice declared herein to be unlawful." N.J. Stat. Ann. § 56:8-2.11. See Amended Complaint ¶ 314, at 81. The underlying harm alleged is also the same. Compare Amended Complaint ¶ 295 at 77 with Amended Complaint ¶ 308, at 80. The Court concludes that, if faced with this case, the Supreme Court of New Jersey would conclude that the presence of an adequate legal remedy in the form of NJCFA precludes unjust-enrichment relief.

**6. The New York Unjust-Enrichment Claim Would Fail, Because the Plaintiffs Have an Adequate Legal Remedy Under NYCDPAP and N.Y. Gen. Bus. Law § 350.**

The New York Court of Appeals has ruled that unjust enrichment does not lie if the "plaintiffs have an adequate remedy at law." Samiento v. World Yacht Inc., 883 N.E.2d at 996. Moreover, "[a]n unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim." Corsello v. Verizon New York, Inc., 967 N.E.2d at 1185. In Samiento v. World Yacht Inc., the Court of Appeals of New York dismissed an unjust-enrichment claim, because a New York labor law provided an adequate remedy at law. 883 N.E.2d at 996. See Response at 67-68. The Court concludes that the Court of Appeals of New York would conclude similarly here that NYCPDAP and N.Y. Gen. Bus. Law § 350 provide an adequate remedy at law and would dismiss the unjust-enrichment claim. The lower New York court cases that the Plaintiffs cite do not persuade the Court otherwise, because one turns on an adequate legal remedy under contract, which is a separate inquiry, and the other case turns on whether an unjust-enrichment claim

failed, because the plaintiff had already been compensated for her harm. See Response at 67 (citing TOT Payments, LLC v. First Data Corp., 9 N.Y.S.3d 44, 45 (N.Y. App. Div. 2015); Farina v. Bastianich, 984 N.Y.S.2d 46, 50 (N.Y. App. Div. 2014)).

**7. The North Carolina Unjust-Enrichment Claim Would Fail, Because the Plaintiffs Have an Adequate Legal Remedy Under North Carolina Law.**

"The court's equitable intervention is obviated when an adequate remedy at law is available to the plaintiff." Embree Const. Group, Inc. v. Rafcor, Inc., 411 S.E.2d 916, 920 (N.C. 1992)(concluding that a statutory remedy did not provide relief to plaintiffs, so their unjust-enrichment claim could proceed). The Plaintiffs argue that it would be premature to dismiss the unjust-enrichment claim. See Response at 68 (citing Thompkins v. Key Health Medical Solutions, Inc., No. 12-0613, 2015 WL 1292228, at *10 (M.D.N.C. March 23, 2015)(Peake, M.J.)("In this case, numerous North Carolina statutes appear to provide adequate remedies for the wrongs alleged. Regardless, because discovery has yet to illuminate the exact nature of the transactions between Plaintiffs and Defendant, it would be premature to foreclose Plaintiffs' claims."), report adopted, 2015 WL 3902340, at *1 (M.D.N.C. June 24, 2015)(Beaty, J.)). The Court concludes that the Supreme Court of North Carolina would not follow that opinion. Thompkins v. Key Health Medical Solutions, Inc. provides no reasoning for why a claim may proceed to discovery when an adequate legal remedy is available. The Court concludes that allowing discovery is inconsistent with Twombly and Iqbal if the law does not allow both claims to be pled. The Court has concluded that the North Carolina statutory scheme plausibly provides the Plaintiffs a remedy, so it likewise concludes that the Court should dismiss the North Carolina unjust-enrichment claim. See Embree Const. Group, Inc. v. Rafcor, Inc., 411 S.E.2d at 920.

### 8. The Ohio Unjust-Enrichment Claim Prevails, Because the Plaintiffs' Legal Remedy Under OSCPA Is Not Complete or Adequate.

"To bring a cause within the jurisdiction of a court of equity, it is requisite that the primary right involved be an equitable right as distinguished from a legal right, or that the remedy at law as to the right involved is not full, adequate and complete." State ex rel. Lien v. House, 58 N.E.2d 675, 678 (Ohio 1944). The OSCPA provides that class-action plaintiffs may bring an action for rescissionary and actual damages. See Ohio Rev. Code Ann. §1345.09(B); Felix v. Ganley Chevrolet, Inc., 49 N.E.3d 329, 334-35 (Ohio 2015). In this case, such relief is identical to the restitutionary remedy requested. See Amended Complaint ¶ 426, at 99-100. The Court, however, concluded, supra, that the OSCPA must be dismissed without prejudice for failure to give the requisite notice. The Court concludes that a defect in that pleading demonstrates that the legal remedy is not necessarily full, adequate, and complete. The Court notes that there is some caselaw from federal courts noting that a legal claim's viability has no bearing on whether a legal remedy is available, see, e.g., In re Porsche Cars N. Am., Inc., 880 F. Supp. 2d 801, 843 (S.D. Ohio 2012)("[T]he plaintiff has an adequate remedy at law even if his . . . claim is ultimately unsuccessful), but the Court concludes that Supreme Court of Ohio would not follow that ruling. Equity is meant to fill in the gaps where law fails. See Abraham v. WPX Energy Production, LLC, 20 F. Supp. 3d 1244, 1282 (D.N.M. 2014)(Browning, J.)("Equity stepped in when the remedy at law -- the contract theory -- was not a viable option for recovery."). Barring equitable claims in the alternative is meant to block equity from working an injustice by inflicting double damages on the defendant. See Abraham v. WPX Energy Production, LLC, 20 F. Supp. 3d at 1282 ("[E]quity will not work an additional injustice."). Where the legal remedy is unavailable, however, the potential for double recovery vanishes. Here, the OSCPA legal remedy might ultimately fail. The Court concludes that, at this early stage in the litigation, where a legal remedy appears uncertain, the

Supreme Court of Ohio would conclude that a viable equitable claim premised on the same or similar conduct is not foreclosed. Cf. Abraham v. WPX Energy Production, LLC, 20 F. Supp. 3d at 1284 (concluding that an unjust-enrichment claim could proceed under New Mexico law when a plaintiff alleges "that there is something preventing his recovery on the contract claim."). The Court concludes, accordingly, that the legal remedy is not complete or ample, and that the Supreme Court of Ohio would, therefore, not dismiss the Plaintiffs' unjust-enrichment claims on this ground.

#### 9. The Washington Unjust-Enrichment Claim Would Fail, Because the Plaintiffs Have an Adequate Legal Remedy Under WCPA.

"Equitable relief is available only if there is no adequate legal remedy." Orwick v. City of Seattle, 692 P.2d 793, 796 (Wash. 1984). In Seattle Professional Engineering Employees Ass'n v. Boeing Co., 991 P.2d 1126 (Wash. 2000)(en banc)("Boeing Co."), for example, the Supreme Court of Washington determined that the plaintiffs "are not entitled to pursue a remedy in equity" where they have an available statutory remedy under Wash. Rev. Code § 49.52.40. See Boeing Co., 991 P.2d at 1134. The Court concludes that, if faced with this case, the Supreme Court of Washington would similarly decide that the WCPA's availability precludes unjust-enrichment relief, because, as in Boeing Co., the Plaintiffs have a statutory remedy available that provides them identical legal and equitable relief.

### D. THE COURT DISMISSES THE NEW JERSEY UNJUST-ENRICHMENT CLAIM, BECAUSE THE PLAINTIFFS CANNOT PLEAD REMUNERATION.

The Court concludes that the Plaintiffs' New Jersey unjust-enrichment claim fails, because they cannot allege one of the requisite elements. See MTD at 62. "To establish a claim for unjust enrichment, 'a plaintiff must show both that defendant received a benefit and that retention of that benefit without payment would be unjust.'" Lliadis v. Wal-Mart Stores, Inc., 922 A.2d 710, 723 (N.J. 2007)(quoting VRG Corp. v. GKN Realty Corp., 641 A.2d 519, 526 (N.J. 1994)). See Thieme

v. Aucoin-Thieme, 151 A.3d 545, 557 (N.J. 2016). "That quasi-contract doctrine also 'requires that plaintiff show that it expected remuneration from the defendant at the time it performed or conferred a benefit on defendant and that the failure of remuneration enriched defendant beyond its contractual rights.'" Lliadis v. Wal-Mart Stores, Inc., 922 A.2d at 723(quoting VRG Corp. v. GKN Realty Corp., 641 A.2d at 526). The Plaintiffs cannot plead that they expected remuneration-- i.e., money paid for services rendered -- so their claim fails.

**E. THE COURT DISMISSES THE OHIO UNJUST-ENRICHMENT CLAIM, BUT NOT THE MICHIGAN, NEW JERSEY, OR NORTH CAROLINA UNJUST-ENRICHMENT CLAIMS, FOR THE INDEPENDENT REASON THAT THE PLAINTIFFS HAVE NOT ALLEGED A DIRECT BENEFIT.**

The Defendants move to dismiss the Michigan, New Jersey, North Carolina, and Ohio unjust-enrichment claims for the independent reason that the Plaintiffs do not allege that the Defendants received a direct benefit from the Plaintiffs. See MTD at 60. The Plaintiffs, however, allege that the Defendants "received a direct benefit" from the Plaintiffs "in the form of a price premium, increased sales, and increased market share." Amended Complaint ¶¶ 282, 310, 390, 422, at 75, 80-81, 95, 99. The Court determines that the Supreme Courts of Michigan, New Jersey, and North Carolina would accept the Plaintiffs' allegations of an indirect benefit from increased market share, but that the Supreme Court of Ohio would not. Accordingly, the Ohio unjust-enrichment claim fails for the independent reason that the defendants received no direct benefit.

**1. Increased Market Share Satisfies Michigan's Indirect-Benefit Requirement.**

Under Michigan Law, the Defendants must receive a benefit, but it need not be direct. See Kammer Asphalt Paving Co., Inc. v. East China Tp. Schools, 504 N.W.2d 635, 641 (Mich. 1993)("Kammer"). In Kammer, the Supreme Court of Michigan permitted an unjust-enrichment claim from a sub-contractor to proceed against a defendant school, because the sub-contractor's

work "indirectly provided defendant a benefit." 504 N.W.2d at 641. There was, however, direct contact between the two parties, and the defendant school assured the sub-contractor plaintiff that the defendant would be paid from bonds. See 504 N.W.2d at 641. The Kammer court, accordingly, concluded that "equity demands plaintiff to be permitted to go forward with this court for those damages that arose after certification . . . and verbal assurances of protection by the bonds." 504 N.W.2d at 641. The Defendants cite A&M Supply Co. v. Microsoft Corp., 2008 WL 540883, at *2 (Mich. Ct. App. February 28, 2008) for its holding that indirect Microsoft product purchases did not establish the requisite direct benefit under Michigan Law. See A&M Supply Co. v. Microsoft Corp., 2008 WL 540883, at *2. See also In re Refrigerant Compressors Antitrust Litig., 2013 WL 1431756, at *26 (E.D. Mich. April 9, 2013)(Cox, J.)(dismissing an unjust-enrichment claim, because "[a]ny benefit the IP Plaintiffs conferred would be on others in the chain of distribution from whom they purchased, not on Defendants"); MTD at 60 n.17. The Court does not conclude that the Supreme Court of Michigan's Kammer decision imposes such an onerous direct-benefit requirement. As already explained, in Kammer, the Supreme Court of Michigan affirmed that an indirect benefit met the requisite unjust-enrichment requirement. See 504 N.W.2d at 641. The Court of Appeals of Michigan's reasoning in A&M Supply Co. v. Microsoft Corp. narrowing Kammer to situations where the plaintiff and defendant have direct contact with each other is not grounded in a convincing principle. See 2008 WL 540883, at *2. How a discussion between the plaintiff and the defendant makes a benefit more direct is unclear, and indicates a reliance requirement and not a direct-benefit requirement.

The Court also concludes that, based on the Amended Complaint's allegations, the Defendants plausibly received a benefit in the form of increased market share. See Amended Complaint ¶¶ 282, 310, 390, 422, at 75, 80-81, 95, 99. The Plaintiffs contend that the Defendants

launched an aggressive marketing campaign in 2015 to highlight "Natural American Spirit's 100-percent additive-free natural tobacco proposition," Amended Complaint ¶ 44, at 21-22, and sold 900 million more cigarettes in 2015 than 2014 for a total of 4.8 billion cigarettes, Amended Complaint ¶ 45(c), at 22. Although the Amended Complaint does not indicate how large the cigarette market is overall, it is plausible that the sale of 900 million more cigarettes would result in increased market share. It is unclear if the Plaintiffs made similar market-share allegations in the cases that the Defendants' cite. Accordingly, the Court concludes that the Supreme Court of Michigan would not dismiss the unjust-enrichment claim for a lack of a direct benefit.

**2. Increased Market Share Satisfies New Jersey's Unjust-Enrichment Test.**

The Supreme Court of New Jersey has not determined whether a direct-benefit requirement exists for unjust-enrichment claims, but a New Jersey appellate court has recognized that unjust enrichment "involve[s] some direct relationship between the parties." Callano v. Oakwood Park Homes Corp., 219 A.2d 332, 335 (NJ. Super. Ct. App. Div. 1966). See Snyder v. Farnam Cos., 792 F. Supp. 2d 712, 724 (D.N.J. 2011)(Martini, J.)("[T]he plaintiff [must] allege a sufficiently direct relationship with the defendant to support the [unjust-enrichment] claim."); Cooper v. Samsung Electronics America, Inc., No. 07-3853, 2008 WL 4513924, at *10 (D.N.J. September 30, 2008)(Linares, J.)("Here, although Cooper alleges that Samsung was unjustly enriched through the purchase of the television, there was no relationship conferring any direct benefit on Samsung . . . as the purchase was through a retailer."). In contrast, in Stewart v. Beam Global Spirits & Wine, 877 F. Supp. 2d 192, 200 (D.N.J. 2012)(Hilliman, J.), the Honorable Judge Noel Hillman, United States District Judge for the District of New Jersey, determined that a direct-benefit allegation is not required where the defendant has "engaged in fraudulent conduct and misrepresented" a product "through a direct nationwide advertising and marketing scheme." 877 F. Supp. 2d at 200. Judge

Hillman reasoned that the relationship requirement "simply reflects the need to curtail the reach of this equitable remedy . . . to prevent a finding of liability in cases where the defendant had absolutely no course of dealings with, and no other demonstrated connection to, the plaintiff." 877 F. Supp. 2d 192 at 200. He determined that the direct-benefit requirement is "inequitable" particularly when the "Plaintiffs cannot seek a remedy directly from the [retailer] based on misrepresentations allegedly made by" the Defendants, as the retailers did not make the misrepresentations. 877 F. Supp. 2d 192 at 200.

> Accordingly, this Court finds that where a plaintiff alleges that a defendant manufacturer has made false claims or misrepresentations directed for the purpose of generating retail sales, and where those retails sales could have the effect of increasing the amount of wholesale sales to the manufacturer, it is plausible that a plaintiff can show evidence of a sufficiently direct relationship between the parties under New Jersey law.

877 F. Supp. 2d 192 at 200. The Court concludes that this reasoning is persuasive and concludes that the Supreme Court of New Jersey would adopt its reasoning for this particular case, i.e., allegations of manufacturer misrepresentations. See 877 F. Supp. 2d 192 at 200 n.6 (noting that the Supreme Court of New Jersey affirmed a class certification under factually similar circumstances in Lee v. Carter-Reed Co., L.L.C., 4 A.3d 561 (N.J. 2010), although the court did not address the direct-benefit element specifically). The cases the Defendants cite are not misrepresentation cases, nor is there evidence that the plaintiffs alleged that the direct benefit conferred was increased market share. See MTD at 61 n.18.

**3. North Carolina's Unjust-Enrichment Requirement is satisfied.**

The Supreme Court of North Carolina has not determined whether unjust enrichment requires a direct benefit. The Court of Appeals of North Carolina, however, has ruled that a plaintiff must show that "she conferred a benefit directly on defendant." Effer v. Pyles, 94 S.E.2d 149, 152 (N.C. Ct. App. 1989). See Baker v. Const. Co., Inc. v. City of Burlington, 683 S.E.2d 790 (table), 2009

WL 3350747, at *7 (N.C. Ct. App. 2009). In arguing that no direct-benefit requirement exists, the Plaintiffs cite Metric Constructors, Inc. v. Bank of Tokyo-Mitsubishi, Ltd., 72 F. App'x 916, 921 (4th Cir. 2003)(unpublished)(per curiam)(before Williams, J., Michael J., and Shed, J.), which asserts that Effer v. Pyles was misguided, and that the Supreme Court of North Carolina, in Embree Construction Group. Inc. v. Rafcor, Inc., 411 S.E.2d at 923, subsequently "suggest[ed] a broader approach to unjust enrichment than is indicated by *Effer's* 'direct benefit' rule." Metric Constructors, Inc. v. Bank of Tokyo-Mitsubishi, Ltd., 72 F. App'x at 921. The Fourth Circuit held that, "[u]nder North Carolina law, it is sufficient for a plaintiff to prove that it has conferred some benefit on the defendant, without regard to the directness of the transaction." Metric Constructors, Inc. v. Bank of Tokyo-Mitsubishi, Ltd., 72 F. App'x at 921. The Fourth Circuit's conclusion that Embree Construction Group. Inc. v. Rafcor, Inc. created a broader direct-benefit approach persuades the Court. The Supreme Court of North Carolina, in Embree Construction. Group. Inc. v. Rafcor, Inc., determined that a contractor plaintiff could maintain an unjust-enrichment action against a third party bank with whom the contractor had no contract. See 411 S.E.2d at 919, 922. The benefit relayed to the third-party bank was "the security for which [the bank] had bargained" for with another party -- "a completely constructed building." See 411 S.E.2d at 919. The contractor plaintiff, however, had no direct relations with the bank, but that lack of relationship was immaterial to the Supreme Court of North Carolina. See 411 S.E.2d at 919, 922. The Court concludes that Embree Contr. Grp. Inc. v. Rafcor, Inc.'s holding signaled that an indirect benefit is sufficient in North Carolina for an unjust-enrichment claim to prevail. Because the Plaintiffs conferred an indirect benefit on the Defendants in the form of increased market share, their North Carolina unjust-enrichment claim is not defeated on this ground.

#### 4. The Plaintiffs Do Not Satisfy Ohio's Direct-Benefit Test.

The Supreme Court of Ohio has clearly stated that "an indirect purchaser cannot assert a common-law claim for restitution and unjust enrichment against a defendant without establishing that a benefit had been conferred upon the defendant by the purchaser." Johnson v. Microsoft Corp., 834 N.E.2d 791, 799 (Ohio 2005). When "no economic transaction occur[s] between" the plaintiff and the defendant, the plaintiff "cannot establish that [the defendant] retained any benefit 'to which [it] is not justly entitled.'" Johnson v. Microsoft Corp., 834 N.E.2d at 799 (quoting Keco Indus., Inc. v. Cincinnati & Suburban Bell Tel. Co., 141 N.E.2d 465, 467 (Ohio 1957)). The Court concludes that Johnson v. Microsoft Corp. controls, and the Court dismisses the Plaintiffs' unjust-enrichment claim, because the Plaintiffs are indirect purchasers who had no direct economic transaction between themselves and the Defendants.

## VIII. THE COURT DISMISSES THE PLAINTIFFS' FLORIDA, ILLINOIS, AND NEW YORK EXPRESS WARRANTY CLAIMS.

The Defendants move to dismiss the Plaintiffs' express warranty claims for three reasons. First, they argue that limiting language modifies any express warranty so that there was no breach. Second, they argue that a subset of the express warranty claims must be dismissed, because the Plaintiffs failed to allege the requisite pre-litigation notice. Finally, they aver that another subset of the express warranty claims must be dismissed, because the Plaintiffs have not alleged privity of contract. The Court concludes that the Defendants have not identified limiting language to the express warranties, but it dismisses the Florida, Illinois, and New York claims, because the Plaintiffs have either failed to allege pre-litigation notice or privity.

### A. THE DEFENDANTS HAVE NOT IDENTIFIED LIMITING LANGUAGE IN THE EXPRESS WARRANTIES THAT WOULD QUALIFY THOSE CLAIMS FOR DISMISSAL.

The Plaintiffs contend that the cigarettes' product labels, including the descriptors at issue -- i.e., additive-free, natural, and organic -- create an actionable express warranty. See Response at 72. The Defendants argue that, under California and New York law, the express warranty claims fail for the same reasons that the packaging and advertising would not mislead a reasonable consumer. See MTD at 64-65. The Court declines to adopt that line of reasoning for the same reasons it rejected their reasonable consumer arguments as articulated above.

The Defendants also argue that California, Colorado, Florida, Illinois, New Jersey, New York, New Mexico, and North Carolina law foreclose the express warranty claims, because warranties must be read as "reasonabl[y] consistent with potentially limiting language." MTD at 65 (citing Cal. Com. Code § 2316(1); Colo. Rev. Stat. § 4-2-316(1); Fla. Stat. § 672.316(1); 810 Ill. Comp. Stat. Ann. § 5/2-316(1); N.J. Stat. Ann. 12A:2-316(1); N.M. Stat. Ann. § 55-2-316(1); N.Y. U.C.C. Law § 2-316(1); N.C. Gen. Stat. § 25-2-316(1)). According to the Defendants, the menthol descriptor is limiting language and necessarily modifies the warranty such that it could not be read "as promising the absence of menthol." MTD at 66. From that premise, they contend that "no reasonable consumer" would rely on a promise that menthol cigarettes did not contain menthol. MTD at 66. See Reply at 34. This assertion is another re-packaging of the Defendants' reasonable-consumer arguments. The Defendants' key inference again, which the Court does not accept, is that a reasonable consumer would know that menthol is an additive. The Court has already concluded that a reasonable consumer could read the no-additive term and conclude that menthol is not an additive. The menthol descriptor, thus, does not reasonably limit the no-additive term, and the Defendants' argument fails.

### B. THE FLORIDA, ILLINOIS, AND NEW YORK EXPRESS WARRANTY CLAIMS FAIL, BECAUSE THE AMENDED COMPLAINT CANNOT SERVE AS THE REQUISITE PRE-LITIGATION NOTICE.

The Defendants' argue that the Plaintiffs failed to give pre-litigation notice in California, Florida, Illinois, New Mexico, New York, and North Carolina. See MTD at 66. Under those states' laws, a buyer must, "within a reasonable time after he or she discovers or should have discovered any breach, notify the seller of breach or be barred from any remedy." Cal. Com. Code § 2607(3)(A). See Fla Stat. § 672.607(3)(a); 810 Ill. Comp. Stat. 5/2-607(3)(a); N.M. Stat. Ann. § 55-2-607(3)(a); N.Y. U.C.C. Law § 2-607(3)(a); N.C. Gen. Stat. § 25-2-607(3)(a). The Plaintiffs argue that the Defendants had actual knowledge that their menthol cigarettes were not one hundred percent additive free, and that the Amended Complaint is sufficient to put the Defendants' on notice. See Response at 73. The Court disagrees with the Plaintiffs' first argument. Actual knowledge of the deception does not suffice, because, in every state but Illinois, the plaintiff has a burden to provide notice, so the Defendants' general awareness cannot meet the requirement. See Cal. Com. Code § 2607(3)(a); Fla Stat. § 672.607(3)(a); N.M. Stat. Ann. § 55-2-607(3)(a); N.Y. U.C.C. Law § 2-607(3)(a); N.C. Gen. Stat. § 25-2-607(3)(a).[65] Regarding whether the Amended Complaint suffices for notice, the Court concludes that it provides sufficient notice for the California, New Mexico, and North Carolina claims, but not for the Florida, Illinois, or New York claims.

Under California law, a buyer must, "within a reasonable time after he or she discovers or should have discovered any breach, notify the seller of breach or be barred from any remedy." Cal. Com. Code § 2607(3)(a). See David v. Winn Automotive, Inc., 2016 WL 4506069, at *7 (Cal. Ct.

[65]For Illinois, the Court does not adopt the argument for state specific reasons explained below.

App. August 29, 2016)(unpublished)(ruling that rescission notice was not requisite breach notice); Cardinal Health 301, Inc. v. Tyco Electronics Corp., 87 Cal. Rptr. 3d 5, 21-22 (Cal. Ct. App. 2008)(ruling that notice by filing a lawsuit was insufficient as a matter of law).[66] The notice requirement's purpose is "to allow the defendant opportunity for repairing the defective item, reducing damages, avoiding defective products, and negotiating settlements." Pollard v. Saxe & Yolles Dev. Co., 525 P.2d 88, 92 (Cal. 1974)(ruling that four-year delay in notice was unreasonable). In an opinion construing similar language in a previously codified breach-express-warranty notice requirement, the Supreme Court of California concluded that "[t]he notice requirement . . . is not an appropriate one for the court to adopt in actions by injured consumers against manufacturers with whom they have not dealt." Greenman v. Yuba Power Products, Inc., 377 P.2d 897, 900 (Cal. 1963). It explained: "The injured consumer is seldom steeped in the business practice which justifies the rule, and at least until he has had legal advice it will not occur to him to give notice to one with whom he has had no dealings." Greenman v. Yuba Power Products, Inc., 377 P.2d at 900 (ruling that a plaintiff consumer who did not give timely notice of an express warranty breach was not barred from bringing an express warranty suit). See Zapata Fonseca v. Goya Foods Inc., No. 16-2559, 2016 WL 4698942, at *6 (N.D. Cal. September 8, 2016)(Koh, J.); Hydroxycut Marketing and Sales Practices Litig., 801 F. Supp. 2d 993, 1009 (S.D. Cal. 2011)(concluding that a plaintiffs' allegation that all "conditions precedent, including notice" had been met satisfied the pre-litigation notice requirement, because notice "is not strictly required under the laws of a number of states" and, in a number of states, "the filing of a complaint can serve as

[66] The Court is aware that, under Erie, it is not bound to follow Court of Appeals of California if it concludes that the Supreme Court of California would decide the issue differently. See supra n.21. The Court will follow the Court of Appeals of California's decisions in David v. Winn Automotive, Inc. and Cardinal Health 301, Inc. v. Tyco Electronics Corp., however, because the Court has found no indication that the Supreme Court of California would apply a contrary rule.

notice."). The Court concludes that the Supreme Court of California would follow its precedent from Greenman v. Yuba Power Products, Inc. and would not require more notice than the Plaintiffs have already given.[67]

Florida law states: "The buyer must within a reasonable time after he or she discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." Fla. Stat. Ann. § 627.607(3)(a). Florida federal courts interpreting this statute have ruled that plaintiffs need not give notice to a product's manufacturer, because the statute requires only seller notification. See Felice v. Invicta Watch Co. of Am., Inc., No. 16-62772, 2017 WL 3336715, at *6 (S.D. Fla. August 4, 2017)(collecting cases)(Rosenberg, J.); Fla Stat. Ann. § 672.103(1)(d) (defining seller as "a person who sells or contracts to sell goods"). But see General Matters, Inc. v. Paramount Canning Co., 382 So.2d 1262, 1264 (Fla. Dist. Ct. App. 1980)(dismissing an express warranty claim where a plaintiff failed to notify a manufacturer). The Court concludes that the statute refers to seller notification and not to manufacturer notification, because the statute states seller and the statute's definition of seller does not encompass the manufacturer. It concludes, however, that Plaintiffs' allegation that it has met "[a]ll conditions precedent" to an express warranty claim is too conclusory to meet the statute's notice requirement and that the Supreme Court of Florida would conclude the same. Amended Complaint ¶ 456, at 104. Although the plaintiffs are not suing the seller, the

[67] The Defendants cite In re Mentor Corp. ObTape Transobturator Slings Products Liability Litig., No. 12-0238, 2015 WL 5468791, at *2 (M.D. Ga. September 16, 2015)(Land, C.J.) for the conclusion that Greenman v. Yuba Power Products, Inc. stands only for the proposition that "procedural requirements of a warranty claim cannot defeat strict products liability in tort." In re Mentor Corp. ObTape Transobturator Slings Products Liability Litig., 2015 WL 5468791, at *2. See Reply at 36. The Court disagrees with the Defendants. The Supreme Court of California addresses express warranty requirements regardless of alternative liability theories in Greenman v. Yuba Power Products, Inc., and the case's strict liability discussion explains an alternative rationale for its conclusion and not an exclusive one. See Greenman v. Yuba Power Products, Inc., 377 P.2d at 900 ("Moreover, to impose strict liability . . . it was not necessary for plaintiff to establish an express warranty.").

statute's language is unequivocal; seller notice is required or an express warranty claim is barred. See Fla. Stat. Ann. § 627.607(3)(a); Felice v. Invicta Watch Co. of Am., Inc., 2017 WL 3336715, at *6 (noting that the plaintiff gave notice to the seller even though the seller was not a named defendant). The Plaintiffs have not alleged that they notified the seller, so the claim fails.

Illinois law similarly requires a buyer to give notice to the seller of a breach within a reasonable time or be barred from recovery. See 810 Ill. Comp. Stat. 5/2-607(3)(a). This notice is not required when "(1) the seller has actual knowledge of the defect of the particular product; or (2) the seller is deemed to have been reasonably notified by the filing of the buyer's complaint." Connick v. Suzuki Motor Co., Ltd., 675 N.E.2d 584, 589 (Ill. 1996). Generalized knowledge about the product defect stemming from third party concerns "is insufficient to fulfill the plaintiffs' UCC notice requirement." Connick v. Suzuki Motor Co., Ltd., 675 N.E.2d at 590. The manufacturer must be "somehow apprised of the trouble with the particular product purchased by a particular buyer." Connick v. Suzuki Motor Co., Ltd, 675 N.E.2d at 590. "Only a consumer plaintiff who suffers a personal injury may satisfy the section 2-607 notice requirement by filing a complaint stating a breach of warranty action." Connick v. Suzuki Motor Co., Ltd., 675 N.E.2d at 590. The Court concludes that the Plaintiffs meet neither of those exceptions. Although the Defendants may have had generalized knowledge that their labeling and advertising might be deceptive, they had no knowledge of the particular buyers at issue. Moreover, the injury here is not a personal injury.

New Mexico also prohibits express warranty claims absent notice to the seller within a reasonable time. See N.M. Stat. Ann. § 55-2-607(3)(a). No New Mexico case has determined whether filing a complaint satisfies the notice requirement. See Badilla v. Wal-Mart Stores East, Inc., 2017-NMCA-021, ¶ 11, 389 P.3d 1050, 1054. The Supreme Court of New Mexico has explained, however:

> a person notifies or gives notice or notification to another by taking such steps as may be reasonably required to inform the other in ordinary course whether or not such other actually comes to know of it. . . . The content of the notification need merely be sufficient to let the seller know that the transaction is still troublesome and must be watched. . . . The notification which saves the buyer's rights under this article need only be such as informs the seller that the transaction is claimed to involve a breach, and thus opens the way for normal settlement through negotiation.

State ex Rel Concrete Sales & Equip. Rental Co., Inc. v. Kent Nowlin Const., Inc., 1987-NMSC-114, ¶ 17, 746 P.2d 645, 648-49 (citing N.M. Stat. Ann. § 55-1-201(26), now codified at § 55-1-202). When there is no definitive Supreme Court of New Mexico interpretation, New Mexico courts often look to out-of-state authorities. See Badilla v. Wal-Mart Stores East, Inc., 2017-NMCA-021, ¶ 11, 389 P.3d at 1054 ("Because the UCC is a uniform law of interstate application, we turn to out-of-state authorities."). As explored above, California has removed the notice requirement when plaintiffs sue manufacturers for injuries, and, as explored below, North Carolina has determined that complaints may serve as the requisite notice. See Greenman v. Yuba Power Products, Inc., 377 P.2d at 900; Maybank v. S.S. Kresge Co., 273 S.E.2d at 683-84. The Court has previously concluded that the Supreme Court of New Mexico would relax UCC standards for lawsuits in light of potential consumer harm. See Bhandari v. VHA Southwest Community Health Corp., No. 09-0932, 2011 WL 4669848, at *24 (D.N.M. March 30, 2011)(Browning, J.). The Court determines that the Supreme Court of New Mexico is likely to agree with the Supreme Court of California's reasoning that notice should not be required in these suits, because "[t]he injured consumer is seldom steeped in the business practice which justifies the rule, and at least until he has had legal advice it will not occur to him to give notice to one with whom he has had no dealings." Greenman v. Yuba Power Products, Inc., 377 P.2d at 900. The Court also concludes that notice via the Amended Complaint serves the purposes that the Supreme Court of New Mexico has identified, namely, that notice must "open[] the way for normal settlement through negotiation." State ex Rel Concrete Sales & Equip. Rental Co.,

Inc. v. Kent Nowlin Const., Inc., 1987-NMSC-114, ¶ 17, 746 P.2d at 648-49. Filing a complaint often triggers settlement negotiations. The Court concludes, accordingly, that the Supreme Court of New Mexico would follow the Supreme Court of California and would not require notice beyond the Amended Complaint.

New York law requires that the buyer provide notice to the seller within a reasonable time after discovering the breach of an express warranty. See N.Y. U.C.C. Law § 2-607(3)(a). The New York Supreme Court, Appellate Division, has eliminated the requirement in "situations involving goods sold for human consumption." Fischer v. Mead Johnson Labs., 41 A.D.2d 737, 737 (N.Y. App. Div. 1973). The decision involves, however, a plaintiff's personal injury, which at least one court has distinguished on those grounds. See In re 5-Hour ENERGY Marketing and Sales Practices Litig., No. 13-2438, 2015 WL 12734796, at *9 (C.D. Cal. January 22, 2015)(Gutierrez, J.). The Court concludes that Fischer v. Mead Johnson Labs is not correctly cabined to only personal injury cases, as it contemplates all cases "grounded on tortious elements," Fischer v. Mead Johnson Labs., 41 A.D.2d at 737 (citing Kennedy v. Woolworth Co., 205 A.D. 648, 649 (N.Y. App. Div. 1923)), but the Court is also not convinced that the Court of Appeals of New York would write in an exception to the statute's clear language to benefit a purchaser, which currently does not allow a complaint to suffice for notice in manufacturer-consumer cases. The Court of Appeals of New York has not expressed the same willingness to modify the UCC for public policy concerns as the Supreme Court of New Mexico has. See Borcre Leasing Corp. v. General Motors Corp. (Allison Gas Turbine Div.), 645 N.E.2d 44*8, 1196 (N.Y. 1995)("Having foregone protecting itself with UCC warranties, plaintiff should not be permitted to fall back on tort when it has failed to preserve its . . . remedies." (ellipses in original)(quotations omitted)). The Court concludes, accordingly, that it should dismiss the New York express warranty claim.

North Carolina also requires that the buyer give notice within a reasonable time after the buyer discovers the breach to recover under an express warranty theory. See N.C. Gen. Stat. § 25-2-607(3)(a). The Supreme Court of North Carolina has ruled that filing a lawsuit may serve as notice. See Maybank v. S.S. Kresge Co., 273 S.E.2d at 683-684. It has also ruled that the reasonable time requirement is relaxed in consumer defective-goods cases that have caused personal injury or where the seller has, regardless of notice, had a reasonable opportunity to learn the facts so that the seller may defend himself. See Maybank v. S.S. Kresge Co., 273 S.E.2d at 684 (ruling that a notice delay of three years was reasonable in a consumer-defect personal-injury case). The Court concludes that the reasonable notice requirement should be relaxed here too, even though it is not a personal injury case, because the same rationale in personal injury cases applies here: "the damage has already occurred and is irreversible." Maybank v. S.S. Kresge Co., 273 S.E.2d at 684. There is no chance that the Defendants can fix the deception; the cigarettes have already been purchased and consumed. The Court concludes, accordingly, that it should not dismiss the North Carolina express warranty claim on the notice requirement ground.

### C. THE COURT DISMISSES THE FLORIDA AND ILLINOIS EXPRESS WARRANTY CLAIMS FOR LACK OF PRIVITY.

The Defendants argue that the Court should dismiss the Plaintiffs' express warranty claims from Florida, Illinois, and New York for lack of privity. See MTD at 67. The Plaintiffs rejoin that there is an exception to the privity requirement under all three states' laws for labeling deceptions. See Response at 75. The Court of Appeals of New York has concluded that privity is not required against a manufacturer or the advertiser for economic loss, so the Court does not dismiss the Plaintiffs' New York claim on that ground. See Randy Knitwear, Inc. v. American Cyanamid Co.,

181 N.E.2d 399, 400-02 (N.Y. 1962); Mahoney v. Endo Health Solutions, Inc., No. 15-9841, 2016 WL 3951185, at *6 (S.D.N.Y. July 20, 2016)(Cote, J.).[68]

The Supreme Courts of Florida and Illinois have not decided the issue.[69] Lower state and federal courts in those states are divided. Compare Hill v. Hoover, 899 F. Supp. 2d 1259, 1266 (N.D. Fla. 2012)(Mickle, J.); Northern Ins. Co. of N.Y. v. Silverton Marine Corp., No.10-0345, 2010 WL 2574225, at *2 (N.D. Ill. June 23, 2010)(Zagel, J.); Intergraph Corp. v. Stearman, 555 So.2d 1282, 1283 (Fla. Dist. Ct. App. 1990) with Mednick v. Precor, Inc., No. 14-3624, 2014 WL 6474915, at *5 (N.D. Ill. November 13, 2017)(Leinenweber, J); Smith v. Wm. Wrigley Jr. Co., 663 F. Supp. 2d 1336, 1343 (S.D. Fla. 2009)(Cohn, J.); Cedars of Lebanon Hosp. Corp. v. European X-ray Distributors of America, Inc., 444 So.2d 1068, 1072 (Fla. Dist. Ct. App. 1984); Fischetti v. American Isuzu Motors, Inc., 918 So.2d 974, 976 (Fla. Dist. Ct. App. 2005). Neither statute governing express warranties discusses privity with manufacturers, and the Court has, in the past, noted that vertical-privity issues are proper for judicial resolution. See Fla. Stat. § 672.313; 810 Ill. Comp. Stat. 5/2-601-616; Bellman v. NXP Semiconductors USA, Inc., 248 F. Supp. 3d at 1151 (D.N.M. 2017).

The Supreme Court of Florida's jurisprudence regarding privity has been relatively murky. In Manheim v. Ford Motor Co., 201 So.2d 440, 442 (Fla. 1967), it ruled that "[o]ur Court has

[68]Some federal cases suggest that Randy Knitwear, Inc. v. American Cyanamid Co. is no longer good law, because the New York legislature ratified the UCC after the decision. See Koenig v. Boulder Brands, Inc., 995 F. Supp. 2d 274, 290 (S.D.N.Y. 2014)(Ramos, J.); Ebin v. Kangadis Food Inc., No. 13-2311, 2013 WL 6504547, at *6 (S.D.N.Y. December 11, 2013)(Rakoff, J.). The Court disagrees that the UCC displaces the Court of Appeals of New York's determination on vertical privity, because the UCC does not govern vertical privity with manufacturers, and the Court has already determined that vertical privity issues are properly judicially resolved. See Bellman v. NXP Semiconductors USA, Inc., 248 F. Supp. 3d 1081, 1151 (D.N.M. 2017)(Browning, J.).

[69]The Supreme Court of Illinois expressly declined to address the issue. See Collins Co., Ltd. v. Carboline Co., 532 N.E.2d 834, 837, 841 (Ill. 1988).

become aligned with those courts holding that an action may be brought against a manufacturer notwithstanding want of privity," but it later walked back that holding in Kramer v. Piper Aircraft Corp., 520 So. 2d 37, 39 (Fla. 1988), clarifying that it had created a strict liability action in tort, which had supplanted the no-privity requirement in breach-of-implied-warranty cases. See Cedars of Lebanon Hosp. Corp. v. European X-Ray Distributors of Am., Inc., 444 So. 2d 1068, 1070-71 (discussing Florida's history with the privity requirement); Smith v. Wm. Wrigley Jr. Co., 663 F. Supp. 2d at 1342-43. The Supreme Court of Illinois' jurisprudence has been similarly ambiguous. In Collins Co. Ltd. v. Carboline Co., the Supreme Court of Illinois left "a door at least slightly ajar for future extension of some warranties in appropriate circumstances to nonprivity plaintiffs," but refused to decide the issue. Collins Co. Ltd. v. Carboline Co., 532 N.E. 2d at 842. See Szajna v. General Motors Corp., 503 N.E.2d 760, 766 (Ill. 1986)(noting that "the professed neutrality of" the UCC on the privity requirement "should not be viewed as an invitation to the courts to abolish the privity requirement . . . [n]or should it be viewed as a prohibition against further development in that direction."). It has, however, ruled that privity must exist for breach of implied warranties when the harm alleged is economic loss. See Rothe v. Cadillac, Inc., 518 N.E.2d 1028, 1029-30 (Ill. 1988). Given the reticence that the Supreme Courts of both states have expressed toward modifying the privity requirement, the Court concludes that neither would do away with the privity requirement to breach-of-express-warranty claims producing pure economic loss. The Court, accordingly, dismisses the Illinois and Florida express warranty claims for lack of privity.

## IX. THE PLAINTIFFS' REQUESTS FOR INJUNCTIVE RELIEF ARE NOT RENDERED MOOT.

The Plaintiffs request an injunction prohibiting the Defendants from advertising Natural American cigarettes as natural and additive free. See Amended Complaint ¶ 159, at 50, Prayer for Relief ¶ C, at 105. The Defendants argue that the Plaintiffs' request is rendered moot, because the

Defendants have entered into a Memorandum of Agreement with the FDA, which requires them to cease using those terms, except for the natural term in their brand name. See MTD at 68; Memorandum of Agreement ¶¶ 1-2, at 1. The Plaintiffs counter that their requested injunction extends to enjoining the Natural American brand name, so the Memorandum of Agreement does not entirely render moot their request. See Response at 76. They also contend that the Memorandum of Agreement is subject to an ongoing lawsuit in the United States District Court for the Southern District of Florida, which, if successful, would invalidate the Memorandum of Agreement. See July Tr. at 60:3-13 (Wolchansky); id. at 61:3-12 (Wolchansky); Sproule v. United States Food and Drug Administration, No. 17-80709 (S.D. Fla. 2017)(Rosenberg, J.). At the July Hearing, the Defendants conceded that, if the pending lawsuit against the FDA is successful, "it would vacate the memorandum," July Tr. at 64:3-4 (Biersteker). The Defendants represent, however, that "Santa Fe is no longer utilizing the phrases 'Additive Free' and 'Natural' in the NAS cigarette product labels, labeling, advertising, and promotional materials . . . and Santa Fe is in compliance with the [Memorandum of] Agreement." Supp. Brief on FDA Agreement ¶ 6, at 3.

Injunctive relief requests are subject to Article III mootness. See WildEarth Guardians v. Public Service Co. of Colorado, 690 F.3d at 1190-91; Ex rel. New Mexico State Highway Dept. v. Goldschmidt, 629 F.2d at 669. A case is rendered moot "when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." Cty. of L.A. v. Davis, 440 U.S. at 631 (1979)(quotations omitted). The Tenth Circuit has explained:

> Like Article III standing, mootness is oft-cited as a constitutional limitation on federal court jurisdiction. *E.g.*, *Building & Constr. Dep't v. Rockwell Int'l Corp.*, 7 F.3d 1487, 1491 (10th Cir. 1993)("Constitutional mootness doctrine is grounded in the Article III requirement that federal courts only decide actual, ongoing cases or controversies). . . . But although issues of mootness often bear resemblance to issues of standing, their conceptual boundaries are not coterminous. . . . [T]he Supreme Court has historically recognized what are often called 'exceptions' to the general rule against consideration of moot cases, as where a plaintiff's status is 'capable of

> repetition yet evading review,' *S. Pac. Terminal Co. v. Interstate Commerce Comm'n*, 219 U.S. 498 (1911), or where a defendant has ceased the challenged action but is likely the defendant will 'return to his old ways' -- the latter often referred to as the voluntary cessation exception, *United States v. W.T. Grant Co.*, 345 U.S. 498, 515 (1911).

Lucero v. Bureau of Collection Recovery, Inc., 639 F.3d at 1242. When injunctive relief does not redress plaintiffs' particular injuries, the injunctive relief requested is rendered moot. See WildEarth Guardians v. Public Service Co. of Colorado, 690 F.3d at 1191 (citing United States v. Vera-Flores, 496 F.3d at 1180). Similarly, if the injunction would have no present-day effect, the injunctive relief requested is also rendered moot. See Utah Animal Rights Coalition v. Salt Lake City Corp., 371 F.3d at 1257 ("The alleged violation took place in 2001, the Olympics have come and gone, and neither temporary restraining order, preliminary injunction, nor permanent injunction could have any present-day effect.").

As already noted, mootness is subject to the voluntary-cessation exception. See Brown v. Buhman, 822 F.3d at 1166. Under that exception, "voluntary cessation of challenged conduct does not ordinarily render a case moot because a dismissal for mootness would permit a resumption of the challenged conduct as soon as the case is dismissed." Brown v. Buhman, 822 F.3d at 1166. "This rule is designed to prevent gamesmanship. If voluntary cessation automatically mooted a case, 'a defendant could engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where he left off, repeating this cycle until he achieves his unlawful ends." Brown v. Buhman, 822 F.3d at 1166 (quoting Already, LLC v. Nike, Inc., 568 U.S. at 91). Nevertheless, a defendant's voluntary cessation may render a case moot if "the defendant carries the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." Brown v. Buhman, 822 F.3d at 1166 (quoting Already, LLC v. Nike, Inc., 568 U.S. at 91).

The Memorandum of Agreement would render moot the Plaintiffs' requested injunctive relief, except for an injunction on the term Natural in the brand name. See Utah Animal Rights Coalition v. Salt Lake City Corp., 371 F.3d at 1257. The ongoing litigation challenging the Memorandum of Agreement's validity, see Sproule v. United States Food and Drug Administration, No. 17-80709 (S.D. Fla. 2017)(Rosenberg, J.), casts doubt, however, on the Memorandum of Agreement's permanency. Absent that agreement, the Defendants' promise to remove the terms is just that -- a promise. As such, the Defendants "carr[y] the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur," and the Court concludes the Defendants have not carried that burden. Brown v. Buhman, 822 F.3d at 1166. There is no evidence, for example, that, absent the Memorandum of Agreement, it would be prohibitively expensive for the Defendants to change their labeling or to restart an advertising campaign. The Court, accordingly, denies the Defendants' request to dismiss the injunctive relief requested.

**IT IS ORDERED** that: (i) the Defendants' Request for Judicial Notice in Support of Motion to Dismiss, filed November 18, 2016 (Doc. 71) is granted in part and denied in part; (ii) the Defendants' Second Motion for Judicial Notice in Support of The Motion to Dismiss the Consolidated Amended Complaint, filed February 23, 2017 (Doc. 91) is granted; (iii) the Defendants' Third Motion for Judicial Notice in Support of the Motion to Dismiss the Consolidated Amended Complaint, filed May 30, 2017 (Doc. 109) is granted; and (iv) the requests in the Defendants' Motion to Dismiss the Consolidated Amended Complaint and Incorporated Memorandum of Law, filed February 23, 2017 (Doc. 90) are granted in part and denied in part. The Court: (i) judicially notices the 2000 FTC Complaint filed against Santa Fe Tobacco, In the Matter of Santa Fe Natural Tobacco Company, Inc., No. C-3952 Complaint, filed November 18, 2016

(Doc. 71-1); the Native American Spirit Advertising attached to the FTC Complaint, In the Matter of Santa Fe Natural Tobacco Company, Inc., No. C-3952, Exhibits A-C, filed November 18, 2016 (Doc. 71-1); the Decision and Order, In the Matter of Santa Fe Natural Tobacco Company, Inc., No. C-3952, filed November 18, 2016 (Doc. 71-1); FTC Accepts Settlements of Charges that "Alternative" Cigarette Ads are Deceptive, issued April 27, 2000, filed November 18, 2016 (Doc. 71-1); FTC Accepts Settlement of Charges that Ads for Winston "No Additive" Cigarettes are deceptive, issued March 3, 1999, filed November 18, 2016 (Doc. 71-1); Assurance of Voluntary Compliance, (dated March 1, 2010), filed November 18, 2016 (Doc. 71-1); Warning Letter, dated August 27, 2015, filed November 18, 2016 (Doc. 71-1); Memorandum of Agreement Between The United States Food and Drug Administration's (FDA) Center for Tobacco Products (CTP) and RAI Services Company (RAIS)/Santa Fe Natural Tobacco Company, Inc. (Santa Fe), (dated January 19, 2017), filed February 23, 2017 (Doc. 91-1)("Memorandum of Agreement"); Request for Informal Staff Guidance Regarding Santa Fe Natural Tobacco Company's Consent Order (FTC Dkt. No. C-3952) dated May 9, 2017, filed May 30, 2017 (Doc. 109-1); (ii) severs and transfers the Plaintiffs' claims, which were not originally brought in a North Carolina forum against Reynolds American Inc., to the Middle District of North Carolina; (iii) dismisses with prejudice California Count I (CLRA), California Count II (CFAL), California Count III (UCL), Colorado Count I (CCPA), Florida Count I (FDUTPA), Illinois Count I (ICFA), Illinois Count II (IUDTPA), Massachusetts Count I (Mass. Gen. Law. 93A), Michigan Count I (MCFA), New Jersey Count I (NJCFA), New Mexico Count I (NMUPA), New Mexico Count II (NMFAL), New York Count I (N.Y. Gen. Bus. Law § 349), New York Count II (N.Y. Gen. Bus. Law § 350), North Carolina Count I (N.C. Gen. Stat. § 75-1.1), Ohio Count I (OCSPA), Ohio Count II (ODTPA), Washington Count I (WCPA) to the extent that those counts are premised on a theory of deception that a reasonable consumer would

believe that the terms natural and additive-free suggest that Natural American cigarettes are less processed than other cigarettes; (iv) dismisses with prejudice Illinois Count I (ICFA) and Illinois Count II (IDUTPA) to the extent those claims are premised on the theory that a reasonable consumer would believe that the terms "additive-free" and "natural" in the Defendants' advertising suggest that Natural American cigarettes are safer or healthier; (v) dismisses with prejudice Illinois Count II (IUDTPA) to the extent that it requests injunctive relief; (vi) dismisses Ohio Count I (OSCPA) without prejudice; (vii) dismisses with prejudice Ohio Count II (ODTPA), New Jersey Count III (Unjust Enrichment), Ohio Count III (Unjust Enrichment); and (viii) dismisses with prejudice the Nationwide Count I (Express Warranty) to the extent that it is premised on Florida, Illinois, and New York law. All other requests for relief from the Defendants' Motion to Dismiss The Consolidated Complaint and Incorporated Memorandum of Law, filed February 23, 2017 (Doc. 90) are denied.



UNITED STATES DISTRICT JUDGE

*Counsel:*

Scott P. Schlesinger
Jonathan Gdanski
Schlesinger Law Offices, P.A.
Fort Lauderdale, Florida

*Attorneys for Plaintiffs Justin Sproule, Steve Okstad, Michael Anderson, Brooke Balocca, Elijah Bent, Charlene Blevins, Sam Bowman, Matokie Brim, Terry Cliver, Christos Christolow, George Coon, Gary Cruse, Margie Harris, Charles Honse, Clinton Horton, Collin Jass, Christopher Jensen, Shereen Keith, Kelly Keiser, Asher King, Marilyn Komarinski, Jodi Kumpula, Tom Kurtz, Richard Kusick, Mike Lair, Tracy Lee, Kathleen Lelli, Robert Litwin, Linda MacDonald-Lewis, Rudolph Miller, Richard Morelock, Deborah Orrtim Paulson, Richard Peavy, Concetta Schultz, Judy Sell, Harrison Thomas, Dani Weir, Tom Weir, Kyle Wiebe, and Vicki Wilson*

Jeffrey Louis Haberman
Schlesinger Law Offices, P.A.
Fort Lauderdale, Florida

*Attorney for Plaintiffs Justin Sproule, Patrick Scott, Victoria Cuebas, Steve Okstad, Michael Anderson, Brooke Balocca, Elijah Bent, Charlene Blevins, Sam Bowman, Matokie Brim, Terry Cliver, Christos Christolow, George Coon, Gary Cruse, Margie Harris, Charles Honse, Clinton Horton, Collin Jass, Christopher Jensen, Shereen Keith, Kelly Keiser, Asher King, Marilyn Komarinski, Jodi Kumpula, Tom Kurtz, Richard Kusick, Mike Lair, Tracy Lee, Kathleen Lelli, Robert Litwin, Linda MacDonald-Lewis, Rudolph Miller, Richard Morelock, Deborah Orrtim Paulson, Richard Peavy, Concetta Schultz, Judy Sell, Harrison Thomas, Dani Weir, Tom Weir, Kyle Wiebe, and Vicki Wilson*

Randi McGinn
McGinn, Carpenter, Montoya & Love, PA
Albuquerque, New Mexico

*Attorney for Plaintiffs Anthony Dunn, Ceyhan Haskal, Michael Robinson, Harry Vartanyan, Michael Yang, Doug Pyle, Nick Vadis, Theodore Rothman, Patrick Scott, Russell Brattain, Shannon White, C.M. LeCompte, Danae Grandison, Michael Laboon, Dave Moyer Victoria Cuebas, Ashley Waldo, Steve Okstad, Michael Anderson, Brooke Balocca, Elijah Bent, Sam Bowman, Makotie Brim, Terry Cliver, Christolow, George Coon, Gary Cruse, Margie Harris, Charles Honse, Clinton Hornton, Colin Jass, Christopher Jensen, Shereen Keith, Kelly Keiser, Asher King, Marilyn Komarinski, Jodi Kumpula, Tom Kurtz, Richard Kusick, Mike Lair, Tracy Lee, Kathleen Lelli, Robert Litwin, Linda MacDonald-Lewis, Richard Morelock, Deborah Orrtim Paulson, Richard Peavy, Concetta Schultz, Judy Sell, Harrison Thomas, Dani Weir, Tom Weir, Kyle Wiebe, Vicki Wilson, Timothy Ruggiero, Desire Gudmundson, Jacques-Rene Herbert, Sara Benson, Justin Sproule, Rudolph Miller, Carol Murphy, Francisco Chavez, Joshua Horne, Albert Lopez, Abigail Emmons, Charlene Blevins, Scott Johnston, Jason Cole, and Rachel King*

Kathleen J. Love
McGinn, Carpenter, Montoya & Love, PA
Albuquerque, New Mexico

*Attorney for Plaintiffs Anthony Dunn, Ceyhan Haskal, Michael Robinson, Harry Vartanyan, Michael Yang, Doug Pyle, Nick Vadis, Theodore Rothman, Patrick Scott, Russell Brattain, Shannon White, C.M. LeCompte, Danae Grandison, Michael Laboon, Dave Moyer Victoria Cuebas, Ashley Waldo, Steve Okstad, Michael Anderson, Brooke Balocca, Elijah Bent, Sam Bowman, Makotie Brim, Terry Cliver, Christolow, George Coon, Gary Cruse, Margie Harris, Charles Honse, Clinton Hornton, Colin Jass, Christopher Jensen, Shereen Keith, Kelly Keiser, Asher King, Marilyn Komarinski, Jodi Kumpula, Tom Kurtz, Richard Kusick, Mike Lair, Tracy Lee, Kathleen Lelli,*

*Robert Litwin, Linda MacDonald-Lewis, Richard Morelock, Deborah Orrtim Paulson, Richard Peavy, Concetta Schultz, Judy Sell, Harrison Thomas, Dani Weir, Tom Weir, Kyle Wiebe, Vicki Wilson, Timothy Ruggiero, Desire Gudmundson, Jacques-Rene Herbert, Sara Benson, Justin Sproule, Rudolph Miller, Carol Murphy, Francisco Chavez, Joshua Horne, Albert Lopez, Abigail Emmons, and Charlene Blevins.*

Charles J. LaDuca
Cuneo Gilbert & LaDuca, LLP
Washington, DC

--and--

Melissa Wolchansky
Charles D Moore
Halunen Law
Minneapolis, Minnesota

--and--

Michael Robert Reese
Reese LLP
New York, New York

--and--

Nicholas Koluncich
Law Offices of Nicholas Koluncich LLC
Albuquerque, New Mexico

*Attorneys for Plaintiff Anthony Dunn*

John C. Bienvenu
Bienvenu Law Office
Santa Fe, New Mexico

--and--

Mark H Donatelli
Reed C. Bienvenu
Rothstein Donatelli LLP
Santa Fe, New Mexico

--and--

Ronald Marron
Law Offices of Ronald A. Marron
San Diego, California

*Attorneys for Plaintiffs Ceyhan Haskal, Michael Robinson, Harry Vartanyan, Michael Yang, Doug Pyle, and Nick Vadis*

Caleb Marker
Zimmerman Reed
Manhattan Beach, California

--and--

Nancy Ruth Long
Long Komer & Associates, P.A.
Santa Fe, New Mexico

*Attorneys for Plaintiffs Theodore Rothman and C.M. LeCompte*

Douglas Gregory Blankinship
Finkelstein Blankinship, Frei-Pearson & Garber, LLP
White Plains, New York

*Attorney for Theodore Rothman*

Kim Eleazer Richman
Richman Law Group
Brooklyn, New York

*Attorney for Theodore Rothman, Danae Grandison, Michael Laboon, and Dave Moyer*

Benjamin Michael Lopatin
Eggnatz, Lopatin, & Pascucci, LLP
San Francisco, California

*Attorney for Plaintiff Russell Brattain*

Daniel L. Warshaw
Alexander R. Safyan
Pearson, Simon & Warshaw, LLP
Sherman Oaks, California

--and--

Erika E Anderson
Law Offices of Erika E. Anderson
Albuquerque, New Mexico

*Attorneys for Plaintiff Shannon White*

Gretchen Mary Elsner
Elsner Law & Policy, LLC
Santa Fe, New Mexico

*Attorney for Plaintiffs Danae Grandison, Michael Laboon, and Dave Moyer*

John Allen Yanchunis, Sr.
Scott W. Weinstein
Keith R. Mitnik
Marisa Kendra Glassman
Morgan & Morgan, PA
Fort Myers, Florida
Orlando, Florida
Tampa, Florida

*Attorneys for Plaintiff Ashley Waldo*

Steven William Teppler
Abbott Law Group, P.A.
Jacksonville, Florida

*Attorney for Plaintiff Timothy Ruggiero*

John Russell Bart Pate
J.R. Pate, PC - Law Office
St Thomas, Virgin Islands

*Attorney for Plaintiff Desire Gudmundson*

Matthew David Schultz
Levin Papantonio Thomas P.A.
Pensacola, Florida

*Attorney for Plaintiff Scott Johnston*

Joel R. Rhine
Rhine Law Firm, P.C.
Wilmington, North Carolina

*Attorney for Jason Cole and Rachael King*

Chad C. Messier
Dudley Topper & Feuerzeig
St. Thomas, United States Virgin Islands

--and--

Andrew G. Schultz
Rodey Dickason Sloan Akin & Robb, P.A.
Albuquerque, New Mexico

--and--

Peter J. Biersteker
David B. Alden
David M. Monde
Paul Courtney Huck, Jr.
Sharyl Reisman
Mark R. Seiden
Charles R. A. Morse
David Craig Kiernan
Michael Fraser Stoer
Jennifer Bunting-Graden
William D Coglianese
Jon Gregory Heintz
Jordan Von Bokern
Joseph R Coburn
Noel J. Francisco
Troy A. Fuhrman
Jones Day
San Francisco, California
Washington, DC
Atlanta, Georgia
Miami, Florida
Tampa Florida
New York, New York
Cleveland, Ohio

*Attorneys for the Defendants*